**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
----------------------------------------------------------x
                              :

In re Vale S.A. Securities Litigation     :          No. 19 Civ. 526 (RJD) (SJB)
                              :
                              :         **ORAL ARGUMENT REQUESTED**
                              :
                              :
----------------------------------------------------------x

**DEFENDANT VALE S.A.'S MEMORANDUM OF LAW**
**IN SUPPORT OF ITS MOTION TO DISMISS**
**THE CONSOLIDATED CLASS ACTION COMPLAINT**

GIBSON, DUNN & CRUTCHER LLP

Mark A. Kirsch
Randy M. Mastro
Christopher M. Joralemon
Mary Beth Maloney
David M. Kusnetz
200 Park Avenue
New York, NY  10166-0193
Telephone:    212.351.4000
Facsimile:    212.351.4035

*Attorneys for Vale S.A.*

**TABLE OF CONTENTS**

Page

PRELIMINARY STATEMENT ...........................................................................................1

RELEVANT BACKGROUND ............................................................................................3

    I.      VALE.........................................................................................................3

    II.     VALE'S TAILINGS DAM MANAGEMENT......................................................4

    III.    THE DAM 1 ACCIDENT AND AFTERMATH .......................................................5

    IV.    PLAINTIFF'S MISAPPREHENSION OR MISCHARACTERIZATION OF CERTAIN DOCUMENTS UPON WHICH IT RELIES ................................6

DISCUSSION ......................................................................................................................11

    I.      PLAINTIFF FAILS TO ALLEGE ANY ACTIONABLE MISSTATEMENTS OR OMISSIONS ...................................................12

          A.     The Vast Majority of the Alleged Misrepresentations Constitute Inactionable Puffery.................................................13

          B.     Plaintiff Fails to Allege That Any of the Purported Misrepresentations Were False or Misleading When Made ......................16

                1.     The Alleged Misrepresentations Were Not False When Made ......................................................................16

                2.     Vale Had No Duty to Disclose Any of the Five Purported Omissions....................................................................18

    II.     THE PSLRA AND BESPEAKS CAUTION DOCTRINE PRECLUDE PLAINTIFF'S CLAIMS PREMISED ON FORWARD-LOOKING STATEMENTS.......................................................................22

          A.     Vale Used Adequate Cautionary Language.................................23

          B.     The Cautionary Language Accompanied the Forward-Looking Statements ..............................................................25

    III.    PLAINTIFF FAILS TO PLEAD FACTS GIVING RISE TO A STRONG INFERENCE OF SCIENTER .............................................27

          A.     Plaintiff Fails to Allege That Defendants Had Access to Adverse Information ............................................................28

i

B.    Plaintiff Concedes That Defendants Received Multiple
Independent Verifications of Dam 1's Safety...............................................31

IV.    PLAINTIFF FAILS TO PLEAD LOSS CAUSATION .......................................34

A.    Plaintiff Has Failed to Plead Corrective Disclosures That Reveal
the Falsity of Any of the Alleged Misstatements.......................................34

B.    The Collapse of Dam 1 Does Not Represent the Materialization of
a Concealed Risk Because Investors Were Aware of the Risks
Posed by Tailings Dams...............................................................................38

V.    PLAINTIFF FAILS TO STATE ANY OF ITS CLAIMS WITH THE
REQUISITE PARTICULARITY ..........................................................................39

CONCLUSION..................................................................................................................40

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*In re Aceto Corp. Sec. Litig.*,
  2019 WL 3606745 (E.D.N.Y. Aug. 6, 2019)........................................................................25, 27

*Acito v. IMCERA Grp., Inc.*,
  47 F.3d 47 (2d Cir. 1995) ......................................................................................................19, 20

*In re Aetna, Inc. Sec. Litig.*,
  617 F.3d 272 (3d Cir. 2010)........................................................................................................25

*In re Alcatel Sec. Litig.*,
  382 F. Supp. 2d 513 (S.D.N.Y. 2005).........................................................................................40

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009).....................................................................................................................11

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
  493 F.3d 87 (2d Cir. 2007)...............................................................................................12, 24, 30

*In re Barrick Gold Corp. Sec. Litig.*,
  341 F. Supp. 3d 358 (S.D.N.Y. 2018)................................................................................16, 17, 35

*Basic Inc. v. Levinson*,
  485 U.S. 224 (1988).....................................................................................................................18

*Bettis v. Aixtron SE*,
  2016 WL 7468194 (S.D.N.Y. Dec. 20, 2016) .............................................................................20

*In re Bristol-Myers Squibb Sec. Litig.*,
  312 F. Supp. 2d 549 (S.D.N.Y. 2004).........................................................................................12

*C.D.T.S. v. UBS AG*,
  2013 WL 6576031 (S.D.N.Y. Dec. 13, 2013), *aff'd sub nom.*,
  604 F. App'x 5 (2d Cir. 2015) .....................................................................................................14

*Caiafa v. Sea Containers Ltd.*,
  525 F. Supp. 2d 398 (S.D.N.Y. 2007).........................................................................................20

*In re Carter-Wallace, Inc., Sec. Litig.*,
  220 F.3d 36 (2d Cir. 2000)......................................................................................................31, 33

*In re Centerline Holding Co. Sec. Litig.*,
  380 F. App'x 91 (2d Cir. 2010) ...................................................................................................27

*In re Centerline Holdings Co. Sec. Litig.*,
    678 F. Supp. 2d 150 (S.D.N.Y. 2009), *aff'd sub nom.*
    380 F. App'x 91 (2d Cir. 2010) ......................................................................33

*In re Chicago Bridge & Iron Co. N.V. Sec. Litig.*,
    2019 WL 5287980 (S.D.N.Y. Oct. 18, 2019)..................................................36

*In re Citigroup, Inc.*,
    2011 WL 744745 (S.D.N.Y. Mar. 1, 2011) .....................................................12

*City of Brockton Ret. Sys. v. Avon Prods., Inc.*,
    2014 WL 4832321 (S.D.N.Y. July 12, 2019) ..................................................16

*City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*,
    752 F.3d 173 (2d Cir. 2014)......................................................................13, 14

*Cortec Indus., Inc. v. Sum Holding L.P.*,
    949 F.2d 42 (2d Cir. 1992)..............................................................................11

*DiFolco v. MSNBC Cable, L.L.C.*,
    622 F.3d 104 (2d Cir. 2010)..............................................................................3

*DoubleLine Capital LP v. Construtora Norberto Odebrecht, S.A.*,
    2019 WL 4600934 (S.D.N.Y. Sept. 23, 2019)................................................16

*Dura Pharm., Inc. v. Broudo*,
    544 U.S. 336 (2005)........................................................................................34

*ECA, Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*,
    553 F.3d 187 (2d Cir. 2009)..........................................................13, 14, 16, 27

*Emerson v. Mut. Fund Series Tr.*,
    393 F. Supp. 3d 220 (E.D.N.Y. 2019) ............................................................21

*Foley v. Transocean Ltd.*,
    861 F. Supp. 2d 197 (S.D.N.Y. 2012)..........................18, 20, 21, 29, 30, 31, 32

*Fort Worth Emp'rs' Ret. Fund v. Biovail Corp.*,
    615 F. Supp. 2d 218 (S.D.N.Y. 2009).............................................................27

*In re Francesca's Holdings Corp. Sec. Litig.*,
    2015 WL 1600464 (S.D.N.Y. March 31, 2015) .........................................38, 39

*In re Gilat Satellite Networks, Ltd.*,
    2005 WL 2277476 (E.D.N.Y. Sept. 19, 2005) ................................................25

iv

*Gregory v. ProNAi Therapeutics Inc.*,
  297 F. Supp. 3d 372 (S.D.N.Y. 2018), *aff'd*,
  757 F. App'x 35 (2d Cir. 2018) .................................................................................25

*Gross v. GFI Grp., Inc.*,
  2019 WL 4389137 (2d Cir. Sept. 13, 2019) .................................................13, 14, 15

*Halliburton Co. v. Erica P. John Fund, Inc.*,
  134 S. Ct. 2398 (2014) ..............................................................................................11

*Halperin v. eBanker USA.com, Inc.*,
  295 F.3d 351 (2d Cir. 2002) .......................................................................................25

*Harris v. Mills*,
  572 F.3d 66 (2d Cir. 2009) .........................................................................................11

*Iowa Pub. Emps' Ret. Sys. v. MF Global, Ltd.*,
  620 F.3d 127 (2d Cir. 2010) .......................................................................................23

*Janbay v. Canadian Solar, Inc.*,
  2012 WL 1080306 (S.D.N.Y. Mar. 30, 2012) ...........................................................37

*Johnson v. Siemens AG*,
  2011 WL 1304267 (E.D.N.Y. Mar. 31, 2011) .....................................................28, 30

*In re Keyspan Corp. Sec. Litig.*,
  383 F. Supp. 2d 358 (E.D.N.Y. 2003) ........................................................................29

*Kuriakose v. Fed. Home Loan Mortg. Corp.*,
  897 F. Supp. 2d 168 (S.D.N.Y. 2012) ........................................................................25

*Lentell v. Merrill Lynch & Co.*,
  396 F.3d 161 (2d Cir. 2005) ...........................................................................34, 36, 37

*Lipow v. Net1 UEPS Techs., Inc.*,
  131 F. Supp. 3d 144 (S.D.N.Y. 2015) ........................................................................18

*Matrixx Initiatives, Inc. v. Siracusano*,
  563 U.S. 27 (2011) .....................................................................................................18

*Menaldi v. Och-Ziff Capital Mgmt. Grp. LLC*,
  164 F. Supp. 3d 568 (S.D.N.Y. 2016) ........................................................................18

*Menaldi v. Och-Ziff Capital Mgmt. Grp. LLC*,
  277 F. Supp. 3d 500 (S.D.N.Y. 2017) ........................................................................15

*Monroe Cty. Emps.' Ret. Sys. v. YPF Sociedad Anonima*,
  15 F. Supp. 3d 336 (S.D.N.Y. 2014) ..........................................................................40

*Nardy v. Chipotle Mexican Grill, Inc.*,
   2019 WL 3297467 (D. Colo. Mar. 29, 2019) ......................................................35, 37

*In re Nokia Oyj (Nokia Corp.) Sec. Litig.*,
   423 F. Supp. 2d 364 (S.D.N.Y. 2006)...............................................................23

*Novak v. Kasaks*,
   216 F.3d 300 (2d Cir. 2000).............................................................................17

*Okla. Firefighters Pension & Ret. Sys. v. Xerox Corp.*,
   300 F. Supp. 3d 551 (S.D.N.Y. 2018), *aff'd sub nom.*,
   771 F. App'x 51 (2d Cir. 2019) ........................................................................22

*In re Omnicom Grp., Inc. Sec. Litig.*,
   597 F.3d 501 (2d Cir. 2010)........................................................................34, 37

*Ong v. Chipotle Mexican Grill, Inc.*,
   294 F. Supp. 3d 199 (S.D.N.Y. 2018)...............................................................17

*In re OSG Sec. Litig.*,
   971 F. Supp. 2d 387 (S.D.N.Y. 2013)....................................................31, 32, 33

*In re Plains All Am. Pipeline, L.P. Sec. Litig.*,
   307 F. Supp. 3d 583 (S.D. Tex. 2018), *aff'd on other grounds sub nom.*,
   777 F. App'x 726 (5th Cir. 2019) .............................................................17, 29, 30

*Prime Mover Capital Partners L.P. v. Elixir Gaming Techs., Inc.*,
   898 F. Supp. 2d 673 (S.D.N.Y. 2012), *aff'd*,
   548 F. App'x 16 (2d Cir. 2013) ........................................................................38

*Reese v. McGraw-Hill Companies, Inc.*,
   2012 WL 9119573 (S.D.N.Y. Mar. 30, 2012), *aff'd sub nom.*,
   506 F. App'x 32 (2d Cir. 2012) ........................................................................14

*In re Rockwell Med., Inc. Sec. Litig.*,
   2018 WL 1725553 (S.D.N.Y. Mar. 30, 2018) ....................................................19

*Rombach v. Chang*,
   355 F.3d 164 (2d Cir. 2004).............................................................................14

*S.E.C. v. Espuelas*,
   579 F. Supp. 2d 461 (S.D.N.Y. 2008)...............................................................33

*In re Sanofi Sec. Litig.*,
   155 F. Supp. 3d 386 (S.D.N.Y. 2016)..........................................................29, 30

*Schiro v. Cemex, S.A.B. de C.V.*,
   396 F. Supp. 3d 283 (S.D.N.Y. 2019)...............................................................15

*Schwab v. E\*TRADE Fin. Corp.*,
258 F. Supp. 3d 418 (S.D.N.Y. 2017)......................................................................28

*Shields v. Citytrust Bancorp, Inc.*,
25 F.3d 1124 (2d Cir. 1994).....................................................................................33

*Singh v. Cigna Corporation*,
918 F.3d 57 (2d Cir. 2019)...........................................................................12, 15, 16

*Singh v. Schikan*,
106 F. Supp. 3d 439 (S.D.N.Y. 2015)......................................................................23

*Slayton v. Am. Express Co.*,
604 F.3d 758 (2d Cir. 2010)...............................................................................11, 23

*Strougo v. Barclays PLC*,
105 F. Supp. 3d 330 (S.D.N.Y. 2015)................................................................37, 38

*In re SunEdison, Inc. Sec. Litig.*,
300 F. Supp. 3d 444 (S.D.N.Y. 2018)......................................................................22

*In re Supercom Inc. Sec. Litig.*,
2018 WL 4926442 (S.D.N.Y. Oct. 10, 2018).........................................................22

*Ong v. Chipotle Mexican Grill, Inc.*,
2017 WL 933108 (S.D.N.Y. Mar. 8, 2017).............................................................31

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*,
531 F.3d 190 (2d Cir. 2008) ....................................................................................28

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007).........................................................................................27, 32

*In re Time Warner Inc. Sec. Litig.*,
9 F.3d 259 (2d Cir. 1993) ........................................................................................11

*In re Vale S.A. Sec. Litig.*,
2017 WL 1102666 (S.D.N.Y. Mar. 23, 2017) ..................................................22, 26

*Waterford Twp. Police & Fire Ret. Sys. v. Smithtown Bancorp., Inc.*,
2013 WL 1345086 (E.D.N.Y. Mar. 29, 2013).........................................................39

*Weiss v. Inc. Vill. of Sag Harbor*,
762 F. Supp. 2d 560 (E.D.N.Y. 2011) .......................................................................5

*Williams v. Globus Med., Inc.*,
869 F.3d 235 (3d Cir. 2017).....................................................................................22

*In re Xinhua Fin. Media, Ltd. Sec. Litig.*,
　　2009 WL 464934 (S.D.N.Y. Feb. 25, 2009)................................................................14

*XYZ Two Way Radio Serv., Inc. v. Uber Techs., Inc.*,
　　214 F. Supp. 3d 179 (E.D.N.Y. 2016) ......................................................................14

**Statutes**

15 U.S.C. § 78u-4(b)(2) ....................................................................................................27

15 U.S.C. § 78u-4(b)(4) ....................................................................................................34

15 U.S.C. § 78u-5(c) ...........................................................................................................2

15 U.S.C. § 78u-5(i)(1) .....................................................................................................22

**Other Authorities**

H.R. Conf. Rep. 104-369 (1995).......................................................................................23

*Vale announces an update on the assistance work in Brumadinho*, Vale (Jan. 26,
　　2019), http://www.vale.com/EN/aboutvale/news/Pages/Vale-announces-an-
　　update-on-the-assistance-work-in-Brumadinho.aspx .................................................6

*Vale provides humanitarian assistance in Brumadinho*, Vale (Jan. 25, 2019),
　　http://www.vale.com/EN/aboutvale/news/Pages/Vale-provides-humanitarian-
　　assistance-in-Brumadinho.aspx .................................................................................6

**Rules**

Fed. R. Civ. P. 12(b)(6)...............................................................................................1, 3, 11

Defendant Vale S.A.[1] ("Vale" or the "Company") respectfully submits this memorandum of law in support of its motion to dismiss with prejudice pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure the Consolidated Class Action Complaint (the "Complaint")[2] of Plaintiff Colleges of Applied Arts and Technology Pensions Plan ("Plaintiff") for failure to state any actionable claim under Section 10(b) of the Securities and Exchange Act of 1934.

### PRELIMINARY STATEMENT

On January 25, 2019, an iron ore tailings dam located at the Córrego do Feijão mine in Brumadinho, Minas Gerais, Brazil ("Dam 1") breached, releasing a torrent of water and mining materials.  This was a tragic accident with genuine victims.  Plaintiff here—a Canadian pension plan that purchased Vale's American Depository Shares ("ADSs")—is not one of them.

Vale, one of the largest mining companies in the world, has a deep and long-standing commitment to safety.  On November 5, 2015, the Fundão Dam, owned by Samarco Mineração ("Samarco"),[3] collapsed in another part of Minas Gerais.  Although Vale already was in compliance with Brazilian regulations governing the safety of its dams, and indeed had been devoting significant resources to dam risk management processes, Vale nevertheless implemented additional verifications and technical reviews of the structural and safety conditions of its own tailings dams after the breach of Samarco's Fundão Dam.

Dam 1 had been inactive since 2016, and was one of Vale's 150 dams or dikes storing

---

[1]  Individual Defendants Murilo Pinto de Oliveira Ferreira, Fabio Schvartsman, Luciano Siani Pires, Gerd Peter Poppinga, and Luiz Eduardo Froes do Amaral Osorio have not been served with the summons and Complaint in this action.

[2]  Attached as Exhibit 1 to the Declaration of Christopher M. Joralemon, executed on December 13, 2019 ("Joralemon Declaration").  Unless otherwise indicated, all references to Exhibits ("Ex.") herein are to Exhibits to the Joralemon Declaration.

[3]  Vale and BHP Billiton are each 50% shareholders of Samarco.

tailings in Brazil, and one of Vale's nearly 400 dam structures worldwide. In the days following Dam 1's collapse, Vale responded swiftly to address the significant humanitarian needs. The speed of Vale's actions was matched only by that of Plaintiff, who, in a breathtaking display of cynical opportunism, now seeks to exploit the misfortune of others by claiming phantom investment losses. This Court should not countenance such gamesmanship—and, indeed, need not—as the Complaint fails as a matter of law for at least six independent reasons:

*First*, the premise of Plaintiff's Section 10(b) claim is that Vale "was not taking the critical measures necessary to protect against another catastrophic dam collapse." Ex. 1 (Complaint) ¶ 10. Allegations of corporate mismanagement, however, have long been rejected as an actionable basis for a federal securities law claim.

*Second*, none of the alleged misstatements is false or otherwise actionable. Nearly all are banal and vague corporate statements too generic to invite reasonable reliance.

*Third,* Vale had no duty to disclose allegedly omitted facts about its dam management. Further, Plaintiff does not—and cannot—allege with any particularity that the alleged misrepresentations were false or misleading *when made*.

*Fourth*, the PSLRA's "safe harbor" provisions and the "bespeaks caution" doctrine preclude Plaintiff's claims based on "forward-looking" statements. 15 U.S.C. § 78u-5(c). During the putative Class Period, Vale repeatedly warned investors about the very risks associated with the mining industry that Plaintiff now complains were realized, rendering inactionable the challenged statements.

*Fifth*, the Complaint fails to plead facts giving rise to a strong inference of scienter, including that Vale had a motive to defraud, relying instead on conclusory assertions about what Defendants knew or should have known based largely on their titles—a pleading approach this

2

Court repeatedly has rejected.

*Sixth*, the Complaint fails to plead loss causation because none of the alleged corrective disclosures revealed some as yet undisclosed fact with regard to the specific misrepresentations alleged in the complaint.

For each—or any—of these reasons and others explained below, Vale respectfully urges the Court to dismiss the Complaint with prejudice.

## RELEVANT BACKGROUND

### I.    VALE

Vale maintains its headquarters in Rio de Janeiro, Brazil, and employs over 130,000 people in 25 different countries on five continents.  Ex. 1 ¶ 35; Ex. 2 (Vale 2017 Sustainability Report) at 15.[4]  Over the course of its 77-year history, Vale has become a global leader in the production of iron ore.  Ex. 3 (Vale 2017 Annual Report) at 1.  Vale retains independent external auditors to assess and certify the safety and regulatory compliance of its mining facilities and tailings dams.  Ex. 1 ¶¶ 10(b)–(c), 57, 74, 87 n.30; Ex. 4 (Vale 2016 Sustainability Report) at 112; Ex. 2 at 67.  During the Class Period, Vale had approximately 150 dams or dikes storing tailings in Brazil and nearly 400 dam structures worldwide.  *See* Ex. 1 ¶ 189; Ex. 2 at 67.

Between 2015 and 2017, Vale invested over $2 billion in environmental and social initiatives in the communities in which it operates.  Ex. 2 at 129.  In 2017 alone, Vale invested $125 million in social expenditures and $487 million in environmental protection and conservation.  *Id*. at 70, 129.

---

[4]   The Court may consider documents Plaintiff incorporated by reference in the Complaint.  *See DiFolco v. MSNBC Cable, L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) ("In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." (citation omitted)).

## II.    VALE'S TAILINGS DAM MANAGEMENT

In the wake of the November 2015 breach of Samarco's Fundão Dam, Ex. 1 ¶ 58, Vale redoubled its efforts to manage the safety of its own tailings dams.  For example, in 2016 Vale created its Geotechnical Risk Management area, focusing exclusively on dams and dam safety. *Id*. ¶¶ 5, 151.  In 2017, Vale invested over $220 million to manage and improve its dams, with a focus on dam maintenance and improvement works, and on revisions of its Mining Dam Emergency Action Plans ("PAEBMs").  *Id*. ¶ 106; Ex. 2 at 68.

Pursuant to Vale policies and Brazilian regulations, Vale's structures were subject to regular safety inspections as well as a rigorous periodic audit program by internal and external consultants and specialists.  Ex. 1 ¶¶ 54–56.  In 2017, Vale instituted the Independent Panel of Experts for Safety and Risk Management of Geotechnical Structures ("PIESEM"), a group comprised of independent national and international risk management and geotechnical experts, to advise Vale on dam management and safety.  *Id*. ¶ 5; Ex. 2 at 67, 69, 71.

The Brazilian mining industry is regulated by Brazil's National Mining Agency ("ANM").  Ex. 1 ¶ 55 & n.22.  The ANM requires, among other things, that regulated entities such as Vale prepare bi-annual dam safety inspection reports for their tailings dams in March and September that are subject to the National Dam Safety Policy.  *See id*. ¶¶ 54–55.  Regulated entities also must provide to the ANM "Declarations of Dam Stability Condition" ("DCEs") for each tailings dam subject to the national dam safety policy, together with the bi-annual safety inspection reports.  *Id*. ¶¶ 55–56.  Each DCE "is a sworn statement attesting to the structural integrity of the dam, that is signed by the dam [auditor] and the dam owner," confirms the stability of the tailings dam, and provides information concerning the dam's technical safety conditions.  *Id*. ¶ 56.

During the Class Period, pursuant to the regulations, external dam safety auditors—

Tractebel Engenharia from 2017 through March of 2018, and, starting in June 2018, TÜV SÜD—inspected Dam 1 and issued DCEs attesting to its stability. *Id.* ¶¶ 57, 87–94. "Dam 1's most recent DCEs were issued by TÜV SÜD do Brasil, an international geotechnics company, on June 13, 2018 and September 26, 2018 in connection with the Periodic Dam Safety Review and the Regular Dam Safety Inspection processes required by law." *Id.* ¶ 57. The Tractebel and TÜV SÜD DCEs consistently classified Dam 1's "Risk Category" as "Low" and included the following auditor certification:

> I declare for purposes of oversight and verification by the DNPM that I performed the Regular Dam Safety Inspection of the above structure in accordance with the Regular Dam Safety Report prepared on 09/03/2018, and *I affirm the stability* of the structure in accordance with Law No. 12,334 of September 20, 2010, and DNPM Ordinances in effect.

Ex. 5 (Sept. 26, 2018 TÜV SÜD DCE) at 44 (emphasis added); *see also* Ex. 6 (June 13, 2018 TÜV SÜD DCE) at 1; Ex. 7 (Mar. 27, 2018 Tractebel DCE) at 13; Ex. 8 (Sept. 26, 2017 Tractebel DCE) at 36.[5]

## III.    THE DAM 1 ACCIDENT AND AFTERMATH

The processing of iron ore creates waste known as "tailings," which are the muddy solid and liquid byproduct that remains after the valuable and saleable part of the iron ore is separated. Ex. 1 ¶ 49. Vale stores its tailings in structures called tailings dams, which are earth-filled embankments comprised of tailings. *Id.* ¶ 50. Dam 1 was a tailings dam, located at Vale's Córrego de Feijão mine. *Id.* ¶ 48. As alleged in the Complaint, Dam 1 was originally built in

---

[5]   Dam 1's DCEs, expressly incorporated by reference in the Complaint, are mentioned over 80 times, and are clearly "integral" to the Complaint and relied upon. *See, e.g.*, Ex. 1 ¶¶ 57, 87–94; *see Weiss v. Inc. Vill. of Sag Harbor*, 762 F. Supp. 2d 560, 567 (E.D.N.Y. 2011).

1976 by Ferteco Mineracão ("Ferteco") via the upstream method.[6]  *Id*. ¶¶ 48, 53.  Vale

subsequently acquired Ferteco (and with it Dam 1) on April 27, 2001.  *Id*. ¶ 53.  In July 2016,

Vale deactivated Dam 1 and ceased depositing tailings there.  *Id.* ¶¶ 68–69.

On January 25, 2019, Dam 1 collapsed.  *Id.* ¶ 3.  In response, Vale undertook

extraordinary efforts to mitigate the effects of the tragedy, including establishing a Humanitarian

Aid Committee of social workers and psychologists, and providing financial assistance, lodging,

food, and medical assistance.[7]  Within a day, Vale provided over 1 million liters of water,

accommodation for more than 800 people, and equipment to assist with rescue efforts.[8]

## IV.    PLAINTIFF'S MISAPPREHENSION OR MISCHARACTERIZATION OF CERTAIN DOCUMENTS UPON WHICH IT RELIES

The gravamen of Plaintiff's Complaint appears to be that Defendants' statements during

the Class Period regarding Vale's risk mitigation, dam management, safety, and sustainability

policies and procedures—48 of them in total—purportedly were false because "many of Vale's

tailings dams, including Dam 1, were not in a good or safe condition and [] the Company was not

taking the critical measures necessary to protect against another catastrophic dam collapse."  Ex.

1 ¶ 10.  According to Plaintiff, "the evidence surfaced in numerous investigations" concerning

the Dam 1 collapse somehow "contradicts Defendants' Class Period statements."  *Id*.  The

"investigations" are political reports issued by Brazil's Federal Senate's Parliamentary

Commission of Inquiry on July 2, 2019 and the House of Representatives of the state of Minas

---

[6]  In the "upstream method," tailings are progressively added to a starter dam to provide additional strength and support as stored tailings volume grows.  *Id.* ¶¶ 50–51.

[7]  *Vale provides humanitarian assistance in Brumadinho*, Vale (Jan. 25, 2019), http://www.vale.com/EN/aboutvale/news/Pages/Vale-provides-humanitarian-assistance-in-Brumadinho.aspx.

[8]  *Vale announces an update on the assistance work in Brumadinho*, Vale (Jan. 26, 2019), http://www.vale.com/EN/aboutvale/news/Pages/Vale-announces-an-update-on-the-assistance-work-in-Brumadinho.aspx.

Gerais on September 12, 2019 (the "CPI Reports").  *Id*. ¶¶ 113–20.

Plaintiff relies entirely on the CPI Reports for its theory that Vale's statements were misleading because of some combination of the following five alleged omissions (the "Five Purported Omissions"):  (1) "at least one of Vale's high-hazard tailings dams, Dam 1, had a high probability of failure";[9] (2) "Vale's dam risk management and sustainability practices and policies were insufficient and/or insufficiently implemented in light of the known risks to human life and the environment posed by Dam 1";[10] (3) "Vale systematically acted to get Stability Condition Statements for dams that were not stable and/or did not meet Vale's own purported safety standards";[11] (4) "certain of the risks Defendants purportedly warned about, such as 'the breach of operating and maintenance standards,' had already materialized and were concealed by Defendants";[12] and (5) "Vale's third-party dam safety auditor had a financial conflict of interest, and issued Stability Condition Statements under fear of economic reprisal from Vale."[13]

A cursory review of the documents and statements referenced in the CPI Reports and cited in the Complaint reveals that Plaintiff variously has misunderstood or mischaracterized the information that underpins Plaintiff's allegations.

First, Plaintiff claims that during the Class Period, studies of Dam 1 "continued to indicate factors of safety well below Vale's purported safety standard" and that "the recommended international standard for the factor of safety for tailings dams in an undrained

---

[9]   *See* Ex. 1 ¶¶ 126, 128, 130, 134, 136, 141, 144, 149, 152, 154, 156, 159, 162, 165, 169, 173, 183, 186, 194, 196, 200.

[10]   *See id.* ¶¶ 126, 128, 130, 134, 136, 141, 144, 149, 152, 154, 156, 159, 162, 165, 169, 173, 175, 183, 186, 194, 196, 198.

[11]   *See id.* (same paragraphs).

[12]   *See id.* ¶¶ 141, 183.

[13]   *See id.* ¶¶ 173, 175, 183, 186, 194, 196, 198, 200.

state, such as Dam 1, was 1.3 or higher." *Id*. ¶¶ 10(b); 10(b) & n.6.  However, Brazilian law does not prescribe a minimum safety factor for "stability analyses that use *undrained* resistance parameters."  Ex. 9 (Nov. 14, 2017 Brazilian Association of Technical Standards) at 12.  Instead, standards published by the Brazilian Association of Technical Standards in 2017, which are explicitly referenced in Brazilian DNPM Ordinance number 70.389/17[14] (which governs DCEs), leave to an auditor's *discretion* the acceptable safety factor for evaluating dams in the *undrained* condition.  *See* Ex. 9 at 12. Thus, when independent dam auditors repeatedly certified Dam 1 as safe, they had the discretion to do so even if they calculated a safety factor below 1.3 for the undrained condition.  In short, the Court should not credit any of Plaintiff's flatly erroneous allegations concerning the safety factor.[15]

Second, Plaintiff alleges that Vale received two Dam 1 liquefaction studies in July 2016 that purportedly found a high probability of failure, and thus should have triggered an "'emergency level 3' (the most severe emergency category, which requires evacuation of the surrounding area and other measures)[.]"  Ex. 1 ¶ 10(a).  Plaintiff's characterization of the July 2016 liquefaction studies is facially false.

The two studies were conducted by independent third party Geoconsultoria on July 15, 2016 and July 26, 2016.  *Id.* ¶ 70.  Contrary to Plaintiff's allegation, Geoconsultoria's July 15 study did not find a safety factor below Vale's standard, or any 50% probability of failure necessitating evacuation.  *Id*.  Instead, it concluded that during 2016, and indeed, the previous ten years, Dam 1's "behavior . . . has been the *best it could possibly be*."  Ex. 11 (July 15, 2016

---

[14]   *See* Ex. 10 (DNPM Ordinance number 70.389/17) at 30.  The Court may consider this regulation, as Plaintiff expressly references it in the Complaint and discusses the regulation's DCE requirements.  Ex. 1 ¶¶ 54–56, 195, 199.

[15]   Ex. 1 ¶¶ 80, 85–86, 88–92, 94, 118, 162, 165, 169, 173, 183, 186, 194, 200.

Geoconsultoria Report) at 10 (emphasis added).  The report also found that there was only a "remote" possibility of rupture, and credited Vale for making improvements on the Dam that were "fundamental for the safety of tailings dams that are raised using the upstream method."  *Id*. Further, the report praised Vale's decision to cease the disposal of tailings at Dam 1, calling it a "favorable circumstance" because it prevented an increase in pressure at the dam.  *Id.* at 10–11.

Plaintiff also misstates Geoconsultoria's conclusion in its second liquefaction study, dated July 26, by citing certain tests yielding safety factors "from 0.93 to 1.19 . . . suggest[ing] a roughly 50% probability of dam failure[.]"  Ex. 1 ¶ 70.  In fact, the study found safety factors as high as 1.68, and nowhere concluded Dam 1 had a 50% or even significant probability of dam failure.  Ex. 12 (July 26, 2016 Geoconsultoria Report) at 9–13.  Thus, once again, the Court should not accept as true Plaintiff's demonstrably misleading allegations.[16]

Third, Plaintiff references a November 2017 slideshow presented by Felipe Rocha (Vale Geotechnical Risk Management employee) at a PIESEM meeting to allege that "risk assessments in 2017 indicated that Dam 1 was at an unacceptably high risk of liquefaction and failure."  Ex. 1 ¶¶ 10(b); 75–77.  Plaintiff, however, baldly misstates the presentation's conclusions, claiming that "Dam 1 was assessed as having a failure probability of $3 \times 10^{-4}$" which "fell in the zones denoting unacceptable risk levels."  *Id.* ¶ 75.  However, the slideshow repeatedly concluded that Dam 1's failure probability was at or below $1 \times 10^{-4}$.  Ex. 13 (Nov. 15, 2017 Slideshow) at 10– 14, 19–20, 25–27.  Such a probability—as even Plaintiff concedes—is a "tolerable risk limit," and only risks *above* that figure are "unacceptable."  *Id.* at 17–20; Ex. 1 ¶ 74.

Plaintiff also misstates the relevance of a quote from the slideshow that "[a]ll risks with

---

[16]  Ex. 1 ¶¶ 70, 126, 128, 130, 134, 136, 139, 141, 144, 149, 152, 154, 156, 159, 162, 165, 169, 173, 183, 186, 194, 196, 198, 200.

probabilities greater than $10^{-4}$ per year are now included in the business risk matrix of Vale and presented to the group of directors, the CEO, and the board of directors." Ex. 1 ¶ 77 (quoting slide 31 of Ex. 13). However, the matrix expressly *excluded* Dam 1 from its coverage. Ex. 13 at 23. The Court therefore should not accept as true the related allegations.[17]

Fourth, Plaintiff alleges that Vale somehow pressured its external auditor, TÜV SÜD, into signing a declaration attesting to Dam 1's stability, Ex. 1 ¶ 10(c), citing a single internal email from TÜV SÜD engineer Makoto Namba to other TÜV SÜD employees. *Id.* ¶ 92. That email, however, fairly read, in no way suggests Vale pressured TÜV SÜD into filing false DCEs, or that Dam 1 was unstable or at risk of imminent collapse. *See id.* The email merely shows that Mr. Namba anticipated Vale employees would ask whether TÜV SÜD would sign a dam stability declaration for Dam 1 and, if not, whether it would sign a declaration if Vale undertook measures to improve the stability of Dam 1. *See id.* The Court should not accept as true a characterization of a document in conflict with its actual language.[18]

Last, Plaintiff alleges that "[t]hroughout 2018, Dam 1 continued to have an unacceptably high probability of failure," Ex. 1 ¶¶10(c), and that "the final report of the PIESEM panel included an extended discussion of the 'liquefaction analysis and decommissioning of Dam 1,'" *id.* ¶ 85 (quoting Ex. 14 (Oct. 17, 2018 PIESEM Report) at 20). Plaintiff ignores though that in this final report issued before Dam 1's collapse, PIESEM found that "Dam I is well maintained" and recommended "no other action be taken" beyond resuming the installation of additional drains until a new stability assessment was carried out. Ex. 14 at 23–24. The report never concluded that Dam 1 "continued to have an unacceptably high probability of failure." Ex. 1 ¶

---

[17] Ex. 1 ¶¶ 75–77, 162, 165, 169, 173, 175, 183, 186, 194, 196, 198, 200.

[18] Ex. 1 ¶¶ 92–93, 173, 175, 183, 186, 194, 196, 198, 200.

10

10(c).  In the face of the documents themselves, the Court need not and should not accept as true the allegations that Dam 1 had an unacceptably high probability of failure in 2018.[19]

### DISCUSSION

In considering a motion to dismiss under Rule 12(b)(6), the Court applies a "plausibility standard" guided by two "'working principles.'"  *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  First, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Id*. (quoting *Iqbal*, 556 U.S. at 678).  Second, only a complaint containing factual content that supports a "plausible claim for relief" can survive a motion to dismiss.  *Id*.

To plead a violation of Section 10b and Rule 10b-5, Plaintiff must allege:  "(1) a material misrepresentation or omission" by Defendants; "(2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation."  *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398, 2407 (2014) (citation omitted).  Plaintiff also must "satisfy the heightened pleading requirements of the PSLRA and Federal Rule of Civil Procedure 9(b) by stating with particularity the circumstances constituting fraud."  *Slayton v. Am. Express Co.*, 604 F.3d 758, 766 (2d Cir. 2010) (citations omitted).  In addition, where an omission is asserted as the basis of the claim, Plaintiff must allege facts showing that Defendants had a duty to disclose the omitted information.  *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 267 (2d Cir. 1993).  "[W]here a plaintiff is unable to allege any fact sufficient to support its claim, a complaint should be dismissed with prejudice."  *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1992).

---

[19]  Ex. 1 ¶¶ 79 n.24, 84, 186, 194, 198, 200.

11

While the Court will accept as true well-pleaded factual allegations when deciding a motion to dismiss, the Court "need not accept as true an allegation that is contradicted by documents on which the complaint relies." *In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d 549, 555 (S.D.N.Y. 2004) (citation omitted). Thus, the Court may consider the entirety of statements or documents incorporated into the Complaint by reference, SEC filings, and any other documents on which Plaintiff relied in bringing suit. *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007). The Court also may consider matters subject to judicial notice. *In re Citigroup, Inc.*, 2011 WL 744745, at \*5 (S.D.N.Y. Mar. 1, 2011).

## I.    PLAINTIFF FAILS TO ALLEGE ANY ACTIONABLE MISSTATEMENTS OR OMISSIONS

While the Complaint lists a handful of wide-ranging general disclosures by Vale as the nominal basis for this action, every one of Plaintiff's theories is premised on the accusation that "the Company was not taking the critical measures necessary to protect against another catastrophic dam collapse." Ex. 1 ¶ 10. This challenged conduct amounts, at best, to a case of corporate mismanagement—not securities fraud. The recent *Singh* decision by the Second Circuit Court of Appeals is instructive on this point:

> This case presents us with a creative attempt to recast corporate mismanagement as securities fraud. The attempt relies on a simple equation: first, point to banal and vague corporate statements affirming the importance of regulatory compliance; next, point to significant regulatory violations; and *voila*, you have alleged a prima facie case of securities fraud! The problem with this equation, however, is that such generic statements do not invite reasonable reliance. They are not, therefore, *materially* misleading, and so cannot form the basis of a fraud case.

*Singh v. Cigna Corporation*, 918 F.3d 57, 59–60 (2d Cir. 2019) (emphasis in original).

Beyond Plaintiff's threshold failure to articulate a securities fraud, the Court also should dismiss the Complaint because the challenged statements are neither actionable nor misleading.

12

Of the 48 alleged misstatements, 41 are inactionable puffery,[20] four are purely cautionary,[21] and *none* are false or misleading (including the three that are not puffery or cautionary).[22]

A. **The Vast Majority of the Alleged Misrepresentations Constitute Inactionable Puffery**

It is well settled in this Circuit that "some statements [are] inactionable as a matter of law because they are 'too general to cause a reasonable investor to rely upon them.'" *Gross v. GFI Grp., Inc.*, 2019 WL 4389137, at *2 (2d Cir. Sept. 13, 2019) (quoting *ECA, Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 206 (2d Cir. 2009)). "This holding follows from the principle that, '[t]o be "material" within the meaning of § 10(b), the alleged misstatement must be sufficiently specific for an investor to reasonably rely on that statement as a guarantee of some concrete fact or outcome which, when it proves false or does not occur, forms the basis for a § 10(b) fraud claim.'" *Id.* (quoting *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 185 (2d Cir. 2014)).

Here, Vale's statements referenced general risk-reducing procedures it had implemented and aimed to implement, and benchmarks it aspired to achieve. Plaintiff claims these statements were false and misleading because certain dams, including Dam 1, were at risk of collapse. But Vale never *guaranteed* it had eliminated or would eliminate all risk associated with its dams. Even a cursory review of the statements at issue reveals they "did not, and could not, amount to a guarantee" of anything. *ECA*, 553 F.3d at 206 (citation omitted).

First, Vale's statements are aspirational, including what Vale "should" do and "aims to"

---

[20] Ex. 1 ¶¶ 125, 127, 129, 131–33, 135, 137–38, 142–43, 147–48, 150–51, 153, 155, 157–58, 160–61, 163–64, 167–68, 170–72, 174, 177–78, 181–82, 184–85, 188, 190, 193, 195,197, 199. *See* Appendix ("App.") A.

[21] Ex. 1 ¶¶ 139–40, 179–80. *See* App. A.

[22] Ex. 1 ¶¶ 189, 191–92. *See* App. A.

13

accomplish,[23] and Vale's "plan of becoming a leader" through "improvement" of risk controls.[24] "[T]outing good risk controls is the equivalent of positive, aspirational puffery found inactionable by courts." *C.D.T.S. v. UBS AG*, 2013 WL 6576031, at *5 (S.D.N.Y. Dec. 13, 2013), *aff'd sub nom.*, 604 F. App'x 5 (2d Cir. 2015). As the Second Circuit has explained, "[u]p to a point, companies must be permitted to operate with a hopeful outlook." *Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004); *see also City of Pontiac*, 752 F.3d at 183 (finding statements inactionable when they are "explicitly aspirational, with qualifiers such as 'aims to,' 'wants to,' and 'should'"); *XYZ Two Way Radio Serv., Inc. v. Uber Techs., Inc.*, 214 F. Supp. 3d 179, 184 (E.D.N.Y. 2016) (same for "committed to," "aim[s] to," and "believe[s] deeply").

Second, the challenged statements are rife with the types of "soft adjectives"—like "extraordinary," "dedicated," and "qualified"[25]—courts within this Circuit routinely find to be inactionable puffery. *In re Xinhua Fin. Media, Ltd. Sec. Litig.*, 2009 WL 464934, at *8 (S.D.N.Y. Feb. 25, 2009) (finding "soft adjectives" like "strong," "experienced," and "capable" are "nothing more than puffery"); *see also ECA*, 553 F.3d at 205–06 (same for "highly disciplined" risk management process). Further, Vale's statements contain vague language— *e.g.*, "practically," "anomalies," "normal limits," and "best practices"[26]—"too open-ended and subjective to constitute a guarantee." *Gross*, 2019 WL 4389137, at *2; *see also Reese v. McGraw-Hill Companies, Inc.*, 2012 WL 9119573, at *1 (S.D.N.Y. Mar. 30, 2012) (finding

---

[23] *See* Ex. 1 ¶¶ 129, 132, 138, 147–48, 150–51, 153, 155, 163, 167–68, 182; *see also* App. B, *Aspirational Language*.

[24] *See* Ex. 1 ¶¶ 127, 137–38, 143, 151, 158, 160–61, 163–64, 170–72, 178, 181–82, 184, 188, 193; *see also* App. B, *Aspirational Language*.

[25] *See* Ex. 1 ¶¶ 135, 150, 157, 174, 188; *see also* App. B, *Soft Adjectives and Vague Word Choice*.

[26] *See* Ex. 1 ¶¶ 125 135, 157, 171, 178, 188, 195, 197, 199; *see also* App. B, *Soft Adjectives and Vague Word Choice*.

14

statements concerning "best practices" in risk management are inactionable puffery), *aff'd sub nom.*, 506 F. App'x 32 (2d Cir. 2012).  "Without any elaboration or contextual cabining of these terms, [Vale's] statement[s] amount[] to no more than [puffery], rather than an assertion of falsifiable facts or a guarantee of certain outcomes."  *Gross*, 2019 WL 4389137, at *2.

Third, Vale's statements concerning its culture and values—*e.g.*, "life matters most"[27]— although true, for these purposes are mere puffery.[28]  *See Schiro v. Cemex, S.A.B. de C.V.*, 396 F. Supp. 3d 283, 298 (S.D.N.Y. 2019) (finding statements framed as a "Golden Rule"—such as the company is "committed to conducting [its] business with transparency and integrity"—are not actionable as they merely indicate a goal, not an achievement).

Fourth, Vale's "simple and generic" statements concerning its policies and procedures are "inactionable 'puffery.'"[29]  *Singh*, 918 F.3d at 63–64.  Such statements are too general for reliance when they fail to "describe specific regions, specific initiatives, or make any assurances of efficacy."  *Menaldi v. Och-Ziff Capital Mgmt. Grp. LLC*, 277 F. Supp. 3d 500, 512–13 (S.D.N.Y. 2017).  The statements at issue here clearly lack such specificity, as they do not even refer to dams generally, let alone Dam 1 specifically, but rather to "the company['s] overall risk level."[30]  And rather than assuring the procedures "would eliminate all risks," Vale merely stated

---

[27]  *See* Ex. 1 ¶¶ 147, 153, 155; *see also* App. B, *Culture and Values*.

[28]  Plaintiff also purports to rely on a non-public statement of Vale's then CEO that did not become public until after the collapse.  Such purported reliance is by definition unreasonable.  *See* Ex. 1 ¶ 155; Ex. 15 (Jan. 25, 2019 *Época Negócios* article).

[29]  *See* Ex. 1 ¶¶ 127, 131–33, 137–38, 142–43, 147–48, 150, 161, 163, 167–68, 170–72, 178, 181–82, 184–85, 188, 190, 193; *see also* App. B, *Simple and Generic Policies and Procedures*.

[30]  *See* Ex. 1 ¶¶ 133, 137–38, 148, 167, 181–82.  Four of the relevant misstatements do mention "dams," but they do not refer to Dam 1 specifically, nor do they make any guarantees of efficacy.  *See* Ex. 1 ¶¶ 150, 188, 190, 193.

that it sought "to reduce" and "mitigate operational risk."[31]  These statements "suggest[] a company actively working to improve . . . rather than one expressing confidence in their complete (or even substantial) effectiveness."[32]  *Singh*, 918 F.3d at 64.

Fifth, Vale's statements concerning "obligations for companies operating mining dams in Brazil," Ex. 1 ¶ 177, and compliance with such obligations are inactionable,[33] *see DoubleLine Capital LP v. Construtora Norberto Odebrecht, S.A.*, 2019 WL 4600934, at *11 (S.D.N.Y. Sept. 23, 2019) (they "fall even further outside the circle of actionable statements than aspirational puffery; they reflect the company's obligations, not its intentions or practice"); *City of Brockton Ret. Sys. v. Avon Prods., Inc.*, 2014 WL 4832321, at *15 (S.D.N.Y. July 12, 2019) ("Courts in this Circuit have found statements . . . [p]roclaiming compliance with ethical and legal standards to be non-material."  (citing *ECA*, 553 F.3d at 206)).

### B.  Plaintiff Fails to Allege That Any of the Purported Misrepresentations Were False or Misleading When Made

Even if almost all of Vale's challenged statements were not immaterial puffery, Plaintiff's claims still would fail, as the Complaint contains no facts showing that *any* of the statements were false or misleading when made.  *See In re Barrick Gold Corp. Sec. Litig.*, 341 F. Supp. 3d 358, 371 (S.D.N.Y. 2018) ("Fraud depends on the state of events when a statement is made, not on what happens later.").

### 1.  The Alleged Misrepresentations Were Not False When Made

The Complaint fails to plead any facts indicating any of the challenged statements by

---

[31]  *See* Ex. 1 ¶¶ 133, 138–39, 147–48, 168, 179–82; *see also* App. B, *Simple and Generic Policies and Procedures*.

[32]  *See, e.g.*, Ex. 1 ¶¶ 163, 170, 172, 184, 190; *see also* App. B, *Simple and Generic Policies and Procedures*.

[33]  *See* Ex. 1 ¶¶ 170–72, 178, 188; *see also* App. B, *Obligations and Compliance*.

16

Vale were false at the time they were made.  For example, Plaintiff does not—and cannot—contest that Vale actually had in place the policies and procedures described in its statements, including that Vale "submits its structures to audits conducted by specialized external consultancies," Ex. 1 ¶ 188, or that "[a]t the end of the year . . . 100% of the audited structures were certified to be in stable condition," *id.* ¶ 189.  Instead, Plaintiff claims Vale's policies proved to be "insufficient and/or insufficiently implemented" because of the dam collapse.  *Id.* ¶ 194.  But such a "fraud by hindsight" claim is simply not actionable.  *Barrick Gold*, 341 F. Supp. 3d at 372 (quoting *Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000)).

In a strikingly similar case in which a mining company experienced a series of spills at a single mine, a court found inactionable the defendant's statement that it "previously completed a series of remedial works to prevent such an incident from occurring again."  *See Barrick Gold*, 341 F. Supp. 3d at 371–72.  There, the plaintiffs alleged that the company's statement was false because the defendant failed to complete certain preventative works required by Argentine authorities.  *See id.* at 372.  The court rejected this theory, however, finding that the statement was not false *when made*, and that the plaintiffs' allegations of falsity depended on "the benefit of hindsight" and knowledge of the ultimate "chain of causation" leading to the spill.  *Id.*

Here, rather than identify anything false about Vale's statements on its safety, environmental sustainability, risk management, and dam stability policies and procedures, Plaintiff "merely quibble[s] with [Vale's] execution of those programs and procedures," *Ong v. Chipotle Mexican Grill, Inc.*, 294 F. Supp. 3d 199, 232 (S.D.N.Y. 2018), and claims (with the benefit of hindsight) they were "insufficient," *see*, *e.g.*, Ex. 1 ¶ 128; *see also In re Plains All Am. Pipeline, L.P. Sec. Litig.*, 307 F. Supp. 3d 583, 620 (S.D. Tex. 2018) ("Allegations that [the company] was ineffective in implementing its policies . . . do not make the general statements

17

describing [its] policies and priorities actionably misleading."), *aff'd on other grounds sub nom.*, 777 F. App'x 726 (5th Cir. 2019).

### 2. Vale Had No Duty to Disclose Any of the Five Purported Omissions

Plaintiff argues that because Vale "elected to speak" on topics concerning Company-wide risk management and dam safety policies, it somehow had a duty to disclose "material facts" concerning Dam 1 "so as to render [its] statements not misleading." *See, e.g.*, Ex. 1 ¶ 126. But Plaintiff fails to show Vale had a duty to make such disclosures, or that its silence was misleading. *See Lipow v. Net1 UEPS Techs., Inc.*, 131 F. Supp. 3d 144, 168 (S.D.N.Y. 2015) ("A defendant's silence is not misleading where no duty to disclose exists." (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 239 n.17 (1988))).

First, Vale's statements did not trigger any duty to disclose the allegedly omitted information. "[Section] 10(b) and Rule 10b–5(b) do not create an affirmative duty to disclose any and all material information." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011). Instead, "omissions are actionable under § 10(b) only when a corporation has a duty to disclose." *Menaldi v. Och-Ziff Capital Mgmt. Grp. LLC*, 164 F. Supp. 3d 568, 576 (S.D.N.Y. 2016). Here, Plaintiff makes no attempt to show how any of Vale's statements were misleading in light of the Five Purported Omissions. Plaintiff does not, for example, explain how the statement that "we practically have no upstream dams in our operation continuously," is a misleading response to a question "concerning efforts by Vale to find alternatives to upstream tailing dams in light of a potential ban on such dams[.]"[34] Ex. 1 ¶ 125. Instead, Plaintiff claims

---

[34] "The notion that a company need not disclose a laundry list of internal information holds particular force in the context of a question-and-answer session with analysts, particularly when, as here, the analysts' inquiries are surface-level in nature." *Foley v. Transocean Ltd.*, 861 F. Supp. 2d 197, 212 (S.D.N.Y. 2012).

in a conclusory manner that "[h]aving elected to speak about Vale's upstream tailings dams, Defendants violated their duties to disclose these material facts[.]" *Id.* ¶ 126. "But it is well settled that a corporation is not required to reveal all facts on a subject just because it reveals a single fact." *In re Rockwell Med., Inc. Sec. Litig.*, 2018 WL 1725553, at *10 (S.D.N.Y. Mar. 30, 2018) (citations and internal quotation marks omitted). Each of Plaintiff's allegations is similarly insufficient because it does not attempt to draw specific connections between the topic on which Vale was speaking (*e.g.*, company-wide "risk management policies") and the precise alleged omissions (*e.g.*, the "probability of failure" at Dam 1). Ex. 1 ¶ 134.

Even more troubling is the fact that some of the omissions could not, according to Plaintiff's own Complaint, apply to the allegedly misleading statements. Plaintiff alleges, for example, that statements from the 2017 Sustainability Report are misleading because "Vale's third-party dam safety auditor had a financial conflict of interest." *See* Ex. 1 ¶¶ 91–94; 188; 194. But Plaintiff does not even allege that Vale's Dam 1 auditor from 2017 to March 2018, Tractebel, *see id.* ¶¶ 87 n.30, 90, had any sort of "financial conflict of interest." The only allegation of that nature concerns TÜV SÜD, whose tenure as Dam 1 auditor did not begin until June 2018. *See id.* ¶ 91. Thus, the allegation that Vale omitted its auditor's purported "conflict of interest" cannot apply to any pre-June 2018 statements, such as the 2017 Sustainability Report, which only refers to Vale's dam audits in 2017. *See id.* ¶ 189.

Ultimately, none of the broad, company-wide statements at issue was misleading because of an alleged omission of information about a single dam. Dams were only part of Vale's massive mining business, and Dam 1 was only one of Vale's nearly 400 dams worldwide. *See Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 52 (2d Cir. 1995) (finding no duty to disclose severe problems with IMCERA's Kansas City plant, since that "plant was one of over thirty IMCERA

19

business locations and produced only ten of the 1000 products manufactured by IMCERA"). It is irrelevant that Dam 1, like all other dams, had some risk of collapse. Indeed, Dam 1 was repeatedly classified by both Tractebel and TÜV SÜD as "low" risk. Under the circumstances, it would have been "unduly burdensome and impractical [for Vale] to publicly disseminate" each and every issue identified in the routine maintenance of Dam 1 and its other 400 dams. *Acito*, 47 F.3d at 52–53. Plaintiff's contention that Vale "was under an obligation to divulge specific safety-related information . . . such as audits that had been conducted of [dams] or individual safety practices that were in need of improvement . . . run[s] counter to established precedent refusing to impose a disclosure burden of this type on public corporations, especially large-scale ones such as [Vale]." *Foley*, 861 F. Supp. 2d at 211.[35]

Second, "on several occasions, [Vale] made exactly the disclosures that Plaintiff claims were withheld from investors." *Bettis v. Aixtron SE*, 2016 WL 7468194, at *11 (S.D.N.Y. Dec. 20, 2016); *see also Foley*, 861 F. Supp. 2d at 210–11 ("If Lead Plaintiff is suggesting that [the CEO] should have disclosed that Transocean had experienced, and would continue to experience, safety-related problems, it is clear that Transocean did disclose such concerns to the market at various points in time."). And it is well settled that a defendant is not required to make further predictions about the precise way in which a disclosed risk will manifest. *See, e.g.*, *Caiafa v. Sea Containers Ltd.*, 525 F. Supp. 2d 398, 411 (S.D.N.Y. 2007) (holding that the defendant had disclosed weaknesses in its internal controls, so its failure to disclose separately that its internal accounting function lacked "sufficient personnel resources and technical accounting expertise" to

---

[35] Moreover, Vale had no duty to disclose that the DCEs may not have been reliable because of the auditor's purported "irresponsible" methodology. *Id.* at 218 ("We are unable to accept that the securities laws imposed a duty on [the CEO] to qualify his comments by stating that even though all pressure tests were successful, and even though the relevant government agency approved the tests at those levels, the tests may not have been reliable because the government agency may have been irresponsible in authorizing the reduced requirements as it did.").

comply with GAAP did not violate Rule 10b-5); *cf. Emerson v. Mut. Fund Series Tr.*, 393 F. Supp. 3d 220, 249 (E.D.N.Y. 2019) (holding in a Section 11 case that "once a risk is disclosed, defendants are not required to predict the precise manner in which risks will manifest themselves") (citation and internal quotation marks omitted).

Here, each omission is allegedly misleading for the same reason—had the omitted information been disclosed, investors would have better understood the risk Dam 1 could collapse.  But Vale repeatedly warned of "significant risks and hazards" in the mining industry, "including . . . incidents involving dams[.]"  Ex. 1 ¶ 180.[36]  It further specified that "[t]his could occur by accident or by breach of operating and maintenance standards, and could result in a significant environmental and social impacts . . . illness or death of employees, contractors or community members close to operations, environmental damage, delays in production, monetary losses and possible legal liability[.]"  *Id.*  Vale consistently made clear that it could never eliminate these risks, but would seek "to reduce" them.[37]  Such statements reaffirmed the reality that any reasonable investor already understood:  the risk of collapsing dams remains ever present, no matter the procedures in place.  "[T]o allow [] Plaintiff's claims to proceed because certain undisclosed safety issues may have contributed to the [dam collapse], would be to permit a claim based on 'fraud by hindsight.'"  *Foley*, 861 F. Supp. 2d at 212 (citations omitted).

Plaintiff cannot sidestep Vale's repeated warnings—which defeat the duty to disclose additional, more specific risks regarding its dams—by alleging that "certain of the risks [Vale] purportedly warned about, such as 'the breach of operating and maintenance standards,' had already materialized and were concealed by Defendants."  Ex. 1 ¶¶ 141, 183.  This allegation

---

[36]  *See* App. C.

[37]  *See* Ex. 1 ¶¶ 138, 182 ("We mitigate operational risk"); *see also e.g.*, ¶¶ 133, 147, 148, 167–68, 181.

distorts Vale's risk disclosures, in which the "breach of operating and maintenance standards" was not the risk warned about, but merely the *means* by which the risk—an "incident[] involving dams"—"could occur." *Id.* ¶ 180; *cf. Williams v. Globus Med., Inc.*, 869 F.3d 235, 241–42 (3d Cir. 2017) (finding that a risk disclosure "that the loss of an independent distributor could have a negative impact on sales" was not misleading, despite alleged omission about a loss of a distributor, since the "risk actually warned of" was the adverse sales impact). The manifestation of the actual risk did not happen until Dam 1 collapsed, at which point it was "widely known to the market." *See In re SunEdison, Inc. Sec. Litig.*, 300 F. Supp. 3d 444, 496 (S.D.N.Y. 2018).

## II. THE PSLRA AND BESPEAKS CAUTION DOCTRINE PRECLUDE PLAINTIFF'S CLAIMS PREMISED ON FORWARD-LOOKING STATEMENTS

No reasonable investor can have been misled by generalized, forward-looking statements, given Vale's specific and substantial warnings about a possible risk of a serious mining-related accident—the realization of which is at the heart of the Complaint. Many of the challenged statements are, in whole or in part, forward-looking, examples of which include "statements whose truth cannot be ascertained until some time after they are made," *In re Vale S.A. Sec. Litig.*, 2017 WL 1102666, at *24 (S.D.N.Y. Mar. 23, 2017) (citation omitted), a "'projection of revenues, income, [or] earnings,' [a] 'plan[] and objective[] of management for future operations,' or 'a statement of future economic performance,'" *Okla. Firefighters Pension & Ret. Sys. v. Xerox Corp.*, 300 F. Supp. 3d 551, 567 (S.D.N.Y. 2018) (citing 15 U.S.C. § 78u–5(i)(1)), *aff'd*, 771 F. App'x 51 (2d Cir. 2019). "[F]orward-looking elements may be severable from non-forward-looking elements." *In re Supercom Inc. Sec. Litig.*, 2018 WL 4926442, at *18 (S.D.N.Y. Oct. 10, 2018) (citation omitted).

For example, the following are all textbook forward-looking statements: Vale is "constantly looking to adapt and evolve." Ex. 1 ¶ 127. "Zero harm targeted throughout all

22

operations." *Id.* ¶ 129. "We seek a clear view of the major risks we are exposed to." *Id.* ¶ 138. "Our business is subject to a number of operational risks that may adversely affect our results of operations." *Id.* ¶ 140. "We want to generate long-term value." *Id.* ¶ 148. "Vale aims . . . " *Id.* ¶ 150. "As a goal for 2018 in the Ferrous area . . ." *Id.* ¶ 193. "Vale's main objectives are . . ." *Id.*[38] Under the PLSRA's safe-harbor provision and the judicially created bespeaks caution doctrine, such statements are nonactionable if accompanied by adequate cautionary language. *See, e.g.*, *Slayton*, 604 F.3d at 766 (under the PSLRA, a forward-looking statement is not actionable if it is "identified and accompanied by meaningful cautionary language"); *Singh v. Schikan*, 106 F. Supp. 3d 439, 451 n.9 (S.D.N.Y. 2015) ("Under the bespeaks caution doctrine, '[a] forward-looking statement accompanied by sufficient cautionary language is not actionable because no reasonable investor could have found the statement materially misleading.'" (quoting *Iowa Pub. Emps.' Ret. Sys. v. MF Global, Ltd.*, 620 F.3d 127, 141 (2d Cir. 2010))).

## A. Vale Used Adequate Cautionary Language

Adequate cautionary language "must convey substantive information about factors that realistically could cause results to differ materially from those projected in the forward-looking statement, such as, for example, information about the issuer's business." *Slayton*, 604 F.3d at 771 (quoting H.R. Conf. Rep. 104-369, at 43 (1995)); *see also In re Nokia Oyj (Nokia Corp.) Sec. Litig.*, 423 F. Supp. 2d 364, 400 (S.D.N.Y. 2006) ("In order to be effective [under the bespeaks caution doctrine], cautionary language needs to warn of, or directly relate to, the risk that brought about the plaintiff's loss.").

Far from containing mere "boilerplate," *Slayton*, 604 F.3d at 772, Vale's 2015, 2016, and

---

[38] *See* App. A (noting that forward-looking statements can be found in Ex. 1 ¶¶ 127, 129, 138–40, 147–48, 150, 153, 158, 160–61, 163–64, 179–80, 182, 184, 193).

2017 20-Fs and May 30, 2017 6-K contain cautionary language warning of the *precise* risks at issue.  For example, the 20-Fs warn of "force majeure events"; "accidents"; "ineffective project management"; "operational risks . . . such as . . . [a]ccidents or incidents involving our mines, industrial facilities and related infrastructure, such as dams"; failings of "[c]ustomers, suppliers, contractors, financial institutions, joint venture partners"; "environmental[] health and safety incidents"; risks and hazards attendant to the "mining industry [] generally" including "incidents involving dams . . . [that] could occur by accident or by breach of operating and maintenance standards"; operational "incidents or accidents that could adversely affect [Vale's] business, stakeholders or reputation" notwithstanding Vale's "standards, policies and controls"; and the possibility of increasingly stringent regulations due to the failure of Samarco's Fundão Dam.  Ex. 16 (Vale 2016 Annual Report) at 7–10; *see also* Ex. 17 (Vale 2015 Annual Report) at 6–8 (providing similar warnings);[39] Ex. 3 at 21–27 (providing similar warnings); Ex. 18 (May 30, 2017 Vale Form 6-K) at 23–25, 33–34, 136 (providing similar warnings).[40]

No reasonable investor could have dismissed as immaterial these risk warnings given the prior dam collapse, and indeed, the same documents extensively discuss the consequences arising from realization of the *very same risks*.  Thus many of the documents Plaintiff references in the Complaint speak *at length* about the Samarco litigation and Fundão Dam incident.  *See, e.g.*, Ex. 16 at 3 ("In November 2015, the Fundão tailings dam owned by Samarco failed, causing environmental damage in the surrounding area. The failure of Samarco's tailings dam has adversely affected and will continue to affect our business, but the full impact is still uncertain

---

[39]  The Court may consider "legally required public disclosure documents filed with the SEC." *ATSI Commc'ns*, 493 F.3d at 98.
[40]  These statements are reproduced in full in App. C.

and cannot be estimated.").[41]  Given that, Plaintiff cannot claim the cautionary statements were somehow inadequate.  The warnings are express, and "directly relate[d] to the risk that brought about plaintiff['s] loss." *Gregory v. ProNAi Therapeutics Inc.*, 297 F. Supp. 3d 372, 398 (S.D.N.Y. 2018), *aff'd*, 757 F. App'x 35 (2d Cir. 2018) (quoting *Halperin v. eBanker USA.com, Inc.*, 295 F.3d 351, 359 (2d Cir. 2002)).  As such, they "not only bespeak caution, they shout it from the rooftops." *Halperin*, 295 F.3d at 360.

B.      **The Cautionary Language Accompanied the Forward-Looking Statements**

Cautionary language is not required to be physically attached to forward-looking statements.  Incorporation by reference, for example, suffices.  *See, e.g.*, *In re Aceto Corp. Sec. Litig.*, 2019 WL 3606745, at *5–6 (E.D.N.Y. Aug. 6, 2019) (finding a press release "incorporate[d] by reference the specific risk identified in the Form 10-K"); *In re Aetna, Inc. Sec. Litig.*, 617 F.3d 272, 282 (3d Cir. 2010) ("Cautionary statements disclosed in SEC filing may be incorporated by reference.").  Further, where, as here, alleged reliance rests upon the fraud-on-the-market doctrine, courts have found time and again that "[t]he cautionary information need not be in the same document that contains the forward looking statement," *Kuriakose v. Fed. Home Loan Mortg. Corp.*, 897 F. Supp. 2d 168, 179 (S.D.N.Y. 2012) (citing *Halperin*, 295 F.3d at 357), but rather "must be treated as if attached to every one of its oral and written statements," *In re Gilat Satellite Networks, Ltd.*, 2005 WL 2277476, at *13 (E.D.N.Y. Sept. 19, 2005) (internal quotation marks omitted).  In light of these principles, each of the documents containing allegedly misleading statements is "accompanied" by cautionary language.

First, Vale's May 30, 2017 6-K and Vale's 2016 and 2017 Annual Reports (*i.e.*, Form 20-

---

[41]  *See also id.* at 4, 10, 24–26, F-61 (similar discussions); Ex. 3 at 9–11; 17–18; 149–52 (similar discussions); Ex. 18 at 23, 32–34, 82–83, 93, 230–31, 296 (similar discussions); *see also* Ex. 17 at 3–6, 8, 17, 22–24, 84–85, 135–37 (similar discussions).

Fs) all contain relevant, thorough cautionary statements.  Because, as discussed above, these cautionary statements address the precise risks at issue, the Court should dismiss all claims based on forward-looking statements contained in those three documents.

Second, six other sources[42] containing Vale's alleged misstatements include both cautionary disclaimers and express references to the relevant cautionary statements in Vale's 20-Fs.[43]  Four additional sources of alleged misstatements are transcripts of analyst and investor presentations, delivered in tandem with slide decks[44] that likewise contain cautionary disclaimers and express references to the relevant cautionary statements in Vale's 20-Fs.[45]  The pertinent language in each of these ten sources is substantially the same:[46]

> This [document] may include statements that present Vale's expectations about future events or results. All statements, when based upon expectations about the future and not on historical facts, involve various risks and uncertainties. . . . To obtain further information on factors that may lead to results different from those forecast by Vale, please consult the reports Vale files with the U.S. Securities and Exchange Commission (SEC) . . . and in particular the factors discussed under "Forward-Looking Statements" and

---

[42]  Ex. 19 (Nov. 29, 2016 NYC Vale Day Presentation) at 2; Ex. 4 at 2; Ex. 20 (Jan. 28, 2019 Form 6-K) at 5; Ex. 21 (Dec. 11, 2018 ESG Webinar) at 2; Ex. 2 at 10; Ex. 22 (May 16, 2017 Form 6-K) at slide 1; *see also* App. C.

[43]  In *In re Vale S.A. Sec. Litig.,* a securities class action arising out of the collapse of the Fundão Dam, Judge Woods observed that "Plaintiffs[] and Defendants[] . . . ignore the fact that the challenged statements come from Vale's 2013 and 2014 Sustainability Reports, while the risk disclosures at issue are found in Vale's 2012-2014 annual reports," and found that the cautionary language in the annual reports does not, therefore, accompany the statements in the sustainability reports. *In re Vale S.A. Sec. Litig.*, 2017 WL 1102666, at *25.  That finding is inapplicable here, as the 2016 and 2017 Sustainability Reports now contain the cautionary language Judge Woods found was missing in earlier Reports, and expressly incorporate by reference the risk disclosures in Vale's 20-Fs.

[44]  *See* Ex. 23 at 1 (July 28, 2016 Conference Call) ("This conference call and the slide presentation are being transmitted via internet as well, also through the company's website."); Ex. 24 at 1 (Oct. 27, 2016 Conference Call) (same); Ex. 25 at 2 (Dec. 6, 2017 Vale Day) ("I would like to start with kind of a bold statement that is written in the presentation, as you can see."); *see also generally* Ex. 26 (Dec. 8, 2017 Vale Day) (referencing slides throughout).  These slide decks, all available online, are paired with their respective transcripts, for the sake of completeness.

[45]  *See* App. C (presentation entries).

[46]  *See* App. C (quoting the similar language from each relevant document and noting location).

"Risk Factors" in Vale's annual report on Form 20-F.

Ex. 19 at 2. This paragraph—putting every reader or participant on notice that forward-looking statements were being made and they could find additional risk information in Vale's 20-Fs—is unquestionably adequate to show these statements were accompanied by adequate cautionary language. *See, e.g.*, *In re Aceto Corp. Sec. Litig.*, 2019 WL 3606745, at *5–6 (finding nearly identical language sufficient); *cf. Fort Worth Emp'rs' Ret. Fund v. Biovail Corp.*, 615 F. Supp. 2d 218, 232–33 (S.D.N.Y. 2009) (finding the PSLRA safe harbor covered statements made during conference call when investors were informed such statements were being made and they should look to a specific document containing cautionary language). Given this and the fact that Vale's 2016 and 2017 20-Fs squarely address the relevant risks, the Court should dismiss all Plaintiff's claims based on forward-looking statements.

## III.    PLAINTIFF FAILS TO PLEAD FACTS GIVING RISE TO A STRONG INFERENCE OF SCIENTER

Nor has Plaintiff sufficiently pleaded scienter. "In order to plead scienter adequately under the PSLRA, a plaintiff must plead 'with particularity facts giving rise to a *strong* inference that the defendant acted with the required state of mind.'" *ECA*, 553 F.3d at 198 (quoting 15 U.S.C. § 78u-4(b)(2)). "[A] court must consider plausible, nonculpable explanations for the defendant's conduct," and only find scienter to be adequately pled if inferences drawn in the plaintiff's favor are "cogent and *at least as compelling* as any opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323–34 (2007) (emphasis added).

To adequately plead a defendant had the required state of mind, a plaintiff must "show either (1) that defendants had the motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness." *In re Centerline Holding Co.*

27

*Sec. Litig.,* 380 F. App'x 91, 93 (2d Cir. 2010).  Where the defendant is a corporation, "[i]t is possible to plead corporate scienter by pleading facts sufficient to create a strong inference either (1) that someone whose intent could be imputed to the corporation acted with the requisite scienter or (2) that the statements would have been approved by corporate officials sufficiently knowledgeable about the company to know that those statements were misleading."  *Schwab v. E\*TRADE Fin. Corp.*, 258 F. Supp. 3d 418, 432 (S.D.N.Y. 2017) (internal quotation marks omitted).

Plaintiff's scienter allegations depend on circumstantial evidence:  alleging without particularity that Defendants possessed the requisite scienter because they had access to certain documents.  Because courts repeatedly have refused to infer scienter from speculative allegations regarding what defendants may have had access to, and because Plaintiff concedes that during the relevant period Vale received several third-party audits assuring it of Dam 1's structural integrity, Plaintiff has not met its burden under the PSLRA.

A.      **Plaintiff Fails to Allege That Defendants Had Access to Adverse Information**

According to Plaintiff, as a result "of the Individual Defendants' positions, they had access to . . . adverse undisclosed information about Vale's business, operations, and practices . . . ." Ex. 1 ¶ 42.  But "[t]o establish an inference of scienter, lead plaintiff must do more than allege that the individual defendants . . . had or should have had knowledge of certain facts contrary to their public statements simply by virtue of their high-level positions, their general responsibility for monitoring [the company's] activities, and their access to inside information." *Johnson v. Siemens AG*, 2011 WL 1304267, at \*15 (E.D.N.Y. Mar. 31, 2011) (citation omitted). Indeed, as the Second Circuit "observed in *Novak*, [w]here plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information." *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d

28

190, 196 (2d Cir. 2008); *see also Foley*, 861 F. Supp. 2d at 212 ("[A] plaintiff must establish what the [d]efendants knew and when they knew it." (internal quotation marks omitted)).

Plaintiff's scienter allegations flout this rule. With respect to Messrs. Ferreira and Osorio, the Complaint includes no allegation specifying what they knew and how they knew it, instead only pleading essentially their Company positions. *See* Ex. 1 ¶ 42. Similarly, with respect to Messrs. Schvartsman and Siani, Plaintiff alleges that Mr. Siani was head of the Business Risk Management group, and Mr. Schvartsman received information from the group, *id.* ¶¶ 64–67, without alleging the nature or content of any materials they purportedly reviewed. In other words, the Complaint ignores the fundamental rule that "[s]cienter . . . cannot be inferred solely from the fact that, due to the defendants' board membership or executive managerial position, they had access to the company's internal documentation as well as any adverse information," *In re Sanofi Sec. Litig.*, 155 F. Supp. 3d 386, 407 (S.D.N.Y. 2016); *see also In re Keyspan Corp. Sec. Litig.*, 383 F. Supp. 2d 358, 388 (E.D.N.Y. 2003) ("[C]onclusory assertion[s] that because of their high positions" the CEO and CFO "'undoubtedly' knew of the problems at [the company] . . . are precisely the sort of vague conclusions that courts have rejected").

Worse yet, with respect to Mr. Poppinga, Plaintiff merely attempts to infer scienter from documents in his subordinates' possession and vague emails that do not identify Dam 1. *See* Ex. 1 ¶¶ 64–68, 70–71, 81–84. For example, the Complaint asserts that "a series of emails from June 2018 . . . show[] that Defendant Poppinga and other high-level executives were aware of the need to make improvements at Dam 1." *Id.* ¶ 82. But Plaintiff never even alleges that Mr. Poppinga received those emails. *See In re Plains*, 307 F. Supp. 3d at 642 (finding that receipt by defendant's subordinate of adverse information was insufficient to create a strong inference of scienter). In another example, Plaintiff alleges that Mr. Poppinga wrote an email in which he

29

vaguely references a "doubt that arose related to" Dam 1.  Ex. 1 ¶ 68.  Plaintiff would have the Court speculate that this unmoored phrase somehow alludes to a looming risk of catastrophic collapse.

Unaccountably, Plaintiff speculates that Mr. Poppinga's email concerned two reports prepared (but not released) by Geoconsultaria around that time.  *Id.* at 70.  But again, Plaintiff does not, and cannot, allege that Mr. Poppinga ever received or even had access to those reports.  Indeed, both were released two to three weeks *after* Mr. Poppinga sent his "doubt" email.  *ATSI Comm's*, 493 F.3d at 103 (rejecting scienter because complaint "relie[d], at best, on speculative inferences"); *see also In re Sanofi*, 155 F. Supp. 3d at 407.  In sum, the Complaint fails to "specifically identify . . . reports or statements that were provided to [Vale] management."  *Johnson*, 2011 WL 1304267, at *15 (internal quotation marks omitted).  Plaintiff alleges "no indication" that any Dam 1 report was "produced in a format readily accessible to a high-level executive . . . and was presented in a manner that would have alerted such an executive of the existence of systemic problems."  *Foley*, 861 F. Supp. 2d at 215.

Courts regularly dismiss similar securities fraud claims for similar reasons.  For example, in *In re Plains*, plaintiffs brought a putative securities class action based on defendants' alleged misrepresentations concerning the integrity of an oil pipeline that ruptured, spilling as much as 140,000 gallons of oil into the Pacific Ocean.  307 F. Supp. at 601–02.  The court dismissed the case in part because, as here, the complaint failed to allege "what [certain defendants] knew, or when" they knew it.  *Id.* at 632.  But perhaps most problematic of all, the court concluded, was that the complaint rested its allegations on "an assumption that the defendants received 'all material information'" because of "their corporate positions."  *Id.* at 642.  Similarly, the court in *Foley* dismissed a securities claim arising out of the massive Deepwater Horizon oil spill in the

30

Gulf of Mexico in part because, as here, the complaint's scienter "allegations amount to a claim that [the CEO] must have been aware of safety problems that existed throughout the company given his high-level corporate position." *Foley*, 861 F. Supp. 2d at 212.

"Overall, Plaintiffs cannot demonstrate that the inference of scienter in this case is at least as compelling as any opposing inference of nonfraudulent intent" because, "[s]ignificantly, Plaintiffs have not pointed to any specific documents, conversations, or exchanges suggesting that [any of the Defendants] knew about the faulty condition of [Dam 1], or even any sources from which they might have learned about it." *In re OSG Sec. Litig.*, 971 F. Supp. 2d 387, 410–11 (S.D.N.Y. 2013). Consequently, the Court should dismiss the Complaint.[47]

### B. Plaintiff Concedes That Defendants Received Multiple Independent Verifications of Dam 1's Safety

While failing to identify a single document Defendants reviewed containing *adverse* information concerning Dam 1, Plaintiff concedes Defendants possessed certified reports *reaffirming* Dam 1's structural integrity. For example, from 2017 through the Class Period's end, Brazilian law required Vale to obtain sworn Stability Condition Statements executed by a dam inspector affirming Vale's dams were safe. Ex. 1 ¶¶ 55–56. Tractebel and TÜV SÜD provided one to Vale for Dam 1 each year the regulation was in effect. *Id.* ¶ 91.

Good faith reliance on the representation of an independent auditor or inspector undercuts any inference of scienter. Indeed, in *In re Carter-Wallace, Inc., Sec. Litig.*, the Second Circuit,

---

[47] Also, for the alleged misrepresentations that are forward-looking statements, *see supr*a § III; App. A, an additional dismissal basis is that "plaintiff fails to prove that [those statements were] made with *actual knowledge* that [they were] false or misleading." *Ong v. Chipotle Mexican Grill, Inc.*, 2017 WL 933108, at *18 (S.D.N.Y. Mar. 8, 2017) (emphasis in original). "The scienter requirement for forward-looking statements—actual knowledge—is 'stricter than for statements of current fact. Whereas liability for the latter requires a showing of either knowing falsity or recklessness.'" *Id.* (citation omitted). Here, the allegations do not support an inference of recklessness, much less a "strong inference" of actual knowledge that the statements were false or misleading.

presented with a securities fraud claim against a manufacturer of an FDA-approved drug based on the manufacturer's failure to disclose adverse medical reports, concluded that the developer did not possess scienter where, even though "the early medical reports may have indicated a potential problem," the manufacturer had no way of knowing that the drug was in fact dangerous because "after all, [the drug] survived the extensive testing process required by the FDA."  220 F.3d 36, 42 (2d Cir. 2000).

And in *Foley*, the court found the defendant lacked scienter after an audit certified the mining rig's safety.  861 F. Supp. 2d at 219.  The court explained that "[g]iven the certifications that the rig was in safe working condition . . . just several weeks before the accident, Lead Plaintiff has not provided a plausible reason to believe that [defendant]" possessed scienter.  *Id.*; *see also In re OSG*, 971 F. Supp. 2d at 410–11 (finding no scienter where "two professional accounting firms overlooked [defendant's] tax liabilities" and "neither defendant [was] a tax expert") (internal quotations marks omitted).  Plaintiff's Complaint shares the same flaw.  Vale's independent auditors *repeatedly certified* Dam 1 was stable as new information became available, thereby expressly reassuring Defendants repeatedly regarding the condition of Dam 1. *Id.* ¶¶ 87–94.  Indeed, in the last report Vale received before the collapse, Vale's independent panel of geotechnical experts found "that Dam I is well maintained."  Ex. 14 at 23–24.

Plaintiff fails to identify any document undercutting these certifications.  But even if Plaintiff had, the document would still be insufficient to allege scienter.  The Complaint's "inference of scienter must be more than merely 'reasonable' or 'permissible'—it must be cogent and compelling, thus strong in light of other explanations." *Tellabs*, 551 U.S. at 324.  In light of the third-party certifications of Dam 1's safety, the inference of scienter here is not cogent, compelling or strong. *Id.* ("[A] court must consider plausible, nonculpable explanations for the

32

defendant's conduct."); *see also In re Centerline Holdings Co. Sec. Litig.*, 678 F. Supp. 2d 150, 162 (S.D.N.Y. 2009), *aff'd sub nom.* 380 F. App'x 91 (2d Cir. 2010). Rather, the Complaint is "an impermissible attempt to plead 'fraud by hindsight.' While it may now seem clear that [Dam 1] was not as safe as [Defendants believed]," the third-party certifications of the Dam's stability ensured that "it was not reckless for [Defendants] to believe the[ir] assertions," at the time they were made, "to be true." *In re Carter-Wallace*, 220 F.3d at 42 (internal citation omitted).

Plaintiff unsuccessfully attempts to dismiss these reports as the product of Vale's allegedly improper influence over its auditors. Ex. 1 ¶¶ 87–96. First, the allegations are conclusory. Second, Plaintiff conspicuously fails to allege who, if anyone, at Vale was involved in purported attempts to improperly influence the auditor. *See Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994) ("Rule 9(b)'s specificity requirement for scienter must not be mistaken for license to base claims of fraud on speculation and conclusory allegations." (internal quotation marks omitted)). As such, there is no factual allegation from which one may reasonably infer that any Defendant was aware the auditors' reports were tainted, and therefore on notice not to trust them. *See S.E.C. v. Espuelas*, 579 F. Supp. 2d 461, 481 (S.D.N.Y. 2008) (rejecting scienter allegation as to an improper accounting method because the appropriate method was not "obvious"). In short, Plaintiff has pleaded no reason that Defendants should have doubted the trustworthiness of Dam 1's certifications.

In sum, because "Plaintiff[] ha[s] not pointed to any specific documents, conversations, or exchanges suggesting that [any of the Defendants] knew about the faulty condition of [Dam 1], or even any sources from which they might have learned about it," Plaintiff has failed to meet its substantial burden of alleging a strong inference of scienter. *In re OSG*, 971 F. Supp. 2d at 410–11. Further, the Complaint concedes Defendants possessed several third-party certifications

affirming Dam 1's structural integrity.  The Court therefore should dismiss the Complaint.

## IV.      PLAINTIFF FAILS TO PLEAD LOSS CAUSATION

The federal securities laws exist "not to provide investors with broad insurance against market losses, but to protect them against those economic losses that misrepresentations actually cause."  *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 345 (2005).  Thus, the PSLRA imposes upon a plaintiff the "burden of proving that the act or omission of the defendant . . . caused the loss for which the plaintiff seeks to recover damages."  *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 172 (2d Cir. 2005) (quoting 15 U.S.C. § 78u-4(b)(4)).  To survive a motion to dismiss, a plaintiff must plead either that:  (1) "the market reacted negatively to a corrective disclosure"; or (2) "the materialization of [a] concealed risk" proximately caused its loss.  *Id.* at 173, 175.

Plaintiff's claim fails under either theory.  The Complaint alleges that the "truth" was revealed on four dates:  (i) January 25, 2019 (Ex. 1 ¶¶ 204–05); (ii) January 28, 2019 (*id.* ¶¶ 206–09); (iii) February 4, 2019 (*id.* ¶ 210); and (iv) February 6, 2019 (*id.* ¶¶ 211–14).  However, the Complaint—on its face—does not establish the requisite nexus between Vale's alleged misstatements and any investment loss on those dates.  First, none of the information revealed on the alleged corrective disclosure dates revealed anything false or fraudulent about Vale's statements.  Second, Plaintiff's materialization of the risk theory fails because Vale repeatedly disclosed that a dam collapse was a significant and realistic risk, especially in the aftermath of the recent Fundão Dam collapse.

###      A.      Plaintiff Has Failed to Plead Corrective Disclosures
######              That Reveal the Falsity of Any of the Alleged Misstatements

Plaintiff cannot recover under its corrective disclosure theory for the simple reason that none of the alleged disclosures "reveal[ed] some then-undisclosed fact with regard to the specific misrepresentations alleged in the complaint."  *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d

34

501, 511 (2d Cir. 2010).  To establish loss causation via corrective disclosures, a plaintiff must allege facts supporting an inference that a misstatement or omission concealed something material from the market, with the subsequent revelation of truth in the marketplace producing an immediate negative stock price reaction.  *See id.*  Here, the alleged corrective disclosures did not reveal any undisclosed fact about the purported fraud.  Indeed, the information discussed on each of the below dates either does not speak to the subject of the alleged misstatements, or *confirms* rather than corrects those statements (which were in fact not false).

*January 25, 2019*:  Plaintiff asserts the Dam 1 collapse and articles released that day reporting on it are a "partial disclosure" of the alleged fraud.  Ex. 1 ¶¶ 204–05.  Nevertheless**,** courts routinely reject the "hindsight-inflected theory" that occurrence of an environmental incident retroactively reveals the falsity of statements about risk prevention.  *See, e.g.*, *Barrick Gold*, 341 F. Supp. 3d at 380.  For example, in *Barrick Gold*, a case involving a mining company's statements on its efforts to prevent chemical spills, the court found "the occurrence of [a] spill by itself cannot plausibly be considered a disclosure."  *Id.*  The court found that the falsity of statements concerning the company's remedial actions prior to the spill depended on what the company had or had not done at the time, "and what occurred afterwards—including the . . . spill—is *irrelevant*."  *Id.* at 371–72 (emphasis added).  Likewise, another court held that articles reporting on the occurrence of a norovirus outbreak at a certain restaurant were not corrective of the company's statements on its food safety protocols because they did not "indicate that the outbreak was caused by the [company's] failure to . . . compl[y] with applicable safety regulations or industry standards."  *Nardy v. Chipotle Mexican Grill, Inc.*, 2019 WL 3297467, at *13 (D. Colo. Mar. 29, 2019).  Just as in those cases, articles reporting on the dam collapse "d[id] not report the cause" of the collapse nor link the collapse to any false fact

35

about Vale's risk mitigation policies, safety standards, or dam audits. *Id.* Instead, the *Reuters* article cited by Plaintiff notes that Vale reaffirmed that "equipment had shown the dam was stable on Jan. 10 and it was too soon to say why it had collapsed." Ex. 27 (Jan. 25, 2019 *Reuters* Article) at 3; *see* Ex. 1 ¶ 204. Accordingly, on January 25, the market had not learned information correcting the alleged fraud.

**January 28, 2019**: Plaintiff asserts that "[s]ignificant news concerning the Dam 1 breach, its impacts, and investigations continued to emerge over the weekend." Ex. 1 ¶ 206. But again, Plaintiff does not allege how the impacts of the dam breach "reveal[ed] to the market the falsity" of any of the alleged misstatements about Vale's policies and procedures on risk mitigation or dam safety. *Lentell*, 396 F.3d at 175 n.4. In fact, no information concerning any new fraud was revealed on January 28. Moreover, Plaintiff puzzlingly alleges that one of Vale's 6-Ks filed that same day contains additional misrepresentations rather than information correcting the fraud. *Id.* ¶¶ 199–200, 209; *see also* Ex. 20 at 3 (stating that "Dam I had Stability Condition Statements issued by TÜV SÜD" and "a Safety Factor in accordance with the world's best practices"). But "Plaintiff[] cannot have it both ways"—a "set of disclosures analyzed on [a single] date . . . cannot be both misrepresentations and a partial corrective disclosure." *In re Chicago Bridge & Iron Co. N.V. Sec. Litig.*, 2019 WL 5287980, at *32–33 (S.D.N.Y. Oct. 18, 2019) (finding "no artificial inflation in the price was created" on a day for which plaintiffs "*rely* on the steep . . . *decline* in the price" to prove loss causation (emphasis in original)).

**February 4, 2019**: Plaintiff next alleges that a *Bloomberg* article reporting that Vale was "temporarily halting some operations at its Brucutu mine . . . in compliance with a Brazilian court order issued to help improve safety" is another corrective disclosure. Ex. 1 ¶ 210. As above, this article does not reveal any falsity concerning Vale's policies and procedures on risk

36

mitigation or dam safety, nor even speak to the "subject of" the alleged misstatements about Vale's audits and standards. *Lentell*, 396 F.3d at 173. The vague disclosure that unidentified actions were taken at a separate mining complex "to help improve safety" does not identify anything remotely connected to the specific alleged misstatements.

*February 6, 2019*: Plaintiff incorrectly alleges that reports on February 6 revealed information about the purported fraud. Reports that Vale was calling force majeure on certain contracts (*see* Ex. 1 ¶ 211) cannot be an appropriate corrective disclosure because they did not "reveal some then-undisclosed fact with regard to" any of the alleged misrepresentations. *In re Omnicom*, 597 F.3d at 511. Likewise, the articles in *The Guardian* and the *Wall Street Journal* merely discussed ongoing work at the dam, but did not purport to reveal the causes of the collapse nor any falsity about Vale's earlier statements. *See* Ex. 28 (Feb. 6, 2019 *The Guardian* Article); Ex. 29 (Feb. 6, 2019 *Wall Street Journal* Article).

At most, the articles merely speculated about potential causes of the collapse, *see, e.g.*, Ex. 29 at 4 ("if" the dam was in an undrained condition "the dam's stability would be in question"), and such "[s]peculation . . . do[es] not reveal any new truth about the alleged fraud[,]" *Strougo v. Barclays PLC*, 105 F. Supp. 3d 330, 352 (S.D.N.Y. 2015) (dismissing corrective disclosure that speculated about "the size of a possible fine" and "the relative importance of the scandal"); *see also Janbay v. Canadian Solar, Inc.*, 2012 WL 1080306, at *16 (S.D.N.Y. Mar. 30, 2012) ("[T]he raising of questions and speculation by analysts and commentators does not reveal any 'truth' about an alleged fraud."). The articles do not identify a known cause of the collapse and indeed, the causes had not been identified even at the time Plaintiff filed its Complaint. *See Nardy*, 2019 WL 3297467, at *13 (dismissing disclosures that "d[i]d not report the cause" of a safety incident). "[B]ecause the article[s] do[] not reveal a new

37

fraud, the Complaint does not adequately plead loss causation." *Strougo*, 105 F. Supp. 3d at 352.

None of the alleged corrective disclosures on any of the four dates revealed any fraud to the market. None revealed that Vale's statements on audits and stability certifications in prior years were false. To the extent the alleged disclosures even speak to the misstatements, they confirm the accuracy of what Plaintiff claims is false—TÜV SÜD issued stability certifications for the Dam, Ex. 5; Ex. 6, and Vale monitored, audited, and managed risks at its dams, *see, e.g.*, Ex. 14. Accordingly, Plaintiff has not proffered any corrective disclosure indicating that its alleged investment losses were caused by the revelation of any fraud.

**B.      The Collapse of Dam 1 Does Not Represent the Materialization of a Concealed Risk Because Investors Were Aware of the Risks Posed by Tailings Dams**

Plaintiff also fails to plead that its losses were attributable to the materialization of a risk that was concealed rather than disclosed. Under that theory of loss causation, "the complaint must allege that the loss was (1) foreseeable and (2) caused by the materialization of the concealed risk." *Prime Mover Capital Partners L.P. v. Elixir Gaming Techs., Inc.*, 898 F. Supp. 2d 673, 685 (S.D.N.Y. 2012), *aff'd*, 548 F. App'x 16 (2d Cir. 2013) (citation omitted). There is no concealment of a risk where the company "repeatedly disclosed . . . that the [allegedly hidden risk] was one of its primary risks." *In re Francesca's Holdings Corp. Sec. Litig.*, 2015 WL 1600464, at *20 (S.D.N.Y. Mar. 31, 2015) (finding risk disclosures indicated that "no reasonable investor would have been misled into believing" the risk would never materialize).

Here, the risk of a tailings dam collapse was repeatedly disclosed during the putative Class Period, and Vale investors certainly appreciated that risk, particularly after the Fundão Dam collapse. *See* Ex. 1 ¶¶ 4, 58–60; *see also supra* Discussion § II; App. C (Vale's Risk Disclosures). Moreover, Vale's 2016 Sustainability Report disclosed that Vale had "50 dams classified as High Potential Associated Damage (DPA) (DNPM Ordinance No. 416/2012)." Ex.

38

¶ 151.  Particularly in light of the Fundão Dam, investors could not have waved away these disclosures as mere boilerplate.  Indeed, Vale's securities filings discuss at length the impacts of the prior Fundão Dam collapse on Vale's business.  *See supra* Discussion § II.A.  As Vale "repeatedly disclosed . . . that [a dam collapse] was one of its primary risks," Plaintiff cannot recover based on an assertion that the Dam's collapse represented the materialization of a concealed risk.  *In re Francesca's*, 2015 WL 1600464, at *25.

## V.   PLAINTIFF FAILS TO STATE ANY OF ITS CLAIMS WITH THE REQUISITE PARTICULARITY

Beyond all the foregoing pleading failures, there remains one final—and fatal—deficiency in the Complaint:  It does not identify the precise statements made by Vale that are purportedly misleading.  The Complaint contains "many long block quotes of public statements made by [Defendants], with smaller sections alleged to be misleading highlighted in bold . . . . [which] often follow one after the other without Plaintiff[] explaining how and why each individual section is misleading."  *Waterford Twp. Police & Fire Ret. Sys. v. Smithtown Bancorp., Inc.*, 2013 WL 1345086, at *5 (E.D.N.Y. Mar. 29, 2013).  The Complaint does not, however, specify exactly which statements within the block quotes "were materially false and misleading because they misrepresented or failed to disclose" some combination of the same Five Purported Omissions repeated throughout the Complaint.

None of the Five Purported Omissions, moreover, addresses the substance of the purportedly false statements.  For example, in ¶¶ 188–193, Plaintiff cites a series of block quotes from Vale's 2017 Sustainability Report with random bolded text.  The bolded text includes the following statements, "Vale submits its structures to audits conducted by specialized external consultants," "At the end of the year . . . 100% of the audited structures were certified to be in stable condition," and all "were issued [DCEs]."  *Id.* ¶¶ 188–191.  The Complaint then claims

39

"the statements described in paragraphs 188–193 were materially false and misleading because they misrepresented or failed to disclose" four out of the Five Purported Omissions.  *Id*. ¶ 194. First, Plaintiff does not contest that, *inter alia*, Vale's dams were audited by external consultants, and that 100% of the audited structures received DCEs that certified those dams to be in stable condition.  Second, the Complaint does not distinguish which omission is tied to which statement, improperly leaving Vale and the Court to guess.  Last, none of these omissions addresses the substance of the purportedly false statements, or shows these statements were false when the 2017 Sustainability Report was released in April 2018.  *Id*. ¶ 188.

This pattern is repeated again and again.  The Complaint:

> "[L]ist[s] numerous statements made by the defendants . . . over the course of [a few] years.  Many of those statements are presented in the form of large block quotations from [Sustainability Reports] and public filings.  Plaintiff[] then allege[s] generally that *all* of the statements were misleading for the same [five] reasons.  Plaintiff[] do[es] not distinguish which statements are attributable to which defendants, or why each statement was misleading for failing to disclose the [five] alleged omissions.  Thus, [P]laintiff[] fail[s] to state a claim for securities fraud with the requisite particularity, and those claims must be dismissed."

*Monroe Cty. Emps.' Ret. Sys. v. YPF Sociedad Anonima*, 15 F. Supp. 3d 336, 354–55 (S.D.N.Y. 2014); *see also In re Alcatel Sec. Litig.*, 382 F. Supp. 2d 513, 534–35 (S.D.N.Y. 2005).

## CONCLUSION

For each—*or any one*—of the foregoing reasons, Defendant Vale respectfully requests that the Court dismiss with prejudice the Complaint for failure to state any actionable claim under the federal securities laws.

Dated:  New York, New York
        December 13, 2019

                              GIBSON, DUNN & CRUTCHER LLP


                              By:  */s/* Mark A. Kirsch
                                   Mark A. Kirsch
                                   Randy M. Mastro
                                   Christopher M. Joralemon
                                   Mary Beth Maloney
                                   David M. Kusnetz

                                   200 Park Avenue
                                   New York, NY  10166-0193
                                   Telephone:      212.351.4000
                                   Facsimile:      212.351.4035

                                   *Attorneys for Vale S.A.*

41