**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In Re VALE S.A. SECURITIES LITIGATION | 19-cv-526-RJD-SJB |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION**
**TO DEFENDANT VALE S.A.'S MOTION TO DISMISS**
**THE CONSOLIDATED CLASS ACTION COMPLAINT**

## TABLE OF CONTENTS

**Page(s)**

TABLE OF AUTHORITIES ......................................................................................................... iii

I.      PRELIMINARY STATEMENT ......................................................................................... 1

II.     FACTUAL BACKGROUND ............................................................................................... 4

        A.      Dam 1 Had a Significant, Heightened Risk of Collapse Throughout the
                Class Period ............................................................................................................. 4

        B.      Vale Wrongly Claims That Plaintiff Misinterprets Some of This
                Damning Evidence ................................................................................................... 6

        C.      Defendants Made Material Misrepresentations and Omissions
                Throughout the Class Period to Assure Investors About the Stability of
                Vale's Dams and its Effective Dam Safety and Risk Management
                Measures .................................................................................................................. 8

        D.      Defendants Knew or Recklessly Disregarded the Heightened
                Probability of Dam 1 Collapse and the Faulty Quality of Vale's Dam
                Safety Management and Risk Management Policies and Practices ........................ 9

        E.      Vale's Securities Prices Fell Precipitously When the Misrepresented
                and Concealed Risks Were Revealed ..................................................................... 11

III.    ARGUMENT ..................................................................................................................... 13

        A.      The Complaint Pleads a Strong Inference of Scienter ......................................... 14

                i.       The Complaint Alleges a Strong Inference of Scienter for the
                         Individual Defendants ............................................................................... 15

                ii.      The Complaint Pleads a Strong Inference of Corporate Scienter ............. 18

        B.      The Complaint Alleges Actionable Misrepresentations and Omissions ............... 20

                i.       The Alleged Misstatements and Omissions Concerning Dam
                         Conditions Were Materially False and Misleading When Made .............. 23

                ii.      The Alleged Misrepresentations and Omissions Concerning
                         Vale's Dam Safety and Risk Management Policies and
                         Practices Were Materially False and Misleading When Made ................. 25

iii.    The Alleged Misrepresentations and Omissions Regarding Vale's Commitment to Safety Were Materially False and Misleading When Made ............................................................... 28

C.    The Alleged Misrepresentations and Omissions are Not Protected by the Bespeaks Caution Doctrine or the PSLRA Safe Harbor ............................... 31

D.    The Complaint Adequately Alleges Loss Causation ........................................... 34

E.    The Complaint is Pled with Particularity ........................................................... 39

F.    Control Person Liability Under Section 20(a) of the Exchange Act is Adequately Alleged ........................................................................................... 40

IV.    CONCLUSION ................................................................................................................. 40

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ark. Teacher Ret. Sys. v. Bankrate, Inc.*,
  18 F. Supp. 3d 482 (S.D.N.Y. 2014) ...................................................................................24

*Ashcroft v. Iqbal*,
  129 S. Ct. 1937 (2009)........................................................................................................13

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
  493 F.3d 87 (2d Cir. 2007).................................................................................................17

*Bell Atlantic Corp. v. Twombly*,
  550 U.S. 544 (2007) ...........................................................................................................13

*Briarwood Investments Inc. v. Care Inv. Tr. Inc.*,
  2009 WL 536517 (S.D.N.Y. Mar. 4, 2009) .......................................................................33

*Bricklayers & Masons Local Union No. 5 Ohio Pension Fund v. Transocean Ltd.*,
  866 F. Supp. 2d 223 (S.D.N.Y. 2012) .................................................... 22, 26, 28, 36

*Christine Asia Co. v. Ma*,
  718 F. App'x 20 (2d Cir. 2017) ..........................................................................................17

*City of Providence v. Aeropostale, Inc.*,
  2013 WL 1197755 (S.D.N.Y. Mar. 25, 2013) ..............................................................32, 34

*Constr. Laborers Pension Tr. for S. California v. CBS Corp.*,
  2020 WL 248729 (S.D.N.Y. Jan. 15, 2020) .......................................................................39

*Credit Suisse First Boston Corp. v. ARM Fin. Group, Inc.*,
  2001 U.S. Dist. LEXIS 3332 (S.D.N.Y. Mar. 27, 2001) ....................................................33

*Dura Pharms., Inc. v. Broudo*,
  544 U.S. 336 (2005) ....................................................................................... 13, 35, 38

*ECA Local 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*,
  553 F.3d 187 (2d Cir. 2009)................................................................................................20

*Fidel v. AK Steel Holding Corp.*,
  2002 WL 31545952 (S.D. Ohio Sept. 19, 2002)..................................................................22

*Foley v. TransOcean Ltd.*,
  861 F. Supp. 2d 197 (S.D.N.Y. 2012) .................................................................................19

*Freudenberg v. E\*Trade Fin. Corp.*,
    712 F. Supp. 2d 171 (S.D.N.Y. 2010) ................................................................. 20, 22, 24, 27

*Galestan v. OneMain Holdings, Inc.*,
    348 F. Supp. 3d 282 (S.D.N.Y. 2018) ................................................................................16

*Ganino v. Citizens Utilities Co.*,
    228 F.3d 154 (2d Cir. 2000).................................................................................................28

*Glickenhaus & Co. v. Household Int'l, Inc.*,
    787 F.3d 408 (7th Cir. 2015).................................................................................................37

*In re Ambac Fin. Grp., Inc. Sec. Litig.*,
    693 F. Supp. 2d 241 (S.D.N.Y. 2010) ..................................................................................31

*In re Avon Sec. Litig.*,
    2019 WL 6115349 (S.D.N.Y. Nov. 18, 2019) ......................................................................17

*In re Bank of Am. Corp. Sec., Deriv. & ERISA Litig.*,
    2011 WL 3211472 (S.D.N.Y. July 29, 2011) .......................................................................14

*In re Barrick Gold Corp. Sec. Litig.*,
    341 F. Supp. 3d 358 (S.D.N.Y. 2018) ..................................................................................36

*In re Barrick Gold Sec. Litig.*,
    2015 WL 1514597 (S.D.N.Y. Apr. 1, 2015)..........................................................................16

*In re Bear Stearns Companies, Inc. Sec., Derivative, & ERISA Litig.*,
    763 F. Supp. 2d 423 (S.D.N.Y. 2011) ..................................................................................35

*In re BHP Billiton Ltd. Sec. Litig.*,
    276 F. Supp. 3d 65 (S.D.N.Y. 2017) ........................................................................ 26, 28, 29

*In re Bristol Myers Squibb Co. Sec. Litig.*,
    586 F. Supp. 2d 148 (S.D.N.Y. 2008) ..................................................................................36

*In re Carter-Wallace, Inc. Sec. Litig.*,
    220 F.3d 36 (2d Cir. 2000)...................................................................................................19

*In re Chicago Bridge & Iron Co. N.V. Sec. Litig.*,
    2019 WL 5287980 (S.D.N.Y. Oct. 18, 2019) .......................................................................37

*In re Countrywide Fin. Corp. Sec. Litig.*,
    588 F. Supp. 2d 1132 (C.D. Cal. 2008) .........................................................................24, 37

*In re Eletrobras Sec. Litig.*,
    245 F. Supp. 3d 450 (S.D.N.Y. 2017) .............................................................................17, 18

*In re Fannie Mae Sec. Litig.*,
  742 F. Supp. 2d 382 (S.D.N.Y. 2010) ...........................................................................27

*In re Lattice Semiconductor Corp. Sec. Litig.*,
  2006 U.S. Dist. LEXIS 262 (D. Or. Jan. 3, 2006)........................................................18

*In re Lehman Bros. Sec. & Erisa Litig.*,
  799 F. Supp. 2d 258 (S.D.N.Y. 2011) ...........................................................................38

*In re Massey Energy Co. Sec. Litig.*,
  883 F. Supp. 2d 597 (S.D.W. Va. 2012)..............................................................29, 31, 36

*In re MF Glob. Holdings Ltd. Sec. Litig.*,
  982 F. Supp. 2d 277 (S.D.N.Y. 2013) ...........................................................................39

*In re MGM Mirage Sec. Litig.*,
  2013 WL 5435832 (D. Nev. Sept. 26, 2013) .................................................................34

*In re Moody's Corp. Sec. Litig.*,
  599 F. Supp. 2d 493 (S.D.N.Y. 2009) ......................................................................19, 29

*In re NTL, Inc. Sec. Litig.*,
  347 F. Supp. 2d 15 (S.D.N.Y. 2004) .............................................................................39

*In re OSG Sec. Litig.*,
  12 F. Supp. 3d 622 (S.D.N.Y. 2014) .............................................................................18

*In re OSG Sec. Litig.*,
  971 F. Supp. 2d 387 (S.D.N.Y. 2013) ...........................................................................19

*In re Oxford Health Plans, Inc. Sec. Litig.*,
  187 F.R.D. 133 (S.D.N.Y. 1999)....................................................................................34

*In re Oxford Health Plans, Inc., Sec. Litig.*,
  51 F. Supp. 2d 290 (S.D.N.Y. 1999) .............................................................................18

*In re Pall Corp.*,
  2009 WL 3111777 (E.D.N.Y. Sept. 21, 2009)...............................................................14

*In re Petrobras Sec. Litig.*,
  116 F. Supp. 3d 368 (S.D.N.Y. 2015) ...........................................................................28

*In re Prudential Sec. Ltd. Pshps. Litig.*,
  930 F. Supp. 68 (S.D.N.Y. 1996)...................................................................................33

*In re Refco, Inc Sec. Litig.*,
  503 F. Supp. 2d 611 (S.D.N.Y. 2007) ...........................................................................16

*In re Salix Pharm., Ltd.*,
  2016 WL 1629341 (S.D.N.Y. Apr. 22, 2016)..................................................................17

*In re Sanofi Sec. Litig.*,
  155 F. Supp. 3d 386 (S.D.N.Y. 2016) ...........................................................................16

*In re Scholastic Corp. Sec. Litig.*,
  252 F.3d 63 (2d Cir. 2001)............................................................................................14

*In re Sirrom Capital Corp. Sec. Litig.*,
  84 F. Supp. 2d 933 (M.D. Tenn. 1999).........................................................................22

*In re Stone & Webster, Inc., Sec. Litig.*,
  414 F.3d 187 (1st Cir. 2005).........................................................................................32

*In re Van der Moolen Holding N.V. Sec. Litig.*,
  405 F. Supp. 2d 388 (S.D.N.Y. 2005) ...........................................................................14

*In re Veeco Instruments, Inc. Sec. Litig.*,
  235 F.R.D. 220 (S.D.N.Y. 2006)....................................................................................18

*In re Vivendi, S.A. Sec. Litig.*,
  838 F.3d 223 (2d Cir. 2016)....................................................................................31, 34

*In re Wash. Mutual, Inc. Sec., Derivative & ERISA Litig.*,
  694 F. Supp. 2d 1192 (W.D. Wash. 2009).....................................................................27

*In re Winstar Commc'ns*,
  2006 WL 473885 (S.D.N.Y. Feb. 27, 2006)..................................................................38

*In re: EZCorp, Inc. Sec. Litig.*,
  181 F. Supp. 3d 197 (S.D.N.Y. 2016) ...........................................................................32

*Johnson v. Siemens AG*,
  2011 WL 1304267 (E.D.N.Y. Mar. 31, 2011) ...............................................................17

*KBC Asset Mgmt. NV v. 3D Sys. Corp.*,
  2016 WL 3981236 (D.S.C. July 25, 2016) ....................................................................40

*Kline v. First W. Gov't. Sec.*,
  24 F.3d 480 (3d Cir. 1994)............................................................................................33

*Lapin v. Goldman Sachs Grp., Inc.*,
  506 F. Supp. 2d 221 (S.D.N.Y. 2006) ...........................................................................29

*Lefkoe v. Jos. A. Bank Clothiers*,
  2007 WL 6890353 (D. Md. Sept. 10, 2007) ..................................................................33

*Lentell v. Merrill Lynch & Co.*,
  396 F.3d 161 (2d Cir. 2005)................................................................35, 38

*Leonard F. v. Israel Discount Bank of N.Y.,*
  199 F.3d 99 (2d Cir.1999).....................................................................2

*Leykin v. AT & T Corp.,*
  423 F. Supp. 2d 229 (S.D.N.Y. 2006) ....................................................35

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
  797 F.3d 160 (2d Cir. 2015)................................................................3, 34

*Lormand v. US Unwired, Inc.*,
  565 F.3d 228 (5th Cir. 2009)................................................................32

*Meyer v. Jinkosolar Holdings Co., Ltd.*,
  761 F.3d 245 (2d Cir. 2014)........................................................ 26, 33, 37

*Milman v. Box Hill Sys. Corp.*,
  72 F. Supp. 2d 220 (S.D.N.Y. 1999) ....................................................33

*Mulligan v. Impax Labs., Inc.*,
  36 F. Supp. 3d 942 (N.D. Cal. 2014)....................................................32

*Nardy v. Chipotle Mexican Grill, Inc.*,
  2019 WL 3297467 (D. Colo. Mar. 29, 2019) .......................................37

*Novak v. Kasaks*,
  216 F.3d 300 (2d Cir. 2000)........................................................... 14, 30

*Ontario Teachers' Pension Plan Bd. v. Teva Pharm. Indus. Ltd.*,
  2019 WL 4674839 (D. Conn. Sept. 25, 2019) .....................................40

*Operating Local 649 Annuity Tr. Fund v. Smith Barney Fund Mgmt., LLC*,
  595 F.3d 86 (2d Cir. 2010)........................................................... 20, 25

*P. Stolz Family P'ship L.P. v. Daum*,
  355 F.3d 92 (2d Cir. 2004)..................................................................32

*Pennsylvania Pub. Sch. Employees' Ret. Sys. v. Bank of Am. Corp.*,
  874 F. Supp. 2d 341 (S.D.N.Y. 2012) .................................................19

*Plumbers & Pipefitters Nat. Pension Fund v. Orthofix Int'l N.V.*,
  89 F. Supp. 3d 602 (S.D.N.Y. 2015) ...................................................18

*Rescuecom Corp. v. Google Inc.*,
  562 F.3d 123 (2d Cir. 2009)................................................................13

*Richman v. Goldman Sachs Grp., Inc.*,
   868 F. Supp. 2d 261 (S.D.N.Y. 2012) ......................................................................28

*Rombach v. Chang*,
   355 F.3d 164 (2d Cir. 2004)......................................................................................34

*Shapiro v. UJB Financial Corp.*,
   964 F.2d 272 (3d Cir. 1992).......................................................................................27

*Solow v. Citigroup, Inc.*,
   827 F. Supp. 2d 280 (S.D.N.Y. 2011) ......................................................................20

*Suez Equity Inv'rs, L.P. v. Toronto-Dominion Bank*,
   250 F.3d 87 (2d Cir. 2001).........................................................................................19

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*,
   531 F.3d 190 (2d Cir. 2008)............................................................................ 14, 16, 17

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007) ........................................................................................ 13, 14, 15

*In re Vale S.A. Sec. Litig.*,
   2017 WL 1102666 (S.D.N.Y. Mar. 23, 2017) ........................................................32

*Virginia Bankshares, Inc. v. Sandberg*,
   501 U.S. 1083 (1991) ............................................................................................24, 33

*Weiner v. Quaker Oats Co.*,
   129 F.3d 310 (3d Cir. 1997)........................................................................................31

## Statutes

15 U.S.C. § 78t..............................................................................................................40

15 U.S.C. § 78u-4 .........................................................................................................14

15 U.S.C. § 78u- 4(b)(1)...............................................................................................20

## Rules

Fed. R. Civ. 9(b) ...........................................................................................................14

Fed. R. Civ. 12(b)(6) ...............................................................................................13, 20

## Regulations

17 C.F.R. § 240.10b-5..................................................................................................25

Court-appointed Lead Plaintiff Colleges of Applied Arts and Technology Pension Plan ("Plaintiff" or "CAAT Pension Plan") respectfully submits this memorandum of law in opposition to Defendant Vale S.A.'s ("Vale") motion to dismiss the Consolidated Class Action Complaint for Violations of the Federal Securities Laws (the "Complaint") (ECF No. 47).[1]

## I.    PRELIMINARY STATEMENT

The motion to dismiss makes all of the standard arguments that defendants make in securities fraud cases, but this is not an ordinary case. The Complaint's detailed allegations—thoroughly-sourced from publicly-available investigatory materials—provide alarming evidence that Dam 1 of the Córrego do Feijão mine was unstable throughout the Class Period,[2] and that Vale and its top executives, including the Individual Defendants, disregarded or actively sought to conceal it. An investigatory panel of Brazil's Senate, following months of examination of the internal documents of Vale and its third-party auditor, TÜV SÜD, and the sworn testimony of some of their top executives, including Defendants Schvartsman and Poppinga, produced a 400-page report that concluded that the catastrophic collapse of Dam 1 "was not an accident . . . . Vale management and the board knew the risks and decided to take them." ¶¶ 113-117.[3] Brazil's Federal Police, the state prosecutors, and other investigatory panels have likewise concluded that Vale and its top executives improperly ignored and concealed the problems with Dam 1. ¶¶ 108-112, 118-120. Defendants' disregard for safety was so great that state prosecutors recently announced

---

[1] Although the Complaint names five Individual Defendants in addition to Vale—former CEO Murilo Ferreira ("Ferreira"), former CEO Fabio Schvartsman ("Schvartsman"), current CFO Luciano Siani Pires ("Siani"), former Executive Director of Ferrous Minerals and Coal, Gerd Peter Poppinga ("Poppinga"), and current Executive Director of Sustainability and International Business, Luiz Eduardo Froes do Amaral Osorio ("Osorio")—only Vale has accepted service and appeared. Plaintiff is in the process of preparing service of the Complaint on the Individual Defendants, all of whom reside in Brazil, in accordance with the Hague Convention.

[2] The Class Period begins on July 28, 2016 and continues through February 6, 2019. ¶ 2.

[3] All references to "¶" or "¶¶" are to paragraphs in the Complaint. Any terms not defined herein shall have the same meaning set forth in the Complaint. All emphasis is added unless otherwise indicated. All references to "MTD" are to page numbers in Vale's memorandum of law in support of its motion to dismiss the Complaint.

criminal homicide charges against Defendants Vale and Schvartsman as well as 10 other Vale executives.[4] Federal charges are likely to follow.

The allegations in the Complaint leave no doubt that when Defendants spoke about the "impeccable" condition of its dams, its adherence to the "strictest international practices" for dam safety and risk management, and its commitment to safety with mottos like "life matters most," it knew full well that those statements were materially false and misleading. Remarkably, even in the face of its malfeasance and the tragedy that it caused, Vale asserted in the introduction to its brief that Vale "has a deep and long-standing commitment to safety" and minimized Dam 1's collapse by noting the number of dams that Vale operates. In Vale's telling, *it* is the actual victim— of Plaintiff and of the Brazilian government's failure to recognize the Company's supposed commitment to safety.

In its motion to dismiss, Vale argues that: (1) the Complaint alleges corporate mismanagement, not fraud; (2) the alleged misrepresentations are immaterial "puffery" or not false; (3) the Company had no duty to disclose the allegedly omitted facts; (4) its statements are protected by the bespeaks caution doctrine and PSLRA "safe harbor;" (5) scienter is inadequately alleged based primarily on the Individual Defendants' titles; (6) loss causation is inadequately alleged because the collapse of Dam 1 and subsequent reports did not reveal any undisclosed fact or risk, and; (7) fraud is not pled with particularity. MTD 2-3.

Each and every one of these positions is demonstrably wrong and should be rejected. As described more fully below, the alleged misrepresentations—about the condition of Vale's dams

---

[4] Press announcement by Minas Gerais state prosecutors available at: https://www mpmg mp.br/comunicacao/ noticias/mpmg-e-pcmg-finalizam-investigacoes-sobre-o-rompimento-da-barragem-em-brumadinho-16-pessoas-sao-denunciadas-por-homicidio-qualificado-e-crimes-ambientais htm. *See also, Leonard F. v. Israel Discount Bank of N.Y.,* 199 F.3d 99, 107 (2d Cir.1999) (judicial notice can be taken of complaints and legal proceedings, press releases, news articles, and published analyst reports).

2

and the risk of a catastrophic collapse, Vale's dam safety and risk management policies and practices, and its commitment to safety—were all highly material to investors, who were keenly concerned about the safety of Vale's tailings dams following the 2015 collapse of another dam co-owned by Vale. These are not "mere" allegations of "corporate mismanagement" because allegations that a company *lied* about dam safety management and risk management constitute *fraud*. *See infra*, Section III.B. Willful misrepresentations such as these have frequently been found to be actionable, and not "mere puffery," because they describe management practices that are important to investors and are belied by information known to Defendants. *See infra*, Sections III.B.i.-iii. They are not protected by the safe harbor or bespeaks caution doctrine because they: (1) are not purely forward-looking; (2) are not accompanied by "meaningful" cautionary language; and (3) were materially false and misleading when made. *See infra*, Section III.C.

Moreover, a strong inference of scienter is alleged by the numerous reports Defendants received or prepared showing Dam 1 was not stable and had a significant probability of failure—which Vale actively participated in papering over by pressuring its safety auditors to certify Dam 1's stability despite the dam's failing stability test scores. *See infra*, Section III.A.

Likewise, loss causation is amply alleged by the significant share price declines that occurred when the misrepresented and concealed risks of a catastrophic dam collapse materialized, and subsequent reports revealed the shoddy dam safety and risk management practices that contributed to the result. *See infra*, Section III.D.

Finally, the allegations of fraud are pled with particularity, as demonstrated by the relevant caselaw. *See infra*, Section III.E.

For these reasons, Vale's motion should be denied in its entirety.[5]

---

[5] In the event that any part of the Complaint is dismissed, Plaintiff requests leave to amend, which should be granted in the interests of justice. *See Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 190-192 (2d

## II.   FACTUAL BACKGROUND

### A.   Dam 1 Had a Significant, Heightened Risk of Collapse Throughout the Class Period

As set forth in the Complaint, Dam 1 was unstable and at a significant, elevated risk of collapse throughout the Class Period.[6] Those allegations include, *inter alia*, that:

- Throughout the Class Period, Dam 1's "Factor of Safety"[7] was consistently below the 1.3 level recommended by international organizations (¶ 10(b) n.6), which Vale claimed to apply (¶ 80). Specifically, Dam 1's Factors of Safety included: (1) 0.93 to 1.19 range in July 2016 (¶ 70); (2) 1.06 in November 2017 (¶ 88); (3) 1.09 in June 2018 (¶ 91), and; (4) 1.09 in September 2018 (¶ 94);

- Liquefaction[8] analyses prepared by Geoconsultoria in July 2016 found Factors of Safety ranging from 0.93 to 1.19, which suggested a roughly 50% probability of dam failure and should have caused Vale to trigger an "emergency level 3" under its emergency action plan for Dam 1, requiring evacuation of the area (¶ 70);

- On July 7, 2016, Defendant Poppinga ordered an ***immediate shutdown of Dam 1*** and asked subordinates "to ***assess reinforcement measures that can be implemented in a preventive manner***" in response to a "doubt that arose" regarding the dam (¶¶ 68-69);

- In February 2017, Vale retained Potamos Engineering to prepare a Geotechnical Risk Management report analyzing Dam 1's failure probability. ¶ 74. That report concluded that ***Dam 1's failure probability was 3 x 10^{-4}***, or three times Vale's risk tolerance (*id*.);

---

Cir. 2015). Indeed, substantial facts described in the criminal complaint against Defendants Schvartsman and Vale provide additional evidence supporting Plaintiff's allegations, which could be used in an amended complaint.

[6] Indeed, even prior to the start of the Class Period, Vale obtained a risk analysis for Dam 1 on December 18, 2015, which indicated a range of failure probabilities with results as high as a 50% likelihood of failure. ¶ 63.

[7] The "factor of safety" represents the ratio of resistance to load. It is the primary measure used to determine whether a Stability Condition Statement can be issued for a dam. ¶ 10(a) n. 5.

[8] Liquefaction is a phenomenon in which solids act like liquids. It was the cause of the Mariana dam collapse and is believed to be the cause of the Dam 1 collapse. ¶ 10(a)-(b) and n. 7.

4

- In November 2017, Vale's Geotechnical Risk Management department indicated that Dam 1's collapse risk (and that of 9 other dams), and its specific risk of liquefaction were ***both*** above the corporate-accepted risk tolerance (¶¶ 75-76);

- Documents produced by Vale's Geotechnical Risk Management department concerning expert panels convened in June 2018 and October 2018 continued to show that Dam 1 was at ***double*** the corporate-accepted risk level, that "***all saturated tailings are susceptible to liquefaction***," and that urgent actions were recommended to lower the water level of Dam 1 and "***to avoid triggering liquefaction***" (¶¶ 78-80, 84-86);

- Notwithstanding this information, a September 2018 Dam 1 Safety Audit reported numerous maintenance and monitoring problems, including indications of internal and external erosion, damaged and clogged drainage tubes, and missing or inconsistent data for important monitoring systems related to the dam's water table and stability (piezometers, flowmeters, and inclinometers), many of which had been previously reported to Defendants but not resolved (¶ 94 n.31); and

- Defendants failed to adequately respond to: (1) a failed attempt in June 2018 to install deep horizontal drains ("DHPs") in the base of Dam 1 that caused dangerous water leaks at precisely the point where liquefaction appears to have begun on January 25, 2019; (2) abnormal interferometric radar readings in March 2018, December 2018, and January 2019 concerning the monitoring of Dam 1's structure; and (3) inconsistent readings in several piezometers (water pressure gauges) in January 2019. ¶¶ 97-107.

Despite this mountain of alleged evidence demonstrating the instability of Dam 1 throughout the Class Period, Defendants failed to take any meaningful action to prevent the collapse of Dam 1 or mitigate the expected impacts of such a catastrophic collapse.

**B.**    **Vale Wrongly Claims That Plaintiff Misinterprets Some of This Damning Evidence**

Vale argues that Plaintiff has misunderstood certain evidence alleged in the Complaint (MTD 6-10), but these arguments are wrong for several reasons. **First,** Vale argues there was no particular Factor of Safety required for Vale's stability certifications under ***Brazilian law*** (MTD 7-8), but that is not what Plaintiff alleged. Plaintiff alleged that the ***international standard*** which Vale claimed to apply was a ***Factor of Safety of 1.3***, as described in Company documents. ¶¶ 80, 89. Vale signed stability certifications that did not meet its own standard, flouting its dam safety management policies and rendering statements that it applied standards in accordance with the "strictest international practices" materially false and misleading.

**Second,** Vale is wrong about the significance of Geoconsultoria's July 2016 liquefaction analyses. MTD 8-9. The analyses imply a roughly 50% probability of collapse based on the range of Factors of Safety found for the ***applicable*** undrained peak resistance measures (0.23 to 0.25), which were ***0.93 to 1.19***, as alleged.[9] The mean of these results is a Factor of Safety of 1.0, which implies a 50% probability of failure because it means that resistance is equal to pressure; thus, the slightest reduction of resistance or increase in pressure would trigger a collapse. This is far from stable, and indeed, Geoconsultoria concluded in its July 15, 2016 report that "***[t]he analyses performed here showed low safety coefficients***". MTD Ex. 11, p.10. Likewise, the Federal Police concluded that "after the release and the science of this liquefaction study prepared by Geoconsultoria, ***Vale should have triggered the Mining Dams Emergency Action Plan – B1 PAEBM, at level 3***[.]" That is the highest level of emergency, requiring evacuation.[10]

---

[9] The Factor of Safety results for undrained peak resistance of 0.23 were: 0.93, 0.96, 1.00, and 1.12. For an undrained peak resistance of 0.25, they were: 1.00, 1.02, 1.08, and 1.19.

[10] In this context, it should be clear that Geoconsultoria's statement that the dam's behavior in the past 10 years was "the best it could possibly be" was another way of saying that it was a miracle the dam had not already collapsed. Likewise, the other statements Vale references in the July 15, 2016 report only undermine the claim that dam rupture was unlikely, because they primarily describe assumptions about future events that did not occur. Specifically, the

6

**Third,** Vale incorrectly asserts that Plaintiff attributed Dam 1's November 2017 failure probability of $3x10^{-4}$ to Felipe Rocha's slides. MTD 9. Rather, it is the failure probability found by Potamos Engineering at that time. ¶ 74. If Dam 1 was, in fact, excluded from Vale's risk matrix then, it plainly violated Vale's risk management policy. Moreover, Vale's citation to a slideshow purportedly portraying which dams were included in its November 2017 risk matrix only highlights the fact that there were ***at least six dams in the unacceptably high-risk zone***—many of which were ***evacuated*** after the collapse of Dam 1 (¶¶123-124). That ***Defendants never disclosed*** this risk only bolsters Plaintiff's allegations that Defendants misrepresented the true risk of its dams.

**Fourth,** Vale disputes the meaning of an email showing it pressured its auditor to issue stability certifications for failing dams (MTD 10), but this is an issue for the trier of fact. Moreover, numerous documents and testimony cited in investigatory reports support Plaintiff's allegation, and those investigators likewise concluded that "***[t]he production, analysis, and review of reports suffered undue influence [by Vale]***, to ensure obtaining the legal requirement of the Stability Condition Statements (DCE)." ¶ 116(3).

**Finally,** Vale grossly misconstrues the October 2018 PIESEM report. MTD 10. As alleged in the Complaint, that report indicated a ***Factor of Safety of 1.1*** for Dam 1 (¶ 85), which was a very unstable condition. Moreover, it prescribed intensive restrictions in activities on or around the dam for the express purpose of "***aiming to avoid triggering liquefaction***". *Id*. If Vale wants to argue that this does not suggest an unacceptably high probability of failure, Plaintiff is happy to take that argument to a jury.

---

assumption that Vale would extract the tailings from the dam, which would decrease pressure on the dam, does not appear to have been borne out. In any event, the merit of premising current stability on future events is dubious.

### C.   Defendants Made Material Misrepresentations and Omissions Throughout the Class Period to Assure Investors About the Stability of Vale's Dams and its Effective Dam Safety and Risk Management Measures

Throughout the Class Period, Defendants misrepresented or failed to disclose:[11] (1) the true risk of Vale's dams, including the fact that at least one of its high-hazard tailings dams, Dam 1, had a high probability of failure;[12] (2) that Vale's dam safety management[13] and risk management[14] policies and practices were not being implemented as described with respect to Dam 1; (3) that Defendants were not conducting business in accordance with their purported commitment to safety and their repeated claims that "safety is our top priority" and "life matters most;"[15] and (4) in light of the foregoing, Defendants Ferreira, Schvartsman, and Siani falsely certified that Vale's 2016 and 2017 Annual Reports disclosed all fraud and did not contain any untrue statement of material facts or any material omissions (¶¶ 145, 187). Thus, Defendants' statements to investors were materially false and misleading, as discussed more fully in Section III.B., below.

---

[11] The Complaint also alleges a fraudulent scheme under SEC Rule 10b-5(a) and (c). *See* Count II at ¶¶ 237-242.

[12] *See e.g.*, ¶ 125 (downplaying the risks of Vale's dams by stating, "we practically have no upstream dams in our operation"); ¶ 135; ¶ 150 ("In 2016, 145 dams were audited in the ferrous metals area, and the respective statements of stability conditions were filed within the deadline"); ¶ 153; ¶ 155; ¶ 157; ¶ 174 (Schvartsman commenting on dam conditions in April 2018: "…*today the dams are impeccable*"); ¶ 189 ("…*100% of the audited structures were certified to be in stable condition, physically and hydraulically.*"); ¶ 195 ("…all the structures in the Ferrous area are completely normal and stability-certified…"); ¶ 199 (*Dam 1 "had a Safety Factor in accordance with the world's best practices and above the reference of the Brazilian Standard*").

[13] *See, e.g.*, ¶ 150 (detailed description of dam safety management practices and policies in 2016 Sustainability Report); ¶ 177; ¶¶ 188-193, 195 (descriptions of dam safety management in 2017 Sustainability Report).

[14] *See, e.g.*, ¶¶ 131-133, ¶ 137 ("The risk management policy requires that we regularly evaluate and monitor the corporate risks on a consolidated basis in order to guarantee that our overall risk level remains in accordance with our strategic guidelines."); ¶ 138 ("We mitigate operational risk with new controls and improvement of existing ones, new mitigation plans and transfer of risk through insurance."); ¶ 158; ¶167-172; ¶ 178; ¶¶ 181-182.

[15] ¶¶ 147-148 ("'*Life matters most' permeates Vale's activities*, which strives to achieve Zero Damage by investing in prevention, process standardization, risk management, and in the Genuine Active Care culture . . . ."); *see also,* ¶127 (Ferreira: "[W]e are driven by our commitment to safety to people and to preserve the environment" and stating that post-Mariana, "*we stood by our commitment to do what is right*."); ¶ 129 ("Sustainability is one of Vale's strategic pillars" with "[z]ero harm targeted throughout all operations" and "significant progress achieved," including a 17% reduction of health and safety incidents with high potential impact); ¶ 142; ¶¶ 160-164 ("*safety is our top priority*").

8

**D.**    **Defendants Knew or Recklessly Disregarded the Heightened Probability of Dam 1 Collapse and the Faulty Quality of Vale's Dam Safety Management and Risk Management Policies and Practices**

Defendants were fully informed about, or recklessly disregarded, the condition of Vale's dams, its dam safety management, and its risk management practices throughout the Class Period. The numerous internal reports described at Section II.A., above, indicated the extreme danger posed by Dam 1 and the insufficient preventative and mitigating actions being taken, and those reports were received by, or available to, Vale's Geotechnical Risk Management group, its Business Risk Management officials, the executives to whom they reported (*i.e.*, Defendants Poppinga and Siani, respectively), and the highest Company executives, as further described below.

***Defendant Schvartsman*.** Defendant Schvartsman was Vale's CEO during most of the Class Period. He stated that "[a]s soon as I started as president [in May 2017], I thought about the state of the dams. If there was another accident like Mariana's, my management would be short." ¶ 174. He therefore ordered a review of the conditions of the dams at that time, and reviewed the results. *Id*. Schvartsman was among the people who received the monthly Business Risk Management reports which included dam risks, and Defendant Poppinga testified that he conveyed all pertinent information about Dam 1 to Schvartsman. ¶ 65-66. Schvartsman signed the allegedly false Sarbanes-Oxley ("SOX") certification in Vale's 2017 Annual Report (¶ 187), evidencing he either knew about the allegedly misrepresented risks or that the controls he attested to were inadequate. And Schvartsman took a leave of absence from Vale under pressure from Federal and state prosecutors related to his role in the Dam 1 collapse (¶ 110), and is facing criminal homicide charges for the same.

***Defendant Poppinga.*** Defendant Poppinga was responsible for dam safety management in the Ferrous Minerals division, and his emails and testimony make clear that he was well-informed

about the stability conditions of those dams. ¶¶ 64, 67. Indeed, he was the official who ordered the closing of Dam 1 and an assessment of preventative "reinforcement measures" in July 2016 (¶¶ 68-69), and he supervised efforts to obtain stability certifications for all dams in the Ferrous Metals division (¶ 71). The "first line of defense" concerning dam safety management, Vale's Geotechnical Risk Management group, was under his leadership, and he testified that he had weekly meetings with his subordinates and had "all the necessary information to know if there was a more serious problem." ¶¶ 64-65. Poppinga took a leave of absence from Vale on the urging of Federal and state prosecutors due to his role in the Dam 1 collapse. ¶ 110.

Additionally, Poppinga's emails show he supervised efforts to obtain dam stability certifications (¶ 71), and employees in his group are alleged to have improperly edited safety audit reports and exerted pressure on safety auditors to obtain stability certifications notwithstanding Dam 1's failing stability test scores. ¶¶ 87-96. For instance, in an internal email between employees of one of Vale's dam auditors, the auditor noted that two of Vale's dams (Dam 1 and Forquila III) appeared to be failing their stability tests, and complained that "*as always Vale will throw us against the wall and ask: what if it doesn't pass, will you sign [the certification] or not?*" ¶ 92. Likewise, other emails referenced in investigatory reports show that Vale executives regularly reviewed and edited draft audit reports "to mitigate the description of the dam weaknesses". ¶ 87 n.30.

***Defendant Siani.*** Defendant Siani, Vale's CFO, headed its Business Risk Management Division, which was its "second line of defense" regarding dam risk management. ¶ 64. His group analyzed dam risks along with all business risks and maintained a risk matrix depicting Vale's tailings dam breach risk, which was reported monthly to Vale's Executive Directors. ¶¶ 64-65. Siani also signed the allegedly false SOX certifications in Vale's 2016 and 2017 Annual Reports

(¶¶ 145, 187), evidencing he either knew about the allegedly misrepresented risks or that the controls he attested to were inadequate.

*Defendants Ferreira and Osorio.* Defendants Ferreira (Vale's CEO prior to May 2017) and Osorio (its Executive Director of Sustainability and International Business from July 2017 to present) both received the monthly reports from the Business Risk Management group, which included dam risks. ¶¶ 64-65. Ferreira signed the allegedly false SOX certification in Vale's 2016 Annual Report (¶145), and was CEO during and after the Mariana dam collapsed, when Vale purportedly enacted a host of measures to ensure proper dam safety and risk management (¶¶ 5, 65). Similarly, as the head of the group responsible for creating the allegedly false and misleading 2017 Sustainability Report, which contained extensive details of Vale's purported dam safety management, Defendant Osorio should be knowledgeable of the matters discussed therein.

*Other Vale Managers and Employees.* Numerous additional executives and employees of Vale were involved in the alleged misconduct. Indeed, federal and state prosecutors advised Vale to terminate seven executives and employees for their involvement, and to immediately remove five others from "any function or activity . . . related to risk management and/or safety monitoring of dams." ¶ 110-111. Vale acquiesced. ¶ 112. Moreover, nine Vale employees, in addition to Defendant Schvartsman, have been charged by state prosecutors with homicide.

### E.    Vale's Securities Prices Fell Precipitously When the Misrepresented and Concealed Risks Were Revealed

Defendants' misstatements and omissions caused precipitous declines in the market value of Vale's Securities when the truth was revealed, causing Plaintiff and other Class members to suffer significant losses and damages. Specifically, the truth about the risk of a catastrophic dam collapse and the unstable condition of Dam 1 was first revealed by reports of the dam break on Friday, January 25, 2019. ¶ 204. On this news, share prices of Vale Securities declined in value,

11

including Vale ADSs, which fell $1.20 per share or over 8% to close at $13.66 per share on January 25, 2019. ¶ 205.

Over the weekend and on Monday, January 28, 2019, further information concerning the misrepresented and concealed risks of a catastrophic dam collapse emerged, including the launch of a Federal Prosecutor's task force to investigate the dam collapse, reports that 305 people were missing and 16 were confirmed dead, disclosure of regulatory fines and judicial attachment totaling approximately $3 billion, and Vale's suspension of dividends due to the breach (previously expected to total at least $4 billion in 2019-2021). ¶¶ 207-208. In response to these disclosures, Vale Securities declined in value, including Vale ADSs, which dropped by $2.46, almost 20%, to close at $11.20 per share on January 28, 2019. ¶ 209.

On February 4, 2019, reports emerged that Vale was ordered by a court to halt certain mining operations due to safety concerns raised by Dam 1's collapse. ¶ 210. On this news, Vale Securities declined in value, including its ADSs, which fell by $0.42, or 3.4%, to close at $12.15 per share. *Id*.

Finally, on February 6, 2019, further material news of Vale's faulty dam safety management and risk management practices emerged when it was reported that Vale had been forewarned by employees and inspectors that Dam 1 was at a high risk of rupture. ¶¶ 212-213. *The Guardian* reported in an article, "'That's going to burst': Brazilian dam workers say they warned of disaster," that at least three Vale employees had raised concerns about Dam 1's likely rupture after significant water leaks appeared on the dam face around July 2018. ¶ 212. Additionally, *The Wall Street Journal* reported that Vale had been warned in September 2018 by its auditor, TÜV SÜD, that "faulty water drainage and monitoring systems represented a potential risk of failure"

12

at Dam 1.[16] ¶ 213. On this news, Vale Securities again declined in value, including its ADSs, which dropped by $0.75, or over 6%, to close at $11.36 per share on February 6, 2019. ¶ 214.

## III.    ARGUMENT

The Complaint alleges material misrepresentations and omissions and a fraudulent scheme[17] involving violations of Section 10(b) of the Securities Exchange Act of 1934 by each of the Defendants. A Section 10(b) claim is properly stated where it alleges that defendants (1) made misstatements or omissions of material fact, (2) with scienter, (3) in connection with the purchase or sale of securities, (4) upon which plaintiffs relied, and (5) that plaintiffs' reliance was the proximate cause of their injury. *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005).

When considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "a court must accept as true all of the factual allegations set out in plaintiff's complaint, draw inferences from those allegations in the light most favorable to plaintiff, and construe the complaint liberally." *Rescuecom Corp. v. Google Inc.*, 562 F.3d 123, 127 (2d Cir. 2009). Furthermore, the court "must consider the complaint in its entirety." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). "[T]he court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically." *Id.* at 326.

A court may not dismiss the complaint if the plaintiff has stated "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009).

---

[16] News was also released after the close of trading on February 5, 2019 indicating that the court-ordered suspension of certain of Vale's mining activities had caused Vale to declare a *force majeure* on certain iron ore supply contracts.

[17] *See* Count II, at ¶¶ 237-242. Vale has not directly challenged this claim in its motion, and should therefore be precluded from doing so in its reply unless Plaintiff is provided an opportunity to respond.

The PSLRA and Rule 9(b) of the Federal Rules of Civil Procedure require that allegations of fraud be pled with particularity. 15 U.S.C. § 78u-4; Fed. R. Civ. P. 9(b). However, the PSLRA "does not require that plaintiffs plead with particularity every single fact upon which their beliefs concerning false or misleading statements are based." *Novak v. Kasaks*, 216 F.3d 300, 313 (2d Cir. 2000). "Rather, plaintiffs need only plead with particularity sufficient facts to support those beliefs." *Id.* at 313-14. Similarly, Rule 9(b) does "not require the pleading of detailed evidentiary matters in securities litigation." *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001). Indeed, "the application of Rule 9(b) ... must not abrogate the concept of notice pleading." *In re Van der Moolen Holding N.V. Sec. Litig.*, 405 F. Supp. 2d 388, 397 (S.D.N.Y. 2005).

As set forth below, the Complaint satisfies all applicable pleading standards and should be upheld.

### A.      The Complaint Pleads a Strong Inference of Scienter

In evaluating scienter, "[t]he inquiry is…whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs,* 551 U.S. at 322-23 (emphasis in original). A plaintiff may establish scienter by alleging facts showing that defendants "(1) benefitted in a concrete and personal way from the purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had access to information suggesting that their public statements were not accurate; or (4) failed to check information they had a duty to monitor." *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.,* 531 F.3d 190, 194 (2d Cir. 2008); *Novak*, 216 F.3d at 311; *In re Pall Corp.*, 2009 WL 3111777, at *6 (E.D.N.Y. Sept. 21, 2009).[18] The inference of scienter need not be more

---

[18] Moreover, "[a]n egregious refusal to see the obvious, or to investigate the doubtful, may in some cases give rise to an inference of . . . recklessness." *Novak*, 216 F.3d at 308 (citations omitted); *see also In re Bank of Am. Corp. Sec., Deriv. & ERISA Litig.*, No. 09 MD 02058, 2011 WL 3211472, at *9 (S.D.N.Y. July 29, 2011) (same).

14

likely than any plausible opposing inference; a tie goes to the plaintiff. *Tellabs,* 551 U.S. at 324.

In accordance with these standards, the Complaint alleges ample evidence establishing a strong inference that Defendants knew or recklessly disregarded evidence of Dam 1's instability and Vale's faulty dam safety management and risk management, including: (1) reports concerning Dam 1's unstable and dangerous condition  that were circulated or available to the Individual Defendants, contradicting Defendants' statements; (2) Defendant Poppinga's emails directly demonstrating his knowledge of Dam 1's instability and his oversight of the dam safety certification process; (3) statements by Defendants Schvartsman and Poppinga admitting knowledge of dam safety conditions; (4) leaves of absence and/or terminations of key Vale executives, including Schvartsman and Poppinga, due to their roles in the Dam 1 collapse; (5) the allegedly false and misleading SOX certifications by Defendants Ferreira, Schvartsman, and Siani, and; (6) Vale's conscious behavior of improperly editing dam safety audit reports to conceal the associated risks, and pressuring auditors to issue stability certifications for failing dams.

### i.    The Complaint Alleges a Strong Inference of Scienter for the Individual Defendants

Vale suggests that Plaintiff relies *solely* on the Individual Defendants' positions to allege what they knew or should have known, and that Defendant Poppinga's own emails and those of his subordinates concerning discussions with Poppinga are not sufficient to plead scienter. Contrary to Vale's argument, there are extensive allegations supporting a strong inference of scienter, which properly include—but are not limited to—the Individual Defendants' positions and Defendant Poppinga's emails.

First, as described in Section II.A., above, the Complaint identifies numerous internal reports and other documents available to the Individual Defendants that evidence the instability and grave collapse risk of Dam 1 throughout the Class Period. Moreover, the Complaint alleges

15

several bases by which the Individual Defendants knew, or should have known, of the information contained in these reports. For instance, according to Vale documents cited in the Complaint (¶ 77), dam risks that exceeded corporate risk tolerance levels were included in Vale's business risk matrix and presented monthly to Vale's CEO (including Defendants Ferreira and Schvartsman), board of directors, and Executive Directors (including Defendants Siani, Poppinga, and Osorio). ¶¶ 64-65. It is undisputed that Dam 1's failure probability exceeded corporate risk tolerances in 2018 (¶¶ 78-79), and there is evidence that it did in 2017 as well (¶¶ 74-76). Additionally, Defendant Poppinga was in charge of Vale's Geotechnical Risk Management group, its "first line of defense" concerning dam safety, and Defendant Siani was in charge of its "second line of defense," the Business Risk Management Group. Defendant Osorio was in charge of the corporate Sustainability division, responsible for monitoring and reporting on dam safety and related measures. Thus, the allegations show that the Individual Defendants had access to internal reports contradicting their statements.

The allegations concerning these internal reports support a strong inference of scienter. *In re Refco*, *Inc Sec. Litig.*, 503 F. Supp. 2d 611, 649 (S.D.N.Y. 2007) ("[S]cienter may be found where there are 'specific allegations of various reasonably available facts, or 'red flags,' that should have put the officers on notice' that the public statements were false."); *Dynex,* 531 F.3d 190, 195 ("[W]hen contradictory facts of critical importance to the company either were apparent, or should have been apparent, an inference arises that high-level officers and directors had knowledge of those facts by virtue of their positions with the company."[19]

---

[19] Vale argues that these allegations are insufficient because Plaintiff is required to allege that a particular defendant reviewed a particular report. That is not the law. Courts in this circuit have repeatedly held that a plaintiff can plead scienter by alleging the existence of circumstantial evidence that the information reached or was accessible to defendants. *See In re Barrick Gold Sec. Litig.,* No. 13 CIV. 3851 SAS, 2015 WL 1514597, at *11 (S.D.N.Y. Apr. 1, 2015) (allegations sufficient where "defendants had access to information in the form of monthly progress reports and statements from the Project Manager"); *Galestan v. OneMain Holdings, Inc.*, 348 F. Supp. 3d 282, 300-301 (S.D.N.Y. 2018) (allegations sufficient where specific reports were circulated and individual defendants attended meetings in

16

Second, Defendant Poppinga's own emails show that he: (1) was aware of Dam 1's unstable condition, as he personally ordered the dam be closed in July 2016,[20] and; (2) supervised efforts to obtain stability certifications for all dams in the Ferrous Minerals division and followed-up when there were problems (¶ 71), which is strong circumstantial evidence that he knew or should have known about the failing stability test scores of one or more of those dams, and that Vale employees improperly applied pressure on auditors to provide certifications that were not supported by the stability test results (¶¶ 87-96). Poppinga's July 2016 email also strongly suggests that he knew of the preliminary findings of Geoconsultoria's July 2016 liquefaction analyses when he ordered the closure of Dam 1, as he specifically referenced "all the tests and additional calculations that are in progress" (¶ 68), and Geoconsultoria's report eight days later noted that Dam 1 had been shut down (MTD Ex. 11, p.11). Hence, there were clearly ongoing communications between Geoconsultoria and Defendant Poppinga or his team in that time frame.

Third, scienter is also supported by the statements Defendants Schvartsman and Poppinga made ***expressly admitting to knowledge of dam safety conditions***. *See* ¶ 174 (Schvartsman's statements) and ¶ 65 (Poppinga's). *In re Salix Pharm., Ltd.*, No. 14-CV-8925 (KMW), 2016 WL 1629341, at *14 (S.D.N.Y. Apr. 22, 2016) (scienter adequately alleged by CFO's statement that

_____

which problems were discussed); *In re Eletrobras Sec. Litig.,* 245 F. Supp. 3d 450, 468 (S.D.N.Y. 2017) (internal audit report circulated to CEO and board of directors supported strong inference of scienter); *see also*, *In re Avon Sec. Litig.,* 2019 WL 6115349, at *19-20 (S.D.N.Y. Nov. 18, 2019) (no need to identify specific internal documents supporting fraud). The cases cited by Vale are distinct. *See Dynex,* 531 F.3d at 196 (rejected allegations where plaintiff referenced only "raw data" and did not allege the "data had been collected into reports"); *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 104 (2d Cir. 2007) (only allegation of scienter was an inference based on defendant's stock trading pattern); *In re Sanofi Sec. Litig.,* 155 F. Supp. 3d 386, 407 (S.D.N.Y. 2016) (could not base scienter on "unreported findings of an unreported internal investigation"); *Johnson v. Siemens AG*, No. 09-CV-5310 JG RER, 2011 WL 1304267, at *16 (E.D.N.Y. Mar. 31, 2011) (complaint admitted that senior management was "not routinely presented with the daily reports and other metrics" and failed to allege that information in the reports would have revealed that positive statements did not have a reasonable basis).

[20] Contrary to Vale's argument (MTD 29), additional emails alleged between Poppinga's direct subordinates discussing problems with Dam 1 that they planned to present to Poppinga (¶¶ 82-83) is further evidence of Poppinga's knowledge of such matters. *Christine Asia Co. v. Ma*, 718 F. App'x 20, 23 (2d Cir. 2017) (ruling it was "virtually inconceivable" that important information was not communicated from subordinates to individual defendants).

17

"we have visibility in the inventories because we know what we ship, we know what pulls through, we know what returns are").

Additionally, scienter is supported by the leaves of absence, resignations, and/or terminations of key Vale executives, including Defendants Schvartsman and Poppinga, as well as both of Poppinga's direct reports (Lucio Cavalli and Silmar Silva) and several other employees referenced in the Complaint (*i.e.*, Alexandre Campanha, Marilene Lopes, and Cesar Grandchamp), which were tendered in response to a formal request by Federal and local prosecutors based on those executives' role in relation to Dam 1's collapse. ¶¶ 110, 112. *See In re Eletrobras Sec. Litig.*, 245 F. Supp. 3d 450, 469 (S.D.N.Y. 2017) (allegations of CEO's removal amid internal investigation supported strong inference of scienter); *Plumbers & Pipefitters Nat. Pension Fund v. Orthofix Int'l N.V.*, 89 F. Supp. 3d 602, 619 (S.D.N.Y. 2015) ("[T]he timing and circumstances of individual defendants' resignations may add some further weight to an overall inference of scienter."); *In re OSG Sec. Litig.,* 12 F. Supp. 3d 622, 633 n. 84 (S.D.N.Y. 2014) (collecting cases).

Finally, the allegedly false SOX certifications by Defendants Ferreira, Schvartsman, and Siani (¶¶ 145, 187) support an inference of their scienter. In this Circuit, "a failure to maintain sufficient internal controls to avoid fraud is sufficiently indicative of scienter." *In re Veeco Instruments, Inc. Sec. Litig.,* 235 F.R.D. 220, 232 (S.D.N.Y. 2006); *In re Oxford Health Plans, Inc., Sec. Litig.*, 51 F. Supp. 2d 290, 294 (S.D.N.Y. 1999); *see also*, *In re Lattice Semiconductor Corp. Sec. Litig.*, 2006 U.S. Dist. LEXIS 262, at *50 (D. Or. Jan. 3, 2006) ("[T]he [false] Sarbanes-Oxley certifications give rise to an inference of scienter because they provide evidence either that defendants knew about the . . . over-reporting of [assets] . . . or, alternatively, knew that the controls they attested to were inadequate…").

### ii.     The Complaint Pleads a Strong Inference of Corporate Scienter

The Complaint's allegations are more than sufficient to establish a strong inference of

18

corporate scienter through the scienter of the Individual Defendants and other high-level employees,[21] which may be imputed to Vale. *In re Moody's Corp. Sec. Litig.*, 599 F. Supp. 2d 493, 515-16 (S.D.N.Y. 2009) ("There is no formulaic method or seniority prerequisite for employee scienter to be imputed to the corporation, but scienter by management-level employees is generally sufficient to attribute scienter to corporate defendants."); *Pennsylvania Pub. Sch. Employees' Ret. Sys. v. Bank of Am. Corp.*, 874 F. Supp. 2d 341, 363 (S.D.N.Y. 2012) (corporate scienter alleged based on knowledge of senior managers and vice presidents who were not named defendants).

Moreover, a strong inference of conscious behavior is supported by the allegations that Vale employees exerted inappropriate pressure on its auditors to obtain stability certifications notwithstanding Dam 1's failing stability test scores, and improperly edited audit reports *See* Section II.C and ¶¶ 87-96. *See Suez Equity Inv'rs, L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 100 (2d Cir. 2001) (doctoring and disseminating reports sufficiently alleged conscious misbehavior).[22]

Vale argues that the allegations of improper influence over Vale's auditors are insufficient because the Complaint does not specify who at Vale was involved in influencing the reports. MTD 33. This is false. The Complaint specifically references the involvement of the following Vale

---

[21] For instance, Vale does not and cannot dispute that Lucio Cavalli and Alexandre Campanha knew about the dangers of Dam 1. ¶¶ 64 n. 17, 68-70, 78-86.

[22] Vale brazenly argues that Plaintiff "concedes" that these stability certifications constituted "independent" verifications of Dam 1's safety, and that Vale relied in good faith on those verifications, defeating scienter. MTD 31. Plaintiff concedes no such thing, and in fact, alleges the opposite. Thus, the cases Vale cites are inapposite to the extent they concern good faith reliance on reports, since Vale did not act in good faith here. Additionally, *In re Carter-Wallace, Inc. Sec. Litig.,* 220 F.3d 36 (2d Cir. 2000) (MTD at 31-32) does not apply because it concerned allegations of sporadic, individualized reports of potential adverse patient reactions that were not statistically significant and therefore did not plead scienter. Likewise, in *Foley v. TransOcean Ltd.,* 861 F. Supp. 2d 197 (S.D.N.Y. 2012), the derogatory information plaintiffs alleged was omitted consisted of a "handful" of "sporadic" "human error incidents." *Id.* at 210-212. There was no allegation of internal or external reports finding that the Deepwater Horizon rig presented unusual safety risks. *Id.* at 212-13. Finally, in *In re OSG Sec. Litig.*, 971 F. Supp. 2d 387 (S.D.N.Y. 2013), the allegedly undisclosed information related to tax liabilities, and the court found there was reasonable ambiguity as to the proper tax treatment of the transactions. The defendants—who were not tax experts—could not be charged with knowledge of falsity. *Id.* at 410-12.

19

executives in pressuring its auditors and revising draft audit reports: Cristina Malheiros (¶ 87 n.30), Felipe Rocha (¶ 92), Marilene Lopes (*id.*), and Cesar Grandchamp (*id.*), as well as the likely involvement of others (*see* ¶ 87 n.30 (referencing Federal Police conclusion that "various Vale employees" edited audit reports and that "higher ranking officials" were involved)). These Vale executives were within Defendant Poppinga's division, and are all criminally-charged in the state case.

Moreover, Plaintiff need not identify each individual involved in order to support a strong inference of scienter. *See Solow v. Citigroup, Inc.*, 827 F. Supp. 2d 280, 291 (S.D.N.Y. 2011) (plaintiff "need not identify specifically the individuals at Citigroup who acted with scienter in order to plead scienter with respect to Citigroup"). Thus, Vale's alleged doctoring of audit reports and dissemination of improper stability certifications supports a strong inference of conscious misbehavior.

### B.     The Complaint Alleges Actionable Misrepresentations and Omissions

A securities fraud complaint adequately pleads a false or misleading statement by "specify[ing] each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading." 15 U.S.C. § 78u - 4(b)(1). Additionally, any misrepresentation or omission must be material. However, materiality is "a mixed question of law and fact, and a complaint may not be dismissed under Rule 12(b)(6) on the ground that the alleged misstatements or omissions are not material 'unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance.'" *Operating Local 649 Annuity Tr. Fund v. Smith Barney Fund Mgmt., LLC*, 595 F.3d 86, 91 (2d Cir. 2010) (*quoting ECA Local 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 197 (2d Cir. 2009). "The materiality requirement poses a very low burden…Thus, the trier of fact usually decides the issue of materiality." *Freudenberg v. E\*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 181

20

(S.D.N.Y. 2010).

The Complaint satisfies these standards by alleging that, throughout the Class Period, Defendants made material misstatements and omissions regarding the following four subjects:

(1) ***Defendants misrepresented the condition of Vale's dams and the risk of a catastrophic collapse***, claiming the dams were in "***impeccable***" and stable condition, and only disclosing in boilerplate fashion that "the mining industry is generally subject to significant risks and hazards, including…incidents involving dams" (¶139), when Defendants knew that Dam 1 was unstable and had a heightened probability of catastrophic collapse throughout the Class Period;

(2) ***Defendants misrepresented Vale's dam safety management and risk management policies and practices***, providing extended, detailed descriptions of its efforts to monitor and maintain its dams in accordance with the "***strictest international practices***," and assuring investors that Vale mitigated operational risks and monitored such risks "to ***guarantee*** that our overall risk level remains in accordance with our strategic guidelines," when in fact Vale was pressuring dam safety auditors to paper over failing stability tests in contravention of Vale's policies, and it had not taken sufficient measures to reduce the probability of Dam 1's collapse or mitigate the impact;

(3) ***Defendants misrepresented Vale's commitment to safety and sustainability***, repeatedly touting that "life matters most" and "safety is our top priority," emphasizing the importance of these commitments to its success, and illustrating them with specific "***achievements***," despite Defendants' true, blatant disregard for safety demonstrated by its secret efforts to conceal the ongoing failing stability test results for Dam 1, and its

21

failure to relocate or evacuate the offices and cafeteria downstream of Dam 1 despite analyses that showed the buildings would be nearly instantaneously destroyed in the event of collapse, causing a significant loss of life (¶ 119); and

(4) In light of the above, Defendants Ferreira, Schvartsman, and Siani falsely certified that Vale's 2016 and 2017 Annual Reports disclosed all fraud and did not contain any untrue statement of material facts or any material omissions (¶¶ 145, 187).

These alleged misrepresentations and omissions were material to investors, as demonstrated by the precipitous declines in the market value of Vale Securities when the misrepresented and concealed risks materialized or were disclosed. ¶¶ 201-215. Moreover, in an industry as dangerous as mining, "it is to be expected that investors will be greatly concerned about an operator's safety[.]" *Bricklayers & Masons Local Union No. 5 Ohio Pension Fund v. Transocean Ltd.*, 866 F. Supp. 2d 223, 244 (S.D.N.Y. 2012) (holding statements that company "conducted 'extensive' training and safety programs" were material to investors in dangerous deepwater drilling industry).

This case is not, as Vale contends, a matter of mere "corporate mismanagement." MTD 12. Rather, Defendants' misrepresentations and omissions—even if they concern matters of faulty dam safety management and risk management—constitute securities fraud. *See, e.g.*, *Freudenberg*, 712 F. Supp. 2d at 193 ("Because Plaintiffs allege that Defendants intentionally misled the public, rather than simply making bad business decisions, Plaintiffs have pled more than mere mismanagement."); *accord Fidel v. AK Steel Holding Corp.*, 2002 WL 31545952, at *5 (S.D. Ohio Sept. 19, 2002); *In re Sirrom Capital Corp. Sec. Litig.*, 84 F. Supp. 2d 933, 941 (M.D. Tenn. 1999) (same).

Vale also contends that the vast majority of the alleged misstatements—41 out of 48, by

22

their count—are inactionable puffery, and that the remaining alleged misrepresentations are not false or misleading. MTD 13. As discussed more fully below, Vale's arguments are meritless and should be rejected.

### i. The Alleged Misstatements and Omissions Concerning Dam Conditions Were Materially False and Misleading When Made

Vale argues that the alleged misstatements and omissions concerning dam safety conditions are inactionable because the statements are either immaterial puffery or truthful. Contrary to these arguments, the statements were highly material to investors and rendered false and misleading by the omission of facts demonstrating that Dam 1 was unstable and the Company's stability certifications were unreliable, which facts Defendants knew or recklessly disregarded.

Throughout the Class Period, Defendants represented that Vale's dams were in safe—and even "impeccable"—condition, and touted the dams' Certificates of Stable Condition by outside auditors despite knowing or recklessly disregarding that: (1) Dam 1 was at a heightened risk of catastrophic collapse throughout the Class Period (according to, *inter alia*, 2016 liquefaction analyses, a 2017 failure risk analysis, and failing Factor of Safety scores); (2) Dam 1's Factor of Safety scores did not support its Certificates of Stable Condition; and (3) Vale was systematically pressuring outside auditors to issue the stability certificates for Dam 1 and other dams when the dams failed to achieve the necessary Factors of Safety (equal to or greater than 1.3, according to Vale's and international standards). Thus, Vale's statement that Dam 1 *"had a Safety Factor in accordance with the world's best practices and above the reference of the Brazilian Standard"* was false, and its repeated touting of the issuance of Certificates of Stable Condition for its dams was materially misleading given Defendants' knowledge that these certificates were not supported by the requisite measure of stability.

Nevertheless, Vale claims that most of these statements are "puffery" due to the use of

vague words or "soft adjectives." For instance, Vale claims that the words "extraordinary" and "anomalies" render statements that Vale "conducted **extraordinary** audits on the stability conditions of our upstream dams, and **no anomalies** were identified" (¶¶ 135, 157) too vague to support liability. MTD 14. However, whether any "anomalies" (i.e., irregularities) were found in an audit of stability conditions is subject to verification through discovery. Similarly, "extraordinary" in this statement simply refers to the fact that the audit was not a periodic one, but was specially ordered by the state (as the prior sentence explains, (¶¶ 135, 157)). Misstatements such as these "are reasonably understood to rest on a factual basis that justifies them as accurate, the absence of which renders them misleading." *Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1093 (1991). Therefore, they are not puffery.

Likewise, Schvartsman's description of Vale dams as "impressive" and "impeccable" are not vague puffery in this context, where the statements are extremely incongruent with the true condition of Dam 1 at the time.[23] *See, e.g., Ark. Teacher Ret. Sys. v. Bankrate, Inc.*, 18 F. Supp. 3d 482, 485 (S.D.N.Y. 2014) ("[W]hile a term like 'high quality' might be mere puffery or insufficiently specific to support liability in some contexts, it is clearly a material misrepresentation when applied to assets that are entirely worthless"); *Freudenberg*, 712 F. Supp. 2d at 185 (statements about "discipline" were actionable based on "the glaring disparity between E*TRADE's operations and Defendants' statements"); *In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1144 (C.D. Cal. 2008) ("where a company's essential operations were so at odds with the company's public statements [,] ... many statements that would not be actionable in the vast majority of cases are rendered cognizable to the securities laws").

---

[23] For the same reason, Vale's argument that statements that its dams "are completely normal" and "safe and operating within normal limits" are vague puffery should be rejected. The safe and "normal" operating limits of Vale's dams should be objectively verifiable, but even if they are vague terms, the unstable condition of Dam 1 was such a stark contrast to what can be considered "safe" or "normal" as to render the statements materially false or misleading.

Vale also argues that its statements that its dams were certified as stable by outside auditors are not actionable because they are literally true (MTD 17), but "[t]he veracity of a statement or omission is measured not by its literal truth, but by its ability to accurately inform rather than mislead prospective buyers." *Operating Local 649 Annuity Tr. Fund v. Smith Barney Fund Mgmt. LLC*, 595 F.3d 86, 92 (2d Cir. 2010); *see also* 17 C.F.R. § 240.10b-5 (prohibiting "omit[ting] to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading."). Where, as alleged here, Defendants knew or recklessly disregarded that the stability certificates were not reliable indicators of stability because some of the dams (including Dam 1) had failed the requisite stability tests, Defendants' repeated touting of the certificates to assure investors of dam safety and low risk were materially false and misleading when made.

### ii.    The Alleged Misrepresentations and Omissions Concerning Vale's Dam Safety and Risk Management Policies and Practices Were Materially False and Misleading When Made

Vale argues that the alleged misrepresentations and omissions concerning its dam safety and risk management policies and practices are not actionable because they are too general to be relied upon and did not constitute a "guarantee of anything." MTD 13. Contrary to Vale's contentions, the alleged misrepresentations are very detailed and specific, and similar statements have repeatedly been found actionable by numerous courts.

First, the alleged misrepresentations are not "simple and generic" statements of policies and procedures. MTD 15. Rather, they provided extensive details to assure investors about the effectiveness of Vale's dam safety and risk management practices, upon which reasonable investors could and did rely. For instance, Vale's 2016 Sustainability Report represented that Vale's dams use "advanced engineering techniques, following strict controls, monitoring their performances in a systemic way, and evaluating safety conditions through annual external audits,"

25

with recommendations from audits incorporated in "an Action Plan that is internally monitored by the auditors." ¶ 150. It indicated that such Action Plans were filed with the state regulatory agency in 2016, and "are duly followed up by Vale managers and auditors." *Id.* The Report also provided details of the visual inspections and monitoring instruments used to monitor the dams, noting that "[t]he information gathered in inspections and in data obtained through monitoring instruments installed in the dams is recorded in auditable systems and analyzed by geotechnical engineers, who periodically evaluate if the conditions raised in the field and the readings from instruments are in accordance with the normal operating conditions of the structures." *Id.* And the Report detailed the periodic maintenance Vale's dams undergo, noting that "all dams, even if no longer in operation, remain under its responsibility and are monitored, audited, and maintained normally under the same criteria and safety levels adopted during their operation."[24] *Id.*

Detailed allegations such as these are actionable where, as here, "the failure to disclose that the prophylactic steps were then failing to prevent serious ongoing . . . problems ***rendered that description misleading***." *Meyer v. Jinkosolar Holdings Co., Ltd.*, 761 F.3d 245, 250 (2d Cir. 2014) (emphasis added). Indeed, these statements are materially misleading even if they are "technically true," and despite not guaranteeing compliance:

> [T]he description of pollution-preventing equipment and 24-hour monitoring teams gave comfort to investors that reasonably effective steps were being taken to comply with applicable environmental regulations. To be sure, these descriptions did not guarantee 100% compliance 100% of the time . . . . However, investors would have been misled by a statement such as that quoted above if in fact the equipment and 24-hour team were then failing to prevent substantial violations of the Chinese regulations.

*Id.* at 251; *see also, In re BHP Billiton Ltd. Sec. Litig.*, 276 F. Supp. 3d 65, 79-80 (S.D.N.Y. 2017) (upholding alleged misrepresentations of company's safety, risk management, and monitoring

---

[24] The 2017 Sustainability Report contained similar detailed information about dam safety management. *See, e.g.*, ¶¶ 188-193, 195.

26

protocols); *Transocean*, 866 F. Supp. 2d 223, 244 (finding actionable statements that the company "conducted 'extensive' training and safety programs").

Likewise, statements about the adequacy of risk management operations and capabilities may be false and misleading where the speaker knows, or should know, that such operations are inadequate to manage the company's risks. *In re Fannie Mae Sec. Litig.,*742 F. Supp. 2d 382, 404–06 (S.D.N.Y. 2010) (finding actionable misstatements that risk management was "appropriate" based on allegations of knowledge that risk management was inadequate for Fannie Mae's subprime assets); *see also In re Wash. Mutual, Inc. Sec., Derivative & ERISA Litig.,* 694 F. Supp. 2d 1192, 1208–09 (W.D. Wash. 2009) (falsity sufficiently alleged for thirteen statements representing that the company maintained "appropriate policies, standards and limits designed to maintain risk exposures" where the company "had in fact weakened its risk management practices in order to increase loan volume").

Defendants here represented, among other things, that "[t]he main operational risks are periodically monitored, ***ensuring the effectiveness of preventative and mitigating key controls in place and the execution of the risk treatment strategy***" (¶ 132), when in reality, Defendants knew or should have known of the heightened risk of Dam 1's collapse, that recommended preventative measures like the lowering of Dam 1's water level had not been completed, and that mitigation measures required by Dam 1's emergency action plan, such as the evacuation of administrative buildings downstream of the dam, had not been attempted. Thus, Defendants' statements are actionable. *Freudenberg*, 712 F. Supp. 2d at 189 ("[M]isstatements regarding risk management, discipline, monitoring and credit quality are not 'puffery' where, as alleged here, they were 'misrepresentations of existing facts.'") (internal citation omitted); *see also*, *Shapiro v. UJB Financial Corp.,* 964 F.2d 272, 282 (3d Cir. 1992) ("By addressing the quality of a particular

27

management practice, a defendant declares the subject of its representation to be material to the reasonable shareholder, and thus is bound to speak truthfully.").

### iii. The Alleged Misrepresentations and Omissions Regarding Vale's Commitment to Safety Were Materially False and Misleading When Made

Vale argues that the alleged misrepresentations of its commitment to safety and sustainability are inactionable puffery; however, such statements have frequently been held actionable where, as here, "the statements are 'made repeatedly in an effort to reassure the investing public' about matters particularly important to the company and investors". *In re BHP Billiton*, 276 F. Supp. 3d at 79 (citing *In re Petrobras Sec. Litig.*, 116 F. Supp. 3d 368, 381 (S.D.N.Y. 2015)). Moreover, Defendants emphasized the importance of Vale's sustainability commitment to the success of its business, which further supports the materiality of such alleged misrepresentations and omissions.

"Whether a representation is 'mere puffery' depends, in part, on the context in which it is made." *In re Petrobras*, 116 F. Supp. 3d at 381; *see also, Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 162 (2d Cir. 2000) ("[W]hether an alleged misrepresentation or omission is material necessarily depends on all relevant circumstances of the particular case."). Even where the alleged statements are "general enough that, had they been made in isolation, they might not be actionable," numerous courts have found that the repeated touting of such statements "over and over and over" precludes finding the statements immaterial as a matter of law. *In re BHP Billiton*, 276 F. Supp. 3d at 80 (finding actionable statements regarding BHP's "relentless focus on the health and safety of our people and the communities in which we operate" and its "overriding commitment . . . to ensuring the safety of our people, and respecting our environment and the communities in which we work."); *Transocean*, 866 F. Supp. 2d at 244 (upholding alleged misrepresentations because "[t]he Court cannot say, as a matter of law, that Transocean's

28

representation that [safety and training] efforts were extensive was 'obviously unimportant'" to shareholders); *Richman v. Goldman Sachs Grp., Inc.*, 868 F. Supp. 2d 261, 279–80 (S.D.N.Y. 2012) (finding actionable Goldman's "repeated assertions that it complies with the letter and spirit of the law, values its reputation, and is able to address 'potential' conflicts of interest"); *In re Massey Energy Co. Sec. Litig.*, 883 F. Supp. 2d 597, 618 (S.D.W. Va. 2012) (statements of defendants' commitment to safety and that company was an "industry leader in safety" were actionable).

The alleged misrepresentations and omissions regarding Vale's commitment to safety and sustainability fall squarely within these precedents. Defendants repeatedly asserted, in conference calls with analysts (¶ 127), annual "Vale Day" events (¶¶ 129, 160-161, 163-164), annual reports on Form 20-F (¶¶ 142-143, 184-185), annual Sustainability Reports (¶¶ 147-148, 188), media interviews (¶¶ 155, 174), and other filings (¶ 153), that Vale was "driven by our commitment to safety to people and to preserve the environment" and was committed to "becoming a leader in sustainability," with "zero harm targeted throughout all operations," and assured investors that "life matters most" to the Company. These assertions were further bolstered by the detailed descriptions in Vale's Sustainability Reports of its specific dam safety management practices. ¶¶ 150, 188-191. Thus, "safety was obviously a major concern" to investors here, as demonstrated by the "extensive, frequent, and prominent discussions of the topic" in Vale's disclosures. *In re BHP Billiton*, 276 F. Supp. 3d at 80.

Additionally, Defendants "closely aligned their statements of commitment to safety to their productivity and success as a company, thereby lending credence to the materiality of their statements." *In re Massey Energy*, 883 F. Supp. 2d at 618; *see also*, *In re Moody's Corp. Sec. Litig.*, 599 F. Supp. 2d 493, 509 (S.D.N.Y. 2009) (statements about "independence" were

actionable where the company "steadfastly maintained independence as a cornerstone of its business"); *Lapin v. Goldman Sachs Grp., Inc.*, 506 F. Supp. 2d 221, 240 (S.D.N.Y. 2006) (statements actionable where company "stated that [its] integrity 'was at the heart' of its business and attempted to distinguish itself from other institutions based on its 'truly independent investment research' while it allegedly knew the contrary was true"). For instance, Defendant Schvartsman indicated in a newspaper article that "sustainability is part of the core business" of Vale and that "it is necessary for the mining company to be environmentally, socially and economically sustainable for its survival, and that the three aspects are interconnected." ¶ 174. Likewise, Defendant Osorio stated that "***sustainability is one of the pillars to the company's growth and prosperity***."[25] ¶ 164. Such statements attributing the Company's success to its commitment to sustainability support the materiality of this subject matter.

Finally, Vale's argument that its statements are not actionable because they are merely "aspirational" or expressions of optimism (MTD 13-14) should be rejected. Statements of optimism and aspiration are actionable where they are anchored in "misrepresentations of existing facts," as they are here. *Novak*, 216 F.3d at 315. For instance, several statements touting the Company's commitment to sustainability and/or safety referenced particular "achievements." *See, e.g.*, ¶ 129 (describing the "significant progress achieved" with respect to sustainability and safety, including a 17% reduction of health and safety incidents with high potential impact, among others); ¶ 142 ("Below is a list of measures illustrating our commitment to sustainability…"); ¶ 148 (sustainable practices including "building an economic, social, and environmental legacy in the regions where we are present, mitigating the impacts of our operations in the communities where

---

[25] *See also* ¶ 153 (in a presentation entitled "[r]eshaping Vale: a leaner and more competitive company," Vale touted "[a] transformational leadership with three main pillars," including "[e]thics and sustainable development" and [z]ero harm" which were credited with Vale's achievement of "higher levels of sustainable development.").

we operate, and inducing sustainable practices throughout the entire value chain . . . are demonstrated in actions that are part of our commitment to the principles of the United Nations Global Compact."); ¶ 153 (listing achievements in environmental and health and safety components of sustainability commitment); ¶ 184 (listing "measures illustrating our commitment to sustainability…").

Such statements are actionable because they "are not stated in a context of a future prediction, but generally recognize the company's *past achievements and current goals*." *In re Massey Energy*, 883 F. Supp. 2d at 618. Moreover, the statements are materially misleading because they failed to disclose then-existing facts that undermined them, including the Company's efforts to obtain stability certifications for unstable dams and its failure to reduce or mitigate the known or recklessly disregarded high probability of Dam 1's collapse.

### C.   The Alleged Misrepresentations and Omissions are Not Protected by the Bespeaks Caution Doctrine or the PSLRA Safe Harbor

Vale argues that nineteen of the alleged misstatements are protected under the PSLRA safe-harbor and bespeak caution doctrine (MTD 23 n.38 and Appendix A), but those protections only apply to statements that are "forward-looking" and: (1) identified as such and accompanied by meaningful cautionary statements; (2) immaterial;[26] or (3) made without actual knowledge that the statements were false or misleading. *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 245 (2d Cir. 2016). The protections do not apply here because many of the challenged misstatements are mixed statements of present or historical fact, none of them are accompanied by "meaningful" cautionary language, and Defendants had actual knowledge that the statements were false or misleading.

First, the safe harbor "does not protect representations of current or historical fact." *In re*

---

[26] Questions of materiality are "fact-specific," thus, "determination of materiality mitigates against a dismissal on the pleadings." *Weiner v. Quaker Oats Co.*, 129 F.3d 310, 317 (3d Cir. 1997).

31

*Ambac Fin. Grp., Inc. Sec. Litig.*, 693 F. Supp. 2d 241, 272 n.36 (S.D.N.Y. 2010).[27] Here, many of the alleged misstatements reference existing or historical facts, including, for example: ¶ 129 (touting "[s]ignificant progress achieved" with respect to Vale's commitment to sustainability and health and safety; ¶ 138 ("We mitigate operational risk with new controls and improvement of existing ones, new mitigation plans, and transfer or risk through insurance."); ¶ 150 (describing in detail Vale's dam safety management practices); ¶ 153 (touting corporate values and stating "[b]ased on these values, Vale achieved higher levels of sustainable development."); ¶ 158 (indicating tailings dams are "subjected to periodic safety audits and also to operating and monitoring procedures to assess geotechnical stability.").

Statements such as these have commonly been found to fall outside the protection of the bespeaks caution doctrine and the PSLRA's safe harbor. *See, e.g.*, *In re Vale S.A. Sec. Litig.*, No. 1:15-CV-9539-GHW, 2017 WL 1102666, at *24 (S.D.N.Y. Mar. 23, 2017) (safe harbor does not apply to mixed statements of fact regarding commitments to preserve health, safety, and environmental standards, and past and ongoing risk mitigation); *City of Providence v. Aeropostale, Inc.*, No. 11 CIV. 7132 CM THK, 2013 WL 1197755, at *13 (S.D.N.Y. Mar. 25, 2013) (mixed fact statements not protected concerning known mistakes made and steps taken to rectify those mistakes); *In re: EZCorp, Inc. Sec. Litig.,* 181 F. Supp. 3d 197, 207 (S.D.N.Y. 2016) (mixed fact statements not protected concerning best practices employed in response to ongoing regulatory announcements); *Mulligan v. Impax Labs., Inc.*, 36 F. Supp. 3d 942, 957 (N.D. Cal. 2014) (mixed

---

[27] "The cautionary language associated with the 'bespeaks caution' doctrine is aimed at warning investors that bad things may come to pass—in dealing with the contingent or unforeseen future. Historical or present fact—knowledge within the grasp of the offeror—is a different matter. Such facts exist and are known; they are not unforeseen or contingent. It would be perverse indeed if an offeror could knowingly misrepresent historical facts but at the same time disclaim those misrepresented facts with cautionary language." *P. Stolz Family P'ship L.P. v. Daum*, 355 F.3d 92, 97 (2d Cir. 2004); *see also In re Stone & Webster, Inc., Sec. Litig.*, 414 F.3d 187, 213 (1st Cir. 2005) ("The mere fact that a statement contains some reference to a projection of future events cannot sensibly bring the statement within the safe harbor if the allegation of falsehood relates to non-forward-looking aspects of the statement.")

fact statements not protected concerning quality and manufacturing improvements undertaken to address regulatory hurdles and the impact on ongoing corporate activities). Thus, the protections do not apply.

Second, Vale's "cautionary language" provides no protection because "[t]he generic language is merely a litany of generally applicable risk factors applied as boilerplate to every alleged misrepresentation[.]"[28] *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 245 (5th Cir. 2009). "A generic warning of a risk will not suffice when undisclosed facts on the ground would substantially affect a reasonable investor's calculations of probability." *Jinkosolar*, 761 F.3d at 251. Indeed, even "warnings of specific risks . . . do not shelter defendants from liability if they *fail to disclose hard facts critical to appreciating the magnitude of the risks described*." *Credit Suisse First Boston Corp. v. ARM Fin. Group, Inc.,* No. 99-cv-12046, 2001 U.S. Dist. LEXIS 3332 at *23 (S.D.N.Y. Mar. 27, 2001).[29]

Here, there is abundant evidence that Defendants knew throughout the Class Period that Dam 1 had a high probability of failure, and that Vale's dam safety and risk management policies were not being effectuated to prevent or mitigate the risks posed by Dam 1. These facts were critical to assessing the magnitude of the risks Vale faced, but were not disclosed by any of Vale's boilerplate risk disclosures, which merely warned of "risks and hazards attendant to the 'mining industry generally' including 'incidents involving dams . . . that could occur by accident or by breach of operating and maintenance standards[.]" MTD at 24; ¶¶ 139-140. Just as in *Briarwood*

---

[28] *See also Milman v. Box Hill Sys. Corp.*, 72 F. Supp. 2d 220, 230 (S.D.N.Y. 1999) ("[C]autionary language must be too prominent and specific to be disregarded and must warn investors of *exactly* the risk that plaintiffs claim was not disclosed."); *In re Prudential Sec. Ltd. Pshps. Litig.,* 930 F. Supp. 68, 72 (S.D.N.Y. 1996) ("Cautionary language ... must precisely address the substance of the specific statement or omission[.]"); *accord Kline v. First W. Gov't. Sec.*, 24 F.3d 480, 489 (3d Cir. 1994) (the "cautionary statement must discredit the alleged misrepresentation to such an extent that the 'risk of real deception drops to nil'") (quoting *Virginia Bankshares*, 501 U.S. at 1097).

[29] "[T]he adequacy of cautionary language is a question of fact, and, typically, is not a question to be resolved on a motion to dismiss." *Lefkoe v. Jos. A. Bank Clothiers*, 2007 WL 6890353, at *5 n.10 (D. Md. Sept. 10, 2007).

33

*Investments Inc. v. Care Inv. Tr. Inc.*, No. 07 CIV. 8159LLS, 2009 WL 536517, at \*3 (S.D.N.Y. Mar. 4, 2009), the Defendants here were "aware of ***an actual danger or cause for concern***," and therefore, "may not rely on a generic disclaimer in order to avoid liability." *See also, Jinkosolar*, 761 F.3d at 251 (warning of financial risk from environmental violations insufficient where there were undisclosed, serious pollution violations).[30]

Finally, the protections do not apply because there are ample allegations that Defendants knew or recklessly disregarded that their statements were false or misleading at the time they were made. *Vivendi*, 838 F.3d at 248; *see also*, Section III.A., above. Indeed, district courts routinely find misstatements outside the safe harbor where, as here, the pleadings allege evidence that a corporate defendant lulled an investor "into a false sense of security" by disclosing certain steps taken to address issues facing the corporation but then omitted or misconstrued other known facts regarding the breadth or depth of those issues. *In re Oxford Health Plans, Inc. Sec. Litig.*, 187 F.R.D. 133, 141 (S.D.N.Y. 1999); *see also In re Vivendi,* 838 F.3d at 249; *City of Providence v. Aeropostale, Inc.*, 2013 WL 1197755, at \*11-12; *In re MGM Mirage Sec. Litig.*, 2013 WL 5435832, at \*8 (D. Nev. Sept. 26, 2013). Vale therefore cannot avail itself of the protections of the bespeak caution doctrine or the PSLRA safe-harbor.

### D.    The Complaint Adequately Alleges Loss Causation

Vale argues that loss causation is insufficiently alleged because (1) none of the corrective disclosures revealed anything fraudulent about the alleged misstatements and (2) Vale warned of the risk of a dam collapse, so there is no materialization of an undisclosed risk. These arguments overstate the pleading standards and ignore the well-pled allegations.

---

[30] *See also, Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004) (cautionary words provide "no protection to someone who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away").

The burden of pleading loss causation is "not a heavy one" as a complaint "must simply give [d]efendants 'some indication' of the actual loss suffered and of a plausible causal link between the alleged loss and the alleged misrepresentations." *Loreley Financing (Jersey) No. 3 Ltd. v. Wells Faro Sec., LLC,* 797 F.3d 160, 187 (2d Cir. 2015) (*quoting Dura*, 544 U.S. at 347); *see also*, *In re Bear Stearns Companies, Inc. Sec., Derivative, & ERISA Litig.*, 763 F. Supp. 2d 423, 505 (S.D.N.Y. 2011) (loss causation governed by Rule 8, requiring only "a short and plain statement of the claim showing that the pleader is entitled to relief"). Loss causation may be adequately pleaded by alleging either a corrective disclosure of a previously undisclosed truth or the materialization of a concealed risk, and a resulting stock price decline. *Leykin v. AT & T Corp.,* 423 F. Supp. 2d 229, 240 (S.D.N.Y. 2006), *aff'd,* 216 Fed. Appx. 14 (2d Cir. 2007). Loss causation is adequately pleaded "if the risk that caused the loss was within the zone of risk ***concealed*** by the misrepresentations and omissions alleged by a disappointed investor." *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173 (2d Cir. 2005) (emphasis in original).

The Complaint satisfies these standards by alleging that the misrepresented and concealed information regarding the heightened risk of Dam 1's collapse, Vale's inadequate dam safety management and risk management practices, and its disregard for safety and the environment materialized and were revealed through a series of events and disclosures, beginning with the collapse of Dam 1 on January 25, 2019, which caused the price of Vale Securities to decline significantly, including its ADSs, which dropped by more than 8%.  ¶¶ 204-205. The Complaint alleges numerous facts showing that Dam 1's collapse was directly related to the matters allegedly misrepresented and concealed by Defendants, including: (1) the unstable structural conditions of Dam 1 which created a heightened risk of collapse, as shown by numerous internal reports and analyses (discussed *supra*, Section II.A.); (2) Vale's inadequate dam safety management practices,

including, for example, the Company's failure to complete the safety audit recommendations to lower Dam 1's water level (¶¶ 82-86, 100) and failure to follow-up on anomalous readings by Dam 1 monitoring instruments (¶¶ 94 n.31, 102-107); and (3) Vale's inadequate risk management practices, which failed to take actions to prevent or mitigate Dam 1's collapse despite Dam 1's alarming status in the Company's risk matrix (¶¶ 75-81) and the expected high impact of its collapse (in terms of both loss of life and costs) (¶¶ 105-106, 119).

Additionally, the Complaint alleges three partial corrective disclosures on *January 28, 2019* (revealing additional information about the unmitigated impacts of Dam 1's rupture), *February 4, 2019* (reporting judicially-ordered closure of one of Vale's mines, revealing that concerns about the adequacy of Vale's dam safety management practices were not limited to Dam 1), and *February 6, 2019* (revealing faulty dam safety management and risk management base on reporting, among other things, that inspectors and employees had warned Vale of unsafe conditions at Dam 1 long before the collapse).[31] Each of these disclosures thus revealed information directly related to the alleged misrepresentations and omissions, and each is alleged to have caused significant price declines in Vale's Securities. ¶¶ 206-214.

These allegations are ample to plead loss causation. *See, e.g., Transocean*, 866 F. Supp. 2d at 245-246 (finding loss causation allegations sufficient where "the Macondo Spill was a manifestation of the very risks that were allegedly improperly concealed from shareholders"); *Massey Energy*, 883 F. Supp. 2d 597, 626 (loss causation allegations sufficient where an "explosion and the cause of the explosion revealed to the market the fraudulent nature of which Plaintiffs complain, specifically, that Defendants mis[led] the market about the safety at its mines and its commitment to put" safety over production).

---

[31] *See In re Bristol Myers Squibb Co. Sec. Litig.*, 586 F. Supp. 2d 148, 165 (S.D.N.Y. 2008) ("[A] corrective disclosure need not take the form of a single announcement, but rather, can occur through a series of disclosing events.").

36

Vale argues that the dam collapse cannot constitute a corrective event, citing *In re Barrick Gold Corp. Sec. Litig.*, 341 F. Supp. 3d 358, 380 (S.D.N.Y. 2018). MTD 35. However, the court in that matter rejected allegations that a cyanide spill was a corrective event because the plaintiffs had alleged facts suggesting ***the spill was not publicly disclosed***, and because the spill occurred after market close, and could not have caused the stock price movements on the day alleged by plaintiffs.[32]

Additionally, Vale argues that loss causation cannot be pleaded through materialization of the risk because the Company disclosed a risk factor that obliquely referenced "[a]ccidents or incidents involving . . . dams", and investors were aware of the risk of dam collapse given the Mariana disaster in 2015.[33] MTD 38. But Plaintiff does not allege that Defendants hid the general risk of dam rupture applicable to any mining operation, but rather, that Defendants misrepresented and concealed facts showing that at least one of Vale's dams was unstable and that its dam safety and risk management practices were not being implemented as described to address this heightened risk. *See Jinkosolar*,  761 F.3d 245 at 251 ("A generic warning of a risk will not suffice when undisclosed facts on the ground would substantially affect a reasonable investor's calculations of probability."). Vale has offered no evidence that any of the allegedly concealed information was, in fact, disclosed.

Vale also argues that the information revealed on January 28, 2019,[34] February 4, 2019,

---

[32] Vale's other case—*Nardy v. Chipotle Mexican Grill, Inc.*, No. 17-CV-01760-WYD-STV, 2019 WL 3297467, at *13 (D. Colo. Mar. 29, 2019)—is likewise inapposite, as it merely found that the disclosure of a norovirus outbreak at a single restaurant was not necessarily indicative of the corporate-wide problem which was allegedly misrepresented and concealed.

[33] Vale also claims the disclosure that Vale had 50 dams classified as High Potential Associated Damage constituted a disclosure of the allegedly concealed information. This is wrong. This regulatory classification merely indicates that damages of a rupture would be high, not that the ***likelihood*** of rupture was high, as here alleged.

[34] Vale also argues that January 28, 2019 cannot contain both an alleged misrepresentation and an alleged corrective disclosure. MTD 36. This argument is faulty. First, it is based on a class certification opinion, which applies a different legal test than the simple pleading standards of Rule 8 applicable here. *Id.*, citing, *In re Chicago Bridge & Iron Co. N.V. Sec. Litig.*, No. 17 CIV. 01580 (LGS), 2019 WL 5287980, at *32–33 (S.D.N.Y. Oct. 18, 2019). Moreover, there

37

and February 6, 2019 concerning the impacts, investigations, and potential causes of the Dam 1 breach are not corrective because they do not reveal "any new truth" about the alleged fraud or are too speculative. MTD 36-37. These arguments are wrong. The information disclosed on these dates—the deaths, remediation costs, regulatory fines, investigations, cessation of mining activities due to dam safety concerns, and contractual repercussions from the cessation of mining activities—were all within the "zone of risk" of the alleged fraud, which is all that the caselaw requires. *Lentell*, 396 F.3d at 173; *see also id.* at 175 ("To plead loss causation, the complaints must allege facts that support an inference that Merrill's misstatements and omissions concealed the circumstances that bear upon the loss suffered such that ***plaintiffs would have been spared all or an ascertainable portion of that loss absent the fraud***."); *In re Lehman Bros. Sec. & Erisa Litig.*, 799 F. Supp. 2d 258, 305 (S.D.N.Y. 2011) (upholding loss causation allegations that misrepresented and concealed risks concerning Lehman's credit risk concentrations and risk mitigation policies were materialized by asset write-downs and ratings agency downgrades, causing share price declines).

Additionally, Vale argues that the February 6, 2019 reports "[a]t most" discuss causes of the Dam 1 break that are too speculative to be corrective. This argument is wrong for at least two reasons: it misconstrues the content of the February 6 reports, and it vastly overstates the pleading standard for loss causation. *Dura* does not require that a corrective disclosure "take a particular form or be of a particular quality." *In re Winstar Commc'ns*, No. 01 CV 11522, 2006 WL 473885, at *14 (S.D.N.Y. Feb. 27, 2006). Rather, "[a]llegations that the market reacted negatively to an

---

is nothing incongruent about Plaintiff's allegation that, on the same day corrective news reports reached the market and caused Vale's share prices to drop, Vale issued a materially misleading statement that maintained some of the artificial inflation in share prices. ¶ 209. *See, e.g.*, *Glickenhaus & Co. v. Household Int'l, Inc.*, 787 F.3d 408, 415 (7th Cir. 2015) (". . . a stock can be inflated even if the price remains the same or declines after a false statement because the price might have fallen even more" but for the false statement); *see also*, *In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1174 (C.D. Cal. 2008) (upholding allegations of "Countrywide's continued misrepresentations and omissions—made concurrently with some alleged corrective disclosures").

opinion or speculation which in fact exposes the falsity of defendants' representations can be sufficient to plead loss causation"[35] *Id.* at \*14. The February 6 articles discussed prior warnings the Company had received from its employees and its safety auditor about Dam 1's instability in mid-2018, exposing the falsity of Defendants' statements that the dam was stable at that time and that its dam safety management and risk management policies were adequate. This news caused Vale Securities prices to significantly decline, including the decline of its ADSs by more than 6%. This connection to the alleged fraud and Plaintiff's losses is all that is required to plead loss causation.

### E.       The Complaint is Pled with Particularity

Vale claims the Complaint fails to allege with particularity which statements were false or misleading and why. MTD 39-40. This argument is wrong and should be rejected.

The Complaint amply satisfies the pleading requirements by alleging the date, publication, and speaker of each alleged misstatement or omission, highlighting in bold the key portions of each alleged misstatement, and setting forth in paragraphs following each alleged misstatement the undisclosed, material facts known to Defendants at the time, which rendered the referenced statements false or misleading. *See, e.g., Constr. Laborers Pension Tr. for S. California v. CBS Corp.*, No. 18-CV-7796 (VEC), 2020 WL 248729, at \*5 (S.D.N.Y. Jan. 15, 2020) (complaint pled with particularity where it "identifies statements and omissions, describes relevant predicate events, and alleges how those events make the statements and omissions false or misleading."); *In re MF Glob. Holdings Ltd. Sec. Litig.*, 982 F. Supp. 2d 277, 309 (S.D.N.Y. 2013) (same); *In re NTL, Inc. Sec. Litig.*, 347 F. Supp. 2d 15, 23 (S.D.N.Y. 2004) (same).

---

[35] Indeed, "[t]o require the pleadings establish that when word exposing the falsity of defendants' statements leaked into the market place, it took the form of a factual revelation which was, at that time, verifiably truthful, would place a prohibitively unreasonable burden on a plaintiff." *Id*. at \*15.

Vale complains that the specific facts allegedly misrepresented or concealed as to each misrepresentation do not "address[] the substance of the purportedly false statements or show[] that these statements were false" when made. MTD at 40. But this is just another way of claiming that the alleged statements were not false or misleading—an argument thoroughly debunked in Section III.B., above. The fact that Vale understood the allegations sufficiently well to make these liability arguments belies its claim that the Complaint is not pled with particularity. *Ontario Teachers' Pension Plan Bd. v. Teva Pharm. Indus. Ltd.*, No. 3:17-CV-558 (SRU), 2019 WL 4674839, at *10 (D. Conn. Sept. 25, 2019) ("[D]efendants' briefs, in which the defendants thoroughly and directly rebut the allegations in the Complaint, prove that the defendants were on notice of the claims against them.").

## F.   Control Person Liability Under Section 20(a) of the Exchange Act is Adequately Alleged

Vale does not directly challenge Plaintiff's claim of control person liability but does so indirectly in arguing that Plaintiff has failed to adequately allege primary liability. Because Plaintiff has properly alleged securities fraud, the control person claims should be upheld. *See KBC Asset Mgmt. NV v. 3D Sys. Corp.*, No. 0:15-CV-02393-MGL, 2016 WL 3981236, at *12 (D.S.C. July 25, 2016).

## IV.   CONCLUSION

For the foregoing reasons, Vale's motion to dismiss should be denied in its entirety.

Dated: January 31, 2020
    New York, NY

KAPLAN FOX & KILSHEIMER LLP

By: s/ *Frederic S. Fox*
       Frederic S. Fox

Donald R. Hall
Jeffrey Campisi
850 Third Ave., 14th Fl.
New York, NY  10022
Telephone: (212) 687-1980

40

Facsimile: (212) 687-7714
FFox@kaplanfox.com
DHall@kaplanfox.com
JCampisi@kaplanfox.com

*Attorneys for Plaintiff*