# Exhibit 3

As filed with the Securities and Exchange Commission on April 13, 2018

# UNITED STATES SECURITIES AND EXCHANGE COMMISSION
## Washington, D.C. 20549

## Form 20-F

### ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d)
### OF THE SECURITIES EXCHANGE ACT OF 1934

**For the fiscal year ended: December 31, 2017**
**Commission file number: 001-15030**

### VALE S.A.
*(Exact name of Registrant as specified in its charter)*

### Federative Republic of Brazil
*(Jurisdiction of incorporation or organization)*

Luciano Siani Pires, Chief Financial Officer
phone: +55 21 3485 5000
**Praia de Botafogo 186 – offices 701 – 1901 – Botafogo**
**22250-145 Rio de Janeiro, RJ, Brazil**
*(Address of principal executive offices)*

Securities registered or to be registered pursuant to Section 12(b) of the Act:

| Title of Each Class | Name of Each Exchange on Which Registered |
|---|---|
| Common shares of Vale, no par value per share | New York Stock Exchange* |
| American Depositary Shares (evidenced by American Depositary Receipts), each representing one common share of Vale | New York Stock Exchange |
| 4.625% Guaranteed Notes due 2020, issued by Vale Overseas | New York Stock Exchange |
| 5.875% Guaranteed Notes due 2021, issued by Vale Overseas | New York Stock Exchange |
| 4.375% Guaranteed Notes due 2022, issued by Vale Overseas | New York Stock Exchange |
| 6.250% Guaranteed Notes due 2026, issued by Vale Overseas | New York Stock Exchange |
| 8.250% Guaranteed Notes due 2034, issued by Vale Overseas | New York Stock Exchange |
| 6.875% Guaranteed Notes due 2036, issued by Vale Overseas | New York Stock Exchange |
| 6.875% Guaranteed Notes due 2039, issued by Vale Overseas | New York Stock Exchange |
| 5.625% Notes due 2042, issued by Vale S.A. | New York Stock Exchange |

---

\* Shares are not listed for trading, but only in connection with the registration of American Depositary Shares pursuant to the requirements of the New York Stock Exchange.

**Securities registered or to be registered pursuant to Section 12(g) of the Act:** None
**Securities for which there is a reporting obligation pursuant to Section 15(d) of the Act:** None
**The number of outstanding shares of each class of stock of Vale as of December 31, 2017 was:**
5,197,432,081 common shares, no par value per share
12 golden shares, no par value per share

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.
Yes ☑  No ☐

If this report is an annual or transition report, indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934.
Yes ☐  No ☑

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports) and (2) has been subject to such filing requirements for the past 90 days.
Yes ☑  No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate website, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).
Yes ☑  No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, or a non-accelerated filer. See definition of "accelerated filer" and "large accelerated filer" in Rule 12b-2 of the Exchange Act. (Check one):
Large accelerated filer ☑      Accelerated filer ☐      Non-accelerated filer ☐      Emerging growth company ☐

If an emerging growth company that prepares its financial statements in accordance with U.S. GAAP, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark which basis of accounting the registrant has used to prepare the financial statements included in this filing:
U.S. GAAP •      International Financial Reporting Standards as issued by the International Accounting Standards Board ☑      Other •

If "Other" has been checked in response to the previous question, indicate by check mark which financial statement item the registrant has elected to follow.
Item 17 ☐  Item 18 ☐

If this is an annual report, indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).
Yes ☐  No ☑

# TABLE OF CONTENTS

Page

Form 20-F cross-reference guide ...................... ii

**I.    Overview**
Business overview....................................... 1
Selected financial data ............................... 12
Forward-looking statements........................... 14
Risk factors .......................................... 15

**II.    Information on the company**
Lines of business ..................................... 30
    1.    Ferrous minerals ............................ 32
    2.    Base metals................................. 43
    3.    Coal ....................................... 56
    4.    Infrastructure .............................. 58
    5.    Other investments .......................... 65
Reserves............................................... 67
Capital expenditures ................................. 76
Regulatory matters ................................... 77

**III.    Operating and financial review and prospects**
Overview............................................... 82
Results of operations ................................. 90
Liquidity and capital resources ...................... 106
Contractual obligations .............................. 110
Off-balance sheet arrangements..................... 111
Critical accounting policies and estimates ......... 112
Risk management..................................... 116

**IV.    Share ownership and trading**
Major shareholders ................................... 118
Related party transactions ........................... 122
Distributions......................................... 124
Trading markets...................................... 126
Share price history .................................. 127
Depositary shares ................................... 128
Purchases of equity securities by the issuer and affiliated purchasers.......................... 130

**V.    Management and employees**
Management ......................................... 131
Management compensation ......................... 144
Employees ........................................... 147

**VI.    Additional information**
Legal proceedings ................................... 149
Memorandum and articles of association .......... 159
Shareholder debentures ............................. 166
Exchange controls and other limitations affecting security holders ........................ 167
Taxation.............................................. 169
Evaluation of disclosure controls and procedures......................................... 177

Management's report on internal control over financial reporting ........................... 178
Corporate governance ............................... 179
Code of ethics and conduct ......................... 183
Principal accountant fees and services ............. 184
Information filed with securities regulators ....... 185
Exhibits............................................... 186
Glossary .............................................. 187
Signatures ........................................... 192

i

# I. OVERVIEW

Vale S.A. is a stock corporation, or *sociedade por ações*, that was organized on January 11, 1943 under the laws of the Federative Republic of Brazil for an unlimited period of time. Its head office is located at Praia de Botafogo 186 – offices 701-1901 – Botafogo, 22250-145 Rio de Janeiro, RJ, Brazil, and its telephone number is 55-21-3485-5000.

In this report, references to "Vale" are to Vale S.A. References to "we," "us" or the "Company" are to Vale and, except where the context otherwise requires, its consolidated subsidiaries. References to our "ADSs" or "American Depositary Shares" are to our common American Depositary Shares (our "common ADSs"), each of which represents one common share of Vale. American Depositary Shares are represented by American Depositary Receipts ("ADRs") issued by the depositary.

Unless otherwise specified, we use metric units.

References to "real," "reais" or "R$" are to the official currency of Brazil, the *real* (singular) or *reais* (plural). References to "U.S. dollars" or "US$" are to United States dollars. References to "€" are to Euros.

# BUSINESS OVERVIEW

### SUMMARY

We are one of the largest metals and mining companies in the world, based on market capitalization. We are the world's largest producer of iron ore and iron ore pellets and the world's largest producer of nickel. We also produce manganese ore, ferroalloys, metallurgical and thermal coal, copper, platinum group metals (PGMs), gold, silver and cobalt. We are presently engaged in greenfield mineral exploration in six countries. We operate large logistics systems in Brazil and other regions of the world, including railroads, maritime terminals and ports, which are integrated with our mining operations. In addition, we have a distribution center to support the delivery of iron ore worldwide. Directly and through affiliates and joint ventures, we also have investments in energy and steel businesses.

1



*Business Overview*

### Commitment to sustainability

We are committed to becoming a sustainability benchmark through a comprehensive approach based on systematic planning and execution, prioritizing risk and impact management (seeking to achieve zero harm to our employees and surrounding communities) and establishing a positive social, economic and environmental legacy in the places where we operate. Below is a list of measures illustrating our commitment to sustainability:

- Since 2013, environmental and social actions are directly incorporated into our strategic planning. In 2017, we joined the International Council on Mining and Metals (ICMM), the most important association in the mining industry, reaffirming our commitment to sustainable development. Also in 2017, we joined the Task Force on Climate-related Financial Disclosures (TCFD). The purpose of the TCFD is to create a set of recommendations to improve the quality of voluntary disclosure of climate-related information.

- We are committed to reducing water use in our activities by investing in technologies and initiatives to control total water withdrawal, especially by promoting water reuse. In 2017, we withdrew a total of 276.3 billion liters of water, and used 179.5 billion liters in our operations (including discontinued operations), with the balance being allocated to third parties. From the total volume of water used in 2017, 83% or 148.9 billion liters was reused.

- We are committed to improving the health and safety of our workers. Our total recordable injury frequency performance in 2017 was 2.0 per million hours worked, slightly higher than the frequency of 1.89 per million hours worked recorded in the previous year, although demonstrating a 24% improvement over the last five years.

- We follow standards for social action in accordance with international guidelines, including principles on business and human rights, which are based on the Guiding Principles on Business and Human Rights of the United Nations Human Rights Council.

- In July 2016, we, together with Samarco and BHPB, established the Fundação Renova to develop and implement remediation and compensation programs over many years, in order to support the recovery of the areas and communities affected by the failure of Samarco's dam.

### Improving our margins in the iron ore business

We are committed to improving our margins in the iron ore business by achieving better price realization, based on adjustments to our product portfolio according to market demand and supply chain optimization. We are focusing our product line to capture industry trends, improving quality and productivity, controlling costs, strengthening our logistics infrastructure of railroads, ports, shipping and distribution centers, and strengthening relationships with customers. Our diversified portfolio of high-quality products, strong technical marketing strategy, efficient logistics and long-standing relationships with major customers will help us achieve this goal.

In September 2017, Vale inaugurated the global Integrated Operations Center (IOC) at the Aguas Claras mine. The IOC brings together various functions in the iron ore supply chain to support improvements in the planning processes from mine to port, including optimization of ship distribution and response to client demands. These improvements to our operations and sales planning are expected to lead to better sales price realization and product quality management.



*Business Overview*

### Resumption of operations of São Luis and Tubarão I and II pellet plants

In January 2018, we resumed the operations of our Tubarão II pellet plant. We expect to resume operations at the Tubarão I and São Luis pellet plants in the second and third quarters of 2018. The operations of these plants had been suspended since 2012 due to market conditions.

**FAILURE OF SAMARCO'S TAILINGS DAM IN MINAS GERAIS**

### Samarco's dam failure

In November 2015, the Fundão tailings dams owned by Samarco S.A. failed, releasing tailings downstream, flooding certain communities and causing impacts on communities and the environment along the Doce river. The failure resulted in 19 fatalities and caused property and environmental damage to the affected areas. Samarco is a joint venture equally owned by Vale S.A. and BHP Billiton Brasil Ltda. ("BHPB"), a Brazilian subsidiary of BHP Billiton plc.

### Emergency actions

Immediately after the dam failure, Samarco, together with the public authorities, provided first aid, food, water, housing, social assistance and financial aid to the affected families and individuals. As Samarco's shareholders, we were actively involved in supporting Samarco during this period. In addition to these emergency actions, Samarco has been monitoring the affected area, performing emergency work to contain any movement of tailings, reinforcing the structures of its dams and dikes to ensure the safety of the region and mitigating the environmental and social impacts of the event.

### Fundação Renova and the remediation process

In August 2016, Samarco and its shareholders (Vale and BHPB) created the Fundação Renova, a not-for-profit private foundation, to develop and implement (i) social and economic remediation and compensation programs and (ii) environmental remediation and compensation programs in the region affected by the dam collapse.

The social and economic remediation and compensation programs conducted by Fundação Renova include, among others:

- Registration of the impacted parties and assessment of the impact;

- Compensation and indemnification of the impacted parties;

- Resettlement of the communities of Bento Rodrigues, Paracatu de Baixo and Gesteira;

- Protection and recovery of life quality of impacted indigenous communities;

- Implementation of social and cultural activities and psychosocial support to people affected;

- Creation of permanent channels of communication and interaction with society;

- Recovery and reconstruction of houses, bridges and other damaged infrastructure;



*Business Overview*

- Recovery of schools and reintegration of school communities;

- Recovery of cultural property, leisure and sport areas and preservation of historical and cultural heritage;

- Development and implementation of programs to support agricultural and livestock farming, aquaculture, fishing, and other economic activities of the affected regions;

- Implementation of specific a program for the recovery of micro and small businesses;

- Development of emergency a financial aid program to the affected population.

The environmental remediation and compensation programs conducted by Fundação Renova include, among others:

- Implementation of tailings retention and treatment systems in impacted rivers;

- Recovery of vegetation, regularization of gutters and margins of impacted rivers and measures to control erosion;

- Recovery of permanent preservation areas and springs in the Doce River basin;

- Assessment of impacts on water quality and aquatic biodiversity, followed by actions for recovery and conservation of aquatic fauna;

- Construction and provision of resources for operational maintenance of wild animals screening and rehabilitation centers in Minas Gerais and Espírito Santo;

- Collection and sewage treatment;

- Improvement of water supply systems;

- Implementation of plans for emergency alert and support;

- Development of a permanent water and sediments monitoring program in the Doce River basin and in the sea area near the river's mouth.

The creation of Fundação Renova was provided for under the Agreement of Transaction and Conduct Adjustment (TTAC or Framework Agreement) signed in March 2016 by Vale, BHPB, Samarco, the Brazilian federal government, the two Brazilian states affected by the failure (Espírito Santo and Minas Gerais) and other governmental authorities. The Framework Agreement has a 15-year term, renewable for successive one-year periods until all the obligations under the Framework Agreement have been performed. The Framework Agreement does not provide for admission of civil, criminal or administrative liability for the Fundão dam failure. In January 2017, Samarco, Vale and BHPB entered into two preliminary agreements with the federal prosecution office (the "MPF") providing for, among other things, the appointment of experts selected by the MPF to review and monitor the remediation programs provided under the Framework Agreement. The preliminary agreements contemplate a potential revision in the remediation programs provided under the Framework Agreement, based on the findings of the experts selected by the MPF.



*Business Overview*

Under the Framework Agreement, Fundação Renova must be funded by Samarco. As Samarco is currently unable to resume its activities, we and BHPB have been funding the foundation and also providing funds directly to Samarco, to preserve its operations and to support Samarco's funding obligations. Samarco's funding obligations to Fundação Renova, pursuant to the Framework Agreement, are summarized below:

- R$2.0 billion in 2016;

- R$1.2 billion in 2017;

- R$1.2 billion in 2018;

- From 2019 to 2021, Samarco will provide funding based on the amounts needed to implement the projects approved for each year, subject to an annual minimum of R$800 million and an annual maximum of R$1.6 billion; and

- Starting in 2022, Samarco will provide the necessary funding in order to complete remaining programs approved for each year.

Fundação Renova must allocate a minimum annual amount of R$240 million over 15 years to the implementation of compensation programs; these annual amounts are included in the annual contributions described above for the first six years.

Under the terms of the Framework Agreement, Fundação Renova must spend R$500 million on sewage collection and treatment and solid waste disposal through the end of 2018.

Fundação Renova and Samarco allocated R$1.7 billion to remediation and compensation programs in 2017, and have allocated R$3.2 billion to these programs since their creation.

### Impact of dam failure on Samarco's operations

Following the dam failure, governmental authorities ordered the suspension of Samarco's operations. Samarco's management is working on a plan that would permit it to obtain the necessary licenses and approvals to resume operations and provide a long-term solution for the disposal of tailings. The feasibility, timing and scope of measures necessary to resume Samarco's operations remain uncertain. With the exception of the Fundão tailings dam and the Santarém water dam, which was impacted by the overflow of tailings from the Fundão dam, all other production assets owned by Samarco were undamaged.

### Impact of the failure of Samarco's tailings dam in our financial statements

For a discussion of the impact of the failure of Samarco's tailings dam in our financial statements, see *Operating and financial review and prospects—Failure of Samarco's tailing dams.*

### Legal proceedings

For a discussion of the legal proceedings resulting from the failure of Samarco's tailings dam, see *Additional information—Legal proceedings.*

11



# FORWARD-LOOKING STATEMENTS

This annual report contains statements that may constitute forward-looking statements within the meaning of the safe harbor provisions of the U.S. Private Securities Litigation Reform Act of 1995. Many of those forward-looking statements can be identified by the use of forward-looking words such as "anticipate," "believe," "could," "expect," "should," "plan," "intend," "estimate" and "potential," among others. Those statements appear in a number of places and include statements regarding our intent, belief or current expectations with respect to:

- our direction and future operation;

- the implementation of our principal operating strategies, including our potential participation in acquisition, divestiture or joint venture transactions or other investment opportunities;

- the implementation of our financing strategy and capital expenditure plans;

- the exploration of mineral reserves and development of mining facilities;

- the depletion and exhaustion of mines and mineral reserves;

- trends in commodity prices, supply and demand for commodities;

- the future impact of competition and regulation;

- the payment of dividends or interest on shareholders' equity;

- compliance with financial covenants;

- industry trends, including the direction of prices and expected levels of supply and demand;

- the outcome of the various regulatory, governmental and legal proceedings in which we are involved;

- other factors or trends affecting our financial condition or results of operations; and

- the factors discussed under *Risk factors*.

We caution you that forward-looking statements are not guarantees of future performance and involve risks and uncertainties. Actual results may differ materially from those in forward-looking statements as a result of various factors. These risks and uncertainties include factors relating to (a) economic, political and social issues in the countries in which we operate, (b) the global economy, (c) commodity prices, (d) financial and capital markets, (e) the mining and metals businesses, which are cyclical in nature, and their dependence upon global industrial production, which is also cyclical, (f) regulation and taxation, (g) operational incidents or accidents, and (h) the high degree of global competition in the markets in which we operate. For additional information on factors that could cause our actual results to differ from expectations reflected in forward-looking statements, see *Risk factors*. Forward-looking statements speak only as of the date they are made, and we do not undertake any obligation to update them in light of new information or future developments. All forward-looking statements attributed to us or a person acting on our behalf are expressly qualified in their entirety by this cautionary statement, and you should not place undue reliance on any forward-looking statement.



# RISK FACTORS

**EXTERNAL RISKS**

*Our business is exposed to the cyclicality of global economic activity and requires significant investments of capital.*

As a mining company, we are a supplier of industrial raw materials. Industrial production tends to be the most cyclical and volatile component of global economic activity, which affects demand for minerals and metals. At the same time, investment in mining requires a substantial amount of funds in order to replenish reserves, expand and maintain production capacity, build infrastructure, preserve the environment and minimize social impacts. Sensitivity to industrial production, together with the need for significant long-term capital investments, are important sources of risk for our financial performance and growth prospects.

Also, we may not be able to adjust production volume in a timely or cost-efficient manner in response to changes in demand. Lower utilization of capacity during periods of weak demand may expose us to higher unit production costs since a significant portion of our cost structure is fixed in the short-term due to the capital intensity of mining operations. In addition, efforts to reduce costs during periods of weak demand could be limited by labor regulations or previous labor or government agreements. Conversely, during periods of high demand, our ability to rapidly increase production capacity is limited, which could prevent us from meeting demand for our products. Moreover, we may be unable to complete expansions and greenfield projects in time to take advantage of rising demand for iron ore, nickel or other products. When demand exceeds our production capacity, we may meet excess customer demand by purchasing iron ore, iron ore pellets or nickel from joint ventures or unrelated parties and reselling it, which would increase our costs and narrow our operating margins. If we are unable to satisfy excess customer demand in this way, we may lose customers. In addition, operating close to full capacity may expose us to higher costs, including demurrage fees due to capacity restraints in our logistics systems.

*The prices for our products are subject to volatility, which may adversely affect our business.*

Global prices for metals are subject to significant fluctuations and are affected by many factors, including actual and expected global macroeconomic and political conditions, regional and sectorial factors, levels of supply and demand, the availability and cost of substitutes, inventory levels, technological developments, regulatory and international trade matters, investments by commodity funds and others and actions of participants in the commodity markets. Sustained low market prices for the products we sell may result in the suspension of certain of our projects and operations, decrease in our mineral reserves, impairment of assets, and may adversely affect our cash flows, financial position and results of operations.

Demand for our iron ore, coal and nickel products depends on global demand for steel. Iron ore and iron ore pellets, which together accounted for 71.2% of our 2017 net operating revenues, are used to produce carbon steel. Nickel, which accounted for 13.7% of our 2017 net operating revenues, is used mainly to produce stainless and alloy steels. The prices of different steels and the performance of the global steel industry are highly cyclical and volatile, and these business cycles in the steel industry affect demand and prices for our products. In addition, vertical backward integration of the steel and stainless steel industries and the use of scrap could reduce the global seaborne trade of iron ore and primary nickel. The demand for copper is affected by the demand for copper wire, and a sustained decline in the construction industry could have a negative impact on our copper business.

We are mostly affected by movements in iron ore prices. For example, a price reduction of US$1 per dry metric ton unit ("dmt") in the average iron ore price would have reduced our operating income for the year ended December 31, 2017 by approximately US$300 million. Average iron ore prices significantly



changed in the last five years, from US$135 per dmt in 2013 to US$97 per dmt in 2014, US$55.5 per dmt in 2015, US$58.5 per dmt in 2016 and US$71.3 per dmt in 2017, according to the average Platts IODEX (62% Fe CFR China). On February 28, 2018, the year to date average Platts IODEX iron ore price was US$76.60 per dmt. See *Operating and financial review and prospects—Overview—Major factors affecting prices*.

### Adverse economic developments in China could have a negative impact on our revenues, cash flow and profitability.

China has been the main driver of global demand for minerals and metals over the last few years. In 2017, Chinese demand represented 74% of global demand for seaborne iron ore, 55% of global demand for nickel and 48% of global demand for copper. The percentage of our net operating revenues attributable to sales to customers in China was 41.3% in 2017. Therefore, any contraction of China's economic growth could result in lower demand for our products, leading to lower revenues, cash flow and profitability. Poor performance in the Chinese real estate sector, the largest consumer of carbon steel in China, would also negatively impact our results.

### Changes in exchange rates for the currencies in which we conduct operations could adversely affect our financial condition and results of operations.

A substantial portion of our revenues, trade receivables and our debt is denominated in U.S. dollars, and given that our functional currency is the Brazilian *real,* changes in exchange rates may result in (i) losses or gains on our net U.S. dollar-denominated indebtedness and accounts receivable and (ii) fair value losses or gains on currency derivatives we use to stabilize our cash flow in U.S. dollars. In 2017, we had net foreign exchange losses of US$463 million, while we had net foreign exchange gains of US$3.252 billion in 2016 and net foreign exchange losses of US$7.044 billion in 2015. In addition, changing values of the Brazilian *real*, the Canadian dollar, the Australian dollar, the Euro, the Indonesian rupiah and other currencies against the U.S. dollar affects our results since most of our costs of goods sold is denominated in currencies other than the U.S. dollar, principally the *real* (52% in 2017) and the Canadian dollar (12% in 2017), while our revenues are mostly U.S. dollar-denominated. We expect currency fluctuations to continue to affect our financial income, expense and cash flow generation.

Significant volatility in currency prices may also result in disruption of foreign exchange markets, which could limit our ability to transfer or to convert certain currencies into U.S. dollars and other currencies for the purpose of making timely payments of interest and principal on our indebtedness. The central banks and governments of the countries in which we operate may institute restrictive exchange rate policies in the future and impose taxes on foreign exchange transactions.

**FINANCIAL RISKS**

### Lower cash flows, resulting from decreased prices of our products, may adversely affect our credit ratings and the cost and availability of financing.

Lower prices of our products may adversely affect our future cash flows, credit ratings and our ability to secure financing at attractive rates. It may also negatively affect our ability to fund our capital investments, provide the financial assurances required to obtain licenses in certain jurisdictions, pay dividends and comply with the financial covenants in some of our long-term debt instruments. See *Operating and financial review and prospects—Liquidity and capital resources.*



### *We may not be able to implement our strategy with respect to divestments and strategic partnerships.*

In the past few years, we have entered into agreements to dispose of assets and to make strategic partnerships, in order to optimize our business portfolio and implement our financing strategy and capital expenditure plans. We may continue to seek opportunities for divestments and strategic partnerships in the future. We are exposed to a number of risks in connection with these transactions, including imposition of regulatory conditions, inability to satisfy conditions for completion or for receipt of additional payments, and negative market reactions. If we are unable to complete our dispositions or strategic partnerships, we may have to revise our business and financing strategy and incur additional costs, which could in turn adversely affect our results of operations, financial conditions or reputation.

### RISKS RELATING TO LEGAL PROCEEDINGS

### *We are involved in legal proceedings that could have a material adverse effect on our business in the event of unfavorable outcomes.*

We are involved in legal proceedings in which adverse parties have sought injunctions to suspend certain of our operations or claimed substantial amounts, including several legal proceedings and investigations relating to the failure of Samarco's Fundão tailings dam. Although we are vigorously contesting them, the outcomes of these proceedings are uncertain and may materially and adversely affect our business, our liquidity and the value of the securities issued by us or our subsidiaries. See *Additional information—Legal proceedings*.

### *Our obligations and potential liabilities arising from the failure of a tailings dam owned by Samarco Mineração S.A. ("Samarco") in Minas Gerais could negatively impact our business, our financial conditions and our reputation.*

In November 2015, the Fundão tailings dam owned by Samarco failed, causing environmental damage in the surrounding area. The failure of Samarco's tailings dam has adversely affected and will continue to affect our business, and the full impact is still uncertain and cannot be estimated. Below is a discussion of the main effects of the dam failure on our business.

- *Legal proceedings.* We are involved in multiple legal proceedings and investigations relating to the failure of the Fundão tailings dam, and other proceedings and investigations may arise in the future. These proceedings include securities class actions in the United States against us and some of our officers, a criminal proceeding in Brazil, public civil actions brought by Brazilian authorities and multiple proceedings involving claims for significant amounts of damages and remediation measures. Adverse results in these proceedings may adversely impact our liquidity and our financial condition. See *Additional information— Legal proceedings.*

- *Reparation obligations and other undertakings.* In March 2016, Samarco and its shareholders (Vale and BHPB) entered into the Framework Agreement with certain governmental authorities, pursuant to which Samarco, Vale and BHPB agreed to create a foundation (Fundação Renova) to develop and implement long-term remediation and compensation programs. In January 2017, Samarco, Vale and BHPB entered into two preliminary agreements with the MPF providing for, among other things, the appointment of experts selected by the MPF to review and monitor the remediation programs provided under the Framework Agreement, the provision of collateral to secure certain remediation obligations, and a timetable for negotiation of a final agreement. The preliminary

17



*Risk Factors*

agreements contemplate a potential revision in the remediation programs provided under the Framework Agreement, based on the findings of the experts selected by the MPF. As Samarco is currently unable to resume its activities, we and BHPB have been funding Fundação Renova and also providing funds directly to Samarco, to preserve its operations and to support certain remediation measures undertaken by Samarco. If Samarco is unable to resume operations or to generate sufficient cash flows to fund the remediation measures required under these agreements, we will be required to continue funding these remediation measures, which in turn may adversely affect our financial conditions and results of operations. See *Business overview—Failure of Samarco's tailings dam in Minas Gerais.*

- *Risk of additional environmental damages.* Failure to contain the remaining tailings in Samarco's dams could cause additional environmental damages, additional impacts on our operations, and additional claims, fines and proceedings against Samarco and against us. Failure to contain the remaining tailings could also impact the feasibility and timing for the restart of Samarco's operations.

- *Other impacts.* We may encounter delays in the receipt of environmental and other licenses for our tailings dams and other facilities, and Brazilian authorities may impose more stringent conditions in connection with the licensing process of our projects and operations. Also, as one of Samarco's shareholders, our reputation has been adversely affected by the failure of Samarco's tailings dam.

## POLITICAL, ECONOMIC, SOCIAL AND REGULATORY RISKS

### *Political, economic and social conditions in the countries in which we have operations or projects could adversely impact our business.*

Our financial performance may be negatively affected by regulatory, political, economic and social conditions in countries in which we have significant operations or projects. In many of these jurisdictions, we are exposed to various risks such as political instability, bribery, extortion, corruption, robbery, sabotage, kidnapping, civil strife, acts of war, guerilla activities, piracy in international shipping routes and terrorism. These issues may adversely affect the economic and other conditions under which we operate in ways that could have a materially negative effect on our business.

### *Political and economic instability in Brazil could adversely impact our business and the market price of our securities.*

The Brazilian federal government's economic policies may have important effects on Brazilian companies, including us, and on market conditions and prices of securities of Brazilian companies. Our financial condition and results of operations may be adversely affected by the following factors and the Brazilian federal government's response to these factors:

- exchange rate movements and volatility;

- inflation and high interest rates;

- financing of the current account deficit;

- liquidity of domestic capital and lending markets;

18



- tax policy;

- political instability resulting from allegations of corruption involving political parties, elected officials or other public officials; and

- other political, diplomatic, social and economic developments in or affecting Brazil.

Historically, the country's political situation has influenced the performance of the Brazilian economy, and political crises have affected the confidence of investors and the general public, which resulted in economic deceleration, downgrading of credit ratings of the Brazilian government and Brazilian issuers, and heightened volatility in the securities issued abroad by Brazilian companies. In August 2016, the Brazilian Congress approved the impeachment of the Brazilian president. Also, ongoing corruption investigations have led to charges against former and current public officials, members of several major political parties and directors and officers of many Brazilian companies. In addition, Brazil's next presidential and federal legislative election will be in October 2018. We cannot predict the outcome of these elections or whether the elections will result in changes in Brazilian governmental and economic policies or in the Brazilian mining industry. Political instability and the upcoming elections may aggravate economic uncertainties in Brazil and increase volatility of securities of Brazilian issuers.

In the last years, Brazil faced an economic recession, adverse fiscal developments and political instability. Brazilian GDP grew by 1.0% in 2017, but declined by 3.6% in 2016 and by 3.85% in 2015. Unemployment rate was 12.7% in 2017, 11.5% in 2016 and 6.9% in 2015. Inflation, as reported by the consumer price index (IPCA), was 2.95% in 2017, 6.29% in 2016 and 10.67% in 2015. The Brazilian Central Bank's base interest rate (SELIC) was 7.00% on December 31, 2017, 13.75% on December 31, 2016 and 14.25% on December 31, 2015. Future economic, social and political developments in Brazil may impair our business, financial condition or results of operations, or cause the market value of our securities to decline.

### *Disagreements with local communities in which we operate could adversely impact our business and reputation.*

Disputes with communities where we operate may arise from time to time. In some instances, our operations and mineral reserves are located on or near lands owned or used by indigenous people or other groups of stakeholders. Some of our mining and other operations are located in territories where title may be subject to disputes or uncertainties, or in areas claimed for agriculture or land reform purposes, which may lead to disagreements with landowners, organized social movements, local communities and the government. In some jurisdictions, we may be required to consult and negotiate with these groups as part of the process to obtain licenses required to operate, to mitigate impact on our operations or to obtain access to their lands.

Disagreements or disputes with local groups, including indigenous groups, organized social movements and local communities, could cause delays in obtaining licenses, increases in planned budget, delays or interruptions to our operations. These issues may adversely affect our reputation or otherwise hamper our ability to develop our reserves and conduct our operations. Protesters have taken actions to disrupt our operations and projects, and they may continue to do so in the future, which may harm our operations and could adversely affect our business. See *Information on the Company—Regulatory matters* and *Additional information—Legal proceedings*.



***We could be adversely affected by changes in government policies or by trends such as resource nationalism, including the imposition of new taxes or royalties on mining activities.***

Mining is subject to government regulation, including taxes and royalties, which can have a significant financial impact on our operations. In the countries where we are present, we are subject to potential renegotiation, nullification or forced modification of existing contracts and licenses, expropriation or nationalization of property, foreign exchange controls, changes in local laws, regulations and policies and audits and reassessments. We are also subject to new taxes or raising of existing taxes and royalty rates, reduction of tax exemptions and benefits, renegotiation of tax stabilization agreements or changes on the basis on which taxes are calculated in a manner that is unfavorable to us. Governments that have committed to provide a stable taxation or regulatory environment may alter those commitments or shorten their duration. We also face the risk of having to submit to the jurisdiction of a foreign court or arbitration panel or having to enforce a judgment against a sovereign nation within its own territory. See *Information on the Company—Regulatory matters* and *Additional information—Royalties and other taxes on mining activities.*

We are also required to meet domestic beneficiation requirements in certain countries, such as local processing rules, export taxes or restrictions or charges on unprocessed ores. The imposition of or increase in such requirements, taxes or charges can significantly increase the risk profile and costs of operations in those jurisdictions. We and the mining industry are subject to rising trends of resource nationalism in certain countries in which we operate that can result in constraints on our operations, increased taxation or even expropriations and nationalizations.

As a supplier of iron ore, nickel and other raw materials to the global integrated steel industry, we are subject to additional risk from the imposition of duties, tariffs, import and export controls and other trade barriers impacting our products and the products our customers produce. Global trade is subject to a growing trend of increased trade barriers, which could exacerbate commodities' price volatility and in turn result in instability in the prices of our products.

***Concessions, authorizations, licenses and permits are subject to expiration, limitation on renewal and various other risks and uncertainties.***

Our operations depend on authorizations and concessions from governmental regulatory agencies in the countries in which we operate. We are subject to laws and regulations in many jurisdictions that can change at any time, and changes in laws and regulations may require modifications to our technologies and operations and result in unanticipated capital expenditures.

Some of our mining concessions are subject to fixed expiration dates and might only be renewed a limited number of times for a limited period of time. Apart from mining concessions, we may need to obtain various authorizations, licenses and permits from governmental or other regulatory bodies in connection with the planning, maintenance, operation and closure of our mines and related logistics infrastructure, which may be subject to fixed expiration dates or periodic review or renewal. There is no assurance that renewals will be granted as and when sought, and there is no assurance that new conditions will not be imposed in connection with renewal. Fees for mining concessions might increase substantially due to the passage of time from the original issuance of each individual exploration license. If so, the costs of holding or renewing our mining concessions may render our business objectives not viable. Accordingly, we need to continually assess the mineral potential of each mining concession, particularly at the time of renewal, to determine if the costs of maintaining the concession are justified by the results of operations to date, and we might elect to let some of our concessions lapse. There can be no assurance that concessions will be obtained on terms favorable to us, or at all, for our future intended mining or exploration targets.

20



In a number of jurisdictions where we have exploration projects, we may be required to retrocede to the state a certain portion of the area covered by the exploration license as a condition to renewing the license or obtaining a mining concession. This requirement can lead to a substantial loss of part of the mineral deposit originally identified in our feasibility studies. For more information on mining concessions and other similar rights, see *Information on the Company—Regulatory matters*.

## OPERATIONAL RISKS

### *Our projects are subject to risks that may result in increased costs or delay in their implementation.*

We are investing to maintain and further increase our production capacity and logistics capabilities. We regularly review the economic viability of our projects. As a result of this review, we may decide to postpone, suspend or interrupt the implementation of certain projects. Our projects are also subject to a number of risks that may adversely affect our growth prospects and profitability, including the following:

- We may not be able to obtain financing at attractive rates.

- We may encounter delays or higher than expected costs in obtaining the necessary equipment or services and in implementing new technologies to build and operate a project.

- Our efforts to develop projects on schedule may be hampered by a lack of infrastructure, including reliable telecommunications services and power supply.

- Suppliers and contractors may fail to meet their contractual obligations to us.

- We may face unexpected weather conditions or other force majeure events.

- We may fail to obtain or renew the required permits and licenses to build a project, or we may experience delays or higher than expected costs in obtaining or renewing them.

- Changes in market conditions or regulations may make a project less profitable than expected at the time we initiated work on it.

- There may be accidents or incidents during project implementation.

- We may face shortages of skilled personnel.

### *Operational problems could materially and adversely affect our business and financial performance.*

Ineffective project management and operational breakdowns might require us to suspend or curtail operations, which could generally reduce our productivity. Operational breakdowns could entail failure of critical plant and machinery. There can be no assurance that ineffective project management or other operational problems will not occur. Any damages to our projects or delays in our operations caused by ineffective project management or operational breakdowns could materially and adversely affect our business and results of operations. Our business is subject to a number of operational risks that may adversely affect our results of operations, such as:

- Unexpected weather conditions or other force majeure events.

21



*Risk Factors*

- Adverse mining conditions delaying or hampering our ability to produce the expected quantity of minerals and to meet specifications required by customers, which can trigger price adjustments.

- Accidents or incidents involving our mines, industrial facilities and related infrastructure, such as dams, plants, railway and railway bridges, ports and ships.

- Delays or interruptions in the transportation of our products, including with railroads, ports and ships.

- Tropical diseases, HIV/AIDS and other contagious diseases in regions where some of our operations or projects are located, which pose health and safety risks to our employees.

- Labor disputes that may disrupt our operations from time to time.

- Changes in market conditions or regulations may affect the economic prospects of an operation and make it inconsistent with our business strategy.

- Failure to obtain the renewal of required permits and licenses, or delays or higher than expected costs in obtaining them.

- Disruptions to or unavailability of critical information technology systems or services resulting from accidents or malicious acts.

### *Our business could be adversely affected by the failure of our counterparties, joint venture partners or joint ventures we do not control to perform their obligations.*

Customers, suppliers, contractors, financial institutions, joint venture partners and other counterparties may fail to perform existing contracts and obligations, which may unfavorably impact our operations and financial results. The ability of suppliers and customers to perform their obligations may be adversely affected in times of financial stress and economic downturn.

Important parts of our iron ore, pelletizing, nickel, coal, copper, energy and other businesses are held through joint ventures. This may reduce our degree of control, as well as our ability to identify and manage risks. Our forecasts and plans for these joint ventures and consortia assume that our partners will observe their obligations to make capital contributions, purchase products and, in some cases, provide skilled and competent managerial personnel. If any of our partners fails to observe its commitments, the affected joint venture or consortium may not be able to operate in accordance with its business plans, or we may have to increase the level of our investment to implement these plans.

Some of our investments are controlled by partners or have separate and independent management. These investments may not fully comply with our standards, controls and procedures, including our health, safety, environment and community standards. Failure by any of our partners or joint ventures to adopt adequate standards, controls and procedures could lead to higher costs, reduced production or environmental, health and safety incidents or accidents, which could adversely affect our results and reputation.



### We may not have adequate insurance coverage for some business risks.

Our businesses are generally subject to a number of risks and hazards, which could result in damage to, or destruction of, properties, facilities and equipment. The insurance we maintain against risks that are typical in our business may not provide adequate coverage. Insurance against some risks (including liabilities for environmental pollution or certain hazards or interruption of certain business activities) may not be available at a reasonable cost, or at all. Even when it is available, we may self-insure where we determine that is more cost-effective to do so. As a result, accidents or other negative developments involving our mining, production or transportation facilities could have a material adverse effect on our operations.

### Labor disputes may disrupt our operations from time to time.

A substantial number of our employees, and some of the employees of our subcontractors, are represented by labor unions and are covered by collective bargaining or other labor agreements, which are subject to periodic negotiation. Strikes and other labor disruptions at any of our operations could adversely affect the operation of facilities and the timing of completion and cost of our capital projects. For more information about labor relations, see *Management and employees—Employees*. Moreover, we could be adversely affected by labor disruptions involving unrelated parties that may provide us with goods or services.

### Higher energy costs or energy shortages would adversely affect our business.

Costs of fuel oil, gas and electricity are a significant component of our cost of production, representing 10.8% of our total cost of goods sold in 2017. To fulfill our energy needs, we depend on the following sources: oil byproducts, which represented 32.0% of total energy needs in 2017, electricity (31.6%), natural gas (16.7%), coal (15.0%) and other energy sources (4.7%).

Electricity costs represented 4.6% of our total cost of goods sold in 2017. If we are unable to secure reliable access to electricity at acceptable prices, we may be forced to curtail production or may experience higher production costs, either of which would adversely affect our results of operations. We face the risk of energy shortages in the countries where we have operations and projects, especially Brazil, due to lack of infrastructure or weather conditions, such as floods or droughts. Future shortages, and government efforts to respond to or prevent shortages, may adversely impact the cost or supply of electricity for our operations.

### Failures in our information technology, operational technology, cybersecurity and telecommunications systems may adversely affect our business and reputation.

We rely heavily on information technology, operational technology and telecommunications systems for the operation of many of our business processes. Failures in those systems, whether caused by obsolescence, technical failures, negligence, accident or malicious acts, may result in the disclosure or theft of sensitive information, misappropriation of funds and disruptions to or interruption in our business operations. We may be the target of attempts to gain unauthorized access to information technology and operational technology systems through the internet, including sophisticated and coordinated attempts often referred to as advanced persistent threats. Disruption of critical information technology, operational technology, cybersecurity or telecommunications systems, or breaches of information security, may harm our reputation and have a material adverse effect on our operational performance, earnings and financial condition.

23



## HEALTH, SAFETY AND ENVIRONMENTAL RISKS

### *Our business is subject to environmental, health and safety incidents.*

Our operations involve the use, handling, storage, discharge and disposal of hazardous substances into the environment and the use of natural resources, and the mining industry is generally subject to significant risks and hazards, including fire, explosion, toxic gas leaks, spilling of polluting substances or other hazardous materials, rockfalls, incidents involving dams, failure of other operational structures and incidents involving mobile equipment, vehicles or machinery. This could occur by accident or by breach of operating and maintenance standards, and could result in a significant environmental and social impacts, damage to or destruction of mineral properties or production facilities, personal injury, illness or death of employees, contractors or community members close to operations, environmental damage, delays in production, monetary losses and possible legal liability. Additionally, in remote localities, our employees may be exposed to tropical and contagious diseases that may affect their health and safety. Notwithstanding our standards, policies and controls, our operations remain subject to incidents or accidents that could adversely affect our business, stakeholders or reputation.

### *Our business may be adversely affected by social, environmental and health and safety regulation, including regulations pertaining to climate change.*

Nearly all aspects of our activities, products, services and projects around the world are subject to social, environmental and health and safety regulations, which may expose us to increased liability or increased costs. These regulations require us to have environmental licenses, permits and authorizations for our operations and projects, and to conduct environmental and social impact assessments in order to get approval for our projects and permission for initiating construction. Significant changes to existing operations are also subject to these requirements. Difficulties in obtaining or renewing permits may lead to construction delays, cost increases, and may adversely impact our production volumes. Social, environmental and health and safety regulations also impose standards and controls on activities relating to mineral research, mining, pelletizing activities, railway and marine services, ports, decommissioning, refining, distribution and marketing of our products. Such regulation may give rise to significant costs and liabilities. Litigation relating to these or other related matters may adversely affect our financial condition or cause harm to our reputation.

Social, environmental and health and safety regulations in many countries in which we operate has become stricter in recent years, and it is possible that more regulation or more aggressive enforcement of existing regulations will adversely affect us by imposing restrictions on our activities and products, creating new requirements for the issuance or renewal of environmental licenses, resulting in operation delays, raising our costs or requiring us to engage in expensive reclamation efforts.

It is possible that in certain of our iron ore mining operations or projects, we may be required to limit or modify our mining plans or to incur additional costs to preserve caves or to compensate for the impact on them, with potential consequences for production volumes, costs or reserves in our iron ore business. For more information about Brazilian environmental regulations related to caves, see *Information on the Company—Regulatory matters—Environmental regulations*.

In response to the failure of Samarco's tailings dam in Minas Gerais, additional environmental and health and safety laws and regulations may be forthcoming in Brazil and authorities may impose more stringent conditions in connection with the licensing process of our projects and operations. Also, we may encounter more stringent requirements for and delays in the receipt of environmental operating license for other tailings dams.



National policies and international regulations regarding climate change may affect a number of our businesses in various countries. The ratification of the Paris Agreement in 2016 increased international pressure for the establishment of a global carbon price, and on companies to adopt carbon pricing strategies. The pricing of greenhouse gas emissions may impact our operational costs, mainly through higher price for fossil fuels as mining is an energy intensive industry, and our cost of international freight. Consumption of coal, one of the products we sell, in particular, is facing pressure from international institutions due to its carbon intensity.

Regulatory initiatives at the national and international levels that affect our shipping practices could increase our costs or require us to make new capital expenditures.

### *Natural disasters may cause severe damage to our operations and projects in the countries where we operate and may have a negative impact on our sales to countries affected by such disasters.*

Natural disasters, such as wind storms, droughts, floods, earthquakes and tsunamis may adversely affect our operations and projects in the countries where we operate, and may cause a contraction in sales to countries adversely affected due to, among other factors, power outages and the destruction of industrial facilities and infrastructure. The physical impact of climate change on our business remains uncertain, but we are likely to experience changes in rainfall patterns, increased temperatures, water shortages, rising sea levels, increased storm frequency and intensity as a result of climate change, which may adversely affect our operations. On some occasions in recent years, we have determined that force majeure events have occurred due to effect of severe weather on our mining and logistics activities.

### RISKS RELATING TO OUR MINING RESERVES

### *Our reserve estimates may materially differ from mineral quantities that we are actually able to recover; our estimates of mine life may prove inaccurate; and market price fluctuations and changes in operating and capital costs may render certain ore reserves uneconomical to mine.*

Our reported reserves are estimated quantities of ore and minerals that we have determined can be economically mined and processed under present and assumed future conditions. There are numerous uncertainties inherent in estimating quantities of reserves and in projecting potential future rates of mineral production, including factors beyond our control. Reserve reporting involves estimating deposits of minerals that cannot be measured in an exact manner, and the accuracy of any reserve estimate is a function of the quality of available data, engineering and geological interpretation and judgment. As a result, no assurance can be given that the indicated amount of ore will be recovered or that it will be recovered at the rates we anticipate. Reserve estimates and estimates of mine life may require revisions based on actual production experience, projects, updated exploration drilling data and other factors. Lower market prices of minerals and metals, reduced recovery rates or increased operating and capital costs due to inflation, exchange rates, changes in regulatory requirements or other factors may render proven and probable reserves uneconomic to exploit and may ultimately result in a reduction of reserves. Such a reduction could affect depreciation and amortization rates and have an adverse effect on our financial performance.

### *We may not be able to replenish our reserves, which could adversely affect our mining prospects.*

We engage in mineral exploration, which is highly uncertain in nature, involves many risks and frequently is non-productive. Our exploration programs, which involve significant expenditures, may fail to result in



the expansion or replacement of reserves depleted by current production. If we do not develop new reserves, we will not be able to sustain our current level of production beyond the remaining lives of our existing mines.

### *The feasibility of new mineral projects may change over time.*

Once mineral deposits are discovered, it can take a number of years from the initial phases of drilling until production is possible, during which the economic feasibility of production may change. Substantial time and expenditures are required to:

- establish mineral reserves through drilling;

- determine appropriate mining and metallurgical processes for optimizing the recovery of metal contained in ore;

- obtain environmental and other licenses;

- construct mining, processing facilities and infrastructure required for greenfield properties; and

- obtain the ore or extract the minerals from the ore.

If a project proves not to be economically feasible by the time we are able to exploit it, we may incur substantial losses and be obliged to take write-downs. In addition, potential changes or complications involving metallurgical and other technological processes arising during the life of a project may result in delays and cost overruns that may render the project not economically feasible.

### *We face rising extraction costs and investment requirements over time as reserves deplete.*

Reserves are gradually depleted in the ordinary course of a given open pit or underground mining operation. As mining progresses, distances to the primary crusher and to waste deposits become longer, pits become steeper, mines may move from being open pit to underground, and underground operations become deeper. In addition, for some types of reserves, mineralization grade decreases and hardness increases at greater depths. As a result, over time, we usually experience rising unit extraction costs with respect to each mine, or we may need to make additional investments, including adaptation or construction of processing plants and expansion or construction of tailings dams. Several of our mines have been operating for long periods, and we will likely experience rising extraction costs per unit in the future at these operations in particular.

### RISKS RELATING TO OUR CORPORATE STRUCTURE

### *The shareholders that are party to our shareholders' agreement have significant power over Vale.*

On August 14, 2017, Litel Participações S.A. ("Litel"), Bradespar S.A. ("Bradespar"), Mitsui & Co., Ltd. ("Mitsui") and BNDES Participações S.A. ("BNDESPAR") entered into a shareholders' agreement pursuant to which they undertake to vote jointly on certain key matters (the "Shareholders' Agreement"). The Shareholders' Agreement is expected to expire on November 9, 2020. See *Share ownership and trading—Major shareholders*. On December 31, 2017, Litel, Bradespar, Mitsui and BNDESPAR together held 40.29% of our total capital stock. As long as no other shareholder or group of shareholders owns more shares than



the parties to the Shareholders' Agreement, these major shareholders may elect a majority of the members of the board of directors and control the outcome of certain actions requiring shareholder approval.

### *The Brazilian Government has certain veto rights.*

The Brazilian government owns 12 golden shares of Vale, granting it limited veto power over certain company actions, such as changes to our name, the location of our headquarters and our corporate purpose as it relates to mining activities. For a detailed description of the Brazilian government's veto powers, see *Additional information—Memorandum and articles of association—Common shares and golden shares.*

### *Our governance and compliance processes may fail to prevent regulatory penalties and reputational harm.*

We operate in a global environment, and our activities extend over multiple jurisdictions and complex regulatory frameworks, with increasing enforcement activities worldwide. Our governance and compliance processes, which include the review of internal control over financial reporting, may not timely identify or prevent future breaches of legal, accounting or governance standards. We may be subject to breaches of our code of ethics and conduct, anti-corruption policies and business conduct protocols and to instances of fraudulent behavior, corrupt practices and dishonesty by our employees, contractors or other agents. Our failure to comply with applicable laws and other standards could subject us to investigations by authorities, litigation, fines, loss of operating licenses, disgorgement of profits, involuntary dissolution and reputational harm.

### *It could be difficult for investors to enforce any judgment obtained outside Brazil against us or any of our associates.*

Our investors may be located in jurisdictions outside Brazil and could seek to bring actions against us or our directors or officers in the courts of their home jurisdictions. We are a Brazilian company, and the majority of our officers and directors are residents of Brazil. The vast majority of our assets and the assets of our officers and directors are likely to be located in jurisdictions other than the home jurisdictions of our foreign investors. It might not be possible for investors outside Brazil to effect service of process within their home jurisdictions on us or on our officers or directors who reside outside their home jurisdictions. In addition, a final conclusive foreign judgment will be enforceable in the courts of Brazil without a re-examination of the merits only if previously confirmed by the Brazilian Superior Court of Justice (STJ—*Superior Tribunal de Justiça*), and confirmation will only be granted if the foreign judgment: (a) fulfills all formalities required for its enforceability under the laws of the country where it was issued; (b) was issued by a competent court after due service of process on the defendant, as required under applicable law; (c) is not subject to appeal; (d) does not conflict with a final and unappealable decision issued by a Brazilian court; (e) was authenticated by a Brazilian consulate in the country in which it was issued or is duly apostilled in accordance with the Convention for Abolishing the Requirement of Legalization for Foreign Public Documents and is accompanied by a sworn translation into Portuguese, unless this procedure was exempted by an international treaty entered into by Brazil; (f) it does not cover matters subject to the exclusive jurisdiction of the Brazilian courts; and (g) is not contrary to Brazilian national sovereignty, public policy or good morals. Therefore, investors might not be able to recover against us or our directors and officers on judgments of the courts of their home jurisdictions predicated upon the laws of such jurisdictions.



*Risk Factors*

**RISKS RELATING TO OUR DEPOSITARY SHARES**

*If ADR holders exchange ADSs for the underlying shares, they risk losing the ability to remit foreign currency abroad.*

The custodian for the shares underlying our ADSs maintains a registration with the Central Bank of Brazil permitting qualifying institutional foreign investors to buy and sell securities on the B3 and entitling the custodian to remit U.S. dollars outside Brazil for payments of dividends and other distributions relating to the shares underlying our ADSs or upon the disposition of the underlying shares. If an ADR holder exchanges its ADSs for the underlying shares, it will be entitled to rely on the custodian's registration for only five business days from the date of exchange. Thereafter, an ADR holder may not be able to obtain and remit foreign currency abroad upon the disposition of, or distributions relating to, the underlying shares unless it obtains its own registration under applicable regulation. See *Additional information—Exchange controls and other limitations affecting security holders*. If an ADR holder attempts to obtain its own registration, it may incur expenses or suffer delays in the application process, which could delay the receipt of dividends or other distributions relating to the underlying shares or the return of capital in a timely manner.

The custodian's registration or any registration obtained could be affected by future legislative changes, and additional restrictions applicable to ADR holders, the disposition of the underlying shares or the repatriation of the proceeds from disposition could be imposed in the future.

*ADR holders may not have all the rights of our shareholders, and may be unable to exercise preemptive rights relating to the shares underlying their ADSs.*

ADR holders may not have the same rights that are attributed to our shareholders by Brazilian law or our bylaws, and the rights of ADR holders may be subject to certain limitations provided in the deposit agreement or by the securities intermediaries through which ADR holders hold their securities. Also, the ability of ADR holders to exercise preemptive rights is not assured, particularly if the applicable law in the holder's jurisdiction (for example, the Securities Act in the United States) requires that either a registration statement be effective or an exemption from registration be available with respect to those rights, as is in the case in the United States. We are not obligated to extend the offer of preemptive rights to holders of ADRs, to file a registration statement in the United States, or to make any other similar filing in any other jurisdiction, relating to preemptive rights or to undertake steps that may be needed to make exemptions from registration available, and we cannot assure holders that we will file any registration statement or take such steps.

*ADR holders may encounter difficulties in the exercise of voting rights.*

ADR holders do not have the rights of shareholders. They have only the contractual rights set forth for their benefit under the deposit agreements. ADR holders are not permitted to attend shareholders' meetings, and they may only vote by providing instructions to the depositary. In practice, the ability of a holder of ADRs to instruct the depositary as to voting will depend on the timing and procedures for providing instructions to the depositary either directly or through the holder's custodian and clearing system. With respect to ADSs for which instructions are not received, the depositary may, subject to certain limitations, grant a proxy to a person designated by us.



*Risk Factors*

### *The legal protections for holders of our securities differ from one jurisdiction to another and may be inconsistent, unfamiliar or less effective than investors anticipate.*

We are a global company with securities traded in several different markets and investors located in many different countries. The legal regime for the protection of investors varies around the world, sometimes in important ways, and investors in our securities should recognize that the protections and remedies available to them may be different from those to which they are accustomed in their home markets. We are subject to securities legislation in several countries, which have different rules, supervision and enforcement practices. The only corporate law applicable to our parent company is the law of Brazil, with its specific substantive rules and judicial procedures. We are subject to corporate governance rules in several jurisdictions where our securities are listed, but as a foreign private issuer, we are not required to follow many of the corporate governance rules that apply to U.S. domestic issuers with securities listed on the New York Stock Exchange, and we are not subject to the U.S. proxy rules.



mitigate environmental and social impacts, and we must operate our facilities in compliance with the terms of the approvals, licenses, permits or authorizations.

We are taking several steps to improve the efficiency of the licensing process, including stronger integration of our environmental and project development teams, funding research into new and alternative technologies to reduce environmental and social impacts, use and continuous improvement of a Best Practices Guide for Environmental Licensing and the Environment, the deployment of highly-skilled specialist teams, closer interaction with environmental regulators and the creation of an executive committee to expedite internal decisions regarding licensing.

Environmental regulations affecting our operations relate, among other matters, to emissions into the air, soil and water; recycling and waste management; protection and preservation of forests, coastlines, caves, cultural heritage sites, watersheds and other features of the ecosystem; water use; financial provisions and closure plans needed since the mining license; climate change and decommissioning and reclamation. Environmental legislation is becoming stricter worldwide, which could lead to greater costs for environmental compliance. In particular, we expect heightened attention from various governments to reducing greenhouse gas emissions as a result of concern over climate change, especially following the entry into force of the Paris Agreement in late 2016.

There are several examples of environmental regulation and compliance initiatives that could affect our operations. For instance, under applicable Brazilian regulations for the protection of caves, we are required to conduct extensive technical studies and negotiate compensatory measures with Brazilian environmental regulators in order to continue to operate in certain sites. In certain of our iron ore mining operations or projects, we may be required to limit or modify our mining plans or to incur additional costs to preserve caves or to compensate for the impact on them, with potential consequences for production volumes, costs or reserves in our iron ore business. Also, a Brazilian regulation for the protection of indigenous people, which was enacted in 2011 and revised in 2015, requires us to conduct specific studies of impact and sponsor mitigation programs in connection with operations and projects close to indigenous people's lands. Also, in 2017, the federal government created new rules for the payment of environmental compensation for activities subjected to environmental assessment.

## REGULATION OF OTHER ACTIVITIES

In addition to mining and environmental regulation, we are subject to comprehensive regulatory regimes for some of our other activities, including rail transport, port operations and electricity generation. We are also subject to more general legislation on workers' health and safety, safety and support of communities near mines, and other matters. The following descriptions relate to some of the other regulatory regimes applicable to our operations:

- *Brazilian railway regulation*. Our Brazilian railroad business operates pursuant to concession contracts granted by the federal government, and our railroad concessions are subject to regulation and supervision by the Brazilian Ministry of Transportation, Ports and Civil Aviation and the regulatory agency for ground transportation (ANTT). The concessions for EFC and EFVM expire in 2027 and may be renewed at the federal government's discretion. VLI has also been awarded a subconcession contract for commercial operation of a 720-kilometer segment of the FNS railroad in Brazil, which expires in 2037, and FCA and MRS concessions expire in 2026. Rail transportation prices can be negotiated directly with the users of such services, subject to tariff ceilings approved by ANTT for each of the concessionaires and each of the different products transported. ANTT regulations also require concessionaires to give trackage rights to other railway operators, to make investments in the railway network, and to meet certain productivity and safety



requirements, among other obligations. In 2016, we and other railroad concessionaries in Brazil initiated discussions with ANTT regarding the possibility of early renewal of railways concession contracts. If we agree to an earlier renewal of our concession, we may have to agree with additional performance indications, new investments obligations and service standards.

- *Brazilian port regulation*. Port operations in Brazil are subject to regulation and supervision by ANTAQ, the federal agency in charge of maritime transportation services, and by the Ministry of Transport, Ports and Civil Aviation through the Secretary of Ports (SNP), whose purpose is to formulate policies and guidelines. In 2014, we renewed the agreements pursuant to which the SNP grants us rights to operate our private terminals, with the exception of the agreement with CPBS, which will expire in 2026. These renewed agreements will be effective until 2039.

- *Brazilian regulation of mining dams*. In May 2017, the DNPM (predecessor to the ANM) created new obligations for companies operating mining dams in Brazil, primarily:

  - *Audit*: Companies operating mining dams must conduct two annual stability audits for each dam and prepare a stability condition report. Specifically in the State of Minas Gerais, these audits and reports must be prepared by external auditors.

  - *Periodic Safety Reviews*: The stability condition report must include detailed analysis of all dam's documentation impacts on surrounding communities, including hazards and failure impact studies. Companies operating mining dams classified as high associated potential damage (DPA) must complete these studies by June 2018, while those for medium-DPA mining dams must be completed by December 2018 and those for low-DPA mining dams must be completed by June 2019.

  - *Emergency Action Plan Training*: Companies operating high-DPA mining dams must conduct two annual emergency action plan training sessions for their employees.

  - *Monitoring*: Video monitor must be implemented for all high-DPA mining dams by June 2019.

- *Regulation of chemicals*. Some of our products are subject to regulations applicable to the marketing, distribution and use of chemical substances present in their composition. For example, the European Commission has adopted a European Chemicals Policy, known as REACH ("Registration, Evaluation and Authorization of Chemicals"). Under REACH, European manufacturers and importers are required to register substances prior to their entry into the European market and in some cases may be subject to an authorization process. A company that fails to comply with the REACH regulations could face fines and penalties. We are compliant with the requirements of the REACH regulations. In addition, South Korea is currently implementing a regulation similar to REACH, and we anticipate further expansion of REACH-like regulations in other Asian countries.

- *Regulation of international maritime transportation*. We are subject to health, safety and environmental regulation by the International Maritime Organization ("IMO"). IMO rules are based not only on the international shipping categories, but also on the types of cargoes transported, including special rules for iron ore, coal, nickel and copper. The IMO is currently discussing further measures for enhancing the energy efficiency of international shipping including the development of a global data collection system which will eventually enable



market-based measures to curb greenhouse gas emissions. These measures to curb greenhouse gas emissions may increase our freight cost in the future. In 2016, the IMO also approved regulation establishing limits for sulfur oxides emission limits, which will become effective in 2020. This regulation may increase freight cost due to the need to use bunker with low sulfur content or to install additional pollutant control equipment to limit air emissions. Also, the International Convention for the Control and Management of Ships' Ballast Water and Sediments became effective in September 2017 for new ships (those with keels laid after that date). For existing ships, the convention will become effective in stages beginning in September 2019, following which date each vessel will have a specific deadline for compliance, with the global fleet required to be fully compliant by September 2024. Under this convention, all compliant ships during their international voyages are required to manage their ballast water and sediments in accordance with the defined requirements, which may also result in increases of freight and port operation costs.



# RISK MANAGEMENT

The purpose of our risk management strategy is to promote enterprise-wide risk management that supports the achievement of our objectives, financial strength and flexibility and business continuity.

We developed an integrated framework for managing risk, which considers the impact on our business of not only market risk factors (market risk), but also risks associated with inadequate or failed internal processes, people, systems or external events (operational risk), risks arising from third-party obligations (credit risk), risks from exposure to legal penalties, fines or reputational losses associated with failure to act in accordance with applicable laws and regulations, internal policies or best practices (compliance risk), and risks associated with political and regulatory conditions in countries in which we operate (political risk), among others.

In order to achieve this objective and to further improve our corporate governance practices, our Board of Directors has established a company-wide risk management policy and a Compliance and Risk Committee. The risk management policy requires that we regularly evaluate and monitor the corporate risks on a consolidated basis in order to guarantee that our overall risk level remains in accordance with our strategic guidelines.

See note 32 to our consolidated financial statements for quantitative information about risks relating to financial instruments, including financial instruments entered into pursuant to our risk management policies.

**MARKET RISK**

We are exposed to various market risk factors that can impact our cash flow. An assessment of the potential impact of the consolidated market risk exposure is performed periodically to support the decision making process regarding the risk management strategy, which may incorporate financial instruments, including derivatives. The financial instrument portfolio is monitored on a monthly basis, enabling us to properly evaluate financial results and their impact on cash flow, and ensure correlation between the strategies implemented and the proposed objectives.

Considering the nature of our business and operations, the main market risk factors that we are exposed to are:

- *Foreign exchange rates and interest rates*. Our cash flows are exposed to the volatility of several currencies against the U.S. dollar and of interest rate on loans and financings. While most of our product prices are indexed to U.S. dollars, most of our costs, disbursements and investments are indexed to currencies other than the U.S. dollar, principally the Brazilian *real* and the Canadian dollar. We also have debt instruments denominated in currencies other than U.S. dollars, mainly in Brazilian *reais* and euros. We may use swaps and forward transactions to convert into U.S. dollars a portion of the cash outflows of these debt instruments.

  Our floating rate debt consists mainly of loans including export pre-payments, commercial bank loans and multilateral organization loans. In general, the U.S. dollar floating rate debt is subject to changes to LIBOR (London Interbank Offer Rate) in U.S. dollars. We take advantage of the potential correlation between commodity prices and U.S. dollar floating interest rates as a partial natural hedge for this risk.

- *Product prices and input costs*. We are also exposed to market risks associated with commodities price volatilities. We may enact risk mitigation programs: (i) in situations where

116



there is a risk of financial distress; (ii) to support commercial activities and specific needs of our business segments; and (iii) to protect from the increase of certain cost items, such as bunker oil and freight chartering. These programs include predominantly forward transactions, futures contracts and options.

## OPERATIONAL RISK

Operational risk management is the structured approach we take to manage uncertainty related to internal and external events. Internal events consist of inadequate or failed internal processes, people and systems, while external events include natural or third party-caused operational catastrophes, regulatory, political, economic or social actions taken by governments or other key stakeholders.

We mitigate operational risk with new controls and improvement of existing ones, new mitigation plans and transfer of risk through insurance. We seek a clear view of the major risks we are exposed to, the cost-benefit on mitigation plans and the controls in place to closely monitor the impact of operational risks and to efficiently allocate capital to reduce it.

## CREDIT RISK

We are exposed to credit risk arising from trade receivables, derivative transactions, guarantees, down payment for suppliers and cash investments. Our credit risk management process provides a framework for assessing and managing counterparties' credit risk and for maintaining our risk at an acceptable level.

### *Commercial credit risk management*

We assign an internal credit rating and a credit limit to each counterparty using our own quantitative methodology for credit risk analysis, which is based on market prices, external credit ratings and financial information of the counterparty, as well as qualitative information regarding the counterparty's strategic position and history of commercial relations.

Based on the counterparty's credit risk, risk mitigation strategies may be used to manage our credit risk. The main credit risk mitigation strategies include non-recourse discount of receivables, insurance instruments, letters of credit, corporate and bank guarantees, mortgages, among others.

From a geographic standpoint, we have a diversified accounts receivable portfolio, with Asia, Europe and Brazil, the regions with the most significant exposure. According to each region, different guarantees can be used to enhance the credit quality of the receivables. We monitor the counterparty exposure in the portfolio periodically and we block additional sales to customers in delinquency.

### *Treasury credit risk management*

To manage the credit exposure arising from cash investments and derivative instruments, credit limits are approved to each counterparty to which we have credit exposure. We control the portfolio diversification and monitor different indicators of solvency and liquidity of our different counterparties that were approved for trading.

## COMPLIANCE RISK

### *Political exposure*

Under our bylaws, we are prohibited from making, directly or indirectly through third parties, any contribution to political movements in Brazil or abroad, including those organized as political parties, and to their representatives or candidates.



**ADVISORY COMMITTEES TO THE BOARD OF DIRECTORS**

Our bylaws provide for the following advisory committees to the Board of Directors, each governed by its own internal rules:

- The *Personnel Committee*, which is responsible for (i) evaluating Vale's general human resources policies as submitted by the executive officers to the Board of Directors; (ii) evaluating the adequacy of the compensation model for members of the Board of Executive Officers and the proposed annual, global budget for the compensation of executives; (iii) aiding the Board of Directors in the setting and monitoring of goals for the performance evaluation of the Board of Executive Officers and other executives who report directly to the Chief Executive Officer; (iv) aiding the Board of Directors in the setting and monitoring of goals for the performance evaluation of those in charge of Vale's Governance Office, Internal Auditing and Ombudsman; (v) supporting the Board of Directors in the process of selecting and appointing the Chief Executive Officer, as well as evaluating the appointment, by the latter, of the other members of the Executive Board and other leaders who report directly to the Chief Executive Officer; (vi) monitoring the development of the succession plan for the Executive Board and other leaders who report directly to the Chief Executive Officer, as well as their successors, and proposing improvements; (vii) evaluating and recommending adjustments to corporate governance best practices concerning the structure, size and composition of the Board of Directors and the Advisory Committees, as well as the balance of experiences, knowledge and diversity of the profiles of their members; (viii) identifying and recommending potential candidates to be directors and also potential candidates to be members of the Advisory Committees; (ix) supporting the Chairman of the Board of Directors in organizing the process for performance evaluation of Vale's Board of Directors and Advisory Committees; (x) preparing and approving the Personnel Committee's annual work plan; and (xi) proposing analysis and evaluation, as well as opining about other topics under its responsibility.

- The *Finance Committee*, which is responsible for (i) evaluating the structure and conditions of investment and divestment transactions, including mergers, consolidations and spin-offs in which Vale is involved; (ii) evaluating the compatibility between the compensation level of shareholders and the parameters established in the annual budget and financial scheduling, as well as their consistency with the general policy on dividends and Vale's capital structure; (iii) evaluating Vale's policies on minimum cash and financial investments; (iv) evaluating Vale's annual budget and annual investment plan; (v) evaluating Vale's annual funding plan and indebtedness limits; (vi) evaluating current and capital investments, which are the responsibility of the Board of Directors; (vii) monitoring the financial execution of capital expenditure projects, ongoing budget and cash flow; (viii) monitoring financial risks and controls in light of the integrated risk map, as well as proposing improvements to risk mitigation plans; (ix) evaluating Vale's policy for communications with the capital markets; (x) preparing and approving the Finance Committee's annual work plan; and (xi) proposing financial analyses and evaluations, as well as opining about other topics under its responsibility.

- The *Compliance and Risk Committee*, which is responsible for (i) monitoring that Vale has the structure, processes, practices, mechanisms and systems, among others, in place to ensure compliance with all applicable legal and regulatory requirements; (ii) ensuring Vale's adoption and improvement of compliance best practices and integrity, including evaluating potential conflicts of interest; (iii) ensuring the effectiveness and compliance of Vale's policies and normative documents with the legal and regulatory requirements applicable to its business and activities; (iv) monitoring the suitability, strength and performance of all of



*Management*

Vale's internal control systems and proposing improvements; (v) monitoring the scope of activities and effectiveness of the departments in charge of Vale's corporate governance, compliance, corporate integrity, risk management and controls and proposing improvements; (vi) supporting the Board of Directors in setting risk exposure limits; (vii) evaluating procedures adopted concerning the effectiveness of processes and controls to identify, assess, monitor and manage risk; (viii) monitoring Vale's integrated risk map, as well as proposing improvements in risk mitigation plans; (ix) ensuring the effectiveness of mechanisms to handle conflicts of interests in Vale's transactions, as well as opining on related-party transactions submitted to the Board of Directors pursuant to the Policy on Transactions with Related Parties; (x) evaluating proposals for modifying the corporate governance documents, such as the By-Laws, the Code of Ethics and Conduct and Internal Rules of Vale's Advisory Committees and Board of Directors, in addition to other Policies and documents which are not the responsibility of other Committees; (xi) promoting, monitoring and ensuring the development and efficacy of the Vale's governance model, assuring that all initiatives are in line with the best practices and are in synergy; (xii) evaluating and monitoring updates related to current norms, regulations and recommendations, in addition to practices and market trends that may impact Vale's activities; (xiii) preparing and approving an annual work plan of the Committee; and (xiv) proposing analysis and evaluation, as well as opining about other topics under its responsibility.

- The *Sustainability Committee,* which is responsible for (i) evaluating Vale's sustainability strategy, and ensuring that it is considered when setting overall strategy; (ii) evaluating Vale's policies and conduct related to Safety, the Environment, Health, Social Actions, Communication and Institutional Relations; (iii) evaluating Vale's performance regarding sustainability aspects and proposing improvements based on a long-term vision; (iv) aiding in setting, evaluating and monitoring the company's sustainability indicators and proposing improvements; (v) evaluating and proposing Vale's adherence to national or international initiatives or agreements related to socio-environmental responsibility matters, and monitoring the preparation and disclosure of the sustainability report; (vi) monitoring the scope of operations and effectiveness in the department of institutional relations in dealing with regulatory entities and other institutional relationships associated with sustainability topics; (vii) evaluating policies and proposals for donations, as well as non-obligatory expenses related to item (ii) above, which are the responsibility of the Board of Directors; (viii) monitoring all operational risks and controls from the perspective of the integrated risk map, including risks to safety, the environment, health and social actions and reputational risks, as well as proposing improvements in risk mitigation plans; (ix) preparing and approving the Sustainability Committee's annual work plan; and (x) proposing analysis and evaluation of topics under its responsibility.

## EXECUTIVE OFFICERS

The executive officers are responsible for day-to-day operations and the implementation of the general policies and guidelines set forth by our Board of Directors. Our bylaws provide for a minimum of six and a maximum of 11 executive officers. The executive officers hold weekly meetings and hold additional meetings when called by any executive officer. Under Brazilian corporate law, executive officers must be Brazilian residents.



# VI.    ADDITIONAL INFORMATION

# LEGAL PROCEEDINGS

We and our subsidiaries are defendants in numerous legal actions in the ordinary course of business, including civil, administrative, tax, social security and labor proceedings. The most significant proceedings are discussed below. Except as otherwise noted below, the amounts claimed, and the amounts of our provisions for possible losses, are stated as of December 31, 2017. See note 27 to our consolidated financial statements for further information.

**LEGAL PROCEEDINGS RELATED TO THE FAILURE OF SAMARCO'S TAILINGS DAM IN MINAS GERAIS**

We are engaged in several legal proceedings relating to the failure of Samarco's tailings dam in the city of Mariana, in the state of Minas Gerais. Most of these proceedings are in early stages, and we cannot reasonably estimate the possible loss or range of loss or the timing for a decision. Other proceedings or investigations relating to the failure of Samarco's tailings dam are expected.

### a) Public civil action filed by the Brazilian government and others

In November 2015, the Brazilian federal government, the states of Minas Gerais and Espírito Santo, certain federal and state authorities and certain public entities collectively filed a public civil action before the 12th Federal Court in Belo Horizonte, state of Minas Gerais, against Samarco and its shareholders, Vale and BHPB. The plaintiffs claimed approximately R$20.2 billion in monetary damages and a number of measures to remediate the environmental damages caused by the Fundão dam failure. Certain claims brought by the plaintiffs refer to specific defendants individually, while other claims are directed at all defendants.

In December 2015, the federal court in Minas Gerais granted an injunction preventing Vale from selling or otherwise transferring its mining rights in Brazil. In November 2016, the federal court ordered that the defendants: (i) in 90 days, present evidence that the leakage of waste from Fundão tailing dam has been definitely contained; (ii) in six months, present conclusive studies, with the endorsement from the appropriate environmental agencies, regarding an action plan and the feasibility of the removal of mud deposited on the banks of Rio Doce river, its tributaries and the areas near its estuary; (iii) in 30 days, make a deposit in the total amount of R$1.2 billion to secure future reparation measures. This proceeding is currently suspended as a result of the Framework Agreement and the preliminary agreements with the MPF described under item b) below. We submitted to the court documentation to comply with items (i) and (ii) above, but the court has not ruled on the sufficiency of these documents. The court has provisionally suspended our obligation to make the R$1.2 billion cash deposit to the extent that we provide the guarantees required under the preliminary agreements with the MPF.

In March 2016, we, together with Samarco and BHPB, entered into the Framework Agreement with the federal government, the state governments of Espírito Santo and Minas Gerais and certain other federal and state authorities. In January 2017, Samarco, Vale and BHPB entered into two preliminary agreements with the MPF as described below. We expect the Framework Agreement and the agreements with the MPF to be a first step towards the settlement of these actions. Any settlement of these actions is subject to approval by the court.



*Legal Proceedings*

### b) Public civil action filed by the Federal Prosecution Office

In May 2016, the MPF filed a public civil action before the 12th Federal Court in Belo Horizonte against Samarco, Vale, BHPB, BNDES and the governmental authorities that are parties to the Framework Agreement. In July 2016, the court excluded all the governmental authorities and BNDES as defendants in this proceeding. In this action, the MPF requested that the court order a broad range of specific actions to be taken by the various parties. The MPF also stated in its complaint that the required remedial measures would have a total value of R$155 billion, based on a comparison with the costs of the Deepwater Horizon oil spill in the Gulf of Mexico in 2010.

In this public civil action, the MPF claims monetary damages from the defendants on a joint and several basis as well as other forms of relief, including injunctions (i) ordering the defendants to implement several measures to mitigate or remediate social, economic and environmental impacts arising from the collapse of the Fundão dam, as well as other emergency measures; (ii) preventing the defendants from encumbering or disposing of their assets; (iii) preventing the defendants from paying dividends; (iv) ordering the defendants to deposit R$7.7 billion into a fund, managed by the defendants, for implementation of social, environmental and emergency programs; (v) ordering the defendants to provide collateral in the amount of R$155 billion to secure their compliance with the final court decision; (vi) ordering the defendants to maintain working capital in the amount of R$2 billion initially, and thereafter in an amount equal to 100% of the expenses of the remediation and compensation measures projected for the subsequent twelve months; and (vii) ordering BNDES to take actions under its credit agreements with the defendants, including cessation of further drawings and acceleration of outstanding principal. A preliminary hearing for conciliation was held in September 2016.

In January 2017, Samarco, Vale and BHPB entered into two preliminary agreements with the MPF in connection with this public civil action and the public civil action brought by the Brazilian government and others.

The first preliminary agreement consists of an initial transitory agreement, which will be effective until the parties agree on the terms of a comprehensive agreement, and provides for (i) a process and timetable for the resolution of the public civil action brought by the Brazilian government and others and the public civil action brought by the MPF; (ii) the appointment of experts selected by the MPF to review and monitor the remediation programs provided under the Framework Agreement; (iii) the holding of public hearings in different communities in the states of Minas Gerais and Espírito Santo and in the territories of the Krenak, Tupiniquim and Guarani indigenous people; and (iv) the obligation of Samarco, Vale and BHPB to provide collateral to secure the payment of the socio-environmental and socio-economic remediation measures, in the amount of R$2.2 billion. The required collateral will consist of R$100 million in financial investments, R$1.3 billion in insurance bonds and R$800 million in assets of Samarco. On November 20, 2017, the court accepted a joint request by Samarco, Vale, BHPB and the MPF to extend the negotiation period of the comprehensive agreement until April 20, 2018.

The second preliminary agreement provides for a timetable to make funds available for remediation measures in the municipalities of Barra Longa, Rio Doce, Santa Cruz do Escalvado and Ponte Nova, in the total amount of R$200 million.

Both preliminary agreements were ratified by the 12th federal court in Belo Horizonte, state of Minas Gerais, in 2017.

We expect the Framework Agreement and the preliminary agreements to be a first step towards the settlement of the public civil action brought by the Brazilian government and others, the public civil action brought by MPF and other related proceedings.



### c) Criminal proceeding

In October 2016, the MPF filed criminal charges before the federal court of Ponte Nova, state of Minas Gerais, against Samarco, Vale, BHPB and a number of individuals who were employees of Samarco or members of Samarco's governance bodies or advisory committees. The charges include murder, physical injury and various environmental crimes due to the failure of Samarco's Fundão dam.

The criminal charges were accepted by the judge in November 2016, which initiated the criminal proceeding. We submitted our initial defense in March 2017 and the parties are now in the evidence-gathering phase. We are not able to anticipate when a judgement will be issued or when a trial relating to the murder charges will commence.

### d) Class actions in the United States

We and certain of our officers have been named as defendants in civil class action suits in federal courts in New York brought by holders of our securities and by holders of Samarco's bonds, each under U.S. federal securities laws. The plaintiffs allege that we made false and misleading statements or omitted to make disclosures concerning the risks of the operations of Samarco's Fundão dam and the adequacy of the related programs and procedures. The plaintiffs have not specified an amount of alleged damages in these actions.

We believe that the claims have no merit, and we will continue contesting them. However, given the preliminary status of the actions, it is not possible to determine a range of outcomes or reliable estimates of the potential exposure at this time, and no provision has been recognized so far.

### d.1) Related to Vale's American Depositary Receipts

Vale and certain of its officers were named as defendants in a securities class action in the U.S. Federal Court for the Southern District of New York brought by holders of Vale's ADRs under U.S. federal securities laws.

In March 2017, the Judge issued a ruling dismissing a significant part of the claims against us and the individual defendants, and allowing the case to continue based on more limited claims. The claims that were not dismissed relate to certain statements contained in our 2013 and 2014 sustainability reports concerning risk mitigation plans, policies and procedures, and certain statements made in a conference call in November 2015 concerning our responsibility for the Fundão dam collapse. This lawsuit is currently in the discovery phase.

### d.2) Related to the Samarco's bonds

Vale, together with Samarco and BHPB, was named as defendant in class action alleging violations of U.S. federal securities laws brought by holders of bonds issued by Samarco in the U.S. Federal Court for the Southern District of New York. The defendants filed a joint motion to dismiss the complaint, and a decision on this motion is still pending. Discovery will not commence until after the court rules on the defendants' pending motion.

### e) Other proceedings

Vale is a defendant in several public civil actions brought by state prosecutors of Minas Gerais and Espírito Santo, other authorities or civil associations claiming environmental damages as a result of the failure of



Samarco's dam. The relief claimed in these proceedings are generally similar to the claims brought in the public civil action brought by the Brazilian government and others and the public civil action brought by the MPF. In 2017, The Superior Court of Justice (STJ) decided that the 12th Federal Court in Belo Horizonte is the competent court to rule on all these public civil actions. All these public civil actions have been suspended while we negotiate an agreement with the MPF, as discussed in item b) above.

Vale has been named as a defendant in a number of private actions, before different state and federal courts in the states of Minas Gerais and Espírito Santo, brought by individuals, business entities, municipalities and other entities seeking remediation and compensation for environmental, property and personal damages resulting from the Fundão dam failure. These proceedings include requests for significant amounts in damages, injunctions, pre-judgment attachment of assets and seizure of our bank accounts. Vale has settled part of these suits, and continues to defend itself in a number of these proceedings.

Samarco is engaged in several other investigations and proceedings claiming damages resulting from the dam failure. Immediately after the dam failure, the environmental authority of the state of Minas Gerais and the DNPM (currently, ANM) commenced an investigation into the causes of the dam failure, and ordered the suspension of Samarco's operations pending the conclusion of these investigations.

## TUBARÃO PORT LITIGATION

In January 2016, as part of an environmental investigation conducted by the Brazilian federal police, a federal court in the Brazilian state of Espírito Santo ordered the suspension of our activities in Pier II and the coal pier of the Tubarão Port, due to potential environmental damages resulting from the release of iron ore in the sea area around Pier II and the coal pier. Our operations in Pier II and the coal pier of the Tubarão Port were suspended for four days, until the Federal Court of Appeals ("TRF") of the Second Region (*Tribunal Regional Federal da Segunda Região*) suspended the effects of the injunction. In July 2016, the TRF confirmed the suspension of the effects of the injunction and ordered an expert investigation to confirm that we had properly implemented measures to monitor, control and mitigate the release of iron ore in the terminal. This expert investigation has not started yet. As part of this proceeding, we may be required to implement additional measures to prevent or mitigate the release of iron ore in the sea.

In September 2017, the federal police concluded its environmental investigation, and recommended that the MPF press charges against us for environmental crimes resulting from the release of iron ore in the sea around the Tubarão port. We cannot anticipate whether the MPF will follow the federal police's recommendation or whether the MPF will seek other actions against us, including actions that may result in further suspension of our activities in the Tubarão port. We will vigorously contest any action against us resulting from the conclusions of the federal police's investigation.

## ONÇA PUMA LITIGATION

In 2009, the MPF brought a public civil action against Vale and the Brazilian state of Pará, seeking the suspension of our nickel operations in Onça Puma, in the state of Pará, due to the alleged impact on the Xikrin do Cateté and Kayapó indigenous communities located close to the mining site. The federal prosecutor contends that (i) our operations would be contaminating the water of the Catete River, which crosses the communities, (ii) we have failed to comply with certain conditions under our environmental licenses, and (iii) the state of Pará should not have granted environmental license to this operation.

In September 2017, the TRF of the First Region (*Tribunal Regional Federal da Primeira Região*) granted an injunction suspending certain of our nickel mining operations at Onça Puma and ordering us to make a

