# Exhibit 14



# INDEPENDENT PANEL OF EXPERTS FOR SAFETY AND RISK MANAGEMENT OF GEOTECHNICAL STRUCTURES (PIESEM)

## REPORT OF THE 3rd PIESEM MEETING
### (Final Version)

## Submitted to VALE

## Belo Horizonte, MG – 17 October 2018

## PIESEM

| | |
|---|---|
| **Paulo ABRÃO** | **André ASSIS** |
| **David BOWLES** | **Paulo FRANCA** |
| **Scott OLSON** | **Fernando SCHNAID** |
| **Luis VALENZUELA** | **Bryan WATTS** |

_____

VALE

**REPORT OF THE 3rd PIESEM MEETING**

## 1. INTRODUCTION

The Independent Panel of Experts for Safety and Risk Management of Geotechnical Structures (PIESEM) was implemented by VALE in March 2017 and had its inaugural meeting from 27-31 March 2017. The PIESEM complements VALE for the initiative of creating and investing in this Panel, with the aim to achieve a consistent evaluation of means and methods for improving safety and risk management of geotechnical structures.

PIESEM members that attended its third meeting, from 01-06 October 2018, were P. Abrão, A, Assis, D. Bowles, M., P. Franca, S. Olson, F. Schnaid, L. Valenzuela and B. Watts. The meeting schedule of activities was:

- Monday 01 – Welcome Address; Filtered Tailings Stack – The Canadian Experience; Filtered Tailings Stack – PDR Cianita; Cianita Pilot Project and PDR Cauê / Conceição; Filtered Tailings Stack – Pilha Tamanduá; Filtered Tailings Stack – PDE Trevo; Recommendations for In Situ Testing.

- Tuesday 02 – Recommendations for Liquefaction Evaluation; Liquefaction Analysis – Dam I (Córrego do Feijão Mine); Proposal for Dam I Decommissioning; Results of Risk Analysis GRG.

- Wednesday 03 – Criteria for Seismic Loading Assessment; Field visit to PDR Cianita and Maravilhas II Dam (Pico Mine) and to Dam I (Córrego do Feijão Mine).

- Thursday 04 – Follow-up of the Panel Action Plan; Panel Discussion and preparation of the Panel Presentation.

- Friday 05 – Panel Presentation of the outcomes of the 3rd PIESEM meeting and writing of the Panel Report.

- Saturday 06 – Writing of and compilation of the first draft of the Panel Report for reviewing among all Panel Members and issuing of the final version to VALE.

Following the presentations and discussions at the 3rd PIESEM meeting, the Panel has decided to include in this report the following topics:

_____

2



- Filtered Tailings Stack – Section 2

- VALE's Proposed Filtered Tailings Stacks – Section 3

- Liquefaction Analysis & Decommissioning of Dam I – Section 4

- Seismic Loading Assessment – Section 5

- In Situ Testing – Section 6

- Geotechnical Risk Management – Section 7

- Follow-up of the Panel Recommendations – Section 8

It is worth noting that this Panel has a consultative status, providing guidance, comments and opinion to VALE, towards safer and lower-risk geotechnical structures, and not a peer review one, examining details of design, construction and operation of specific structures.

## 2. FILTERED TAILINGS STACK (FTS)

In this section the Panel presents an overview of the state-of-the-practice on filtered tailings stack and major concerns and challenges related to changing of technology and production planned to VALE's filtered planned stacks. In this sense, the Chilean experience to move from low to safe-high sand tailings dams is presented to illustrate the necessary steps to learn, acquaint experience and mature a complex project involving new technologies and challenges.

### 2.1. State-of-the-Practice on Filtered Tailings Technology

The Independent Technical Review Board that investigated the cause of the Mount Polley tailings dam failure in 2014 in British Columbia, Canada, recommended that all new mining projects evaluate tailings disposal without a pond or fluid tailings. The motivation was to reduce the consequences of failure by reducing tailings mobility. Following that recommendation, MEND (Mine Environmental Neutral Drainage) published a study entitled "A Study of Tailings Management Technologies" in October 2017 that looked at the use of tailings thickening and filtration in Canada. Figure 2.1 depicts a plot of annual mean precipitation and daily tailings tonnage for a variety of filtered tailings projects. Most projects are less than 10,000 tons per day (tpd) in regions with high pluviosity.

_____



Figure 2.1. Relationship between daily production of filtered tailings and mean annual precipitation minus evaporation.

Globally, the use of filtered tailings stacks is driven mainly by the need to recover water. The costs of filtering, transporting, placing and compacting filtered tailings are higher relative to conventional slurry tailings storage. A common constraint is control of water content at the filter plant or on the stack to a low enough level that it can be compacted in the stack. It is common enough that filtered tailings stacks have an outer compacted shell that is constructed when plant and weather conditions permit and an inner contained zone that can be placed all year round.

The largest filtered tailings operation in Brazil is Alunorte at 17,200 tpd, which is located in a quite flat region (no mountains and valleys as in Minas Gerais). There is a filtered tailings operation in the dry climate of Australia designed for 35,000 tpd but the Panel understands this filtered plant generally operates at 20,000 tpd. The Panel is not aware of any successful filtered tailings operations larger than these projects.

The tonnages and the height of filtered tailings stacks contemplated at VALE in the wet climate and topography of Brazil is unprecedented. Normally, a major advancement in earth fill construction technology such as this is done incrementally over decades. The example of the development of high sand tailings dams in Chile is described in Section 2.2.

_____

4



Although the elimination of the tailings pond and loose mobile tailings can reduce the consequences of failure significantly, the requirement for water storage by embankment dams in a wet climate still remains. That is an additional risk for every mine site.

The requirement for filtered tailings to be transported by trucks or conveyors necessitates a maximum water content feed to the filtration plant. That will take away flexibility from the main plant operators. Also, the required construction control during continuous stack raising will require that VALE implement such procedures on a scale not practiced in this mining sector before. Efficiencies may have to be found, which is described later in the test fill section (Section 3.1).

The floatation plants will lose some of their flexibility so a new governance structure will have to be developed to deal rapidly with out of specification tailings. The operations must develop concepts to deal with out of specification tailings at the floatation plant, the filtered tailings plant and on the stack itself.

Filtered tailings stacks generally do not exceed 30 m or so in height (or thickness). VALE is contemplating stacks ten times higher than this. It is increasingly recognized in geotechnical engineering that the "state" of the material controls the behavior of fills. That is, even though the fill densifies under increasing load, the "state" of the material moves towards the critical state line where the material behavior changes from dilative to contractive. This together with particle breakage and mounding of pore water in the stack may limit the height of the stack. This can be estimated with laboratory testing. The Panel recommends that a laboratory investigation be designed and carried out to identify whether there are any such fundamental height restrictions for these iron ore tailings materials. The Panel cautions that it is unaware of any embankment of sandy, silty materials of the heights contemplated by VALE.

Monitoring programs to track stack behavior after placement and compaction need to be developed. These programs will need to be more comprehensive than normal because of the unprecedented heights and rates of rise contemplated by VALE. The pore pressures in the stack should be monitored by vibrating wire piezometers, especially near the base of the stack. The settlement profile of the stack should be monitored by gauges that measure multiple points in a

_____



single borehole. Displacements of the stack surface should be monitored by surface gauges. It will be necessary to push the SCPTu, especially with shear and compressional wave measurements, into the stack at regular intervals during raising. All of these data needs to be digitally recovered during stack raising so that it is available in real time. Surveillance procedures need to be developed for each structure, together with alert levels for each instrument. These data, together with as-built contours, need to input into a GIS program for easy digital retrieval and examination. The Panel would like to review a typical monitoring program for these stacks.

## 2.2. Chilean Experience in Developing Methodology to Build Safe High Sand Tailings Dams

The Chilean experience on sand tailings dams was discussed during the Panel meeting not as a possible solution for VALE, but to demonstrate the challenges associated to the development of new technologies or in the introduction of a technology beyond the existent precedents. The copper mining industry in Chile and the whole country suffered the catastrophic failure of El Cobre tailings dam in 1965 as a consequence of a 7.8 magnitude earthquake that resulted in about 300 casualties.

After this failure the reaction from the mining industry and regulators was to build conventional civil engineering dams (Los Leones Dam and Colihues Dam). Only late in 1968, a relatively low sand tailings dam (68 m high) was built as a replacement of the failed dam (El Cobre 4), but now designed as a compacted downstream sand tailings dam. In 1970 regulators banned the upstream construction of tailings dams, a situation that prevails until now. In the decade of the 1970's started a boom in the copper industry in Chile, with new projects and expansions that required bigger tailings deposits and much higher dams. Los Bronces was the first mine to build the relatively high Perez Cakdera 2 dam (115 m high), as a downstream sand tailings dam with cyclone sand under very strict specifications, compaction and with a major instrumentation scheme (pneumatic piezometers). The information provided by the control and early operation of this dam was essential later on to support the decision to raise the dam to 135 m and at the same time to provide valuable information for the design of the following 150 m high Las Tortolas sand tailings dam.

_____

6



A new methodology to design and build safe high sand tailings dam in an extremely high seismic environment, based on the principles of the observational method supported with substantial geotechnical investigation and field instrumentation, was developed over decades of experience (Valenzuela, 2015), as shown in Figure 2.2.



Figure 2.2. Evolution of sand tailings dam heights along time in Chile.

The accumulated experience has allowed the design and approval of the future sand tailings dam in Quellaveco, Peru that will have a maximum height of 315 m, which would become the highest dam in the world.

Since approximately the year 2000, mining companies in Chile, when analyzing the possible solutions for tailings deposits, have considered the alternatives of thickened and filtered tailings, due to the scarcity of water in the North of Chile, where most of the mines are located and due to high seismicity. However, because of some technical complexity with thickened tailings and high costs involved in filtering tailings, conventional tailings deposits with a retaining dam (sand tailings or waste rock) have been selected. There is only one big mine (Esperanza) that has adopted thickened tailings for a production over 100.000 tpd, although this mine has experienced several problems and high costs due to a much longer ramp up period and change of thickener type. Thickened and filtered tailings have been applied to a few low production operations, the biggest with tailings production of 18.000 tpd.

_____



The case of the development of the Chilean sand tailings dams shows that an intense research on material properties has to be carried out to properly design these high structures and that the process should be developed step by step.

## 2.3. Summary Recommendations Related to Filtered Tailings Stacks

Main remarks and recommendations on filtered tailings stacks are:

- Most existent projects are less than 10,000 tpd and are located in regions with a water deficit (negative water balance).

- Two major challenges are to produce a great tonnage of filtered tailings with the proper water content at the filter plant and to place and compact it within the compaction specifications of water content and dry density.

- It is common that filtered tailings stacks have a compacted outer shell that is constructed when plant and weather conditions permit and an inner contained zone that can be placed year round.

- The tonnages and the height of filtered tailings stacks contemplated at VALE in the wet climate and topography of Brazil are unprecedented, requiring laboratory tests to anticipate the state behavior of tailings in such conditions, comprehensive field testing and monitoring, and trained staff to follow and control construction quality.

- Normally, new methodologies to design and build safe high sand tailings dams, based on the principles of the observational method supported with substantial geotechnical investigation and field instrumentation, are done incrementally over years.

## 3. VALE'S PROPOSED FILTERED TAILINGS STACKS

At this moment, there are four proposed Filtered Tailings Stacks (FTS) in VALE. To understand the technology and behavior of this material, VALE has implemented a Filtration Pilot Plant, with different types of filters, and a test fill, varying mixtures of granular tailings and slimes, and compaction variables, such as water content, lift thickness and compaction equipment. This section discusses the main findings of this test fill and comments on the four FTS planned (Cianita, Cauê, Tamanduá and Trevo), as well alternative tailings disposal schemes.

_____

8



### 3.1. Cianita Test Fill

VALE has been involved in the study of compaction of iron tailings for some time, constructing the first test fill in 2016 (VALE, 2018b). In these fills, several mixtures of coarse tailings, slimes and total tailings were tested. The tests were run at the Cianita site (Pico Mine), where construction and transport equipment were available. The filtration pilot plant is also located at the Cianita site (Figure 3.1).



Figure 3.1. General view of the Cianita Filtration Pilot Plant and test fill.

From 2018 on, VALE will be dealing with iron ore of low content (typically 40% Fe) and the requirement of available disposal volume will increase significantly. The total tailings are estimated to include 70 to 90% of coarse tailings and 10 to 30% of fine tailings (slimes or ultra fines). According to a VALE presentation to this Panel the objective of the tests were:

- Check the water content of the filtered tailings
- Check the workability of the filtered tailings
- Geotechnical characteristics of the filtered tailings
- Check mixtures of tailings and slimes - Proportions 90 x 10, 80 x 20 and 70 x 30

The summary of the results shown in the VALE presentation (VALE, 2018b) was the following:

- Landfills with low or poor operational feasibility

_____



- Thickened slimes

- Filtered slimes (press filter)

- Filtered floatation tailings (disc filter) + filtered slimes (press filter)

- Filtered total tailings (mixture 70x30) + filtered slimes/disc filter

• Landfills with high or good operational feasibility

- Filtered floatation tailings (disc filter)

- Filtered floatation tailings + filtered slimes/UF → not recommended

- Filtered total tailings 80x20 and 90x10 (disc filter)

The results for the filtered floatation tailings and filtered total tailings in a mixture 90x10 gave good results in term of water content control, and marginally also for the mixture 80x20. Regarding compaction, the results are shown in Figures 3.2 (filter flotation tailings), 3.3 (mix tailings 80x20) and 3.4 (mix tailings 90x10).



Figure 3.2. Compaction control for filter floatation tailings, throughout lift thickness for different compacted lift thicknesses (0.6, 1.0, 2.0 and 3.5 m).

Final conclusions of the test fills as reported in the VALE presentation were the following:

• Good construction results in terms of water content control and obtained degree of compaction with adequate lift thickness are filtered total tailings and filtered mixed tailings (90x10).

_____

10



- Degree of compaction above 95% standard Proctor could be achieved with layers of 0.60 and 1.00 m of apparently loose materials (before compaction).



Figure 3.3. Compaction control for mix tailings 80x20, for different compacted lift thicknesses (0.6, 1.0 and 2.0 m).



Figure 3.4. Compaction control for mix tailings 90x10.

It was not clear in the presentation nor in the discussions during the meetings whether the reported layers thickness was loose or compacted. The important objective is to obtain a homogenous compacted fill with compaction degree over 95% standard Proctor throughout the

_____

11



lift thickness (top` to bottom of the layer). In the CPTu result shown in Figure 3.5, it is clear that the layer thickness should be probably less or in the order of 1.0 m in order to comply with the required minimum degree of compaction.



Figure 3.5. Typical CPTu result done in the Cianita Test Fill.

In the site visit to the Cianita stack, the Panel observed a trench excavated in a compacted fill of total tailings (not filtered) that showed compacted layers approximately 1,0 m thick that were well-compacted but with the bottom of the layer looser than the top of the layer. Evidently it will be necessary to calibrate the loose lift thickness in order to obtain the required compaction specifications. Nevertheless, the Panel recommends a 1,0-m loose lift thickness in the planning of the construction of the filtered tailings stack in the structural part of the stack, which is the portion of the stack that controls its stability. This recommendation is to be validated based on yet to be conducted material specific test fills constructed using the tailings planned for construction.



## 3.2. PDR Cianita

This deposit of filtered tailings and waste is an important part of the more ambitious plan of VALE for the rest of the tailings from the Iron Quadrangle, since it will be the first one to be built and consequently will be a testing ground for all construction details and geotechnical aspects that have to be controlled.

According to the VALE (2018a) presentation to the Panel, it is stated that:

> "*The Cianita project is an integrated mine waste deposit and dewatered tailings area being developed by VALE to receive future tailings from 4 separate sources: the Vargem Grande I and II plants; the Pico ITMD plant and excavated material from the Maravilhas II tailings impoundment. Although both flotation tailings and slimes are produced by the plants, only flotation tailings will be deposited in the Cianita facility.*
> *The rate of tailings placement will be 40,000 t/day from 2020 through 2027. The tailings will be deposited jointly with mine waste, so placement of the two materials must be coordinated.*"

Figure 3.6 depicts the tailings management in the Pico / Vargem Grande Mine Complex.



Figure 3.6. Tailings management in the Pico / Vargem Grande Mine Complex.

The tailings stack will have a maximum height/thickness of 190 m, a considerable height for any soil stack. The borings done for the foundation characterization identified weak/soft soils.

_____



The stack will include mine waste material, excavated tailings from Maravilhas II deposit, and compacted filtered tailings. The structural portions of the stack that are responsible for the stability of this high structure will be constructed using compacted filtered tailings and, in some zones, mine waste material, as shown in Figure 3.7.



Figure 3.7. Typical cross-sections of the PDR Cianita: a) Section A; and b) Section D.

The Panel was able to find some information on geotechnical properties of the filtered tailings from the tests fills already conducted by VALE, but no information was available for the mine waste material that will be used as the perimeter retaining structure, for example, as shown in Figure 3.7b (Section D).

The project, as it was presented to the Panel, is considering a specification of a minimum degree of compaction of 90% standard Proctor. The Panel considers that such a low degree of compaction is not acceptable for this large, important structure. Internationally the common practice in this type of structure is to specify a minimum 95% standard Proctor.

The project, at the present stage, is considering compaction in layers of 0.40 m thickness in the lower part of the stack to level ground irregularities in the foundation, but above this leveled surface, the project considers compaction in layers 2.0 m thick. The Panel considers that this operational thickness, as it has been defined, is not supported by the results of the test fills



described in Section 3.1. The compacted layer thickness should be defined such that a minimum degree of compaction of 95% standard Proctor is achieved throughout the layer (top to bottom). The Panel suggests that for construction planning of this structure a maximum compacted layer thickness of 1.0 m be considered.

Since this structure is the first filtered tailings of the VALE strategy to go to filtered tailings, the laboratory testing and field instrumentation programs will be especially important because these programs must provide the information necessary to confirm the assumptions adopted in the present design and construction methodology as well as to validate or improve the design of the other stacks presently in conceptual design.

### 3.3. PDR Cauê, PDR Tamanduá and PDE Trevo

These three projects are in initial conceptual design (VALE 2018c and 2018d). For PDR Tamanduá, placement of a total volume of $317 \times 10^6$ m$^3$ is planned over a 42 year period, reaching a maximum height of 250 m with a daily tailings production of 22,000 m$^3$. For the PDR Cauê, the planned total volume is around $232 \times 10^6$ m$^3$ with a height of 180 m. PDE Trevo is planned to reach a maximum height of 370 m.

All these structures are very challenging, pushing filtered tailings technology and sand tailings behavior beyond the range of global geotechnical experience. The Panel reiterates that all recommendations given in Sections 2 and 3 must be considered, and each material (including each range of grain size and mineralogy) must be tested at the extreme stress conditions planned for the project.

In addition, for the PDR Tamanduá site, a comprehensive investigation of the foundation conditions is necessary, since the region is covered by thick layers of talus. Moreover, it is necessary to study the impact on the stack of the runoff from the steep natural abutments after events of high precipitation and duration. It also concerns the Panel that the structural compacted tailings shell is very thin, as shown in Figure 3.8.

_____



Figure 3.8. Typical cross-section of the PDR Tamanduá (240 m high).

Regarding PDR Cauê, it is important to mention that it will be built over a tailings backfilled pit (Figure 3.9). The geotechnical parameters for the backfilled tailings require an intense investigation. As the backfilled tailings may contain undesirable values of water content, it is mandatory to define a rate of construction that limits the increase in porewater pressure, which seems too optimistic considering a 30 m raise in one year.

Figure 3.9. Typical cross-section of the PDR Cauê.

Finally, PDE Trevo presents enormous challenges, not only due to its planned height of 370 m, but also due to its location and environmental impact, considering the presence of 47 springs and nearby infrastructure (Figure 3.10). Furthermore, there are neither precedents of such high stacks and probably also nor precedents of civil engineering structures with this height. The only structures of that height are some waste rock dumps in the mining industry, but some of them presenting failures with rock flows (Dawson et al., 1998; Valenzuela, 2004).

### 3.4. Alternative Tailings Disposal Schemes

The filtered tailings stack projects are still at a conceptual level as part of the FEL 1 project stage, with only the Cianita project in a slightly more advanced stage, at least in the sense that for that particular project the alternative was fully selected, maybe starting FEL 2 project stage.





Figure 3.10. General view of the PDE Trevo location and presence of springs.

The Panel has not been informed of any evaluation of alternatives to high filtered tailings stacks, although the evaluation of alternatives is a fundamental part of FEL 1 process. Consequently, the Panel was not able to comment on the merits or drawbacks of possible alternatives.

For the Panel it was not clear also how the slimes flow will be treated. The Panel understood that part of the slimes could be mixed with the floatation tailings, but it is not clear if that mixture will be done at the floatation plant or at the filtration plant or at the site. Also, it is not clear to the Panel what the alternatives are for slimes disposal and under what conditions (solids concentration as they come out from the plant; thickened slimes or filtered slimes).

The general scheme of filtered tailings stacks and slimes deposit could represent an important corporate risk if their feasibility has not been fully confirmed by the preliminary studies, laboratory tests and test fills. Consequently, VALE should be prepared with alternative methods of tailings storage in case the filtered tailings stacks are not as successful as hoped.

The Panel recommends consideration of alternative materials and disposal schemes that could be applied totally or partially, as complementary solutions, in case it is necessary. Some of these



alternatives could be of the following nature and, of course, other alternatives could be identified or may have already been identified by VALE:

- Lower filtered tailings stacks (which would require more land) than the heights currently planned. If this possibility exists it could be convenient to consider it as soon as possible, mainly in the case of the higher stacks (such as the Trevo stack).

- Reinforced filtered tailings stacks. Reinforcing the structural part of the stack (the portion controlling the stack stability), for instance, mixing the filtered tailings with coarse granular material or including layers of pervious coarse granular material in the structural portion. Other reinforcing systems should be analyzed to verify if they are suitable to be used with the silty sandy nature of the iron tailings of VALE mines. This is the case for example of the use of soil-cement techniques.

- Use of mine waste material used as borrow material in structural zones of the stack if this material shows better geotechnical properties than the filtered tailings. The Panel was not informed of the geotechnical characteristic of this material, although this material is proposed to be used as structural fill in the Cianita stack.

- In-pit disposal could be used as a complementary solution to reduce the height of some of the planned stacks.

- Filtered tailings storage behind compacted rockfill/embankment dams (centerline construction could be used; upstream construction over compacted filtered tailings should be carefully analyzed, but for a high stack over 200 m could be unprecedented for any type of deposit).

- Conventional tailings storage behind compacted rockfill/embankment dams (apparently not accepted by regulators although very safe dams can be built following the example of water retention dams in hydroelectric and irrigation projects.).

These very high stacks of filtered tailings are unprecedented although quite attractive, but they could represent a significative corporate risk. With that in mind, the investigation to identify possible quarries for rock suitable to use in a rockfill dam associated to the filtered tailings deposit is recommended. The same recommendation applied to the investigation of possible borrow material for compacted embankment, drains and eventual coarse material to be mixed with filtered tailings.



The Panel insists that while these designs are analyzed, VALE also analyze other alternatives considering that the feasibility of extreme high filtered tailings stacks has not been proved yet and there are no precedents for guidance.

The VALE approach for final selection of future tailings disposal should consider the potential failure modes for each alternative and their associated probabilities and consequences. To be consistent with the present VALE policies with regard to tailings disposal and tailings management, the evaluation and final selection of alternatives should be a risk-informed process with appropriate supporting engineering analysis.

## 3.5. Summary Recommendations Related to VALE´s Planned Filtered Tailings Stacks

Main remarks and recommendations on VALE´s planned filtered tailings stacks are:

- Cianita Test Fill indicates good construction results in terms of water content control and degree of compaction (above 95% standard Proctor) with compacted lift thicknesses of 0.60 to 1.00 m for filtered total tailings and filtered mixed tailings (90x10).
- PDR Cianita is the first filtered tailings stack of VALE with great height (190 m), where previous Panel´s recommendations on Section 2.3 must be considered, as well in the other three stacks proposed.
- The Panel recommends strict control of compacted water content and dry density, with a minimum degree of compaction of 95% standard Proctor and a lift thickness that allow this compaction requirement to be met throughout the layer. For planning, VALE should consider a maximum layer thickness of 1.0 m.
- The general scheme of filtered tailings stacks and slimes deposit could represent an important corporate risk if their feasibility has not been fully confirmed by the preliminary studies, laboratory tests and test fills.
- VALE should be prepared with alternative tailings storage in case of filtered tailings stacks are not as successful as hoped.
- The VALE approach for final selection of future tailings disposal should consider the potential failure modes for each alternative and their associated probabilities and consequences, consistently with the present VALE policies with regard to safety and risk management of geotechnical structures with appropriate supporting engineering analysis.

_____

19



## 4. LIQUEFACTION ANALYSIS AND DECOMMISSIONING OF DAM I

Two presentations on Dam I (Córrego do Feijão Mine) were done by Tuv-Sud, one on the liquefaction analysis (Tuv-Sud, 2018a) and the other on its decommissioning (Tuv-Sud, 2018b). Dam I, presently 86 m high, had its construction and operation from 1976 to 2015, encompassing ten raisings by the upstream method. Presently, the dam is not being raised, but measures such as pumping and drainage of the surface water coming from the surrounding abutments have been done to ensure no surface water on the beach. The Panel's field visit confirmed a dry tailings beach and a well-maintained structure (Figure 4.1).



Figure 4.1. General view of the Dam I (Córrego do Feijão Mine).

### 4.1. Liquefaction Analysis and Undrained Stability Analysis of Dam I

Parameters needed to run undrained slope stability analyses of Dam I for the saturated tailings were obtained from thirteen CPTu tests done in two different campaigns (2005 and 2016). After CPTu results interpretation, all saturated tailings were considered liquefiable, and the average ratio between undrained strength and effective vertical stress ($s_u/\sigma'_v$) assumed as 0.26. Water table inside the dam and piezometric levels were obtained from measurements from open standpipes and piezometers, as well from the CPTu tests (Figure 4.2). Three cross-sections along the dam were analyzed and the lowest factor of safety (FS) was on the order of 1.1. As the ratio $s_u/\sigma'_v$ presents natural variability, a slope stability sensitivity analysis also was presented for the three sections. While there is still room for alternative interpretations of

_____

20



undrained strength ratios and piezometric levels, based on the existing data, it seems that the outcome results in terms of factor of safety would not change much.



Figure 4.2. Phreatic water table assumed for Cross-Section 4 (highest height).

Considering the results of the undrained slope stability analyses for Dam I, based on undrained peak strength parameters, several restrictions, such as no traffic of heavy equipment, no blasting nearby, minimum beach distance and so on, were imposed at the dam, aiming to avoid triggering liquefaction.

Also, as uncertainties still prevail in some geomechanical parameters and, mainly, on the interpretation of the piezometric level, a program of additional CPTu tests and installation of multilevel piezometers was specified. The Panel was able to observe recent SCPTu profiles during the field visit. These profiles seem to suggest some downward drainage to the foundation, which should be confirmed with the new planned site investigation. If confirmed, it should be considered the stability assessment.

Finally, some attempts to drawdown the phreatic level inside the dam were done, including pumping of the remaining free water in the reservoir, collection of the surface water coming from surrounding abutments and draining it directly to the spillway, and installation of horizontal drains, 100 m long, at the toe berm and at the set back. This horizontal drain installation was stopped after an incident, probably due to installation problems. As the position of the phreatic levels inside the dam strongly affects the structure safety, it is recommended to resume as soon as possible the horizontal drain installation, with a skilled contractor, as well as to look for alternatives to water table drawdown (including wells).



In summary, although the dam is well maintained, monitoring controlled and if restrictions imposed to avoid triggers of flow liquefaction are observed, the Panel recognizes that, besides the recommendation to resume as soon as possible the draining measures already commented, no other action be taken until the results of the complementary investigation is concluded and new stability assessment carried out. The complementary in situ investigation and multilevel piezometer installation must continue, providing more information for stability and seepage analysis reevaluation, and defining measures to reduce risk presented by this structure.

## 4.2. Decommissioning of Dam I

Tuv-Sud (2018b) presented a preliminary study of alternatives for decommissioning Dam I, which include one or more of the following measures:

- Berms with different crest width (13 to 20 m), slopes (1V:2.5H to 1V: 3.0H), elevations (885 to 898 m) and volumes (108 to 393 x $10^3$ m$^3$)
- Mining tailings at different percentage volumes (30, 70 and 90% at elevations of 929, 916 and 898 m, respectively)
- Drawdown of the piezometric level inside the tailings

Results from the slope stability analyses show that the upstream piezometric level chiefly affects the factor of safety, as shown in Figure 4.3. It is also worth mentioning that berms or tailings mining alone are not sufficient to effectively increase the safety of this structure. It may be necessary to combine them with the piezometric level drawdown. This reinforces the need to apply all possible dewatering measures, including horizontal drains, already mentioned and those necessary to avoid inflow from the natural abutments.

The Panel considers that tailings mining of this structure is feasible. If VALE proceeds with the removal of Dam B1, an adequate engineering design must be provided. In this sense, the Panel recommends that an experienced engineer be retained to develop excavation options for this specific set of conditions. For instance, if excavation starts just upstream of crest, the drop in the effective stresses below the excavation may cause the undrained strength to drop. While the induced overconsolidation may preclude this loss of undrained strength, this effect is not fully understood for this project and the site-specific tailings. An excavation distant from the crest



will have a different, probably less, effect on the undrained strength because the phreatic surface is higher. It seems preferable to start the excavation well back from the crest and slope it towards the crest, but this must be borne out by detailed engineering.



Figure 4.3. Relationship between FS and possible measures for decommissioning.

Another important issue here is drainage during excavation. The excavation of trench drains that would direct the water towards the spillway seems quite reasonable. The phreatic surface slopes up away from the crest so the groundwater will flow towards the crest. Extreme precaution is needed to never allow water to pond at or near the crest.

Finally, it is highly recommended to apply a progressive approach (first through simple means then through more analysis if necessary) and to have a monitoring program for the whole operation and then, follow the principles of the observational method.

### 5.3. Summary Recommendations Related to Dam I

Main remarks and recommendations on Dam I are:

- Considering the results of the undrained slope stability analyses for Dam I, based on undrained peak strength parameters, several operational restrictions were imposed to Dam I, aiming to avoid triggering liquefaction.

23



- As some uncertainties still prevail, a program of additional SCPTu tests and installation of multilevel piezometers was specified, and is endorsed by the Panel, to provide more information for stability and seepage analysis reevaluation, and defining measures to reduce risk at this structure.

- The Panel also recommends to continue installing horizontal drains at the set back and lowest berm, provided that proper engineering is provided prior to resuming installation.

- Considering that Dam I is well maintained, monitoring controlled and observing the restrictions imposed to prevent triggering liquefaction, the Panel recognizes that, besides the recommendation to resume as soon as possible the draining measures already commented, no other action be taken until the results of the complementary investigation is concluded and new stability assessment carried out.

- The Panel considers that tailings mining of this structure is feasible, provided an adequate engineering design is developed, including a progressive analysis approach and a monitoring program following the principles of the observational method.

## 5. IMPROVEMENTS TO IN SITU TESTING

The five presentations related to the design of tailings deposition facilities (Cianita Project, Tamanduá, Cauê and Trevo Filtered Stacks, and Dam I) referred to analysis and design under static and dynamic loading conditions. The methodology currently adopted to evaluate the stability of tailings facilities under these loading conditions is based on the prediction of undrained shear strength for saturated tailings that is, in a subsequent stage, used as an input parameter to perform total stress analysis.

Although total stress analysis has been a well-established practice in Brazil, the Panel's recommendation is to extend this approach by incorporating effective stress analysis to evaluate both slope stability and liquefaction assessment of saturated tailings. Effective-stress analysis uses an effective stress friction angle and effective cohesion intercept to represent drained shearing, while in undrained strength stability analysis the undrained shear strength is typically expressed as a ratio to the effective vertical overburden stress, $s_u/\sigma'_v$.

_____



The reason for recommending more robust models is because the earth structures operated by VALE and new structures under design are among the largest tailings operations worldwide, requiring design approaches in line with international experience. The state-of-practice in countries with major mining operations such as Canada, USA, Australia, and South Africa have already incorporated effective stress analysis, using constitutive models such as NorSand and UBCsand.

The benefits of performing effective stress analysis are twofold: (a) fundamental understanding of the geotechnics of tailings is required; and (b) site investigation programs have to be conceived to provide suitable data to support geotechnical design according to the selected constitutive models.

Site characterization should then be based on the use of in situ testing techniques commercially available (such as CPT, DMT, FVST and laboratory tests) combined with other technologies. Test procedures have to be adapted to comply with the characteristics of tailings. The Panel recommendations are:

- Measure shear wave velocities for seismic evaluation. The seismic cone piezocone (SCPTu) has become a routine site investigation tool in Brazil, adding a seismic adapter equipped with an accelerometer or geophone to a standard CPTu probe. This downhole seismic technique is the simplest and most cost-effective way for measuring shear wave velocities, a parameter required for seismic load assessment.

- Evaluate rate effects on in situ tests. In tailings with intermediate permeability, transient drainage conditions affect in situ test results. For the particular case of piezocone tests, the standard rate of penetration of 20 mm/s leads to drained penetration in sands while it is associated with undrained penetration in clays. Partial drainage effects during cone penetration in silts should be considered by performing tests in selected locations (clusters) under different rates of penetration rates. Similarly, rate effects should be evaluated for DMT. Assessment of drainage conditions associated with loading rate effects during field vane tests (FVST) is critical in estimating the shear strength properties of iron tailings. In fact, it is essential to understand the drainage conditions around the FVST because, strictly speaking, is the only test that measures directly the undrained shear strength ($s_u$) of saturated materials with an exact closed form solution for $s_u$. FVST is the reference test for



undrained analysis and even the interpretation of CPTU data requires using an $N_k$(FV) factor calibrated against the field vane measurements. From reported results and analysis, recommendations are made for evaluating rate effects in tailings within the permeability range of $10^{-8}$ to $10^{-5}$ m/s. This may require piezocone tests to be carried out under several different penetration rates ranging typically from 4 to 40 mm/s, corresponding to 1/5 to 2 times the standard penetration rate of 20 mm/s.

- Test other technologies such as T-bar, Ball-bar, and self-boring pressuremeter (SBP) should be explored to evaluate their applicability in predicting tailings parameters.

- Incrementally increase the use of direct simple shear tests (DSS) in routine site investigations to assess critical state parameters in tailings.

The Panel stresses the need to set guidelines and recommendations for in situ testing, which includes detailed and specific procedures customized for intermediate permeability tailings. Local contractors have to be accredited to provide the standards required by VALE, in compliance with revised guidelines.

## 5.1. Liquefaction

Liquefaction encompasses two different mechanisms depending on the static shear stress and liquefied shear strength, and can be typically divided into flow instability and cyclic mobility. Liquefaction flow instability is associated with a state of instability characterized as a phenomenon in which saturated, contractive low plasticity soils experience a reduction in shearing resistance and shear stiffness triggered by an increase in excess pore pressures. This behavior can only occur when the static shear stress exceeds the liquefied shear strength of the soil; i.e., in sloping ground close to the perimeter dams in a tailings facility. In contrast, cyclic mobility can occur in both contractive and dilative saturated low plasticity soils and involves softening under cyclic loading. Often these soil stiffen when monotonically loaded in undrained conditions following cyclic softening. This behavior occurs when the static shear stress is smaller than the liquefied shear strength of the soil, i.e., in near level-ground conditions far from the perimeter dam in a tailings facility.

Recommendations regarding both flow liquefaction and cyclic mobility are outlined as follows.

_____



## 5.1.1. Flow liquefaction

The 2nd Panel Meeting addressed the theme of flow liquefaction and provided a set of recommendations regarding data collection, data interpretation, stability calculations and probability/risk analysis. The Panel identified a lack of consistency in the liquefaction assessment and the need to establish standard design procedures. In particular, they recommended that data used for liquefaction assessment must be interpreted and presented consistently since some laboratory data were considered unreliable.

Although VALE has been diligent to comply with previous recommendations, there is still need for further actions. A Standard Manual for flow liquefaction assessment is still seen as a necessary step towards standardization, aiming at supporting contractors in the design process.

The approach for liquefaction assessment earlier recommended by the Panel stands. Two-dimensional stability analysis should be performed using generalized limit equilibrium methods for: (1) drained conditions; undrained conditions at liquefaction triggering ($s_u(yield)/\sigma'_{vo}$); and undrained post-triggering (liquefied) conditions ($s_u(liq)/\sigma'_{vo}$).

Previous considerations on the need to perform additional effective stress analysis as a requirement for liquefaction assessment also applies, since the Panel considers it important to understand and model the stress-strain behavior of the material and to identify its intrinsic properties. The simple elastic-perfectly plastic Mohr-Coulomb model cannot capture the strain hardening/softening behavior of tailings material. An alternative is the NorSand constitutive model, which is already implemented in the commercially available software FLAC. Other similar options can be pursued, because any critical state soil mechanics constitutive model can be easily implemented numerically to support stability analysis.

Effective stress analysis in strain-softening materials, implemented in numerical codes, is commonly used in engineering design to predict the behavior of soils and structures. However, this type of approach should be implemented gradually by VALE, since the ability to enhance the design capability using new constitutive models is a stepwise process that involves personnel training and calibration against case studies.

_____



### 5.1.2. Geomechanics-based characterization of tailings

The Panel recommends starting a laboratory investigation program designed to study the behavior of every material incorporated in filter tailings stacks. Ultimately, this will lead to fundamental understanding of the geotechnics of iron filter tailings, based on both laboratory and field tests.

Laboratory tests should include oedometer, triaxial, DSS, and permeability test. The main variables to be investigated are:

- Mineralogy

- Initial void ratio

- Fines content

- Effective confining stress (including the high stress levels expected in the thick stack piles)

Specimens can be prepared by dry pluviation and moist tamping to evaluate the influence of the possible changes of field moisture content during the dry and wet seasons.

In a subsequent stage of the laboratory program, tests can be performed on undisturbed samples retrieved from experimental testing sites to evaluate the combined effects of structure and fabric as well as to evaluate the effect of disturbance during sampling, transport, and specimen preparation.

Field tests such as the piezocone need proper calibration for iron tailings. Laboratory calibration chamber tests should be performed using the piezocone (and other in situ testing techniques) to provide sounding calibration of cone resistance and constitutive properties, as well as fundamental understanding of rate effects. Tailings at different densities and a range of stress states have to be tested, conducted on both dry and saturated specimens.

### 5.2. Summary Recommendations Related to Improvements to In Situ Testing

Main remarks and recommendations on improvements to in situ testing are:

_____



- Total stress analysis and effective stress analysis should be performed to evaluate slope stability and liquefaction of saturated tailings. The reason for recommending effective stress analysis is because the earth structures operated by VALE and new structures under design are among the largest tailings operations worldwide, requiring design approaches in line with international experience.

- The consequence of incorporating a new approach and new constitutive models is the need to adapt routine site investigation to ensure suitable data to support geotechnical design. Recommendations are to use in situ testing techniques currently adopted in geotechnical investigation, such as CPT, DMT, Vane and laboratory tests, combined with other technologies:
  - ✓ Shear wave velocity measurements are necessary for seismic evaluation;
  - ✓ Other technologies such as T-bar, Ball-bar, SBP can be tested in tailings to evaluate their applicability in predicting constitutive parameters; and
  - ✓ Direct simple shear tests (DSS) should be used in routine site investigations to assess critical state parameters in tailings.

- Test procedures have to be adapted to comply with the characteristics of the tailings. In particular, rate effects on in situ tests have to be evaluated by performing tests at different shear rates.

- The Panel recommends starting a laboratory investigation program designed to study the behavior of every material incorporated in the filtered tailings stacks, which should comprise oedometer, triaxial, DSS and permeability tests. Main variables to be investigated are: mineralogy, initial void ratio, fines content and stress state (high confining stresses compatible with the height of stacks).

- The Panel stresses the need to set guidelines and recommendations for in situ testing in tailings, which includes specific procedures and assessment for rate effects in these intermediate permeability materials

_____



# 6. SEISMIC LOADING ASSESSMENT

## 6.1. Introduction

The Panel spent considerable time discussing the role of seismicity on the design of new tailings facilities (e.g., filtered tailings stacks) and the evaluation of existing tailings dams in Brazil. The discussion identified the following:

- Seismicity is relatively low in Brazil (e.g., Assumpção et al., 2014).
- Reservoir-induced earthquakes (related to hydroelectric dams) have occurred in Brazil (e.g., Assumpção et al., 2002) and future events may be triggered by the construction of tailings dams.
- Recent legislation requires that seismic analyses be performed for all existing and planned tailings facilities.
- Dr. Gail Atkinson, under contract to Samarco, recently developed a detailed seismic hazard source model for the Iron Quadrangle region of Minas Gerais.

It is the Panel's opinion that seismic loading is unlikely to be a controlling risk, with the possible exception of very vulnerable[1] or very high structures. Nevertheless, legislation and proper due diligence requires that VALE perform seismic analysis for their tailings facilities. The seismic analysis for tailings facilities can be divided into two components: (1) defining seismic demand; and (2) performing analyses to evaluate soil resistance to seismic demand (geotechnical earthquake engineering analyses). The Panel looks forward to a presentation of the recent Atkinson PSHA when it becomes available.

## 6.2. Defining Seismic Demand

Seismic demand can be defined loosely as the energy from an earthquake applied to a structure. A large number of alternative parameters can be used to characterize seismic demand. The parameter of choice typically depends on the application. For seismic slope stability and liquefaction analyses applied to tailings facilities, the most commonly used parameters are

---

[1] Very vulnerable structures are defined as those with a factor of safety close to or less than unity when using peak undrained shear strengths in the contractive tailings.



earthquake moment magnitude (M) and peak ground acceleration (pga). The process of defining seismic demand involves several steps: (1) performing a seismic hazard analysis; and (2) characterizing the ground motions.

### 6.2.1. Seismic hazard analysis (SHA)

Seismic hazard can be defined as the intensity and frequency of earthquake shaking at a given site. Thus, a seismic hazard analysis is used to define seismic hazard, and can be performed deterministically or probabilistically. Both of these analyses involve similar steps:

1) Identify and characterize earthquake sources (i.e., fault location and type, fault slip rate, maximum earthquake magnitude, magnitude distribution, recurrence relationship etc.)
2) Select appropriate attenuation relationships (wave path or source-to-site effects)
3) Compute site-specific seismic hazard.

In the case of a deterministic seismic hazard analysis (DHSA), simply stated, each step is characterized upper-bound parameters—maximum magnitude, shortest source-to-site distance (R), 84th-percentile attenuation relationship, etc. The results of a DHSA are the controlling ground motion parameter of interest, such as M, pga, peak ground velocity (pgv), spectral acceleration (Sa) at a spectral period (T) of 1.0 seconds ($Sa_{T=1s}$), etc.

In a probabilistic seismic hazard analysis (PHSA), uncertainties are characterized in each step of the process. For example, multiple attenuation relationships commonly are used to characterize epistemic uncertainty and a probability distribution is defined for each relationship to characterize aleatory uncertainty. Furthermore, PHSA requires more sophisticated probability theory to compute site-specific seismic hazard. Typical results from a PHSA include a uniform hazard curve (Figure 6.1) and a uniform hazard response spectra (UHRS) as shown in Figure 6.2. One major benefit of a site-specific PHSA is the output can be used directly in VALE's risk analysis for the dam. One shortcoming of a PHSA is that the earthquake magnitude that is required for many geotechnical earthquake engineering analyses (e.g., liquefaction analysis) is not defined in a PHSA as all earthquake sources and corresponding magnitudes are combined mathematically. This shortcoming is addressed by performing a hazard

_____



deaggregation to identify the contributions to the total hazard from combinations (bins) of M and R (Figure 6.3).



Figure 6.1. Example uniform hazard curves for various spectral periods for a B/C boundary site class location in the United States (developed using webtools available at www.usgs.gov).



Figure 6.2. Example uniform hazard response spectra (UHRS) for various spectral periods for a B/C boundary site class location in the United States (developed using webtools available at www.usgs.gov).

32



Figure 6.3. Example hazard deaggregation for a B/C boundary site class location in the United States (Mw = earthquake magnitude; developed using webtools available at www.usgs.gov).

### 6.2.2. Characterizing ground motions

The output from the SHA then are used to characterize bedrock ground motions at the return period of interest. Probabilities of exceedance (PE) of 10, 5, 2 and 0.5% in 50 years (corresponding to return periods of approximately 500, 1,000, 2,500, and 10,000 years, respectively) are commonly used for design. However, in a probability- or risk-based design, all PEs can be incorporated directly. At the desired PE, required bedrock ground motion parameters can be defined, such as pga, $Sa_{T=1s}$, or the entire response spectrum. In addition, complete acceleration time histories are needed for site-specific ground response analysis (as discussed below) and for dynamic numerical (e.g., Newmark, finite element) analyses.

A key component of characterizing ground motions for tailings dams involves propagating the motions from bedrock to the tailings surface (or perhaps within the tailings profile), as soft tailings deposits are likely to amplify bedrock ground motions. This step can be accomplished using a site-specific ground response analysis or using code-based amplification factors.

Ground response analyses can be conducted in the frequency or time domain, where frequency domain analyses include linear and equivalent linear (e.g., SHAKE) methods and time domain



analyses include linear, nonlinear total stress, and nonlinear effective stress methods. Today, nonlinear total and effective stress methods are as computationally efficient as, and more accurate than, equivalent linear methods, and therefore should be used in practice. One such tool is DEEPSOIL ([www.deepsoil.cee.illinois.edu](www.deepsoil.cee.illinois.edu); Hashash et al., 2016). However, as noted above, ground response analysis requires a suite of input motions as well as relationships between shear strain ($\gamma$), shear modulus ($G/G_{max}$-$\gamma$), and damping (D-$\gamma$). Because of the lack of recorded strong ground motions in Brazil, ground motions from worldwide locations of similar tectonic settings and published $G/G_{max}$-$\gamma$ and D-$\gamma$ relationships can be used, but code-based amplification factors can be employed without these inputs. In addition, the Panel considers that one-dimensional analyses are adequate and reasonable for most tailings facilities.

Code-based amplification factors, specifically those developed by the National Earthquake Hazard Reduction Program (FEMA P-750), have been widely adopted in building codes and are widely used in practice. Code-based amplification factors require a bedrock UHRS and the shear wave velocity measured to a depth of 30 m ($V_{S,30}$). The value of $V_{S,30}$ is used to define a Site Class (Table 6.1). Using the Site Class and bedrock UHRS, short- and long-period amplification factors are selected (Table 6.2) and used to develop a ground surface UHRS.

Table 6.1. Site class definitions based on shear wave velocity (FEMA P-750).

| Site Class | Profile type | $V_{S,30}$ (m/s) |
|---|---|---|
| A | Hard rock | > 1500 |
| B | Firm rock | 760 – 1500 |
| C | Very dense soil or soft rock | 360 – 760 |
| D | Stiff soil | 180 – 360 |
| E | Soft soil | < 180 |
| F | Special case | |

## 6.3. Analyzing Soil Resistance to Seismic Demand

For tailings facilities, the following geotechnical earthquake engineering analyses are commonly performed: (1) seismic (or pseudo-static) slope stability; (2) seismic displacements; and (3) seismic liquefaction. A seismic slope stability analysis involves performing a limit-equilibrium analysis that includes a pseudo-static force to represent seismic demand. This pseudo-static force is applied automatically using modern slope stability software packages



(e.g., Slide, Slope/W, SVSlope etc.). These software packages require only a seismic coefficient ($k_h$) for analysis, which is defined as a percentage of the pga. Several researchers have proposed values for $k_h$ (Terzaghi, 1950; Seed, 1979; Marcuson, 1981; Hynes-Griffin and Franklin, 1984; among others). Many practitioners use a value of $k_h \sim 0.5pga$, although in some highly seismic countries such as Chile a lower value of $k_h$ is generally used. This analysis yields a pseudo-static factor of safety against sliding.

Table 6.2. Short-period and long-period amplification factors, $F_a$ and $F_v$ (FEMA P-750).

| Soil Profile Type | Values of $F_a$ | | | | |
| | Shaking Intensity | | | | |
| | $A_a \le 0.1$ | $A_a = 0.2$ | $A_a = 0.3$ | $A_a = 0.4$ | $A_a \ge 0.5$ |
|---|---|---|---|---|---|
| A | 0.8 | 0.8 | 0.8 | 0.8 | 0.8 |
| B | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 |
| C | 1.2 | 1.2 | 1.1 | 1.0 | 1.0 |
| D | 1.6 | 1.4 | 1.2 | 1.1 | 1.0 |
| E | 2.5 | 1.7 | 1.2 | 0.9 | SS[1] |
| F | SS | SS | SS | SS | SS |

| Soil Profile Type | Values of $F_v$ | | | | |
| | Shaking Intensity | | | | |
| | $A_v \le 0.1$ | $A_v = 0.2$ | $A_v = 0.3$ | $A_v = 0.4$ | $A_v \ge 0.5$ |
|---|---|---|---|---|---|
| A | 0.8 | 0.8 | 0.8 | 0.8 | 0.8 |
| B | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 |
| C | 1.7 | 1.6 | 1.5 | 1.4 | 1.3 |
| D | 2.4 | 2.0 | 1.8 | 1.6 | 1.5 |
| E | 3.5 | 3.2 | 2.8 | 2.4 | SS[1] |
| F | SS | SS | SS | SS | SS |

Seismic displacements can be estimated by: (1) simplified Newmark-based methods; (2) a conventional Newmark (1965) procedure; or (3) a numerical stress-deformation analysis. Simplified Newmark-based methods have been proposed by Makdisi and Seed (1978), Bray and Travasarou (2007), among others. These methods require a yield coefficient ($k_y$; defined in a pseudo-static stability analysis) and one or more seismic demand parameters. To define $k_y$, constant strengths must be assigned to soils in the stability analysis. As a result, seismic displacement analyses best apply to soils that are not strain-softening (i.e., liquefiable).

_____

35



A Newmark analysis involves: (1) defining $k_y$ in a pseudo-static stability analysis; (2) selecting one or more representative acceleration time histories; and (3) computing displacements by comparing the acceleration time history to $k_y$. This method was developed for soils that are not strain-softening and can be treated as a rigid block, but it has been adapted for strain-softening soils (e.g., Houston et al., 1987) and flexible blocks (e.g., Kramer and Smith, 1997).

A numerical stress-deformation analysis involves a constitutive model coded in a finite element or finite difference software platform such as FLAC, Plaxis and LS-DYNA. Numerous constitutive models are available that can capture reasonably the monotonic behavior of tailings, such as NorSand (Jefferies and Shuttle, 2005); PM4Sand/PM4Silt (Boulanger and Ziotopoulou, 2017); UBCsand (Byrne et al., 2004), among others. However, the Panel notes that all of these models have shortcomings related to properly capturing cyclic loading, and to provide reasonable results all of these models should be calibrated against laboratory test results for each tailings material.

Like the analyses described above, seismic liquefaction of tailings dams can be evaluated using simplified and more rigorous methods that capture soil response. The response of saturated, contractive tailings differs depending on the location in a tailings dam: (1) near the slope where static shear stresses are present; and (2) far from the slope where level-ground conditions prevail. In these two cases, the definition of liquefaction triggering differ. Under sloping ground, liquefaction is triggered when the stress path attempts to cross the yield strength envelope (Olson, 2015). Depending on the static shear stresses and soil state, this may require only a small seismic disturbance and a small increase in excess porewater pressure. In contrast under level ground, liquefaction occurs when the effective vertical stress approaches zero. This condition requires a larger increase in porewater pressure, although porewater pressure increases more readily when stress reversals occur.

Simplified methods must capture this difference in response. For level ground conditions, the latest version of the Seed and Idriss (1971) method proposed by Boulanger and Idriss (2016) is used commonly. For sloping ground, the Seed and Harder (1990) method as updated by Idriss and Boulanger (2008) can be used, but this method requires corrections for effective overburden stress ($K_\sigma$) and static shear stress ($K_\alpha$) that have significant uncertainties. Alternately, the Olson

---



and Stark (2003) and Olson (2009) simplified procedure can be used to circumvent these uncertain corrections. More rigorous methods involve stress-deformation calculations as described above. Again, the limitations of available constitutive models must be understood and the models carefully calibrated.

## 6.4. Summary Recommendations Related to Seismic Load Assessment

Main remarks and recommendations on seismic load assessment are:

- A regional seismic hazard source model should be developed for the stable continental region of the Iron Quadrangle that covers all of VALE's tailings facilities. The Panel understands that Dr. Gail Atkinson, under contract to Samarco, has developed such a model. If VALE can access this model, this task would be complete. If this model cannot be obtained, VALE must develop the model independently. The regional seismic data used in the model should be updated as needed using acceleration records collected from VALE sites and from the improving seismic network in Brazil.

- VALE should obtain and use available SHA software such as EZ-FRISK (www.ez-frisk.com) or OpenSHA (http://www.opensha.org/) to perform mine-specific PHSA based on the seismic hazard source model developed in Item (1). These PSHA should be updated as needed using the updated seismic hazard source model.

- Using the mine-specific PSHA results, VALE should define seismic demand parameters (e.g., M and bedrock UHRS) needed to perform geotechnical earthquake analyses required by Brazilian standards and legislation.

- At this time, VALE can utilize code-based amplification factors to develop ground surface seismic demand parameters for each dam site. These code-based factors require shear wave velocities, which can be measured using seismic CPTu. In the longer term, VALE should work toward developing ground response analyses (following proper training) that can be used to validate or update this code-based approach.

- Geotechnical earthquake engineering analyses, including seismic slope stability, seismic slope displacements, and seismic liquefaction, should be conducted using a progressive approach. That is, simplified analyses should be performed first, and more rigorous analyses should be performed only as needed depending on the results of the simplified analyses.

_____



- Simplified and more rigorous geotechnical earthquake engineering analyses are outlined in the preceding sections.

- VALE engineers and their consultants should be trained to properly apply these procedures and software for PSHA, ground response analysis, and geotechnical earthquake engineering analyses.

- The results of the seismic analyses, if performed in a probabilistic framework, should directly feed into the risk analyses performed for each dam.

## 7. GEOTECHNICAL RISK MANAGEMENT

### 7.1. Overview

The 3rd PIESEM meeting included a presentation by Mr. Felipe Figueiredo Rocha, which provided an update (referred to herein as "the GRG update presentation") of the following aspects of VALE's Geotechnical Structures Risk Management Program (GRG) covering the period since the 2nd PIESEM meeting in November 2017:

1. Summary of risk analysis framework
2. Status of completion of risk analyses
3. Integration of GRG and the corporate enterprise risk management program (GRN)
4. Summary of risk analysis results, GRG guidance on tolerability of risk and urgency for action, and actions taken to manage the risk
5. Closing remarks

The experience of the GRG and its impact on the management of the safety of VALE's tailings dams have been described as a long journey. Like all journeys it had a beginning, but unlike other journeys it has no destination in the sense that VALE will always be responsible for managing the safety of its tailings dams and other geotechnical structures. Therefore, it is a continuing journey that is changing VALE's approach the management of tailings dam safety. Like all long journeys, it is advisable to plan for the journey, and to review the progress achieved, the direction of travel, and the means of travel (i.e., methodologies, procedures and policies). As a result, it may be appropriate to make changes in direction or the means of travel.



It is the Panel's desire that the comments, suggestions and recommendations will help the GRG to improve its rate of progress and the benefits that it yields.

Section 7.2 summarizes and comments on progress made by the GRG. Sections 7.3 and 7.4 discuss current and future GRG risk assessment procedures, respectively. Section 7.5 comments on the current GRG guidance on risk tolerability and urgency for action.  Section 7.6 comments on the portrayal of tailings dam breach risk at the corporate level in the GRN (VALE's enterprise risk management system).

## 7.2. GRG Progress

Significant progress has been made with completing risk assessments on all but four of VALE's high hazard tailings dams. The GRG's plan calls for completion of risk assessments on all of its 137 tailings dams by 2021.

A primary purpose of the GRG is to support better decision making on all matters that affect the management of risk associated with the potential for breaches of VALE's tailings dams. Many examples of how this is taking place have been presented to the Panel, including the following:

- Identifying preventative controls – to reduce the probability of dam failure
- Identifying mitigative controls – to reduce the consequences of dam failure
- Identifying additional investigations - to reduce uncertainties and improve understanding of dam performance
- Identifying additional monitoring and surveillance - to reduce uncertainties and improve understanding of dam performance, and also to improve warning time through early detection of the initiation of some failure modes
- A basis for oversight and tracking of the implementation of controls by management
- To inform management and the GRN about the status of tailings dam safety risks
- Cultivating a "risk" culture for tailings dam safety management throughout the VALE organization, including in the GRG, operations, management, executives and the Boards.

_____



The specific examples summarized in the GRG update presentation continue to demonstrate that the GRG is maturing. As experience is gained with using the outcomes of risk assessments to support various types of decisions, this experience should be continuously evaluated to assess how the scoping and implementation of the risk analyses for individual dams can be both strengthened and made more efficient.

The GRG has also made significant progress in agreeing a format for portraying tailings dam breach risks for the corporate enterprise risk management program (GRN). This agreement represents a significant step in integrating tailings dam breach risk into the GRN, which should increase the visibility, appreciation and support for addressing tailings dam breach risk at the corporate level. Some details of this approach are discussed in Section 7.6.

The Panel congratulates the GRG for receiving an award from the Brazilian Association of Soil Mechanics and Geotechnical Engineering (ABMS) as a recognition for the advances they have made in risk-informed tailings dam safety management. The Panel believes that this award is well deserved and recognizes the industry leadership position of VALE in this field.

## 7.3. Current GRG Risk Assessment Procedures

The GRG has developed a quantitative risk assessment (QRA) approach. In terms of the four-level system used in the US to classify the level of detail of dam safety risk assessments, the GRG approach is probably a "Level 2." The Panel considers that the approach is appropriate for baseline risk assessments and for informing initial portfolio risk management. It is noted that many organizations use semi-quantitative risk assessment (SQRA) approaches for these purposes, but it is the Panel's view that a QRA approach, while requiring some additional resources, is a more defensible approach that can be expected to yield more valuable insights than SQRA.

The GRG has documented and standardized procedures. This has been valuable for assuring consistency between risk assessments conducted by different consulting firms.

---



Operations staff are routinely included in the risk analysis process. This provides for a valuable two-way flow of information from operations staff to provide inputs to risk analyses based on their intimate knowledge of their projects, and for operations staff to become familiar with risk assessment outcomes. The latter provides the immediate opportunity for operations staff to apply the risk insights and understanding obtained from their involvement in risk assessments in practical ways.

The Panel has not seen detailed documentation on individual dam safety risk assessments that have been completed over the past 18 months. However, based on the high-level coverage of the topic of estimating warning issuance times in the GRG update presentation, the Panel wishes to ask the following questions related to warning issuance time:

- Are assumed warning issuance times well justified and realistic?
- What has been done to assure that assumed warning issuance times can be achieved?

Asking these questions does not imply any form of criticism but rather we ask them to seek confirmation that there is a sound basis for this very important input to dam safety risk assessments. Estimated life loss is extremely sensitive to warning issuance time and life loss is usually considered the most critical type of dam breach consequence. It is therefore worthy of some scrutiny. It is suggested that the GRG consider displaying life-loss estimates as a range, rather than point (single value) estimates, based on a range of estimated warning issuance times obtained from sensitivity analyses, or preferably employing uncertainty analysis in the HEC-LifeSim life-loss estimation software. Panel member, Dr. David Bowles, provided the GRG with guidance[2] that has been developed for the U.S. Army Corps of Engineers, which may be useful in justifying warning issuance times.

The Panel was asked to comment on VALE's policy of issuing warnings to public at Alert Level 2, which is defined as *the moment when remedial measures implemented to resolve the anomaly did not work effectively and the failure of the structure is possible at any time.* It is the Panel's judgment that this is a prudent policy, although it will inevitably result in some "false alarms."

---

[2] This guidance comprises several working papers developed by Drs. Dennis Mileti and John Sorenson for the US Army Corps of Engineers to strengthen the life-loss estimation for dam and levee safety risk analyses. They address the following topics: First Alert and/or Warning Issuance Time Estimation, First Alert or Warning Diffusion Time Estimation, and Protective Action Initiation Time Estimation.



However, it can also be expected to provide an earlier warning issuance and this would be expected to lead to more opportunity for evacuation and therefore to lower life loss. Interestingly, studies[3] in the US have shown that "false alarms" do not decrease the effectiveness of future warnings, which goes against the conventional wisdom.

### 7.4. Future GRG Risk Assessment Procedures

As stated in Section 7.3, the Panel considers that the current GRG risk assessment approach is "*appropriate for baseline risk assessments and for informing initial portfolio risk management.*" However, the Panel affirms VALE's plans to progressively improve its QRA procedures based on international practice. The Panel believes that this is a wise policy and necessary to maintain the defensibility of risk assessment outcomes. In addition, more detailed risk assessment procedures should be considered to develop risk-informed justifications for long-term risk reduction measures (or the basis for not needing such measures). The practice in the US is to use a "Level 4" QRA to support these decisions.

The Panel understands that the GRG is planning to include seismic risk for some tailings dams. The Panel has expertise in geotechnical earthquake engineering and incorporating seismic failure modes into dam safety risk assessments, which it believes would be useful for assisting the GRG to achieve this plan. Including seismic risk in a QRA will require characterizing seismic hazard using a probabilistic seismic hazard analysis (PSHA) (see Section 6.2). The potential failure modes to be included should be determined as appropriate for a particular tailings dam, but may include overtopping of a deformed dam crest, liquefaction-induced instability, a delayed seepage-erosion-through-cracks failure associated with loss of integrity of the dam core or filters, and liquefaction-induced flow slides. In addition, accounting for uncertainty in system response using fragility relationships may be appropriate.

---

[3] In "*Public Alerts and Warnings for Dam and Levee Emergencies,*" which Drs. Dennis Mileti and John Sorenson developed for the US Army Corps of Engineers, they describe the "*False Alarm Myth,*" as follows: "*People's response to warnings is not hindered by what is sometimes called the "cry wolf" syndrome, where predicted events fail to occur. This is especially true if the reasons for the false alarm are clearly communicated to the public. Belief in this myth has caused emergency managers to withhold or delay issuing messages for fear of being wrong.*"



The GRG update presentation mentions that the GRG is in the process of "*Incorporation of some assumptions of the Piping Toolbox for the refinement of the Event Tree tool.*" The Panel suggests that the GRG obtain advice on the selection of procedures from the Piping Toolbox because significant advances have been made since the toolbox was developed.

There is a potentially valuable role for detailed QRA in evaluating tailings disposal alternative approaches, such as but not limited to the following (Section 3.4):

- Filtered Tailings Stack Design, including different heights
- Tailings storage behind compacted rockfill/embankment dams
- In-pit disposal

A Level 3 or 4 QRA will likely be appropriate for these evaluations in order to capture the necessary detail that distinguishes the risk associated with each alternative approach. Such risk assessments will likely provide valuable risk insights as inputs to the selection process for a tailings disposal alternative approach.

The Panel affirms that the GRG plan to review, and if appropriate to update, the current QRAs as part of the Periodic Dam Safety Review process. This demonstrates that VALE is viewing risk as an integral part of its dam safety program and not as a separate approach. It is another essential element in integrating risk into the VALE dam safety management program and to further developing a risk culture in which risk inform all types of dam safety decisions. The frequency of Periodic Dam Safety Reviews is understood to be as follows, based on the hazard class for a dam:

- High Hazard: 3 years interval
- Significant Hazard: 5 years interval
- Low Hazard: 7 years interval

VALE also plans to perform updates of its QRAs when raising, decommissioning, or evaluating risk reduction measures for its tailings dams. This is consistent with the practice of other organizations that have committed to a risk-informed dam safety management program. In addition, the Panel suggests that VALE should consider performing reviews and potential

_____



updates of its QRAs if there are significant changes in consequences, including factors that may influence warning issuance times or warning and evacuation effectiveness.

The following significant trends in risk assessment practice in US, which have recently been reinforced by the findings of the Independent Forensic Team Report for the Oroville Dam Spillway Incident, are noted for consideration by VALE:

- Definition of failure: In the past, emphasis dam safety risk assessments have typically been performed for a "breach" of the containment defined as an uncontrolled release of the "reservoir." Future risk assessments may also consider partial failures leading to a damage states that could result in, for example, negative publicity, an Alert Level 2 false alarm, or a mine shut down.
- More rigorous potential failure modes analysis (PFMA), including:
  - o Complex failure modes, such as combinations of relatively frequent events (e.g., operation of spillway gates or removal of stop logs).
  - o Human factors[4], which can be considered as the ultimate root cause for all dam failures.

## 7.5. GRG Guidance on Tolerability of Risk and Urgency for Action

The GRG update presentation included the probability-monetary consequences chart shown in Figure 7.1, titled "GRG Tolerance Criteria – Probability." This slide appears to contain guidance on the following different issues, although their distinction appears to be unclear in the GRG update presentation:

- Tolerability of risk
- Urgency for action

Another form of this chart, showing life loss instead of monetary consequences, is included in the GRG update presentation, as shown Figure 7.2. Two tolerability of risk considerations are mentioned on the charts shown in Figures 7.1 and 7.2:

---

[4] An August 2018 ASDSO Webinar on "*Human Factors in the Oroville Dam Spillway Incident*," by Irfan Alvi, stated that "*Human factors means factors related to people: Individuals, Groups, Organizations, Industries, and Social, cultural, economic and political context*."



- A probability of failure tolerable risk limit guideline of 1 in 10,000/year (was stated in a GRG presentation made at the 2nd meeting of the PIESEM and in the GRG update presentation)

- ALARP zone between a probability of failure of 1 in 1,000/year and 1 in 10,000/year

## GRG TOLERANCE CRITERIA - PROBABILITY

The results of the risk analysis are materialized in a Probability x Consequence graph. The graph also delimits an Attention Zone / Risk ALARP.

- **Attention Zone / ALARP** defined for the interval of probability of dam failures between 1E-03 and 1E-04, equivalent to events with probability of occurrence of 1 / 1,000 years and 1 / 10,000 years.

- In the ALARP Zone it should be ensured that all prevention and mitigation controls are being applied and that a reduction in probability is not feasible in the short term.



Figure 7.1. GRG urgency for action guidance (VALE, 2018e).

The probability of failure tolerable risk limit guideline of 1 in 10,000/year is the same as the annual probability of failure (APF) tolerable risk guideline used by the Bureau of Reclamation and US Army Corps of Engineers. It also matches the value of the individual risk tolerable risk limit guideline used by those US federal government dam owners and by many other organization in many countries, although there are a few examples of lower values of 1 in 100,000/year and even 1 in 1,000,000/year.



# Risk Estimates and Possible Effect of a Societal Risk Guideline



Figure 7.2. Illustrative societal tolerable risk guideline (VALE, 2018 e).

For the ALARP zone the GRG update presentation states that "*it should be ensured that all prevention and mitigation controls are being applied and that a reduction in probability is not feasible in the short term*" (Figure 7.1). This definition states that VALE is applying this application of ALARP to short-term risk reduction. However, this is an appropriate application of the ALARP concept, but referring to this range of probability of failure as the ALARP zone is inconsistent with all other uses of this term and may lead to confusion. An example of a common definition of an ALARP zone is as follows (USACE, 2014):

"*The application of ALARP considerations mean that actions should be taken to reduce risk below the tolerable risk limit until such actions are impracticable or not cost effective…In making a judgment on whether risks are ALARP, the following factors should be taken into account (adapted from NSW DSC, 2006):*

- *The level of risk in relation to the tolerable risk limit;*
- *The cost-effectiveness of the risk reduction measures;*
- *Any relevant recognized good practice; and*
- *Societal concerns as revealed by consultation with the community and other stakeholders.*"



So the commonly-used definition of an ALARP zone, with its roots in common law, provides a basis for how much long-term risk reduction is justified below the tolerable risk limit guidelines. Following this common practice, the ALARP zone would start at tolerable risk limit guideline, which VALE has defined as a probability of failure of 1 in 10,000/year. Where ALARP is required by common law legal considerations there are examples of where it is specified as a band of probability, typically two orders of magnitude wide and starting with the tolerable risk limit guideline as its upper boundary. However, Bowles (2004) states that it is likely that a lower bound to the ALARP zone is not a legally defensible concept in a common law country and that ALARP should be applied without any lower boundary unless such as boundary is recognized in a legally binding way. It is noted, however, that in practical terms, ALARP justification for further risk reduction does not typically support more than one or two orders of magnitude risk reduction below individual and societal tolerable risk limit guidelines. Overall, it is important to recognize that while some aspects of ALARP reasoning have been applied outside of common law countries, the legal system of the country in which the project is located should be considered and should be the overruling consideration in decision making on the extent of long-term risk reduction.

Therefore, while there is nothing wrong with including the ALARP principle in justifying how much short-term risk reduction can be reasonably achieved, as presented in the GRG update presentation it seems confusing to refer the zone between a probability of failure of 1 in 1,000/year and 1 in 10,000/year as an ALARP Zone. Therefore, it is suggested that this would be better referred to as the Attention Zone with an explanation that ALARP concepts should be applied to justify how much risk reduction should be achieved in the short term but clearly distinguishing risk reduction in the Attention Zone from long-term risk reduction.

Referring to the zone between a probability of failure of 1 in 1,000/year and 1 in 10,000/year as the Attention Zone rather than an ALARP Zone avoids the conflict with the widely-used definition of ALARP. It is also consistent with previous Panel recommendations for VALE to develop guidelines on the priority and urgency for risk reduction[5]. Based on the charts shown

---

[5] Report of the 2nd PIESEM Meeting, Section 4.2a) includes discussion of priority, urgency and staging for risk reduction.



in Figures 7.1 and 7.2, the current GRG guidance on priority and urgency of actions is interpreted to be defined for three probability of failure zones, as follows:

1.  Immediate treatment zone: probability of failure > 1 in 1,000/year

2.  Attention zone - short-term risk reduction: probability of failure between 1 in 1,000/year and 1 in 10,000/year

3.  Maintenance and control zone: probability of failure < 1 in 10,000/year

This approach is reasonably consistent with the practices of other dam owners that use risk-informed approaches, except that in the third zone with a probability of failure below 1 in 10,000/year, there is no mention of long-term risk reduction. As mentioned above, this is the zone in which ALARP is often considered to evaluate further risk reduction below the limit guideline of 1 in 10,000/year. Also, to account for uncertainty in risk estimates, especially for risk estimates obtained from risk analyses of less than a Level 4 (i.e. a Level 2 QRA) some dam owners will evaluate an ALARP justification for reducing the probability of failure for dams that are within half to one order of magnitude below the tolerable risk limit line, which is currently 1 in 10,000/year for VALE, although risk reduction in this zone would generally be with lower priority and urgency than the first two groups listed above. In addition, if a societal risk guideline is adopted, this would introduce another group of dams for consideration for risk reduction with probabilities of failure below 1 in 10,000/year but above the red sloping societal risk[6] limit line illustrated in Figure 7.2.

It should be emphasized that it is undesirable for tailings dams to remain in the Attention Zone for a long period of time because of the relatively high level of risk that this implies, especially from a portfolio perspective if multiple VALE projects are in this zone. This is illustrated using the following examples considering a portfolio of the size of VALE's portfolio of 137 tailings dams:

•   A case with all dams having an individual dam probability of failure of 1 in 10,000/year – probability of at least one failure across the portfolio of 137 dams is 1 in 73/year or 1.4%/year, which is equivalent to 1 in 8 or 13% in ten years.

---

[6] Report of the 2nd Board Meeting of the PIESEM, Sections 4.3 and 4.4 include discussion of societal tolerable risk guidelines and development of such guidelines in Brazil.



- A case with half the portfolio with an individual dam probability of failure of 1 in 10,000/year and the other half having a probability of failure of 1 in 1,000/year – probability of at least one failure across the portfolio of 137 dams is 1 in 14/year or 7%/year, which is equivalent to 1 in 2 or 53% in ten years. About 90% of the total portfolio probability of failure is associated with the dams with a higher individual probability of failure of 1 in 1,000/year even though they represent only half the dams in the portfolio.

- A case with the same assumption as in the Example 2, except that one dam has an individual probability of failure of 1 in 10/year - probability of at least one failure across the portfolio of 137 dams is 1 in 6/year or 16%/year, which is equivalent to 1 in 1.2 or 83% in ten years. About 60% of the total portfolio probability of failure is associated with the single dams with an individual probability of failure of 1 in 10/year.

The above examples illustrate that the larger the portfolio of dams the more likely it is that the owner will experience at least one dam failure in any given year and that this probability increases for longer periods of time. It also illustrates the dominant effect on the portfolio probability of failure of having even a single dam in the portfolio with a high probability of failure. The above examples are based on an assumption that failures occur in statistically independent manner. Factors that may not comply with that assumption, and thus lead to higher portfolio probabilities of failure, include regional storms (or earthquakes) impacting multiple projects in the same event, and a geomechanical deterioration phenomenon, such as grain crushing occurring in multiple high tailings stacks thus increasing the potential for a liquefaction failure during filling.

## 7.6. GRN Portrayal of Dam Breach Risk

A fundamental purpose for communicating risk to all levels in an organization is to stimulate an appropriate response in the form of risk management actions. This should be a guiding principal in developing approaches to communicating risk assessment outcomes. Therefore, the form in which risk outcomes are communicated to each level in the organization should be such that it stimulates an appropriate response, resulting in an effective corporate-wide risk management approach for tailings dam breach risk. What constitutes an appropriate response should be a matter of corporate policy that defines the types of risk management actions that

_____



should be considered and the urgency and priority[7] with which they should be implemented. These actions should include interim risk reduction measures[8] to manage the risk as low as reasonably practicable while long-term risk reduction measures are being developed and implemented. Such policies should be backed by a corporate commitment to implement them and corporate procedures to assure that the commitment is followed through.

It is common to classify risks using descriptors such as "low", "medium" and "high", and to represent them in corporate risk matrices using colors such as green, yellow and red. However, it is important that the appropriate risk management actions to which the corporation is committed are described for each risk class. The selection of colors should be appropriate for these meanings. For example, using green when risk reduction is justified does not seem appropriate.

Incorporating low-frequency high-severity risks, which include dam breach risks, into enterprise risk management systems is a common challenge for organizations that own such risks. This has been a topic of discussion in previous Panel meetings and was one of several focus topics during a one-week visit by Panel Member, Dr. David Bowles, in July 2017.

A popular approach to reporting and managing enterprise risk is through displaying them in a risk matrix, which is formed by several discrete ranges of severity of consequences versus several discrete ranges of frequency of occurrence. The goal is to display all types of corporate or enterprise risks on a single matrix, which is periodically reviewed to identify and track the implementation of measures to reduce each risk, typically focusing on those with highest severity and frequency first. However, the smallest frequency range used in such systems is often 1 in 100/year, but because even dams that are considered high risk may have an estimated probability of failure lower than 1 in 100, the result can be that non-engineers at a corporate level may have the impression that tailings dam breach risks are already small enough. On the other hand, the magnitudes of severity of the life-loss, economic, environmental and other types of consequences associated with dam breach are often much higher than the highest range

---

[7] Report of the 2nd PIESEM Meeting, Section 4.2a) includes discussion of priority, urgency and staging for risk reduction.
[8] Report of the 2nd PIESEM Meeting, Section 4.2a) includes discussion of interim risk reduction measures (IRRMs).



included in typical enterprise risk matrices. This means that the impact of a major dam breach could result in bankruptcy or a loss of public and regulatory trust in the company. In contrast the impact of many other risks faced by a corporation may be much lower and may be managed through cash flow, insurance or other loss management approaches without a threat to the survival of the corporation.

The new GRN risk matrix for tailings dam breach risk, which was presented in the GRG update presentation, is shown in Figure 7.3. It addresses the limitation in the range of frequency described above by extending the previous lowest frequency range from "less 1 in 100/year" in the general GRN approach shown in Figure 7.4, to "less than 1 in 10,000/year." However, the Panel suggests that it may be of value to add an additional range of "less than 1 in 100,000/year" to distinguish dam that are estimated to have a probability of failure that is barely less than 1 in 10,000/year from those that are estimated to have a significantly lower probability of failure.



Figure 7.3. New GRN risk matrix for tailings dams (VALE, 2018e).



# CORPORATE TOLERANCE – CONSEQUENCES AND PROBABILITY

**Tolerance Map - Current**

| Dimension | Low | | Moderate | | Severe | | Critical | | Catastrophic | | N/A | Likelihood / Vulnerability | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Finance** | < US$ 1M | 8 | US$ 1M - US$ 10M | 41 | US$ 10M - US$ 100M | 123 | US$ 100M - US$ 1BI | 80 | > US$ 1BI | 10 | 71 | **Frequent** | It is estimated that the event/consequence could occur several times per year (e.g. once or more per month). | 0 |
| **Environment** | Environmental impact restricted to the limit of the enterprise, without adverse effects to the environment. | 79 | Significant environmental impact, reaching external areas, without adverse effects to the environment. | 32 | Significant environmental impact, reaching external areas with a remediation period of up to 3 years | 33 | Significant environmental impact, reaching external areas with remediation period between 3 years and 6 years | 6 | Significant environmental impact, reaching external areas with a remediation period of more than 6 years | 1 | 182 | **Likely** | Very harmful environment and/or there are several missing or inadequate controls.The occurrence of the event/consequence over a one-year time horizon is almost certain. | 5 |
| **Reputational** | Regional / national impact: There is usually regional public interest, wide repercussion in the regional media, some coverage in the national media and regional political attention. | 116 | National repercussion: National media coverage, repercussions with strategic government authorities. Possible reactions of workers' unions and social networks. | 21 | National and international repercussion. National and international media coverage, with measures restrictive to the business. Possible reactions of workers' unions and social networks. | 50 | Condemnation of NGOs / international media. Revocation of a single license. Significant impact on the stock price / credit assessment; adverse reactions of strategic political authorities | 14 | Prolonged repercussion in the international media / condemnation of NGOs. Multiple licenses revoked; product boycott; mass manifestations; adverse reactions from strategic government authorities | 0 | 132 | **Occasional** | Harmful environment and/or there are some missing or inadequate controls. It is estimated that the event/consequence could occur in a 1 to 10 year timeframe. | 9 |
| **Social & Human Rights** | Regional impact (one or more municipalities) without affecting physical integrity and without the need for urgent remediation. | 54 | Punctual impact (a person or a family), without affecting physical integrity, but in need of urgent remediation. | 23 | Local (neighborhood, community) or regional impact (one or more municipalities), without affecting physical integrity, but in need of urgent remediation. | 23 | Punctual impact (a person or a family), affecting physical integrity. | 8 | Local (neighborhood, community) or regional impact (one or more municipalities), affecting physical integrity. | 7 | 218 | **Unlikely** | Little harmful environment and/or there is a satisfactory level of preventive controls in place.It is estimated that the event/consequence could occur in a 10 to 100 year timeframe. | 14 |
| **Occupational Health** | Severe reversible effects. | 28 | Irreversible effects. | 7 | Risk of life or disabling diseases. | 8 | Risk of life or disabling diseases in a group of more than 5 people at risk. | 0 | Risk of life or disabling diseases in a group of more than 20 people at risk. | 0 | 290 | **Rare** | Non harmful environment and/or there are adequate and sufficient controls. It is estimated that the event/consequence could occur once every 100 years or longer. | 5 |
| **Safety** | Incidents with remoteness. | 24 | Permanent incapacitating incidents or 01 (one) fatality. | 56 | Incident resulting in fatality with more than one person exposed to risk. | 86 | Incident resulting in fatality in a group of more than 5 people exposed to risk. | 10 | Incident resulting in fatality in a group of more than 20 people exposed to risk. | 3 | 154 | | | |

0 Events under validation by owners    ☐ Risk Impacts    ☐ Risk Events

\* Dam risks are not prioritized using Tolerance Map. These will be analyzed in Risk Matrix.



Figure 7.4.  Corporate Tolerance Map"[10]*(VALE, 2018e)*

---

[10] The term, "Tolerance Map," does not seem to be appropriate since tolerability of risk is not defined in this table.



The largest severity range in the new GRN risk matrix for tailings dam breach risk appears to be unchanged from the main GRN system and is > US$1B for financial consequences. The Panel recommends that VALE should evaluate whether the nature of the impact on VALE and its options for surviving such an impact would be significantly different in higher ranges such as US$5B - US$10B, US$10B - US$15B or US$15B - US$20B[11]. If they are, then it may be of value to add higher severity ranges to communicate the difference in the potential impact. In addition, within the GRN it should be understood what the potential impacts on VALE are in each different severity range and what actions VALE is prepared to make to avoid such risks and with what priority and urgency. This may not be widely shared information but it is important to be clear about these considerations within the organization.

It is also suggested that VALE reevaluate the appropriateness of describing cells in the GRN risk matrix that have a potential monetary impact of > US$1B and a frequency of < 1 in 10,000/year as "average risk" (yellow). In contrast, the GRN "Tolerance Map" shown in Figure 7.4 refers to this level of monetary impact as "Catastrophic," which seem more appropriate. Similarly, the use of the term "Low Risk" (orange) should also reviewed.

As shown in Figure 7.5, the frequency scale the GRN risk matrix refers to the range of frequency between 1 in 1,000 and 1 in 100 as a "casual" range of frequency. The use of this term seems questionable and should be reviewed.

| Rare (1) | $P \leq 10^{-4}$ |
|---|---|
| Unlikely (2) | $10^{-4} < P \leq 10^{-3}$ |
| Casual (3) | $10^{-3} < P \leq 10^{-2}$ |
| Likely (4) | $10^{-2} < P \leq 10^{-1}$ |
| Frequent (5) | $P > 10^{-1}$ |

Figure 7.5. Terminology for describing frequency ranges in new GRN risk matrix for tailings dams (VALE, 2018e).

---

[11] US$20B is approximately the largest value shown in the GRG update presentation for VALE tailings dams.

_____



While significant progress has been made in agreeing a risk matrix for reporting low probability high consequences tailings dam breach risk at the corporate level, the Panel remains concerned about the approach of commensuration and summing of different types of consequences into a single dollar amount. The types of consequences that are combined in GRG risk assessments are as follows:

- Health and safety
- Environment
- Direct and indirect economic damages
- Company's image
- Social impacts
- Regulatory authorities

It is noted that these categories are similar to but not exactly aligned with those in the Corporate Tolerance Map shown in Figure 7.4, which are as follows:

- Finance
- Environment
- Reputational
- Social and human rights
- Occupational health
- Safety

As an example, financial consequences are not the same as economic consequences.

The Panel is concerned that insights into the magnitudes of each type of consequences may not being clearly communicated to higher levels in VALE and that these are an important input to judging the significance and criticality of the risk. Without this important perspective, corporate decision making may be handicapped because the impact on the corporation or the value that society places on each type of consequence may not be properly communicated using only an aggregate monetary equivalent. Also, the options for mitigation of different types of consequences are different.

_____



The primary example of this concern is the commensuration of life loss. Although it is understood that the magnitude of life-loss consequences is provided to the GRN and Directors, it is questioned whether it has the same visibility as the single monetary total value of consequences, which is displayed on the GRN risk matrix. The Panel suggest that a risk matrix that is devoted to life-loss risk, in addition to the current GRN risk matrix, to communicate life-loss risk upline to the GRN, Directors, Executives and the Board. The format of this risk matrix should incorporate colors that are based on the significance of individual (and societal when added) tolerable risk guidelines. Other methods should be explored for efficiently and effectively communicating the magnitudes of each types of consequences and bringing attention to sensitive and critical impacts, such as major life loss and long-term loss of critical environmental resources, that may be hidden in the current approach that focuses on a single aggregate monetary value. The Panel recognizes that there are significant challenges in reporting these details in a large company such as VALE, but the investment of effort to successfully communicate this information may have great potential value for VALE's corporate risk management.

The Panel also recognizes that VALE has not been able to find Brazilian examples of societal willingness to pay (WTP) to avoid a statistical fatality and that in place of this it is commensurating life loss with reference to the IATA compensation amount of about US$ 2.5 million per fatality. It is understood that this amount is about 25 times the court-awarded compensation for loss of life of about US$100,000 in Brazil.

The Panel notes that for use of in the evaluation of ALARP and disproportionality, it is the normal practice in other countries to use WTP to assign a value per fatality (VPF) avoided. WTP is sometimes available from government safety regulators, transportation departments or environmental regulators. Viscusi (1998) found that industry uses an implicit disproportionality multiplier averaging 10 to increase WTP when using it to inform decision making, although this multiplier is not necessarily defined explicitly in corporate decision processes.

Based on a general knowledge of VPF values from various countries the use of US$ 2.5 million per fatality does not seem unreasonable for Brazil. However, it is suggested that further comparisons of VPF used on other countries may provide better support for the value that is

_____

55



currently being used rather than the current reference to IATA compensation, which is fundamentally different in concept from a WTP measure.

## 7.7. Summary Recommendations Related to Risk Management

The main remarks and recommendations on risk management are:

- Each GRG risk assessment should be evaluated after completion to assess how the scoping and implementation of the risk analyses for individual dams can be both strengthened and made more efficient.

- The GRG should obtain advice from experienced Panel members for including seismic risk and procedures in the USACE Piping Toolbox in their risk assessments.

- The GRG should evaluate and document the justification for, and realism of, assumed warning issuance times to ensure that realistic ranges of times are used in risk assessments and that the emergency plans are consistent with achieving these assumed times.

- The GRG should consider making and displaying life-loss estimates as ranges rather than point estimates based on uncertainty in estimates of warning issuance times and other important variables using a sensitivity analyses, or preferably uncertainty analyses.

- VALE's final selection of future tailings disposal approach(es) should consider the potential failure modes for each alternative and their associated probabilities and consequences. To be consistent with the present VALE policies with regard to tailings disposal and tailings management, the evaluation and final selection of alternatives should be a risk-informed process with appropriate supporting engineering analysis.

- In addition to its current plans for reviewing and if appropriate updating, its QRAs, the GRG should include significant changes in consequences, including factors that may influence warning issuance times or warning and evacuation effectiveness, as triggers for such reviews.

- The GRG should change the term "Attention Zone/ALARP" to "Attention Zone" to avoid confusion with the widely accepted use of the term, "ALARP Zone." It should also clarify that the "Attention Zone" is defined to guide the priority (and urgency) of implementation of short-term risk reduction measures.  Consistent with the widely accepted use of the term, "ALARP Zone," this zone could then be defined below the individual tolerable risk limit



guideline of 1 in 10,000/year (and below a societal tolerable risk limit when one is defined) to guide long-term risk reduction.

- VALE's new GRN risk matrix should be supplemented with clear corporate commitments to appropriate risk management actions and the priority and urgency for such actions, which are commensurate with the magnitude of the estimated risk, including the severity of impacts for all types of consequences evaluated separately for each type of consequence. The selection of terms and colors for each cell in the GRN risk matrix should be evaluated to ensure that they are appropriate for the gravity of the risk, including its potential consequences, and the level of corporate commitment to risk management actions.

- VALE should consider adding an additional range of "less than 1 in 100,000/year" to the GRN risk matrix and additional high severity ranges that recognize significantly different potential impacts on VALE and others.

- The Panel suggests that a risk matrix that is devoted to life-loss risk should be used in addition to the current GRN risk matrix to communicate life-loss risk upline to the GRN, Directors, Executives and the Board. Other methods should be explored for efficiently and effectively communicating the magnitudes of other types of consequences to bring attention to sensitive and critical impacts

## 8. FOLLOW-UP OF THE PANEL RECOMMENDATIONS

After Panel meetings, VALE has been compiling all recommendations on several subjects and structuring them into an Action Plan, shown on Table 8.1.

The status of all the fifteen plans were presented at the meeting, as well as the path forward to achieve them. The comparison of the action statuses along the last year indicates:

- Eleven actions present significant progress.

- Four actions present no progress at all, including Action 15, which states the promotion of legislation changes for the benefit of safer mining structures; despite this initiative is not easy, a mining company as VALE has to lead these actions for its own benefit and the society.

_____



- Action 7 (risk owner) presented no progress during the last year. The Panel reinforces the importance to define clearly the risk owner and risk responsible for each dam.

Table 8.1. Follow-up of the Panel recommendations – Action Plan (VALE, 2018f).

| Item | Action/Activity | Status |
|------|-----------------|--------|
| 1 | Evolve and implement instruments to guarantee the quality of dam projects (guidelines / PRO / Contracting Rules, etc.) | ● |
| 2 | Improve and formalize the Operational Readiness model ensuring the effective participation of the client area from the design phase to the start-up | ◕ |
| 3 | Define the responsibilities of the Geotechnical Engineer in the scope of the activities of the Management (man-hour dedicated to the technical activities) | ● |
| 4 | Standardize the performance evaluation procedure of geotechnical structures (control levels, safety assessment, reports, meetings and communication flows) | ◐ |
| 5 | Create procedures to guarantee that the dam safety, dam failure risk, emergency and information management policies defined by top management are accomplished. | ● |
| 6 | Develop and / or formalize communication flow of security management and risk management between different hierarchical levels (meetings and reporting) | ◕ |
| 7 | Map processes, defining the "owner of the dam", clarify "owner of the risk" and divulgate the technical responsibilities of each one. | ◕ |
| 8 | Develop and implement procedures for performing external audits in order to ensure reliability, quality and avoid conflicts of interest from the procurement phase to the conclusion of the work | ◕ |
| 9 | Guarantee the adequate and efficient communication between the Geotechnical IT systems. | ● |
| 10 | Update the procedures and the Risk Management Manual based on the evolution of the analysis methodologies and the results of the ongoing studies (seismic network, micro-seismic, event trees, etc.) | ◐ |
| 11 | Define and formalize the Risk Management Governance model (including tolerance) | ● |
| 12 | Implement the "Engineer of Records" model in one dam as a pilot project | ● |
| 13 | Develop and implement an Integrated Water Resources Management System in operations | ● |
| 14 | To develop together with the universities and consultancies, methodology for the elaboration of turbidity plume studies | ○ |
| 15 | Promote legislation change regarding the role of the "stability statement" legislation | ○ |

While the Panel observed some improvements in the quality of the liquefaction analyses described during the 2nd Panel Meeting (November 2017), there persisted a lack of consistency in the analyses presented during the 3rd Panel Meeting. As described in the Report from the 2nd Panel Meeting (dated 18 December 2017), this lack of consistency makes it difficult for VALE to make consistent risk-informed decisions related to liquefaction at their tailings dams. To address this issue, the Panel proposed a Standard Procedure for liquefaction analysis and an Accreditation Process. For convenience, these items are repeated in Appendix A of this report. Following the closing discussions from the 3rd Panel meeting, the Panel felt it was important to reinforce the need for these steps, particularly the Accreditation Process, to improve consistency in the input to the risk assessments.



The Panel recognizes the enormous efforts done by VALE to develop and implement such a comprehensive Action Plan, and compliments VALE for this well done work.

## 9. CLOSING REMARKS

The Panel would like to express its appreciation for the openness and collaboration of VALE's staff and confidence in the Panel.

The Panel's main recommendations were addressed at the end of each section, which can be summarized as:

- The VALE´s planned filtered tailings stacks, in terms of height, topography and climate, are unprecedent, requiring proper engineering and alternatives, otherwise they may constitute in major corporate risks.

- Dam I requires more field investigation and monitoring to identify and design more efficient complementary measures, such as berms and tailings mining if they prove to be needed, in order to reduce present risk, but meanwhile efforts have to continue attempting to drawdown the present phreatic surface through horizontal drains and other draining solutions. The Panel opinion is that tailings mining is feasible, although a proper detailed engineering is required.

- Existing and future geotechnical structures of VALE present major challenges, which requires advances in laboratory testing and dedicated improvements to in situ testing, including accreditation of suppliers and standard guidelines and procedures.

- Seismic loading assessment, despite low magnitudes in the region, has to be defined and establish design criteria due to legislation and proper due diligence.

- GRG Risk Management applied currently in VALE presents high standards, but requires continuously advances, especially related to definition of tolerance risk levels and communication to the enterprise risk management.

- The follow-up of the recommended actions of the Panel presents a fair overall progress over the last year, but some actions need to be separated to allow proper follow-up of specific and important actions.



The next Panel meeting is scheduled to 30 September to 05 October 2019, also indicating a possible meeting in the second week of March 2019.



## REFERENCES

Bowles, D.S. (2003). ALARP Evaluation: Using Cost Effectiveness and Disproportionality to Justify Risk Reduction. ANCOLD Bulletin 127:89-106. August 2004. Invited Paper at the Australian National Committee on Large Dams Risk Workshop, Launceston, Tasmania, Australia, October 2003.

Assumpcao, M., Marza, V., Barros, L., Chimpliganond, C., Soares, J.E., Carvalho, J., Caixeta, D., Amorim, A., and Cabral, E. (2002). Reservoir-induced seismicity in Brazil. *Pure and Applied Geophysics*, 159, 597-617.

Assumpcao, M., Ferreira, J., Barros, L., Bezerra, H., Franca, G.S., Barbosa, J.R., Menezes, E., Ribotta, L.C., Pirchiner, M., Nascimento, A.D., and Dourado, J.C. (2014). Intraplate seismicity in Brazil. *in Intraplate Earthquakes*, P. Talwani, editor, Cambridge University Press, 50-73.

Boulanger, R.W. and Idriss, I.M. (2016). CPT-based liquefaction triggering procedure. *Journal of Geotechnical and Geoenvironmental Engineering*, ASCE, 142(2).

Boulanger, R.W. and Ziotopoulou, K. (2017). PM4Sand (version 3.1): A sand plasticity model for earthquake engineering applications. *Report No. UCD/CGM-17/01*, Center for Geotechnical Modeling, University of California, Davis, CA, March, 112 p.

Bray, J.D. and Travasarou, T. (2007). Simplified procedure for estimating earthquake-induced deviatoric slope displacements. *Journal of Geotechnical and Geoenvironmental Engineering*, ASCE, 133(4).

Byrne, P.M., Park, S.S., Beaty, M., Sharp, M.K., Gonzalez, L., and Abdoun, T. (2004). Numerical modeling of liquefaction and comparison with centrifuge tests. *Canadian Geotechnical Journal*, 41(2), 193-211.

Dawson, R.F., Morgenstern, N.R. and Stokes, A.W. (1998). Liquefaction flowslides in Rocky Mountain coal mine waste dumps. Canadian Geotechnical Journal, 35: 328-343.

Hashash, Y.M.A., Musgrove, M.I., Harmon, J.A., Groholski, D.R., Phillips, C.A., and Park, D. (2016). *DEEPSOIL 6.1, User Manual*. Urbana, IL, Board of Trustees of University of Illinois at Urbana-Champaign.

Houston, S.L., Houston, W.N., and Padilla, J.M. (1987). Microcomputer-aided evaluation of earthquake-induced permanent slope deformations. *Microcomputers in Civil Engineering*, 23, 207-222.



Hynes-Griffin, M.E. and Franklin, A.G. (1984). Rationalizing the seismic coefficient method. *Miscellaneous Paper GL-84-13*, U.S. Waterways Experiment Station, Department of the Army, Vicksburg, MS.

Idriss, I.M. and Boulanger, R.W. (2008). Soil liquefaction during earthquakes. *EERI Publication, Monograph MNO-12*, Earthquake Engineering Research Institute, Oakland.

Jefferies, M. and Shuttle, D. (2005). NorSand: features, calibration and use. *Proc. Geo-Frontiers Congress*, Austin, TX, January 24-26.

Kramer, S.L. and Smith, M.W. (1997). Modified Newmark model for seismic displacements of compliant slopes. *Journal of Geotechnical and Geoenvironmental Engineering*, ASCE, 133(4), 635-644.

Makdisi, F.I. and Seed, H.B. (1978). A simplified procedure for estimating earthquake-induced deformation in dams and embankments, *Journal of Geotechnical and Geoenvironmental Engineering*, ASCE, 105(12), 1427-1434.

Marcuson, W.F. (1981). Moderator's report for session on earth dams and stability of slopes under dynamic loads. *Proc., International Conference on Recent Advances in Geotechnical Earthquake Engineering and Soil Dynamics*. St. Louis, Missouri, Vol. 3, 1175.

Newmark, N.M. (1965). Effects of earthquakes on dams and embankments. *Geotechnique*, 15(2), 139-160.

NSW DSC (2006). Risk Management Policy Framework for Dam Safety. Endorsed by Parliament August 26, 2006.

Olson, S.M. (2009). Strength ratio approach for liquefaction analysis of tailings dams. *Proc., 57th Annual Geotechnical Engineering Conference*, Minnesota Geotechnical Society, Minneapolis, MN.

Olson, S.M. (2015). Residual strength of liquefied soils. in Beer, M., Kougioumtzoglou, I.A., Patelli, E., and Au, I.S.-K. (editors). *Encyclopedia of Earthquake Engineering*, Springer-Verlag Berlin Heidelberg Publishing.

Olson, S.M. and Stark, T.D. (2003). Yield strength ratio and liquefaction analysis of slopes and embankments. *Journal of Geotechnical and Geoenvironmental Engineering*, ASCE, 129, 727-737.

Seed, H.B. (1979). Considerations in the earthquake resistant design of earth dams. *Geotechnique*, 29, 215-263.



Seed, H.B. and Idriss, I.M. (1971). Simplified procedure for evaluating soil liquefaction potential. *Journal of the Soil Mechanics and Foundation Engineering Division*, ASCE, 97(9), 1249-1273.

Seed, R.B. and Harder, L.F. (1990). SPT-based analysis of cyclic pore pressure generation and undrained residual strength. *Proc., H.B. Seed Memorial Symposium*, Bi-Tech Publishing Ltd., 2, 351-376.

Terzaghi, K. (1950). Mechanisms of landslides. *Geological Society of America*, 83-123.

Tuv-Sud (2018a). Dam I – Córrego do Feijão Mine – Period Review of Dam Safety – Liquefaction Analysis. PPT presentation for the 3rd PIESEM meeting.

Tuv-Sud (2018b). Decommissioning B I Dam. PPT presentation for the 3rd PIESEM meeting.

USACE (2014). Safety of Dams – Policy and Procedures. Engineering Regulation, ER 110-2-1156.

VALE (2018a). Cianita Dewatered Tailings Facility. PPT presentation for the 3rd PIESEM meeting.

VALE (2018b). Alternative Methods for tailings Disposal. Experimental Landfills. PPT presentation for the 3rd PIESEM meeting.

VALE (2018c). Filtered Tailings Stacks: PDR Tamanduá and PDR Cauê. PPT presentation for the 3rd PIESEM meeting.

VALE (2018d). Filtered Tailings Stacks: PDE Trevo. PPT presentation for the 3rd PIESEM meeting.

VALE (2018e). GRG – Geotechnical Risk Management Results. PPT presentation for the 3rd PIESEM meeting.

VALE (2018f). Action Plan Follow Up. PPT presentation for the 3rd PIESEM meeting.

Valenzuela, L. (2004). Stability issues in natural and man-made slopes in miming. International Congress on Landslides, Rio de Janeiro, Brazil.

Valenzuela, L. (2015). Hydraulic fills and Tailings Dams. Casagrande Lecture. 12th Panamerican Conference of the ISSMGE. Buenos Aires, Argentina.

Viscusi, W. Kip (1998). Rational Risk Policy. The 1996 Arne Ryde Memorial Lectures Series. Clarendon Press, Oxford.



## APPENDIX A. Excerpt from Report of the 2nd PIESEM Meeting - Section 3. LIQUEFACTION ANALYSIS

**Developing a Standard Procedure for Liquefaction Assessment**

In the Panel's experience, the broad procedure for liquefaction assessment should include the following five major steps.

1. *Collect available data.* The first step of any liquefaction assessment is to collect available historical data related to the entire dam. This includes all field testing, laboratory results, instrumentation data, survey and bathymetry data, aerial photography, design reports, construction drawings, and any other data or reports related to the dam.

2. *Define the construction history of the dam.* Using the data collected in Step (1), a construction history should be established. Importantly, this history should be defined in a graphical information system (GIS) framework. Ideally, the history would start with pre-construction conditions and would proceed to present time, providing all of available data as GIS overlays (e.g., aerial photography, topography, bathymetry, instrument locations and measurements, etc.). This would allow VALE and their consultants to understand variations in time of depositional practices (beach length, continuity of slimes layers), pond levels, and all other key design components.

3. *Supplement the available data and update the construction history, as needed.* This step involves filling gaps in the available dataset if components of data needed to define the construction history are missing. This could involve additional field studies, laboratory studies, surveys, etc.

4. *Interpret and present **consistently** the data used for liquefaction assessment.* As discussed below, the Panel feels that some existing laboratory data are not reliable and are not consistently interpreted. As a result, we recommend that current liquefaction assessments use field tests as the primary means to assess undrained shear strengths of tailings needed for stability analysis. The use of laboratory tests for estimating undrained strengths should be discontinued until VALE has completed a Standards Manual related to liquefaction and contractors have been properly trained (these activities are proposed below). The data used for assessment should include the following, and the data presentation should follow a consistent format to facilitate interpretation.

_____



a.  *Field vane shear test (FVST).* The FVST provides measurements of torque (T) and rotation ($\theta$). The torque measurements can be used to compute undrained peak shear strength, $s_u$(peak), and undrained remolded shear strength, $s_u$(remolded). These shear strengths are assumed to equal the yield and liquefied shear strengths [$s_u$(yield) and $s_u$(liq)], respectively, used for liquefaction analysis. The FVST data should be presented as plots of T - $\theta$ for each test, profiles of $s_u$(peak) and $s_u$(remolded) with depth, and plots of $s_u$(yield) and $s_u$(liq) with effective vertical stress ($\sigma'_{vo}$) that can be used to estimate yield and liquefied shear strength ratios, $s_u$(yield)/$\sigma'_{vo}$ and $s_u$(liq)/$\sigma'_{vo}$, respectively. These strengths and strength ratios should be benchmarked against the strengths back-calculated from the static liquefaction flow failure that occurred at the Germano tailings facility (Appendix C of the Fundao dam failure report).

b.  *Seismic piezocone tests (sCPTu).* The sCPTu provides independent measurements of tip resistance ($q_T$; corrected for unequal end area effects), sleeve friction ($f_s$), penetration-induced porewater pressure behind the cone tip ($u_2$), and shear wave velocity (Vs). These parameters can be used with existing correlations to compute friction ratio ($R_f$) and estimate state parameter ($\psi$), $s_u$(peak) via a cone factor ($N_k$; estimated using FVSTs), as well as $s_u$(yield)/$\sigma'_{vo}$ and $s_u$(liq)/$\sigma'_{vo}$ directly via published correlations. The sCPTu data should be presented in profiles of $q_T$, $f_s$, $R_f$, $u_2$, Vs, $\psi$, $s_u$(peak) and $s_u$(yield), and $s_u$(liq). Shear strengths also should be plotted with $\sigma'_{vo}$ to estimate $s_u$(yield)/$\sigma'_{vo}$ and $s_u$(liq)/$\sigma'_{vo}$. Again, these strengths and strength ratios should be benchmarked against the strengths back-calculated from the static liquefaction flow failure that occurred at the Germano tailings facility (Appendix C of the Fundao dam failure report).

c.  *Discrete field sampling and limited laboratory testing.* Sampling programs should combine split spoon sampling (using the standard penetration test procedure) with Shelby tube sampling. At this time, laboratory testing should be limited to water content (w), Atterberg limits, specific gravity (Gs), grain size distribution (GSD), limit void ratio (maximum, $e_{max}$, and minimum, $e_{min}$), and consolidation testing (to define the compression index, Cc). The laboratory data should be presented in profiles with depth of w and Atterberg limits; Gs; GSD; initial void ratio ($e_o$), $e_{max}$, and $e_{min}$; and Cc. These laboratory data should reference the laboratory data from the Fundao dam failure report.

---



5. *Conduct **consistent** stability analyses.*  Using the strengths defined for the tailings from Step (4) and appropriate strengths for the perimeter dam, foundation, and other components, conduct two-dimensional stability analyses using methods that satisfy both force and moment equilibrium [e.g., Spencer's method, Morgenstern-Price method, Generalized Limit Equilibrium (GLE) method]. These stability analyses should be conducted for (at a minimum): drained conditions, undrained conditions at liquefaction triggering [using $s_u(yield)/\sigma'_{vo}$], and undrained post-triggering (liquefied) conditions [using $s_u(liq)/\sigma'_{vo}$].

**Developing Standards to Promote Data Integrity**

Based on the inconsistencies observed in the field and laboratory testing, as well as in the interpretation and analysis performed for the TSFs, the Panel recommends that VALE initiate an Accreditation Process for their contractors. This process should include the following steps.

1. *Accreditation for field and laboratory contractors.*  All current and future field testing contractors (sCPTu, FVST, survey) should be required to prove the capabilities of their equipment and personnel in order to contract with VALE. The Germano test pit site provides an excellent opportunity for accreditation, where field contractors should show that they can provide reproducible results that are consistent with the high-quality test results obtained at the site during the Fundao dam failure investigation. Similarly, all current and future laboratory contractors should be required to prove the capabilities of their equipment and personnel in order to contract with VALE. The Fundao dam site provides an excellent opportunity for accreditation, where laboratory contractors should show that they can provide reproducible results that are consistent with the high-quality tests performed on samples from the Fundao dam failure investigation. Furthermore, this Accreditation Process should require that all field and laboratory contractors provide digital and print files in **standard formats** (defined by VALE) to facilitate permanent storage and future use. The Accreditation Process should include regular oversight by VALE and select design consultants. For example, VALE and select consultants should regularly review laboratory specimen preparation, testing, and reporting procedures at each accredited laboratory. In addition, the Accreditation Process should include a reporting and remedial process for substandard field or laboratory contractors.



2. *On-going mandatory training for contractors.* Because liquefaction testing and analysis, probability, and risk analysis are new to many of VALE's design and laboratory contractors, the Panel recommends that VALE require contract design consultants and laboratory technicians to complete mandatory training courses in liquefaction analysis and laboratory testing procedures, respectively. For example, VALE could host training sessions taught by international/national experts every 6 or 12 months for prospective contractors, based on VALE's requirements and demand from contractors.