# Exhibit 18

Table of Contents

# United States
# Securities and Exchange Commission

**Washington, D.C. 20549**

# FORM 6-K

**Report of Foreign Private Issuer**
**Pursuant to Rule 13a-16 or 15d-16**
**of the**
**Securities Exchange Act of 1934**

**For the month of**
**May 2017**

# Vale S.A.

**Avenida das Américas, No. 700 – Bloco 8, Sala 218**
**22640-100 Rio de Janeiro, RJ, Brazil**
(Address of principal executive office)

(Indicate by check mark whether the registrant files or will file annual reports under cover of Form 20-F or Form 40-F.)

(Check One) Form 20-F ☒ Form 40-F ☐

(Indicate by check mark if the registrant is submitting the Form 6-K in paper as permitted by Regulation S-T Rule 101(b)(1))

(Check One) Yes ☐ No ☒

(Indicate by check mark if the registrant is submitting the Form 6-K in paper as permitted by Regulation S-T Rule 101(b)(7))

(Check One) Yes ☐ No ☒

(Indicate by check mark whether the registrant by furnishing the information contained in this Form is also thereby furnishing information to the Commission pursuant to Rule 12g3-2(b) under the Securities Exchange Act of 1934.)

(Check One) Yes ☐ No ☒

(If "Yes" is marked, indicate below the file number assigned to the registrant in connection with Rule 12g3-2(b). 82- .)

Table of Contents

Table of Contents:

Press Release                                                                                     3

Signature Page                                                                                 592

2

Table of Contents

**4.1 - Description of risk factors**

**(a) Risks related to the Company**

*The Company may not be able to adjust production volume in a timely or cost-effective manner in response to changes in demand.*

Lower utilization of the Company's capacity during periods of weak demand may expose the Company to higher production costs per unit, since a significant part of its cost structure is fixed in the short term due to the high capital intensity of mining operations. In addition, efforts to reduce costs during periods of weak demand may be limited by labor regulations or collective bargaining agreements or by agreements made with the previous government.

On the other hand, during periods of high demand, Vale's ability to rapidly increase production is limited, which may make it unable to meet the demand for its products. In addition, it is possible that the Company may not be able to complete expansions and new Greenfield projects in time to take advantage of the growing demand for iron ore, nickel or other products. When demand outstrips its production capacity, the Company will be able to meet the excess demand through the purchase of iron ore, iron ore pellets or nickel from joint ventures or resell them, increasing their costs and reducing their operating margins. If it is not able to meet the excess demand of its customers in this way, Vale may lose these customers. In addition, operating near full capacity may expose the Company to higher costs, including over-stay rates (Demurrage) due to constraints on the capacity of their logistics systems.

*Lower cash flows, due to the fall in prices of the Company's products, negatively affected the Company's credit ratings, as well as the cost and availability of financing.*

The lower prices for the Company's products can adversely affect its future cash flows, Credit ratings and the ability to obtain financing at attractive rates. This may also adversely affect their ability to finance their capital investments, pay dividends and meet financial commitments (Covenants) included in some of its long-term debt securities.

In addition, certain Canadian provinces where the Company operates require the provision of financial guarantees from Vale, such as letters of credit, sureties or guarantees, to cover certain closing and recovery costs upon completion of its operations. The Company may be required to increase the value of these financial guarantees if its credit assessment is downgraded to certain levels. If Vale is unable to provide such financial guarantees, it will have to discuss with other competent jurisdictions alternative options and, ultimately, this could affect its ability to operate in such jurisdictions.

*It is possible that the Company may not be able to implement its strategy regarding divestitures and strategic partnerships.*

In recent years, the Company has entered into contracts for the sale of assets and strategic partnerships, in order to optimize its business portfolio and implement its financing strategy and capital investment plans. It is possible that the Company will continue to seek divestitures and strategic partnerships in the future. The Company is exposed to a number of risks in relation to these transactions, including the imposition of regulatory conditions, the inability to meet the conditions for completion or receipt of additional payments, in addition to negative market reactions. If the Company is unable to complete divestitures or strategic partnerships, especially the sale of its fertilizer business or the partnership in its coal assets in Mozambique, it may have to review its business and financing strategy and incur additional costs, which could, in turn, adversely affect its operating results, financial condition or reputation.

Table of Contents

*The Company is involved in lawsuits that may have a material adverse effect on its business in the event of unfavorable results.*

The Company is involved in lawsuits in where the opposing parties are claiming substantial amounts, including various lawsuits and investigations related to the breach of the Fundão tailings dam owned by Samarco. Although the Company is vigorously contesting these actions, the outcome is uncertain and may result in obligations that could materially adversely affect its business and the value of the securities issued by Vale and its subsidiaries. For information on such processes, see items 4.3 to 4.7 below.

*The Company's projects are subject to risks that may result in an increase in costs or a delay in their implementation.*

The Company is investing to maintain and increase its production capacity and logistics. Vale regularly reviews the economic viability of its projects. As a result of this analysis, the Company may decide to delay, suspend or interrupt the implementation of certain projects. Its projects are also subject to several risks that may adversely affect their prospects for growth and profitability, including the following:

- The Company may not be able to obtain financing at attractive rates.

- There may be delays or costs greater than that anticipated in obtaining the necessary equipment or services and in implementing new technologies to build and operate a project.

- Efforts to develop projects on schedule may be hampered by the lack of infrastructure, including reliable telecommunication and energy supply services.

- Suppliers and contractors may not fulfil their contractual obligations assumed with the Company.

- Unexpected weather conditions or other force majeure events could be faced.

- The Company may not be able to obtain the permits and licenses required to construct a certain project, or it may suffer delays or costs that are greater than those expected for obtaining or renewal of certain permits and licenses

- Changes in market conditions or regulations may make the project less profitable than expected at the time the work is started.

- There may be accidents or incidents during project implementation.

- One can face shortage of qualified personnel.

*Operational problems can negatively and significantly affect the Company's business and financial performance.*

Inefficient project management and operational failures can lead to the suspension or reduction of the Company's operations, causing a general reduction in its productivity. Operational incidents can lead to failures in plants and machinery. It is never certain that inefficient project management or other operational problems will not occur. Any losses to the Company's projects or delays in its operations caused by inefficient project management or operational incidents can negatively and significantly affect its business and operational results.

Table of Contents

The Company's businesses are subject to several operational risks that may adversely affect the results of its operations, such as:

· Unexpected climatic conditions or other force majeure events.

· Adverse mining conditions can delay or hinder their ability to produce the expected amount of minerals and meet the specifications required by customers, which can lead to price adjustments.

· There may be accidents or incidents involving mines and associated infrastructure, such as dams, power plants, railways, railway bridges, ports and ships.

· Delays or interruptions in the transportation of their products, including on the railways, in ports and ships.

· Tropical diseases, HIV/AIDS and other contagious diseases in regions where some of its operations or some of its projects are located, posing risks to the health and safety of its employees.

· Labor lawsuits may interrupt their operations from time to time.

· Changes in market conditions or regulations may affect the economic prospects of an operation and render it incompatible with the Company's business strategy.

· Failure to obtain renewal of required licenses and permits, or delays with obtaining same, or higher-than-expected costs to obtain them.

· Interruptions or unavailability of crucial information technology services or systems resulting from accidents or malicious acts.

*The Company's business may be adversely affected by the failure of its counterparts to meet their obligations.*

Customers, suppliers, contractors, financial institutions, joint ventures and other counterparts may fail to comply with existing contracts and obligations and may have an unfavorable impact on the Company's operations and financial results. The ability of the Company's suppliers and customers to meet their obligations may be adversely affected in times of financial stress or during an economic downturn.

Through joint ventures, Vale currently operates a significant part of its ore segments Iron, pelletizing, nickel, coal, copper, fertilizers, bauxite and steel. Important parts of its investments and electrical energy projects are operated through consortiums or joint ventures. The projections and plans for these joint ventures and consortiums are based on the premise that their partners will fulfill their obligations to make their capital contributions, purchase products and, in some cases, provide qualified and competent management personnel. If any of their partners fail to meet their commitments, the joint venture or the affected consortium may not be able to operate in accordance with its business plans, or it is possible that the Company may have to increase the level of its investment to implement those plans.

Some of the Company's investments are controlled by partners or may have a separate and independent management. These investments may not fully comply with the Company's standards, controls and procedures, including health, safety, environment and community standards. Failure to adopt the appropriate standards, controls and procedures by any of its partners or joint ventures can raise costs, reduce production or cause environmental, health and safety incidents or accidents, which can adversely affect the Company's results and reputation.

24

Table of Contents

*The Company may not have adequate insurance coverage for some of the risks concerning its business.*

The Company's business is generally subject to various risks and dangers, which may result in damage or destruction of property, plant and equipment. The insurance that Vale maintains against typical risks in its business may not provide adequate coverage. Insurance against certain risks (including liability for pollution or certain damages to the environment or disruption of certain activities of their business) may not be available at a reasonable cost or at any cost. Even when available, the Company may self-insure when determining that such an act will bring a greater cost-benefit. As a consequence, accidents or other negative occurrences involving the mining, production, or transportation facilities may adversely affect the operations.

*The Company's reserve deposit estimates may differ materially from the mineral volumes that the Company can actually recover. Their estimates of mine useful productive life may not be accurate, and fluctuations in market prices and changes in operating and capital costs may make certain ore reserves economically nonviable for mining.*

Reported reserves are estimated amounts of ore and minerals that the Company determines to be economically feasible to be mined and processed, in accordance with present and future assumed conditions. There are numerous uncertainties inherent in estimating the quantity of reserves and projecting possible future mineral production rates, including factors beyond the Company's control. The reserve report involves estimating mineral deposits that cannot be measured accurately and the accuracy of any reserve estimates is a function of the quality of the data available and the interpretation and judgement of engineers and geologists. As a result, it is not possible to guarantee that the quantity of ore indicated will be recovered or that it will be recovered at the rates that the Company expects. Reserve estimates and the mine`s useful life may require revisions based on actual production experience, projects, up-to-date exploratory drilling data, and other factors. For example, lower market prices for minerals and metals, reduced recovery rates or increased operating costs and capital costs due to inflation, exchange rates, changes in regulatory requirements or other factors, may make proved reserves unprofitable for exploitation and eventually result in a reduction of these reserves. Such reduction may affect depreciation and amortization rates and cause a negative impact on the Company's financial performance.

*The Company may not be able to rebuild its reserves, which may adversely affect its mining prospects.*

The Company is involved in mineral exploration, which is highly uncertain in nature, involves many risks and is often unproductive. Its exploration programs, which involve significant expenses, may not result in the expansion or replacement of reduced reserves through current production. If the Company does not develop new reserves, it will not be able to sustain its current level of production beyond the remaining useful lives of its existing mines.

*The viability of new mineral projects may change over time.*

Once mineral deposits are discovered, it may take several years from the initial drilling phases until production is possible, a period in which the economic viability of production may change. Substantial time and expenses are required to:

•Establish ore reserves through drilling;

•Determine the appropriate mining and metallurgical processes to optimize the recovery of the metal contained in the ore;

•Obtain environmental and other licenses;

25

Table of Contents

- Construct mining and processing facilities and infrastructure necessary for Greenfield operations; and

- to obtain the ore or extract the minerals from the ore.

If it is proven that a project is not economically viable at the time the Company is able to exploit it, it may suffer substantial losses and be required to write off the assets. In addition, possible changes or complications involving metallurgical processes and other technological processes that arise during a project can result in delays and excess costs which, in turn, may make the project not economically viable.

*The Company faces an increase in extraction costs or investment requirements as reserves are reduced.*

Reserves are gradually reduced during the normal course of a given underground or open-cast mining operation. As mining progresses, distances from the primary crusher and tailing deposits become larger, trenches become steeper, mines can shift from open-cast to underground, and underground operations become deeper. In addition, in some types of reserves, the mineralization content reduces and the solidity increases with greater depths. As a result, over time, the Company generally experiences an increase in the unit extraction costs of each mine, or may need to make additional investments, including adaptation or construction of processing plants and expansion or construction of tailing dams. Many of the Company's mines have been operated for long periods, and it is probable that the Company will experience an increase in unit extraction costs in the future in these special operations.

*Labor lawsuits may eventually interrupt the Company's operations.*

A considerable number of Company employees and some of the employees of their subcontractors are represented by unions and are backed by collective agreements or other labor agreements, which are subject to periodic negotiation. Strikes and other work stoppages in any of its operations may adversely affect the operation of these facilities, the completion period, and the cost of the Company's major projects. For more information on labor relations, see item 14 of this Reference Form.

In addition, the Company may be adversely affected by work stoppages involving third parties who maybe providing us with goods or services.

*Higher costs with energy or energy shortages can negatively affect the Company's business.*

Fuel, diesel and electricity costs are a significant component of the Company's production cost, accounting for 10.9% of its total cost of goods sold in 2016. To meet its demand for energy, the Company relies on the following resources: petroleum products, which accounted for 36% of total energy needs in 2016, electricity (32%), natural gas (15%), coal (15%) and other sources of energy (2%).

Electricity costs accounted for 3.9% of its total cost of goods sold in 2016. If the Company cannot guarantee safe access to electrical energy at acceptable prices, it may be required to reduce production or may experience higher production costs, both of which may adversely affect its operating results. The Company faces the risk of energy shortages in countries where it maintains operations and projects, especially in Brazil, due to lack of infrastructure or climatic conditions, such as floods or droughts. Future scarcity and government efforts to respond to or avoid shortages may have an adverse impact on the cost or supply of electricity to the Company's operations.

*Failures in the Company's information technology systems or difficulties in integrating new business resource planning software may interfere with the normal operation of the Company's business.*

26

Table of Contents

The Company has technology information systems ("IT") for the operation of several of their business processes. Failures in the IT systems, whether caused by accident or malicious acts, can result in the disclosure or theft of sensitive information, misappropriation of resources, and disruption to one's operations.

*The Company's governance and compliance processes may fail to avoid regulatory penalties and damage to its reputation.*

The Company operates in a global environment and its activities span multiple jurisdictions and complex regulatory structures with increasing legal obligations worldwide. Its governance and compliance processes, which include analysis of internal controls through financial reporting, may not be able to prevent future violations of the law, of their accounting standards or governance. The Company may be subject to violations of its Code of Ethics and Conduct, its anti-corruption policies, business conduct protocols, and instances of fraudulent behavior and dishonesty on the part of its employees, contractors and other agents. Failure to comply with applicable of laws and other standards by the Company may result in fines, loss of operating licenses and loss of reputation.

*It may be difficult for investors to enforce any court judgement issued outside Brazil against the Company or **a**ny of its associates.*

The Company's investors may be located in jurisdictions outside Brazil and may file lawsuits against it or against the members of the Board or executive officers under the Judiciary of its forums of origin. Vale is a Brazilian company, and most of its directors and members of the Board reside in Brazil. The vast majority of the Company's assets and the assets of its directors and members of the Board are likely to be located in jurisdictions other than the jurisdictions of its foreign investors. It may not be possible for investors located outside Brazil to file the summons within their jurisdiction against the Company or its directors or members of the Board of Directors residing outside its jurisdiction. In addition, a final foreign judgement may be executed in the Brazilian judiciary without a new examination of merit, only if previously filed with the Superior Court of Justice, and the filing will only be granted if the foreign judgement: (a) complies with all the formalities required for its taxability under the law of the country where it was issued; (b) has been rendered by a competent court after the due summons of the defendant, as required by applicable law; (c) is not subject to appeal; (d) does not conflict with a final and un-appealable decision rendered by a Brazilian court; (e) has been authenticated by a Brazilian consulate in the country where it was issued or is duly filed in accordance with the Convention for the Abolishment of the Requirement of Legalization for Foreign Public Documents and accompanied by a sworn translation into Portuguese, unless such procedure has been exempted by an international treaty signed by Brazil; (f) does not cover matters which should be under the exclusive competence of the Brazilian judiciary; and (g) is not contrary to Brazilian national sovereignty, public policies or good customs. Therefore, investors may not obtain a favorable judgement in any legal proceedings against the Company or its directors and executive officers in judgements in the courts of origin from these courts when such judgement is based on the laws of such foreign courts.

**(b) Risks related to the Controller or Controlling Group of the Company and (c) Risks related to the Company's shareholders.**

*The controlling shareholder of the Company has significant influence over Vale, and the Brazilian Federal Government has certain veto rights.*

On March 31, 2017, Valepar S.A. ("Valepar") held 53.9% of the common shares and 33.7% of the Company's total capital. As a result of this equity interest, Valepar may elect a majority of the members of the Board of Directors and control the results of certain actions that require the approval of the shareholders. Valepar's shareholders are part of a shareholders' agreement

27

Table of Contents

governing Valepar's shares as if they were Vale's shareholder. The current shareholders' agreement came into effect on May 10, 2017 and will be in force for a period of six months or until Valepar's merger with Vale. The new shareholders' agreement contemplates a proposal to change the Company's governance structure and to enter into a shareholders' agreement at the Vale level, binding on 20% of its common shares, which will continue to provide significant influence to these shareholders. For a description of the Company's shareholding structure, regarding Valepar's current shareholders' agreement, see item 15 of this Reference Form.

The Brazilian Federal Government holds 12 special class preferred shares (Golden shares*)* of Vale, which give it veto power over certain matters involving the Company, such as changes in the corporate name, location of its headquarters and its corporate purpose, regarding mining activities. For a detailed description of the veto power of these *Golden shares*, see item 18.1 of this Reference Form.

*The implementation of a change in the Company's capital structure and governance, and any potential benefits are subject to uncertainty and may not lead to the benefits that the Company expects to achieve.*

In accordance with the Valepar shareholders' agreement, which entered into force on May 10, 2017, Valepar presented a proposal to simplify the Company's shareholding structure and corporate governance, with the purpose of eventually allowing Vale to be listed on the special segment of the BM & FBOVESPA New Markets, making it a company without defined control.

The implementation of the proposal to simplify the Company's shareholding structure is subject, among other requirements, to (i) the approval of the proposal, including the merger of Valepar by Vale, by the shareholders, Executive Officers and members of the Board of Directors of Vale and Valepar and (ii) the acceptance of at least 54.09% of the class A preferred shares from the voluntary conversion into common shares within 45 days of the shareholders' meeting decision on the matter. It is not possible to predict how long it will take to implement all the necessary steps or whether even if they will be implemented successfully. Finally, the Company cannot predict whether or when it will migrate to the New Market segment of BM & FBOVESPA, since the listing is subject to the conversion of all its preferred shares into common shares.

Uncertainty about timing and actual implementation may delay or limit the Company's ability to derive certain benefits that may be derived from the simplified corporate structure and the eventual migration to the New Market, such as increased liquidity for shareholders. There can be no assurance that these benefits will be fully realized and any failure to achieve these benefits may affect the value of the Company's shares and ADSs.

**(d)Risks related to the Company's subsidiaries.**

For information on the risks related to companies invested by the Company, see the Risk Factor described in item (a) above: "*The Company may have its business affected adversely if its counterparts do not meet their obligations.*"

**(e)Risks related to Company suppliers**

For information on risks related to the Company's suppliers, see the Risk Factors described in item (a) above: "*Higher costs with energy or energy shortages can affect the Company's business* negatively" and "*The Company may have its business affected adversely if its counterparts do not meet their obligations.*"

28

Table of Contents

**(f) Risks related to the Company's clients**

*The Company's business may be adversely affected by declines in demand and prices of products produced by its clients.*

Demand for iron ore, coal and nickel products depends on global demand for steel. Iron ore and pellets, which accounted for 71.5% of the Company's net operating revenues in 2016, are used for the production of carbon steel. Nickel, which accounts for 11.1% of the Company's net operating revenue in 2016, is mainly used to produce stainless steel and steel alloys. Demand for steel depends largely on global economic conditions, but it also depends on a variety of regional and sectoral factors. The prices of different types of steel and the performance of the global steel industry are highly cyclical and volatile, and these business cycles in the steel industry affect the demand and prices of their products. In addition, the vertical integration of the number of steel and stainless steel industries and the use of scrap can reduce global trans-ocean trade in iron ore and primary nickel. Demand for copper is affected by demand for copper wire and a sustained decline in demand in the construction industry could have a negative impact on the Company's copper business.

For information on other risks related to the Company's customers, see the Risk Factor described in item (a) above: and "*The Company may have its business affected adversely if its counterparts do not meet their obligations.*"

**(g) Risks Relating to the Economy Sectors in which the Company operates**

*The Company's businesses are exposed to the cyclical effect of global economic activity and require significant capital investments.*

As a mining company, Vale is a supplier of industrial raw materials. Industrial production tends to be the most cyclical and volatile component of all global economic activity, affecting the demand for minerals and metals. At the same time, investment in mining requires a substantial amount of financial resources in order to replenish reserves, expand and maintain production capacity, build infrastructure, preserve the environment, and minimize social impacts. Sensitivity to industrial production, coupled with the need for significant long-term capital investments, are important sources of potential risk to Vale's financial performance and growth prospects.

*The adverse economic developments in China may have a negative impact on Vale's revenue, cash flow and profitability.*

China has been the main driver of global demand for minerals and metals in recent years. In 2016, China's demand accounted for 72% of global transoceanic demand for iron ore, 52% of global demand for nickel and 48% of global demand for copper. The percentage of the Company's net operating revenue attributable to consumer sales in China was 46.4% in 2016.

Therefore, any slowdown in China's economic growth may result in a reduction in demand for products, leading to a reduction in revenue, cash flow and profitability. Weak performance in Chinese real estate, the largest consumer of carbon steel in China, would also have a negative impact on the Company's results.

**(h) Risks Relating to the Regulation of Sectors in which the Company operates**

*Political, economic and social conditions in countries where the Company operates or has projects may have an adverse impact on its business.*

Vale may have its financial performance negatively affected by regulatory, political, economic and social conditions in the countries where it operates or has relevant projects. In many of these jurisdictions, Vale is exposed to a number of risks, including political instability, bribery, extortion, corruption, robbery, sabotage, kidnapping, civil war, acts of war, guerrilla activities, piracy on international transportation routes, and terrorism.

Table of Contents

These problems may adversely affect the economic conditions and other conditions under which the Company operates in various ways, significantly impairing its business. For example, sections of the Carajás (EFC) railroad in the Brazilian State of Pará and other railroads around the world are subject to disruptions that may adversely affect operations and adversely affect the Company's business.

*Disagreements with the local communities where the Company operates may have a negative impact on its business and reputation.*

There may be disputes with the communities where the Company operates. In some cases, the Company's operations and mineral reserves are located on indigenous lands or on neighboring lands owned or used by indigenous tribes or other interested parties.

Some of the Company's mining operations and other operations are located in territories whose ownership may be subject to disputes or uncertainties, or in areas intended for agriculture, or for agrarian reform purposes, which may lead to disagreements with landowners, community organizations, local communities and the government. The Company may be required to consult such groups and negotiate with them as part of the process to obtain the necessary licenses to operate in order to minimize the impact on their operations or to gain access to their land.

Disagreements or legal disputes with local groups, including indigenous groups, organized social movements, and local communities may cause delays or disruptions to operations, adversely affecting the Company's reputation, or impair its ability to develop its reserves and conduct its operations. There have already been situations where demonstrators acted to interrupt the Company's operations and projects, and may continue to do so in the future, which could adversely affect the Company's operations and adversely affect its business.

*The Company may be adversely affected by changes in public policies or by trends such as the nationalization of resources, including the imposition of new taxes or royalties on mining activities.*

Mining is subject to government regulation, including taxes and Royalties, which may have a material financial impact on the Company's operations. In the countries where the Company is present, the Company is exposed to potential renegotiation, cancellation or forced modification of existing contracts and licenses, expropriation or nationalization of properties, exchange controls, changes in local laws, regulations and policies. The Company is also exposed to new taxes or increased tax rates and royalties, reduction in exemptions and tax benefits, renegotiation of fiscal stabilization agreements or changes in the calculation basis in a way unfavorable to the Company. Governments that have committed themselves to establishing a stable taxation or regulatory environment can change or shorten the duration of these commitments.

The Company also faces the risk of having to submit to the jurisdiction of a foreign arbitration forum or tribunal, or having to enforce a judgement against a sovereign nation within its own territory.

The Company is also required to meet internal processing requirements in certain countries in which it operates, such as local processing standards, export taxes or restrictions, or charges on unprocessed ores. The imposition or increase of such requirements, taxes or charges can significantly increase the risk profile and operating costs in those jurisdictions. The Company and the mining sector are subject to a tendency to increase the nationalism of resources in certain countries where it operates, which may result in restrictions on its operations, increased taxation or even expropriations and nationalization.

*The concessions, authorizations, licenses and permits are subject to expiration, limitation or renewal and various other risks and uncertainties.*

30

Table of Contents

Vale's operations depend on authorizations and concessions from government regulatory agencies in the countries where it operates. The Company is subject to the laws and regulations in many jurisdictions, which may change at any time, and such changes in laws and regulations may require modifications to Vale's technologies and operations, resulting in unexpected capital expenditures.

Some of Vale's mining concessions are subject to fixed expiration dates and may only be renewed for a limited number of times, for a limited period. In addition to the mining concessions, it is possible that the Company will have to obtain several authorizations, licenses and permits from public agencies and regulatory agencies regarding the planning, maintenance, operation and closure of the Company's mines and associated logistics infrastructure, which may be subject to fixed expiry dates or periodic revision or renewal. There is no guarantee that such renewals will be granted when requested, and there is no guarantee that new conditions will not be imposed up on renewal. The fees due for mining concessions may increase substantially over time, from that of the original issue of each individual exploration license. If this happens, the costs of obtaining or renewing the mining concessions may render the Company's business objectives unfeasible. Accordingly, the Company needs to continuously assess the mineral potential of each mining concession, especially at the time of renewal, in order to determine whether the maintenance costs of the concessions are justified by the results of operations so far, and thus may opt to allow some concessions to expire. It cannot be certain that such concessions will be obtained on terms favorable to the Company, or even obtained, for the Company's mining plans or future exploration targets.

In several jurisdictions where the Company has exploration projects, it may be required to return to the State a certain portion of the area covered by the exploration license as a condition to renew the license or obtain a mining concession. This obligation may lead to a substantial loss of part of the mineral deposit originally identified in its feasibility studies. For more information on mining concessions and other similar rights, see "Regulation of mining activities" in item 7 of this Reference Form.

**(i) Risks related to ADSs (*American Depositary Shares*) belonging to The Company**

*If holders of ADSs exchange their ADSs for underlying shares, they risk losing the ability to remit foreign currency abroad.*

The custodian of the underlying shares of the Company's ADSs maintains a registration with the Central Bank of Brazil, giving it the right to remit US dollars outside Brazil for dividend payments and other distributions related to the shares underlying the ADSs or through disposal of the underlying shares. If the holder of an ADR exchanges his ADSs for the underlying shares, he will

be entitled to rely on the custodian's registration for only five business days from the date of exchange. Thereafter, an ADR holder may not be able to obtain and remit foreign currency abroad through the disposal or distributions relating to the underlying shares unless he obtains his own registration in accordance with applicable regulations allowing qualified foreign institutional investors to buy and sell securities at the BM & FBOVESPA. If the ADR holder attempts to obtain his registration, he may incur expenses or be late in the application process, which may delay the receipt of dividends and other distributions relating to the underlying shares or the return of capital in a timely manner.

The record of the custodian or any record obtained may be affected by future changes in the law, and additional restrictions applicable to holders of ADRs, the disposal of the underlying shares or the repatriation of the proceeds from the sale may be imposed in the future.

31

Table of Contents

*Holders of ADRs may not be able to exercise their preemptive rights in respect of the underlying shares of their ADSs.*

The ability of ADR holders to exercise their preemptive rights is not assured, especially if the applicable law in the holder's jurisdiction (for example, the *Securities Act* in the United States) to require that a registration statement be effective or an exemption from registration be available in respect of such rights, as in the case of the United States. The Company is not required to extend the offer of preemptive rights to ARDS holders, to file a registration statement in the United States, or to make any similar registration under any other jurisdiction, regarding preemptive rights, or to take such measures as may be necessary to provide exemptions from the registration, and cannot assure the holders that it will make any registration statement or take such measures.

*Holders of ADRs may find it difficult to exercise their voting rights.*

Holders of ADRs do not have shareholder rights. They have only the contractual rights established regarding their benefit in the deposit agreements. Holders of ADRs are not permitted to attend general meetings and may only vote by providing instructions to the depositary. In practice, the ability of a holder of ADRs to instruct the depositary on how to vote will depend on the timing and procedures for providing instructions to the depositary, either directly or through the holder's clearing and custody rights. With respect to ADSs for which no instructions are received, the depositary may, subject to certain limitations, grant a power of attorney to a person designated by the Company.

*Legal protections for holders of the Company's securities differ from one jurisdiction to another and may be inconsistent, unfamiliar or less effective in relation to investor expectations.*

Vale is a global company with securities traded in various markets and with investors located in many different countries. The legal regime for investor protection varies across the world, sometimes in important respects, and investors in our securities must recognize that the protections and remedies available to them may be different from those they are accustomed to in their local markets. The Company is subject to securities legislation in several countries that have different standards, monitoring and enforcement practices. The only Corporate S.A. law applicable to the company is the Brazilian corporation law, with its specific and substantial legal rules and procedures. The Company is also subject to corporate governance standards in several jurisdictions where its securities are listed, but only as a foreign private issuer, the Company is not required to follow many of the corporate governance standards applied to US domestic issuers with securities listed in the New York Stock Exchange and is not subject to US procurement rules.

**(j)Risks related to socio-environmental issues**

*The potential obligations and liabilities arising from the rupture of the tailings dam owned by Samarco Mineração S.A. ("Samarco") in Minas Gerais may adversely affect the Company's business, financial condition and reputation.*

In November 2015, the Samarco-owned Fundão tailings dam broke, causing environmental damage. The rupture of the Samarco tailings dam has adversely affected and will continue to affect the Company's business, but the overall impact is still uncertain and cannot yet be estimated. Below is an account of the main effects of the rupture of the dam on the Company's business.

- *Court lawsuits*. The Company is involved in several processes and investigations related to the dam rupture of Fundão, and other processes and investigations may be initiated in the future. These lawsuits include alleged collective actions by US investors against the Company and some of its directors, a criminal proceeding in

32

Table of Contents

Brazil, public civil actions filed by the Brazilian authorities and several lawsuits involving significant claims related to damages and remedial measures. Adverse results in such processes may adversely affect the liquidity and financial condition of the Company. For more information on these processes, see items 4.3 to 4.7 of this Reference Form.

Obligations of redress and other obligations. In March 2016, Samarco and its shareholders, Vale and BHP Billiton Brasil Ltda. ("BHPB"), a Brazilian subsidiary of BHP Billiton plc, concluded the Transaction Agreement and Adjustment of Conduct TAAC with some government authorities that Samarco, Vale and BHPB agree to create a foundation to develop and implement long-term compensation and compensation programs. In addition, in January 2017, Samarco, Vale and BHPB entered into preliminary agreements with the Federal Public Ministry ("MPF"), which provides, inter alia, for the appointment of experts selected by the MPF to review and monitor the repair programs created under the March 2016 TTAC, provide guarantees to ensure certain repair obligations, and a timetable for negotiation of a final agreement. For more information, see items 4.7 and 7.9 of this Reference Form.

As Samarco is currently unable to resume its activities, the Company and BHPB are financing the foundation and providing funds directly to Samarco in order to preserve its operations and support certain remedial measures undertaken by Samarco. Should Samarco continue to be unable to resume its operations or generate enough cash flows to finance the necessary repair measures under these agreements, the Company will be obliged to continue financing these repair measures, which in turn may adversely affect its financial condition and the results of its operations.

- *Risk of additional environmental damage.* Samarco continues to strengthen and improve its dams to contain the remaining tailings. Failure to contain the remaining tailings may cause additional environmental damage, additional impacts on Company operations, and additional claims, fines and lawsuits against Samarco and the Company. Failure to contain the remaining tailings could also affect the viability and schedule for the resumption of Samarco operations.

- *Other impacts*. The Company may face delays in obtaining an environmental operation permit for other tailing dams, and Brazilian authorities may impose stricter conditions in connection with the licensing process of its projects and operations. In addition, as one of Samarco's shareholders, the Company's reputation has been adversely affected by the rupture of the Samarco tailings dam.

*The Company's business is subject to environmental, health and safety incidents.*

The Company's operations involve the use, handling, storage, discharge and disposal of hazardous substances in the environment and the use of natural resources. As a result, the mining industry is generally subject to significant risks and dangers, including fire, explosion, toxic gas leakage, polluting substances or other hazardous materials, rock slides, dam-related accidents, failure of other operating structures and accidents involving vehicles, machinery and mobile equipment. This may occur by accident or by breach of operating and maintenance standards and may result in significant environmental and social impacts, damage or destruction of mineral property or production facilities, injury, illness or death of employees, service providers or members from the surrounding community to operations, environmental damage, production delays, financial losses and possible civil liability. In addition, in remote locations, employees may be exposed to tropical and contagious diseases that may affect their health and safety. Notwithstanding the Company's rules, policies and controls, its operations

33

Table of Contents

remain subject to incidents or accidents, which may adversely affect its stakeholders or reputation.

*The Company's business may be adversely affected by environmental and health and safety regulations, including regulations related to climate change.*

Almost all aspects of their activities, products, services and projects around the world are subject to environmental, health and safety regulations, which may expose them to increased liability or costs. Such regulations require Vale to have environmental permits, permits and authorizations for its operations and projects and to carry out environmental and social impact assessments in order to obtain approval of its projects and permission to start construction. Significant changes in existing operations are also subject to these requirements. Difficulties in obtaining or renewing permits can lead to delays in construction, cost increases and may adversely impact production volumes. Environmental, health and safety regulations also impose standards and controls on activities related to mineral exploration, mining, pelleting activities, rail and maritime services, ports, decommissioning, refining, distribution and marketing of its products. Such regulation can entail significant costs and responsibilities. Disputes related to these and other matters may adversely affect the financial condition or harm the Company's reputation.

Environmental and health and safety regulations in many of the countries where Vale operates have become stricter in recent years, and it is possible that further regulation or stricter enforcement of existing regulations may adversely affect the Company by imposing restrictions in their activities and products, creating new requirements for the issuance or renewal of environmental licenses, increasing their costs or forcing them to engage in costly repair efforts. For example, changes in Brazilian legislation to protect diggings forced the Company to carry out extensive technical studies and negotiate compensatory measures with Brazilian environmental regulators in order to continue operating in certain locations. It is possible that in some of its iron ore operations or projects Vale may be required to limit or modify its mining plans or incur additional costs to preserve or compensate for impact, with potential consequences on the volumes of production, costs or reserves in its iron ore business. For more details on Brazilian environmental regulations regarding workings, see item 7 of this Reference Form.

In response to the rupture of the Samarco tailings dam in Minas Gerais, additional environmental, health and safety regulations and standards may arise in Brazil and authorities may impose stricter conditions regarding the licensing process of the Company's projects and operations. In addition, Vale may face delays in receiving the operating license for other tailing dams.

National policies and international regulations on climate change can affect many of the Company's businesses in several countries. Ratification of the Paris Accord in 2016 has increased international pressure to establish a global carbon price and on companies to adopt carbon pricing strategies. Pricing for greenhouse gas emissions can affect its operating costs, mainly through higher fossil fuel prices, since mining is an energy-intensive industry. The consumption of coal, one of the products that the Company sells, is facing pressure from international institutions due to its carbon intensity.

Regulatory initiatives at national and international levels that affect shipping practices could increase costs or force Vale to make new investments.

*Natural disasters can cause serious damage to the Company's operations and projects in the countries in which it operates and may have a negative impact on its sales to countries affected by such disasters.*

Natural disasters, such as windstorms, droughts, floods, earthquakes and tsunamis, can negatively affect Vale's operations and projects in the countries where it operates, and may generate a contraction in sales to affected countries, among other factors, by interrupting the

34

Table of Contents

supply of energy and the destruction of industrial facilities and infrastructure. The physical impact of climate change on business remains uncertain, but Vale may experience changes in precipitation patterns, rising temperatures, water shortages, rising sea levels, increasing frequency and intensity of storms because of climate change, which may adversely affect its operations. On some occasions in recent years, the Company has determined that force majeure events occurred due to the effect of bad weather on its mining and logistics activities.

Table of Contents

Case 1:19-cv-00526-EK-VMS    Document 66-18    Filed 02/21/20    Page 17 of 30 PageID #: 1521

supply of energy and the destruction of industrial facilities and infrastructure. The physical impact of climate change on business remains uncertain, but Vale may experience changes in precipitation patterns, rising temperatures, water shortages, rising sea levels, increasing frequency and intensity of storms because of climate change, which may adversely affect its operations. On some occasions in recent years, the Company has determined that force majeure events occurred due to the effect of bad weather on its mining and logistics activities.

Table of Contents

challenge had not yet been made final.

| | |
|---|---|
| Chance of loss | Possible |
| Analysis of impact in event of loss / Reasons this case is significant to the Company | The Minas Gerais State Public Prosecutors' Office claims that the accident involving the Fundão Dam directly impacted the distribution of water in the municipality of Governador Valadares and it intends to continually evaluate the quality of the drinking water distributed there. |
| | The lawsuit is still at a very early stage to evaluate the impacts. Notwithstanding the above, the Company also considers the case to be significant because of the subject in question. |

12) Lawsuit 1:15-cv-09539

| | |
|---|---|
| Court | Federal Court of New York |
| Level of court | District Court of United States for Southern District of New York |
| Date instigated | December 7, 2015 ("First Complaint") and April 29, 2016 ("Amended Complaint") |
| Parties | Alameda County Employees' Retirement Association and Orange County Employees Retirement System ("Plaintiffs") and Vale S.A., Murilo Pinto de Oliveira Ferreira, Luciano Siani Pires and Gerd Peter Poppinga ("Defendants") |
| Sums, assets or rights involved | The plaintiffs have not specified the amount of alleged losses. |
| Main facts | Vale and some of its executives have been indicted as defendants in potential class action lawsuits related to securities filed with the Federal Court of New York, brought by investors holding American Depositary Receipts issued by Vale, based on US federal securities laws. In the lawsuits, it is alleged that Vale made false and misleading declarations or failed to disclose the risks and hazards of operations involving Samarco's Fundão tailings dam and the appropriateness of related programs and procedures. The plaintiffs did not specify a value for the alleged losses involving their shares, but only requested that the defendants be condemned to compensate the losses incurred, to be calculated in the expert opinion phase. |
| | On March 7, 2016, the judge overseeing the class action lawsuits related to the securities ordered the consolidation of these cases and designated lead plaintiffs and a lawyer. |
| | On April 29, 2016, the lead plaintiffs of the lawsuit filed an initial amended and consolidated request to serve as the case's initial petition. |
| | On July 25, 2016, Vale filed a motion to dismiss the initial amended and consolidated petition, in which it basically claimed: (i) that the cause of the plaintiffs' claims do not justify a Securities Fraud Claim; (ii) that the plaintiffs have not identified any omissions supposedly committed by the defendants; (iii) that the plaintiffs have not demonstrated the defendants' intention to defraud the market; and (iv) that the plaintiffs have not imputed any unlawful acts to the individual defendants. |
| | On March 23, 2017, the court issued a ruling, dismissing the case with regard to the majority of the requests filed against |

82

Table of Contents

Vale and the individual defendants, as well as deeming null and void all the requests formulated against Vale's chief executive officer, Murilo Ferreira, and those related to the personal liability of the individual defendants. The small share of the case that remains is limited to certain declarations regarding risk mitigation in Vale's 2013 and 2014 Sustainability Reports, and isolated declarations regarding Vale's responsibility for the failure of the Fundão dam made during a single conference call in November 2015.

On April 6, 2017, Vale filed a request for clarification/reconsideration through which it requested that other requests made by the plaintiffs be dismissed.

On April 7, 2017, Vale submitted a proposed schedule for the next steps related to the case. The parties agreed to this schedule and, on April 14, 2017, they met with the judge to establish the future timeframes.

Vale plans to continue to defend itself from these lawsuits.

| | |
|---|---|
| Chance of loss | Because of the preliminary nature of these proceedings, it is not possible to determine the extent of their results or to make firm estimates of potential exposure at this stage, and so no provisions have been made. |
| Analysis of impact in event of loss / Reasons this case is significant to the Company | Loss of the case could generate financial, image and reputational losses for the Company. |

13) Lawsuit 0073114-91.2016.4.01.3800 (formerly 0000640-06.2016.8.08.0014)

| | |
|---|---|
| Court | 12th Federal Court of Belo Horizonte (original court: 2nd Civil Court of Colatina, Espírito Santo Court of Appeals) |
| Level of court | 1st instance |
| Date instigated | January 15, 2016 |
| Parties | Espírito Santo State Public Prosecutors' Office (Plaintiff) and Samarco Mineração S.A. ("Samarco"), Vale S.A. ("Company or "Vale") and BHP Billiton Brasil Ltda. ("BHPB") (together "Defendants") |
| Sums, assets or rights involved | R$2,000,000,000 |
| Main facts | On January 15, 2016, the Espírito Santo State Public Prosecutors' Office filed a class action lawsuit aimed at forcing Samarco to pay damages for diffuse pain and suffering arising from alleged hardship experienced by the population of the municipality of Colatina because of the failure of the tailings dam in the municipality of Mariana. For information on this accident, see item 7.9 of this Reference Form.

The plaintiff formulated a number of provisional requests, aiming to: (i) freeze R$2 billion in the bank accounts of the Defendants, in order to guarantee future enforcement; (ii) remove the tax confidentiality of the Defendants; (iii) supply documentation related to the accident; and (iv) report this demand to the Brazilian Securities and Exchange Commission |

83

Table of Contents

| | |
|---|---|
| Chance of losing | Possible |
| Impact analysis in case of loss / Reasons for the relevance of the process to the Company | The value assigned to the cause by the MP-MG is of R$155.052.000.000,00. However, it should be noted that the lawsuit is still at a very early stage, which makes a more precise assessment of the losses in the event of losing the dispute difficult. |

16) Process Nr. 16-CV-8800

| | |
|---|---|
| Court | Federal Court of New York |
| Instance | United States District Court for the Southern District of New York |
| Date of institution | 06/Mar/2017 |
| Parties to the proceedings | Holders of debt securities issued by Samarco Mineração S.A. ("Plaintiffs") and Samarco, Vale and BHPB (jointly "Defendants") |
| Involved values, assets or rights | Value still to be determined during the pre-trial phase. |
| Main facts | In March 2017, the Plaintiffs filed a collective action claiming compensation for alleged violations of securities laws and other credits related to the purchase and sale of debt securities issued by Samarco. |
| | The legal proceedings include the allegation that Vale had submitted false and misleading statements or would have omitted disclosures about the risks and hazards of Samarco's Fundão dam operations and the adequacy of related programs and procedures. |
| | With the breach of the Fundão dam in November 2015, they claim that the bonds had a sharp fall in their value, so that the investors who had acquired them in error should be compensated. |
| | On April 4, 2017, the plaintiffs filed a petition voluntarily waiving all lawsuits that had been directed at the defendants individually. |
| | Vale has already been summoned in this process but has not yet presented its defense. |
| Chance of losing | Possible |
| Impact analysis in case of loss / Reasons for the relevance of the process to the Company | An eventually unfavorable decision could generate financial losses to the Company and damage its image. |

**(iv) Environmental**

The tables below give an individual description of the processes of environmental nature considered relevant to the Company's and / or its subsidiaries' business.

1) Process Nr. 0317.02.002974-8

| | |
|---|---|
| Court | 2nd Civil Court of the County of Itabira - Minas Gerais |

Instance                                  1st instance

Date of institution                       26/Sep/1996

Parties to the proceedings                Municipality of Itabira (plaintiff) and Vale (defendant)

Involved values, assets or rights         R$5,420,633,947.99 (December 2016).

Main facts                                The municipality of Itabira seeks compensation for the expenses

93

Table of Contents

**5.1 - The policy to manage risks and internal controls in relation to the risks indicated in item 4.1**

**a. If the Company has a formal market risk management policy, highlight the body that approved it and the date it was approved, and, if not, state why the company has not adopted such a policy**

The Company understands that effective risk management is fundamental to support the achievement of its objectives and to guarantee the Company's soundness and financial flexibility and the business continues as a going concern. As such, it has developed its risk management strategy in order to provide an integrated view of the risks to which it is exposed.

The guidelines for the corporate risk management strategy are set out in the Company's Corporate Risk Management Policy, originally approved by the Board of Directors on December 22, 2005 and amended on August 25, 2011.

**b. Objectives and strategies of the risk management policy, if any, including:**

The Company's Corporate Risk Management Policy is based on the following principles: (i) support the growth plan, strategic planning and business continuing as a going concern; (ii) strengthen the capital structure and asset management; (iii) allow an adequate degree of flexibility in financial management; and (iv) strengthen Vale's corporate governance practices.

**i. Risks for which protection is sought**

The Company seeks to protect the main risks that may adversely and relevantly impact the objectives set by the Company's senior management, its reputation as well as its financial and operating profit, which are described in item 4.1 of this Reference Form, the following are highlighted, among others:

(i) risks that may impact the Company's operations, in particular relating to events, whether due to force majeure or arising from the ordinary processes of the Company and its subsidiaries that may impact its production process and the use of installed capacity;

(ii) risks associated with the Company's strategic decisions to achieve its objectives and/or arising from the Company's ability to protect or adapt to changes in the mining sector, in particular regarding the demand for its products, the Company's capital structure and performance in different markets;

(iii) risks of legal or regulatory sanctions, legal proceedings against the Company and its subsidiaries, where a loss or the application of penalties, may impact the Company in a relevant manner, from a financial or operational point of view or damage its image;

(iv) risks of stoppages to project activities of the Company and its subsidiaries due to the non-acquisition or non-renewal of regulatory licenses, including but not limited to environmental licenses;

(v) risk of increases in the costs of the Company's operations, not only due to market conditions but also due to legal and regulatory changes in the locations where the Company operates;

(vi) risks associated with the lack of consistency and adequacy of the systems and control of Company operations and projects, including, but not limited to, information systems, as well as to failures in the management of the Company's internal controls.

Table of Contents

*Dams*

In May 2016, the state of Minas Gerais issued a decree ordering an immediate assessment of the stability conditions of upstream dams and suspending new licensing procedures for the construction or lifting of upstream dams until the state environmental authority defined new rules and procedures. Vale carried out extraordinary audits on the stability conditions of its upstream dams and no anomalies were identified. Vale has filed reports with local government authorities in September 2016. In March 2017, the state of Minas Gerais determined that dams already altered by the upstream method, but had their stability conditions verified by audit, could be altered by other constructive methods.

*Environmental liability*

Environmental liability can occur in three diverse and independent spheres: (i) civil; (ii) administrative and, (iii) criminal.

- *Civil liability:* The entrepreneur, regardless of the existence of guilt, shall indemnify or repair damages caused to the environment and to third parties affected by their activities. Environmental legislation stipulates joint liability among polluters (Federal Law 6,938/81), which implies the possibility of holding all parties involved in an event that causes damages to the environment.

- *Administrative liability:* The administrative liability arises from an action or omission that results in the violation of any norm of preservation of the environment (Federal Decree nº 6,514 / 08). Sanctions against an administrative infraction may include warning, fine, product disruption, suspension of sale and manufacture of the product, seizure of work or activity, demolition of work, among other rights restrictions.

- *Criminal liability:* In the criminal sphere, Federal Law no. 9,605 / 98 (Environmental Crimes Law) is subject to its effects any person, physical or juridical who practices conduct that is harmful to the environment. The Law also provides for the possibility of disregarding the legal personality that causes the environmental infraction in certain cases. The sanctions applicable to legal entities may be (i) partial or total suspension of the activity; (ii) temporary interdiction of establishment, work or activity; and, (iii) prohibition of contracting with the Power Authority, as well as to obtain subsidies, grants or donations.

*Other Considerations on Environmental Legislation*

Environmental legislation is becoming more stringent around the world, which can lead to higher costs for compliance with environmental laws. In particular, the Company expects more attention from several governments on issues associated with the reduction of greenhouse gas emissions as a result of concerns about climate change, especially after the entry into force of the Paris Agreement at the end of 2016 . There are several examples of environmental regulation and compliance initiatives that may affect the Company's operations:

- *Canada.* In Canada, stricter water effluent standards are being proposed by the government, and a cap on greenhouse gas emissions and trade regulation are being enacted in Ontario and proposed in Manitoba and Newfoundland and Labrador, which could affect Company. In Canada, Vale is making significant investments to ensure compliance with air emissions regulations, which include, among other things, sulfur dioxide, greenhouse gas emissions, particulates and metals.

- *Indonesia.* Under the Indonesian Government Regulation of 2014 on waste B3, PTVI slag is classified as hazardous waste, and PTVI submitted a formal request to the regulatory body for approval.

- *China.* An amendment to the environmental protection law was approved in April 2014, imposing tougher obligations on pollution prevention and control of companies and

Table of Contents

providing more severe penalties. This change could negatively affect exports of coal from Mozambique's Vale to China.

- *New Caledonia.* A law approved in the Southern New Caledonia Province in February 2014 has imposed stricter limits on emissions of nitrogen oxide, sulfur oxide and particulates from large power plants, which will affect the power station that supplies electricity to the VNC. This is expected to result in an increase in the price of energy paid by VNC.

**Royalties and other taxes on mining activities**

In many jurisdictions, Vale is required to pay royalties or taxes on its incomes or profits from extractions and sales of the minerals. These payments constitute an important element of the economic performance of a mining operation. The following royalties and taxes apply in some of the jurisdictions in which Vale has its largest operations:

- Brazil. Vale pays a royalty known as Financial Compensation for the Exploration of Mineral Resources (CFEM) on net sales, and is calculated based on revenues from the sale, net of taxes, of extracted mineral products, less insurance and transportation costs. The current rates on our products are: 2% for iron ore, copper, nickel, fertilizers and other materials, 3% for bauxite, potassium and manganese ore and 1% for gold. In 2013, the Brazilian Federal Government sent to Congress a bill proposing changes to the Brazilian Mineral Code, which may result in an increase of *royalties* rates. The bill is currently under discussion in the Brazilian Congress. Several Brazilian states charge a tax on mineral production (Inspection Fee of Mineral Resources - TFRM), with rates ranging from R $ 0.50 to R $ 3,214 per metric ton of minerals produced or transferred from the state.

- Canada. The Canadian provinces where Vale operates charge a profit tax on mining operations. Profit from mining operations is generally determined by reference to gross revenue from sales of mine output and deducting some costs, such as mining and processing costs and investment in processing assets. Statutory mining rates are 10% in Ontario, with graded aliquots of up to 17% in Manitoba and a combined 16% *royalty* and mining rate in Newfoundland and Labrador. The mining tax paid is deductible for company income tax purposes.

- Indonesia. Vale's subsidiary PTVI pays 2% mining royalties on its nickel matte revenues when LME nickel prices are below US$ 21,000 per metric ton and 3% on its nickel matte LME nickel prices are equal to or greater than US$ 21,000 per metric ton.

- Zambia. In June 2016, the Zambian government amended the Mines and Mining Act and implemented a series of changes to the tax regime applicable to the mining industry. The mineral royalties applicable to underground copper operations, such as *joint venture* operations, are 4% of the standard value, when the price of copper is below US$ 4,500 per ton, 5%, when the price of copper is Between US$ 4,500 and US$ 6,000, and 6% when the price of copper is above US$ 6,000. The 15% tax on profit, applicable when taxable profits exceed 8% of gross sales, was not reintroduced and profit tax on mining operations remained at 30% and 35% for profit from mineral processing.

**Regulation of other activities**

In addition to mining and environmental regulation, Vale is subject to comprehensive regulatory regimes for some of its activities, such as rail transportation, port operations and power generation. It is also subject to legislation regarding employee health and safety, security and support to communities close to mines and other issues. The descriptions below are related to some of the other regulatory regimes applicable to your operations:

217

Table of Contents

- Regulation of the Brazilian railways and ports. Vale's Brazilian rail business operates under concession contracts with the Brazilian Federal Government, and its railway concessions are subject to regulation and supervision by the Ministry of Transport, Ports and Civil Aviation and the National Land Transport Agency (ANTT). The EFC and EFVM concessions expire in 2027 and may be renewed at the discretion of the Brazilian Federal Government. VLI also obtained a sub-concession contract for commercial operation of a 720-kilometer segment of the FNS railroad in Brazil, which expires in 2037, while the FCA and MRS concessions expire in 2026. The prices of rail transport can be negotiated directly with the users of these services, subject to the maximum tariff limits approved by ANTT for each of the concessionaires and each of the different products transported. ANTT regulations also oblige concessionaires to grant railroad rights use (*trackage rights*) to other railroad operators, to make investments in the railway network, and to meet certain productivity and safety requirements, among other obligations. In 2015, Vale and other railroad concessionaires in Brazil began discussions with ANTT about the possibility of early renewal of railway concession contracts. If an early renewal of the concession is agreed, Vale may agree on additional performance indicators, new investment obligations and service standards.

  Port operations in Brazil are subject to regulation and supervision by the National Aquatic Transportation Agency (ANTAQ), the federal agency that oversees maritime transport and ports, and by the Ministries of Transportation, Ports and Civil Aviation, through the National Ports, whose purpose is to formulate policies and guidelines. In 2014, Vale entered into adhesion contracts by which the Union authorizes the operation and operation of private terminals. These agreements will be in force until 2039, with the exception of the lease of CPBS, which will expire in 2026.

- Regulation of chemical products. Some of Vale's products are subject to regulations applicable to the marketing, distribution and use of chemical substances present in its composition. For example, the European Commission has adopted the European Chemicals Policy, known as REACH - Registration, Evaluation and Authorization of Chemicals (REACH). According to REACH, European manufacturers and importers are required to register substances before entering the European market and in some cases may be subject to an authorization procedure. A company that does not comply with REACH regulations may receive fines and penalties.

- *Regulation of international shipping.* Vale is subject to the health, safety and environmental regulations issued by the International Maritime Organization ("IMO"). IMO standards are based not only on international shipping categories but also on types of cargoes transported, including special rules for iron ore, coal, nickel and copper. IMO is currently debating new measures to improve the energy efficiency of international shipping, including the development of a global data collection system, which will ultimately enable market-based measures to curb greenhouse gas emissions. These measures to curb greenhouse gas emissions can increase our freight cost in the future.

  In 2016, the IMO also approved a regulation setting limits for the emission of sulfur oxides, which will come into force in 2020. Such regulation may increase the cost of freight due to the need to use low sulfur fuels or additional air pollutant control equipment. In addition, the International Convention for the Control and Management of Ships' Ballast Water and Sediments will enter into force in September 2017. Under this convention, all ships during their international voyages are required to manage their ballast water and sediment in accordance with defined requirements, which may also result in increases in freight costs and port operation.

**b. Environmental policy of the Company and costs incurred to comply with environmental regulations and, if applicable, other environmental practices, including adherence to international environmental protection standards**

Table of Contents

Vale's governance structure is based on policies with guidelines and principles that guide the Company's strategy, processes and actions. The main policies related to the environment and social performance are Vale's Global Sustainability Policy, revised in 2016, to include improvements in health, safety, environment and community management, the Global Climate Change Policy, and the Human Rights Policy. The Company also follows standards of social action and commercial and human rights principles based on the Human Rights and Business Matrix of the United Nations Human Rights Council.

Such policies, along with specific plans and programs for each unit, provide the guidance needed to achieve your sustainability goals and your business decisions in the short, medium and long term.

The Integrated Management of Health and Safety and Environment System, known as SGI, aims to identify and treat risks to workers, the environment and communities through the implementation of control, monitoring, conservation, protection and recovery measures, aimed at To ensure the minimization of risks and impacts to workers and the ecosystems where it operates.

The SGI is defined through the Sustainability Policy (POL-0019-G), the Sustainability Standard (NFN0009) and its Manual is based on the international guidelines of ISO 14001 and OHSAS 18001. Vale's Sustainability Standard defines its structure through 12 (twelve) Requirements and the SGI Manual describes in detail the content of the requirements and their management. In order to evaluate the effectiveness of the SGI, Vale periodically submits its operations to internal and external audits:

Below are Vale's unities with certification ISO 14001 and OHSAS 18001:

ISO 14001

- Iron ore: Ferrosos South, Ferrosos Southeast, Ferrosos Central West, Ferrosos North, Tubarão Complex and Vale Omã;
- Nickel: Onça Puma, Vale Europa (Refineries Acton and, Clydach), Vale Dalian (China), Vale Taiwan (Taiwan) e Vale Matsusaka (Japan);
- Logistics: Port and Rail Operations of the Tubarão Complex;
- Copper: Minas do Sossego and Salobo;
- Fertilizers: Cubatão (1, 2 and, 3), Catalão, Araxá, Tapira and, Uberaba.

OHSAS 18001

- Nickel: Onça Puma, Vale Europa (Refineries Acton and, Clydach), Vale Dalian (China) and, Vale Taiwan (Taiwan);
- Copper: Minas do Sossego and Salobo;

In the last 3 years, approximately US$ 2 billion have been invested in environmental management actions, such actions being aimed at compliance with regulations or other environmental practices.

In mining, the most significant atmospheric emissions are of particulate matter from diffuse sources (fugitive emissions), such as vehicular traffic on unpaved roads, exposed areas subject to wind dragging, handling of ore and bulk materials and rail transport.

The particulate matter from these diffuse sources is monitored at points defined in conjunction with environmental agencies and that seek to represent the area of the operational unit and surrounding communities.

Vale acts strongly to reduce these diffuse emissions by adopting control measures such as the improvement of sprinkler systems, testing of dust suppressor products, conveying of conveyor

Table of Contents

belts and transfer houses, windfences(1), revegetation of slopes and improvement of management processes.

Emissions from fixed sources allow a more consistent monitoring since these facilities have chimneys and allow to implement specific control actions, such as filters and electrostatic precipitators integrated by online systems, that aim to guarantee the control of the legal requirements and performance standards of the Vale.

Another relevant aspect of the Integrated Management System is the subject of water resources, a fundamental input for operations. The optimization of its use and the control and treatment of the generated effluents are present in the routine of the managers by means of the implementation of the monitoring plans, the analysis of the indicators, the establishment of goals and also the search for the development of new technologies.

The guidelines for asset demobilization and mine closure include corporate practices and procedures, implemented throughout the life cycle of the enterprise. Such procedures include the composition of the asset demobilization provision, in line with the Brazilian Securities Commission (CVM) and the *Securities Exchange Commission* (SEC) guidelines (IAS 37 and *Sarbanes-Oxley* Act). The definition of the future use of each unit is established in the Mine Closure Plan, considering environmental, social and economic aspects, according to specific operational procedure, observing that the Sustainability Report reflects the percentage of adherence to these guidelines.

With regard to risk management, tailings dams are highly relevant, being subjected to periodic safety audits and also to operating and monitoring procedures to assess geotechnical stability. For more information, see the item "Dams" in the item above.

Vale's environmental performance also involves the recovery of degraded areas ("RAD"), a set of interventions whose purpose is to restore the altered sites to a condition of physical, chemical, biological and socioeconomic stability. It applies both to areas that have been affected by the company's typical activities (opening access roads, mine operations, industrial and administrative facilities, etc.) and in places where environmental conditions have been altered by other economic activities (agriculture, livestock, etc.), as a form of environmental compensation (areas acquired for this purpose, Conservation Units) and/or environmental regularization of properties occupied by the Company (Legal Reserves, Permanent Preservation Areas). The recovery can be carried out in different environmental compartments (water, soil, vegetation cover), in an individualized or integrated way, in accordance with the specific characteristics of the sites to be recovered and with the intended future uses. Therefore, RAD may involve manual, mechanized or combined procedures with varying degrees of intensity, lead times, and costs.

Vale operates in several regions, including areas of high cultural value and high relevance to biodiversity. In all stages of its ventures, Vale develops actions to mitigate, monitor and compensate for negative impacts and to potentiate positive impacts in the localities where it operates. In addition, it develops and supports actions that encourage research and conservation of biodiversity and the sustainable use of natural resources. Among these, Vale maintains its own protected natural areas and, in partnership with government agencies, supports the maintenance of several conservation units contributing to the conservation of threatened species and biomes, as well as promoting engagement with communities, scientific insights and other relevant actors.

In order to build a positive legacy in the last 25 years, Vale offers support to indigenous communities in the fields of education, health, infrastructure development and technical assistance, in order to improve the quality of life and self-sufficiency of these communities. For

_____

(1) Wind barriers that surround the product storage yards and reduce the drag of dust.

Table of Contents

| Mine | Type | Production for the year ended December 31 | | | Process Recovery in 2016 |
|------|------|------|------|------|------|
| | | 2014 | 2015 | 2016 | |
| | | (Thousand metric tons) | | | (%) |
| Taquari-Vassouras | Underground | 492 | 481 | 501 | 86.1 |

**Updates related to the rupture of the Samarco tailings dam**

On November 5, 2015, the iron ore tailings dam (Fundão) dam in the state of Minas Gerais, Brazil, owned by Samarco S.A. ("Samarco"), which affected communities and ecosystems, including the Rio Doce. The rupture resulted in 19 fatalities and caused material and environmental damage to the affected areas.

After the rupture, Samarco, together with the authorities, provided first aid, food, water, housing, social assistance and financial aid to families and affected persons, and Vale and BHPB, Samarco shareholders, actively Support to Samarco during this period.

As a consequence of the rupture of the dam, the Government of Minas Gerais determined the suspension of Samarco operations. Except for the Fundão tailings dam and the Santarém water dam, which was affected by the overflow of tailings from the Fundão dam, all other Samarco production assets remained intact. As of the date of this Reference Form, Samarco has not yet resumed its operations. Mining and processing activities.

On March 2, 2016, Samarco, and its shareholders, Vale and BHPB entered into an agreement with the Federal Government, the two Brazilian states affected by the rupture of the dam (Espírito Santo and Minas Gerais) and certain other parties. Term of Transaction and Adjustment of Conduct ("TTAC"). For information on this TTAC as well as on other relevant terms of conduct adjustment related to Samarco, see item 4.7 of this Reference Form.

Under the terms of the TTAC, on June 24, 2016, Samarco, Vale and BHPB established a foundation called "Fundação Renova" ("Foundation") to develop and implement restoration programs to restore the environment, communities Local and social conditions of the affected areas, as well as compensation programs.

If Samarco fail to fulfill its obligations to provide resources to the Foundation, Vale and BHPB will be responsible, under the terms of the agreement, for providing funds to the Foundation in proportion to its 50% stake in Samarco.

As a result of the uncertainties regarding Samarco's future cash flow, Vale recorded a provision in its interim financial statements of June 30, 2016, in the amount of R $ 3.7 billion, which is the best estimate of the resources necessary to comply with the Repair and compensation programs foreseen in the TTAC, equivalent to the percentage of 50% of Vale's stake in Samarco.

Given the updated cash flow forecast of Samarco, shareholders were required to comply with the obligations of the TTAC and therefore, Vale contributed R $ 239 million to the Foundation in the second half of 2016 and R $ 75 million in the first quarter of 2017. These amounts were deducted from the R $ 3.7 billion provision made in June 2016. For information on provisions, see item 10.1 (h) of this Reference Form.

In the first half of 2017, Vale made available short-term credit facilities of up to R $ 375 million (US$ 115 million) to Samarco in order to support its operation, without this setting up an obligation of the shareholders with Samarco. The working capital maintenance funds of Samarco are being released by shareholders as they are required and are subject to certain conditions.

On December 20, 2016, the Company informed that it has entered into a non-binding with BHPB and Samarco on the general terms and conditions for the use of Vale's Timbopeba pit for

Table of Contents

the deposit of tailings by Samarco, since it operate again. The Company would transfer the Timbopeba pit to Samarco, and in return, Samarco would provide Vale with a quantity of unprocessed ore (*Run-of-Mine - ROM*) for a certain period. A definitive agreement regarding this transaction remains subject to the success of the negotiation between the parties, *due diligence* and the necessary governmental approvals, which the Company expects to happen during the year 2017. After obtaining the environmental licenses necessary for the use of the Alegria Sul pit, Samarco is expected to temporarily deposit its tailings in this pit for a period of 2 to 3 years. The use of the Timbopeba pit will allow Samarco to operate for several years, without the need for a new dam structure.

***Law 12,973***

Law 12,973 (regulated by Normative Instructions No. 1,515 and 1,520) was amended on May 13, 2014, which significantly altered the federal tax legislation in force, affecting broadly the taxation of Brazilian companies. Among the issues addressed by Law 12,973, the following are included:

- A new mechanism for the taxation in Brazil of profits generated abroad by direct and indirect subsidiaries abroad, on an accrual basis and by affiliates on a cash basis, calculated on the balance sheet in accordance with local practices, and there are conditions for the deduction of taxes paid in the outside with limit. If certain conditions brought by the law are reached, it will be allowed: (1) consolidation of results (profits and losses) of direct and indirect subsidiaries eligible for taxation purposes up to 2022, and (2) deferred payment of up to eight years of tax due on the profits of eligible foreign companies. [This change resulted in an increase in income tax from the year 2015];

- Termination of the Transitional Tax Regime ("RTT"), with the adaptation of the fiscal rules in force to the new accounting standards in force in Brazil. In general terms, Law 12,973 regulated the tax treatment applicable to revenues, costs, expenses and equity variations recognized by Brazilian companies in accordance with the new accounting criteria adopted in Brazil, which are the result of the convergence process of the accounting rules then adopted in Brazil International standards (IFRS);

- changes in the tax amortization rules of the goodwill paid on the acquisition of shareholdings. Among the several new rules referring to goodwill on acquisitions of equity interest, Law 12,973 determined that only will be deductible from the IRPJ and CSLL calculation base, and the deduction of the goodwill generated between the Company's companies is no longer accepted, among other new rules regarding goodwill on acquisitions of shareholdings. Same group or by exchange of shares (between the respective broadcasters). Additionally, Law 12,973 established the order in which the PPA (purchase price allocation) will be made in acquisitions and corporate reorganizations.

- new concept of gross revenue, for purposes of incidence of PIS and COFINS. Law 12,973 also broadened the concept of gross revenue, which may impact the calculation of PIS and COFINS, which affect gross revenues of legal entities;

- Treatment of dividends and interest on shareholders' equity ("JCP"). Law 12,973 recognized the exemption of profits or dividends distributed until November 12, 2013, the date of publication of Law 12,973, in excess of the amount calculated based on the accounting criteria in force in 2007. For the calculation of the deductible limit of the JCP, Law 12,973 authorized the use of the value of the shareholders' equity of the respective Brazilian company, as calculated based on Law 6,404/76.

The new rules resulting from Law 12,973 came into effect as of January 1, 2015.

231

Table of Contents

**c. Unusual events or transactions**

**2016**

**Contingencies related to the Samarco accident**

(i) Public-interest civil action filed by the federal government and others

The Federal Government, both Brazilian states affected by the collapse of the dam (Espírito Santo and Minas Gerais) and other governmental authorities, filed a public-interest civil action against Samarco and its shareholders, Vale S.A. and BHPB, for the amount stated by the plaintiffs at R$ 20.2 billion.

On May 5, 2016, the Transaction and Adjustment of Conduct ("TTAC") of March 2, 2016 was ratified in the Federal Regional Court of the 1st Region (TRF). In June 2016, the Superior Court of Justice (STJ) issued an injunction, suspending the decision of the TRF, until the final judgment of the action. With this injunction, the public civil action, previously suspended due to the homologation of the TTAC, was restored. For more information on TTAC, see item 4.7 of this Reference Form.

On August 17, 2016, the TRF of the 1st Region dismissed the interlocutory appeal filed by Samarco, Vale and BHPB against the aforementioned injunction and declared the decision null and void that approved the TTAC. The injunction maintained by the TRF of the 1st Region determined, among other measures, the unavailability of the Samarco, Vale and BHPB mining concessions, without, however, limiting its production and sales activities and the deposit of R$ 1.2 billion, by January 2017. This deposit was provisionally replaced by the guarantees included in the preliminary agreement with the Federal Public Prosecutor, as shown in detail below.

(ii) Public-interest Civil action filed by the Federal Public Ministry

On May 3, 2016, the MPF filed a public-interest civil action ("ACP") against Samarco and its shareholders (Vale and BHPB), through which it submits several requests, including: (i) the adoption of measures aimed at mitigating the social, economic and environmental impacts resulting from the collapse of the Fundão dam, as well as other emergency measures; (ii) payment of compensation to the community; and (iii) payment of collective pain and suffering. The initial value of the lawsuit stated by the MPF is R$ 155 billion. On September 13, 2016, the first hearing was held. On November 21, 2016, the Court determined to serve the defendants with a process and the lawsuit was contested. On January 18, 2017, Samarco and its shareholders (Vale and BHPB) entered into an agreement with the Federal Public Prosecutor's Office for a Preliminary Adjustment ("TAP"), which was approved by the court of the 12th Federal Civil/Agricultural Court of Minas Gerais on March 16, 2017. Preliminary Adjustment the TAP establishes procedures and the timeframe to conclude the final agreement, the hiring of specialized companies for technical advice to the MPF and offer of certain guarantees. The Preliminary Adjustment I approval implied the suspension of the ACP, as well as the suspension of other related proceedings, with the aim of avoiding contradictory or conflicting decisions, bringing a procedural unit to allow a final agreement to be negotiated. For more information on Preliminary Adjustment Term I, see item 4.7 of this Reference Form.

In addition, a second Preliminary Term ("Second Term") was signed, which establishes a timeframe for the provision of funds for programs to award socio-environmental and socio-environmental damages caused by the collapse of the Fundão Dam in the municipalities of Barra Longa, Rio Doce, Santa Cruz do Escalvado and Ponte Nova for R$ 200 million. For more information on Preliminary Adjustment Term II, see item 4.7 of this Reference Form.

The commitments established in both Terms of the Preliminary Adjustment were partially approved.

For more information regarding the collapse of the Samarco Mineração S.A. Dam, see section 10.1 h.

296