UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------- x

In Re VALE S.A. SECURITIES LITIGATION

**MEMORANDUM & ORDER**

19 CV 526 (RJD) (SJB)

-------------------------------------------------------------- x

DEARIE, District Judge

Plaintiff, the Colleges of Applied Arts and Technology Pension Plan, commenced this

action against Vale S.A. ("Vale") and several Vale executives (collectively, "Defendants"),

alleging securities fraud under Sections 10(b) and 20(a) of the Securities Exchange Act

("Exchange Act"). The Court assumes the parties' familiarity with the underlying facts and legal

issues. After extensive briefing, the Court denied Defendant Vale's Motion to Dismiss under

Fed. R. Civ. P. 12(b)(6). Vale now seeks reconsideration of the Court's decision. For the reasons

described below, the Motion for Reconsideration is DENIED.

## STANDARD OF REVIEW

Motions for reconsideration in this district are governed by Local Civil Rule 6.3 of the

Southern and Eastern Districts of New York. "The decision to grant or deny a motion for

reconsideration is within the sound discretion of the district court, and is an extraordinary

remedy to be employed sparingly in the interests of finality and conservation of scarce judicial

resources." Mangino v. Inc. Vill. of Patchogue, 814 F. Supp. 2d 242, 247 (E.D.N.Y. 2011)

(quotations and citations omitted). Accordingly, "[a] motion for reconsideration should be

granted only when the defendant identifies an intervening change of controlling law, the

availability of new evidence, or the need to correct a clear error or prevent manifest injustice."

Kolel Beth Yechiel Mechil of Tartikov, Inc. v. YLL Irrevocable Tr., 729 F.3d 99, 104 (2d Cir.

2013) (quotations and citations omitted).

**DISCUSSION**

Vale raises four grounds for reconsideration: (1) intervening Second Circuit precedent mandates dismissal based on Plaintiff's failure to plead scienter; (2) the order places improper weight on allegations that Vale's auditors were unduly influenced and conflicted; (3) the Court conflates materiality with falsity in its discussion of statements about risk management; and (4) the PSLRA safe-harbor provision and bespeaks caution doctrine are misapplied.

## I. Plaintiff Pleads Scienter

Vale argues that the Second Circuit's *per curiam* decision in Jackson v. Abernathy, 960 F.3d 94 (2d Cir. 2020), demonstrates that Plaintiff fails to allege particularized facts raising a strong inference of scienter. Notably, Jackson does not create a basis for reconsideration, as it did not pronounce a new legal standard for evaluating scienter, but "merely applied the existing standard to a new set of facts." In re Fannie Mae 2008 ERISA Litig., Case No. 09-cv-1350 (PAC), 2014 WL 1577769, at *4 (S.D.N.Y. Apr. 21, 2014). Jackson addressed whether a plaintiff pled collective corporate scienter based on imputed knowledge of three employees where "no connective tissue [existed] between those employees and the alleged misstatements." 960 F.3d at 99. It reasoned that while the

> allegations support a strong inference that those employees knew of issues . . . Jackson has not alleged facts sufficient to impute their knowledge to the corporate entities. And because Jackson has otherwise failed to plead facts tending to show that senior executives must have known that the challenged statements were false, we conclude that Jackson's proposed amended complaint does not raise a strong inference of collective corporate scienter.

Id. at 96. By contrast, scienter in this case is based on allegations that the individual defendants, including senior executives, possessed knowledge of dam safety issues and made allegedly false statements. As Jackson recognized, "the most straightforward way to raise a strong inference of corporate scienter is to impute it from an individual defendant who made the challenged

2

misstatement . . . [or from] other officers or directors who were involved in the dissemination of the fraud . . . . " Id. at 98 (quotation and citation omitted). That is what Plaintiff does.

Vale's attempt to equate Plaintiff's factual allegations regarding Individual Defendants' scienter with the facts of Jackson rewrites the complaint and relitigates decided issues. First, Vale argues that the risk matrix depicting Vale's tailings dam breach risk cannot support scienter because the Court speculated that the risk matrix was or should have been shown to the Individual Defendants. Vale claims that this is akin to the issue presented in Jackson, where employee testimony that documents were distributed to senior management was insufficient to establish scienter because the employee "merely assumed" that the documents reached the CEO and the court was left to "speculate" about what precisely the CEO was told. Id. at 97. By contrast, a November 2017 presentation explicitly states that the high-risk dams were presented to management: "[a]ll risks with probabilities higher than $10^{-4}$/year are now included in VALE's Business Risk Matrix and presented to the board of directors, CEO and Administrative Council." Ex. 13, ECF No. 66-13, at 31. And, the risk matrix's circulation among the Individual Defendants is further supported by the fact that Defendant Siani led the Business Risk Management unit ("GRN") that maintained the risk matrix, and Defendant Poppinga testified that the GRN reported to Vale's Executive Directors monthly. Compl., ECF No. 47, ¶¶ 64-65.[1]

Next, Vale seeks to recast allegations regarding Defendant Poppinga as "steps . . . to raise concern" that "belie any inference of fraudulent intent." Jackson, 960 F.3d at 99 (citing Slayton v. Am. Express Co., 604 F.3d 758, 777 (2d Cir. 2010)). Indeed, Defendant Poppinga sent emails

---

[1] The parties dispute to what extent the risk matrix included Dam 1. The November 2017 risk matrix unambiguously indicates that six dams fell into zones denoting unacceptable risk levels, which are labeled "Unacceptable except in extraordinary circumstance[.] Must be send [sic] to Corporate Business Risk Management Matrix," and appears to place Dam 1 exactly on the line of acceptable risk level. Ex. 13 at 19, 23. But even assuming Dam 1 was not included in the November 2017 curve, the inclusion of six other problematic dams certainly supports Plaintiff's contention that Defendants knowingly misrepresented the state of Vale's dams.

3

shutting down Dam 1 due to "doubt that arose" and following up on the failure to obtain DCEs for eight Ferrous Minerals tailings or sediment containment structures in 2016. Compl. ¶¶ 67-69, 71. But in the context of Plaintiff's broader allegations, the emails suggest that Defendant Poppinga was engaged in a cover up rather than heroic efforts. These allegations include: the existence of repeated and unaddressed red flags regarding Dam 1's stability; Defendant Poppinga's testimony that he had "weekly" meetings providing "all the necessary information to know if there was a more serious problem" with dam safety; evidence that the Geotechnical Risk Management Department pressured auditors to issue DCEs for unqualified dams; Vale's statement that all dams in Poppinga's division received 2016 DCEs; and Minas Gerais' House of Representatives' ("State CPI") recommendation that criminal and civil charges be levied against Defendant Poppinga. Id. ¶¶ 65, 72, 91, 120. With ease, "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 324 (2007).

Third, Vale argues that findings regarding former-CEO Schvartsman's scienter were speculative. But Vale's own document indicates that the risk matrix was shown to the CEO. Ex. 13 at 31. Media reports state that Defendant Schvartsman commissioned a review of dam conditions and said himself that "As soon as [he] started as president, [he] thought about the state of the dams . . . today the dams are impeccable." Compl. ¶ 174. Defendant Poppinga testified that he "never refrained from passing anything along to Mr. Fabio Schvartsman" about problems with dam safety, and the State CPI recommended that Defendant Schvartsman be prosecuted. Id. ¶¶ 65-66, 120. These allegations "giv[e] rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2).

Fourth, Vale accuses the Court of inferring that Defendants Siani, Ferreira, and Osorio

4

possessed scienter "solely from the fact that, due to the defendants' board membership or executive managerial position, they had access to the company's internal documentation as well as any adverse information." In re Refco, Inc. Sec. Litig., 503 F. Supp. 2d 611, 649 (S.D.N.Y. 2007) (quoting In re Winstar Commc'ns, Case No. 01-cv-3014 (GDB), 2006 WL 473885, at *7 (S.D.N.Y. Feb. 27, 2006)). But the Court did not merely assume that the Defendants had access to information by virtue of their position; the Court found scienter based on "specific allegations of various reasonably available facts, or red flags, that should have put the officers on notice that the public statements were false." Id. (quotations omitted). Defendant Siani allegedly signed annual reports containing misstatements, managed the GRN unit that analyzed dam risks and maintained the risk matrix, and received information on dam risks in monthly reports that the GRN issued to the Executive Risk Committee he chaired. Compl. ¶¶ 38, 64-65; see In re Winstar Commc'ns, 2006 WL 473885, at *7 ("High level corporate officers who signed SEC filings . . . have a duty to familiarize themselves with the facts relevant . . . ."). And Defendants Ferreira and Osorio's receipt of monthly risk reports from the GRN together with public representations regarding dam safety and sustainability satisfy the pleading standard. See Compl. ¶¶ 65, 127, 161, 164; Citiline Holdings, Inc. v. iStar Fin. Inc., 701 F. Supp. 2d 506, 516 (S.D.N.Y. 2010) (finding "strong circumstantial evidence of misbehavior or recklessness" where "Defendants are alleged to have told the investing public that they monitored" the matter at issue).[2]

## II. The DCEs Do Not Undermine the Court's Findings

Vale argues that the DCEs undermine scienter and mandate dismissal of all claims before

---

[2] Brazilian investigatory findings also bolster the finding of scienter. See, e.g., Compl. ¶ 109 ("[H]igh officers of Vale SA were frequently fed with information related to the safety conditions of the structures under the company's responsibility."); ¶ 114 ("Vale management and the board knew the risks and decided to take them."); ¶ 116 ("The management and senior management of Vale, within their competence and assignments, were aware of the risks of Dam I and the necessary steps to increase safety.").

June 2018, the point at which Plaintiff alleges its auditor developed a conflict of interest. But the alleged findings of third-party auditors and consultants and the facts surrounding the issuance of DCEs undercut the argument that Defendants, especially Defendant Poppinga, relied on DCEs in "good faith" and were unaware of dam stability problems before June 2018. For example:

- Dec. 18, 2015: Vale obtained a risk analysis for Dam 1 from Pimenta de Ávila Consultoria indicating a range of failure probabilities as high as 50%. Compl. ¶ 63.
- July 7, 2016: Defendant Poppinga sent an email shutting down Dam 1 due to "doubt that arose," while Geoconsultoria Ltda ("Geoconsultoria") was preparing two static liquefaction analyses of Dam 1 that ultimately found factors of safety as low as 0.93. Id. ¶¶ 67-70.
- Oct. 4, 2016: Defendant Poppinga emailed his subordinates following up on the failure to obtain DCEs for eight Ferrous Minerals tailings or sediment containment structures. Subsequent disclosures from Vale indicate that all dams in Defendant Poppinga's division received DCEs that year. Id. ¶¶ 71-72 (citing 2016 Sustainability Report).
- Feb. 2017: Potamos Engineering and Hydrology, Ltd. ("Potamos") prepared a Geotechnical Risk Management report analyzing Dam 1's failure probability by overtopping, finding a $3 \times 10^{-4}$ failure probability, three times Vale's maximum risk tolerance. Id. ¶¶ 74.
- Aug. 28, 2017: an engineer in Vale Geotechnical Management sent Tractebel Engenharia ("Tractebel") substantive edits to Dam 1's 2017 Audit Report. Id. ¶ 87 n.30.
- Nov. 2017: Potamos produced the results of Dam 1 stability studies, finding a 1.06 factor of safety, and informed Vale and TÜV SÜD (Vale's auditor) that the findings precluded issuing a DCE for Dam 1. Id. ¶ 88.
- Mar. 2018: Vale approved a Dam 1 DCE by Tractebel. The DCE relied on Geoconsultoria's laboratory testing, which used a methodology that PIESEM and Potamos deemed unreliable in November 2017. Id. ¶¶ 88-90.
- June 2018: Vale approved a Dam 1 stability declaration submission by TÜV SÜD after TÜV SÜD calculated a factor of safety of 1.09. Id. ¶ 91. TÜV SÜD's audit also reported erosion, damaged and clogged drainage tubes, and missing or inconsistent monitoring data related to Dam 1's water table and stability. Id. ¶ 94 n.31. Prior to submission, on May 13, 2018, an internal TÜV SÜD email indicated that TÜV SÜD was pressured by Vale's Geotechnical Department management to submit the stability declaration and that such practice was previously used by Vale with at least one other dam and auditor. Id. ¶¶ 91-92.
- Sept. 2018: Tractebel informed Vale that a DCE could not be issued for Dam 1 because of TÜV SÜD's 1.09 factor of safety. Vale promptly replaced Tractebel with TÜV SÜD, who issued the DCE. Id. ¶ 94.
- At least as early as 2018: TÜV SÜD had a conflict of interest by working as both a consultant and independent safety inspector for Vale. Id. ¶¶ 10-11; Def. Ex. 29, ECF No. 66-29, at 2.
- Feb. 2019: TÜV SÜD notified the state prosecutor and Vale that it could not confirm the stability of several previously certified dams and that the factors of safety may be lower than previously indicated. Compl. ¶ 95.

Additionally, internal documents, such as the risk matrix, demonstrate knowledge that dams did not conform to Vale's safety standards and public statements on the matter prior to June 2018.[3]

## III.  The Court Did Not Base Its Materiality Determination on Falsity

Third, Vale takes aim at a brief footnote in the Court's opinion, contending that the analysis of four alleged statements[4] about Vale's operational risk management conflates falsity with materiality. "[T]o be 'material' within the meaning of § 10(b), the alleged misstatement must be sufficiently specific for an investor to reasonably rely on that statement as a guarantee of some concrete fact or outcome which, when it proves false or does not occur, forms the basis for a § 10(b) fraud claim." Gross v. GFI Grp., Inc., 784 F. App'x 27, 29 (2d Cir. 2019) (quoting City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG, 752 F.3d 173, 185 (2d Cir. 2014)). This Court did not find the four statements material merely because they were false; it applied the Second Circuit's standard for determining if a statement was material, decided that "the

---

[3] Vale's reliance on Acito v. IMCERA Grp., Inc., 47 F.3d 47 (2d Cir. 1995), is unavailing. The court in Acito determined that the defendant had no duty to publicly disseminate the results of two FDA plant inspections that resulted in deficiencies. Because the plant improved between the inspections and "no materially adverse action was taken," the information was "not material to the average investor." Id. at 52. See also Freudenberg v. E*Trade Fin. Corp., 712 F. Supp. 2d 171, 193 (S.D.N.Y. 2010) (describing the allegedly omitted information in Acito as "related to relatively minor aspects of the company's businesses"). But information about dam safety may have been relevant to the average Vale investor given the subject's importance after a prior deadly dam collapse. Acito also found no duty to disclose the mere possibility of failing a third inspection where prior inspections suggested the plant was improving and no other facts hinted at problems with the plant. 47 F.3d at 53. By contrast, Vale embraced a duty to disclose information whose absence made its representations about dam safety and risk management misleading when it affirmatively chose to publicly comment on the subject.

[4] Compl. ¶¶ 133, 168 ("The main operational risks are periodically monitored, ensuring the effectiveness of preventative and mitigating key controls in place and the execution of the risk treatment strategy (implementation of new or improved controls, changes in the risk environment, risk sharing by contracting insurance, provisioning of resources, etc.). Therefore, the Company seeks to have a clear view of its major risks, the best cost-benefit mitigation plans and the effectiveness of the controls in place, monitoring the potential impact of operational risk and allocating capital efficiently."); Id. ¶¶ 138, 182 ("Operational risk management is the structured approach we take to manage uncertainty related to internal and external events. Internal events consist of inadequate or failed internal processes, people and systems, while external events include natural or third party caused operational catastrophes, regulatory, political, economic or social actions taken by governments or other key stakeholders. We mitigate operational risk with new controls and improvement of existing ones, new mitigation plans and transfer of risk through insurance. We seek a clear view of the major risks we are exposed to, the cost-benefit on mitigation plans and the controls in place to closely monitor the impact of operational risks and to efficiently allocate capital to reduce it.").

Court cannot yet say that statements about Vale's operational risk mitigation *'are so obviously unimportant to a reasonable investor'* in assessing the risk of dam collapse," and dismissed Vale's contention that the statements were also inactionable because they were false.[5] Order at 21 n.13 (quoting Gross, 784 F. App'x at 29) (emphasis added).

In isolation, the four statements at issue appear vague. Critically, however, they were made in the years after the catastrophic Mariana dam collapse, which spurred heightened attention to dam safety. Compl. ¶¶ 5, 58. The obvious importance of dam safety is laid bare in Defendant Schvartsman's 2018 public statement:

> "As soon as I started as president, I thought about the state of the dams. If there was another accident like Mariana's, my management would be short," he said at an Itaú event in São Paulo. "I don't know if this work was done after Mariana or if it was already like that, but today the dams are impeccable."

Id. ¶ 174. Within this context of Vale's emphasis on dam safety and investors' particularized understanding of the consequences of a dam collapse, Vale investors conceivably would have paid outsized attention to Vale's statements about operational risk management, even when articulated broadly. See In re BHP Billiton Ltd. Sec. Litig., 276 F. Supp. 3d 65, 79 (S.D.N.Y. 2017) ("While certain statements, viewed in isolation, may be mere puffery, when the statements are made repeatedly in an effort to reassure the investing public about matters particularly important to the company and investors, those statements may become material to investors.") (collecting cases) (internal quotations omitted).[6] Vale points to the statement "We seek a clear

---

[5] Vale again disputes the statements' falsity, claiming that "the considered allegation—that Vale 'improperly obtained DCEs'—does not even apply to the statements at issue, all of which were made before June 2018." MFR, ECF No. 77, at 12 (referencing Order, ECF No. 74, at 21 n.13). For the reasons described in Section II, Plaintiff pleads that efforts to improperly obtain DCEs predated June 2018. And, the Court's falsity determination was also based on Defendants having "disregarded warnings about Dam 1's stability," for which the Complaint contains ample support. Order at 21 n.13.

[6] As Vale notes, there are some similarities between the statements at issue and the risk management statements deemed inactionable. See Order at 20 (citing Compl. ¶¶ 131-32, 137, 167, 170-71, 178, 181). But the distinction is that Compl. ¶¶ 133, 138, 168, 182 specifically address *operational* risk management, while the inactionable statements discuss risk management more broadly. See Compl. ¶¶ 131, 137, 167, 181 (discussing risk management

view of the major risks we are exposed to," arguing that it is "puffery," akin to "explicitly aspirational [language], with qualifiers such as 'aims to,' 'wants to,' and 'should.'" <u>City of Pontiac Policemen's & Firemen's Ret. Sys.</u>, 752 F.3d at 183. Standing alone, "we seek" may sound aspirational; but within the broader paragraph discussing Vale's risk management practices, it is not "explicitly aspirational" and may be read as describing Vale's current efforts.

### IV. The Bespeaks Caution Doctrine and PSLRA Do Not Mandate Dismissal

Finally, Vale again claims that certain statements are protected by the bespeaks caution doctrine and PSLRA safe-harbor provision. Under the bespeaks caution doctrine, "a forward-looking statement accompanied by sufficient cautionary language is not actionable because no reasonable investor could have found the statement materially misleading." <u>Iowa Pub. Employees' Ret. Sys. v. MF Glob., Ltd.</u>, 620 F.3d 137, 141 (2d Cir. 2010). The PSLRA similarly shields forward-looking statements that (1) are "identified and accompanied by meaningful cautionary language," or (2) are immaterial, or (3) where "plaintiff fails to prove that [the forward-looking statement] was made with actual knowledge that it was false or misleading." <u>In re Vivendi, S.A. Sec. Litig.</u>, 838 F.3d 223, 245 (2d Cir. 2016) (quotations and citations omitted) (alterations in original).

The Court concluded that the statements are largely not forward-looking, a necessary precursor to applying either provision. <u>See</u> 15 U.S.C. § 78u-5; <u>Iowa Pub. Employees' Ret. Sys.</u>, 620 F.3d at 141-42. As the Court explained, "while Vale contends that several statements are forward-looking, it offers excerpted lines from broader statements that include representations as to present or historical facts and are, at best, severable." Order at 28-29. Reviewing the

---

strategy across market, credit, and operational risks); ¶¶ 132, 137, 167, 181 (discussing corporate risk management and Executive Risk Management Committee); ¶¶ 170-171, 178 (discussing Compliance and Risk Committee).

statements Vale asserts to be forward-looking in Appendix A only reinforces this assessment. Each of these statements contains language about "present or historical facts," and much of the limited forward-looking language was already addressed in the Court's discussion of aspirational language.[7] See In re Vale S.A. Sec. Litig., Case No. 15-cv-9539 (GHW), 2017 WL 1102666, at *24 (S.D.N.Y. Mar. 23, 2017) (collecting cases).

Vale contends that the Court erred in considering only one of three means by which a forward-looking statement may be deemed inactionable under the PSLRA and posits that

---

[7] Compl. ¶ 127 ("As I think you all know, *we are driven* by our commitment to safety[,] to people and to preserve the environment. Moreover, *we understand* that it's important to all of our stakeholders, including the people and place[s] where we operate. We *are constantly looking* to adapt and evolve by building what we have seen, experience[d] and learne[d]. On that regard, on November 5th, Samarco accident, will complete one year anniversary. And *since then we stood* by our commitment to do what is right." (emphasis added on present and past tense language that is not forward-looking)); ¶ 129 (while the Court recognized that "[z]ero harm targeted throughout all operations" is inactionable as aspirational language, Order at 22, "[s]ignificant progress achieved," and "[r]isk management: 17% reduction in the number of incidents with high potential impact" are statements of past practices); ¶ 138 ("Operational risk management *is the structured approach we take to manage* uncertainty related to internal and external events . . . . *We mitigate operational risk with* new controls and improvement of existing ones, new mitigation plans and transfer of risk through insurance. *We seek a clear view* of the major risks we are exposed to, the cost-benefit on mitigation plans and the controls in place to closely monitor the impact of operational risks and to efficiently allocate capital to reduce it. (emphasis added on language indicating current practices)); ¶ 147 (while the Court recognized that "[Vale] strives to achieve Zero Damage by…" is inactionable, Order at 22-23, "'Life matters most' permeates Vale's activities" is not forward-looking); ¶ 148 ("We want to generate . . ." and "This means building . . ." are forward-looking. "We know the size of our responsibility . . ."; "These, alongside other issues such as human rights, labor rights, anticorruption, and environmental protection, are demonstrated in actions that are part of our commitment to the principles of the United Nations Global Compact"; and "Life matters most at work, at home, and in our communities. We are responsible for making this a reality" are not clearly forward-looking); ¶ 150 ("Vale aims to operate its dams using advanced engineering techniques" is aspirational, Order at 20, but remaining language discusses current and past practices regarding dam audits and inspections); ¶ 153 ("Zero Harm targeted" is forward-looking, but remaining statements regarding company leadership "pillars" and revised values that helped Vale achieve "higher levels of sustainable development" are not clearly forward-looking); ¶ 158 (statements about policies, standards, and procedures are not forward-looking); ¶ 161 ("First of all, and most importantly, *safety is our top priority*. . . . But I think the take away message today is that we are totally committed to this plan of becoming a leader in sustainability. . . . So *we are just making sure* that we have the proper and correct goals, indicators, organizational model and structure to deliver these results in this bold commitment." (emphasis added on language indicating current practices)); ¶ 163 (while "Regarding sustainability, [] our idea here is a systematic one. We think that we have to treat this in a different manner than we've been treating [it] in the past" is forward-looking, "We did a much more systematic planning and execution of all measures regarding sustainability, regarding both environment and social and we are starting to do that" is not); ¶ 164 (while "we will see alot of progress in the sustainability arena because it's [an] essential pillar to our growth" is forward-looking, remaining statement discusses current priorities and commitments); ¶ 182 (statement about means by which Vale "mitigate[s] operational risk" is not forward-looking); ¶ 184 (statement regarding commitment to sustainability is not forward-looking where it discusses the means by which the company is pursuing that goal and "a list of measures illustrating [Vale's] commitment to sustainability"; 2018 statement regarding "commit[ment] to improving the health and safety of our workers," 2017 injury rates, and compliance with international standards describes current practices and historic facts).

consideration of the other two factors—immateriality and meaningful cautionary language—would yield dismissals of certain statements. Putting aside that the statements are not forward-looking, the Court dedicated five full pages to discussing materiality. <u>See</u> Order Section II.A. Further, as this Court recognized, "[c]autionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired." <u>Id.</u> at 28 (quoting <u>Rombach v. Chang</u>, 355 F.3d 164, 173 (2d Cir. 2004)). <u>See also</u> <u>Hawaii Structural Ironworkers Pension Tr. Fund v. AMC Entm't Holdings, Inc.</u>, 422 F. Supp. 3d 821, 847 (S.D.N.Y. 2019) ("cautionary statements were . . . misleading in light of the fact that they bespoke caution concerning a risk that had already begun to occur") (quoting <u>In re BioScrip, Inc. Sec. Litig.</u>, 95 F. Supp. 3d 711, 736 (S.D.N.Y. 2015) (internal quotations omitted). When Vale warned investors of the "risks" of "incidents involving dams" which could arise "by breach of operating and maintenance standards" and result in attendant damage, <u>see, e.g.</u>, Compl. ¶¶ 139, 180, it had already allegedly began disregarding repeated third-party warnings and red flags about dam stability and engaging in a campaign to obtain DCEs for dams that did not meet certification standards. Crediting Plaintiff's allegations, the risk of dam collapse due to breach of operating and maintenance standards had already materialized prior to Vale issuing its warnings.

**CONCLUSION**

For the reasons described, Defendant's motion to dismiss is DENIED. In the interest of advancing this litigation, the parties are directed to promptly schedule a status conference with Magistrate Judge Bulsara and file a proposed discovery schedule.

SO ORDERED.

Dated: Brooklyn, New York
July 23, 2020

/s/ Raymond J. Dearie
RAYMOND J. DEARIE
United States District Judge

11