**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE VALE S.A. SECURITIES LITIGATION | Case No.: 19-cv-526 (RJD) (SJB)<br><br>JURY TRIAL DEMANDED |

**MEMORANDUM OF LAW IN SUPPORT OF LEAD PLAINTIFF'S**
**MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF**
**CLASS REPRESENTATIVE AND CLASS COUNSEL**

**TABLE OF CONTENTS**

                                                                                    **Page(s)**

TABLE OF AUTHORITIES ................................................................................. iii

I.    PRELIMINARY STATEMENT ................................................................1

II.   STATEMENT OF FACTS .......................................................................2

      A.    Summary of the Alleged Fraud...........................................................2

      B.    Procedural History ...........................................................................3

III.  ARGUMENT ...........................................................................................4

      A.    Legal Standard for Class Certification................................................5

      B.    This Case Meets the Requirements of Rule 23(a) ...............................6

            1.    The Class Is Numerous ...........................................................6

            2.    Questions of Law and Fact Are Common to the Class...............7

            3.    Lead Plaintiff's Claims Are Typical of the Class .....................9

            4.    Lead Plaintiff Will Fairly and Adequately Protect the Interests of the Class ......................................................................10

      C.    This Case Meets the Requirements of Rule 23(b)(3).........................11

            1.    Common Questions of Law and Fact Predominate ..................11

                  a.    Lead Plaintiff Is Entitled to the Fraud-on-the-Market Presumption of Reliance Pursuant to Basic .....................12

                        i.     Average Trading Volume ................................. 14

                        ii.    Analyst Coverage............................................. 14

                        iii.   Presence of Market Makers .............................. 15

                        iv.    Eligibility to File an F-3 Registration Statement .............. 16

                        v.     Price Reaction of Vale Securities to Unexpected Information ....................................................... 16

                        vi.    Market Capitalization....................................... 17

i

vii.    Float ........................................................................ 17

viii.    Bid-Ask Spread................................................................. 18

ix.    Institutional Ownership..................................................... 19

b.    Lead Plaintiff Is Entitled to a Presumption of Reliance Pursuant to *Affiliated Ute*....................................................19

c.    Lead Plaintiff's Damages Methodology is Consistent with Its Theory of Liability and is Capable of Measuring Damages on a Classwide Basis.........................................................20

2.    A Class Action Is Superior to Alternative Methods for Resolving This Dispute ......................................................................22

D.    The Proposed Class Satisfies the Requirement of Ascertainability...................23

E.    Kaplan Fox Satisfies the Rule 23(g) Prerequisites for Appointment as Class Counsel.......................................................................................23

IV.    CONCLUSION.........................................................................................24

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Affiliated Ute Citizens of Utah v. United States*,
  406 U.S. 128 (1972) ........................................................................................ 12, 19, 20

*Amchem Prods., Inc. v. Windsor*,
  521 U.S. 591 (1997) ................................................................................................ *passim*

*Amgen Inc. v. Conn. Ret. Plans and Trust Funds*,
  133 S. Ct. 1184 (2013) ........................................................................................ 6, 8, 20

*Annunziato v. Collecto, Inc.*,
  293 F.R.D. 329 (E.D.N.Y. 2013) ................................................................................... 9

*Arkansas Teacher Ret. Sys. v. Goldman Sachs Grp., Inc.*,
  955 F.3d 254 (2d Cir. 2020) ........................................................................................... 5

*Basic Inc. v. Levinson*,
  485 U.S. 224 (1988) ........................................................................................ 11, 12, 19

*Brecher v. Republic of Argentina*,
  806 F.3d 22 (2d Cir. 2015) ............................................................................................ 6

*Califano v. Yamasaki*,
  442 U.S. 682 (1979) ..................................................................................................... 23

*Cammer v. Bloom*,
  711 F. Supp. 1264 (D.N.J. 1989) ....................................................................... 13, 14, 15, 16

*Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*,
  310 F.R.D. 69 (S.D.N.Y. 2015)........................................................................ 12, 13, 16, 21

*Central States Se. & Sw. Areas Health & Welfare Fund v.*
  *Merck-Medco Managed Care, L.L.C.*,
  504 F.3d 229 (2d Cir. 2007)........................................................................................... 6

*Comcast Corp. v. Behrend*,
  569 U.S. 27 (2013) ....................................................................................................... 21

*Dandong v. Pinnacle Performance Ltd.*,
  No. 10 CIV. 8086 JMF, 2013 WL 5658790 (S.D.N.Y. Oct. 17, 2013) ..................................... 4

*Dodona I, LLC v. Goldman, Sachs & Co.*,
  296 F.R.D. 261 (S.D.N.Y. 2014) ................................................................................... 22

iii

*Dover v. British Airways, PLC (UK)*,
   321 F.R.D. 49 (E.D.N.Y. 2017) ................................................................................. 7

*Erica P. John Fund v. Halliburton Co.*,
   131 S. Ct. 2179 (2011) ..................................................................................... 6, 12

*Fogarazzo v. Lehman Bros. Inc.*,
   263 F.R.D. 90 (S.D.N.Y. 2009) .............................................................................. 6

*Halliburton Co. v. Erica P. John Fund, Inc.*,
   134 S. Ct. 2398 (2014) ........................................................................................ 12

*In re Barrick Gold Secs. Litig.*,
   314 F.R.D. 91 (S.D.N.Y. 2016) ....................................................................... 12, 21

*In re Facebook, Inc., IPO & Sec. & Deriv. Litig.*,
   986 F. Supp. 2d 428 (S.D.N.Y. 2013) ................................................................... 20

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
   245 F.R.D. 147 (S.D.N.Y. 2007) ............................................................................ 8

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
   574 F.3d 29 (2d Cir. 2009) .............................................................................. 8, 10

*In re Ind. Energy Holdings PLC Sec. Litig.*,
   210 F.R.D. 476 (S.D.N.Y. 2002) ............................................................................ 5

*In re Marsh & McLennan Cos., Inc. Sec. Litig.*,
   No. 04 CIV. 8144 (CM), 2009 WL 5178546 (S.D.N.Y. Dec. 23, 2009) .................................. 8

*In re MF Glob. Holdings Ltd. Inv. Litig.*,
   310 F.R.D. 230 (S.D.N.Y. 2015) ............................................................................ 9

*In re Nassau County Strip Search Cases*,
   461 F.3d 219 (2d Cir. 2006) ................................................................................. 7

*In re NYSE Specialists Sec. Litig.*,
   260 F.R.D. 55 (S.D.N.Y. 2009) .............................................................................. 8

*In re Petrobras Sec. Litig.*,
   312 F.R.D. 354 (S.D.N.Y. 2016) ............................................................................ 9

*In re Petrobras,Sec.*,
   862 F.3d 250 (2d Cir. 2017) ...................................................................... 9, 23, 24

*In re Pfizer Inc. Sec. Litig.*,
   282 F.R.D. 38 (S.D.N.Y. 2012) ............................................................................ 12

*In re Salomon Analyst Metromedia Litig.*,
544 F.3d 474 (2d Cir. 2008)...............................................................................................5

*In re SCOR Holding (Switzerland) AG Litig.*,
537 F. Supp. 2d 556 (S.D.N.Y. 2008)............................................................................ 5, 23

*In re Smith Barney Transfer Agent Litig.*,
290 F.R.D. 42 (S.D.N.Y. 2013)...................................................................................... 20

*In re Vale S.A. Sec. Litig.*,
No. 19-CV-526 (RJD) (SJB), 2020 WL 2610979 (E.D.N.Y. May 20, 2020)........................... 20

*In re Vivendi Universal, S.A.*,
242 F.R.D. 76 (S.D.N.Y. 2007)..................................................................................... 5, 7

*In re Winstar Commc'ns Sec. Litig.*,
290 F.R.D. 437 (S.D.N.Y. 2013) ................................................................................... 15

*In re Xcelera.com Sec. Litig.*,
430 F.3d 503 (1st Cir. 2005) ......................................................................................... 15

*Johnson v. Nextel Commc'ns Inc.*,
780 F.3d 128 (2d Cir. 2015)............................................................................................ 7

*Katz v. Image Innovations Holdings, Inc.*,
No. 06 CIV. 3707 (JGK), 2010 WL 2926196 (S.D.N.Y. July 22, 2010)............................. 4, 23

*Krogman v. Sterritt,*
202 F.R.D. 467 (N.D. Tex. 2001) .............................................................................. 13, 18

*Madden v. Midland Funding, LLC,*
237 F. Supp. 3d 130 (S.D.N.Y. 2017).............................................................................. 9

*McIntire v. China MediaExpress Holdings, Inc.*,
38 F. Supp. 3d 415 (S.D.N.Y. 2014)...................................................................... 13, 14, 17

*Pa. Pub. Sch. Emps.' Ret. Sys. v. Morgan Stanley & Co.*,
772 F.3d 111 (2d Cir. 2014)............................................................................................ 6

*Pearlstein v. Blackberry Ltd.*,
No. 13 CIV. 7060 (CM), 2021 WL 253453 (S.D.N.Y. Jan. 26, 2021) .................................... 8

*Penn. Ave. Funds v. Inyx Inc.*,
No. 08 CIV. 2732544 (PKC), 2011 WL 2732544 (S.D.N.Y. July 5, 2011) .............................. 9

*Phillips Petroleum Co. v. Shutts*,
472 U.S. 797 (1985) ................................................................................................... 22

v

*Roach v. T.L. Cannon Corp.*,
   778 F.3d 401 (2d Cir. 2015) ................................................................. 21

*Robidoux v. Celani*,
   987 F.2d 931 (2d Cir. 1993) ................................................................... 9

*Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148 (2008) ..................................................................... 20

*Strougo v. Barclays PLC*,
   312 F.R.D. 307 (S.D.N.Y. 2016) .......................................................... 13

*Sykes v. Mel Harris & Assocs., LLC*,
   285 F.R.D. 279 (S.D.N.Y. 2012) .......................................................... 10

*Sykes v. Mel S. Harris & Assocs. LLC*,
   780 F.3d 70 (2d Cir. 2015) ............................................................. 10, 21

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007) ............................................................................... 4

*Tsereteli v. Residential Asset Securitization Tr. 2006–A8*,
   283 F.R.D. 199 (S.D.N.Y. 2012) ............................................................ 9

*UFCW Local 1776 v. Eli Lilly and Co.*,
   620 F.3d 121 (2d Cir. 2010) ................................................................. 11

*Waggoner v. Barclays PLC*,
   875 F.3d 79 (2d Cir. 2017) ................................................................... 21

*Wal-Mart Stores, Inc. v. Dukes, et al.*,
   564 U.S. 338 (2011) .......................................................................... 6, 8

**Statutes**

15 U.S.C. §78j(b) ...................................................................................... 1

15 U.S.C. §78t(a) ...................................................................................... 1

**Rules**

Fed. R. Civ. P. 23 .............................................................................. *passim*

Fed. R. Civ. P. 23(a) ......................................................................... *passim*

Fed. R. Civ. P. 23(a)(1) ............................................................................ 6

Fed. R. Civ. P. 23(a)(2) ....................................................................... 7, 11

Fed. R. Civ. P. 23(a)(3)...................................................................................................... 9

Fed. R. Civ. P. 23(a)(4)...................................................................................................... 10

Fed. R. Civ. P. 23(b) ...................................................................................................... 5, 11

Fed. R. Civ. P. 23(b)(3).............................................................................................. *passim*

Fed. R. Civ. P. 23(g) ......................................................................................................... 24

Fed. R. Civ. P. 23(g)(1)(A) ............................................................................................... 24

**Regulations**

17 C.F.R. §240.10b-5....................................................................................................... 1

**Other Authorities**

*The Fraud-on-the-Market Theory and the Indicators of Common Stocks' Efficiency*,
   19 J. Corp. L. 285 (1994) ............................................................................................. 13

Bromberg & Lowenfels, Securities Fraud and Commodities Fraud § 8.6 (Aug. 1988)............... 15

Lead Plaintiff Colleges of Applied Arts and Technology Pension Plan ("Lead Plaintiff" or "CAAT") respectfully submits this memorandum of law in support of its motion for class certification, and to appoint the class representative and class counsel.

## I.    PRELIMINARY STATEMENT

This is a securities fraud class action brought against Vale S.A. ("Vale" or the "Company") and certain of its senior executives[1] for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the U.S. Securities and Exchange Commission ("SEC"), 17 C.F.R. §240.10b-5, during the proposed Class Period.

Lead Plaintiff seeks certification of a class, pursuant to Rule 23 of the Federal Rules of Civil Procedure ("Rule 23"), consisting of:

> all persons who purchased on the New York Stock Exchange ("NYSE") or other U.S. exchanges or in a U.S. transaction between October 27, 2016 and February 6, 2019, inclusive (the "Class Period"), any of the following publicly-traded Vale securities: (1) Vale ADS; (2) 5.875% Guaranteed Notes due 2021; (3) 4.375% Guaranteed Notes due 2022; (4) 6.250% Guaranteed Notes due 2026; (5) 8.250% Guaranteed Notes due 2034; (6) 6.875% Guaranteed Notes due 2036; (7) 6.875% Guaranteed Notes due 2039; or (8) 5.625% Notes due 2042 (the "Class"). Excluded from the Class are: (i) Defendants; (ii) members of the immediate family of any Defendant who is an individual; (iii) any person who was an officer or director of Vale during the Class Period; (iv) any firm, trust, corporation, or other entity in which any Defendant has or had a controlling interest; (v) Vale's employee retirement and benefit plan(s) and their participants or beneficiaries, to the extent they made purchases through such plan(s); and (vi) the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person.

¶ 221.[2]  Lead Plaintiff also seeks an Order pursuant to Rule 23: (a) appointing Lead Plaintiff as Class Representative; and (b) appointing the law firm of Kaplan Fox & Kilsheimer LLP ("Kaplan

---

[1] Those senior executives are: Murilo Ferreira, Fabio Schvartsman, Luciano Siani Pires, Gerd Peter Poppinga, and Luiz Eduardo Froes do Amaral Osorio (collectively, "Individual Defendants," and together with Vale, "Defendants").

[2] All references to "¶_" are to paragraphs of the Consolidated Class Action Complaint For Violations of the Federal Securities Laws ("Complaint") (ECF No. 47), unless otherwise indicated. The Vale ADS and Notes described above are collectively referred to as the "Vale Securities."

Fox") as Class Counsel.

As detailed below, this action satisfies all the requirements for class certification under Rule 23(a): numerosity; commonality; typicality; and adequacy of representation. Fed. R. Civ. P. 23(a). Further, this action satisfies the requirements for certification under Rule 23(b)(3): predominance of common questions of law or fact; and superiority of a class over other available methods for adjudication. Fed. R. Civ. P. 23(b)(3). For these reasons, as further described below, Lead Plaintiff's motion for class certification should be granted.

## II.    STATEMENT OF FACTS

### A.  Summary of the Alleged Fraud

This case arises from the horrific collapse on January 25, 2019 of Dam 1 of Vale's Córrego do Feijão iron ore mine near the town of Brumadinho in Minas Gerais, Brazil. Following the collapse, Brazil's Federal Police, state prosecutors, and other investigatory panels have concluded that Vale and its top executives improperly concealed and failed to correct known problems with Dam 1. In January 2020, state prosecutors charged Defendants Vale and Schvartsman, and 10 other Vale executives, with homicide and environmental crimes. Those cases remain ongoing.

Throughout the Class Period, Defendants repeatedly and publicly assured investors that Vale's dams were in "impeccable" condition, that Vale monitored and maintained its dams in accordance with the "strictest international practices" and mitigated operational risks "to guarantee that our overall risk level remains in accordance with our strategic guidelines," and that "life matters most" and "safety is our top priority."

Yet documents produced in this case and in post-collapse investigations demonstrate that prior to and during the Class Period, Defendants knew: (1) that Dam 1 and several other Vale dams were unstable and had a high probability of failure with enormous attendant damages; (2) that Vale had not followed or completed the recommended measures for reducing the risk of Dam 1's

2

collapse; and (3) that Vale was papering over its dam risks by systematically submitting compromised certifications of stability to regulators for unstable dams that did not meet Vale's own purported safety standards. As summarized in the Brazilian Senate's Parliamentary Commission of Inquiry report, "Vale management and the board knew the risks and decided to take them." When Dam 1 collapsed and the true nature of the Company's dam safety and risk management operations were revealed, Class Members suffered over a billion dollars in losses.

The Complaint alleges that during the Class Period, Defendants misrepresented and failed to disclose material information that: (1) at least one of Vale's high-hazard tailings dams, Dam 1, had a high probability of failure; (2) Vale's dam risk management and sustainability policies and practices were insufficient in light of the known risks to human life and the environment posed by Dam 1; (3) Vale systematically obtained stability certifications for dams that were not stable or did not meet Vale's own purported safety standards; and (4) Vale's third-party dam safety auditor had a financial conflict of interest and had issued Stability Condition Statements under fear of economic reprisal from Vale. Additionally, the Complaint alleges that Defendants engaged in a scheme to defraud investors under Rule 10b-5(a) and (c), and that the Individual Defendants are liable as control persons.

### B.  Procedural History

Lead Plaintiff filed the Complaint on October 25, 2019. On December 13, 2019, Defendants moved to dismiss the Complaint (ECF Nos. 63-64 and 66), and Lead Plaintiff opposed on January 31, 2020 (ECF No. 65). Defendants replied on February 21, 2020. ECF No. 67. On May 20, 2020, the Court denied Defendants' motion to dismiss in part.[3] ECF No. 74. On June 3,

---

[3] The Court did, however, dismiss certain alleged misrepresentations, primarily concerning Vale's general risk management policy and the risk factor disclosures. *See* ECF No. 74 at 36 (Appendix listing upheld/dismissed misrepresentations by paragraph number).

2020, Defendants moved for reconsideration. ECF Nos. 76-77. Lead Plaintiff opposed on June 17, 2020 (ECF No. 79), and the Court denied Defendants' motion on July 23, 2020 (ECF No. 80).

The parties then negotiated a stipulated schedule, which was entered by the Court on August 12, 2020 (the "Scheduling Order"). Pursuant to the Scheduling Order, discovery commenced, with Lead Plaintiff serving document requests on August 14, 2020 and the parties exchanging initial disclosures on August 26, 2020. Defendants produced roughly 50,000 documents in Phase I of discovery, and Phase II discovery is currently underway. Defendants served document requests and interrogatories on December 7, 2020, and Lead Plaintiff responded on January 20, 2021. The Scheduling Order requires all fact discovery be completed by June 18, 2021 and all expert discovery completed by November 5, 2021.

## III.    ARGUMENT

The Supreme Court has repeatedly recognized the importance of class actions in redressing wrongs committed under the federal securities laws. *See, e.g.*, *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313-14, 320 (2007) ("This Court has long recognized that meritorious private actions to enforce federal antifraud securities laws are an essential supplement to criminal prosecutions and civil enforcement actions . . . ."). Likewise, as this Court has observed, "[c]ourts have consistently held that claims alleging violations of Sections 10(b) and 20(a) of the Exchange Act are especially amenable to class certification." *Katz v. Image Innovations Holdings, Inc.*, No. 06 CIV. 3707 (JGK), 2010 WL 2926196, at *3 (S.D.N.Y. July 22, 2010). Indeed, courts in this Circuit have overwhelmingly found securities fraud actions appropriate for class treatment. *See, e.g.*, *Dandong v. Pinnacle Performance Ltd.*, No. 10 CIV. 8086 JMF, 2013 WL 5658790, at *13

4

(S.D.N.Y. Oct. 17, 2013) ("Courts have held that class actions are particularly appropriate in federal securities actions").[4]

By providing a single forum to litigate the same or similar claims, class actions afford an indispensable mechanism for the conservation of judicial resources. *See, e.g.*, *In re SCOR Holding (Switzerland) AG Litig.*, 537 F. Supp. 2d 556, 579 (S.D.N.Y. 2008) ("Litigating each case separately would be wasteful, and result in delay and an inefficient expenditure of judicial resources" and "risk disparate results among those seeking redress."). As demonstrated below, all of Rule 23's requirements are satisfied, and the proposed Class should be certified.

### A.  Legal Standard for Class Certification

To certify a class under Rule 23 of the Federal Rules of Civil Procedure, the named plaintiff must demonstrate: (1) that the class is so numerous that joinder is impracticable, (2) that at least one question of law or fact is common to the class, (3) that the class representatives' claims are typical of the class wide claims, and (4) that the class representatives will be able to fairly and adequately protect the interests of the class. *See* Fed. R. Civ. P. 23(a). *Arkansas Teacher Ret. Sys. v. Goldman Sachs Grp., Inc.*, 955 F.3d 254, 260 (2d Cir. 2020), *cert. granted sub nom.*, 2020 WL 7296815 (Dec. 11, 2020). A plaintiff must also show that the action falls within one of the sub-categories of Rule 23(b). *In re Salomon Analyst Metromedia Litig.*, 544 F.3d 474, 478 (2d Cir. 2008). Here, Lead Plaintiff seeks certification under Rule 23(b)(3), which requires a showing that (1) common questions of fact and law predominate over any individual questions; and (2) a class action is superior to other available methods for adjudicating the controversy. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 615 (1997). Finally, the Second Circuit has also "recognized an

---

[4] *See also*, *In re Vivendi Universal, S.A.*, 242 F.R.D. 76, 91-92 (S.D.N.Y. 2007) (collecting cases); *In re Ind. Energy Holdings PLC Sec. Litig.*, 210 F.R.D. 476, 479 (S.D.N.Y. 2002) (holding that courts should err in favor of certifying a class where securities fraud claims are alleged).

implied requirement of ascertainability in Rule 23," which demands that a class be "sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member." *Brecher v. Republic of Argentina*, 806 F.3d 22, 24 (2d Cir. 2015).

While courts must conduct a "rigorous analysis" to determine whether the elements of Rule 23 have been satisfied, *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011), Rule 23 is not a "license to engage in free-ranging merits inquiries at the class certification stage." *Amgen Inc. v. Conn. Ret. Plans and Trust Funds*, 133 S. Ct. 1184, 1194-95 (2013). "Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Id.* at 1195. Accordingly, while it is appropriate to consider whether a securities market was efficient to support a presumption of reliance, it is not appropriate to delve into merits issues such as scienter, materiality, or loss causation. *Erica P. John Fund v. Halliburton Co.*, 131 S. Ct. 2179, 2186 (2011) ("*Halliburton I*"); *see also Amgen*, 133 S. Ct. at 1193-94.

As demonstrated below, this action satisfies both the prerequisites of Rule 23(a) and the requirement of Rule 23(b)(3) and, accordingly, class certification is appropriate.

### B. This Case Meets the Requirements of Rule 23(a)

#### 1. The Class Is Numerous

Rule 23(a)(1) requires the proposed class to be so numerous that joinder of all members is impracticable. Fed. R. Civ. P. 23(a)(1). "Impracticable does not mean impossible; joinder may merely be difficult or inconvenient, rendering use of a class action the most efficient method to resolve plaintiffs' claims." *Fogarazzo v. Lehman Bros. Inc.*, 263 F.R.D. 90, 96 (S.D.N.Y. 2009) (citing *Central States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.*, 504 F.3d 229, 244-45 (2d Cir. 2007)). Numerosity is presumed for classes larger than forty members in the Second Circuit. *See Pa. Pub. Sch. Emps.' Ret. Sys. v. Morgan Stanley & Co.*, 772

6

F.3d 111, 120 (2d Cir. 2014). "[I]n securities fraud class actions relating to publicly owned and nationally listed corporations, the numerosity requirement may be satisfied by a showing that a large number of shares were outstanding and traded during the relevant period." *In re Vivendi Universal, S.A.*, 242 F.R.D. at 83 (collecting cases).[5]

The average trading volume for Vale ADS was over 26.7 million shares per day during the Class Period, and the ADS traded on the NYSE. *See* Declaration of F. Fox in Support of Lead Plaintiff's Motion for Class Certification and Appointment of Class Representative and Class Counsel ("Fox Decl.") at Ex. A, ¶ 74 (Report on Market Efficiency of Professor Steven P. Feinstein, Ph.D., CFA, dated February 15, 2021 ("Feinstein Rep.")). Likewise, the Vale Notes exhibited both a high trading volume and high trading frequency throughout the Class Period (*id.* at ¶¶ 230-236) and were held by at least 356 financial institutions during the Class Period (*id.* at ¶¶ 245-248). Based on these facts, Lead Plaintiff believes the Class Members likely number in the thousands—vastly exceeding the 40-member presumptive threshold—and reside in many states. Joinder is therefore impracticable, and numerosity is satisfied. *Dover v. British Airways, PLC (UK)*, 321 F.R.D. 49, 54 (E.D.N.Y. 2017) ) (Dearie, J.) (numerosity satisfied where "proposed class contains . . . far more than the 40 members at which numerosity is ordinarily presumed").

**2.  Questions of Law and Fact Are Common to the Class**

Rule 23(a)(2) requires the existence of "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). Rule 23 requires at least one "issue[ ] whose resolution will affect all or a significant number of the putative class members." *Johnson v. Nextel Commc'ns Inc.*, 780 F.3d 128, 137-38 (2d Cir. 2015). "[A]n issue is common to the class when it is susceptible to generalized, class-wide proof." *In re Nassau County Strip Search Cases*, 461 F.3d 219, 227 (2d

---

[5] Unless otherwise noted, all internal citations are omitted, and emphasis is added.

Cir. 2006). "Even a single common legal or factual question will suffice." *In re NYSE Specialists Sec. Litig.*, 260 F.R.D. 55, 70 (S.D.N.Y. 2009). Thus, the commonality requirement is a "low hurdle easily surmounted . . . particularly in securities fraud litigation." *In re Marsh & McLennan Cos., Inc. Sec. Litig.*, No. 04 CIV. 8144 (CM), 2009 WL 5178546, at *9 (S.D.N.Y. Dec. 23, 2009). The proposed Class satisfies the Rule 23(a) commonality requirement.

The Complaint alleges that Defendants made a series of false or misleading statements and omissions to the investing public, which injured each Class member who acquired Vale Securities during the Class Period. Common questions thus include: (a) whether Defendants misrepresented or omitted material information; (b) whether Defendants knew or recklessly disregarded that their statements and omissions were false and misleading; (c) whether the prices of Vale Securities were artificially inflated during the Class Period; and (d) the extent of damages sustained by Class Members and the appropriate measure of damages.[6] These questions are susceptible to generalized, class-wide proof and will "generate common ***answers*** apt to drive resolution of the litigation." *Wal–Mart*, 564 U.S. at 350 (emphasis in original). The commonality requirement is therefore satisfied. *See, e.g.*, *Pearlstein v. Blackberry Ltd.*, No. 13 CIV. 7060 (CM), 2021 WL 253453, at *7 (S.D.N.Y. Jan. 26, 2021) (commonality satisfied by common issues including whether defendants made misrepresentations, whether the misrepresentations were material, and whether they acted with scienter); *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 245 F.R.D. 147, 158 (S.D.N.Y. 2007), *order aff'd in relevant part,* 574 F.3d 29 (2d Cir. 2009) (same); *see also*, *Amgen*, 568 U.S. at 473 (observing in securities class action that "market efficiency, publicity, and materiality can all be proved on a classwide basis.")

---

[6] Additionally, Lead Plaintiff's Section 20(a) claim for control person liability requires proof at trial of an additional element of "control" over the violation by Defendants, which is likewise common to the Class. *See, e.g., In re NYSE Specialists*, 260 F.R.D. at 75.

8

### 3.   Lead Plaintiff's Claims Are Typical of the Class

Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims and defenses of the class." Fed. R. Civ. P. 23(a)(3). The typicality requirement is "not demanding." *In re MF Glob. Holdings Ltd. Inv. Litig.*, 310 F.R.D. 230, 236 (S.D.N.Y. 2015) (quoting *Tsereteli v. Residential Asset Securitization Tr. 2006–A8*, 283 F.R.D. 199, 208 (S.D.N.Y. 2012)). It "does not require factual identity between the named plaintiffs and the class members, only that the disputed issues of law or fact occupy essentially the same degree of centrality to the named plaintiff's claim as to that of other members of the proposed class." *MF Glob. Holdings*, 310 F.R.D. at 238 (quoting *Penn. Ave. Funds v. Inyx Inc.*, No. 08 CIV. 2732544 (PKC), 2011 WL 2732544, at *4 (S.D.N.Y. July 5, 2011)). Nor does typicality "require that damages be identical among class members." *Madden v. Midland Funding, LLC*, 237 F. Supp. 3d 130, 157 (S.D.N.Y. 2017) (citing *Annunziato v. Collecto, Inc.*, 293 F.R.D. 329, 337 (E.D.N.Y. 2013)). Thus, "[w]hen it is alleged that the same unlawful conduct was directed at or affected both the named plaintiff and the class sought to be represented, the typicality requirement is usually met irrespective of minor variations in the fact patterns underlying individual claims." *Robidoux v. Celani*, 987 F.2d 931, 936-37 (2d Cir. 1993).

Here, the claims asserted by Lead Plaintiff are typical of, if not identical to, the claims of the other Class Members. Lead Plaintiff and the Class allege that Defendants violated Sections 10(b) and 20(a) of the Exchange Act by making statements that misrepresented or omitted material facts. Because the claims of Lead Plaintiff and the Class involve Vale Securities, are based upon the same facts and legal theories, and will be proven with the same evidence, Lead Plaintiff satisfies the typicality requirement. *In re: Petrobras Sec. Litig.*, 312 F.R.D. 354, 360 (S.D.N.Y. 2016) (plaintiff was typical because class claims were based on the same alleged misrepresentations), *aff'd in relevant part,* 862 F.3d 250 (2d Cir. 2017).

### 4. Lead Plaintiff Will Fairly and Adequately Protect the Interests of the Class

The adequacy requirement of Rule 23(a)(4) demands that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "Adequacy entails inquiry as to whether: 1) plaintiff's interests are antagonistic to the interest of other members of the class and 2) plaintiff's attorneys are qualified, experienced and able to conduct the litigation." *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 35 (2d Cir. 2009). This inquiry "serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem*, 521 U.S. at 625. "The conflict that will prevent a plaintiff from meeting the Rule 23(a)(4) prerequisite must be fundamental, and speculative conflict should be disregarded at the class certification stage." *Sykes v. Mel Harris & Assocs., LLC*, 285 F.R.D. 279, 287 (S.D.N.Y. 2012), *aff'd sub nom.* 780 F.3d 70 (2d Cir. 2015).

Lead Plaintiff's interests are neither antagonistic to, nor in conflict with, the interests of other Class Members. To the contrary, Lead Plaintiff acquired Vale Securities during the Class Period and sustained damages because of the same alleged material misrepresentations and omissions as other Class Members. ¶ 34; ECF No. 8-1 (CAAT's certification). Further, Lead Plaintiff has demonstrated a willingness and ability to take an active role in (and control of) the litigation to protect the interests of the absent Class Members. ECF No. 8-1. Lead Plaintiff understands the requirements and responsibilities of serving as a class representative in a securities class action under the Private Securities Litigation Reform Act of 1995 and shall provide testimony at deposition and trial, if necessary. *Id.* In short, Lead Plaintiff has vigorously prosecuted the claims of other Class Members and will continue to do so.

Lead Plaintiff is also adequate because it retained Kaplan Fox, a firm with considerable experience in securities class actions and complex litigation.[7] Lead Plaintiff's chosen counsel has zealously and competently represented the interests of the Class Members and will continue to do so. For example, Kaplan Fox has vigorously prosecuted this action since 2019, filed a detailed 96-page Complaint, prevailed on motion to dismiss and a motion for reconsideration, and zealously pursued discovery from Defendants.

### C.  This Case Meets the Requirements of Rule 23(b)(3)

In addition to meeting Rule 23(a)'s requirements, a class action must also satisfy at least one of the three conditions imposed by Rule 23(b). Here, Lead Plaintiff moves for class certification under Rule 23(b)(3), which authorizes certification where: (1) "the questions of law or fact common to class members predominate over any questions affecting only individual members"; and (2) "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). This action satisfies Rule 23(b)(3).

### 1.  Common Questions of Law and Fact Predominate

As the Supreme Court has held, "[p]redominance is a test readily met in certain cases alleging . . . securities [claims]." *Amchem*, 521 U.S. at 625; *see, generally, Basic Inc. v. Levinson*, 485 U.S. 224 (1988). "Class-wide issues predominate if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof." *See UFCW Local 1776 v. Eli Lilly and Co.*, 620 F.3d 121, 131 (2d Cir. 2010). Indeed, as detailed in the above analysis of Lead Plaintiff's allegations under Rule 23(a)(2), there are an overwhelming number of questions of law and fact common to Lead Plaintiff and the

---

[7] *See* Kaplan Fox firm resume, attached to the Fox Decl. at Ex. B.

proposed Class. The predominance standard of Rule 23(b)(3) is therefore satisfied as these numerous common questions predominate over any perceived or potential individual issues. *Amchem*, 521 U.S. at 625.

Moreover, as described further below, common questions also predominate in this action because the Class is entitled to a presumption of reliance in accordance with *Basic*, 485 U.S. 224 and *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972). Therefore, individual reliance issues will not predominate over issues common to the class. *See In re Barrick Gold Secs. Litig.*, 314 F.R.D. 91, 101 (S.D.N.Y. 2016) ("plaintiffs can meet their burden of proving predominance by establishing their entitlement to the *Basic* presumption"); *see also In re Pfizer Inc. Sec. Litig.*, 282 F.R.D. 38, 40-41 (S.D.N.Y. 2012).

### a. Lead Plaintiff Is Entitled to the Fraud-on-the-Market Presumption of Reliance Pursuant to Basic

Under the fraud-on-the market presumption, reliance on material statements and omissions is presumed if the stock traded in an efficient market. *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398, 2407-2408 (2014) ("*Halliburton II*"); *Basic*, 485 U.S. at 247. This is because an efficient market rapidly reacts to new information about a listed company or its prospects, causing the price of its securities to rise or fall as investors trade upon the news. By purchasing a security at the price set by an efficient market, an investor is constructively relying upon all of the public information about the company.[8] *Basic*, 485 U.S. at 241-42; *accord Halliburton I*, 131 S. Ct. at 2185. Thus, proof sufficient to support a finding of an efficient market is all that is required to entitle a class of investors to the presumption of reliance. *See, e.g.*, *Carpenters Pension Tr. Fund*

---

[8] When a company publishes false information about its business (or fails to disclose negative information), the price of its securities traded in an efficient market will be higher than if a truthful disclosure had been made. An investor that purchases at the inflated price is constructively relying upon the false information, whether that investor personally read or knew anything about the falsehoods. *Basic*, 485 U.S. at 241-42 ("Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements").

*of St. Louis v. Barclays PLC*, 310 F.R.D. 69, 77 (S.D.N.Y. 2015) (proof of price impact not necessary under *Halliburton II* to invoke presumption at class certification).

Here, there is no question that there were efficient markets for Vale Securities. In evaluating whether the market for an individual security is efficient, courts in the Second Circuit have looked to the five factors set forth in *Cammer v. Bloom*, 711 F. Supp. 1264, 1286-87 (D.N.J. 1989) (the "*Cammer* factors"). *See McIntire v. China MediaExpress Holdings, Inc.*, 38 F. Supp. 3d 415, 431 (S.D.N.Y. 2014). The *Cammer* factors are: (1) the stock's average trading volume; (2) the number of analysts that followed and reported on the stock; (3) the number of market makers; (4) eligibility to file an S-3 Registration Statement; and (5) the reaction of the stock price to unexpected news events. *Cammer*, 711 F. Supp. at 1286-87. In addition to the five *Cammer* factors, courts often consider three factors from *Krogman v. Sterritt,* 202 F.R.D. 467, 478 (N.D. Tex. 2001) (the "*Krogman* factors"), which assess: 1) the company's market capitalization, 2) the stock's float, and 3) the typical bid-ask spread. *See Strougo v. Barclays PLC*, 312 F.R.D. 307, 315–16 (S.D.N.Y. 2016) (applying the *Krogman* factors). Another relevant factor to market efficiency in the academic literature is institutional ownership. *See, e.g.*, B. Barber et. al., *The Fraud-on-the-Market Theory and the Indicators of Common Stocks' Efficiency*, 19 J. Corp. L. 285, 302 (1994). Courts have used all these factors as "an analytical tool rather than as a checklist" to evaluate market efficiency. *Carpenters*, 310 F.R.D. at 83.

As demonstrated in the Feinstein Report and described herein, every one of these factors supports a finding that the markets for Vale Securities were efficient.

### i. Average Trading Volume

An average weekly trading volume for a security[9] that meets or exceeds the benchmark of one to two percent of a company's total outstanding shares is widely recognized as a sign of an efficient market. *McIntire*, 38 F. Supp. 3d at 431 (referencing one to two percent benchmark); *Cammer*, 711 F. Supp. at 1293 ("Turnover measured by average weekly trading of 2% or more of the outstanding shares would justify a strong presumption that the market for the security is an efficient one; 1% would justify a substantial presumption.").

Here, the average trading volume for the ADS and Notes strongly support finding market efficiency. During the Class Period, the average weekly trading volumes for Vale ADS vastly exceeded the 2% threshold, with average weekly trading of approximately 133.6 million shares, or 9.9% of all Vale ADS outstanding. Feinstein Rep. ¶ 75. Likewise, the Vale Notes' average weekly trading volumes as a percentage of outstanding issue during the Class Period were: (1) 1.67% for the TAN3 Note; (2) 1.50% for the TAM5 Note; (3) 4.57% for the TAP8 Note; (4) 0.95% for the TAE3 Note; (5) 2.14% for the TAH6 Note; (6) 1.85% for the TAK9 Note, and (7) 1.82% for the EAA3 Note. *Id*. at ¶ 230. These volumes exceed the 1% threshold for a substantial presumption of market efficiency for four series of Notes, and exceed the 2% threshold for a strong presumption of market efficiency for two series of Notes. *Id*. at ¶ 231. This factor thus supports market efficiency for the Vale ADS and Notes. *Id.* at ¶¶ 75-76 and ¶¶ 231-233.

### ii. Analyst Coverage

The existence of numerous analysts that followed Vale during the Class Period is another indicator of an efficient market, as it indicates that new information is rapidly being disseminated

---

[9] Bonds typically exhibit less price volatility and trade less frequently than common stock due to their senior status in a company's capital structure. Feinstein Rep. ¶ 224-226. Nonetheless, the Vale Notes included in the Class were actively traded. *Id*. at ¶ 233.

to and acted upon by investors. Indeed, the presence of even a single analyst can support an efficient market. *In re Xcelera.com Sec. Litig.*, 430 F.3d 503, 514-15 (1st Cir. 2005); *see also In re Winstar Commc'ns Sec. Litig.*, 290 F.R.D. 437, 446 (S.D.N.Y. 2013) (market efficient where three analysts followed security).

Here, analysts from at least 35 different firms covered Vale throughout the Class Period, which strongly supports market efficiency. Feinstein Rep. ¶ 79. Additionally, the three major bond rating agencies—Fitch, Moody's, and Standard & Poor—all performed analysis, ratings, and surveillance on the Vale Notes throughout the Class Period and commented in the financial press about them. *Id.* at ¶¶ 239-244. This additional information and analysis fostered the efficiency of the market for Vale Notes throughout the Class Period. *Id.*

### iii.   Presence of Market Makers

Market makers are financial intermediaries who trade in a particular security, standing ready to buy and sell with individual investors, institutions, and other market makers. Feinstein Rep. ¶ 89. The more market makers a security has, the more traders there are and the more efficient the market will be in responding to new information about the issuer, thereby incorporating that information into the market price. *Cammer*, 711 F. Supp. at 1286-87.

Here, Vale ADS traded on the NYSE with continuous public price and volume reporting, which strongly indicates an efficient market and renders the number of market makers less significant than the over-the-counter market discussed in *Cammer*.[10] Feinstein Rep. ¶¶ 90-94. The NYSE is one of the largest, most liquid, and most efficient security exchanges in the world. *Id.* at

---

[10] *See Cammer,* 711 F. Supp. at 1292, *citing* Bromberg & Lowenfels, Securities Fraud and Commodities Fraud § 8.6 (Aug. 1988): ("We think that, at a minimum, there should be a presumption – probably conditional for class determination – that certain markets are developed and efficient for virtually all the securities traded there: the New York and American Stock Exchanges, the Chicago Board Options Exchange and the NASDAQ National Market System.").

¶ 90. Moreover, the ADS had at least 140 market makers during the Class Period. *Id*. ¶ 93. Similarly, the Vale Notes were traded on the NYSE in addition to trading in the over-counter-market, had at least 15 underwriters, including some of Wall Street's largest and most prominent investment banks. *Id*. at ¶¶ 249-250. Based on their NYSE listing, the number of firms that underwrote the Vale Notes, the fact that underwriters typically make markets in the securities they underwrite, and the disclosures by analyst firms that they made markets in Vale securities, it is apparent that there were numerous market makers for the Vale Notes. *Id*. at ¶¶ 249-254. Accordingly, this factor supports finding an efficient market during the Class Period.

### iv. Eligibility to File an F-3 Registration Statement

Through Form F-3, the SEC allows certain foreign companies that have previously provided sufficiently high levels of public information to incorporate prior SEC filings into current filings by reference, since such information is already deemed to be widely publicly available. *See Carpenters*, 310 F.R.D. at 79-80; Feinstein Rep. ¶ 95 (Form F-3 is the equivalent for foreign companies of Form S-3 for domestic ones). To be eligible to issue a Form F-3, among other things, a company must have an outstanding float above a certain minimum value and must have filed Exchange Act reports in a timely manner for the past twelve months. *Id*. ¶¶ 96-97. Here, Vale was eligible for F-3 registration throughout the Class Period, and did, in fact, file an F-3 on June 19, 2018. *Id*. ¶ 104. To the extent that F-3 registration eligibility indicates company characteristics associated with market efficiency, the Company clearly possessed those characteristics throughout the Class Period. *Id*. at ¶ 98.

### v. Price Reaction of Vale Securities to Unexpected Information

Evidence that the price of a security regularly reacts to unexpected news about the issuer is strong evidence of an efficient market. *Cammer*, 711 F. Supp. at 1291. "[O]ne of the most

convincing ways to demonstrate [market] efficiency would be to illustrate, over time, a cause-and-effect relationship between company disclosures and resulting movements in stock price." *Id.* at 1287. Here, Professor Feinstein has demonstrated through event studies and other empirical tests that Vale ADS and Notes reacted rapidly to unexpected information. Feinstein Rep. at ¶ 178 (ADS); *id.* at ¶¶ 273-276 (Notes). The event studies and other analyses demonstrate a clear cause-and-effect relationship between unexpected material news concerning Vale and changes in the market price of Vale ADS and Notes, supporting market efficiency. *Id.*

### vi.    Market Capitalization

Market capitalization is the total value of all outstanding shares. Feinstein Rep. ¶ 68. The larger the market capitalization of a company, the more analyst and news media coverage it attracts, and the greater the number of investors, including large institutional investors, it gains. *Id.* These characteristics, which accompany a large market capitalization, promote market efficiency. *Id.*

Here, over the Class Period, the market capitalization of Vale ADS averaged $15.3 billion, placing Vale in the 1st decile of U.S. companies by size. *Id.* ¶ 107. Indeed, as measured by market capitalization, Vale was larger than 94% of all other publicly-traded companies in the United States. *Id.* Similarly, the aggregate par value of the Vale Notes totaled $12.05 billion and was larger than the market capitalizations of at least 93% of all public companies listed on the NYSE, AMEX, NASDAQ, and ARCA during the Class Period. *Id.* ¶ 256. Accordingly, this factor is supportive of market efficiency for the Vale ADS and Notes. *See also, McIntire*, 38 F. Supp. 3d 433 (finding market capitalization of $292 to $585 million was sufficient).

### vii.    Float

A security's float is the number of shares outstanding, less shares held by insiders and affiliated corporate entities. Feinstein Rep. ¶ 69. Securities with large floats tend to trade more

17

actively, attract more analyst and news media coverage, and garner the attention of greater numbers of investors, including large institutional investors. *Id*. Thus, a high float level can be indicative of market efficiency. *Id*.

Here, the average float of the Vale ADS alone, not including the shares that traded in Brazil, was $15.3 billion during the Class Period, and ranged between $10.0 billion and $20.6 billion. *Id*. ¶ 101. Likewise, the float of the Vale Notes was equal to their outstanding par values, as indicated by Company filings, and the outstanding par values were individually larger than the market capitalizations of most publicly-traded companies.[11] *Id*. ¶¶ 255-257. Thus, the massive size of Vale's float easily satisfies the second *Krogman* factor for market efficiency.

### viii.    Bid-Ask Spread

The bid-ask spread is the difference between the price at which market makers are offering to buy a security and the price at which they are offering the security for sale. Feinstein Rep. ¶ 70. If a security is actively traded and information about the security is readily available, the bid-ask spread will tend to be narrow. *Id*. Moreover, a narrow bid-ask spread makes trading in the security less costly for investors, and thereby tends to attract greater interest, greater coverage, and greater volume. *Id*. Thus, the narrower the bid-ask spread, the greater the indication of an efficient market. *Id*.

Here, the average bid-ask spread for Vale ADS over the course of the Class Period was 0.09%. *Id*. at ¶ 113. By comparison, the average month-end bid-ask spread over the course of the Class Period for all stocks in the CRSP database was 0.55%. *Id*. Vale ADS average bid-ask spread was therefore substantially narrower than the mean level among all other CRSP stocks—stocks traded on the NYSE, AMEX, NASDAQ, and ARCA. *Id*. In dollar terms, Vale ADS bid-ask spread

---

[11] The individual par values for each of the Vale Notes is set forth in Table 5 (at paragraph 257) of the Feinstein Report.

during the Class Period averaged $0.01 per Vale ADS, which was much narrower than the average for all stocks in the CRSP database of $0.11 during the Class Period. *Id*. ¶ 114.

### ix.    Institutional Ownership

Empirical research has found high institutional ownership to be indicative of market efficiency. Feinstein Rep. ¶ 62. Major institutions are defined as firms or individuals that exercise investment discretion over the assets of others in excess of $100 million. *Id*. ¶ 83. During the Class Period, at least 937 major institutions owned Vale ADS and 356 financial institutions held one or more of the Vale Notes. *Id*. ¶¶ 84, 248. These high levels of institutional ownership during the Class Period further support a conclusion of market efficiency.

*        *        *

In sum, the markets for Vale ADS and Notes were efficient throughout the Class Period. Accordingly, Class Members are entitled to a presumption that they relied upon the false and misleading statements and omissions on which this action is based. *Basic*, 485 U.S. at 247. Because Class Members will not have to individually prove reliance, common issues will predominate, and this action should proceed as a class action.  *Id*.

### b.    Lead Plaintiff Is Entitled to a Presumption of Reliance Pursuant to *Affiliated Ute*

Lead Plaintiff is also entitled a presumption of reliance pursuant to *Affiliated Ute*, 406 U.S. 128. The *Affiliated Ute* presumption applies to claims involving a failure to disclose. *Id*. at 153; *see, also*, *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 159 (2008). In such circumstances, "positive proof of reliance is ***not*** a prerequisite to recovery." *Affiliated Ute*, 406 U.S. at 153-54. Instead, "[a]ll that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of [their] decision." *Id.* The *Affiliated Ute* presumption reflects the reality that where information is omitted,

19

"reliance as a practical matter is impossible to prove." *In re Facebook, Inc., IPO & Sec. & Deriv. Litig.*, 986 F. Supp. 2d 428, 469 (S.D.N.Y. 2013); *In re Smith Barney Transfer Agent Litig.*, 290 F.R.D. 42, 47 (S.D.N.Y. 2013).

Furthermore, because materiality itself is a common question, a plaintiff need not prove materiality to invoke the *Affiliated Ute* presumption at class certification; it need only be alleged. *See Amgen*, 133 S. Ct. at 1195 ("[B]ecause [t]he question of materiality . . . is an objective one, involving the significance of an omitted or misrepresented fact to a reasonable investor, materiality can be proved through evidence common to the class.").

Here, the Complaint alleges Defendants made material omissions regarding the failure probability of Vale's dams and Vale's dam risk management practices (*see, e.g.*, ¶¶ 128, 154, 196) and that Defendants engaged in a fraudulent scheme (¶¶ 237-242).  In denying Defendants' motion to dismiss, the Court ruled that Defendants had a duty to disclose the allegedly omitted material information, and that Lead Plaintiff alleged actionable omissions. *See generally*, *In re Vale S.A. Sec. Litig.*, No. 19-CV-526 (RJD) (SJB), 2020 WL 2610979, at *13–15 (E.D.N.Y. May 20, 2020). Because the Complaint alleges actionable omissions, Lead Plaintiff is also entitled to rely on the *Affiliated Ute* presumption to establish reliance.

> **c. Lead Plaintiff's Damages Methodology is Consistent with Its Theory of Liability and is Capable of Measuring Damages on a Classwide Basis**

In accordance with *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013), "damages questions should be considered at the certification stage when weighing predominance issues." *Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 408 (2d Cir. 2015). However, "*Comcast* [ ] did not hold that a class cannot be certified under Rule 23(b)(3) simply because damages cannot be measured on a classwide basis." *Roach*, 778 F.3d at 407-408. Rather, "[a]ll that is required at class certification is that the plaintiffs must be able to show that their damages stemmed from the defendant's actions

20

that created the legal liability." *Sykes v. Mel S. Harris & Assocs. LLC*, 780 F.3d 70, 88 (2d Cir. 2015).

Here, Lead Plaintiff asserts claims under Section 10(b) of the Exchange Act for investor losses sustained in connection with the purchase or sale of securities due to Defendants' allegedly fraudulent misrepresentations and omissions. In accordance with this liability theory, Professor Feinstein found that Class Members' out-of-pocket damages may be calculated using economic analyses, including an event study, to determine the amount of artificial inflation in Vale Securities' prices during the Class Period caused by the alleged fraud, and removed by the alleged corrective events and disclosures. Feinstein Rep. ¶¶ 288-296. This methodology has been widely accepted at class certification in securities litigation. *See, e.g.*, *Waggoner v. Barclays PLC*, 875 F.3d 79, 106 (2d Cir. 2017) (upholding certification where damages model "focused on the decline in stock price following the [corrective] disclosure . . . and then isolate[ed] company-specific events from market and industry events."); *Carpenters*, 310 F.R.D. at 99 (certifying class where damages methodology was based on calculation of share price inflation caused by the allegedly false statements and removed by corrective disclosures); *In re Barrick Gold Sec. Litig.*, 314 F.R.D. at 105-106 (certifying class where "plaintiffs' actual theory of damages (out-of-pocket damages) is entirely consistent with their theory of Section 10(b) liability and would be measurable on a class-wide basis."); *see also*, *Dodona I, LLC v. Goldman, Sachs & Co.*, 296 F.R.D. 261, 271 (S.D.N.Y. 2014) (when there is a "class-wide methodology for calculation of damages, any necessary individualized inquiries are a far cry from the scope of individualized issues of proof that would defeat a finding of predominance under Rule 23(b)(3)"). Thus, Lead Plaintiff's damages methodology amply satisfies class certification requirements.

### 2. A Class Action Is Superior to Alternative Methods for Resolving This Dispute

Rule 23(b)(3) requires that a class action also be "superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Rule 23(b)(3) provides four factors for courts to consider in evaluating the superiority requirement: (A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action. *Id.* Courts have found the superiority requirement met where: (a) many in the class of investors likely suffered only small losses, making it impracticable to proceed with their claims as individuals; (b) use of the class vehicle will achieve judicial economy, as well as prevent inconsistent judgments; and (c) there are no other actions against the company involving the same claims, and the court foresees no particular difficulties with adjudicating the class action. *See*, *e.g.*, *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 809 (1985) (class action mechanism allows plaintiffs to pool claims that would otherwise be uneconomical to litigate individually); *see also Amchem*, 521 U.S. at 617.

There can be no dispute that in this case a class action is superior to any other available method of adjudication. Defendants' alleged violations of the federal securities laws caused economic injury to many geographically dispersed investors, making the cost of pursuing individual claims plainly impracticable. Resolving the claims in this case on a classwide basis promotes judicial economy because the alternative is thousands of separate individual actions, which offer no practical recourse for most Class Members and would burden the judicial system. *See, e.g., Katz*, 2010 WL 2926196, at *6 ("[A]s a general rule, securities fraud cases easily satisfy the superiority requirement because most violations of federal securities laws . . . inflict economic

22

injury on large numbers of geographically dispersed persons such that the cost of pursuing individual litigation to seek recovery is often not feasible."). Finally, there is no reason to expect any difficulty in the management of this case as a class action. As discussed above, all proposed Class Members were subject to the same alleged misstatements and omissions made by Defendants, thus requiring the same proof to establish Exchange Act violations.

The alternatives to a class action are either to foreclose recourse for thousands of stock purchasers or to permit a multiplicity of suits throughout the United States, which would result in the inefficient administration of justice and the risk of inconsistent judgments. *See In re SCOR*, 537 F. Supp. 2d at 579 ("Litigating each case separately would be wasteful, and result in delay and an inefficient expenditure of judicial resources" and "risk disparate results among those seeking redress."). This is precisely the "evil that Rule 23 was designed to prevent." *Califano v. Yamasaki*, 442 U.S. 682, 690, 701 (1979). Thus, the class action device is superior to any other means to adjudicate this action.

**D. The Proposed Class Satisfies the Requirement of Ascertainability**

"The ascertainability requirement, as defined in this Circuit, asks district courts to consider whether a proposed class is defined using objective criteria that establish a membership with definite boundaries." *In re Petrobras Sec.*, 862 F.3d 250, 269 (2d Cir. 2017). Where, as here, the class is defined based on "securities purchases identified by subject matter, timing, and location," which "are clearly objective" criteria, and is further limited to domestic transactions bounded by a definite class period, the requirement of ascertainability is met. *Petrobras*, 862 F.3d at 269–70.

**E. Kaplan Fox Satisfies the Rule 23(g) Prerequisites for Appointment as Class Counsel**

Rule 23(g)(1)(A) sets forth the factors a court must consider in appointing Class Counsel, including: (i) the work counsel has done in identifying or investigating potential claims in the

23

action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class.  Fed. R. Civ. P. 23(g)(1)(A).

Kaplan Fox has extensive experience prosecuting securities class actions. Lead Counsel has effectively used its experience to vigorously pursue the interests of all Class Members, including the filing of a detailed Complaint, successfully defending the Complaint against Defendants' motion to dismiss and against Defendants' motion for reconsideration of the denial of their motion to dismiss, and pursuing an aggressive discovery plan.

## IV.    CONCLUSION

For the foregoing reasons, Lead Plaintiff respectfully requests that the Court: (a) certify this action as a class action pursuant to Rule 23(a) and (b)(3); (b) certify Lead Plaintiff as representative of the proposed Class; and (c) appoint Kaplan Fox as Class Counsel.

Dated: February 15, 2021

**KAPLAN FOX & KILSHEIMER LLP**

/s/ *Frederic S. Fox*
Frederic S. Fox
Donald R. Hall
Melinda Campbell
Aaron Schwartz
850 Third Avenue, 14th Floor
New York, NY 10022
Telephone: (212) 687-1980
Facsimile: (212) 687-7714
*Lead Counsel for Lead Plaintiff and the Class*

**THE ROSEN LAW FIRM, P.A.**
Brian Alexander, Esq.
Brent J. LaPointe, Esq.
Phillip Kim, Esq.
275 Madison Avenue, 40th Floor
New York, New York 10016
Telephone: (212) 686-1060
*Additional Counsel*