# EXHIBIT 2

CONFIDENTIAL

Page 1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK

------------------------------------x

IN RE:  VALE S.A. SECURITIES LITIGATION

No. 19-cv-526-RJD-SJB

------------------------------------x


CONFIDENTIAL


VIRTUAL DEPOSITION OF STEVEN FEINSTEIN

March 24, 2021


Reported By:

JEREMY RICHMAN

CONFIDENTIAL

Page 2

March 24, 2021

10:00 a.m.

Virtual Videotaped Deposition of STEVEN FEINSTEIN, taken by Defendant, at the offices of Gibson Dunn & Crutcher LLP, 200 Park Avenue of the Americas, New York, New York, before JEREMY RICHMAN, a Shorthand Reporter and Notary Public within and for the State of New York.

Page 3

A P P E A R A N C E S:

KAPLAN FOX
    Attorneys for Plaintiffs
    850 Third Avenue
    New York, New York 10022

BY:   DONALD R. HALL, ESQ.
    AARON SCHWARTZ, ESQ.
    MELINDA D. CAMPBELL, ESQ.

GIBSON DUNN & CRUTCHER LLP
    Attorneys for Defendants
    200 Park Avenue, 47th Floor
    New York, New York 10166-5268
BY:   CHRISTOPHER M. JORALEMON, ESQ.
    ALISHA SIQUEIRA, ESQ.
    JASON BRESSLER, ESQ.

ALSO PRESENT:
    AHMER NABI
RON MARRAZZO, Videographer

Page 4

STIPULATIONS

IT IS HEREBY STIPULATED AND AGREED, by and among counsel for the respective parties hereto, that the filing, sealing and certification of the within deposition shall be and the same are hereby waived;

IT IS FURTHER STIPULATED AND AGREED that all objections, except as to form of the question, shall be reserved to the time of the trial;

IT IS FURTHER STIPULATED AND AGREED that the within deposition may be signed before any Notary Public with the same force and effect as if signed and sworn to before the Court.

              *    *    *

Page 5

S. FEINSTEIN

THE VIDEOGRAPHER:  Good          10:05:15
morning, we are now going on the        10:05:26
record.  The time is approximately      10:05:28
10:05 a.m. It is the 24th of          10:05:30
March 2021.  Audio and video          10:05:34
recording will continue to take        10:05:37
place unless all parties agree to      10:05:39
go off the record.                10:05:41
    This is the video recorded        10:05:42
deposition of Steven Feinstein in      10:05:43
the matter of Vale S.A. securities      10:05:46
litigation.  This case is filed in      10:05:50
the United States District Court,      10:05:52
Eastern District of New York.  This    10:05:54
deposition is being held via Zoom      10:05:56
video conference.                10:05:58
    My name is Ron Marazzo from        10:05:59
the firm Veritext Legal Solutions,      10:06:03
and our court reporter is Jeremy        10:06:05
Richman from the firm Veritext        10:06:07
Legal Solutions.  I'm not related      10:06:10
to any party in this action, nor am    10:06:12
I financially interested in the        10:06:14
outcome.                    10:06:15

2 (Pages 2 - 5)

CONFIDENTIAL

Page 42

S. FEINSTEIN

the work is done under my direction, and we've done enough evaluations that are similar so that the level of direction varies from case to case depending on how unusual the case is. But we knew that we would be studying the Cammer Krogman factors for market efficiency. It's a set of factors that require evaluation of specific data, so I assigned that, I believe I assigned it to Jack Long. He did that. He reported back to me what the findings were.

We talked about how we're going to address the empirical factor, what sort of statistical test would be appropriate, given the company and the time frame. We build a regression model that's appropriate for the securities involved. We run the regression model. We do what's called a news analysis. A news analysis is where I personally, but also supported by staff, peruse -- we're not going to

Page 43

S. FEINSTEIN

read every one of the four or 5,000 articles published by the company, but we skim through the headlines, stopping where it's clear from the headlines of these articles that important news events may have occurred, and read those articles more carefully, but we do a pretty careful review of what was the experience of the company over the time frame at issue, and based on that, we make a determination about what events ought to be tested to see if there's empirical evidence of a demonstration of market efficiency.

We run those tests, we evaluate those tests. Depending on what the outcome is, we conduct further analysis or not. We then talk about the results as we have them, determine what the opinion is going to be, and write it up.

A lot -- I should add, a lot of the writing has been honed -- a lot of the writing is common to different

Page 44

S. FEINSTEIN

market efficiency reports. For example, the definition of what market efficiency is, it would be the same definition whether it's this case or another case. So that language has been honed, and we'll use prior reports as a template for sections that are common -- that are common descriptions of common phenomenon.

Q.   Who's responsible for the actual drafting of the report?

A.   Well, much of it has already been drafted, both for, if it's common topics, like definition of market efficiency, and that's entirely mine. Over the years people have made suggestions to me about clarity, and so I would make edits and changes, but most of it is my words that I've written, maybe not specifically for this case, but that I've written.

A section, like, about the company, we have that on page 7 of this report. I'll ask one of the analysts

Page 45

S. FEINSTEIN

working with me to do a rough draft, get a rough draft started about the company so that when I get it, I'm not looking at a blank piece of paper. I've got something already there. I'll read what they've written, and then I'll rewrite it, essentially, rewrite it, edit it, do further research. I do rely on my staff to get the ball rolling on each of these sections, and then I review them and direct them and complete them, and make them my own.

Usually when I write, I like to have someone, in the old days before COVID, right next to me. I like writing with a partner. We've been -- over the last year we've been working virtually side by side as I write each section, or rewrite each section.

Q.   Did anyone beyond you or CFR staff draft any portion of your report?

A.   No.

Q.   Did you make any changes to your report at the request of counsel?

12 (Pages 42 - 45)

CONFIDENTIAL

Page 78

S. FEINSTEIN

complaint alleges were false or misleading?

A. Yes, the very last page of that order, I think it was an appendix, was a table of dismissed alleged misrepresentations, and then actionable ones. And I looked at that list. Wait one moment, though. Another reason for looking at an order like that, what I do is in the general course of any engagement, but in this case it was also very valuable, was to read the judge's take on what the allegations are, and what the relevant experience of the company was during this proposed class period, and that was helpful to me in writing the allegation section, and review the recap of the allegations in my report.

Q. Do you recall, sitting here today, what your conclusions were with respect to the judge's take on those issues?

MR. HALL: Objection.

Page 79

S. FEINSTEIN

A. Yes. That the judge relayed them in a very succinct and clear manner, which was helpful for me understanding the allegations.

Q. Now, is it your understanding that that May 20th memorandum and order reflected the court's view of the allegations?

A. No. There was no determination on the merits of the allegations. What I'm saying is that in the order itself, the judge summarizes the allegations, and that summary was helpful to me.

Q. Got it, okay. Do you know whether all of the alleged misstatements that remain in this case preceded the dam collapse?

A. Well, I know that corrective disclosures continued after the dam collapse, and so that the allegations were not yet full disclosure to the marketplace about -- well, about what had been concealed via the

Page 80

S. FEINSTEIN

representations and omissions. I don't recall, without looking at that document, whether there were alleged misrepresentations, I mean, so clearly -- let me back up.

So clearly, the allegations include that there continued to be omissions after the dam collapse. I don't recall, as I sit here now, whether there were affirmative misrepresentations alleged after the dam collapse.

Q. Would that information be relevant to your analysis, that is, whether there were both precollapse affirmative misstatements and post-collapse affirmative misstatements?

A. No, the damage model will accommodate either.

Q. Okay. Now, I note that the February 18th report marked as Exhibit 2 here is a corrected version of your report; is that right?

Page 81

S. FEINSTEIN

A. That's right.

Q. What corrections did you make to your report?

A. Well, I corrected errors that I identified. I identified errors immediately after it had been submitted, and put together an errata sheet, put together the corrected version and notified the client immediately so that I can submit the corrected version. There's a whole page. You have it, I don't have it in front of me, but there's two pages, I believe, that list what the corrections were.

Q. How did you go about identifying the errors in your report that were corrected?

A. Well, I think it's -- to understand, put this into context, it's important to explain how the errors occurred. So as I explained, when I wrote the report and when I finalized the report, even, when I thought I

21 (Pages 78 - 81)

CONFIDENTIAL

Page 94

S. FEINSTEIN

In the case of distress, they get paid 12:01:11 before any capital is distributed to 12:01:16 equity holders, although hard to 12:01:21 believe that whatever happened with 12:01:24 Vale, that there would be that kind of 12:01:25 distress. 12:01:28

In the case of a cash crunch, 12:01:29 note investors get their coupons before 12:01:34 equity investors would get any 12:01:37 dividends. I cite to the, some of the 12:01:40 different characteristics of bonds 12:01:46 versus stock in the report. Bonds tend 12:01:47 to trade less frequently, but in larger 12:01:51 quantities than do stocks or ADRs. And 12:01:55 that was certainly the case for these 12:01:58 securities. 12:02:02

The payments to notes are 12:02:07 fixed. That's why they're called fixed 12:02:10 income securities. There's a fixed 12:02:13 coupon rate that determines what the 12:02:14 coupon dollar amounts would be. And 12:02:16 they, whereas equities, the -- 12:02:20 typically with equities, the dividend 12:02:31 was more at the discretion of the board 12:02:35

Page 95

S. FEINSTEIN

of directors of the company. With 12:02:37 respect to Vale, there were some 12:02:39 constraints on the dividend, but 12:02:41 nonetheless, there's more discretion in 12:02:43 the determination of a dividend than 12:02:46 there is in the payment of a coupon. 12:02:49

And the other thing is the 12:02:50 ADRs are exactly that, an American 12:02:54 depository receipt. They are backed by 12:02:58 a Brazilian security. Brazilian 12:03:01 securities are deposited with a 12:03:03 depository, and then the value and cash 12:03:05 flows to those Brazilian securities 12:03:08 determines the value and cash flows to 12:03:11 the ADRs, whereas the notes themselves 12:03:13 traded directly on the New York Stock 12:03:18 Exchange as themselves, not as a 12:03:20 receipt representing a deposit. Those 12:03:22 are the main differences. 12:03:27

Q. You agree that generally, 12:03:31 bond valuations are, by design, less 12:03:32 sensitive to most company news, right? 12:03:35

A. Yes. But I want to be clear, 12:03:36 they're less sensitive by design, by 12:03:43

Page 96

S. FEINSTEIN

virtue of fundamental financial 12:03:45 principles, not because by design 12:03:48 investors wouldn't care to monitor 12:03:52 valuation relevant information. It's 12:03:53 just that more information is going to 12:03:56 be -- more and different information -- 12:04:01 more information will impact, on a 12:04:03 day-to-day basis, ADRs than a bond. 12:04:07

Q. Well, let's take the example 12:04:11 of earnings prospects for a company. 12:04:13 Do you agree that an investor in a 12:04:16 company's bonds would be affected 12:04:20 differently than investors in an equity 12:04:22 security by any representations 12:04:26 concerning earnings prospects? 12:04:28

MR. HALL: Objection. 12:04:33

A. Yes, I totally agree with 12:04:33 that. For the bond holders, what they 12:04:35 care about is, are the earnings 12:04:37 sufficient so that the company can 12:04:40 afford the coupon, whereas the residual 12:04:42 investor, which is the equity investor, 12:04:45 they're saying, Well, after -- is the 12:04:49 cash flow enough so I can get what I 12:04:51

Page 97

S. FEINSTEIN

expected my dividend to be. 12:04:59

Q. Given that, is it fair to 12:05:02 say, Dr. Feinstein, that as a general 12:05:05 matter, investors in bonds have a 12:05:06 different risk tolerance than investors 12:05:08 in equities? 12:05:09

MR. HALL: Objection. 12:05:10

A. It's hard to characterize 12:05:16 across -- in terms of generalizations, 12:05:17 it's hard to generalize that to that 12:05:20 extent. Institutions that own equities 12:05:22 also own bonds, so some institutions 12:05:26 own both. It doesn't mean that -- I 12:05:29 mean, it's -- it's each -- it's hard -- 12:05:32 I don't think you can generalize, 12:05:39 because you're going to find some 12:05:40 investors that prefer one over the 12:05:41 other, and you're going to find 12:05:43 investors that buy both. 12:05:47

Q. Understood. You can always 12:05:49 find examples of different risk 12:05:51 profiles. I'm asking as a general 12:05:54 matter of an expert in finance, do you 12:05:55 agree that equity investors, generally 12:06:02

25 (Pages 94 - 97)

CONFIDENTIAL

Page 98

S. FEINSTEIN

speaking, are less risk averse than 12:06:06 bond investors? 12:06:09

MR. HALL: Objection. 12:06:11

A. Look, I'll give you this: 12:06:11 I'll say that bonds tend to be safer 12:06:14 investments than stocks, but you've got 12:06:16 the same investors buying both. 12:06:21 Commonly, typically, I mean, investors 12:06:27 make a choice of -- investors across 12:06:29 the entire spectrum make a choice of 12:06:35 what their mix of stock and bonds is 12:06:37 going to be, so investors typically, 12:06:39 across the entire range of risk 12:06:40 preferences and risk tolerances, will 12:06:43 be buying some combination of both. 12:06:45

They're not, it's not 12:06:47 segregated where only risk averse 12:06:48 investors by -- there's no segregation 12:06:50 that says risk-averse investors only 12:06:54 buy stocks -- buy bonds, and 12:06:56 risk-tolerant investors only buy 12:06:59 stocks. It's just not how modern 12:07:00 principles of investment work. 12:07:03

Q. No, I agree, I wasn't asking 12:07:05

Page 99

S. FEINSTEIN

you to embrace such a broad 12:07:07 proposition, I'm simply talking about 12:07:10 the differences in risk profiles 12:07:11 between a bond investment and an 12:07:14 equities investment. 12:07:16

So let me try this a 12:07:19 different -- I didn't have a question 12:07:21 for you. 12:07:24

A. No, I mean, bonds, as an 12:07:25 isolated individual security, tend to 12:07:29 be safer. Their cash flows are more 12:07:30 predictable than are stocks, that's a 12:07:34 fact. But it doesn't -- that doesn't 12:07:37 produce a segregation in the market 12:07:42 where they're only bought by one class 12:07:45 of investors, and the other security 12:07:48 equities is bought by another class of 12:07:52 investors. 12:07:54

Typically, investors, whether 12:07:55 institutional or individual, will hold 12:07:56 some combination of both. 12:08:00

Now, you do have institutions 12:08:02 that specialize in one or the other. I 12:08:04 mean, there are bond portfolio funds, 12:08:07

Page 100

S. FEINSTEIN

and then there are stock portfolio 12:08:11 funds. Because of the nature of their 12:08:13 investment policy statement or their 12:08:17 purpose or their charter, they're 12:08:20 required to buy only one or the other, 12:08:23 but then those products that those bond 12:08:27 or equity mutual funds offer are often 12:08:29 blended together into institutional and 12:08:32 individual portfolios. 12:08:34

Q. Okay. You agree with the 12:08:42 statement that the trading behavior and 12:08:44 price movements of corporate bonds 12:08:45 differ markedly from those of common 12:08:48 stock, correct? 12:08:53

MR. HALL: Objection. 12:08:53

A. Yes. 12:08:54

Q. And you also agree with the 12:08:54 proposition that bonds generally trade 12:08:56 less frequently than stocks, right? 12:08:58

A. Yes. 12:09:00

Q. In fact, bonds may not trade 12:09:01 at all on any given day, isn't that 12:09:05 right? 12:09:07

A. Well, it's true that some 12:09:16

Page 101

S. FEINSTEIN

bonds won't have any trading in a 12:09:18 particular day. And that -- I mean, 12:09:20 there were some examples in this case 12:09:23 of that, but much less frequently than 12:09:24 most corporate bonds. These bonds 12:09:29 traded far more actively than other 12:09:30 corporate bonds that have been studied 12:09:35 in the literature. 12:09:38

Q. So with respect to your 12:09:41 analysis here, you found that the Vale 12:09:42 ADRs and bonds did not always 12:09:44 experience the same price movements on 12:09:46 the dates you analyze; isn't that 12:09:48 right? 12:09:51

A. Yes. 12:09:51

Q. For example, if you look at 12:09:51 paragraph 275 of your report, you 12:09:53 concluded that only one of the bonds, 12:09:55 QUSIP with TAP8, had a price reaction 12:09:59 that was statistically significant at 12:10:03 the 95 percent confidence level on 12:10:05 February 4th; is that right? 12:10:08

A. Right, well six of the seven 12:10:09 bonds moved. Only one of them moved by 12:10:17

26 (Pages 98 - 101)

CONFIDENTIAL

Page 134

S. FEINSTEIN

trading is going to be easy. And you 12:45:55 know that someone with -- if there's a 12:45:57 lot of market makers, you know that 12:45:59 there's not likely to be an impediment 12:46:03 to getting your trades placed. 12:46:05

You know that if there's a 12:46:07 lot of coverage by securities analysts, 12:46:09 you know that it's not likely that 12:46:10 there would be an impediment to market 12:46:12 a security caused by a blockage of 12:46:14 information, a blockage making 12:46:16 information unavailable. So existence 12:46:20 of market makers and coverage by 12:46:22 security analysts do go to the market 12:46:24 behavior of the stock. They do tell 12:46:26 you something about how the stock is 12:46:28 likely to behave. 12:46:30

I understand that Tabak and 12:46:37 others writing this article wanted to 12:46:42 focus attention on the empirical 12:46:42 factor. They're suggesting a new kind 12:46:45 of test, but I think they were wrong, 12:46:46 or maybe just too early, in -- 12:46:53 chronologically, to disparage the other 12:46:56

Page 135

S. FEINSTEIN

Cammer Krogman factors to this extent. 12:46:58

Q. Well, so just again, so we're 12:47:01 clear, this Exhibit 3, the St. John's 12:47:04 Law Review article concluded that there 12:47:09 were instances in which a security 12:47:14 satisfied the fifth Cammer factor, but 12:47:15 in fact traded in a clearly inefficient 12:47:18 market. You're aware of that, right? 12:47:21

A. Yeah, I'm aware that there 12:47:23 are rare, infrequent exceptions. 12:47:26

Q. And did you consider those 12:47:30 exceptions in reaching your conclusions 12:47:32 in this case? 12:47:35

MR. HALL: Objection. 12:47:36

A. I did. I ran the entire 12:47:37 battery of tests. 12:47:41

Q. What does that entire battery 12:47:42 of tests include? 12:47:47

A. I looked at all the Cammer 12:47:48 and Krogman factors, and I ran an event 12:47:52 study on events that are indisputably 12:47:53 important events in the life of this 12:47:58 company. 12:47:59

Q. Well, turning to that event 12:47:59

Page 136

S. FEINSTEIN

study, would you agree that an integral 12:48:11 step in conducting a market efficiency 12:48:25 event study is the identification of 12:48:27 similar events to test? 12:48:31

MR. HALL: Objection. 12:48:34

A. Yes, yes. 12:48:34

Q. And you agree that events 12:48:36 should be selected on the basis of an 12:48:42 independent analysis of which candidate 12:48:44 events are the most informative about 12:48:48 market efficiency? 12:48:50

A. That's correct. 12:48:52

Q. Now, the four news dates you 12:48:59 selected for your event study here are 12:49:01 the four dates alleged to be corrective 12:49:04 events by plaintiffs, correct? 12:49:07

MR. HALL: Objection. 12:49:10

A. No. Well, no, not anymore. 12:49:17 I don't think that January 28th -- I 12:49:21 think January 28th was dismissed as a 12:49:29 collective disclosure, so I considered 12:49:31 it an important event. The news that 12:49:33 was coming out was important enough 12:49:35 that that date would be a good 12:49:37

Page 137

S. FEINSTEIN

candidate for testing market 12:49:39 efficiency, but I think that it was 12:49:41 determined by the judge not to be 12:49:45 relevant for the allegations or 12:49:47 damages. 12:49:51

Q. Just so we're clear, my 12:49:51 question to you was, you understand the 12:49:56 four dates you selected are the four 12:49:59 dates on which corrective events 12:50:01 occurred according to the complaint, 12:50:04 according to plaintiffs? 12:50:06

MR. HALL: Objection. 12:50:07

A. Yes, originally. 12:50:12

Q. And was it just a coincidence 12:50:13 that the four dates you selected are 12:50:16 the four corrective disclosure dates 12:50:18 alleged in the complaint? 12:50:20

MR. HALL: Objection. 12:50:21

A. Probably not a coincidence at 12:50:22 all. This is a large company with, 12:50:24 that's, as characterized by the 12:50:34 analysts as fairly predictable. The 12:50:36 lawyers, apparently, were drawn to 12:50:41 those dates because they were -- well, 12:50:43

35 (Pages 134 - 137)

CONFIDENTIAL

Page 138

S. FEINSTEIN

for legal reasons, I mean, they were 12:50:49
anomalous, and apparently indicated 12:50:52
that there may have been fraud, but I 12:50:57
was drawn to them because they were big 12:50:59
news days. 12:51:03

Q. Well, you read the complaint 12:51:04
before conducting your event study, 12:51:09
right? 12:51:12

A. That's right. 12:51:12

Q. And you were aware, from the 12:51:13
allegations in the complaint, that Vale 12:51:15
Securities experienced highly negative 12:51:18
price changes on those four days, 12:51:20
right? 12:51:23

A. Well, what I was more 12:51:24
interested in is that they were big 12:51:26
news days. They were very, very big 12:51:29
news days. There was, I mean, it's 12:51:35
indisputable that on those days, there 12:51:37
was a heavy flow of news that was, on 12:51:42
balance, either positive or negative; 12:51:46
in this case negative; and therefore, 12:51:48
they were ideal candidates for testing 12:51:51
whether the securities traded 12:51:53

Page 139

S. FEINSTEIN

efficiently. 12:51:57

I would imagine the lawyers 12:52:00
were interested in days where 12:52:01
misrepresentations and omissions were 12:52:07
corrected, or maybe days on which their 12:52:09
clients and plaintiffs, lead plaintiff 12:52:12
suffered losses, but we were drawn to 12:52:16
the days, those days those events 12:52:18
occurred, and they served different 12:52:22
purposes for different people. For me 12:52:23
they served the purpose of being 12:52:25
indisputably big, adverse news days. 12:52:27

Q. My question -- thank you. My 12:52:34
question was, prior to designing your 12:52:37
event study, were you aware that the 12:52:39
four dates ultimately used, Vale 12:52:41
Securities experienced significant 12:52:46
negative price changes? 12:52:47

MR. HALL: Objection. 12:52:49

A. No, no. I was not aware of 12:52:51
any statistical significance 12:52:55
determination for any of those days 12:53:00
before I built my regression model and 12:53:04
ran the T-test. And numerous times I 12:53:07

Page 140

S. FEINSTEIN

find in other cases, I have found in 12:53:12
other cases that days that are alleged 12:53:16
to be corrective disclosure dates are 12:53:19
not statistically significant. 12:53:21

Didn't turn out to be the 12:53:24
case here with respect to the ADRs, but 12:53:26
nonetheless, I had no way of knowing if 12:53:28
they would be statistically significant 12:53:32
until I ran what's called the T-test. 12:53:33

All I knew going in was that 12:53:36
these were big information days that 12:53:39
indisputably were important news and 12:53:42
negative news, and therefore ideal 12:53:45
candidates for running a market 12:53:47
efficiency event study. 12:53:49

Q. So is it your testimony that 12:53:51
you reached that conclusion independent 12:53:54
of the allegations in the complaint? 12:53:56

A. That there were statistically 12:53:58
significant drops on those days? Yes. 12:54:01
I don't think there's any -- I don't 12:54:05
think the complaint tells you whether 12:54:06
or not those drops were statistically 12:54:07
significant. 12:54:10

Page 141

S. FEINSTEIN

Q. Well, let me ask you this: 12:54:10
Just as a general matter, would a 12:54:13
security price drop of 20 percent, in 12:54:16
your experience, qualify as 12:54:19
statistically significant on a given 12:54:21
day? 12:54:22

MR. HALL: Objection. 12:54:24

A. That's true. Something that 12:54:24
big usually would be, that's right. 12:54:29

Q. How about 8 percent on a 12:54:30
different day? 12:54:31

A. Not necessarily. Could be, 12:54:32
depends on the stock. I don't know, 12:54:33
for Vale, probably yes, because it was 12:54:36
so stable. 12:54:38

However, something like a 12:54:48
20 percent drop or an 8 percent drop, 12:54:53
after separating out market and sector 12:54:58
and currency effects using the 12:55:00
regression, might produce a residual 12:55:02
return that's very small, very modest. 12:55:10
I mean, that 20 or 8 or some number in 12:55:13
that range might not be because of 12:55:17
company specific information, and just 12:55:20

36 (Pages 138 - 141)

CONFIDENTIAL

Page 186

S. FEINSTEIN

Dr. Tabak writes, "To test the general     14:22:07
proposition of whether a stock price     14:22:09
responds to news, it is necessary to     14:22:11
examine the stock price responses to     14:22:12
two different groups of dates; those     14:22:15
with news and those without news."  Do     14:22:18
you see that?     14:22:22
   A.   I see that.     14:22:24
   Q.   Do you agree with that?     14:22:25
   A.   As a general principle, yes,     14:22:29
but not with a specific manner of     14:22:33
addressing it that he then follows     14:22:36
with.  So for example, my event study     14:22:39
and the event studies described by     14:22:42
Professor Fama do compare news days to     14:22:47
non-news days, because the regression     14:22:50
is estimated across all days that     14:22:52
include all the non-news days, and then     14:22:54
whether or not the news day or the     14:22:57
selected event day stands out as     14:22:58
unusual against that backdrop is a     14:23:00
comparison of a news day to a non-news     14:23:02
day.     14:23:04
        But I know, that's not, so     14:23:05

Page 187

S. FEINSTEIN

there are more -- let me just leave it     14:23:11
at that.  So as a general proposition I     14:23:14
do agree, but I would also want to     14:23:17
point out there are different ways of     14:23:19
making that comparison.  There's not     14:23:20
just one way to make that comparison.     14:23:22
   Q.   If you read down further in     14:23:26
paragraph 23, on the top of page 14,     14:23:28
Dr. Tabak explains that establishing     14:23:31
two such groups -- that is, days with     14:23:34
news and days without news -- "is     14:23:40
necessary, because even if the market     14:23:48
for a stock were not efficient, there     14:23:51
would generally still be some news days     14:23:54
that were randomly associated with     14:23:57
stock price movements."  Do you agree     14:23:59
with that observation?     14:24:05
   A.   Well, I do agree that it is     14:24:05
possible for some news days to randomly     14:24:07
be associated with stock price     14:24:08
movements, but you don't necessarily     14:24:12
have to run the type of test that -- I     14:24:14
disagree with the methodology in the     14:24:16
sentence before that being a necessary     14:24:17

Page 188

S. FEINSTEIN

way of conducting a market efficiency     14:24:21
event study.  There are at least two     14:24:26
different ways, and probably more ways     14:24:29
of running valid market efficiency     14:24:32
event studies, his proposed method     14:24:34
being only one.     14:24:35
   Q.   Well, what method did you     14:24:37
apply here to compare news days to     14:24:39
non-news days in the Vale Securities?     14:24:41
   A.   I ran a regression across all     14:24:45
days, using control variables or dummy     14:24:48
variables to isolate out potentially     14:24:52
important news days, so the regression     14:25:00
does establish the normal range of     14:25:02
movement on non-news days, and then the     14:25:03
event study compares the stock price     14:25:06
movements on the news days, the four     14:25:08
selected event days, to what's typical     14:25:11
for non-news days to see if they -- if     14:25:14
the news days stand out, and in fact     14:25:17
they did.  They stood out far, you     14:25:19
know, to a highly significant degree.     14:25:22
        So the regression model, the     14:25:25
regression model establishes the     14:25:27

Page 189

S. FEINSTEIN

control, the regression model     14:25:29
establishes -- the regression model     14:25:32
uses all non-news days as a control     14:25:33
group, and it compares all the days in     14:25:36
the class period, all typical days to     14:25:39
the unusual news days.     14:25:42
   Q.   Dr. Feinstein, did you do     14:25:43
anything in your analysis to remove any     14:25:48
possible subjectivity on your part as     14:25:51
to which news days were selected for     14:25:55
examination?     14:25:59
        MR. HALL:  Objection.     14:25:59
   A.   Yes, a number of things.  One     14:26:05
is I picked days that, frankly, before     14:26:08
today I would think were indisputably     14:26:10
important news days.  It's hard to     14:26:16
fathom that somebody would consider the     14:26:19
dam break and the immediate aftermath     14:26:19
flow of information to be unimportant     14:26:22
to Vale and Vale's investors, so I     14:26:24
picked event days that are     14:26:26
indisputably, objectively important     14:26:30
news days.     14:26:31
   Q.   And it's your testimony that     14:26:47

48 (Pages 186 - 189)

CONFIDENTIAL

Page 238

S. FEINSTEIN

earnings announcements were not -- were 15:32:44 uniformly unsurprising, uniformly 15:32:47 uneventful in this case based on the 15:32:51 information in the news analysis. 15:32:53

I've seen people use other 15:32:56 buckets. Essentially, they call them 15:32:58 buckets or screens or groups. One has 15:33:00 to be careful. I mean, if you start, 15:33:06 you know, if you do anything novel, you 15:33:08 look like you're data mining, and it 15:33:10 looks like you're being too creative, 15:33:13 so I didn't want to do something too 15:33:15 novel. But also, well, two groups that 15:33:18 I know Dr. Tabak uses are 8Ks or 6ks, 15:33:24 and sometimes just appearance of 15:33:28 news -- of the name of the company in 15:33:30 news articles. And I don't think those 15:33:32 are good methodologies. You capture 15:33:35 too many non-news days in that 15:33:39 approach. 15:33:41

Q. In other cases in which 15:33:41 you've analyzed market efficiency, 15:33:45 you've performed collective event 15:33:49 studies, correct? 15:33:51

Page 239

S. FEINSTEIN

MR. HALL: Objection. 15:33:51

Q. I think the answer was yes; 15:34:11 is that right, Doctor? 15:34:13

A. Yes. 15:34:14

Q. In fact, it would be fair to 15:34:14 say that in the majority of your prior 15:34:25 engagements where you were analyzing 15:34:26 market efficiency, you've conducted a 15:34:28 collective event study; is that right? 15:34:29

A. Not in the majority over the 15:34:32 course of my career, but reasonably, 15:34:34 the majority over the last couple 15:34:36 years. The methodology has to fit the 15:34:38 facts and circumstances of the case. 15:34:44 So you can't just apply a methodology 15:34:45 blindly, it's got to fit. 15:34:48

And in this case, grouping 15:34:50 earnings announcements as a high 15:34:53 information flow date or treating them 15:34:55 like a high information flow group 15:34:58 would have been inappropriate, because 15:35:00 for this company those dates were not 15:35:02 that. 15:35:07

Q. Well, isn't it true that the 15:35:08

Page 240

S. FEINSTEIN

aim of a collective event study is to 15:35:14 identify dates when you would expect 15:35:17 higher information flow regardless of 15:35:21 the news released; is that correct? 15:35:25

MR. HALL: Objection. 15:35:30

A. Well, you -- the buckets that 15:35:30 you construct have to be justified as 15:35:40 one bucket being abnormally high 15:35:46 information flow, and the other bucket 15:35:50 being everything else, or everything 15:35:51 more ordinary. 15:35:54

Q. Well, it's the abnormally 15:35:56 high that I'm having trouble with. 15:35:57 Isn't it just higher than normal, 15:35:59 meaning -- 15:36:03

MR. HALL: Objection. 15:36:04

Q. -- I mean, are you comparing 15:36:04 days where there's no news to days 15:36:08 where there's a higher flow of news? 15:36:11 Is that the sort of overarching aim of 15:36:13 a collective event study, or is it 15:36:16 something different? 15:36:18

A. No, you got it right, that's 15:36:19 about right, what you just said. 15:36:20

Page 241

S. FEINSTEIN

Q. Okay. And you agree with 15:36:21 this statement, just to -- I'm quoting 15:36:24 you to yourself, out of fairness, but 15:36:26 in the Grupo Televisa case in your 15:36:33 report you stated "Each event" -- this 15:36:35 is about a collective event study, I 15:36:37 apologize. "Each event need not be so 15:36:39 momentous as to be expected to elicit a 15:36:43 significant ADR price reaction; rather, 15:36:45 the group of events is selected such 15:36:47 that the group as a whole is 15:36:50 characterized as having higher 15:36:52 information flow than ordinary days." 15:36:54

Do you agree with that 15:36:56 general principle, as stated in your 15:36:58 Grupo Televisa report? 15:37:01

A. Right, for cases, facts and 15:37:04 circumstances where that test is 15:37:06 appropriate, right. It fit the Grupo 15:37:07 test -- case, rather. That methodology 15:37:13 did. 15:37:15

Q. And why doesn't it -- why 15:37:16 doesn't that methodology fit this case, 15:37:28 in your opinion? 15:37:30

61 (Pages 238 - 241)

CONFIDENTIAL

Page 242

S. FEINSTEIN

A.   This company had been    15:37:31 predictable, its earnings announcements    15:37:34 were uneventful.    15:37:36

Q.   I understand that that was    15:37:43 your assessment, but how do you -- what    15:37:44 does that assessment have to do with    15:37:47 the notion of identifying days that, as    15:37:50 a whole, have higher information flow    15:37:56 than ordinary days?    15:37:59

A.   I'm not sure I understand the    15:38:04 question.  I mean --    15:38:06

Q.   It seems like there are two    15:38:07 different things you're talking about,    15:38:09 right?  Clearly you agree that as a    15:38:10 general matter, earnings days for Vale,    15:38:12 those dates as a whole had a higher    15:38:16 flow of information, as opposed to    15:38:19 ordinary days?    15:38:23

MR. HALL:  Objection.    15:38:25

A.   But not, you know,    15:38:26 objectively evaluated, not so much that    15:38:29 you would expect a higher incidence of    15:38:32 significant stock price reactions among    15:38:36 those days.    15:38:38

Page 243

S. FEINSTEIN

Q.   Okay, I just -- what I'm    15:38:40 stumbling on is that sort of, that    15:38:46 seems to put the cart before the horse,    15:38:48 right?  I understand that was your    15:38:50 conclusion here based on reviewing    15:38:51 analyst reports and other things, but I    15:38:54 understood the purpose of a collective    15:39:01 event study to be achieving a different    15:39:03 purpose.    15:39:06

MR. HALL:  Objection.    15:39:07

A.   Well, the purpose is to    15:39:08 identify -- the purpose is to assess    15:39:12 whether there's evidence that the stock    15:39:17 is reacting to information.  But if we    15:39:21 know that there's not a higher flow of    15:39:23 information or reason to believe a    15:39:25 higher expected incidence of    15:39:28 significant movements among earnings    15:39:33 announcement dates, the test wouldn't    15:39:36 be informative.    15:39:38

Q.   Right, but plainly, on    15:39:40 earnings release dates, objectively,    15:39:40 there was a higher flow of information    15:39:43 concerning Vale, correct?    15:39:45

Page 244

S. FEINSTEIN

MR. HALL:  Objection.    15:39:46

A.   Yes.    15:39:46

Q.   And it sounds like what    15:39:49 you're saying is notwithstanding that    15:39:50 higher flow of information, you    15:39:52 determined that that higher flow was    15:39:54 not material, is what it sounds like,    15:39:59 right?    15:40:02

A.   No, the --    15:40:02

MR. HALL:  Objection.    15:40:04

A.   The information was highly    15:40:04 economically material, but it wasn't    15:40:08 unexpected or surprising or momentous.    15:40:11

Q.   Okay.  I would like to turn    15:40:19 now to the Vale notes specifically.  I    15:40:41 know we've touched upon them throughout    15:40:43 today, but so specifically your    15:40:46 assessment of the market efficiency    15:40:51 with respect to the Vale notes.    15:40:54 Let's start with    15:40:56 counter-factor one, trading volume.    15:40:59 Dr. Feinstein, it's true that when    15:41:02 calculating bond value trading volume,    15:41:04 one must remove duplicative volume for    15:41:08

Page 245

S. FEINSTEIN

interdealer trades?    15:41:12

A.   Well, duplicative volume, but    15:41:13 not necessarily interdealer trades.    15:41:23

Q.   Are you thinking of a    15:41:32 circumstance in which interdealer    15:41:33 trades are not duplicative of some    15:41:37 other trade that you're already    15:41:39 calculating?    15:41:41

A.   Well, the way the trace data    15:41:42 works is both sides of the world, if    15:41:44 they are dealers, have to report the    15:41:46 trade to FINRA, and it will show up as    15:41:51 two separate trades, when in fact it    15:41:56 was the same trade between two    15:41:59 counterparties.  So that's the    15:42:01 duplicativeness I removed.    15:42:03 However, if a dealer -- let's    15:42:09 say a particular dealer or broker has a    15:42:12 customer who wants a Vale bond, and    15:42:14 that dealer then goes to the bond    15:42:20 market and buys it from another dealer    15:42:21 in order to deliver it to his or her    15:42:24 customer.  So there would be two trades    15:42:27 there, one from dealer A to dealer B,    15:42:29

62 (Pages 242 - 245)

CONFIDENTIAL

Page 246

S. FEINSTEIN

and then from dealer B to the customer. 15:42:33 Those are both -- those would not be 15:42:35 duplicative. I mean, they serve the 15:42:39 purpose of getting the bond from one 15:42:42 another to another customer. 15:42:44

But along the way, you've got 15:42:47 sophisticated bond market participants 15:42:50 evaluating the price, and I think both 15:42:52 should be included. 15:42:54

Q. Understood. So just so we're 15:42:54 clear, you have, or purport to remove 15:42:57 all duplicate trades from the trace 15:43:00 data or the Vale notes, correct? 15:43:05

A. Right, meaning that if the 15:43:07 same trade was reported twice, which is 15:43:08 usually the case, I would eliminate one 15:43:11 of them. One of the reports, not one 15:43:13 of the trades, but one of the reports 15:43:15 of the trades. 15:43:17

Q. Right. So on paragraph 332 15:43:17 of your report, you indicate that you 15:43:20 removed entries with "audit trail only" 15:43:22 or "position transfer" in the special 15:43:27 processing field; is that right? It's 15:43:31

Page 247

S. FEINSTEIN

on paragraph 332? 15:43:34

A. Paragraph 332 says, "All 15:43:38 submissions which identified as audit 15:43:40 trail only or position transfer in the 15:43:43 special processing CD field are 15:43:45 discarded from the trace data set." 15:43:48

Q. And notwithstanding that 15:43:50 representation in paragraph 332, are 15:43:53 you aware that you did not actually 15:43:54 remove all position transfer trades 15:43:57 from the Vale notes? 15:43:59

A. I certainly sought to. 15:44:02

Q. Now, taking my statement as 15:44:03 true for present purposes, if you did 15:44:07 not correctly remove all position 15:44:09 transfer trades, would your calculation 15:44:12 of daily and weekly trading volume be 15:44:15 incorrect? 15:44:17

MR. HALL: Objection. 15:44:19

A. I would have to check to see. 15:44:24 First of all, I don't necessarily 15:44:25 accept your premise, but if it's true, 15:44:27 I would have to see why it was true 15:44:30 before knowing the answer to your 15:44:32

Page 248

S. FEINSTEIN

question. 15:44:33

Q. No, I understand you're not. 15:44:33 I'm not asking you to verify the 15:44:39 statement that not all position trade 15:44:41 transfers were removed. I'm saying if 15:44:42 you accept that premise for purposes of 15:44:44 this question, would that not result in 15:44:46 the incorrect calculation of daily and 15:44:47 weekly trading volume? 15:44:50

MR. HALL: Objection. 15:44:52

A. Not necessarily. I would 15:44:55 need to know why a particular trade 15:44:58 that may have been identified this way 15:44:59 was not removed. 15:45:00

Q. Okay. I guess we'll circle 15:45:01 back to that. I just for the record 15:45:40 want to make clear, paragraph 332 says 15:45:41 "All submissions identified as audit 15:45:44 trail only or position transfer are 15:45:49 discarded from the trace data sets." 15:45:52 It sounds like your answer, you're 15:45:53 allowing for the possibility that 15:45:55 certain trades marked position transfer 15:45:56 you did not discard from the trace 15:45:58

Page 249

S. FEINSTEIN

data, and you need to follow up on 15:46:01 that. 15:46:06

MR. HALL: Objection. 15:46:06

A. You did not read paragraph 15:46:06 332 correctly. It says, "All 15:46:13 submissions with identified as audit 15:46:16 trade only or position transfer in the 15:46:19 special processing CD field are 15:46:22 discarded from the trace data set." 15:46:25

Q. Right. 15:46:26

A. So there's a reason, if it's 15:46:27 a position trade that wasn't identified 15:46:30 as a position trade in the special 15:46:31 processing CD field, there may have 15:46:35 been a reason to keep it, and I'll look 15:46:37 into that. 15:46:39

Q. Okay. Turning to Krogman 15:46:40 factor three, the bid ask spread for 15:46:47 the Vale notes, you do not examine the 15:46:49 third Krogman factor for the notes; is 15:46:54 that right? 15:46:57

A. Right. That data is not 15:46:57 available with bid ask spreads broken 15:47:02 out the way it is for a stock. The bid 15:47:04

63 (Pages 246 - 249)

CONFIDENTIAL

Page 250

S. FEINSTEIN

and the ask are built into the actual   15:47:06
quoted price that's reported, but not   15:47:10
tabulated separately the way it is for   15:47:17
a stock or an ADR.   15:47:20

Q.   And paragraphs 232 and 233 of   15:47:23
your report, you conclude that there   15:47:28
was an "active" market for the volume   15:47:31
notes compared to other bonds; is that   15:47:38
right?   15:47:40

A.   Yes.   15:47:40

Q.   And Dr. Feinstein, would you   15:47:40
expect there to be at least some   15:47:41
trading activity for an actively traded   15:47:43
bond on dates that are associated with   15:47:45
important events and announcements?   15:47:50

A.   Sometimes yes, but not   15:47:51
always.  It could be that the investors   15:47:55
holding the bonds on those days,   15:48:00
observing that the price of similar   15:48:05
bonds had already fallen, felt it was   15:48:08
best to hold on.  I mean, the loss was   15:48:13
suffered regardless of whether they   15:48:15
trade and realized the lost, or hold or   15:48:17
maintained the loss, so you can go   15:48:22

Page 251

S. FEINSTEIN

either way.   15:48:25

Q.   With respect to the notes   15:48:26
here, you recall that certain of the   15:48:26
seven different notes did not trade at   15:48:33
all on some of the four special dates   15:48:35
you've identified; is that right?   15:48:37

A.   No, I wouldn't characterize   15:48:39
it that way.  You're close to the right   15:48:42
way of characterizing it, but not   15:48:44
exactly.  There's two bonds -- the   15:48:47
missing -- not missing, but the missing   15:48:56
data, essentially, or the missing was   15:48:59
for two bonds.  One of them didn't have   15:49:02
a daily return because it didn't trade   15:49:05
the day before the dam break.  So out   15:49:07
of seven bonds, five had traded on   15:49:11
every single one of those days.  I have   15:49:15
to look at -- what I recall is we're   15:49:19
only talking about two bonds.  One of   15:49:20
them wasn't even on the event date   15:49:22
where there was missing data, it was   15:49:25
the prior date, which made it   15:49:27
impossible to calculate a single day   15:49:28
return, and one of the bonds also had   15:49:31

Page 252

S. FEINSTEIN

trading, but it was after the -- it was   15:49:33
off hours.  It was after the 4:00 close   15:49:37
period, so there was actually a trade,   15:49:40
but it wasn't during within the time   15:49:42
period that I was confining the price   15:49:44
calculations to for purposes of   15:49:46
matching up movements to events.   15:49:49

Q.   Right.  So if you use   15:49:51
multi-day returns when a bond did not   15:49:54
trade on a curative disclosure date,   15:49:56
then how can you conclude that the   15:50:04
price did not decrease on the day prior   15:50:06
to the disclosure?   15:50:08

A.   Oh, no, it was -- let's get   15:50:09
the exact date.  It was, I mean if the   15:50:11
bond didn't trade on January 24th, but   15:50:16
did trade on the 25th, you won't have a   15:50:19
one-day return for the 25th.  But it   15:50:25
did trade.  Let's find that section of   15:50:33
the report.   15:50:41

Q.   Okay, I think it's, let me   15:50:41
see if I can help you here.  Paragraph   15:50:44
134.   15:50:49

A.   134?   15:50:56

Page 253

S. FEINSTEIN

Q.   Maybe that's wrong.   15:50:58

A.   Should be 260 something.   15:50:59

Q.   134, just discussing what   15:51:01
happens on January 25th, that was the   15:51:03
day of the dam collapse.   15:51:05

A.   Okay.  In paragraph 273, so   15:51:17
the TAE3 note did not trade on   15:51:20
January 24th.  So I used a two-day   15:51:25
return from the 23rd to the 25th, and   15:51:32
it was a significant drop.  There's no   15:51:37
way anyone reasonably can think that   15:51:40
there was a significant drop on the   15:51:42
missing day, the 24th, and that the   15:51:44
significant drop had nothing to do with   15:51:47
the dam break on the 25th.  That's   15:51:49
just, that's unreasonable.   15:51:52

So the fact that it fell from   15:51:55
the 23rd to the 25th proves that it   15:51:56
fell because of the news on the 25th.   15:52:00
I mean, if you want to keep it as an   15:52:06
open-ended hypothesis that maybe the   15:52:07
stock, maybe the bond didn't fall on   15:52:12
the 25th, but it fell significantly on   15:52:14
the 24th, I would just think that's an   15:52:18

64 (Pages 250 - 253)

CONFIDENTIAL

Page 282

S. FEINSTEIN

or there's legal reason not to?   16:43:31

Q.   That it's infeasible, from   16:43:34 your perspective as an economist, to   16:43:36 apply a common damages methodology to a   16:43:39 proposed securities class.  I'm asking   16:43:44 just generally, right, you've certainly   16:43:51 seen that situation before in your   16:43:53 experience, right?   16:43:54

A.   I haven't, not that I can   16:43:55 think of now.  I have never seen a   16:43:57 class action securities case where the   16:44:04 out-of-pocket damage model was   16:44:06 infeasible or impossible to be applied.   16:44:12

Q.   Never, not once over the   16:44:14 25 years serving as an expert have you   16:44:18 witnessed a proposed securities class   16:44:22 action incapable of a damages model   16:44:23 that is applied on a classified basis?   16:44:29

A.   Well, I've heard of, I mean,   16:44:31 there have been decisions where a judge   16:44:35 would determine that there's not one   16:44:37 theory of liability, that there are   16:44:42 multiple theories of liability, and   16:44:44 therefore a single model can't address   16:44:46

Page 283

S. FEINSTEIN

both theories of liabilities.  I've   16:44:51 seen that.  So that doesn't apply to   16:44:54 this case.  In this case there's a   16:44:56 single theory of liability.   16:44:58

Q.   And what is that single   16:44:59 theory of liability here, that, as you   16:45:02 understand it?   16:45:05

MR. HALL:  Objection.   16:45:07

A.   That the security prices were   16:45:07 artificially inflated because of   16:45:09 allegedly fraudulent misrepresentations   16:45:12 and omissions.  Ultimately, there were   16:45:15 corrective disclosures that provided   16:45:18 the truth to the market.  The   16:45:20 securities prices fell with that new   16:45:22 information.  Investors who had bought   16:45:24 when the security prices were inflated,   16:45:26 therefore overpaid, and the amount they   16:45:30 overpaid was lost when the price   16:45:33 corrected with the disclosure.  And the   16:45:37 out-of-pocket damage model directly   16:45:40 addresses that theory of liability.  It   16:45:42 was directly appropriate for that   16:45:46 theory of liability.   16:45:48

Page 284

S. FEINSTEIN

Q.   You understand that there are   16:45:49 different -- that plaintiffs here   16:45:51 allege different types of   16:45:52 misrepresentations though, right?   16:45:55

A.   No.  My understanding is that   16:45:57 --   16:46:00

MR. HALL:  Objection.   16:46:00

A.   -- the complaint is written   16:46:01 on behalf of all class members, and   16:46:03 lays out a list of misrepresentations   16:46:07 and omissions that allegedly inflated   16:46:11 the securities prices.  My   16:46:13 understanding at least is it has the   16:46:15 same theory of liability for all   16:46:18 proposed class members.   16:46:20

Q.   So let's just take   16:46:26 January 25th, for example, 2019, the   16:46:29 day of the collapse.  How do the events   16:46:31 of that day relate to plaintiff's   16:46:35 single theory of liability, as you   16:46:37 understand it?   16:46:39

A.   That that --   16:46:41

MR. HALL:  Objection.   16:46:44

A.   -- development, that   16:46:45

Page 285

S. FEINSTEIN

development, that event informed the   16:46:46 marketplace that representations that   16:46:49 had been made about the safety,   16:46:52 security, procedures, protocols,   16:46:54 conformity to regulations and standards   16:46:57 regarding mine -- mine dam stability   16:47:00 and safety were untrue, or had a high   16:47:05 likelihood of being untrue.   16:47:12

Q.   So the dam collapse itself   16:47:14 was a corrective disclosure, as you   16:47:17 understand it?   16:47:18

A.   Yes.   16:47:19

MR. HALL:  Objection.   16:47:20

A.   Yes, I mean, it wasn't a full   16:47:24 corrective disclosure, because not all   16:47:25 the alleged misrepresentations and   16:47:31 omissions were corrected by it, nor was   16:47:32 the market fully apprised of the   16:47:35 severity of the defects and   16:47:40 consequences.   16:47:46

Q.   Now, you understand that   16:47:48 there are certain challenge statements   16:48:02 at issue here that didn't occur until   16:48:04 after the dam collapsed, right?  We   16:48:07

72 (Pages 282 - 285)

CONFIDENTIAL

Page 286

S. FEINSTEIN

talked about this earlier. I think you were not aware of that prior to today, but you testified earlier today upon learning of that, correct?

MR. HALL: Objection.

A. So the question is am I aware of that, I'll take your word for it, sure. You froze for a second.

Q. I froze, you froze. I didn't hear it, I don't know if you responded, but the court reporter can just read it back if you did.

(Requested portion of the record was read back.)

Q. I'm sorry I missed that. Okay, I apologize, I lost my train. How would you propose then, Dr. Feinstein, to go about constructing a common damages methodology to account for a corrective disclosure that preceded an alleged misstatement?

MR. HALL: Objection.

A. There's a number of -- I would calculate an inflation ribbon. I

Page 287

S. FEINSTEIN

would calculate what the artificial inflation was on each day of the class period. Artificial inflation is the difference between the price that actually is observed to be prevailing for the security in the marketplace and what the price would have been had there already been full corrective disclosure, so that there was no misinformation remaining in the marketplace, and I can use a variety of valuation tools and a variety of statistical tools for calculating both the but-for price and the artificial inflation ribbon.

Q. And just so we're clear, you haven't done any of that analysis yet, correct? You haven't performed an artificial inflation event study here, have you?

A. Well, no --

MR. HALL: Objection.

A. I wouldn't call it an artificial inflation event study.

Page 288

S. FEINSTEIN

Event study is one of the tools that can be applied in order to measure the artificial inflation. I have run an event study, but I didn't do it for the purposes of calculating artificial inflation, and you are correct, I have not done a damages computation yet. I mean, the model exists, I know the model is feasible, because it involves standard valuation tools. The model is essentially statutory, determined by caselaw in a common use and class actions, and the financial tools that are used for implementing that standard and articulated model are commonly used tools that are available that are used every day by financial analysts and valuation practitioners on a whole universe of financial instruments they're trading. So that's why I know it's feasible.

I know it exists because it exists, and is used in virtually all class action cases, and I know it's

Page 289

S. FEINSTEIN

feasible because it uses tools that are commonly used all the time in a wide variety of applications.

Q. And is it your testimony, Dr. Feinstein, that you will construct a single damages model that calculates all damages following the alleged corrective disclosures on the four special dates you've identified in your report?

MR. HALL: Objection.

A. Well, I haven't been asked to. I know that I could calculate damages for each of the securities for every class member using a common damage model. I can do that, although I haven't been asked to do it, so I don't know if I will be doing it.

Q. Okay.

A. Even though, I mean, the model calls for -- the model is the same formula, but the parameters of the model will differ depending on which security's being used. It's the same

73 (Pages 286 - 289)

CONFIDENTIAL

Page 290

S. FEINSTEIN

model, but it's parameterized 16:52:44 differently for different securities. 16:52:46 But then for every investor in any 16:52:48 particular security, the parameterized 16:52:51 model is applied commonly, and all that 16:52:54 differs from one investor to another is 16:53:00 when they bought the securities, when 16:53:00 they sold the securities, if they sold 16:53:02 them, and at what prices. 16:53:03

Q. How would this model account 16:53:12 for the existence of alleged 16:53:14 misstatements that both precede and 16:53:17 proceed some of the alleged corrective 16:53:23 disclosures here? 16:53:25

MR. HALL: Objection. 16:53:26

A. It would take into account 16:53:26 what -- well, there are two. The model 16:53:31 is -- one of the components of the 16:53:35 model is what's called the artificial 16:53:39 inflation ribbon. The artificial 16:53:41 inflation ribbon is the time series of 16:53:45 artificial inflation, and artificial 16:53:47 inflation is the difference between the 16:53:48 actual price that is observably -- that 16:53:49

Page 291

S. FEINSTEIN

observably prevailed in the marketplace 16:53:52 for the security, so that's no problem. 16:53:54 That's easy. We observe what prices 16:53:59 prevailed, and we can also observe -- 16:54:03 the claims administrator can observe 16:54:07 from confirmation statements and such 16:54:10 what prices were transacted at for 16:54:12 claimants. 16:54:14

The other part of the 16:54:16 artificial inflation ribbon is the 16:54:19 but-for price, what would the price 16:54:21 have been if there had been full truth. 16:54:23 Well, that's essentially valuation 16:54:25 analysis under an alternative scenario. 16:54:28 That's done all the time for every 16:54:31 security that's out there, and right 16:54:33 now, as we sit here, there are 16:54:36 financial analysts that are valuing 16:54:39 Apple stock under a wide variety of 16:54:40 hypothetical scenarios. They're 16:54:43 valuing Tesla stock under a wide 16:54:44 variety of hypothetical scenarios. 16:54:46

I would also evaluate Vale 16:54:47 stock under the hypothetical scenario 16:54:51

Page 292

S. FEINSTEIN

that there had been no 16:54:52 misrepresentations and omissions for 16:54:54 each day in the class period, both 16:54:56 before the dam break and after the dam 16:54:58 break. Both before corrective 16:55:01 disclosures, after corrective 16:55:03 disclosures, before certain 16:55:05 misrepresentations, after 16:55:07 misrepresentations. I would look at 16:55:08 the information that would have been in 16:55:12 the market. I would have -- I would be 16:55:13 able to look at the information that 16:55:20 was in the market, that would have been 16:55:22 in the market had there been full 16:55:23 disclosure and value, what the stock 16:55:25 would have been had that information 16:55:27 been in the market. And whereas 16:55:28 financial analysts and valuation 16:55:31 experts are doing this all the time, a 16:55:33 forensic analyst has the added 16:55:35 advantage of also using event study 16:55:37 analysis that identifies how the stock 16:55:39 and bond prices did move when 16:55:43 information became available, or when 16:55:45

Page 293

S. FEINSTEIN

misrepresentations were made. 16:55:48

Q. I want to go back to your 16:56:00 reference to the single theory of 16:56:02 liability here. You'll agree that an 16:56:03 identified corrective disclosure need 16:56:21 not cure every alleged misstatement in 16:56:28 a case, right? 16:56:30

MR. HALL: Objection. 16:56:30

A. That's true, some corrective 16:56:31 disclosures are only partially 16:56:33 corrective. And that seems to be the 16:56:35 case here in this case. 16:56:37

Q. Right, so in this case you 16:56:39 have multiple alleged 16:56:41 misrepresentations, multiple alleged 16:56:42 curative disclosures, correct? 16:56:44

A. Well, a handful of corrective 16:56:45 disclosures, but more than one, yes. 16:56:49

Q. Right. And you're -- in 16:56:51 attempting to construct a damages 16:56:54 methodology, you're going to have to 16:56:58 match the alleged misrepresentations to 16:57:01 their respective curative disclosures, 16:57:02 correct? 16:57:05

74 (Pages 290 - 293)

CONFIDENTIAL

Page 294

S. FEINSTEIN

MR. HALL: Objection.    16:57:06

A.   Well, I'm not constructing a    16:57:06 damage methodology. I'm identifying    16:57:10 one that's commonly used and certainly    16:57:12 fits the facts of this case. I would    16:57:14 be implementing that damage methodology    16:57:19 if I were asked to, and it's not    16:57:21 necessary -- well, one corrective    16:57:25 disclosure could correct a variety of    16:57:32 misrepresentations and omissions. So    16:57:37 it's not always necessary to match them    16:57:40 up one against the other.    16:57:43

Q.   You will agree, though, that    16:57:44 an identified corrective disclosure    16:57:48 cannot cure a misstatement that hasn't    16:57:51 been made yet, right?    16:57:53

MR. HALL: Objection.    16:57:56

A.   It's, you know, I can't agree    16:58:03 to it as a general principle. It's    16:58:07 altogether possible that a corrective    16:58:09 disclosure would make a subsequent    16:58:11 statement that did have impact on the    16:58:14 stock price, not have impact on the    16:58:17 stock price. I mean, that would be --    16:58:19

Page 295

S. FEINSTEIN

that could be the outcome of the    16:58:23 valuation analysis, so as a general    16:58:24 statement, I can't accept it without    16:58:26 exception for every possible way of it    16:58:30 being presented.    16:58:34

Q.   I think earlier in your    16:58:35 testimony you spoke generally about the    16:58:47 concept of passive investing -- oh, did    16:58:49 I break up?    16:58:56

A.   I think we talked    16:58:59 about passive investing.    16:59:02

Q.   I paused in the middle of my    16:59:03 question because I thought I had frozen    16:59:05 again. Let me restate that.    16:59:07

Earlier in your testimony we    16:59:09 had talked about passive investing in    16:59:10 the context of the Babson College Fund,    16:59:14 specifically with respect to index    16:59:16 investing. Do you recall that?    16:59:20

MR. HALL: Objection.    16:59:21

A.   Oh, well, we were not a    16:59:21 passive fund. Unallocated money was    16:59:29 invested passively, but most of the    16:59:32 money was actively allocated.    16:59:35

Page 296

S. FEINSTEIN

Q.   When you say "unallocated    16:59:37 money," what do you mean by that?    16:59:41

A.   Well, there were position    16:59:43 limits. For example, no security could    16:59:45 have more than 5 percent of the funds    16:59:47 money, capital. And so that would mean    16:59:52 you would need at least 20 active    16:59:59 positions to fully advocate all the    17:00:01 money to active positions. But if the    17:00:03 students had only researched 15 stocks,    17:00:06 they might have 75 percent of the money    17:00:08 allocated to active positions, and then    17:00:10 we would have 25 percent waiting to be    17:00:13 allocated actively, and the interim    17:00:16 would be in a passive sector fund.    17:00:19

Q.   So Dr. Feinstein, if you were    17:00:22 to perform an event study in this case    17:00:53 for purposes of calculating damages,    17:00:55 you would use either a single-factor    17:00:59 model or a multifactor model; is that    17:01:02 correct?    17:01:05

MR. HALL: Objection.    17:01:06

A.   I haven't crossed that bridge    17:01:06 yet. But I think it might be -- well,    17:01:12

Page 297

S. FEINSTEIN

the way you phrased it, the answer is    17:01:17 yes, it may be single-factor, it may be    17:01:19 multifactor.    17:01:23

Q.   Sitting here today, do you    17:01:23 have any expectation about which type    17:01:25 of model you would employ here?    17:01:26

A.   Well, usually I would use a    17:01:28 multifactor model, but we saw that    17:01:30 Dr. Tabak didn't -- he had fewer    17:01:33 factors in his model. I would revisit    17:01:36 maybe what he did and try to    17:01:39 investigate why he did it the way he    17:01:41 did before making a final decision.    17:01:43

Q.   Okay. And if you were to    17:01:48 perform an event study in this case for    17:01:50 purposes of loss causation and damages,    17:01:52 you would have to use industry or    17:01:57 market indices to account for economic    17:01:58 or sector-wide events, correct?    17:02:04

MR. HALL: Objection.    17:02:06

A.   The answer to that is the    17:02:06 same as my prior answer. That is the    17:02:08 difference between single and    17:02:12 multifactor models, what indices are    17:02:13

75 (Pages 294 - 297)

CONFIDENTIAL

Page 310

S. FEINSTEIN

Q. So for purposes of applying a common damages methodology, does it matter to you whether a plaintiff is adopting a materialization of the risk theory of loss causation, or a corrective disclosure theory of loss causation?

MR. HALL: Objection.

A. There's certain tasks that differ in the implementation of the model, but the model's the same model.

Q. Now, what if you have a case where a plaintiff is adopting both theories with respect to different challenge statements at issue?

MR. HALL: Objection.

A. It's the same model would apply, the same model is feasible. There may be different issues of confounding information that need to be addressed. That's sometimes what I see. But that the model and the fact that there's confounding information, that happens whether it's a

Page 311

S. FEINSTEIN

materialization of the risk allegation disclosure, or an announcement corrective disclosure.

So I guess really what I'm saying here is it really doesn't matter. The same model could handle both. The same model could handle a mix.

Q. In your experience as an expert, have you ever applied a common damages model in which a plaintiff has adopted both theories of lost causation to different challenge statements?

MR. HALL: Objection.

A. Well, let's be clear. When we're talking about -- the theories aren't really dramatically different. In fact, my understanding is that the vocabulary, the terminology calling it a materialization of the risk is sort of a construct of defense counsel, defense attorneys, generally. It's not necessarily embraced by everybody in the legal field. All it means is that

Page 312

S. FEINSTEIN

the corrective disclosure was an event, an event that informed the marketplace of the truth, rather than a statement informing the market of the truth. That's really the only difference between the two. And same damage model accommodates both.

Q. Okay. Other than to note my objection to your suggesting that defense counsel has developed this materialization of the risk theory, I would respectfully suggest it's plaintiff's counsel. I have no further questions for you, Dr. Feinstein. I appreciate your patience, so thank you.

MR. JORALEMON: Donee, I'm not sure if you have any questions for the witness.

MR. HALL: We have no questions, so thank you.

MR. JORALEMON: All right, terrific.

THE VIDEOGRAPHER: The time is approximately 5:31 p.m., this

Page 313

S. FEINSTEIN

concludes today's testimony. We are off the record.

(Time noted: 5:31 p.m.)

_____

STEVEN FEINSTEIN

Subscribed and sworn to before me this \_\_\_ day of _____, 2021.

_____

Notary public

79 (Pages 310 - 313)