**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE VALE S.A. SECURITIES LITIGATION | Case No.: 19-cv-526 (RJD) (SJB)<br><br>JURY TRIAL DEMANDED |

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF LEAD
PLAINTIFF'S MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF
CLASS REPRESENTATIVE AND CLASS COUNSEL**

**TABLE OF CONTENTS**

**Page(s)**

TABLE OF AUTHORITIES ........................................................................................ ii

I.    PRELIMINARY STATEMENT ...........................................................................1

II.   ARGUMENT.......................................................................................................3

    A.    The Proposed Class Satisfies The Predominance Requirement of Rule 23(b)(3) ..................................................................................................... 3

        1.    Lead Plaintiff Is Entitled To The *Basic* Presumption of Reliance ...............3

            a.    Professor Feinstein's Event Study Is Methodologically Sound And Strongly Supports Market Efficiency ..............................5

            b.    Defendants Have Failed To Rebut Lead Plaintiff's Strong Evidence That Vale Securities Traded In Efficient Markets ............10

        2.    Individual Questions About Domesticity of Bond Transactions Will Not Predominate ...................................................................13

        3.    Lead Plaintiff Is Entitled To The *Affiliated Ute* Presumption of Reliance............................................................................................14

        4.    Lead Plaintiff Has Shown That Damages Can Be Calculated On A Classwide Basis........................................................................15

            a.    Lead Plaintiff's Damages Model Is Sufficiently Detailed For Class Certification Purposes.........................................................15

            b.    The Purported "Complexities" Of This Case Are No Impediment To Certification............................................................17

        5.    The Class Definition Is Appropriate ...........................................................22

    B.    The Proposed Class And Class Representative Satisfy Rule 23(a)...................... 24

        1.    CAAT Is Typical Because The Alleged Losses Arise From A Single Course Of Conduct .........................................................................24

        2.    CAAT Is Adequate And Defendants' Attack Regarding "Candor" Is Baseless and Disingenuous .................................................................24

III.  CONCLUSION..................................................................................................25

i

# TABLE OF AUTHORITIES

**Page(s)**

Cases

*Affiliated Ute Citizens of Utah v. United States,*
406 U.S. 128 (1972) ................................................................................ 3, 14

*Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*,
568 U.S. 455 (2013)..................................................................................... 21

*Anwar v. Fairfield Greenwich Ltd.*,
306 F.R.D. 134 (S.D.N.Y. 2015) ................................................................ 14

*Basic Inc. v. Levinson*,
485 U.S. 224 (1988).......................................................................... 1, 3, 13

*Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*,
310 F.R.D. 69 (S.D.N.Y. 2015) ............................................................ 2, 16

*City of Livonia Employees' Ret. Sys. v. Wyeth*,
284 F.R.D. 173 (S.D.N.Y. 2012) ................................................................ 14

*Fogarazzao v. Lehman Bros.*,
232 F.R.D. 176 (S.D.N.Y. 2005) ................................................................ 15

*Gross v. Grupo Televisa*,
S.A.B., No. 18-cv-1979 (S.D.N.Y.),.................................................... 24, 25

*Hawaii Structural Ironworkers Pension Tr. Fund, Inc., v. AMC Ent. Holdings, Inc.*,
2021 WL 1198799 (S.D.N.Y. Mar. 30, 2021) .......................................... 14

*In re BP p.l.c. Securities Litigation*,
2014 WL 2112823 (S.D. Tex. May 20, 2014) ............................................ 20

*In re Facebook, Inc., IPO Sec. & Derivative Litig.*,
312 F.R.D. 332 (S.D.N.Y. 2015) ................................................................ 13

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
574 F.3d 29 (2d Cir. 2009)................................................................... 18, 23

*In re Global Brokerage, Inc.*,
2021 WL 1185426 (S.D.N.Y. Mar. 18, 2021) .......................................... 12

*In re Grupo Televisa Sec. Litig.*,
2020 WL 3050550 (S.D.N.Y. June 8, 2020) ......................................... 7, 25

*In re Petrobras Sec.,*
   862 F.3d 250 (2d Cir. 2017) ............................................................... 2, 4, 12, 14

*In re Petrobras Sec. Litig.,*
   312 F.R.D. 354 (S.D.N.Y. 2016) ......................................................... 2, 6, 12, 22

*In re Petrobras Sec. Litig.,*
   317 F. Supp. 3d 858 (S.D.N.Y. 2018) ................................................................. 13

*In re PolyMedica Corp. Sec. Litig.,*
   453 F. Supp. 2d 260 (D. Mass. 2006) ................................................................... 7

*In re Sadia, S.A. Sec. Litig.,*
   269 F.R.D. 298 (S.D.N.Y. 2010) ..................................................................... 9, 18

*In re Scotts EZ Seed Litig.,*
   304 F.R.D. 397 (S.D.N.Y. 2015) ......................................................................... 17

*In re Signet Jewelers Ltd. Sec. Litig.,*
   2019 WL 3001084 (S.D.N.Y. July 10, 2019) ............................................. 16, 21, 22

*In re Teva Sec. Litig.,*
   2021 WL 872156 (D. Conn. Mar. 9, 2021) ............................................................ 6

*In re TOUSA, Inc.,*
   422 B.R. 783 (Bankr. S.D. Fla. 2009) .................................................................. 9

*In re Turquoise Hill Res. Ltd. Sec. Litig.,*
   2021 WL 148752 (S.D.N.Y. Jan. 15, 2021) ......................................................... 14

*In re Vale S.A. Sec. Litig.,*
   2019 WL 11032303 (S.D.N.Y. Sept. 27, 2019) ......................................... 4, 8, 18, 22

*In re Vivendi Universal, S.A. Sec. Litig.,*
   634 F. Supp. 2d 352 (S.D.N.Y. 2009) ................................................................. 21

*McIntire v. China MediaExpress Holdings, Inc.,*
   38 F. Supp. 3d 415 (S.D.N.Y. 2014) ................................................................ 6, 16

*Monroe Cty. Employees' Ret. Sys. v. S. Co.,*
   332 F.R.D. 370 (N.D. Ga. 2019) ......................................................................... 17

*Morrison v. Nat'l Australia Bank Ltd.,*
   561 U.S. 247 (2010) ..................................................................................... 13, 14

*Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.,*
   2018 WL 3861840 (N.D. Ohio Aug. 14, 2018) ................................................. 9, 16

*Pirnik v. Fiat Chrysler Automobiles, N.V.*,
   327 F.R.D. 38 (S.D.N.Y. 2018) .................................................................................. 16, 21

*Roach v. T.L. Cannon Corp.*,
   778 F.3d 401 (2d Cir. 2015) .......................................................................................... 22

*Robidoux v. Celani*,
   987 F.2d 931 (2d Cir. 1993) .......................................................................................... 22

*Schleicher v. Wendt*,
   618 F.3d 679 (7th Cir. 2010) ........................................................................................ 21

*Sicav v. Wang*,
   2015 WL 268855 (S.D.N.Y. Jan. 21, 2015) ................................................................. 17

*Waggoner v. Barclays PLC*,
   875 F.3d 79 (2d Cir. 2017) .................................................................................... *passim*

*Wilson v. LSB Indus., Inc.*,
   2018 WL 3913115 (S.D.N.Y. Aug. 13, 2018) .............................................................. 17

## Rules

Fed. R. Civ. P. 23(a) ................................................................................................ 1, 2, 24, 25

Fed. R. Civ. P. 23(b) ........................................................................................................... 25

Fed. R. Civ. P.23(b)(3) ................................................................................................. 1, 3, 25

Fed. R. Civ. P. 23(c)(1)(C) ................................................................................................. 22

## Other Authorities

Expert Report of Zachary Nye, Ph.D.,
   2015 WL 13505645 (S.D.N.Y.) ..................................................................................... 16

Lead Plaintiff Colleges of Applied Arts and Technology Pension Plan ("Lead Plaintiff" or "CAAT") respectfully submits this reply memorandum of law in further support of its motion requesting that the Court (1) certify this case as a class action; (2) appoint Lead Plaintiff as Class Representative; and (3) appoint Kaplan Fox & Kilsheimer, LLP ("Kaplan Fox") as Class Counsel.

## I.      PRELIMINARY STATEMENT

Lead Plaintiff's motion presents a straightforward case for class certification. Every element of Fed. R. Civ. P. 23(a) and 23(b)(3) is established with substantial support, and Defendants do little to disturb this.[1] Defendants primarily argue that predominance is not satisfied because Lead Plaintiff is not entitled to a presumption of reliance, and they assert various other purported infirmities in the Class definition or damages model that they say will render classwide adjudication unmanageable. Additionally, Defendants argue that CAAT is not adequate or typical to serve as Class Representative as required by Fed. R. Civ. P. 23(a), because they claim there is no single theory of liability alleged, and they impugn CAAT's character on such strained bases as asserting that CAAT should have updated its lead plaintiff certification for recent changes. These arguments fail.

First, predominance is satisfied because Lead Plaintiff has amply established its entitlement to a presumption of reliance under *Basic Inc. v. Levinson*, 485 U.S. 224 (1988) ("*Basic*"). Market efficiency of the Vale Securities is demonstrated by their strong showing under all seven of the indirect factors set forth in *Cammer* and *Krogman*. Indeed, Defendants do not contest that these factors are satisfied as to the Vale ADS. This, alone, is sufficient for the Court to find that the market for Vale Securities was efficient throughout the Class Period and Lead Plaintiff is entitled

---

[1] Defendants do not dispute that the Rule 23(a) requirements of numerosity and common questions of law and fact are met. Additionally, they do not dispute that the proposed Class is ascertainable or that Kaplan Fox satisfies the requirements for appointment as Class Counsel.

to a presumption of reliance. *Waggoner v. Barclays PLC*, 875 F.3d 79, 97 (2d Cir. 2017) ("*Waggoner*") ("All seven of the indirect factors considered by the district court . . . weighed so clearly in favor of concluding that the market for Barclays' ADS was efficient that the Defendants did not even challenge them . . . . Under the circumstances here, the district court was not required to reach a conclusion concerning direct evidence of market efficiency.")

Moreover, Professor Feinstein's exhaustive event studies further demonstrate that the market for Vale Securities was efficient. Notably, Defendants' expert **does not** opine that the market for Vale Securities was inefficient, and he fails to provide any event study that challenges market efficiency or rebuts Professor Feinstein's conclusions.[2] *See Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*, 310 F.R.D. 69, 94-95 (S.D.N.Y. 2015) (criticizing defense market efficiency expert for failing to perform his own event study); *see also Petrobras*, 862 F.3d at 278 ("the Court's opinions consistently suggest that the [evidentiary] burden [for market efficiency] is not an onerous one."). For these reasons, and as further described below and in Professor Feinstein's concurrently-filed rebuttal report,[3] Lead Plaintiff's class certification motion should be granted.

Additionally, all of the Fed. R. Civ. P. 23(a) prerequisites are met, and Defendants' strained effort to recharacterize the alleged misrepresentations as representing two distinct theories of liability—one concerning pre-collapse misrepresentations, which they argue solely concerned the risk of Dam 1 collapsing, and another concerning post-collapse misrepresentations about Vale's responsibility for the collapse—fails. The pre-collapse and post-collapse misrepresentations

---

[2] Judge Rakoff credited Professor Feinstein's market efficiency report in finding that the plaintiffs were entitled to the fraud-on-the-market presumption of reliance in *In re Petrobras Sec. Litig.,* 312 F.R.D. 354 (S.D.N.Y. 2016), and the Second Circuit affirmed that ruling in *In re Petrobras Sec*., 862 F.3d 250 (2d Cir. 2017).

[3] Professor Feinstein's Rebuttal Report on Market Efficiency is Exhibit A to the Declaration of Frederic S. Fox in Further Support of Lead Plaintiff's Moton for Class Certification and Appointment of Class Representative and Class Counsel dated June 4, 2021 (the "Reply Decl.").

2

contained nearly identical information, and unlike the case Defendants are trying to invoke, there was never any confusion here about who was responsible for maintaining Dam 1.

Likewise, Defendants' contentions that Lead Plaintiff is inadequate because it has not updated its lead plaintiff certification for subsequent events, and based on a purported "lack of candor"—which actually represents nothing more than a reasonable legal dispute in another matter concerning the relevance of certain third-party investments—are wholly meritless and should be rejected.

For these reasons, as further described below, Lead Plaintiff's motion for class certification should be granted.

## II.      ARGUMENT

### A.  The Proposed Class Satisfies The Predominance Requirement of Rule 23(b)(3)

Defendants argue that the predominance requirement is not met for five reasons: (1) Lead Plaintiff has not established entitlement to a presumption of reliance under *Basic*; (2) domesticity issues regarding the Vale Notes will purportedly predominate; (3) Lead Plaintiff is not entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972) ("*Affiliated Ute*"); (4) Lead Plaintiff's damages model is too vague to show that damages can be calculated on a classwide basis; and (5) the Class definition is too broad. As described below, these arguments are meritless and should be rejected.

### 1.  Lead Plaintiff Is Entitled To The *Basic* Presumption of Reliance

Defendants claim that *Cammer* factor 5—the reaction of the securities prices to unexpected news events—is the "*sine qua non* of efficiency" (Defs.' Br. 5), and that Professor Feinstein's event study is purportedly inadequate to satisfy that factor. Defendants' arguments are wrong on both the law and the facts.

The Second Circuit has clearly stated that "a plaintiff seeking to demonstrate market

efficiency need not always present direct evidence of price impact through event studies." *Waggoner,* 875 F.3d at 97. The *Waggoner* Court forcefully rejected the argument that *Cammer* 5 is the definitive test of market efficiency: "[w]e have repeatedly—and recently—declined to adopt a particular test for market efficiency." *Id.* at 94.[4] Rather, *Waggoner* endorsed "a holistic analysis based on the totality of the evidence presented." *Id.* at 97. Following this precedent, the court in *In re Vale S.A. Sec. Litig.*, 2019 WL 11032303, at *14 (S.D.N.Y. Sept. 27, 2019) found that "[e]ven if Lead Plaintiffs had failed to satisfy the fifth *Cammer* Factor, the Court's conclusion that the market for Vale ADRs was efficient would remain unchanged" because "[t]he remaining four *Cammer* Factors and three *Krogman* Factors support a finding of market efficiency" for the class period of November 7, 2013 through November 30, 2015. That ruling applies with equal force here.

This is not a close case on market efficiency. As described in Lead Plaintiff's opening brief and the Feinstein Report, Vale Securities trade on the NYSE with market capitalizations in the top ten percent of all companies listed on U.S. exchanges, and are widely followed by analysts and news outlets. These facts, encapsulated in Professor Feinstein's findings on *Cammer* factors 1-4 and the *Krogman* factors are, standing alone, ample evidence to prove market efficiency for the Vale Securities. Indeed, Professor Feinstein found that the Vale ADS "satisfied all of the *Cammer* and *Krogman* factors **by wide margins**," Ex. A to Fox Decl. ("Feinstein Rep.") at ¶18,[5] and ***Defendants do not dispute these findings***. This evidence is further bolstered by the fact that Defendants' own expert, Professor Torous, did not opine that the Vale Securities markets were

---

[4] *See also*, *In re Petrobras Sec.*, 862 F.3d 250, 278 (2d Cir. 2017) ("We never suggested . . . that [an event study] was the *only* way to prove market efficiency; indeed, we explicitly declined to adopt any particular test for the market efficiency of stocks or bonds.") (internal quotation omitted).

[5] The "Fox Decl." is the Supplemental Declaration of F. Fox in Support of Lead Plaintiff's Motion for Class Certification and Appointment of Class Representative and Class Counsel dated February 19, 2021.

*inefficient*. *See* Ex. B to Reply Decl. ("Torous Dep.") at 23:13-17 ("[E]valuating whether the market for Vale ADRs or notes was inefficient or not was not a task that I was an assigned, so that was not something that I investigated in this report.").

It is no mystery why Defendants are side-stepping the central issue of market efficiency: overwhelming evidence establishes that the market for Vale Securities was efficient during the Class Period. As described below, Defendants' limited criticisms of Professor Feinstein's selection of events for his event study under *Cammer* factor 5 cannot overcome the formidable evidence of market efficiency.

### a. Professor Feinstein's Event Study Is Methodologically Sound And Strongly Supports Market Efficiency

Defendants rest their case on minor disputes over the selection of events in Professor Feinstein's event study, which they claim "render his conclusions unreliable." Defs.' Br. 6. Defendants do not contend that Professor Feinstein made any errors in the statistical component of his event study—the regression models—and, indeed, their expert relied on those models as the basis for his own opinions, which belies any argument that the results are "biased" or unreliable. To the contrary, Professor Feinstein's event studies provide one piece of the compelling evidence, viewed holistically with the evidence on *Cammer* factors 1-4 and the *Krogman* factors, that Vale Securities traded efficiently.

<u>***Professor Feinstein's Method of Selecting Dates Is Proper***</u>: Defendants mischaracterize Professor Feinstein's event selection process, claiming "he simply handpicks the dates to study based on his subjective thoughts about which news is important enough to affect the securities' price." Defs.' Br. 6. This is false. It is undisputed that proper event selection requires identifying company-specific news that is new, unexpected, and that is value-relevant (*i.e.*, that would reasonably be expected to elicit a securities price reaction). *See* Torous Dep. at 36:11-16. These

5

criteria plainly require the exercise of professional judgment.

For this reason, Defendants' argument has repeatedly been rejected by courts. "No matter what date classification methodology an expert uses, there is likely to be some subjectivity involved. Courts recognize that reality, and, in the normal course, do not discount or exclude *Cammer* 5 event studies based on that fact." *In re Teva Sec. Litig.*, 2021 WL 872156, at *33 (D. Conn. Mar. 9, 2021); *McIntire v. China MediaExpress Holdings, Inc.*, 38 F. Supp. 3d 415, 429 (S.D.N.Y. 2014) ("[A]n expert who is conducting an event study necessarily must use his or her discretion to define selection criteria that are conducive to the execution of a meaningful multivariate regression analysis."); *see also*, *Petrobras*, 312 F.R.D. at 368 ("There is always some subjectivity in analyses of this nature, and courts would be unable to rely on expert testimony if they could not tolerate a modest level of subjectivity.").

Here, to identify new, unexpected, value-relevant news about Vale, Professor Feinstein conducted an extensive review of analysts' responses to the news, as detailed in his report. *See* Feinstein Rep. at ¶¶132-151 (regarding the selected events) and *id*. at ¶¶179-219 (regarding rejected candidate events). Defendants criticize Professor Feinstein for excluding earnings announcements which were found to contain either mixed news (positive and negative) or expected results, arguing that Vale's earnings announcement on February 23, 2017—which beat consensus estimates and announced a dividend—was unequivocally positive news and should have been included in the event study. Defs.' Br. 7. But, as noted in the Feinstein Report, ***analysts*** did not receive this announcement as unmitigatedly positive, noting, for instance, that BTG Pactual analysts cautioned that "going forward 'the balance of risks of iron ore is significantly tilted to the downside, and [we] remain Neutral on shares.'" Likewise, Scotiabank noted that Vale's free cashflow generation "missed" Scotiabank's estimates, and Morningstar attributed Vale's

6

performance to higher iron ore prices that it considered "unsustainable." Feinstein Rep. at ¶188. Defendants' selective focus on only the positive aspects of the February 23, 2017 news ignores the evidence of the market's mixed view, and therefore, does not suggest any flaw in Professor Feinstein's analysis.[6]

*__The Event Studies Support Market Efficiency__*: Defendants argue that Professor Feinstein's event studies analyzed too few days to support market efficiency (Defs.' Br. 7), but they ignore that, in addition to the four event days, he conducted a deep-dive analysis on all of the earnings announcements—unlike Professor Torous—and determined they were not good candidate events. Defendants cite no financial economic authority for the notion that a valid event study must include some absolute number of events and, as Professor Feinstein testified, an expert has to work with the news that exists: "the analyst doesn't get to manufacture events." Ex. C to Reply Decl. ("Feinstein Dep.") at 153:3-19. The fact that there may be few good candidate events does not mean that the market for the securities is inefficient. *Id*. at 154:14-20. Indeed, in *In re Grupo Televisa Sec. Litig.*, 2020 WL 3050550, at *5-7 (S.D.N.Y. June 8, 2020), the court credited Professor Feinstein's event study and found that a significant price reaction to **only one event** "was consistent with an efficient market." While Defendants rely on *In re PolyMedica Corp. Sec. Litig.*, 453 F. Supp. 2d 260, 270 (D. Mass. 2006) for criticism of an event study with few events, that court said it "might well have been inclined to deem such a showing sufficient for class certification purposes," but declined to do so based on PolyMedica's evidence of market **inefficiency** (impediments to short selling and serial correlation). Defendants have presented no comparable evidence here, thus, *PolyMedica* is inapposite.

---

[6] Likewise, in Professor Feinstein's rebuttal report, he demonstrates why Professor Torous's arguments for including the earnings announcements and certain other 6-K events is objectively wrong; those announcements reflected immaterial news, which would not be expected to impact securities prices. Feinstein Rebuttal at ¶¶62-95.

***The Selection of Corrective Disclosure Dates Is Proper***: Defendants' argument that the use of the alleged curative disclosure dates "biases" Professor Feinstein's event studies is wrong. These dates were correctly selected based on the news released on them; Professor Feinstein did not check Vale Securities prices prior to testing, or otherwise select the dates based on pricing data. Feinstein Dep. at 151:10-20. The fact that one could surmise the dramatic, surprising, value-relevant news on the curative disclosure dates ***should*** change the price of Vale Securities in an efficient market in no way suggests an impropriety in the selection of these events, because "[t]he test is to identify days on which the security price ***should change*** a significant amount in an efficient market, and then see whether it ***did change*** a significant amount, and that will tell you whether or not it's a demonstration of market efficiency or a demonstration of inefficiency." *Id*. at 151:20-152:4.

In fact, curative disclosures are often included in event studies accepted by courts for proving market efficiency. *See, e.g*., *In re Vale*, 2019 WL 11032303, at *13 (finding that because corrective disclosures "are dates on which Lead Plaintiffs allege that important information was revealed to the market . . . the price movement associated with these dates may be some of the most relevant evidence for determining whether the price of Vale ADRs responds to news.")

***The Fact That The Studied Events Fall At The End of The Class Period Does Not Diminish The Evidence of Market Efficiency***: Defendants argue that the event studies cannot prove market efficiency for the entire Class Period because the studied events all fall in the final weeks of that period. But Defendants have not identified any structural changes in Vale Securities markets during the Class Period that would prevent one from inferring the same market efficiency condition throughout. Contrary to their baseless argument, Professor Feinstein's analyses of *Cammer* factors 1-4 and *Krogman* factors 1-3 demonstrate that there were no "major structural

8

changes in terms of the volume of analyst coverage, listing on the New York Stock Exchange, F3 registration eligibility, [and] bid ask spreads." Feinstein Dep. at 164:16-165:1. Because "the conditions in the market were the same" over the entire Class Period, it "allow[s] someone to make inferences about the entire class period based on the statistical test done" on the events at the end of the Class Period. *Id*. at 165:3-12.[7]

Defendants' argument of a theoretical possibility that the earlier period might be different—without any actual evidence that it was—is entitled to no weight. *In re Sadia, S.A. Sec. Litig.*, 269 F.R.D. 298, 315 (S.D.N.Y. 2010) (rejecting expert opinion because "[n]either he nor [the defendant] submitted evidence specific to *this* case or conducted an independent study that would lend credence to their position."); *In re TOUSA, Inc.,* 422 B.R. 783, 826 (Bankr. S.D. Fla. 2009) (discrediting expert's criticisms because they "are almost entirely theoretical and there is no evidence that they actually undermine the applicability and reliability of [the opposing expert's] calculations").[8]

Finally, Defendants argue that the "extraordinary" events studied do not demonstrate market efficiency, but the inverse is true. "Lesser news events, which according to valuation principles should not cause large price movements, are inappropriate event study candidate events because the absence of a statistically significant price movement would prove nothing." Ex. A to Reply Decl. ("Feinstein Rebuttal") at ¶50; *id*. ¶¶ 91-92 (none of seven production events caused EBITDA to change by more than 1%, if at all).

---

[7] *See also, id*. at 165:24-166:15. ("[W]hat we saw from those four days . . . was – there were no impediments to market efficiency . . . . [T]he behavior we observed . . . on those four days is representative of what would have happened if there had been similar announcements earlier in the class period.").

[8] Defendants claim that in *Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*, 2018 WL 3861840, at *3 (N.D. Ohio Aug. 14, 2018), Professor Feinstein acknowledged that an event study "could not possibly" demonstrate market efficiency for an earlier period (Defs.' Br. 9), but that is not what he said. Asked whether a single-event event study, *without consideration of any of the other Cammer or Krogman factors*, would be sufficient to prove market efficiency for the entire class period, Feinstein testified that while it might be enough for some courts, he was basing his opinion on all of the *Cammer* and *Krogman* factors, an event study, and collective test. 2018 WL 3861840, at *3.

9

**b.** ***Defendants Have Failed To Rebut Lead Plaintiff's Strong Evidence That Vale Securities Traded In Efficient Markets***

<u>***Vale ADS***</u>**:** Defendants argue that Lead Plaintiff has not established market efficiency for the Vale ADS, despite the overwhelming and ***undisputed*** evidence that the seven indirect *Cammer* and *Krogman* factors are satisfied, which, by itself, is ample to demonstrate market efficiency. *Waggoner*, 875 F.3d at 97.

Nevertheless, Defendants argue that this evidence is insufficient because Vale ADS prices did not react significantly to earnings announcements or to "news days" identified by their expert as all earnings announcements, production data releases, and 6-Ks. But Defendants' expert performed no analysis to determine whether the information released on these days was of the type that is expected to impact share prices in an efficient market, *i.e.*, new, unexpected, and value-relevant information. *See, generally*, Torous Rep. at ¶¶55-59. By contrast, Professor Feinstein did analyze the news on these dates, and found that the insignificant price reactions were consistent with the mixed or expected news and were "neither evidence for nor against market efficiency." Feinstein Rep. at ¶219; Feinstein Dep. at 220:9-221:14 (testifying that production data releases were not uniformly surprising relative to analysts' expectations).

Moreover, Professor Torous explicitly testified that "evaluating whether the market for Vale ADRs or notes was inefficient or not was not a task that I was an assigned, so ***that was not something that I investigated in this report***." Torous Dep. at 23:13-17. Thus Professor Torous ***does not*** opine that any of the Vale Securities traded inefficiently. *Id*. at 23:18-20.

Finally, Defendants argue that the fact that Vale ADS were found to trade in efficient markets in another case does not help Lead Plaintiff because the test done in that case—which they now call "appropriate" despite their contrary arguments there—would not support efficiency here. Defs.' Br. 11. But that argument assumes the news on earnings announcements in this Class Period

10

was new, unexpected, and value relevant, which Professor Feinstein has shown it was not, and Defendants have not rebutted.

**_Vale Bonds_**: Defendants argue that market efficiency of the bonds is not established because: (1) the bonds did not react significantly to earnings announcements or credit rating changes; (2) some of the bonds did not react on two of the four event study dates; and (3) certain of the indirect *Cammer* or *Krogman* factors are purportedly not satisfied for some of the bonds. These arguments are wrong and should be rejected.

First, as discussed above, the fact that the bonds did not react to the mixed or unsurprising news identified by Professor Torous actually **_supports_** market efficiency because in an efficient market, securities prices do not react to information unless it is new, unexpected, and value-relevant.

Second, Professor Feinstein's event study for the Vale Notes, which found all seven notes responded significantly to the first two events and certain notes to the third and fourth events, supports market efficiency because "bonds' values are substantially insulated from all but the most extreme news by a valuation cushion provided by the common and preferred stock." Feinstein Rebuttal at ¶110. Thus, "bond prices often do not change significantly because analysts and investors assess that the proper revaluation of the bond in light of new information or events is only a small change[.]" *Id*. Moreover, Professor Feinstein presented further empirical evidence of market efficiency for the bonds with a regression analysis showing all Vale Notes moved significantly on a day-to-day basis in response to news concerning market interest rates. Feinstein Rep. at ¶¶277-280. This "day-to-day cause-and-effect relationship . . . between changes in market interest rates and the prices of the Vale Notes, proves that market participants did not ignore valuation-relevant information when pricing and trading the Vale Notes." *Id.* at ¶280. Defendants

11

do not challenge these findings.

Finally, Defendants argue that not all of the Vale Notes satisfied all of the indirect *Cammer* and *Krogman* factors, but their arguments either misstate the record or are based on a single district court case that is inapposite.

- *Cammer* factor 1, trading volume: Professor Torous' findings are driven by his improper choice to exclude agency trades, not by any "error" on Professor Feinstein's part. Feinstein Rebuttal at ¶¶99-108; Torous Dep. at 78:21-79:2. Agency trades are those made by brokers or other market makers, thus, Professor Torous "is essentially stripping out a component of the trading activity that directly plays a role in making the market efficient." Feinstein Rebuttal ¶106. With these trades included, all but one Note exceeded the 2% threshold for a strong presumption of market efficiency, and the TAE3 Notes exceeded the 1% threshold for a substantial presumption of market efficiency. *Id*. at ¶109.

- *Cammer* factor 2, analyst coverage: Defendants cite to *In re Global Brokerage, Inc*., 2021 WL 1185426, at *14 (S.D.N.Y. Mar. 18, 2021) to argue that this factor is not met because Lead Plaintiff does not provide evidence that the Vale Notes were specifically covered by the numerous analysts that covered Vale. But in *Global Brokerage*, the notes at issue not only had no analyst coverage, they had no ratings agency coverage— unlike the Vale Notes. *See* Feinstein Rep. ¶240 ("Throughout the Class Period, the rating agencies published detailed research and credit analyses on the Vale Notes."). Moreover, analyst coverage of the company "became quite sparse" during the class period, and it was this combination of factors that led the court to find *Cammer* 2 was not satisfied.[9] The present matter is more like in *In re Petrobras Sec. Litig*., 312 F.R.D. 354, 366 (S.D.N.Y. 2016), *aff'd in part, In re Petrobras Sec*., 862 F.3d 250 (2d Cir. 2017), where the court found analyst coverage of the company and ratings agency coverage satisfied *Cammer* 2 for the bonds at issue.

- *Cammer* factor 3, market makers: Defendants again rely on the inapposite *Global Brokerage* case to say that this factor is not satisfied because underwriters cannot be assumed to be market makers. But the identical analysis of underwriters as market makers was accepted in *In re Petrobras*, 312 F.R.D. at 366 to satisfy *Cammer* factor 3, and should be here as well.

- *Krogman* factor 2, bid-ask spread: Defendants argue that the lack of available data on the bid-ask spread should count against market efficiency, but even in the case they cited, it was deemed a "neutral" factor. Defs.' Br. 12. The bonds in *Petrobras* were found to trade efficiently without this data, and as that court noted, "the modified

---

[9] The bonds at issue in *Global Brokerage* also failed—by a wide margin—the *Cammer* factor 1 test. *See* 2021 WL 1185426, at *13.

*Cammer* factors provide a useful rubric to evaluate debt markets." 312 F.R.D. at 366. Thus, the indirect *Cammer* and *Krogman* factors demonstrate market efficiency for the Vale Notes, as Professor Feinstein opined, and the *Basic* presumption of reliance applies.

### 2. Individual Questions About Domesticity of Bond Transactions Will Not Predominate

Defendants argue that any class including Vale bonds cannot be certified due to individual proof of domesticity that may be required for over-the-counter bond investors. But Defendants acknowledge that Vale bonds traded, in part, on the NYSE, and there is no question that such transactions are domestic. *See Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 267 (2010). Thus, at a bare minimum, the Class can and should include all Vale bond investors who purchased on the NYSE.

With regard to over-the-counter Vale bond investors, Defendants have not presented any evidence that they are such a substantial portion of the putative Class that domesticity issues would predominate. *See In re Facebook, Inc., IPO Sec. & Derivative Litig.*, 312 F.R.D. 332, 350–51 (S.D.N.Y. 2015) (finding domesticity issues concerning "295 investors in a potential class of many thousands . . . does not defeat predominance."). Indeed, to the extent there are any over-the-counter Vale bond purchasers who want to participate if there is a recovery, they can submit proof of domesticity during the claims administration process, when all Class Members will be required to provide evidence of their transactions—just as they did in *In re Petrobras Sec. Litig.*, 317 F. Supp. 3d 858, 865–66 (S.D.N.Y. 2018), *aff'd,* 784 F. App'x 10 (2d Cir. 2019).[10] Thus, there is no basis to find that an unspecified number of potential over-the-counter bond purchasers will present

---

[10] In *Petrobras*, the settlement class that was ultimately certified included "any transaction in a Petrobras Security to which the United States securities laws apply, including as applicable pursuant to the Supreme Court's decision in *Morrison v. National Australia Bank*, 561 U.S. 247, 130 S.Ct. 2869, 177 L.Ed.2d 535 (2010)." *In re Petrobras*, 317 F. Supp. 3d at 865–66. Thus, it ultimately fell to the claims administrator to assess claimants' proof of domesticity.

individual evidence problems so substantial as to defeat predominance.

Moreover, "[i]f *Morrison* issues become significant in the prosecution of this case, the Court will have the means to deal with them." *In re Turquoise Hill Res. Ltd. Sec. Litig.*, 2021 WL 148752, at *9 (S.D.N.Y. Jan. 15, 2021); *In re Petrobras Sec.*, 862 F.3d at 274 (where *Morrison* issues arise, "we emphasize that district courts are authorized to implement management strategies tailored to the particularities of each case," including "modifying class definitions and issuing class-wide rulings," and "district courts can, for example, bifurcate the proceedings to home in on threshold class-wide inquiries; sever claims not properly adjudicated on a class-wide basis to isolate key common issues; or certify subclasses that separate class members into smaller, more homogenous groups defined by common legal or factual questions"). Thus, there is no basis to find at this time that individual domesticity issues will predominate over common issues.

### 3.   Lead Plaintiff Is Entitled To The *Affiliated Ute* Presumption of Reliance

Defendants argue that the *Affiliated Ute* presumption does not apply because the claims here are based primarily on misrepresentations rather than omissions. But unlike the cases Defendants cite, the alleged omissions are not "simply the inverse of the Lead Plaintiffs' misrepresentation allegation." *Waggoner*, 875 F.3d at 96. For example, Lead Plaintiff alleges that Vale failed to disclose that its third-party dam safety auditor had a financial conflict of interest which incentivized it to falsely certify the stability of unstable dams (Compl. ¶11), yet there are no alleged misrepresentations concerning the independence of dam safety inspectors. For alleged omissions such as this one, just as in *Affiliated Ute*, "reliance as a practical matter is impossible to prove." *Waggoner*, 875 F.3d at 95; *see also*, *Hawaii Structural Ironworkers Pension Tr. Fund, Inc., v. AMC Ent. Holdings, Inc.*, 2021 WL 1198799, at *7 (S.D.N.Y. Mar. 30, 2021) (*Affiliated Ute* presumption applied where there were alleged misrepresentations and omissions in registration statement); *Anwar v. Fairfield Greenwich Ltd.*, 306 F.R.D. 134, 147 (S.D.N.Y. 2015) (rejecting

14

"semantic argument" and holding that presumption applied); *City of Livonia Employees' Ret. Sys. v. Wyeth*, 284 F.R.D. 173, 184 (S.D.N.Y. 2012) (presumption applied where defendants allegedly misrepresented drug revenue potential and omitted drug safety information); *Fogarazzao v. Lehman Bros.*, 232 F.R.D. 176, 186 (S.D.N.Y. 2005) (presumption applied where "defendants omitted their own quid pro quo arrangements in addition to deliberately misrepresenting their opinions").

### 4. Lead Plaintiff Has Shown That Damages Can Be Calculated On A Classwide Basis

Defendants argue that Lead Plaintiff has failed to propose a sufficiently detailed damages model that can address the "complexities" of this case. But the Second Circuit has rejected similar arguments because "*Comcast* explicitly states that '[c]alculations need not be exact.'" *Waggoner*, 875 F.3d at 106. Lead Plaintiff's damages model provides ample detail and is the same model commonly accepted by courts in class action securities fraud cases. Defendants' attempt to manufacture "complexities" through an expert who has never conducted a securities class action damages analysis and has no knowledge of whether and how these issues are routinely addressed fails. *See* Torous Dep. at 82:24-83:16 (admitting he has never submitted a damages model or calculated a plan of allocation in a securities class action and testifying, "since I don't believe I've ever been asked to perform that type of analysis, I would not think that I'm well qualified to speak on that topic.").

#### a. *Lead Plaintiff's Damages Model Is Sufficiently Detailed For Class Certification Purposes*

Defendants claim that Professor Feinstein's damages methodology is too vague because he does not identify "what specific 'valuation tools and models' he would use" or provide "step-by-step detail." Defs.' Br. 15. Contrary to their assertions, Professor Feinstein describes the commonly used valuation tools that can address any unique issues that may arise when a full damages analysis

15

is done. Feinstein Rep. at ¶294. And he provides a step-by-step explanation of how damages would be calculated, describing the use of an event study, construction of an inflation ribbon, and calculation of damages within PSLRA limits. *Id*. at 295(i)-(v).

Moreover, this damages model is "the generally accepted method for measuring damages in a securities fraud class action," *In re Signet Jewelers Ltd. Sec. Litig.*, 2019 WL 3001084, at *20 (S.D.N.Y. July 10, 2019), and it easily satisfies the standard for class certification. *Comcast* and Second Circuit authority merely require that a plaintiff's "damages model . . . track his theory of liability." *Waggoner*, 875 F.3d at 106. Here, Lead Plaintiff alleges that shareholders of Vale Securities were harmed when share prices plummeted after the truth about Vale's dam conditions, dam safety management, and risk management were revealed by the collapse of Dam 1 and subsequent disclosures. Just like the nearly identical damages model approved by the Second Circuit in *Waggoner* (*see* Expert Report of Zachary Nye, Ph.D., 2015 WL 13505645 (S.D.N.Y.)), Lead Plaintiff's damages model directly tracks Lead Plaintiff's theory of liability by measuring shareholders' damages based on the share price drops when the true information was revealed. Thus, "this is a case in which the Plaintiffs' proposed measure for damages is ... directly linked with their underlying theory of classwide liability ... and is therefore in accord with the Supreme Court's ... decision in *Comcast*." *Waggoner*, 875 F.3d at 105-06 (approving damages model where class members were allegedly harmed by the significant share price drop after statements about defendants' business practices were shown to be false and the "damages model directly measured that harm by examining the drop in price that occurred" when the truth was revealed); *Pirnik v. Fiat Chrysler Automobiles, N.V.*, 327 F.R.D. 38, 47 (S.D.N.Y. 2018) (same); *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 310 F.R.D. 69, 99 (S.D.N.Y. 2015) (same); *McIntire*, 38 F. Supp. 3d at 435 (same).

16

Against the weight of this Circuit's jurisprudence, Defendants cite *Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*, 2018 WL 3861840 (N.D. Ohio Aug. 14, 2018) to argue that the damages model must specify all economic tools used to calculate damages. Not only is this decision plainly out of step with the above jurisprudence of this Circuit, but courts have repeatedly rejected identical arguments "[b]ecause the decision of which, if any, of those tools will be necessary to measure damages in this case depends on development of the fact record on the merits," and therefore, "it would be inappropriate for Professor Feinstein to conclusively state which he would use at this stage of the litigation." *Monroe Cty. Employees' Ret. Sys. v. S. Co.*, 332 F.R.D. 370, 399 (N.D. Ga. 2019); *Wilson v. LSB Indus., Inc.*, 2018 WL 3913115, at \*17 (S.D.N.Y. Aug. 13, 2018) (rejecting argument that expert must specify which "valuation tools" he will use); *see also, In re Scotts EZ Seed Litig.*, 304 F.R.D. 397, 414 (S.D.N.Y. 2015) ("[N]othing in *Comcast* requires an expert to ***perform*** his analyses at the class certification stage.") (citing cases) (emphasis in original).

Defendants also cite *Sicav v. Wang*, 2015 WL 268855, at \*3 (S.D.N.Y. Jan. 21, 2015) in support, but that case is inapposite. There, the plaintiffs were trying to establish classwide damages based on a gradual share price decline allegedly caused by insider selling—there was no damages model like the one here. As the *Sicav* Court noted, the plaintiffs faced "daunting precedent" because "claims of injury due not to corrective disclosures but rather to the mechanics by which shares of stock were priced during a protracted period of open-market trading have almost always been held ill-suited to classwide resolution." *Id.* Thus, that case is not instructive here.[11]

### b.   The Purported "Complexities" Of This Case Are No Impediment To Certification

---

[11] Moreover, class certification was ultimately denied based on the grounds of adequacy, typicality, and numerous other deficiencies in addition to the classwide damages issues. *Id*. at \*3-7.

Defendants also argue that the proposed damages model is insufficient because it fails to "grapple" with the purported complexities of: (1) pre- and post-collapse alleged misstatements; (2) causation theories including both materialization of the risk and corrective disclosures, and (3) claimed differences among investors in debt and equity. Defs.' Br. 17. Defendants' arguments are unsupported and should be rejected.

*Pre- and Post-Collapse Alleged Misstatements*: Defendants argue that the damages model is insufficient because it does not address purported differences that arise from there being multiple alleged misstatements, including one made after the Dam 1 collapse. But Defendants fail to raise anything beyond "theoretical"—and counterfactual—issues which do not support rejecting the damages model here. *In re Sadia*, 269 F.R.D. at 315 ("[Defendant], by relying on nothing more than [the expert]'s unsubstantiated hypothesis, invites this Court to engage in rampant speculation and certainly does not successfully rebut plaintiffs' proof by a preponderance of the evidence.").

First, Defendants argue that having multiple alleged misrepresentations is somehow "problematic" and that Professor Feinstein needed to "determine which corrective disclosures address which proposed misrepresentations." Defs.' Br. at 17. But "[s]ecurities class actions involving more than one misstatement are far from unusual," *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 37 (2d Cir. 2009), and such cases are routinely certified without such a detailed analysis.[12]

Additionally, Defendants argue that there are "two distinct theories of liability" here which the damages model does not address, rendering it inadequate. Defendants rely on *In re Vale S.A. Sec. Litig.*, 2019 WL 11032303 (S.D.N.Y. Sept. 27, 2019), another case against Vale concerning

---

[12] Additionally, Defendants criticize Professor Feinstein's report for purportedly not addressing any of the alleged misstatements. They are wrong. Although he was not asked to analyze the alleged misstatements, his report references certain of them at paragraphs 183, 187, and 203.

18

a dam break, where the court denied certification on adequacy and typicality grounds because it found there was a tension between the alleged pre-collapse and post-collapse misrepresentations that precluded finding a common scheme and class. But notwithstanding the court's unfavorable ruling overall, it **approved** the damages model, ruling that "Lead Plaintiffs have carried their burden of showing that damages can be calculated on a classwide basis" and that the "computation of damages is also consistent with Lead Plaintiffs' theory of fraud." *Id*. at *14. And the conflict found in that case arose from the fact that the dam was owned by a joint venture, Samarco, in which Vale was a partner, which resulted in two separate theories of liability for pre- and post-collapse misrepresentations. Specifically, the pre-collapse statements concerning the safety of Vale's dams required the class to believe that Vale was responsible for the Samarco dam, while the post-collapse statements that Vale was not involved in the Samarco dam management required the class to believe the opposite. *Id*. at *6. There is simply no equivalent set of facts here.

Here, the single alleged post-collapse misrepresentation is nearly identical to the pre-collapse misrepresentations, and does not require the Class to hold any conflicting views. In the final alleged misrepresentation on January 28, 2019, Defendants claimed that Dam 1 "had a Safety Factor in accordance with the world's best practices and above the reference of the Brazilian Standard. Both of the . . . stability declarations attest to the physical and hydraulic safety of the dam." Compl. ¶199. This language closely mirrors that of the pre-collapse alleged misrepresentations, for instance, that "Vale maintains the management of its dams in permanent alignment and updating with the good and strictest international practices, standards of which exceed the legal requirements" and that "100% of the audited structures were certified to be in stable condition, physically and hydraulically." *Id*. ¶¶188-189 (from the 2017 Sustainability Report). Thus, Professor Feinstein's testimony—that Lead Plaintiff asserted a single theory of

19

liability—is correct, and there is no tension created by the fact that one alleged misrepresentation occurred after Dam 1 collapsed.

Moreover, Professor Torous's criticisms on this point are admittedly theoretical and entitled to no weight. When asked whether he had compared the January 28, 2019 alleged misrepresentation to any of the pre-collapse misrepresentations, Professor Torous testified that "I didn't have to do that for my assignment." *See* Torous Dep. at 91:22-92:4. He could not recall the content of *any* of the pre-collapse statements, and when asked whether the pre-collapse statements dealt with anything more than the risk of a dam collapse, Professor Torous testified, "[a]gain, I don't recall. I don't recall." *Id*. at 90:6-11; 91:12-15 ("Well, again, I really don't know the content of these prior – these misrepresentations prior to the dam collapse . . ."). Professor Torous further admitted that his criticism was based on the "theoretical" possibility that the January 28, 2019 statement could have introduced price inflation into Vale Securities prices, but that he undertook no analysis to determine whether, in fact, it did. *Id*. at 92:3-15. Likewise, while he suggested that the context of the post-collapse statement was different and that therefore, "the implications might very well be different" even if the pre- and post-collapse statements were the same (*id*. at 93:11-94:2), he admitted that he "didn't do any analysis to determine whether or not the implications were different[.]" *Id*. at 94:3-7.

***Materialization of the Risk and Corrective Disclosures***: Defendants argue that Lead Plaintiff's damages model must treat separately the materialization of the risk on January 25, 2019 and the corrective disclosures on February 4, 2019 and February 6, 2019, relying on *In re BP p.l.c. Securities Litigation*, 2014 WL 2112823 (S.D. Tex. May 20, 2014). But courts in this jurisdiction have rejected the argument, correctly finding that the "contention that Plaintiff's methodology did not adequately isolate the impact of the materialization of known risks from the impact of allegedly

20

concealed risks is simply a loss causation argument in disguise, because it tests the causal relationship between the alleged misstatements and the price decline." *In re Signet Jewelers*, 2019 WL 3001084, at *20. Thus, "[s]uch an argument 'goes beyond the Rule 23 inquiry.'" *Id.*, quoting *Pirnik*, 327 F.R.D. at 47 (citing, *inter alia, Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455, 475 (2013) ("[P]laintiffs are not required to establish loss causation ... on class certification")).

Moreover, Defendants' claim that there are "stark" differences between materialization of the risk events and corrective disclosures is incorrect. As Judge Easterbrook has explained:

> If a firm that is losing money says "we expect to lose $100 million next quarter" when the managers actually expect the loss to be $200 million, that statement will keep the price higher than it ought to be, and when the next quarterly results show the real $200 million loss the price will adjust .... The parties are wont to call the bad outcome (the $200 million loss) a "materialization of the risk" that the loss would exceed $100 million .... [but] [t]he phrase adds nothing to the analysis .... [T]he fraud lies in an intentionally false or misleading statement, and the loss is realized when the truth turns out to be worse than the statement implied.

*Schleicher v. Wendt*, 618 F.3d 679, 683–84 (7th Cir. 2010). Indeed, "[f]raud depends on the state of events when a statement is made, not on what happens later." *Id*. at 684.

Similarly, in *In re Vivendi Universal, S.A. Sec. Litig.*, 634 F. Supp. 2d 352, 370–71 (S.D.N.Y. 2009), the court rejected the same materialization of the risk argument made here, noting that under tort law principles, "plaintiffs seeking damages for fraud are entitled to seek out-of-pocket damages **and** "pecuniary loss suffered otherwise as a consequence of the recipient's reliance upon the misrepresentation." Thus, "if the plaintiff stores his goods in a warehouse represented [to] him to be fireproof and they are destroyed when it burns down, he can recover . . . not only the inflated price he paid for a fireproof storage facility, but also the cost of the goods lost in the fire." *Id*. Hence, Defendants' argument is meritless.

**_Investors in Debt and Equity_**: Finally, Defendants argue that the damages model is

21

inadequate because it does not describe how it will assess damages differently for investors in Vale ADS versus Vale Notes. Defs.' Br. at 20-21. But this is not required at class certification. *Waggoner*, 875 F.3d at 106; *In re Signet Jewelers*, 2019 WL 3001084, at *20 ("Plaintiff's burden at this stage is simply to propose a methodology for calculating damages that corresponds to its theory of liability."). Moreover, the argument that differences in the type of securities purchased creates a conflict has been expressly rejected: "[w]here 'the same alleged misconduct drives plaintiffs' claims, regardless of whether they arise from purchases of Notes, common ADS, or preferred ADS, the interests of' class members are aligned." *In re Vale S.A. Sec. Litig.*, 2019 WL 11032303, at *9 (S.D.N.Y. Sept. 27, 2019) (quoting *In re Petrobras*, 312 F.R.D. at 361).

Moreover, even if Defendants had successfully raised some individualized damages issue based on the different types of securities in this case, which they did not, it would not warrant denial of class certification because "individualized damages determinations alone cannot preclude certification under Rule 23(b)(3)[.]" *Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 409 (2d Cir. 2015).

### 5.    The Class Definition Is Appropriate

Defendants argue that the proposed Class is "fatally overbroad" because it potentially includes investors who suffered no cognizable damages under the PSLRA, as well as investors who sold their Vale Securities before the first corrective event on January 25, 2019 (*i.e.*, in-and-out traders). But this argument is "contrary to the law of this Circuit," as noted above, "that individualized damages determinations alone cannot preclude certification under Rule 23(b)(3)[.]" *Roach*, 778 F.3d at 409.[13] Moreover, Defendants' arguments that these damages issues render the

---

[13] The Court has discretion to modify the Class definition if it determines the definition is overbroad. *See Robidoux v. Celani*, 987 F.2d 931, 937 (2d Cir. 1993) ("A court is not bound by the class definition proposed in the complaint and should not dismiss the action simply because the complaint seeks to define the class too broadly."); Fed. R. Civ. P.

22

Class overbroad are meritless, and their proffer of Professor Torous's report in support is unavailing as he is grossly unqualified to offer opinions on any of these matters, as discussed *supra* Section 4 (citing Torous Tr. at 82:24-83:16).

First, their contention that the inclusion of investors with no losses under the PSLRA "bounce back" provision would make class treatment untenable because "the need to identify those individuals will predominate" is wrong and is based on inapplicable antitrust class decisions. *See* Defs.' Br. at 22. The PSLRA provision is routinely addressed in securities class actions on a classwide basis through incorporation in the damages analysis, just as it is here. *See* Feinstein Rep. at ¶295(iv) (describing the step in the damages calculations in which the PSLRA bounce-back provision is applied). As Professor Feinstein explains, it is part of the "mechanical arithmetic exercise for all Class members, applying the results of the classwide analyses described [in his report] to each Class member's trading data." *Id*. at ¶295(v). Moreover, Defendants' submission of Professor Torous's simplistic analysis to purportedly identify the portion of the Class with no damages under the PSLRA bounce-back undercuts their claim that there are insurmountable individual issues.

Likewise, Defendants' argument that the class definition must expressly carve-out investors who sold before the first corrective event ignores the simple fact that investors who sold out before any of the fraudulent inflation dissipated from the share price will have no damages under Lead Plaintiff's damages methodology. Defendants' premature attempt to assess and eliminate potential class members based on speculative damages analyses should be rejected.[14]

---

23(c)(1)(C). To that end, the addition of "and was damaged thereby" to the proposed Class definition would exclude putative members with no damages without engaging in speculative and premature damages analyses.

[14] Indeed, in the case Defendants cited in support—*In re Flag Telecom*, 574 F.3d at 39—the Second Circuit stated that "we do not disagree with the premise that it may be premature for courts to attempt to determine whether in-and-out traders have suffered losses at the class certification stage of the game," but found that an analysis was required there because an in-and-out trader was proposed to serve as a class representative, and may be inadequate or atypical on this basis. That is not the case here.

**B.  The Proposed Class And Class Representative Satisfy Rule 23(a)**

**1.  CAAT Is Typical Because The Alleged Losses Arise From A Single Course Of Conduct**

Defendants' only argument against typicality is their effort to mischaracterize the pre-collapse alleged misrepresentations as solely addressing the risk that Dam 1 would collapse, whereas the post-collapse misrepresentation, they say, concerns Vale's responsibility for the collapse. This strained construction, in an unsuccessful effort to analogize to the factually distinct Samarco matter, ignores the actual statements at issue here. All of the statements here concern the safety of Vale's dams generally, its dam safety and risk management efforts, and its commitment to health and safety. As discussed above, the single post-collapse alleged misrepresentation closely mirrors the language of the pre-collapse statements, there was no confusion that Vale was responsible for the dam, and Vale is not alleged to have ever even mentioned Dam 1 prior to its collapse. Thus, Defendants' argument that their pre-collapse statements concerned a different topic than their post-collapse statements rings hollow and should be rejected.

**2.  CAAT Is Adequate And Defendants' Attack Regarding "Candor" Is Baseless and Disingenuous**

Defendants falsely assert that there is an "error" in CAAT's certification and a "lack of candor" in another matter that render CAAT an inadequate class representative. These spurious arguments should be swiftly rejected.

First, Defendants' contention that there is an "error" in CAAT's certification because CAAT has not updated it for events that happened years later is false and baseless. On March 28, 2019, when CAAT signed the certification, it was serving as a lead plaintiff in the matter of *Gross v. Grupo Televisa*, S.A.B., No. 18-cv-1979 (S.D.N.Y.), a fact which it correctly disclosed on its certification. ECF No. 8-1. More than a year later, on June 6, 2020, CAAT lost a motion to serve as class representative in the *Grupo* matter on typicality grounds. *In re Grupo Televisa Sec. Litig.*,

24

2020 WL 3050550, at *8 (S.D.N.Y. June 8, 2020). Defendants cite no legal support for the dubious proposition that CAAT is obligated to update its certification in perpetuity for subsequent events, and they further mischaracterize the lack of an update as a "fail[ure] to correct this mistake" (Defs.' Br. at 24) when, in fact, there was no mistake.

Second, Defendants' argument that CAAT showed a disqualifying "lack of candor" in the *Grupo* matter should be rejected.[15]  Importantly, the *Grupo* Court did not find—or even suggest—that CAAT had not been truthful there. *See generally*, *In re Grupo Televisa*, 2020 WL 3050550. Rather, in *Grupo* there was (and is) a legitimate dispute concerning the relevance of CAAT's ownership interest in a third-party fund that held a short position in Grupo Televisa.[16] CAAT's counsel provided discovery on the investment but did not include it in CAAT's lead plaintiff motion because it "believed in good faith then, and still does today, that based on legal authorities CAAT's investment in 'units' of a third-party pooled investment fund . . . are legally irrelevant to CAAT's Exchange Act claims and . . . typicality." Ex. D to Reply Decl. CAAT's counsel has acknowledged that it was aware of the investment at the time of the lead plaintiff filing (*id*.), thus, there is no basis in the record to suggest that CAAT was dishonest there, much less for finding it inadequate here.

## III.    CONCLUSION

For the foregoing reasons, Lead Plaintiff respectfully requests that the Court: (a) certify this action as a class action pursuant to Rule 23(a) and 23(b)(3); (b) certify Lead Plaintiff as Class Representative of the proposed Class; and (c) appoint Kaplan Fox as Class Counsel.

---

[15] To be clear, Defendants do not—and cannot—claim that CAAT failed to disclose any investments in Vale Securities here, whether direct or through third-party funds. Lead Plaintiff has disclosed and provided discovery in connection with all of its Vale Securities investments during the Class Period.

[16] Defendants make numerous factual claims about the *Grupo* matter which CAAT disputes, including whether CAAT itself held a short position at all, and the value of CAAT's losses. In *Grupo*, CAAT has reserved its rights to appeal the district court's typicality ruling based on CAAT's third-party fund investment. Ex. D to Reply Decl. at fn.3.

Dated: June 4, 2021

**KAPLAN FOX & KILSHEIMER LLP**

/s/ *Frederic S. Fox*
Frederic S. Fox
Donald R. Hall
Melinda Campbell
Aaron Schwartz
850 Third Avenue, 14th Floor
New York, NY 10022
Telephone: (212) 687-1980
Facsimile: (212) 687-7714
*Lead Counsel for Lead Plaintiff and the Class*


**THE ROSEN LAW FIRM, P.A.**
Brian Alexander, Esq.
Brent J. LaPointe, Esq.
Phillip Kim, Esq.
275 Madison Avenue, 40th Floor
New York, New York 10016
Telephone: (212) 686-1060
*Additional Counsel*

26