# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| |
|---|
| In Re VALE S.A. SECURITIES LITIGATION |

No. 19-cv-526-RJD-SJB

REBUTTAL REPORT ON MARKET EFFICIENCY

PROFESSOR STEVEN P. FEINSTEIN, PH.D., CFA

June 4, 2021

# TABLE OF CONTENTS

I.    SCOPE OF PROJECT AND REPORT ................................................................1

II.   SUMMARY OF OPINIONS ............................................................................2

III.  CRITIQUE OF THE TOROUS REPORT.........................................................8

      A.    Areas of Agreement .............................................................................8

      B.    Areas of Disagreement..........................................................................11

      C.    The *Cammer* and *Krogman* Factors are Indeed Dispositive ...................12

            1.    A Correct Reading of the Academic Literature: The *Cammer* and
                  *Krogman* Factors Are Dispositive ..............................................13

            2.    Dr. Torous Ignores the Numerous Court Opinions that Recognize
                  the *Cammer* and *Krogman* Factors as Dispositive.....................18

      D.    My Event Study Analysis and Dr. Torous' Erroneous Criticisms........................20

            1.    My Event Study Together with an Analysis of the *Cammer* and
                  *Krogman* Factors Demonstrates Market Efficiency for Vale ADRs .........22

            2.    Dr. Torous' Allegation of Potential Selection Bias is Erroneous ..............23

            3.    Dr. Torous' Opinion That My Event Study Assessed Only Market
                  Efficiency for Four Dates is Erroneous ......................................24

      E.    Dr. Torous' Proposed Additional Event Dates are Inappropriate for a
            Market Efficiency Event Study in this Case .........................................25

            1.    The Four Earnings Announcement Events Proposed by Dr. Torous.........27

                  a.    27 October 2016..................................................................28

                  b.    23 February 2017 ................................................................30

                  c.    26 July 2018.......................................................................31

                  d.    25 October 2018.................................................................34

            2.    The Seven Production Announcement Events Identified By Dr.
                  Torous Are Not Appropriate Events for a Market Efficiency Event
                  Study ...............................................................................35

            3.    The Form 6-K Filing Events Identified By Dr. Torous Are Not
                  Appropriate Events for a Market Efficiency Event Study .......................36

F.    The Vale Notes Trade in an Efficient Market.........................................................38

        1.    The Inclusion of Agency Transactions in the Weekly Average Volume Calculation Is Correct and Supported by the Literature on TRACE Data Cleaning ...........................................................................38

        2.    Dr. Torous' Removal of Agency Trades Misleadingly Overstates the Impact of the Minor TRACE Data Cleaning Errors and Misleadingly Results in an Underestimate of Actual Volume...................41

G.    My Event Study Demonstrates Market Efficiency for the Vale Notes..................43

H.    The Out-Of-Pocket Damages Methodology Can Be Applied Commonly to Measure Damages for All Class Members ............................................................45

IV.    LIMITING FACTORS AND OTHER ASSUMPTIONS..................................................50

## I.    SCOPE OF PROJECT AND REPORT

1.    In my expert report dated 18 February 2021 ("Feinstein Report"), I reported that I conducted an analysis to assess the efficiency of the markets in which the Vale Securities traded during the period from 27 October 2016 through 6 February 2019, inclusive (the "Class Period").[1] The analysis I conducted was the widely used and generally accepted market efficiency analysis. Specifically, I analyzed the *Cammer* and *Krogman* factors, including an empirical event study, which are generally accepted as indicative of the efficiency of the market in which a security trades.

2.    In the Feinstein Report, I showed that each of the Vale Securities satisfied all of the *Cammer* and *Krogman* factors.[2] Among the factors examined, event study analysis showed that each of the Vale Securities demonstrated market efficiency by reacting promptly to new Company-specific information as that information entered the market.[3] Based on my analysis of all of these factors, I concluded that the markets for the Vale Securities were efficient over the course of the Class Period.[4]

3.    I also explained in the Feinstein Report that Section 10(b) damages for all Class members could be computed using a common methodology, the standard out-of-pocket damage model typically applied in Section 10(b) class action securities cases.[5]

4.    I am now asked by Kaplan Fox & Kilsheimer LLP, Lead Counsel for the Lead Plaintiff, to consider, evaluate, and respond to the arguments and conclusions in the Rebuttal Expert Report of Walter N. Torous, Ph.D., dated 9 April 2021 (the "Torous Report"), which was submitted by Defendants in this matter. Dr. Torous was asked to "evaluate Dr. Feinstein's opinions relating to market efficiency and whether damages can be calculated using a common methodology on a class-wide basis."[6]

5.    This report presents my response to the Torous Report.

---

[1] Unless otherwise indicated, capitalized terms used herein have the meaning ascribed to them in the Feinstein Report.

[2] Feinstein Report, ¶¶17-21.

[3] Feinstein Report, ¶¶19-20.

[4] Feinstein Report, ¶21.

[5] Feinstein Report, ¶¶288-297.

[6] Torous Report, ¶13.

6.     Documents that I reviewed and relied upon in preparing this report in addition to those already cited in my previous report are listed in Exhibit-1. My credentials and compensation are presented in the Feinstein Report, as is a list of testimony that I provided during the four years preceding that report. Testimony I provided subsequent to the submission of the Feinstein Report is presented in Exhibit-2.

7.     I reserve the right to amend, refine, or modify my opinion and report, including in the event any new or additional information or analysis becomes available.

## II.    SUMMARY OF OPINIONS

8.     The Torous Report provides no basis for revising my conclusion that the Vale Securities traded in efficient markets during the Class Period. I correctly conducted the widely used and generally accepted market efficiency analysis, and I applied generally accepted and well-supported standards. The findings clearly indicate that the Vale Securities traded in efficient markets throughout the Class Period.

9.     Dr. Torous' conclusion that the evidence and my analysis do not indicate market efficiency is at odds with the financial literature, court decisions, and generally accepted methodologies for assessing market efficiency. Dr. Torous' challenge to not only my work in this matter but also to the generally accepted and widely used market efficiency assessment methodology are at odds with the mainstream of academic and forensic economics. My analysis and the conclusion compelled by the evidence and my analysis stand.

10.    The Vale ADRs traded on the NYSE with numerous market makers facilitating trading in the security. Trading volume was well above the level warranting a strong presumption of market efficiency. The Company was widely covered by analysts and the news media. Institutional ownership of the Vale ADR was widespread. The Company was not only eligible for F-3 registration throughout the Class Period but actually did file an F-3 registration during the Class Period. Throughout the Class Period, Vale made regular and timely filings with the SEC. Financial information about the Company was always readily available to investors and analysts. Market capitalization and float were high, both for the Company as a whole and for the Vale ADR independently. The security's bid-ask spread was narrow, substantially narrower than the average bid-ask spread among all stocks traded on U.S. exchanges. No impediments to market efficiency were present.

2

11. Event study analysis provides a demonstration of market efficiency by the Vale ADRs. The Vale ADRs exhibited highly statistically significant price reactions immediately after major Company news events. The event study proves that there was a cause-and-effect relationship between the release of Company information and movements in the Vale ADR prices. The only reasonable inference from this demonstrated cause-and-effect relationship is market efficiency.

12. The Vale Notes traded on the NYSE, thereby satisfying the *Cammer* market-making factor. The *Cammer* court articulated the importance of an NYSE listing, stating that market efficiency can be presumed for virtually all securities that trade on the NYSE.[7] All seven of the Notes surpassed the trading volume that justifies for stocks a substantial presumption of market efficiency. Bonds are known to generally trade less frequently than stocks, but the Vale Notes satisfied even the volume standard used for stocks. Compared to other bonds in general, the trading of the Vale Notes was extraordinarily frequent and active. The Company was widely covered by analysts and the news media. The extensive coverage by analysts of Vale, as well as dedicated analyst coverage focusing on the Notes, promoted market efficiency for the Notes. Institutional ownership of the Notes was widespread. As mentioned, the Company was not only eligible for F-3 registration throughout the Class Period but actually did file an F-3 registration during the Class Period. Throughout the Class Period, Vale made regular and timely filings with the SEC. Financial information about the Company was always readily available to investors and analysts. Not only was the Company's market capitalization and float high, but the size of the Vale Note issues, in the aggregate and individually, were extraordinarily large.

13. The Vale Notes observably reacted to major Company events. All seven Notes declined significantly in response to the first two news events, which informed market participants about the Dam 1 collapse. The Vale Notes thus demonstrated a cause-and-effect relationship between the release of information and movements in their prices, thereby satisfying the fifth *Cammer* factor.

14. The Vale Notes also demonstrated that they consistently responded to and reflected available information, by observably incorporating market interest rate information on a day-to-day basis over the course of the Class Period. That they did so is evident in the

---

[7] *Cammer*, 711 F. Supp. 1264, at 1292 (quoting Bromberg and Lowenfels [1988], §8.6).

highly statistically significant relationship between the Benchmark Bond returns and the Vale Note returns. The empirical demonstrations of market efficiency prove that there were no impediments to information flow precluding market efficiency, no impediments to trading that could have impeded market efficiency, and that market participants did not irrationally ignore economically material information. These findings are compelling evidence supporting the conclusion that the market for the Vale Notes was an efficient market.

15.    After disregarding all of the other *Cammer* and *Krogman* factors, which compel the conclusion of market efficiency, Dr. Torous levies three criticisms at the event study I performed: i) that an event study focused on major news events cannot prove market efficiency for the entire Class Period,[8] ii) that my event selection was biased,[9] and iii) that collective tests on Vale's earnings announcements, production announcements, or 6-K filing dates should have also been run.[10] Dr. Torous' criticisms are unfounded and misguided.

16.    First, proper market efficiency event study analysis should only be run on major news events, but the results from those events allow for inferences about the nature of the market on all other days. The experimental design is to determine whether news that should move the security price significantly in an efficient market did move the security price significantly. Testing lesser news days proves nothing, because one would not expect a significant price reaction to mixed or minimal news. If a cause-and-effect relationship between information and price movement is established based on an examination of major news events, one can reasonably conclude that there are no impediments to market efficiency on the other days as well. In fact, one function of the *Cammer* and *Krogman* factors that Dr. Torous chooses to disregard is to establish that the structural conditions that make the market efficient on the major news dates are also in place and make the market efficient on all other days in the examination period. That, in fact, is the case with the Vale Securities.

---

[8] Torous Report, ¶36.

[9] Torous Report, ¶¶37-40.

[10] Torous Report, ¶¶43-59.

17. Second, a forensic analyst cannot manufacture test events, but rather must work with the actual history the company experienced. If only four big news events occurred, then four is the number of events to test. Dr. Torous is wrong to suggest that more events should and can be appropriately tested, or that lesser news events should be inserted to make up for what he considers to be a deficit relative to an imaginary standard.

18. Dr. Torous cannot and does not dispute that the 25 January 2019, 28 January 2019, 4 February 2019, and 6 February 2019 event dates were major news dates in the life of the Company. As such, they are objectively appropriate event dates for a market efficiency event study.

19. Third, as analysts stated, Vale's routine business had become rather predictable, such that Vale's earnings announcements, production announcements, and most 6-Ks did not constitute major unexpected news that would reasonably be expected to elicit statistically significant price reactions in an efficient market. Proper financial analysis must take into account the specific facts and circumstances of the case and company. Just because examination of earnings announcements or 6-Ks may have been appropriate and informative in one case does not mean that they are appropriate and informative in every case. Dr. Torous is wrong to suggest the identical methodological details must be applied in every case regardless of distinguishing facts and circumstances. In the instant case, Vale's earnings announcements, production announcements, and 6-K filings are not suitable candidate events for assessing the efficiency of the market for the Vale Securities. Non-significance to mixed or minimally informative events proves nothing about efficiency.  If anything, non-significance to such events proves the securities reacted appropriately and consistently with market efficiency.

20. Dr. Torous' criticisms regarding my cleaning of the TRACE data are highly misleading. He claims I made three mistakes in the processing of the data, and that if corrected, the average weekly turnover metric would be substantially lower. However, one of the three purported mistakes, is not a mistake at all. And, this is the only discrepancy between my processing of the data and Dr. Torous' that has any consequential impact on the volume calculation. Ultimately, Dr. Torous' numbers are wrong. My volume metrics required only slight adjustment, and this correction changes no qualitative conclusion.

21. Regarding my event study for the Vale Notes, Dr. Torous argues, that in his opinion, "an event study that tests four dates and does not consistently find statistically significant

price movements for half of those dates does not support a finding of market efficiency from an economic perspective."[11] Dr. Torous cites to no authority, academic or legal, to support his opinion that a company's various debt securities must react in exactly the same fashion in order for the market for such securities to be efficient. Such a requirement disregards the nature of bonds.

22. While Dr. Torous advises care and caution to ensure that the ultimate implementation of the damage model is executed correctly, he does not dispute my conclusion in the Feinstein Report that the out-of-pocket damage model is consistent with Plaintiff's theory of liability and can be applied commonly for all Class members. Similarly, though he does not challenge the damage model, Dr. Torous criticizes my articulation of it. He contends that in order to be a complete description I must provide more granular detail about how I would address confounding information.[12] Dr. Torous also seeks more detail about how I would estimate what the security prices would have been prior to the dam break had there been full disclosure rather than alleged misrepresentations and omissions.[13]

23. Disaggregating confounding information and estimating a "but-for" price, are not unusual issues and certainly not unique to this case. Not only can the out-of-pocket damage model accommodate confounding information, but it would do so in a common manner for all Class members. Similarly, not only do valuation and analytic tools exist to compute hypothetical full disclosure but-for security prices, but this valuation too would be executed commonly for all Class members. While it is premature at this stage to actually undertake the damage computation exercise, so it is premature to address every potential complexity that may be encountered, it is the case that the standard tools of valuation and statistical analysis can be applied to perform the measurements and disaggregation that Dr. Torous is concerned about.

24. Moreover, whether or not there is any confounding information, will be determined in the course of loss causation analysis, which has not yet been conducted in this case. If there is any confounding information, the standard tools of valuation analysis can separate out

---

[11] Torous Report, ¶79.

[12] Torous Report, ¶84.

[13] Torous Report, ¶89.

6

the effects. Financial analysts routinely perform attribution analyses, determining how much of a particular security price reaction was caused by one piece of news as opposed to another. The computation for each security of the but-for price is also a straightforward application of generally accepted and widely used valuation tools. Financial analysts routinely produce valuation forecasts contingent on alternative scenarios, concluding for example, that the price of a security will be X if one course of events takes place, or alternatively Y if different events occur. The widely used and generally accepted valuation and statistical tools usually applied for these purposes include valuation multiples, discounted cash flow, application of the expansive literature on the studied effects of various valuation factors, probability weighted estimates, the principle of rational expectations (recognizing that investors rarely make systematic valuation errors), and statistical maximum likelihood analysis (wherein an observed outcome informs about the most likely ex ante probability distribution of certain potential events).

25.     The actual execution of the but-for valuation requires full development of the record, however, so that the forensic financial analyst can assess what information could have been disclosed to the public that was instead concealed or misrepresented. Dr. Torous is wrong to assume that the valuation impact of the allegedly concealed information about the risk of a dam break was necessarily less than the security price declines that did occur when Dam 1 did collapse. With all information in hand, investors may have anticipated a far more catastrophic disaster than the one that did occur. The assumption underlying Dr. Torous' criticism is speculative and unfounded. It may be the case that for each security the price decline actually sustained, which the event study accurately measures, represents a conservative estimate of how much the security price would have fallen if prior full disclosure had informed the market about the true likelihood of a dam break and the range of possible catastrophic severity. Common valuation analysis, as described above, will tell.

26.     At this juncture, Dr. Torous' criticism is premature and based on speculative assumptions. There is no reason to suspect that the generally accepted and widely used valuation and statistical tools could not be applied to estimate but-for prices and disaggregate the effects of confounding information in this case.

27. It is noteworthy that Dr. Torous' concern that confounding information impacted the Vale Securities prices implicitly acknowledges that the Vale Securities incorporated available information and therefore traded in efficient markets.

28. Given all of the above, and as explained in more detail below, the Torous Report provides no reason to modify any of the opinions or conclusions in the Feinstein Report.

## III. CRITIQUE OF THE TOROUS REPORT

### A. Areas of Agreement

29. Dr. Torous does not dispute or even adopts most of the elements of my market efficiency analyses for the Vale Securities. Specifically, Dr. Torous does not dispute the following findings:

    i. The Vale ADRs had a weekly average turnover of 9.9% throughout the Class Period, which is above the 2% threshold for a substantial presumption of market efficiency.[14]

    ii. 35 analysts covered Vale during the Class Period. Barber et al. [1994] found that coverage by one or two analysts strengthened the presumption of market efficiency.[15]

    iii. The Vale ADRs traded on the NYSE, and its market was facilitated by an additional 140 market markers.[16] The 2nd Circuit concluded that an NYSE listing is a good indicator of market efficiency.[17]

    iv. Vale was eligible to file a Form F-3 with the SEC throughout the Class Period (the equivalent of a Form S-3 for domestic companies). Vale actually filed a Form F-3 during the Class Period, on 19 June 2018.[18]

---

[14] Feinstein Report, ¶75.

[15] Feinstein Report, ¶79.

[16] Feinstein Report, ¶93.

[17] "While other courts have been reluctant to conclude that a stock was traded efficiently solely because it was traded on the NYSE or NASDAQ, most courts agree that such listing is a good indicator of efficiency." (Opinion and Order, filed 20 August 2015, *Carpenters Pension Trust Fund of St. Louis v. Barclays*, 12-vc-5329-SAS, p. 9).

[18] Feinstein Report, ¶104.

v.      Vale is an exceptionally large company, and the outstanding market capitalization of the ADRs is also extraordinarily large. The average market capitalization of the Vale ADRs during the Class Period was larger than the respective market capitalizations of 94% of all publicly traded companies in the U.S.[19]

vi.     The average float of the Vale ADRs during the Class Period was larger than respective market capitalizations of 94% of all publicly traded companies in the U.S.[20]

vii.    The average bid-ask spread of the Vale ADRs during the Class Period was substantially narrower than the mean level among all stocks traded on the NYSE, AMEX, NASDAQ, and ARCA.[21]

viii.   My regression model for the Vale ADRs properly controls for market, sector, and currency effects.[22]

ix.     The Vale ADR residual declines on 25 January 2019, 28 January 2019, 4 February 2019, and 6 February 2019 were each statistically significant at the 99% confidence level.[23]

x.      Moody's and Fitch covered and rated the Vale Notes during the Class Period, which coverage entails continuous surveillance. Moody's and Fitch published detailed research and credit analyses focused on the Vale Notes.[24]

xi.     The number of institutional investors that owned the Vale Notes during the Class Period ranged between 146 and 242, depending on the Note.[25]

xii.    All seven of the Vale Notes were listed and traded on the NYSE, and also over-the-counter facilitated by sophisticated market makers. Further, Dr. Torous

---

[19] Feinstein Report, ¶107.

[20] Feinstein Report, ¶109.

[21] Feinstein Report, ¶113.

[22] Feinstein Report, ¶154.

[23] Feinstein Report, ¶171, ¶173, ¶175, ¶177.

[24] Feinstein Report, ¶¶239-240.

[25] Feinstein Report, ¶245.

does not dispute that there were at least 15 underwriters of the Vale Notes, including the following: ABN AMRO, Banco Bradesco BBI, BB Securities, BNP Paribas, Citigroup, Credit Suisse, Deutsche Bank, HSBC, JPMorgan, Merrill Lynch, Natixis, Santander, SG Americas Securities, SMBC Nikko Securities America, and UBS.[26]

xiii.  The aggregate par value of the Vale Notes totaled $12.05 billion, which is larger than the respective market capitalizations of at least 93% of all publicly traded companies listed on the NYSE, AMEX, NASDAQ, and ARCA during the Class Period.[27]

xiv.  My regression model for the Vale Notes properly controls for market, sector, currency, and market interest rate effects.[28]

xv.  All seven Vale Notes fell significantly in price after the collapse of Dam 1 on 25 January 2018.[29]

xvi.  All six Vale Notes for which TRACE price data were available to compute a 1-day return on 28 January 2019 had statistically significant price declines that day.[30]

xvii.  Six of the seven Vale Notes had negative raw and residual returns on 4 February 2018, with one Note's price remaining essentially flat.[31]

xviii.  Six of the seven Vale Notes had negative residual returns on 6 February 2018. One Note's price remained essentially flat. The prices of three of the seven Notes fell by statistically significant amounts that day.[32]

xix.  The Benchmark Bond return variable in the regressions for the Vale Notes reflects changes in market interest rates, and the regressions show that all of

---

[26] Feinstein Report, ¶¶249-250.

[27] Feinstein Report, ¶256.

[28] Feinstein Report, ¶265.

[29] Feinstein Report, ¶273.

[30] Feinstein Report, ¶274.

[31] Feinstein Report, ¶275.

[32] Feinstein Report, ¶275.

the Notes moved significantly on a day-to-day basis with the Benchmark Bond return.[33]

30.   Dr. Torous adopts almost all elements of the regression models I used to empirically assess the market efficiency of the Vale Securities, including:

  i.   my choice of US Market Index, Brazilian Market Index, Sector Index, and currency exchange rate factor for the Vale ADRs;[34]

  ii.   my choice of using 252-day rolling regressions to estimate the residual returns of the Vale ADRs;[35]

  iii.   my choice of US Market Index, Brazilian Market Index, Sector Index, currency exchange rate, and Benchmark Bond factor for the Vale Notes;[36]

  iv.   my choice of using the Class Period as the estimation period to estimate the residual return for the Vale Notes.[37]

### B.   Areas of Disagreement

31.   Dr. Torous nonetheless contends that I provided insufficient evidence to prove that the Vale Securities traded in efficient markets,[38] based on the following erroneous contentions:

  i.   "The indirect *Cammer* and *Krogman* factors are not sufficient to establish market efficiency."[39]

---

[33] Feinstein Report, ¶280.

[34] Torous Report, ₱54.

[35] Torous Report, ₱54.

[36] Torous Report, §VI.D.

[37] Torous Report, §VI.D.

[38] Torous Report, ¶15.

[39] Torous Report, ¶15.

ii. "Dr. Feinstein's event study fails to demonstrate a cause-and-effect relationship between new, material information and the price of the Vale ADRs during the relevant period."[40]

iii. "Dr. Feinstein has not accurately estimated trading volume of the Vale Notes, and his estimates of 'average weekly turnover' are overstated."[41]

iv. "Dr. Feinstein's event study fails to demonstrate a cause-and-effect relationship between new, material information and the prices of the Vale Notes during the Proposed Class Period."[42]

32. In addition, with respect to my opinion that a common damages methodology exists for all Class members, Dr. Torous argues that: i) "Dr. Feinstein fails to provide any methodological details regarding how he would structure this hypothetical analysis, which hypotheses he would test, how the results would be used to calculate artificial inflation on each day of the Proposed Class Period, or whether this methodology would appropriately reflect Plaintiff's multiple and varied liability claims"[43] and ii) "Dr. Feinstein does not specify any method to distinguish the price movements related to [materializations of a disclosed risk], and without such a method, it would be impossible to accurately calculate the amount of inflation (if any) in the Vale Securities over a class period spanning approximately two and a half years."[44]

33. As I discuss herein, I disagree with Dr. Torous' contentions. All of Dr. Torous' opinions and conclusions are either deeply flawed, misguided, or outright misleading.

## C. The *Cammer* and *Krogman* Factors are Indeed Dispositive

34. Among the most egregious errors underlying Dr. Torous' erroneous opinion is his wholesale disregard of the *Cammer* and *Krogman* factors, with the exception of the fifth *Cammer* factor, as indicators of market efficiency. Dr. Torous opines that "the indirect

---

[40] Torous Report, ¶15.

[41] Torous Report, ¶15.

[42] Torous Report, ¶15.

[43] Torous Report, ¶15.

[44] Torous Report, ¶15.

*Cammer* and *Krogman* factors are not sufficient to establish market efficiency."[45] To support his opinion, Dr. Torous makes two claims: i) that a direct test of market efficiency (i.e., an event study) is recognized by the literature "as the standard for an efficient market";[46] and ii) "Academic studies show that there are many instances where securities that fulfill the first four *Cammer* factors and the three *Krogman* factors (that is, the indirect tests) still trade in inefficient markets."[47]

### 1. A Correct Reading of the Academic Literature: The *Cammer* and *Krogman* Factors Are Dispositive

35. In making the claim that the only "standard for an efficient market" is a "*direct* test of market efficiency," Dr. Torous cites to Barber et al. [1994], explaining the following:

> "… the authors acknowledged the apparent absence of a 'systematic body of evidence showing that [the *Cammer* and *Krogman* factors] or any other criteria distinguish between efficient and inefficient stocks.' The authors proposed 'to measure the efficiency of a firm's security price by analyzing the stock price response to the announcement of unexpected earnings.' They therefore proposed performing a *direct* test of market efficiency, thus recognizing the existence of a cause-and-effect relationship between news and security prices as the standard for an efficient market."
> **Torous Report, ¶24 (emphasis in original).**

36. Dr. Torous interprets Barber et al. [1994] incorrectly, and misleadingly leaves out the proper context of the authors' statement. While prior to 1994 it may have been the case that there is no "systematic body of evidence showing that [the *Cammer* and *Krogman* factors] or any other criteria distinguish between efficient and inefficient stocks," Barber et al. [1994] made this statement in the context of a problem to be solved. The Barber et al. [1994] study was intended to provide the very systematic body of evidence that the authors had found was lacking. As Barber et al. [1994] stated, in full context:

---

[45] Torous Report, ¶23.

[46] Torous Report, ¶24.

[47] Torous Report, ¶24.

"The various market efficiency criteria applied so far by courts are ad hoc. We know of no systematic body of evidence showing that these or any other criteria distinguish between efficient and inefficient stocks. Nor are we aware of evidence supporting specific cutoff values of these criteria. ***This study fills the void*** created by the Supreme Court decision in *Basic, Inc. v. Levinson* by providing evidence on the factors that systematically distinguish between efficiently and inefficiently traded stocks. Specifically, based on an operational definition of stock efficiency–a price reaction to the release of significant, unexpected information–we select samples of efficient and inefficient stocks and derive in a statistical multivariate framework a set of factors, or 'efficiency drivers,' that best discriminates between the two samples. ***Our findings confirm some efficiency factors used by courts,*** while finding other factors unsupported by the data."
**"The Fraud-on-the-Market Theory and the Indicators of Common Stocks' Efficiency," by Brad Barber et al., *Journal of Corporation Law*, 1994, p. 290 (emphasis added).**

37. Thus, the authors did not claim that empirical testing was the only way to assess market efficiency. Rather, Barber et al. marshalled empirical tests to assess the efficacy of the *Cammer* factors as market efficiency indicators. Barber et al. [1994] found the volume, analyst coverage, and market maker *Cammer* factors to be probative of market efficiency.

"Consistent with the efficiency indicators used recently by the courts, the inefficient firms have lower mean trading volume, fewer market makers, lower analyst following, and lower institutional ownership (number and percentage) than efficient firms."
**"The Fraud-on-the-Market Theory and the Indicators of Common Stocks' Efficiency," by Brad Barber et al., *Journal of Corporation Law*, 1994, p. 302.**

38. Dr. Torous' mischaracterization of the literature does not end there. In citing to the recent study I conducted with Dr. Miguel Villanueva, Dr. Torous mistakenly infers that reactivity to earnings announcements is the only determinant of an efficient market.[48] To the contrary, my co-author and I clearly explained that the decision to assess reactivity to earnings announcements, rather than other events, was based on feasibility, as the study involved thousands of stocks over several years:

---

[48] Torous Report, ¶25.

> "Choosing earnings announcements as the news events is not the only possible screening criterion to construct a group of high information days. However, as this study examines over a thousand stocks, over several years, it is the most feasible of objective screens."
>
> **"Stock Price Reactivity to Earnings Announcements: The Role of the *Cammer/Krogman* Factors," by Miguel Villanueva and Steven Feinstein, *Review of Quantitative Finance and Accounting*, 1 October 2020, p. 6.**

39. We also explained that there are a variety of reasons for why a particular stock may not react to earnings announcements, with market inefficiency being only a potential explanation:

> "Reactivity demonstrates that a stock's price is impacted by information and is therefore evidence of informational efficiency. However, failure to find reactivity in a given sample does not necessarily prove inefficiency. Market inefficiency is, of course, a reason for a stock not to react significantly to an information event such as an earnings announcement, but there are other reasons why a stock might not react significantly. The event may have conveyed no news, or the news may have been of such modest nature that the appropriate stock price reaction was negligible. The information event may have contained countervailing positive and negative news."
>
> **"Stock Price Reactivity to Earnings Announcements: The Role of the *Cammer/Krogman* Factors," by Miguel Villanueva and Steven Feinstein, *Review of Quantitative Finance and Accounting*, 1 October 2020, pp. 3-4.**

40. Dr. Torous further leaves out the relevant conclusion of our study, which is that "Our findings that the *Cammer/Krogman* factors are generally dispositive of reactivity supports the widespread use by courts of the *Cammer/Krogman* factors as indicia of market efficiency."[49] These findings from my study are consistent with my opinion in the Feinstein Report that the *Cammer* and *Krogman* factors are "indicative of market efficiency."[50]

41. Dr. Torous goes on to cite Erenburg et al. [2011] to argue that "the indirect factors are inadequate to reach conclusions regarding market efficiency, and that some of the indirect factors are more likely to exist if the market for the stock in question is

---

[49] "Stock Price Reactivity to Earnings Announcements: The Role of the *Cammer/Krogman* Factors," by Miguel Villanueva and Steven Feinstein, *Review of Quantitative Finance and Accounting*, 1 October 2020, p. 31.

[50] Feinstein Report, ¶¶60-71.

inefficient."[51] But the Erenburg et al. [2011] article was essentially an opinion piece that examines the wrong type of market efficiency. Erenburg et al. [2011] do no study informational market efficiency, that is, the property that a security responds promptly to new information, which is relevant to securities cases ("markets which are so active and followed that material information disclosed by a company is expected to be reflected in the stock price"[52]). Rather, these researchers examined serial correlation in security prices and the profitability of momentum strategies to determine if subject securities satisfied an alternative standard of "perfectly" efficient, which they opine is a better standard. And, they find, as they initially presumed, that many securities are not perfectly efficient, notwithstanding that they may satisfy the *Cammer* and *Krogman* factors.

> "In a perfectly efficient market, the price response to information is instantaneous and unbiased. Prices adjust without trading rather than in response to trading, and the only reasons for trading to occur at all are related to changes in the circumstances of investors–wealth changes, changes in exposure to nonmarket risk, institutional fund flows, and the like–and changes in the circumstances of publicly traded companies that affect their appropriateness for inclusion in an investor's portfolio.
>
> Markets, however, are not perfectly efficient; rather, price discovery occurs through active trading by investors who have expertise in processing information, the ability to execute trades quickly and at low cost, and collective resources sufficient to affect the price. ….   How serious are the departures from perfect efficiency? In terms of implications for the legitimacy of investor or court reliance on market efficiency, this empirical question has not previously been examined."
> **"The Paradox of 'Fraud-on-the-Market Theory': Who Relies on the Efficiency of Market Prices?" Grigori Erenburg et al., *Journal of Empirical Legal Studies*, Vol. 8, Issue 2, 2011, pp. 265-266.**

42.     Erenburg et al. [2011] do not dispute, nor do they even study, the probative value of the *Cammer* and *Krogman* factors for indicating that a market is informationally efficient. The authors simply argue that the *Cammer* and *Krogman* factors are not probative of a perfectly efficient market. It is my understanding that the form of efficiency courts assess for purposes of applying the fraud on the market principle is informational efficiency, not

---

[51] Torous Report, ¶27.

[52] *Cammer*, 711 F. Supp. at 1273.

perfect efficiency (i.e., whether a security price reflects all publicly available information).[53] For example, in its 2014 *Halliburton II* decision, the Supreme Court stated that what is necessary for the fraud-on-the market doctrine is the "fairly modest premise that 'market professionals generally consider most publicly announced material statements about companies, thereby affecting stock market prices.'"[54] Dr.'"[55] Dr. Torous' reference to Erenburg et al. [2011] misses this crucial point.

43. Finally, in an attempt to disparage the *Cammer* and *Krogman* factors, Dr. Torous cites to academic literature that identifies anomalous instances of market inefficiency that is evident in apparent mispricing.[56,57] However, the isolated occurrences that Dr. Torous points to of market inefficiency among stocks that satisfy the *Cammer* and *Krogman* factors are rare and unusual. They are noteworthy because they are so anomalous. That the examples in these articles are anomalous exceptions to the general rule is evident even in the title of the paper by Lamont and Thaler: "Anomalies: The Law of One Price in Financial Markets."[58] Dr. Torous omits the word "Anomalies" from the title in his citation of this article.[59] Furthermore, Lamont and Thaler's other article published the same year warned that the incidences of inefficiency are so rare and brief that "[W]e caution readers not to rush out to form hedge funds to exploit this phenomenon… ."[60]

---

[53] See, for example, *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398, 2410, (2014).

[54] *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398, 2410, (2014).

[55] *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398, 2410, (2014).

[56] Torous Report, ¶¶28-29.

[57] Moreover, mispricing violates fundamental market efficiency, another form of efficiency distinct from informational efficiency. That fundamental market efficiency is not the form of efficiency relevant in a securities case was articulated by the Supreme Court in its 2014 *Halliburton II* decision: "Debates about the precise *degree* to which stock prices accurately reflect public information are thus largely beside the point. 'That the...price [of a stock] may be inaccurate does not detract from the fact that false statements affect it, and cause loss,' which is 'all that *Basic* requires.'" (*Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398, 2410 (2014) (emphasis in original)).

[58] "Anomalies: The Law of One Price in Financial Markets," by Owen Lamont and Richard Thaler, *Journal of Economic Perspectives*, Vol. 17, No. 4, Fall 2003.

[59] Torous Report, p. 16, footnote 50.

[60] "Can the Market Add and Subtract? Mispricing in Tech Stock Carve-Outs," by Owen Lamont and Richard Thaler, *Journal of Political Economy*, Vol. 111, No. 2, 2003, p. 242.

44.   The article cited by Dr. Torous titled "The Chipotle Paradox" similarly noted that an "anomalous" trading pattern was the basis for their study:

> "It is the anomalous pattern of trading since October 16, 2006, and following the final McDonald's disposition of its entire interest in Chipotle, that constitutes the Chipotle Paradox."
> **"The Chipotle Paradox," by Mark Fedenia and Mark Hirschey, *Journal of Applied Finance*, Vol. 19, 2009, p. 145.**

45.   Clearly, the rare incidences of inefficiency cited in these articles are unusual exceptions, not common or regular occurrences and not the general rule. Dr. Torous does not contend that any of the specific anomalous pricing phenomenon identified in these articles existed in the markets for the Vale Securities during the Class Period. It is far more likely than not that the markets for the Vale Securities would conform to the norm rather than join the short list of rare anomalies.

### 2.   Dr. Torous Ignores the Numerous Court Opinions that Recognize the *Cammer* and *Krogman* Factors as Dispositive

46.   In dismissing the *Cammer* and *Krogman* results as irrelevant, Dr. Torous ignores the vast majority of prior court opinions in class action securities cases, which after considering copious expert testimony recognized the *Cammer* and *Krogman* factors as dispositive indicators of market efficiency. It is my understanding that Courts in all circuits routinely rely on the full set of *Cammer* and *Krogman* factors to determine whether a security market is efficient. Representative opinions from cases in the Second Circuit include those rendered in the *Petrobras Securities Litigation*, *Waggoner v. Barclays*, and the very recent opinion in *Pearlstein v. Blackberry*.

> "However, it has recognized that courts generally apply a set of eight factors, known as the '*Cammer* factors.' Id.; see *Cammer v. Bloom*, 711 F. Supp. 1264, 1286 (D.N.J. 1989) (setting out five factors); *Krogman v. Sterritt*, 202 F.R.D. 467, 478 (N.D. Tex. 2001) (considering three additional '*Cammer*' factors)."
> ***In re Petrobras Sec. Litig.*, 312 F.R.D. 354, 369 (S.D.N.Y. 2016).**

"And as to market efficiency, the Court looks to the *Cammer* and *Krogman* factors, the prevailing tests for market efficiency, which are so named after *Cammer v. Bloom*, 711 F. Supp. 1264, 1286–87 (D.N.J. 1989) and *Krogman v. Sterritt*, 202 F.R.D. 467, 474 (N.D. Tex. 2001)."
**Pearlstein v. Blackberry Ltd., No. 13 CIV. 7060 (CM), 2021 WL 253453, at \*15 (S.D.N.Y. Jan. 26, 2021).**

"In addition to the *Cammer* factors, courts often consider what are known as the three *Krogman* factors when analyzing whether the market for a stock is efficient. Petrobras, 862 F.3d at 276. Those factors are '(1) the capitalization of the company; (2) the bid-ask spread of the stock; and (3) the percentage of stock not held by insiders ('the float').' *Krogman*, 202 F.R.D. at 474."
**Waggoner v. Barclays PLC, 875 F.3d 79, 94-95 (2d Cir. 2017).**

47. While Dr. Torous represented that the first four *Cammer* and the three *Krogman* factors are insufficient on their own to establish market efficiency, numerous courts in the Second Circuit and other circuits have explicitly stated otherwise, deciding that those *Cammer* and *Krogman* factors were sufficient to establish market efficiency even without the fifth *Cammer* factor.

"Even if Lead Plaintiffs had failed to satisfy the fifth *Cammer* Factor, the Court's conclusion that the market for Vale ADRs was efficient would remain unchanged. The remaining four *Cammer* Factors and three *Krogman* Factors support a finding of market efficiency. The Second Circuit explained that if these seven factors are satisfied, the fifth *Cammer* Factor is not necessary for a finding of market efficiency."
**In re Vale S.A. Sec. Litig., No. 1:15-CV-9539-GHW, 2019 WL 11032303, at \*13-14 (S.D.N.Y. Sept. 27, 2019).**

"The only factor that is subject to disagreement is *Cammer*'s fifth factor, i.e., whether there was a 'demonstration of a cause and effect relationship between [BlackBerry]'s unexpected, material disclosures and changes in stock price.' *Waggoner*, 875 F.3d at 94 (alteration omitted) (quoting *Bombardier*, 546 F.3d at 200). As the Second Circuit noted in *Waggoner*, where the remaining four *Cammer* factors and the three *Krogman* factors all point toward market efficiency, a court can dispense with the fifth *Cammer* factor completely."
**Pearlstein v. Blackberry Ltd., 2021 WL 253453, at \*16.**

"The Second, Fourth, Fifth, and Eleventh Circuits have instructed that the *Cammer* factors serve only as a guide for determining market efficiency to be applied in a case-by-case basis in addition to other considerations and that, while important in certain cases, the fifth *Cammer* factor is not a mandatory prerequisite in every case for finding market efficiency. *Waggoner v. Barclays PLC*, 875 F.3d 79, 97-98 (2d Cir. 2017); *Gariety v. Grant Thornton, LLP*, 368 F.3d 356, 368 (4th Cir. 2004); *Unger v. Amedisys Inc.*, 401 F.3d 316, 323 (5th Cir. 2005); *Bell v. Ascendant Solutions, Inc.*, 422 F.3d 307, 313, 316 (5th Cir. 2005); *Local 703, I.B. of T. Grocery & Food Employees Welfare Fund v. Regions Financial Corp.*, 762 F.3d 1248, 1255-56 (11th Cir. 2014). Although these circuit courts require proof and thorough analysis of market efficiency in context, they disclaim rigid adherence to a bright line test. The parties have not cited, and the Court has not found, contrary authority."
**Di Donato v. Insys Therapeutics, Inc., No. CV-16-00302-PHX-NVW, at \*12 (D. Ariz. Sept. 20, 2019).**

"The parties have expended much effort discussing and disputing the application of the fifth *Cammer* factor, whether it has been met, and whether it matters if it has or has not been met. In fact, it doesn't matter. '[N]o court has adopted a per se rule that any one *Cammer* factor is dispositive.' *Strougo v. Barclays PLC*, 312 F.R.D. 307, 320-21 (S.D.N.Y. 2016). Numerous Courts within the Sixth Circuit have held that market efficiency can be established without regard to the fifth *Cammer* factor. *See In re Accredo Health, Inc. Sec. Litig.*, 2006 WL 1716910, \*10 (W.D. Tenn. 2006) (even if plaintiffs failed to establish *Cammer* 5, 'this alone would not negate the efficiency of the market'); *Zwick Partners, LP v. Quorum Health Corp.*, 2019 WL 1450546, \*13 (M.D. Tenn. 2019) (market efficiency established without reference to *Cammer* 5); *Burges v. BancorpSouth, Inc.*, 2017 WL 2772122, \*9 (M.D. Tenn. 2017)(same); *Ross v. Abercrombie & Fitch Co.*, 257 F.R.D. 435, 454 (S.D. Ohio 2009)(same)."
**Dougherty v. Esperion Therapeutics, Inc., No. 16-10089, 2020 WL 2832252, at \*6 (E.D. Mich. May 31, 2020), *report and recommendation adopted*, No. 16-10089, 2020 WL 6793326 (E.D. Mich. Nov. 19, 2020).**

48.  Dr. Torous' attack on the *Cammer* and *Krogman* factors is not only a challenge to my analysis, but it is also an attack on the generally accepted and widely used methodology for assessing market efficiency. Courts rely on this methodology, the methodology I applied in the instant case and numerous others. Exhibit-3 presents a sample of securities cases where my market efficiency analysis and opinion have been accepted by courts.

**D.     My Event Study Analysis and Dr. Torous' Erroneous Criticisms**

49.  As detailed in the Feinstein Report, I conducted an event study to investigate whether the Vale ADRs demonstrated market efficiency by reacting significantly to major news

events during the Class Period.[61] A market efficiency event study identifies news events that, according to valuation principles, should reasonably elicit a large security price reaction. The event study then tests to determine whether the subject security price did change by an amount so large that one can rule out random volatility as the cause of the observed movement. A price movement that is so large that it is not likely a random fluctuation is termed "statistically significant." If the event study finds that important news events do elicit statistically significant price movements, the event study proves that the subject security demonstrated market efficiency.

50. Lesser news events, which according to valuation principles should not cause large price movements, are inappropriate event study candidate events because the absence of a statistically significant price movement would prove nothing. One cannot tell from a nonsignificant price response whether the security failed to efficiently capture the new information, or if instead the nonsignificant movement was the appropriate efficient response to the modest or mixed news. In the Feinstein Report, I explained that "ideal candidate events for inclusion in an event study testing for market efficiency are therefore events on which company-specific information was released that is new, unexpected, and of such import as to reasonably be expected to elicit a stock price reaction over the threshold for statistical significance" in an efficient market.[62]

51. As noted above, Dr. Torous adopts my event study regression model and does not dispute the result that the returns for the Vale ADRs following all four events I tested were statistically significant. Dr. Torous levies three criticisms at the event study I performed: 1) that the results of my event study cannot prove market efficiency for the entire Class Period,[63] 2) that my event selection was biased,[64] and 3) that collective tests on either Vale's earnings announcement events, production announcement events, or 6-K filing dates should also have been run.[65] None of Dr. Torous' criticisms is valid.

---

[61] Feinstein Report, ¶126.

[62] Feinstein Report, ¶127.

[63] Torous Report, ¶36.

[64] Torous Report, ¶37-40.

[65] Torous Report, ¶43-59.

1. **My Event Study Together with an Analysis of the *Cammer* and *Krogman* Factors Demonstrates Market Efficiency for Vale ADRs**

52. Based on the event study results and analysis of the first four *Cammer* and three *Krogman* factors, I correctly concluded that Vale ADRs traded in an efficient market throughout the Class Period. In my deposition, I reiterated that my conclusion was based on the entirety of the evidence holistically:

> "Q. If I can, now, I want to turn to the five *Cammer* factors and the three *Krogman* factors. You considered those eight factors collectively to determine whether the Vale ADRs traded in an efficient market, correct?
> A. Yes."
> **Feinstein Deposition at 108:22-109:4.**

53. Dr. Torous' criticism that market efficiency for the Class Period cannot be proved with an event study of four events is a straw man argument of his own invention. I did not draw my conclusion from only the event study. The conclusion of Class Period market efficiency was compelled by all of the *Cammer* and *Krogman* factors, measured over the entire Class Period, in concert with an event study focusing on major news events that reasonably would warrant a large ADR price reaction in an efficient market. When Dr. Torous erroneously contends that my event study analysis on 25 January 2019, 28 January 2019, 4 February 2019, and 6 February 2019 "is unreliable because it tests only four dates in a proposed Class Period that spans 572 trading days,"[66] he ignores all the other indicia of efficiency presented in the Feinstein Report.

54. With respect to the number of major news events in the event study, Dr. Torous' criticism is again unavailing. Dr. Torous declares, "I am not aware of any peer-reviewed academic literature that recommends testing less than one percent of dates when evaluating the efficiency of the market for a given security over an extended period."[67] But, he is wrong. Not only does the literature address what are appropriate news events for the focus of an event study, but he is wrong to characterize the event study as only examining the major news events. A market efficiency event study compares the subject security's price

---

[66] Torous Report, ¶36.

[67] Torous Report, ¶36.

behavior on major news days to the price behavior exhibited on all other days in the examination period.  Thus, all days are examined. In a seminal exposition on event study methodology, MacKinlay [1997] describes how an event study compares event dates to all non-news days in the control period (the regression period, which in this case was the entire Class Period).[68]

55.    As explained above, and also in a *Law360* column I co-authored,[69] the forensic analyst cannot manufacture test events, but rather must work with the actual history the company experienced. If only four major news events occurred, then four is the number of events to test. Dr. Torous is wrong to suggest that more events should and can be appropriately tested, or that lesser news events should be inserted to make up for what he considers to be a deficit relative to an imaginary standard.

### 2.    Dr. Torous' Allegation of Potential Selection Bias is Erroneous

56.    Dr. Torous contends that my report and testimony present "no framework – other than a vague, qualitative description he provided in his deposition – for how he assessed whether the news on each day was unexpected and/or on balance either positive or negative. Without providing such a framework, his selection of dates is not replicable or verifiable and is thus inappropriate."[70] His contention is incorrect. I explained and demonstrated that candidate news events and announcements were evaluated for valuation relevance relative to generally accepted principles of valuation and considering the assessments of equity analysts covering Vale. In examining earnings announcements as potential event study event dates, I examined commonly considered financial performance metrics, such as revenue and earnings, and also other news and developments mentioned by analysts to be noteworthy. I took into account what reported information analysts considered surprising versus what they stated was expected, and assessed whether such characterizations were uniform or divergent across analysts and media reports. Dr. Torous cannot and does not dispute that the 25 January 2019, 28

---

[68] "Event Studies in Economics and Finance," by A. Craig MacKinlay, *Journal of Economic Literature*, Vol. 35, 1997, p. 15.

[69] "What a Solar Eclipse Has to Do with Market Efficiency," by Daniel Bettencourt and Steven Feinstein, *Law360*, 17 November 2017.

[70] Torous Report, ¶37.

January 2019, 4 February 2019, and 6 February 2019 event dates were the most important event dates in the life of the Company during the Class Period. As such, they are objectively the appropriate event dates for a market efficiency event study.

57. Dr. Torous claims that "It is highly inconceivable that over a 572 trading day period … Dr. Feinstein would find no other dates with value-relevant news that was unexpected and on balance positive or negative."[71] However, Dr. Torous finds no additional suitable candidates either. For additional consideration, he suggests four particular earnings announcements, but as I explained in the Feinstein Report and address again below, the news on these dates did not satisfy the fully articulated screen and were thus not appropriate events for a market efficiency event study.[72] Notwithstanding Dr. Torous' personal incredulity, the historical experience of the Company is not in the control of the forensic analyst.

58. Dr. Torous goes on to assert that because my identification of event dates was partially informed by my reading of the Complaint, it was a foregone conclusion that the returns on the dates I selected would be statistically significant.[73] Dr. Torous is wrong. My selection of the 25 January 2019, 28 January 2019, 4 February 2019, and 6 February 2019 events were based on the content of the news that transpired on those days. The information disclosed on 25 January 2019, 28 January 2019, 4 February 2019, and 6 February 2019 was highly important and valuation-relevant to analysts and investors. Dr. Torous does not contest this. That I too should focus on these events for a market efficiency event study is a result of the importance of the news that came out. To ignore the price behavior of the Vale ADRs on these event dates in a market efficiency study would render such a study incomplete and biased.

### 3. Dr. Torous' Opinion That My Event Study Assessed Only Market Efficiency for Four Dates is Erroneous

59. Dr. Torous absurdly suggests that the event study results only prove that the ADRs behaved efficiently on the four event dates tested, and one has no way of knowing if the

---

[71] Torous Report, ¶37.

[72] Torous Report, ¶37.

[73] Torous Report, ¶¶38-39.

stock also behaved efficiently on other days in the Class Period.[74] Dr. Torous attacks the generally accepted and widely used event study methodology, primarily because he apparently does not understand it. While a market efficiency event study should be run only on major news event dates, the results allow for inferences about all other dates. In fact, one of the roles of the other *Cammer* and *Krogman* factors is to justify extension of the results from the sample of tested events to all other dates. If the market behaves efficiently on the test dates, and the structure of the market remained well developed and supportive of market efficiency throughout the Class Period, it is reasonable and appropriate to conclude that the market was efficient throughout the Class Period. The evidence compels this conclusion in the instant case for the Vale ADRs and Notes.

60. In a 2017 *Law360* column, Bettencourt and Feinstein [2017],[75] I explained that while Albert Einstein could only test his theory of relativity when there was a total eclipse of the sun, it would have been unreasonable to conclude that the theory of relativity was operative only during solar eclipses. This is the logical error Dr. Torous makes when he argues that market efficiency demonstrated on appropriate event dates says nothing about market efficiency on other dates. Market efficiency demonstrated on appropriate event dates, coupled with consistently strong *Cammer* and *Krogman* factor results, compels a conclusion of continuous market efficiency.

61. One cannot test for a significant, efficient security price reaction to news on days when there was no major news. But, if an event study conducted on major news days proves that the stock responds to news, and thus proves there are no impediments to efficiency in that market, this result is extendable to the other lesser news or no-news days.

### E.    Dr. Torous' Proposed Additional Event Dates are Inappropriate for a Market Efficiency Event Study in this Case

62. In the Feinstein Report, I explained that based on financial valuation principles and the nature of the news that transpired, Vale's earnings announcements were not appropriate events for testing the efficiency of the Vale ADR market during the Class Period.[76] I

---

[74] Torous Report, ¶41.

[75] "What a Solar Eclipse Has to Do with Market Efficiency," by Daniel Bettencourt and Steven Feinstein, *Law360*, 17 November 2017.

[76] Feinstein Report, ¶¶179-218.

explained that the earnings announcements during the Class period repeatedly contained an offsetting mix of positive and negative news, combined frequently with anticipated results that were in line with expectations, or nearly in line. These earnings announcements would reasonably not drive a statistically significant ADR price change in an efficient market, thus are inappropriate events for a market efficiency event study.

63.     In the Feinstein Report, I provided a detailed analysis of every Vale earnings announcement during the Class Period. Just as the news was repeatedly unexceptional, modest, mixed, or unsurprising, the ADR price responses were unexceptional, modest, and non-significant. While significant security price reactions to big news events are evidence of market efficiency, non-significant price reactions to expected or mixed news are neither evidence for nor against market efficiency.

64.     In paragraphs 43-59 of the Torous Report, Dr. Torous asserts that I should have performed collective event study tests on Vale's earnings announcements, production announcements, and 6-K filing dates during the Class Period. Dr. Torous performs a collective Z-test on these events and finds, as expected, the price movements within those samples were unexceptional. But, unexceptional price reactions to unexceptional news is what one would expect in an efficient market. Dr. Torous' tests prove nothing.

65.     To justify running the collective tests on earnings announcements, production announcements, and 6-K dates, Dr. Torous makes a variety of claims. He states that i) some analysts found some earnings announcements to be surprising;[77] ii) production announcement events were novel and important enough to be expected to elicit significant price reactions even if earnings announcements did not;[78] and iii) I have conducted similar collective tests in past cases.[79] In light of the nature of the news that transpired on Dr. Torous' proposed event dates, these claims are unavailing. Analysts commented that Vale had become predictable.[80]

---

[77] Torous Report, ¶¶45-49.

[78] Torous Report, ¶50.

[79] Torous Report, ¶52.

[80] For example, on 25 April 2018 BTG Pactual analysts characterized the Company's earnings results as "largely anticipated by the market" and stated that "Vale delivered a fairly predictable set of results, *which is ultimately management's goal*." ("1Q18: Who Said Predictable (In-Line) Is Unexciting?" by Leonardo Correa and Gerard Roure, BTG Pactual, analyst report, 25 April 2018, p. 1). Similarly, Credit Suisse analysts recognized that "Vale

26

66.     In the Feinstein Report, I explained that an event study tests the joint hypothesis that (i) the security trades in an efficient market, and (ii) the appropriate valuation impact of the information disseminated on the event date is of such a large magnitude as to exceed the threshold for statistical significance.[81] Appropriate candidate events for inclusion in an event study testing for market efficiency are therefore events on which company-specific information was released that is new, unexpected, and of such import as to be reasonably expected to elicit a stock price reaction over the threshold for statistical significance in an efficient market.[82] Dr. Torous' proposed additional event dates fail this screen.

### 1.    The Four Earnings Announcement Events Proposed by Dr. Torous

67.     The only analysis Dr. Torous conducts to support his assertion that four particular earnings announcements contained the kind of momentous news that should elicit a statistically significant price reaction was to gather a smattering of excerpts from analyst reports where analysts stated they were indeed surprised by at least some of the content in the earnings announcement. But, Dr. Torous' argument suffers from the biased selectivity that he accuses me of. On these four proposed events, analysts were not uniformly surprised. Interpretations as to whether the news was good or bad was mixed among analysts. Even the assessments from the analysts Dr. Torous cited were mixed; the analysts did not view the news as wholeheartedly positive or negative. A broader review of the analyst reports undercuts Dr. Torous' contention that the news on any of the four proposed dates was decidedly positive or negative.  Rather, a more complete review supports the opposite conclusion – the news was mixed, modest, or expected.

---

delivered another step to be recognized by the market as a predictable company". ("1Q18: A Predictable Quarter," by Ivano Westin et al., Credit Suisse, analyst report, 25 April 2018, p. 1).

[81] Feinstein Report, ¶128.

[82] Feinstein Report, ¶127.

### a.    27 October 2016

68.    On 27 October 2016, prior to the start of trading in the U.S., Vale announced financial results for Q3 2016.[83] Vale reported net revenue of $7.3 billion (below consensus estimates of $7.5 billion) and adjusted EBITDA of $3.0 billion (above consensus estimates of $2.8 billion).[84]

69.    Analyst commentary was mixed, reflecting Vale's mixed Q3 2016 results. Deutsche Bank saw the EBITDA result as "in line" with its estimate for the quarter, "with softer iron ore sales volumes offset by streaming gains in base metals."[85] Morgan Stanley noted, "Lower-than-expected costs more than offset the revenue miss."[86] Credit Suisse pointed out various offsetting items: "Prices made the difference" and "Vale kept its discipline on costs," while "iron ore division disappointed on volumes" and fertilizers EBITDA was "weak."[87]

70.    Dr. Torous argues that "Other analyst reports released following that earnings announcement, however, indicate that many considered Vale's Q3 2016 earnings to be a surprise."[88] Dr. Torous cites to two analysts, RBC Capital Markets and BMO Capital Markets.[89] Dr. Torous observed that RBC commented "that they had 'updated [their] analysis,' including raising their price target from $6.50 to $7.00, because Vale's Q3 2016 earnings were 'above expectations" and that BMO analysts commented "'We have updated our forecasts to take into account Vale's recent Q3/16 earnings results, which beat our expectations…'"[90]

---

[83] Brazil's Vale 3Q Net Profit $575M, Vs $2.12B Loss a Year Earlier," by Rogerio Jelmayer, *Dow Jones Institutional News*, 27 October 2016, 4:14 AM.

[84] Consensus estimates obtained from analyst reports.

[85] "3Q16: Streaming Offsets Soft Iron Ore Sales," by Rene Kleyweg and Chris Terry, Deutsche Bank, analyst report, 27 October 2016, p. 1.

[86] "3Q16 EBITDA in Line; Cash from Ops Ahead of Our Estimate," by Carlos De Alba et al., Morgan Stanley, analyst report, 27 October 2016, p. 1.

[87] "3Q16: Strong and In Line," by Ivano Westin and Renan Criscio, Credit Suisse, analyst report, 27 October 2016, p. 1.

[88] Torous Report, ¶47.

[89] Torous Report, ¶47.

[90] Torous Report, ¶47.

28

71.    As an initial matter, both analyst reports Dr. Torous cites were released days after the 27 October 2016 earnings announcement, so it is not clear that their opinions were based only on the earnings announcement. RBC issued its report on 1 November 2016 (3 trading days after the earnings announcement) and BMO issued its report even later, on 7 November 2016 (6 trading days after the earnings announcement).

72.    Timing issues aside, Dr. Torous ignores that the very analyst reports he cites contained negative commentary regarding Vale's earnings announcement alongside the positives Dr. Torous highlights. For example, both RBC and BMO analysts commented that, while the 3Q 2016 earnings results were positive, the more important news was elsewhere (balance sheet, refinancing, asset sales, commodity prices), and their outlook for Vale remained subdued (RBC) or negative (BMO).

> "We have updated our analysis following the Q3/16 results. The focus remains on Vale's balance sheet and refinancing requirements, and its asset sales program. Our analysis indicates that Vale will require asset sales in addition to the Moatize/Nacala transaction to achieve its debt reduction target by 2018 at current spot prices. ***Given our subdued outlook for iron ore and the debt reduction challenges, we maintain our Sector Perform recommendation.***"
> **"Vale, Balance Sheet Remains the Focus," by Fraser Philips and Alexander Jackson, RBC Capital Markets, analyst report, 1 November 2016, p. 1 (emphasis added).**

> "We have updated our forecasts to take into account Vale's recent Q3/16 earnings results, which beat our expectations primarily on lower costs within the Ferrous and Base Metals divisions. Slightly lower costs flow through to a 9% improvement in 2016 EBITDA and a 23% improvement to earnings, reflecting the relatively high sensitivity Vale exhibits at lower commodity prices. ***Although improved, Vale's outlook remains one of falling profitability in 2017 on an expected decline in iron ore prices.***"
> **"Vale S.A., Earnings Increased on Slightly Lower Costs," by David Gagliano and Edward Sterck, BMO Capital Markets, analyst report, 7 November 2016, p. 1 (emphasis added).**

73.    These reports simply do not express enthusiastic positive surprise. Combined with the evidence and excerpts I presented in the Feinstein Report, Vale's earnings announcement on 27 October 2016 was definitely mixed news. The mixed nature of the information supports my determination that this earnings announcement is not an appropriate candidate for a market efficiency event study.

**b.    23 February 2017**

74.    On 23 February 2017, prior to the start of trading in the U.S., Vale announced financial results for Q4 2016 and the fiscal year.[91] Vale reported net revenue of $9.7 billion (above consensus estimates of $9.0 billion) and adjusted EBITDA of $4.8 billion (above consensus estimates of $4.4 billion).[92]

75.    Despite the seemingly positive results for past performance, analyst reaction was tempered by negatives within the earnings announcement and indications of concerning future performance. For example, BTG Pactual analysts explained that a "strong set of 4Q results" was driven by iron ore price realizations rather than shipments, and that going forward "the balance of risks of iron ore is significantly tilted to the downside, and remain Neutral on shares."[93] Scotiabank noted that "despite the high EBITDA beat," Vale's FCF generation "missed" Scotiabank's estimates "due to a US$1.5 billion increase in accounts receivable."[94] Morningstar highlighted higher iron ore prices as the "primary driver" of improved 2016 results, but viewed the iron ore price rally as "unsustainable."[95]

76.    Dr. Torous argues that my analysis did not consider the positive commentary from BMO and Itaú BBA. Specifically, Dr. Torous states:

> "Dr. Feinstein claims he quoted three 'representative' analyst reports released after Vale's earnings announcement on February 23, 2017. However, he does not quote analyst reactions such as 'Vale has reported an underlying Q4/16 profit of US$2.7B, or US$0.53/share, ***beating our forecast by 76%*** (US$0.30/sh) and ***consensus by 66%***. The beat was

---

[91] "Vale 4Q Rev $9.69B," by Rogerio Jelmayer, *Dow Jones Institutional News*, 23 February 2017, 4:27 AM.

[92] Consensus estimates obtained from analyst reports.

[93] "4Q16: Pace of Deleveraging Accelerating," by Leonardo Correa and Caio Ribeiro, BTG Pactual, analyst report, 23 February 2017, p. 1.

[94] "Quarter Results Ahead of Estimates; Dividends are Back," by Alfonso Salazar and Christian C. Landi, Scotiabank, analyst report, 23 February 2017, p. 1.

[95] "Vale 2016 Results Buoyed by Higher Iron Ore Prices, but These Elevated Profits Are Unsustainable," by David Wang, Morningstar, analyst report, 23 February 2017, p. 1.

primarily due to ***lower-than-expected*** costs in the ferrous and the coal divisions, assisted by higher revenues from the base metals and coal divisions.' Analysts from Itaú BBA also commented, 'Vale reported better-than-expected 4Q16 results… ***We expect a positive market reaction***.'"
**Torous Report, ¶48 (emphasis in original).**

77. But, mixed means mixed. While some analysts did highlight positives in the announcement, others latched onto the negatives. For example:

"Despite the high EBITDA beat, Vale generated ***FCF of US$1,134 million in Q4/16 that missed our US$1,281 million forecast*** due to a US$1.5 billion increase in accounts receivable (which should be collected in 2017)."
**"Quarter Results Ahead of Estimates; Dividends are Back," by Alfonso Salazar and Christian C. Landi, Scotiabank, analyst report, 23 February 2017, p. 1 (emphasis added).**

"Vale reported improved 2016 results versus 2015, with adjusted EBITDA increasing 72% to $12.2 billion. The primary driver was higher iron ore prices, which rose 14% to average $62.34 per metric ton in 2016. The rally accelerated during the fourth quarter, with prices reaching $79.10, which is 75% higher than the same period last year. ***In our view, this rally is unsustainable since it was built on credit-fueled Chinese stimulus that we expect will end.***"
**"Vale 2016 Results Buoyed by Higher Iron Ore Prices, but These Elevated Profits Are Unsustainable," by David Wang, Morningstar, analyst report, 23 February 2017, p. 1 (emphasis added).**

78. Combined with the excerpts and evidence I had presented in the Feinstein Report, clearly Vale's earnings announcement on 23 February 2017 was mixed. The mixed nature of the information supports my determination that this earnings announcement is not an appropriate candidate for a market efficiency event study.

### c.    26 July 2018

79. On 25 July 2018, after the close of trading in the U.S., Vale announced Q2 2018 financial results.  For the quarter, the Company reported net revenues of $8.6 billion (below consensus estimates of $8.8 billion) and adjusted EBITDA of $3.9 billion (slightly below consensus estimates of $4.0 billion).

80. Analysts viewed the news as a mix of negative and positive. Reported results were slightly disappointing, but the earnings announcement also contained positive developments. Analysts viewed the higher-than-expected dividends, a share buyback

program, and continued de-leveraging as positive factors countervailing or even outweighing the misses on past revenue and EBITDA. Morgan Stanley wrote that EBITDA was "basically in line" and free cash flow was "below our estimate," but "we believe the market will focus on Vale's announced dividends of ~$2.1B (~8% higher than MSe [Morgan Stanley estimate]) and an unexpected $1B share buyback program."[96] In Santander's view, "the good results reflect the company's strategy of focusing more on premium products with higher margins at the detriment of increasing market share." [97] Santander also highlighted that "leverage reache[d] lowest level in six years."[98] Deutsche Bank analysts commented that the results were "largely in-line with DBe [Deutsche Bank estimate]" and "overall guidance is largely unchanged," noting that the Company "remain[ed] on track to largely meet its $10bn target Net Debt by YE18."[99]

81.   Dr. Torous argues that my analysis did not consider the positive commentary from RBC, Jefferies, and CFRA analysts.[100] Specifically, Dr. Torous states:

> "Following Vale's earnings announcement on July 26, 2018, Dr. Feinstein again quotes three supposedly 'representative' analyst reports, which suggest that Vale's operating results were in line with consensus estimates. But he fails to quote other reports, such as this takeaway from RBC Capital Markets: 'Vale's quarter, although in line at the EBITDA level, *is peppered with positives*.' Analysts from Jefferies raised their price target for the Vale ADRs to $15.00 from $14.50, commenting, '*Vale reported better than*

---

[96] "2Q18 Results First Pass: EBITDA Basically in Line; FCF Below Our Estimate, but Focus on Dividends/Buybacks," by Carlos de Alba et al., Morgan Stanley, analyst report, 25 July 2018, p. 1.

[97] "Sound 2Q18 Operating Results; Leverage Reaches Lowest Level in Six Years," by Gustavo Allevato and Renato Maruichi, Santander, analyst report, 25 July 2018, p. 1.

[98] "Sound 2Q18 Operating Results; Leverage Reaches Lowest Level in Six Years," by Gustavo Allevato and Renato Maruichi, Santander, analyst report, 25 July 2018, p. 1.

[99] "2Q18 Operating Results In-Line; Dividend/Buyback Announced," by Chris Terry et al., Deutsche Bank, analyst report, 25 July 2018, p. 1.

[100] Torous Report, ¶48.

*expected* results this week and is firing on all cylinders… ***We have updated our model*** to fully reflect reported results and new guidance.' Like Jefferies, other firms also revised their price targets for the Vale ADRs following this earnings announcement. For example, CFRA increased its target price from $17.00 to $18.00, and HSBC increased its target price from $17.50 to $18.00."
**Torous Report, ¶48 (emphasis in original).**

82.   However, Dr. Torous ignores the negative commentary from other analysts that countervailed against the positive commentary he identified. For example:

"3Q18 Nickel output guided to be lower QoQ at 60kt due to the annual shutdown at Sudbury and Thompson fully transitioning to the minemill operation. Fullyear production outlook reduced to 250kt (vs. 263kt prior) due to management's strategy of focusing on value over volumes.
…
2Q18 coal EBITDA was down 57% QoQ to $45m, due to lower Nacala Logistics Corridor (NLC) debt service to Vale and the decline in met coal pricing (-9% QoQ)."
**"2Q18 Operating Results In-Line; Dividend/Buyback Announced," by Chris Terry, et al., Deutsche Bank, analyst report, 25 July 2018, p. 1.**

"The Negatives: i) Cash from operations of US$3.5B missed our US$5.4B estimate mainly due to higher working capital and higher cash taxes and cash financial expenses than we expected; ii) Pellets EBITDA/t of US$52.3/t came in 12% below our estimate of US$59.2/t, on the back of lower realized prices (US$114.7/t vs. US$122.8/t MSe); iii) VNC unit cash COGS rose to US$12,515/t vs. US$8,874/t in 1Q18 and US$11,222/t in 2Q17 mainly due to reduced output."
**"Dividends and Buybacks the Focus of 2Q18 Report," by Carlos de Alba et al., Morgan Stanley, analyst report, 26 July 2018, p. 1.**

83.   Further, despite Dr. Torous' portrayal of the 26 July 2018 as a positive surprise, the change in analysts' consensus EBITDA forecasts do not paint the same picture. According to consensus data I obtained from Thomson Eikon, prior to the 26 July 2018 earnings announcement, analysts expected Vale's forward EBITDA to be $16.36 billion. Following the 26 July 2018 earnings announcement, analysts revised their forward EBITDA estimate to $16.49 billion. The change in analysts' estimate is only 0.77% (equal to $16.49 divided by $16.36 minus 1) - far less positive than Dr. Torous would have one believe, and not strong enough to elicit a price reaction over the threshold for statistical significance.

84.     Combined with the evidence I had provided in the Feinstein Report, clearly Vale's earnings announcement on 26 July 2018 was mixed. The mixed nature of the information supports my determination that this earnings announcement is not an appropriate candidate for a market efficiency event study.

### d.      25 October 2018

85.     On 24 October 2018, after the close of trading in the U.S., Vale announced financial results for Q3 2018.[101] The Company reported net revenue of $9.5 billion (slightly below consensus estimates of $9.6 billion) and adjusted EBITDA of $4.4 billion (slightly above consensus estimates of $4.3 billion).[102]

86.     Analysts noted that the mixed results were close to expectations. BTG Pactual wrote that Vale's "largely in-line" results were "supporting the thesis that it's becoming a more predictable company."[103] RBC analysts wrote that that quarterly results "should, at first glance, provide some positive sentiment for the shares," though the analysts "continue to see challenges in the short-term over iron prices into a slowing China."[104] BMO analysts wrote that they "continue to like Vale's strategic direction but note that we are approaching a period of seasonal softness in iron ore prices."[105]

87.     Dr. Torous argues that my analysis did not consider the positive commentary from Credit Suisse and JP Morgan analysts.[106]

> "For Vale's earnings announcement on October 25, 2018, Dr. Feinstein again quotes analyst reports that state Vale's results are 'largely in-line with expectations,' but he ignores other reactions, such as positive sentiment from Credit Suisse: 'Considering the consensus beat and positive messages

---

[101] "Vale 3Q Net Income Falls on Weaker Real," by Jeffrey T. Lewis, *Dow Jones Institutional News*, 24 October 2018, 6:23 PM.

[102] Consensus estimates obtained from analyst reports.

[103] "3Q18: Cash (and Predictability) Is King," by Leonardo Correa and Gerard Roure, BTG Pactual, analyst report, 24 October 2018, p. 1.

[104] "Vale Posts Impressive Q3 Performance in Iron Ore; Salobo III, Gelado Expansion Approved," by Tyler Broda, RBC Capital Markets, analyst report, 24 October 2018, p. 1.

[105] "Slightly Light Q3 Earnings but Vale Continues to Deliver Strategic Direction," by Edward Sterck et al., BMO, analyst report, 25 October 2018, p. 1.

[106] Torous Report, ¶48.

> from capital allocation and business outlook, ***we see the results as positive for the shares***.' Similarly, analysts from J.P. Morgan noted, 'Vale delivered a solid 3Q18 performance… ***We expect a positive reaction [from the*** Vale ADRs] tomorrow.'"
>
> **Torous Report, ¶48 (emphasis in original).**

88.   I did not ignore that there was a mix of analyst responses. That analysts' reactions were mixed is what I highlighted as evidence that the news was mixed.

89.   It is Dr. Torous who overlooks half the evidence, ignoring the negative commentary. For example:

> "There remains so much to like about Vale over the medium-term; however, we continue to see challenges in the short-term over iron prices into a slowing China. … We continue to approach Vale shares with caution … ."
> **"3Q18: Cash (and Predictability) Is King," by Leonardo Correa and Gerard Roure, BTG Pactual, analyst report, 24 October 2018, p. 1.**

> "EPS of US$0.31 were materially below our US$0.47 estimate (and the Street at US$0.40) due to FX losses."
> **"Sizable Cash Distributions and Growth Plans Find Harmony," by Alfonso Salazar and Christian C. Landi, Scotiabank, analyst report, 25 October 2018, p. 1.**

90.   Combined with the excerpts and evidence I had presented in the Feinstein Report, clearly Vale's earnings announcement on 25 October 2018 was mixed. As was the case with the other three earnings announcements that Dr. Torous proposes for the event study, the mixed nature of the information on 25 October 2018 supports my determination that this earnings announcement is not an appropriate candidate for a market efficiency event study.

> **2.   The Seven Production Announcement Events Identified By Dr. Torous Are Not Appropriate Events for a Market Efficiency Event Study**

91.   I examined changes in consensus EBITDA forecasts to determine whether Vale's production announcements conveyed enough unexpected valuation-relevant information to be appropriate events for testing market efficiency. I focused on the changes in analysts' EBITDA forecasts for the upcoming fiscal year as it is a generally accepted principle of valuation that it is persistent future effects that dictate present valuation, more so than past transient effects.

92.     As shown in Table-1 below, none of the seven production announcement events identified by Dr. Torous elicited a large change in the consensus EBITDA forecast. Not a single event caused forward EBITDA to change by more than 1%. Five caused no change at all. These production announcement events would therefore not be expected to elicit statistically significant price reactions in an efficient market. As such, these events are inappropriate for assessing the efficiency of the market for the Vale ADRs.

**Table-1: Changes in Analysts' Consensus EBITDA Forecasts the Vale Production Announcement Dates Identified by Dr. Torous**

| Production Announcement Dates Identified by Dr. Torous | Consensus EBITDA Forecast on Day of Announcement | Consensus EBITDA Forecast on Prior Trading Day | Change in EBITDA Estimates |
|---|---|---|---|
| 2/16/2017 | $14.97 Billion | $14.97 Billion | 0.00% |
| 4/20/2017 | $15.37 Billion | $15.37 Billion | 0.00% |
| 7/20/2017 | $17.27 Billion | $17.27 Billion | 0.00% |
| 10/19/2017 | $12.68 Billion | $12.68 Billion | 0.00% |
| 2/16/2018 | $13.01 Billion | $13.01 Billion | 0.00% |
| 4/16/2018 | $15.54 Billion | $15.39 Billion | 0.96% |
| 7/16/2018 | $16.36 Billion | $16.40 Billion | -0.22% |

Source: Thomson Eikon.

### 3.     The Form 6-K Filing Events Identified By Dr. Torous Are Not Appropriate Events for a Market Efficiency Event Study

93.     Finally, Dr. Torous suggests that I should have collectively assessed Vale's 6-K filing dates simply because "This definition of 'news days' has also been used by Dr. Feinstein in previous securities litigations."[107] Dr. Torous' reasoning does not take into consideration that proper analysis must take into account the particular facts and circumstances that may differentiate one case or company from another. Just because I used a test in a previous case does not mean that that same test should be applied blindly to every future case without consideration of the distinguishing facts and circumstances. For Vale, while the earnings announcements did contain information, their content did not qualify these dates as appropriate market efficiency event study events. The same

---

[107] Torous Report, ¶56.

predictability that made earnings announcements uneventful also made the routine 6-K filings uneventful.

94.    Upon finding that his additional lesser news events did not elicit statistically significant price reactions, Dr. Torous should have analyzed whether the nonsignificance was due to the relatively low news content in the supplemental events, rather than jump to the conclusion that the efficiency of the market was questionable, especially given the preponderance of the evidence supporting market efficiency. Consistent with principles of classical hypothesis testing, a finding of statistical significance indicates market efficiency because it proves that the security reacted to information, but a finding of nonsignificance does not establish inefficiency. A modest nonsignificant stock price reaction (or no movement at all) is the appropriate and efficient stock price reaction to a modest, mixed, expected, or immaterial event.

95.    During his deposition, Dr. Torous acknowledged these principles, undercutting his conclusions and criticisms presented in the Torous Report:

> "Q. Is it fair to say that in examining an event study one is looking for price reactions of security in response to company specific new material value relevant information?
>
> A. I think you said a mouthful there. I think certainly it should be value relevant information. Certainly it should be new information or unanticipated information. So to that extent, I would agree with that statement."
> **Torous Deposition, 36:20-37:6.**

> "Q. I'm talking in general. If everyone agreed that a piece of information was immaterial, would you expect a price response from the security?
>
> A. I think you know to the extent that absolutely everyone agrees that it is immaterial, I would not expect a stock price reaction, but again you know I prefaced it by everyone agreeing that it's immaterial."
> **Torous Deposition, 40:22-41:6.**

> "Q. If it were negative news would one expect it to respond negatively to that information?
>
> A. Well, to the extent that everyone agrees that this information is a negative is significant enough to impact the value and under those circumstances that would – I would expect that the price of the security to fall in response to that. Again, that's what I would expect. And again – yeah, you know I guess

I would ask – only answer that, you know, sometimes empirically you may not see that because potentially they may be confounding events et cetera, but to the extent there is a single event, everyone agrees that it's negative, and it's unanticipated, I would expect that the security price would respond negatively to that."
**Torous Deposition, 41:24-42:18.**

**F.    The Vale Notes Trade in an Efficient Market**

**1.    The Inclusion of Agency Transactions in the Weekly Average Volume Calculation Is Correct and Supported by the Literature on TRACE Data Cleaning**

96.    Dr. Torous claims in his rebuttal report that I failed to properly process the TRACE data for the VALE Notes.[108] Dr. Torous states that I made three mistakes when processing the TRACE data:

i.    "While Dr. Feinstein attempted to process the TRACE data to remove duplicate interdealer trades, he did so incorrectly";[109]

ii.    "although he claims he did so, he also failed to remove entries identified as a 'Position Transfer'";[110] and

iii.    "Dr. Feinstein failed to remove duplicate agent trades."[111]

97.    Dr. Torous claims that on account of these three purported errors, the average weekly turnover rates I reported for the Vale Notes was overstated by as much as 31%.[112]

98.    Dr. Torous is wrong.  While for the first two items I did err as he points out, these errors were virtually inconsequential and had little effect on the reported volume metrics. TRACE data is a record of reported bond trades made by FINRA members. The Vale Note TRACE data contains over 100,000 lines of transaction code. The raw data as provided by TRACE requires intricate matching and cleaning in order to yield the

---

[108] Torous Report, ¶15 and ¶60

[109] Torous Report, ¶15 and ¶60.

[110] Torous Report, ⁣P15 and ¶60.

[111] Torous Report, ¶15 and ¶60.

[112] Torous Report, ¶¶68-69.

measures of trading activity reflected within.[113] As shown in Table-2 below, I accomplished this task with only very slight discrepancies deriving from issues one and two identified by Dr. Torous.

99.    With regard to the third item, Dr. Torous is wrong to contend I made a mistake. My treatment of agent trades was correct and consistent with the authority on the subject, the same author Dr. Torous cites.[114] The trades Dr. Torous is referring to were legitimate trades, executed between sophisticated market participants, and should not be excluded from the data and volume computation. These are not "duplicate" trades that should be excluded according to TRACE. In the published article by Jens Dick-Nielsen that Dr. Torous cites and relies on, the author writes the following:

> "On the other hand, the agency transactions are included in the official FINRA TRACE fact book statistics, which means that calculating the turnover measure on the data sample without the agency transactions will bias the turnover downward when comparing with the fact book statistics."
> **"Liquidity Biases in TRACE," by Jens Dick-Nielsen, in *The Journal of Fixed Income*, Fall 2009, page 43.**

100.    Dr. Torous makes precisely this error, resulting in precisely this downward bias. It is Dr. Torous' incorrect alternative treatment of agent trades that accounts for the bulk of the 31% discrepancy between my reported volume metrics and Dr. Torous' alternative and incomplete levels.

101.    As shown in Table-2, correcting items one and two has a *de minimis* effect on the average weekly turnover of the Vale Notes.

---

[113] "Liquidity Biases in TRACE," by Jens Dick-Nielsen, in *The Journal of Fixed Income*, Fall 2009.

[114] *See*, for example, "Agency transactions are not errors and could be kept in the data. Hence, deleting agency transactions is a choice." ("How to Clean Enhanced TRACE Data" by Jens Dick-Nielsen, December 3, 2014, p. 7).

**Table-2: Average Weekly Turnover of the Vale Notes**

| Vale Note | Face Value | Average Weekly Turnover Reported in the Feinstein Report | Corrected Average Weekly Turnover |
|---|---|---|---|
| TAN3 | $1,250,000,000 | 2.32% | 2.32% |
| TAM5 | $2,250,000,000 | 2.06% | 2.05% |
| TAP8 | $2,000,000,000 | 6.31% | 6.31% |
| TAE3 | $800,000,000 | 1.28% | 1.27% |
| TAH6 | $2,500,000,000 | 2.91% | 2.91% |
| TAK9 | $1,750,000,000 | 2.66% | 2.66% |
| EAA3 | $1,500,000,000 | 2.49% | 2.51% |

102. Dr. Torous' conclusion that "when the TRACE data are processed and analyzed correctly, three of the Vale Notes do not meet the two percent threshold for a 'strong presumption' of market efficiency," is erroneous.[115] Five of the Notes had weekly turnover over the 2% threshold justifying a strong presumption of market efficiency (based on standards generally applied to common stock), while one Note had weekly turnover over the 1% threshold warranting a substantial presumption. Bonds are known to generally trade less frequently than stocks, but the Vale Notes satisfied even the high volume standard used for stocks.

103. As elaborated in the following section, the reduction in Dr. Torous' computed volume for the Notes stems from his removal of "agent trades,"[116] which the very literature he relies on says is not necessary.

---

[115] Torous Report, ¶69.

[116] Torous Report, ¶15 and ¶60.

**2.      Dr. Torous' Removal of Agency Trades Misleadingly Overstates the Impact of the Minor TRACE Data Cleaning Errors and Misleadingly Results in an Underestimate of Actual Volume**

104.    Dr. Torous falsely contends that my inclusion of agent trades was an error.  It was not an error. The following excerpt is from the very article supplement that Dr. Torous relies upon:[117]

> "Agency transactions are not errors and deleting them remains a choice (see Dick-Nielsen (2014) for a discussion on agency transactions)."
> **"How to Clean Academic TRACE Data," by Jens Dick-Nielsen and Thomas Poulsen, 18 September 2019, p. 2, available at https://ssrn.com/abstract=3456082.**

105.    Economic rationale further supports including (and not removing) agency transactions from the TRACE data in order to measure trading volume for purposes of assessing market efficiency. An agent who acquires a note on behalf of a customer is generally a sophisticated bond market participant, whose analysis and skill reasonably contributes to the efficiency of the market. An agent in this capacity is essentially a market maker. Just as the *Cammer* court and numerous other courts have recognized, market makers provide liquidity and lower transaction costs. With a large number of market makers, it is generally easy for investors to execute trades in a timely fashion and with reasonable transaction costs. These features preclude certain potential impediments to trading and conveyance of information and therefore promote market efficiency.

106.    By removing agency trades from the TRACE data when assessing the volume *Cammer* factor, Dr. Torous is essentially stripping out a component of the trading activity that directly plays a role in making the market efficient. To properly assess whether trading volume is at a level to indicate market efficiency, market maker transactions should be included and given proper weight.

107.    The Torous Report neglects to attribute how much of the purported 31% discrepancy in measured volume derives from each item identified.  As it turns out, the discrepancy due to legitimate mistakes (items one and two) is negligible.

---

[117] *See*, Torous Report, FN 133.

**Table-3: Average Weekly Turnover Inclusive of Agency Trades**

| | | From Torous Exhibit 7 | | | Corrected Average Weekly Turnover | |
|---|---|---|---|---|---|---|
| Vale Note | Face Value | Feinstein Average Weekly Turnover | Torous Average Weekly Turnover | Torous' Claimed "Overstatement" | Feinstein Corrected Average Weekly Turnover | Effect of Correction |
| TAN3 | $1,250,000,000 | 2.32% | 1.80% | 28.92% | 2.32% | 0.09% |
| TAM5 | $2,250,000,000 | 2.06% | 1.67% | 23.71% | 2.05% | 0.46% |
| TAP8 | $2,000,000,000 | 6.31% | 4.92% | 28.33% | 6.31% | -0.03% |
| TAE3 | $800,000,000 | 1.28% | 1.20% | 6.73% | 1.27% | 0.70% |
| TAH6 | $2,500,000,000 | 2.91% | 2.22% | 31.34% | 2.91% | 0.16% |
| TAK9 | $1,750,000,000 | 2.66% | 2.15% | 23.74% | 2.66% | 0.07% |
| EAA3 | $1,500,000,000 | 2.49% | 2.04% | 22.08% | 2.51% | -0.66% |

108.    During his deposition, Dr. Torous either conceded to or confirmed these facts.

"Q. Let's focus on the Tan 3 note for a second…how much in that decline in average weekly turnover volume was related to changes regarding the issue of inner dealer trades?

A. I don't know precisely the answer to that question as it pertains to the Tan 3 note. I know in general most of the reduction is due to so-called duplicate agent trades."
**Torous Deposition, 72:23-73:8.**

"Q. And can you read the second sentence under the heading 'Agency Transactions'? …

A. Right. So the second – the second sentence reads 'agency transactions are not errors and could be kept in the data.'

Q. What about the – can you read the next sentence?

A. 'Hence … [deleting] agency transactions is a choice.'"
**Torous Deposition, 76:7-18.**

109.    Notwithstanding the slight legitimate correction to the volume metrics, the finding presented in the Feinstein Report about trading volume in the Notes stands. The TAN3 Notes, TAM5 Notes, TAP8 Notes, TAH6 Notes, TAK9 Notes, and EAA3 Notes all had average weekly turnover exceeding the 2% threshold for a strong presumption of market

42

efficiency during the Class Period, while the TAE3 Notes exceeded the 1% threshold for a substantial presumption of market efficiency.

**G.     My Event Study Demonstrates Market Efficiency for the Vale Notes**

110.    In the Feinstein Report, I explained that because of their senior status, bonds' values are substantially insulated from all but the most extreme news by a valuation cushion provided by the common and preferred stock. As a result, bonds are the least sensitive of all securities to firm-specific news while being highly sensitive to a change in a firm's probability of default. That bond prices often do not react significantly to all company news is not due to market inefficiency. Investors and analysts in efficient bond markets are not ignoring important company news. Rather, bond prices often do not change significantly because analysts and investors assess that the proper revaluation of the bond in light of new information or events is only a small change (below the threshold for statistical significance), or perhaps no change at all.

111.    Nonetheless, I performed an event study on the same events tested in the Vale ADR event study. The findings were as follows:

i.      All seven Vale Notes fell significantly in price after the collapse of Dam 1 on 25 January 2019;[118]

ii.     All six Vale Notes for which TRACE price data were available to compute a 1-day return on 28 January 2019 had a statistically significant price decline that day;[119]

iii.    Six of the seven Vale Notes had negative raw and residual returns on 4 February 2018, with one Note's price remaining essentially flat (a residual increase of 0.02%). One of the Vale Notes (TAP8) declined by a statistically significant amount on 4 February 2018;[120]

---

[118] Feinstein Report, ¶273.

[119] Feinstein Report, ¶274.

[120] Feinstein Report, ¶275.

43

iv.    Six of the seven Vale Notes had negative residual returns on 6 February 2018, with one Note's price remaining essentially flat. The prices for three of the seven Notes fell by statistically significant amounts that day.[121]

112.    All price changes observed over the first two event dates were statistically significant declines. One note fell significantly again after the 3rd event date, and three notes fell significantly after the 4th event date. Based on these findings, I concluded that the Vale Notes demonstrated market efficiency, falling in response to serious adverse news about the Company.

113.    Dr. Torous does not challenge any of these event study findings. Instead, Dr. Torous challenges that the findings support the conclusion of market efficiency.[122] However, Dr. Torous offers no other explanation aside from market efficiency for why the Notes would have fallen promptly and significantly upon the news of the Dam 1 collapse. He characterizes the dam collapse as extraordinary event, but he does not dispute that bonds and notes generally move significantly only in the face of extraordinary events. They are insulated from routine information by their design and seniority.

114.    While Dr. Torous observes that significant movement was not uniformly observed among all the Notes for the latter events, he conducts no analysis to determine whether the movements were statistically different from one another. Moreover, each note has its own unique features, coupon rates, and time to maturity. These differences, as well as random volatility and the insulation provided by their senior status and the equity cushion allows for a range of independent movement.  Dr. Torous offered no opinion and did no analysis to ascertain if deviations among the Notes' price movements created an arbitrage opportunity that would evidence inefficiency. Dr. Torous' opinion about how much consistency of movement among the bonds on the latter event dates is or is not consistent with market efficiency is mere conjecture lacking support.

115.    Dr. Torous also suggests that I should have tested earnings and production announcement dates for the Vale Notes.[123] However, as those dates are inappropriate event dates for

---

[121] Feinstein Report, ¶275.

[122] Torous Report, ¶79.

[123] Torous Report, ¶80.

testing efficiency of the Vale ADRs, even more so they are inappropriate for testing the efficiency of the Vale Notes.

116. Dr. Torous' final criticism with respect to the fifth *Cammer* factor for the Vale Notes is that I should have assessed the Vale Notes' price reactions to credit rating upgrades during the Class Period.[124] Specifically, Dr. Torous argues that I should have studied the three dates on which Moody's "upgraded the credit rating of both Vale and the Vale Notes."[125] However, Dr. Torous' suggestion ignores the academic literature – which has found that bond prices rarely respond significantly to credit rating ***upgrades***:

> "Using monthly and multi-day return windows, research shows that credit rating downgrades often reveal new information and lead to significant stock price reactions but that upgrades do not."
> **"What Moves Stock Prices around Credit Rating Changes?" by Omri Even-Tov and Naim Bugra Ozel, *Review of Accounting Studies*, 10 August 2020, p. 1 (Forthcoming).**

> "The evidence in this paper suggests that downgrades by both Moody's and Standard and Poor's are associated with negative abnormal stock returns in the two-day window beginning the day of the press release by the rating agency. … There is little evidence of abnormal performance on announcement of an upgrade."
> **"The Effect of Bond Rating Changes on Common Stock Prices," by Robert Holthausen and Richard Leftwich, *Journal of Financial Economics*, Vol. 17, 1986, p. 1.**

117. That credit rating upgrades are not typically associated with large security price movements renders such events inappropriate for a market efficiency event study.

118. Given the above, I see no reason to modify any of my conclusions with respect to my analysis of the fifth *Cammer* factor for the Vale Notes.

### H. The Out-Of-Pocket Damages Methodology Can Be Applied Commonly to Measure Damages for All Class Members

119. The Feinstein Report explains that the out-of-pocket damage methodology can be applied commonly to compute damages for all Class members. As detailed, "Out-of-pocket damages are measured as the difference between the amount of security price inflation at

---

[124] Torous Report, ¶81.

[125] Torous Report, ¶81.

purchase and the amount of inflation in the security price at sale or, if held, at the end of the Class Period, taking into account formulaic prescriptions in relevant case law and statutes."[126]

120. The Feinstein Report also explains that to measure stock price inflation, which is undertaken in the implementation of the out-of-pocket damages methodology: 1) "Economic analyses, including valuation and empirical event study analysis, can be used to estimate the relationship between specific statements or sets of statements and the subsequent effect on prices";[127] and 2) "an inflation ribbon would be constructed, using generally accepted empirical analysis and valuation tools, indicating how much artificial inflation caused by the alleged misrepresentations and omissions was in the price of Vale Securities on each day during the Class Period, if any. An inflation ribbon is a time series of the difference between a security's actual price observed in the marketplace, and the estimated price that the security would have traded at each day had there been full disclosure. Construction of the inflation ribbon generally employs event study analysis, combined with widely used and generally accepted valuation tools. The inflation ribbon is often constructed by working chronologically backwards from the final corrective disclosure to the start of the Class Period, accounting for alleged fraud-related residual price declines as they occurred. Inflation prior to a corrective disclosure that dissipated inflation is greater than the inflation afterward by the amount of inflation that dissipated."[128]

121. The Feinstein Report expounds, "The full array of generally accepted and widely used valuation tools can be applied, if necessary, to calculate the but-for stock prices under the assumption of prior full disclosure. This analysis would also apply on a class-wide basis."[129] The valuation analysis that can be applied to measure artificial inflation is regularly used by security analysts every day to value almost all publicly traded securities and to produce contingent valuations that vary with alternative hypothetical scenarios. The valuation tools and analysis that can be applied to measure inflation in the

---

[126] Feinstein Report, ¶290.

[127] Feinstein Report, ¶291.

[128] Feinstein Report, ¶295, ii.

[129] Feinstein Report, ¶295, ii.

implementation of the out-of-pocket damages methodology are not at all unusual, as they are routinely used to value stocks under a wide variety of conditions.

122. Dr. Torous does not dispute the existence or common applicability of the out-of-pocket damages methodology, nor does he dispute that the out-of-pocket damages methodology can be applied in this case. As explained in the Feinstein Report, out-of-pocket damages can be measured as the difference between the amount of share price inflation at purchase and the amount of inflation in the share price at sale, taking into account formulaic prescriptions in relevant case law (e.g., Dura) and statutes.[130] Rather, Dr. Torous essentially takes issue with the fact that I have not already performed the analysis and consequently did not address every potential complexity that could potentially be encountered.

> "… an appropriate damages methodology would require an articulation of the alleged misrepresentations claimed by Plaintiff, as well as an explanation of which disclosures are corrective of which alleged misrepresentations. An appropriate damages methodology would also require an explanation of how any price movements of the Vale Securities would be apportioned between allegedly corrective information and Vale-specific information unrelated to the alleged fraud. Yet, Dr. Feinstein's report is silent regarding these considerations."
> **Torous Report, ¶84.**

> "Specifically, Dr. Feinstein's report does not detail how his methodology would account for the numerous complexities of calculating and assigning damages in this particular case. These complexities include addressing twenty-six alleged misrepresentations that occurred both pre- and post-collapse, multiple alleged corrective disclosures, claims for both the Vale ADRs and the Vale Notes (which may have been affected differently by any of the alleged misrepresentations or corrective disclosures), as well as price movements due to the materialization of a disclosed risk (discussed in greater detail below)."
> **Torous Report, ¶85.**

123. After evaluating Dr. Torous' criticisms of my proposed damages methodology, I see no reason to change my opinion that my damages methodology is appropriate, common, and feasible in the instant case. I nevertheless address certain of Dr. Torous' criticisms below.

---

[130] Feinstein Report, ¶290; and, for example, *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336 (S.Ct. 2005).

That I do not address and/or respond to each of his criticisms, arguments, and/or opinions is not, and should not be considered, as tacit acceptance of any such criticisms, arguments, and/or opinions.

124.   Dr. Torous' primary criticism is that "Dr. Feinstein's report does not detail how his methodology would account for the numerous complexities of calculating and assigning damages in this particular case."[131] However, Dr. Torous does not identify a single potential complexity that valuation analysis cannot address when constructing an inflation ribbon. Indeed, Dr. Torous' concerns overlook the fact that market participants are able to arrive at valuations for virtually all publicly traded securities, all the time, in real-time, no different from those analyses undertaken in many securities class action cases. I found no complexities in this case that would cause me to reach a different opinion.

125.   Damages for every Class member will derive from the misrepresentations and omissions, and the same corrective disclosures, and for each security will be based upon a common artificial inflation ribbon that is derived from the price reactions to those disclosures, adjusted using standard valuation tools if the facts prove such adjustment necessary. For example, if it is appropriate to disaggregate the causes of a price reaction following a corrective disclosure when calculating damages, that disaggregation will apply commonly to all Class members. If, for example, the Plaintiff fails to prove that a price reaction was caused by Defendants' alleged misrepresentations, as Dr. Torous speculates, then no inflation will be input into the model corresponding to that disclosure or particular information and the model will return a result of zero damages for that disclosure or information. The Class' proof of loss causation will thus rise and fall together. In all cases, the damages methodology I propose will yield a Class-wide damages solution, regardless of what the trier of fact decides are the appropriate inputs for the construction of the inflation ribbon.

126.   Dr. Torous' criticisms of a hypothetical inflation ribbon, which I have yet to construct, does not cause me to change my opinion that the inflation ribbon will appropriately reflect the difference between the security prices that actually prevailed in the marketplace and the prices the Vale Securities would have had if there had been full

---

[131] Torous Report, ¶85.

disclosure. In fact, by claiming to identify what an inflation ribbon must address, Dr. Torous appears to concede that it is possible for a ribbon to address all of those issues. To reiterate, I have not yet conducted a loss causation or damages analysis, but will do so at the appropriate stage, if requested. The inflation ribbon will appropriately reflect the differences between the security prices that prevailed in the marketplace and the alternative but-for prices that would have resulted from full disclosure.

127.    Dr. Torous' secondary criticism is that because "the Court has found that the change in the price of Vale Securities immediately after the Dam collapse may be due to the materialization of a disclosed risk … any appropriate damages analysis must isolate the portion of the price decline attributable to the alleged fraud from the observed price decline following the materialization of the disclosed risk."[132] At this juncture, Dr. Torous' assumption that the investment losses sustained when the dam collapsed do not reflect the artificial inflation caused by the misrepresentations and omissions that concealed the risk of collapse is pure speculation.[133] Prior full disclosure could have caused an even greater drop in the security prices than the declines that actually ensued, as investors may have anticipated a far worse catastrophe. Development of the record and examination of the evidence regarding what the Company knew about event probability and potential severity will not only reveal if there is any merit to Dr. Torous' concern, but will also facilitate the computations to address that concern if it does have merit. If information on the subject is not forthcoming, application of the body of economic principles regarding how securities are valued under uncertainty and when information is withheld can be applied to estimate the but-for security prices.

128.    Dr. Torous does not consider and so does not contest that even if the stock price decline upon disclosure combines disclosure of previously concealed risks with realizations of risks, and only some of this information is corrective of the fraud, valuation tools can be applied to appropriately separate the effects. Such a parsing of losses requires a full development of the record, which Dr. Torous acknowledges. Dr. Torous does not contend that such a parsing is impossible. He merely suggests that one may do it incorrectly. I

---

[132] Torous Report, ¶¶88 and 92.

[133] Torous Report, ¶89.

agree that the damages expert should exercise care to execute the analysis correctly. In short, Dr. Torous criticism is unfounded, speculative, and most certainly premature.

129.   The Torous Report provides no reason to revise my conclusion that an appropriate and feasible methodology exists to calculate damages commonly for all Class members.

## IV.   LIMITING FACTORS AND OTHER ASSUMPTIONS

130.   This report is furnished solely for the purpose of court proceedings in the above-referenced matter and may not be used or referred to for any other purpose. The analysis and opinions contained in this report are based on information available as of the date of the report. I reserve the right to amend, refine, or supplement this report in the event that I become aware of additional information, evidence, arguments, or analyses which bear on my work on this matter.

Steven P. Feinstein, Ph.D., CFA

**Exhibit-1**

## Documents and Other Information
## Considered in Addition to Those Cited in the Feinstein Report

### CASE DOCUMENTS

- Expert Report of Steven P. Feinstein, Ph.D., CFA, dated 18 February 2021.
- Deposition of Steven P. Feinstein, Ph.D., CFA, dated 24 March 2021.
- Rebuttal Expert Report of Walter N. Torous, Ph.D., dated 9 April 2021.
- Deposition of Walter Torous, Ph.D., dated, 14 May 2021.

### ACADEMIC AND PROFESSIONAL LITERATURE

- Bettencourt, Daniel and Steven Feinstein, "What a Solar Eclipse Has to Do with Market Efficiency," *Law360*, 2017.
- Dick-Nielsen, Jens, "Liquidity Biases in TRACE," *The Journal of Fixed Income*, Fall 2009.
- Erenburg, Grigori, Janet Smith, and Richard Smith, "The Paradox of 'Fraud-on-the-Market Theory': Who Relies on the Efficiency of Market Prices?" *Journal of Empirical Legal Studies*, Vol. 8, Issue 2, 2011.
- Even-Tov, Omri and Naim Bugra Ozel, "What Moves Stock Prices around Credit Rating Changes?" *Review of Accounting Studies*, 2020.
- Fedenia, Mark and Mark Hirschey, "The Chipotle Paradox," *Journal of Applied Finance*, Vol. 19, 2009.
- Holthausen, Robert and Richard Leftwich, "The Effect of Bond Rating Changes on Common Stock Prices," *Journal of Financial Economics*, Vol. 17, 1986.
- Lamont, Owen and Richard Thaler, "Anomalies: The Law of One Price in Financial Markets," *Journal of Economic Perspectives*, Vol. 17, No. 4, Fall 2003.
- Lamont, Owen and Richard Thaler, "Can the Market Add and Subtract? Mispricing in Tech Stock Carve-Outs," *Journal of Political Economy*, Vol. 111, No. 2, 2003.
- MacKinlay, Craig A., "Event Studies in Economics and Finance," *Journal of Economic Literature*, Vol. 35, 1997.

### DATA AND DATABASES

- Bloomberg
- Capital IQ
- CRSP (Center for Research in Security Prices)
- EDGAR
- Factiva

51

**Exhibit-1**

## Documents and Other Information
### Considered in Addition to Those Cited in the Feinstein Report

- FactSet
- Thomson Eikon
- S&P


**LEGAL CASES**

- *Carpenters Pension Trust Fund of St. Louis v. Barclays*, 12-vc-5329-SAS, Opinion and Order, filed 20 August 2015.
- *Dougherty v. Esperion Therapeutics, Inc.*, No. 16-10089, 2020 WL 2832252, (E.D. Mich. May 31, 2020), *report and recommendation adopted*, No. 16-10089, 2020 WL 6793326 (E.D. Mich. Nov. 19, 2020).
- *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336 (S.Ct. 2005).


**OTHER**

- Dick-Nielsen, Jens, "How to Clean Enhanced TRACE Data," 3 December 2014.
- Dick-Nielsen, Jens, "How to Clean Academic TRACE Data," 18 September 2019, available at https://ssrn.com/abstract=3456082.
- Other documents cited in my report.

**Exhibit-2**

**Steven P. Feinstein, Ph.D., CFA**
**Testimony Provided Since the Feinstein Report**

In Re Vale S.A. Securities Litigation
No. 19-cv-526-RJD-SJB
United States District Court
Eastern District of New York
Deposition Testimony
March 2021

In Re EQT Corporation Securities Litigation
Master File No. 2:19-cv-00754-MPK
United States District Court
Western District Of Pennsylvania
Deposition Testimony
May 2021

53

**Exhibit-3**

**Recent Securities Cases Where Professor Feinstein's Opinions Have Been Accepted**

| Company | Identifier | District |
| --- | --- | --- |
| American Realty Capital Properties Inc. | 1:15-mc-00040 | U.S.D.C. Southern District Of New York |
| BancorpSouth, Inc. | 3:14-cv-01564 | U.S.D.C. Middle District Of Tennessee Nashville Division |
| Corrections Corp. | 3:16-cv-02267 | U.S.D.C. Middle District Of Tennessee |
| JELD-WEN | 20-cv-112 | U.S.D.C Eastern District of Virginia |
| BlackBerry | 13-cv-07060 | U.S.D.C. Southern District Of New York |
| McKesson | 18-cv-06525 | U.S.D.C. Northern District Of California |
| El Pollo Loco Holdings, Inc. | 8:15-cv-01343 | U.S.D.C. Central District Of California |
| Eletrobras | 1:15-cv-05754 | U.S.D.C. Southern District Of New York |
| First Solar | 2:12-cv-00555 | U.S.D.C District Of Arizona |
| Grupo Televisa | 18-cv-01979 | U.S.D.C. Southern District Of New York |
| Genworth Financial, Inc. | 1:14-cv-02392 | U.S.D.C. Southern District Of New York |
| JPMorgan Chase & Co. | 1:12-cv-03852 | U.S.D.C. Southern District Of New York |
| Las Vegas Sands Corp. | 2:10-cv-00765 | U.S.D.C. District Of Nevada |
| LSB Industries, Inc. | 1:15-cv-07614 | U.S.D.C. Southern District Of New York |
| Novo Nordisk | 3:17-cv-00209 | U.S.D.C. District Of New Jersey |
| Marvell Technology Group, Ltd. | 5:15-cv-05447 | U.S.D.C Northern District Of California |
| Petrobras | 1:14-cv-09662 | U.S.D.C. Southern District Of New York |
| Prudential Financial, Inc. | 2:12-cv-05275 | U.S.D.C. District Of New Jersey |
| Puma Biotechnology, Inc. | 8:15-cv-00865 | U.S.D.C. Central District Of California |
| Resource Capital Corp. | 1:15-cv-07081 | U.S.D.C. Southern District Of New York |
| RH, Inc. | 4:17-cv-00554 | U.S.D.C. Northern District Of California |
| Silver Wheaton Corp. | 2:15-cv-05146 | U.S.D.C. Central District Of California |
| Staar Surgical Company | 2:14-cv-05263 | U.S.D.C. Central District Of California |
| SunEdison | 1:16-md-02742 | U.S.D.C. Southern District Of New York |
| The Southern Company | 1:17-cv-00241 | U.S.D.C Northern District Of Georgia |
| Twitter, Inc. | 3:16-cv-05314 | U.S.D.C Northern District Of California |