# EXHIBIT B

Case 1:19-cv-00526-EK-VMS   Document 101-3   Filed 06/04/21   Page 2 of 11 PageID #: 2872

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK

--------------------------- X


In Re:  VALE S.A.

SECURITIES LITIGATION


                              19-cv-526-

                               RJD-SJB


--------------------------- X


                    May 14, 2021

                    10:06 a.m.




        Videotaped deposition of WALTER N.

TOROUS, Ph.D., held via Zoom at 75

Cambridge Parkway, Cambridge,

Massachusetts, pursuant to Notice, before

Theresa Tramondo, AOS, CLR, a Notary

Public of the State of New York.

Page 2

APPEARANCE OF COUNSEL:

FOR PLAINTIFF:

KAPLAN FOX & KILSHEIMER LLP

850 Third Avenue

New York, New York 10022

BY:  DONALD R. HALL, ESQ.

AARON SCHWARTZ, ESQ.

MELINDA C. CAMPBELL, ESQ.

aschwartz@kaplanfox.com

dhall@kaplanfox.com

mcampbell@kaplanfox.com

(212)687-1980

FOR DEFENDANTS and WITNESS:

GIBSON DUNN & CRUTCHER LLP

200 Park Avenue, 47th Floor

New York, New York 10166

BY:  CHRISTOPHER M. JORALEMON, ESQ.

JASON BRESSLER, ESQ.

cjoralemon@gibsondunn.com

jbressler@gibsondunn.com

jason.m.bressler@gmail.com

(212)351-2668

Page 3

APPEARANCE OF COUNSEL (CONT'D):

ALSO PRESENT:

PHIL GLAUBERSON, Videographer, Veritext Legal Solutions

ANNE LA RUE, Analysis Group

Page 4

THE VIDEOGRAPHER:  Good morning. We are going on the record at 10:07 a.m. Eastern Time, May 14, 2021. Please note that microphones are sensitive and may pick up whispering and private conversations.  Please mute your microphone whenever possible.  Audio and video recording will continue to take place unless all parties agree to go off the record.

This is media unit number 1 of the video-recorded deposition of Dr. Walter N. Torous in the matter of In Re:  Vale S.A. Securities Litigation filed in the United States District Court, Eastern District of New York, 19-cv-526-RJD-SJB.  This deposition is being held remotely.

My name is Phil Glauberson from the firm Veritext and I'm the videographer.  The court reporter is Theresa Tramondo from Veritext.

I am not authorized to administer an oath.  I am not related

Page 5

to any party in this action, nor am I financially interested in the outcome.

Counsel will please now state their appearances and affiliations for the record.  If there are any objections to proceeding or to the court reporter administering the oath virtually, please state them at the time of your appearance beginning with the noticing attorney.

MR. HALL:  Hi, this is Donald Hall from the law firm Kaplan Fox & Kilsheimer LLP on behalf of the class lead Plaintiff and on the class. Joining me today are Melinda Campbell and Aaron Schwartz from my office.

MR. JORALEMON:  Good morning, everyone.  Christopher Joralemon of Gibson Dunn & Crutcher, appearing today on behalf of Defendants in this action as well as the witness.  I'm joined by my colleague Jason Bressler as well as Anne LaRue from Analysis Group.

2 (Pages 2 - 5)

Page 22

Torous

we can go to paragraph 15 of your report. It's on page 7, and there's a heading that says, "SUMMARY OF OPINIONS." Do you see that?

A.   Yes.

Q.   And then this goes from page 7 through the bottom of page 9, correct?

A.   That's correct.

Q.   And this is your summary of the opinions that are contained within your report, correct?

A.   That's correct. It's -- you know, as the title would indicate, a summary of the issues that I deal with in the rest of the report in greater detail. So yes, so I guess this would all be -- paragraph 15 is just, again, a quick summary of what issues I more fully discuss in the rest of my report.

Q.   That's fair.

Do you opine that the market for Vale securities is inefficient from the class period in this litigation?

A.   I think the opinion that I

Page 23

Torous

provide in this matter is that Dr. Feinstein has not provided reliable evidence as to whether either of the ADRs or the notes traded in an efficient market during the proposed class period.

Q.   Do you render any opinion in this report whether the market for Vale ADRs and notes is efficient or inefficient?

A.   Again, that was not the assignment given to me. I was asked to review and respond to Dr. Feinstein's analysis. And evaluating whether the market for Vale ADRs or notes was inefficient or not was not a task that I was an assigned, so that was not something that I investigated in this report.

Q.   Okay. So you render no opinion on that issue, correct?

A.   That is correct.

Q.   What is "market efficiency" in the context of securities class action litigation?

A.   Well, I spent -- well, as I was going to respond earlier, I've written an

Page 24

Torous

entire -- Section 4 of my report provides an overview of, you know, market efficiency in the context of securities class actions. And I think as -- even though the finance literature distinguishes between weak-form, semi-strong-form and the strong-form of the efficient markets hypothesis, as I indicate in that section of my report, typically in securities litigation market efficiency refers to the semi-strong-form or variant of the market efficiency hypothesis in which the stock market is required to respond to publicly available information.

Q.   Is that type of efficiency sometimes referred to as informational efficiency?

A.   That I don't know. I think you have to be a little more precise in that question. I think the term "informational" is used quite a bit in financial economics. I really -- I don't know what that -- you'd have to be a little more granular to enable me to answer that question.

Q.   Is it fair to say that part of

Page 25

Torous

the semi-strong market efficiency is that information concerning the company at issue is able to be relayed to investors and to the market as a whole in a timely manner?

A.   I think that's generally correct, but I think you have to preface the word "information" with "publicly available information." So that would be the type of information that should be quickly impounded in securities prices.

Q.   Thank you.

You refer to something in your report called "Cammer factors." What is your understanding of what Cammer factors are?

A.   Well, my understanding of the Cammer factors is that they are a set of factors that have been put forward in legal decisions, that according to these factors they should be satisfied in order to, from a legal perspective, establish market efficiency.

Q.   I don't want to get into a legal debate, but you say need to be satisfied.

7 (Pages 22 - 25)

Page 34

Torous

there is at least a relationship between the event and the price of the security in question.

Q. And as part of that, the person performing the event study would run a regression analysis over the selected period; is that correct?

A. Yeah. Again, I mentioned that. That sometimes you would -- so again, the selected period is accurately described as the estimation period. And one then runs a regression analysis to establish how the security returns behave under so-called normal conditions and compare that to the actual return corresponding to the event.

Q. As part of that process, are you trying to isolate company-specific news for the company that you're analyzing?

A. Yes. To the extent that you are running an event study, you would have to then select an event against which you're going to compare, yeah, the normal performance and see whether indeed it was normal or not.

Page 35

Torous

Q. And in this litigation the type of event study that was used is called a "single company event study." Have you heard that term before?

A. No, not really. Again, I haven't heard that term specifically; though, I can agree to the fact that it -- that the event study was run for a single company, in this case Vale.

Q. I was just making a distinction. Some of the academic articles, they have more than one company they can handle. I just wanted to point out that this was specifically for Vale securities.

A. Right. No, no. Yeah, I agree. It is the case that as an academic when one, for example, wants to assess what are -- you know, what is the wealth effects of a firm cutting dividends, one would do that over a whole portfolio or collection of firms, so as to, if you will, average out sort of idiosyncratic factors that may be particular to individual firms in that event study. But yes, in this particular matter what

Page 36

Torous

Dr. Feinstein performed was an event study for a single firm.

Q. And I will probably get this wrong, but you can correct me for your terminology. But is it fair to say that in examining an event study one is looking for price reactions of a security in response to company-specific new material, value-relevant information?

A. I think you said a mouthful there. I think certainly it should be value-relevant information. Certainly it should be new information or unanticipated information. So, to that extent, I would agree with that statement.

Q. And in a single company event study like we have here, it should be company-specific news, correct?

A. Maybe you can clarify. I'm just -- you know, what do you mean by "company-specific"? I mean, in the sense that there might be information that's released by the company reflecting its own internal operations, as opposed to, for

Page 37

Torous

example, there may be market-wide information, global information, that's very negative that may very well affect the company as well.

So it need not be -- it may go beyond the company, but it certainly would -- it would go beyond being emanated by the company, the piece of information or news. But it could very well be an economy-wide piece of information, that because the firm operates in the economy or in the global economy might very well affect the firm's stock or ADR performance in this case or the note performance.

Q. That's fair. In conducting an event study like was done here, and Dr. Feinstein attempted to do this, one normally would attempt to account for general market information or general sector information to be able to determine what an abnormal return is on the price of the security, correct?

A. Well, you can or you can't, right? Like so, I mean, there will be

Page 74

Torous transactions that you have an issue with, correct?

A. That's correct.

Q. Who is Jens Dick-Nielson? Have you heard that name before?

A. Yes. Actually he's a -- I'm working on a paper with him. He is a professor of finance at the Copenhagen Business School.

Q. And is he a reliable source related to cleaning bond data?

A. I believe he's written a paper to that effect that was published in the Journal of Fixed Income.

Q. Would you consider him an expert in the cleaning of bond data?

MR. JORALEMON: Object to the form.

A. I believe so, yes.

Q. Are you familiar with Dr. Nielsen -- I would assume he's a doctor, I assume that, I think I'm probably correct -- his December 3, 2014 paper on "How to Clean Enhanced TRACE Data"?

Page 75

Torous

A. What's the question?

Q. Are you familiar with that article by Dr. Dick-Nielson?

A. I'm -- I'm aware of it. I wouldn't argue that I'm extremely familiar with it, but I am aware of it, yes.

Q. If you can look at Footnote 139 of your report, right at the end of that footnote you cite to him, correct?

A. Yes. I cite two papers. There's a -- Paul Asquith and his coauthors have an MBR working paper which I refer to. And I have -- I cite the paper by Professor Dick-Nielson.

Q. And in the cite to his paper you say "the Supplement to"; do you see that? What do you mean when you say "the Supplement to"?

A. Well, my recollection was that there's a supplement to that paper which contains more technical details, but I would have to sort of see the article to remind myself more precisely.

MR. HALL: Aaron, can you mark K

Page 76

Torous as the next exhibit.

(Exhibit Torous 4, 25 pages, article titled "How to clean Enhanced TRACE data" by Jens Dick-Nielsen, dated 12/3/2014, no Bates numbers, marked for identification, as of this date.)

MR. SCHWARTZ: Okay. Stand by.

Q. Let me know when you've had a chance to look at Exhibit 4.

A. Yeah, give me a few moments. Can I please indulge you to let me sort of take a look at this?

Q. Yes, please do.

A. Okay. Again, I haven't read it in its entirety, but depending on the questions, I may go back. But anyway, let's go.

Q. Okay. Is this the supplement you're referring to in Footnote 139?

A. Yes.

Q. And it says on the front page of Exhibit 4, the first line of the asterisk says, "This note is a supplement to

Page 77

Torous 'Liquidity biases in TRACE'"; do you see that?

A. Yes.

Q. Turn to page 7 of Exhibit 4, please. And do you see a heading there "Agency transactions"?

A. Yes.

Q. And can you read the second sentence under the heading "Agency transactions"?

A. Right. So the second -- the second sentence reads, "Agency transactions are not errors and could be kept in the data."

Q. What about the -- can you read the next sentence?

A. "Hence, deleting agency transactions is a choice."

Q. So isn't it true that the fact that Dr. Feinstein left in agency transactions not an error?

MR. JORALEMON: Object to the form.

A. Well, again, I do cite to this

20 (Pages 74 - 77)

Page 78

Torous

particular paper, but I also cite to the Asquith, et al. paper. And again, I think the point here is that these agency transactions are simply transactions where an entity stands, if you will, the role of an intermediary between two parties and that if you are going to count these multiple legs, then in my opinion you are over counting the volume of transactions, that literally there's just simply one transaction, a firm sold a bond or -- you know, to a customer, and that was done via a particular dealer who acted as an agent. And again, there was no impact on the price that was being charged, if you will. It was just simply a transaction where an entity played the role as an agent. And to me that represents a single transaction, not two or three transactions.

Q. But isn't it true that Professor Dick-Nielson in the supplement that you cite to specifically says that agency transactions are not errors and could be kept in the data?

Page 79

Torous

A. Well, he says that. But again, notice he doesn't say they should be kept in the data. Okay.

So again, the next, very next sentence says, "Hence, deleting agency transactions is a choice," and clearly in the present context where we're interested in precisely measuring the volume of transactions, I think the choice should be that these duplicate agency transactions should be removed.

Q. Isn't it true that if you leave in the agency transactions, that the TAN3 and the TAM5 volume exceeds 2 percent?

MR. JORALEMON: Object to the form.

A. I would have to go back and check that. I don't know the answer to that question.

Q. If that were true, would it change your opinion about TAN3 and TAM5 as it relates to Cammer 1?

A. No, it wouldn't. Because again, as Jens Dick-Nielson makes clear, deleting

Page 80

Torous

agency transactions is a choice, right? So he's not saying it's wrong to delete agency transactions. In this context I think it's correct to delete agency transactions. So that would not change my opinion.

Q. And he's also not saying it's wrong to leave them in, correct?

A. He's saying they could be kept in the data.

Q. Okay. Thank you.

MR. HALL: I think we've been going for about an hour. Why don't we take a quick -- you know, take maybe a 10 or 15-minute break and then come back?

THE WITNESS: Well, it's almost 1 o'clock.

MR. HALL: We can take a longer one.

THE WITNESS: Yes. I would like to have lunch at some point.

THE VIDEOGRAPHER: Are we going off the record?

MR. HALL: Yes.

Page 81

Torous

THE VIDEOGRAPHER: This will end media unit 2. We're going off the record at 12:45, May 14, 2021.

(Luncheon recess: 12:45 p.m.)

21 (Pages 78 - 81)

Page 82

Torous

A F T E R N O O N   S E S S I O N
(Time noted: 1:33 p.m.)
THE VIDEOGRAPHER: We are back on the record. The time is 1:34, May 14, 2021. This will begin media unit 3.

W A L T E R   T O R O U S, resumed and testified as follows:

EXAMINATION BY (CONT'D.)

MR. HALL:

Q. Welcome back, Dr. Torous.

A. Thank you.

Q. Have you ever submitted an event study as part of an expert report in a securities class action litigation?

A. I may have. Again, I think in the context of class action securities litigation, I have been asked to evaluate other event study, and I'm not sure whether I myself, distinct from that role, have submitted an event study in the context of securities class actions.

Q. Thank you. Have you ever submitted a damage model in a sort of

Page 83

Torous

securities class action expert report?

A. Not to the best of my recollection.

Q. Have you ever constructed a plan of allocation to class members in a securities class action litigation?

A. Not to the best of my recollection.

Q. Are you familiar with plans of allocations in securities class action litigation?

A. Well, since I don't believe I've ever been asked to perform that type of analysis, I would not think that I'm well qualified to speak on that topic.

Q. One of the criticisms you raise with a damage model by Dr. Feinstein is related to, I'll call them "in-and-out transactions"; is that correct?

A. That's correct.

Q. Are you aware that in-and-out transactions are routinely excluded from damage models and plans of allocation in securities class action litigation?

Page 84

Torous

MR. JORALEMON: Object to the form.

A. Again, I'm not. I understand as an economist why they should be, but no, I don't know whether that is the case or not.

Q. And you also have criticisms to the damage model related to what I'll call the "PSLRA lookback periods"; is that correct?

A. That's correct.

Q. I think, just for clarity, I think you referred to it as the "bounce-back," I believe is the terminology, correct?

A. Yeah, I referred -- yes, I referred to it as the bounce-back provision of the PSLRA of 1995.

Q. And are you aware that it's routinely the case that the PSLRA lookback period is taken into account in plan of allocation and class action securities litigation?

MR. JORALEMON: Object to the form.

Page 85

Torous

A. Again, I am not aware of that since again I'm not aware -- I've never been asked to participate at that stage of a class action litigation, so I'm not aware of that and nor aware of that particular fact.

Q. And even the -- your analysis of the -- I'll call it in your terminology -- the bounce-back price actually shows that there are class members throughout the class period who would still have damages, correct, just not everyone?

A. Well, yes. Again, I took a very conservative approach and I found that across the entire proposed class period, the periods in which, conservatively speaking, no investor would be entitled to recover damages under the bounce-back provision was 46 percent of the proposed class period.

Q. And what percentage of the number of investors who were involved during that period would that cover?

A. Well, again, I don't do that calculation. I think that would require additional analysis, analysis on an

22 (Pages 82 - 85)

Page 86

Torous

investor-by-investor basis, to understand which investors purchased on which date and when they sold and whether they were subject to the bounce-back provision and what would be their bounce-back price. So I did not do that analysis.

Q. Thank you. I'm going to turn to paragraph 86 of your report.

A. Yes.

Q. About halfway through that paragraph there's a sentence that starts "This exercise is complicated"; do you see that?

A. Yes.

Q. And what point are you trying to get across in that sentence?

A. Well, the point that I'm trying to get across in that sentence is the fact that to the extent that the Plaintiff is alleging a misrepresentation after the dam collapse, that then theoretically would introduce additional price inflation into the Vale security prices. And the point I'm trying to make then is that investors who

Page 87

Torous

purchased before this date, the date of the misrepresentation after the dam collapse, would not be entitled to damages stemming from this alleged misrepresentation because, you know, the misrepresentation hadn't occurred when they had purchased the security.

And so the point I'm trying to make is that it's very important to apportion the price declines following the subsequent corrective disclosures alleged for February 4 and February 6 between the investors; if you will, the -- I guess the January 28th misrepresentation and all of the previous misrepresentations prior to the dam collapse. And that's something that Dr. Feinstein in his claim to be able to calculate damages on a common class-wide basis hadn't considered.

Q. Isn't it true that the misrepresentation on January 28th is similar and almost identical to misrepresentations made prior to the dam collapse?

MR. JORALEMON: Object to the

Page 88

Torous

form.

A. Well, again, I'm not a lawyer, but I would -- I think the misrepresentations prior to the dam collapse, my understanding would be that those dealt with the risk of the possibility of a dam collapse; whereas after the dam collapsed, clearly that risk has been realized. And so this January 28th, 2019 misrepresentation dealt with, you know, was Vale responsible for this dam collapse. So in my mind they're distinct.

Q. What makes you say the statement on the 28th dealt with whether or not Vale was responsible for the dam collapse?

A. Again, my understanding of the January 28th misrepresentation was that -- and I believe I read this in your complaint -- that Vale continued to attest to the fact that they -- that the dam had been certified safe prior to the dam collapse. So again, the misrepresentation dealt with Vale continuing. Because I believe they released a Form 6-K on that

Page 89

Torous

date in which they claim that, you know, the dam had received a safety certification prior to the dam collapse, and they continued to attest to that fact. And that was my interpretation of what the misrepresentation on January the 28th entailed.

Q. Were there statements prior to the dam collapse about the safety certification of Dam 1 that were less (phonetic) to be misleading?

A. Again, I don't remember the exact content of the 25 misrepresentations prior to the dam collapse. I do recall the misrepresentation after the dam collapse in only that it added this complication to Professor Feinstein's claim that he can calculate damages on a common class-wide basis.

But again, I understand that prior to the dam collapse, those misrepresentations spoke to the possibility or the risk of the dam collapsing. After the dam collapse, clearly -- you know, the

23 (Pages 86 - 89)

Page 90

Torous

dam had collapsed, so clearly that misrepresentation dealt with, you know, not the ex-ante probability of this event occurring.

Q. But isn't it true that the misstatements prior to the dam collapse dealt more with than the possibility of the risk of the dam collapse?

A. Again, I don't recall. I don't recall.

Q. All right. And then on the next page, on page 54, you say that theoretically that statement should "introduce additional artificial inflation"; do you see that?

A. Yes.

Q. Isn't it also possible that it just kept the stock from falling more?

A. Well, I think to the extent that Vale made the claim that they had passed a safety certification prior to the dam collapse, I think that would probably be -- again, assuming that's true, okay -- that that would have erroneously increased people's positive assessment of Vale and

Page 91

Torous

would probably have raised the price of the Vale securities, assuming, you know, that that alleged misrepresentation is true.

Q. Even if they had prior to the dam collapse claimed that it passed a safety certification, meaning that they had said the same thing prior to the dam collapse that they had said after related to this issue, would you still expect an increase in price?

A. Well, again, I really don't know the content of these prior -- these misrepresentations prior to the dam collapse, but to the extent that they're confirming that, you know, they're filing a 6-K to the effect that the safety certification had been passed, I would think that would have been viewed as positive information and would have raised the price, at least theoretically.

Q. But you didn't compare the January 28th statement to prior alleged misstatements in the class period, did you?

MR. JORALEMON: Object to the

Page 92

Torous

form.

A. Well, I'm -- I'm simply -- I didn't have to do that for my assignment. Again, I brought up a complication to Dr. Feinstein's claim that he could calculate damages in a -- using a common class-wide methodology, and to that extent -- and again, theoretically if that introduced additional price inflation, he then has to apportion that price inflation between investors who purchased before the dam collapse versus those who purchased after the dam collapse. And that's the point that I'm making, that he hasn't.

In fact, I believe, if I am not mistaken, in his deposition he hadn't even realized that the -- this particular misrepresentation that we're talking about actually occurred prior to the dam collapse. So to the extent that obviously it did occur after the dam collapse, and to the extent that it introduced additional price inflation, it's not clear to me how a common class-wide methodology can accommodate that.

Page 93

Torous

Q. But isn't the real question whether there's a complication at all? Because if the misstatement on the 28th was the same as misstatements prior to the dam collapse, is there really any added new inflation going to be introduced into the stock?

MR. JORALEMON: Object to the form.

A. Well, again, that's something that Dr. Feinstein should have looked into. But again, I would point out that 25 of these misrepresentations took place before the dam collapse. The fact that one is talking about a safety certification after the dam collapse, that to me is very much different in terms of the context because clearly the 25 earlier misrepresentations deal with the prospect or the risk of the dam collapsing. This 26th deals with the aftereffect of the dam collapsing. So the context in which -- even if the information may on paper look the same, the implications might very well be different because the

24 (Pages 90 - 93)

Page 94

Torous

context is quite different.

Q. And you didn't do any analysis to determine whether or not the implications were different, did you?

A. No, I did not, nor did Dr. Feinstein.

Again, Dr. Feinstein didn't even recognize that this misrepresentation took place after the dam collapsed and didn't even entertain the possibility that there may have been different implications. And to the extent that there are different implications, I'm pointing out that this is something Dr. Feinstein would have difficulty handling on a common class-wide basis.

Q. Why would there be a difficulty handling it?

A. Well, because then he has to apportion, you know, the price decline following the February 4th corrective disclosure and the February 6th corrective disclosure, how much of that -- you know, what's -- how much of those price declines

Page 95

Torous

are dissipating the alleged misrepresentation on January the 26th and how much is dissipating the earlier misrepresentations before the dam collapsed.

Q. Right. And that type of analysis where there are multiple corrective disclosures with the class period continuing is routinely dealt with in securities class action litigation damage models, correct?

MR. JORALEMON: Object to the form.

A. I -- again, I think I stated earlier that, you know, to the extent that you're in the damages phase, I really don't have any experience and I really can't answer that question.

Q. So you don't know if there's a way to handle this or not then, correct?

MR. JORALEMON: Object to the form.

A. Well, I'm not saying that it's impossible to do. I think it's something that should be done and Dr. Feinstein has not acknowledged that it's something that

Page 96

Torous

should be done.

Q. Doesn't Dr. Feinstein talk about creating the inflation ribbon and accounting for prior to a corrective disclosure and after a corrective disclosure in his report?

A. Well, I believe he made, you know, general statements to that effect, but again, to the extent that the complication arises whereby one of the alleged misrepresentations occurs after the dam collapse, that's not explicitly discussed in his report.

Q. But do you deny that he actually said there were methods and valuation tools to deal with the situation where the inflation changed before and after a corrective disclosure?

A. No, he made that statement. I believe you correctly summarized his statement. But again, my point is that this particular complication he does not discuss.

Q. Let's turn to paragraph 88 of your report, please.

A. Yes, hold on. Yes, I'm there.

Page 97

Torous

Q. At the end of the first sentence, right prior to Footnote 179, you talk about the "materialization of a disclosed risk"; do you see that?

A. Yes, I do.

Q. What do you mean by that, and I'm focusing on the "disclosed risk" part?

A. Well, I think if you continue reading that paragraph, I answer that question because I state, "That is, Vale disclosed in its filings with the SEC that safety events could occur, and if those risks materialize, this could have negative economic implications for the Company."

Q. But is that really the materialization of the risk that we're talking about? We're not talking about Vale stating that they have risk, correct, in the Complaint?

A. I don't understand. I mean, they're revealing that safety events could occur and a major safety event would be a dam collapse, and even if there were no alleged misrepresentations, the dam

25 (Pages 94 - 97)