# EXHIBIT C

CONFIDENTIAL

Page 1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK

-----------------------------------x

IN RE:  VALE S.A. SECURITIES LITIGATION


        No. 19-cv-526-RJD-SJB

-----------------------------------x


           CONFIDENTIAL


   VIRTUAL DEPOSITION OF STEVEN FEINSTEIN

          March 24, 2021


Reported By:

    JEREMY RICHMAN

CONFIDENTIAL

Page 2

March 24, 2021

10:00 a.m.

Virtual Videotaped Deposition of STEVEN FEINSTEIN, taken by Defendant, at the offices of Gibson Dunn & Crutcher LLP, 200 Park Avenue of the Americas, New York, New York, before JEREMY RICHMAN, a Shorthand Reporter and Notary Public within and for the State of New York.

Page 3

A P P E A R A N C E S:

KAPLAN FOX
Attorneys for Plaintiffs
850 Third Avenue
New York, New York 10022

BY:  DONALD R. HALL, ESQ.
AARON SCHWARTZ, ESQ.
MELINDA D. CAMPBELL, ESQ.

GIBSON DUNN & CRUTCHER LLP
Attorneys for Defendants
200 Park Avenue, 47th Floor
New York, New York 10166-5268
BY:  CHRISTOPHER M. JORALEMON, ESQ.
ALISHA SIQUEIRA, ESQ.
JASON BRESSLER, ESQ.

ALSO PRESENT:
AHMER NABI
RON MARRAZZO, Videographer

Page 4

STIPULATIONS
IT IS HEREBY STIPULATED AND AGREED, by and among counsel for the respective parties hereto, that the filing, sealing and certification of the within deposition shall be and the same are hereby waived;
IT IS FURTHER STIPULATED AND AGREED that all objections, except as to form of the question, shall be reserved to the time of the trial;
IT IS FURTHER STIPULATED AND AGREED that the within deposition may be signed before any Notary Public with the same force and effect as if signed and sworn to before the Court.
*   *   *

Page 5

S. FEINSTEIN

THE VIDEOGRAPHER:  Good          10:05:15
morning, we are now going on the          10:05:26
record.  The time is approximately          10:05:28
10:05 a.m. It is the 24th of          10:05:30
March 2021.  Audio and video          10:05:34
recording will continue to take          10:05:37
place unless all parties agree to          10:05:39
go off the record.          10:05:41
This is the video recorded          10:05:42
deposition of Steven Feinstein in          10:05:43
the matter of Vale S.A. securities          10:05:46
litigation.  This case is filed in          10:05:50
the United States District Court,          10:05:52
Eastern District of New York.  This          10:05:54
deposition is being held via Zoom          10:05:56
video conference.          10:05:58
My name is Ron Marazzo from          10:05:59
the firm Veritext Legal Solutions,          10:06:03
and our court reporter is Jeremy          10:06:05
Richman from the firm Veritext          10:06:07
Legal Solutions.  I'm not related          10:06:10
to any party in this action, nor am          10:06:12
I financially interested in the          10:06:14
outcome.          10:06:15

2 (Pages 2 - 5)

CONFIDENTIAL

Page 150

S. FEINSTEIN

surprising and economically material to the extent that they would cause the stock price to move a lot in one direction or the other, so either surprisingly good or surprisingly bad. Nothing passed that test.

Q. How did you go about determining whether an acquisition, for example, was surprising to the market?

A. You can look at analyst reports and you can look at how it's reported in the news. You can look at how it's described by the company, whether it's going to materially change the nature of the company. Or the other thing to look for in an acquisition is whether market participants thought the price paid was far too high or far too low. Because if the price paid was exactly right, it might be great news, but it wouldn't have much valuation impact.

Q. Dr. Feinstein, did you ever look at changes in Vale's ADR stock

Page 151

S. FEINSTEIN

price to determine whether there was a significant news day in the proposed period?

A. No, I did not pick the event dates based on the results of the event study. They were picked based on the flow of news.

Q. No, I'm asking a slightly more nuanced question. Did you ever look at the daily price changes in Vale's ADRs in determining which news days to examine more closely?

A. No, that's the last thing to look at, is the price change.

Q. Why is that?

A. Because the methodology is to pick the news day -- pick the event days based on the nature of the news relative to economic principles. The test is to identify days on which the security price should change a significant amount in an efficient market, and then see whether it did change a significant amount, and that

Page 152

S. FEINSTEIN

will tell you whether or not it's a demonstration of market efficiency or a demonstration of inefficiency. So the methodology is to identify the dates based on the news.

Q. And you're aware that the current proposed class period in this case is from October 27th, 2016 to February 6th, 2019, right?

A. Right.

Q. So we're talking about 27 months, right?

A. Right. Right.

Q. And that's more than 800 days, does that sound about right?

MR. HALL: Objection.

A. Well, it's around 250 per year, no -- oh, I'm thinking trading days, you're thinking calendar days. Okay, I'll take your estimation.

Q. So right, more than 800 calendar days, more than 500 trading days in that period, does that sound right to you?

Page 153

S. FEINSTEIN

A. Yes.

Q. Now, in your experience, is selecting only four dates for a period of 500 plus trading days a pretty low sample size?

MR. HALL: Objection.

A. Well, I mean, that's what my article was about in Law360, written before I was engaged in this case, that the analyst doesn't get to manufacture events. The analyst has to take the events as they occurred, or acknowledge that there were no ideal events.

I was surprised. I was surprised to find that Vale was such a stable company and had become so predictable to the analysts and investors. But those are the facts.

Q. So sitting here today, can you think of any other case in the 120 plus engagements you referenced earlier where you provided expert testimony in which you tested so few dates in an event study on a relative basis, so

39 (Pages 150 - 153)

CONFIDENTIAL

Page 154

S. FEINSTEIN

here we're talking four days out of a proposed class period spanning over 800 days.

MR. HALL: Objection.

Q. Can you think of any comparable --

A. Well, I'm quite sure examples exist. That's why I wrote that article, that's why I wrote the Law360 article to explain that the analyst has to work with the history of the company as it exists.

If the history of the company as it exists is that there are no good days to test market efficiency, that doesn't mean the stock traded inefficiently, that just means that the empirical test doesn't have a lot of good candidates for being conducted. I mean, and in the article I explain, if that eclipse, if that solar eclipse had not happened, that wouldn't mean there's a problem with Einstein's theory of relativity, it just would

Page 155

S. FEINSTEIN

have meant that there wasn't an ideal opportunity to test it, and that does happen from time to time in securities cases. Or even outside of securities cases, when you're evaluating the efficiency of securities.

Q. In your view, is that what happened in the Groupon case?

A. You would have to show me the report. I don't recall specifically how many events were tested there. But, you know, Groupon may have had more major events that lent themselves to testing market efficiency. Vale didn't.

Q. Do you recall providing expert testimony on market efficiency in the Groupon case?

A. I recall going to Chicago and testifying in court. I recall the judge agreeing with my opinion. I would have to look at the report to tell you what's in it.

Q. Okay. The Groupon case was a

Page 156

S. FEINSTEIN

punitive securities class action, right?

A. Right.

Q. And you were retained by plaintiffs in that case to opine that the Groupon securities traded in an efficient market, correct?

A. No, I was engaged to evaluate whether it traded in an efficient market, and Groupon did trade in an efficient market, and the judge agreed.

Q. Are you sure about that?

A. Yes.

Q. Sitting here today, you don't recall the judge striking your opinion on the market efficiency in the Groupon case?

A. Correct. Want to show me that.

Q. Yes, let's mark as Feinstein Exhibit 4 -- this won't take long, let's just mark this exhibit. It's just the decision by the court.

Just for the record, while

Page 157

S. FEINSTEIN

the exhibit is coming up, Feinstein Exhibit 4 is a March 5, 2015, memorandum opinion and order in the In re: Groupon, Inc. securities litigation in the Northern District of Illinois.

(Exhibit 4, marked for identification, March 5, 2015, memorandum opinion and order in the in re: Groupon, Inc. securities litigation in the Northern District of Illinois.)

A. It hasn't uploaded yet.

MR. JORALEMON: Let's just break for lunch. We'll sort out this technical --

THE WITNESS: I'm going to open the box, if you don't mind.

THE VIDEOGRAPHER: Let me read us off. The time is approximately 1:12 p.m., we're going off the record.

(Luncheon recess.)

40 (Pages 154 - 157)

CONFIDENTIAL

Page 162

S. FEINSTEIN

Q. And do you recall how long 13:56:01 the class period was from which you 13:56:04 selected those two event dates? 13:56:09

A. No, it was several months, a 13:56:10 few months. 13:56:12

Q. If I represented to you it 13:56:12 was seven weeks, does that sound right 13:56:15 to you? 13:56:18

A. I would have to check. 13:56:18

Q. So in Groupon, when you 13:56:19 selected two event dates from a 13:56:21 seven-week class period, you testified 13:56:22 there that that was on the low side, 13:56:24 right? 13:56:28

A. Well, I mean, two is on the 13:56:32 low side. But again, I don't get to 13:56:35 choose how many events the company -- 13:56:38 how many -- I don't get to choose that 13:56:43 the company did or did not make major 13:56:45 surprising announcements during the 13:56:49 course of the class period. I have to 13:56:51 work with what actually happened. 13:56:52

Q. So just focusing on the event 13:56:56 study you've conducted here again, the 13:57:14

Page 163

S. FEINSTEIN

four dates you identified all occur at 13:57:17 the end of the class period, correct? 13:57:22

A. That's right. 13:57:23

Q. And in fact, they all occur 13:57:24 within a 13-calendar-day period; isn't 13:57:25 that right? 13:57:28

A. Sounds about right. 13:57:29

Q. And four of those 13 days 13:57:30 were actually nontrading days; isn't 13:57:32 that right? 13:57:34

A. I'll take your word for it. 13:57:35 I mean, I've looked at the calendar 13:57:38 before, but I don't have it memorized. 13:57:40

Q. So I just want to orient you, 13:57:42 that 13-day span in which you selected 13:57:48 those four special dates represents 13:57:51 less than 3 percent of the proposed 13:57:54 class period here; does that sound 13:57:57 about right? 13:57:59

MR. HALL: Objection. 13:58:00

A. Well, wait, four out of 800, 13:58:00 that would be like one out of 200. 13:58:09

Q. The math I was doing was 13:58:11 taking the 13-day window that 13:58:12

Page 164

S. FEINSTEIN

encompassed all four of those dates. 13:58:15 That 13-day window represents less than 13:58:17 3 percent of the proposed class period 13:58:21 here? 13:58:24

A. Again, I'll take your math 13:58:24 and your calendar as -- I'll accept 13:58:28 that you've done that right. I haven't 13:58:36 verified it, though. 13:58:38

Q. Is it your testimony, 13:58:39 Dr. Feinstein, that that 13-day period 13:58:48 that includes those four special dates 13:58:52 is representative of the entire class 13:58:55 period? 13:58:58

MR. HALL: Objection. 13:58:59

A. Well, I did, that's one of 13:59:00 the functions of the other Cammer and 13:59:07 Krogman factors, is to see if there 13:59:10 were major structural changes in the 13:59:12 market over the course of the period 13:59:12 you're examining, and I did not see any 13:59:14 major structural changes in terms of 13:59:15 the volume of analyst coverage, listing 13:59:18 on the New York Stock Exchange, F3 13:59:27 registration eligibility, bid ask 13:59:29

Page 165

S. FEINSTEIN

spreads. 13:59:32

I mean, based on the other 13:59:33 Cammer and Krogman factors, yes, the 13:59:34 conditions in the market were the same 13:59:38 over the period when there were good 13:59:39 candidate events to test market 13:59:47 efficiency as they were earlier in the 13:59:47 class period that would then allow 13:59:50 someone to make inferences about the 13:59:50 entire class period based on the 13:59:53 statistical test done. 13:59:54

Q. Right, I'm asking a slightly 13:59:56 different question. I'm focusing on 13:59:57 your statistical test. Is it your 14:00:00 testimony that the analysis, the 14:00:02 empirical analysis you performed on 14:00:05 those four dates over that 13-day 14:00:07 period at the end of the class are 14:00:10 representative of the market efficiency 14:00:12 in the Vale Securities over the entire 14:00:16 class period? 14:00:18

MR. HALL: Objection. 14:00:19

A. Absolutely. I mean, what we 14:00:21 saw from those four days were, was that 14:00:23

42 (Pages 162 - 165)

CONFIDENTIAL

Page 166

S. FEINSTEIN

there was -- there were no impediments    14:00:27
to market efficiency.  There were no    14:00:30
impediments to people trading on    14:00:32
information, there were no impediments    14:00:34
to information flow, there was no    14:00:37
indication that market participants    14:00:39
were irrationally ignoring economically    14:00:42
material information, and I think that    14:00:45
what -- the behavior we observed in    14:00:46
those -- on those four days is    14:00:48
representative of what would have    14:00:50
happened if there had been similar    14:00:52
announcements earlier in the class    14:00:53
period.    14:00:55
    Q.    Do you agree with the general    14:01:02
proposition that market efficiency for    14:01:04
a given security may fluctuate over    14:01:06
time?    14:01:09
        MR. HALL:  Objection.    14:01:10
    A.    It could, and that's why I    14:01:10
ran tests that show that there were no    14:01:14
major changes in the structure of the    14:01:16
markets for these companies over time.    14:01:19
So for -- in general, it may, I mean,    14:01:21

Page 167

S. FEINSTEIN

anything's possible, but for this    14:01:25
company in particular, no, it didn't.    14:01:27
    Q.    Well, help me understand    14:01:30
this.  Why isn't it important, then,    14:01:33
that an event study test dates across    14:01:36
the proposed class period?    14:01:40
        MR. HALL:  Objection.    14:01:42
    A.    Well, if there are days    14:01:43
across the class period that are good    14:01:46
candidates for testing market    14:01:48
efficiency, you should test them, but    14:01:55
if the days that are appropriate for    14:01:58
testing market efficiency are    14:02:00
concentrated, then you run the tests on    14:02:01
those concentrated days.    14:02:03
        You know, you can only    14:02:04
analyze the history that happened.  You    14:02:06
can't concoct a different history for    14:02:11
purposes of making the test satisfy    14:02:15
some arbitrary restriction or    14:02:18
condition.  I mean, that's the reason    14:02:19
we have other Cammer and Krogman    14:02:21
factors.  Those other ones are easy to    14:02:23
examine every single day in the course    14:02:26

Page 168

S. FEINSTEIN

of the class period, whereas an event    14:02:27
study should only be run on days when    14:02:29
major surprising news emerged.    14:02:32
    Q.    Right, and that's what I'm    14:02:35
struggling with, right, is that I    14:02:37
understand, basically, what you're    14:02:41
saying.  What I'm struggling with is    14:02:41
the exercise you went through of    14:02:48
identifying these four special dates    14:02:51
all at the end of the class period --    14:02:53
strike that.    14:02:53
        Sorry, let me try to    14:03:01
formulate a question for you.  Do you    14:03:02
agree with this statement: "A proper    14:03:08
event study for purposes of determining    14:03:10
market efficiency over a class period    14:03:13
must look for consistent demonstration    14:03:15
of market efficiency, not just    14:03:17
occasional price movements on days with    14:03:20
news."    14:03:22
        Do you agree with that    14:03:25
statement?    14:03:26
        MR. HALL:  Objection.    14:03:26
    A.    Can you read it again,    14:03:27

Page 169

S. FEINSTEIN

please?    14:03:29
    Q.    Sure.  "A proper event study    14:03:29
for purposes of determining market    14:03:32
efficiency over a class period must    14:03:33
look for consistent demonstration of    14:03:36
market efficiency, not just occasional    14:03:38
price movements on days with news."    14:03:41
        MR. HALL:  Objection.    14:03:45
    A.    The terms aren't defined.  I    14:03:45
mean, yes, I agree that a proper event    14:03:50
study testing market efficiency should    14:03:53
rigorously assess, as comprehensive as    14:03:56
possible, the population of appropriate    14:04:03
test dates.  That's, that is a    14:04:06
component of a proper event study.  I    14:04:08
did that.    14:04:10
        The outcome of that analysis    14:04:12
is not something I can control, or    14:04:14
anyone can control.  So yes, you should    14:04:17
rigorously assess and test all the    14:04:23
ideal candidates, all of the proper,    14:04:25
appropriate candidates, but if all of    14:04:27
the ideal appropriate candidates are    14:04:29
grouped in a concentrated interval,    14:04:31

43 (Pages 166 - 169)

CONFIDENTIAL

Page 218

S. FEINSTEIN

MR. HALL: Objection.

A. Yes, again, it's not one of the opinions I expressed in the report. You're asking what had I learned in the course of that analysis, and I think it's fair to say that there was attention and concern addressed towards safety issues during this class period.

Q. And yet, you identified no specific date on which safety-related information was disclosed by the company to test as a special day?

MR. HALL: Objection.

A. That's not what I said.

Q. No, I'm asking you.

A. No, I didn't find any days, except for the end of the class period, where surprising unexpected safety announcements were made. So everything the company said was consistent with what the market had previously been led to believe, or at least not so different that it would elicit a significant stock price movement.

Page 219

S. FEINSTEIN

The company said, We have a commitment towards safety, the company reiterated, We have a commitment towards safety. Both of those things are what the market expected to hear. It would have been certainly blockbuster news if they had said the opposite, but affirming what the market had previously been led to believe is not the kind of news that would warrant -- that would make an announcement a good event for a market efficiency event study, because it doesn't change the mix of information.

Q. Circling back to your earlier testimony, in part of your report you note that one of the reasons you concluded that earnings announcements didn't have a significant impact was because the primary drivers of the company's top-line results were already known to market participants before the earnings dates, and there you're specifically referring to the earlier

Page 220

S. FEINSTEIN

release of production data; is that right?

A. Yes. So it was a splitting of the announcement between two kinds of announcements, between two event dates, essentially, or announcement dates.

Q. Did you identify any of the dates on which production data was released as potentially special dates for purposes of your event study?

MR. HALL: Objection.

A. I looked, those dates are listed -- there's a table in the report with all of those dates. I looked to see if anybody was surprised or expressed major surprise, and I didn't find that.

Q. And "anybody" you're referring to in that answer is analysts covering Vale?

A. Yeah, what I was looking for was to see if any -- I used the analysts' reports for that purpose.

Page 221

S. FEINSTEIN

For production numbers, I would -- there's not a good data source for what prior expectations were, except the analyst reports. So I looked at the analyst reports to see if the numbers that were coming in were uniformly surprisingly bigger or worse than what was previously expected.

And look, I mean, out of 35, some will be surprised and some won't be. There weren't any production days where there was a consensus that it was a major positive or negative surprise.

Q. We've been going a little over an hour. It's a convenient time for a break, if you're ready for one.

A. Sure, sounds good.

MR. JORALEMON: We'll go off the record.

THE VIDEOGRAPHER: The time is approximately 3:00 p.m., going off the record.

(Recess.)

THE VIDEOGRAPHER: The time

56 (Pages 218 - 221)