**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-----------------------------------------------------------x
                                                    :
In re Vale S.A. Securities Litigation               :
                                                    :        No. 19 Civ. 526 (RJD) (SJB)
                                                    :
                                                    :        **ORAL ARGUMENT REQUESTED**
                                                    :
                                                    :
                                                    :
-----------------------------------------------------------x

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO
PLAINTIFF'S MOTION FOR CLASS CERTIFICATION AND
APPOINTMENT OF CLASS REPRESENTATIVE AND CLASS COUNSEL**

GIBSON, DUNN & CRUTCHER LLP

Mark A. Kirsch
Randy M. Mastro
Christopher M. Joralemon
Mary Beth Maloney
David M. Kusnetz

200 Park Avenue
New York, NY  10166-0193
Telephone:    212.351.4000
Facsimile:    212.351.4035

*Attorneys for Defendants*

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ..................................................................................1

DISCUSSION ...........................................................................................................4

    I.    THE PROPOSED CLASS DOES NOT SATISFY THE
PREDOMINANCE REQUIREMENTS OF RULE 23(B) ...................................4

        A.    Plaintiff Is Not Entitled To The *Basic* Presumption of Reliance.................5

            1.    Dr. Feinstein's event study is methodologically unsound
and  does not support a finding of market efficiency for
Vale Securities. ..............................................................................6

            2.    Plaintiff has not met its burden to show that the Vale ADRs
and Bonds traded in efficient markets. .........................................10

        B.    Plaintiff Cannot Satisfy The Predominance Requirement Given
Individualized Questions About Whether Bond Transactions Were
Domestic .......................................................................................13

        C.    Plaintiff Is Not Entitled To A Presumption Of Reliance Under
*Affiliated Ute* .................................................................................13

        D.    Plaintiff Has Failed To Establish That Damages Can Be Calculated
On A Classwide Basis.......................................................................14

            1.    Dr. Feinstein's purported "damages model" is too vague to
permit any meaningful examination by the Court. ........................14

            2.    Dr. Feinstein's ambiguous damages model is particularly
problematic given the complexities of this case. ..........................17

        E.    The Proposed Class Cannot Be Certified Because It Includes
Numerous Class Members Who Were Not Injured .................................21

    II.    THE PROPOSED CLASS DOES NOT MEET THE REQUIREMENTS
OF RULE 23(A) .............................................................................23

        A.    Plaintiff Does Not Satisfy The Typicality Requirement Of Rule
23(a) Because The Alleged Losses Arise From Different Courses
Of Events .......................................................................................23

        B.    Plaintiff's Lack of Candor Precludes It From Satisfying Rule
23(a)'s Adequacy Requirement ..........................................................24

CONCLUSION.......................................................................................................25

**TABLE OF AUTHORITIES**

Page(s)

**Cases**

*Affiliated Ute Citizens of Utah v. United States*,
406 U.S. 128 (1972)..................................................................................................13, 14

*In re Am. Int'l Grp., Inc. Sec. Litig.*,
265 F.R.D. 157 (S.D.N.Y. 2010), *vacated and remanded on other grounds*,
689 F.3d 229 (2d Cir. 2012)...........................................................................................12

*Banco Safra S.A. v. Samarco Mineracao S.A.*,
2021 WL 825743 (2d Cir. Mar. 4, 2021)........................................................................13

*In re Barclays Liquidity Cross and High Frequency Trading Litig.*,
126 F. Supp. 3d 342 (S.D.N.Y. 2015).............................................................................14

*Basic Inc. v. Levinson*,
485 U.S. 224 (1988)......................................................................................................1, 5

*Bell v. Ascendant Sols., Inc.*,
2004 WL 1490009 (N.D. Tex. July 1, 2004) ...................................................................8

*In re BP p.l.c. Securities Litigation*,
2013 WL 6388408 (S.D. Tex. Dec. 6, 2013)...........................................14, 17, 18, 21

*In re BP p.l.c. Securities Litigation*,
2014 WL 2112823 (S.D. Tex. May 20, 2014).............................................................14, 19

*Brown v. China Integrated Energy Inc.*,
2014 WL 12576643 (C.D. Cal. Aug. 4, 2014)..................................................................6

*Cammer v. Bloom*,
711 F. Supp. 1264 (D.N.J. 1989) .....................................................................................2

*Comcast Corp. v. Behrend*,
569 U.S. 27 (2013)..................................................................................................1, 5, 14

*Culver v. City of Milwaukee*,
277 F.3d 908 (7th Cir. 2002) ..........................................................................................25

*Cunha v. Hansen Nat. Corp.*,
2013 WL 12124073 (C.D. Cal. June 20, 2013), *subsequently confirmed*,
Dkt. No. 155, 5:08-cv-01249-GW-JC (C.D. Cal. Jan. 17, 2014) ....................................9

*In re Fed. Home Loan Mortg. Corp. (Freddie Mac) Sec. Litig.*,
281 F.R.D. 174 (S.D.N.Y. 2012) .....................................................................................5

**TABLE OF AUTHORITIES** (*continued*)

Page(s)

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
   574 F.3d 29 (2d Cir. 2009).................................................................................21, 23

*Fort Worth Emps.' Ret. Fund v. J.P. Morgan Chase & Co.*,
   301 F.R.D. 116 (S.D.N.Y. 2014) .................................................................15, 17, 19

*George v. China Auto. Sys., Inc.*,
   2013 WL 3357170 (S.D.N.Y. July 3, 2013) ............................................3, 5, 10, 11

*Goodman v. Genworth Fin. Wealth Mgmt., Inc.*,
   300 F.R.D. 90 (E.D.N.Y. 2014) .................................................................................14

*Gross v. Grupo Televisa, S.A.B.*,
   No. 18-cv-1979 (S.D.N.Y.)........................................................................................24

*In re Grupo Televisa Sec. Litig.*,
   2020 WL 3050550 (S.D.N.Y. June 8, 2020) ......................................................4, 24

*In re Global Brokerage, Inc. f/k/a FXCM Inc. Sec. Litig.*,
   2021 WL 1185426 (S.D.N.Y. Mar. 18, 2021) .............................................1, 6, 9, 12

*In re Juniper Networks, Inc. Sec. Litig.*,
   264 F.R.D. 584 (N.D. Cal. 2009)...............................................................................23

*Krogman v. Sterritt*,
   202 F.R.D. 467 (N.D. Tex. 2001) ................................................................................2

*Li Hong Cheng v. Canada Goose Holdings Inc.*,
   2019 WL 6617981 (S.D.N.Y. Dec. 5, 2019) .............................................................24

*Loritz v. Exide Techs.*,
   2015 WL 6790247 (C.D. Cal. July 21, 2015)......................................................17, 19

*In re Northfield Lab'ys, Inc. Sec. Litig.*,
   267 F.R.D. 536 (N.D. Ill. 2010)...................................................................................8

*Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*,
   2018 WL 3861840 (N.D. Ohio Aug. 14, 2018) ............................................... *passim*

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,
   2021 WL 1257845 (9th Cir. Apr. 6, 2021) ................................................................22

*In re Petrobras Sec.*,
   862 F.3d 250 (2d Cir. 2017)....................................................................................3, 13

**TABLE OF AUTHORITIES** (*continued*)

Page(s)

*Plaut v. Goldman Sachs Grp., Inc.*,
2019 WL 4512774 (S.D.N.Y. Sept. 19, 2019)..........................................................................24

*In re PolyMedica Corp. Sec. Litig.*,
453 F. Supp. 2d 260 (D. Mass. 2006) ........................................................................................7

*In re Rail Freight Fuel Surcharge Antitrust Litigation*,
292 F. Supp. 3d 14 (D.D.C. 2017) ..........................................................................................22

*In re Restasis (Cyclosporine Ophthalmic Emulsion) Antitrust Litig.*,
335 F.R.D. 1 (E.D.N.Y. 2020)..................................................................................................22

*Sicav v. Wang*,
2015 WL 268855 (S.D.N.Y. Jan. 21, 2015) ...........................................................................16

*Singleton v. Fifth Generation, Inc.*,
2017 WL 5001444 (N.D.N.Y. Sept. 27, 2017) ........................................................................15

*Tawfilis v. Allergan, Inc.*,
2017 WL 3084275 (C.D. Cal. June 26, 2017) ........................................................................19

*In re Vale S.A. Sec. Litig*,
2019 WL 11032303 (S.D.N.Y. Sept. 27, 2019)..........................................................11, 18, 23

*In re Vale S.A. Sec. Litig.*,
2020 WL 2610979 (E.D.N.Y. May 20, 2020) .............................................................14, 19, 20

*Villare v. ABIOMED, Inc.*,
2020 WL 3497285 (S.D.N.Y. June 29, 2020) ........................................................................25

*In re Vivendi Universal, S.A. Sec. Litig.*,
123 F. Supp. 3d 424 (S.D.N.Y. 2015)................................................................................21, 22

*Waggoner v. Barclays PLC*,
875 F.3d 79 (2d Cir. 2017)................................................................................................10, 14

*Wal-Mart Stores, Inc. v. Dukes*,
564 U.S. 338 (2011).............................................................................................................1, 22

**Statutes**

15 U.S.C. § 78u–4(e)(1).................................................................................................................22

**TABLE OF AUTHORITIES** (*continued*)

Page(s)

**Rules**

Fed. R. Civ. P. 23(a)(3)..................................................................................................4, 23

Fed. R. Civ. P. 23(a)(4)........................................................................................................24

Fed. R. Civ. P. 23(b) ..................................................................................................4, 5, 22

Fed. R. Civ. P. 23(b)(3)........................................................................................................1

Defendants respectfully submit this memorandum of law in opposition to the motion for class certification and appointment of class representative and class counsel (the "Motion") filed by Lead Plaintiff Colleges of Applied Arts and Technology Pension Plan ("CAAT" or "Plaintiff").

**PRELIMINARY STATEMENT**

Class actions are "an exception to the usual rule that litigation is conducted by and on behalf of the individual[ly] named parties only." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011) (citation omitted). To take advantage of that exception, Plaintiff "must affirmatively demonstrate [its] compliance with Rule 23." *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) (quoting *Wal-Mart Stores*, 564 U.S. at 350). For multiple reasons—any one of which alone mandates denial of the Motion—Plaintiff has failed to do so here.

To start, Plaintiff fails to show that questions of law or fact common to the proposed class predominate over individual issues. Fed. R. Civ. P. 23(b)(3). Plaintiff claims that Vale securities were sold in an efficient market and thus the proposed class should be entitled to a presumption of reliance under *Basic Inc. v. Levinson*, 485 U.S. 224 (1988). Not so. Plaintiff proffers a purported expert report on market efficiency from Dr. Steven P. Feinstein. *See* Corrected Report on Market Efficiency of Dr. Steven P. Feinstein ("Feinstein Rep.").[1] But Dr. Feinstein's empirical test of efficiency is fatally flawed. He improperly handpicks relevant dates through an "unscientific and biased" approach, based solely on his subjective opinion about what news is important. *In re Global Brokerage, Inc. f/k/a FXCM Inc. Sec. Litig.*, 2021 WL 1185426, at *16–17 (S.D.N.Y. Mar. 18, 2021), *report and recommendation adopted*, 2021 WL 1105367 (S.D.N.Y. Mar. 23, 2021). Indeed, Dr. Feinstein *just so happened* to choose the exact same dates

---

[1] The Feinstein Rep. was attached as Exhibit A to Plaintiff's Motion.

and events alleged in the Complaint to be "corrective disclosures," knowing in advance the magnitude of price changes on those dates.  However, courts regularly reject such an approach given the indisputable fact that "securities plaintiffs intentionally select [corrective] dates for purposes of increasing potential damages."  *See, e.g.*, *Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.* ("*OPERS*"), 2018 WL 3861840, at *2 (N.D. Ohio Aug. 14, 2018).  This is not the first time that Dr. Feinstein has tailored a purported market efficiency analysis to serve the goals of securities plaintiffs, nor would it be the first time a federal court has rejected his biased and unreliable approach should the Court properly deny Plaintiff's Motion here.  *Id.* (excluding virtually identical analysis offered by Dr. Feinstein because it was "***not a scientifically valid way to test for market efficiency***" (emphasis added)).

Given the substantial flaws in its event study, Plaintiff will have to fall back on purported indirect evidence of efficiency under various factors cited in *Cammer v. Bloom*, 711 F. Supp. 1264, 1286–87 (D.N.J. 1989) and *Krogman v. Sterritt*, 202 F.R.D. 467, 478 (N.D. Tex. 2001). But in this case, such evidence is patently insufficient because even Plaintiff's own fatally biased event study "suggest[s] market *inefficiency*" with respect to the Vale ADRs and Bonds.  Ex. 1 (Rebuttal Expert Report of Dr. Walter N. Torous) ("Torous Rep.") ¶¶ 51–59.[2]  For example, Defendants' rebuttal expert, Dr. Walter N. Torous, ran a series of widely accepted market efficiency tests using Dr. Feinstein's regression analysis, all of which "suggest[] that there is no difference . . . between the Vale ADRs' price movements on news days versus non-news days." *Id.* ¶ 55.  Indeed, Dr. Feinstein's own model indicates that the ADRs exhibited no statistically significant price reaction on every single earnings release date throughout the proposed class period.  *See* Torous Rep. ¶ 51.  "[N]umerous days during the Class Period when news events did

---

[2]  Citations to "Ex. __" are to the accompanying Declaration of Christopher M. Joralemon.

not result in price movement . . . cannot be ignored." *George v. China Auto. Sys., Inc.*, 2013 WL 3357170, at *13 (S.D.N.Y. July 3, 2013).

Individualized issues plague the class for two other reasons. First, while Plaintiff's proposed class includes individuals who obtained Vale bonds via over-the-counter purchases (which, as a general matter, would encompass a significant number of non-U.S. transactions), Plaintiff has not identified any methodology for determining which members of the class in fact engaged in domestic bond transactions. Thus, "the investigation of domesticity appears to be an 'individual question.'" *In re Petrobras Sec.*, 862 F.3d 250, 272 (2d Cir. 2017).

Second, Plaintiff has failed to show that damages can be calculated on a classwide basis. Plaintiff's expert describes a proposed damages model too vague to resolve questions of damages across the class. For example, Dr. Feinstein's model does not explain how "out-of-pocket damage[s]" should be calculated, leaving the Court to guess whether unidentified "valuation tools" and models would be appropriate. Feinstein Rep. ¶¶ 290, 295. Dr. Feinstein's vague model is particularly problematic here because of factual complexities. His theoretical model fails to account for conflicts between (1) pre- and post-collapse alleged misstatements, (2) corrective disclosures and a materialization of the risk, and (3) putative class members that invested in securities with different risk profiles (*e.g.*, debt vs. equity). Again, another federal court rejected a nearly identical report written by Dr. Feinstein as incapable of resolving questions of classwide damages. *OPERS*, 2018 WL 3861840, at *19. This Court should do the same. In addition, Plaintiff's proposed class is fatally overbroad because it includes a significant number of plaintiffs for whom Vale's alleged misconduct caused no investment losses.

Nor can Plaintiff satisfy the adequacy or typicality requirements of Rule 23(a). Plaintiff has sought to serve as lead plaintiff before. In a separate securities class action, *In re Grupo*

3

*Televisa Sec. Litig.*, 2020 WL 3050550 (S.D.N.Y. June 8, 2020), Plaintiff filed a motion for class certification insisting, as it does here, that it met the Rule 23 requirements.  But in a damning lack of candor, Plaintiff failed to disclose—prior to applying to serve as class representative—that it held a substantial short position in the relevant security that netted Plaintiff "roughly three times what [it] had lost in its . . . long position." *Id.* at *7–8 (finding "the price drop which injured the other class members enriched CAAT thrice what it cost CAAT," and therefore "CAAT is not typical of the class").

Plaintiff's conduct in *Grupo* renders it inadequate to serve as class representative here. First, Plaintiff's Private Securities Litigation Reform Act ("PSLRA") certification here is false—and has been false for over ten months—in light of the *Grupo* ruling. *See* Dkt. 8-1 ¶ 5.  The failure to correct the inaccurate PSLRA Certification for ten months—and even after Plaintiff's 30(b)(6) deposition witness was confronted with the information at his deposition on March 26, 2021—only exacerbates the offense.  But even if that alone were not enough, Plaintiff's lack of candor in *Grupo* certainly is.  By failing to disclose a critical fact dispositive of its motion for class certification, Plaintiff has revealed a shocking lack of judgment, at best, or a self-serving untrustworthiness, at worst, sufficient to render it unable to "fairly and adequately protect the interests of the class," Fed. R. Civ. P. 23(a)(3).

For each—or any—of the foregoing reasons, Defendants respectfully request that the Court deny Plaintiff's motion for class certification.

## DISCUSSION

**I.    THE PROPOSED CLASS DOES NOT SATISFY THE PREDOMINANCE REQUIREMENTS OF RULE 23(B)**

Plaintiff's Motion fails to demonstrate that questions of law or fact common to the proposed class members will predominate over any questions affecting only individual members.

*See* Fed. R. Civ. P. 23(b).  "Rule 23(b)(3)'s predominance criterion is even more demanding than Rule 23(a)," and courts therefore have a "duty to take a 'close look' at whether common questions predominate."  *Comcast*, 569 U.S. at 34.  Here, individualized questions will predominate because Plaintiff:  (i) is not entitled to a classwide presumption of reliance; (ii) has failed to show how the domesticity of bond transactions can be evaluated without individual inquiry; and (iii) has failed to establish that damages can be measured on a classwide basis.

### A.      Plaintiff Is Not Entitled To The *Basic* Presumption of Reliance

Plaintiff is not entitled to the presumption of reliance recognized by the Supreme Court in *Basic Inc. v. Levinson*, 485 U.S. 224 (1988), as it has not demonstrated "the presence of an efficient market critical to the fraud-on-the-market theory."  *George*, 2013 WL 3357170, at *7.  Plaintiff's "burden is higher than showing mere consistency" with an efficient market; it "bear[s] the burden of showing market efficiency by a preponderance of the evidence."  *Id.* at *12.

To assess whether the Vale ADRs and bonds traded in an efficient market, Plaintiff offers a report from its proposed expert on each of the *Cammer* and *Krogman* factors.  But *Cammer* factor five, which requires "evidence of a cause-and-effect relationship between unexpected news and market price . . . is the critical factor—the *sine qua non* of efficiency."  *In re Fed. Home Loan Mortg. Corp. (Freddie Mac) Sec. Litig.*, 281 F.R.D. 174, 182 (S.D.N.Y. 2012) (finding that the other "less important factors . . . cannot substitute for evidence of a cause-and-effect relationship between unexpected news and market price"); *see also* Torous Rep. ¶¶ 23–33. In a recent case, a federal court rejected Dr. Feinstein's substantially similar analysis of *Cammer* factor five as "***not a scientifically valid way to test for market efficiency***."  *OPERS*, 2018 WL 3861840, at *2 (emphasis added).  Where, as here, an expert's empirical tests of efficiency do not "provide[] a reliable basis upon which to rest an opinion" that the market is efficient, a plaintiff cannot "carry [its] burden of proof."  *George*, 2013 WL 3357170, at *13.

5

**1.    Dr. Feinstein's event study is methodologically unsound and does not support a finding of market efficiency for Vale Securities.**

Dr. Feinstein's analysis of the fifth *Cammer* factor suffers from pervasive methodological flaws that render his conclusions unreliable, as detailed below.

***Dr. Feinstein's method of selecting event dates is wholly subjective***:  Although Dr. Feinstein admits that the proper selection of dates for an event study requires "independent analysis" (Feinstein Rep. ¶ 131) and is an "integral step" (Ex. 2 ("Feinstein Dep.") 135:25–136:7), here, he simply handpicks the dates to study based on his subjective thoughts about which news is important enough to affect the securities' price.  Courts have found that this exact type of "subjective determination of which events to examine in [an] event study renders unreliable [an expert's] analysis and conclusion."  *Brown v. China Integrated Energy Inc.*, 2014 WL 12576643, at *7 (C.D. Cal. Aug. 4, 2014) (finding selection of dates based on expert's understanding of "whether information is 'of the import necessary to change the price of' stock is not objective"); *see also Global Brokerage*, 2021 WL 1185426, at *16–17 (finding plaintiff failed to meet its burden on efficiency where expert selected only two event dates in an "unscientific and biased way").  An expert "must take steps to minimize [any] inevitable subjectivity." *Brown*, 2014 WL 12576643, at *7.[3]  Dr. Feinstein has plainly failed to do so here.

Indeed, Dr. Feinstein provided absolutely no replicable framework for how, after his purported review of 4,315 news articles released about Vale, he selected just four dates to test (which not coincidentally are the alleged corrective dates listed in the Complaint).[4]  Torous Rep.

---

[3]  Experts—including Dr. Feinstein in the "majority" of his recent engagements (Feinstein Dep. 239:13–14)—typically run a collective event study across an objective set of new dates, such as all earnings releases, securities filings, or dates when the company was in the headlines of major publications.

[4]  Dr. Feinstein does not sufficiently explain why he chose not to test many other apparent news dates over the more than two-year class period, including:  (i) Vale's securities filings; (ii) Vale's releases of production data; (iii) Vale's credit ratings changes; (iv) an announcement that Vale was acquiring another company; (v) the

¶ 37.  He claims he did not test earnings releases because they *all* purportedly contained "an offsetting mix of positive and negative news, combined frequently with anticipated results that were in line with expectations."  Feinstein Rep. ¶ 180.  This conclusion is completely unfounded. *See* Torous Rep. ¶¶ 44–51.  For example, on February 23, 2017, Vale beat consensus revenue estimates by 8% and EBITDA estimates by 9%, and announced a dividend of 4.7B reais ($1.53B).  *See* Feinstein Rep. ¶ 187.  Yet, Dr. Feinstein inexplicably does not consider the thrust of this news to be positive.  Such an arbitrary method of selecting event dates does not comport with the rigors of typical expert analysis and is patently unreliable.

*An event study analyzing only a handful of days does not prove market efficiency*:  Because "it is possible for some news days to randomly be associated with stock price movements," (Feinstein Dep. 187:19–22), Dr. Feinstein's test of only four dates during the proposed class period spanning *well over 500 trading days* says nothing about the general propensity of the securities' price to respond to news.  *See OPERS*, 2018 WL 3861840, at *3 (excluding Dr. Feinstein's report because testing "a single or small number of cases . . . is not enough").  Indeed, courts have found that the "[m]ere listing of five days on which news was released and which exhibited large price fluctuations *proves nothing*."  *In re PolyMedica Corp. Sec. Litig.*, 453 F. Supp. 2d 260, 270 (D. Mass. 2006) (emphasis added).  And here, moreover, certain of the Vale bonds only had a significant price reaction on *two of the four* dates handpicked by Plaintiff's expert as those most likely to elicit such a reaction, further undermining his conclusions of efficiency for the bonds.

*Dr. Feinstein's selection of only the curative dates to study improperly biases his analysis*:  Dr. Feinstein's decision to study only the dates alleged by Plaintiff to be corrective

---

settlement of litigation in Brazil related to the prior Fundão dam collapse; (vi) a change in Vale's CEO; and (vii) the misrepresentations alleged by Plaintiff.  *See* Torous Rep. ¶ 37.

disclosures or events "tend[s] to skew [his analysis] toward a conclusion that the market was efficient," and further renders his opinion unreliable. *See In re Northfield Lab'ys, Inc. Sec. Litig.*, 267 F.R.D. 536, 548 (N.D. Ill. 2010); *Bell v. Ascendant Sols., Inc.*, 2004 WL 1490009, at *3 (N.D. Tex. July 1, 2004) (study of six or seven "dates that appear to be consciously chosen in order artificially to support his hypothesis of efficiency" was unreliable). Another court rejected a substantially similar study by Dr. Feinstein, finding that this approach was "***not a scientifically valid way to test for market efficiency*** because . . . securities plaintiffs intentionally select [corrective] dates for purposes of increasing potential damages." *OPERS*, 2018 WL 3861840, at *2 (emphasis added). In other words, contrary to the principle that "you are supposed to hypothesize and then see your results," *id.* at *7, Dr. Feinstein knew in advance from his review of the Complaint that there was a highly negative price reaction on each of the dates he selected. Feinstein Dep. 138:7–10. While Dr. Feinstein testified that he "had no way of knowing if they would be statistically significant" before he ran his analysis, he admitted that a price drop of 20% "usually would be" significant and even a drop of 8% "probably" would be significant for Vale. *Id.* at 140:8–9, 141:2–16. His decision to select the exact four corrective dates listed in the Complaint despite this knowledge turns the scientific method on its head and fatally biases his conclusions to support the result sought by Plaintiff. *See* Torous Rep. ¶ 39 ("Statistical analyses that predetermine the outcome of their investigation are not reliable or consistent with the professional standards for statistical testing.").

    ***An event study that only considers days grouped at the end of the Class Period cannot demonstrate efficiency across a more than two-year span***: Dr. Feinstein's selection of the corrective dates is improper for the additional, independent reason that an expert must test dates "throughout a class period." *OPERS*, 2018 WL 3861840, at *4, *7. An expert simply cannot

credibly conclude that a market was efficient over a period of several years "based upon a lone stock price reaction to news that concludes the class period." *Id.* at *2; *see also Cunha v. Hansen Nat. Corp.*, 2013 WL 12124073, at *7 (C.D. Cal. June 20, 2013) (denying class certification where expert "examined only three days" and "ignored roughly the first six months of the year-long class period"), *subsequently confirmed*, Dkt. No. 155, 5:08-cv-01249-GW-JC (C.D. Cal. Jan. 17, 2014). As Dr. Torous explains, there is no academic support for a study of a few dates "clustered in the final two weeks" of a lengthy period; to the contrary, the economic literature dismisses such studies as "noncompliant with the 'scientific method.'" Torous Rep. ¶ 36. Indeed, Dr. Feinstein previously has conceded that "a single stock price reaction . . . could not possibly demonstrate that the stock traded in an efficient market fifteen months earlier." *OPERS*, 2018 WL 3861840, at *3. The same is true here.

Another problem arising from Dr. Feinstein's skewed study is that a reaction to "extraordinary events" does not show that the securities "traded efficiently with respect to the specific type of information alleged to have been misrepresented." *Global Brokerage*, 2021 WL 1185426, at *16; *see also* Torous Rep. ¶ 40 ("[N]ews items of significant importance may move stock prices, but that does not necessarily mean that the stock price quickly impounds new, material information in general. . . ."). Demonstrating that Vale securities reacted to the extraordinary event of a dam collapse only "reflects the assimilation of market information at its grossest level" and does not demonstrate, for example, that the securities were quickly incorporating all information buried in hundreds of pages of securities filings. *Global Brokerage*, 2021 WL 1185426, at *17.

### 2.    Plaintiff has not met its burden to show that the Vale ADRs and Bonds traded in efficient markets.

**Vale ADRs**:  Plaintiff has not established market efficiency for Vale ADRs, even when considering all the *Cammer* and *Krogman* factors,[5] because its own expert's analysis actually "suggest[s] market *inefficiency*."  Torous Rep. ¶¶ 52–59 (emphasis added).  While the indirect factors may be sufficient to show market efficiency in a simple case, *Waggoner v. Barclays PLC*, 875 F.3d 79, 98 (2d Cir. 2017), this is no such case.  Here, direct evidence of market efficiency is required because there are "specific circumstances" indicating inefficiency "that weigh in favor of scrutinizing *Cammer* [factor] 5."  *OPERS*, 2018 WL 3861840, at \*15 n.14.  Indeed, Dr. Feinstein's report itself indicates that there was *no statistically significant price reaction on any of Vale's earnings dates*, which are dates typically considered by experts to be highly informative about efficiency.  *See* Torous Rep. ¶¶ 43, 52; Feinstein Rep. ¶ 180.  Plaintiff cannot dispute that the earnings announcements in this case were "highly economically material," (Feinstein Dep. 242:13–244:14), or that there were "more analyst reports covering Vale . . . released on days surrounding earnings announcements compared to any other day," Torous Rep. ¶ 46.  This indisputable evidence of "numerous days during the Class Period when news events did not result in price movement . . . ***cannot be ignored***."  *George*, 2013 WL 3357170, at \*12–13 (emphasis added) (price reaction on seven out of sixteen earnings releases and analysis ratings changes "is an insufficient foundation upon which to pronounce market efficiency").

Defendants' expert, Dr. Torous, ran collective event studies using Dr. Feinstein's own regression results and found "that there is no difference (from a statistical perspective) between the Vale ADRs' price movements on news days versus non-news days."  *Id.* ¶¶ 54–59 (running

---

[5]  As described in the Torous Report, from an economic perspective, the indirect *Cammer* and *Krogman* factors "are inadequate to reach conclusions regarding market efficiency" and "some of the indirect factors are more likely to exist if the market for the stock in question is inefficient."  Torous Rep. ¶¶ 23–30.

tests across earnings announcements, production data releases, and 6-Ks). The indirect *Cammer* and *Krogman* factors are insufficient to outweigh this significant finding. *See, e.g.*, *George*, 2013 WL 3357170, at *13 (plaintiffs must show direct evidence when there are results "supportive . . . of market inefficiency"). In short, where *zero* out of nine earnings dates here exhibited a price reaction, Plaintiff cannot meet its burden to show efficiency by a preponderance of the evidence.

Plaintiff also attempts to make much of the conclusion in a prior action that the market for Vale ADRs was deemed efficient during a different time period. *See In re Vale S.A. Sec. Litig.*, 2019 WL 11032303, at *14 (S.D.N.Y. Sept. 27, 2019) ("Vale I"). However, in that case, the plaintiffs' expert Dr. Tabak ran an appropriate event study across all earnings dates that Dr. Feinstein fails to run here, and found—in contrast to the proposed class period here—that Vale shares were more likely to react to news throughout the prior class period. *Id.* at *11. "While [D]efendants do not bear the burden of showing market inefficiency, . . . [it] cannot be ignored" that the results of the same test on the new proposed class period here suggest that the market is *inefficient*. *George*, 2013 WL 3357170, at *13; *see* Torous Rep. ¶¶ 51–59.

**Vale Bonds**: Plaintiff also fails to meet its burden of demonstrating efficiency for Vale bonds. The aforementioned analysis of the ADRs applies with equal force to the bonds, which also overwhelmingly do not exhibit a significant price reaction on earnings release dates or the dates of credit ratings changes. *See* Torous Rep. ¶¶ 80–82 (none of the bonds react on eight of the nine earnings dates; on the final date only three of seven bonds react, a random and inconsistent response that indicates *inefficiency*). In addition, the majority of the bonds exhibited no price reaction on two of the four end-of-class-period news dates cherry-picked by Dr. Feinstein. Feinstein Rep. ¶¶ 275–76. "[A]n event study that tests four dates and does not

11

consistently find statistically significant price movements for half of those dates does not support

a finding of market efficiency. . . ."  Torous Rep. ¶ 79.

Moreover, several other *Cammer* and *Krogman* factors also do not support a finding of

efficiency for Vale's bonds:

- *Cammer* factor 1 (trading volume):  Dr. Feinstein performs his stated analysis incorrectly and thereby overestimates the trading volume for the bonds.  *See* Torous Rep. ¶¶ 60–73.  After correcting for this error, "three of the Vale Notes do not meet the two percent threshold for a 'strong presumption' of market efficiency."  *Id.* ¶ 69.

- *Cammer* factor 2 (analyst coverage):  Plaintiff only argues that *Vale* was covered by analysts, but provides no evidence that analysts specifically covered the Notes.  *See* Feinstein Rep. ¶ 237.  This does not suffice as courts must "look at the number of analysts following ***a given security*** (as opposed to the company as a whole)."  *Global Brokerage*, 2021 WL 1185426, at *14 (emphasis added).  "The fact that a bond is rated by one or more of the major credit rating agencies is ***not***, in and of itself, a strong indicator of market efficiency."  *Id.* (emphasis added).

- *Cammer* factor 3 (market makers):  Plaintiff's suggestion that "underwriters typically make markets in the securities they underwrite" (Mot. at 16) is insufficient.  *See Global Brokerage*, 2021 WL 1185426, at *15 (courts cannot "simply assume that the underwriters who 'typically [ ] serve as market makers for the notes' did so").  Absent this assumption, Dr. Feinstein's citation to three market makers for the bonds (compared to 140 for the ADRs) actually suggests *inefficiency*.  Feinstein Rep. ¶¶ 93, 252.

- *Krogman* factor 2 (bid-ask spread):  Dr. Feinstein admitted at his deposition that he did not analyze the bid-ask spread for the bonds because he did not have the data available.  Feinstein Dep. 249:18–250:5; *see Global Brokerage*, 2021 WL 1185426, at *18 (assessing this factor as neutral because plaintiff's expert lacked bond data).

For example, certain bonds did not even trade on some of the alleged corrective

disclosure dates, and this "lack of sales [is] inconsistent with the theory of an efficient market."

*In re Am. Int'l Grp., Inc. Sec. Litig.*, 265 F.R.D. 157, 180 (S.D.N.Y. 2010), *vacated and*

*remanded on other grounds*, 689 F.3d 229 (2d Cir. 2012).  The bonds also had "inconsistent"

price responses on some of the disclosure dates, further suggesting inefficiency.  *See* Torous

Rep. ¶¶ 82–84.  This additional evidence of inefficiency conclusively establishes that Plaintiff

has failed to meet its burden with respect to the Vale bonds.

**B.      Plaintiff Cannot Satisfy The Predominance Requirement Given Individualized Questions About Whether Bond Transactions Were Domestic**

The class proposed by Plaintiff includes not only those bonds traded on the New York Stock Exchange ("NYSE"), but any bonds purportedly purchased "in a U.S. transaction." Mot. at 1. But Plaintiff offers no methodology for determining which bonds in fact were traded domestically. Plaintiff's expert acknowledges that Vale bonds trade over-the-counter in addition to trading on the NYSE, (*see* Feinstein Rep. ¶ 249), and an indeterminate percentage of those transactions occurred abroad.[6] The Second Circuit has recently held that "the investigation of domesticity" for over-the-counter bond transactions "appears to be an 'individual question' requiring putative class members 'to present evidence that varies from member to member.'" *Petrobras*, 862 F.3d at 272 (noting that such individualized evidence may include "facts concerning the formation of the contracts, the placement or purchase orders, the passing of title, or the exchange of money"). These transaction-specific questions cannot be determined on a classwide basis for the Vale bonds, nor has Plaintiff made *any* attempt to satisfy its burden of showing otherwise. As such, any class that includes Vale bonds cannot be certified. *See id.* at 273 (vacating certification of class of bond holders for failure to show that "a 'domestic transaction' applies equally to each putative class member").

**C.      Plaintiff Is Not Entitled To A Presumption Of Reliance Under *Affiliated Ute***

The presumption of reliance established in the Supreme Court's *Affiliated Ute Citizens of Utah v. U.S.*, 406 U.S. 128 (1972) decision "is not available where a plaintiff's theory is based entirely, or even primarily, on misrepresentations as opposed to omissions." *In re Barclays*

---

[6] Dr. Feinstein analyzed the bond transactions using the Trade Reporting and Compliance Engine ("TRACE") data provided by FINRA. *See* Feinstein Rep. ¶¶ 324–36. But the mere fact "that a transaction is reported to TRACE does not mean that either party to the transaction acted within the United States." *Banco Safra S.A. v. Samarco Mineracao S.A.*, 2021 WL 825743, at *4 (2d Cir. Mar. 4, 2021).

*Liquidity Cross and High Frequency Trading Litig.*, 126 F. Supp. 3d 342, 365 (S.D.N.Y. 2015). When there are "numerous affirmative representations"—with no fewer than twenty-six alleged in this case—"establishing reliance does not pose the particular evidentiary challenge warranting the *Affiliated Ute* presumption." *Goodman v. Genworth Fin. Wealth Mgmt., Inc.*, 300 F.R.D. 90, 106 (E.D.N.Y. 2014). Plaintiff ignores that the Court only found that "Plaintiff . . . alleges material omissions as to other statements." *In re Vale S.A. Sec. Litig.*, 2020 WL 2610979, at *14 (E.D.N.Y. May 20, 2020). Where, as here, the omission is defined in terms of "the truth that the statement misrepresents," *Affiliated Ute* does not apply. *See Waggoner*, 875 F.3d at 96.

> ### D.     Plaintiff Has Failed To Establish That Damages Can Be Calculated On A Classwide Basis

In *Comcast*, the Supreme Court held that damages must be "capable of measurement on a classwide basis," and plaintiffs must show that the methodology for calculating those damages is consistent with their theory of liability. 569 U.S. at 34. Following *Comcast*, courts have "rigorously examined proposed damages methodologies in putative class action cases for disconnects between damages and liability." *In re BP p.l.c. Securities Litigation*, 2013 WL 6388408, at *17 (S.D. Tex. Dec. 6, 2013). "Plaintiffs cannot avoid this hard look by refusing to provide the specifics of their proposed methodology." *Id.* But that is precisely what Plaintiff attempts to do here. Plaintiff's expert, Dr. Feinstein, provides a rote damages model that is completely untethered from the unique complexities of this case. The Court can and should deny Plaintiff's motion for class certification on this basis alone.

> #### 1.     Dr. Feinstein's purported "damages model" is too vague to permit any meaningful examination by the Court.

When a class plaintiff presents an "out-of-pocket" damages model without "giv[ing] the Court any information about how" that model will operate, the plaintiff does not meet its "burden of proving all elements of Rule 23." *In re BP p.l.c. Securities Litigation*, 2014 WL 2112823, at

14

*12 (S.D. Tex. May 20, 2014).  Dr. Feinstein claims that an "out-of-pocket damage methodology" can be applied on a classwide basis here through the use of "generally accepted valuation tools and models."  Feinstein Rep. ¶¶ 290, 295.  But Dr. Feinstein makes no effort to explain what specific "valuation tools and models" he would use or what factors the model would consider.  *See, e.g.*, Feinstein Dep. 288:8–22, 301:11–16; *see also Fort Worth Emps.' Ret. Fund v. J.P. Morgan Chase & Co.*, 301 F.R.D. 116, 141 (S.D.N.Y. 2014) (rejecting expert's opinion "'that class-wide damages can be calculated in a formulaic manner[,]' [w]ithout more specificity as to the methodology that will be used").  He fails to provide the sort of "step-by-step detail necessary to evaluate whether the methodology is workable here," *Singleton v. Fifth Generation, Inc.*, 2017 WL 5001444, at *22 (N.D.N.Y. Sept. 27, 2017), and when asked at his deposition to elaborate on his model, Dr. Feinstein failed to provide any specifics.[7]  Instead, Dr. Feinstein merely insisted that his damages model is tried and true, "essentially statutory, determined by caselaw."  Feinstein Dep. 288:11–22.  In reality, however, Dr. Feinstein's vaguely described model has been tried and *rejected*.

In *OPERS*, Dr. Feinstein offered a nearly identical proposed damages methodology that was soundly rejected by the court.  *Compare* Ex. 3 (Feinstein *OPERS* Report) ¶¶ 149–57, *with* Feinstein Rep. ¶¶ 288–97.[8]  There, Dr. Feinstein offered a report that merely alluded to "unspecified 'valuation tools'" and "various techniques he believe[d] he could use to calculate out-of-pocket damages based on inflation that can be applied on a classwide basis."  2018 WL

---

[7]  *See, e.g.*, Feinstein Dep. 296:24–297:4 ("*I haven't crossed that bridge yet*. . . . [I]t may be single factor [model], it may be multi factor.") (emphasis added); *see also id.* at 287:18–288:7 ("I'm not necessarily sure in a damages model which is the right way to go . . . *I haven't done the analysis yet*, it seems that in this particular case there's considerations that weigh in favor of either of those approaches [to account for economic sector-wide events].") (emphasis added).

[8]  Dr. Feinstein admitted in his deposition that "much of [his report] has already been drafted . . . *maybe not specifically for this case*."  Feinstein Dep. 44:13–22 (emphasis added).

15

3861840, at *19.  He also stated there—as he has here—that he had not yet determined "the specifics of . . . which model [he] would use."  *Id.*  The *OPERS* court found that "[w]hen a class plaintiff presents a damages model that is vague, indefinite, and unspecific, or simply asserts (as did Dr. Feinstein) that there are unspecified 'tools' available to measure damages, the model amounts to 'no damages model at all,' and the class cannot be certified."  *Id.*

*OPERS* is not the only court that has rejected a Dr. Feinstein damages model as overly vague.  In *Sicav v. Wang*, the plaintiffs claimed that defendant violated federal securities laws by amending an agreement that barred its company insiders from selling its shares until a specified date.  2015 WL 268855, at *2 (S.D.N.Y. Jan. 21, 2015).  The court rejected Dr. Feinstein's opinion that it was theoretically possible for the infusion of shares to lower a stock's price, since he did "not undertake a close analysis, or indeed any analysis, of the trading activity at issue *in this case*."  *Id.* at *4.  The court ultimately denied class certification because "plaintiffs ha[d] not shown or explained, *concretely*, how damages would be calculated as to any individual purchaser."  *Id.* at *6 (emphasis added).

The "model" Dr. Feinstein offers here is just as vague as those previously rejected by other courts.  When pressed on how this model could accommodate the particular complexities of this case, Dr. Feinstein resorted to the refrain that he knows "standard valuation tools" are sufficient in every case, without any further elaboration.  *See, e.g.*, Feinstein Dep. 288:21–25 ("So that's why I know it's feasible.  I know it exists because it exists, and is used in virtually all class action cases."); 289:14–19 ("I know that I could calculate damages for each of the securities for every class member using a common damage model.  I can do that, although I haven't been asked to do it, so I don't know if I will be doing it.").  But "without assurance

16

beyond [Dr. Feinstein's] say-so, the Court cannot conclude that there is a damages model that will permit the calculation of damages on a classwide basis." *Fort Worth*, 301 F.R.D. at 142.

### 2.    Dr. Feinstein's ambiguous damages model is particularly problematic given the complexities of this case.

While the lack of specificity in Dr. Feinstein's report would be troubling under any circumstances, it is particularly problematic here given the complexities of this case. Dr. Feinstein's model makes no attempt to grapple with the following conflicts pervading Plaintiff's allegations: (1) pre- *and* post-collapse alleged misstatements; (2) causation theories tied to corrective disclosures *and* a materialization of the risk; and (3) investors in both debt *and* equity. If Dr. Feinstein's damages model could purportedly calculate damages on a classwide basis despite these competing interests—a tall, and likely impossible order—Plaintiff has the burden of showing, with at least *some* degree of specificity, how that would happen. Dr. Feinstein's cursory description of a general damages model plainly fails to satisfy Plaintiff's burden.

***Pre- and Post-Collapse Alleged Misstatements***:  Courts have found that vague damages models are "particularly problematic" where "there are multiple alleged misrepresentations." *Loritz v. Exide Techs.*, 2015 WL 6790247, at *22 (C.D. Cal. July 21, 2015); *see also* Torous Rep. ¶ 86. ***Twenty-six*** alleged misstatements remain in this case and Dr. Feinstein's report does not address *any of them*. *See* Feinstein Rep. ¶¶ 288–97; Feinstein Dep. 294:3–13. Dr. Feinstein's utter disregard for these allegations results not only in a failure to determine "which corrective disclosures address which proposed misrepresentation(s)," Torous Rep. ¶ 86 but also to show that "the class-wide damages methodology proposed will track Plaintiff['s] theories of liability," *BP*, 2013 WL 6388408, at *17.

Dr. Feinstein claims that his model does not need to track separate theories of liability here since Plaintiff has only alleged one theory:  "That the security prices were artificially

17

inflated because of allegedly fraudulent misrepresentations and omissions."  Feinstein Dep.

283:6–25; *see also id*. at 80:14–21.  But there is *not* a single theory of liability propounded here.

There is one theory based on the *pre-collapse* alleged misstatements:  That Defendants misled

investors as to the *risk* that Dam 1 would collapse.  And there is a separate theory based on the

*post-collapse* alleged misstatement:  That Defendants misled investors about its *responsibility* for

the Dam 1 collapse and, thus, the likely consequences of that collapse.

These two distinct theories of liability are similar to those identified by the court in *Vale
I*.  There, the plaintiffs also alleged the pre- and post-collapse misstatements shared a common

theory of liability:  That Defendants "violate[d] the Exchange Act by issuing public statements

that misrepresented or omitted material facts to all investors."  2019 WL 11032303, at *6.  The

court found that this theory of liability "only ma[de] sense at an excessively high level of

abstraction," and that "[w]hen considered at a more appropriate level of generality, Lead

Plaintiffs' attempt to shoehorn the Pre- and Post-Collapse Statements into a single 'common

scheme' pushes that concept past its breaking point."  *Id.* at *7. That reasoning applies here with

equal force.[9]  *See* Torous Rep. ¶ 87.

Any explanation Dr. Feinstein now provides in defense of his single theory determination

is post hoc and inherently suspect because Dr. Feinstein strikingly admitted that he *did not even
know* about the post-collapse alleged misstatement until it was brought to his attention at his

deposition.[10]  Feinstein Dep. 80:9–13.  This abject failure to account for such foundational

---

[9]  Other courts have similarly concluded that two theories of liability exist when alleged misstatements were made both before and after a materialization of the risk.  *See, e.g.*, *BP*, 2013 WL 6388408, at *11 ("Class members who purchased prior to the . . . explosion may very well have interests different from, and possibly competing with, class members who purchased after that event." (emphasis added)).

[10]  Once made aware of the pre- and post-collapse alleged misstatements, Dr. Feinstein argued that his damages model could account for all alleged misstatements by using an "artificial inflation ribbon," which looks to the difference between the actual price and the "but for" price.  Feinstein Dep. 290:17–291:23.  But Dr. Feinstein

18

information casts doubt on Dr. Feinstein's proposed damages analysis generally and his single theory of liability more specifically.

*Corrective Disclosures and a Materialization of The Risk*:  Courts also have rejected vague damages models where "corrective information was allegedly disclosed at multiple times." *Loritz*, 2015 WL 6790247, at *22–23.  Here, Plaintiff alleges that corrective disclosures occurred on February 4, 2019 and February 6, 2019, when reports revealed that Vale had allegedly misrepresented the stability of its dams. *See Vale*, 2020 WL 2610979, at *17–18.  Separately, the Court found that the January 25, 2019 dam collapse constitutes a materialization of the risk. *Id.*  The differences between corrective disclosures and materialization of the risk are stark.

Out-of-pocket damages may be calculated using the abnormal price decline on the day of a corrective disclosure.  But "when the corrective event is the materialization of an understated risk, the stock price movement on the date of correction (*i.e.*, on the date that the risk materialized) will not equate to inflation on the date of purchase unless the probability of the risk materializing was 100 percent." *BP*, 2014 WL 2112823, at *10.  "If the probability is less than 100 percent, the stock price correction after the risk materializes will be larger than the pre-materialization inflation." *Id.*[11]  Thus, out-of-pocket damages can only be determined by the

fails to explain how the artificial inflation ribbon applies to the unique facts of *this case*. *See Tawfilis v. Allergan, Inc.*, 2017 WL 3084275, at *7 (C.D. Cal. June 26, 2017); *Fort Worth*, 301 F.R.D. at 141.

[11]  To illustrate this proposition, the *BP* court quoted a simplified example from the defendants' expert report:  "Imagine that a company announced that it was going to draw a marble from an urn of 100 marbles, of which 99 were black and one was red.  If the company drew a red marble, it would have to pay $1 million.  Prior to finding out the outcome, the company's market value would reflect the expected loss from this lottery of 1% of $1 million, or $10,000.  If the company subsequently drew a red marble, the market value would have fallen $990,000 to reflect the new information—the certainty of a $1 million loss.  If, however, contrary to the company's statement, there were two red marbles (increasing the probability of drawing a red marble), the share price would still have fallen when the company drew a red marble.  In order to understand the value implication of the company's misstatement that there was only one red marble, the relevant issue is what the market value would have been, prior to drawing, had the company told the truth.  In this case, the market value would have reflected an expected loss of $20,000, only $10,000 lower than the actual market value, not the $990,000 less that would be implied by looking at the reaction to the drawing of a red marble." *Id.* at *10 n.10.

19

difference between the "*true*" probability that an adverse event could occur, and the *perceived* probability, due to the alleged concealment, that the event could occur.  Torous Rep. ¶ 92.  "The calculation of either probability is not a straight-forward exercise, which is further complicated by the fact that these probabilities may change over time (*e.g.*, the expected and actual risks of a safety event may change as a result of natural causes such as seismic activities or floods)."  *Id.*

Dr. Feinstein "fails to articulate how he would quantify either the 'true' *ex-ante* probability of the [Dam 1 collapse] or the market's assessed probability, and how he would then translate those probabilities into changes in the price of the Vale Securities, which would be needed for him to calculate the inflation required for his out-of-pocket measure of damages."  *Id.* ¶ 93.  When pressed on how his model would account for the differences between materialization of the risk and corrective disclosures, Dr. Feinstein vaguely stated that it would require "certain tasks that differ in the implementation of the model, but the model's the same model."  Feinstein Dep. 310:10–12.  Dr. Feinstein gave no indication, however, of what these "certain tasks" might be.  He simply dismissed materialization of the risk as "a construct of defense counsel . . . not necessarily embraced by everybody in the legal field."  *Id*. at 311:19–25.  But this Court has already articulated the difference in the two theories of loss causation and explicitly found that the Dam 1 collapse was a materialization of the risk, *not* a corrective disclosure.  *Vale*, 2020 WL 2610979, at *17–18.  It is therefore the law of the case and will necessarily affect the damages model applied—Dr. Feinstein's dismissive view notwithstanding.  *See OPERS*, 2018 WL 3861840, at *18 (rejecting Dr. Feinstein's materialization of the risk model).

***Investors In Both Debt and Equity***:  Dr. Feinstein's report makes no reference to how his model will assess damages for investors in both equity and debt securities.  When asked about this at his deposition, Dr. Feinstein stated in a conclusory fashion that the same model would be

used for both types of securities "but the parameters of the model will differ depending on which security's being used." Feinstein Dep. 289:21–25. But Dr. Feinstein did not provide any explanation for *how* these so-called "parameters" of the model will differ. He does not address any of the complex concerns arising from the application of the same model across different securities with varied attributes, including that bonds "tend to be safer" than equities, and "more information will impact, on a day-to-day basis, ADRs than a bond." Feinstein Dep. 98:6–8, 96:5–9; *see also* Torous Rep. ¶ 85. These non-answers plainly fail to satisfy Plaintiff's burden. "Without a more complete explication of how Plaintiff[] propose[s] to use an event study to calculate class members' damages, and how that event study will incorporate—and, if necessary, respond to—the various theories of liability, the Court cannot certify this litigation for class action treatment." *BP*, 2013 WL 6388408, at *17.

E. **The Proposed Class Cannot Be Certified Because It Includes Numerous Class Members Who Were Not Injured**

Plaintiff's proposed class is fatally overbroad because it includes two significant categories of putative plaintiffs for whom Vale's alleged misconduct caused no legally cognizable investment losses under the federal securities laws. Plaintiff seeks to certify a class of all persons who purchased Vale ADRs or Notes "between October 27, 2016 and February 6, 2019." Mot. at 1. But this includes both: (i) persons who traded on wide swaths of dates for which any recovery is precluded by the PSLRA's "nominal loss" damages cap; and (ii) in-and-out traders, whom the Second Circuit has found are not properly included in a securities class. *See In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 39 (2d Cir. 2009).

Under the PSLRA, if the mean trading price of a security during the 90–day bounce back period following the correction "is greater than the price at which the plaintiff purchased his stock[,] then that plaintiff would recover nothing." *In re Vivendi Universal, S.A. Sec. Litig.*, 123

21

F. Supp. 3d 424, 439 (S.D.N.Y. 2015) (referencing 15 U.S.C. § 78u–4(e)(1)). Here, the lowest potential "bounce back" price[12] is above the price at which Vale ADRs were trading for nearly *half* (46%) of the Class Period, and any potential plaintiff who purchased on those dates *cannot recover any damages*. *See* Torous Rep. ¶ 101. With nearly half of the dates in the Class Period below the lowest potential "bounce back" price, it is a near certainty that the putative class contains more than a "de minimis" number of members (*i.e.*, 5–6%) who have suffered no compensable injury. *See In re Restasis (Cyclosporine Ophthalmic Emulsion) Antitrust Litig.*, 335 F.R.D. 1, 17 (E.D.N.Y. 2020); *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 2021 WL 1257845, at *10 (9th Cir. Apr. 6, 2021) ("If a substantial number of class members 'in fact suffered no injury,' the 'need to identify those individuals will predominate.'"). Also, investors in certain Vale notes cannot recover damages under the PSLRA cap for purchases made on approximately 8–13% of dates during the Class Period. *See* Torous Rep. ¶ 103. "Rule 23(b)(3) requires courts 'to make findings about predominance and superiority *before* allowing the class.'" *Olean*, 2021 WL 1257845, at *12 (quoting *Wal-Mart Stores*, 564 U.S. at 363). Accordingly, the Court should deny certification because "the Court cannot find that 'all or virtually all' class members were injured under the predominance prong of Rule 23(b)(3)." *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 292 F. Supp. 3d 14, 138, 141 (D.D.C. 2017) (denying certification where at least 12.7% of class members were uninjured).

At a minimum, the Court should narrow the proposed class to exclude any investors who purchased Vale ADRs before February 10, 2017 and between February 24 and August 31, 2017, as all such investors are foreclosed from establishing any cognizable injury under the PSLRA.

---

[12] The individual calculation of the cap varies based on the exact timing of any sale. Dr. Torous conservatively selected the ADR price of $11.20, which is the "minimum across all possible" calculations, meaning that many additional putative class members likely cannot recover damages. Torous Rep. ¶ 100.

22

*See* Torous Rep. ¶ 101.  The Court also should narrow any certified class to exclude "in and out"

traders, *i.e.*, those who sold before any corrective disclosure.  Because in-and-out traders cannot

"even 'conceivably' be able to prove loss causation as a matter of law," they are not properly

part of the class.  *Flag Telecom*, 574 F.3d at 39; *see also In re Juniper Networks, Inc. Sec. Litig.*,

264 F.R.D. 584, 594 (N.D. Cal. 2009) (excluding "in-out traders who sold their securities prior to

. . . curative disclosures").

## II.     THE PROPOSED CLASS DOES NOT MEET
##         THE REQUIREMENTS OF RULE 23(A)

### A.     Plaintiff Does Not Satisfy The Typicality Requirement Of Rule 23(a) Because The Alleged Losses Arise From Different Courses Of Events

Rule 23(a)(3) requires that a class representative have claims typical of the claims of the

class.  Fed. R. Civ. P. 23(a)(3).  Here, Plaintiff is atypical because not all class members have

been allegedly injured by the same course of conduct; there was not a common scheme to

defraud.  *Vale I*, 2019 WL 11032303, at *6–7.  Plaintiff alleges in general terms:  "Defendants

violated . . . the Exchange Act by making statements that misrepresented or omitted material

facts."  Mot. at 9.  This fails to consider the alleged misstatements at "a more appropriate level of

generality," where it is clear that not all class members rely on a single theory of liability.  *Vale I*,

2019 WL 11032303, at *7.  As discussed *supra* Section I.D.2, the alleged misstatements can be

segregated into two separate alleged frauds:  (1) the pre-collapse alleged misstatements misled

investors as to the risk that Dam 1 would collapse; and (2) the post-collapse alleged misstatement

misled investors about its responsibility for the Dam 1 collapse.  This presents a problem similar

to the one identified by the court in *Vale I*, which found that pre- and post-dam collapse

statements were not part of the same scheme to defraud.  *Id.*  Here, although there may be a

"common thread" running through Plaintiff's allegations relating to the collapse of Dam I, "that

is not enough for Defendants' behavior to be characterized as a single 'course of conduct.'"  *Id.*

23

**B.      Plaintiff's Lack of Candor Precludes It From Satisfying Rule 23(a)'s Adequacy Requirement**

Plaintiff has demonstrated it will not "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). In assessing adequacy under Rule 23(a)(4), courts consider whether the Plaintiff's submissions contain "errors" that would "militate against appointment and render [it] inadequate to serve as lead plaintiff under Rule 23's adequacy requirement." *Plaut v. Goldman Sachs Grp.,* 2019 WL 4512774, at *5 (S.D.N.Y. Sept. 19, 2019).

On March 28, 2019, Plaintiff certified that it "sought to serve and *serves as* a lead plaintiff in . . . *Gross v. Grupo Televisa, S.A.B.*, No. 18-cv-1979 (S.D.N.Y.)." Dkt. 8-1 ¶ 5 (emphasis added). This statement is inaccurate. *See Grupo*, 2020 WL 3050550, at * 8 ("CAAT is not typical of the class. Accordingly, the motion for class certification is denied."). Plaintiff and its counsel have failed to correct this mistake, despite having over ten months to do so, and despite being notified of this inaccuracy during Plaintiff's recent deposition, Ex. 4 ("Rorwick Dep.") 72:24–73:25. This alone is reason to dismiss Plaintiff on adequacy grounds. *See, e.g.*, *Li Hong Cheng v. Canada Goose Holdings Inc.*, 2019 WL 6617981, at *6 n.7 (S.D.N.Y. Dec. 5, 2019) ("erroneous[]" failure to disclose previously sought appointment in a prior action was a "clerical error" that "nonetheless speaks to a level of carelessness, and causes . . . doubt" regarding "adequacy and sophistication"); *Plaut*, 2019 WL 4512774, at *5.

But even if that alone were not enough—and it should be—Plaintiff's lack of candor in *Grupo* certainly is. In *Grupo*, CAAT failed to disclose a short position worth roughly three times the losses it was claiming. 2020 WL 3050550, at *7. CAAT was aware of this short position *prior* to applying to serve as lead plaintiff in that case, but CAAT and its counsel failed to disclose it in its submission. Rorwick Dep. 70:14–72:23. The short position was only revealed *twenty months* into the litigation during CAAT's 30(b)(6) deposition. *See id*. at 62:5–7; Ex. 5 at

24

33. CAAT's counsel in that case is currently defending accusations that it should be disqualified as lead counsel for lack of candor. *See* Ex. 6 at 1–2.

This Court can—and should—consider CAAT's recent lack of candor in *Grupo* even though it occurred in another case. *See Villare v. ABIOMED, Inc.*, 2020 WL 3497285, at *8 (S.D.N.Y. June 29, 2020) (FRE 201 allows a court to take judicial notice of a violation of a duty of candor in a ***separate*** securities action).[13] The striking lack of candor displayed in *Grupo* is clearly relevant. CAAT's application to serve as lead plaintiff here was premised, in part, on its PSLRA certification stating that it currently serves as lead plaintiff in *Grupo*. Dkt. 8-1 ¶ 5. That is now false, and Plaintiff was careless in not correcting that information. Further, the certification states that CAAT understands its responsibilities under the PSLRA, which include reviewing and certifying filings. *Id.* at ¶ 3. Its failure to do so here and in *Grupo* speaks directly to CAAT's adequacy as lead plaintiff, and compels denial of class certification.

## CONCLUSION

For each—or any—of the foregoing reasons, Defendants respectfully request that the Court deny Plaintiff's motion for class certification and appointment of class representatives and class counsel.

---

[13] Some cases have applied this analysis to instances where *counsel* displayed a lack of candor. This distinction is immaterial because"[f]or purposes of determining whether the class representative is an adequate representative of the members of the class, the performance of the class lawyer is inseparable from that of the class representative." *Culver v. City of Milwaukee*, 277 F.3d 908, 913 (7th Cir. 2002).

25

Dated: New York, New York
April 9, 2021

GIBSON, DUNN & CRUTCHER LLP


By:  /s/ Mark A. Kirsch
Mark A. Kirsch
Randy M. Mastro
Christopher M. Joralemon
Mary Beth Maloney
David M. Kusnetz

200 Park Avenue
New York, NY  10166-0193
Telephone:        212.351.4000
Facsimile:        212.351.4035

*Attorneys for Defendants*