# EXHIBIT 1

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In Re VALE S.A. SECURITIES LITIGATION | No. 19-cv-526-RJD-SJB |

**REBUTTAL EXPERT REPORT OF WALTER N. TOROUS, PH.D.**

**April 9, 2021**

**TABLE OF CONTENTS**

I.      Introduction...............................................................................................................1

        A.      Qualifications................................................................................................1

        B.      Background....................................................................................................2

                1.      Vale and the Collapse of the Córrego do Feijão Dam ("Dam 1") ..............2

                2.      Vale ADRs and Notes At Issue ("Vale Securities") ..................................3

                3.      Summary of Allegations ..........................................................................4

                4.      Summary of Dr. Feinstein's Opinions .....................................................5

        C.      Assignment ...................................................................................................6

II.     Summary of Opinions ...............................................................................................7

III.    Overview of Market Efficiency in the Context of Securities Class Actions .....................10

IV.     The Indirect *Cammer* and *Krogman* Factors Are Not Sufficient to Establish
        Market Efficiency ....................................................................................................12

        A.      Academic Studies Demonstrate that Indirect Factors Are Not Dispositive
                of Market Efficiency ....................................................................................12

        B.      The Fifth *Cammer* Factor Is the Only *Cammer* Factor that Provides Direct
                Evidence of Whether a Security Trades in an Efficient Market ...........................17

V.      Dr. Feinstein Fails to Reliably Establish a Cause-and-Effect Relationship Between
        News and the Price of the Vale ADRs...........................................................................18

        A.      Dr. Feinstein's Test of Only the Four Corrective Disclosure Dates is
                Methodologically Unsound.............................................................................19

        B.      Dr. Feinstein's Event Study Shows No Statistically Significant Price
                Movements on News Days Typically Considered When Evaluating
                Market Efficiency, Suggesting Inefficiency in the Market for the Vale
                ADRs...........................................................................................................25

                1.      Dr. Feinstein's Own Event Study Shows No Statistically
                        Significant Price Reaction on Earnings Announcement Dates or
                        Production Report Dates ........................................................................25

                2.      The Results of a Collective Event Study Suggest that the Price of
                        the Vale ADRs Did Not React to the Type of Value-Relevant
                        Information Typically Analyzed in a Collective Event Study, such
                        as Earnings Announcements ...................................................................34

                3.      Dr. Feinstein's Own Event Study Shows No Statistically
                        Significant Price Reaction on Form 6-K Dates..........................................37

VI.     Dr. Feinstein Fails to Provide Reliable Evidence that the Vale Notes Traded in an Efficient Market ..........................................................................................................39

    A.     Dr. Feinstein's Organization and Treatment of the TRACE Data Is Incorrect and Incomplete ............................................................................39

    B.     Dr. Feinstein Overstates Trading Volume of the Vale Notes ................................43

    C.     Dr. Feinstein's Trading Frequency Analysis Is Misleading .................................44

    D.     Dr. Feinstein's Analyses of the Fifth *Cammer* Factor for the Vale Notes Are Flawed and Fail to Demonstrate Market Efficiency ......................................46

        1.     Dr. Feinstein's Event Study for the Vale Notes Suffers from the Same Flaws as His Event Study for the Vale ADRs ............................... 46

        2.     Dr. Feinstein's Own Event Study Shows No Statistically Significant Price Movements on Some of the Alleged Corrective Disclosure Dates for Several of the Vale Notes........................................ 46

        3.     The Vale Notes' Price Response on Earnings Announcements and Production Report Dates Suggests Inefficiency ...................................... 49

VII.    Dr. Feinstein's Opinion that Damages Can Be Calculated Through a Common Class-Wide Methodology Is Flawed and Unreliable ...........................................................52

    A.     Dr. Feinstein Has Not Specified a Methodology to Calculate Damages on a Common, Class-Wide Basis that is Consistent with Plaintiff's Allegations .............................................................................................................52

    B.     Dr. Feinstein's Proposed Common Damages Methodology Does Not Articulate How It Would Account for the Materialization of a Disclosed Risk ........................................................................................................................56

VIII.   Many Proposed Class Members Did Not Incur Any Losses and Would Not Be Awarded Damages ............................................................................................................60

IX.     From an Economic Perspective, Lead Plaintiff Is Not Representative of the Proposed Class ..................................................................................................................65

## I.    INTRODUCTION

### A.    Qualifications

1.    I, Walter Torous, am a Senior Lecturer at the Massachusetts Institute of Technology with a joint position at the Sloan School of Management and the Center for Real Estate. I am also a Professor Emeritus and the former Lee and Seymour Graff Endowed Professor at the John E. Anderson School of Management at the University of California at Los Angeles. I am a member of the American Finance Association and the Western Finance Association. I received my Ph.D. degree in Economics from the University of Pennsylvania in 1981. I have taught courses in managerial finance at the master's level and empirical methods in finance at the doctoral level.

2.    My areas of research include fixed income securities and derivative instruments, the pricing of securities (including stocks, risky debt, options, futures, and mortgages), the reorganization of financially distressed firms, the behavior of interest rates, and statistical issues in finance. I have published peer-reviewed articles on event studies,[1] as well as market efficiency,[2] the pricing of stocks and bonds, the modeling of interest rate movements, and the valuation of a variety of financial instruments including options, futures, corporate debt, and mortgage-related securities. I have spoken at numerous academic and business conferences about my research. I am currently, or have been, the editor or associate editor of a number of finance journals, including the *Pacific-Basin Finance Journal*, *Economic Notes*, and *the Journal of Real Estate Finance and Economics*. I am currently, or have been, an *ad hoc* referee for several finance journals, including the *Journal of Finance*, *Journal of Financial and Quantitative*

---

[1]    *See*, *e.g.*, Clifford A. Ball and Walter N. Torous, "Investigating Security Price Performance in the Presence of Event-Date Uncertainty," *Journal of Financial Economics* 22, 1988, pp. 123-153.

[2]    *See*, *e.g.*, Harrison Hong, Walter Torous, and Rossen Valkanov, "Do Industries Lead Stock Markets?" *Journal of Financial Economics*, 83:2, 2007, pp. 367-396.

*Analysis*, *Review of Financial Studies*, *Journal of Financial Economics*, and the *Journal of Empirical Finance.*

3.    My complete curriculum vitae, which includes a list of my publications, is attached as **Appendix A** to this report. **Appendix B** lists my testimony in the past four years.

### B.    Background

#### 1.    *Vale and the Collapse of the Córrego do Feijão Dam ("Dam 1")*

4.    Vale S.A. ("Vale" or the "Company") is one of the largest metals and mining companies in the world. Vale is the world's largest producer of iron ore and iron ore pellets, and the iron ore business represents its primary source of revenues. Sales of iron ore and iron ore pellets ranged from 71.3 percent of Vale's net operating revenues in 2016 to 77.9 percent in 2019.[3] Vale engages in mineral exploration in multiple countries worldwide, utilizing integrated logistics systems that include railroads, maritime terminals, and ports, in addition to its mining operations.[4]

5.    As part of its operations, Vale used dams, including "Dam 1" (or the "Dam") at Vale's Córrego do Feijão iron ore mine located in Brumadinho, Minas Gerais, Brazil, to store the tailings or byproducts of its mining operations.[5] On January 25, 2019, Dam 1 failed, resulting in the release "of a flow of tailings residue, which affected [Vale's] administrative area at the

---

[3]    Sales of iron ore and iron ore pellets comprised 71.3, 71.2, 73.9, and 77.9 percent of Vale's net operating revenues in 2016, 2017, 2018, and 2019, respectively. *See* US Securities and Exchange Commission, Form 20-F for Vale S.A., December 31, 2016, p. 17; US Securities and Exchange Commission, Form 20-F for Vale S.A., December 31, 2019, p. 12.

[4]    US Securities and Exchange Commission, Form 20-F for Vale S.A., December 31, 2019, p. 1.

[5]    Consolidated Class Action Complaint ("Complaint"), ¶ 3.

2

Córrego do Feijão mine and parts of the communities of Córrego do Feijão and Parque da Cachoeira outside of Brumadinho, reaching the nearby Paraopeba River."[6]

### 2.     *Vale ADRs and Notes At Issue ("Vale Securities")*

6.      The at-issue securities in this case include Vale's American depository shares (also referred to as American depository receipts, hereafter, the "Vale ADRs"), which are Vale's equity securities listed on the New York Stock Exchange ("NYSE") under the symbol "VALE."[7] **Exhibit 1** shows the price of the Vale ADRs between October 27, 2016 and February 6, 2019 (the "Proposed Class Period").  As shown in **Exhibit 1**, the price of the Vale ADRs generally increased over the Proposed Class Period.

7.      Also at issue are seven debt securities issued by Vale between January 2004 and August 2016 (the "Vale Notes," and collectively with the Vale ADRs, "Vale Securities").[8]  The Vale Notes, all of which are senior unsecured debt securities, had terms ranging from five years to 30 years with maturity dates between June 2021 and September 2042.  The face amount at issuance for the Vale Notes ranged from $800 million to $2.5 billion; the total collective face amount at issuance across the Vale Notes was $12.05 billion.  Additional information on the Vale Notes is provided in **Exhibit 2**.  As shown in **Exhibit 3**, the prices of the Vale Notes also generally increased over the Proposed Class Period.

---

[6]     US Securities and Exchange Commission, Form 20-F for Vale S.A., December 31, 2019, p. 2.

[7]     Complaint, ¶¶ 2, 35.

[8]     Complaint, ¶ 2.

3

3.    *Summary of Allegations*

8.    The Colleges of Applied Arts and Technology Pension Plan ("CAAT" or "Lead Plaintiff") brought this suit on behalf of a proposed class of Vale investors, consisting of all other persons or entities who purchased the Vale Securities during the Proposed Class Period (collectively, the "Proposed Class").[9]  Plaintiff alleges that as a result of Defendants' false and misleading statements about Vale's dam safety conditions and risk management efforts throughout the Proposed Class Period, members of the Proposed Class paid artificially inflated prices for the Vale Securities.[10]

9.    Specifically, I understand that Plaintiff contends that throughout the Proposed Class Period, Defendants misrepresented or omitted facts regarding, among other things, "the risk that Dam 1 would fail" and "the sufficiency of Vale's dam risk management and sustainability policies and practices."[11]  Plaintiff alleges that Defendants made these allegedly false and misleading statements in Vale's annual reports, Vale's sustainability reports, Forms 6-K filed with the SEC, and publicly available presentations and articles.[12]  The Complaint purports to identify 25 alleged misrepresentations on 17 dates *prior* to the collapse of Dam 1 on January 25, 2019, as well as one *post*-collapse misrepresentation on January 28, 2019 regarding Dam 1's "Safety Factor" and whether it met Brazilian standards.[13]

---

[9]    Complaint, ¶ 2.

[10]    Complaint, ¶ 24.

[11]    *In re: Vale S.A. Securities Litigation,* Memorandum & Order [Motion to Dismiss], May 20, 2020, pp. 12-13; Complaint, § V.

[12]    *In re: Vale S.A. Securities Litigation,* Memorandum & Order [Motion to Dismiss], May 20, 2020, pp. 12-13; Complaint, § V.

[13]    *See* Complaint, § V.  *See also In re: Vale S.A. Securities Litigation,* Memorandum & Order [Motion to Dismiss], May 20, 2020, § II.  On January 28, 2019, Plaintiff alleges that Vale filed a Form 6-K with the SEC in

10. Plaintiff further contends that the "truth about the risk of Vale's tailing dams" and its sustainability policies and practices was disclosed through a series of corrective disclosures, beginning with the news of Dam 1's collapse on January 25, 2019 and concluding with news published on February 6, 2019.[14] These alleged corrective disclosures and the dates on which they occurred per the Complaint are summarized in **Exhibit 4**.[15] Plaintiff claims that following these "disclosures or materializations of the risks concealed by Defendants' fraud, the price of Vale Securities declined significantly as the artificial inflation was removed,"[16] and this decline was a "direct result" of Defendants' allegedly misleading statements, causing members of the Proposed Class to purportedly suffer "substantial economic loss."[17]

### 4. *Summary of Dr. Feinstein's Opinions*

11. Plaintiff's expert, Dr. Steven Feinstein, submitted a corrected expert report in this matter on February 18, 2021 in which he opines that the Vale Securities traded in an efficient market over the Proposed Class Period and that damages can be calculated on a class-wide basis using a common methodology.[18] Specifically, Dr. Feinstein finds that "[t]he market for the Vale ADR satisfied all of the *Cammer* and *Krogman* factors, which indicate market efficiency,"[19] and he

---

which Vale "continued to falsely assert that Dam 1 was certified as stable prior to its collapse." Complaint, ¶¶ 199-200.

[14] Complaint, ¶ 203.

[15] I note that the Complaint identifies January 28, 2019 as an alleged corrective disclosure. *See* Complaint, ¶¶ 206-209. However, I also understand that the Court ruled that Plaintiff failed to plead that the reports released on January 28, 2019 (and over the weekend of January 26-27, 2019) qualify as corrective events. *See In re: Vale S.A. Securities Litigation,* Memorandum & Order [Motion to Dismiss], May 20, 2020, p. 33.

[16] Complaint, ¶ 215.

[17] Complaint, ¶ 202.

[18] Corrected Report on Market Efficiency, Professor Steven P. Feinstein, Ph.D, CFA, February 18, 2021, ("Corrected Feinstein Report"), ¶¶ 17, 21-22.

[19] Corrected Feinstein Report, ¶ 222.

5

argues that his empirical analyses "prove[] that there was a cause-and-effect relationship between the release of new information" and the prices of the Vale ADRs and Vale Notes.[20]

12.    In addition, Dr. Feinstein states in his report that "Lead Plaintiff's counsel asked me to opine on whether Section 10(b) [damages] for each of the Vale Securities could be measured using a common methodology that is consistent with Lead Plaintiff's theory of liability for all Class members."[21] Dr. Feinstein concludes that "each Class member's damages under Section 10(b) can be computed in the same way, applying this common methodology to all Class members, using readily available daily pricing information, in accordance with widely used and generally accepted methodologies and the prescriptions of the PSLRA."[22]

### C.    Assignment

13.    I have been retained by Gibson, Dunn & Crutcher, counsel for Defendants.  Counsel has requested that I do the following:

    a.    Review and respond to Dr. Feinstein's opinions in the Corrected Feinstein Report. In particular, counsel has asked me to evaluate Dr. Feinstein's opinions relating to market efficiency and whether damages can be calculated using a common methodology on a class-wide basis.

    b.    Evaluate from an economic perspective whether the claims of the Lead Plaintiff are representative of the economic claims of all of the Proposed Class members Lead Plaintiff seeks to represent.

14.    In performing my research and analyses, I have relied upon the documents and data listed in **Appendix C** and/or cited in this report and exhibits.  My work on this matter is ongoing, and I may review additional materials or conduct further analysis.  I reserve the right to update, refine,

---

[20]    Corrected Feinstein Report, ¶¶ 19-20.

[21]    Corrected Feinstein Report, ¶ 288.

[22]    PSLRA stands for the "Private Securities Litigation Reform Act" of 1995.  *See* Corrected Feinstein Report, ¶ 296.

6

or revise my opinions.  My rate for time I spend on this matter is $950 per hour.  In addition, I receive compensation based on the professional fees of Analysis Group, Inc. ("Analysis Group"), a financial and economic consulting firm, which has provided research support under my direction and supervision.  My fees and Analysis Group's fees do not depend upon the opinions I form nor upon the outcome of this litigation.

## II.    SUMMARY OF OPINIONS

15.    Based on my review and analysis, I have reached the following conclusions:

- The indirect *Cammer* and *Krogman* factors are not sufficient to establish market efficiency.  Academic literature demonstrates the inadequacy of these indirect indicators of market efficiency.  The literature includes many real-world examples of securities that, although satisfying these supposed factors, traded in inefficient markets.  (**Section IV.A**)

- The fifth *Cammer* factor (*i.e.*, whether there are "empirical facts showing a cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price") is the most important factor because it is the only one that provides direct evidence of whether a security trades in an efficient market.  Therefore, my report primarily focuses on analyzing Dr. Feinstein's evaluation of the fifth *Cammer* factor.  (**Section IV.B**)

- Dr. Feinstein's event study fails to demonstrate a cause-and-effect relationship between new, material information and the price of the Vale ADRs during the relevant period.  (**Section V**)  Specifically:

  - o  Dr. Feinstein's selection of only four dates to test in his event study analysis is flawed for a variety of reasons, and these flaws, in turn, render his conclusions regarding the cause-and-effect relationship between the release of company-specific information and changes in the price of Vale ADRs unreliable. Dr. Feinstein's test of only four dates within the last nine trading days of the Proposed Class Period provides little or no information about whether the Vale ADRs impounded new and material information during the remaining 568 trading days.  Dr. Feinstein provides no objective, verifiable framework as to how he selected and/or ruled out dates to test.  Because the Vale ADRs had large price movements on his four selected dates, Dr. Feinstein's test is predisposed toward finding statistically significant abnormal returns (and thus a conclusion of market efficiency).  (**Section V.A**)

  - o  Dr. Feinstein's own event study shows no statistically significant price movements in the Vale ADRs on the types of news days widely considered

7

when evaluating market efficiency, which actually suggests that the market for the Vale ADRs was *inefficient*. In particular, Dr. Feinstein's own regression results for this case suggest that the price of the Vale ADRs did *not* react to value-relevant information typically analyzed in a collective event study, such as earnings announcements, and there is no statistically significant difference between the Vale ADRs' price movements on earnings release dates versus those on non-earnings release dates. Further, there is no statistically significant difference between the Vale ADRs' price movements on an alternative set of news days, as defined by Form 6-K releases, versus those on non-news days. (**Section V.B**)

- Dr. Feinstein's analyses of the Vale Notes are flawed and do not provide reliable evidence that these securities traded in an efficient market during the Proposed Class Period. (**Section VI**)

  o Dr. Feinstein's analyses of the Vale Notes rely on TRACE data, but Dr. Feinstein has failed to properly process these TRACE data. While Dr. Feinstein attempted to process the TRACE data to remove duplicate interdealer trades, he did so incorrectly. In addition, Dr. Feinstein failed to remove duplicate agent trades, and, although he claims he did so, he also failed to remove entries identified as a "Position Transfer." Consequently, Dr. Feinstein has not accurately estimated trading volume of the Vale Notes, and his estimates of "average weekly turnover" are overstated. (**Sections VI.A and VI.B**)

  o By selectively contrasting the Vale Notes with a sample of highly illiquid and infrequently traded bonds, Dr. Feinstein attempts to create the illusion that the Vale Notes are frequently traded. This comparison provides no basis for Dr. Feinstein's conclusions that the Vale Notes traded in an efficient market. (**Section VI.C**)

  o Dr. Feinstein's event study fails to demonstrate a cause-and-effect relationship between new, material information and the prices of the Vale Notes during the Proposed Class Period. (**Section VI.D**)

    ▪ Dr. Feinstein's event study for the Vale Notes suffers from the same flaws as his event study for the Vale ADRs. In particular, Dr. Feinstein analyzes only the dates of the four alleged corrective disclosures. This approach is not informative of whether the Vale Notes traded in an efficient market during the first 117 weeks of the Proposed Class Period. (**Section VI.D.1**)

    ▪ The results of Dr. Feinstein's event study show that four of the seven Vale Notes did not have statistically significant price movements (at the 95 percent confidence level) on *either* February 4 or February 6, 2019. From an economic perspective, an event study that tests four dates and does not find statistically significant price movements for half of those dates does not support a finding of market efficiency. (**Section VI.D.2**)

- The support that Dr. Feinstein provides is inadequate—and often contradictory—to conclude that the prices of Vale Notes displayed a cause-and-effect relationship with events that he tested. Dr. Feinstein's own analysis provides inconsistent results between the Vale ADRs and Vale Notes, as well as inconsistent results among the Vale Notes, which suggest inefficiency in the market for Vale ADRs, inefficiency in the market for Vale Notes, or both. (**Section VI.D.3**)

- Dr. Feinstein's opinion that class-wide damages can be calculated through a common class-wide methodology is flawed and unreliable. (**Section VII**)

  o There are numerous omissions in Dr. Feinstein's proposed damages methodology that render it inadequate, from an economic perspective, for measuring artificial inflation and/or computing damages in this matter. Dr. Feinstein fails to provide any methodological details regarding how he would structure this hypothetical analysis, which hypotheses he would test, how the results would be used to calculate artificial inflation on each day of the Proposed Class Period, or whether this methodology would appropriately reflect Plaintiff's multiple and varied liability claims. (**Section VII.A**)

  o Any appropriate damages analysis, from an economic perspective, must isolate the portion of the price decline attributable to the alleged fraud from the observed price decline following the materialization of a disclosed risk. Dr. Feinstein does not specify any method to distinguish the price movements related to these distinct causes, and without such a method, it would be impossible to accurately calculate the amount of inflation (if any) in the Vale Securities over a class period spanning approximately two and a half years. (**Section VII.B**)

- Many Proposed Class Members would not be eligible for damages either because they are "in-and-out" investors who sold prior to the first alleged corrective disclosure or because they purchased the Vale Securities at a price below the "bounce back" price prescribed under the terms of the PSLRA. (**Section VIII**)

- From an economic perspective, Lead Plaintiff is not representative of the Proposed Class it seeks to represent. (**Section IX**)

  o CAAT held only the Vale ADRs. Due to their relative positions in the Company's waterfall, investors in the Vale ADRs would be affected differently by any representations or disclosures regarding the earning prospects of the company than investors in the Vale Notes.

  o Lead Plaintiff did not trade in the period after the Dam collapsed. Because Lead Plaintiff did not buy or sell the Vale ADRs after the Dam collapse, it may have distinct economic claims from those persons or entities who purchased the Vale ADRs after the Dam collapsed.

9

### III.   OVERVIEW OF MARKET EFFICIENCY IN THE CONTEXT OF SECURITIES CLASS ACTIONS

16.   Economists consider a market for a security efficient when it quickly impounds new and material information into the security's price.  As acknowledged by Plaintiff's expert, there are three recognized variants of the efficient market hypothesis, distinguished by the degree and type of information incorporated into a security's price:[23]

- **Weak-form efficiency:**  Under this theory, the price of a security quickly incorporates all of the information contained in the history of the security's prior prices.  That is, future price movements cannot be predicted based on past price movements.

- **Semi-strong-form efficiency:**  Under this theory, the price of a security quickly incorporates all publicly available information.

- **Strong-form efficiency:**  Under this theory, the price of a security quickly incorporates both public *and* private information.[24]

17.   Each form of efficiency builds on the previous form such that weak-form efficiency is a prerequisite for semi-strong form efficiency, and semi-strong form efficiency is a prerequisite for strong-form efficiency.

18.   In the context of securities litigation, and consistent with the type of market efficiency that the Supreme Court discussed in the *Basic v. Levinson* decision,[25] the term "market efficiency" typically refers to the semi-strong form.[26]  As defined in the academic literature,

---

[23]   *See also* Steven P. Feinstein, "Teaching the Strong-Form Efficient Market Hypothesis and Making the Case for Insider Trading: A Classroom Experiment," *Journal of Financial Education,* Vol. 26 (Fall 2000), pp. 40-44.

[24]   *See*, *e.g.*, Eugene F. Fama, "Efficient Capital Markets: A Review of Theory and Empirical Work," *Journal of Finance*, 1970, pp. 383-417.

[25]   *See Basic, Inc. v. Levinson,* 485 U.S. 224, 246-247 (1988).

[26]   The Supreme Court has stated that "the Court [in *Basic*] relied upon the 'semi-strong' version of [efficient markets] theory, which posits that the average investor cannot earn above-market returns (*i.e.*, 'beat the market') in an efficient market trading on the basis of publicly available information."  *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 636 (2013).

under semi-strong market efficiency, the current price of a security fully incorporates all publicly available information.[27]

19.    Efficient market theory posits that investors rely on the market price of a security because prices quickly impound *all publicly available information* about the value of the security.[28]  This reliance is the basis for the fraud-on-the-market presumption central to securities class actions. For example, as discussed in the *Basic v. Levinson* decision:

> "The fraud on the market theory is based on the hypothesis that, in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business. … Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements. … The causal connection between the defendants' fraud and the plaintiffs' purchase of stock in such a case is no less significant than in a case of direct reliance on misrepresentations."[29]

20.    To assess market efficiency for the Vale Securities, Dr. Feinstein states he evaluated two sets of factors:  (1) the five "*Cammer* factors," as enumerated in *Cammer v. Bloom*; and (2) the three "*Krogman* factors," as described in *Krogman v. Sterritt*.  The five *Cammer* factors are:[30]

1) Whether the security exhibited "average weekly trading of two percent or more of the outstanding shares;"

2) Whether a "significant number of securities analysts followed and reported on a company's stock during the class period;"

3) Whether the "stock had numerous market makers" or other evidence of "arbitrageurs;"

4) Whether the "Company was entitled to file an S-3 Registration Statement in connection with public offerings;" and

---

[27]    *See*, *e.g.*, Eugene Fama, "Efficient Capital Markets: A Review of Theory and Empirical Work," *Journal of Finance*, 1970, p. 404.

[28]    *See*, *e.g.*, Richard Brealey, Stewart Myers, and Franklin Allen, *Principles of Corporate Finance*, 10th Edition, McGraw-Hill Irwin, 2011, p. 330.  *See also, e.g.*, Eugene F. Fama, "Efficient Capital Markets: A Review of Theory and Empirical Work," *Journal of Finance*, 1970, pp. 383-417.

[29]    *Basic, Inc. v. Levinson*, 485 U.S. 224, 241-242 (1988).

[30]    *Cammer v. Bloom*, 711 F. Supp. 1286, 1287 (D.N.J. 1989).

5) Whether there are "empirical facts showing a cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price."

21.     The first four *Cammer* factors are commonly referred to as "indirect" indicators of market efficiency.  The *Cammer* decision describes the fifth factor as the "essence of an efficient market."[31]

22.     The three *Krogman* factors, which are also "indirect" indicators of market efficiency, include:[32]

1) The market capitalization of the company;

2) The typical bid-ask spread; and

3) The percentage of stock not held by insiders.

## IV.     THE INDIRECT *CAMMER* AND *KROGMAN* FACTORS ARE NOT SUFFICIENT TO ESTABLISH MARKET EFFICIENCY

### A.     Academic Studies Demonstrate that Indirect Factors Are Not Dispositive of Market Efficiency

23.     Dr. Feinstein asserts that the indirect *Cammer* and *Krogman* factors are "indicative of market efficiency."[33]  In my opinion, from an economic perspective, the indirect *Cammer* and *Krogman* factors are not sufficient to establish market efficiency.

24.     Academic studies show that there are many instances where securities that fulfill the first four *Cammer* factors and the three *Krogman* factors (that is, the indirect tests) still trade in inefficient markets.  For example, Dr. Feinstein cites an article by Barber, et al. (2004) in which

---

[31]   *Cammer v. Bloom*, 711 F. Supp. 1264, 1287 (D.N.J. 1989).

[32]   *See Krogman v. Sterritt*, 202 F.R.D. 467 (N.D. Tex. 2001).

[33]   Corrected Feinstein Report, ¶¶ 61, 62, 66.

the authors acknowledged the apparent absence of a "systematic body of evidence showing that [the *Cammer* and *Krogman* factors] or any other criteria distinguish between efficient and inefficient stocks."[34]  The authors proposed "to measure the efficiency of a firm's security price by analyzing the stock price response to the announcement of unexpected earnings."[35]  They therefore proposed performing a *direct* test of market efficiency, thus recognizing the existence of a cause-and-effect relationship between news and security prices as the standard for an efficient market.

25.    Dr. Feinstein extends the analysis of Barber, et al. (2004) in a recent study he conducted with Dr. Miguel Villanueva.[36]  In particular, while the authors in Barber, et al. (2004) analyzed stock price reactivity on days with earnings "surprises," Dr. Villanueva and Dr. Feinstein conducted a collective event study to compare stock price reactions (in terms of both statistically significant abnormal returns as well as volatility) on earnings announcements days versus non-earnings announcement days over arbitrarily selected one-year periods.[37]  Dr. Villanueva and Dr. Feinstein found that stocks that satisfy five of the seven indirect *Cammer* and *Krogman* factors are more likely to exhibit statistically significant price movements on earnings announcement days.[38]  However, Dr. Villanueva and Dr. Feinstein only conclude that the indirect factors "*may*

---

[34]    *See* Corrected Feinstein Report, ¶ 61.  Brad M. Barber, et al., "The Fraud-on-the-Market Theory and the Indicators of Common Stocks' Efficiency," *Journal of Corporation Law* 19, 1994, p. 290.

[35]    Brad M. Barber, et al., "The Fraud-on-the-Market Theory and the Indicators of Common Stocks' Efficiency," *Journal of Corporation Law* 19, 1994, p. 294.

[36]    Miguel Villanueva and Steven Feinstein, "Stock Price Reactivity to Earnings Announcements: The Role of the *Cammer/Krogman* Factors," *Review of Quantitative Finance and Accounting* (forthcoming), September 2020, pp. 9-11.

[37]    Miguel Villanueva and Steven Feinstein, "Stock Price Reactivity to Earnings Announcements: The Role of the *Cammer/Krogman* Factors," *Review of Quantitative Finance and Accounting* (forthcoming), September 2020, pp. 10-13.

[38]    Dr. Villanueva and Dr. Feinstein did not analyze all of the indirect factors and instead only analyzed market capitalization, volume, analyst coverage, number of market makers, and bid-ask spread.  The authors do not

*be* indicators of informational market efficiency" and do not—and cannot—conclude that a stock trades efficiently because it satisfies the indirect factors.[39]  Rather, as the authors note, stocks that satisfy the indirect factors will not necessarily exhibit reactivity to earnings announcements.[40] Reactivity to news such as earnings announcements is the crux of market efficiency and must be tested separately (discussed in greater detail below).

26.      Another study by Erenburg, et al. (2011) tested three of the indirect *Cammer* factors and two of the *Krogman* factors[41] and found that "the *Cammer* and *Krogman* factors that [they] examine exhibit little relation to weak-form market efficiency."[42]  In addition, the authors concluded that "[t]he evidence does not support the blanket presumption of market efficiency for NYSE-listed firms."[43]  Similarly, the authors found that the number of analysts covering a stock "is essentially neutral, rather than implying market efficiency."[44]  Also, with respect to the *Cammer* factor related to share turnover (that is, trading volume), the authors found that "the net

---

[ ]      specifically analyze S-3 registration eligibility or float.  Miguel Villanueva and Steven Feinstein, "Stock Price Reactivity to Earnings Announcements: The Role of the *Cammer/Krogman* Factors," *Review of Quantitative Finance and Accounting* (forthcoming), September 2020, pp. 4-6.

[39]      Miguel Villanueva and Steven Feinstein, "Stock Price Reactivity to Earnings Announcements: The Role of the *Cammer/Krogman* Factors," *Review of Quantitative Finance and Accounting* (forthcoming), September 2020, p. 6 (emphasis added).

[40]      Miguel Villanueva and Steven Feinstein, "Stock Price Reactivity to Earnings Announcements: The Role of the *Cammer/Krogman* Factors," *Review of Quantitative Finance and Accounting* (forthcoming), September 2020, pp. 5-6.

[41]      The indirect *Cammer* factor not tested by Erenburg et al. (2011) is the fourth *Cammer* factor (whether the firm is eligible to file an S-3 registration statement).  Erenburg et al. (2011) did not test the third *Krogman* factor (or the percentage of stock held by insiders).  Grigori Erenburg, et al., "The Paradox of 'Fraud-on-the-Market Theory': Who Relies on the Efficiency of Market Prices?" *Journal of Empirical Legal Studies*, Vol. 8, Issue 2, 2011, n. 31.

[42]      Grigori Erenburg, et al., "The Paradox of 'Fraud-on-the-Market Theory': Who Relies on the Efficiency of Market Prices?" *Journal of Empirical Legal Studies*, Vol. 8, Issue 2, 2011, p. 292.

[43]      Grigori Erenburg, et al., "The Paradox of 'Fraud-on-the-Market Theory': Who Relies on the Efficiency of Market Prices?" *Journal of Empirical Legal Studies*, Vol. 8, Issue 2, 2011, p. 289.

[44]      Grigori Erenburg, et al., "The Paradox of 'Fraud-on-the-Market Theory': Who Relies on the Efficiency of Market Prices?" *Journal of Empirical Legal Studies*, Vol. 8, Issue 2, 2011, p. 290.

14

relationship [between turnover and weak-form efficiency] is in the opposite direction of the *Cammer* court's intuition."[45] That is, "on net, inefficient pricing induces more trading" rather than less.[46]

27.      Erenburg, et al. (2011) reached similar conclusions regarding the *Krogman* factors. For example, with respect to evaluating market efficiency based on a firm's market capitalization, the authors found that "high-market-cap firms have more positive serial correlation than other firms," which is indicative of market *inefficiency*.[47] Finally, with respect to the *Krogman* court's conclusion that efficient stocks will exhibit a narrower bid-ask spread, Erenburg, et al. (2011) found instead that "profitable momentum trading (economically significant weak-form inefficiencies) is more likely for firms with narrower spreads."[48] In summary, the Erenburg, et al. (2011) paper demonstrates that the indirect factors are inadequate to reach conclusions regarding market efficiency, ***and that some of the indirect factors are more likely to exist if the market for the stock in question is inefficient***.

28.      Several other academic studies highlight cases where a company's stock "passes" the tests associated with most, and in some cases all, of the *Cammer* factors and yet trades in an inefficient market. Some of these examples highlight instances where apparent arbitrage

---

[45]   Grigori Erenburg, et al., "The Paradox of 'Fraud-on-the-Market Theory': Who Relies on the Efficiency of Market Prices?" *Journal of Empirical Legal Studies*, Vol. 8, Issue 2, 2011, p. 291.

[46]   Grigori Erenburg, et al., "The Paradox of 'Fraud-on-the-Market Theory': Who Relies on the Efficiency of Market Prices?" *Journal of Empirical Legal Studies*, Vol. 8, Issue 2, 2011, p. 291.

[47]   Grigori Erenburg, et al., "The Paradox of 'Fraud-on-the-Market Theory': Who Relies on the Efficiency of Market Prices?" *Journal of Empirical Legal Studies*, Vol. 8, Issue 2, 2011, p. 291.

[48]   Grigori Erenburg, et al., "The Paradox of 'Fraud-on-the-Market Theory': Who Relies on the Efficiency of Market Prices?" *Journal of Empirical Legal Studies*, Vol. 8, Issue 2, 2011, p. 292.

opportunities persisted for extended periods.[49]  For example, Lamont and Thaler (2003a) and Fedenia and Hirschey (2009) identified examples in which two classes of shares with known relative claims on the underlying company's cash flows nevertheless traded at prices that were inconsistent with those relative claims.[50]  Another study by Lamont and Thaler (2003b) identified five examples of spinoff initial public offerings where the spinoff's post-offering price was so high for at least a two-month period that the implied standalone value of the parent company that retained a large ownership share in the spinoff was negative.[51]

29.     Still other studies researched pricing anomalies for stocks that meet many of the *Cammer* and *Krogman* factors.  These pricing anomalies include the reaction of stocks to news already known to the market, indicating a lack of semi-strong form efficiency.  For example, the stock of a biotech firm generated a 330 percent return after a *New York Times* article mentioned a research breakthrough, even though various news outlets, including the *New York Times* itself,

---

[49]    *Cammer* recognized the importance of arbitrageurs: "The existence of market makers and arbitrageurs would ensure completion of the market mechanism; these individuals would react swiftly to company news and reported financial results by buying or selling stock and driving it to a changed price level."  *Cammer v. Bloom*, 711 F. Supp. 1264, 1286-87 (D.N.J. 1989).  However, the mere existence of arbitrageurs in a market does not ensure that the market is efficient.  In other words, there may be limits to arbitrage.  *See*, *e.g.*, Andrei Shleifer and Robert W. Vishny, "The Limits of Arbitrage," *The Journal of Finance*, Vol. 52, No. 1, March 1997, pp. 35-55.

[50]    Owen Lamont and Richard Thaler, "The Law of One Price in Financial Markets," *Journal of Economic Perspectives* 17, 2003, pp. 191-202; Mark Fedenia and Mark Hirschey, "The Chipotle Paradox," *Journal of Applied Finance*, Vol. 19, 2009, p. 146.  A later paper by Bajaj, et al. (2014) confirmed that the stocks analyzed in these papers fulfilled the *Cammer* factors.  *See* Mukesh Bajaj, et al., "Assessing Market Efficiency for Reliance on the Fraud-on-the-Market Doctrine after *Wal-Mart* and *Amgen*," *Research in Law and Economics*, Vol. 26, 2014, pp. 185-187.

[51]    Owen Lamont and Richard Thaler, "Can the Market Add and Subtract? Mispricing in Tech Stock Carve-Outs," *Journal of Political Economy* 111, 2003, pp. 233, 235.  Bajaj, et al. (2014) confirmed that these stocks fulfilled the Cammer factors as well.  *See* Mukesh Bajaj, et al., "Assessing Market Efficiency for Reliance on the Fraud-on-the-Market Doctrine after *Wal-Mart* and *Amgen*," *Research in Law and Economics*, Vol. 26, 2014, pp. 185-187.

had previously published that same news several months prior.[52]  Another study found that the

markets for a large cross section of stocks experienced reactions to stale news.[53]  In a market

exhibiting semi-strong form efficiency, prices should have already incorporated stale news by

the time the repeated "news" is released, implying that there should not be a significant abnormal

return (in contrast to the reaction observed by these studies).[54]

30.     In my view, these studies demonstrate that an evaluation of the indirect *Cammer* and

*Krogman* factors is not sufficient to establish market efficiency.

### B.     The Fifth *Cammer* Factor Is the Only *Cammer* Factor that Provides Direct Evidence of Whether a Security Trades in an Efficient Market

31.     Given the insufficiency of the indirect *Cammer* and *Krogman* factors for demonstrating

market efficiency, the fifth *Cammer* factor is of critical importance.  In my opinion, and

consistent with the academic literature described above, the fifth *Cammer* factor is the only

factor that provides direct evidence of whether a security trades in an efficient market.

32.     Research clearly delineates between the indirect *Cammer* and *Krogman* factors and the

fifth *Cammer* factor with respect to their ability to demonstrate market efficiency for a given

---

[52]   Gur Huberman and Tomer Regev, "Contagious Speculation and a Cure for Cancer: A Nonevent that Made Stock Prices Soar," *The Journal of Finance*, Vol. 56, No. 1, February 2001, pp. 391-392.

[53]   Paul C. Tetlock, "All the News That's Fit to Reprint: Do Investors React to Stale Information?" *The Review of Financial Studies*, Vol. 24, No. 5, 2011, pp. 1481-1512.

[54]   On a given day, a wide range of information may affect a publicly traded security's price.  Such information includes, for example, market- and/or industry-specific factors, as well as company-specific news.  Financial economists use regression analysis, hereafter referred to as an "event study," in an effort to isolate the part of the daily stock return that is attributable to market and industry factors.  The remainder is referred to as the "abnormal" return.

security.  For example, a paper by Ferrillo et al. (2004), which Dr. Feinstein references in his own research,[55] states:

> [J]ust relying on many of Cammer's factors does not necessarily prove that the stock in question behaved in an efficient manner.  Many of the factors, like the existence of market makers and coverage by securities analysts, do not even go to the market behavior of a stock.  Other factors, like the average weekly trading volume, are imprecise as well, and certainly do not show or prove market efficiency.  Indeed, during the Internet boom, many stocks exhibited relatively high average weekly trading volumes, but also behaved in a volatile manner, often rising many dollars per share without the disclosure of news or material information concerning the company.[56]

33.    Below, I provide the basis for my conclusion that Dr. Feinstein fails to establish reliable evidence of a cause-and-effect relationship between company-specific news and the prices of the Vale Securities.

## V.    DR. FEINSTEIN FAILS TO RELIABLY ESTABLISH A CAUSE-AND-EFFECT RELATIONSHIP BETWEEN NEWS AND THE PRICE OF THE VALE ADRS

34.    Dr. Feinstein's analysis of the fifth *Cammer* factor for the Vale ADRs is flawed and fails to demonstrate market efficiency.  Dr. Feinstein performed a single empirical test to assess whether the price of the Vale ADRs incorporated new and material information.  Specifically, Dr. Feinstein performed an event study to investigate whether the Vale ADRs' price reacted to

---

[55]    This paper is cited by Dr. Feinstein in his September 2020 paper co-written with Dr. Miguel Villanueva.  Drs. Villanueva and Feinstein explain that Ferillo, et al. (2004) "developed a different empirical test for informational market efficiency, which evaluates events collectively… The news events may be earnings announcements, publication of news articles about the company, or filings of 8-Ks, for example… Ferillo et al. (2004) conduct a two-proportions *Z*-test to ascertain whether the incidence of significant abnormal returns is significantly greater among the news days than among the non-news days."  *See* Miguel Villanueva and Steven Feinstein, "Stock Price Reactivity to Earnings Announcements: The Role of the *Cammer/Krogman* Factors," *Review of Quantitative Finance and Accounting* (forthcoming), September 2020, pp. 6-7.

Further, Dr. Feinstein references his research from this paper in his corrected expert report.  *See* Corrected Feinstein Report, ¶¶ 63, 71.

[56]    Paul A. Ferrillo, et al., "The 'Less Than' Efficient Capital Markets Hypothesis: Requiring More Proof from Plaintiffs in Fraud-on-the-Market Cases," *St. John's Law Review*, Volume 78, Winter 2004, Number 1, p. 128.

18

allegedly corrective information released on the following dates: January 25, 2019, January 28, 2019, February 4, 2019, and February 6, 2019.[57]  To conduct his event study, Dr. Feinstein ran rolling regressions on daily returns over 252 trading days (comprising approximately one year of data) prior to each event.[58]  Based on the results of his event study, Dr. Feinstein concluded that each of the alleged corrective disclosures "elicited statistically significant ADR price reactions" and thus there existed "empirical proof of a cause-and-effect relationship between the release of Company information and changes in the Vale ADR market price."[59]  However, as I describe below, Dr. Feinstein's empirical test is flawed and does not provide a reliable basis for his conclusion.

### A.       Dr. Feinstein's Test of Only the Four Corrective Disclosure Dates is Methodologically Unsound

35.       Dr. Feinstein claims that he "reviewed news and analyst reports to ascertain which events *over the course of the Class Period* were appropriate candidates for a market efficiency event study" (emphasis added).[60]  Over the course of the Proposed Class Period—a period of more than 550 trading days—Dr. Feinstein found only "four events [that] reasonably would warrant a large stock price reaction in an efficient market… these news events are 25 January 2019, 28 January 2019, 4 February 2019, and 6 February 2019."[61]  Dr. Feinstein's selection of dates to test is flawed for a variety of reasons, and these flaws, in turn, render unreliable his conclusions

---

[57]    Corrected Feinstein Report, ¶ 132.

[58]    Corrected Feinstein Report, ¶ 162.

[59]    Corrected Feinstein Report, ¶ 221.

[60]    Corrected Feinstein Report, ¶ 132.

[61]    Corrected Feinstein Report, ¶ 132.

regarding the cause-and-effect relationship between the release of company-specific information and changes in the price of the Vale ADRs.

36.    First, Dr. Feinstein's event study is unreliable because it tests only four dates in a Proposed Class Period that spans 572 trading days—*i.e.*, it provides little or no information about the remaining 568 trading days in the Proposed Class Period.[62]  In fact, these four days tested by Dr. Feinstein are all clustered in the final 13 calendar days of the Proposed Class Period, four of which are non-trading (weekend) days.  I am not aware of any peer-reviewed academic literature that recommends testing less than one percent of dates when evaluating the efficiency of the market for a given security over an extended period.  Nor am I aware, for that matter, of any peer-reviewed academic literature that recommends testing dates that are clustered in the final two weeks of a period that spans 119 weeks.  To the contrary, the academic literature recognizes that the efficiency of a market for a given security can fluctuate over time and therefore recommends analyzing events throughout the entire period of interest.[63]  Furthermore, Ferrillo et al. (2004) describes a test of only a limited number of dates in the Class Period, as Dr. Feinstein has performed, as noncompliant with the "scientific method."[64]  The authors state that, "[m]erely demonstrating a single or small number of cases where there is an apparent cause and effect relationship is not enough [to demonstrate market efficiency], since this measures only one point

---

[62]    *See* Corrected Feinstein Report, Exhibit-4.

[63]    *See, e.g.*, *See* Mukesh Bajaj, et al., "Assessing Market Efficiency for Reliance on the Fraud-on-the-Market Doctrine after *Wal-Mart* and *Amgen*," *Research in Law and Economics*, Vol. 26, 2014, pp. 190-192.

[64]    Paul A. Ferrillo, et al., "The 'Less Than' Efficient Capital Markets Hypothesis: Requiring More Proof from Plaintiffs in Fraud-on-the-Market Cases," *St. John's Law Review*, Volume 78, Winter 2004, Number 1, p. 128.

in time during the class period, and only the stock's response to one or a handful of disclosures."[65]

37.    Second, Dr. Feinstein claims that the events he tested were selected "on the basis of an independent analysis of which candidate events are the most informative about market efficiency."[66] Dr. Feinstein testified that only events that are unexpected and, on balance, either positive or negative enough to elicit a stock price reaction should be tested.[67] While in his deposition Dr. Feinstein further testified that he reviewed 4,315 article headlines in Factiva,[68] and his report cites more than 1,000 analyst reports released during the Proposed Class Period, he provides no framework—other than a vague, qualitative description he provided in his deposition[69]—for how he assessed whether the news on each day was unexpected and/or on balance either positive or negative. Without providing such a framework, his selection of dates is not replicable or verifiable and is thus inappropriate. It is highly inconceivable that over a 572

---

[65]    Paul A. Ferrillo, et al., "The 'Less Than' Efficient Capital Markets Hypothesis: Requiring More Proof from Plaintiffs in Fraud-on-the-Market Cases," *St. John's Law Review*, Volume 78, Winter 2004, Number 1, p. 128.

[66]    Corrected Feinstein Report, ¶ 131.

[67]    Deposition of Steven P. Feinstein, March 24, 2021 ("Feinstein Deposition, March 24, 2021"), at 147:18–148:20. In prior cases, Dr. Feinstein conflictingly maintained, "When selecting events for a collective event study, each event need not be so momentous as to be expected to elicit a significant ADR price reaction. Rather, the group of events is selected such that the group as a whole is characterized as having higher information flow than ordinary days." *See In re: Grupo Televisa Securities Litigation*, Report on Market Efficiency, Professor Stephen P. Feinstein, Ph.D., C.F.A., October 30, 2019, ¶¶ 101, 108.

[68]    Feinstein Deposition, March 24, 2021, at 67:15–68:16. *See also* Corrected Feinstein Report, ¶ 86, Exhibit-1.

[69]    For example, Dr. Feinstein testified that he reviewed news articles for specific language that can indicate "big surprises," but he does not specify how he ruled out every date during the Proposed Class Period, nor does he specify a systematic, replicable, and verifiable methodology to conduct such a review. *See, e.g.*, Feinstein Deposition, March 24, 2021, at 70:5–71:2 ("But things that are out of the ordinary, major news, generally there's a flurry of articles around earnings announcements, generally for companies that have either big surprises, big misses or big beats on their earnings, that will show up in the head lines. There's certain language that's typically used when the market is surprised about a company announcement. Those are the kinds of things, kind of things that would typically major news events that would surprise the market, like I said major beats or major misses on earnings or revenue. Acquisitions, restructurings that are out of the ordinary that are highly -- sometimes they're highly valuation relevant, sometimes they aren't. But those are the kind of things.").

trading day period—a period during which the Vale ADRs' price fluctuated between $6.67 and $15.93 (an approximately 140 percent difference from trough to peak),[70] Vale made nine earnings announcements,[71] Vale experienced at least three credit ratings changes,[72] and other noteworthy events known to affect public corporations, such as the departure of Vale's CEO,[73] occurred—Dr. Feinstein would find *no other* dates with value-relevant news that was unexpected and on balance positive or negative.

38.     Third, the four dates tested by Dr. Feinstein are the dates of the four alleged corrective disclosures identified in the Complaint.[74] Dr. Feinstein testified in his deposition that "the complaint said there was big news [on] those days, I checked the news for those days, determined the complaint was correct, it was big news."[75] The absence of any objective, verifiable framework as to how Dr. Feinstein selected and/or ruled out dates to test, combined with the concession during his deposition that his selection of dates to test was informed by the days identified in the Complaint to be corrective disclosures with large price declines, renders his selection process uninformative and unreliable.

39.     Dr. Feinstein's selection of *only* these dates biases his analysis. Because the Vale ADRs had large price movements on these dates, Dr. Feinstein's test is predisposed toward finding

---

[70]   *See* **Exhibit 1**.

[71]   *See*, *e.g.*, Corrected Feinstein Report, Table-1.

[72]   Moody's, "Moody's upgrades Vale's ratings to Ba2; positive outlook," March 20, 2017; Moody's, "Moody's upgrades Vale's ratings to Ba1; stable outlook," September 5, 2017; Moody's, "Moody's upgrades Vale to Baa3; stable outlook," July 23, 2018.

[73]   On February 24, 2017, Vale disclosed that Murilo Ferreira would not renew his term as the company's CEO. *See*, *e.g.*, BTG Pactual, Vale (ON), "Mr. Ferreira steps down, but we expect continuity," February 24, 2017, CAAT_Feinstein_00001212.

[74]   *See* **Exhibit 4**.

[75]   Feinstein Deposition, March 24, 2021, at 142:14–143:11.

statistically significant abnormal returns (and thus a conclusion of market efficiency).  For example, the Vale ADRs experienced substantial price declines of 8 percent and 18 percent on January 25 and January 28, 2019, respectively (*see* **Exhibit 4**), whereas the Vale ADRs' returns over the Proposed Class Period had a standard deviation of only 2.7 percent,[76] meaning that any return in excess of positive or negative 5.4 percent—or approximately two times the standard deviation—would be an outlier event (when not controlling for market and industry related factors).  Given that these price movements are clear outliers during the Proposed Class Period, this all but guarantees that Dr. Feinstein's event study would find statistically significant abnormal returns on these dates.  Statistical analyses that predetermine the outcome of their investigation are not reliable or consistent with the professional standards for statistical testing.[77]

40.     Relatedly, news items of significant importance may move stock prices, but that does not necessarily mean that the stock price quickly impounds new, material information in general over the Proposed Class Period.  Instead, it shows at most that the market reacted to a handful of extraordinary pieces of information.  It does not show that the market reacted throughout the Proposed Class Period to the release of less extraordinary but nevertheless new and material information.  As a paper by Cornell and Rutten (2006) states, "even a grossly inefficient market will incorporate to some degree news about extremely significant events."[78]

---

[76]   Bloomberg.

[77]   *See* Ethical Guidelines for Statistical Practice, Prepared by the Committee on Professional Ethics of the American Statistical Association, April 14, 2018, p. 3.

[78]   Bradford C. Cornell and James Rutten, "Market Efficiency, Crashes, and Securities Litigation," *Tulane Law Review*, Vol. 81, 2006, n. 55.

41.    Finally, Dr. Feinstein in essence testified that it is necessary to conduct an independent review of *every single news item* on *every single date* during the Proposed Class Period to ascertain which dates contain new, unexpected information.[79]  Dr. Feinstein maintains that he followed such an approach and found only four dates that are appropriate candidates for a market efficiency event study in a Proposed Class Period that spans approximately two and a half years. In doing so, Dr. Feinstein implicitly argues that it is *impossible* to empirically test for market efficiency during the first 117 weeks of the Proposed Class Period, and following Dr. Feinstein's own logic, Dr. Feinstein has therefore failed to specify an empirical test that is informative for determining whether the Vale ADRs satisfied the fifth *Cammer* factor during the *entire* Proposed Class Period.[80]

42.    In summary, Dr. Feinstein's test of the four corrective disclosure dates is unreliable because its outcome is predetermined to find statistically significant price reactions and because it does nothing to directly evaluate whether the Vale ADRs quickly impounded new and material information during the remaining 99.3 percent of trading days in the Proposed Class Period. Therefore, Dr. Feinstein has failed to provide any direct evidence that the Vale ADRs traded in an efficient market throughout the Proposed Class Period.

---

[79]    Feinstein Deposition, March 24, 2021, at 63:7–75:24.

[80]    Dr. Feinstein testified, "[It is] all together possible that there would be instances where we're unable to run a statistical test, because there's just no good candidates for running -- no good candidates for an event study, no good candidate events.  If that were the case, I would say so."  Feinstein Deposition, March 24, 2021, at 124:7–14.

**B.     Dr. Feinstein's Event Study Shows No Statistically Significant Price Movements on News Days Typically Considered When Evaluating Market Efficiency, Suggesting Inefficiency in the Market for the Vale ADRs**

1.     *Dr. Feinstein's Own Event Study Shows No Statistically Significant Price Reaction on Earnings Announcement Dates or Production Report Dates*

43.     In his own research, Dr. Feinstein suggests that price reactions on earnings announcements are informative when assessing market efficiency.[81]  For example, Dr. Feinstein recently analyzed the relationship between stock reactivity to earnings announcements and the other *Cammer* and *Krogman* factors.[82]  Dr. Feinstein found that stocks that satisfy other *Cammer* and *Krogman* factors—such as the Vale ADRs—are "far more likely to exhibit reactivity to earnings announcements than stocks without those factor characteristics."[83]

44.     Dr. Feinstein nonetheless asserts that "Vale's earnings announcements during the Class Period are not appropriate information events for testing market efficiency."[84]  Specifically, he believes that an analysis of earnings announcements in this case is inappropriate for three

---

[81]   In addition, in prior cases, Dr. Feinstein has evaluated market efficiency by examining whether the at-issue securities displayed statistically significant price movements on earnings announcement dates.  For example, in *RH, Inc. Securities Litigation*, Dr. Feinstein opined that "According to the finance literature, the flow of company-specific information is elevated on earnings announcement dates."  Dr. Feinstein further explained that "[a] company's financial results and forecasts are among the most important considerations to investors assessing the value of its stock," and "based on these principles and observations," Dr. Feinstein selected earnings announcements to test for market efficiency.  In re: *RH, Inc. Securities Litigation*, Report on Market Efficiency, Professor Stephen P. Feinstein, Ph.D., C.F.A., June 22, 2018, ¶¶ 88, 98, 100.  *See also*, *e.g.*, *Michael Courtney, et al. v. Avid Technology, Inc., et al.*, Report on Market Efficiency, Professor Stephen P. Feinstein, Ph.D., C.F.A., September 15, 2014, ¶¶ 98-99; *Nikki Bollinger Grae v. Corrections Corporation of America, et al.*, Report on Market Efficiency, Professor Stephen P. Feinstein, Ph.D., C.F.A., June 1, 2018, ¶¶ 94, 103; *In re: Equifax Securities Litigation*, Report on Market Efficiency, Professor Stephen P. Feinstein, Ph.D., C.F.A., March 29, 2019, ¶¶ 94, 103; *Daniel Luna v. Marvell Technology Group, Ltd., et al.*, Report on Market Efficiency, Professor Stephen P. Feinstein, Ph.D., C.F.A., July 31, 2017, ¶¶ 85-86.

[82]   Miguel Villanueva and Steven Feinstein, "Stock Price Reactivity to Earnings Announcements: The Role of the *Cammer/Krogman* Factors," *Review of Quantitative Finance and Accounting* (forthcoming), September 2020, p. 43.

[83]   Miguel Villanueva and Steven Feinstein, "Stock Price Reactivity to Earnings Announcements: The Role of the *Cammer/Krogman* Factors," *Review of Quantitative Finance and Accounting* (forthcoming), September 2020, p. 43.

[84]   Corrected Feinstein Report, ¶ 180.

reasons.  First, *all* of Vale's earnings announcements purportedly contained an "offsetting mix" of positive and negative news.[85]  Second, Dr. Feinstein opined that Vale is a highly "predictable" company, and thus Vale's earnings announcements frequently contained "anticipated results that were in line with expectations or nearly in line."[86]  Third, Vale released production reports one to two weeks prior to each earnings announcement, and as a result, "one of the primary drivers" of Vale's profitability allegedly was already known to market participants at the time of the earnings announcements.[87]

45.     As an initial matter, as discussed above, Dr. Feinstein states that a date is an appropriate candidate for an event study *only if* the news on that date is unanticipated and on balance either positive or negative from a valuation perspective to elicit a meaningful stock price change,[88] but he has provided no framework as to how he evaluated the individual pieces of news on a given day.  Dr. Feinstein has instead—and inappropriately—provided a subjective, qualitative discussion of the analyst commentary following Vale's earnings announcements,[89] but has not demonstrated that the net effect of the news was value-neutral.  That is, he has not shown that the positive and negative news he cites balance such that the news had no observable impact on the price of the Vale ADRs.

46.     Moreover, any given earnings announcement can often be construed to contain both positive and negative information.  Earnings announcement dates, however, are still more likely

---

[85]     Corrected Feinstein Report, ¶ 180.

[86]     Feinstein Deposition, March 24, 2021, at 206:4–11; Corrected Feinstein Report, ¶ 180.

[87]     Corrected Feinstein Report, ¶ 181.

[88]     *See*, *e.g.*, Feinstein Deposition, March 24, 2021, at 147:18–148:20.

[89]     *See* Corrected Feinstein Report, § IX.C.

to contain value-relevant information pertinent to investors than a day without any news.  For example, as I show in **Exhibit 5**, more analyst reports covering Vale were released on days surrounding earnings announcements compared to any other day during the Proposed Class Period.  This observation suggests that analysts typically consider the information from Vale's earnings announcements in their market research and investment recommendations, and it is consistent with Dr. Feinstein's testimony that the information in earnings announcements is "highly economically material."[90]  Indeed, Dr. Feinstein also implicitly appears to agree—in his event study, he used dummy variables to control for the effects of earnings announcements (or "potentially atypical observations" on these dates).[91]  Dr. Feinstein's use of these dummy variables in his event study model is inconsistent with his claim that earnings announcements are not informative for market efficiency in this case.  That is, controlling for the effects of earnings announcements in an event study is only necessary if one believes that the company-specific information released in the earnings announcements is likely to elicit a statistically significant price movement.  Finally, in his own academic work, Dr. Feinstein cites studies that found "the flow of company-specific information is generally elevated on earnings announcement dates,"[92]

---

[90]  *See* Feinstein Deposition, March 24, 2021, at 243:22–243:14 ("Q.  Right, but plainly, on earnings release dates, objectively, there was a higher flow of information concerning Vale, correct?  A.  Yes.  Q.  And it sounds like what you're saying is notwithstanding that higher flow of information, you determined that that higher flow was not material, is what it sounds like, right?  A.  No, the -- The information are was highly economically material, but it wasn't unexpected or surprising or momentous.").

[91]  Corrected Feinstein Report, ¶ 164.

[92]  Miguel Villanueva and Steven Feinstein, "Stock Price Reactivity to Earnings Announcements: The Role of the *Cammer/Krogman* Factors," *Review of Quantitative Finance and Accounting* (forthcoming), September 2020, p. 9.

and he therefore concludes "[e]arnings announcements are a reasonable choice for a class of generally high information events that can be selected objectively."[93]

47.    With respect to Dr. Feinstein's claim that Vale was a highly "predictable" company and its earnings announcements were always in-line with expectations, it appears that Dr. Feinstein was selective in the analyst reports he cites in support for this claim.[94]  By way of example, Dr. Feinstein notes that in response to Vale's earnings announcement on October 27, 2016, "analyst commentary [on this date] was mixed, reflecting Vale's mixed Q3 2016 results."[95]  Specifically, he cites three analyst reports that were released in response to Vale's earnings announcement on October 27, 2016, which he claims "illustrate the mixed nature of the news and the mix of reactions to it."[96]  Other analyst reports released following that earnings announcement, however, indicate that many considered Vale's Q3 2016 earnings to be a surprise.  For example, analysts from RBC Capital Markets commented on November 1, 2016 that they had "updated [their] analysis," including raising their price target from $6.50 to $7.00, because Vale's Q3 2016 earnings were "above expectations."[97]  Similarly, analysts from BMO Capital Markets commented on November 7, 2016, "We have updated our forecasts to take into account Vale's

---

[93]    Miguel Villanueva and Steven Feinstein, "Stock Price Reactivity to Earnings Announcements: The Role of the *Cammer/Krogman* Factors," *Review of Quantitative Finance and Accounting* (forthcoming), September 2020, p. 9.

[94]    Dr. Feinstein testified that he "easily found four [analysts] saying this was a predictable company."  Feinstein Deposition, March 24, 2021, at 206:4–11.  That is, Dr. Feinstein's claim that Vale was "predictable" is based on the views of four (out of 35) investment analysts whose reports he reviewed.

[95]    Corrected Feinstein Report, ¶ 184.

[96]    Corrected Feinstein Report, ¶ 185; *see also* Corrected Feinstein Report, Appendix-2.

[97]    RBC Capital Markets, "Vale, Balance sheet remains the focus," November 1, 2016, CAAT_Feinstein_00001050.

recent Q3/16 earnings results, which beat our expectations…"[98]  It is therefore inappropriate for Dr. Feinstein to dismiss the October 27, 2016 earnings announcement as a candidate for an event study simply because three analyst reports that he chooses to quote—out of the more than 30 analysts covering Vale[99]—conveyed a "mixed" reaction to the information released on that date. To the contrary, the commentary in other analyst reports indicates that new, value-relevant information was contained in this earnings announcement—information that prompted investment firms to revise their analyses and forecasts—and it is inappropriate for Dr. Feinstein to make a subjective and/or improper determination as to whether the information contained in this earnings announcement was informative or valuable to the market as a whole.

48.    Dr. Feinstein did not cite to other examples, including analyst reports that he included in his "Documents and Other Information Considered,"[100] related to other Vale earnings releases:

- Dr. Feinstein claims he quoted three "representative" analyst reports released after Vale's earnings announcement on February 23, 2017.[101]  However, he does not quote analyst reactions such as "Vale has reported an underlying Q4/16 profit of US$2.7B, or

---

[98]    BMO Capital Markets, "Vale S.A., Earnings Increased on Slightly Lower Costs," November 7, 2016, CAAT_Feinstein_00001057.

[99]    *See*, *e.g.*, Feinstein Deposition, March 24, 2021, at 206:4–11; Corrected Feinstein Report, ¶¶ 78-80.  *See also* **Exhibit 5**.

[100]    *See* Corrected Feinstein Report, Exhibit-1. Dr. Feinstein testified with regard to the materials listed in his report: "Q. How did you select the materials listed in Exhibit 1 in consideration for preparing your report? A. Well, I have a standard procedure that I follow in almost all cases. Most of this is from that standard procedure. I mean, I seek to obtain all the analyst reports from the proposed class period, and from a slight period before, and including a slight period after the class period. So I get the analyst reports, I get, so that's --- starts on page 107 and in this case, it's a long list of analyst reports, continues to page, continues to page 144, so I always endeavor to get as many analyst reports as I can about the company." Feinstein Deposition, March 24, 2021, at 63:7–64:2. Dr. Feinstein further testified that he used the analyst reports to determine whether Vale's earnings announcements were surprises or if they contained mixed information. *See* Feinstein Deposition, March 24, 2021, at 210:15–211:11. Dr. Feinstein also agreed that an earnings beat or miss is, by definition, a surprise. *See* Feinstein Deposition, March 24, 2021, at 212:14–18.

[101]    Corrected Feinstein Report, Appendix-2.

US$0.53/share, ***beating our forecast by 76%*** (US$0.30/sh) and ***consensus by 66%***.  The beat was primarily due to ***lower-than-expected*** costs in the ferrous and the coal divisions, assisted by higher revenues from the base metals and coal divisions."[102]  Analysts from Itaú BBA also commented, "Vale reported better-than-expected 4Q16 results… ***We expect a positive market reaction***."[103]

- Following Vale's earnings announcement on July 26, 2018, Dr. Feinstein again quotes three supposedly "representative" analyst reports, which suggest that Vale's operating results were in line with consensus estimates.[104]  But he fails to quote other reports, such as this takeaway from RBC Capital Markets: "Vale's quarter, although in line at the EBITDA level, ***is peppered with positives***."[105]  Analysts from Jefferies raised their price target for the Vale ADRs to $15.00 from $14.50, commenting, "***Vale reported better than expected*** results this week and is firing on all cylinders… ***We have updated our model*** to fully reflect reported results and new guidance."[106]  Like Jefferies, other firms also revised their price targets for the Vale ADRs following this earnings announcement.

---

[102] BMO Capital Markets, "Vale S.A., Q4 Earnings Beat Estimates on Lower Costs from Ferrous and Coal Divisions," February 23, 2017, CAAT_Feinstein_00001195 (emphasis added).

[103] Itaú BBA, "Vale, 4Q16 Better Than Our Bullish Estimates," February 23, 2017, CAAT_Feinstein_00001201 (emphasis added).

[104] Corrected Feinstein Report, Appendix-2.

[105] RBC Capital Markets, "VALE: Vale opens the wallet for shareholders with dividend and buyback," July 26, 2018, CAAT_Feinstein_00000112 (emphasis added).

[106] Jefferies, "Vale (VALE), Impressive Operating Performance and Supportive Market Dynamics," July 27, 2018, CAAT_Feinstein_00000117 (emphasis added).

For example, CFRA increased its target price from $17.00 to $18.00,[107] and HSBC increased its target price from $17.50 to $18.00.[108]

- For Vale's earnings announcement on October 25, 2018, Dr. Feinstein again quotes analyst reports that state Vale's results are "largely in-line with expectations,"[109] but he ignores other reactions, such as positive sentiment from Credit Suisse: "Considering the consensus beat and positive messages from capital allocation and business outlook, *we see the results as positive for the shares*."[110]  Similarly, analysts from J.P. Morgan noted, "Vale delivered a solid 3Q18 performance… *We expect a positive reaction [from the Vale ADRs] tomorrow*."[111]

49.    These examples suggest that Dr. Feinstein selectively quoted and disregarded information in other analyst reports he claims to have reviewed and, instead, only discusses analyst reports that comport with his assertion that *every* earnings announcement contained anticipated and/or offsetting news such that Vale's earnings announcements are not appropriate dates to test in an event study.[112]  Furthermore, as these examples demonstrate, it is inappropriate for Dr. Feinstein

---

[107]   CFRA, Vale S.A. Stock Report, July 27, 2018, CAAT_Feinstein_00000116.

[108]   HSBC Global Research, "Vale (VALE US), Buy: Transforming – more than meets the eye," July 26, 2018, CAAT_Feinstein_00000109.

[109]   Corrected Feinstein Report, Appendix-2.

[110]   Credit Suisse, "Vale, 3Q18: Solid quarter as Vale delivers optionalities," October 24, 2018, CAAT_Feinstein_00000175 (emphasis added).

[111]   J.P. Morgan, "Vale, A Solid 3Q18 Performance Drive by High Premiums and Low Costs - ALERT," October 24, 2018, CAAT_Feinstein_00000178 (emphasis added).

[112]   *See*, *e.g.*, Feinstein Deposition, March 24, 2021, at 211:18–212:23 ("There were a couple of occasions where revenue and EBITDA either both missed or both beat, most of them it was like one would miss and the other would beat, so they were mixed…  [b]ut that's not the only information that comes out in an earnings announcement.  The company will also talk about other things going on, and when you look at the holistic mix of information, it was never -- there were no bombshells.  There were no bombshell events among the 9 earnings announcements.  There was nothing that said [w]ow, this is a company that the market should be

to make the sweeping generalization that, in effect, all market analysts had neutral or mixed reactions to the information in Vale's earnings announcements;[113] to the contrary, these examples make clear that market analysts were often surprised by Vale's results, revised their price targets and other analyses to incorporate unanticipated information from Vale's earnings announcements, and expected the price of the Vale ADRs to respond in a meaningful way to Vale's earnings announcements.  Dr. Feinstein testified in his deposition that if investment analysts revise their analyses, such as price targets, this is indicative of a "major surprise" that would constitute news worthy of assessment in an event study.  However, Dr. Feinstein does not follow this approach, nor, as discussed above, does he specify a methodology that is replicable or verifiable.[114]

50.     With respect to Dr. Feinstein's claim that Vale's earnings announcements were stale because the information was already available in the production reports, since he argues that Vale's production reports contain information on "one of the primary drivers of the Company's top-line results,"[115] Dr. Feinstein's logic suggests that the dates when production reports were

---

valuing higher or lower… [I]t could be a modest surprise, and you might have a positive surprise on one metric, and a negative surprise on the other, and that would be mixed.  And that's typically what happened.").

[113]   Dr. Feinstein testified in his deposition that he determined the "magnitude of a surprise" in reaction to an earnings announcement by reviewing analyst reports and found that "consistently," in this case, analysts did not update their models or price targets in response to the information in Vale's earnings announcements.  Based on the analyst reports I discuss above, this conclusion is simply incorrect.  *See* Feinstein Deposition, March 24, 2021, at 206:21–208:2.

[114]   *See* Feinstein Deposition, March 24, 2021, at 206:21–208:2 ("But the news [in Vale's earnings announcements] was never of such magnitude, the surprises were never of such magnitude that [would] suggest that the stock price movement following the news should be so big as to be over the threshold for statistical significance.  Q. How do you determine that?  How do you determine the magnitude of a surprise in this context?  A.  Sometimes it's from the analyst's reaction, sometimes if the analysts say this was a major surprise, this was something we didn't expect.  This is such a big miss or such a big beat that we're going to revalue the stock, change our price targets, feed the new data through our models and come up with the new valuation, that was nothing -- that's not what happened in this case consistently across the analysts and across the earnings announcements.").

[115]   Corrected Feinstein Report, ¶ 181.

issued would then be appropriate dates to test.  However, here again, Dr. Feinstein argues that *all* of the production reports also contained information that was anticipated and/or offsetting such that the production dates are not appropriate events to consider in a market efficiency analysis,[116] but he fails explain what information or disclosures in each production report were unanticipated and/or offsetting or how one would go about assessing that.

51.    The end result of Dr. Feinstein's unconvincing attempts to discount all news during the Proposed Class Period prior to January 25, 2019 as either being stale or offsetting is that he dismisses entire categories of events typically considered in market efficiency analyses, such as earnings releases (or production reports, in Vale's case).  His supposed basis for this dismissal runs counter to the very reason that other market efficiency analyses, including those in his own work, typically test these dates: they generally contain value-relevant information.  As such, the expectation would be that at least some of these dates would exhibit a statistically significant price reaction.  Yet, in this case, the results of Dr. Feinstein's own event study do not show statistically significant price movements on any of the earnings announcement dates *or production report dates* during the Proposed Class Period, suggesting market *inefficiency*.[117]

---

[116]    *See*, *e.g.*, Feinstein Deposition, March 24, 2021, at 220:9–221:14 ("So I looked at the analyst reports to see if the numbers that were coming in [the production reports] were uniformly surprisingly bigger or worse than what was previously expected.  And look, I mean, out of 35 [analysts], some will be surprised and some won't be.  There weren't any production days where there was a consensus that it was a major positive or negative surprise.").

[117]    Corrected Feinstein Report, ¶ 181 and Exhibit-8.

2.    *The Results of a Collective Event Study Suggest that the Price of the Vale ADRs Did Not React to the Type of Value-Relevant Information Typically Analyzed in a Collective Event Study, such as Earnings Announcements*

52.    In his prior research, Dr. Feinstein has conducted collective event studies of earnings announcements, an approach that he notes is "used in class action securities litigation."[118]  A collective event study analyzes whether a security in general displays greater price reactivity on "news days" (a group of related dates that are likely to contain value-relevant information, such as earnings announcements) than on "non-news days."  If there is no statistically significant difference between the percentage of "news days" and "non-news days" that have statistically significant price movements, this result may suggest market inefficiency.  In his report for this case, Dr. Feinstein notes that "[e]arnings announcements typically compose the group of news days in collective event studies used to test market efficiency."[119]  And this approach—a collective event study of earnings announcements—was also used to evaluate market efficiency

---

[118]   Miguel Villanueva and Steven Feinstein, "Stock Price Reactivity to Earnings Announcements: The Role of the *Cammer/Krogman* Factors," *Review of Quantitative Finance and Accounting* (forthcoming), September 2020, p. 43.

[119]   Corrected Feinstein Report, ¶ 180.  Further, Dr. Feinstein has used a collective event study as an expert in prior securities litigations.  For example, in *In re: Grupo Televisa Securities Litigation,* Dr. Feinstein conducted a collective event study to evaluate price reactions on earnings announcements. He explained, "My event study analysis focused on Grupo Televisa's quarterly earnings announcements, during which the Company reported its financial results and other important company news.  A company's financial results are among the most important considerations to investors assessing the value of its securities… When selecting events for a collective event study, each event need not be so momentous as to be expected to elicit a significant ADR price reaction.  Rather, the group of events is selected such that the group as a whole is characterized as having higher information flow than ordinary days." *See In re: Grupo Televisa Securities Litigation*, Report on Market Efficiency, Professor Stephen P. Feinstein, Ph.D., C.F.A., October 30, 2019, ¶¶ 101, 108.  *See also* Feinstein Deposition, March 24, 2021, at 238:22–239:14.  Dr. Feinstein testified that in the "majority [of his market efficiency reports] over the last couple of years" he conducted a collective event study.

in a prior Vale securities litigation related to the collapse of the Fundão Dam,[120] which Dr. Feinstein cites.[121]

53.     However, Dr. Feinstein's opinions in this case implicitly suggest that a collective event study is *never* appropriate.  As discussed above in **Section V.A**, Dr. Feinstein maintains that it is necessary to review every single news item on every single day during the period of interest to ascertain which dates to test in an event study.  Under this approach, a collective event study is apparently meaningless because Dr. Feinstein implies that one cannot evaluate events collectively and instead one must make an independent determination whether each day has "company-specific information… that is new, unexpected, and of such import as to reasonably be expected to elicit a stock price reaction over the threshold for statistical significance."[122]

54.     Disregarding his inconsistent and conflicting opinions about the merits of a collective event study, Dr. Feinstein's own regression results for this case suggest that the price of the Vale ADRs did *not* react to value-relevant information typically analyzed in a collective event study, such as earnings announcements.  In **Exhibit 6**, I used Dr. Feinstein's regression results to run a collective event study on the earnings announcement and production report dates during the Proposed Class Period.  Specifically, I used a Z-test to assess whether the percentage of earnings announcement and production report dates (*i.e.*, "news days") with statistically significant price

---

[120]  *See In re: Vale S.A. Securities Litigation*, Case No. 1:15-cv-9539-GHW, Order, September 27, 2019, pp. 20-21.

Vale owned a 50 percent interest in a joint venture named Samarco Mineração S.A. ("Samarco").  Samarco used dams, including the Fundão Dam, to store the byproducts, or tailings, of its mining operations.  The Fundão Dam failed in November 2015, resulting in the release of tailings downstream.  This event was the subject of prior securities litigation.  US Securities and Exchange Commission, Form 20-F for Vale S.A., December 31, 2015, pp. 22-29.

[121]  Corrected Feinstein Report, ¶ 23.

[122]  Corrected Feinstein Report, ¶ 127.

movements is statistically significantly different from the percentage of "non-news days" with statistically significant price movements.[123]  In simpler terms, I analyzed whether the Vale ADRs were more likely (in general) to have a price reaction on earnings and production dates—*i.e.*, dates when value-relevant information was released—compared to all other dates during the Proposed Class Period.  I perform this test for purposes of this report to be consistent with the methodology considered by the Court in the prior Vale case related to the Fundão Dam.[124]

55.     As shown in **Exhibit 6**, the Vale ADRs *never* displayed a statistically significant price reaction on any of the 17 earnings or production dates during the Proposed Class Period, whereas the Vale ADRs had a statistically significant price movement on 4.4 percent of all other dates.  Put differently, this analysis suggests that there is no difference (from a statistical perspective) between the Vale ADRs' price movements on news days versus non-news days.  As such, Dr. Feinstein's own model suggests that the Vale ADRs did not respond to new, material information—again suggesting market inefficiency.[125]

---

[123]   The Z-test examines whether the means of two populations (in this case, news days and non-news days) with potentially different variances are statistically different from one another under the null hypothesis that the two means are equal (*i.e.*, that there is no difference in the Vale ADRs' price reactivity on news days when compared to non-news days).

[124]   *See supra* at ¶ 52.

[125]   In the prior Vale case related to the collapse of the Fundão Dam, Plaintiffs' class certification expert, Dr. Tabak, found that the Vale ADRs were more likely to have statistically significant abnormal returns on earnings dates than on non-earnings dates. *See In re: Vale S.A. Securities Litigation*, Case No. 1:15-cv-09359-GHW, Expert Report of David I. Tabak, Ph.D., September 14, 2017, Exhibit 8a1. While Dr. Feinstein touts that the Court found the Vale ADRs to trade in an efficient market in that case, he has not explained why the Vale ADRs reacted to earnings announcements during the prior case's class period but did not during this case's Proposed Class Period. *See* Corrected Feinstein Report, § IV.  Dr. Feinstein testified that he would "have to take more time to look at" Dr. Tabak's analysis to determine why Dr. Tabak found statistically significant price movements on the dates of Vale's earnings announcements but he did not. *See* Feinstein Deposition, March 24, 2021, at 214:23–217:18.

3.    *Dr. Feinstein's Own Event Study Shows No Statistically Significant Price Reaction on Form 6-K Dates*

56.    In addition to earnings announcements and production reports, I also analyzed whether the Vale ADRs collectively responded to a broader set of news, represented by information released by Vale in Forms 6-K filed with the SEC.[126]  This definition of "news days" has also been used by Dr. Feinstein in previous securities litigations.[127]

57.    To conduct this test, I first identified an appropriate set of Form 6-K release dates, seeking to exclude information that was already known to the market.  During the Proposed Class Period, Vale filed 328 Forms 6-K, which were associated with 184 unique trading dates.  I then reviewed the content of the Form 6-K filings to determine whether the information was either duplicative of previously released news or primarily administrative (such as scheduling announcements).  Based on this review, I excluded the following types of Form 6-K filings:

- Filings containing previously released financial or marketing information;

- Summaries of earnings calls and board meetings that occurred previously; and

- Scheduling announcements for shareholder events and other procedural and administrative documents.

---

[126]    SEC Forms 6-K are used by foreign companies in lieu of Forms 8-K.  Dr. Feinstein acknowledges this definition of news in his recent research with Dr. Miguel Villanueva.  Drs. Villanueva and Feinstein explain that Ferillo, et al. "developed a different empirical test for informational market efficiency, which evaluates events collectively…  The news events may be earnings announcements, publication of news articles about the company, or filings of 8-Ks, for example…  Ferillo et al. (2004) conduct a two-proportions Z-test to ascertain whether the incidence of significant abnormal returns is significantly greater among the news days than among the non-news days."  *See* Miguel Villanueva and Steven Feinstein, "Stock Price Reactivity to Earnings Announcements: The Role of the *Cammer/Krogman* Factors," *Review of Quantitative Finance and Accounting* (forthcoming), September 2020, pp. 6-7.

[127]    *See*, *e.g.*, *In re: American Realty Capital Properties, Inc. Litigation*, Report on Market Efficiency, Professor Stephen P. Feinstein, Ph.D., C.F.A., March 15, 2017, ¶¶ 113-114, 151-153; *In re: Petrobas Securities Litigation,* Report on Market Efficiency, Professor Stephen P. Feinstein, Ph.D., C.F.A., October 23, 2015, ¶¶ 127, 145-146.

58.     Implementing the above content screen leaves 122 unique trading dates on which Vale filed a Form 6-K containing new information.  I then used Dr. Feinstein's regression results to determine whether the Vale ADRs' price reaction was statistically significant on these 122 dates.  According to Dr. Feinstein's model, the Vale ADRs displayed a statistically significant price movement on only four (3.3 percent) of these 122 dates.  In comparison, the Vale ADRs displayed a statistically significant price movement on 4.5 percent of the remaining non-news days according to Dr. Feinstein's model.  (*See* **Exhibit 6**.[128])

59.     I find that there is no statistically significant difference between the Vale ADRs' price movements on news days, as defined by Form 6-K releases, versus those on non-news days.  Coupled with the fact that the Vale ADRs *never* exhibited statistically significant price movements on any of the earnings announcements or production report dates as described in **Section V.B.1**, this result is further evidence that the price of the Vale ADRs did not respond to company-specific information releases during the Proposed Class Period and, therefore, again demonstrates Dr. Feinstein's failure to adequately establish a cause-and-effect relationship between the disclosure of information and price of the Vale ADRs.

---

[128] In **Exhibit 6**, I also perform a sensitivity in which the defined set of "news days" is all Form 6-K release dates (without applying the content screens discussed above), and my results do not change.  Finally, I also perform a sensitivity in which the defined set of "news days" contains *both* earnings/production report dates and Form 6-K release dates (both with and without applying the content screens discussed above), and my results do not change.

## VI.   DR. FEINSTEIN FAILS TO PROVIDE RELIABLE EVIDENCE THAT THE VALE NOTES TRADED IN AN EFFICIENT MARKET

### A.   Dr. Feinstein's Organization and Treatment of the TRACE Data Is Incorrect and Incomplete

60.    Dr. Feinstein's analyses of the Vale Notes rely on bond trading data (TRACE data) from the Financial Industry Regulatory Authority ("FINRA").  Dr. Feinstein has failed to properly process these TRACE data.  As he notes in his Appendix-4, Dr. Feinstein processed the TRACE data to account for cancelled trades, reversal trades, and corrected trades.[129]  However, while Dr. Feinstein attempted to process the TRACE data to remove duplicate interdealer trades, he did so incorrectly.[130]  In addition, Dr. Feinstein failed to remove duplicate agent trades, and, although he claims he did so, he also failed to remove entries identified as a "Position Transfer."  Consequently, Dr. Feinstein has not accurately estimated trading volume of the Vale Notes.  I explain below why each of these types of trades should be removed from the TRACE data to arrive at an accurate assessment of trading volume.

61.    The TRACE data contain information self-reported by bond dealers that are FINRA members.  Every dealer involved in a given trade must report the trade to FINRA, resulting in duplicative reporting of many trades.[131]  For example, in **Table 1** below, I show an excerpt of the TRACE data for the TAE3 Note on February 6, 2019, the date of the last alleged corrective disclosure:

---

[129]   Corrected Feinstein Report, Appendix-4.

[130]   Dr. Feinstein testified that he intended to remove all trades with duplicate reported entries.  *See* Feinstein Deposition, March 24, 2021, at 244:15–246:20.

[131]   *See* Paul Asquith, et al., "The Effects of Mandatory Transparency in Financial Market Design: Evidence from the Corporate Bond Market," *NBER Working Paper Series*, Working Paper 19417, September 2013, Revised April 2019, p. 9.

**Table 1**
**Excerpt of TRACE Data for TAE3 Note on February 6, 2019**

| Row | Time | Reporter | Contraparty | Side | Price | Volume | Report Type | Current Matched Status |
|---|---|---|---|---|---|---|---|---|
| 1 | 16:05:14 | GFIG | OPCO | Sell | $120.98 | $2,000,000 | D | M |
| 2 | 16:05:14 | GFIG | SMRD | Buy | $120.92 | $1,000,000 | D | M |
| 3 | 16:05:14 | GFIG | JEFF | Sell | $120.98 | $3,000,000 | D | M |
| 4 | 16:05:14 | GFIG | BOFA | Buy | $120.92 | $3,000,000 | D | M |
| 5 | 16:05:14 | GFIG | SANT | Buy | $120.92 | $1,000,000 | D | M |
| 6 | 16:11:06 | SANT | GFIG | Sell | $120.92 | $1,000,000 | D | M |
| 7 | 16:11:24 | SMRD | GFIG | Sell | $120.92 | $1,000,000 | D | M |
| 8 | 16:11:31 | BOFA | GFIG | Sell | $120.92 | $3,000,000 | D | M |
| 9 | 16:11:40 | OPCO | GFIG | Buy | $120.98 | $2,000,000 | D | M |
| 10 | 16:11:47 | JEFF | GFIG | Buy | $120.98 | $3,000,000 | D | M |

62.     In the TRACE data, interdealer trades have a Report Type of "D", and of those interdealer trades, those with a corresponding match in the data can be identified when Current Matched Status equals "M".[132]  Each of these matched pairs should be consolidated into a single trade record to avoid double counting.[133]  In his attempt to remove such duplicative trades, Dr. Feinstein restricts the data to trades that have a Current Matched Status of "M", sorts the data by execution date and execution time, and then removes every other entry.[134]  Thus, Dr. Feinstein implicitly assumes under this approach that each pair of duplicative trades will appear successively in the data.  In other words, under his approach, Dr. Feinstein would remove all odd numbered rows in **Table 1** above.  However, the data in the table demonstrate that this

---

[132]   *See* TRACE Data Dictionary, CAAT_Feinstein_00000656.xlsx.

[133]   This data treatment is also consistent with the academic literature.  *See* the Online Appendix to Paul Asquith, et al., "The Effects of Mandatory Transparency in Financial Market Design: Evidence from the Corporate Bond Market," *NBER Working Paper Series*, Working Paper 19417, September 2013, Revised April 2019.  *See also* the supplement to Dick-Nielsen, Jens, "Liquidity Biases in TRACE," *Journal of Fixed Income* 19.2, 2009: 43-55.  The Mahanti et al. (2008) paper cited by Dr. Feinstein similarly notes that their sample does *not* include any interdealer trading, which is a less "relevant portion of the trading universe (for the purpose of studying liquidity effects)."  *See* Sriketan Mahanti, et al., "Latent Liquidity: A New Measure of Liquidity, with an Application to Corporate Bonds," *Journal of Financial Economics* 88.2, 2008: 272-298, p. 274.

[134]   CAAT_Feinstein_00000470.m.

approach is incorrect.  Duplicative interdealer trades do not necessarily appear sequentially.  For example, rows one and nine in **Table 1** are a pair, (each trade has the same price and volume, as well as the same seller (GIFG) and buyer (OPCO)), but Dr. Feinstein drops *both* of these rows.  And further, for example, Dr. Feinstein *keeps* rows four and eight in **Table 1**, which are also a pair.  Consequently, Dr. Feinstein double counts the trade represented by rows four and eight but entirely excludes the trade represented by rows one and nine.  In this example, total volume across these two trades should be $5 million ($2 million + $3 million), but Dr. Feinstein calculates a trading volume of $6 million, overstating volume by $1 million.

63.     I also note that Dr. Feinstein's approach is inconsistent with the methodology he describes Appendix-4 to his report.  In his Appendix-4, Dr. Feinstein claims that he identified a "universe of potential duplicate submissions" as all trades executed within a 10-minute window of when the original trade was executed.  Dr. Feinstein then claims that within this universe, he identified duplicate submissions as entries that had the same price, volume, buyer, and seller, and where the Buy/Sell field had opposing entries (*i.e.*, one entry was labeled as a buy and the other as a sell).[135]  However, based on his code, Dr. Feinstein did not follow this approach.  Instead, based on his code, Dr. Feinstein filtered the TRACE data to entries that have a Current Matched Status of "M", sorted the data by execution date and execution time, and removed every other entry.[136]  It is unclear why Dr. Feinstein's actual approach is different than the one he describes in his report, and his actual approach yields erroneous estimates of volume (and, consequently, volume-weighted average prices).

---

[135]   Corrected Feinstein Report, Appendix-4, ¶¶ 334-335.

[136]   CAAT_Feinstein_00000470.m.

64.     The TRACE data also contain trade reports from dealers that acted as an agent between two principals.[137]  An agent dealer transfers the bond from one principal to another without assuming any price risk, and the TRACE data clearly identify such trades.[138]  Agent trades should similarly be removed from analyses of the TRACE data to avoid double counting.[139]  For example, in **Table 2** below, I show an excerpt of the TRACE data for the TAK9 Note on February 4, 2019:

**Table 2**
**TRACE Data for TAK9 Note on February 4, 2019**

|   | Time | Reporter | Contraparty | Side | Price | Volume | Report Type | Capacity |
|---|------|----------|-------------|------|-------|--------|-------------|----------|
| 1 | 12:24:42 | PARI | A | Sell | $111.48 | $1,000,000 | A | A |
| 2 | 12:24:42 | PARI | TPCD | Buy | $111.48 | $1,000,000 | D | A |
| 3 | 12:24:42 | TPCD | PARI | Sell | $111.48 | $1,000,000 | D | P |
| 4 | 12:41:43 | SANT | C | Sell | $111.34 | $100,000 | C | A |
| 5 | 12:41:43 | SANT | A | Buy | $111.34 | $100,000 | A | A |
| 6 | 16:15:36 | BOFA | C | Sell | $111.35 | $5,000,000 | C | P |

65.     **Table 2** shows that PARI bought $1,000,000 of TAK9 Notes from TPCD at a price of $111.48 (rows two and three) and sold $1 million to a customer ("A", which identifies affiliates) at the same price of $111.48 (row one).  Thus, PARI was functioning as an intermediary between TPCD and the customer, and PARI reported to TRACE (in rows one and two) that its "capacity"

---

[137]   Principals are parties (dealers or customers) that hold the bond and assume the associated risks.  Agents are dealers that intermediate between two principals by transferring the bond from one principal to another without assuming any of the associated risks.  *See* the Online Appendix to Paul Asquith, et al., "The Effects of Mandatory Transparency in Financial Market Design: Evidence from the Corporate Bond Market," *NBER Working Paper Series*, Working Paper 19417, September 2013, Revised April 2019, p. 5.

[138]   The TRACE data contains a "Capacity" field, which indicates the reporter's trading capacity as either principal ("P") or agency ("A").  *See* TRACE Data Dictionary, CAAT_Feinstein_00000656.xlsx.

[139]   *See* the Online Appendix to Paul Asquith, et al., "The Effects of Mandatory Transparency in Financial Market Design: Evidence from the Corporate Bond Market," *NBER Working Paper Series*, Working Paper 19417, September 2013, Revised April 2019, p. 5.  *See also* the Supplement to Dick-Nielsen, Jens, "Liquidity Biases in TRACE," *Journal of Fixed Income* 19.2, 2009: 43-55.

was "A" (agent) and not "P" (principal).[140]  Removing these agency trades reported by PARI in rows one and two and leaving only the principal trade reported by TPCD in row three reduces the total traded volume for TAK9 Note on this day by $2,000,000.[141]

66.     Lastly, in his report, Dr. Feinstein claims to remove trades identified as "Audit Trail Only" or "Position Transfer" in the "Special Processing Cd" field, but in fact only removes entries identified as "Audit Trail Only."[142]

67.     In the following section, I show that Dr. Feinstein's failure to properly analyze the TRACE data caused him to overstate his estimates of trading volume, which is a measure that he cites as supposed evidence that the Vale Notes traded in an efficient market during the Proposed Class Period.

### B.     Dr. Feinstein Overstates Trading Volume of the Vale Notes

68.     As part of his evaluation of the indirect *Cammer* factors for the Vale Notes, Dr. Feinstein evaluated the trading volume of the Vale Notes.  In particular, using the TRACE data discussed

---

[140]    *See* TRACE Data Dictionary, CAAT_Feinstein_00000656.xlsx.

[141]    In this example in **Table 2**, Dr. Feinstein keeps the entries in rows one and two but removes the entry in row three, thus overstating volume by $1,000,000 for this particular trade.

[142]    *See* Corrected Feinstein Report, Appendix-4; CAAT_Feinstein_00000470.m.  Specifically, in his code, Dr. Feinstein removes trades where "Special Processing Cd" equals "A", which corresponds to "Audit Trail Only," but Dr. Feinstein does not remove trades where "Special Processing Cd" equals "P", which corresponds to "Position Transfer."  It is again unclear why Dr. Feinstein's actual approach is different from the one he describes in Appendix-4 to his report.  *See also* TRACE Data Dictionary, CAAT_Feinstein_00000656.xlsx.

Dr. Feinstein testified that he "certainly sought to" remove entries with "Position Transfer" in the "Special Processing Cd" field, but if he failed to remove such entries this would "[n]ot necessarily" result in an incorrect estimation of weekly trading volume because he "would need to know why a particular trade that may have been identified this way was not removed."  *See* Feinstein Deposition, March 24, 2021, at 246:21–248:15.  Dr. Feinstein further testified, "[I]f it's a position trade that wasn't identified as a position trade in the special processing CD field, there may have been a reason to keep it and I'll look into that."  Feinstein Deposition, March 24, 2021, at 249:12–17.

above, Dr. Feinstein calculated the "average weekly turnover" for each of the Vale Notes.[143] However, Dr. Feinstein's findings are flawed and overstated due to his incorrect organization and treatment of the TRACE data discussed above.

69.     In **Exhibit 7**, I conduct Dr. Feinstein's trading volume analysis after correcting for his failure to properly remove duplicate interdealer trades, duplicate agent trades, and position transfers.  As shown, Dr. Feinstein has overstated each of the Notes' trading volume by as much as 31 percent.  Moreover, two of the Vale Notes—the TAN3 and TAM5 Notes—actually have an average weekly trading volume below the "2% threshold."  That is, when the TRACE data are processed and analyzed correctly, three of the Vale Notes do not meet the two percent threshold for a "strong presumption" of market efficiency.[144]

## C.     Dr. Feinstein's Trading Frequency Analysis Is Misleading

70.     Dr. Feinstein also calculated the average number of days between successive trades for each of the Vale Notes, finding that the average number of days "between successive trades ranged between 0.0352 and 0.1299 days for the Vale Notes over the Class Period."[145]  He compared these trading frequencies to a study by Mahanti et al. (2008), which evaluated a sample of bonds and found that they typically traded every 12 to 22 days.[146]  Dr. Feinstein concluded that his findings present "compelling evidence" of market efficiency for the Vale Notes because the Vale Notes traded more frequently than the bonds in the Mahanti et al. (2008)

---

[143]   Corrected Feinstein Report, ¶ 230 and Table-2.

[144]   *See* Corrected Feinstein Report, ¶ 231.

[145]   *See* Corrected Feinstein Report, ¶ 236.

[146]   *See* Sriketan Mahanti, et al., "Latent Liquidity: A New Measure of Liquidity, with an Application to Corporate Bonds," *Journal of Financial Economics* 88 (2008), 272-298, p. 282; *see also* Corrected Feinstein Report, ¶ 234.

study.[147]   However, for the reasons discussed below, I do not agree that Dr. Feinstein's

misleading comparison with the trading frequencies presented in the Mahanti et al. (2008) study

provides "compelling evidence" of market efficiency for the Vale Notes.

71.     First, as with the indirect *Cammer* and *Krogman* factors I discussed above in **Section IV**,

an analysis of a security's trading frequency is not sufficient to demonstrate market efficiency.

Frequent trading does not prove the security trades in an efficient market.

72.     Second, the Mahanti et al. (2008) study Dr. Feinstein cited acknowledged that the U.S.

corporate bond market is "one of the most well-known, but illiquid markets in the world."[148]

Their sample universe of bonds from 2000 to 2005 was provided by a single custodian (State

Street) and exhibited very infrequent trading.  Specifically, for each year in their sample,

approximately 40 percent of the bonds in the sample did not have any trades, and of the bonds

that did have trades, more than half had trades on fewer than ten days, with nearly 80 percent

having trades on fewer than 30 days a year.[149]   As such, Dr. Feinstein's comparison of the Vale

Notes against this "highly illiquid" sample of securities (as described by Mahanti et al. (2008)[150])

does not provide sufficient evidence that the Vale Notes traded in an efficient market.

73.     In contrast to the highly illiquid sample of bonds they studied, Mahanti et al. (2008) point

out that the time between trades for the median *stock* is measured in *minutes*, and that "[f]or the

---

[147]   *See* Corrected Feinstein Report, ¶ 236 and Exhibit-9.

[148]   Sriketan Mahanti, et al., "Latent Liquidity: A New Measure of Liquidity, with an Application to Corporate Bonds," *Journal of Financial Economics* 88 (2008), 272-298, p. 273.

[149]   *See* Sriketan Mahanti, et al., "Latent Liquidity: A New Measure of Liquidity, with an Application to Corporate Bonds," *Journal of Financial Economics* 88 (2008), 272-298, p. 279.

[150]   *See* Sriketan Mahanti, et al., "Latent Liquidity: A New Measure of Liquidity, with an Application to Corporate Bonds," *Journal of Financial Economics* 88 (2008), 272-298, p. 278.

most liquid stocks, this statistic is in *seconds*."[151]  Dr. Feinstein calculated a range of 0.0352 to

0.1299 *days* between consecutive trades for the Vale Notes, which translates to a range of 51 to

187 *minutes*, or 3,041 to 11,223 *seconds*.[152]  Thus, by selectively contrasting the Vale Notes with

a sample of highly illiquid and infrequently traded bonds, Dr. Feinstein attempts to create the

illusion that the Vale Notes are frequently traded.  This misleading comparison provides no

support for Dr. Feinstein's conclusions.

> **D.  Dr. Feinstein's Analyses of the Fifth *Cammer* Factor for the Vale Notes Are Flawed and Fail to Demonstrate Market Efficiency**
>
> > 1.  *Dr. Feinstein's Event Study for the Vale Notes Suffers from the Same Flaws as His Event Study for the Vale ADRs*

74.     Dr. Feinstein's event study for the Vale Notes suffers from the same flaws as his event

study for the Vale ADRs.  (*See* **Section V.A**.)  In particular, Dr. Feinstein analyzes only the dates

of the four alleged corrective disclosures.[153]  This approach is not informative of whether the

Vale Notes traded in an efficient market in the first 117 weeks of the Proposed Class Period.

> > 2.  *Dr. Feinstein's Own Event Study Shows No Statistically Significant Price Movements on Some of the Alleged Corrective Disclosure Dates for Several of the Vale Notes*

75.     Dr. Feinstein claims that the "Vale Notes demonstrated market efficiency over the four

event dates, falling promptly in response to serious adverse news about the Company."[154]

However, based on Dr. Feinstein's own event study results, his conclusion is incorrect.

---

[151]  *See* Sriketan Mahanti, et al., "Latent Liquidity: A New Measure of Liquidity, with an Application to Corporate Bonds," *Journal of Financial Economics* 88 (2008), 272-298, p. 282 (emphasis added).

[152]  *See* Feinstein Report, ¶ 236.

[153]  *See* Corrected Feinstein Report, ¶ 264.

[154]  Corrected Feinstein Report, ¶ 276.

76.     First, Dr. Feinstein's own analysis shows that the TAN3 Note did not trade on January 25, 2019,[155] *the date of the Dam collapse*, which is contradictory to Dr. Feinstein's contention that the price of the Vale Notes "[fell] promptly in response to serious adverse news."[156]  That there was no trading activity for TAN3 on the date of the Dam collapse suggests that for this note, there was no immediate market response to the Dam collapse, an event that Dr. Feinstein himself believes is "serious adverse news about the Company"[157] and was among "important unexpected events and announcements."[158]  (In contrast, for example, the price of the Vale ADRs declined over eight percent, and the other Vale Notes experienced price declines ranging from 1.71 percent to 5.63 percent on this date.[159])  This observation—no trading activity for the TAN3 Note on the date of the Dam collapse—suggests market inefficiency.

77.     Second, Dr. Feinstein's own analysis shows that six of the seven Vale Notes did not exhibit statistically significant price movements (at the 95 percent confidence level) on February 4, 2019.  In **Exhibit 8**, I summarize Dr. Feinstein's event study results for the Vale Notes on February 4 and 6, 2019.  As shown in **Exhibit 8**, only the TAP8 Note experienced a statistically significant price movement on February 4, 2019.[160]  That six of the seven Vale Notes did not respond to one of the "four [] important news events within the Class Period" suggests

---

[155]   *See*, *e.g.*, Corrected Feinstein Report, Exhibit-12a.

[156]   Corrected Feinstein Report, ¶ 276.

[157]   Corrected Feinstein Report, ¶ 276.

[158]   Corrected Feinstein Report, ¶ 285.

[159]   *See* Corrected Feinstein Report, Exhibit-7, Exhibit-12.

[160]   Dr. Feinstein states that "[o]ne note fell significantly again after the 3rd event date."  Corrected Feinstein Report, ¶ 276.

47

inefficiency under Dr. Feinstein's theory.[161]  This result also suggests a lack of a price impact on February 4, 2019 (*i.e.*, the alleged misrepresentation did not impact the price of the Vale Notes).

78.     Third, Dr. Feinstein's own analysis shows that four of the seven Vale Notes did not exhibit statistically significant price movements (at the 95 percent confidence level) on February 6, 2019.[162]  (*See* **Exhibit 8**.)  This result again suggests market inefficiency under Dr. Feinstein's theory and also a lack of a price impact on February 6, 2019.

79.     Fourth, the results of Dr. Feinstein's event study show that four of the seven Vale Notes—TAN3, TAM5, TAE3, and TAK9—did not have statistically significant price movements (at the 95 percent confidence level) on *either* February 4 or February 6.  (*See* **Exhibit 8**.)  According to Dr. Feinstein's results, TAM5, TAE3, and TAK9 experienced statistically significant price movements only on January 25 and 28, 2019, and TAN3 only on January 28, 2019 (and, as discussed above, did not even trade on January 25, 2019, the date of the Dam collapse).[163]  Dr. Feinstein claims that his results—including that only one Vale Note had a statistically significant decline on February 4, 2019 and only three of the Vale Notes had statistically significant declines on February 6, 2019—"demonstrate a cause-and-effect relationship between the release of information and movements in the prices of the Vale Notes," and that the "[t]he Vale Notes demonstrated market efficiency over the four event dates."[164]  In my opinion, however, an event study that tests four dates and does not consistently find statistically significant price movements for half of those dates does not support a finding of

---

[161]   Corrected Feinstein Report, ¶¶ 127, 132.

[162]   Dr. Feinstein states that "3 notes fell significantly after the 4th event date."  Corrected Feinstein Report, ¶ 276.

[163]   Corrected Feinstein Report, Exhibit-12.

[164]   Corrected Feinstein Report, ¶ 276.

market efficiency from an economic perspective.  The support that Dr. Feinstein provides is inadequate—and often contradictory—to conclude that the prices of the Vale Notes displayed a cause-and-effect relationship with the events he tested.

### 3.    *The Vale Notes' Price Response on Earnings Announcements and Production Report Dates Suggests Inefficiency*

80.    Beyond the four corrective disclosure dates, Dr. Feinstein failed to analyze whether the Vale Notes responded to other news events throughout the Proposed Class Period.  While Dr. Feinstein's model shows that the Vale ADRs did not have a statistically significant price reaction to *any* earnings releases or production announcements (suggesting inefficiency), interestingly, as shown in **Table 3** below, his regression results for the Vale Notes show that three of the Vale Notes exhibited a statistically significant price movement on October 27, 2016, the date of an earnings announcement, and three different Vale Notes exhibited a statistically significant price movement on April 20, 2017 when Vale released a production report. According to Dr. Feinstein's own analysis, these inconsistent results between the Vale ADRs and Vale Notes, as well as inconsistent results among the Vale Notes, suggest inefficiency in the market for the Vale ADRs, inefficiency in the market for the Vale Notes, or both.

49

**Table 3**

**Dr. Feinstein's Regression Results for the Vale Notes on Earnings Announcement and Production Report Dates**

| Date | Earnings Announcement / Production Report | Vale Notes with Statistically Significant Returns |
|---|---|---|
| 10/27/2016 | Earnings Announcement | EAA3, TAP8, TAH6 |
| 2/16/2017 | Production Report | N/A |
| 2/23/2017 | Earnings Announcement | N/A |
| 4/20/2017 | Production Report | TAP8, TAH6, TAK9 |
| 4/27/2017 | Earnings Announcement | N/A |
| 7/20/2017 | Production Report | N/A |
| 7/27/2017 | Earnings Announcement | N/A |
| 10/19/2017 | Production Report | N/A |
| 10/26/2017 | Earnings Announcement | N/A |
| 2/16/2018 | Production Report | N/A |
| 2/28/2018 | Earnings Announcement | N/A |
| 4/16/2018 | Production Report | N/A |
| 4/26/2018 | Earnings Announcement | N/A |
| 7/16/2018 | Production Report | N/A |
| 7/26/2018 | Earnings Announcement | N/A |
| 10/15/2018 | Production Report | N/A |
| 10/25/2018 | Earnings Announcement | N/A |

*Source: Corrected Feinstein Report, Table-1, Exhibit-11, ¶¶ 265-272.*

81.    Second, Dr. Feinstein argues that corporate bonds such as the Vale Notes "are substantially insulated from all but the most extreme news by a valuation cushion provided by the common and preferred stock.  As a result, bonds are the least sensitive of all the securities to firm-specific news and while being highly sensitive to a change in a firm's probability of default."[165]  Applying this argument, one potential measure of a "firm's probability of default," to which Dr. Feinstein himself contends bonds are "highly sensitive," is changes in a company's credit rating.  During the Proposed Class Period, Moody's upgraded the credit rating of both Vale and the Vale Notes three times.  Specifically, Moody's upgraded Vale and the Vale Notes

---

[165]    Corrected Feinstein Report, ¶ 261.

50

from a rating of Ba3 to Ba2 on March 20, 2017, from Ba2 to Ba1 on September 5, 2017, and from Ba1 to Baa3 on July 23, 2018.[166]  Also during the Proposed Class Period, Moody's provided a rating affirmation of Vale and the Vale Notes on November 4, 2016 and April 10, 2018.[167]  However, Dr. Feinstein's own regression results show that the Vale Notes reacted in a non-uniform manner with respect to statistically significant price reactions—both across the Vale Notes and across different rating actions for the same note—on the dates near these ratings actions by Moody's, again suggesting inefficiency.[168, 169]

82.     Specifically, **Exhibit 9** displays Dr. Feinstein's regression results for the Vale Notes on the dates of each of these ratings actions (as well as the following two trading days).[170]  As shown, five of the Vale Notes had at least one statistically significant price response (at the 95 percent confidence level) associated with the ratings actions (TAP8, TAE3, TAH6, TAK9, and

---

[166]  Moody's, "Moody's upgrades Vale's ratings to Ba2; positive outlook," March 20, 2017; Moody's, "Moody's upgrades Vale's ratings to Ba1; stable outlook," September 5, 2017; Moody's, "Moody's upgrades Vale to Baa3; stable outlook," July 23, 2018.

[167]  Moody's, "Moody's changes Vale's outlook to stable; affirms Ba3 ratings," November 4, 2016; Moody's, "Moody's takes action on Brazilian corporates following sovereign rating action," April 10, 2018.

[168]  While Dr. Feinstein testified in his deposition that actions by credit rating agencies often lag the market—*i.e.*, ratings changes often reflect information already known to market participants—he has not demonstrated that this was the case for the Vale Notes. *See* Feinstein Deposition, March 24, 2021, at 71:5–21, 264:13–265:8. Assuming that the ratings changes for the Vale Notes that occurred during the Proposed Class Period were anticipated as of the time they were announced, under this theory, new, unanticipated information must have been released prior to the ratings actions such that the ratings actions were anticipated.  However, as discussed above, Dr. Feinstein did not identify or test any other event dates, including when any such new information would have been disclosed under this theory.

[169]  I further note that—inconsistent with his deposition testimony that actions by credit rating agencies often lag the market—in his report, Dr. Feinstein summarizes the news that was released on or before January 28, 2019 and explains that S&P put Vale on "credit watch with negative implications" after market close on January 25, 2019.  He also notes that prior to market open on January 28, 2019, Fitch downgraded Vale's ratings from BBB+ to BBB- and placed Vale on a negative rating watch. *See* Corrected Feinstein Report, ¶¶ 139, 142.  This implies that Dr. Feinstein considers actions by ratings agencies to constitute value-relevant information—*i.e.*, news that he tests in his market efficiency event study.

[170]  The exact times of the ratings actions are not published by Moody's.  Because of this, one cannot determine the precise effective trading date of each ratings action, so I evaluate Dr. Feinstein's regression results for the date of each ratings action, as well as the following two trading days.

EAA3), whereas two of the Vale Notes did not (TAN3 and TAM5). Two of the Vale Notes (TAM5 and TAE3) had a marginally statistically significant (at the 90 percent confidence level) price response to the ratings affirmation on November 4, 2016 and five did not; however, these price responses were directionally inconsistent, with TAM5 experiencing a negative return while TAE3 experienced a positive return. Four of the Vale Notes had a statistically significant price movement (at the 95 percent confidence level) in reaction to the upgrade on March 20, 2017, yet three did not (including EAA3, which has the longest maturity). While EAA3 did not have a statistically significant price reaction in connection with the March 20, 2017 upgrade, it was the only note that had a statistically significant price response to the July 23, 2018 upgrade. These inconsistent price reactions to the same news—both across the Vale Notes and across different rating actions for the same note—once again suggest market inefficiency.

## VII.   DR. FEINSTEIN'S OPINION THAT DAMAGES CAN BE CALCULATED THROUGH A COMMON CLASS-WIDE METHODOLOGY IS FLAWED AND UNRELIABLE

### A.   Dr. Feinstein Has Not Specified a Methodology to Calculate Damages on a Common, Class-Wide Basis that is Consistent with Plaintiff's Allegations

83.   Dr. Feinstein has failed to propose a damages methodology that is specific to Plaintiff's allegations in this matter. Dr. Feinstein vaguely claims that "valuation tools… would be used to establish if the disclosures, correcting the alleged misrepresentations and omissions, caused the price of the Vale Securities to fall."[171] Dr. Feinstein does not specify which of the "valuation tools" one would use to conduct this analysis and instead claims that the "full array" of valuation tools could be applied, including multiple models, scenario analyses, discounted cash flow

---

[171]   Corrected Feinstein Report, ¶ 295.

analyses, and event studies.[172]  He then further asserts that "an inflation ribbon would be constructed, using generally accepted empirical analysis and valuation tools" to measure artificial inflation introduced into the prices of the Vale Securities by the alleged misrepresentations and omissions, and damages would be calculated as "the reduction in the inflation ribbon over an investor's holding period."[173]

84.     There are numerous omissions in Dr. Feinstein's proposed damages methodology that render it inadequate, from an economic perspective, for measuring artificial inflation and/or computing damages in this matter.  (There are other conceptual issues that render it inadequate for measuring damages on a class-wide basis in particular, which I discuss in greater detail in the next section.)  Dr. Feinstein fails to provide any methodological details regarding how he would structure this hypothetical analysis, which hypotheses he would test, how the results would be used to calculate artificial inflation on each day of the Proposed Class Period, or whether this methodology would appropriately reflect Plaintiff's multiple and varied liability claims.  Among other details, from an economic perspective, an appropriate damages methodology would require an articulation of the alleged misrepresentations claimed by Plaintiff, as well as an explanation of which disclosures are corrective of which alleged misrepresentations.  An appropriate damages methodology would also require an explanation of how any price movements of the Vale Securities would be apportioned between allegedly corrective information and Vale-specific information unrelated to the alleged fraud.  Yet, Dr. Feinstein's report is silent regarding these considerations.

---

[172]   Corrected Feinstein Report, ¶¶ 294-295.

[173]   Corrected Feinstein Report, ¶ 295.

85.     Specifically, Dr. Feinstein's report does not detail how his methodology would account for the numerous complexities of calculating and assigning damages in this particular case. These complexities include addressing twenty-six alleged misrepresentations that occurred both pre- and post-collapse, multiple alleged corrective disclosures, claims for both the Vale ADRs and the Vale Notes (which may have been affected differently by any of the alleged misrepresentations or corrective disclosures), as well as price movements due to the materialization of a disclosed risk (discussed in greater detail below).  All of these are necessary components that need to be considered in an appropriate damages methodology, yet Dr. Feinstein is silent on the specifics of how he would address any of these issues.

86.     In particular, Plaintiff alleges that various misrepresentations occurred throughout the Proposed Class Period both *before* and *after* the Dam collapse.  Plaintiff also alleges that these purported misrepresentations were corrected in a series of multiple corrective disclosures that occurred over the course of nearly two weeks.  From an economic perspective, an appropriate damages methodology would require a determination of which corrective disclosures address which purported misrepresentation(s).  This exercise is complicated by the fact that Plaintiff alleges on January 28, 2019, after the Dam collapse, a misrepresentation occurred regarding Dam 1's "Safety Factor" and whether it met Brazilian standards.[174]  However, Dr. Feinstein testified in deposition that he could not recall whether Plaintiff alleges that misrepresentations occurred after the Dam collapse.[175]  Under Plaintiff's theory, the misrepresentation that occurred *after* the

---

[174]    *See* Complaint, § V.  *See also In re: Vale S.A. Securities Litigation,* Memorandum & Order [Motion to Dismiss], May 20, 2020, § II.  On January 28, 2019, Plaintiff alleges that Vale filed a Form 6-K with the SEC in which Vale "continued to falsely assert that Dam 1 was certified as stable prior to its collapse."  Complaint, ¶¶ 199-200.

[175]    Feinstein Deposition, March 24, 2021, at 79:16–80:13.

Dam collapse would theoretically introduce additional artificial inflation into the price of the Vale Securities.  As a result, investors who purchased the Vale Securities *prior* to this alleged misrepresentation would not be entitled to economic damages resulting from this misrepresentation because it had not yet occurred when they purchased the Vale Securities.[176]

87.    Thus, to the extent that investors who purchased the Vale Securities *prior* to the Dam collapse are awarded the damages associated with the artificial inflation attributable to the alleged misrepresentation that occurred *after* the Dam collapse (*e.g.*, if the entire artificial inflation that was dissipated on February 4 and February 6 was carried back to the pre-collapse period even though a portion of the dissipation was attributable to the *post*-collapse misstatement), these pre-collapse investors would enjoy an economic windfall.  To appropriately account for this complexity, it is important for the price declines following the subsequent alleged corrective disclosures on February 4 and 6, 2019 to be appropriately apportioned between the pre-collapse and post-collapse alleged misrepresentations.  However, Dr. Feinstein did not articulate how his common damages methodology would account for this necessary apportionment—and in fact he testified that he could not recall whether Plaintiff alleges that misrepresentations occurred after the Dam collapse[177]—rendering inadequate his purported (but unexplained) proposed methodology to calculate damages on a common, class-wide basis.[178]

---

[176]  Dr. Feinstein testified in deposition that "one corrective disclosure could correct a variety of misrepresentations… [so] it's not always necessary to match them up one against the other."  However, in this case, which deals with an alleged misrepresentation that occurred after an alleged corrective disclosure, it is important to match the corrective disclosures with the misrepresentations they allegedly correct to appropriately apportion the artificial inflation that was allegedly dissipated on February 4 and 6, 2019 between pre-collapse and post-collapse misrepresentations.  *See* Feinstein Deposition, March 24, 2021, at 294:9–13.

[177]  Feinstein Deposition, March 24, 2021, at 79:16–80:13.

[178]  Dr. Feinstein states in his report that the "out-of-pocket damage methodology discussed herein can be applied commonly for all Class members."  Corrected Feinstein Report, ¶ 290.  Dr. Feinstein further explains that under his proposed damages methodology, "for each Class member, per security damages would be calculated as the difference between the inflation on the date the security was purchased and the inflation on the date those same

**B.      Dr. Feinstein's Proposed Common Damages Methodology Does Not Articulate How It Would Account for the Materialization of a Disclosed Risk**

88.      As discussed above, I understand from counsel that the Court has found that the change in the price of Vale Securities immediately after the Dam collapse may be due to the materialization of a disclosed risk.[179]  That is, Vale disclosed in its filings with the SEC that safety events could occur, and if those risks materialize, this could have negative economic implications for the Company.[180]  Under this materialization of risk theory, alleged misrepresentations conceal the likelihood of a risk materializing, and the value of a security suffers a decline when that risk materializes.[181]  However, as I discuss below, the decline in the

---

security [*sic*] was subsequently sold, or, if held, at the end of the Class Period."  Corrected Feinstein Report, ¶ 295.

I understand that such an "out-of-pocket" damages methodology assumes all class members would have purchased the Vale Securities absent the alleged fraud at the but-for price (*i.e.*, the actual price less any inflation on the date of purchase).  However, the Proposed Class potentially includes investors with different risk tolerances.  That is, the Proposed Class would include investors, who, if the true level of risk had been disclosed—*i.e.*, but for the alleged misrepresentations—may not have purchased the Vale Securities *at all*, whereas others would have still bought the Vale Securities absent the alleged fraud (albeit at a lower price because, in this hypothetical scenario, investors are aware that there is a higher likelihood that an adverse material event could occur and subsequently affect Vale's future performance).  Dr. Feinstein's "out-of-pocket" damages methodology in effect argues that all investors who had the same purchase and sale dates should be awarded the same amount of damages.  However, his approach is insufficient for calculating damages for any Proposed Class members who assert they would not have purchased any of the Vale Securities at all.  Therefore, to the extent that differences in risk tolerances among the Proposed Class members are to be considered, the "out-of-pocket" damages methodology described by Dr. Feinstein cannot be applied on a class-wide basis because individualized inquiry would be necessary to determine each investor's risk tolerance.

[179]   *In re: Vale S.A. Securities Litigation,* Memorandum & Order [Motion to Dismiss], May 20, 2020, pp. 32-33.

[180]   For example, Vale disclosed in its Form 20-F that its operations could generally be subject to "significant risks and hazards, including fire, explosion, toxic gas leaks, spilling of polluting substances or other hazardous materials, rockfalls, incidents involving dams, failure of other operational structures, as well as activities involving mobile equipment, vehicles or machinery and other potentially fatal incidents and accidents."  It further stated, "Incidents may occur due to deficiencies in identifying and assessing risks or in implementing sound risk management, and once these risks materialize, they could result in significant environmental and social impacts, damage to or destruction of mines or production facilities, personal injury, illness and fatalities, involving employees, contractors or community members near our operations, as well as delays in production, monetary losses and possible legal liability…  Notwithstanding our standards, policies, controls and monitoring procedures, our operations remain subject to incidents or accidents that could adversely impact our business, stakeholders or reputation."  US Securities and Exchange Commission, Form 20-F for Vale S.A., December 31, 2018, p. 31.

[181]   Simply stated, in the absence of an alleged misrepresentation, the market still would have assessed a less than 100 percent probability of a safety incident occurring on any given day.  When a safety incident actually

value of the security following the materialization of the risk is likely greater than the amount of inflation due to the alleged concealment.

89.    The misrepresentations alleged by Plaintiff do not change the "true" likelihood that an adverse event, such as the collapse of Dam 1, could occur.  That is, even if there had been no misrepresentations, a collapse still may have occurred, and this collapse still may have negatively impacted Vale.  Because of this, any methodology used to calculate damages on a common, class-wide basis must apportion the price decline of the Vale Securities when the risk of a safety incident materializes between at least two distinct causes of a price movement:[182]

1)  The materialization of the risk of a safety incident, as represented by the Dam collapse itself on January 25, 2019, which could have occurred regardless of any alleged misrepresentation and is therefore unrelated to the alleged misconduct;

2)  The alleged misrepresentations prior to the Dam collapse, which allegedly caused a difference between the market's assessed probability of a safety incident and the "true" probability of a safety incident.

This means that the stock price decline after the risk materializes would be larger than the amount of the decline that was attributable to the removal of inflation from the stock price, assuming the probability of the risk occurring had been understated.

---

occurred (*i.e.*, the Dam collapse), the difference between the certainty of the event and the market-assessed probability pre-collapse still may cause a decline in the stock price.

[182]  Aside from these two potential causes of price movement following the disclosure of a safety incident, a security's price could move due to other confounding information unrelated to the safety event (including the portion attributable to the alleged fraud), which a damages methodology also would need to disentangle.

90.     To illustrate this point, consider a lottery for a coin toss.  The lottery buyers are told that there are equal odds the coin will land Heads or Tails; Heads wins $100, while Tails receives $0.  In this scenario, the actuarially fair price of a lottery ticket (a hypothetical security) is $50.  If we assume the coin is tossed and comes up Tails (the risk fully materializes), the lottery ticket's price will drop from $50 to $0.

91.     Now suppose the lottery buyers learn that the coin was biased, and the odds of Heads was only 20 percent (the alleged misrepresentation in this hypothetical example).  Knowing these odds, the true actuarially fair price of the lottery ticket would have been $20 (20 percent of $100).  Once the coin landed on Tails, this $20 would have been lost regardless of whether buyers paid the "true" price of $20 or the inflated price of $50.  Only the $30 that buyers overpaid for their ticket represents damages due to the alleged misrepresentations, which is less than the $50 observed loss in value following the coin toss.

92.     From an economic perspective, any appropriate damages analysis must isolate the portion of the price decline attributable to the alleged fraud from the observed price decline following the materialization of the disclosed risk.  Such an apportionment requires an understanding—and quantification—of the "true" *ex-ante* probability that an adverse event, such as the Dam collapse, could occur.  This "true" probability must then be compared to Proposed Class members' perceived probability, due to the alleged concealment, that an adverse event could occur.  The calculation of either probability is not a straight-forward exercise, which is further complicated by the fact that these probabilities may change over time (*e.g.*, the expected and actual risks of a safety event may change as a result of natural causes such as seismic activity or floods).

93.    Dr. Feinstein does not specify any method to distinguish the price movement related to these distinct causes, which would be needed in order to calculate the amount of inflation in the Vale Securities over a Proposed Class Period spanning approximately two and a half years.  In particular, he fails to articulate how he would quantify either the "true" *ex-ante* probability of the event or the market's assessed probability, and how he would then translate those probabilities into changes in the price of the Vale Securities, which he would need to calculate any inflation as part of his out-of-pocket measure of damages.

94.    Further, Dr. Feinstein's testimony suggests he believes that it is not necessary to distinguish between these two different causes of price movement.  He testified that there is no difference between the price movements due to the materialization of a disclosed risk and those due to a corrective disclosure that cures the alleged misrepresentation.  Specifically, Dr. Feinstein testified—incorrectly in my opinion—that the phrase "materialization of the risk" is only a matter of terminology and means that the alleged corrective disclosure was an "event" rather than a "statement." [183]  To the extent that Dr. Feinstein's proposed damages methodology, as explained in his report and deposition testimony, would attribute the *entire* price decline of the Vale Securities on the date of the Dam collapse (January 25, 2019) to the dissipation of alleged artificial inflation, without accounting for the portion of the price decline attributable to the

---

[183]    When asked whether it matters to him for the purposes of applying a common damages methodology whether a plaintiff is adopting a materialization of risk theory of loss causation or a corrective disclosure theory of loss causation, Dr. Feinstein testified that "Well let's be clear.  When we're talking about -- the theories aren't really dramatically different.  In fact, my understanding is that the vocabulary, the terminology calling it a materialization of the risk is sort of a construct of defense counsel, defense attorneys generally.  It's not necessarily embraced by everybody in the legal field.  All it means is that the corrective disclosure was an event, an event that informed the marketplace of the truth rather than a statement informing the market of the truth.  That's really the only difference between the two.  And the same damage model accommodates both." *See* Feinstein Deposition, March 24, 2021, at 311:16–312:8.

59

materialization of a disclosed risk, such an approach would result in a windfall to the Proposed Class members.

## VIII.    MANY PROPOSED CLASS MEMBERS DID NOT INCUR ANY LOSSES AND WOULD NOT BE AWARDED DAMAGES

95.    I understand from counsel that nearly all members of a proposed class must be injured in order for the class to be certified.  As an initial matter, assuming that Plaintiff's allegations are valid, the Proposed Class members who purchased Vale Securities during the Proposed Class Period but sold prior to the first alleged corrective disclosure on January 25, 2019 would not have incurred any losses.  These investors have not suffered any injury because even if they purchased Vale Securities at an allegedly artificially inflated price, they also sold Vale Securities at an allegedly artificially inflated price.  (And the level of artificial inflation present in the Vale Securities cannot change absent any intervening corrective disclosures.)  Such "in-and-out" investors should be excluded from the Proposed Class, as their damages are logically zero.

96.    I further understand that the Private Securities Litigation Reform Act of 1995 (PSLRA) provides for a limitation on damages such that damages shall not exceed the difference between the price a plaintiff purchased the subject security and the average trading price of the security in the 90-day period following the dissemination of corrective information to the market, *i.e.*, the "bounce-back" price.[184]  And if a plaintiff sells the subject security before the end of the 90-day period, that plaintiff's damages shall not exceed the difference between the price the plaintiff paid for the subject security and the average closing price between the last alleged corrective disclosure date and the date the plaintiff sells the security.  For example, if a plaintiff sells the subject security on day 50 of the 90-day "bounce-back" period, then that plaintiff shall be subject

---

[184]    15 U.S.C. § 78u–4(e)(1).

to a "bounce-back" price that equals the average price over the 50 days between the alleged corrective disclosure and the date they sold the security, *i.e.*, a "rolling average" price. For purposes of this calculation, I understand from counsel that for investors who held the subject security through the end of the class period, this "bounce-back" period begins on the last alleged corrective disclosure date; for investors who sold the subject security between the first and last alleged corrective disclosures, I was asked to assume that the "bounce-back" period begins on the last alleged corrective disclosure date prior to their sale. Thus, the discussion below assumes that investors who sold after any of the four corrective disclosures are subject to the "bounce-back" provision under the PSRLA.

97.    Under this "bounce-back" provision, many Proposed Class members whose purchase price is below the "bounce-back" price may not recover damages. That is, under the terms of the PSLRA, because damages are calculated mathematically as the difference between the price at purchase and the "bounce-back" price, if the "bounce-back" price is equal to or higher than the price at purchase, then damages are $0 for that particular class member.

98.    Given that the price of the Vale ADRs gradually increased over the course of the Proposed Class Period such that the price following the alleged corrective disclosures was higher than the price at the start of the Proposed Class Period, I analyze whether there was a portion of the Proposed Class Period during which no purchaser would be eligible to recover damages under the provisions of the PSLRA. To do so, I determine the minimum possible "bounce-back" price following the alleged corrective disclosures; investors who purchased at or below this minimum "bounce-back" price would not be awarded damages under the terms of the PSLRA, regardless of when they purchased the Vale ADRs.

61

99.     My analysis conservatively considers every possible "bounce-back" period an investor could be subject to given the timing of the corrective disclosures and the possible timing of their sale.  I start by calculating the rolling average price for potential "bounce-back" periods beginning after each of the four alleged corrective disclosure dates.  For each alleged corrective disclosure date, these potential "bounce-back" periods begin on the alleged corrective disclosure date and end on each subsequent day until the next alleged corrective disclosure date or the end of the respective 90-day period (whichever is earlier).  (For example, for the alleged corrective disclosure on January 28, 2019, I calculate the rolling average closing price of Vale ADRs for the following periods: from January 28, 2019 to January 28, 2019; from January 28, 2019 to January 29, 2019; from January 28, 2019 to January 30, 2019; and so on up to the period from January 28, 2019 to February 3, 2019—*i.e.*, the day before the next alleged corrective disclosure.)[185]  Calculating the rolling average price across all of these different periods allows me to account for how the "bounce-back" price would vary for investors based on differences in the timing of each investor's sale (*e.g.*, how the bounce-back price would differ for an investor who sold on February 2, 2019 as compared to an investor who sold on April 4, 2019).  I then take the minimum "bounce-back" price across all of the possible "bounce-back" periods following each of the alleged corrective disclosures.

100.     Looking across all of these rolling averages following each alleged corrective disclosure date, as shown in **Exhibit 10A**, the minimum "bounce-back" price is $11.20.  By taking the minimum across all possible rolling periods, this $11.20 represents the most conservative price

---

[185]   Given the number of trading days between each of the alleged corrective disclosures and following the last alleged corrective disclosure, I calculate one rolling average following the first alleged corrective disclosure, five rolling averages following the second alleged corrective disclosure, two rolling averages following the third alleged corrective disclosure, and 62 rolling averages following the last alleged corrective disclosure.

for purposes of this calculation.  That is, the actual "bounce-back" price for individual investors will vary depending on the timing of their purchase and sale, but it will always be equal to or greater than $11.20.  (As an example, **Exhibit 10A** shows that the minimum rolling average price over the 90-day period between February 6, 2019 and May 5, 2019—which encompasses 62 trading days—was $11.27.  For any investor who sold after February 6, 2019 to possibly have a damages claim, their purchase price must be greater than $11.27, not $11.20.)  Thus, to the extent that investors who sold after any of the four alleged corrective disclosures are subject to the "bounce-back" provision under the PSLRA, all investors who purchased the Vale ADRs at or below a price of $11.20 (*i.e.,* the minimum "bounce-back" price across all possible rolling periods following the four corrective dates) would not be awarded damages under the "bounce-back" provision.

101.    Next, I determine the portion of the Proposed Class Period during which no purchaser would be eligible to recover damages (*i.e.,* the number of days when any purchaser would have bought the Vale ADRs at a price at or below the minimum $11.20 "bounce back" price).  To identify the days during the Proposed Class Period when the Vale ADRs traded at or below this minimum average "bounce-back" price, I use the daily "high" prices of the Vale ADRs, which represent the maximum price an investor could have paid for the securities on a given day.  As displayed in **Exhibit 10B**, investors who purchased the Vale ADRs on 268 days during the Proposed Class Period, including, for example, all purchases from October 27, 2016 to February 10, 2017 and from February 24 to August 31, 2017, cannot recover damages under the PSLRA.  These findings indicate that purchasers during more than 46 percent of the Proposed Class Period (calculated as 268 days where the "high" price of the Vale ADRs was equal to or lower than the

"bounce-back" price divided by 572 trading days in the Proposed Class Period) would not be awarded damages under the PSLRA's "bounce-back" provision.

102.    Again, this represents a floor on days with purchasers who would not be able to recover damages; additional purchasers subject to a higher "bounce-back" price based on the timing of their purchases and sales would also not be awarded damages under the PSLRA.  To use the example above, an investor who sold after February 6, 2019 would be subject to a "bounce-back" price of at least $11.27, not $11.20 as I conservatively use for my analysis.

103.    I also find that many investors in the Vale Notes would not be awarded any damages under the PSLRA's "bounce-back" provision.  In **Exhibit 11A**, I conduct for the Vale Notes the same analysis that I conduct for the Vale ADRs in **Exhibits 10A and 10B**.[186]  As shown in **Exhibit 11A**, investors who purchased the TAE3 Note on more than eight percent of days during the Proposed Class Period would not be awarded damages under *any* "bounce-back" price according to the calculation outlined in the PSLRA.  Similarly, investors who purchased the TAH6, TAK9, and EAA3 Notes on more than eleven, thirteen, and twelve percent of days during the Proposed Class Period, respectively, would also not be awarded damages under *any* "bounce-back" price according to the calculation outlined in the PSLRA.[187]  **Exhibits 11B to 11E** are a

---

[186]    Specifically, I use VWAP (after correcting for Dr. Feinstein's TRACE data processing errors described in **Section VI.A**) to calculate the minimum average "bounce-back" price for each of the Vale Notes.  For "high" price, I use the maximum price an investor paid for the respective Vale Note on a given date, calculated using the TRACE data for the Vale Notes.

[187]    This analysis quantifies the number of days during the Proposed Class Period on which all purchasers, regardless of when they sold, would not be awarded damages under any "bounce-back" price.  This analysis does not capture, however, (i) investors who may have purchased below the minimum average "bounce-back" price, but on a day where the "high" price of the respective security was greater than the minimum average "bounce-back" price, or (ii) investors who are subject to a higher "bounce-back" price based on the timing of their sale but who still purchased at a price below their respective "bounce-back" price.  Therefore, there are likely many more purchasers of the TAP8 Note, as well as purchasers of the TAN3 and TAM5 Notes, who fall

64

graphical representation of the analysis in **Exhibit 11A** for the TAE3, TAH6, TAK9, and EAA3 Notes.[188]

## IX.   FROM AN ECONOMIC PERSPECTIVE, LEAD PLAINTIFF IS NOT REPRESENTATIVE OF THE PROPOSED CLASS

104.    Lead Plaintiff brought this action on behalf of all other persons or entities who purchased "any of the following publicly-traded Vale securities: (1) Vale ADSs, (2) 5.875% Guaranteed Notes due 2021, (3) 4.375% Guaranteed Notes due 2022, (4) 6.250% Guaranteed Notes due 2026, (5) 8.250% Guaranteed Notes due 2034, (6) 6.875% Guaranteed Notes due 2036, (7) 6.875% Guaranteed Notes due 2039, or (8) 5.625% Notes due 2042…."[189]   However, I find that the claims of the Lead Plaintiff are not representative of the economic claims of all of the Proposed Class members it seeks to represent.

105.    Specifically, as of the corrective disclosure dates, CAAT held only the Vale ADRs.[190] But the Vale noteholders, as owners of senior unsecured debt, have a higher payment priority in the Company's capital structure than the ADR shareholders, and thus have assumed less risk than the ADR shareholders.  In general, bond investors are more risk averse than equity investors.[191]   As Dr. Feinstein explains in his report:

> In the case of a Company liquidation, secured debt would receive payment first from the sale of the corporate assets securing that debt, similar to a mortgage foreclosure.  The senior unsecured debt follows the secured debt holders in the queue to receive payment from corporate assets.  The senior unsecured debt

---

into one of these two groups and thus would not be awarded damages under the calculation outlined under the PSLRA.

[188]   **Appendix D** presents the daily "high" prices of the Vale ADRs and the TAE3, TAH6, TAK9, and EAA3 Notes during the Proposed Class Period.

[189]   Complaint, ¶ 2.

[190]   *See* CAAT Pension Plan's Transaction in Vale Securities, CAAT_00000001 to CAAT_00000003, at 003.

[191]   *See*, *e.g.*, Berk and DeMarzo, *Corporate Finance,* 2nd Edition, 2011, pp. 77-82, 293-294, 301-303.

65

receives liquidation proceeds before, in order of seniority, subordinated debt holders, preferred shareholders, and common stock and ADR shareholders. Similarly, interest on senior unsecured debt must be paid before common and preferred stock dividends are distributed.[192]

106.    Due to their relative positions in the Company's waterfall, investors in Vale ADRs would be affected differently by any representations or disclosures regarding the earning prospects of the company than investors in the Vale Notes. As such, because Lead Plaintiff only held the Vale ADRs at the time of the alleged corrective disclosures, it is not representative, from an economic perspective, of the Proposed Class members who were Vale noteholders.

107.    Furthermore, Lead Plaintiff did not trade in the period after the Dam collapsed. CAAT retained all of the Vale ADRs that it held prior to the Dam collapse throughout the remainder of the Proposed Class Period (*see* **Exhibit 12**). Because Lead Plaintiff did not buy or sell the Vale ADRs after the Dam collapse, it may have distinct economic claims from those persons or entities who purchased the Vale ADRs after the Dam collapsed. In particular, Plaintiff alleges that a misrepresentation occurred on January 28, 2019, the trading date following the Dam collapse (and first alleged corrective disclosure) on January 25, 2019.[193] Distinct economic claims may create the potential for economic conflict between the Lead Plaintiff and the members of the Proposed Class who purchased after the Dam collapse. That is, Lead Plaintiff and post-collapse investors may be conflicted with respect to the apportionment of any allegation-specific excess return on the alleged corrective disclosure dates after the Dam collapse

---

[192]    Corrected Feinstein Report, ¶ 34. Dr. Feinstein also explained, "In the case of a cash crunch, note investors get their coupons before equity investors would get any dividends." Feinstein Deposition, March 24, 2021, at 94:8–11.

[193]    Complaint, ¶¶ 27, 199-200.

(*e.g.*, February 4 and 6, 2019) between the alleged misrepresentations made prior to the Dam collapse relative to the alleged misrepresentation made on January 28, 2019.[194]

108. For these reasons, from an economic perspective, I do not consider the Lead Plaintiff to be representative of the entire Proposed Class.

***

Executed on April 9, 2021.


_____

Walter N. Torous, Ph.D.

---

[194] Furthermore, Lead Plaintiff's trading behavior is informative of its risk tolerance, which may distinguish it from other members of the Proposed Class. Lead Plaintiff did not sell any of its Vale ADRs following the Dam collapse and continued to hold its shares through the end of the Proposed Class Period (*see* **Exhibit 12**). This suggests that Lead Plaintiff may have a higher risk tolerance than those ADR shareholders, for example, who sold their shares immediately after the Dam collapse. Lead Plaintiff is not representative of such investors who exhibit a lower risk tolerance.

Moreover, documentary evidence suggests that CAAT was willing to assume the risk of an investment in the Vale ADRs even if it knew the "true" likelihood of a safety incident. For example, Fisher Investments, CAAT's investment manager, maintained after the Dam collapse that "Vale remains well positioned to benefit from better than appreciated Chinese stimulus and robust global commodity demand, in our view." CAAT Pension Plan, "Responsible Investing Policy," CAAT00000605 to CAAT00000612, at 610. Considering this statement—coupled with the fact that CAAT maintained its position in the Vale ADRs after the Dam collapse— CAAT may have purchased the Vale ADRs even if the "true" likelihood of a safety incident was known. This would distinguish Lead Plaintiff from other Proposed Class members who would not have purchased the Vale ADRs but for the alleged misrepresentation of the probability that a safety event would occur (see discussion in **Section VII.A** above).

Exhibit 1

## Price of the Vale ADRs

*Proposed Class Period: October 27, 2016 to February 6, 2019*



**Note:**

[1] Vale ADR price adjusted for stock splits and dividends as reported by Bloomberg.

**Sources:**

Complaint; Bloomberg.

Exhibit 2

## Summary of the At-Issue Vale Notes

| Vale Note | CUSIP | Coupon | Issue Date | Maturity Date | Term | Rank | Note Rating at Issuance[1] | Years to Maturity as of Feb. 6, 2019 | Amount Issued |
|---|---|---|---|---|---|---|---|---|---|
| TAN3 Note | 91911TAN3 | 5.875% | 6/7/2016 | 6/10/2021 | 5 Years | Senior Unsecured | Ba3 | 2.3 | $1,250,000,000 |
| TAM5 Note | 91911TAM5 | 4.375% | 1/4/2012 | 1/11/2022 | 10 Years | Senior Unsecured | Baa2 | 2.9 | $2,250,000,000 |
| TAP8 Note | 91911TAP8 | 6.250% | 8/3/2016 | 8/10/2026 | 10 Years | Senior Unsecured | Ba3 | 7.5 | $2,000,000,000 |
| TAE3 Note | 91911TAE3 | 8.250% | 1/6/2004 | 1/17/2034 | 30 Years | Senior Unsecured | Ba2 | 14.9 | $800,000,000 |
| TAH6 Note | 91911TAH6 | 6.875% | 11/16/2006 | 11/21/2036 | 30 Years | Senior Unsecured | Baa3 | 17.8 | $2,500,000,000 |
| TAK9 Note | 91911TAK9 | 6.875% | 11/3/2009 | 11/10/2039 | 30 Years | Senior Unsecured | Baa2 | 20.8 | $1,750,000,000 |
| EAA3 Note | 91912EAA3 | 5.625% | 9/4/2012 | 9/11/2042[2] | 30 Years | Senior Unsecured | Baa2 | 23.6 | $1,500,000,000 |
| | | | | | | | | **Total** | **$12,050,000,000** |

**Notes:**

[1] Ratings displayed are Moody's ratings.

[2] Note EAA3 matures on September 11, 2042. In Appendix-1.G to his corrected report, Dr. Feinstein incorrectly presents this note's maturity as September 2024.

**Sources:**

Complaint; S&P Capital IQ; CAAT_Feinstein_00000636-642.

Exhibit 3

## Price of the At-Issue Vale Notes

*Proposed Class Period: October 27, 2016 to February 6, 2019*



**Note:**

[1] This analysis displays the volume-weighted average prices (VWAP) of the Vale Notes.  VWAP is calculated using the TRACE data for the Vale Notes.  I describe how I correct Dr. Feinstein's TRACE data processing in **Section VI.A** of my report.  Consistent with Dr. Feinstein, VWAP is computed using trades that occurred during market hours (9:30 a.m. to 4:00 p.m.).  *See* Corrected Feinstein Report, Appendix-4, ¶ 336.

**Sources:**

Complaint; TRACE Data for the Vale Notes.

**Exhibit 4**

**Summary of Alleged Corrective Disclosure Dates per Complaint**

| Date Alleged in Amended Complaint | Time (EST) per Complaint | Effective Trading Date | Event per Complaint | Adjusted Closing Share Price of the Vale ADRs[1] | Price Change from Prior Trading Day | Vale ADR Return |
|---|---|---|---|---|---|---|
| 1/25/19 | 10:28 AM | 1/25/19 | Vale's Córrego do Feijão iron ore mine ("Dam 1") collapses. News of the event quickly spread via numerous media outlets. | $13.66 | -$1.20 | -8.08% |
| 1/28/19 | N/A | 1/28/19 | Significant news concerning the Dam 1 breach continued to emerge over the weekend of January 26-27, 2019, and on Monday January 28, 2019. | $11.20 | -$2.46 | -18.01% |
| 2/4/2019[2] | 1:11 PM | 2/4/19 | Bloomberg reports temporary halting of Brucutu mine in response to Brazilian court order issued to help improve safety after the Dam 1 collapse. | $12.15 | $0.95 | 8.48% |
| 2/6/2019[3],[4] | 12:30 AM | 2/6/19 | *The Guardian* and *The Wall Street Journal* report that Vale had been forewarned about the likely rupture of Dam 1. | $11.36 | -$0.75 | -6.19% |

**Notes:**

[1] Closing price is adjusted for splits and dividends as reported by Bloomberg.

[2] Dr. Feinstein references a different *Bloomberg* article published at 9:31 AM on February 4, 2019 which reported that "a Brazilian court issued an injunction ordering Vale to halt a mine that produces 30 million tons of ore per year after a request from public prosecutors." The article also noted that the dam for the Brucutu mine was not built using the same upstream method as Dam 1. *See* Corrected Feinstein Report, February 18, 2021, ¶ 46.

[3] *The Guardian* report was released at 12:30 AM EST on February 6, 2019, while the *Wall Street Journal* report was released at 3:37 PM EST the same day.

[4] After the close of trading on February 5, 2019, Vale released a statement explaining that, "as a result of the temporary suspension of the Brucutu mine production, [the company would declare] force majeure on a number of related iron ore and pellets sales contracts."

**Sources:**

Complaint, ¶¶ 3, 25, 26, 28, 29, 204-205, 206-209, 210, 211-213; Corrected Feinstein Report, February 18, 2021, ¶ 46; Watson, R.T., "Vale Iron-Ore Mine Halt Risks 'Incremental Supply Shock,'" *Bloomberg,* February 4, 2019; Phillips, Dom, "'That's going to burst': Brazilian dam workers say they warned of disaster," *The Guardian,* February 6, 2019; Kowsmann, Patricia and Scott Patterson, "Inspectors of Vale Dam in Brazil Issued Warning Before Collapse," *The Wall Street Journal,* February 6, 2019; SEC Edgar; Vale S.A. Form 6-K, February 5, 2019; Bloomberg.

Exhibit 5



**Timeline of Publication of Analyst Reports Covering Vale Identified by Dr. Feinstein and Vale's Earnings Releases[1],[2]**

*October 27, 2016 to December 31, 2017*

**Notes:**
[1] "Earnings Dates" represent the effective trading dates of Vale's earnings announcements.
[2] Each bar in the timeline represents the number of analyst reports identified by Dr. Feinstein that was published on each day.
[3] The timeline does not include the 12 analyst reports for which Dr. Feinstein does not provide a full date in Exhibit-1 of his report.

**Source:** Corrected Feinstein Report, February 18, 2021, Table-1 and Exhibit-1.

Page 1 of 2

Exhibit 5



**Timeline of Publication of Analyst Reports Covering Vale Identified by Dr. Feinstein and Vale's Earnings Releases[1],[2]**

*January 1, 2018 to February 6, 2019*

**Notes:**

[1] "Earnings Dates" represent the effective trading dates of Vale's earnings announcements.

[2] Each bar in the timeline represents the number of analyst reports identified by Dr. Feinstein that was published on each day.

[3] The timeline does not include the 12 analyst reports for which Dr. Feinstein does not provide a full date in Exhibit-1 of his report.

**Source:** Corrected Feinstein Report, February 18, 2021, Table-1 and Exhibit-1.

**Exhibit 6**
A. 3026

**Percentage of Days with Statistically Significant Returns on News Days as Compared to Non-News Days for the Vale ADRs**
**Based on Dr. Feinstein's Event Study Model**
*Proposed Class Period: October 27, 2016 to February 6, 2019* [1],[2]

| Definition of "News Days" | News Days | | | Non-News Days | | | Difference in Percentages | z-Statistic[4] | Is the Difference in Percentages Between News News and Non-News Days Statistically Significant? |
|---|---|---|---|---|---|---|---|---|---|
| | Total Number | Number with Significant Excess Returns Based on Daily Returns in Dr. Feinstein's Model[3] | Percentage of Days with Significant Excess Returns | Total Number | Number with Significant Excess Returns Based on Daily Returns in Dr. Feinstein's Model[3] | Percentage of Days with Significant Excess Returns | | | |
| **Earnings and Production Dates per Feinstein Table-1** | 17 | 0 | 0.0% | 551 | 24 | 4.4% | -4.4% | -0.879 | No |
| **All other 6-K Report Days** | 163 | 7 | 4.3% | 405 | 17 | 4.2% | 0.1% | 0.052 | No |
| **All other 6-K Report Days - Removing duplicative and/or administrative reports[5]** | 122 | 4 | 3.3% | 446 | 20 | 4.5% | -1.2% | -0.587 | No |
| *Earnings, Production Dates, and all other 6-K Report Days* | 180 | 7 | 3.9% | 388 | 17 | 4.4% | -0.5% | -0.272 | No |
| *Earnings, Production Dates, and all other 6-K Report Days - Removing duplicative and/or administrative reports* | 139 | 4 | 2.9% | 429 | 20 | 4.7% | -1.8% | -0.909 | No |

**Notes:**

[1] The dates of the four alleged corrective disclosures are excluded from this analysis.

[2] The effective trading dates of all earnings releases, production announcements, and 6-K filings are based on the date and time the filing "was accepted" as reported by the SEC.

[3] Statistical significance is measured at the 95 percent confidence level.

[4] A z-statistic (also known as a z-score) represents the number of standard deviations that a specific value is from the population mean. The z-statistics measure the probability that this calculated difference, assuming the price movements on News and Non-News Days were indistinguishable, could have occurred by chance. An absolute value of a z-statistic of 1.96 or higher would indicate statistical significance with at least 95 percent confidence and thereby would suggest that the Vale ADRs experienced statistically different price movements on News Days when compared to Non-News days.

[5] Forms 6-K containing duplicative and/or administrative news are excluded from this analysis based on the following criteria: 1) containing previously released financial or marketing information, 2) summaries of earnings calls and board meetings that occurred previously, and 3) scheduling announcements for shareholder events and other procedural and administrative documents.

**Sources:**

Corrected Feinstein Report, February 18, 2021, § IX, Table-1, and Exhibit-8; CAAT_Feinstein_00000477.XLSX; SEC Edgar; SEC Forms 6-K Filed by Vale S.A. between October 27, 2016 and February 6, 2019.

Exhibit 7

## Average Weekly Turnover of the Vale Notes
## Dr. Feinstein's Corrected Report vs. Corrected TRACE Data[1]
*Proposed Class Period: October 27, 2016 to February 6, 2019*

| Vale Note | Face Value | Feinstein Table-2 Average Weekly Turnover[2],[3] | Corrected TRACE Data Average Weekly Turnover[2],[3] | Dr. Feinstein's Volume Overstatement |
|---|---|---|---|---|
| TAN3 Note | $1,250,000,000 | 2.32% | 1.80% | 28.92% |
| TAM5 Note | $2,250,000,000 | 2.06% | 1.67% | 23.71% |
| TAP8 Note | $2,000,000,000 | 6.31% | 4.92% | 28.33% |
| TAE3 Note | $800,000,000 | 1.28% | 1.20% | 6.73% |
| TAH6 Note | $2,500,000,000 | 2.91% | 2.22% | 31.34% |
| TAK9 Note | $1,750,000,000 | 2.66% | 2.15% | 23.74% |
| EAA3 Note | $1,500,000,000 | 2.49% | 2.04% | 22.08% |

**Notes:**

[1] I describe how I correct Dr. Feinstein's TRACE data processing in **Section VI.A** of my report.

[2] Average daily trading volume is equal to the sum of the face value traded during the Proposed Class Period, divided by the number of days in the Class Period, and then divided by the size of the outstanding issue. Average Weekly Turnover is equal to average daily trading volume multiplied by five.

[3] There are 602 bond trading dates in the Proposed Class Period (*see, e.g.,* CAAT_Feinstein_00000657).

**Sources:**

Corrected Feinstein Report, Table-2, Table-5, Appendix-4; TRACE Data for the Vale Notes.

**Exhibit 8**

## Summary of Dr. Feinstein's Event Study Results for the Vale Notes
*February 4, 2019 and February 6, 2019*

| Note | Maturity | Issue Amount | Coupon | February 4, 2019 | | | February 6, 2019 | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | Return (%) | Excess Return (%) | t-statistic[1] | Return (%) | Excess Return (%) | t-statistic[1] |
| TAN3 | Jun-2021 | $1,250,000,000 | 5.88% | 0.03% | 0.02% | 0.07 | 0.04% | 0.02% | 0.06 |
| TAM5 | Jan-2022 | $2,250,000,000 | 4.38% | -0.26% | -0.26% | -0.90 | -0.61% | -0.55% | **-1.86*** |
| TAP8 | Aug-2026 | $2,000,000,000 | 6.25% | -0.74% | -0.75% | **-2.13**** | -1.40% | -1.33% | **-3.78***** |
| TAE3 | Jan-2034 | $800,000,000 | 8.25% | -1.13% | -1.20% | **-1.73*** | -0.27% | -0.23% | -0.33 |
| TAH6 | Nov-2036 | $2,500,000,000 | 6.88% | -0.78% | -0.85% | **-1.67*** | -1.21% | -1.33% | **-2.62***** |
| TAK9 | Nov-2039 | $1,750,000,000 | 6.88% | -0.30% | -0.34% | -0.63 | -0.74% | -0.78% | -1.46 |
| EAA3 | Sep-2042[2] | $1,500,000,000 | 5.63% | -0.85% | -0.91% | -1.33 | -1.41% | -1.40% | **-2.04**** |
| **Number of Notes with Statistically Significant Excess Returns at the 95% Confidence Level** | | | | | | 1 | | | 3 |

**Notes:**

[1] *, **, *** indicate statistical significance at the 90 percent, 95 percent, and 99 percent confidence levels, respectively.

[2] Note EAA3 matures on September 11, 2042. In Appendix-1.G for EAA3, Dr. Feinstein incorrectly presents the maturity as September 2024.

**Sources:**

Corrected Feinstein Report, February 18, 2021, Appendix-1 and Exhibit-12; CAAT_Feinstein_00000636-642.

**Exhibit 9**

### Dr. Feinstein's Regression Results for the Vale Notes on Dates Near Ratings Actions by Moody's

| Date | Event[1] | TAN3 Return[2] | TAN3 t-statistic[3] | TAM5 Return[2] | TAM5 t-statistic[3] | TAP8 Return[2] | TAP8 t-statistic[3] | TAE3 Return[2] | TAE3 t-statistic[3] |
|---|---|---|---|---|---|---|---|---|---|
| 11/4/2016 | Rating Affirmation | 0.00% | 0.176 | -0.63% | **-1.806*** | -0.04% | 0.099 | 0.94% | **1.713*** |
| 11/7/2016 | -- | 0.69% | 0.325 | 0.64% | -0.525 | 0.80% | -0.681 | 0.21% | -1.482 |
| 11/8/2016 | -- | -0.09% | -0.323 | -0.11% | -0.389 | 0.22% | 0.469 | -0.25% | -0.244 |
| 3/20/2017 | Upgrade | -0.03% | 0.012 | 0.13% | 0.479 | -0.27% | -0.758 | -1.11% | -1.528 |
| 3/21/2017 | -- | 0.23% | 1.044 | 0.23% | 1.433 | 0.59% | **2.598*** | 1.55% | **2.536** |
| 3/22/2017 | -- | -0.03% | 0.432 | -0.26% | -0.048 | -0.52% | -0.646 | -0.50% | -0.134 |
| 9/5/2017 | Upgrade | -- | -- | -- | -- | -- | -- | -- | -- |
| 9/6/2017 | -- | 0.39% | 0.881 | -0.07% | -0.702 | 0.26% | 0.195 | 0.00% | -0.367 |
| 9/7/2017 | -- | -0.11% | -0.440 | 0.07% | 0.019 | -0.22% | -0.922 | 0.41% | 0.427 |
| 4/10/2018 | Rating Affirmation | -- | -- | -0.03% | -0.405 | 0.06% | -0.499 | -0.58% | -1.037 |
| 4/11/2018 | -- | -- | -- | -0.10% | -0.885 | 0.23% | 0.060 | 1.15% | 1.303 |
| 4/12/2018 | -- | -- | -- | -0.07% | -0.101 | 0.15% | 0.579 | -0.23% | -0.413 |
| 7/23/2018 | Upgrade | -0.02% | 0.077 | -0.18% | -0.257 | -0.07% | 0.137 | -- | -- |
| 7/24/2018 | -- | -- | -- | 0.30% | 0.416 | 0.20% | -0.285 | -- | -- |
| 7/25/2018 | -- | -- | -- | 0.04% | -0.386 | 0.12% | -0.404 | -0.12% | -0.508 |

Page 1 of 2

**Exhibit 9**

### Dr. Feinstein's Regression Results for the Vale Notes on Dates Near Ratings Actions by Moody's

| Date | Event[1] | TAH6 Return[2] | TAH6 t-statistic[3] | TAK9 Return[2] | TAK9 t-statistic[3] | EAA3 Return[2] | EAA3 t-statistic[3] |
|---|---|---|---|---|---|---|---|
| 11/4/2016 | Rating Affirmation | 0.02% | 0.309 | 0.50% | 1.219 | 0.79% | 1.320 |
| 11/7/2016 | -- | 1.56% | 0.314 | 0.44% | **-2.032**** | 1.66% | 0.153 |
| 11/8/2016 | -- | -0.21% | -0.589 | -0.10% | -0.318 | -0.07% | -0.224 |
| 3/20/2017 | Upgrade | -0.31% | -0.510 | -0.08% | -0.089 | 0.25% | 0.330 |
| 3/21/2017 | -- | 0.88% | **2.478**** | 0.76% | **2.093**** | 0.63% | 1.456 |
| 3/22/2017 | -- | -0.41% | -0.026 | -0.19% | 0.562 | -0.59% | -0.202 |
| 9/5/2017 | Upgrade | -- | -- | -- | -- | -- | -- |
| 9/6/2017 | -- | 0.35% | 0.209 | 0.48% | 0.367 | 0.32% | -0.018 |
| 9/7/2017 | -- | -0.23% | -0.753 | 0.34% | 0.311 | -0.18% | -0.558 |
| 4/10/2018 | Rating Affirmation | 0.10% | -0.547 | 0.37% | 0.075 | 0.11% | -0.343 |
| 4/11/2018 | -- | -0.22% | -0.907 | 0.16% | -0.302 | 0.23% | -0.210 |
| 4/12/2018 | -- | 0.52% | 0.966 | 0.22% | 0.467 | 0.35% | 0.547 |
| 7/23/2018 | Upgrade | -0.36% | -0.444 | -0.48% | -0.553 | 1.51% | **2.448**** |
| 7/24/2018 | -- | 0.49% | 0.245 | 0.36% | -0.115 | -0.79% | **-1.846*** |
| 7/25/2018 | -- | 0.26% | -0.206 | 0.17% | -0.414 | 0.80% | 0.559 |

**Notes:**

[1] All Vale Notes shared the same credit rating actions by Moody's during the Proposed Class Period.

[2] Dr. Feinstein only includes dates with a one-day return available in his event study for the Vale Notes. "--" as shown here denotes that a one-day return for the respective note was unavailable and thus not analyzed by Dr. Feinstein.

[3] *, **, *** indicate statistical significance at the 90 percent, 95 percent, and 99 percent confidence levels, respectively.

[4] On January 29, 2019, Moody's placed the Baa3 rating of the Vale Notes under review.

[5] S&P did not have any ratings changes or other actions for Vale or the Vale Notes during the Proposed Class Period.

**Sources:** S&P Capital IQ; Factiva; Corrected Feinstein Report, February 18, 2021, ¶ 263–272, Exhibit-11, Exhibit-12; CAAT_Feinstein_00000477.xlsx.

Exhibit 30A

## Minimum Average Closing Price of the Vale ADRs in the "Bounce-Back" Period[1]

*Proposed Class Period: October 27, 2016 to February 6, 2019*

| Alleged Corrective Disclosure Date | "Bounce-Back" Period Start Date | "Bounce-Back" Period End Date | Number of Trading Days in "Bounce-Back" Period | Minimum Average Closing Price of the Vale ADRs in the "Bounce-Back" Period[1] |
|---|---|---|---|---|
| 1/25/2019 | 1/25/2019 | 1/25/2019 | 1 | $13.66 |
| 1/28/2019 | 1/28/2019 | 2/3/2019 | 5 | $11.20 |
| 2/4/2019 | 2/4/2019 | 2/5/2019 | 2 | $12.13 |
| 2/6/2019 | 2/6/2019 | 5/6/2019 | 62 | $11.27 |
| **Minimum Across All Periods** | | | | **$11.20** |

**Note:**

[1] I understand that the PSLRA provides for a limitation on damages such that damages shall not exceed the difference between the price a plaintiff purchased the subject security and the average trading price of the security in the 90-day period following the dissemination of corrective information to the market. I further understand that if a plaintiff sells the at-issue security before the end of such 90-day period, that plaintiff's damages shall not exceed the difference between the price plaintiff paid for the subject security and the average closing price between the last alleged corrective disclosure date and the date plaintiff sells the security. In this analysis, I calculate the rolling average of the Vale ADRs' closing price in the 90-day periods beginning after each alleged corrective disclosure date. The average PSLRA "bounce-back" price presented above is the minimum of those rolling averages. All investors who purchased the Vale ADRs at or below this minimum average price, regardless of when they purchased or sold the Vale ADRs, cannot recover damages under the PSLRA.

**Sources:**
Complaint; Bloomberg.

**Exhibit 10B**



### Trading Days on which the High Price of the Vale ADRs was At or Below the Minimum Average PSLRA "Bounce-Back" Price[1]

*October 27, 2016 to May 6, 2019*

**Note:**

[1] Vale ADR Price is the "high" price of NYSE VALE (the maximum price an investor could have paid for the securities on a given day), as reported by Bloomberg.

**Sources:**

Complaint; Bloomberg; Exhibit 10A.

**Exhibit 11A**

## Number of Trading Days on which the "High" Price of the At-Issue Vale Notes was At or Below the Minimum Average PSLRA "Bounce-Back" Price[1],[2],[3]

*Proposed Class Period: October 27, 2016 to February 6, 2019*

| Vale Note | Minimum Average PSLRA "Bounce-Back" Price[2],[3] | Number of Days in Proposed Class Period with "High" Price At or Below the Minimum Average PSLRA "Bounce-Back" Price[1],[2],[3] | Percentage of Days in Proposed Class Period with "High" Price At or Below the Minimum Average PSLRA "Bounce-Back" Price[1],[2],[3] | Number of Days in the Proposed Class Period on which the Vale Note Did Not Trade |
|---|---|---|---|---|
| TAN3 Note | $101.90 | 0 | 0.00% | 101 |
| TAM5 Note | $97.99 | 1 | 0.17% | 23 |
| TAP8 Note | $103.13 | 0 | 0.00% | 33 |
| TAE3 Note | $115.44 | 53 | 8.80% | 52 |
| TAH6 Note | $106.36 | 71 | 11.79% | 30 |
| TAK9 Note | $106.42 | 84 | 13.95% | 46 |
| EAA3 Note | $94.76 | 73 | 12.13% | 52 |

**Notes:**

[1] "High" price of the Vale Notes represents the maximum price an investor paid for the respective Vale Note on a given day, calculated using the TRACE data for the Vale Notes.

[2] In this analysis, I calculate the minimum average PSLRA "bounce-back" price using the volume-weighted average prices (VWAP) of the Vale Notes. VWAP is calculated using the TRACE Data for the Vale Notes. I describe how I correct Dr. Feinstein's TRACE data processing in **Section VI.A** of my report. Consistent with Dr. Feinstein, VWAP is computed using trades that occurred during market hours (9:30 a.m. to 4:00 p.m.). *See* Corrected Feinstein Report, Appendix-4, ¶ 336.

[3] I understand that the PSLRA provides for a limitation on damages such that damages shall not exceed the difference between the price a plaintiff purchased the subject security and the average trading price of the security in the 90-day period following the dissemination of corrective information to the market. I further understand that if a plaintiff sells the at-issue security before the end of such 90-day period, that plaintiff's damages shall not exceed the difference between the price plaintiff paid for the subject security and the average closing price between the last alleged corrective disclosure date and the date plaintiff sells the security. In this analysis, I calculate the rolling average of the Vale Notes' VWAP in the 90-day periods beginning after each alleged corrective disclosure date. The average PSLRA "bounce-back" price presented above is the minimum of those rolling averages. All investors who purchased the Vale Notes at or below this minimum average price, regardless of when they purchased or sold the Vale Notes, cannot recover damages under the PSLRA.

**Sources:**

Complaint; TRACE Data for the Vale Notes; CAAT_Feinstein_00000657.

**Exhibit 11B**

### Trading Days on which the High Price of TAE3 Note was At or Below the Minimum Average PSLRA "Bounce-Back" Price[1],[2]

*October 27, 2016 to May 6, 2019*



**Notes:**

[1] "High" price of the Vale Notes represents the maximum price an investor paid for the respective Vale Note on a given day, calculated using the TRACE data for the Vale Notes.

[2] In this analysis, I calculate the minimum average PSLRA "bounce-back" price using the volume-weighted average prices (VWAP) of the Vale Notes. VWAP is calculated using the TRACE Data for the Vale Notes. I describe how I correct Dr. Feinstein's TRACE data processing in **Section VI.A** of my report. Consistent with Dr. Feinstein, VWAP is computed using trades that occurred during market hours (9:30 a.m. to 4:00 p.m.). *See* Corrected Feinstein Report, Appendix-4, ¶ 336.

**Sources:**

Complaint; TRACE Data for the Vale Notes; CAAT_Feinstein_00000657; Exhibit 11A.

**Exhibit 11C**

**Trading Days on which the High Price of TAH6 Note was At or Below the
Minimum Average PSLRA "Bounce-Back" Price[1],[2]**

*October 27, 2016 to May 6, 2019*



**Notes:**

[1] "High" price of the Vale Notes represents the maximum price an investor paid for the respective Vale Note on a given day, calculated using the TRACE data for the Vale Notes.

[2] In this analysis, I calculate the minimum average PSLRA "bounce-back" price using the volume-weighted average prices (VWAP) of the Vale Notes. VWAP is calculated using the TRACE Data for the Vale Notes. I describe how I correct Dr. Feinstein's TRACE data processing in **Section VI.A** of my report. Consistent with Dr. Feinstein, VWAP is computed using trades that occurred during market hours (9:30 a.m. to 4:00 p.m.). *See* Corrected Feinstein Report, Appendix-4, ¶ 336.

**Sources:**

Complaint; TRACE Data for the Vale Notes; CAAT_Feinstein_00000657; Exhibit 11A.

**Exhibit 11D**

## Trading Days on which the High Price of TAK9 Note was At or Below the Minimum Average PSLRA "Bounce-Back" Price[1],[2]

*October 27, 2016 to May 6, 2019*



**Notes:**

[1] "High" price of the Vale Notes represents the maximum price an investor paid for the respective Vale Note on a given day, calculated using the TRACE data for the Vale Notes.

[2] In this analysis, I calculate the minimum average PSLRA "bounce-back" price using the volume-weighted average prices (VWAP) of the Vale Notes. VWAP is calculated using the TRACE Data for the Vale Notes. I describe how I correct Dr. Feinstein's TRACE data processing in **Section VI.A** of my report. Consistent with Dr. Feinstein, VWAP is computed using trades that occurred during market hours (9:30 a.m. to 4:00 p.m.). *See* Corrected Feinstein Report, Appendix-4, ¶ 336.

**Sources:**

Complaint; TRACE Data for the Vale Notes; CAAT_Feinstein_00000657; Exhibit 11A.

**Exhibit 11E**

### Trading Days on which the High Price of EAA3 Note was At or Below the Minimum Average PSLRA "Bounce-Back" Price[1],[2]

*October 27, 2016 to May 6, 2019*



**Notes:**

[1] "High" price of the Vale Notes represents the maximum price an investor paid for the respective Vale Note on a given day, calculated using the TRACE data for the Vale Notes.

[2] In this analysis, I calculate the minimum average PSLRA "bounce-back" price using the volume-weighted average prices (VWAP) of the Vale Notes. VWAP is calculated using the TRACE Data for the Vale Notes. I describe how I correct Dr. Feinstein's TRACE data processing in **Section VI.A** of my report. Consistent with Dr. Feinstein, VWAP is computed using trades that occurred during market hours (9:30 a.m. to 4:00 p.m.). *See* Corrected Feinstein Report, Appendix-4, ¶ 336.

**Sources:**

Complaint; TRACE Data for the Vale Notes; CAAT_Feinstein_00000657; Exhibit 11A.

Exhibit 12



**CAAT's Cumulative Holdings of the Vale ADRs**

*Proposed Class Period: October 27, 2016 to February 6, 2019*

**Note:**
[1] CAAT did not trade any of the Vale Notes during the Proposed Class Period.

**Sources:**
CAAT Pension Plan's Transactions in Vale Securities (Schedule A to Exhibit A), CAAT_00000001-3 at CAAT_00000003; Bloomberg.

Appendix A

# Curriculum Vitae

## WALTER N. TOROUS

Massachusetts Institute of Technology

**Office Address:**

Massachusetts Institute of Technology
Building 9-332
77 Massachusetts Avenue
Cambridge, MA, 02139
Telephone:    (Office)        (617) 324-7027

E-Mail        wtorous@mit.edu

**Home Address**

75 Cambridge Parkway, Unit E801
Cambridge, MA, 02142
Telephone:    (310) 873-8325

**Academic Degrees**

B. Math.     University of Waterloo, Statistics and Economics, 1976
Ph. D.       University of Pennsylvania, Economics, 1981
             Dissertation Title "Differential Taxation and the Equilibrium Structure of Interest Rates"
             Supervisor: Robert J. Shiller
             Awarded William Polk Carey Prize for Best Doctoral Dissertation

**Academic Appointments**

1980-81      Graduate School of Business Administration, University of Michigan, Lecturer

1981-85      Graduate School of Business Administration, University of Michigan, Assistant Professor

1986-87      Graduate School of Management, University of California, Los Angeles, Visiting
             Assistant Professor

1987-90      Graduate School of Management, University of California,
             Los Angeles, Assistant Professor

1990-95      John E. Anderson Graduate School of Management, University of California, Los
             Angeles, Associate Professor

A-1

**Appendix A**

| | |
|---|---|
| 1995-97 | London Business School, Corporation of London Professor of Finance |
| 1995-2006 | John E. Anderson Graduate School of Management, University of California, Los Angeles, Professor |
| 1997-2003 | Director, Richard S. Ziman Real Estate Center, John E. Anderson Graduate School of Management, University of California, Los Angeles |
| 2006-2012 | John E. Anderson Graduate School of Management, University of California, Los Angeles, Lee and Seymour Graff Endowed Professor |
| 2009-2011 | Visiting Professor Center for Real Estate Massachusetts Institute of Technology, Cambridge, MA |
| 2012- | Senior Lecturer Center for Real Estate / Sloan School of Management Massachusetts Institute of Technology, Cambridge, MA |

**Professional Activities**

Journal of Housing Economics, Associate Editor, 1991 -
Journal of Real Estate Finance and Economics, Associate Editor, 1992 -
Real Estate Economics,
      Associate Editor, 1993 - 2005, 2015 -
      Editor, 2006 - 2014
Pacific-Basin Finance Journal, Associate Editor, 1997- 2003
Economic Notes, Associate Editor, 1999 - 2011

Ad hoc referee for Journal of Finance, Journal of Financial and Quantitative Analysis, Journal of Banking and Finance, Journal of Business, Review of Financial Studies, Journal of Financial Economics, Journal of Money, Credit, and Banking, Management Science, Journal of Empirical Finance, Journal of International Money and Finance

Member:
American Finance Association, 1980 -
American Real Estate and Urban Economics Association, 1990 -
Western Finance Association, 1980 -
      Associate Program Chair, 1990
      Board of Directors, 1991-94

## Appendix A

**Refereed Publications**

1. Ball, C. A., and Torous, W. N., "A Simplified Jump Process for Common Stock Returns," Journal of Financial and Quantitative Analysis, 18:1, pp. 53-65, March 1983.

2. Ball, C. A., and Torous, W. N., "Bond Price Dynamics and Options," Journal of Financial and Quantitative Analysis, 18:4, pp. 517-531, December 1983.

3. Ball, C. A., and Torous, W. N., "The Maximum Likelihood Estimation of Security Price Volatility: Theory, Evidence, and Application to Option Pricing," Journal of Business, 57:1, pp. 97-112, January 1984.

4. Milne, W. J., and Torous, W. N., "Long-Term Interest Rates and the Price Level: The Canadian Evidence on the Gibson Paradox," Canadian Journal of Economics, 17:2, pp. 327-339, May 1984.

5. Ball, C. A., Torous, W. N., and Tschoegl, A. E., "On Inferring Standard Deviations from Path Dependent Options," Economic Letters, 18, pp. 377-380, 1985.

6. Ball, C. A., Torous, W. N., and Tschoegl, A. E., "The Degree of Price Resolution: The Case of the Gold Market," Journal of Futures Markets, 5:1, pp.29-43, Spring 1985.

7. Ball, C. A., Torous, W. N., and Tschoegl, A. E., "An Empirical Investigation of the EOE Gold Options Market," Journal of Banking and Finance, 9:1, pp. 101-113, March 1985.

8. Ball, C. A., and Torous, W. N., "On Jumps in Common Stock Prices and Their Impact on Call Option Pricing," Journal of Finance, 40:1, pp. 155-173, March 1985.

9. Torous, W. N., "Differential Taxation and the Equilibrium Structure of Interest Rates," Journal of Banking and Finance, 9, pp. 363-385, August 1985.

    Reprinted in The Debt Market, S. Ross (Editor), Edward Elgar, 2000.

10. Ball, C. A., and Torous, W. N., "Futures Options and the Volatility of Futures Prices," Journal of Finance, 41:4, pp. 857-870, September 1986.

11. Ball, C. A., and Torous, W. N., "Investigating Security Price Performance in the Presence of Event Date Uncertainty," Journal of Financial Economics, 22, pp. 123-153, October 1988.

12. Schwartz, E. S., and Torous, W. N., "Prepayment and the Valuation of Mortgage-Backed Securities," Journal of Finance, 44:2, pp. 375-392, June 1989.

13. Titman, S., and Torous, W. N., "Valuing Commercial Mortgages: An Empirical Investigation of the Contingent-Claims Approach to Valuing Risky Debt," Journal of Finance, 44:2, pp. 345-373, June 1989.

    Reprinted in The Debt Market, S. Ross (Editor), Edward Elgar, 2000.

14. Franks, J. R., and Torous, W. N., "An Empirical Investigation of U.S. Firms in Reorganization," Journal of Finance, 44:3, pp. 747-769, July 1989.

    Reprinted in Corporate Bankruptcy and Distressed Restructurings: Analytical Issues and Investment Opportunities, E. Altman (Editor), Irwin, 1992.

A-3

Appendix A

15. Schwartz, E. S., and Torous, W. N., "Valuing Stripped Mortgage-Backed Securities," <u>Housing Finance Review</u>, 8, pp. 241-251, Fall 1989.

   Reprinted in <u>The Debt Market</u>, S. Ross (Editor), Edward Elgar, 2000.

16. Haugen, R. A., Talmor, E., and Torous, W. N., "The Effect of Volatility Changes on the Level of Stock Prices and Subsequent Expected Returns," <u>Journal of Finance</u>, 46:8, pp. 985-1007, July 1991.

17. Geske, R. L., and Torous, W. N., "Skewness, Kurtosis, and Black-Scholes Option Mispricing," <u>Statistical Papers</u>, 32, pp. 299-309, December 1991.

18. Schwartz, E. S., and Torous, W. N., "Prepayment, Default, and the Valuation of Mortgage Pass-Through Securities," <u>Journal of Business</u>, 65:2, pp. 221-239, April 1992.

19. Franks, J. R., and Torous, W. N., "Lessons from a Comparison of U.S. and U.K. Insolvency Codes," <u>Oxford Review of Economic Policy</u>, 8:3, pp. 70-82, September 1992.

   Reprinted in <u>Journal of Applied Corporate Finance</u>, pp. 95-103, January 1993.

20. Schwartz, E. S., and Torous, W. N., "Mortgage Prepayment and Default Decisions: A Poisson Regression Approach", <u>Journal of the American Real Estate and Urban Economics Association</u>, 21:4, pp. 431-448, March 1993.

21. Franks, J. R., and Torous, W. N., "A Comparison of Financial Recontracting in Workouts and Chapter 11 Reorganizations," <u>Journal of Financial Economics</u>, 28:8, pp. 349-370, June 1994.

   Reprinted in <u>Studies in Empirical Corporate Finance</u>, M. Brennan (Editor), Edward Elgar, 2001.

22. Ball, C. A., and Torous, W. N., "On Unit Roots and the Estimation of Interest Rate Dynamics", <u>Journal of Empirical Finance</u>, 3:2, pp. 215-238, June 1996.

23. Franks, J. R., Nyborg, K., and Torous, W. N., "A Comparison of U. K, U. S., and German Insolvency Codes," <u>Financial Management</u>, 25:3, pp. 274-301, Autumn 1996.

24. Roma, A., and Torous, W. N., "On the Cyclical Behavior of Interest Rates," <u>Journal of Finance</u>, 52:4, pp. 1519-1542, September 1997.

25. Brennan, M. J., and Torous, W. N., "Individual Decision Making and Investor Welfare," <u>Economic Notes</u>, 28:2, pp. 119-143, July 1999.

26. Ball, C. A., and Torous, W. N., "The Stochastic Volatility of Short-term Interest Rates: Some International Evidence," <u>Journal of Finance</u>, 54:6, pp. 2339-2359, December 1999.

   Reprinted in <u>Model Risk: Concepts, Calibration, and Pricing</u>, R. Gibson (Editor), Risk Books, 2000.

27. Ball, C. A., and Torous, W. N., "Stochastic Correlation Across International Stock Markets," <u>Journal of Empirical Finance</u>, 7:3-4, pp. 373-388, November 2000.

**Appendix A**

28. Torous, W. N., Yan, S. and Valkanov, R., "On Predicting Stock Returns with Nearly Integrated Explanatory Variables," Journal of Business, 77:4, pp. 937-966, October 2004.

29. Dierker, M., Quan, D., and Torous, W. N., "Pricing the Defeasance Option in Securitized Commercial Mortgages," Real Estate Economics, 33:4, pp. 663-680, Winter 2005.

30. Berardi, A., and Torous, W. N., "Term Structure Forecasts of Long Term Consumption Growth," Journal of Financial and Quantitative Analysis, 40:2, pp. 241-258, June 2005.

31. Brennan, M. J., Lee, F., and Torous, W. N., "Dollar Cost Averaging", Review of Finance, 9:4, pp. 509-535, 2005.

32. Hong, H, Torous, W. N., and Valkanov, R., "Do Industries Lead Stock Markets?", Journal of Financial Economics, 83:2, pp. 367-396, 2007.

33. Schwartz, E. S., and Torous, W. N., "Commercial Office Space: Testing the Implications of Real Options Model with Competitive Interactions", Real Estate Economics, 35:1, pp. 1-20, 2007.

    Awarded Edwin S. Mills Prize for best paper in Real Estate Economics for 2007.

34. Plazzi, A., Torous, W. N., and Valkanov, R., "The Cross-Sectional Dispersion of Commercial Real Estate Returns and Rent Growth: Time Variation and Economic Fluctuations", Real Estate Economics, 36:3, pp. 403-429, 2008.

35. Plazzi, A., Torous, W. N., and Valkanov, R., "Expected Returns and the Expected Growth in Rents of Commercial Real Estate", Review of Financial Studies, 23:9, pp. 3469-3519, 2010.

36. Plazzi, A., Torous, W.N., and Valkanov, R., "Exploiting Property Characteristics in Commercial Real Estate Portfolio Allocation", Journal of Portfolio Management, Special Real Estate Issue, pp. 39-50, 2011.

37. Linnainmaa, J. T., Torous, W. N., and Yae, J., "Reading the Tea Leaves: Model Uncertainty, Robust Forecasts and the Autocorrelation of Analysts' Forecast Errors" Journal of Financial Economics, 122:1, pp. 42-64, 2016.

38. Ghent, A., Torous, W. N., and Valkanov, R., "Complexity in Structured Finance", Review of Economic Studies, 86:2, pp. 694-722, 2019.

39. Ghent, A., Torous, W. N., and Valkanov, R., "Commercial Real Estate as an Asset Class", Annual Review of Financial Economics, 11, pp. 153-171, 2019.

40. Ghent, A., Miltersen, K., and Torous, W. N., "Second Mortgages: Valuation and Implications for the Performance of Structured Financial Products", Real Estate Economics, 48:4, pp.1234-1273, 2020.

**Chapters in Books**

41. Geske, R. L., and Torous, W. N., "Black-Scholes Option Pricing and Robust Variance Estimation," pp. 49-69, in Options: Recent Advances in Theory and Practice, S. Hodges (Editor), Manchester University Press, 1990.

Appendix A

42. Schwartz, E. S., and Torous, W. N., "Caps on Adjustable Rate Mortgages: Valuation, Insurance, and Hedging," pp. 283-303, in <u>Financial Markets and Financial Crises</u>, R. G. Hubbard (Editor), University of Chicago Press, 1991.

43. Betker, B. L., Franks, J. R., and Torous, W. N., "Are Stockholders Better Off When Debt is Restructured Privately?", pp. 391-400, in <u>Corporate Bankruptcy and Distressed Restructuring: Analytical Issues and Investment Opportunities</u>, E. Altman (Editor), Irwin, 1992.

44. Torous, W. N., "Mortgage Backed Securities," in <u>North-Holland Handbook of Operations Research and Management Science</u>, R. A. Jarrow, V. Maksimmovic, and W. T. Ziemba (Editors), North-Holland, 1995.

45. Franks, J. R., Nyborg, K, and Torous, W. N., "A Tale of Three Codes: A Comparison of U. K., U. S., and German Insolvency Codes," in <u>Mastering Finance</u>, H. Rose (Editor), Pittman Publishing, 1998.

46. Torous, W. N. "The Behaviour of Short Term Interest Rates," in <u>Mastering Finance</u>, H. Rose (Editor), Pittman Publishing, 1998.

47. Schwartz, E. S., and Torous, W. N., "Can We Disentangle Risk Aversion from Intertemporal Substitution in Consumption?", in <u>Essays on Uncertainty: Festschrift in Honor of Steinar Ekern</u>, Norges Handelshoyskole, Bergen, Norway, 2002.

48. Ghyssels, E., Plazzi, A., Torous, W. N., and R. Valkanov, R., "Forecasting Real Estate Prices", in <u>Handbook of Economic Forecasting,</u> Volume 2A, G. Elliott and A. Timmermann (Editors), North-Holland, 2013.

49. Plazzi, A., Torous, W.N., and U. Yilmaz, "What You See is What You Get but Do Investors Reward Good Corporate Governance When They See It?", in Venezia, I. (Ed.) <u>Behavioral Finance: A Novel Approach</u>, World Scientific Publishers, London, forthcoming 2020.

## <u>Working Papers</u>

50. Agarwal, Sumit, Crocker Liu, Walter Torous, and Vincent Yao, "Household Financial Decision Making when Buying and Owning a Home," 2015.

51. Boudry, W., Liu, C., Mulhofer, T., and Torous, W.N., "Pricing Infrequently Traded Assets", 2020.

Appendix B

**APPENDIX B: LIST OF TRIAL AND DEPOSITION TESTIMONY
IN THE LAST FOUR YEARS**

**WALTER N. TOROUS**

2021 - *U.S. Bank National Association, solely in its capacity as Trustee of the Home Equity Asset Trust 2007-3 (HEAT 2007-3) v. DLJ Mortgage Capital, Inc.*, Supreme Court of the State of New York County of New York, Index No. 651563/2013.
Provided expert report and deposition testimony.

2020 - *Salvadora Ortiz and Thomas Scott, et al., v. American Airlines Inc., et al.*, United States District Court for the Northern District of Texas, No. 4:16-cv-00151-A.
Provided expert report and deposition testimony.

2019 - *Homeward Residential, Inc., solely in its capacity as Master Servicer for the Option One Mortgage Loan Trust 2006-2, for the benefit of the Trustee and the holders of Option One Mortgage Loan Trust 2006-2 Certificates against Sand Canyon Corporation f/k/a Option One Mortgage Corporation*, United States District Court for the Southern District of New York, No. 12-cv-5067.
Provided expert report and deposition testimony.

2019 - *Homeward Residential, Inc., solely in its capacity as Servicer for the Option One Mortgage Loan Trust 2006-3, for the benefit of the Trustee and the holders of Option One Mortgage Loan Trust 2006-3 Certificates, against Sand Canyon Corporation f/k/a Option One Mortgage Corporation*, United States District Court for the Southern District of New York, No. 12-cv-7319.
Provided expert report and deposition testimony.

2019 - *Federal Deposit Insurance Corporation as Receiver for Guaranty Bank v. Deutsche Bank Securities Inc., et al.*, United States District Court for the Western District of Texas Austin Division, No. 1:14-cv-00129-SS.
Provided expert report and deposition testimony.

2019 - *In Re Vale S.A. Securities Litigation*, United States District Court for the Southern District of New York, No. 1:11-cv-09539-GHW.
Provided expert report and deposition testimony.

2019 - *Megan Villella, et al. v. Chemical and Mining Company of Chile Inc., et al.*, United States District Court for the Southern District of New York, Case no. 1:15-cv-02106-ER- GWG.
Provided expert report and deposition testimony.

2019 - *In re American Realty Capital Properties, Inc. Litigation*, United States District Court for the Southern District of New York, Case no. 1:15-mc-00040-AKH.
Provided expert report and deposition testimony.

# Appendix B

2018 - *Federal Home Loan Bank of Boston v. Ally Financial, Inc. F/K/A GMAC LLC, et al.*, United States District Court for the District of Massachusetts, Case No. 1:11-cv-10952-GAO.
Provided expert report and deposition testimony.

2018 - *United States of America v. Quicken Loans Inc.*, United States District Court for the Eastern District of Michigan, Civil Action No. 16-14050-MAG-RSW.
Provided expert report and deposition testimony.

2018 - *Gurbir S. Grewal, et al. v. Credit Suisse Securities (USA) LLC, et al.*, Superior Court of the State of New Jersey Chancery Division Mercer County, Civil Action No. MER-C-137-13.
Provided expert report and deposition testimony.

2018 - *U.S. Bank National Association, solely in its capacity as Trustee of the CSMC Asset-Backed Trust 2007-NC1 (CSMC 2007-NC1) v. DLJ Mortgage Capital, Inc.*, Supreme Court of the State of New York County of New York, Index No. 652699/2013.
Provided expert report and deposition testimony.

2018 - *U.S. Bank National Association, solely in its capacity as Trustee of the Home Equity Asset Trust 2006-8 (HEAT 2006-8) v. DLJ Mortgage Capital, Inc.*, Supreme Court of the State of New York County of New York, Index No. 654157/2012.
Provided expert report and deposition testimony.

2018 - *U.S. Bank National Association, solely in its capacity as Trustee of the Home Equity Asset Trust 2007-2 (HEAT 2007-2) v. DLJ Mortgage Capital, Inc.*, Supreme Court of the State of New York County of New York, Index No. 651174/2013.
Provided expert report and deposition testimony.

2018 - *Residential Funding Company, LLC v. Home Loan Center, Inc.*, United States District Court for the District of Minnesota, Case No. 14-cv-01716 (SRN/HB).
Provided expert report and deposition testimony.

2018 - *Residential Funding Company, LLC v. Decision One Mortgage Company, LLC*, United States District Court for the District of Minnesota, Case No. 14-cv-1737 (MJD/JSM).
Provided expert report and deposition testimony.

2018 - *Residential Funding Company, LLC v. HSBC Mortgage Corp. (USA)*, United States Bankruptcy Court for the Southern District of New York, Case No. 14-01915 (MG).
Provided expert report and deposition testimony.

2018 - *Federal Deposit Insurance Corporation as Receiver for United Western Bank v. RBS Acceptance Inc., et al.*, United States District Court for the District of Colorado, Case No. 1:14-CV-00418-PAB-MJW.
Provided expert report and deposition testimony.

**Appendix B**

2018 – *Federal Deposit Insurance Corporation as Receiver for Guaranty Bank v. RBS Securities Inc., et al.*, United States District Court for the Western District of Texas Austin Division, Case No. 1:14-cv-00126-SS.
Provided expert report and deposition testimony.

2017 – *Ramon Moreno, et al. v. Deutsche Bank Americas Holding Corp., et al.*, United States District Court for the Southern District of New York, Case No. 1:15-cv-09936 (LGS).
Provided expert report and deposition testimony.

2017 – *Lou Baker, et al. v. SeaWorld Entertainment, Inc., et al.*, United States District Court for the Southern District of California, Case No. 3:14-cv-02129-MMA-AGS.
Provided expert report and deposition testimony.

2017 – *Old Republic Insurance Company and Old Republic Insured Credit Services, Inc., n/k/a Republic Insured Credit Services, Inc. v. The Bank of New York Mellon, BNY Mellon Trust of Delaware, Countrywide Bank, FSB, n/k/a Bank of America, N.A., Countrywide Home Loans Servicing, LP, n/k/a Bank of America, N.A.; Countrywide Bank, FSB, n/k/a Bank of America, N.A., Countrywide Home Loans, Inc., Countrywide Home Loans Servicing, LP, n/k/a Bank of America, N.A., The Bank of New York Mellon, and BNY Mellon Trust of Delaware v. Old Republic Insurance Company*; Circuit Court of Cook County, Illinois for the County Department, Chancery Division, Case No. 08 CH 47501.
Provided expert report and deposition testimony.

2017 – *Royal Park Investments SA/NV v. HSBC Bank USA, National Association*, United States District Court for the Southern District of New York, Case No. 14-CV-8175-LGS- SN; *BlackRock Balanced Capital Portfolio (FI), et al. v. HSBC Bank USA, National Association*, United States District Court for the Southern District of New York, Case No. 14-CV-9366-LGS-SN.
Provided expert report and deposition testimony.

2017 – *U.S. Bank National Association, solely in its capacity as Trustee for Citigroup Mortgage Loan Trust 2007-AR7 v. Citigroup Global Markets Realty Corp. and CitiMortgage, Inc.*, United States District Court for the Southern District of New York, Civil Action No. 13 Civ. 6989 (GBD).
Provided expert report and deposition testimony.

## Materials Relied Upon

**Legal Documents**

Consolidated Class Action Complaint, *In re: Vale S.A. Securities Litigation,* Case No. 19-cv-526-RJD-SJB, October 25, 2019.

15 U.S.C. § 78u–4(e)(1).

*Basic, Inc. v. Levinson,* 485 U.S. 224 (1988).

*Cammer v. Bloom,* 711 F. Supp. 1286 (D.N.J. 1989).

*Halliburton Co. v. Erica P. John Fund, Inc.,* 134 S. Ct. 636 (2013).

*In re: Vale S.A. Securities Litigation,* Case No. 1:15-cv-9539-GHW, Order, September 27, 2019.

*In re: Vale S.A. Securities Litigation,* Memorandum & Order [Motion to Dismiss], May 20, 2020.

*Krogman v. Sterritt,* 202 F.R.D. 467 (N.D. Tex. 2001).

**Expert Reports and Deposition**

Corrected Report on Market Efficiency of Professor Steven P. Feinstein, Ph.D., CFA, February 18, 2021, and supporting materials.

Deposition of Steven P. Feinstein, March 24, 2021.

*In re: Grupo Televisa Securities Litigation,* Report on Market Efficiency, Professor Stephen P. Feinstein, Ph.D., C.F.A., October 30, 2019.

*In re: Equifax Securities Litigation,* Report on Market Efficiency, Professor Stephen P. Feinstein, Ph.D., C.F.A., March 29, 2019.

*In re: RH, Inc. Securities Litigation,* Report on Market Efficiency, Professor Stephen P. Feinstein, Ph.D., C.F.A., June 22, 2018.

*Nikki Bollinger Grae v. Corrections Corporation of America, et al.,* Report on Market Efficiency, Professor Stephen P. Feinstein, Ph.D., C.F.A., June 1, 2018.

## Materials Relied Upon

*Daniel Luna v. Marvell Technology Group, Ltd., et al.,* Report on Market Efficiency, Professor Stephen P. Feinstein, Ph.D., C.F.A., July 31, 2017.

*In re: American Realty Capital Properties, Inc. Litigation,* Report on Market Efficiency, Professor Stephen P. Feinstein, Ph.D., C.F.A., March 15, 2017.

*In re: Petrobas Securities Litigation,* Report on Market Efficiency, Professor Stephen P. Feinstein, Ph.D., C.F.A., October 23, 2015.

*Michael Courtney, et al. v. Avid Technology, Inc., et al.,* Report on Market Efficiency, Professor Stephen P. Feinstein, Ph.D., C.F.A., September 15, 2014.

*In re: Vale S.A. Securities Litigation* , Case No. 1:15-cv-09359-GHW, Expert Report of David I. Tabak, Ph.D., September 14, 2017.


**Case Documents**

CAAT_00000001 – CAAT_00000003.

CAAT_00000605 – CAAT_00000612.

CAAT_Feinstein_00000109.

CAAT_Feinstein_00000112.

CAAT_Feinstein_00000116.

CAAT_Feinstein_00000117.

CAAT_Feinstein_00000175.

CAAT_Feinstein_00000178.

CAAT_Feinstein_00000470.

CAAT_Feinstein_00000477.

## Materials Relied Upon

CAAT_Feinstein_00000636 – CAAT_Feinstein_00000642.

CAAT_Feinstein_00000656.

CAAT_Feinstein_00000657.

CAAT_Feinstein_00001050.

CAAT_Feinstein_00001057.

CAAT_Feinstein_00001195.

CAAT_Feinstein_00001201.

CAAT_Feinstein_00001212.

### SEC Filings

SEC Forms 6-K Filed by Vale S.A. between October 27, 2016 and February 6, 2019.

US Securities and Exchange Commission, Form 20-F for Vale S.A., December 31, 2015.

US Securities and Exchange Commission, Form 20-F for Vale S.A., December 31, 2016.

US Securities and Exchange Commission, Form 20-F for Vale S.A., December 31, 2018.

US Securities and Exchange Commission, Form 20-F for Vale S.A., December 31, 2019.

# Materials Relied Upon

## Publicly-Available Documents

Kowsmann, Patricia and Scott Patterson, "Inspectors of Vale Dam in Brazil Issued Warning Before Collapse," *The Wall Street Journal,* February 6, 2019.

Phillips, Dom, "'That's going to burst': Brazilian dam workers say they warned of disaster," *The Guardian,* February 6, 2019.

Watson, R.T., "Vale Iron-Ore Mine Halt Risks 'Incremental Supply Shock,'" *Bloomberg,* February 4, 2019.

Moody's, "Moody's upgrades Vale to Baa3; stable outlook," July 23, 2018.

Moody's, "Moody's takes action on Brazilian corporates following sovereign rating action," April 10, 2018.

Moody's, "Moody's upgrades Vale's ratings to Ba1; stable outlook," September 5, 2017.

Moody's, "Moody's upgrades Vale's ratings to Ba2; positive outlook," March 20, 2017.

Moody's, "Moody's changes Vale's outlook to stable; affirms Ba3 ratings," November 4, 2016.

## Academic Publications

Andrei Shleifer and Robert W. Vishny, "The Limits of Arbitrage," *The Journal of Finance,* Vol. 52, No. 1, March 1997.

Berk and DeMarzo, *Corporate Finance,* 2nd Edition, 2011.

Brad M. Barber, et al., "The Fraud-on-the-Market Theory and the Indicators of Common Stocks' Efficiency," *Journal of Corporation Law* 19, 1994.

Bradford C. Cornell and James Rutten, "Market Efficiency, Crashes, and Securities Litigation," *Tulane Law Review,* Vol. 81, 2006.

Clifford A. Ball and Walter N. Torous, "Investigating Security Price Performance in the Presence of Event-Date Uncertainty," *Journal of Financial Economics* 22, 1988.

Dick-Nielsen, Jens, "Liquidity Biases in TRACE," *Journal of Fixed Income* 19.2, 2009.

Ethical Guidelines for Statistical Practice, Prepared by the Committee on Professional Ethics of the American Statistical Association, April 14, 2018.

## Materials Relied Upon

Eugene F. Fama, "Efficient Capital Markets: A Review of Theory and Empirical Work," *Journal of Finance,* 1970.

Grigori Erenburg, et al., "The Paradox of 'Fraud-on-the-Market Theory': Who Relies on the Efficiency of Market Prices?" *Journal of Empirical Legal Studies,* Vol. 8, Issue 2, 2011.

Gur Huberman and Tomer Regev, "Contagious Speculation and a Cure for Cancer: A Nonevent that Made Stock Prices Soar," *The Journal of Finance,* Vol. 56, No. 1, February 2001.

Harrison Hong, Walter Torous, and Rossen Valkanov, "Do Industries Lead Stock Markets?" *Journal of Financial Economics* 83:2, 2007.

Mark Fedenia and Mark Hirschey, "The Chipotle Paradox," *Journal of Applied Finance,* Vol. 19, 2009.

Miguel Villanueva and Steven Feinstein, "Stock Price Reactivity to Earnings Announcements: The Role of the Cammer/Krogman Factors," *Review of Quantitative Finance and Accounting* (forthcoming), September 2020.

Mukesh Bajaj, et al., "Assessing Market Efficiency for Reliance on the Fraud-on-the-Market Doctrine after Wal-Mart and Amgen," *Research in Law and Economics,* Vol. 26, 2014.

Owen Lamont and Richard Thaler, "Can the Market Add and Subtract? Mispricing in Tech Stock Carve-Outs," *Journal of Political Economy* 111, 2003.

Owen Lamont and Richard Thaler, "The Law of One Price in Financial Markets," *Journal of Economic Perspectives* 17, 2003.

Paul A. Ferrillo, et al., "The 'Less Than' Efficient Capital Markets Hypothesis: Requiring More Proof from Plaintiffs in Fraud-on-the-Market Cases," *St. John's Law Review,* Volume 78, Winter 2004.

Paul Asquith, et al., "The Effects of Mandatory Transparency in Financial Market Design: Evidence from the Corporate Bond Market," *NBER Working Paper Series,* Working Paper 19417 and Online Appendix, September 2013, Revised April 2019.

Paul C. Tetlock, "All the News That's Fit to Reprint: Do Investors React to Stale Information?" *The Review of Financial Studies,* Vol. 24, No. 5, 2011.

Richard Brealey, Stewart Myers, and Franklin Allen, *Principles of Corporate Finance,* 10th Edition, McGraw-Hill Irwin, 2011.

Sriketan Mahanti, et al., "Latent Liquidity: A New Measure of Liquidity, with an Application to Corporate Bonds," *Journal of Financial Economics* 88, 2008.

Steven P. Feinstein, "Teaching the Strong-Form Efficient Market Hypothesis and Making the Case for Insider Trading: A Classroom Experiment," *Journal of Financial Education,* Vol. 26, Fall 2000.

## Materials Relied Upon

**Data**

Bloomberg.

Factiva.

S&P Capital IQ.

SEC Edgar.

TRACE Data for the Vale Notes (CAAT_Feinstein_00000476, CAAT_Feinstein_00000478 – CAAT_Feinstein_00000483).

Appendix D

**Trading Days on which the "High" Price of the At-Issue Vale Securities was
At or Below the Minimum Average PSLRA "Bounce-Back" Price**

*Proposed Class Period: October 27, 2016 to February 6, 2019*

| Date | Minimum Average PSLRA "Bounce-Back" Price | Daily "High" Price | | | | |
|---|---|---|---|---|---|---|
| | | Vale ADRs | TAE3 Note | TAH6 Note | TAK9 Note | EAA3 Note |
| | | $11.20 | $115.44 | $106.36 | $106.42 | $94.76 |
| | | *(Shading denotes "high" price is equal to or below the "bounce-back" price)* | | | | |
| 10/27/2016 | | $7.05 | $114.25 | $104.13 | $102.75 | $90.51 |
| 10/28/2016 | | $7.05 | $114.60 | $104.50 | $101.88 | $90.24 |
| 10/31/2016 | | $6.97 | $114.00 | $103.50 | $99.74 | $89.75 |
| 11/1/2016 | | $7.03 | $113.49 | $103.17 | $101.58 | $90.08 |
| 11/2/2016 | | $6.90 | $113.00 | $103.50 | $101.27 | $89.40 |
| 11/3/2016 | | $6.97 | $114.24 | $103.50 | $100.00 | $89.87 |
| 11/4/2016 | | $6.82 | $114.95 | $103.35 | $100.75 | $89.80 |
| 11/7/2016 | | $7.21 | $114.45 | $104.65 | $100.38 | $91.23 |
| 11/8/2016 | | $7.65 | $113.70 | $104.90 | $100.00 | $91.84 |
| 11/9/2016 | | $8.03 | $115.48 | $104.50 | $101.35 | $90.48 |
| 11/10/2016 | | $8.10 | $112.03 | $101.30 | $99.50 | $88.50 |
| 11/11/2016 | | $8.04 | $110.08 | $98.57 | $97.50 | N/A |
| 11/14/2016 | | $7.74 | $110.65 | $97.38 | $95.75 | $84.25 |
| 11/15/2016 | | $7.38 | $110.00 | $99.19 | $96.00 | $87.04 |
| 11/16/2016 | | $7.34 | $109.21 | $99.13 | $95.28 | $85.89 |
| 11/17/2016 | | $7.48 | $110.06 | $99.25 | $98.17 | $88.11 |
| 11/18/2016 | | $7.30 | $110.58 | $99.14 | $97.00 | $85.85 |
| 11/21/2016 | | $7.73 | $109.50 | $98.00 | $95.50 | $87.42 |
| 11/22/2016 | | $8.31 | $109.50 | $98.46 | $95.35 | $87.00 |
| 11/23/2016 | | $8.44 | $108.01 | $97.74 | $95.30 | $85.79 |
| 11/25/2016 | | $8.44 | $109.25 | $98.23 | $97.28 | $85.25 |
| 11/28/2016 | | $9.18 | $109.75 | $98.85 | $97.33 | $85.75 |
| 11/29/2016 | | $8.79 | $110.00 | $99.29 | $96.43 | $87.00 |
| 11/30/2016 | | $8.71 | $109.66 | $98.90 | $95.25 | $86.49 |
| 12/1/2016 | | $8.83 | $110.25 | $98.25 | $97.45 | $88.58 |
| 12/2/2016 | | $8.52 | $110.25 | $99.07 | $95.50 | $87.25 |
| 12/5/2016 | | $8.75 | $110.60 | $99.00 | $97.81 | $88.05 |
| 12/6/2016 | | $8.82 | $111.15 | $100.35 | $96.29 | $87.59 |
| 12/7/2016 | | $9.32 | $112.00 | $100.80 | $99.21 | $90.50 |
| 12/8/2016 | | $9.34 | $111.68 | $100.60 | $97.75 | $89.69 |
| 12/9/2016 | | $9.01 | $111.99 | $101.00 | $99.40 | $91.95 |
| 12/12/2016 | | $8.96 | $112.79 | $100.98 | $99.84 | $92.70 |
| 12/13/2016 | | $8.88 | $113.79 | $103.00 | $99.25 | $92.05 |
| 12/14/2016 | | $8.62 | $114.69 | $103.03 | $99.54 | $93.73 |

**Appendix D**

**Trading Days on which the "High" Price of the At-Issue Vale Securities was
At or Below the Minimum Average PSLRA "Bounce-Back" Price**

*Proposed Class Period: October 27, 2016 to February 6, 2019*

| Date | Minimum Average PSLRA "Bounce-Back" Price | Daily "High" Price | | | | |
|---|---|---|---|---|---|---|
| | | Vale ADRs | TAE3 Note | TAH6 Note | TAK9 Note | EAA3 Note |
| | | $11.20 | $115.44 | $106.36 | $106.42 | $94.76 |
| | | *(Shading denotes "high" price is equal to or below the "bounce-back" price)* | | | | |
| 12/15/2016 | | $8.52 | $113.20 | $101.50 | $98.25 | $91.35 |
| 12/16/2016 | | $8.46 | $113.99 | $106.00 | $98.25 | $92.50 |
| 12/19/2016 | | $8.13 | $111.90 | $101.69 | $101.00 | $91.21 |
| 12/20/2016 | | $7.96 | $114.39 | $102.25 | $99.00 | $90.65 |
| 12/21/2016 | | $8.03 | $112.00 | $102.35 | $100.00 | $90.00 |
| 12/22/2016 | | $7.87 | $111.31 | $101.26 | $98.25 | $91.90 |
| 12/23/2016 | | $7.89 | $111.99 | $99.95 | $100.50 | $90.50 |
| 12/27/2016 | | $8.05 | $113.75 | $101.25 | $98.50 | $92.02 |
| 12/28/2016 | | $8.19 | $113.93 | $101.23 | $100.75 | $89.42 |
| 12/29/2016 | | $8.16 | $112.13 | $102.17 | $100.34 | $87.90 |
| 12/30/2016 | | $7.95 | $111.00 | $101.25 | $99.48 | N/A |
| 1/3/2017 | | $8.06 | $113.25 | $101.62 | $100.46 | $91.00 |
| 1/4/2017 | | $8.12 | $112.19 | $101.45 | $100.49 | $90.88 |
| 1/5/2017 | | $8.40 | $115.00 | $102.50 | $101.70 | $92.50 |
| 1/6/2017 | | $8.31 | $115.00 | $103.25 | $101.50 | $91.38 |
| 1/9/2017 | | $8.38 | $117.53 | $104.26 | $102.75 | $94.16 |
| 1/10/2017 | | $8.98 | $115.75 | $103.56 | $102.51 | $92.50 |
| 1/11/2017 | | $9.35 | $115.25 | $104.25 | $100.76 | $92.45 |
| 1/12/2017 | | $9.55 | $117.68 | $105.04 | $104.00 | $93.25 |
| 1/13/2017 | | $9.73 | $114.07 | $104.10 | $101.88 | $90.89 |
| 1/17/2017 | | $9.70 | $117.79 | $104.00 | $103.93 | $92.25 |
| 1/18/2017 | | $10.12 | $116.25 | $104.91 | $103.44 | $93.50 |
| 1/19/2017 | | $9.89 | $116.40 | $104.75 | $103.94 | $93.25 |
| 1/20/2017 | | $10.18 | $114.90 | $103.78 | $102.10 | $92.65 |
| 1/23/2017 | | $10.55 | $116.47 | $103.85 | $101.53 | $92.80 |
| 1/24/2017 | | $10.96 | $116.10 | $105.50 | $102.75 | $91.25 |
| 1/25/2017 | | $10.95 | $116.50 | $103.50 | $104.44 | $91.37 |
| 1/26/2017 | | $10.83 | $115.75 | $105.52 | $104.50 | $93.50 |
| 1/27/2017 | | $10.74 | $116.90 | $105.00 | $102.80 | $94.77 |
| 1/30/2017 | | $10.55 | $118.57 | $105.80 | $103.18 | $93.00 |
| 1/31/2017 | | $10.50 | $118.75 | $105.70 | $105.84 | $92.15 |
| 2/1/2017 | | $10.53 | $116.50 | $105.81 | $104.64 | $94.63 |
| 2/2/2017 | | $10.62 | $117.50 | $107.55 | $106.48 | $95.34 |
| 2/3/2017 | | $10.16 | $119.86 | $107.42 | $106.50 | $95.49 |

Appendix D

**Trading Days on which the "High" Price of the At-Issue Vale Securities was
At or Below the Minimum Average PSLRA "Bounce-Back" Price**

*Proposed Class Period: October 27, 2016 to February 6, 2019*

| Date | Minimum Average PSLRA "Bounce-Back" Price | Daily "High" Price | | | | |
|---|---|---|---|---|---|---|
| | | Vale ADRs | TAE3 Note | TAH6 Note | TAK9 Note | EAA3 Note |
| | | $11.20 | $115.44 | $106.36 | $106.42 | $94.76 |
| | | *(Shading denotes "high" price is equal to or below the "bounce-back" price)* | | | | |
| 2/6/2017 | | $9.85 | $118.49 | $106.13 | $104.95 | $95.26 |
| 2/7/2017 | | $9.88 | $120.10 | $106.83 | $106.50 | $95.40 |
| 2/8/2017 | | $9.81 | $117.50 | $107.26 | $106.04 | $96.21 |
| 2/9/2017 | | $10.00 | $117.18 | $107.75 | $106.43 | $96.13 |
| 2/10/2017 | | $10.50 | $119.26 | $107.00 | $107.38 | $93.95 |
| 2/13/2017 | | $11.49 | $119.32 | $108.35 | $105.56 | $97.02 |
| 2/14/2017 | | $11.29 | $120.10 | $107.85 | $105.78 | $96.50 |
| 2/15/2017 | | $11.29 | $120.00 | $106.10 | $106.24 | $95.90 |
| 2/16/2017 | | $11.25 | $117.80 | $108.63 | $105.50 | $95.40 |
| 2/17/2017 | | $11.04 | $118.25 | $107.48 | $105.45 | $96.52 |
| 2/21/2017 | | $11.70 | $118.50 | $107.15 | $106.53 | $96.70 |
| 2/22/2017 | | $11.26 | $118.91 | $109.18 | $108.09 | $96.25 |
| 2/23/2017 | | $11.45 | $120.15 | $108.84 | $108.53 | $99.00 |
| 2/24/2017 | | $10.90 | $123.00 | $110.50 | $108.00 | $99.10 |
| 2/27/2017 | | $10.93 | $120.25 | $110.25 | $109.75 | $98.13 |
| 2/28/2017 | | $10.58 | $119.80 | $111.25 | $109.90 | $99.40 |
| 3/1/2017 | | $10.76 | $119.84 | $110.46 | $109.05 | $97.45 |
| 3/2/2017 | | $10.61 | $120.00 | $109.43 | $109.00 | $95.94 |
| 3/3/2017 | | $10.25 | $120.75 | $110.25 | $108.45 | $96.00 |
| 3/6/2017 | | $10.06 | $119.25 | $110.70 | $108.65 | $97.20 |
| 3/7/2017 | | $10.11 | $119.25 | $108.45 | $109.21 | $96.90 |
| 3/8/2017 | | $9.85 | $118.17 | $108.64 | $107.07 | $95.88 |
| 3/9/2017 | | $9.62 | $118.50 | $107.00 | $105.46 | $94.86 |
| 3/10/2017 | | $9.69 | $119.00 | $106.51 | $105.88 | $93.75 |
| 3/13/2017 | | $9.97 | $117.25 | $107.85 | $105.88 | $93.00 |
| 3/14/2017 | | $9.95 | $119.50 | $107.08 | $104.54 | $94.50 |
| 3/15/2017 | | $10.71 | $118.47 | $106.53 | $106.50 | $94.63 |
| 3/16/2017 | | $10.80 | $119.75 | $108.73 | $108.75 | $96.00 |
| 3/17/2017 | | $10.55 | $119.75 | $108.59 | $106.18 | $95.50 |
| 3/20/2017 | | $10.35 | $120.00 | $107.23 | $106.50 | $96.50 |
| 3/21/2017 | | $10.11 | $120.50 | $109.00 | $107.09 | $96.25 |
| 3/22/2017 | | $9.75 | $118.72 | $107.85 | $107.00 | $96.38 |
| 3/23/2017 | | $9.50 | $118.38 | $107.75 | $108.25 | $96.44 |
| 3/24/2017 | | $9.37 | $119.40 | $110.38 | $107.03 | $95.73 |

Page 3 of 17

**Trading Days on which the "High" Price of the At-Issue Vale Securities was At or Below the Minimum Average PSLRA "Bounce-Back" Price**

*Proposed Class Period: October 27, 2016 to February 6, 2019*

| Date | Minimum Average PSLRA "Bounce-Back" Price | Daily "High" Price | | | | |
|---|---|---|---|---|---|---|
| | | Vale ADRs | TAE3 Note | TAH6 Note | TAK9 Note | EAA3 Note |
| | | $11.20 | $115.44 | $106.36 | $106.42 | $94.76 |
| | | *(Shading denotes "high" price is equal to or below the "bounce-back" price)* | | | | |
| 3/27/2017 | | $9.43 | $118.45 | $108.55 | $106.98 | $95.91 |
| 3/28/2017 | | $9.59 | $119.63 | $109.42 | $107.65 | $95.25 |
| 3/29/2017 | | $9.79 | $118.84 | $108.35 | $107.78 | $97.30 |
| 3/30/2017 | | $9.74 | $119.38 | $110.75 | $107.75 | $97.95 |
| 3/31/2017 | | $9.68 | $119.40 | $107.90 | $107.50 | $96.13 |
| 4/3/2017 | | $9.64 | $121.25 | $109.00 | $107.05 | $95.98 |
| 4/4/2017 | | $9.90 | $120.79 | $108.90 | $107.74 | $98.00 |
| 4/5/2017 | | $10.10 | $122.08 | $110.16 | $107.89 | $97.50 |
| 4/6/2017 | | $9.56 | $120.50 | $108.53 | $109.13 | $97.90 |
| 4/7/2017 | | $9.47 | $120.00 | $110.74 | $109.32 | $97.55 |
| 4/10/2017 | | $9.30 | $120.18 | $109.65 | $107.25 | $95.81 |
| 4/11/2017 | | $9.27 | $119.47 | $107.91 | $108.98 | $95.88 |
| 4/12/2017 | | $8.90 | $119.10 | $107.00 | $107.75 | $97.06 |
| 4/13/2017 | | $8.94 | $119.75 | $106.91 | $106.29 | $96.60 |
| 4/17/2017 | | $8.83 | $120.68 | $108.90 | $105.57 | $96.62 |
| 4/18/2017 | | $8.66 | $119.00 | $107.48 | $105.98 | $94.63 |
| 4/19/2017 | | $8.80 | $121.63 | $106.70 | $108.25 | $94.53 |
| 4/20/2017 | | $8.94 | $121.00 | $108.85 | $107.55 | $97.35 |
| 4/21/2017 | | $9.07 | $121.87 | $111.64 | $108.38 | $98.25 |
| 4/24/2017 | | $8.86 | $121.82 | $110.95 | $108.28 | $96.16 |
| 4/25/2017 | | $8.98 | $120.27 | $111.13 | $109.60 | $97.75 |
| 4/26/2017 | | $8.97 | $120.25 | $109.88 | $107.62 | $97.50 |
| 4/27/2017 | | $8.78 | $121.00 | $110.20 | $107.80 | $97.50 |
| 4/28/2017 | | $8.69 | $123.43 | $108.44 | $108.26 | $97.73 |
| 5/1/2017 | | $8.78 | $121.84 | $109.84 | $109.40 | $96.00 |
| 5/2/2017 | | $8.90 | $124.64 | $111.39 | $111.05 | $99.27 |
| 5/3/2017 | | $8.71 | $123.32 | $109.96 | $110.57 | $98.98 |
| 5/4/2017 | | $8.07 | $119.88 | $107.38 | $107.51 | $96.00 |
| 5/5/2017 | | $8.30 | $119.63 | $109.73 | $107.00 | $96.60 |
| 5/8/2017 | | $8.18 | $122.39 | $108.00 | $106.73 | $94.15 |
| 5/9/2017 | | $8.42 | $120.25 | $108.50 | $108.72 | $96.21 |
| 5/10/2017 | | $8.54 | $121.02 | $106.88 | $106.10 | $96.00 |
| 5/11/2017 | | $8.47 | $121.25 | $108.25 | $106.95 | $96.38 |
| 5/12/2017 | | $8.40 | $120.99 | $108.38 | $107.90 | $98.00 |

Page 4 of 17

**Trading Days on which the "High" Price of the At-Issue Vale Securities was
At or Below the Minimum Average PSLRA "Bounce-Back" Price**

*Proposed Class Period: October 27, 2016 to February 6, 2019*

| | | Daily "High" Price | | | | |
|---|---|---|---|---|---|---|
| | | Vale ADRs | TAE3 Note | TAH6 Note | TAK9 Note | EAA3 Note |
| Date | Minimum Average PSLRA "Bounce-Back" Price | $11.20 | $115.44 | $106.36 | $106.42 | $94.76 |
| | | *(Shading denotes "high" price is equal to or below the "bounce-back" price)* | | | | |
| 5/15/2017 | | $8.54 | $123.68 | $108.48 | $108.25 | $98.17 |
| 5/16/2017 | | $8.83 | $123.92 | $108.91 | $108.88 | $98.67 |
| 5/17/2017 | | $8.79 | $124.42 | $111.56 | $109.35 | $98.80 |
| 5/18/2017 | | $8.24 | $119.00 | $108.60 | $106.91 | $96.78 |
| 5/19/2017 | | $8.55 | $120.25 | $109.75 | $108.49 | $97.85 |
| 5/22/2017 | | $8.60 | $121.67 | $108.99 | $108.50 | $98.00 |
| 5/23/2017 | | $8.70 | $121.96 | $109.62 | $107.66 | $97.85 |
| 5/24/2017 | | $8.54 | $121.00 | $108.40 | $108.00 | $98.41 |
| 5/25/2017 | | $8.53 | $120.60 | $110.13 | $108.16 | $98.00 |
| 5/26/2017 | | $8.58 | $122.77 | $109.90 | $107.75 | N/A |
| 5/30/2017 | | $8.88 | $120.75 | $111.24 | $109.98 | $97.20 |
| 5/31/2017 | | $8.66 | $123.05 | $108.02 | $108.38 | $97.47 |
| 6/1/2017 | | $8.42 | $120.75 | $107.75 | $107.60 | $97.66 |
| 6/2/2017 | | $8.32 | $122.59 | $108.50 | $107.50 | $98.00 |
| 6/5/2017 | | $8.15 | $121.67 | $107.50 | $107.00 | $96.21 |
| 6/6/2017 | | $8.29 | $122.66 | $108.00 | $107.35 | $97.79 |
| 6/7/2017 | | $8.21 | $120.38 | $107.50 | $107.04 | $97.85 |
| 6/8/2017 | | $8.36 | $121.50 | $108.72 | $106.49 | $97.11 |
| 6/9/2017 | | $8.43 | $120.00 | $108.25 | $106.00 | $96.76 |
| 6/12/2017 | | $8.35 | $122.21 | $108.96 | $107.83 | $97.34 |
| 6/13/2017 | | $8.11 | $119.75 | $109.70 | $108.05 | $97.43 |
| 6/14/2017 | | $8.15 | $121.35 | $110.00 | $107.38 | $98.15 |
| 6/15/2017 | | $7.92 | $122.91 | $109.37 | $107.48 | $97.60 |
| 6/16/2017 | | $7.92 | $120.50 | $110.75 | $107.60 | $98.84 |
| 6/19/2017 | | $8.20 | $122.88 | $110.40 | $109.00 | $97.95 |
| 6/20/2017 | | $7.92 | $123.54 | $109.50 | $108.26 | $98.50 |
| 6/21/2017 | | $8.06 | $123.08 | $109.81 | $108.00 | $98.44 |
| 6/22/2017 | | $8.25 | $120.00 | $107.64 | $107.58 | $98.65 |
| 6/23/2017 | | $8.28 | $122.31 | $109.75 | $109.00 | $99.00 |
| 6/26/2017 | | $8.37 | $123.29 | $107.87 | $107.53 | $98.90 |
| 6/27/2017 | | $8.75 | $122.85 | $108.75 | $110.07 | $98.75 |
| 6/28/2017 | | $8.79 | $120.20 | $109.63 | $107.50 | $98.62 |
| 6/29/2017 | | $8.93 | $122.53 | $107.50 | $107.50 | $98.62 |
| 6/30/2017 | | $8.84 | $120.47 | $107.53 | $107.38 | $96.75 |

**Appendix D**

**Trading Days on which the "High" Price of the At-Issue Vale Securities was At or Below the Minimum Average PSLRA "Bounce-Back" Price**

*Proposed Class Period: October 27, 2016 to February 6, 2019*

| Date | Minimum Average PSLRA "Bounce-Back" Price | Daily "High" Price | | | | |
|---|---|---|---|---|---|---|
| | | Vale ADRs | TAE3 Note | TAH6 Note | TAK9 Note | EAA3 Note |
| | | $11.20 | $115.44 | $106.36 | $106.42 | $94.76 |
| | | *(Shading denotes "high" price is equal to or below the "bounce-back" price)* | | | | |
| 7/3/2017 | | $9.01 | N/A | $108.70 | $107.25 | $98.79 |
| 7/5/2017 | | $8.98 | $121.50 | $109.25 | $107.70 | $98.62 |
| 7/6/2017 | | $8.76 | $122.15 | $108.75 | $107.19 | $97.25 |
| 7/7/2017 | | $8.91 | $119.75 | $108.61 | $106.79 | $96.83 |
| 7/10/2017 | | $9.11 | $121.54 | $109.90 | $106.91 | $97.13 |
| 7/11/2017 | | $9.24 | $119.94 | $109.88 | $110.38 | $98.00 |
| 7/12/2017 | | $9.34 | $120.00 | $108.50 | $108.38 | $97.70 |
| 7/13/2017 | | $9.31 | $122.21 | $108.41 | $108.25 | $98.82 |
| 7/14/2017 | | $9.30 | $121.88 | $109.25 | $108.80 | $99.00 |
| 7/17/2017 | | $9.49 | $123.68 | $108.45 | $108.44 | $98.70 |
| 7/18/2017 | | $9.45 | $123.93 | $110.50 | $111.15 | $99.52 |
| 7/19/2017 | | $9.54 | $124.44 | $109.13 | $109.49 | $99.60 |
| 7/20/2017 | | $9.35 | $124.81 | $109.55 | $111.35 | $99.58 |
| 7/21/2017 | | $9.24 | $121.29 | $110.00 | $111.65 | $99.90 |
| 7/24/2017 | | $9.22 | $125.32 | $110.00 | $112.27 | $99.90 |
| 7/25/2017 | | $9.66 | $122.11 | $110.50 | $109.93 | $98.75 |
| 7/26/2017 | | $9.63 | $123.08 | $112.50 | $110.40 | $100.25 |
| 7/27/2017 | | $9.54 | $123.50 | $112.61 | $112.00 | $100.55 |
| 7/28/2017 | | $9.69 | $124.86 | $111.31 | $111.13 | $101.25 |
| 7/31/2017 | | $10.08 | $122.87 | $112.00 | $111.75 | $101.80 |
| 8/1/2017 | | $9.96 | $125.86 | $112.00 | N/A | $102.15 |
| 8/2/2017 | | $9.98 | $123.07 | $113.25 | $112.15 | $100.68 |
| 8/3/2017 | | $9.91 | $126.36 | $114.15 | $112.00 | $103.25 |
| 8/4/2017 | | $10.06 | $124.50 | $114.18 | $112.25 | $100.75 |
| 8/7/2017 | | $10.36 | $126.66 | $113.25 | $112.73 | $103.45 |
| 8/8/2017 | | $10.40 | $124.16 | $112.38 | $112.53 | $102.50 |
| 8/9/2017 | | $10.21 | $125.37 | $112.25 | $114.09 | $101.71 |
| 8/10/2017 | | $10.14 | $123.63 | $114.00 | $111.65 | $101.23 |
| 8/11/2017 | | $9.83 | $122.33 | $112.67 | $112.35 | $100.02 |
| 8/14/2017 | | $9.87 | $125.39 | $111.00 | $112.72 | $101.64 |
| 8/15/2017 | | $9.80 | $123.00 | $110.63 | $110.78 | $101.33 |
| 8/16/2017 | | $10.14 | $123.25 | $111.10 | $111.53 | $100.63 |
| 8/17/2017 | | $10.10 | $123.30 | $111.75 | $111.30 | $102.30 |
| 8/18/2017 | | $10.12 | $122.75 | $113.88 | $111.16 | $100.25 |

**Trading Days on which the "High" Price of the At-Issue Vale Securities was
At or Below the Minimum Average PSLRA "Bounce-Back" Price**

*Proposed Class Period: October 27, 2016 to February 6, 2019*

| Date | Minimum Average PSLRA "Bounce-Back" Price | Daily "High" Price | | | | |
|---|---|---|---|---|---|---|
| | | Vale ADRs | TAE3 Note | TAH6 Note | TAK9 Note | EAA3 Note |
| | | $11.20 | $115.44 | $106.36 | $106.42 | $94.76 |
| | | *(Shading denotes "high" price is equal to or below the "bounce-back" price)* | | | | |
| 8/21/2017 | | $10.23 | $125.09 | $110.91 | $111.03 | $101.34 |
| 8/22/2017 | | $10.22 | $124.10 | $112.00 | $113.15 | $101.63 |
| 8/23/2017 | | $10.33 | $123.50 | $111.60 | $111.92 | $101.57 |
| 8/24/2017 | | $10.80 | $126.33 | $113.33 | $112.18 | $101.90 |
| 8/25/2017 | | $10.80 | N/A | $114.35 | $112.50 | $102.00 |
| 8/28/2017 | | $10.90 | $125.00 | $113.28 | $115.10 | $102.03 |
| 8/29/2017 | | $10.89 | $125.23 | $113.58 | $113.53 | $104.25 |
| 8/30/2017 | | $10.91 | $126.50 | $113.77 | $113.75 | $101.50 |
| 8/31/2017 | | $11.13 | $126.25 | $115.80 | $116.67 | $102.38 |
| 9/1/2017 | | $11.46 | $127.50 | $114.75 | $114.66 | $104.35 |
| 9/5/2017 | | $11.65 | $127.08 | $116.00 | $115.10 | $102.78 |
| 9/6/2017 | | $11.56 | $126.56 | $116.60 | $117.60 | $105.44 |
| 9/7/2017 | | $11.72 | $127.60 | $115.85 | $115.88 | $103.22 |
| 9/8/2017 | | $11.52 | $127.50 | $115.68 | $115.50 | $104.98 |
| 9/11/2017 | | $11.36 | $127.50 | $115.33 | $115.25 | $104.75 |
| 9/12/2017 | | $11.43 | $129.94 | $115.15 | $115.45 | $102.75 |
| 9/13/2017 | | $11.11 | $127.00 | $116.05 | $114.70 | $103.33 |
| 9/14/2017 | | $10.78 | $126.75 | $116.09 | $114.25 | $102.98 |
| 9/15/2017 | | $10.89 | $125.76 | $114.03 | $114.35 | $103.65 |
| 9/18/2017 | | $10.98 | $126.75 | $115.40 | $114.50 | $103.72 |
| 9/19/2017 | | $10.80 | $126.00 | $114.18 | $113.88 | $102.70 |
| 9/20/2017 | | $10.83 | $125.30 | $113.13 | $113.13 | $101.00 |
| 9/21/2017 | | $10.41 | $125.00 | $113.00 | $112.44 | $102.00 |
| 9/22/2017 | | $10.28 | $125.50 | $114.60 | $114.00 | $102.32 |
| 9/25/2017 | | $10.25 | $125.85 | $113.75 | $114.00 | $102.78 |
| 9/26/2017 | | $10.05 | $125.97 | $113.75 | $113.75 | $102.25 |
| 9/27/2017 | | $10.05 | $125.29 | $114.15 | $113.09 | $100.75 |
| 9/28/2017 | | $9.96 | $124.50 | $113.53 | $114.20 | $103.52 |
| 9/29/2017 | | $10.14 | N/A | $116.32 | $114.93 | $103.00 |
| 10/2/2017 | | $10.17 | $126.97 | $115.50 | $115.58 | $102.65 |
| 10/3/2017 | | $10.31 | $127.80 | $117.30 | $116.13 | $105.18 |
| 10/4/2017 | | $10.54 | $128.43 | $116.63 | $116.31 | $104.75 |
| 10/5/2017 | | $10.54 | $128.25 | $116.39 | $116.50 | $104.25 |
| 10/6/2017 | | $10.15 | $127.75 | $116.19 | $116.35 | $105.38 |

**Trading Days on which the "High" Price of the At-Issue Vale Securities was
At or Below the Minimum Average PSLRA "Bounce-Back" Price**

*Proposed Class Period: October 27, 2016 to February 6, 2019*

| Date | Minimum Average PSLRA "Bounce-Back" Price | Daily "High" Price | | | | |
|---|---|---|---|---|---|---|
| | | Vale ADRs | TAE3 Note | TAH6 Note | TAK9 Note | EAA3 Note |
| | | $11.20 | $115.44 | $106.36 | $106.42 | $94.76 |
| | | *(Shading denotes "high" price is equal to or below the "bounce-back" price)* | | | | |
| 10/9/2017 | | $10.04 | N/A | N/A | N/A | N/A |
| 10/10/2017 | | $9.91 | $128.13 | $118.12 | $116.38 | $104.60 |
| 10/11/2017 | | $9.91 | $129.45 | $117.00 | $116.13 | $105.62 |
| 10/12/2017 | | $9.97 | $127.63 | $117.00 | $116.33 | $105.63 |
| 10/13/2017 | | $10.48 | $127.75 | $117.14 | $116.70 | $105.00 |
| 10/16/2017 | | $10.65 | $130.00 | $116.50 | $116.65 | $103.81 |
| 10/17/2017 | | $10.46 | $128.10 | $117.29 | $117.30 | $107.00 |
| 10/18/2017 | | $10.23 | $129.00 | $117.92 | $117.48 | $105.13 |
| 10/19/2017 | | $10.35 | $131.50 | $118.43 | $118.50 | $105.70 |
| 10/20/2017 | | $10.56 | $132.25 | $120.53 | $118.99 | $106.13 |
| 10/23/2017 | | $10.34 | $132.24 | $121.34 | $119.38 | $107.27 |
| 10/24/2017 | | $10.39 | $130.25 | $121.04 | $119.03 | $107.25 |
| 10/25/2017 | | $10.41 | $129.08 | $118.75 | $118.75 | $107.40 |
| 10/26/2017 | | $10.30 | $129.02 | $118.66 | $119.75 | $105.68 |
| 10/27/2017 | | $10.06 | $129.11 | $118.91 | $119.10 | $107.69 |
| 10/30/2017 | | $10.09 | $132.50 | $119.23 | $119.23 | $106.17 |
| 10/31/2017 | | $9.95 | $132.07 | $119.82 | $119.78 | $108.27 |
| 11/1/2017 | | $10.16 | $132.75 | $120.55 | $120.49 | $109.28 |
| 11/2/2017 | | $10.26 | $134.13 | $121.25 | $120.89 | $109.75 |
| 11/3/2017 | | $10.22 | $133.68 | $121.00 | $121.10 | $109.60 |
| 11/6/2017 | | $10.54 | $134.13 | $121.10 | $121.00 | $107.93 |
| 11/7/2017 | | $10.47 | $131.88 | $122.00 | $121.00 | $107.88 |
| 11/8/2017 | | $10.44 | $133.50 | $120.80 | $119.92 | $108.50 |
| 11/9/2017 | | $10.23 | $132.25 | $119.93 | $119.93 | $106.93 |
| 11/10/2017 | | $10.11 | $129.25 | $119.50 | $119.25 | $105.97 |
| 11/13/2017 | | $10.19 | $130.94 | $119.30 | $118.70 | $105.63 |
| 11/14/2017 | | $10.05 | $129.13 | $120.79 | $119.13 | $108.00 |
| 11/15/2017 | | $9.87 | $128.76 | $118.77 | $119.21 | $105.25 |
| 11/16/2017 | | $10.00 | $130.33 | $119.18 | $119.50 | $106.13 |
| 11/17/2017 | | $10.18 | $131.13 | $119.75 | $119.53 | $106.25 |
| 11/20/2017 | | $10.20 | $131.75 | $120.03 | $120.22 | $107.15 |
| 11/21/2017 | | $10.50 | $134.96 | $120.90 | $120.90 | $109.95 |
| 11/22/2017 | | $10.84 | $134.86 | $123.09 | $123.25 | $107.99 |
| 11/24/2017 | | $11.13 | $132.00 | $121.00 | $120.75 | $107.83 |

Page 8 of 17

**Trading Days on which the "High" Price of the At-Issue Vale Securities was
At or Below the Minimum Average PSLRA "Bounce-Back" Price**

*Proposed Class Period: October 27, 2016 to February 6, 2019*

| | | Daily "High" Price | | | | |
|---|---|---|---|---|---|---|
| | | Vale ADRs | TAE3 Note | TAH6 Note | TAK9 Note | EAA3 Note |
| Date | Minimum Average PSLRA "Bounce-Back" Price | $11.20 | $115.44 | $106.36 | $106.42 | $94.76 |
| | | *(Shading denotes "high" price is equal to or below the "bounce-back" price)* | | | | |
| 11/27/2017 | | $11.02 | $134.88 | $121.63 | $121.75 | $108.38 |
| 11/28/2017 | | $11.42 | $135.36 | $122.25 | $122.25 | $108.90 |
| 11/29/2017 | | $11.31 | $135.70 | $122.15 | $122.50 | $108.93 |
| 11/30/2017 | | $11.01 | $133.00 | $122.40 | $122.75 | $110.88 |
| 12/1/2017 | | $11.04 | $135.48 | $122.75 | $122.88 | $112.60 |
| 12/4/2017 | | $11.41 | $135.70 | $123.75 | $123.28 | $109.76 |
| 12/5/2017 | | $11.47 | $133.97 | $123.62 | $123.61 | $110.39 |
| 12/6/2017 | | $11.09 | $133.55 | $123.50 | $123.63 | $110.45 |
| 12/7/2017 | | $10.76 | $136.23 | $123.30 | $123.00 | $111.80 |
| 12/8/2017 | | $10.89 | $134.60 | $124.50 | $123.17 | $110.60 |
| 12/11/2017 | | $10.94 | $133.01 | $123.17 | $123.25 | $111.20 |
| 12/12/2017 | | $11.06 | $133.75 | $122.35 | $122.95 | $109.48 |
| 12/13/2017 | | $11.02 | $132.88 | $122.50 | $122.90 | $111.95 |
| 12/14/2017 | | $10.97 | $136.03 | $122.49 | $122.60 | $109.63 |
| 12/15/2017 | | $11.28 | $135.90 | $122.82 | $122.84 | $109.65 |
| 12/18/2017 | | $11.58 | $135.66 | $122.83 | $122.80 | $109.87 |
| 12/19/2017 | | $11.60 | $132.78 | $122.60 | $122.71 | $109.68 |
| 12/20/2017 | | $11.94 | $133.75 | $122.90 | $123.07 | $109.58 |
| 12/21/2017 | | $12.08 | $135.54 | $123.25 | $123.44 | $110.25 |
| 12/22/2017 | | $12.03 | $133.00 | $122.88 | $123.25 | $110.00 |
| 12/26/2017 | | $12.11 | $132.72 | $123.26 | $123.19 | $110.08 |
| 12/27/2017 | | $12.12 | $133.01 | $123.50 | $122.78 | $110.47 |
| 12/28/2017 | | $12.20 | $132.97 | $122.81 | N/A | $109.75 |
| 12/29/2017 | | $12.30 | N/A | N/A | $121.59 | $109.60 |
| 1/2/2018 | | $12.80 | $132.60 | $123.04 | $123.33 | $112.00 |
| 1/3/2018 | | $12.87 | $134.00 | $124.10 | $124.53 | $113.11 |
| 1/4/2018 | | $13.09 | $136.50 | $124.19 | $125.50 | $111.13 |
| 1/5/2018 | | $13.09 | $137.31 | $125.10 | $125.00 | $111.20 |
| 1/8/2018 | | $13.32 | $136.97 | $125.50 | $124.68 | $111.33 |
| 1/9/2018 | | $13.42 | $133.61 | $124.55 | $127.12 | $111.25 |
| 1/10/2018 | | $13.21 | $133.07 | $124.09 | $124.18 | $111.05 |
| 1/11/2018 | | $13.46 | $135.75 | $124.75 | $124.75 | $111.30 |
| 1/12/2018 | | $13.57 | $137.79 | $124.50 | $124.75 | $111.32 |
| 1/16/2018 | | $13.31 | $133.88 | $124.60 | $124.85 | $111.75 |

Page 9 of 17

**Trading Days on which the "High" Price of the At-Issue Vale Securities was
At or Below the Minimum Average PSLRA "Bounce-Back" Price**

*Proposed Class Period: October 27, 2016 to February 6, 2019*

| Date | Minimum Average PSLRA "Bounce-Back" Price | Daily "High" Price | | | | |
|------|------|------|------|------|------|------|
| | | Vale ADRs | TAE3 Note | TAH6 Note | TAK9 Note | EAA3 Note |
| | | $11.20 | $115.44 | $106.36 | $106.42 | $94.76 |
| | | *(Shading denotes "high" price is equal to or below the "bounce-back" price)* | | | | |
| 1/17/2018 | | $13.36 | $133.87 | $124.58 | $125.00 | $111.75 |
| 1/18/2018 | | $13.49 | $133.91 | $124.48 | $124.94 | $111.76 |
| 1/19/2018 | | $13.43 | $132.00 | $124.40 | $124.13 | $111.60 |
| 1/22/2018 | | $13.32 | $133.57 | $124.35 | $124.75 | $111.43 |
| 1/23/2018 | | $12.83 | $134.25 | $124.50 | $124.68 | $111.62 |
| 1/24/2018 | | $13.31 | $134.75 | $124.77 | $125.16 | $112.38 |
| 1/25/2018 | | $13.28 | $135.75 | $125.87 | $126.25 | $113.08 |
| 1/26/2018 | | $13.19 | $135.40 | $126.06 | $126.90 | $113.38 |
| 1/29/2018 | | $13.24 | $135.16 | $126.75 | $126.75 | $114.88 |
| 1/30/2018 | | $13.11 | $134.83 | $126.00 | $126.50 | $112.90 |
| 1/31/2018 | | $13.42 | $135.10 | $126.03 | $126.80 | $113.13 |
| 2/1/2018 | | $13.35 | $135.20 | $125.63 | $126.53 | $112.91 |
| 2/2/2018 | | $12.93 | $133.93 | $124.75 | $125.83 | $111.25 |
| 2/5/2018 | | $12.96 | $135.00 | $123.57 | $124.25 | $110.25 |
| 2/6/2018 | | $13.10 | $132.50 | $122.10 | $122.84 | $109.78 |
| 2/7/2018 | | $13.14 | $134.94 | $122.03 | $123.03 | $109.66 |
| 2/8/2018 | | $12.87 | $130.57 | $121.00 | $121.12 | $108.00 |
| 2/9/2018 | | $12.93 | $130.59 | $117.25 | $118.25 | $105.28 |
| 2/12/2018 | | $13.17 | $128.25 | $118.41 | $119.25 | $106.50 |
| 2/13/2018 | | $13.32 | $131.33 | $118.53 | $119.16 | $106.15 |
| 2/14/2018 | | $14.00 | $130.56 | $119.75 | $119.00 | $106.33 |
| 2/15/2018 | | $14.18 | $131.00 | $120.01 | $120.80 | $107.75 |
| 2/16/2018 | | $14.37 | $131.25 | $121.00 | $121.50 | $109.03 |
| 2/20/2018 | | $14.29 | $130.18 | $120.50 | $120.75 | $108.38 |
| 2/21/2018 | | $14.10 | $129.57 | $119.92 | $120.68 | $108.06 |
| 2/22/2018 | | $14.00 | $129.62 | $119.00 | $119.32 | $106.99 |
| 2/23/2018 | | $14.22 | $132.33 | $120.69 | $119.75 | $107.13 |
| 2/26/2018 | | $14.67 | $130.66 | $120.50 | $121.50 | $109.04 |
| 2/27/2018 | | $14.62 | $129.55 | $120.34 | $121.13 | $107.75 |
| 2/28/2018 | | $14.42 | $129.94 | $120.75 | $121.41 | $108.10 |
| 3/1/2018 | | $13.96 | $132.12 | $120.53 | $120.95 | $107.63 |
| 3/2/2018 | | $13.42 | N/A | $120.03 | $120.70 | $106.97 |
| 3/5/2018 | | $13.45 | $131.96 | $120.55 | $120.75 | $107.15 |
| 3/6/2018 | | $13.85 | $131.50 | $121.03 | $121.52 | $107.66 |

**Appendix D**

## Trading Days on which the "High" Price of the At-Issue Vale Securities was At or Below the Minimum Average PSLRA "Bounce-Back" Price

*Proposed Class Period: October 27, 2016 to February 6, 2019*

| Date | Minimum Average PSLRA "Bounce-Back" Price | Daily "High" Price | | | | |
|---|---|---|---|---|---|---|
| | | Vale ADRs | TAE3 Note | TAH6 Note | TAK9 Note | EAA3 Note |
| | | $11.20 | $115.44 | $106.36 | $106.42 | $94.76 |
| | | *(Shading denotes "high" price is equal to or below the "bounce-back" price)* | | | | |
| 3/7/2018 | | $13.25 | $129.75 | $121.75 | $120.95 | $107.40 |
| 3/8/2018 | | $12.93 | $130.03 | $120.20 | $121.21 | $107.13 |
| 3/9/2018 | | $12.96 | $130.25 | $120.00 | $120.74 | $108.33 |
| 3/12/2018 | | $13.03 | $130.05 | $120.20 | $121.00 | $107.25 |
| 3/13/2018 | | $13.14 | $129.85 | $119.83 | $120.95 | $107.00 |
| 3/14/2018 | | $13.27 | $133.48 | $120.50 | $121.25 | $107.75 |
| 3/15/2018 | | $12.96 | $132.85 | $119.92 | $121.13 | $107.43 |
| 3/16/2018 | | $12.92 | $130.26 | $119.75 | $120.70 | $106.75 |
| 3/19/2018 | | $12.53 | $129.29 | $118.97 | $120.18 | $107.50 |
| 3/20/2018 | | $12.68 | $129.04 | $118.28 | $119.15 | $105.29 |
| 3/21/2018 | | $13.00 | $130.00 | $118.69 | $119.75 | $105.48 |
| 3/22/2018 | | $12.79 | $129.75 | $118.43 | $119.41 | $105.63 |
| 3/23/2018 | | $12.76 | $129.27 | $117.88 | $118.90 | $105.37 |
| 3/26/2018 | | $12.78 | $130.50 | $117.40 | $118.85 | $105.16 |
| 3/27/2018 | | $12.70 | $128.88 | $117.70 | $118.93 | $105.33 |
| 3/28/2018 | | $12.49 | $129.35 | $117.48 | $118.70 | $105.18 |
| 3/29/2018 | | $12.89 | $129.82 | $117.75 | $118.07 | $105.87 |
| 4/2/2018 | | $13.07 | $129.76 | $118.00 | $118.74 | $105.70 |
| 4/3/2018 | | $13.11 | $130.55 | $117.88 | $117.36 | $107.30 |
| 4/4/2018 | | $12.72 | $129.76 | $117.94 | $118.60 | $105.53 |
| 4/5/2018 | | $13.12 | $130.50 | $120.50 | $119.67 | $106.73 |
| 4/6/2018 | | $12.84 | $133.19 | $119.84 | $119.00 | $106.51 |
| 4/9/2018 | | $12.70 | $130.75 | $118.75 | $119.96 | $106.66 |
| 4/10/2018 | | $13.12 | $130.43 | $118.99 | $119.91 | $107.25 |
| 4/11/2018 | | $13.20 | $131.00 | $118.86 | $120.17 | $107.08 |
| 4/12/2018 | | $13.23 | $130.69 | $119.47 | $120.63 | $107.40 |
| 4/13/2018 | | $13.23 | $130.57 | $119.42 | $120.25 | $107.48 |
| 4/16/2018 | | $13.12 | $131.25 | $119.53 | $120.13 | $107.57 |
| 4/17/2018 | | $13.48 | $130.93 | $119.37 | $117.98 | $107.21 |
| 4/18/2018 | | $14.18 | $133.88 | $119.44 | $120.30 | $107.40 |
| 4/19/2018 | | $14.16 | $131.97 | $119.25 | $120.03 | $107.03 |
| 4/20/2018 | | $14.05 | N/A | $118.50 | $118.00 | $106.02 |
| 4/23/2018 | | $13.95 | $132.41 | $117.43 | $118.46 | $105.49 |
| 4/24/2018 | | $14.02 | $129.74 | $117.21 | $118.10 | $106.34 |

**Trading Days on which the "High" Price of the At-Issue Vale Securities was
At or Below the Minimum Average PSLRA "Bounce-Back" Price**

*Proposed Class Period: October 27, 2016 to February 6, 2019*

| Date | Minimum Average PSLRA "Bounce-Back" Price | Daily "High" Price | | | | |
|---|---|---|---|---|---|---|
| | | Vale ADRs | TAE3 Note | TAH6 Note | TAK9 Note | EAA3 Note |
| | | $11.20 | $115.44 | $106.36 | $106.42 | $94.76 |
| | | *(Shading denotes "high" price is equal to or below the "bounce-back" price)* | | | | |
| 4/25/2018 | | $13.87 | $128.75 | $116.53 | $117.56 | $104.60 |
| 4/26/2018 | | $14.07 | $128.80 | $117.00 | $117.83 | $104.50 |
| 4/27/2018 | | $14.11 | $128.38 | $116.25 | N/A | $104.05 |
| 4/30/2018 | | $14.03 | $131.07 | $116.03 | $116.93 | $103.76 |
| 5/1/2018 | | $13.91 | N/A | $115.34 | $116.23 | $103.25 |
| 5/2/2018 | | $13.92 | $127.18 | $115.41 | $116.03 | $103.03 |
| 5/3/2018 | | $13.98 | $127.05 | $116.83 | $115.78 | $102.43 |
| 5/4/2018 | | $14.17 | $127.40 | $114.75 | $115.75 | $102.53 |
| 5/7/2018 | | $14.03 | $128.63 | N/A | $115.53 | $104.99 |
| 5/8/2018 | | $13.92 | $128.00 | $114.43 | $115.18 | $102.03 |
| 5/9/2018 | | $13.99 | $126.63 | $114.15 | $114.78 | $101.70 |
| 5/10/2018 | | $14.48 | $127.61 | $114.88 | $115.50 | $102.69 |
| 5/11/2018 | | $14.95 | $128.05 | $115.60 | $116.44 | $103.55 |
| 5/14/2018 | | $15.00 | $128.55 | $115.75 | $116.62 | $103.30 |
| 5/15/2018 | | $14.93 | $128.27 | $115.10 | $114.76 | $102.75 |
| 5/16/2018 | | $15.24 | $128.07 | $115.00 | $115.48 | $102.57 |
| 5/17/2018 | | $15.09 | $127.83 | $114.57 | $115.16 | $102.50 |
| 5/18/2018 | | $14.87 | $127.16 | $114.16 | $114.53 | $101.08 |
| 5/21/2018 | | $14.85 | $127.06 | $113.68 | $114.27 | $102.38 |
| 5/22/2018 | | $14.53 | $127.20 | $114.29 | $114.52 | $102.50 |
| 5/23/2018 | | $14.42 | $127.00 | $114.14 | $114.87 | $101.78 |
| 5/24/2018 | | $14.57 | $127.04 | $114.34 | $114.09 | $101.76 |
| 5/25/2018 | | $14.22 | $126.66 | $113.78 | N/A | $103.95 |
| 5/29/2018 | | $14.00 | $126.47 | $113.11 | $113.75 | $101.04 |
| 5/30/2018 | | $13.78 | $126.55 | $113.28 | $114.22 | $100.98 |
| 5/31/2018 | | $13.80 | $126.00 | $112.82 | $114.13 | $100.59 |
| 6/1/2018 | | $14.11 | $126.07 | $112.56 | $113.89 | $100.27 |
| 6/4/2018 | | $14.22 | $125.50 | $112.88 | $113.79 | $100.57 |
| 6/5/2018 | | $14.34 | $125.66 | $112.83 | $113.88 | $100.90 |
| 6/6/2018 | | $14.73 | $124.91 | $112.50 | $112.93 | $99.80 |
| 6/7/2018 | | $14.48 | $124.78 | $111.53 | $112.55 | $99.41 |
| 6/8/2018 | | $14.10 | N/A | $112.36 | $111.75 | $101.08 |
| 6/11/2018 | | $14.08 | $123.88 | $110.55 | $111.78 | $100.03 |
| 6/12/2018 | | $14.15 | $123.08 | $109.62 | $110.55 | $97.50 |

**Trading Days on which the "High" Price of the At-Issue Vale Securities was
At or Below the Minimum Average PSLRA "Bounce-Back" Price**

*Proposed Class Period: October 27, 2016 to February 6, 2019*

| Date | Minimum Average PSLRA "Bounce-Back" Price | Daily "High" Price | | | | |
|---|---|---|---|---|---|---|
| | | Vale ADRs | TAE3 Note | TAH6 Note | TAK9 Note | EAA3 Note |
| | | $11.20 | $115.44 | $106.36 | $106.42 | $94.76 |
| | | *(Shading denotes "high" price is equal to or below the "bounce-back" price)* | | | | |
| 6/13/2018 | | $14.03 | $123.55 | $111.20 | $110.57 | $98.00 |
| 6/14/2018 | | $13.94 | $123.30 | $111.50 | $110.91 | $98.28 |
| 6/15/2018 | | $13.51 | $124.72 | $110.50 | $111.02 | $101.80 |
| 6/18/2018 | | $13.24 | $123.77 | $111.10 | $110.87 | $101.75 |
| 6/19/2018 | | $13.10 | $122.78 | $108.91 | $109.33 | $101.75 |
| 6/20/2018 | | $13.19 | $125.88 | $110.33 | $110.63 | $100.75 |
| 6/21/2018 | | $12.96 | $123.75 | $110.75 | $111.67 | $101.75 |
| 6/22/2018 | | $12.90 | $125.74 | $111.50 | $112.38 | N/A |
| 6/25/2018 | | $12.72 | $124.50 | $111.68 | $112.56 | $101.50 |
| 6/26/2018 | | $12.82 | $127.25 | $113.28 | $113.00 | $101.78 |
| 6/27/2018 | | $12.91 | $127.19 | $113.45 | $112.80 | $101.50 |
| 6/28/2018 | | $12.89 | $124.88 | $112.13 | $113.06 | $101.27 |
| 6/29/2018 | | $13.02 | $125.27 | $112.38 | $113.75 | $101.74 |
| 7/2/2018 | | $12.64 | $124.50 | $112.30 | $113.63 | $101.25 |
| 7/3/2018 | | $12.73 | $125.06 | $114.13 | $113.56 | $101.81 |
| 7/5/2018 | | $12.75 | $124.64 | $113.10 | $113.80 | $101.75 |
| 7/6/2018 | | $13.09 | $124.88 | $113.31 | N/A | $101.13 |
| 7/9/2018 | | $13.23 | $125.71 | $114.10 | $115.10 | $101.30 |
| 7/10/2018 | | $13.23 | $126.75 | $114.02 | $115.74 | $101.64 |
| 7/11/2018 | | $12.85 | $126.32 | $114.75 | $115.69 | $102.00 |
| 7/12/2018 | | $13.12 | $126.05 | $114.80 | N/A | $101.80 |
| 7/13/2018 | | $13.20 | $126.47 | $115.00 | $115.85 | $102.13 |
| 7/16/2018 | | $13.15 | $126.78 | $114.88 | $115.78 | N/A |
| 7/17/2018 | | $13.30 | $129.20 | $114.88 | $115.88 | $101.65 |
| 7/18/2018 | | $13.49 | $129.59 | $114.88 | $115.66 | N/A |
| 7/19/2018 | | $13.13 | $127.13 | $115.03 | $116.03 | $101.78 |
| 7/20/2018 | | $13.16 | $126.52 | $115.28 | $116.26 | $101.78 |
| 7/23/2018 | | $13.28 | N/A | $115.00 | $115.90 | $103.38 |
| 7/24/2018 | | $13.95 | $127.10 | $117.07 | $117.12 | $102.23 |
| 7/25/2018 | | $14.00 | $128.95 | $115.78 | $117.27 | $103.00 |
| 7/26/2018 | | $14.30 | $128.90 | $116.38 | $117.40 | $102.95 |
| 7/27/2018 | | $14.50 | $128.05 | $116.58 | $117.88 | $105.00 |
| 7/30/2018 | | $14.59 | $127.90 | $116.50 | $117.25 | $103.07 |
| 7/31/2018 | | $14.68 | $130.06 | $116.28 | $117.25 | $103.13 |

**Trading Days on which the "High" Price of the At-Issue Vale Securities was
At or Below the Minimum Average PSLRA "Bounce-Back" Price**

*Proposed Class Period: October 27, 2016 to February 6, 2019*

| | | Daily "High" Price | | | | |
|---|---|---|---|---|---|---|
| | | Vale ADRs | TAE3 Note | TAH6 Note | TAK9 Note | EAA3 Note |
| Date | Minimum Average PSLRA "Bounce-Back" Price | $11.20 | $115.44 | $106.36 | $106.42 | $94.76 |
| | | *(Shading denotes "high" price is equal to or below the "bounce-back" price)* | | | | |
| 8/1/2018 | | $14.38 | $128.36 | $116.17 | $117.25 | $103.05 |
| 8/2/2018 | | $14.08 | $128.60 | $115.85 | $116.78 | $103.37 |
| 8/3/2018 | | $14.27 | $128.15 | $115.91 | $117.05 | N/A |
| 8/6/2018 | | $14.22 | N/A | $116.21 | $117.01 | $103.50 |
| 8/7/2018 | | $14.44 | $128.07 | $116.75 | $117.25 | $105.08 |
| 8/8/2018 | | $14.21 | $127.95 | $116.34 | $117.25 | $103.04 |
| 8/9/2018 | | $13.98 | $130.54 | $116.13 | $117.13 | $102.83 |
| 8/10/2018 | | $13.48 | $127.38 | $117.50 | $116.66 | N/A |
| 8/13/2018 | | $13.55 | $126.04 | $114.48 | $115.38 | $101.25 |
| 8/14/2018 | | $13.67 | $126.92 | $115.09 | $116.15 | $102.45 |
| 8/15/2018 | | $13.29 | $127.25 | $115.25 | $116.75 | $101.75 |
| 8/16/2018 | | $13.16 | $126.75 | $115.39 | N/A | $104.97 |
| 8/17/2018 | | $13.06 | $127.46 | $115.99 | $116.59 | $102.40 |
| 8/20/2018 | | $13.13 | $127.63 | $116.17 | $117.37 | $104.30 |
| 8/21/2018 | | $13.07 | $127.81 | $116.42 | $116.70 | $103.27 |
| 8/22/2018 | | $13.15 | N/A | $116.25 | $117.50 | $103.47 |
| 8/23/2018 | | $13.08 | $130.89 | $116.88 | $117.28 | $102.80 |
| 8/24/2018 | | $13.30 | $127.68 | $116.32 | $117.28 | $103.16 |
| 8/27/2018 | | $13.65 | $127.97 | $116.39 | $117.16 | $103.16 |
| 8/28/2018 | | $13.74 | $127.25 | $116.20 | N/A | $102.82 |
| 8/29/2018 | | $13.59 | $127.54 | $116.10 | $117.07 | $102.80 |
| 8/30/2018 | | $13.41 | $127.54 | $115.85 | $116.88 | $102.29 |
| 8/31/2018 | | $13.29 | $126.88 | $115.88 | $116.50 | $102.67 |
| 9/4/2018 | | $12.82 | $126.53 | $115.34 | $116.02 | N/A |
| 9/5/2018 | | $12.75 | $125.88 | $115.07 | $116.03 | N/A |
| 9/6/2018 | | $13.05 | $126.05 | $115.06 | $116.07 | $102.00 |
| 9/7/2018 | | $13.15 | $126.24 | $115.48 | $116.75 | $102.28 |
| 9/10/2018 | | $13.19 | $128.00 | $115.00 | $116.38 | $102.13 |
| 9/11/2018 | | $12.76 | $126.38 | $115.00 | $115.65 | $103.75 |
| 9/12/2018 | | $13.04 | $128.52 | $114.98 | $116.25 | $102.36 |
| 9/13/2018 | | $13.10 | $126.75 | $115.19 | $116.00 | $101.75 |
| 9/14/2018 | | $13.30 | $127.03 | $115.07 | $116.40 | $101.75 |
| 9/17/2018 | | $13.44 | $126.37 | $114.75 | $115.88 | $102.13 |
| 9/18/2018 | | $13.96 | $126.70 | $114.70 | $115.50 | $101.88 |

**Trading Days on which the "High" Price of the At-Issue Vale Securities was
At or Below the Minimum Average PSLRA "Bounce-Back" Price**

*Proposed Class Period: October 27, 2016 to February 6, 2019*

| Date | Minimum Average PSLRA "Bounce-Back" Price | Daily "High" Price | | | | |
|---|---|---|---|---|---|---|
| | | Vale ADRs | TAE3 Note | TAH6 Note | TAK9 Note | EAA3 Note |
| | | $11.20 | $115.44 | $106.36 | $106.42 | $94.76 |
| | | *(Shading denotes "high" price is equal to or below the "bounce-back" price)* | | | | |
| 9/19/2018 | | $14.40 | $125.50 | $114.25 | $115.30 | N/A |
| 9/20/2018 | | $14.56 | $126.53 | $114.83 | $115.94 | $101.32 |
| 9/21/2018 | | $15.10 | $126.63 | $115.65 | $116.66 | $104.50 |
| 9/24/2018 | | $15.19 | $129.97 | $115.80 | $116.40 | N/A |
| 9/25/2018 | | $15.26 | $126.35 | $115.28 | $116.41 | $102.33 |
| 9/26/2018 | | $15.29 | $128.88 | $115.98 | $116.86 | $102.50 |
| 9/27/2018 | | $15.02 | $127.40 | $116.25 | $117.47 | $104.13 |
| 9/28/2018 | | $15.13 | $127.25 | $116.37 | $117.65 | $103.23 |
| 10/1/2018 | | $15.13 | $127.37 | $116.38 | $117.75 | $103.25 |
| 10/2/2018 | | $15.80 | $128.35 | $116.80 | $117.91 | $103.24 |
| 10/3/2018 | | $16.13 | $129.96 | $117.16 | $117.88 | N/A |
| 10/4/2018 | | $15.52 | N/A | $116.25 | $117.66 | $104.50 |
| 10/5/2018 | | $15.08 | N/A | $116.03 | $117.03 | N/A |
| 10/8/2018 | | $15.36 | $126.63 | N/A | N/A | N/A |
| 10/9/2018 | | $15.64 | $127.40 | $116.00 | $117.50 | $100.54 |
| 10/10/2018 | | $15.53 | $129.54 | $115.35 | $116.35 | $102.40 |
| 10/11/2018 | | $15.29 | $124.96 | $114.66 | $116.10 | N/A |
| 10/12/2018 | | $15.49 | $126.75 | $114.75 | $115.73 | $101.54 |
| 10/15/2018 | | $15.69 | $125.75 | $114.99 | $115.70 | N/A |
| 10/16/2018 | | $15.90 | $126.05 | $114.91 | $115.85 | $102.01 |
| 10/17/2018 | | $16.02 | $125.95 | $114.90 | $115.83 | $101.64 |
| 10/18/2018 | | $15.85 | $125.07 | $114.31 | $115.23 | $101.71 |
| 10/19/2018 | | $15.55 | $125.99 | $115.90 | $115.37 | N/A |
| 10/22/2018 | | $15.79 | $125.25 | $114.32 | $115.18 | $101.25 |
| 10/23/2018 | | $15.40 | $124.85 | $113.70 | $114.74 | $100.75 |
| 10/24/2018 | | $15.57 | $125.60 | $113.25 | $114.25 | $101.16 |
| 10/25/2018 | | $14.97 | $124.25 | $112.68 | $114.50 | $100.35 |
| 10/26/2018 | | $15.21 | $123.75 | $112.25 | $113.63 | $100.05 |
| 10/29/2018 | | $15.41 | $123.85 | $112.68 | $113.71 | $101.84 |
| 10/30/2018 | | $14.69 | N/A | $111.82 | $112.88 | $98.72 |
| 10/31/2018 | | $15.18 | $123.55 | $111.53 | $112.43 | $99.39 |
| 11/1/2018 | | $15.73 | $123.46 | $111.63 | $112.36 | $98.80 |
| 11/2/2018 | | $15.92 | N/A | $112.47 | $113.28 | $100.50 |
| 11/5/2018 | | $15.63 | $124.41 | $112.63 | $113.88 | N/A |

**Appendix D**

## Trading Days on which the "High" Price of the At-Issue Vale Securities was At or Below the Minimum Average PSLRA "Bounce-Back" Price

*Proposed Class Period: October 27, 2016 to February 6, 2019*

| Date | Minimum Average PSLRA "Bounce-Back" Price | Daily "High" Price | | | | |
|---|---|---|---|---|---|---|
| | | Vale ADRs | TAE3 Note | TAH6 Note | TAK9 Note | EAA3 Note |
| | | $11.20 | $115.44 | $106.36 | $106.42 | $94.76 |
| | | *(Shading denotes "high" price is equal to or below the "bounce-back" price)* | | | | |
| 11/6/2018 | | $15.44 | $126.22 | $112.60 | $113.91 | $100.36 |
| 11/7/2018 | | $15.42 | N/A | $113.30 | $115.00 | $100.15 |
| 11/8/2018 | | $15.63 | $124.50 | $114.33 | $114.73 | $100.82 |
| 11/9/2018 | | $15.04 | N/A | $114.83 | $115.78 | $100.97 |
| 11/12/2018 | | $14.70 | N/A | N/A | N/A | N/A |
| 11/13/2018 | | $14.74 | $124.28 | $114.00 | $115.60 | $100.88 |
| 11/14/2018 | | $14.74 | $124.13 | $113.88 | N/A | $100.90 |
| 11/15/2018 | | $14.99 | $123.25 | $113.75 | $114.47 | $100.00 |
| 11/16/2018 | | $15.04 | N/A | $114.90 | $114.30 | $99.91 |
| 11/19/2018 | | $14.82 | $123.00 | $113.03 | $113.50 | $100.50 |
| 11/20/2018 | | $14.42 | N/A | $114.65 | $114.16 | N/A |
| 11/21/2018 | | $14.37 | $122.00 | $112.38 | N/A | $99.20 |
| 11/23/2018 | | $13.67 | $119.90 | $112.80 | $112.76 | $99.65 |
| 11/26/2018 | | $13.15 | N/A | $112.16 | $113.25 | N/A |
| 11/27/2018 | | $12.94 | $122.39 | $112.42 | $112.68 | N/A |
| 11/28/2018 | | $13.57 | $124.43 | $111.80 | N/A | N/A |
| 11/29/2018 | | $13.59 | $123.50 | $112.33 | N/A | $99.30 |
| 11/30/2018 | | $13.87 | $122.62 | $112.49 | $113.39 | $99.88 |
| 12/3/2018 | | $14.28 | $123.16 | $113.45 | $114.38 | $101.03 |
| 12/4/2018 | | $14.18 | $123.50 | $113.45 | $114.54 | $100.43 |
| 12/6/2018 | | $13.56 | N/A | $112.38 | $113.80 | $101.59 |
| 12/7/2018 | | $13.73 | $124.68 | $113.99 | $114.07 | $99.10 |
| 12/10/2018 | | $13.04 | $122.80 | $112.93 | $113.88 | $100.32 |
| 12/11/2018 | | $13.22 | N/A | $113.63 | $114.55 | $100.44 |
| 12/12/2018 | | $13.29 | $123.31 | $114.25 | $115.00 | $101.50 |
| 12/13/2018 | | $13.16 | $124.05 | $114.78 | $115.50 | $101.25 |
| 12/14/2018 | | $13.12 | $124.00 | $114.60 | $115.37 | $101.55 |
| 12/17/2018 | | $13.41 | $124.57 | $115.22 | $115.88 | $103.85 |
| 12/18/2018 | | $13.36 | $123.00 | $115.69 | $116.55 | $102.08 |
| 12/19/2018 | | $13.50 | $125.24 | $115.25 | $116.08 | $101.80 |
| 12/20/2018 | | $13.25 | $124.42 | $115.38 | $116.16 | $101.63 |
| 12/21/2018 | | $13.23 | $123.75 | $114.75 | $115.50 | $101.13 |
| 12/24/2018 | | $13.03 | $124.75 | N/A | N/A | N/A |
| 12/26/2018 | | $13.07 | $122.90 | $113.03 | N/A | $99.24 |

Page 16 of 17

**Trading Days on which the "High" Price of the At-Issue Vale Securities was
At or Below the Minimum Average PSLRA "Bounce-Back" Price**

*Proposed Class Period: October 27, 2016 to February 6, 2019*

| Date | Minimum Average PSLRA "Bounce-Back" Price | Daily "High" Price | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | | Vale ADRs | TAE3 Note | TAH6 Note | TAK9 Note | EAA3 Note |
| | | $11.20 | $115.44 | $106.36 | $106.42 | $94.76 |
| | | *(Shading denotes "high" price is equal to or below the "bounce-back" price)* | | | | |
| 12/27/2018 | | $12.99 | $123.00 | $114.30 | $115.25 | $100.55 |
| 12/28/2018 | | $13.16 | $123.50 | $114.03 | $115.25 | $100.92 |
| 12/31/2018 | | $13.26 | N/A | $114.85 | N/A | N/A |
| 1/2/2019 | | $13.48 | $123.51 | $114.66 | $115.38 | $100.47 |
| 1/3/2019 | | $13.38 | $124.38 | $114.25 | $115.40 | $100.75 |
| 1/4/2019 | | $14.09 | $125.25 | $116.75 | $116.63 | $101.01 |
| 1/7/2019 | | $14.28 | $125.53 | $116.63 | $118.02 | $101.75 |
| 1/8/2019 | | $14.15 | $125.88 | $116.62 | $117.77 | $102.00 |
| 1/9/2019 | | $14.66 | $126.75 | $116.97 | $117.82 | $102.75 |
| 1/10/2019 | | $14.40 | $126.86 | $116.80 | $117.66 | $102.50 |
| 1/11/2019 | | $14.25 | $126.00 | $116.53 | $117.94 | $102.43 |
| 1/14/2019 | | $14.22 | $129.22 | $116.48 | $117.47 | $102.61 |
| 1/15/2019 | | $14.26 | $126.00 | $116.82 | $117.58 | $102.57 |
| 1/16/2019 | | $14.16 | $127.20 | $116.55 | $117.63 | $102.40 |
| 1/17/2019 | | $14.63 | N/A | $116.78 | $117.50 | $102.16 |
| 1/18/2019 | | $14.71 | $126.87 | $117.25 | $117.75 | $102.54 |
| 1/22/2019 | | $14.55 | $128.75 | $117.33 | $118.38 | $102.92 |
| 1/23/2019 | | $14.79 | $126.88 | $117.77 | $118.53 | $102.26 |
| 1/24/2019 | | $14.96 | $127.75 | $117.38 | $119.01 | $104.80 |
| 1/25/2019 | | $15.45 | $124.00 | $118.13 | $118.26 | $101.22 |
| 1/28/2019 | | $11.81 | $120.52 | $111.20 | $112.50 | $97.67 |
| 1/29/2019 | | $11.77 | $117.50 | $107.85 | $108.25 | $97.25 |
| 1/30/2019 | | $12.70 | $120.25 | $110.25 | $109.53 | $98.75 |
| 1/31/2019 | | $12.72 | $121.50 | $112.37 | $111.38 | $102.38 |
| 2/1/2019 | | $12.65 | $124.50 | $112.75 | $112.75 | $102.38 |
| 2/4/2019 | | $12.21 | $122.97 | $112.25 | $112.23 | $100.05 |
| 2/5/2019 | | $12.18 | $122.85 | $111.88 | $112.00 | $100.47 |
| 2/6/2019 | | $11.97 | $122.50 | $111.50 | $111.50 | $100.07 |

**Notes:**

[1] If the security was not traded on a given day, the "high" price is displayed as N/A.

[2] Shading indicates that the "high" price is at or below the minimum average PSLRA "bounce-back" price.

**Sources:**

Complaint; Bloomberg; TRACE Data for the Vale Notes; Exhibits 10 and 11.