# EXHIBIT 2

CONFIDENTIAL

Page 1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK

-----------------------------------x

IN RE:   VALE S.A. SECURITIES LITIGATION


             No. 19-cv-526-RJD-SJB

-----------------------------------x


            CONFIDENTIAL


   VIRTUAL DEPOSITION OF STEVEN FEINSTEIN

            March 24, 2021


Reported By:

     JEREMY RICHMAN

CONFIDENTIAL

Page 2

March 24, 2021

10:00 a.m.

Virtual Videotaped Deposition of STEVEN FEINSTEIN, taken by Defendant, at the offices of Gibson Dunn & Crutcher LLP, 200 Park Avenue of the Americas, New York, New York, before JEREMY RICHMAN, a Shorthand Reporter and Notary Public within and for the State of New York.

Page 4

STIPULATIONS

IT IS HEREBY STIPULATED AND AGREED, by and among counsel for the respective parties hereto, that the filing, sealing and certification of the within deposition shall be and the same are hereby waived;

IT IS FURTHER STIPULATED AND AGREED that all objections, except as to form of the question, shall be reserved to the time of the trial;

IT IS FURTHER STIPULATED AND AGREED that the within deposition may be signed before any Notary Public with the same force and effect as if signed and sworn to before the Court.

* * *

Page 3

A P P E A R A N C E S:

KAPLAN FOX
    Attorneys for Plaintiffs
    850 Third Avenue
    New York, New York 10022

BY:   DONALD R. HALL, ESQ.
      AARON SCHWARTZ, ESQ.
      MELINDA D. CAMPBELL, ESQ.

GIBSON DUNN & CRUTCHER LLP
    Attorneys for Defendants
    200 Park Avenue, 47th Floor
    New York, New York 10166-5268
BY:  CHRISTOPHER M. JORALEMON, ESQ.
     ALISHA SIQUEIRA, ESQ.
     JASON BRESSLER, ESQ.

ALSO PRESENT:
    AHMER NABI
RON MARRAZZO, Videographer

Page 5

S. FEINSTEIN

THE VIDEOGRAPHER:  Good        10:05:15
morning, we are now going on the       10:05:26
record.  The time is approximately     10:05:28
10:05 a.m. It is the 24th of          10:05:30
March 2021.  Audio and video           10:05:34
recording will continue to take        10:05:37
place unless all parties agree to      10:05:39
go off the record.                     10:05:41
    This is the video recorded        10:05:42
deposition of Steven Feinstein in      10:05:43
the matter of Vale S.A. securities     10:05:46
litigation.  This case is filed in     10:05:50
the United States District Court,      10:05:52
Eastern District of New York.  This    10:05:54
deposition is being held via Zoom      10:05:56
video conference.                      10:05:58
    My name is Ron Marazzo from        10:05:59
the firm Veritext Legal Solutions,     10:06:03
and our court reporter is Jeremy       10:06:05
Richman from the firm Veritext         10:06:07
Legal Solutions.  I'm not related      10:06:10
to any party in this action, nor am    10:06:12
I financially interested in the        10:06:14
outcome.                               10:06:15

2 (Pages 2 - 5)

CONFIDENTIAL

Page 42

S. FEINSTEIN

the work is done under my direction, and we've done enough evaluations that are similar so that the level of direction varies from case to case depending on how unusual the case is. But we knew that we would be studying the Cammer Krogman factors for market efficiency. It's a set of factors that require evaluation of specific data, so I assigned that, I believe I assigned it to Jack Long. He did that. He reported back to me what the findings were.

We talked about how we're going to address the empirical factor, what sort of statistical test would be appropriate, given the company and the time frame. We build a regression model that's appropriate for the securities involved. We run the regression model. We do what's called a news analysis. A news analysis is where I personally, but also supported by staff, peruse -- we're not going to

Page 43

S. FEINSTEIN

read every one of the four or 5,000 articles published by the company, but we skim through the headlines, stopping where it's clear from the headlines of these articles that important news events may have occurred, and read those articles more carefully, but we do a pretty careful review of what was the experience of the company over the time frame at issue, and based on that, we make a determination about what events ought to be tested to see if there's empirical evidence of a demonstration of market efficiency.

We run those tests, we evaluate those tests. Depending on what the outcome is, we conduct further analysis or not. We then talk about the results as we have them, determine what the opinion is going to be, and write it up.

A lot -- I should add, a lot of the writing has been honed -- a lot of the writing is common to different

Page 44

S. FEINSTEIN

market efficiency reports. For example, the definition of what market efficiency is, it would be the same definition whether it's this case or another case. So that language has been honed, and we'll use prior reports as a template for sections that are common -- that are common descriptions of common phenomenon.

Q. Who's responsible for the actual drafting of the report?

A. Well, much of it has already been drafted, both for, if it's common topics, like definition of market efficiency, and that's entirely mine. Over the years people have made suggestions to me about clarity, and so I would make edits and changes, but most of it is my words that I've written, maybe not specifically for this case, but that I've written.

A section, like, about the company, we have that on page 7 of this report. I'll ask one of the analysts

Page 45

S. FEINSTEIN

working with me to do a rough draft, get a rough draft started about the company so that when I get it, I'm not looking at a blank piece of paper. I've got something already there. I'll read what they've written, and then I'll rewrite it, essentially, rewrite it, edit it, do further research. I do rely on my staff to get the ball rolling on each of these sections, and then I review them and direct them and complete them, and make them my own.

Usually when I write, I like to have someone, in the old days before COVID, right next to me. I like writing with a partner. We've been -- over the last year we've been working virtually side by side as I write each section, or rewrite each section.

Q. Did anyone beyond you or CFR staff draft any portion of your report?

A. No.

Q. Did you make any changes to your report at the request of counsel?

12 (Pages 42 - 45)

CONFIDENTIAL

Page 78

S. FEINSTEIN

complaint alleges were false or misleading?

A. Yes, the very last page of that order, I think it was an appendix, was a table of dismissed alleged misrepresentations, and then actionable ones. And I looked at that list. Wait one moment, though. Another reason for looking at an order like that, what I do is in the general course of any engagement, but in this case it was also very valuable, was to read the judge's take on what the allegations are, and what the relevant experience of the company was during this proposed class period, and that was helpful to me in writing the allegation section, and review the recap of the allegations in my report.

Q. Do you recall, sitting here today, what your conclusions were with respect to the judge's take on those issues?

MR. HALL: Objection.

Page 79

S. FEINSTEIN

A. Yes. That the judge relayed them in a very succinct and clear manner, which was helpful for me understanding the allegations.

Q. Now, is it your understanding that that May 20th memorandum and order reflected the court's view of the allegations?

A. No. There was no determination on the merits of the allegations. What I'm saying is that in the order itself, the judge summarizes the allegations, and that summary was helpful to me.

Q. Got it, okay. Do you know whether all of the alleged misstatements that remain in this case preceded the dam collapse?

A. Well, I know that corrective disclosures continued after the dam collapse, and so that the allegations were not yet full disclosure to the marketplace about -- well, about what had been concealed via the

Page 80

S. FEINSTEIN

representations and omissions. I don't recall, without looking at that document, whether there were alleged misrepresentations, I mean, so clearly -- let me back up.

So clearly, the allegations include that there continued to be omissions after the dam collapse. I don't recall, as I sit here now, whether there were affirmative misrepresentations alleged after the dam collapse.

Q. Would that information be relevant to your analysis, that is, whether there were both precollapse affirmative misstatements and post-collapse affirmative misstatements?

A. No, the damage model will accommodate either.

Q. Okay. Now, I note that the February 18th report marked as Exhibit 2 here is a corrected version of your report; is that right?

Page 81

S. FEINSTEIN

A. That's right.

Q. What corrections did you make to your report?

A. Well, I corrected errors that I identified. I identified errors immediately after it had been submitted, and put together an errata sheet, put together the corrected version and notified the client immediately so that I can submit the corrected version. There's a whole page. You have it, I don't have it in front of me, but there's two pages, I believe, that list what the corrections were.

Q. How did you go about identifying the errors in your report that were corrected?

A. Well, I think it's -- to understand, put this into context, it's important to explain how the errors occurred. So as I explained, when I wrote the report and when I finalized the report, even, when I thought I

21 (Pages 78 - 81)

CONFIDENTIAL

Page 94

S. FEINSTEIN

In the case of distress, they get paid before any capital is distributed to equity holders, although hard to believe that whatever happened with Vale, that there would be that kind of distress.

In the case of a cash crunch, note investors get their coupons before equity investors would get any dividends. I cite to the, some of the different characteristics of bonds versus stock in the report. Bonds tend to trade less frequently, but in larger quantities than do stocks or ADRs. And that was certainly the case for these securities.

The payments to notes are fixed. That's why they're called fixed income securities. There's a fixed coupon rate that determines what the coupon dollar amounts would be. And they, whereas equities, the -- typically with equities, the dividend was more at the discretion of the board

Page 95

S. FEINSTEIN

of directors of the company. With respect to Vale, there were some constraints on the dividend, but nonetheless, there's more discretion in the determination of a dividend than there is in the payment of a coupon.

And the other thing is the ADRs are exactly that, an American depository receipt. They are backed by a Brazilian security. Brazilian securities are deposited with a depository, and then the value and cash flows to those Brazilian securities determines the value and cash flows to the ADRs, whereas the notes themselves traded directly on the New York Stock Exchange as themselves, not as a receipt representing a deposit. Those are the main differences.

Q. You agree that generally, bond valuations are, by design, less sensitive to most company news, right?

A. Yes. But I want to be clear, they're less sensitive by design, by

Page 96

S. FEINSTEIN

virtue of fundamental financial principles, not because by design investors wouldn't care to monitor valuation relevant information. It's just that more information is going to be -- more and different information -- more information will impact, on a day-to-day basis, ADRs than a bond.

Q. Well, let's take the example of earnings prospects for a company. Do you agree that an investor in a company's bonds would be affected differently than investors in an equity security by any representations concerning earnings prospects?

MR. HALL: Objection.

A. Yes, I totally agree with that. For the bond holders, what they care about is, are the earnings sufficient so that the company can afford the coupon, whereas the residual investor, which is the equity investor, they're saying, Well, after -- is the cash flow enough so I can get what I

Page 97

S. FEINSTEIN

expected my dividend to be.

Q. Given that, is it fair to say, Dr. Feinstein, that as a general matter, investors in bonds have a different risk tolerance than investors in equities?

MR. HALL: Objection.

A. It's hard to characterize across -- in terms of generalizations, it's hard to generalize that to that extent. Institutions that own equities also own bonds, so some institutions own both. It doesn't mean that -- I mean, it's -- it's each -- it's hard -- I don't think you can generalize, because you're going to find some investors that prefer one over the other, and you're going to find investors that buy both.

Q. Understood. You can always find examples of different risk profiles. I'm asking as a general matter of an expert in finance, do you agree that equity investors, generally

25 (Pages 94 - 97)

CONFIDENTIAL

Page 98

S. FEINSTEIN

speaking, are less risk averse than  12:06:06
bond investors?  12:06:09
        MR. HALL:  Objection.  12:06:11
    A.   Look, I'll give you this:  12:06:11
I'll say that bonds tend to be safer  12:06:14
investments than stocks, but you've got  12:06:16
the same investors buying both.  12:06:21
Commonly, typically, I mean, investors  12:06:27
make a choice of -- investors across  12:06:29
the entire spectrum make a choice of  12:06:35
what their mix of stock and bonds is  12:06:37
going to be, so investors typically,  12:06:39
across the entire range of risk  12:06:40
preferences and risk tolerances, will  12:06:43
be buying some combination of both.  12:06:45
        They're not, it's not  12:06:47
segregated where only risk averse  12:06:48
investors by -- there's no segregation  12:06:50
that says risk-averse investors only  12:06:54
buy stocks -- buy bonds, and  12:06:56
risk-tolerant investors only buy  12:06:59
stocks.  It's just not how modern  12:07:00
principles of investment work.  12:07:03
    Q.   No, I agree, I wasn't asking  12:07:05

Page 99

S. FEINSTEIN

you to embrace such a broad  12:07:07
proposition, I'm simply talking about  12:07:10
the differences in risk profiles  12:07:11
between a bond investment and an  12:07:14
equities investment.  12:07:16
        So let me try this a  12:07:19
different -- I didn't have a question  12:07:21
for you.  12:07:24
    A.   No, I mean, bonds, as an  12:07:25
isolated individual security, tend to  12:07:29
be safer.  Their cash flows are more  12:07:30
predictable than are stocks, that's a  12:07:34
fact.  But it doesn't -- that doesn't  12:07:37
produce a segregation in the market  12:07:42
where they're only bought by one class  12:07:45
of investors, and the other security  12:07:48
equities is bought by another class of  12:07:52
investors.  12:07:54
        Typically, investors, whether  12:07:55
institutional or individual, will hold  12:07:56
some combination of both.  12:08:00
        Now, you do have institutions  12:08:02
that specialize in one or the other.  I  12:08:04
mean, there are bond portfolio funds,  12:08:07

Page 100

S. FEINSTEIN

and then there are stock portfolio  12:08:11
funds.  Because of the nature of their  12:08:13
investment policy statement or their  12:08:17
purpose or their charter, they're  12:08:20
required to buy only one or the other,  12:08:23
but then those products that those bond  12:08:27
or equity mutual funds offer are often  12:08:29
blended together into institutional and  12:08:32
individual portfolios.  12:08:34
    Q.   Okay.  You agree with the  12:08:42
statement that the trading behavior and  12:08:44
price movements of corporate bonds  12:08:45
differ markedly from those of common  12:08:48
stock, correct?  12:08:53
        MR. HALL:  Objection.  12:08:53
    A.   Yes.  12:08:54
    Q.   And you also agree with the  12:08:54
proposition that bonds generally trade  12:08:56
less frequently than stocks, right?  12:08:58
    A.   Yes.  12:09:00
    Q.   In fact, bonds may not trade  12:09:01
at all on any given day, isn't that  12:09:05
right?  12:09:07
    A.   Well, it's true that some  12:09:16

Page 101

S. FEINSTEIN

bonds won't have any trading in a  12:09:18
particular day.  And that -- I mean,  12:09:20
there were some examples in this case  12:09:23
of that, but much less frequently than  12:09:24
most corporate bonds.  These bonds  12:09:29
traded far more actively than other  12:09:30
corporate bonds that have been studied  12:09:35
in the literature.  12:09:38
    Q.   So with respect to your  12:09:41
analysis here, you found that the Vale  12:09:42
ADRs and bonds did not always  12:09:44
experience the same price movements on  12:09:46
the dates you analyze; isn't that  12:09:48
right?  12:09:51
    A.   Yes.  12:09:51
    Q.   For example, if you look at  12:09:51
paragraph 275 of your report, you  12:09:53
concluded that only one of the bonds,  12:09:55
QUSIP with TAP8, had a price reaction  12:09:59
that was statistically significant at  12:10:03
the 95 percent confidence level on  12:10:05
February 4th; is that right?  12:10:08
    A.   Right, well six of the seven  12:10:09
bonds moved.  Only one of them moved by  12:10:17

26 (Pages 98 - 101)

CONFIDENTIAL

Page 134

S. FEINSTEIN

trading is going to be easy.  And you know that someone with -- if there's a lot of market makers, you know that there's not likely to be an impediment to getting your trades placed.

You know that if there's a lot of coverage by securities analysts, you know that it's not likely that there would be an impediment to market a security caused by a blockage of information, a blockage making information unavailable.  So existence of market makers and coverage by security analysts do go to the market behavior of the stock.  They do tell you something about how the stock is likely to behave.

I understand that Tabak and others writing this article wanted to focus attention on the empirical factor.  They're suggesting a new kind of test, but I think they were wrong, or maybe just too early, in -- chronologically, to disparage the other

Page 135

S. FEINSTEIN

Cammer Krogman factors to this extent.

Q.   Well, so just again, so we're clear, this Exhibit 3, the St. John's Law Review article concluded that there were instances in which a security satisfied the fifth Cammer factor, but in fact traded in a clearly inefficient market.  You're aware of that, right?

A.   Yeah, I'm aware that there are rare, infrequent exceptions.

Q.   And did you consider those exceptions in reaching your conclusions in this case?

MR. HALL:  Objection.

A.   I did.  I ran the entire battery of tests.

Q.   What does that entire battery of tests include?

A.   I looked at all the Cammer and Krogman factors, and I ran an event study on events that are indisputably important events in the life of this company.

Q.   Well, turning to that event

Page 136

S. FEINSTEIN

study, would you agree that an integral step in conducting a market efficiency event study is the identification of similar events to test?

MR. HALL:  Objection.

A.   Yes, yes.

Q.   And you agree that events should be selected on the basis of an independent analysis of which candidate events are the most informative about market efficiency?

A.   That's correct.

Q.   Now, the four news dates you selected for your event study here are the four dates alleged to be corrective events by plaintiffs, correct?

MR. HALL:  Objection.

A.   No.  Well, no, not anymore.  I don't think that January 28th -- I think January 28th was dismissed as a collective disclosure, so I considered it an important event.  The news that was coming out was important enough that that date would be a good

Page 137

S. FEINSTEIN

candidate for testing market efficiency, but I think that it was determined by the judge not to be relevant for the allegations or damages.

Q.   Just so we're clear, my question to you was, you understand the four dates you selected are the four dates on which corrective events occurred according to the complaint, according to plaintiffs?

MR. HALL:  Objection.

A.   Yes, originally.

Q.   And was it just a coincidence that the four dates you selected are the four corrective disclosure dates alleged in the complaint?

MR. HALL:  Objection.

A.   Probably not a coincidence at all.  This is a large company with, that's, as characterized by the analysts as fairly predictable.  The lawyers, apparently, were drawn to those dates because they were -- well,

35 (Pages 134 - 137)

CONFIDENTIAL

Page 138

S. FEINSTEIN

for legal reasons, I mean, they were 12:50:49 anomalous, and apparently indicated 12:50:52 that there may have been fraud, but I 12:50:57 was drawn to them because they were big 12:50:59 news days. 12:51:03

Q. Well, you read the complaint 12:51:04 before conducting your event study, 12:51:09 right? 12:51:12

A. That's right. 12:51:12

Q. And you were aware, from the 12:51:13 allegations in the complaint, that Vale 12:51:15 Securities experienced highly negative 12:51:18 price changes on those four days, 12:51:20 right? 12:51:23

A. Well, what I was more 12:51:24 interested in is that they were big 12:51:26 news days. They were very, very big 12:51:29 news days. There was, I mean, it's 12:51:35 indisputable that on those days, there 12:51:37 was a heavy flow of news that was, on 12:51:42 balance, either positive or negative; 12:51:46 in this case negative; and therefore, 12:51:48 they were ideal candidates for testing 12:51:51 whether the securities traded 12:51:53

Page 139

S. FEINSTEIN

efficiently. 12:51:57

I would imagine the lawyers 12:52:00 were interested in days where 12:52:01 misrepresentations and omissions were 12:52:07 corrected, or maybe days on which their 12:52:09 clients and plaintiffs, lead plaintiff 12:52:12 suffered losses, but we were drawn to 12:52:16 the days, those days those events 12:52:18 occurred, and they served different 12:52:22 purposes for different people. For me 12:52:23 they served the purpose of being 12:52:25 indisputably big, adverse news days. 12:52:27

Q. My question -- thank you. My 12:52:34 question was, prior to designing your 12:52:37 event study, were you aware that the 12:52:39 four dates ultimately used, Vale 12:52:41 Securities experienced significant 12:52:46 negative price changes? 12:52:47

MR. HALL: Objection. 12:52:49

A. No, no. I was not aware of 12:52:51 any statistical significance 12:52:55 determination for any of those days 12:53:00 before I built my regression model and 12:53:04 ran the T-test. And numerous times I 12:53:07

Page 140

S. FEINSTEIN

find in other cases, I have found in 12:53:12 other cases that days that are alleged 12:53:16 to be corrective disclosure dates are 12:53:19 not statistically significant. 12:53:21

Didn't turn out to be the 12:53:24 case here with respect to the ADRs, but 12:53:26 nonetheless, I had no way of knowing if 12:53:28 they would be statistically significant 12:53:32 until I ran what's called the T-test. 12:53:33

All I knew going in was that 12:53:36 these were big information days that 12:53:39 indisputably were important news and 12:53:42 negative news, and therefore ideal 12:53:45 candidates for running a market 12:53:47 efficiency event study. 12:53:49

Q. So is it your testimony that 12:53:51 you reached that conclusion independent 12:53:54 of the allegations in the complaint? 12:53:56

A. That there were statistically 12:53:58 significant drops on those days? Yes. 12:54:01 I don't think there's any -- I don't 12:54:05 think the complaint tells you whether 12:54:06 or not those drops were statistically 12:54:07 significant. 12:54:10

Page 141

S. FEINSTEIN

Q. Well, let me ask you this: 12:54:10 Just as a general matter, would a 12:54:13 security price drop of 20 percent, in 12:54:16 your experience, qualify as 12:54:19 statistically significant on a given 12:54:21 day? 12:54:22

MR. HALL: Objection. 12:54:24

A. That's true. Something that 12:54:24 big usually would be, that's right. 12:54:29

Q. How about 8 percent on a 12:54:30 different day? 12:54:31

A. Not necessarily. Could be, 12:54:32 depends on the stock. I don't know, 12:54:33 for Vale, probably yes, because it was 12:54:36 so stable. 12:54:38

However, something like a 12:54:48 20 percent drop or an 8 percent drop, 12:54:53 after separating out market and sector 12:54:58 and currency effects using the 12:55:00 regression, might produce a residual 12:55:02 return that's very small, very modest. 12:55:10 I mean, that 20 or 8 or some number in 12:55:13 that range might not be because of 12:55:17 company specific information, and just 12:55:20

36 (Pages 138 - 141)

CONFIDENTIAL

Page 186

S. FEINSTEIN

Dr. Tabak writes, "To test the general proposition of whether a stock price responds to news, it is necessary to examine the stock price responses to two different groups of dates; those with news and those without news." Do you see that?

A. I see that.

Q. Do you agree with that?

A. As a general principle, yes, but not with a specific manner of addressing it that he then follows with. So for example, my event study and the event studies described by Professor Fama do compare news days to non-news days, because the regression is estimated across all days that include all the non-news days, and then whether or not the news day or the selected event day stands out as unusual against that backdrop is a comparison of a news day to a non-news day.

But I know, that's not, so

Page 187

S. FEINSTEIN

there are more -- let me just leave it at that. So as a general proposition I do agree, but I would also want to point out there are different ways of making that comparison. There's not just one way to make that comparison.

Q. If you read down further in paragraph 23, on the top of page 14, Dr. Tabak explains that establishing two such groups -- that is, days with news and days without news -- "is necessary, because even if the market for a stock were not efficient, there would generally still be some news days that were randomly associated with stock price movements." Do you agree with that observation?

A. Well, I do agree that it is possible for some news days to randomly be associated with stock price movements, but you don't necessarily have to run the type of test that -- I disagree with the methodology in the sentence before that being a necessary

Page 188

S. FEINSTEIN

way of conducting a market efficiency event study. There are at least two different ways, and probably more ways of running valid market efficiency event studies, his proposed method being only one.

Q. Well, what method did you apply here to compare news days to non-news days in the Vale Securities?

A. I ran a regression across all days, using control variables or dummy variables to isolate out potentially important news days, so the regression does establish the normal range of movement on non-news days, and then the event study compares the stock price movements on the news days, the four selected event days, to what's typical for non-news days to see if they -- if the news days stand out, and in fact they did. They stood out far, you know, to a highly significant degree.

So the regression model, the regression model establishes the

Page 189

S. FEINSTEIN

control, the regression model establishes -- the regression model uses all non-news days as a control group, and it compares all the days in the class period, all typical days to the unusual news days.

Q. Dr. Feinstein, did you do anything in your analysis to remove any possible subjectivity on your part as to which news days were selected for examination?

MR. HALL: Objection.

A. Yes, a number of things. One is I picked days that, frankly, before today I would think were indisputably important news days. It's hard to fathom that somebody would consider the dam break and the immediate aftermath flow of information to be unimportant to Vale and Vale's investors, so I picked event days that are indisputably, objectively important news days.

Q. And it's your testimony that

48 (Pages 186 - 189)

CONFIDENTIAL

Page 238

S. FEINSTEIN

earnings announcements were not -- were    15:32:44
uniformly unsurprising, uniformly    15:32:47
uneventful in this case based on the    15:32:51
information in the news analysis.    15:32:53
    I've seen people use other    15:32:56
buckets. Essentially, they call them    15:32:58
buckets or screens or groups. One has    15:33:00
to be careful. I mean, if you start,    15:33:06
you know, if you do anything novel, you    15:33:08
look like you're data mining, and it    15:33:10
looks like you're being too creative,    15:33:13
so I didn't want to do something too    15:33:15
novel. But also, well, two groups that    15:33:18
I know Dr. Tabak uses are 8Ks or 6ks,    15:33:24
and sometimes just appearance of    15:33:28
news -- of the name of the company in    15:33:30
news articles. And I don't think those    15:33:32
are good methodologies. You capture    15:33:35
too many non-news days in that    15:33:39
approach.    15:33:41
    Q.   In other cases in which    15:33:41
you've analyzed market efficiency,    15:33:45
you've performed collective event    15:33:49
studies, correct?    15:33:51

Page 239

S. FEINSTEIN

    MR. HALL:  Objection.    15:33:51
    Q.   I think the answer was yes;    15:34:11
is that right, Doctor?    15:34:13
    A.   Yes.    15:34:14
    Q.   In fact, it would be fair to    15:34:14
say that in the majority of your prior    15:34:25
engagements where you were analyzing    15:34:26
market efficiency, you've conducted a    15:34:28
collective event study; is that right?    15:34:29
    A.   Not in the majority over the    15:34:32
course of my career, but reasonably,    15:34:34
the majority over the last couple    15:34:36
years. The methodology has to fit the    15:34:38
facts and circumstances of the case.    15:34:44
So you can't just apply a methodology    15:34:45
blindly, it's got to fit.    15:34:48
    And in this case, grouping    15:34:50
earnings announcements as a high    15:34:53
information flow date or treating them    15:34:55
like a high information flow group    15:34:58
would have been inappropriate, because    15:35:00
for this company those dates were not    15:35:02
that.    15:35:07
    Q.   Well, isn't it true that the    15:35:08

Page 240

S. FEINSTEIN

aim of a collective event study is to    15:35:14
identify dates when you would expect    15:35:17
higher information flow regardless of    15:35:21
the news released; is that correct?    15:35:25
    MR. HALL:  Objection.    15:35:30
    A.   Well, you -- the buckets that    15:35:30
you construct have to be justified as    15:35:40
one bucket being abnormally high    15:35:46
information flow, and the other bucket    15:35:50
being everything else, or everything    15:35:51
more ordinary.    15:35:54
    Q.   Well, it's the abnormally    15:35:56
high that I'm having trouble with.    15:35:57
Isn't it just higher than normal,    15:35:59
meaning --    15:36:03
    MR. HALL:  Objection.    15:36:04
    Q.   -- I mean, are you comparing    15:36:04
days where there's no news to days    15:36:08
where there's a higher flow of news?    15:36:11
Is that the sort of overarching aim of    15:36:13
a collective event study, or is it    15:36:16
something different?    15:36:18
    A.   No, you got it right, that's    15:36:19
about right, what you just said.    15:36:20

Page 241

S. FEINSTEIN

    Q.   Okay. And you agree with    15:36:21
this statement, just to -- I'm quoting    15:36:24
you to yourself, out of fairness, but    15:36:26
in the Grupo Televisa case in your    15:36:33
report you stated "Each event" -- this    15:36:35
is about a collective event study, I    15:36:37
apologize. "Each event need not be so    15:36:39
momentous as to be expected to elicit a    15:36:43
significant ADR price reaction; rather,    15:36:45
the group of events is selected such    15:36:47
that the group as a whole is    15:36:50
characterized as having higher    15:36:52
information flow than ordinary days."    15:36:54
    Do you agree with that    15:36:56
general principle, as stated in your    15:36:58
Grupo Televisa report?    15:37:01
    A.   Right, for cases, facts and    15:37:04
circumstances where that test is    15:37:06
appropriate, right. It fit the Grupo    15:37:07
test -- case, rather. That methodology    15:37:13
did.    15:37:15
    Q.   And why doesn't it -- why    15:37:16
doesn't that methodology fit this case,    15:37:28
in your opinion?    15:37:30

61 (Pages 238 - 241)

CONFIDENTIAL

Page 242

S. FEINSTEIN

A. This company had been 15:37:31 predictable, its earnings announcements 15:37:34 were uneventful. 15:37:36

Q. I understand that that was 15:37:43 your assessment, but how do you -- what 15:37:44 does that assessment have to do with 15:37:47 the notion of identifying days that, as 15:37:50 a whole, have higher information flow 15:37:56 than ordinary days? 15:37:59

A. I'm not sure I understand the 15:38:04 question. I mean -- 15:38:06

Q. It seems like there are two 15:38:07 different things you're talking about, 15:38:09 right? Clearly you agree that as a 15:38:10 general matter, earnings days for Vale, 15:38:12 those dates as a whole had a higher 15:38:16 flow of information, as opposed to 15:38:19 ordinary days? 15:38:23

MR. HALL: Objection. 15:38:25

A. But not, you know, 15:38:26 objectively evaluated, not so much that 15:38:29 you would expect a higher incidence of 15:38:32 significant stock price reactions among 15:38:36 those days. 15:38:38

Page 243

S. FEINSTEIN

Q. Okay, I just -- what I'm 15:38:40 stumbling on is that sort of, that 15:38:46 seems to put the cart before the horse, 15:38:48 right? I understand that was your 15:38:50 conclusion here based on reviewing 15:38:51 analyst reports and other things, but I 15:38:54 understood the purpose of a collective 15:39:01 event study to be achieving a different 15:39:03 purpose. 15:39:06

MR. HALL: Objection. 15:39:07

A. Well, the purpose is to 15:39:08 identify -- the purpose is to assess 15:39:12 whether there's evidence that the stock 15:39:17 is reacting to information. But if we 15:39:21 know that there's not a higher flow of 15:39:23 information or reason to believe a 15:39:25 higher expected incidence of 15:39:28 significant movements among earnings 15:39:33 announcement dates, the test wouldn't 15:39:36 be informative. 15:39:38

Q. Right, but plainly, on 15:39:40 earnings release dates, objectively, 15:39:40 there was a higher flow of information 15:39:43 concerning Vale, correct? 15:39:45

Page 244

S. FEINSTEIN

MR. HALL: Objection. 15:39:46

A. Yes. 15:39:46

Q. And it sounds like what 15:39:49 you're saying is notwithstanding that 15:39:50 higher flow of information, you 15:39:52 determined that that higher flow was 15:39:54 not material, is what it sounds like, 15:39:59 right? 15:40:02

A. No, the -- 15:40:02

MR. HALL: Objection. 15:40:04

A. The information was highly 15:40:04 economically material, but it wasn't 15:40:08 unexpected or surprising or momentous. 15:40:11

Q. Okay. I would like to turn 15:40:19 now to the Vale notes specifically. I 15:40:41 know we've touched upon them throughout 15:40:43 today, but so specifically your 15:40:46 assessment of the market efficiency 15:40:51 with respect to the Vale notes. 15:40:54

Let's start with 15:40:56 counter-factor one, trading volume. 15:40:59 Dr. Feinstein, it's true that when 15:41:02 calculating bond value trading volume, 15:41:04 one must remove duplicative volume for 15:41:08

Page 245

S. FEINSTEIN

interdealer trades? 15:41:12

A. Well, duplicative volume, but 15:41:13 not necessarily interdealer trades. 15:41:23

Q. Are you thinking of a 15:41:32 circumstance in which interdealer 15:41:33 trades are not duplicative of some 15:41:37 other trade that you're already 15:41:39 calculating? 15:41:41

A. Well, the way the trace data 15:41:42 works is both sides of the world, if 15:41:44 they are dealers, have to report the 15:41:46 trade to FINRA, and it will show up as 15:41:51 two separate trades, when in fact it 15:41:56 was the same trade between two 15:41:59 counterparties. So that's the 15:42:01 duplicativeness I removed. 15:42:03

However, if a dealer -- let's 15:42:09 say a particular dealer or broker has a 15:42:12 customer who wants a Vale bond, and 15:42:14 that dealer then goes to the bond 15:42:20 market and buys it from another dealer 15:42:21 in order to deliver it to his or her 15:42:24 customer. So there would be two trades 15:42:27 there, one from dealer A to dealer B, 15:42:29

62 (Pages 242 - 245)

CONFIDENTIAL

Page 246

S. FEINSTEIN

and then from dealer B to the customer. 15:42:33 Those are both -- those would not be 15:42:35 duplicative. I mean, they serve the 15:42:39 purpose of getting the bond from one 15:42:42 another to another customer. 15:42:44

But along the way, you've got 15:42:47 sophisticated bond market participants 15:42:50 evaluating the price, and I think both 15:42:52 should be included. 15:42:54

Q. Understood. So just so we're 15:42:54 clear, you have, or purport to remove 15:42:57 all duplicate trades from the trace 15:43:00 data or the Vale notes, correct? 15:43:05

A. Right, meaning that if the 15:43:07 same trade was reported twice, which is 15:43:08 usually the case, I would eliminate one 15:43:11 of them. One of the reports, not one 15:43:13 of the trades, but one of the reports 15:43:15 of the trades. 15:43:17

Q. Right. So on paragraph 332 15:43:17 of your report, you indicate that you 15:43:20 removed entries with "audit trail only" 15:43:22 or "position transfer" in the special 15:43:27 processing field; is that right? It's 15:43:31

Page 247

S. FEINSTEIN

on paragraph 332? 15:43:34

A. Paragraph 332 says, "All 15:43:38 submissions which identified as audit 15:43:40 trail only or position transfer in the 15:43:43 special processing CD field are 15:43:45 discarded from the trace data set." 15:43:48

Q. And notwithstanding that 15:43:50 representation in paragraph 332, are 15:43:53 you aware that you did not actually 15:43:54 remove all position transfer trades 15:43:57 from the Vale notes? 15:43:59

A. I certainly sought to. 15:44:02

Q. Now, taking my statement as 15:44:03 true for present purposes, if you did 15:44:07 not correctly remove all position 15:44:09 transfer trades, would your calculation 15:44:12 of daily and weekly trading volume be 15:44:15 incorrect? 15:44:17

MR. HALL: Objection. 15:44:19

A. I would have to check to see. 15:44:24 First of all, I don't necessarily 15:44:25 accept your premise, but if it's true, 15:44:27 I would have to see why it was true 15:44:30 before knowing the answer to your 15:44:32

Page 248

S. FEINSTEIN

question. 15:44:33

Q. No, I understand you're not. 15:44:33 I'm not asking you to verify the 15:44:39 statement that not all position trade 15:44:41 transfers were removed. I'm saying if 15:44:42 you accept that premise for purposes of 15:44:44 this question, would that not result in 15:44:46 the incorrect calculation of daily and 15:44:47 weekly trading volume? 15:44:50

MR. HALL: Objection. 15:44:52

A. Not necessarily. I would 15:44:55 need to know why a particular trade 15:44:58 that may have been identified this way 15:44:59 was not removed. 15:45:00

Q. Okay. I guess we'll circle 15:45:01 back to that. I just for the record 15:45:40 want to make clear, paragraph 332 says 15:45:41 "All submissions identified as audit 15:45:44 trail only or position transfer are 15:45:49 discarded from the trace data sets." 15:45:52 It sounds like your answer, you're 15:45:53 allowing for the possibility that 15:45:55 certain trades marked position transfer 15:45:56 you did not discard from the trace 15:45:58

Page 249

S. FEINSTEIN

data, and you need to follow up on 15:46:01 that. 15:46:06

MR. HALL: Objection. 15:46:06

A. You did not read paragraph 15:46:06 332 correctly. It says, "All 15:46:13 submissions with identified as audit 15:46:16 trade only or position transfer in the 15:46:19 special processing CD field are 15:46:22 discarded from the trace data set." 15:46:25

Q. Right. 15:46:26

A. So there's a reason, if it's 15:46:27 a position trade that wasn't identified 15:46:30 as a position trade in the special 15:46:31 processing CD field, there may have 15:46:35 been a reason to keep it, and I'll look 15:46:37 into that. 15:46:39

Q. Okay. Turning to Krogman 15:46:40 factor three, the bid ask spread for 15:46:47 the Vale notes, you do not examine the 15:46:49 third Krogman factor for the notes; is 15:46:54 that right? 15:46:57

A. Right. That data is not 15:46:57 available with bid ask spreads broken 15:47:02 out the way it is for a stock. The bid 15:47:04

63 (Pages 246 - 249)

CONFIDENTIAL

Page 250

S. FEINSTEIN

and the ask are built into the actual 15:47:06 quoted price that's reported, but not 15:47:10 tabulated separately the way it is for 15:47:17 a stock or an ADR. 15:47:20

Q. And paragraphs 232 and 233 of 15:47:23 your report, you conclude that there 15:47:28 was an "active" market for the volume 15:47:31 notes compared to other bonds; is that 15:47:38 right? 15:47:40

A. Yes. 15:47:40

Q. And Dr. Feinstein, would you 15:47:40 expect there to be at least some 15:47:41 trading activity for an actively traded 15:47:43 bond on dates that are associated with 15:47:45 important events and announcements? 15:47:50

A. Sometimes yes, but not 15:47:51 always. It could be that the investors 15:47:55 holding the bonds on those days, 15:48:00 observing that the price of similar 15:48:05 bonds had already fallen, felt it was 15:48:08 best to hold on. I mean, the loss was 15:48:13 suffered regardless of whether they 15:48:15 trade and realized the lost, or hold or 15:48:17 maintained the loss, so you can go 15:48:22

Page 251

S. FEINSTEIN

either way. 15:48:25

Q. With respect to the notes 15:48:26 here, you recall that certain of the 15:48:26 seven different notes did not trade at 15:48:33 all on some of the four special dates 15:48:35 you've identified; is that right? 15:48:37

A. No, I wouldn't characterize 15:48:39 it that way. You're close to the right 15:48:42 way of characterizing it, but not 15:48:44 exactly. There's two bonds -- the 15:48:47 missing -- not missing, but the missing 15:48:56 data, essentially, or the missing was 15:48:59 for two bonds. One of them didn't have 15:49:02 a daily return because it didn't trade 15:49:05 the day before the dam break. So out 15:49:07 of seven bonds, five had traded on 15:49:11 every single one of those days. I have 15:49:15 to look at -- what I recall is we're 15:49:19 only talking about two bonds. One of 15:49:20 them wasn't even on the event date 15:49:22 where there was missing data, it was 15:49:25 the prior date, which made it 15:49:27 impossible to calculate a single day 15:49:28 return, and one of the bonds also had 15:49:31

Page 252

S. FEINSTEIN

trading, but it was after the -- it was 15:49:33 off hours. It was after the 4:00 close 15:49:37 period, so there was actually a trade, 15:49:40 but it wasn't during within the time 15:49:42 period that I was confining the price 15:49:44 calculations to for purposes of 15:49:46 matching up movements to events. 15:49:49

Q. Right. So if you use 15:49:51 multi-day returns when a bond did not 15:49:54 trade on a curative disclosure date, 15:49:56 then how can you conclude that the 15:50:04 price did not decrease on the day prior 15:50:06 to the disclosure? 15:50:08

A. Oh, no, it was -- let's get 15:50:09 the exact date. It was, I mean if the 15:50:11 bond didn't trade on January 24th, but 15:50:16 did trade on the 25th, you won't have a 15:50:19 one-day return for the 25th. But it 15:50:25 did trade. Let's find that section of 15:50:33 the report. 15:50:41

Q. Okay, I think it's, let me 15:50:41 see if I can help you here. Paragraph 15:50:44 134. 15:50:49

A. 134? 15:50:56

Page 253

S. FEINSTEIN

Q. Maybe that's wrong. 15:50:58

A. Should be 260 something. 15:50:59

Q. 134, just discussing what 15:51:01 happens on January 25th, that was the 15:51:03 day of the dam collapse. 15:51:05

A. Okay. In paragraph 273, so 15:51:17 the TAE3 note did not trade on 15:51:20 January 24th. So I used a two-day 15:51:25 return from the 23rd to the 25th, and 15:51:32 it was a significant drop. There's no 15:51:37 way anyone reasonably can think that 15:51:40 there was a significant drop on the 15:51:42 missing day, the 24th, and that the 15:51:44 significant drop had nothing to do with 15:51:47 the dam break on the 25th. That's 15:51:49 just, that's unreasonable. 15:51:52

So the fact that it fell from 15:51:55 the 23rd to the 25th proves that it 15:51:56 fell because of the news on the 25th. 15:52:00 I mean, if you want to keep it as an 15:52:06 open-ended hypothesis that maybe the 15:52:07 stock, maybe the bond didn't fall on 15:52:12 the 25th, but it fell significantly on 15:52:14 the 24th, I would just think that's an 15:52:18

64 (Pages 250 - 253)

CONFIDENTIAL

Page 282

S. FEINSTEIN

or there's legal reason not to?                16:43:31

Q.    That it's infeasible, from        16:43:34
your perspective as an economist, to        16:43:36
apply a common damages methodology to a    16:43:39
proposed securities class.  I'm asking      16:43:44
just generally, right, you've certainly     16:43:51
seen that situation before in your          16:43:53
experience, right?                16:43:54

A.    I haven't, not that I can        16:43:55
think of now.  I have never seen a          16:43:57
class action securities case where the      16:44:04
out-of-pocket damage model was              16:44:06
infeasible or impossible to be applied.     16:44:12

Q.    Never, not once over the          16:44:14
25 years serving as an expert have you      16:44:18
witnessed a proposed securities class       16:44:22
action incapable of a damages model         16:44:23
that is applied on a classified basis?      16:44:29

A.    Well, I've heard of, I mean,      16:44:31
there have been decisions where a judge     16:44:35
would determine that there's not one        16:44:37
theory of liability, that there are         16:44:42
multiple theories of liability, and         16:44:44
therefore a single model can't address      16:44:46

Page 283

S. FEINSTEIN

both theories of liabilities.  I've         16:44:51
seen that.  So that doesn't apply to        16:44:54
this case.  In this case there's a          16:44:56
single theory of liability.                 16:44:58

Q.    And what is that single          16:44:59
theory of liability here, that, as you      16:45:02
understand it?                16:45:05

MR. HALL:  Objection.           16:45:07

A.    That the security prices were    16:45:07
artificially inflated because of            16:45:09
allegedly fraudulent misrepresentations     16:45:12
and omissions.  Ultimately, there were      16:45:15
corrective disclosures that provided        16:45:18
the truth to the market.  The               16:45:20
securities prices fell with that new        16:45:22
information.  Investors who had bought      16:45:24
when the security prices were inflated,     16:45:26
therefore overpaid, and the amount they     16:45:30
overpaid was lost when the price            16:45:33
corrected with the disclosure.  And the     16:45:37
out-of-pocket damage model directly         16:45:40
addresses that theory of liability.  It     16:45:42
was directly appropriate for that           16:45:46
theory of liability.                16:45:48

Page 284

S. FEINSTEIN

Q.    You understand that there are    16:45:49
different -- that plaintiffs here           16:45:51
allege different types of                   16:45:52
misrepresentations though, right?           16:45:55

A.    No.  My understanding is that    16:45:57
--                16:46:00

MR. HALL:  Objection.           16:46:00

A.    -- the complaint is written      16:46:01
on behalf of all class members, and        16:46:03
lays out a list of misrepresentations       16:46:07
and omissions that allegedly inflated       16:46:11
the securities prices.  My                  16:46:13
understanding at least is it has the        16:46:15
same theory of liability for all            16:46:18
proposed class members.                16:46:20

Q.    So let's just take                16:46:26
January 25th, for example, 2019, the        16:46:29
day of the collapse.  How do the events     16:46:31
of that day relate to plaintiff's           16:46:35
single theory of liability, as you          16:46:37
understand it?                16:46:39

A.    That that --                16:46:41

MR. HALL:  Objection.           16:46:44

A.    -- development, that             16:46:45

Page 285

S. FEINSTEIN

development, that event informed the        16:46:46
marketplace that representations that       16:46:49
had been made about the safety,             16:46:52
security, procedures, protocols,            16:46:54
conformity to regulations and standards     16:46:57
regarding mine -- mine dam stability        16:47:00
and safety were untrue, or had a high       16:47:05
likelihood of being untrue.                16:47:12

Q.    So the dam collapse itself       16:47:14
was a corrective disclosure, as you         16:47:17
understand it?                16:47:18

A.    Yes.                16:47:19

MR. HALL:  Objection.           16:47:20

A.    Yes, I mean, it wasn't a full    16:47:24
corrective disclosure, because not all      16:47:25
the alleged misrepresentations and          16:47:31
omissions were corrected by it, nor was     16:47:32
the market fully apprised of the            16:47:35
severity of the defects and                 16:47:40
consequences.                16:47:46

Q.    Now, you understand that        16:47:48
there are certain challenge statements      16:48:02
at issue here that didn't occur until       16:48:04
after the dam collapsed, right?  We         16:48:07

72 (Pages 282 - 285)

CONFIDENTIAL

Page 286

S. FEINSTEIN

talked about this earlier. I think you were not aware of that prior to today, but you testified earlier today upon learning of that, correct?

MR. HALL: Objection.

A. So the question is am I aware of that, I'll take your word for it, sure. You froze for a second.

Q. I froze, you froze. I didn't hear it, I don't know if you responded, but the court reporter can just read it back if you did.

(Requested portion of the record was read back.)

Q. I'm sorry I missed that. Okay, I apologize, I lost my train. How would you propose then, Dr. Feinstein, to go about constructing a common damages methodology to account for a corrective disclosure that preceded an alleged misstatement?

MR. HALL: Objection.

A. There's a number of -- I would calculate an inflation ribbon. I

Page 287

S. FEINSTEIN

would calculate what the artificial inflation was on each day of the class period. Artificial inflation is the difference between the price that actually is observed to be prevailing for the security in the marketplace and what the price would have been had there already been full corrective disclosure, so that there was no misinformation remaining in the marketplace, and I can use a variety of valuation tools and a variety of statistical tools for calculating both the but-for price and the artificial inflation ribbon.

Q. And just so we're clear, you haven't done any of that analysis yet, correct? You haven't performed an artificial inflation event study here, have you?

A. Well, no --

MR. HALL: Objection.

A. I wouldn't call it an artificial inflation event study.

Page 288

S. FEINSTEIN

Event study is one of the tools that can be applied in order to measure the artificial inflation. I have run an event study, but I didn't do it for the purposes of calculating artificial inflation, and you are correct, I have not done a damages computation yet. I mean, the model exists, I know the model is feasible, because it involves standard valuation tools. The model is essentially statutory, determined by caselaw in a common use and class actions, and the financial tools that are used for implementing that standard and articulated model are commonly used tools that are available that are used every day by financial analysts and valuation practitioners on a whole universe of financial instruments they're trading. So that's why I know it's feasible.

I know it exists because it exists, and is used in virtually all class action cases, and I know it's

Page 289

S. FEINSTEIN

feasible because it uses tools that are commonly used all the time in a wide variety of applications.

Q. And is it your testimony, Dr. Feinstein, that you will construct a single damages model that calculates all damages following the alleged corrective disclosures on the four special dates you've identified in your report?

MR. HALL: Objection.

A. Well, I haven't been asked to. I know that I could calculate damages for each of the securities for every class member using a common damage model. I can do that, although I haven't been asked to do it, so I don't know if I will be doing it.

Q. Okay.

A. Even though, I mean, the model calls for -- the model is the same formula, but the parameters of the model will differ depending on which security's being used. It's the same

73 (Pages 286 - 289)

CONFIDENTIAL

Page 290

S. FEINSTEIN

model, but it's parameterized 16:52:44 differently for different securities. 16:52:46 But then for every investor in any 16:52:48 particular security, the parameterized 16:52:51 model is applied commonly, and all that 16:52:54 differs from one investor to another is 16:53:00 when they bought the securities, when 16:53:00 they sold the securities, if they sold 16:53:02 them, and at what prices. 16:53:03

Q. How would this model account 16:53:12 for the existence of alleged 16:53:14 misstatements that both precede and 16:53:17 proceed some of the alleged corrective 16:53:23 disclosures here? 16:53:25

MR. HALL: Objection. 16:53:26

A. It would take into account 16:53:26 what -- well, there are two. The model 16:53:31 is -- one of the components of the 16:53:35 model is what's called the artificial 16:53:39 inflation ribbon. The artificial 16:53:41 inflation ribbon is the time series of 16:53:45 artificial inflation, and artificial 16:53:47 inflation is the difference between the 16:53:48 actual price that is observably -- that 16:53:49

Page 291

S. FEINSTEIN

observably prevailed in the marketplace 16:53:52 for the security, so that's no problem. 16:53:54 That's easy. We observe what prices 16:53:59 prevailed, and we can also observe -- 16:54:03 the claims administrator can observe 16:54:07 from confirmation statements and such 16:54:10 what prices were transacted at for 16:54:12 claimants. 16:54:14

The other part of the 16:54:16 artificial inflation ribbon is the 16:54:19 but-for price, what would the price 16:54:21 have been if there had been full truth. 16:54:23 Well, that's essentially valuation 16:54:25 analysis under an alternative scenario. 16:54:28 That's done all the time for every 16:54:31 security that's out there, and right 16:54:33 now, as we sit here, there are 16:54:36 financial analysts that are valuing 16:54:39 Apple stock under a wide variety of 16:54:40 hypothetical scenarios. They're 16:54:43 valuing Tesla stock under a wide 16:54:44 variety of hypothetical scenarios. 16:54:46

I would also evaluate Vale 16:54:47 stock under the hypothetical scenario 16:54:51

Page 292

S. FEINSTEIN

that there had been no 16:54:52 misrepresentations and omissions for 16:54:54 each day in the class period, both 16:54:56 before the dam break and after the dam 16:54:58 break. Both before corrective 16:55:01 disclosures, after corrective 16:55:03 disclosures, before certain 16:55:05 misrepresentations, after 16:55:07 misrepresentations. I would look at 16:55:08 the information that would have been in 16:55:12 the market. I would have -- I would be 16:55:13 able to look at the information that 16:55:20 was in the market, that would have been 16:55:22 in the market had there been full 16:55:23 disclosure and value, what the stock 16:55:25 would have been had that information 16:55:27 been in the market. And whereas 16:55:28 financial analysts and valuation 16:55:31 experts are doing this all the time, a 16:55:33 forensic analyst has the added 16:55:35 advantage of also using event study 16:55:37 analysis that identifies how the stock 16:55:39 and bond prices did move when 16:55:43 information became available, or when 16:55:45

Page 293

S. FEINSTEIN

misrepresentations were made. 16:55:48

Q. I want to go back to your 16:56:00 reference to the single theory of 16:56:02 liability here. You'll agree that an 16:56:03 identified corrective disclosure need 16:56:21 not cure every alleged misstatement in 16:56:28 a case, right? 16:56:30

MR. HALL: Objection. 16:56:30

A. That's true, some corrective 16:56:31 disclosures are only partially 16:56:33 corrective. And that seems to be the 16:56:35 case here in this case. 16:56:37

Q. Right, so in this case you 16:56:39 have multiple alleged 16:56:41 misrepresentations, multiple alleged 16:56:42 curative disclosures, correct? 16:56:44

A. Well, a handful of corrective 16:56:45 disclosures, but more than one, yes. 16:56:49

Q. Right. And you're -- in 16:56:51 attempting to construct a damages 16:56:54 methodology, you're going to have to 16:56:58 match the alleged misrepresentations to 16:57:01 their respective curative disclosures, 16:57:02 correct? 16:57:05

74 (Pages 290 - 293)

CONFIDENTIAL

Page 294

S. FEINSTEIN

MR. HALL: Objection. 16:57:06

A. Well, I'm not constructing a 16:57:06 damage methodology. I'm identifying 16:57:10 one that's commonly used and certainly 16:57:12 fits the facts of this case. I would 16:57:14 be implementing that damage methodology 16:57:19 if I were asked to, and it's not 16:57:21 necessary -- well, one corrective 16:57:25 disclosure could correct a variety of 16:57:32 misrepresentations and omissions. So 16:57:37 it's not always necessary to match them 16:57:40 up one against the other. 16:57:43

Q. You will agree, though, that 16:57:44 an identified corrective disclosure 16:57:48 cannot cure a misstatement that hasn't 16:57:51 been made yet, right? 16:57:53

MR. HALL: Objection. 16:57:56

A. It's, you know, I can't agree 16:58:03 to it as a general principle. It's 16:58:07 altogether possible that a corrective 16:58:09 disclosure would make a subsequent 16:58:11 statement that did have impact on the 16:58:14 stock price, not have impact on the 16:58:17 stock price. I mean, that would be -- 16:58:19

Page 295

S. FEINSTEIN

that could be the outcome of the 16:58:23 valuation analysis, so as a general 16:58:24 statement, I can't accept it without 16:58:26 exception for every possible way of it 16:58:30 being presented. 16:58:34

Q. I think earlier in your 16:58:35 testimony you spoke generally about the 16:58:47 concept of passive investing -- oh, did 16:58:49 I break up? 16:58:56

A. I think we talked 16:58:59 about passive investing. 16:59:02

Q. I paused in the middle of my 16:59:03 question because I thought I had frozen 16:59:05 again. Let me restate that. 16:59:07

Earlier in your testimony we 16:59:09 had talked about passive investing in 16:59:10 the context of the Babson College Fund, 16:59:14 specifically with respect to index 16:59:16 investing. Do you recall that? 16:59:20

MR. HALL: Objection. 16:59:21

A. Oh, well, we were not a 16:59:21 passive fund. Unallocated money was 16:59:29 invested passively, but most of the 16:59:32 money was actively allocated. 16:59:35

Page 296

S. FEINSTEIN

Q. When you say "unallocated 16:59:37 money," what do you mean by that? 16:59:41

A. Well, there were position 16:59:43 limits. For example, no security could 16:59:45 have more than 5 percent of the funds 16:59:47 money, capital. And so that would mean 16:59:52 you would need at least 20 active 16:59:59 positions to fully advocate all the 17:00:01 money to active positions. But if the 17:00:03 students had only researched 15 stocks, 17:00:06 they might have 75 percent of the money 17:00:08 allocated to active positions, and then 17:00:10 we would have 25 percent waiting to be 17:00:13 allocated actively, and the interim 17:00:16 would be in a passive sector fund. 17:00:19

Q. So Dr. Feinstein, if you were 17:00:22 to perform an event study in this case 17:00:53 for purposes of calculating damages, 17:00:55 you would use either a single-factor 17:00:59 model or a multifactor model; is that 17:01:02 correct? 17:01:05

MR. HALL: Objection. 17:01:06

A. I haven't crossed that bridge 17:01:06 yet. But I think it might be -- well, 17:01:12

Page 297

S. FEINSTEIN

the way you phrased it, the answer is 17:01:17 yes, it may be single-factor, it may be 17:01:19 multifactor. 17:01:23

Q. Sitting here today, do you 17:01:23 have any expectation about which type 17:01:25 of model you would employ here? 17:01:26

A. Well, usually I would use a 17:01:28 multifactor model, but we saw that 17:01:30 Dr. Tabak didn't -- he had fewer 17:01:33 factors in his model. I would revisit 17:01:36 maybe what he did and try to 17:01:39 investigate why he did it the way he 17:01:41 did before making a final decision. 17:01:43

Q. Okay. And if you were to 17:01:48 perform an event study in this case for 17:01:50 purposes of loss causation and damages, 17:01:52 you would have to use industry or 17:01:57 market indices to account for economic 17:01:58 or sector-wide events, correct? 17:02:04

MR. HALL: Objection. 17:02:06

A. The answer to that is the 17:02:06 same as my prior answer. That is the 17:02:08 difference between single and 17:02:12 multifactor models, what indices are 17:02:13

75 (Pages 294 - 297)

CONFIDENTIAL

Page 310

S. FEINSTEIN

Q.   So for purposes of applying a    17:28:28
common damages methodology, does it    17:28:31
matter to you whether a plaintiff is    17:28:40
adopting a materialization of the risk    17:28:41
theory of loss causation, or a    17:28:45
corrective disclosure theory of loss    17:28:45
causation?    17:28:46
     MR. HALL:  Objection.    17:28:46
A.   There's certain tasks that    17:28:47
differ in the implementation of the    17:28:49
model, but the model's the same model.    17:28:54
Q.   Now, what if you have a case    17:28:56
where a plaintiff is adopting both    17:28:57
theories with respect to different    17:29:00
challenge statements at issue?    17:29:07
     MR. HALL:  Objection.    17:29:08
A.   It's the same model would    17:29:08
apply, the same model is feasible.    17:29:10
There may be different issues of    17:29:13
confounding information that need to be    17:29:18
addressed.  That's sometimes what I    17:29:19
see.  But that the model and the fact    17:29:22
that there's confounding information,    17:29:24
that happens whether it's a    17:29:28

Page 311

S. FEINSTEIN

materialization of the risk allegation    17:29:30
disclosure, or an announcement    17:29:36
corrective disclosure.    17:29:38
     So I guess really what I'm    17:29:39
saying here is it really doesn't    17:29:43
matter.  The same model could handle    17:29:45
both.  The same model could handle a    17:29:47
mix.    17:29:50
Q.   In your experience as an    17:29:51
expert, have you ever applied a common    17:29:53
damages model in which a plaintiff has    17:29:55
adopted both theories of lost causation    17:29:58
to different challenge statements?    17:30:01
     MR. HALL:  Objection.    17:30:03
A.   Well, let's be clear.  When    17:30:03
we're talking about -- the theories    17:30:07
aren't really dramatically different.    17:30:09
In fact, my understanding is that the    17:30:12
vocabulary, the terminology calling it    17:30:15
a materialization of the risk is sort    17:30:19
of a construct of defense counsel,    17:30:20
defense attorneys, generally.  It's not    17:30:25
necessarily embraced by everybody in    17:30:27
the legal field.  All it means is that    17:30:30

Page 312

S. FEINSTEIN

the corrective disclosure was an event,    17:30:36
an event that informed the marketplace    17:30:39
of the truth, rather than a statement    17:30:41
informing the market of the truth.    17:30:46
That's really the only difference    17:30:50
between the two.  And same damage model    17:30:52
accommodates both.    17:30:56
Q.   Okay.  Other than to note my    17:30:59
objection to your suggesting that    17:31:11
defense counsel has developed this    17:31:13
materialization of the risk theory, I    17:31:16
would respectfully suggest it's    17:31:20
plaintiff's counsel.  I have no further    17:31:22
questions for you, Dr. Feinstein.  I    17:31:25
appreciate your patience, so thank you.    17:31:26
     MR. JORALEMON:  Donee, I'm    17:31:29
not sure if you have any questions    17:31:31
for the witness.    17:31:33
     MR. HALL:  We have no    17:31:33
questions, so thank you.    17:31:34
     MR. JORALEMON:  All right,    17:31:35
terrific.    17:31:36
     THE VIDEOGRAPHER:  The time    17:31:37
is approximately 5:31 p.m., this    17:31:37

Page 313

S. FEINSTEIN

concludes today's testimony.  We    17:31:40
are off the record.    17:31:42
     (Time noted:  5:31 p.m.)    17:31:58


_____

STEVEN FEINSTEIN



Subscribed and sworn to before me
this ___ day of _____, 2021.

_____

Notary public

79 (Pages 310 - 313)