**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

------------------------------------------------------------x

                                    :

In re Vale S.A. Securities Litigation       :          No. 19 Civ. 526 (EK) (SJB)

                                    :         **ORAL ARGUMENT REQUESTED**

                                    :

------------------------------------------------------------x

## VALE'S REPLY MEMORANDUM OF LAW
## IN FURTHER SUPPORT OF CLASS DECERTIFICATION

GIBSON, DUNN & CRUTCHER LLP

Christopher M. Joralemon
Akiva Shapiro
Mary Beth Maloney
David M. Kusnetz

200 Park Avenue
New York, NY  10166-0193
Telephone:     212.351.4000
Facsimile:      212.351.4035

*Attorneys for Defendants*

**TABLE OF CONTENTS**

Page

PRELIMINARY STATEMENT ...................................................................................................1

DISCUSSION .............................................................................................................................1

    **I.**    Plaintiff Grossly Misapprehends the Standards for Decertification ........................1

        A.    The Court Should Reject Plaintiff's Myriad Attempts to Impose Unfounded Hurdles to Decertification..........................................................2

        B.    Plaintiff Seeks to Improperly Shift the Burden of Showing Market Efficiency .........................................................................................................3

    **II.**    The Markets for Vale Securities Were Inefficient Throughout the Class Period ........................................................................................................................5

        A.    Tabak's Criticisms of Dr. Mazumdar Are Baseless....................................5

        B.    Tabak's Methodology Is Fatally Flawed .......................................................6

        C.    Tabak's Report Does Not Demonstrate Efficiency .....................................8

        D.    Tabak Actually Confirms Dr. Mazumdar's Finding of Inefficiency ...........9

CONCLUSION...........................................................................................................................10

# TABLE OF AUTHORITIES

**Cases**

*Amgen Inc. v. Ct. Ret. Plans & Tr. Funds*,
    568 U.S. 455 (2013)........................................................................................................2

*In re AXA Equitable Life Ins. Co. COI Litig.*,
    2022 WL 3018104 (S.D.N.Y. July 29, 2022) .................................................................3

*Basic Inc. v. Levinson*,
    485 U.S. 224 (1988).......................................................................................................3

*Gen. Tel. Co. of Sw. v. Falcon*,
    457 U.S. 147 (1982)....................................................................................................2, 3

*Goldman Sachs. Grp., Inc. v. Arkansas Tchr. Ret. Sys.*,
    141 S. Ct. 1951 (2021)....................................................................................................4

*Hargrove v. Sleepy's LLC*,
    974 F.3d 467 (3d Cir. 2020)............................................................................................2

*Jin v. Shanghai Original, Inc.*,
    990 F.3d 251 (2d Cir. 2021)........................................................................................2, 3

*Mazzei v. Money Store*,
    829 F.3d 260 (2d Cir. 2016).......................................................................................2, 3

*Monaco v. Hogan*,
    2016 WL 1322431 (E.D.N.Y. Mar. 31, 2016) ................................................................3

*Morangelli v. Chemed Corp.*,
    922 F. Supp. 2d 278 (E.D.N.Y. Feb. 4, 2013) ...............................................................3

*Rodriguez v. It's Just Lunch Int'l*,
    2018 WL 3733944 (S.D.N.Y. Aug. 6, 2018)...................................................................3

*In re Vale S.A. Sec. Litig.*,
    2022 WL 122593 (E.D.N.Y. Jan. 11, 2022) ...................................................................4

*Waggoner v. Barclays PLC*,
    875 F.3d 79 (2d Cir. 2017).........................................................................................3, 4

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011).......................................................................................................2

**Other Authorities**

David I. Tabak, *Use and Misuse of Event Studies to Examine Market Efficiency*, at
    2, NERA Working Paper (Apr. 30, 2010) .....................................................................10

Defendants respectfully submit this Reply Memorandum of Law in further support of their Motion for Class Decertification.[1]

## PRELIMINARY STATEMENT

This case is a house of cards on the brink of collapse. And Plaintiff knows it.

Indeed, this class action—a vehicle deemed to be an "exception" to the rule and "tentative" in nature by no less an authority than the United States Supreme Court—rests on a faulty presumption of classwide reliance, which in turn teeters on a thin reed of "indirect factors" purportedly suggestive of market efficiency.

But a hurricane is at the door. And it has brought with it—at the implicit invitation of the Court—overwhelming *direct* evidence that the markets for Vale Securities were inefficient throughout the class period. Faced with this existential threat, Plaintiff tries to change the rules governing this motion, launches baseless *ad hominem* attacks, and offers up speculative and reverse-engineered expert critiques that ultimately only provide additional evidence of *inefficiency*.

We respectfully urge the Court to peer through Plaintiff's subterfuge, consider the clear evidence of market inefficiency, and issue an order decertifying this case as a class action.

## DISCUSSION

**I.    PLAINTIFF GROSSLY MISAPPREHENDS
        THE STANDARDS FOR DECERTIFICATION**

In its zeal to preserve a disintegrating case, Plaintiff seems to have lost sight of bedrock principles governing class actions. First, the *very existence* of a class action represents a stark "exception" to the standard rules of litigation in the United States. *See Wal-Mart Stores, Inc. v.*

---

[1] This brief uses the same abbreviations, citations, and defined terms as Defendants' opening brief. Exhibits to the Declaration of Christopher M. Joralemon in Further Support of Defendants' Motion for Class Decertification are styled "Ex. __."

*Dukes*, 564 U.S. 338, 348 (2011).  Second, class certifications *never* are "frozen once made."

*Amgen Inc. v. Ct. Ret. Plans & Tr. Funds*, 568 U.S. 455, 479 n.9 (2013).  Third, *Plaintiff* bears the

enduring burden of demonstrating "actual, not presumed, conformance" with the requirements for

maintaining a class action.  *See Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 160 (1982).

Governed by these principles, the Second Circuit has made clear that district courts "*must* ensure

that a certified class satisfies Rule 23 throughout the litigation," and are "*required* to . . . reassess

[their] rulings as the case develops." *Jin v. Shanghai Original, Inc.*, 990 F.3d 251, 261–62 (2d

Cir. 2021) (emphasis added) (alteration adopted); *see also Mazzei v. Money Store*, 829 F.3d 260,

268 (2d Cir. 2016) (explaining that "decertification procedure . . . protects [parties'] due process

rights . . . by ensuring that any class claim that proceeds to final judgment—and thus binds them—

is fairly and appropriately the subject of class treatment").

> **A.     The Court Should Reject Plaintiff's Myriad Attempts**
> **to Impose Unfounded Hurdles to Decertification**

Ignoring the aforementioned standards, Plaintiff first contends that a court's consideration

of decertification somehow is "discretionary." *See* Opp. at 12 n.4.  Of course, Plaintiff fails to cite

a single case in support of this proposition, as it obviously is incorrect.  Plaintiff next invokes the

law of the case doctrine, making much of the fact that this motion was brought before a new judge.

Plaintiff does not—and cannot—cite to any Second Circuit case applying the law of the case

doctrine (or the motion-for-reconsideration standard) in the decertification context. *See Jin*, 990

F.3d at 262 n.18; *see also Hargrove v. Sleepy's LLC*, 974 F.3d 467, 470 (3d Cir. 2020) ("Courts

cannot graft onto [Rule 23] the heightened motion-for-reconsideration standard").  This is

unsurprising, as the Second Circuit has explained that plaintiff "retain[s] the burden to

demonstrate" that Rule 23's requirements are satisfied in opposing a motion for decertification,

2

*Mazzei*, 829 F.3d at 270, and that, in granting such a motion, "the district court need only find that a previously satisfied requirement of Rule 23 is now lacking," *Jin*, 990 F.3d at 262.

Thus, the proper standard when "considering the appropriateness of decertification" is "the same as a motion for class certification: whether the Rule 23 requirements are met." *Monaco v. Hogan*, 2016 WL 1322431, at *2 (E.D.N.Y. Mar. 31, 2016) (citation omitted); *see also In re AXA Equitable Life Ins. Co. COI Litig.*, 2022 WL 3018104, at *5 (S.D.N.Y. July 29, 2022) (explaining a "significant intervening event is not a prerequisite for decertification or modification of a class" when a defendant seeks decertification (internal quotation marks omitted)); *Rodriguez v. It's Just Lunch Int'l*, 2018 WL 3733944, at *2 n.1 (S.D.N.Y. Aug. 6, 2018) (rejecting assertion that "compelling reasons [must] exist to revisit an earlier class certification ruling" (internal quotation marks omitted)). Indeed, Plaintiff's bid here to graft heightened law-of-the-case or reconsideration standards onto the decertification motion ignores the well-established principle that class certification orders are "inherently tentative." *Morangelli v. Chemed Corp.*, 922 F. Supp. 2d 278, 310 (E.D.N.Y. Feb. 4, 2013) (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 160 (1982)).[2]

**B.      Plaintiff Seeks to Improperly Shift the Burden of Showing Market Efficiency**

Plaintiff next misconstrues black letter law by claiming that *Defendants* bear the burden of showing that the market for Vale Securities was *inefficient*. In *Basic Inc. v. Levinson*, 485 U.S. 224 (1988), the Supreme Court held that plaintiffs bear the burden of showing market efficiency and, *if* that burden is satisfied, defendants may rebut the presumption of reliance by showing a lack of price impact. *Id.* at 248–49. Plaintiff, failing to grasp the distinction between market efficiency and price impact, mistakenly cites *Waggoner v. Barclays PLC*, 875 F.3d 79 (2d Cir. 2017) in

---

[2] Even if law of the case somehow did apply (and it does not), the doctrine would support decertification here. There can be no more compelling a reason to decertify a securities class than the existence of newly adduced evidence demonstrating the absence of market efficiency.

support of the confused proposition that once plaintiff satisfies its burden of showing market efficiency, the burden then shifts to defendant to rebut the presumption of reliance by showing market inefficiency.[3]  Not so.  The burden of demonstrating market efficiency always remains with plaintiff, as *Waggoner*'s explanation of burden-shifting makes clear; it is only the burden of showing an impact (or lack of impact) on price that shifts *if* market efficiency is shown:

> [W]hen the plaintiffs have demonstrated that they are entitled to the *Basic* presumption by showing that the alleged misrepresentation was material and publicly transmitted into a well-developed market, plaintiffs do not bear the burden of showing an impact on price.  But the burden of showing that there was no price impact is properly placed on defendants at the rebuttal stage.

*Waggoner*, 875 F.3d at 102 (internal quotation marks and citations omitted).[4]

Ultimately, however, Plaintiff's invented dispute about which party bears what burden here is much ado about nothing.  In short, Defendants contend that Plaintiff has not demonstrated—as it must—that the Vale Securities at issue traded in efficient markets throughout the class period. In support of this contention, Defendants now have adduced overwhelming direct evidence of inefficiency.  Plaintiff, having failed to develop any direct evidence of efficiency, *In re Vale S.A. Sec. Litig.*, 2022 WL 122593, at *14 (E.D.N.Y. Jan. 11, 2022), instead relies solely on the satisfaction of various "indirect" factors.  Opp. at 13.  In essence, the Court need only decide which party is correct on the (in)efficiency question.

---

[3]  Plaintiff also brazenly misconstrues recent Supreme Court precedent to support its confused position, suggesting the Court was referencing market inefficiency in *Goldman* when it stated that "the defendant must carry that burden by a preponderance of the evidence."  Opp. at 12 (quoting *Goldman Sachs. Grp., Inc. v. Arkansas Tchr. Ret. Sys.*, 141 S. Ct. 1951, 1963 (2021)).  Read in context, however, there can be no doubt that the Supreme Court is referencing price impact.  *See Goldman*, 141 S. Ct. at 1963 ("Thus, the best reading of our precedents . . . is that the defendant bears the burden of persuasion to prove a lack of price impact.  We likewise agree with the Courts of Appeals that the defendant must carry that burden by a preponderance of the evidence." (internal citations omitted)).

[4]  While Plaintiff does its best to distort his words, Mr. Joralemon correctly described this burden-shifting framework at oral argument.  *Compare Waggoner*, 875 F.3d at 103, *with* Opp. at 3.

4

## II.    THE MARKETS FOR VALE SECURITIES WERE INEFFICIENT THROUGHOUT THE CLASS PERIOD

Dr. Mazumdar's detailed analysis provides unassailable evidence that the markets for the Vale Securities at issue were inefficient.  In response, Plaintiff offers a thin report from David Tabak infected with fatal errors and rank speculation.  Tabak is the *second* expert Plaintiff has hired to attempt the impossible:  show that the Vale Securities traded in an efficient market.  But it cannot be done, and Tabak's report only further underscores that inescapable conclusion.

### A.    Tabak's Criticisms of Dr. Mazumdar Are Baseless

Tabak tries to identify "various" errors in Dr. Mazumdar's Report in an effort to cast a shadow on the ultimate conclusion of market inefficiency.  Tabak ¶ 3.  But all he could come up with are two insignificant quibbles concerning coding and data presentation.  The former was an immaterial coding oversight corrected over a month before Tabak finalized his report, and, more importantly, did not change *any* of Dr. Mazumdar's conclusions.  *Id.* ¶ 1, p. 27; *see also id.* ¶¶ 9–17; Ex. A (Mazumdar Reply) ¶¶ 8.a., 13–14.  The latter was not, as Tabak himself concedes, a substantive issue.  Tabak. ¶ 20; *see* Ex. A ¶¶ 8.b., 15–18.

Tabak also takes issue with Dr. Mazumdar's selection of news days and non-news days.  But even if any of these critiques had merit (and, as explained below, none of them do), they are immaterial to Dr. Mazumdar's findings.  Indeed, Dr. Mazumdar re-ran Tabak's "gold standard" market efficiency test after excluding each day Tabak identified as problematic, *and the results did not change*: the markets for Vale Securities were inefficient throughout the class period.  Ex. A ¶ 8.c., 20.

As for the purported news-day selection "errors" identified by Tabak, they can be succinctly addressed (and set aside) as follows:

- Tabak claims that three of the identified news days *may have* included articles with stale news.  Tabak ¶¶ 28–30.  But those articles all either fall on a day with other news—

5

thus warranting those days' inclusion as a news day—or contain additional value-relevant information warranting those news stories' inclusion. Ex. A ¶¶ 21–22, 24–26.

- Tabak argues that one of the news days should be excluded on account of its content—*i.e.*, content regarding broader market factors. Tabak ¶ 33. But in doing so, Dr. Tabak ignores the uncontroverted scholarship Dr. Mazumdar cited that supports its inclusion, and defies his *own* study which includes substantively similar news. Ex. A ¶¶ 31–35.

- Tabak claims certain debenture stock payment information should have been excluded as immaterial. Tabak ¶ 31. But he apparently never bothered to understand the mechanics of "infrastructure debentures," which differentiate them from typical debt payments, and provide much more relevant information for investors. Ex. A ¶¶ 27–30.

- Tabak claims that one of the 214 news days was misdated, but furnishes no evidence to substantiate that assertion. Ex. A ¶ 23.

**B.    Tabak's Methodology Is Fatally Flawed**

Tabak's analysis is replete with flaws that fatally undermine his Report. As an initial matter, Tabak's methodology inexplicably differs from his own prior reports. For example, he often—if not always—excludes the last day of the class period on the theory that its inclusion biases his results. *See, e.g.*, Ex. A ¶ 81–83 & n.148. Here, he neither excluded the last day nor offered any explanation for that failure. Ex. A ¶ 83. Also, based on an extensive review of his prior reports, Tabak seemingly for the first time ever includes a "top 25%" cutoff. When asked at his deposition about this novel inclusion, Tabak gave the facially absurd answer that he—either before or after seeing his results—included it "just to add to the number of rows" in his exhibits. Ex. E (Tabak Depo.) at 95:21-22, 98:7-10. In prior engagements, Tabak also often examined the substance of articles for relevance. *See, e.g.*, Ex. A ¶¶ 7, 19 & n.22, 52 n.88, 78.d & n.144, 90.c. But, again, he did not do so here, and, again, did not explain why. Considered together, these anomalous methodological changes suggest one—and only one—explanation: they were adopted to manufacture conclusions desired by Plaintiff. *See, e.g.*, Ex. A ¶¶ 60 & n.108, 68–72.

6

But even to the extent aspects of Tabak's methodology are consistent with his prior reports, he fails to explain why that methodology—*e.g.*, limiting his search to one news source and sub-setting news by 10, 25, and 50th percentiles—is appropriate here.[5]  And for good reason.  It is not.  For example, Tabak previously justified sub-setting his news days based on the fact that his DJN queries turned up news on many if not most days.  *See, e.g.*, Ex. A ¶ 59 & n.107.  Here, however, Dr. Tabak's DJN query resulted in only 41 ADR news days, or only 7.2% of all class days.  *See* Ex. A, Ex. 1.  Yet despite such a small number and percentage of news days, Tabak—without explanation—nevertheless applied "top 10%" and "top 25%" filters, resulting in *only three and six* "news days," respectively, *out of 572 trading days in the class period.  See, e.g.*, Ex. A ¶¶ 58 & n.103, 61, 63, 81.  Similarly, Tabak offered no explanation for why these subsets make sense where, as here, the difference between a 10% news day and a 25% news day, or the difference between a 25% news day and a 50% news day, is the appearance of *one* news article.  *See* Ex. A ¶ 73.  Indeed, Tabak miscites to a single study in support of his methodology, which in no way advocates using—and which itself did not use—any such subsets.  Ex. A ¶¶ 66–67 & n.122.

And even if it somehow would be valid to draw conclusions based on this exceedingly narrow data and methodology, Tabak failed to take any steps to ensure his study's accuracy.  For example, at least one article on a statistically significant news days from his "top 25%" sample should not have been counted because it was not even about Vale.  *See* Ex. A ¶¶ 87; Ex. E at 105:18-106:4.  Again, there are only three statistically significant news days in his *entire* ADR sample.  *See* Ex. A ¶ 84; Tabak Ex. 6a.  So this error has significant ramifications.  Removing it from the "top 25%" results in Vale's ADRs failing at the 25% level using his DJN specification.

---

[5]  The top 10%, 25%, and 50% samples are actually the top 7.3%, 14.6%, and 36.6%.  *See* Ex. A ¶ 58 & n.103.

Ex. A ¶ 88.  Other such errors afflict his data and results.  *See* Ex. A ¶¶ 52, 90–92, § VIII.  In short, the cutoffs are arbitrary, unjustified, and improperly applied here.

Tabak's data also is deficient.  The notion that there were only 41 news days across 572 days related to the world's largest iron ore producer beggars belief.  And data substantiates that common-sense incredulity.  Tabak's news days do not include a number of days he himself conceded should be "news days"—days regularly used by academics because they are likely to contain material information and whose absence actually "surprised" Tabak.  Ex. E at 82:8-9, 85:18-86:2, 87:10.   Those include the departure of Vale's CEO, virtually all earnings announcements, and—most shockingly—Dam 1's collapse.  Ex. A ¶¶ 50–51, 56 & n.95.  To reiterate, *Tabak's approach to identifying Vale "news days" failed even to identify January 25, 2019—the day of Dam 1's collapse—as a day on which Vale investors learned new, relevant information concerning the company.*  In sum, Tabak's data flies in the face of academic literature and, more importantly, looks nothing like reality.

### C.    Tabak's Report Does Not Demonstrate Efficiency

Apart from the aforementioned foundational issues, Tabak's Report also fails to demonstrate that the markets for the Vale Securities were efficient throughout the class period.  For example, the only three statistically significant news days in Tabak's ADR sample comprise of two corrective disclosure days and one other day in the final week of the class period.  So if Tabak's study of ADR efficiency ended on January 24, 2019—*i.e.*, the day before the dam collapse—there would be *zero* statistically significant news days across the *entire* class period.  *See, e.g.*, Ex. A ¶ 84.  Needless to say, no security should pass an FDT test if the number of statistically significant news days is zero.

But even if one were to include corrective disclosures (in contravention of Tabak's prior expert views), Tabak's current efficiency analysis remains deficient.  Tabak's own scholarship

argues against finding efficiency based on a small number of days. *See, e.g.*, Ex. A ¶ 61. Yet his determination that the Vale Securities purportedly traded in efficient markets for over two years rests solely on two days in the final nine days of the class period—when events with billion dollar consequences were unfolding.

### D.    Tabak Actually Confirms Dr. Mazumdar's Finding of Inefficiency

Tabak typically begins his market efficiency analyses by focusing on days on which earnings are announced because "the academic literature generally says that there is material news on most earnings announcements." Ex. E at 21:24-:22:3. Here, Vale had nine earnings days during the class period. Ex. A ¶ 94–95. Remarkably, zero out of nine earnings days were statistically significant for the ADRs and nearly all Notes, *id.*—a result Tabak could not recall ever seeing, a finding his own scholarship indicates is extraordinarily unusual, and a fact, as he conceded, that obviously could be explained by market inefficiency, Ex. E at 24:2-26:17, 29:18-23, 30:25–31:9-18.

In the face of this overwhelming evidence and, again, charged with an impossible task, Tabak offers up a laughable—and easily disproved—theory that these conclusive results of inefficiency might derive from an issue with Dr. Mazumdar's Industry Index—*i.e.*, that it somehow is not "close enough" to Vale and its competitors. Tabak ¶¶ 37–38. But Dr. Mazumdar's Index *includes* Vale *and* it main competitors, Ex. A ¶ 41–42. Tabak just never looked. Ex. E at 41:22-42:3, 43:18-44:2. Thus, it is beyond question that the Mazumdar Index is the perfect industry index to study Vale's price movements, and the earnings announcement results based on Dr. Mazumdar's data are strong evidence of market inefficiency—as highlighted by Tabak's *own* prior reports and *own* academic work. *See, e.g.*, Ex. ¶ 39, 42–43, 50 & n.86, 93, 95.

Tabak also acknowledges, as he must, that Dr. Mazumdar's approach to selecting news days—considering the "content" of news, as opposed to just the number of news articles—"may

9

allow for more specific identification of which news is value relevant." Tabak ¶ 25. And Tabak further conceded at his deposition that including additional "reliable" news sources, as Dr. Mazumdar did, can produce a more accurate picture of the most material news days. *See* Ex. E at 71:23-72:23; *see* Ex. A ¶ 74. That helps explain why, unlike Tabak's selection process, *every* obvious news day—such as the day of the dam collapse and all earnings announcements—*is* a news day in Dr. Mazumdar's data. Ex. A ¶ 56 & n.95. Dr. Mazumdar's data set is thus plainly superior to Tabak's, particularly, under Tabak's own logic, at the top 10% and top 25% levels. *See, e.g.*, Ex. A ¶ 74; *see also, e.g.*, *id.* ¶ 56.

When Dr. Mazumdar's data is put through Tabak's test—that is, when it is filtered to the top 10% and top 25%—Vale ADRs, along with Notes 1, 4, and 7, fail the FDT test at both the 10% and 25% levels, and Notes 2 and 5 fail at the 10% threshold. *See* Tabak Ex. 5; *see* Ex. A ¶ 74. Even just limiting the data to Dr. Mazumdar's first five sources, all of which are undisputedly "reliable," and replicating Tabak's methodology, the ADRs (and Note 7) fail the FDT test across the board, and five of the six other notes fail at either the top 10% or the top 25%, Ex. A ¶ 99, "providing evidence against efficiency," Tabak ¶ 47. In other words, Tabak's *own* methodology— when applied to data that Tabak's *own* logic dictates is superior—makes clear that the markets for the Vale Securities were *inefficient* throughout the class period.[6]

**CONCLUSION**

For the foregoing reasons, as well as those set forth in its opening memorandum, Vale respectfully requests that the Court grant Vale's Motion to Decertify the Class.

---

[6] Dr. Tabak does not dispute Dr. Mazumdar's critiques of the indirect factors. Nor could he. *See* David I. Tabak, *Use and Misuse of Event Studies to Examine Market Efficiency*, at 2, NERA Working Paper (Apr. 30, 2010) ("[M]any of the factors used by courts do not appear to correlate with the results of empirical measurements of market efficiency.").

Dated: New York, New York
       November 17, 2023

                                    GIBSON, DUNN & CRUTCHER LLP


                                    By:  */s/ Christopher M. Joralemon*
                                         Christopher M. Joralemon
                                         Akiva Shapiro
                                         Mary Beth Maloney
                                         David M. Kusnetz


                                         200 Park Avenue
                                         New York, NY  10166-0193
                                         Telephone:      212.351.4000
                                         Facsimile:      212.351.4035

                                         *Attorneys for Defendants*

11