# Exhibit A

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In Re VALE S.A. SECURITIES LITIGATION | No. 19-cv-526-EK-SJB |

**EXPERT REPLY REPORT OF DR. SUMON C. MAZUMDAR**

**November 17, 2023**

**TABLE OF CONTENTS**

I.      Background and Assignment ....................................................................................................1

II.     Summary of Opinions ............................................................................................................3

III.    Dr. Tabak's Critiques of My First Report Are Uniformly Incorrect ...................................6

        A.      The "Errors in Return Calculations for the Mazumdar Regression" that Dr. Tabak discusses were corrected weeks before the filing of his report and do not affect my conclusion that all Vale Notes fail the FDT Test...................................................................6

        B.      The "Errors in Return Calculations for the Feinstein Regression" that Dr. Tabak discusses are irrelevant because they do not affect the inputs or results of my FDT Test, as Dr. Tabak admits ...................................................................................7

        C.      Dr. Tabak's assertion that some of the news days I identified were purportedly based on non-material information, not news, is false and irrelevant ....................8

        D.      Dr. Tabak's claim that my analysis "Fail[s] to Consider the Effect of Vale Announcements on the Metals and Mining Industry" reflects a fundamental misunderstanding of regression analysis .................................................................14

        E.      Dr. Tabak's critiques of my serial correlation analysis are irrelevant ...................17

IV.     Dr. Tabak's Purportedly "More Objective" FDT Tests Are Fundamentally Flawed, Biased, And Unsuitable For Testing The Market Efficiency Of The Vale Securities.......18

        A.      Dr. Tabak's methodology for selecting news days is flawed .................................18

                1.      Dr. Tabak improperly restricts his initial selection of news days by mechanically searching for news articles on Vale through a single source (Dow Jones Newswires), ignoring several other well-known news sources ....................................................................................................... 19

                2.      Dr. Tabak improperly further restricts his set of news days to a small handful of days by applying his "Cut-Off Theory," which is arbitrary and contradicts his prior testimony................................................................. 22

                3.      Contrary to his claim, Dr. Tabak's Cut-Off Theory is not supported by any academic literature ..................................................................................... 25

                4.      Dr. Tabak's methodology is also unreliable because it is biased ............. 27

                5.      Dr. Tabak's claim that a news day with one additional article is a relatively "more material" news day is arbitrary, and his logic supports using Dr. Mazumdar's news selection in any case ................................... 30

        B.      Dr. Tabak's mechanical implementation of his methodology is rife with errors and inconsistencies that render his conclusions unreliable and incorrect....................32

1.      Dr. Tabak's results based on his preferred cut-offs hinge on including Complaint Alleged Corrective Disclosures Dates in his FDT Tests which biases his results and demonstrates the absence of reliable findings ........ 33

2.      Dr. Tabak improperly includes days when only Dow Jones Newswires articles unrelated to Vale were published as news days for his FDT Test which biases his results ............................................................. 35

3.      The articles that Dr. Tabak counts to apply his arbitrary news days cut-offs include duplicates, the re-publication of stale information, and discussion of price movements which are well-understood to be immaterial ............ 37

C.      Dr. Tabak's own results and methodology support my conclusion that the Vale Securities traded in inefficient markets throughout the Class Period .................... 39

1.      Dr. Tabak's FDT Test of earnings days provides strong evidence of inefficiency ............................................................................. 39

2.      Dr. Tabak's own flawed methodology supports a finding in favor of inefficiency ............................................................................. 41

V.      Dr. Tabak Does Not Rebut My Opinion That There Was No Consistent Relationship Between News And The Vale Notes' Abnormal Returns Throughout The Class Period Which Supports My Conclusion That The Markets For The Vale Notes Were Inefficient Throughout The Class Period ........................................................................... 42

VI.     Dr. Tabak Does Not Refute My Opinion That The Indirect Indicia Of Efficiency Have Little Probative Value In Assessing Market Efficiency Throughout The Class Period And Direct Tests Of Efficiency Are Necessary To Reach Such A Conclusion ........................ 43

VII.    Conclusion ..................................................................................... 43

VIII.   Appendix A – Other Methodological Errors In Dr. Tabak's Analysis ............................. 45

A.      The articles that Dr. Tabak counts to apply his arbitrary news days cut-offs include duplicates ............................................................................ 45

B.      The articles that Dr. Tabak counts to apply his arbitrary news days cut-offs include re-publications of stale information ......................................................... 47

C.      The articles that Dr. Tabak counts to apply his arbitrary news days cut-offs include discussion of price movements which are well-known to be immaterial . 48

## I.     Background and Assignment

1. At the request of Gibson, Dunn & Crutcher LLP, counsel for Defendants ("Counsel"), I submitted an expert report in this matter dated June 26, 2023.  On September 13, 2023, I submitted five revised exhibits related to my analyses of the Vale Notes[1] that accompanied my report, which corrected a programming error pertaining to secondary results that was brought to my attention during a deposition on August 24, 2023.  The corrections did not change any of my conclusions. Henceforth, I refer to my June 26, 2023 report and the accompanying and revised exhibits as the "Mazumdar Report" or my "First Report."[2]

2. In the Mazumdar Report:

    a. I determined that the market for each of the Vale Securities (*i.e.*, the Vale ADS and the seven Vale Notes) throughout the Class Period was inefficient based on direct economic evidence.[3]

        i.  My news day event studies demonstrated that company-specific news releases (on specific subsets of news days commonly examined by economists, as well as the vast majority of all 214 news days throughout the Class Period) did not cause the Vale Securities' prices to change in a statistically discernible manner consistently throughout the Class Period.

        ii.  To assess whether a Vale Security's price consistently reacted to news throughout the Class Period, I conducted the FDT Test, which compares the results of event studies on news and non-news days throughout the Class

---

[1] My report included 19 exhibits and two "Overview Exhibits." I submitted corrected versions of: (a) four exhibits (Exhibits 10, 13, 16, and 19), which document the calculations of the "Vale Notes' Percentage Of All News And Non-News Days With Statistically Significant Returns," where abnormal returns are calculated using the Mazumdar Note Regression Model; and (b) Overview Exhibit 2, which documents the corrected calculations of the "Vale Notes Daily Abnormal Returns, T-Statistics, And News During The Class Period" using the Matched Portfolio, Mazumdar Regression and Feinstein Regression Models.

[2] In that report, I provided information about my qualifications and my compensation, which remain unchanged.  In Appendix B of this report, I list the additional materials that I have relied upon in forming my opinions in this report that were not included in Appendix B of my First Report.  Payment for my services, or that of Analysis Group staff working under my direction and supervision, does not depend in any way on the opinions I form or the outcomes in this matter. Capitalized terms not defined herein have the meaning set forth in my First Report.  Expert Report of Dr. Sumon C. Mazumdar, *In Re Vale S.A. Securities Litigation*, United States District Court, Eastern District of New York, Case No. 19-cv-526-LDH-SJB, filed June 26, 2023 ("Mazumdar Report").

[3] Mazumdar Report, Section IV.

Period.[4]  All the Vale Securities failed the FDT Test, which further confirms my finding —based on direct economic evidence— that the market for each of the Vale Securities over the Class Period was inefficient.  These empirical results were robust across different methods used to calculate abnormal returns (two methods for the Vale ADS and three methods for the Vale Notes), sensitivity analyses based on alternative definitions of news days (*i.e.*, including or excluding Factiva News Dates), and different price series for the Vale Notes (*i.e.,* those provided by Dr. Feinstein and by Dr. Torous).[5]

    iii.    The Vale Notes "experienced inconsistent abnormal returns on news days throughout the Class Period.  In particular, there were only seven news days (out of 161 total news days and 417 total days in the Class Period when pricing data on all seven Vale Notes are available) on which more than one of the seven Vale Notes had statistically significant abnormal returns on the same day."[6]  The fact that these seven closely-related Vale Notes did not consistently react to news further supports my conclusion that the market for each of the Vale Notes over the Class Period was inefficient.[7]

    b.  Based on my review of the economic research on the relationship between indirect indicia of efficiency and market efficiency, I also observed in the Mazumdar Report that: "The indirect indicia of efficiency, on which the Court solely based its order in this case to grant class certification, provide little to no economic insight into a security's actual market efficiency."[8]

3.  On October 18, 2023, Plaintiff submitted a rebuttal expert report by Dr. David I. Tabak dated October 17, 2023 ("Tabak Report")[9] in which Dr. Tabak: (1) identifies certain purported errors "in

---

[4]    The FDT Test calculates the percentage of news and non-news days when the at-issue security's abnormal return was statistically significant.  If the difference in these percentages is not statistically significant then the security fails the FDT Test, *i.e.,* "then there would be no basis for saying that the defendant's stock price is affected by news." *See* Mazumdar Report, ¶ 45.  *See also* Rebuttal Expert Report of David I. Tabak, Ph.D., *In Re Vale S.A. Securities Litigation*, United States District Court, Eastern District of New York, 19 Civ. 526 (EK) (SJB), October 17, 2023 ("Tabak Report"), ¶ 47 (noting that failing an FDT Test "provid[es] evidence against efficiency").

[5]    *See* Mazumdar Report, Exhibits.

[6]    Mazumdar Report, ¶ 21(ii) a(3).

[7]    Mazumdar Report, ¶ 79.

[8]    Mazumdar Report, ¶ 21(iii).

[9]    The Tabak Report (dated October 17, 2023) is attached as Appendix A of Declaration of Frederic S. Fox in Support of Plaintiff's Opposition to Defendants' Motion for Class Decertification, *In Re: Vale S.A. Securities Litigation,* United States District Court, Eastern District of New York, Case No. 19 Civ. 526 (EK) (SJB), October 18, 2023.

the analysis of the Mazumdar Report;" (2) purports to conduct "a more objective application of the FDT Test," and (3) critiques my serial correlation tests of weak-form efficiency.[10]

4.  Counsel has asked me to review and comment on the Tabak Report.

5.  My work on this matter is ongoing, and I may review additional materials or conduct further analysis. To the extent that additional information comes to my attention, I reserve the right to update, refine, and/or revise my opinions.

## II.    Summary of Opinions

6.  Nothing in the Tabak Report leads me to change any of the opinions I expressed in my First Report.

7.  To the contrary, as I discuss in more detail in the remainder of this report, Dr. Tabak's analysis corroborates my findings, *i.e.*, the direct economic evidence demonstrates that the markets for the Vale Securities were inefficient throughout the Class Period.

8.  Dr. Tabak's claim that certain data errors in my First Report render some of my conclusions "unreliable" is incorrect as I discuss in **Section III**.

    a.  The "Errors in Return Calculations for the Mazumdar Regression" that Dr. Tabak discusses pertain to secondary analyses, were corrected weeks before the filing of his report, and do not affect my conclusion that all Vale Notes fail the FDT Test (based on the Mazumdar Regression, a secondary method) which is direct economic evidence that these Notes traded in inefficient markets throughout the Class Period. **(Section III.A)**

    b.  The "Errors in Return Calculations for the Feinstein Regression" that Dr. Tabak discusses are irrelevant because they do not affect the inputs or results of my FDT Test for the Vale Notes (based on the Feinstein Regression, a secondary method), as Dr. Tabak admits. **(Section III.B)**

    c.  Dr. Tabak's assertion that five of the 214 news days I identified were purportedly based on non-material information rather than news is: (a) false and reflects his incomplete review of the news announced on those days; and (b) irrelevant because my results hold even if I

---

[10]   Tabak Report, ¶ 3.

reclassify as non-news days the five news days Dr. Tabak alleges I mis-classified.  (**Section III.C**)

    d.   Dr. Tabak's claim that my regression's industry index fails to account for a purported "spillover" effect of Vale earnings announcements on the metals and mining industry is based on an incomplete review of the facts (as he has admitted in his deposition) and reflects a fundamental misunderstanding of economics and statistics.  (**Section III.D**)

    e.   Dr. Tabak's critiques of my serial correlation analysis are irrelevant as they do not affect my findings that the Vale Securities traded in semi-strong form inefficient markets throughout the Class Period.  (**Section III.E**)

9.  Dr. Tabak's purportedly "more objective" FDT Tests are fundamentally flawed, biased, and unsuitable for testing the market efficiency of the Vale Securities.  (**Section IV**)

    a.   Dr. Tabak's methodology for selecting news days for his other FDT Tests is flawed. (**Section IV.A**)

        i.   Dr. Tabak's method of selecting news days by mechanically searching for news articles on Vale through a single source (*Dow Jones Newswires* ("DJN")) is fundamentally flawed and incapable of properly identifying all news days in this case.  Dr. Tabak's set of news days does not include certain days when important Vale-specific news was released, including for example, the vast majority of Vale's nine earnings announcements over the Class Period, and even the very day that Dam 1 collapsed.  (**Section IV.A.1**)

        ii.   Dr. Tabak's FDT Tests, which he claims focus on "more material" news days based on arbitrary cut-offs, *i.e.,* his DJN top 25% or top 10% subsets of all news days, are fundamentally flawed, unscientific, and biased.  (**Section IV.A.2-5**)

    b.   Dr. Tabak's implementation of his cut-off methodology is also rife with errors and inconsistencies that render his conclusions unreliable and incorrect.  Correcting only some of these flaws and inconsistencies results in *all* the Vale Securities failing Dr. Tabak's FDT Tests using his own arbitrary 10% and 25% cut-offs (except for Note 6 at the 10% cut-off). In other words, his own FDT Tests, when corrected, overwhelmingly show that the Vale Securities traded in *inefficient* markets throughout the Class Period.  (**Section IV.B**)

    i.     Dr. Tabak's key results *hinge* on the classification of a single day (an alleged corrective disclosure in the Complaint) as a news day despite his previous work highlighting the inherent flaws in drawing conclusions from such results. (**Section IV.B.1**)

    ii.     In ranking news days based on the number of *Dow Jones Newswires* articles he found on a day, Dr. Tabak improperly counts news articles that were unrelated to Vale. As a result, Dr. Tabak improperly considers January 30, 2019 as a news day, which biases his FDT Test results in favor of finding efficiency of the Vale Securities. (**Section IV.B.2**)

    iii.     In applying his arbitrary cut-offs, Dr. Tabak also counts articles that contain no material news on Vale, such as articles that are duplicates, or have re-published stale information, or discuss securities' price movements. Such information releases are well-understood to be immaterial, as Dr. Tabak himself has previously acknowledged. (**Section IV.B.3**)

c.     The results of Dr. Tabak's own FDT Tests of earnings announcement dates show that the Vale Securities traded in inefficient markets throughout the Class Period. In addition, Dr. Tabak's own FDT Tests (based on all *Dow Jones Newswires* articles he has identified) support my conclusion that the Vale Securities traded in inefficient markets throughout the Class Period when his arbitrary cut-offs are set aside. Even accepting Dr. Tabak's arbitrary use of news day cut-offs *and* his critique of my selection of news sources, his FDT Tests show robust evidence that the Vale Securities traded in inefficient markets throughout the Class Period. (**Section IV.C**)

10. Dr. Tabak does not dispute my opinion that there was no consistent relationship between news and the Vale Notes' abnormal returns throughout the Class Period which supports my conclusion that the markets for the Vale Notes were inefficient throughout the Class Period. (**Section V**)

11. Dr. Tabak does not dispute my opinion that the "indirect indicia of efficiency, on which the Court solely based its order in this case to grant class certification, provide little to no economic insight into a security's actual market efficiency."[11] (**Section VI**)

---

[11] Mazumdar Report, ¶ 21(iii).

### III.     Dr. Tabak's Critiques of My First Report Are Uniformly Incorrect

12. In Tabak Report Sections IV.A-D and Section VI, Dr. Tabak claims that certain errors in my First Report render some of my conclusions incorrect.  As I explain in detail below, Dr. Tabak's criticisms are irrelevant and incorrect.

### A.     The "Errors in Return Calculations for the Mazumdar Regression" that Dr. Tabak discusses were corrected weeks before the filing of his report and do not affect my conclusion that all Vale Notes fail the FDT Test

13. In Section IV.A of the Tabak Report entitled "Errors in Return Calculations for the Mazumdar Regression," Dr. Tabak dedicates more than four of the 14 pages of his report's Section IV to discuss an error related to the Mazumdar Regression  that was *corrected more than a month* before he submitted his report.[12]   In addition, although Dr. Tabak acknowledges the corrections, he appears to not have reviewed, or overlooked, the *results* of such corrections.[13]   Even after correcting the error, my original results and conclusions remain *unaffected*, *i.e.,* all Vale Notes fail all FDT Tests (with one exception), which is direct economic evidence that these Notes traded in inefficient markets throughout the Class Period.[14]

14. Furthermore, the Mazumdar Regression was one of the two *secondary* market models I used to calculate the Vale Notes' abnormal returns,[15] and Dr. Tabak does not question the data, or my conclusions based on my *primary* approach (the Matched Portfolio method)—*i.e.*, that the Vale Notes traded in inefficient markets throughout the Class Period.[16]   In other words, Dr. Tabak's

---

[12]   Tabak Report, ¶ 16.

[13]   Tabak Report, ¶¶ 16-17.

[14]   *See* Mazumdar Report, Corrected Exhibits 10 and 13, in which the set of news days includes Form 6-K Dates, Credit Rating Announcement Dates, and Factiva Dates.  When the set of news days excludes Factiva Dates, all Vale Notes, except Note 3, fail the FDT Test.  (*See* Mazumdar Report, Corrected Exhibits 16 and 19).

[15]   As I noted in Mazumdar Report, ¶¶ 70-73:

> Bessembinder *et al.* (2009) find that [the matched-portfolio] approach is the "best specified and most powerful" among the common event study methods (including the regression-based event study approach I discussed above in the context of the Vale ADS). … Therefore, I used the matched portfolio approach as the **primary method of calculating each Vale Note's daily abnormal return** over the Class Period. …As sensitivity analyses, I also calculate the Vale Notes' abnormal returns using two variants of the regression model approach (citations omitted, emphasis added).

[16]   In a footnote of his report, Dr. Tabak appears to question my Matched Portfolio method because it "does not use any variable to control for industry effects." (Tabak Report, ¶ 38, footnote 32).  His comment reflects his lack of

6

discussion of a minor error that I corrected well before he submitted his report, and confirmed does not affect my conclusions, is irrelevant.

**B.** **The "Errors in Return Calculations for the Feinstein Regression" that Dr. Tabak discusses are irrelevant because they do not affect the inputs or results of my FDT Test, as Dr. Tabak admits**

15. Dr. Tabak's presentation of a minor error in Section IV.B of his Report ("Errors in Return Calculations for the Feinstein Regression") —*i.e.*, that the Vale Notes' abnormal returns calculated using the Feinstein Regression (shown in my First Report's Overview Exhibit 2) are incorrect—is deeply misleading.[17]

16. First, the error Dr. Tabak discusses merely concerns the presentation of data in a summary exhibit.[18] My actual calculations, upon which I drew my conclusions, were not in any way affected by this error in the summary exhibit, which Dr. Tabak recognizes.[19]

17. Second, the data presentation error only pertains to four values related to a secondary sensitivity analysis.[20] I do not endorse the Feinstein Notes Regression Model, and believe my model is superior.

---

understanding of the large literature on *bond* event studies where matched portfolios typically do not include a variable that "controls for industry effects." *See* Mazumdar Report, ¶ 71. Further, Dr. Tabak's assertion that an industry index must always be included in any event study to control for industry effects contradicts his prior work. In the Tabak Vale (2017) Report, the regression Dr. Tabak used to calculate the Vale ADS' abnormal returns did not include an industry index. *See* Expert Report of David I. Tabak, Ph.D., *In Re: Vale S.A. Securities Litigation*, United States District Court, Southern District of New York, 1:16-cv-00658-GHW, filed September 15, 2017 ("Tabak Vale (2017) Report"), ¶ 37, Exhibits 8b1 and 8b2.

[17] Tabak Report, ¶ 18.

[18] *See* Tabak Report, ¶ 18. Specifically, Overview Exhibit 2 showed the daily abnormal returns and test statistics as reported in the back-up of Dr. Torous' report, which contained daily figures from Dr. Feinstein's regression. *See* Mazumdar Report, ¶ 73 and Appendix C, footnote 48. As Dr. Feinstein used dummy variables for these four dates, the daily abnormal returns and corresponding test statistics for these dates are 0 in Dr. Torous' backup; the actual estimates on these dates are captured by the coefficient for the dummy variables. *See* "Feinstein Note Event Study.xlsx" from Dr. Torous' report back-up materials, also included in Mazumdar Report back-up materials. In preparing the Overview Exhibit the correct values were mistakenly not substituted in.

[19] Tabak Report, ¶ 20 ("It appears, however, that the Mazumdar Report used a different, and correct, set of residuals from Dr. Feinstein's analysis for its actual FDT Tests.").

[20] Mazumdar Report, ¶ 73 and Appendix C, ¶ 24.

18. In short, Dr. Tabak's recitation of errors in my Notes event studies are irrelevant and do not change my ultimate conclusion that: "Regardless of the regression methodology used, I find that none of the seven Vale Notes consistently reacted to news throughout the Class Period."[21]

### C.   Dr. Tabak's assertion that some of the news days I identified were purportedly based on non-material information, not news, is false and irrelevant

19. In Section IV.C of his Report, Dr. Tabak claims that I purportedly misclassified five of the 214 news days in my First Report.[22]  He claims these errors illustrate "[t]he drawbacks of a 'subjective' approach,"[23] as opposed to his purportedly superior "objective" approach.[24]

20. Dr. Tabak is simply wrong because he has failed to review all the facts.  Furthermore, Dr. Tabak's quibbles with five of the 214 news days I selected are irrelevant.  I have now re-run my FDT Tests by reclassifying those five news days that Dr. Tabak claims are non-news days and confirmed that my results remained unchanged.  Dr. Tabak's invalid criticism does not, therefore, lead me to change my analysis or my conclusions.

### 1.   July 24, 2018 (News Day 173)

21. Dr. Tabak incorrectly assumes that I identified July 24, 2018 as a news day based solely on the news that the Vale Notes' credit ratings had been upgraded to Baa3 by Moody's.[25]  He argues that my inclusion of this day as a news day was improperly based on "duplicative" information because news of the Moody's upgrade had been released the previous day.  Dr. Tabak's criticism is misplaced and reflects his incomplete review of the evidence I have presented.

---

[21]   Mazumdar Report, ¶ 74.

[22]   In my First Report I applied a rigorous and fully documented approach to identify news days (*i.e.,* days when new, value-relevant information about Vale was publicly released) using several news sources.  My method excludes non-material information such as: stale news, articles unrelated to Vale, and articles about price movements, as Dr. Tabak has done in prior reports, but fails to do in this case as I detail in **Section IV**.

Moreover, as I discuss below, such disputes about whether particular days should be classified as news days are irrelevant if the results of the FDT Tests remain unchanged regardless of how such dates in dispute are classified.  Dr. Tabak has failed to evaluate this issue.

[23]   Tabak Report, ¶ 25.

[24]   Tabak Report, ¶¶ 23-24.

[25]   Tabak Report, ¶ 28, citing a cell in Mazumdar Report, Overview Exhibit 1.

22. As the cell in Mazumdar Report Overview Exhibit 1 that Dr. Tabak cites clearly shows, Day 173 included new information releases which merited the inclusion of July 24, 2018 as a news day. That cell shows that in addition to the article on the Moody's rating upgrade of Vale's *Notes* (which I included for completeness in my Overview Exhibit 1), an additional piece of Vale-related news release on July 24, 2018, *viz.,* news of an upgrade of Vale's *ADS* by Clarksons Platou Securities.[26] This second piece of news *which Dr. Tabak has chosen to ignore* qualifies July 24, 2018 as a news day under my methodology.

23. Dr. Tabak also claims that my classification of **July 23, 2018** as a news day *may* have been incorrect because he speculates that the Moody's credit rating announcement made that day *may* have been made after trading hours.[27] But Dr. Tabak admitted at his deposition that he did no independent analysis to identify the timing of the July 23, 2018 Moody's credit rating announcement other than reviewing later *Dow Jones Newswires* articles about that announcement.[28] Even if some *Dow Jones Newswires* articles about the Moody's credit rating announcement were published after hours, that does not prove that the Moody's credit rating announcement was not published during trading hours, as I (like Dr. Feinstein) had assumed since Moody's credit rating announcements do not have time stamps.[29] Dr. Tabak's criticism of my classification of July 23, 2018 as a news day is pure speculation.

### 2.  June 12, 2018 (News Day 161)

24. Dr. Tabak claims that I improperly classified June 12, 2018 as a news day because the news is purportedly stale, *i.e.*, repeated the announcement of a deal between Vale and Wheaton Precious Metals on June 11, 2018 (which I also classified as a news day).[30] Dr. Tabak's assertion is incorrect because he fails to recognize that I identified June 11 and June 12, 2018 as news days based on two separate news releases.

---

[26]  *See* excerpt from Mazumdar Report, Overview Exhibit 1 shown in Tabak Report, ¶ 26 (headlines on July 24, 2018 include "Vale upgraded to Buy from Neutral at Clarksons PlatouCLKS").

[27]  Tabak Report, ¶ 29.

[28]  Deposition Testimony of David Tabak, *In Re: Vale S.A. Securities Litigation*, United States District Court, Southern District of New York, 19 Civ. 526 (EK) (SJB), November 8, 2023 ("Tabak Deposition"), at 54:7-55:21.

[29]  Mazumdar Report, ¶ 58.  *See also* Corrected Report on Market Efficiency Professor Steven P. Feinstein, Ph.D., CFA, *In Re Vale S.A. Securities Litigation*, United States District Court, Eastern District of New York, 19-cv-526-RJD-SJB, filed February 18, 2021, ¶ 244, Table-3.

[30]  Tabak Report, ¶ 30.

25. I classified Monday, June 11, 2018 as the effective news day[31] because rumors about a Vale deal to sell its cobalt output had surfaced after trading hours on Friday, June 8, 2018.[32]   I classified Tuesday, June 12, 2018 as another effective news day because specific details about Vale-Wheaton Precious deal and its formal announcement did not occur until after hours on Monday, June 11, 2018 when Vale issued a Form 6-K[33] formally announcing the deal and releasing new value-relevant information about the deal structure.   That second announcement included new information, not the repetition of a prior news release, as Dr. Tabak incorrectly claims, and led to my including June 12, 2018 as a news day.  Accordingly, Dr. Tabak's assertion that my inclusion of this date as a news day is improper is baseless.

### 3.   June 20, 2018 (News Day 163)

26. Dr. Tabak also claims that I improperly classified June 20, 2018 (News Day 163) as a news day because it repeats the deal terms discussed in news articles I had considered to classify June 12, 2018 as a news day.[34]  Dr. Tabak's claim is again wrong because he has failed to review the facts, *viz.,* the contents of the relevant news articles.  I classified June 20, 2018 as a news day because

---

[31]   The effective news day is the trading day where the market would be expected to react to the release of new information. If the information is released during trading hours then the effective news day is the same as the date of the information release.  If the information is released after trading hours then the following trading day is the effective news day.

[32]   Mazumdar Report, Overview Exhibit 1.  "Vale reaches $700M pact to sell cobalt output, Bloomberg says," Theflyonthewall.com, June 8, 2018.  Ther article was published on Friday, June 8, 2018 after hours at 6:21 PM EDT.

A Bloomberg article (also published after hours on Friday, June 11, 2018), which the theflyonthewall.com article appears to reference, discussed statements by "people with knowledge of the matter" about a deal, but did not name the transaction counterparty or any details about the transaction. *See* Farchy, Jack and Watson, R.T., "Vale is said to reach $700 million deal to sell cobalt output," *Bloomberg News*, June 8, 2018.

[33]   *See,* Mazumdar Report, Overview Exhibit 1; Vale S.A., "Form 6-K: US$ 690 million Cobalt Stream unlocks Vale's Voisey's Bay Mine Expansion," filed on June 11, 2018, available at <https://www.sec.gov/Archives/edgar/data/917851/000110465918039516/a18-15200_16k.htm>.

[34]   Tabak Report, ¶ 30.

*new* value-relevant information about the deal (the transaction's expected profitability and its implications for Vale's production)[35] was released that day.[36]

### 4.    January 17, 2017 (News Day 23)

27. After market close on Friday, January 13, 2017, Vale released a Form 6-K announcing that it had paid "interest on infrastructure debentures."[37]  I therefore classified January 17, 2017 (the next effective trading day) as a news day.  Dr. Tabak questions my decision to do so as "[a]nother error, or, at a minimum, a highly dubious assumption," because in his opinion a company "making a previously scheduled interest payment [on debt] should not be considered an example of a value-relevant news event."[38]

28. Dr. Tabak's argument appears to stem from his mistaken belief that the interest payments at issue related to debt claims against Vale because he has again ignored the facts.  Vale's Form 6-K[39] notes that Vale's interest payment was not to its debtholders.  Instead, the interest payment was on its debenture stock, "[a] type of stock that makes fixed payments at scheduled intervals of time. Debenture stock differs from a debenture in that it has the status of equity, not debt, in liquidation."[40,41]

---

[35]   "The streaming deal enables development of VBME, Vale's first significant investment announcement in recent years. The transaction substantially improves the financial returns on invested capital of VBME to more than 35% p.a. at market consensus prices…VBME will extend the mine life of Voisey's Bay, granting Vale access to nickel, copper and cobalt reserves and, thus, increasing to an estimated annual production of around 45 kt of nickel, on average, about 20 kt of copper and about 2.6 kt of cobalt, in total. In order to secure a smooth transition from the open pit to the underground mine, nickel production from Voisey's Bay mine will be maintained at 38 ktpa from 2018 to 2020, ramping up to 45-50 ktpa of nickel contained in concentrate from 2024 onwards." *See* "Vale exposed to about 40% of future cobalt production from Voisey's...," Theflyonthewall.com, June 19, 2018.

[36]   Further, I classified June 20, 2018 as a news day because I identified news released that day through my Factiva news search.  My results do not depend on whether I classify such Factiva News Dates as news days or non-news days. *See* Mazumdar Report, ¶¶ 82-84 and Exhibits 14-19.

[37]   Mazumdar Report, Overview Exhibit 1 and Appendix B, p. B-7.

[38]   Tabak Report, ¶ 31.

[39]   Vale announced that it "will pay the interest on its shareholders debentures (debentures)." *See* United States Securities and Exchange Commission, "Form 6-K: Report of Foreign Private Issuer Pursuant to Rule 13a-16 or 15d-16 of the Securities Exchange Act of 1934 for the month of January 2017, Vale S.A.," January 13, 2017, available at <https://www.sec.gov/Archives/edgar/data/917851/000110465917002331/a17-2503_16k.htm>.

[40]   *See* Campbell Harvey's Hypertextual Finance Glossary, available at <https://people.duke.edu/~charvey/Classes/wpg/bfglosd.htm>.

[41]   "At the time of the first stage of our privatization in 1997, we issued **shareholder revenue interests** known in Brazil as ''debentures participativas' to our then-existing shareholders. The terms of the debentures were established to ensure that

29. The contractual debenture interest payments here were not simply contingent on Vale's financial position (or "bankruptcy risk" as Dr. Tabak assumes[42]) but also on other factors such as Vale "exceed[ing] defined thresholds of sales volume relating to certain mineral resources, and from the sale of certain mineral rights."[43]  Moreover, the size of Vale's interest payments (if any payments were made) also varied based on "an agreed percentage of our net revenues (revenues less value-added tax, transport fee and insurance expenses related to the trading of the products) from certain identified mineral resources."[44]  Finally, Vale further noted that: "Our obligation to make payments to the holders will cease when the relevant mineral resources are exhausted."[45]

30. In other words, confirmation that Vale had made an interest payment on its shareholder debentures conveyed value-relevant news to investors *e.g.,* Vale had continued to exceed its sales targets related to certain mineral resources, and such resources had until then not been exhausted. Accordingly, Dr. Tabak's assertion that I classified this day as a news day based on information that was not "value-relevant" is baseless.[46]

---

our pre-privatization shareholders, including the Brazilian government, would participate alongside us in potential future financial benefits that we derive from exploiting certain mineral resources that were not taken into account in determining the minimum purchase price of our shares in the privatization. In accordance with the debentures deed, holders have the right to receive semi-annual payments equal to an agreed percentage of our net revenues (revenues less value-added tax, transport fee and insurance expenses related to the trading of the products) from certain identified mineral resources that we owned at the time of the privatization, to the extent that we exceed defined thresholds of sales volume relating to certain mineral resources, and from the sale of mineral rights that we owned at that time. Our obligation to make payments to the holders will cease when the relevant mineral resources are exhausted. We made available for withdrawal by holders of shareholder debentures US$65 million in 2015, US$84 million in 2016 and US$135 million in 2017. In October 2013, the accumulated sales volume of iron ore from the Northern System reached the relevant threshold established in the debentures deed, which triggered our obligation to make additional semi-annual payments of the premium on iron ore products, starting in 2014." (*See* United States Securities and Exchange Commission, "Form 20-F: Annual Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 for the fiscal year ended December 31, 2017, Commission file number: 001-15030, Vale S.A.," April 13, 2018, available at <https://www.sec.gov/Archives/edgar/data/917851/000104746918002777/a2234766z20-f.htm>. ("Vale 2017 Form 20-F"), p. 166) (emphasis added).

"At the time of its privatization in 1997, Vale issued debentures to then-existing stockholders, including the Brazilian Government. **The debentures' terms were set to ensure that pre-privatization stockholders would participate in potential future benefits that might be obtained from exploiting mineral resources**." (*See* Vale, "Financial Statements," December 31, 2017, available at <https://api.mziq.com/mzfilemanager/v2/d/53207d1c-63b4-48f1-96b7-19869fae19fe/8f438405-d393-4e97-8318-bd6539cd01ff?origin=1>, p. 26) (emphasis added).

42   Tabak Report, ¶ 31.

43   Vale 2017 Form 20-F, p. 166.

44   Vale 2017 Form 20-F, p. 166.

45   Vale 2017 Form 20-F, p. 166.

46   Tabak Report, ¶ 32.

12

### 5.    March 31, 2017 (News Day 45)

31. Dr. Tabak claims that my selection of March 31, 2017 as a news day, based on news that day that Vale was being upgraded by BMO Capital Markets,[47] was incorrect purportedly because of my "apparent misunderstanding of what an abnormal return is."[48]  He incorrectly asserts that:[49]

> A change in an analyst's view of Vale due to a "higher iron ore price outlook" is an example of a change due to a broader market factor and should not be considered a news event that should be the cause of an ***abnormal*** return.

32. Dr. Tabak's claim reflects a fundamental conceptual misunderstanding of economic principles and statistics.  A security's abnormal return on any day is the difference between a security's *observed return* and its *predicted return* that day.

33. The *predicted return* is estimated based on the "*historical* relationship of the stock's return to changes in market and industry factors over an estimation period using a regression, *viz.,* the stock's estimated market and industry 'betas'."[50]  That is, in calculating the Vale ADS' predicted return on any day, the Mazumdar Regression considers two factors, among others: (i) the Iron Ore Index beta (which is based on *historical* data); and (ii) the observed change in the Iron Ore Index *on the day at issue*.[51]  In other words, according to basic statistic principles, the calculation of the ADS' *predicted return* on any day is not affected by the announcement of an analyst's opinion about how *future* changes in iron ore prices may affect Vale ADS' price.

34. However, the Vale ADS' *observed return* on any day may be impacted by an announcement of an analyst's opinion.  Professional equity analysts calculate a stock's target price based on their assessment of the stock's future cash flows.  Analysts are considered sophisticated market participants.  Hence, a change in an analyst's rating of a stock conveys *firm-specific* news to investors, according to a large body of economics research I discussed in my First Report, which Dr. Tabak has ignored.[52]  In this case, BMO Capital Markets analysts upgraded Vale ADS on

---

47    Tabak Report, ¶ 33.  *See also* Mazumdar Report, Overview Exhibit 1, see entry for March 31, 2017.

48    Tabak Report, ¶ 33.

49    Tabak Report, ¶ 33 (emphasis in original).

50    Mazumdar Report, footnote 27 (emphasis added), ¶ 21(ii) a ("abnormal returns (price changes not attributable to broader market, industry and other explanatory factors on the same day)").

51    Mazumdar Report, Appendix C, ¶ 10.

52    *See* Mazumdar Report, Appendix C, ¶4.v, footnote 16 for a list of sources on this topic in the First Report.

March 31, 2017 from "Underperform" to "Market Perform"[53] because of their outlook that *future* iron ore prices would be higher.[54]  Thus, according to basic economic principles, it is well understood that such a news release is value-relevant, firm-specific information that could affect a security's observed return and hence its *abnormal returns*.

35. Dr. Tabak's claims to the contrary defy economic logic.  In fact, Dr. Tabak himself has included at least one *Dow Jones Newswires* article which discusses an analyst opinion that is also premised primarily on changing industry conditions.[55]  In sum, Dr. Tabak's arguments do not establish that my inclusion of March 31, 2017 as a news day was improper for any reason.[56]

> **D.    Dr. Tabak's claim that my analysis "Fail[s] to Consider the Effect of Vale Announcements on the Metals and Mining Industry" reflects a fundamental misunderstanding of regression analysis**

36. In Section IV.D of the Tabak Report entitled "Failure to Consider the Effect of Vale Announcements on the Metals and Mining Industry," Dr. Tabak attempts to cast doubt on the industry indices used as explanatory variables in the Mazumdar Regression Model and the Feinstein Regression Model for the Vale ADS (henceforth, I refer to these indices as the Mazumdar and Feinstein industry index, respectively) in order to undermine the earnings announcements-

---

[53]    Sterck, Edward and Gagliano, David, "Upgrading to Market Perform on Higher Iron Ore Price Outlook," *BMO Capital Markets*, March 31, 2017.

[54]    "We are upgrading Vale to Market Perform with a $10.00 target price (from US$7.00) to align with our new commodity price forecasts." *See* Sterck, Edward and Gagliano, David, "Upgrading to Market Perform on Higher Iron Ore Price Outlook," *BMO Capital Markets*, March 31, 2017.

[55]    "Premiums fading with weaker Chinese profits…On our trip to China last week we came away more cautious on near-term Chinese steel mill profits due to a combination of demand and supply factors…As such, we have trimmed our forecasts for Vale's iron ore premiums…" (Tanners, Timna, Fairclough, Jason, and Heluany, Antonio, "Upbeat on shareholder payout, cautious on premiums; cut PO to $16.50 but reit. Buy," *Bank of America Merrill Lynch*, December 12, 2018.) *See also* Tabak Report Production, "Exhibit 5,6c-6i.xlsx," sheet "DJN Mazumdar Parameters;" Tabak Report Production, "Exhibit 6a-6b.xlsx," sheet "DJN Mazumdar Parameters."

[56]    Further, I classified March 31, 2017 as a news day because I identified news released that day through my Factiva news search.  As I noted above, my results do not depend on whether I classify such Factiva News Dates as news days or non-news days.  *See* Mazumdar Report, ¶¶ 82-84 and Exhibits 14-19.

based FDT Test results he reports,[57] which provide *strong evidence of inefficiency*.[58]  Dr. Tabak's critiques are meritless, as I explain below.

37. Dr. Tabak's dismissal of his own findings rests on the notion that Vale's earnings announcements may have had "spillover" effects on the Mazumdar and Feinstein industry indices.[59]  Dr. Tabak arrived at his conjecture through several convoluted steps.

38. First, Dr. Tabak examined on how many of Vale's nine earnings announcement dates in the Class Period the returns of the Mazumdar and Feinstein industry indices were unusually high or unusually low.[60]  Then, upon finding some *correlation* between Vale earnings announcements and the Feinstein industry index (but not the Mazumdar industry index),[61] Dr. Tabak asserted that there are only two possible reasons for his finding, *viz.,* "either Vale was very lucky (or unlucky) in announcing earnings on days with large, independent industry effects present, or its earnings announcements tended to affect the industry."[62]  Next, without doing any further analysis to determine which of his two proffered explanations was valid, Dr. Tabak *assumes* it is the latter, *i.e.,* Vale's earnings announcements *caused* a relatively large change in the industry index value— a purported "spillover effect."

39. This assumption then leads Dr. Tabak to speculate that the absence of a correlation between the Mazumdar industry index and Vale's earnings announcement days, which "would [normally] be

---

[57]   *See* Tabak Report, ¶ 37 ("To the extent that these spillover effects from its earnings announcements affected the Feinstein Industry Index, they would contaminate the effect of Vale earnings announcements on average on the abnormal return, which is a function of the industry index. Thus, the results of any FDT Test of earnings announcements, as well as the event studies of the earnings announcements themselves, using this index should be considered improperly specified and not to be relied upon.").

[58]   Tabak Report, Exhibit 5.

[59]   Dr. Tabak describes the purported "spillover" effect he claims to have found as follows: "On eight of the nine Vale earnings announcements during the Class Period, the movement of the Feinstein Industry Index was in the outer half of movements (i.e., in the top 25% or bottom 25% of movements).  See [Tabak Report] Exhibit 4.  In addition, the movement of the Feinstein Industry Index was in the outer quintile (i.e., in the top 10% or bottom 10% of movements) on more than half of the earnings announcement days, rather than that happening only 20% of the time, which is what would be expected by chance. Thus, either Vale was very lucky (or unlucky) in announcing earnings on days with large, independent industry effects present, or its earnings announcements tended to affect the industry. To the extent that these spillover effects from its earnings announcements affected the Feinstein Industry Index, they would contaminate the effect of Vale earnings announcements on average on the abnormal return, which is a function of the industry index." *See* Tabak Report, ¶ 37 (emphasis omitted).

[60]   Tabak Report, ¶¶ 36-38 and Exhibit 4.

[61]   Tabak Report, Exhibit 4.

[62]   Tabak Report, ¶ 37.

15

considered a mark in favor of using this index, because it does not appear to be affected by Vale's earnings announcements," meant that the Mazumdar industry index was not "'close enough' to Vale to properly pick up external industry effects."[63]   In sum, Dr. Tabak asserted that the results of his FDT Tests of earnings announcements dates based on the Mazumdar and Feinstein Regression Models could not be relied upon based on his speculation that (1) Dr. Feinstein's industry index was too close to Vale, and (2) the Mazumdar industry index might not be close enough.

40. Dr. Tabak's assertion is meritless.   First, Dr. Tabak's analysis is unscientific and unreliable.   Dr. Tabak's analysis does not in fact prove that "spillover effects from [Vale's] earnings announcements affected" either industry index.[64]   At most, his analysis shows some *correlation* between Vale earnings announcements and the Feinstein industry index (but ***not*** between Vale earnings announcements and the Mazumdar industry index).   But such correlation does not prove causality, as is well understood in empirical research.[65]

41. Second, Dr. Tabak's assertions are easily disproven.   If Vale's earnings announcements affected an industry index as Dr. Tabak speculates, then logically such a spillover effect should be more noticeable on an industry index that includes other iron ore miners[66] than on an industry index that does not.   As I noted in my First Report, the Mazumdar industry index is constructed by one of the world's major index providers (S&P) and *includes* Vale and other major iron ore miners.[67]   By contrast, the Feinstein industry index includes neither.[68]   So by Dr. Tabak's logic, the "spillover"

---

[63]   Tabak Report, ¶ 38.

[64]   Tabak Report, ¶ 37.

[65]   Dr. Tabak's false causation arguments would in my experience likely not satisfy the standards for peer-reviewed research.

[66]   Top iron ore producers include Vale, Rio Tinto, BHP, Fortescue, Anglo American, among others. *See, e.g.,* Löf, Anton and Löf, Olaf, "Iron Ore Miners Increase Production Capacity," *Engineering and Mining Journal*, December 2022, available at < https://www.e-mj.com/features/iron-ore-miners-increase-production-capacity/>; "Global Iron Ore Mining Markets Report 2018-2022 Featuring Leading Players - Vale, Rio Tinto, Anglo American Plc, BHP Billiton & Fortescue Metals Group," *PR Newswire*, January 18, 2018, available at < https://www.prnewswire.com/news-releases/global-iron-ore-mining-markets-report-2018-2022-featuring-leading-players---vale-rio-tinto-anglo-american-plc-bhp-billiton--fortescue-metals-group-300780869.html>.

[67]   Before including this index as an explanatory variable in my regression analysis I adjusted it to remove Vale. *See* Mazumdar Report, Appendix C, ¶ 10 (ii) and footnote 30.

[68]   Data from Morningstar Direct on holdings of an exchange-traded fund tracking the Feinstein industry index (*viz.*, SPDR S&P Metals and Mining ETF) indicate that none of the top global iron ore producers mentioned in the footnote above were included in the index as of December 31, 2018.   In contrast, data from Morningstar Direct on holdings of an

effect should be more apparent for the Mazumdar industry index compared to the Feinstein industry index. However, the results of Dr. Tabak's spillover "analysis" are exactly the opposite which highlights the fundamental flaw in Dr. Tabak's reasoning.

42. Dr. Tabak did not review the composition of the Feinstein and Mazumdar industry indices when preparing his report.[69] When informed in his deposition that the Feinstein industry index did not include iron ore miners (a fact I had reported in my First Report), Dr. Tabak was "surprised,"[70] and admitted that his finding that Vale's earnings announcements had a purported "spillover effect" on the Feinstein industry index could have been a "fluke" (not a causal effect as he claimed in his report), in which case he had "no problem" with the Mazumdar industry index.[71]

43. In short, Dr. Tabak's criticism of my use of the Feinstein and Mazumdar Regression models to calculate the Vale ADS' abnormal returns following earnings announcements rests on a series of speculative assumptions that contradict the facts and defy economic logic.

### E.    Dr. Tabak's critiques of my serial correlation analysis are irrelevant

44. In Section VI of the Tabak Report entitled "Analysis of Serial Correlation," Dr. Tabak criticizes the results of my *weak-form* efficiency tests of serial correlation.

45. Dr. Tabak does not question my finding that the "daily returns of one of the Vale Notes (Note 1) were serially correlated over the Class Period."[72]  He simply argues that "[i]n order to show

---

exchange-traded fund tracking the S&P Global Natural Resources index, of which the Mazumdar industry index is a sub-index, (*viz.*, SPDR S&P Global Natural Resources ETF) indicate that all the major iron ore producers mentioned in the footnote above were included in the index as of December 31, 2018. (*See,* "Morningstar Direct - Index Constituents.xlsx.") Note that the Mazumdar industry index, S&P Global Natural Resources – Metals and Mining, is one of a three sub-indices of a S&P Global Natural Resources Index, with the other two sub-indices being S&P Global Natural Resources – Agriculture and S&P Global Natural Resources – Energy. *See*, "S&P Thematic Indices Methodology," *S&P Dow Jones Indices*, November 2023, pp. 27-28.

[69]  Tabak Deposition, at 37:12-16 and 43:18-22 ("Q.    And sitting here -- in preparing your report, did you examine the content of the Mazumdar industry index? A.    I did not.").

[70]  Tabak Deposition, at 40:12-18.

[71]  *See* Tabak Deposition, at 47:17-22. ("A.    So the question is, what the reason is for the movement of the Feinstein industry index on the Vale earnings announcement dates. If it's just a fluke, then there is no problem with the Mazumdar index.") and Tabak Deposition, at 50:10-24 ("Q.    Okay. Assuming the Feinstein correlation is a fluke. A.    In that – let's me jump in. A.    In that case I have no problem with the Mazumdar index. Q.    And would it be fair to say that the results of any FDT test on Vale's earnings announcements using the Mazumdar industry index, would be valid. Correct? A.    Assuming there are no other issues to deal with, yes, they would be valid.").

[72]  Mazumdar Report, ¶ 50.

17

inefficiency, any serial correlation must be associated with profitable trading strategies" after accounting for trading costs.[73]   However, Dr. Tabak has shown no evidence that trading costs would render trading strategies for Note 1 based on serial correlation unprofitable.

46. More importantly, Dr. Tabak's criticism of my serial correlation analysis does not affect my findings that the Vale Securities traded in *semi-strong* form inefficient markets throughout the Class Period.[74]

### IV.    Dr. Tabak's Purportedly "More Objective" FDT Tests Are Fundamentally Flawed, Biased, And Unsuitable For Testing The Market Efficiency Of The Vale Securities

47. A critical first step in market efficiency tests based on event studies, such as FDT Tests, is to identify news days appropriately.[75]   Regardless of whether Dr. Tabak's news day selection methodology is "objective,"[76] it is unscientific, biased, and fails to properly distinguish news days from non-news days.  Dr. Tabak's FDT Tests therefore cannot be considered a reliable method for assessing the Vale Securities' market efficiency throughout the Class Period.

### A.    Dr. Tabak's methodology for selecting news days is flawed

48. Dr. Tabak's news selection methodology is unscientific, fundamentally flawed, and biased, and I am aware of no peer-reviewed event study that supports Dr. Tabak's two-step procedure to "provide alternative news selections"[77] when conducting an FDT Test.  As a consequence, the results of his FDT Test, which hinge critically on his selection of news days, are fundamentally flawed and unreliable.

---

[73]   Tabak Report, ¶ 50.

[74]   Mazumdar Report, ¶¶ 48-50.

[75]   Dr. Tabak agrees with this principle.  *See* Tabak Deposition, at 16:22-17:2. ("Q.   Okay.  So you would agree with me that a critical step in setting up an FDT test is how one goes about identifying news days.  Correct?  A.   Yes, I will agree.").

[76]   Tabak Report, ¶¶ 23-24.

[77]   Tabak Report, ¶ 39.

*1.      Dr. Tabak improperly restricts his initial selection of news days by mechanically searching for news articles on Vale through a single source (Dow Jones Newswires), ignoring several other well-known news sources*

49. In the first step of his two-step news selection procedure, Dr. Tabak restricts his search for all value-relevant news on Vale to a mechanical search of only *Dow Jones Newswires* stories. Based on this limited and mechanical search, he identifies an initial set of news days when there was "at least one news article on Vale," which he refers to as the "DJN All" set.[78]

50. There are at least three fundamental problems with this step. First, it results in a set of news that is obviously incomplete.[79] For example, none of the DJN All sets include what is perhaps the most central news day in this litigation, January 25, 2019, when news of Dam 1's collapse first emerged.[80] That is, according to Dr. Tabak's methodology, no news was released during trading hours on January 25, 2019,[81] which defies common sense, contradicts the facts and Plaintiff's allegations.[82] Even Dr. Tabak was "surprised" when this glaring omission in his DJN All set of news days was pointed out to him in his deposition.[83] The DJN All sets (for the Vale ADS) also do not include eight of Vale's nine earnings announcement dates over the Class Period,[84] even though academic research has found "compelling evidence that there is information content in

---

[78]   *See* Tabak Report, footnote 11 of Exhibits 6a and 6b.

[79]   The DJN All news day sets vary across the eight Vale Securities at issue. *See* DJN All sets shown for the Vale ADS and the Vale Notes in Exhibits 6a-6i. These differences occur in part because Dr. Tabak assumes that the ADR trading session ends at 4 PM Eastern whereas the Notes' trading sessions ends at 5 PM Eastern, and in part because all Vale Securities do not trade on all days over the Class Period. But regardless of which DJN All set one were to consider, they are all deficient in the way discussed above.

[80]   *See* Tabak Report Production, "Exhibit 5,6c-6i.xlsx," sheet "DJN Mazumdar Parameters;" Tabak Report Production, "Exhibit 6a-6b.xlsx," sheet "DJN Mazumdar Parameters."

[81]   The dam breach was disclosed during trading hours on January 25, 2019. *See* Mazumdar Report, Appendix B, pp. B-22 and B-33.

[82]   According to the Plaintiff, "The truth about the risk of Vale's tailing dams and its inadequate dam maintenance and safety certifications was disclosed through a series of disclosures beginning with the news of the Dam 1 collapse on January 25, 2019 and concluding with related news on February 6, 2019." (Complaint, ¶ 203.)

[83]   Tabak Deposition, at 86:25-87:10 ("Q…. So with that information, are you not shocked that the DJN approach you adopted here did not identify January 25th as a news day? A.   I'm surprised.").

[84]   Vale made nine earnings announcements over the Class Period. The DJN All sets (for the Vale Notes) also do not include seven of Vale's nine earnings announcement dates over the Class Period. *See* Tabak Report Production, "Exhibit 5,6c-6i.xlsx," sheet "EA Times and Dates Pasted;" Tabak Report Production, "Exhibit 6a-6b.xlsx," sheet "EA Times and Dates Pasted."

19

accounting earnings announcements,"[85] and Dr. Tabak has acknowledged in expert reports he has submitted in other cases that earnings announcement dates are objectively considered news days.[86] Again, Dr. Tabak was "surprise[d]" when the absence of most earnings announcement dates in his DJN All set of news days was pointed out to him in his deposition.[87]

51. The absence of most earnings announcement dates in Dr. Tabak's DJN All set of news days, and the absence of any news on the date of Dam 1's collapse, clearly indicates that Dr. Tabak's reliance on a single news source is inadequate for identifying important news.

52. Second, Dr. Tabak has included articles that had no material news on Vale (*i.e.*, duplicates, or report stale information, or only discuss security price movements, or are not about Vale), which he has acknowledged in earlier reports and writings should not be considered "material" news.[88]

53. Surprisingly, in his deposition Dr. Tabak testified that *because* he has a mechanical news selection rule that does not require a review of a news article's contents, non-material information implicitly should be considered news.[89]  Such a claim defies common sense.  Dr. Tabak's personal action (to review or not review a news article) does not change the content of any news article.  That is, an

---

[85]   *See* Kothari, S.P., "Capital markets research in accounting," *Journal of Accounting and Economics*, 2001, Vol. 31, p. 117, cited at Mazumdar Report, footnote 77.

   In contrast, my selection of news dates includes *all* earnings announcements, even within Dr. Tabak's arbitrary subset of the top 10% days based on the news days I relied upon in my First Report.  *See* Tabak Report Production, "Exhibit 5,6c-6i.xslx," sheet "Top % (Mazumdar);" Tabak Report Production, "Exhibit 6a-6b.xlsx," sheet "Top %."

[86]   *See* Tabak Vale (2017) Report, ¶ 35; Tabak Alibaba (2018) Report, ¶ 39; Tabak PPG Report, ¶ 40; Tabak Teva Report, ¶¶ 41-42; Tabak GE Report, ¶¶ 34-35.  *See also* Tabak, David I., "Testing Securities Market Efficiency With Cammer Factors," *Law360*, February 5, 2019, cited at Mazumdar Report, footnote 81.

[87]   Tabak Deposition, at 81:22-82:9 ("Q…So we're talking about two different things here. It's not a question of price movement, it's a question of whether there is a news report about Vale's earnings…A.   Okay, . . . Yeah, then that does surprise me.").

[88]   Ferrillo, Paul A., Dunbar, Frederick C., Tabak, David I., "The 'Less Than' Efficient Capital Markets Hypothesis: Requiring More Proof from Plaintiffs in Fraud-on-the-the-Market Cases," *St. John's Law Review*, 2004, Vol. 78(1) ("Ferrillo et al. (2004)"), p. 120 ("In any case, one would still have to be careful to … remove any stories that exist because they report on a price movement."); Tabak Vale (2017) Report, ¶ 35 ("Finally, I performed an additional test, using stories that appeared in Dow Jones Newswires and removing any that were solely reporting on Vale's ADR or stock price movements or volume (*i.e.,* instances where the news was responding to the ADR or stock price rather than the ADR price potentially responding to news), that appeared to be duplicates of previously reported news, or were deemed to be non-material because they reported data irrelevant to the value of the Company."); Tabak PPG Report, ¶ 40, footnote 26; Tabak Alibaba (2018) Report, ¶ 39, footnote 37.

[89]   Tabak Deposition, at 103:8-19 ("Q.   Dr. Tabak, you would agree that a news item with no information content related to a company should not be treated as a news day when running a test for market efficiency.  Correct? A.   If you're going to look at it subjectively, I would exclude that. **If you've got a rule that says we're not going to review these subjectively, then you do whatever the rule says** and don't make an adjustment.")  (emphasis added).

20

article with no news about a company is not transformed into one that purportedly has news, simply because Dr. Tabak chose not to read it. Contrary to Dr. Tabak's convoluted reasoning, it is not logical to "do whatever the rule says," if the rule defies economic logic and in this case is clearly unsuitable for testing market efficiency (*i.e.*, assessing price reactions to news events).

54. Third, Dr. Tabak's myopic focus on time-stamped *Dow Jones Newswires* articles[90] is meaningless because without considering if the same news was published earlier elsewhere he has not addressed the central question,[91] *i.e.*, when did the relevant news first become public?[92] It is also not justified simply because he habitually uses the same method.

55. In sum, Dr. Tabak's news selection process is wholly unjustified, unscientific,[93] and unreliable.

56. Notably, none of these issues plague my analysis. First, unlike Dr. Tabak, my news gathering process was not arbitrarily limited to a single news source. To the contrary, my First Report included news from numerous well-known news sources.[94] Second, the dates discussed above— for example, the date of Dam 1's collapse and all of the earnings announcements—are all news

---

[90] Dr. Tabak notes: "The advantage of this source is that news stories have time stamps, eliminating the need to guess whether a story came out before or after the close of market hours." Tabak Report, ¶ 39. *See also* Tabak Deposition, at 52:11-21 ("Q. … Did you use only DJN because you viewed DJN as more likely to be providing to the market material news? A. More likely than what? Q. Than other news sources. A. Not necessarily. I think one of the main reasons that I said is that all stories on DJN are time stamped. So we know if they came out before, during or after market hours.").

[91] Tabak Deposition, at 55:15-21 ("Q. And there naturally would be a lag in time between when Moody's published its report and when DJN picked it up. Correct? A. The question is how substantial a lag. I mean, it's not -- DJN will not be instantaneous.").

[92] Absent a review of *other* articles published in news sources other than *Dow Jones Newswires*, one cannot determine when the relevant news was first made public. For example, even if a *Dow Jones Newswires* was published during trading hours on a given day, the contents of that articles may be stale in light of news articles published in other outlets, potentially days earlier. A similar issue arises where a *Dow Jones Newswires* article published after hours merely repeats another *Dow Jones Newswires* article, or an article published by a different outlet during trading hours that same day. Dr. Tabak's focus on time stamps of *Dow Jones Newswires* articles per se is meaningless. To address this central question of when information was first made publicly available, I considered a wide range of news sources.

[93] Dr. Tabak notes: "I have also used *Dow Jones Newswires* in numerous previous cases, meaning that I have not selected it based on what results it produces in this case." Tabak Report, ¶ 39.

[94] For example, I noted the Company's own disclosures through Form 6-Ks, credit rating announcements and 10 news sources available through *Factiva,* "one of the largest news aggregators and archives in the world, that economists routinely use to identify news in peer-reviewed event study research." *See* Mazumdar Report, ¶ 58 (iii). The 10 news sources I used are: (i) The Wall Street Journal, (ii) Financial Times, (iii) Reuters News, (iv) Dow Jones Industrial News, (v) PR Newswire, (vi) Moody's Investors Service Press Release, (vii) CQ FD Disclosure, (viii) RTT News, (ix) Mining Business Media, and (x) theflyonthewall.com, a financial news aggregator that provides real-time news updates, and which tracked analyst coverage on Vale according to my Factiva news review. *See* Mazumdar Report, footnote 66.

days in my data set.[95]   Third, I removed, among other things, duplicative articles, stale articles, and articles that only discussed price movements.[96]   Fourth, by having more than one source and reviewing the articles, my method addresses the central question of when did the relevant news first become public.[97]

> 2.   *Dr. Tabak improperly further restricts his set of news days to a small handful of days by applying his "Cut-Off Theory," which is arbitrary and contradicts his prior testimony*

57. In the second step of his news selection methodology, Dr. Tabak sorts "the news dates (in separate analyses for the Mazumdar news stories and the *Dow Jones Newswire* stories) by the number of stories on each date"[98] and argues that "the focus should be on the *Dow Jones Newswire* tests, and specifically on the top 25% and top 10% of dates"[99] because he assumes that "dates when more sources report on news or the same source issues multiple stories about news would be a proxy for more material news."[100]   Henceforth, I refer to this as Dr. Tabak's "Cut-Off Theory."

58. As with Dr. Tabak's first step, there are several fundamental issues with his second step.  First, his *Dow Jones Newswires* top 25% and top 10% cut-offs are arbitrary.  As he acknowledges "there is nothing that says that the dividing line should be between the top 50% and the top 25% or anywhere else."[101]   In fact, while Dr. Tabak claims that his samples are of the "top 25% and top 10% of dates," this definition does not match his actual methodology.[102]   As a result, he ends up using just

---

[95]   Mazumdar Report, Overview Exhibit 1, E1-19 (showing "Friday, January 25, 2019" as a news day); for earnings announcement dates, *see* Overview Exhibit 1, *e.g.*, OE1-1 (showing "October 27, 2016" as a news day), OE1-3 (showing "February 23, 2017" as a news day).  In fact, according to Dr. Tabak's flawed methodology, all earnings announcement dates and the date of Dam 1 collapse fall within the "Mazumdar Sources top 25%" sample of news days.  *See* Tabak Report Production, "Exhibit 5,6c-6i.xlsx," sheet "Top % (Mazumdar);" Tabak Report Production, "Exhibit 6a-6b.xlsx," sheet "Top %." Other days, including the day the departure of Vale's CEO was announced, are also news days in my data but not Dr. Tabak's.

[96]   *See* Mazumdar Report, Appendix C, ¶¶ 3-5.

[97]   *See* Mazumdar Report, Appendix C, ¶¶ 2, 4, 6.

[98]   Tabak Report, ¶ 41.

[99]   Tabak Report, ¶ 43.  (Henceforth I refer to these news day subsets as "Dow Jones Newswire top 25% and top 10%" as Dr. Tabak does).  *See* Tabak Report, ¶ 46.

[100]   Tabak Report, ¶ 41 and footnote 33.

[101]   Tabak Report, ¶ 45 and footnote 35.

[102]   Tabak Report, ¶ 43.

7.3%, 14.6%, and 36.6% of his DJN All news days, respectively, for his "10%," "25%," and "50%" cut-off analyses.[103]

59. Second, Dr. Tabak's application of his Cut-Off Theory is completely *ad hoc*. Dr. Tabak has never used a 25% cut-off in any of the nine reports he has authored since 2017 listed in Exhibit 1.[104] In his deposition, Dr. Tabak testified that he reported the top 25% news day-based cut-off FDT Test results in this case "just to add to the number of rows" in his exhibits.[105] As for his 10% and 50% cut-offs, Dr. Tabak has applied (and not applied) them in other cases without any systematic justification: only 10%; 10% and 50%; no cut-offs at all; or different cut-offs depending on the security.[106] At best, he has sometimes justified including a 10% cut-off because the number of news days was a large proportion of the total number of days in the Class Period,[107] which it is not in this case here.

---

[103] Recall that Dr. Tabak selects a total of 41 days as news days. Therefore, mathematically, a subset of 50% of these dates should comprise of twenty days, a subset of 25% of these dates should comprise of 10 days, and a subset of 10% of these dates should comprise of four days. However, Dr. Tabak's set of news days includes only 15 days based on his 50% cut-off (36.6%), only six days based on his 25% cut-off (14.6%), and only three days based on his 10% cut-off (7.3%). The reason for this discrepancy is that Dr. Tabak actually applies his cut-offs not based on a count of days but on a count of news articles on each news days and as a result uses even more restrictive samples than he claims. *See* Tabak Report, ¶ 43; Tabak Report, Exhibit 5, footnotes 8, 10, 11; Tabak Report, Exhibits 6a-6b.

[104] Exhibit 1 includes the nine opening reports related to market efficiency that I could publicly access that Dr. Tabak lists on his curriculum vitae filed from the time of Dr. Tabak's 2017 report for *Vale (2017)*. *See* Tabak Report, Exhibit 1.

[105] Tabak Deposition, at 95:14-22 ("Q. Okay. I'll just represent to you you've never, or at least we've never been able to find any report you've ever filed where you've used a 25 percent cutoff. Assuming that to be true, why did you use 25 percent cutoff here? A. Probably just to add to the number of rows.").

[106] For example, Dr. Tabak used no cut-offs in *Vale (2017)* or *GE*; in *Oracle*, *Heinz*, and *Qualcomm*, Dr. Tabak used only a 10% cut-off; in *PPG*, *Teva, Alibaba (2018)*, *and Alibaba (2023)*, Dr. Tabak used 10% and 50% cut-offs. *See* Tabak Vale (2017) Report; Tabak GE Report; Tabak Oracle Report; Tabak Heinz Report; Expert Report of David I. Tabak, Ph.D., *In Re Qualcomm Incorporated Securities Litigation*, United States District Court, 3:17-cv-00121-JO-MSB, filed May 23, 2022 ("Tabak Qualcomm Report"); Tabak PPG Report; Tabak Alibaba (2018) Report; Tabak Alibaba (2023) Report.

[107] In *Alibaba (2023)*, Dr. Tabak argued that "there is a large amount of news about Alibaba, and we should not treat over 90% of the trading days as if they contained surprising, material news" as the reason for focusing on the top 10% of news days. *See* Tabak Alibaba (2023) Report, ¶ 40. Dr. Tabak has offered a similar reason in Alibaba (2018). *See* Tabak Alibaba (2018) Report, ¶ 39 ("As there was news on 69 out of 88 days in the Class Period, I also performed the analysis two more times by looking at a proxy for the amount of news each day by counting the number of stories in Dow Jones Newswires, a technique from the field of content analysis."). In his expert report in *Alibaba (2023), after applying his 10% cut-off,* Dr. Tabak identified 6.8% or 7.7% of the trading days in the Class Period as news days based on alternative search criteria, which he presumably deemed to be a reasonable proportion of days to be considered news days for his FDT Test in that case. Dr. Tabak identified 6.8% of all Class Period based on a "Text" search and 7.7% based on a "Company" search. For his description of these searches, see Tabak Alibaba (2023) Report, Exhibit 8-a, footnotes 7 and 11. In this case, *even before applying any cut-off,* Dr. Tabak identifies only 7.2% of the trading days in the Class Period as news days based on his limited *Dow Jones Newswires* search. Although this initial set of news days is within the range (6.8%-7.7%) of the number of Class Period days that he identified as suitable in *Alibaba (2023)*, Dr.

60.  In his writings from 2023, Dr. Tabak criticized "data-snooping" efforts, which he describes as an expert structuring his analysis "in reverse, choosing a methodology because it yields favorable results," which his methodology in this case appears to be.[108]

61. Third, using these stringent and arbitrary cut-offs, especially in this case, severely restricts the number of news days in Dr. Tabak's FDT Tests, which biases his results, and contradicts Dr. Tabak's own prior writings.  For example, in his FDT Test of the Vale ADS, Dr. Tabak chooses to focus on *only three news* days based on his arbitrary 10% cut-off and *only six news days* based on his arbitrary 25% cut-off.[109]  Dr. Tabak acknowledged the "dangers of a small sample" in drawing conclusions about market efficiency in one of his prior reports.[110]  And in his paper on the FDT Test, Dr. Tabak warned against doing exactly what he has done here:[111]

> Merely demonstrating a single or small number of cases where there is an apparent cause and effect relationship is not enough, since this measures only one point in time during the class period, and only the stock's response to one or a handful of disclosures. If we have learned anything about the advances of knowledge, it is that proper tests of whether an effect is present must be done through the scientific method.

62. In summary, to conduct his FDT Tests in prior reports, Dr. Tabak has consistently used a much larger set of news days (measured in terms of number of days or as a proportion of all Class Period days) than he has done in this case (*See* Exhibit 1).  In some cases, Dr. Tabak has chosen not to apply any cut-offs and considered a much larger set of news days to be necessary to conduct the FDT Test, *e.g.*, 70% (rounded) in his *GE* report.  In his deposition, the only reason that Dr. Tabak proffered for relying on a small set of news days in conducting his FDT Tests in this case is because

---

Tabak cuts the set of news days to "focus" on three or six days (or 0.5% or 1% of the days in the Class Period, respectively) by applying a "10%" or "25%" cut-off, respectively.  *See* Exhibit 1; Tabak Report, ¶ 43.

[108]  Tabak, David I., "p-Hacking and Event Studies in Securities Litigation," *NERA Working Paper*, April 12, 2023, p. 1 ("Often, it is extremely difficult to determine whether an expert has chosen a methodology on its merits independent of the results that it yields or whether the expert has structured their analysis in reverse, choosing a methodology because it yields favorable results.  This latter procedure, using the results to determine the methodology, is known in the statistical literature by terms such as data mining, data snooping, researcher degrees of freedom, and p-hacking and may invalidate the resulting statistical conclusions.").

[109]  The six news days that Dr. Tabak considers to test market efficiency using his arbitrary 25% cut-off are: December 19, 2016, February 6, 2017, June 12, 2018, January 28, 2019, January 29, 2019, and January 30, 2019.  Of these, the following three (December 19, 2016, January 28, 2019, and January 29, 2019) are the only days that Dr. Tabak considers worthy of focus based on his arbitrary 10% cut-off.  *See* Tabak Report Production, "Exhibit 6a-6b.xlsx," sheet "Top %."

[110]  *See* Supplemental Rebuttal Expert Report of David I. Tabak, Ph.D., *In Re: Vale S.A. Securities Litigation*, United States District Court, Southern District of New York, 1:16-cv-00658-GHW, filed August 22, 2019, ¶ 15.

[111]   Ferrillo *et al.* (2004), p. 128.

24

Vale is a "mining company" that generally sells at a fixed price in the worldwide market and is not dependent on sales to specific customers.[112] Such reasoning is *ad hoc*. Dr. Tabak has provided no academic support for his claim, nor did he use such a reason to apply *any* cut-offs in the FDT Tests for Vale in his *Vale (2017)* report. Instead, Dr. Tabak used all news days which comprised 17% of all Class Period days as news days in his FDT Tests in his *Vale (2017)* report.

63. Ultimately, a limited review of Vale Securities' price reactions on only three "news days" over a 572 trading day-long Class Period (0.5%) cannot reliably prove that the securities of the largest iron ore manufacturer in the world traded in efficient markets over the remaining 99% of the days in the Class Period.

64. Again, my First Report has none of these issues. Based on my broader news search, I identified 214 news days over a 572 trading day-long Class Period for the ADS (37%) and evaluated whether the Vale Securities consistently reacted to news throughout the Class Period.

> 3.    *Contrary to his claim, Dr. Tabak's Cut-Off Theory is not supported by any academic literature*

65. Dr. Tabak misleadingly claims that his methodology is supported by the scientific literature on event studies. It is not. The event study approach was developed more than fifty years ago.[113] Since then, hundreds of event studies have been published in peer-reviewed finance journals. But in over three decades of research and teaching finance at Berkeley and other major universities, and in refereeing articles submitted for publication to peer-reviewed journals, I have never encountered a study that proposes that one ought to focus on only days with the top 10% or 25% of news article counts as potential news days, as Dr. Tabak suggests.[114]

---

[112] Tabak Deposition, at 77:11-78:9 ("A….You're selling into the worldwide market at, you know, a generally fixed price for you. If you lose one customer, you'll probably be able to sell it to some other customer, that's the way commodities work.").

[113] For an example of an early event study analysis that was published in a peer-reviewed journal, see Fama, Eugene F., *et al.*, "The Adjustment of Stock Prices to New Information," *International Economic Review,* February 1969, Vol. 10(1), pp. 1-21.

[114] In his deposition, Dr. Tabak could not cite a single academic study supporting his methodology. *See* Tabak Deposition, at 88:2-12 ("Q.   Well, other than you yourself having done this in prior reports, are you aware of any other academic support for the suggestion that the number of news stories in a day is a proxy for the materiality of the news that day? A. Sitting here I don't know. I could look through the literature on content analysis. But I believe that's a fairly extensive literature on that. And I just don't know it sitting here.").

66. The only peer-reviewed article he proffers as support is one by Griffin *et al.* (2011).[115]  However, that study does *not* support Dr. Tabak's methodology for a host of reasons:

  a. Griffin *et al.* (2011) do not conduct direct event study tests of cause and effect, *i.e.*, do not examine if a stock's abnormal returns are statistically significant following the release of unexpected material news, as Dr. Tabak attempts to do in this case.[116]

  b. Griffin *et al.* (2011) do not state that to conduct an event study one ought to only consider an arbitrary sub-set of news days.  If anything, the Griffin *et al.* (2011) study[117] contradicts Dr. Tabak's Cut-Off Theory.  The Griffin *et al.* (2011) study does *not* eliminate certain news days from its analysis based on the number of news articles found on those dates, as Dr. Tabak has done.  On the contrary, Griffin *et al.* (2011):

    i. Identify news days from a wide array of news sources, including those I considered in my First Report (not just *Dow Jones Newswires* as Dr. Tabak has done);[118]

    ii. Include earnings announcements as news events; [119]

    iii. Include a day when even one news article was published as a news day;[120]

---

[115]  Griffin *et al.* (2011) cited at Tabak Report, footnote 33.

[116]  Griffin *et al.* (2011) analyze the correlation between volatility (relative to volatility during the 55 days before and after a four-day event window) and news announcements, in 56 markets around the world. By contrast, the FDT Test of market efficiency analyzes stock's daily abnormal return, and is a test of cause and effect for a specific security. Griffin *et al.* (2011) also find that "[c]ross-country differences in stock price reactions are best explained by insider trading, followed by differences in the quality of the news dissemination mechanism. **Our findings are useful for quantifying the extent of insider trading and how the financial media affects international markets**" (emphasis added).  *See* Griffin *et al.* (2011) Abstract, p. 3955.

[117]  Tabak report, footnote 33 cites Griffin *et al.* (2011)'s result in the article's "Panel A in Figure 2 shows that most developed markets are to the left with a greater fraction of return volatility 'explained' by news days and article counts on those news days."

[118]  Griffin *et al.* (2011), p. 3947.

[119]  Griffin *et al.* (2011), p. 3949.  ("Without accurate earnings announcement event dates, any analysis of market reactions is flawed. For this reason, we spend considerable effort investigating methods for obtaining accurate earnings announcement dates.").

[120]  Griffin *et al.* (2011), p. 3949.

iv.   Treat all news days alike, and do not focus on subsets of news days based on arbitrary cut-offs of the number of articles published on a news day, as Dr. Tabak has done;[121] and

v.   Do not assume that if two articles were published on a given day, and only one article on another day, then the events on the former day are "more likely" to be material, contrary to Dr. Tabak's methodology.[122]

67. In sum, Dr. Tabak has provided no academic support for his arbitrary Cut-Off Theory on which his FDT Test results critically depend.

### 4.   Dr. Tabak's methodology is also unreliable because it is biased

68. The design of Dr. Tabak's methodology is biased in two ways toward finding the Plaintiff's desired conclusion, *i.e.*, showing that the Vale Security *passes* the FDT Test.  Recall that the FDT Test is based on the statistical significance of the difference of two ratios:

a.   The number of news days when a Vale Security's abnormal return is statistically significant divided by the total number of news days ["Ratio A"]; and

b.   The number of non-news days when a Vale Security's abnormal return is statistically significant divided by the total number of non-news days ["Ratio B"].

i.   The first bias in Dr. Tabak's methodology

69. By applying arbitrary cut-offs, Dr Tabak lowers the number of news days and correspondingly increases the number of non-news days, which increases Ratio A and lowers Ratio B, and widens

---

[121]   In particular, the Griffin *et al.* (2011) finding that Dr. Tabak cites as the foundation of his Cut-Off Theory are the results of firm-specific regressions across 1,342 firms in 26 countries. *See* Griffin *et al.* (2011), Table 1 and p. 3962, equation (1).  That regression tests whether the absolute abnormal return can be explained by the presence of any news (which is $NewsDay_{t-1}$, a binary variable that identifies *all* days when "at least one article with the firm's name in the headline or lead paragraph appear[ed] just prior to that trading day" as news days) and article counts ($ArtCount_{t-1}$, which counts the number of *all* articles meeting this criteria).  *See* Griffin *et al.* (2011), p. 3962.

[122]   *See* Tabak Deposition, 91:24-92:10 ("Yes, because it talks about article counts being more likely to explain price movements.")  Dr. Tabak misunderstands that "Panel A in Figure 2 show[ing] that most developed markets are to the left with a greater fraction of return volatility 'explained' by news days and article counts on those new days" refers to both variables together and does not distinguish between a news day variable and an article count variable.  In fact, nothing in the Griffin *et al.* (2011) study suggests that having more articles on a given day, all else equal, is "more likely to explain price movements," nor that the effect is statistically significantly different from zero.  *See* Griffin *et al.* (2011), p. 3964.

27

the difference between these two ratios and tends to increase the likelihood that the security at issue passes the FDT Test.

70. Indeed, even a small change in the set of selected news days has a large impact on his results. For example, using Dr. Tabak's 50% cut-off, the Vale ADS fails the FDT Test, which supports the finding that the market for the Vale ADS was *in*efficient throughout the Class Period. Vale ADS' abnormal returns were statistically significant on only two of 15 news days Dr. Tabak selected using the 50% cut-off (13.33%).[123] But by arbitrarily changing the cut-off to 25%, Dr. Tabak reduces the number of news days by 60% from 15 to six, *while the number of news days when Vale ADS's abnormal return was statistically significant remains two*. Consequently, Ratio A increases from 13.33% to 33.33%.[124] Unsurprisingly, given this big increase in Ratio A simply due to Dr. Tabak's arbitrary cut-off change, the difference between Ratios A and B becomes statistically significant. That is, by focusing on an exceedingly narrow set of news days and by arbitrarily changing the cut-off to 25%, Dr. Tabak biases his FDT Test towards finding evidence in "favor"[125] of market efficiency and reaches Plaintiff's desired conclusion.

ii.    The second bias in Dr. Tabak's methodology

71. Dr. Tabak chooses to only focus on a handful of days using a "proxy for [when] more material news" was purportedly released, when the likelihood of Vale Securities' abnormal returns being statistically significant is highest.[126] This bias is known in the scientific literature as the "streetlight effect," which occurs when "[r]esearchers tend to look for answers where the looking is good, rather than where the answers are likely to be hiding."[127] The result of an FDT Test, biased by this streetlight effect, does *not* prove that the Vale Securities' prices consistently reacted to news throughout the Class Period. This bias is similar to that found in Dr. Feinstein's analyses where he concluded that the Vale Securities' markets were efficient throughout the Class Period by also examining the Vale Securities' price reactions on a handful of days, *viz.*, only the four corrective

---

[123]    *See* Tabak Report, Exhibit 5, Exhibits 6a, 6b.

[124]    Corresponding, Ratio B declines slightly from 4.85% (27 days out of 557) to 4.77% (27 days out of 566). *See* Tabak Report, Exhibit 6a.

[125]    Tabak Report, ¶ 58.

[126]    Tabak Report, ¶ 41.

[127]    "Why Scientific Studies Are So Often Wrong: The Streetlight Effect," *Discover,* December 10, 2010.

disclosure dates (the "Complaint Alleged Corrective Disclosures Dates").[128,129]  As I stated in my First Report:[130]

> Attempts to prove that a security's price reacts consistently to news and thus traded in an efficient market over a long period of time (*e.g.,* a class period) using a handful of news days are improper from an economic perspective.

72. In fact, Dr. Tabak has recognized that proof by example proves nothing.[131]  Yet, in this case, Dr. Tabak's conclusions rest largely on his purported finding that Vale ADS' prices reacted significantly to news on two days (January 28 and 30, 2019) which should be either removed from his analysis or reclassified as non-news days (for reasons I discuss later).  Dr. Tabak's conclusions regarding the Vale Notes similarly rest largely on his purported finding that the Vale Notes' prices reacted significantly to news on a handful of days (one to four), which in most cases also improperly include January 28 and 30, 2019.[132]

---

[128]    There are four alleged corrective disclosure dates in Plaintiff's complaint (25 January 2019, 28 January 2019, 4 February 2019, and 6 February 2019.  *See* Complaint, ¶¶ 206-209.  I understand that in the Ruling on the Motion to Dismiss, the Court ruled that disclosures between January 26, 2019 and January 28, 2019 are "not necessarily indicative of any alleged misrepresentation or fraud" and thus do not qualify as corrective disclosures.  *See* Ruling on the Motion to Dismiss, p. 33.

[129]    The Court's Report & Recommendation found that Dr. Feinstein's "event study is entitled to no weight."  *See* Report & Recommendation, *In Re Vale S.A. Securities Litigation*, United States District Court, Eastern District of New York, 19-cv-526-RJD-SJB, filed January 11, 2022, p. 38.

[130]    Mazumdar Report, ¶ 39.

[131]    Tabak, David I., "Use and Misuse of Event Studies to Examine Market Efficiency," NERA Economic Consulting, April 30, 2010.  ("Tabak (2010)"), p. 2, available at <https://www.nera.com/content/dam/nera/publications/archive2/PUB_Use_Misuse_of_Event_Studies_0410_final.pdf>. Cited at Mazumdar Report, footnote 41 ("There are various ways in which one can attempt to examine whether stock prices respond to news. **Perhaps the easiest, and the least reliable, is a form of "proof by example," in which one finds a number of days in which there is news followed by a relatively large stock price movement**. The court in *PolyMedica*, properly noted that the "mere listing of five days on which news was released and which exhibited large price fluctuations proves nothing." Though this proof-by-example may be fancied up with various statistics (e.g., making sure that the stock price movement is statistically significant under some form of measurement) or even by looking at all of the days with price movements at or above some level, this form of proof by example still proves nothing, or perhaps more accurately proves merely that there were a few days when there was news and a large price movement without proving any reliable correlation between those two factors.") (emphasis added).

[132]    Tabak Report Production, "Exhibit 5,6c-6i.xlsx;" Tabak Report Production, "Exhibit 6a-6b.xlsx."

5. *Dr. Tabak's claim that a news day with one additional article is a relatively "more material" news day is arbitrary, and his logic supports using Dr. Mazumdar's news selection in any case*

73. According to Dr. Tabak, whether a day counts as a news day worthy of focus depends on the number of *Dow Jones Newswires* articles he identified for that day. The set of news days selected using the 50%, 25% and 10% cut-offs must include at least two, three or four articles, respectively.[133] That is, according to Dr. Tabak's theory, one additional article on a news day somehow makes the news content on that day "more material,"[134] which contradicts the fundamental premise of market efficiency according to which even a single piece of "material new, unexpected positive (negative) information about an issuer,"[135] should impact a security's price if it trades in an efficient market. As noted above, I have never encountered a published event study in which, after a set of "all news" event dates have been identified, some dates are arbitrarily discarded from the event study by assuming *ex ante* that they are somehow less "material" than other dates based on article counts on these event dates, as Dr. Tabak does, let alone based on counts that differ by one story.

74. Even if one were to accept for the sake of argument Dr. Tabak's assertion that FDT Tests ought to focus only on "more material" news (the rationale for his Cut-Off Theory), doing so based on a limited set of news sources (only *Dow Jones Newswires* articles) is illogical. According to Dr. Tabak's own reasoning, the mere incidence of more news articles on a day increases the materiality of the news released that day.[136] It follows that if a larger set of news sources was considered (such as the "Mazumdar Sources"),[137] then the number of articles one could identify on a given

---

[133] The counts of Dr. Tabak's News Days that I discuss in this paragraph related to his direct test of efficiency for the Vale ADS. *See* Tabak Report Production, "Exhibit 6a-6b," sheet "Top %." The counts of Dr. Tabak's News Days related to his direct tests of efficiency for the Vale Notes are either the same, or lower. *See* Tabak Report Production, "Exhibit 5,6c-6i," sheet "Top % (Mazumdar)."

[134] Only one incremental article separates Dr. Tabak's sub-sets sets of news days at the 50% versus 25% cut-offs, or at the 10% versus 25% cut-offs.

[135] Tabak Teva Report, ¶¶ 10-11.

[136] In his deposition, Dr. Tabak stated that the addition of news sources such as those I relied upon in my First Report, such as *The Wall Street Journal*, *The New York Times*, and *Reuters*, would "increases [his] confidence in the materiality of that news." *See* Tabak Deposition at 63:4-19 and 64:19-65:3.

[137] As I noted above, in my First Report I relied on ten news sources including many which were endorsed by the Griffin *et al*. (2011) paper Dr. Tabak cites, albeit mistakenly, in support of his Cut-Off Theory. *See* Griffin *et al*. (2011) cited at Tabak Report, footnote 33.

day would likely be larger and differences between subsets of news days based on arbitrary cut-offs more meaningful (*i.e.*, differences between more material and less material news day subsets would not hinge on identifying just one additional article on news days in the former set, as Dr. Tabak's methodology requires).[138]  That is, Dr. Tabak's own reasoning suggests that the FDT Test results based on the "Mazumdar Sources" top 10% news days are more probative than those based on the *Dow Jones Newswires* top 10% news days.  As the Tabak Report acknowledges, the FDT Test results based on the "Mazumdar Sources Top 10%" news days and my primary approaches (the Mazumdar Regression for the Vale ADS and the Matched Portfolio approach for the Vale Notes) overwhelmingly support the conclusion that the Vale Securities traded in inefficient markets throughout the Class Period with all but Notes 3 and 6 failing the FDT Tests.[139]

75. In summary, for the reasons I have discussed in the preceding subsections, Dr. Tabak's so-called "objective" methodology is fundamentally flawed because it cannot be used to reliably classify all days in the Class Period as news or non-news days.  His *mechanical* news day selection methodology, and his FDT Tests which depend on that selection methodology, cannot be used to determine whether the Vale Securities traded in efficient markets throughout the Class Period.

76. Further Dr. Tabak's mechanical approach is inconsistent with his prior testimony and writings, and suffers from "classification error[s]"[140] to use his own terminology, *i.e.*, identifies some days as news days when no material news was actually published on those days, as I detail in the next section.

---

[138]  For example, for the Vale ADS, Dr. Tabak's 10% cut-off using the "Mazumdar Sources" includes any news day with more than 4 articles, the 25% cut-off includes any news day with more than two articles, and the 50% cut-off includes any news day with more than 1 article.  Furthermore, the cut-offs align more reasonably with Dr. Tabak's methodology of examining a certain percent of news days: the top 10% cut-off considers 9.8% of news days, the top 25% cut-off considers 23.8% of news days, and the top 50% cut-off considers 45.3% of news days, which contrasts with Dr. Tabak's use of just 7.3%, 14.6%, and 36.6% of news days when using his *Dow Jones Newswires* sample.  While I disagree with the premise of using cut-offs, it is evident that relying on the "Mazumdar Sources" leads to more meaningful differences between the sub-samples and that the analysis more closely aligns with the stated intent of examining 10%, 25%, or 50% of news days.  *See* Tabak Report Production, "Exhibit 6a-6b.xlsx," sheet "Top %."

[139]  Tabak Report, Exhibit 5.

[140]  Tabak Report, ¶ 45.

**B.** **Dr. Tabak's mechanical implementation of his methodology is rife with errors and inconsistencies that render his conclusions unreliable and incorrect**

77. As I noted in my First Report:[141]

> To directly test semi-strong form efficiency, economists conduct "event studies" to examine whether the security's price impounds value-relevant news quickly after such news is publicly released, *i.e.*, evaluate whether there is a cause-and-effect relationship between the release of news and price reactions.

78. Thus, as a first step in any event study, it is necessary to properly identify the appropriate event dates, *i.e.,* the dates when potential value-relevant news was released. The DJN All sets of news days that Dr. Tabak mechanically selects to conduct his FDT Tests are fundamentally flawed in at least four ways:

   a. They are self-evidently incomplete (*e.g.,* ignore news of the Dam 1 collapse and Vale's earnings announcements), as I discussed above;

   b. They include Complaint Alleged Corrective Disclosures Dates that are clustered at the end of the Class Period which biases Dr. Tabak's FDT Test's conclusions towards a finding of market efficiency;

   c. They improperly include as news days, days when no material news about Vale was released by conflating news articles about other companies as "news article[s] **on** Vale"[142]; and

   d. They improperly include as news days, days when non-material information about Vale (*e.g.,* duplicates, stale information and articles that discussed security price movements only) was published, which Dr. Tabak has acknowledged in his earlier writings[143] and reports should not be considered news in testing market efficiency.[144]

---

[141] Mazumdar Report, ¶ 28.

[142] Tabak Report, Exhibit 6, footnote 11.

[143] For instance, in Ferrillo *et al.* (2004), Dr. Tabak states: "In any case, one would still have to be careful to … remove any stories that exist because they report on a price movement." Ferrillo *et al.* (2004), p. 120.

[144] Tabak Vale (2017) Report, ¶ 35 ("Finally, I performed an additional test, using stories that appeared in Dow Jones Newswires and removing any that were solely reporting on Vale's ADR or stock price movements or volume (*i.e.,* instances where the news was responding to the ADR or stock price rather than the ADR price potentially responding to

79. Correcting just some of the flaws in Dr. Tabak's own methodology entirely negates his primary conclusion that, "with the exception of what the Mazumdar Report calls Note 1, the ADSs and the other Notes demonstrate statistically significant price responses to news."[145]  To the contrary, when corrected, Dr. Tabak's FDT Test results confirm that the Vale Securities traded in inefficient markets throughout the Class Period.

80. In sum, notwithstanding Dr. Tabak's assertions, his mechanical news selection methodology is unscientific and his FDT Test results, which hinge on his news selection methodology, are unreliable.

   *1. Dr. Tabak's results based on his preferred cut-offs hinge on including Complaint Alleged Corrective Disclosures Dates in his FDT Tests which biases his results and demonstrates the absence of reliable findings*

81. The Vale ADS passes Dr. Tabak's FDT Tests applying his 10% cut-off on news days because Vale ADS' abnormal return was statistically significant on *one* of the three identified news days (January 28, 2019), a Complaint Alleged Corrective Disclosures Date.[146]  However, in his published research, and his prior reports, Dr. Tabak has acknowledged that including alleged corrective disclosure dates in the FDT Test biases the test towards finding evidence in favor of market efficiency when none may exist.

82. In his 2004 FDT paper Dr. Tabak wrote:[147]

> The examination would exclude those days in which a corrective disclosure was made because **plaintiffs would normally choose a class period where corrective disclosures coincide with large negative price movements; including those days in the analysis would bias the results.**

---

news), that appeared to be duplicates of previously reported news, or were deemed to be non-material because they reported data irrelevant to the value of the Company.").

[145]  Tabak Report, ¶ 3.

[146]  Complaint, ¶ 206.

[147]  Ferrillo *et al.* (2004), footnote 155 (emphasis added).  *See also* Tabak Vale (2017) Report, ¶ 34 ("Another relevant consideration in this [news selection] analysis is to recognize that we typically cannot use the news and price movement at the end of a class period in an analysis of market efficiency. This is because most class periods are chosen to end with a news event corresponding with a large stock price decline. Defining or analysis period to include such a date would improperly bias towards finding an association between news and stock price movements. Thus, I end my analysis before the price movements associated with the end of the Class Period.").

83. I understand that Dr. Tabak has included some but not all alleged corrective disclosure dates in FDT Tests he has conducted in some recent expert reports.[148]  In this instance, Dr. Tabak has included all four Complaint Alleged Corrective Disclosures Dates,[149] which are clustered together over a period consisting of just the last nine trading days of the 572-trading day Class Period,[150] in his FDT Tests.

84. Dr. Tabak's FDT Test's finding in "favor of efficiency" for the Vale ADS using DJN top 25% or top 10% news days samples *critically depends* on the inclusion of January 28, 2019, a Complaint Alleged Corrective Disclosures Date, as a news day.[151]  In fact, all three news days (January 28, 2019, January 30, 2019, and February 6, 2019) where Dr. Tabak finds the Vale ADS' abnormal returns were statistically significant occur over the nine-day period when according to the Complaint "the truth" emerged, and two of the three (January 28, 2019 and February 6, 2019) are Complaint Alleged Corrective Disclosures Dates.[152]

85. If one does classify a Complaint Alleged Corrective Disclosures Date as a news day, it is necessary to verify that one's conclusion regarding market efficiency over the entire Class Period does not critically depend on the statistical significance of the Vale Securities' returns on that day alone,[153]

---

[148]  *See, e.g.,* Tabak Qualcomm Report, ¶ 33 ("end[ing] the analysis on January 19, 2017, the last trading day before the price movement associated with the end of the Class Period" on January 20, 2017).

[149]  The four Complaint Alleged Corrective Disclosures Dates are: January 25, 2019, January 28, 2019, February 4, 2019, and February 6, 2019.

[150]  According to the Complaint: "The truth about the risk of Vale's tailing dams and its inadequate dam maintenance and safety certifications was disclosed through a series of disclosures beginning with the news of the Dam 1 collapse on January 25, 2019 and concluding with related news on February 6, 2019." Complaint, ¶ 203.

[151]  In conducting the FDT Test for the Vale ADS based on a selection of news days using his arbitrary DJN top 25% cut-off, Dr. Tabak identifies six news days, of which Vale ADS's abnormal return was statistically significant on only two (January 28, 2019 and January 30, 2019).  If January 28, 2019, a Complaint Alleged Corrective Disclosures Date, was removed from Dr. Tabak's analysis, then instead of finding that Vale ADS's price reacted to news in a statistically significant manner on two of six news days (or 33% of all news days), Dr. Tabak's own analysis would indicate that Vale ADS's price reacted to news in a statistically significant manner on only one of five news days (or 20% of all news days), and this security would then fail the FDT Test, even if news days were selected based on an arbitrary DJN top 25% cut-off according to Dr. Tabak's Cut-Off Theory.

[152]  Complaint, ¶ 203.  *See*, Tabak Report Production, "Exhibit 6a-6b.xlsx," sheet "News Test (Mazumdar).".

[153]  I *included* the Complaint Alleged Corrective Disclosures Dates in my FDT Tests to determine whether the Vale Securities traded in *inefficient* markets through the Class Period, even if the FDT Tests are biased in favor of finding the opposite conclusion, *i.e.*, finding evidence in favor of efficiency.  As I discussed in my First Report, the results of my FDT Tests provide overwhelming evidence in favor of inefficiency of the Vale Securities' markets throughout the Class Period.  Moreover, unlike Dr. Tabak, I considered a much larger set of news days in my FDT Test (214 versus Dr. Tabak's set of three or six news dates depending on his use of the DJN top 25% or top 10% cut-off).  Thus, my results do not *critically depend* on the inclusion of a single day as a news day.

which Dr. Tabak has failed to do.[154]  His conclusion regarding market efficiency for the Vale ADS hinges on the statistical significance of a security's abnormal return on a *single* news day over a long Class Period (572 days in this case).  A conclusion that rests on a single day, *especially if that single day is a Complaint Alleged Corrective Disclosures Date*, is unreliable and has no probative value for assessing whether the security traded in an efficient market throughout the Class Period.

86. As shown in **Exhibit 2**, excluding all the Complaint Alleged Corrective Disclosure Dates reverses Dr. Tabak's FDT Test results.  Using my primary approaches for calculating the Vale Securities' abnormal returns:

    a.   The Vale ADS and *all* of the Vale Securities, except Note 6, fail the FDT Test using Dr. Tabak's arbitrary Dow Jones Newswires top 10% cut-off. [155]

    b.   The Vale ADS and *all* of the Vale Securities, except Notes 3 and 6, fail the FDT Test using Dr. Tabak's arbitrary Dow Jones Newswires top 25% cut-off. [156]

    *2.*     *Dr. Tabak improperly includes days when only Dow Jones Newswires articles unrelated to Vale were published as news days for his FDT Test which biases his results*

87. Dr. Tabak's approach starts, as I did, by looking to an article's headline or lead paragraph and whether it was "tagged by Factiva as related to the company" to determine whether the article should be included as a news article on Vale.[157]  But unlike my approach, he does not assess if the

---

[154]  For instance, the Court's Report & Recommendation noted that Dr. Feinstein's unclear methodology that led him to focus on just the Complaint Alleged Corrective Disclosure Dates was made more problematic by the dependence of his results on such a limited sample of dates and their concentration at the very end of the Class Period: "The preceding lack of clarity [as to Dr. Feinstein's date selection methodology] is compounded by, or heightens, the force of the other criticisms proffered by Defendants: the use of only four dates in the event study, all of which fall within the final two weeks of a multi-year class period. CAAT points out that there are no bright line rules about either the number of minimum days required for an event study or how they must be distributed across a class period.  That being said, several courts have criticized the limitation of an event study to a handful of days." *See* Report & Recommendation, *In Re Vale S.A. Securities Litigation*, United States District Court, Eastern District of New York, 19-cv-526-RJD-SJB, filed January 11, 2022, p. 30.

[155]  For the DJN top 10% sample, Vale ADS and all Vale Notes, except Note 6, fail the FDT Test under the Mazumdar Regression approach for the Vale ADS and the Matched Portfolio approach for the Vale Notes.  All Vale Notes, except Notes 2 and 3, fail the FDT Test under Mazumdar Regression approach.  *See* **Exhibit 2**.

[156]  For the DJN top 25% sample, Vale ADS and all Vale Notes, except Notes 3 and 6, fail the FDT Test under the Mazumdar Regression approach for the Vale ADS and the Matched Portfolio approach for the Vale Notes.  All Vale Notes, except Notes 2, 3, and 6, fail the FDT Test under Mazumdar Regression approach.  *See* **Exhibit 2.**

[157]  Tabak Report, ¶ 40.

article he initially identified as purportedly related to Vale, in fact contained any news about Vale. For example, Dr. Tabak claims that there were three Vale-related articles published on **January 30, 2019**.[158,159,160]  However, these articles do not actually contain any news about Vale.  Thus, there is a reasonable basis to exclude all three articles,[161] but excluding even one article would eliminate January 30, 2019 as a news day from Dr. Tabak's DJN top 25% sub-set of news days for the Vale ADS and the Vale Notes.  When shown one of these three articles at his deposition, Dr. Tabak conceded that its "headline suggests it probably does not" have any information concerning Vale.[162]  In fact, it does not.

88. Omitting just this one article would reverse Dr. Tabak's FDT Test results for his DJN top 25% sub-set, *i.e.,* the Vale ADS and five of seven Vale Notes would then fail his FDT Test under my primary approach, leaving just Vale Notes 3 and 6 as passing the FDT Test, which is direct evidence that these securities traded in inefficient markets throughout the Class Period (*See* **Exhibit 3**).  In short, Dr. Tabak's approach assumes all *Dow Jones Newswires* articles that refer to Vale in its headline or lead paragraph are Vale-related even when they are clearly not.  This error in identifying news related to Vale completely undermines the reliability of his results, which are based on just two news days with statistically significant abnormal returns.

---

[158]  "Shares of Cleveland-Cliffs Inc. (CLF) soared 12.6% in active morning trade Wednesday, enough to pace the NYSE's gainers, after rival iron ore miner Vale S.A. (VALE3.BR) said it would cut production in the wake of the deadly dam disaster."  (Kilgore, Tomi, "Cleveland-Cliffs' Stock Soars To Pace NYSE Gainers After Vale Cuts Iron Ore Production – MarketWatch," *Dow Jones Institutional News,* January 30, 2019).

[159]  "Fitch Ratings-Rio de Janeiro-30 January 2019: The collapse of Vale S.A.'s Feijao dam on Jan. 25 2019, which resulted in a number of fatalities and missing people, should not materially affect MRS Logistica S.A.'s credit quality. Fitch currently rates MRS's Long-Term Foreign Currency Issuer Default Rating (IDR) 'BB', Long-Term Local Currency IDR 'BBB-', and Long-Term National Scale Rating 'AAA(bra)'. Including both direct and indirect stakes, Vale owns 43.8% of MRS's total capital and is its largest client with around 37% of all volumes transported by MRS annually." (Fitch Ratings, "Press Release: Fitch Ratings: MRS's Ratings Unaffected by Dam Break," *Dow Jones Institutional News,* January 30, 2019).

[160]  "Fitch Ratings-Rio de Janeiro-30 January 2019: The collapse of Vale S.A.'s tailings dam at the Feijao mine in Brumadinho, Brazil should not materially affect the operating cash flow or ratings of Companhia Energetica de Minas Gerais (Cemig) and its subsidiaries, according to Fitch Ratings." (Fitch Ratings, "*Fitch Rtgs: Cemig's Ratings Unaffected by Vale Dam Collapse," *Dow Jones Institutional News,* January 30, 2019).

[161]  Notably, the three identified articles refer to Vale tangentially as having cut its iron ore production.  But Dr. Tabak's *Dow Jones Newswires* search did not identify a single news article that discusses the implications of this production cut for Vale itself.  According to Dr. Tabak's own rationales, this is strong evidence that this development was not deemed "material" in regards to Vale.

[162]  Tabak Deposition, at 106:18-107:4.

36

89. Further, if in addition to excluding January 30, 2019 from Dr. Tabak's DJN top 25% news days sub-set, the four Complaint Alleged Corrective Disclosures Dates were excluded from Dr. Tabak's analyses as well, for reasons I discussed above, then according to Dr. Tabak's methodology under my primary approaches:

a. The Vale ADS and *all* of the Vale Securities would fail the FDT Test using Dr. Tabak's 25% cut-off;[163] and

b. The Vale ADS and *all* of the Vale Securities, except Note 6, would fail the FDT Test using Dr. Tabak's 10% cut-off.[164]

> *3.    The articles that Dr. Tabak counts to apply his arbitrary news days cut-offs include duplicates, the re-publication of stale information, and discussion of price movements which are well-understood to be immaterial*

90. In addition to the clear conceptual errors and inconsistencies in Dr. Tabak's Cut-Off Theory that I discussed above, Dr. Tabak's implementation of his own methodology includes several other errors that affect his news day selection based on arbitrary cut-offs, which render all his FDT Test results unreliable.  These errors include:

a. **Duplicate articles:** Dr. Tabak's set of news articles includes clear duplicates, including articles with the same author, headline, article contents, and publishing time.  (*See* Section VIII.A).  There is no reasonable basis for one day with three articles, of which two are duplicates of each other, being deemed more relevant to assess market efficiency than another date with two different, non-duplicative articles.

b. **Articles containing stale information**: Dr. Tabak's set of news articles includes articles that merely repeat information published in another article in his DJN All set that was published on an earlier date.  (*See* Section VIII.B).  There is no reasonable economic basis

---

[163]   For the DJN top 25% sample, all of the Vale Securities fail the FDT Test under all other approaches as well, except Vale Note 3 under Mazumdar Regression approach.  *See* **Exhibit 4**.

[164]   Also, for the DJN top 10% sample, all Vale Notes, except Notes 2 and 3, fail the FDT Test under Mazumdar Regression approach.  *See* **Exhibit 4**.

to consider the later article which only includes stale information as "news" (*i.e.*, new, value-relevant information) on Vale, and counting it to identify "most material" news days.

c. **Articles discussing price movements**: Dr. Tabak's set of news articles includes articles that merely discuss Vale ADS' price movements that day, which Dr. Tabak has acknowledged in his prior writings and expert testimony do not convey any new, value-relevant information and ought to be removed from any set of news dates. (*See* Section VIII.C).

91. By including such articles that did not convey any new, value-relevant news as "news articles," Dr. Tabak's selection of news dates is wrong, under his own arbitrary Cut-Off Theory. For example, per Dr. Tabak's methodology, a day must have at least three news articles to be included in his set of news dates, applying his 25% cut-off. But if on such a day one of the three articles Dr. Tabak counts has only non-material information, and therefore should not be counted, then that day would not be included in Dr. Tabak's set of news days according to his own arbitrary Cut-Off Theory. Notably, Dr. Tabak's failure to remove such news in this case is egregious because he is well-aware of this flaw, as he has removed such news articles in selecting news days in prior expert reports[165] and has advised others to do so in his published research.[166]

92. The above errors further illustrate how his mechanical determination of news days does not properly identify news days, and any FDT Tests based on such flawed news selection have no probative value in assessing the efficiency of the Vale Securities' markets throughout the Class Period.

---

[165] Tabak Vale (2017) Report, ¶ 35 ("Finally, I performed an additional test, using stories that appeared in Dow Jones Newswires and removing any that were solely reporting on Vale's ADR or stock price movements or volume (*i.e.,* instances where the news was responding to the ADR or stock price rather than the ADR price potentially responding to news), that appeared to be duplicates of previously reported news, or were deemed to be non-material because they reported data irrelevant to the value of the Company."). *See also* Tabak PPG Report, ¶ 40, footnote 26; Tabak Alibaba (2018) Report, ¶ 39, footnote 37.

[166] *See* Ferrillo *et al.* (2004), pp. 120-121.

**C.    Dr. Tabak's own results and methodology support my conclusion that the Vale Securities traded in inefficient markets throughout the Class Period**

*1.    Dr. Tabak's FDT Test of earnings days provides strong evidence of inefficiency*

93. As I noted in my First Report, "earnings announcements are routinely the subject of event studies in academic research because of 'compelling evidence that there is information content in accounting earnings announcements.'"[167]  Dr. Tabak agrees.[168]  In prior reports on class certification, Dr. Tabak has typically started his analyses of direct tests of market efficiency by focusing on earnings announcements as news days,[169] describing tests of earnings announcements as his "standard procedure."[170]  For example, in the Tabak Teva Report, Dr. Tabak described the FDT Test that relies on earnings announcement dates as a "standard procedure … that **minimizes any possible subjectivity** on my part as to which 'news days' were selected for examination."[171]

---

[167]   Mazumdar Report, ¶ 64 (i) citing Kothari, S.P., "Capital markets research in accounting," *Journal of Accounting and Economics*, 2001, Vol. 31, p. 117.  *See also* Villanueva, Miguel and Steven Feinstein, "Stock price reactivity to earnings announcements: the role of the Cammer/Krogman factors," *Review of Quantitative Finance and Accounting*, 2020, Vol. 57, p. 208 ("Earnings announcements are a reasonable choice for a class of generally high information events that can be selected objectively. Ball and Brown (1968), Ball and Kothari (1991), Beaver (1998), and Patell and Wolfson (1984) provide evidence that the flow of company-specific information is generally elevated on earnings announcement dates.").

[168]   Tabak Deposition, at 21:16-22:3 ("Q.   Dr. Tabak, you would agree that the academic literature on market efficiency confirms that earnings announcements generally should be treated as news days.  Correct? A.   I don't know if that addresses the question of what should be a news day.  But I would say that the academic literature generally says that there is material news on most earnings announcements."); Mazumdar Report, footnotes 48, 77.

[169]   Tabak Deposition, at 22:4-11 ("Q.   Okay.  And you yourself in conducting FDT tests begin with an analysis of a company's earnings announcements.  Correct? A.   In the context of my reports on market efficiency, for plaintiffs or defendants, that is typically the first line item.").  *See* Tabak Vale (2017) Report, Exhibit 8a1; Expert Report of David I. Tabak, Ph.D., *In Re Alibaba Group Holding Limited Securities Litigation*, United States District Court, Southern District of New York, 1:15-md-02631 (CM), filed March 12, 2018 ("Tabak Alibaba (2018) Report"), Exhibit 8a; Expert Report of David I. Tabak, Ph.D., *Trevor Mild, Individually and on Behalf of All Others Similarly Situated v. PPG Industries, Inc., Michael H. McGarry, Vincent J. Morales, and Mark C. Kelly*, United States District Court, Central District of California, 2-18-cv-04231-RGK-JEM, filed March 8, 2019 ("Tabak PPG Report"), Exhibit 8a-a; Expert Report of David I. Tabak, Ph.D., *In Re Teva Securities Litigation*, United States District Court, District of Connecticut, 3:17-cv-00558-SRU, filed June 19, 2020 ("Tabak Teva Report"), Exhibit 8a-a;  Expert Report of David I. Tabak, Ph.D., *Sjunde Ap-Fonden et al. v General Electric Company et al.*, United States District Court, Southern District of New York, 17-CV-8457 (JMF), filed May 21, 2021 ("Tabak GE Report"), Exhibit 8a.

[170]   *See, e.g.*, Tabak Teva Report, ¶ 41.  *See also* Tabak Deposition, at 22:24-23:7 ("Q.   And you've also previously opined that testing earnings announcements is specifically called for in the Cammer decision.  Correct? A.   Yes, I think both of the things you said are things that I either stated or testified to in the Teva, T-e-v-a, securities litigation.").

[171]   Tabak Teva Report, ¶ 41 (emphasis added). Dr. Tabak makes similar statements in his expert reports in *Alibaba (2018)*, *PPG*, *General Electric,* and *Vale (2017)*.  *See* Tabak Alibaba (2018) Report, ¶ 39; Tabak PPG Report, ¶ 40; Tabak GE Report, ¶ 34, Tabak Vale (2017) Report, ¶ 35.

94. In this case too, Dr. Tabak conducted an FDT Test in which he identifies Vale's nine earnings announcements over the Class Period as the only news releases and found that *none* of the Vale Securities pass the FDT Test.

95. As I noted in my First Report,[172] this finding constitutes clear, direct economic evidence that none of the Vale Securities traded in efficient markets throughout the Class Period.[173]  Moreover, according to Dr. Tabak's own research, large companies' stock prices typically react to earnings announcements.  In one study, he found that the abnormal returns of 97.5% of the stocks in the S&P 500 were statistically significant following at least one of four quarterly earnings announcements in 2018 (a year that lies within this case's Class Period).[174]  In contrast, in this case, the Vale ADS's abnormal returns were not statistically significant following any one of Vale's nine successive quarterly earnings announcements over the two-and-a-half year Class Period.  According to Dr. Tabak's own research and deposition testimony, such a finding is virtually impossible[175] for a stock that purportedly trades in an efficient market.[176]

96. In sum, the results of Dr. Tabak's FDT Tests (which he has accepted without dismissing in prior reports[177]) provide conclusive direct evidence of market inefficiency for the Vale Securities.[178]

---

[172]  In my First Report, I too had shown that the Vale ADS failed the FDT Test in which I had defined Vale's nine earnings announcement dates over the Class Period as the only news days.  I also documented that the Vale ADS failed to respond to *any* of the nine earnings announcement dates as well as *any* of the production announcement dates.  *See* Mazumdar Report, footnote 82, and Exhibits 3 and 4.

[173]  Tabak Report, Exhibit 5.  *See also* Tabak Deposition, at 33:5-15 ("Q.   Okay.  So with respect to your work here, it's true that you found zero earnings announcement days had statistically significant abnormal returns for Vale.  Correct? A.  Correct.  Although 'found' may be a little improper, because those are the results that Dr. Mazumdar already had.  I did not try to change those results.").

[174]  Mazumdar Report, ¶ 64, citing Tabak, David I., "Testing Securities Market Efficiency With Cammer Factors," *Law360*, February 5, 2019.

[175]  Dr. Tabak agrees that if a security's price reactions to different quarterly earnings announcements are independent, then the odds that a company's security price would not react statistically significantly to eight earnings announcements over two years is "2-1/2 percent times 2-1/2 percent," which equals 0.06%.  *See* Tabak Deposition, at 28:17-29:17.

[176]  Dr. Tabak testified that one explanation is that the securities at issue did not trade in efficient markets.  *See* Tabak Deposition, at 29:18-23 ("Q.   Would one explanation for why that occurs be that market for that security in question is not efficient? A.   That is certainly a possibility given no other information.").

[177]  *See* Tabak Vale (2017) Report, ¶ 35; Tabak PPG Report, ¶ 40; Tabak Teva Report, ¶ 41; Tabak GE Report, ¶ 34.

[178]  I understand that in some instances Dr. Tabak has argued that his earnings announcements-based FDT Test results only count if they support a finding of efficiency.  *See, e.g.*, Tabak Alibaba (2023) Report, ¶¶ 35-36.  However, his rationale for that inherently biased opinion (viz. in an earnings announcements-based FDT Test other news days are considered non-news dates which could increase the odds that securities at issue fail the FDT Test) is moot here where the evidence is stark.  In this case, based on Dr. Tabak's analysis, none of the Vale Securities' prices (except Note 1) ever reacted

### 2. Dr. Tabak's own flawed methodology supports a finding in favor of inefficiency

97. As I discussed above, Dr. Tabak's conclusions based on arbitrary 10% or 25% cut-offs are fundamentally flawed and unreliable. Correcting just some of the flaws in Dr. Tabak's methodology, based on economic reasoning that he has adopted in his prior writings and expert work, negates his results. Therefore, all results in Tabak Report Exhibit 5 (in which Dr. Tabak summarizes all his FDT Test results) based on cut-offs are irrelevant in assessing the Vale Securities' market efficiency throughout the Class Period.

98. But even Dr. Tabak's own analysis, based on his flawed "DJN All" set of news articles, confirms that the majority of the Vale Securities, including the Vale ADS, traded in inefficient markets throughout the Class Period.[179] Dr. Tabak has also confirmed that based on my broader selection of news sources ("Mazumdar Sources"), all eight Vale Securities traded in inefficient markets throughout the Class Period.[180]

99. In addition, in response to Dr. Tabak's critique that some of the news sources I selected are not "well supported,"[181] I re-ran Dr. Tabak's "Mazumdar Sources" FDT Tests (see **Exhibit 5**) after removing these news sources,[182] and I confirmed that my conclusion that the Vale Securities traded

---

statistically significantly to any of Vale's nine earnings announcements over the two-plus year-long Class Period under my primary Mazumdar Regression approach for Vale ADS and Matched Portfolio approach for Vale Notes. *See* Tabak Report, Exhibits 6a, 6c-Note 1-a, 6d-Note 2-a, 6e-Note 3-a, 6f-Note 4-a, 6g-Note 5-a, 6h-Note 6-a, and 6i-Note 7-a. That is, the proportion of news days with statistically significant abnormal returns is zero (for all Vale Securities but Note 1). So any potential bias regarding the difference between zero and the proportion of non-news days with statistically significant abnormal returns is clearly moot in this case. Vale Note 1's abnormal returns were statistically significant on just one of the nine earnings announcement dates, however this Vale Note conclusively failed Dr. Tabak's earnings announcement-based FDT Test. *See* Tabak Report, Exhibit 6c-Note 1-a.

[179] *See* Tabak Report, Exhibit 5. Row "DJN All" shows that all but Notes 2, 3, and 6 fail the FDT Test under the Mazumdar Regression for the Vale ADS and the Matched Portfolio approach for the Vale Notes.

[180] The one exception is Note 5 using the Feinstein Regression, which I explained in my First Report is the least reliable approach for estimating abnormal returns for the Vale Notes. All other FDT Tests for the Vale Securities show that they traded in inefficient markets throughout the Class Period. *See* Mazumdar Report, ¶ 73 and Appendix C.5.

[181] Tabak Report, footnote 11.

[182] The Mazumdar sources in this sensitivity analysis only include *The Wall Street Journal*, *Financial Times,* and *Reuters* (which Griffin *et al.* (2011) used; *see* Griffin *et al.* (2011), p. 3947) and *PR Newswire* and *Dow Jones Institutional News* (which are sources that feature in Dr. Tabak's *Dow Jones Newswires* search results; *see, e.g.,* PR Newswire, "Vale Announces Cash Tender Offer for Up to US$1B of Notes Due 2022, 2026, 2036, 2039 and 2042," *Dow Jones Institutional News*, November 9, 2018 and Fitch Ratings, "*Fitch Ratings : Vale's Brucutu Mine Stoppage Considered In Scenario Analysis," Dow Jones Institutional News, February 5, 2019).

in inefficient markets throughout the Class Period remained unchanged. Using my primary approaches, in this sensitivity analysis I confirm that: [183]

a.  The Vale ADS and Note 7 fail the FDT Test using *any* cut-offs;

b.  The Vale ADS and all Vale Notes but Note 2 fail the FDT Test at either Dr. Tabak's preferred 10% or 25% cut-off levels.

Put simply, even accepting Dr. Tabak's flawed Cut-Off Theory and accepting his critiques of my selection of news sources—none of which have merit—the FDT Tests show robust evidence that the Vale Securities traded in inefficient markets throughout the Class Period.

## V.   DR. TABAK DOES NOT REBUT MY OPINION THAT THERE WAS NO CONSISTENT RELATIONSHIP BETWEEN NEWS AND THE VALE NOTES' ABNORMAL RETURNS THROUGHOUT THE CLASS PERIOD WHICH SUPPORTS MY CONCLUSION THAT THE MARKETS FOR THE VALE NOTES WERE INEFFICIENT THROUGHOUT THE CLASS PERIOD

100.     Dr. Tabak's assessment of market efficiency is restricted to FDT Tests and does not consider if there was any consistent relationship between news and the Vale Notes' abnormal returns throughout the Class Period. As I noted in my First Report:[184]

> [T]here was no consistent relationship between news and the Vale Notes' abnormal returns throughout the Class Period, … [which] supports my conclusion that the markets for the Vale Notes were inefficient throughout the Class Period.

In my opinion, the fact that the Vale Notes, which share similar characteristics, rarely react to the same news events throughout the Class Period is inconsistent with market efficiency (a conclusion that Dr. Tabak does not question) as one would expect these related securities to respond in similar ways to new, value-relevant information.[185]

---

[183]  The 25% and 50% cut-off levels in this analysis have *identical* overall news days, which illustrates the illogical results of applying Dr. Tabak's methodology for determining cut-offs.

[184]  Mazumdar Report, ¶ 79.

[185]  Mazumdar Report, ¶¶ 69, 78-79 and Exhibit 7.

42

## VI. DR. TABAK DOES NOT REFUTE MY OPINION THAT THE INDIRECT INDICIA OF EFFICIENCY HAVE LITTLE PROBATIVE VALUE IN ASSESSING MARKET EFFICIENCY THROUGHOUT THE CLASS PERIOD AND DIRECT TESTS OF EFFICIENCY ARE NECESSARY TO REACH SUCH A CONCLUSION

101. The Tabak Report offers no opinion whatsoever on Section V of my First Report where I discuss the academic literature on the indirect indicia of market efficiency, namely that:

> Academic studies, including those I have discussed above, have demonstrated that the actual relationship between these indirect indicia and efficiency is at best tenuous. From an economic perspective, direct tests of efficiency are necessary to prove that a security traded in an efficient market throughout the class period.[186]

102. Dr. Tabak's silence in this regard is unsurprising because his testimony in prior reports mirrors my opinion. For instance, in his expert report in *Vale (2017)*, Dr. Tabak wrote: "[w]hether a stock price responds to material, new unexpected information is often the most direct and important of the *Cammer* factors."[187]

## VII. CONCLUSION

103. For the reasons discussed above, none of the claims in the Tabak Report lead me to change the opinions I expressed in my First Report, *viz.* the "direct tests of market efficiency that I conducted overwhelmingly demonstrate that the Vale Securities traded in inefficient markets throughout the Class Period,"[188] and "indirect indicia of market efficiency are not probative from an economic perspective as they have little relationship to actual efficiency."[189]

104. Dr. Tabak's critiques of the analyses in my First Report are incorrect and irrelevant for all the reasons I discussed above.

105. Dr. Tabak's proposed alternative FDT Tests are fundamentally flawed, unscientific, and biased. His FDT Test results critically depend on his overly narrow definition and arbitrary selection of news days. The mechanical methodology Dr. Tabak has used to select news days in

---

[186] Mazumdar Report, ¶ 92.

[187] *See*, *e.g.*, Tabak Vale (2017) Report, ¶ 31. *See also* Tabak Teva Report, ¶ 37; Tabak Alibaba (2023) Report, ¶ 31.

[188] Mazumdar Report, ¶ 93.

[189] Mazumdar Report, ¶ 94.

this case contradicts economic logic and his own prior writings and testimony. After correcting just some of the more glaring flaws in Dr. Tabak's methodology, I found that his conclusion no longer holds, *viz.* his own corrected FDT Tests demonstrate the inefficiency (not efficiency) of the Vale Securities' markets throughout the Class Period. In addition, Dr. Tabak's own rationales suggest the results based on my data are more reliable.

Respectfully submitted,

Sumon C. Mazumdar, Ph.D.

44

## VIII.  APPENDIX A – OTHER METHODOLOGICAL ERRORS IN DR. TABAK'S ANALYSIS

### A.  The articles that Dr. Tabak counts to apply his arbitrary news days cut-offs include duplicates

1. Dr. Tabak's population of news articles from *Dow Jones Newswires* includes a total 76 articles which he determines corresponds to 41 news dates during the Class Period.  A basic review of these 76 articles' content (which Dr. Tabak has deliberately not performed) indicates that at least 15 articles (20% of the set) are near-exact duplicates of other articles, sharing the same headline, author, near-identical article word count, and, often, release time.[190]  Dr. Tabak improperly fails to exclude such duplicates from his set of news articles, which squarely contradicts economic logic and his own prior testimony.[191]  By contrast, in identifying news days I properly excluded such duplicates in identifying news.

2. He then compounds his error by counting such improperly selected news articles to determine which news days he ought to focus on in his FDT Tests under his Cut-Off Theory.  Such a mechanical approach is devoid of economic logic.  There is no reasonable basis for one day with three articles, of which two are duplicates of each other, being deemed more relevant to assess market efficiency than another date with two distinct articles.[192]  Yet, Dr. Tabak's Cut-Off Theory hinges on that critically flawed assumption.

3. For example, a review of two articles, published five minutes apart, that Dr. Tabak identifies on **March 21, 2017,** confirms they are virtual duplicates, (*i.e.,* have identical headlines, authors, and near-identical word counts).  Therefore, if duplicates were ignored, as Dr. Tabak has stated in other reports they should, then March 21, 2017, would not be included as a news day based on his 50% cut-off based on his count of *Dow Jones Newswires* articles (with a threshold count of two articles).

4. According to Dr. Tabak, four of the Vale Notes' (Notes 3, 4, 5 and 6) abnormal returns were statistically significant on March 21, 2017 under the Feinstein Regression approach for the Vale

---

[190]  *See* backup materials where I provide summary information on the duplicate articles and highlight the minor differences, if any, across these articles.

[191]  Tabak Vale (2017) Report, ¶ 35; Tabak PPG Report, ¶ 40; Tabak Alibaba (2018) Report, ¶ 40.

[192]  According to Dr. Tabak's Cut-Off Theory, which as I noted has no scientific support, an article that is reprinted is somehow more material, than one that is not.  There is no foundation for such a claim, and he has not provided a single academic study to support this claim, which is the linchpin of his FDT Test.

Notes.[193]  Removing March 21, 2017, as a news day would therefore result in one of 14 news days being removed from all analyses that rely on the DJN top 50% news days sample, highlighting the arbitrary and unreliable nature of Dr. Tabak's mechanical methodology.

5.  I next discuss two further examples where Dr. Tabak has selected a day as a news day applying his arbitrary cut-offs based on the number of *Dow Jones Newswires* articles published per day (December 19, 2016 and June 12, 2018) but the articles he counts include duplicates.  If these duplicates were removed, then these dates would not be included in Dr. Tabak's *Dow Jones Newswires* top 25% or top 10% sets of news days.  These examples illustrate the arbitrary and unreliable nature of Dr. Tabak's mechanical news selection methodology.

    a.  **December 19, 2016:** Dr. Tabak includes this date as a "material" news day for all Vale Securities applying his 25% and 10% cut-offs based on his count of *Dow Jones Newswires* articles.  He claims 10 news articles on Vale were published that day.[194]  However, six of the 10 articles Dr. Tabak identifies on December 19, 2016, are exact or near duplicates, with the same title, author, near-exact word count and publishing time.  In addition, of the four remaining articles, two are updates to an original article published earlier the same day.  Removing such articles, only two news articles remain, which would disqualify December 19, 2016, as a new day worthy of focus applying Dr. Tabak's 25% or 10% cut-offs.

    b.  **June 12, 2018**: Dr. Tabak improperly includes this day in his *Dow Jones Newswires* top 25% set as a news day related to the Vale ADS (but not for the Vale Notes).[195, 196]  But two of the three articles Dr. Tabak identifies have identical headlines, authors, and word counts.  Removing one of duplicates reduces the article count on June 12, 2018 to two, which would disqualify this date from inclusion as a news day in Dr. Tabak's *Dow Jones Newswires* top 25% set.

---

[193]  Note 4 also had a statistically significant abnormal return under Mazumdar Regression approach.

[194]  Tabak Report Production, "Exhibit 5, 6c-6i.xslx," sheet "Top % (Mazumdar)."

[195]  Tabak Report Production, "Exhibit 6a-6b.xslx," sheet "Top %."

[196]  Dr. Tabak includes the previous trading day, June 11, 2018, in his *Dow Jones Newswires* top 25% set for the Vale Notes based on the same three news articles.  The articles in question all have time stamps between 4PM and 5PM ET, so Dr. Tabak counts them as within trading hours for Vale Notes, but after-hours for Vale ADS.  Therefore, everything I mention regarding June 12, 2018 news day for Vale ADS applies to June 11, 2018 news day for Vale Notes.

**B.**     **The articles that Dr. Tabak counts to apply his arbitrary news days cut-offs include re-publications of stale information**

6.    Some of the news days that Dr. Tabak selected is based on improperly counting the re-publication of stale information as news.   I discuss three such examples below, which illustrate the arbitrary and unreliable nature of Dr. Tabak's mechanical news selection methodology.

a.    **October 26, 2018**: Dr. Tabak claims this date is a news day applicable to the Vale ADS because of a single article on Vale that was published after trading hours (*i.e.,* at 4:50 PM Eastern) the previous day, October 25, 2018.   However, that article is an exact duplicate of another article published *during* trading hours on October 25, 2018 that Dr. Tabak includes in his set of news days.[197]   Thus, the information provided in the article published after hours on October 25, 2018 was stale.   Yet, Dr. Tabak counts this stale information as a news release to identify October 26, 2018 as a news day.   Dr. Tabak does not identify any other article available through *Dow Jones Newswires* that was published on October 26, 2018.   Therefore, his determination that October 26, 2018 was a news day solely on the basis of stale information released the previous day is devoid of economic logic.

b.    **October 25, 2018**: Dr. Tabak counts the article on Vale published at 4:50 PM Eastern on October 25, 2018 as the third news article published during the Vale Notes' trading hours that day which he assumes ends at 5 PM Eastern.[198]   Therefore, applying his 25% cut-off, Dr. Tabak concludes that October 25, 2018, is a news day for the Vale Notes.   However, as I noted above, this article was a duplicate of the first.   Removing one of the two articles as a duplicate would reduce the count of articles on October 25, 2018 to two, which would disqualify that day from being included in Dr. Tabak's *Dow Jones Newswires* top 25% set of news days for the Vale Notes.

c.    **April 21, 2017:** Dr. Tabak identifies this date as a news day applicable to all Vale Securities applying his *Dow Jones Newswires* top 50% cut-off because he claims there were two news

---

[197]   Moreover, the top line of the article states: "The latest Market Talks covering Basic Materials.   Published exclusively on Dow Jones Newswires at 4:20 ET, 12:20 ET and 16:50 ET."   One of the two articles in question was published at 12:20 ET while the other was published at 16:50 ET.   This news roundup is then clearly published multiple times a day as a matter of routine and the repetition has nothing to do with the newsworthiness of any news related to Vale that day.   *See* "Basic Materials Roundup: Market Talk," *Dow Jones Institutional News,* October 25, 2018.

[198]   *See, e.g.*, Tabak Report, Exhibit 5.

articles released that day. However, one of these articles discusses stale information (*viz.,* Vale's production announcement which had been announced the previous day, April 20, 2017) which would have been apparent to Dr. Tabak had he actually read the April 20, and 21, 2017 articles.[199] Excluding this stale news article[200] on April 21, 2017 would leave only one *Dow Jones Newswires* article on April 21, 2017, which would disqualify that day from being included in Dr. Tabak's *Dow Jones Newswires* top 50% set of news days.

### C. The articles that Dr. Tabak counts to apply his arbitrary news days cut-offs include discussion of price movements which are well-known to be immaterial

7. Dr. Tabak's set of news articles also includes articles that merely report on the ADS' price movements over a given day. Dr. Tabak has treated such information as non-material in his prior expert reports, as I noted above. Yet, he has chosen to include such articles as value-relevant in this case. Dr. Tabak's treatment of articles that merely report on price movements as immaterial in some cases, but not in this case highlights the arbitrary nature of his analysis. For example:

   a. **February 5, 2019**: Dr. Tabak selects this date as a news day using his *Dow Jones Newswires* top 50% cut-off because he found two *Dow Jones Newswires* articles that could impact Vale Securities prices that day. One of these articles, published after hours the previous day,[201] summarizes price movements for several indices and ADRs, including the Vale ADS. This article does not provide any new, value-relevant information about Vale.[202] Removing this article would leave only one article that could impact Vale Securities prices on February 5, 2019, according to Dr. Tabak's methodology. As a result, February 5, 2019 would then not count as a news day based on Dr. Tabak's *Dow Jones Newswires* top 50% cut-off sample.

---

[199] This would also have been apparent from reviewing Mazumdar Report, Overview Exhibit 1.

[200] Bennett, Johanna, "Emerging Markets Today: Vale, Rio Tinto Rise; Venezuela Seizes GM Plant; Time To Sell Baba? – Barron's Blog," *Dow Jones Institutional News*, April 20, 2017, at 5:13 PM Eastern.

[201] "ADRs Gain in New York Trading; Vale Trades Actively," *Dow Jones Institutional News,* February 4, 2019, at 5:26 PM Eastern.

[202] The article ("ADRs Gain in New York Trading; Vale Trades Actively," *Dow Jones Institutional News,* February 4, 2019, at 5:26 PM Eastern) also discusses a court order against Vale, which was previously disclosed during trading hours that day and thus constituted stale, non-material information. *See* Mazumdar Report, B-23 (item 325), citing sec.gov/Archives/edgar/data/917851/000110465919005417.

b. **April 21, 2017**: Dr. Tabak's selects this date as a news day using his *Dow Jones Newswires* top 50% cut-off because he found two *Dow Jones Newswires* articles that could impact Vale Securities prices that day. However, one of these, published after hours the previous day, [203] only discusses the Vale ADS' price movement which is not material information. That article also discusses some stale information, *i.e.*, Vale's share price had increased following Vale's strong Q1 production figures which had been released earlier on April 20, 2017.[204] Removing this article would leave only one article that could impact Vale Securities prices on February 5, 2019, according to Dr. Tabak's methodology. As a result, April 21, 2017 would then not count as a news day based on Dr. Tabak's *Dow Jones Newswires* top 50% cut-off sample.

8. In summary, the examples above illustrate that Dr. Tabak's mechanical methodology (which is based on *Dow Jones Newswires* articles and arbitrary subsets of the corresponding news days) is unfit for evaluating market inefficiency as it cannot distinguish days when new, value-relevant information was released, from days when no material news was released. The flaws in Dr. Tabak's methodology highlight why the methodology I implemented in my First Report (which is consistent with Dr. Tabak's prior expert work) is appropriate and necessary to accurately and robustly perform tests of market efficiency throughout the Class Period.

---

[203] Bennett, Johanna, "Emerging Markets Today: Vale, Rio Tinto Rise; Venezuela Seizes GM Plant; Time To Sell Baba? – Barron's Blog," *Dow Jones Institutional News*, April 20, 2017, at 5:13 PM Eastern.

[204] As discussed above, Vale's production numbers had been announced *during trading hours* on 20 April 2017. *See* Appendix, Section B.c.

**Appendix B**
**Materials Relied Upon In Addition To My First Report**

**Case Documents *In Re Vale S.A. Securities Litigation***

1. Declaration of Frederic S. Fox in Support of Plaintiff's Opposition to Defendants' Motion for Class Decertification, *In Re: Vale S.A. Securities Litigation*, United States District Court, Eastern District of New York, 19 Civ. 526 (EK) (SJB), October 18, 2023.

2. Deposition Testimony of David Tabak, *In Re: Vale S.A. Securities Litigation*, United States District Court, Southern District of New York, 19 Civ. 526 (EK) (SJB),  November 8, 2023.

3. Memorandum & Order, *In Re Vale S.A. Securities Litigation*, United States District Court, Eastern District of New York, 19-cv-526-RJD-SJB, filed May 20, 2020.

4. Rebuttal Expert Report of David I. Tabak, Ph.D., *In Re Vale S.A. Securities Litigation*, United States District Court, Eastern District of New York, 19 Civ. 526 (EK) (SJB), October 17, 2023, and backup materials thereto.

**Dr. Tabak's Reports in Prior Cases**

1. Expert Report of David I. Tabak, Ph.D., *In Re Alibaba Group Holding Limited Securities Litigation*, United States District Court, Southern District of New York, 1:15-md-02631 (CM), filed March 12, 2018.

2. Expert Report of David I. Tabak, Ph.D., *In Re Kraft Heinz Securities Litigation*, United States District Court, Northern District of Illinois, 1:19-cv-01339, filed March 28, 2022.

3. Expert Report of David I. Tabak, Ph.D., *In Re Oracle Corporation Securities Litigation*, United States District Court, Northern District of California, 18-cv-4844-BLF, filed October 8, 2021.

4. Expert Report of David I. Tabak, Ph.D., *In Re Qualcomm Incorporated Securities Litigation*, United States District Court, 3:17-cv-00121-JO-MSB, filed May 23, 2022.

5. Expert Report of David I. Tabak, Ph.D., *In Re Teva Securities Litigation*, United States District Court, District of Connecticut, 3:17-cv-00558-SRU, filed June 19, 2020.

6. Expert Report of David I. Tabak, Ph.D., *In re: Alibaba Group Ltd. Securities Litigation*, United States District Court, Southern District of New York, 1:20-CV-09568-GBD-JW, filed October 6, 2023.

7. Expert Report of David I. Tabak, Ph.D., *In Re: Vale S.A. Securities Litigation*, United States District Court, Southern District of New York, 1:16-cv-00658-GHW, filed September 15, 2017.

8. Expert Report of David I. Tabak, Ph.D., *Sjunde Ap-Fonden et al. v General Electric Company et al.*, United States District Court, Southern District of New York, 17-CV-8457 (JMF), filed May 21, 2021.

9. Expert Report of David I. Tabak, Ph.D., *Trevor Mild, Individually and on Behalf of All Others Similarly Situated v. PPG Industries, Inc., Michael H. McGarry, Vincent J. Morales, and Mark C. Kelly*, United States District Court, Central District of California, 2-18-cv-04231-RGK-JEM, filed March 8, 2019.

10. Supplemental Rebuttal Expert Report of David I. Tabak, Ph.D., *In Re: Vale S.A. Securities Litigation*, United States District Court, Southern District of New York, 1:16-cv-00658-GHW, filed August 22, 2019.

**Research Articles and Textbooks**

1. Fama, Eugene F., *et al.*, "The Adjustment of Stock Prices to New Information," *International Economic Review*, February 1969, Vol. 10(1).

2. Griffin, John M., Hirschey, Nicholas H., and Kelly, Patrick J., "How Important Is the Financial Media in Global Markets?" *The Review of Financial Studies*, 2011, Vol. 24(12).

3. Tabak, David I., "p-Hacking and Event Studies in Securities Litigation," *NERA Working Paper*, April 12, 2023.

**Other Publicly Available Documents**

1. "Global Iron Ore Mining Markets Report 2018-2022 Featuring Leading Players - Vale, Rio Tinto, Anglo American Plc, BHP Billiton & Fortescue Metals Group," *PR Newswire*, January 18, 2018, available at < https://www.prnewswire.com/news-releases/global-iron-ore-mining-markets-report-2018-2022-featuring-leading-players---vale-rio-tinto-anglo-american-plc-bhp-billiton--fortescue-metals-group-300780869.html>.

2. "S&P Thematic Indicies Methodology," *S&P Dow Jones Indices*, November 2023.

3. "Vale Debt Rating Teetering on Junk After Dam Collapse -- Market Talk," *Dow Jones Institutional News,* January 29, 2019 at 12:57 PM Eastern.

**Appendix B**
**Materials Relied Upon In Addition To My First Report**

4.  "Why Scientific Studies Are So Often Wrong: The Streetlight Effect," *Discover* , December 10, 2010, available at <https://www.discovermagazine.com/the-sciences/why-scientific-studies-are-so-often-wrong-the-streetlight-effect>.

5.  Campbell Harvey's Hypertextual Finance Glossary, available at <https://people.duke.edu/~charvey/Classes/wpg/bfglosd.htm>.

6.  Farchy, Jack and Watson, R.T., "Vale Is Said to Reach $700 Million Deal to Sell Cobalt Output," *Bloomberg News* , June 8, 2018.

7.  Kiernan, Paul, "Mosaic to Buy Vale's Fertilizer Business for $2.5 Billion -- Update," *Dow Jones Newswires Chinese (English),* December 19, 2016 at 8:09 AM Eastern.

8.  Kiernan, Paul, "Mosaic to Buy Vale's Fertilizer Business for $2.5 Billion -- Update," *Dow Jones Newswires Chinese (English),* December 19, 2016 at 8:10 AM Eastern.

9.  Kiernan, Paul, "Mosaic to Buy Vale's Fertilizer Business for $2.5 Billion," *Dow Jones Newswires Chinese (English),* December 19, 2016, at 6:45 AM Eastern.

10. Löf, Anton and Löf, Olaf, "Iron Ore Miners Increase Production Capacity," *Engineering and Mining Journal* , December 2022, available at < https://www.e-mj.com/features/iron-ore-miners-increase-production-capacity/>.

11. PR Newswire, "Press Release: Wheaton Precious Metals Acquires Cobalt Stream from Vale's Voisey's Bay Mine," *Dow Jones Institutional News* , June 28, 2018 at 4:08 PM Eastern.

12. Sterck, Edward and Gagliano, David, "Upgrading to Market Perform on Higher Iron Ore Price Outlook," *BMO Capital Markets* , March 31, 2017.

13. Tanners, Timna, Fairclough, Jason, and Heluany, Antonio, "Upbeat on shareholder payout, cautious on premiums; cut PO to $16.50 but reit. Buy," *Bank of America Merrill Lynch* , December 12, 2018.

14. United States Securities and Exchange Commission, "Form 6-K: Report of Foreign Private Issuer Pursuant to Rule 13a-16 or 15d-16 of the Securities Exchange Act of 1934 for the month of January 2017, Vale S.A.," January 13, 2017, available at <https://www.sec.gov/Archives/edgar/data/917851/000110465917002331/a17-2503_16k.htm>.

15. United States Securities and Exchange Commission, "Form 20-F: Annual Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 for the fiscal year ended December 31, 2017, Commission file number: 001-15030, Vale S.A.," April 13, 2018, available at <https://www.sec.gov/Archives/edgar/data/917851/000104746918002777/a2234766z20-f.htm>.

16. Vale S.A., "Form 6-K: US$ 690 million Cobalt Stream unlocks Vale's Voisey's Bay Mine Expansion," filed on June 11, 2018, available at <https://www.sec.gov/Archives/edgar/data/917851/000110465918039516/a18-15200_16k.htm>.

17. Vale, "Financial Statements," December 31, 2017, available at <https://api.mziq.com/mzfilemanager/v2/d/53207d1c-63b4-48f1-96b7-19869fae19fe/8f438405-d393-4e97-8318-bd6539cd01ff?origin=1>.

**Data**

1.  Morningstar Direct - Index Constituents.xlsx

**Exhibit 1**
**News Day Samples in Select Prior Reports Filed by Dr. David I. Tabak**

| | Report | Type of *Dow Jones Newswire* Search[1] | Total No. of Trading Days [A] | Full Sample | | | Top 10% Sample | | | Top 25% Sample? |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | No. of News Days [B] | % News Days [B] / [A] | Average No. of Trading Days for Each News Day [A] / [B] | No. of News Days [C] | % News Days [C] / [A] | Average No. of Trading Days for Each News Day [A] / [C] | |
| 1 | Vale (2017) | Text; All Hours; Excluding Selected Articles | 393 | 67 | 17.0% | 6 | N/A | N/A | N/A | No |
| 2 | Alibaba (2018) | Text; All Hours | 88 | 69 | 78.4% | 1 | 8 | 9.1% | 11 | No |
| | | Text; All Hours; Excluding Selected Articles | 88 | N/A | N/A | N/A | 4 | 4.5% | 22 | |
| 3 | PPG (2019) | Text; All Hours | 330 | 123 | 37.3% | 3 | 12 | 3.6% | 28 | No |
| 4 | General Electric (2021) | Text; Outside Market Hours | 731 | 511 | 69.9% | 1 | N/A | N/A | N/A | No |
| 5 | Oracle (2021) | Text; Outside Market Hours | 280 | 66 | 23.6% | 4 | 5 | 1.8% | 56 | No |
| 6 | Teva (2021) | Text; All Hours | 1324 | 678 | 51.2% | 2 | 63 | 4.8% | 21 | No |
| 7 | Heinz (2022) | Company; Outside Market Hours | 943 | 207 | 22.0% | 5 | 20 | 2.1% | 47 | No |
| 8 | Qualcomm (2022) | Text; Outside Market Hours | 1250 | 570 | 45.6% | 2 | 56 | 4.5% | 22 | No |
| 9 | Alibaba (2023) | Company; Outside Market Hours | 117 | 104 | 88.9% | 1 | 9 | 7.7% | 13 | No |
| | | Text; Outside Market Hours | 117 | 102 | 87.2% | 1 | 8 | 6.8% | 15 | |
| 10 | **Vale (Matter at Issue) (2023)** | **Text and Company; All Hours[2]** | **572** | **41** | **7.2%** | **14** | **3** | **0.5%** | **191** | **Yes** |

**Notes:**

[1] This column summarizes the search criteria Dr. Tabak claims to have used to identify news articles in a particular expert report.

[2] *See* Tabak Report, ¶ 40 and Exhibits footnotes.

**Sources:**

This exhibit summarizes the news day samples that Dr. Tabak has used in his Vale (2017) report and his later publicly available expert reports listed below.

[1] Expert Report of David I. Tabak, Ph.D., *In Re: Vale S.A. Securities Litigation*, United States District Court, Southern District of New York, 1:15-CV-09539-GHW consolidated with 1:16-cv-00658-GHW, filed September 15, 2017, p. 96.

[2] Expert Report of David I. Tabak, Ph.D., *In Re Alibaba Group Holding Limited Securities Litigation*, United States District Court, Southern District of New York, 1:15-md-02631 (CM), filed March 12, 2018, p. 90.

[3] Expert Report of David I. Tabak, Ph.D., *Trevor Mild, Individually and on Behalf of All Others Similarly Situated v. PPG Industries, Inc., Michael H. McGarry, Vincent J. Morales, and Mark C. Kelly*, United States District Court, Central District of California, 2-18-cv-04231-RGK-JEM, filed March 8, 2019, p. 81.

[4] Expert Report of David I. Tabak, Ph.D., *Sjunde Ap-Fonden et al. v General Electric Company et al.*, United States District Court, Southern District of New York, 17-CV-8457 (JMF), filed May 21, 2021, p. 348.

[5] Expert Report of David I. Tabak, Ph.D., *In re Oracle Corporation Securities Litigation*, United States District Court, Northern District of California, 18-cv-4844-BLF, filed October 8, 2021, p. 98.

[6] Expert Report of David I. Tabak, Ph.D., *In Re Teva Securities Litigation*, United States District Court, District of Connecticut, 3:17-cv-00558 (SRU), filed June 19, 2020, p. 177.

[7] Expert Report of David I. Tabak, Ph.D., *In re Kraft Heinz Securities Litigation*, United States District Court, 1:19-cv-01339, filed March 28, 2022, p. 131.

[8] Expert Report of David I. Tabak, Ph.D., *In re Qualcomm Incorporated Securities Litigation*, United States District Court, 3:17-cv-00121-JO-MSB, filed May 23, 2022, p. 229.

[9] Expert Report of David I. Tabak, Ph.D., *In re: Alibaba Group Ltd. Securities Litigation*, United States District Court, Southern District of New York, 1:20-CV-09568-GBD-JW, filed October 6, 2023, p. 110.

[10] Rebuttal Expert Report of David I. Tabak, Ph.D., *In Re: Vale S.A. Securities Litigation*, United States District Court, Eastern District of New York, 19-cv-526 (EK) (SJB), filed October 17, 2023, Exhibit 6a.

**Exhibit 2**

**Changes in Dr. Tabak's FDT Tests Results After Excluding Complaint Alleged Corrective Disclosures Dates[1]**

| | ADS | | Note #1 (91911TAN3) | | | Note #2 (91911TAM5) | | | Note #3 (91911TAP8) | | | Note #4 (91911TAE3) | | | Note #5 (91911TAH6) | | | Note #6 (91911TAK9) | | | Note #7 (91912EAA3) | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | B[4] | C[5] | A[3] | B[4] | C[5] | A[3] | B[4] | C[5] | A[3] | B[4] | C[5] | A[3] | B[4] | C[5] | A[3] | B[4] | C[5] | A[3] | B[4] | C[5] | A[3] | B[4] | C[5] |
| ***DJN All*** | | | | | | | | | | | | | | | | | | | | | | | |
| Dr. Tabak's Results | No | Yes | No | No | No | Yes | Yes | No | Yes | Yes | Yes | No | No | No | No | No | Yes | Yes | Yes | Yes | No | No | No |
| Excluding Complaint Alleged Corrective Disclosures Dates | No | No | No | No | No | No | No | No | No | Yes | No | No | No | No | No | No | No | Yes | Yes | Yes | No | No | No |
| ***DJN Top 50%*** | | | | | | | | | | | | | | | | | | | | | | | |
| Dr. Tabak's Results | No | No | No | No | No | Yes | Yes | No | Yes | Yes | Yes | No | Yes | Yes | No | No | Yes | Yes | Yes | Yes | Yes | Yes | No |
| Excluding Complaint Alleged Corrective Disclosures Dates | No | No | No | No | No | Yes | Yes | No | Yes | Yes | Yes | No | Yes | Yes | No | No | Yes | Yes | Yes | Yes | No | Yes | No |
| ***DJN Top 25%*** | | | | | | | | | | | | | | | | | | | | | | | |
| Dr. Tabak's Results | Yes | Yes | No | No | No | Yes | Yes | Yes | Yes | Yes | Yes | No | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| Excluding Complaint Alleged Corrective Disclosures Dates | No | No | No | No | No | No | Yes | No | Yes | Yes | Yes | No | No | No | No | No | Yes | Yes | Yes | Yes | No | No | No |
| ***DJN Top 10%*** | | | | | | | | | | | | | | | | | | | | | | | |
| Dr. Tabak's Results | Yes | Yes | No | No | No | Yes | Yes | Yes | Yes | Yes | Yes | Yes | No | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | No | No |
| Excluding Complaint Alleged Corrective Disclosures Dates | No | No | No | No | No | No | Yes | No | No | Yes | No | No | No | No | No | No | Yes | Yes | No | Yes | No | No | No |

**Notes:**

[1] The "Excluding Corrective Disclosures Dates" rows in this exhibit report the results of Dr. Tabak's FDT Tests in which January 25, 2019, January 28, 2019, February 4, 2019 and February 6, 2019 (the four Complaint Alleged Corrective Disclosures Dates) are removed.

[2] Dr. Tabak's Results are obtained from Tabak Report, Exhibits 5 and 6.

[3] Column **"A"** reports results of FDT Tests in which abnormal returns for the Vale Notes are calculated using the Matched Portfolio approach.

[4] Column **"B"** reports results of FDT Tests in which abnormal returns for the Vale ADS and the Vale Notes are calculated using the Mazumdar Regression models for the ADS and Notes, respectively.

[5] Column **"C"** reports results of FDT Tests in which abnormal returns for the Vale ADS and the Vale Notes are calculated using the Feinstein Regression models for the ADS and Notes, respectively.

[6] Highlighted cells denote instances where Dr. Tabak's FDT Test results are reversed, and the Vale Security fails the FDT Test when Complaint Alleged Corrective Disclosure Dates are excluded.

**Sources:** Tabak Report Production, "Exhibit 5,6c-6i.xlsx" and "Exhibit 6a-6b.xlsx."

**Exhibit 3**

**Changes in Dr. Tabak's FDT Tests Results Using the DJN Top 25% News Days Set Excluding January 30, 2019[1]**

| | ADS | | Note #1 (91911TAN3) | | | Note #2 (91911TAM5) | | | Note #3 (91911TAP8) | | | Note #4 (91911TAE3) | | | Note #5 (91911TAH6) | | | Note #6 (91911TAK9) | | | Note #7 (91912EAA3) | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | B[4] | C[5] | A[3] | B[4] | C[5] | A[3] | B[4] | C[5] | A[3] | B[4] | C[5] | A[3] | B[4] | C[5] | A[3] | B[4] | C[5] | A[3] | B[4] | C[5] | A[3] | B[4] | C[5] |
| *DJN Top 25%* | | | | | | | | | | | | | | | | | | | | | | | |
| Dr. Tabak's Results | Yes | Yes | No | No | No | Yes | Yes | Yes | Yes | Yes | Yes | No | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| Excluding January 30, 2019 as a News Day | No | No | No | No | No | No | Yes | No | Yes | Yes | Yes | No | No | No | No | No | Yes | Yes | No | Yes | No | No | No |

**Notes:**

[1] Removing one news article that was unrelated to Vale from the set of news articles Dr. Tabak identified on January 30, 2019 excludes this day as a news day in Dr. Tabak's DJN Top 25% set of news days only.

[2] Dr. Tabak's Results are obtained from Tabak Report, Exhibits 5 and 6.

[3] Column **"A"** reports results of FDT Tests in which abnormal returns for the Vale Notes are calculated using the Matched Portfolio approach.

[4] Column **"B"** reports results of FDT Tests in which abnormal returns for the Vale ADS and the Vale Notes are calculated using the Mazumdar Regression models for the ADS and Notes, respectively.

[5] Column **"C"** reports results of FDT Tests in which abnormal returns for the Vale ADS and the Vale Notes are calculated using the Feinstein Regression models for the ADS and Notes, respectively.

[6] Highlighted cells denote instances where Dr. Tabak's FDT Test results are reversed, and the Vale Security fails the FDT Test when January 30, 2019 is excluded as a news day and considered a non-news day.

**Sources:** Tabak Report Production, "Exhibit 5,6c-6i.xlsx" and "Exhibit 6a-6b.xlsx."

**Exhibit 4**

**Changes in Dr. Tabak's FDT Tests Results After Excluding Complaint Alleged Corrective Disclosures Dates**

**And Excluding January 30, 2019 From Dr. Tabak's *DJN Top 25%* set of News Days[1]**

| | ADS | | Note #1 (91911TAN3) | | | Note #2 (91911TAM5) | | | Note #3 (91911TAP8) | | | Note #4 (91911TAE3) | | | Note #5 (91911TAH6) | | | Note #6 (91911TAK9) | | | Note #7 (91912EAA3) | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | $B^4$ | $C^5$ | $A^3$ | $B^4$ | $C^5$ | $A^3$ | $B^4$ | $C^5$ | $A^3$ | $B^4$ | $C^5$ | $A^3$ | $B^4$ | $C^5$ | $A^3$ | $B^4$ | $C^5$ | $A^3$ | $B^4$ | $C^5$ | $A^3$ | $B^4$ | $C^5$ |
| ***DJN All*** | | | | | | | | | | | | | | | | | | | | | | | |
| Dr. Tabak's Results | No | Yes | No | No | No | Yes | Yes | No | Yes | Yes | Yes | No | No | No | No | No | Yes | Yes | Yes | Yes | No | No | No |
| Excluding Complaint Alleged Corrective Disclosures Dates | No | No | No | No | No | No | No | No | No | Yes | No | No | No | No | No | No | No | Yes | Yes | Yes | No | No | No |
| ***DJN Top 50%*** | | | | | | | | | | | | | | | | | | | | | | | |
| Dr. Tabak's Results | No | No | No | No | No | Yes | Yes | No | Yes | Yes | Yes | No | Yes | Yes | No | No | Yes | Yes | Yes | Yes | Yes | Yes | No |
| Excluding Complaint Alleged Corrective Disclosures Dates | No | No | No | No | No | Yes | Yes | No | Yes | Yes | Yes | No | Yes | Yes | No | No | Yes | Yes | Yes | Yes | No | Yes | No |
| ***DJN Top 25%*** | | | | | | | | | | | | | | | | | | | | | | | |
| Dr. Tabak's Results | Yes | Yes | No | No | No | Yes | Yes | Yes | Yes | Yes | Yes | No | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| Excluding Complaint Alleged Corrective Disclosures Dates And January 30, 2019 | No | No | No | No | No | No | No | No | No | Yes | No | No | No | No | No | No | No | No | No | No | No | No | No |
| ***DJN Top 10%*** | | | | | | | | | | | | | | | | | | | | | | | |
| Dr. Tabak's Results | Yes | Yes | No | No | No | Yes | Yes | Yes | Yes | Yes | Yes | Yes | No | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | No | No |
| Excluding Complaint Alleged Corrective Disclosures Dates | No | No | No | No | No | No | Yes | No | No | Yes | No | No | No | No | No | No | Yes | Yes | No | Yes | No | No | No |

**Notes:**

[1] This exhibit reports the results of Dr. Tabak's FDT Tests in which January 25, 2019, January 28, 2019, February 4, 2019 and February 6, 2019 (the four Complaint Alleged Corrective Disclosures Dates) are removed, and one news article that was unrelated to Vale from the set of news articles Dr. Tabak identified on January 30, 2019 is excluded, making this day a non-news day in Dr. Tabak's *DJN Top 25%* sample.

[2] Dr. Tabak's Results are obtained from Tabak Report, Exhibits 5 and 6.

[3] Column **"A"** reports results of FDT Tests in which abnormal returns for the Vale Notes are calculated using the Matched Portfolio approach.

[4] Column **"B"** reports results of FDT Tests in which abnormal returns for the Vale ADS and the Vale Notes are calculated using the Mazumdar Regression models for the ADS and Notes, respectively.

[5] Column **"C"** reports results of FDT Tests in which abnormal returns for the Vale ADS and the Vale Notes are calculated using the Feinstein Regression models for the ADS and Notes, respectively.

[6] Highlighted cells denote instances where Dr. Tabak's FDT Test results are reversed, and the Vale Security fails the FDT Test when Complaint Alleged Corrective Disclosure Dates are excluded, and January 30, 2019 is excluded from Dr. Tabak's *DJN Top 25%* news days sample.

**Sources:** Tabak Report Production, "Exhibit 5,6c-6i.xlsx" and "Exhibit 6a-6b.xlsx."

**Exhibit 5**

**Dr. Tabak's "Mazumdar Sources" FDT Test Results After Excluding News Sources that Dr. Tabak Claims Are Not "Well-Supported"[1]**

| | ADS Mazumdar Regression | Note #1 (91911TAN3) Matched Portfolio | Note #2 (91911TAM5) Matched Portfolio | Note #3 (91911TAP8) Matched Portfolio | Note #4 (91911TAE3) Matched Portfolio | Note #5 (91911TAH6) Matched Portfolio | Note #6 (91911TAK9) Matched Portfolio | Note #7 (91912EAA3) Matched Portfolio |
|---|---|---|---|---|---|---|---|---|
| **Mazumdar Sources - All** | No | No | Yes | No | No | No | Yes | No |
| **Mazumdar Sources - Top 50%** | No | No | Yes | Yes | Yes | Yes | Yes | No |
| **Mazumdar Sources - Top 25%** | No | No | Yes | Yes | Yes | Yes | Yes | No |
| **Mazumdar Sources - Top 10%** | No | Yes | Yes | No | No | No | No | No |

**Notes:**

[1] The Mazumdar Sources - All set of news in this sensitivity analysis are only those from The Wall Street Journal, Financial Times, Reuters, PR Newswire and Dow Jones Institutional News that Dr. Tabak used for his "Mazumdar Sources" FDT Test.

[2] The Mazumdar Sources Top 50%, 25% and Top 10% FDT Tests are based on application of Dr. Tabak's cut-off methodology.

[3] Highlighted cells denote instances where a Vale Security fails the FDT Test.

**Sources:** Tabak Report Production, "Exhibit 5,6c-6i.xlsx" and "Exhibit 6a-6b.xlsx."