# Exhibit E

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

------------------------------------x



IN RE:  VALE S.A. SECURITIES LITIGATION

        No. 19 Civ. 526(EK)(SJB)

------------------------------------x

        DEPOSITION OF DAVID TABAK
            New York, New York
            November 8, 2023


Reported By:

ERIC J. FINZ

Page 2

November 8, 2023
9:28 a.m.

Videotaped Deposition of DAVID TABAK, taken by Defendants, at the offices of Gibson Dunn & Crutcher LLP, 200 Park Avenue, New York, New York, before ERIC J. FINZ, a Shorthand Reporter and Notary Public within and for the State of New York.

Page 3

APPEARANCES:

KAPLAN FOX
Attorneys for Plaintiffs
    800 Third Avenue
    New York, NY 10022

BY:  DONALD HALL, ESQ.
    dhall@kaplanfox.com

GIBSON DUNN & CRUTCHER LLP
Attorneys for Defendants
    200 Park Avenue
    New York, New York 10166

BY:  CHRISTOPHER JORALEMON, ESQ.
    cjoralemon@gibsondunn.com
    ANDREW FREIRE, ESQ.
    afriere@gibsondunn.com
    AMANDA BELLO, ESQ.
    abello@gibsondunn.com
    CHASE WEIDNER, ESQ.
    cweidner@gibsondunn.com

ALSO PRESENT:

    THIAGO MUCURY CARDOSO, Vale S.A.

    ROBERT RUDIS, Videographer

Page 4

DAVID TABAK

THE VIDEOGRAPHER:  Good morning.    09:28:19  09:28:20

We are going on the record at 9:28 a.m., November 8, 2023.    09:28:22  09:28:25

Please note the microphones are sensitive and may pick up whispering and private conversations.  Please mute your mobile phones at this time.  Audio and video recording will continue to take place unless all parties agree to go off the record.    09:28:31  09:28:33  09:28:35  09:28:36  09:28:38  09:28:41  09:28:43  09:28:45

This is media unit 1 of the video recorded deposition of David Tabak, taken by counsel for defendant, in the matter of Vale S.A. Securities Litigation, filed in the United States District Court, Eastern District of New York, Case No. 19-cv-526(EK)(SJB).    09:28:47  09:28:49  09:28:52  09:28:54  09:28:57  09:28:59  09:29:02  09:29:06

The location of the deposition is Gibson Dunn & Crutcher LLP, 200 Park Avenue, New York, New York.    09:29:18  09:29:20  09:29:24

My name is Robert Rudis, I'm    09:29:26

Page 5

DAVID TABAK

the videographer.  The court reporter is Eric Finz, and we represent the firm Veritext Legal Solutions.  I am not related to any party in this action, nor am I financially interested in the outcome.    09:29:28  09:29:29  09:29:31  09:29:34  09:29:35  09:29:38  09:29:40

If there are any objections to proceeding, please state them at the time of your appearance.  Counsel will now please state their appearances and affiliations for the record, beginning with the noticing attorney.    09:29:40  09:29:41  09:29:43  09:29:45  09:29:47  09:29:48  09:29:49

MR. JORALEMON:  Good morning, everyone.  Christopher Joralemon, Gibson Dunn, on behalf of defendants.  I'm joined by my colleagues Chase Weidner, Andrew Freire and Amanda Bello.  Also joining us is Thiago Cardoso of Vale.    09:29:51  09:29:52  09:29:55  09:29:57  09:29:58  09:30:01  09:30:03  09:30:06

MR. HALL:  Good morning.  Donald Hall, Kaplan Fox &    09:30:07  09:30:08

2 (Pages 2 - 5)

Page 6

DAVID TABAK

Kilsheimer LLP, on behalf of CAAT, 09:30:12 the class and the witness. 09:30:14

THE VIDEOGRAPHER: Would the 09:30:16 court reporter swear in the witness 09:30:19 and counsel may proceed. 09:30:20

DAVID TABAK, 09:30:20 having been first duly sworn by the 09:30:20 Notary Public (Eric J. Finz), was 09:30:20 examined and testified as follows: 09:30:20

EXAMINATION BY 09:30:28
MR. JORALEMON: 09:30:28

Q. Good morning, sir. Can you 09:30:28 please just state your name and business 09:30:34 address for the record? 09:30:36

A. The name is David Tabak. 09:30:37 T-a-b-a-k. My business address is 1166 09:30:39 Avenue of the Americas, New York, New 09:30:43 York 10036. 09:30:47

Q. Mr. Tabak, I know you've been 09:30:49 deposed before because I have deposed you 09:30:57 before. 09:30:59

A. That's true. 09:30:59

Q. Just to assist us in having 09:31:00 things go smoothly today, just a few 09:31:05

Page 7

DAVID TABAK

things to remind you. First, if at any 09:31:08 point you need a break, please just let 09:31:10 me know and I'll be happy to accommodate 09:31:13 you. The one caveat to that being if 09:31:17 there is a question pending, I'll ask you 09:31:20 for a response and then we can take a 09:31:22 break. 09:31:24

Your counsel may object today. 09:31:24 I doubt it. But maybe one or two times 09:31:26 where he objects. Once he makes his 09:31:29 objection, you'll still provide a 09:31:33 response unless he specifically directs 09:31:35 you not to answer the question. 09:31:36

Do you understand that? 09:31:38

A. I do. 09:31:40

Q. You understand you're 09:31:40 testifying under oath today. Correct? 09:31:42

A. I understand that too. 09:31:44

Q. Is there any reason you cannot 09:31:45 give complete and accurate testimony 09:31:47 today? 09:31:48

A. There is not. 09:31:49

Q. Prior to your engagement in 09:31:49 this action, had you ever met Professor 09:31:57

Page 8

DAVID TABAK

Sumon Mazumdar? 09:32:01

A. I don't believe so. 09:32:02

Q. Were you aware of him by 09:32:03 reputation prior to your engagement here? 09:32:05

A. A little, yes. 09:32:08

Q. Okay. Anything in particular 09:32:09 about him, do you recall, what's your 09:32:14 understanding of what your understanding 09:32:18 of Professor Mazumdar was before this 09:32:20 engagement? 09:32:23

A. I knew that he had co-authored 09:32:24 at least one article with Dr. Mukesh 09:32:25 Bajha. M-u-k-e-s-h, and then B-a-j-h-a. 09:32:32

Q. Do you recall the subject 09:32:32 matter of that article? 09:32:33

A. It was market efficiency. 09:32:34

Q. Did you review that article 09:32:36 prior to your engagement in this action? 09:32:38

A. Yeah, I read it. 09:32:41

Q. Anything else you recall about 09:32:42 Professor Mazumdar? 09:32:51

A. Not in particular. 09:32:53

Q. Prior to your engagement, were 09:32:55 you aware of, I believe it's Stephen, 09:33:00

Page 9

DAVID TABAK

Stephen Feinstein, an expert, another 09:33:05 expert engaged by plaintiffs in this 09:33:08 matter? 09:33:11

A. Yes, I've crossed paths with 09:33:11 him professionally several times. 09:33:13

Q. Okay. Did you speak to 09:33:15 Professor Feinstein about your engagement 09:33:18 in this matter? 09:33:22

A. I did not. 09:33:23

Q. And I note in your report, 09:33:23 which I'll mark in a minute, you had 09:33:26 indicated that you had reviewed Vale's 09:33:29 memorandum of law in support of class 09:33:34 decertification. Is that correct? 09:33:39

A. Yes, that is correct. 09:33:41

Q. Did you review the 09:33:41 consolidated class action complaint in 09:33:46 this matter? 09:33:48

A. I don't believe I did. I may 09:33:50 have briefly, but not in depth. 09:33:54

Q. Okay. And it's true you also 09:33:57 did not review the magistrate judge's 09:34:00 report and recommendation concerning 09:34:04 class certification here. Is that right? 09:34:06

3 (Pages 6 - 9)

Page 10

DAVID TABAK

A. That is not correct. I have certainly -- I reviewed it -- I know first of all I reviewed it before this engagement.

Q. Okay. In connection with this engagement, did you review that report and recommendation in preparing your report?

A. I don't recall if I did.

Q. Okay.

MR. JORALEMON: Mr. Tabak, the court reporter is going to hand to you what will be marked as Tabak Exhibit 1.

(Tabak Exhibit 1 for identification, Rebuttal Expert Report of David I. Tabak, Ph.D.)

MR. JORALEMON: For the record, Tabak Exhibit 1 is the rebuttal expert report of David I. Tabak, Ph.D., dated October 17, 2023.

BY MR. JORALEMON:

Q. Sir, do you recognize this

Page 11

DAVID TABAK

exhibit?

A. I do.

Q. What is it?

A. It's my report. I haven't looked through every page, but it appears to be complete.

Q. If I can direct your attention to page 27 of Exhibit 1. Is that your signature?

A. It is.

Q. And if you can turn to, I believe it's Exhibit 2, page 1, at the back of your report. It's titled "materials considered."

Do you see that?

A. I do.

Q. And directing your attention to the pleadings in this matter, that's on page 2 of Exhibit 2, you see it lists Vale's memorandum of law in support of class decertification?

A. I do.

Q. Okay. It does not list the report and recommendation by the

Page 12

DAVID TABAK

magistrate judge, though; correct?

A. That is correct.

Q. It also does not list the consolidated class action complaint. Correct?

A. That is also correct.

Q. Okay. So just returning to my earlier question about the report and recommendation. Did you not consider that in preparing this report?

A. I didn't refer to it. I was reasonably familiar with it, but I don't recall thinking I'm going to write a particular section in my report based on my recollection of the R&R.

Q. In preparing your report, did you review the District Court's decision on plaintiffs' motion for class certification?

A. No, I believe I did not. But again, I had seen that previously.

Q. Prior to your engagement?

A. Correct.

Q. Okay. In preparing your

Page 13

DAVID TABAK

report, did you review the parties' briefing in connection with plaintiffs' motion for class certification?

A. No, I did not.

Q. Did you review that briefing prior to your engagement in this matter?

A. I don't believe so.

I did review some of it after my report?

Q. Some of the parties' class certification briefing?

A. Yes.

Q. After you prepared and filed this report, you're saying you read some of the parties' briefing. Am I understanding you correctly?

A. I'm not sure if this report was filed, but after it was served, yes.

Q. Okay. Thank you.

Why did you review the parties' briefing after you served this report?

A. Mostly curiosity.

Q. Did anything about that

4 (Pages 10 - 13)

Page 14

DAVID TABAK

briefing cause you to question the    09:38:56
content of your report?    09:38:59

A.    No.    09:39:00

Q.    Were you surprised by anything    09:39:00
in the briefing?    09:39:04

A.    Maybe one line.  I don't know    09:39:06
if I was surprised, but I appreciated.    09:39:10

Q.    What was that?    09:39:13

A.    It was when defendants said    09:39:14
that in the earlier Vale case I performed    09:39:17
a, quote, appropriate event study, end    09:39:20
quote.  Probably better than what they    09:39:25
said in that case.    09:39:28

Q.    Fair enough.  Fair enough.    09:39:28
Okay.  And if I can direct    09:39:35
your attention back to Tabak Exhibit 1.    09:39:42
Specifically page 2, paragraph 3.    09:39:46

A.    Yes.    09:39:50

Q.    Does that paragraph summarize    09:39:50
the opinions you're offering in this    09:39:53
matter?    09:39:56

A.    It does.    09:39:58

Q.    Okay.  Dr. Tabak, what is an    09:39:58
FDT test?    09:40:07

Page 15

DAVID TABAK

A.    So it stands for Ferrillo,    09:40:09
F-e-r-r-i-l-l-o, Dunbar Tabak.  It's a    09:40:14
test that two co-authors and I proposed a    09:40:18
while ago.  And it is meant to provide    09:40:22
evidence as to whether the price of a    09:40:25
security responds to news.    09:40:28

Q.    And in prior matters as a    09:40:33
testifying expert on issues of market    09:40:38
efficiency, you've employed the FDT test.    09:40:40
Is that correct?    09:40:44

A.    That is correct.    09:40:44

Q.    And you're aware of other    09:40:44
experts in market efficiency using the    09:40:46
FDT test to examine market efficiency.    09:40:49
Correct?    09:40:52

A.    That is also correct.    09:40:52

Q.    And is it fair to say that the    09:40:54
test is a standard application of    09:40:59
econometrics?    09:41:04

A.    Yes.    09:41:05

Q.    And is it also fair to say    09:41:05
that the FDT test was intended to mirror    09:41:08
traditional scientific inquiry with a    09:41:11
control group and a study group?    09:41:13

Page 16

DAVID TABAK

A.    Yes.    09:41:16

Q.    Okay.  And in the context of    09:41:16
market efficiency, the control group --    09:41:19
I'm sorry, let me start with the study    09:41:24
group.    09:41:26
The study group represents    09:41:27
days with company-specific news during a    09:41:28
class period.  Correct?    09:41:32

MR. HALL:  Objection.    09:41:33

A.    It's used generally during    09:41:34
class periods, but can be used in other    09:41:36
times.  But yes.    09:41:38

Q.    Okay.  And the control group    09:41:39
would be non-news days within the    09:41:41
relevant period.  That is, days with no    09:41:43
company-specific news.  Is that correct?    09:41:48

A.    Either no company-specific    09:41:50
news, or sometimes we'll say that some    09:41:53
company-specific news is not deemed to be    09:41:55
likely to be material.    09:41:58

Q.    Okay.  So you would agree with    09:41:59
me that a critical step in setting up an    09:42:04
FDT test is how one goes about    09:42:06
identifying news days.  Correct?    09:42:12

Page 17

DAVID TABAK

A.    Yes, I will agree.    09:42:15

Q.    And do you agree with the    09:42:18
principle that undercounting of news days    09:42:22
would increase the likelihood of a    09:42:26
security passing an FDT test?    09:42:28

A.    In general, no.    09:42:33

Q.    Why not?    09:42:34

A.    Because any type of random    09:42:36
error, or even that type of error of    09:42:41
undercounting of new days -- news days,    09:42:46
excuse me, will push the test against a    09:42:48
finding of market efficiency.  Basically    09:42:50
if you undercount news days, what you're    09:42:53
saying here, in the way that Dr. Mazumdar    09:42:55
and I performed this test, those days    09:42:58
would be put into the group categorized    09:43:00
as non-news.    09:43:03
So to the extent that those    09:43:05
days actually elicited a price response,    09:43:06
you will find an inflated percentage of    09:43:10
non-news days associated with a price    09:43:13
response.  Which will make that category    09:43:16
look more like the news days, therefore    09:43:20
making it harder to distinguish the two    09:43:22

5 (Pages 14 - 17)

Page 18

DAVID TABAK

statistically.

Q. So if I understand you correctly, so would that same principle apply to overinclusion of news days?

A. When you say overinclusion of news days, by overinclusion of news days, you mean counting actual days of no news as a news day?

Q. Correct.

A. Yes, because in that case the category that we're calling news days, will be days that don't have actual news, which will not engender any type of price movement, so the percentage of times that you see a price movement in the news day category will fall to be closer to what you see in the non-news day category. And that will make it harder to say that they are statistically different.

Q. Why would it make it harder to say that they are statistically different?

A. Well, as I said, the percentage of the news day category with

Page 19

DAVID TABAK

statistically significant price movement falls if you include non-news days that makes that percentage closer to the percentage that you see on the non-news days. The closer those two percentages are, the harder it is to say that they are different.

Q. Right. But why would it automatically make them closer? Let me try and make sure I understand the principle here.

A. Mm-hmm.

Q. If you're dealing with a ten-day class period, okay. And -- strike that. I'll construct the hypothetical later and we can try and nail this down.

A. I mean, I can try if you'd like.

Q. Please. Sure.

A. So you're right that by chance it can go in either direction. But on average, if you're including non-news days in the news day category, you will

Page 20

DAVID TABAK

typically be including days that do not have associated price movements, or statistically significant price movements. That will lower the percentage of the days in the news day category with statistically significant price movements, such that presumably you will get closer to the number that you see or the percent you see of the non-news day category. And if the two numbers are closer, then in general it will be harder to say through a statistical test that they are different.

Q. Okay.

A. You're right when you said, you know, it's not always, this is the expectation and what you expect to have happened. You can always, you know, certainly if you cherry-pick, you can move days one way or the other to go against this. But this is what you expect to see.

Q. Okay. Understood. So let me try and just reframe

Page 21

DAVID TABAK

this then. It's fair to say that the misclassification of news days versus non-news days decreases the reliability of the FDT test. Correct?

A. Well, it's in one direction. It makes it less likely to show a difference. It doesn't just make it randomly unreliable.

Q. Okay. Unless one is cherry-picking specifically to achieve a pass test. Correct?

A. If you're cherry-picking, presumably if the data allow, you can get almost any result you like.

Q. Dr. Tabak, you would agree that the academic literature on market efficiency confirms that earnings announcements generally should be treated as news days. Correct?

MR. HALL: Objection.

A. I don't know if that addresses the question of what should be a news day. But I would say that the academic literature generally says that there is

6 (Pages 18 - 21)

Page 22

DAVID TABAK

material news on most earnings 09:47:29 announcements. 09:47:32

Q. Okay. And you yourself in 09:47:33 conducting FDT tests begin with an 09:47:37 analysis of a company's earnings 09:47:42 announcements. Correct? 09:47:46

A. In the context of my reports 09:47:49 on market efficiency, for plaintiffs or 09:47:50 defendants, that is typically the first 09:47:53 line item. 09:47:55

Q. Okay. In fact, you've 09:47:55 previously opined that it would be 09:47:59 incorrect to exclude earnings 09:48:01 announcements days as potential news 09:48:02 events. Correct? 09:48:05

MR. HALL: Objection. 09:48:05

A. I assume you've got that from 09:48:06 somewhere. I don't remember where. But 09:48:08 all those things are, unless there is a 09:48:11 particular reason to, as opposed to just 09:48:13 blindly saying I will exclude them with 09:48:15 no reason. 09:48:17

Q. And you've also previously 09:48:18 opined that testing earnings 09:48:29

Page 23

DAVID TABAK

announcements is specifically called for 09:48:32 in the Cammer decision. Correct? 09:48:34

A. Yes, I think both of the 09:48:40 things you said are things that I either 09:48:41 stated or testified to in the Teva, 09:48:43 T-e-v-a, securities litigation. 09:48:46

Q. And you alluded to this 09:48:55 before, but the rationale for those views 09:48:57 is that days with earnings announcements 09:49:01 are more likely to be associated with a 09:49:03 statistically significant stock price 09:49:05 movement than days without news events. 09:49:07 Correct? 09:49:10

A. I think that's fair, yes. 09:49:12

Q. Okay. And do you recall 09:49:15 performing a study on the S&P 500 09:49:20 companies and whether they experienced 09:49:24 statistically significant price movements 09:49:27 on earnings announcements? I think it 09:49:29 was in 2018. Do you recall that study? 09:49:35

A. I'll take your word on the 09:49:37 date, it sounds about right. But yes, I 09:49:39 published a working paper through NERA, 09:49:41 N-E-R-A in capitals, my company, on that. 09:49:44

Page 24

DAVID TABAK

Q. And do you recall any of the 09:49:46 conclusions you reached in that study, 09:49:48 sitting here today? 09:49:50

A. I don't recall the specific 09:49:50 numbers. But generally it was that a 09:49:52 large fraction, but not all of the 09:49:53 earnings announcements were associated 09:49:56 with statistically significant price 09:49:58 movements. 09:50:00

Q. Do you recall that 97.5 09:50:04 percent of the S&P companies' securities 09:50:08 experienced at least one statistically 09:50:13 significant earnings -- one statistically 09:50:15 significant price movement on an earnings 09:50:18 day in the one-year period you studied? 09:50:20

MR. HALL: Objection. 09:50:23

A. First I studied multiple 09:50:23 one-year periods. I don't remember the 09:50:27 specific percentage. But if you say it's 09:50:28 97.5, that sounds reasonable to me. 09:50:30

Q. Okay. And do you recall that 09:50:32 you also concluded, or concluded I think 09:50:40 is probably the right verb, that the S&P 09:50:48 500 companies' securities experienced -- 09:50:57

Page 25

DAVID TABAK

experiencing three significant earnings 09:51:02 announcements within a year -- sorry. 09:51:04 Three statistically significant price 09:51:08 movement on earnings announcements, three 09:51:11 out of the four days, earnings days of a 09:51:14 given year, was the 50th percentile. Is 09:51:18 that correct? 09:51:24

A. I don't recall that. But I do 09:51:24 not dispute that. 09:51:25

Q. Okay. Can you, much more 09:51:26 articulately than I just said, explain 09:51:29 for me what that finding indicates. 09:51:32

A. I don't have that working 09:51:34 paper in front of me. But from how 09:51:36 you've described it, you can think of it 09:51:40 as saying that, if I understand it 09:51:42 correctly, and my memory is right, if you 09:51:44 ranked the S&P 500 companies by how 09:51:47 frequently they had a statistically 09:51:51 significant price movement on earnings 09:51:53 dates, and cut them into the upper half 09:51:56 and the lower half, the -- that cut would 09:52:00 go through the block that has three 09:52:03 statistically significant price movements 09:52:06

7 (Pages 22 - 25)

Page 26

DAVID TABAK

on the four earnings announcement dates. 09:52:08

Q. Okay. So based on your study, 09:52:11 it would be fair to say that a company 09:52:16 experiencing no statistically significant 09:52:20 price movement on any of its earnings 09:52:24 dates in a year would be unusual? 09:52:27

MR. HALL: Objection. 09:52:29

Q. Correct? 09:52:30

A. Either it would be unusual or 09:52:31 the test would be improperly specified, 09:52:35 is another possibility one should 09:52:37 consider. 09:52:39

Q. Assuming a test is properly 09:52:44 specified, it would be unusual. Correct? 09:52:47

A. Everything else held constant, 09:52:55 yes, that would be unusual. 09:52:58

Q. And in fact you yourself found 09:52:59 that only 2-1/2 percent of the S&P 500 09:53:00 companies would fall into this bucket of 09:53:05 no statistically significant price 09:53:08 movement in a given year. Correct? 09:53:09

MR. HALL: Objection. 09:53:12

A. You're representing that to 09:53:13 me. I will take your word that that is 09:53:14

Page 27

DAVID TABAK

the percentage that I found. 09:53:17

Q. Okay. And so what about -- 09:53:19 what if a company experiences no 09:53:22 statistically significant price movement 09:53:24 on earnings dates for two consecutive 09:53:26 years? 09:53:30

MR. HALL: Objection. 09:53:31

A. What is the question? 09:53:33

Q. As an economist, based on your 09:53:34 prior study, would it be 2.5 percent 09:53:39 times 2.5 percent to determine the 09:53:42 likelihood of that happening? 09:53:43

MR. HALL: Objection. 09:53:45

A. Only if you've assumed that 09:53:46 those events were independent. 09:53:48 Certainly, for example, if the test was 09:53:50 misspecified, it could be misspecified in 09:53:52 both years. And certainly if there was 09:53:55 some other fundamental reason why that 09:53:59 was the case, then it could also be true 09:54:02 in both years. 09:54:06

Q. Assuming the test was properly 09:54:07 specified, what's -- you made reference 09:54:12 to some other fundamental reason. What 09:54:17

Page 28

DAVID TABAK

do you mean by that? 09:54:20

A. For example, you might imagine 09:54:21 a holding company that -- where it 09:54:27 reports its earnings after the things 09:54:32 that it holds, so that it's no longer 09:54:35 really a surprise. 09:54:38

Q. Do you know if Vale S.A. is a 09:54:48 holding company that reports its earnings 09:54:51 after the things it holds reports its 09:54:53 earnings? 09:54:56

A. I don't believe that to be the 09:54:56 case. 09:54:57

Q. And were any of the S&P 500 09:54:58 companies you studied holding companies? 09:55:02

A. I don't believe so. 09:55:04

Q. Okay. So again, just as a 09:55:05 matter of statistics, in your opinion, 09:55:11 assuming it's properly specified and 09:55:13 assuming there is not some anomalous 09:55:15 holding company feature, if a company has 09:55:19 no statistically significant price 09:55:23 reaction on earnings dates for two 09:55:25 consecutive years, would that be -- the 09:55:27 likelihood of that would be 2-1/2 percent 09:55:32

Page 29

DAVID TABAK

times 2-1/2 percent? 09:55:35

MR. HALL: Objection. 09:55:36

A. Well, I gave the holding 09:55:37 company as an example. If you want to 09:55:39 exclude all other possible reasons why 09:55:41 the earnings surprises -- earnings 09:55:43 announcements may not be surprises to the 09:55:45 market, then -- I'm just thinking of 09:55:48 whether or not the two years are 09:55:54 independent. Certainly if they're 09:55:56 independent you are correct that it is 09:55:58 2-1/2 percent times 2-1/2 percent. I 09:56:00 think in general if you came to that 09:56:03 situation you may want to think about why 09:56:05 that occurs, and whether that reason 09:56:06 means they are independent or not. 09:56:13

Q. Would one explanation for why 09:56:15 that occurs be that the market for that 09:56:16 security in question is not efficient? 09:56:19

MR. HALL: Objection. 09:56:22

A. That is certainly a 09:56:23 possibility given no other information. 09:56:24

Q. Assuming the test is properly 09:56:29 specified, can you think, sitting here 09:56:31

8 (Pages 26 - 29)

Page 30

DAVID TABAK

today, can you think of any other reason to explain why a company that's not a holding company, would have no statistically significant price reaction to earnings announcements for two consecutive years?

MR. HALL: Objection.

A. I think the answer would generally be some form of the market anticipated the earnings well. Could be because the company updates guidance frequently, and therefore tends not to have earnings surprises. It could be because the earnings are very well tied to some type of index or commodity price, or exchange rate, such that the market is able to do a reasonable good job of anticipating what the earnings are in advance.

Q. Anything else?

A. There may be others, but sitting here those are the ones that come to mind.

Q. In all of your prior work as a

Page 31

DAVID TABAK

testifying expert on issues of market efficiency, have you ever seen a security you're examining have no statistically significant price reaction on eight -- I'm sorry, nine consecutive earnings announcements?

MR. HALL: Objection.

A. I don't recall seeing that. I can't say it's never happened, but I don't recall seeing that.

Q. Okay. I'm asking a more specific question. A study that you were retained to -- I'm sorry. A security that you were retained to examine. Have you ever seen that?

A. Not that I recall.

Q. Okay. And is it fair to say that you yourself have never concluded that a security with no statistically significant price reaction on nine consecutive earnings dates nevertheless passed an FDT test?

MR. HALL: Objection.

Page 32

DAVID TABAK

A. Well, first of all, if I don't recall ever having seen it, I certainly can't recall any prior time that I reached any conclusion about something I don't recall. Or may not have ever seen.

Q. So is the answer you yourself have never concluded, prior to this engagement, that a security with no statistically significant price reaction on nine consecutive earnings dates nevertheless passed the FDT test?

MR. HALL: Objection.

A. First of all, I don't want the implication here that I concluded it did pass the FDT test. I said it may be misspecified -- the test related to earnings may be misspecified and not relied upon. But I did not say in this case Vale -- any of Vale's securities passed the FDT test with respect to earnings announcements. Similarly, I do not believe I've ever said that in the past about any security for a company that, when we were looking at nine

Page 33

DAVID TABAK

consecutive earnings announcement dates with no statistically significant price movement on any of them.

Q. Okay. So with respect to your work here, it's true that you found zero earnings announcement days had statistically significant abnormal returns for Vale. Correct?

MR. HALL: Objection.

A. Correct. Although "found" may be a little improper, because those are the results that Dr. Mazumdar already had. I did not try to change those results.

Q. Okay.

A. In terms of directly reporting them.

Q. Okay. And that was true for the ADRs as well as all seven of the notes. Correct?

A. I believe that to be the case, but let me just double-check.

Q. Yeah. I think it's Exhibit 5.

A. You didn't photocopy this in

9 (Pages 30 - 33)

Page 34

DAVID TABAK

color.

Q. Sorry.

A. That is correct.

Q. Okay. You're skeptical of those conclusions though; correct?

A. I'm sorry, could you repeat the prior question, that made me look at Exhibit 5? Because Exhibit 5 is a summary. So I don't know if that answers it in full.

Q. Yeah. I just was asking you to confirm that there are no statistically significant abnormal returns on any of the nine earnings dates for either the Vale ADRs or the seven notes at issue here.

A. Right. So Exhibit 5 is just a summary of the FDT test, it doesn't tell me about each individual one. If you want I can go through it, but I'm also willing to take your representation that there are no such statistically significant returns for any of the notes or for the ADRs on any of the earnings

Page 35

DAVID TABAK

announcement dates.

Q. Okay. And your report expressed some skepticism about those results. Correct?

MR. HALL: Objection.

A. I don't know if it's directly the results or the methodology. But yes.

Q. Okay. Can you explain the root of that skepticism?

A. Sure. Let me just find the relevant exhibit. And it's Exhibit 4.

And what I noted here first, was that the index used by Dr. Feinstein, or on the nine earnings announcement dates, on eight of them the returns for the index used by Dr. Feinstein were either in the top or bottom 25 percent of those returns ordered over the class period. So rather than half, which is what you would expect if there was no relationship between an announcement by Vale and a movement in the Feinstein index, you have eight of nine. Which is unusual.

Page 36

DAVID TABAK

I looked at the top and bottom 10 percent. You had five of nine rather than roughly one. So that was also unusual.

And we looked at Dr. Mazumdar's index, it's a little unusual, but not particularly unusual.

Q. Okay. So focusing on the Feinstein industry index. If I understand you correctly, your study suggests there to be some correlation between Vale's earnings days and the statistical significant of returns for the Feinstein index. Is that correct?

A. I didn't even --

MR. HALL: Objection.

A. Technically I didn't look at the statistical significance of returns, I looked at the percentiles. Similar, but basically, yes, the Vale earnings announcement dates tended to be on the large movement dates of the Feinstein index, which is an industry index out of which he has already stripped Vale.

Page 37

DAVID TABAK

Q. So it's your understanding that Professor Feinstein stripped Vale out of his industry index?

A. Yes.

Q. Would it surprise you to learn that Vale was not part of the -- never part of the Feinstein industry index?

A. Maybe I got it backwards and Dr. Mazumdar stripped it out of his index. But I believe one was stripped.

Q. Did you look at the composition of the Feinstein industry index, which is the S&P Metals and Mining Select Industry Index?

A. I don't recall doing that.

Q. Okay. So you don't know sitting here today one way or the other whether Vale was part of that index?

A. Well, the index over here, either Vale was never part of it or it was stripped out of it. I don't know -- I would have to check originally whether it was part of the index.

Q. Okay. For right now I just

10 (Pages 34 - 37)

Page 38

DAVID TABAK

want to focus on the Feinstein industry index. Because you found some correlation that gave you concern with that index. Correct?

MR. HALL: Objection.

A. Yes, correct.

Q. And is it fair to say that that correlation you detected is enough for you to conclude that the Feinstein industry index was improperly specified?

MR. HALL: Objection.

A. Well, for earnings announcement dates it leads me to at least conclude that there is a question about whether it is improperly specified for that particular analysis.

Q. If I can direct your attention to paragraph 37 of your report.

A. Okay.

Q. So you're discussing only the Feinstein industry index in paragraph 37. Correct?

A. That is correct.

Q. Okay. And the last sentence

Page 39

DAVID TABAK

you state, "Using this index should be considered improperly specified and not to be relied upon."

Do you see that?

MR. HALL: Objection.

A. The sentence starts, by saying, "Thus the results of any FDT test of earnings announcements using this index," putting aside the phrasing of "using this index should be considered improperly specified."

Q. Right.

A. So the subject, you inadvertently missed it, is the subject of FDT tests, not necessarily other tests.

Q. Of earnings announcements?

A. Of earnings announcements, correct.

Q. Understood.

And you reached that conclusion based on the correlation you detected. Right?

A. Correct.

Page 40

DAVID TABAK

Q. But you didn't detect that same troubling correlation with the Mazumdar industry index. Correct?

MR. HALL: Objection.

A. It's slight, but would not be considered unusual.

Q. Okay. You understand that Vale's principal business is iron ore mining. Correct?

A. That is my understanding.

Q. Okay. Would it surprise you to learn that the Feinstein industry index had no iron ore mining companies in it?

MR. HALL: Objection.

A. Maybe a little. I hadn't thought of the question. Yes.

Q. So if the Feinstein industry index doesn't include Vale and doesn't include any mining ore -- iron ore mining companies, wouldn't that call into question the nature of this correlation you detected?

MR. HALL: Objection.

Page 41

DAVID TABAK

A. It's an interesting question because the whole point of an industry index is to somehow relate to the company in question. So I'd want to take a look back, I don't think I have it here, the market models, in other words, the original tests of how the various -- the ADRs and the various notes -- I'm sorry, the notes -- sorry, just the ADRs, moved with the Feinstein index. If there is a correlation, the question is, why, in the first place.

Q. Right.

Because you wouldn't expect to see that -- you wouldn't expect Vale to have some outsized impact on this industry index given that it's not included in it and there are no iron ore mining companies in it.

MR. HALL: Objection.

Q. And in fact, would it surprise you to learn that none of Vale's main competitors in the iron ore industry are in the Feinstein industry index?

11 (Pages 38 - 41)

Page 42

DAVID TABAK

MR. HALL: Objection.

A. I haven't looked at that. So maybe I'm not surprised one way or the other.

Q. Well, so I just want to take a step back.

A. Mm-hmm.

Q. I understand you detected this correlation between the Feinstein industry index and Vale earnings announcements. And based on that correlation, you determined that the results of any FDT test on earnings announcements using the Feinstein industry index should not be relied upon. Correct?

MR. HALL: Objection.

A. Yes.

Q. Okay. Turning to the Mazumdar industry index, you did not find that troubling correlation, correct? In fact, in your report you say this seems like a proper index to use. Right?

A. I don't know if I said --

Page 43

DAVID TABAK

MR. HALL: Objection.

A. -- those words, but I agree I did not find any, you know, substantial correlation.

Q. Let me direct your attention to paragraph 38 of your report.

A. Mm-hmm.

Q. You're discussing your examination of the Mazumdar industry index. And in the middle paragraph you say, quote, normally this would be considered a mark in favor of using this index. Do you see that? "Because it does not appear to be affected by Vale's earnings announcements."

A. Yes.

Q. And sitting here -- in preparing your report, did you examine the content of the Mazumdar industry index?

A. I did not.

Q. Okay. You're aware that it actually included Vale as a component. Correct?

Page 44

DAVID TABAK

A. Yes.

Q. And Professor Mazumdar excluded Vale when using this index?

A. That is correct.

Q. Because it would not have been proper to keep Vale in the index; would it have been?

A. It would not have been for this test.

Q. Okay. Would it surprise you to learn that included in the Mazumdar index were Vale's main competitors in the iron ore industry?

MR. HALL: Objection.

A. Again, it wouldn't surprise me one way or the other.

Q. In fact, all of the major iron ore mining companies in the world are included in the Mazumdar industry index.

MR. HALL: Objection.

Q. Is that surprising to you?

A. Not particularly.

Q. So I'm representing to you that to be the case. I want to direct

Page 45

DAVID TABAK

your attention to paragraph 88. 38, sorry.

A. Okay.

Q. I jumped ahead.

In the middle of paragraph 38, you raise the question, quote, which then leads to the question of whether the Mazumdar industry index is close enough, in quotes, to Vale to properly pick up external industry effects.

A. I see that.

Q. Now, given what I've just represented to you about the constituents in the Mazumdar industry index, do you stand by that -- the question raised in paragraph 38?

MR. HALL: Objection.

A. I stand by the question to the extent that I'd still want to understand what -- why it is that the Feinstein index seems to be moving a lot on the Vale earnings announcement dates. I would say that it's still a question I would like to have fully resolved. I

12 (Pages 42 - 45)

Page 46

DAVID TABAK

understand your point that it may resolve 10:12:57 to be that the Mazumdar index is fine. 10:12:59 But I think it's a bit of an open 10:13:01 question as to why the Feinstein index is 10:13:03 moving on the Vale earnings announcement 10:13:09 dates. And knowing the answer to that 10:13:11 may be helpful in understanding whether 10:13:13 the Mazumdar index is appropriate or not. 10:13:15

Q. That's where you lose me. Why 10:13:18 do your questions about the Feinstein 10:13:20 industry index, which we can stipulate is 10:13:22 not properly specified. 10:13:24

MR. HALL: Objection. 10:13:26

Q. Why does that raise any 10:13:27 question for you about the proper use of 10:13:31 the Mazumdar industry index? They're 10:13:35 totally unrelated. There is -- one 10:13:37 includes Vale, the proper one includes 10:13:41 Vale; the Feinstein one, which you have 10:13:44 questions about, does not include Vale. 10:13:46

MR. HALL: Objection. 10:13:48

Q. The Mazumdar industry index 10:13:48 includes Vale's main competitors in the 10:13:50 iron ore industry, the Feinstein industry 10:13:52

Page 47

DAVID TABAK

index does not. 10:13:55

The S&P itself thought that 10:13:56 the Mazumdar industry index, the S&P, 10:13:59 responsible for comprising this, 10:14:03 determined that it was, quote/unquote, 10:14:05 close enough to Vale to properly pick up 10:14:10 external industry effects. 10:14:12

Why -- what is your basis, 10:14:14 other than this anomalous correlation 10:14:16 with a totally different 10:14:18 plaintiff-sponsored industry index, why 10:14:22 would that give you any reason to 10:14:25 question the proper specification of the 10:14:27 Mazumdar industry index? 10:14:29

MR. HALL: Objection. 10:14:31

A. So the question is, what the 10:14:32 reason is for the movement of the 10:14:34 Feinstein industry index on the Vale 10:14:36 earnings announcement dates. If it's 10:14:39 just a fluke, then there is no problem 10:14:41 with the Mazumdar index. If there is 10:14:43 something happening over there, we would 10:14:47 want to know what it is and why whatever 10:14:48 that thing is does not appear in the 10:14:51

Page 48

DAVID TABAK

Mazumdar index. It might mean that the 10:14:53 Mazumdar index is fine, it might mean 10:14:56 that it is missing something. 10:14:59

Q. So if I understand that last 10:15:00 question you're saying, there is a 10:15:02 problem with the Feinstein industry 10:15:07 index. Correct? 10:15:10

MR. HALL: Objection. 10:15:11

A. Only in, as far as I can tell, 10:15:12 on earnings announcement dates, that it 10:15:15 moves a lot on the Vale earnings 10:15:18 announcement dates. 10:15:20

Q. And you don't know why that to 10:15:21 be the case. Correct? 10:15:22

A. Correct. 10:15:24

Q. And you don't detect that same 10:15:24 problem in the Mazumdar industry index. 10:15:28 Correct? 10:15:31

A. Also correct. 10:15:32

MR. HALL: Objection. 10:15:32

Q. So you want to know why you 10:15:33 didn't detect that problem in the 10:15:34 Mazumdar industry index, that's what's 10:15:36 giving you pause? 10:15:38

Page 49

DAVID TABAK

A. That is. Because maybe when 10:15:39 you say problem, you're talking about an 10:15:40 actual effect of some form. 10:15:41

Q. The bottom line, though, 10:15:49 whatever question you're raising about 10:15:51 the Mazumdar industry index is that 10:15:52 you're worried it does not sufficiently 10:15:55 account for Vale's industry. Is that 10:15:57 correct? 10:16:00

A. That is the possibility that 10:16:00 I'm raising, yes. 10:16:01

Q. That's the only possibility 10:16:02 you're raising? 10:16:03

A. That is correct. 10:16:04

Q. Okay. And you still have that 10:16:05 concern, notwithstanding, first, that 10:16:10 Vale -- S&P included Vale in the Mazumdar 10:16:13 industry index, correct, you still have 10:16:16 that concern? 10:16:18

MR. HALL: Objection. 10:16:19

A. I have that concern because of 10:16:19 this unexplained relationship coming from 10:16:21 the Feinstein index. Standing by itself, 10:16:23 if that's all I've seen, I would have no 10:16:26

13 (Pages 46 - 49)

Page 50

DAVID TABAK

issues with the Mazumdar index. I'm simply saying there is something happening with the Feinstein index and we would want to know what it is, whether it's a fluke, which is perfectly fine for the Mazumdar index, or some actual effect that we would want to consider when dealing with any industry index.

Q. Okay. Assuming the Feinstein correlation is a fluke.

A. In that -- let's me jump in.

MR. HALL: Objection.

A. In that case I have no problem with the Mazumdar index.

Q. And would it be fair to say that the results of any FDT test on Vale's earnings announcements using the Mazumdar industry index, would be valid. Correct?

MR. HALL: Objection.

A. Assuming there are no other issues to deal with, yes, they would be valid.

Q. Okay. Turning back to the

Page 51

DAVID TABAK

selection of -- I'm sorry, the identification of news days in connection with an FDT test. Here you provided an alternative news selections for FDT test. Correct?

A. That is correct.

Q. Okay. And as a first step, you define news days as days with stories published by the Dow Jones Newswire. Is that correct?

MR. HALL: Objection.

A. Dow Jones Newswires, yes.

Q. Wires, right.

And just for sake of ease today, I'll refer to Dow Jones Newswires as DJN. Is that okay?

A. That's fine with me.

Q. So when identifying Vale news days during the class period, you used only DJN. Correct?

MR. HALL: Objection.

A. That is correct.

Q. And was part of your decision to use only DJN informed by the fact that

Page 52

DAVID TABAK

DJN holds itself out as, quote, providing market-moving news?

MR. HALL: Objection.

A. I don't remember that exact phrase. But it is a well-known and important news source. But that particular phrase doesn't jump to mind.

Q. Okay. Well, let me state it differently then.

Did you use only DJN because you viewed DJN as more likely to be providing to the market material news?

A. More likely than what?

Q. Than other news sources.

MR. HALL: Objection.

A. Not necessarily. I think one of the main reasons that I said is that all stories on DJN are time stamped. So we know if they came out before, during or after market hours.

Q. Any other reason you selected DJN other than the use of time stamps?

A. I've used it in past cases, so I wasn't going to go around to look for a

Page 53

DAVID TABAK

different news source because I was in a new case.

Q. In past cases, other than the use of time stamps, was there any reason you selected DJN as the news source?

MR. HALL: Objection.

A. I probably have to go back to the first one. But as -- at least one if not the -- well, probably not the only. But a primary, broad-based news source provided by Factiva, F-a-c-t-i-v-a, which is the data vendor from which we get the information.

Q. Right.

You're aware that Professor Mazumdar used Factiva for his news searches here. Correct?

A. I am aware of that.

Q. And you've used Factiva in prior engagements to identify news days. Correct?

A. That is correct.

Q. Now, with respect to the time stamps, if a news report is disclosed

14 (Pages 50 - 53)

Page 54

DAVID TABAK

after market hours, do you treat it as 10:21:02 the news is happening on that day or the 10:21:07 following day? 10:21:09

A. We treat it as if the effect 10:21:10 will be seen on the next trading day. 10:21:12

Q. Okay. Now, you agree it's 10:21:15 possible to determine the timing of a 10:21:22 news story without a time stamp. 10:21:25 Correct? 10:21:27

MR. HALL: Objection. 10:21:28

A. Sometimes. 10:21:29

Q. In your opinion, did Professor 10:21:30 Mazumdar misdate any of the news days in 10:21:43 his study? 10:21:46

A. I think it's likely that he 10:21:47 misdated the dates of the Moody's credit 10:21:49 announcements. 10:21:54

Q. Okay. You think it's likely. 10:21:56 So you're not sure if he did or didn't? 10:21:58

A. Those do not have time stamps, 10:22:00 so I cannot be sure that he did it 10:22:02 correctly or that he did it incorrectly. 10:22:04

Q. You didn't do any independent 10:22:06 inquiry into when those -- that 10:22:09

Page 55

DAVID TABAK

information was disclosed to the market. 10:22:13 Correct? 10:22:15

A. We looked at the stories, they 10:22:16 did not have time stamps. 10:22:17

Q. Other than looking at the 10:22:21 stories and not seeing time stamps, did 10:22:23 you do any investigation as to when that 10:22:25 news was disclosed? 10:22:28

MR. HALL: Objection. 10:22:30

A. The only things we obviously 10:22:32 looked at the Dow Jones -- DJN stories to 10:22:35 see when they reported on Moody's. But 10:22:39 that's it. 10:22:42

Q. And there naturally would be a 10:22:44 lag in time between when Moody's 10:22:47 published its report and when DJN picked 10:22:50 it up. Correct? 10:22:53

A. The question is how 10:22:54 substantial a lag. I mean, it's not -- 10:22:55 DJN will not be instantaneous. 10:22:59

Q. Okay. Other than the Moody's 10:23:01 credit announcements, do you think 10:23:20 Professor Mazumdar misdated -- 10:23:23 potentially misdated any other news dates 10:23:26

Page 56

DAVID TABAK

here? 10:23:29

MR. HALL: Objection. 10:23:30

A. Well, when you say 10:23:30 "potentially," obviously anything without 10:23:32 a time stamp would potentially be 10:23:33 misdated. Because you don't know if it 10:23:36 came out before, during or after market 10:23:38 hours. 10:23:40

Q. Right. 10:23:40 I'm asking you, did you -- 10:23:41 other than the Moody's credit 10:23:44 announcements, are you raising any 10:23:46 question as to the proper dating of news 10:23:48 days identified by Professor Mazumdar? 10:23:52

A. I'm not raising questions with 10:23:55 respect to any specific ones. But I am 10:23:57 saying that if you make an assumption as 10:23:59 to whether something came out before, 10:24:02 during or after market hours, that is an 10:24:04 assumption. And it is possibly misdated. 10:24:07

Q. Is it your understanding that 10:24:11 Professor Mazumdar was making assumptions 10:24:12 about when news was published? 10:24:14

MR. HALL: Objection. 10:24:17

Page 57

DAVID TABAK

A. Certainly from Moody's. 10:24:17

Q. Other than Moody's, let me -- 10:24:20 other than Moody's? 10:24:25

A. I don't recall any other 10:24:26 assumptions. 10:24:27

Q. Did you review at all the 10:24:28 process that Professor Mazumdar undertook 10:24:32 in identifying news days here? 10:24:35

A. I tried. But it was 10:24:37 difficult. As I mentioned in my report, 10:24:41 in a footnote, he says that he used ten 10:24:44 news stories -- ten news sources. Five 10:24:47 that he said was well-known, and five 10:24:50 that he said were meant at various points 10:24:52 either to be those that frequently had 10:24:56 news or picked up other news. At another 10:24:58 point he said he meant to get all other 10:25:01 news. 10:25:04 So I just could not understand 10:25:04 how he got his ten sources and the news 10:25:06 that came from them. 10:25:10

Q. Could you understand -- are 10:25:11 you aware of any steps that Professor 10:25:15 Mazumdar took to verify the timing of 10:25:17

15 (Pages 54 - 57)

Page 58

DAVID TABAK

information disclosed to the market?      10:25:21

MR. HALL: Objection.      10:25:24

A.   Well, he certainly looked at      10:25:25
time stamps when they existed.      10:25:27

Q.   Anything else are you aware      10:25:29
of?      10:25:31

A.   Sitting here, not that I      10:25:33
recall.      10:25:35

Q.   You did review his report      10:25:35
though; right?      10:25:36

A.   I did.      10:25:37

Q.   And the exhibits. Correct?      10:25:37

A.   That is correct.      10:25:39

Q.   Okay.      10:25:40

A.   Okay, I mean, I do remember he      10:25:45
looked and tried to remove duplicates,      10:25:49
for example. Or repeated news or stale      10:25:51
news.      10:25:53

Q.   Anything else?      10:25:57

A.   That's what comes to minds.      10:25:58

Q.   All things being equal, would      10:26:07
you agree that the inclusion of more      10:26:09
reliable news sources would lead to a      10:26:12
clearer picture of news days in      10:26:16

Page 59

DAVID TABAK

connection with an FDT test?      10:26:22

MR. HALL: Objection.      10:26:24

A.   All things being equal, and if      10:26:29
there is no misdating issues, that will      10:26:31
pick up additional news. I think the      10:26:34
question is, when you're talking about      10:26:37
more reliable, news that is picked up      10:26:42
only by, you know, the marginal news      10:26:44
sources is less likely to be material.      10:26:46
So you do have the question, as we spoke      10:26:49
about earlier, Mr. Joralemon, about if      10:26:51
you take news that is not material and      10:26:55
treat it as a news day, you will bias the      10:26:58
test against a finding of a market      10:27:00
efficiency.      10:27:02

Q.   Okay. Let me try this again.      10:27:09
You used DJN to identify news      10:27:12
days. Correct?      10:27:15

A.   That is correct.      10:27:15

MR. HALL: Objection.      10:27:15

Q.   Do you agree that if you also      10:27:21
were to use the Wall Street Journal to      10:27:23
identify news days, that adding that      10:27:26
source would increase the accuracy of      10:27:27

Page 60

DAVID TABAK

identifying news days?      10:27:30

MR. HALL: Objection.      10:27:35

A.   So are we talking about Wall      10:27:35
Street Journal online with time stamps?      10:27:44
Can we assume that we know the time of      10:27:48
any Wall Street Journal article for your      10:27:50
question?      10:27:52

Q.   Yes.      10:27:52

A.   I think that -- put it this      10:27:54
way, either it will give you no      10:27:57
additional news days, which is      10:27:59
irrelevant, or it will give you      10:28:01
additional news days that were not picked      10:28:02
up by any source within DJN. And the      10:28:05
question is, is that because you're      10:28:10
picking up additional news that is likely      10:28:12
to be material, or additional news that      10:28:15
is likely not to be material but perhaps      10:28:17
just commentary in the Wall Street      10:28:21
Journal.      10:28:24

I think that's an empirical      10:28:24
question about whether the additional      10:28:26
news sources are picking up actual      10:28:27
factual, relevant information, or to the      10:28:31

Page 61

DAVID TABAK

extent that they are providing news that      10:28:34
no one else is picking up, whether that      10:28:36
is more in the nature of commentary or      10:28:39
discussion that should not be considered      10:28:42
material news.      10:28:44

Q.   Well, you would have to review      10:28:57
the article to determine that then;      10:28:59
wouldn't you?      10:29:00

A.   For any particular article, if      10:29:03
you wanted to know about any particular      10:29:07
article, yes, you would want to look at      10:29:09
that particular article. The other      10:29:13
question you can do is take a look at the      10:29:16
overall number of news days and think      10:29:18
about -- this is not necessarily, you      10:29:20
know, a purely objective question,      10:29:22
whether there are just a lot of news days      10:29:24
there that seems unusual.      10:29:27

And I admit that there is no      10:29:30
clear way to do that. But, you know, if      10:29:31
you're getting over, let's say, a third      10:29:35
of the days in the class period being      10:29:37
news days, that might seem kind of high.      10:29:39

Q.   So I just want to take a step      10:29:43

16 (Pages 58 - 61)

Page 62

DAVID TABAK

back to my earlier question.

Do you have an opinion, assuming time stamps is not an issue, would an economist be more accurately identifying news days by using not only DJN but also the Wall Street Journal?

MR. HALL: Objection.

A.  Can I ask just one thing to clarify?

Q.  Sure.

A.  When you say "news days," do you mean, you know, potentially material and value relevant news, or just any news story independent of whether it's potentially or likely to be material and value relevant?

Q.  Well, in using only DJN here, you were trying to identify potentially material and value relevant news. Correct?

MR. HALL: Objection.

A.  Correct.

Q.  So is it fair to say that in constructing an FDT test, that is the

Page 63

DAVID TABAK

goal of an economist. Correct?

A.  That would be the goal, yes.

Q.  Okay. So back to my initial question.

Would adding the Wall Street Journal as a news source increase the likelihood that you are accurately identifying days with potentially material and value relevant news?

MR. HALL: Objection; asked and answered.

A.  Well, it increases two probabilities: That you are finding days with material and value relevant news and then calling them news days, and that you are identifying days with news that is not material and potentially value relevant and calling them news days.

Q.  And sitting here today, do you have any view as to the relative probabilities of those two scenarios, using the Wall Street Journal?

MR. HALL: Objection.

A.  Using the Wall Street Journal.

Page 64

DAVID TABAK

Again, as an additional news source on top of Dow Jones News, I like to base my opinions on evidence and fact, so I'm going to say I don't have a strong opinion.

Q.  And the same is true for Bloomberg?

MR. HALL: Objection.

A.  I will say that's true for many things. But the more you add, the more likely it is when you come up with a news story that only one source or your last additional source has, the more likely it is that that story is not material, value relevant news, because we've gone through a whole bunch of other sources that have not picked it up.

Q.  Right.

So wouldn't -- if news is picked up by DJN and the Wall Street Journal and The New York Times and Reuters, that increases your confidence in the materiality of that news. Correct?

Page 65

DAVID TABAK

MR. HALL: Objection.

A.  Yes.

Q.  So why doesn't that counsel in favor of using more of these identified news sources?

A.  Well, that question doesn't follow from your previous question, Mr. Joralemon.

You asked if it was picked up by all of them. And what you're saying is over -- what Dr. Mazumdar did is he included news that was picked up by any of them. That's different. If you said what if I only counted news that was picked up by, I believe you listed four sources, would that increase your confidence that the news you're picking up is material, value relevant news, I would say yes.

Q.  Right.

That was the foundation of all the questions I was asking you prior. I'm asking about you. You're conducting an FDT test.

17 (Pages 62 - 65)

Page 66

DAVID TABAK

A. Mm-hmm.

Q. And you said you've sort of recently relied on only DJN, but you previously relied on Factiva that aggregated all these other reliable sources, including the Wall Street Journal?

MR. HALL: Objection.

A. I don't think I said that.

Q. Which part?

A. I don't think I said I relied on a broader Factiva. But I said DJN comes -- or we get DJN from Factiva.

Q. Okay. Let me clarify. In prior engagements, not this engagement, prior engagements, isn't it true that you've used news sources beyond DJN?

A. I would have to check. I think there was another source from Factiva. But I'd have to look. And DJN does repeat -- does republish or is the source for others. But I'm not sure about that, I'd have to take a look at

Page 67

DAVID TABAK

the prior report that you're referring to.

Q. So just to reset. It's gotten a little convoluted here. I'm asking you, not what Professor Mazumdar did, but what you would do in constructing an FDT test, wouldn't adding the Wall Street Journal as a news source increase your confidence that you're identifying news with material -- I'm sorry, days with material news?

MR. HALL: Objection.

A. No, not necessarily. Because again, it's adding it. If you're saying -- the things that are being added are stories that the Wall Street Journal has but are not in any of the sources picked up by DJN, that's what it means to add another news day. Correct.

Q. No, no. I'm saying identifying news days. You don't know if they're going to add news days. But if a given day, there is news about Vale

Page 68

DAVID TABAK

appearing both in DJN and the Wall Street Journal, doesn't that increase your confidence that that is a news day?

MR. HALL: Objection.

A. That is a different question.

Q. That's the question I'm asking you.

A. With all due respect I don't think it was the question that you asked before. But this question, if a news story appears in both DJN and the Wall Street Journal, that does increase my confidence that that story is likely to be material and value relevant.

Q. And just to clarify, I wasn't asking you -- when I said "add," I wasn't saying adding new days, I was saying adding news sources to identify news days.

MR. HALL: Objection.

A. Yes. But when you say add news sources to identify news days, that's different from saying news that appears in both. When you say add news

Page 69

DAVID TABAK

sources to identify news days, do you mean I should take the union of the stories from both news sources or the intersection? In other words, stories that appear in one or both, or just stories that appear in both? What do you mean when you say add the news source?

Q. Well, you don't know, right, as an economist you don't know at the outset what these news sources are going to identify as news days. Correct? You're not starting from the end and working back; are you?

MR. HALL: Objection.

A. No. But let's put it this way, your question is unclear. When you say adding news source, does that mean that I am going to identify news stories that appear in both the original and the news source as news days, or ones that appear in either or both? What do you mean by add a news source?

Q. That's up to you.

A. Ah.

18 (Pages 66 - 69)

Page 70

DAVID TABAK

Q. You're -- let me just reset here.

Before you know whether your search is going to identify a day as a news day, you identify the source you're going to look at. Correct? Here you used DJN.

A. That is correct.

Q. Okay. My -- this whole series of questions to you was, if you were to add the Wall Street Journal or whatever other reliable news source you identified, and I didn't give you the next part, like you can either aggregate them and say, you know, were there multiple hits across multiple sources, I'm going to use those news days. You can do it however you want. But whatever you choose to do, doesn't that increase your confidence in the exercise of identifying news days?

MR. HALL: Objection.

A. And the answer is not necessarily.

Page 71

DAVID TABAK

Q. Why not necessarily?

A. Because you said I can choose what to do. One of the things to choose to do is to say as long as something appears in any news source, if I have ten news sources and now I have an eleventh news source, and that gives me an extra day, what I'm saying is, that is a story that appeared only in source number 11, not in any of the first ten, do I believe that is a material, value relevant event? Maybe, if source 11 is particularly good at picking them up. But maybe not because it's a story that the first ten did not pick up and that might be a story that is only tangentially related to the company in question.

So the answer is no, I cannot say it will necessarily improve the selection of news days.

Q. Right.

But how would you go about improving the selection of news days if you're using multiple sources? Let's try

Page 72

DAVID TABAK

it that way.

MR. HALL: Objection.

A. That is an interesting question.

One thing to do is, which I've done over here, and take a look at the top 50 percent, top 25 percent, top 10 percent, and basically say I will limit my analysis to news stories that appear repeatedly, whether in the same or in multiple sources. And repeatedly doesn't mean the exact same thing. But more stories on the same day, or the same effective trading day.

Q. Okay. So if you were to use multiple reliable sources, you can do sort of a counting similar to your 50th, 25th and 10th percentile, correct, and sort of across publications news stories occurring on a given day. Is that right?

MR. HALL: Objection.

A. That is correct.

MR. JORALEMON: Now would be a good time for a quick break if

Page 73

DAVID TABAK

you're ready.

THE VIDEOGRAPHER: Off the record at 10:40. Marking the end of Media Unit No. 1.

(A recess was taken.)

THE VIDEOGRAPHER: On the record at 11:10. This marks the beginning of Media Unit No. 2.

Please proceed.

BY MR. JORALEMON:

Q. Dr. Tabak, in your experience as a testifying expert on issues of market efficiency, can you give me a general sense of, on a percentage basis, how many days within a given class period you identify as news days for purposes of an FDT test?

MR. HALL: Objection.

Q. Just based on your experience.

A. It depends. On earnings announcements, it's going to be about 1-1/2 to 2 percent, probably. Of trading days. On the other news when we go down from the full amount to often the bottom

19 (Pages 70 - 73)

Page 74

DAVID TABAK

10 percent, the number varies. We'll often start with something around half, perhaps, less probably. And work our way down to, you know, maybe six days. That's not a percentage. But it would be a much smaller number. I don't have a particular percentage in mind.

Q. When you say work your way down, you're referring to that 10 percent cutoff you used in this case?

A. Yes.

Q. Okay. So I'm just going to run through a few of your prior engagements and ask you if these percentages sound accurate.

A. It looks like you have a spreadsheet there.

Q. Very rudimentary chart.

You recall being engaged in the PPG case?

A. I do.

Q. And there your FDT test identified 37 percent of the class period as being news days.

Page 75

DAVID TABAK

Does that sound accurate to you?

MR. HALL: Objection.

A. I wouldn't say the FDT test. It's the news search that identifies the news days.

Q. Fair enough. The news search in preparation for conducting the FDT test.

A. That's before looking at any percentages such as top 50 percent?

Q. Correct.

A. I have no reason to dispute that.

Q. Okay. And in the Teva case, you identified 51 percent of the class period as news days. Does that sound right?

MR. HALL: Objection.

A. I don't recall, but I have no reason to dispute that.

Q. And in the GE case, 70 percent of the 730-day class period you identified as news days.

Page 76

DAVID TABAK

MR. HALL: Objection.

A. Again, I don't recall, but I have no reason to dispute that sitting here.

Q. 23.6 percent in the Oracle case.

MR. HALL: Objection.

A. Same answer.

Q. 46 percent news days out of the class period in Qualcomm.

MR. HALL: Objection.

A. Same answer.

Q. 89 percent of the Alibaba class period you identified as news days. Does that sound right to you?

MR. HALL: Objection.

A. Which Alibaba case?

Q. Alibaba A, the first one.

A. I remember it was a very high percentage.

Q. And in the -- your report in this case, do you know how many -- what percent of the days you are identifying as news days?

Page 77

DAVID TABAK

MR. HALL: Objection.

A. It was a much smaller percentage.

Q. It's 7 percent. Does that sound right? 41 out of 572 days in the class period.

A. That's -- those are the correct figures. And then I think your percentage is correct.

Q. Do you have any explanation for why the percentage of news days in this case is so much smaller than your prior engagements?

MR. HALL: Objection.

A. Yes.

Q. What is it?

A. Vale is a mining company, basically. They're selling a commodity that has a fixed price, generally, in the market. So it's not as if there is that much they can do, for example, to change prices the way, you know, other companies can change the prices of their products.

They also, you know, when

20 (Pages 74 - 77)

Page 78

DAVID TABAK

you've got a worldwide commodity, there is less, I think, in terms of getting particular customers. You're selling into the worldwide market at, you know, a generally fixed price for you. If you lose one customer, you'll probably be able to sell it to some other customer, that's the way commodities work.

So unlike others like Qualcomm that sells chips, you know, if they have a deal with Apple, that's great. If they don't have a deal with Apple, that's bad. Vale doesn't have many of those same issues.

Q. And that leads you to believe that they would be in the news less?

A. Yes.

MR. HALL: Objection.

Q. You understand Vale's a Fortune 500 company. Right?

A. Yes.

Q. That it has operations around the world. Right?

A. That's my understanding.

Page 79

DAVID TABAK

Q. And has senior leadership that gives speeches or step down or change positions. Correct?

A. I would assume so.

Q. Okay. And those are newsworthy events. Correct?

MR. HALL: Objection.

A. Speeches? It depends on what the content of the speech is.

Q. Change in senior leadership, let's use that one.

MR. HALL: Objection.

A. It may be.

Q. Are you saying that change in the CEO of a Fortune 500 company may not be a newsworthy event for that company's security?

MR. HALL: Objection.

A. It depends whether it was planned and so forth. It certainly could be an important event.

Q. And Vale regularly announced its earnings every quarter. Right?

A. That is correct.

Page 80

DAVID TABAK

Q. Where you discussed, those are news days. Correct?

MR. HALL: Objection.

A. Yes.

Q. And of course Vale is a high risk industry. Correct?

MR. HALL: Objection.

Q. You understand the mining industry comes with its specific set of operational risks. Correct?

A. Without getting into the details of this case, yes, I understand that.

Q. And certainly to the extent there is a realization of an operational risk, that would be a newsworthy event for the company. Correct?

MR. HALL: Objection.

A. Obviously -- I mean, a material realization, you know, mine -- mine shuts down for an hour because of something, no. But a material realization, absolutely.

Q. Collapse of a dam would be a

Page 81

DAVID TABAK

material realization. Correct?

A. I would say in general, yes.

Q. Now, so turning now to the 41 -- your use of DJN and the identification of 41 news days during the 572-day class period, are you aware that eight of the nine earnings announcements during the class period were not identified as news days by your DJN search?

MR. HALL: Objection.

A. I was not.

Q. Does that surprise you?

A. I can say both yes and no. Yes, because typically we expect that. But no, in the sense that that is consistent with there not being price movements on the earnings announcement dates because the market basically doesn't learn much new information, is a possibility.

Q. So we're talking about two different things here. It's not a question of price movement, it's a question of whether there is a news

21 (Pages 78 - 81)

Page 82

DAVID TABAK

report about Vale's earnings.

MR. HALL: Objection.

Q. It doesn't mean the price has to move, right? We're only talking about identifying news days now; aren't we?

A. Okay, so -- I see what you're saying. Yeah, then that does surprise me.

Q. It surprises me too.

Are you aware that using the Mazumdar news days, though, all nine earnings announcements are considered news days. Are you aware of that?

MR. HALL: Objection.

A. I was not aware of that.

Q. In fact, those, all nine of those days would be in your articulation of the top 10 percent, if you were to take the top 10 percent of the Mazumdar news days, all of those earnings announcements would be in the top 10 percent. That's what you would expect. Correct?

MR. HALL: Objection.

Page 83

DAVID TABAK

A. It may or may not be. It's not -- I wouldn't say it's particularly surprising.

Q. Doesn't that suggest to you, sir, that the Mazumdar approach to identifying news days more accurately identified news days, at least with respect to the earnings announcements?

MR. HALL: Objection.

A. I think it's circular if you ask about the earnings announcements. You're saying does the Mazumdar index news search pick up earnings announcements, and you're saying it does.

Q. What about the broader question? Leave the earnings -- relying on the fact that his approach actually identifies the earnings announcements as news days, and your approach doesn't, doesn't that suggest to you that his approach more accurately identifies news days?

MR. HALL: Objection.

A. It's an interesting question

Page 84

DAVID TABAK

because again, we know that the stock price is not moving on the earnings announcements. So the question is whether the market actually thinks of them as news or for some reason believes that it already has the information. I really want to think about that.

I understand your point. But there is a counterpoint, that you're providing in some sense an additional piece of information, I believe, that the earnings announcements are not treated as news by the market.

Q. Well, respectfully, sir, isn't that putting the cart before the horse? Surely you're not suggesting that the Dow Jones Newswire's editors see that Vale announces earnings and decides they're not going to report it because the market's not likely to react to it? Does that make sense to you as an economist?

MR. HALL: Objection.

A. I would find it unusual.

Q. Okay. So you weren't

Page 85

DAVID TABAK

suggesting that, were you, in your prior response?

A. I would want to understand why it's not picked up.

Q. But it can't be because the market is not going to react to it. Can it?

MR. HALL: Objection.

A. You know, at this point I just can't say why it isn't picked up, so I'm not going to include or exclude anything automatically. But I understand your concern.

Q. Are you aware that during the class period, Vale's CEO stepped down?

A. Yes, I generally recall that.

Q. Okay. And are you aware that your DJN approach to identifying news days did not capture that news as a news day?

MR. HALL: Objection.

A. I was not aware.

Q. Okay. Are you surprised by that?

22 (Pages 82 - 85)

Page 86

DAVID TABAK

A.   A little, yes.

Q.   Are you aware that Professor Mazumdar's approach did identify the departure of Vale's CEO as a news day?

A.   I was not aware of that.

Q.   Do you know when Dam 1 collapsed?

A.   Was it January 29th or something like that?  Near the end of the class period.

Q.   It was January 25, 2019.

A.   Okay.

Q.   Are you aware that your DJN approach to identifying news days did not identify January 25, 2019 as a news day here?

MR. HALL:  Objection.

A.   I was not aware of that.

Q.   Isn't that shocking?

MR. HALL:  Objection.

A.   I'd want to check -- it was a middle of the day collapse, I don't know when the first news stories came out.

Q.   Okay.  I will represent to you

Page 87

DAVID TABAK

that the collapse occurred 10:30 in the morning New York time.  On January 25th, a trading day.

So with that information, are you not shocked that the DJN approach you adopted here did not identify January 25th as a news day?

MR. HALL:  Objection.

A.   I'm surprised.

Q.   Now, turning to your use of the 10 percent, 25 percent and 50 percent cutoffs.  If I understand your report, you believe that the number of news stories on a day is a proxy for the materiality of news.  Is that correct?

MR. HALL:  Objection.

A.   That is correct.

Q.   Okay.  And you -- the only support you cite for that proposition is the Griffin article.  Correct?

A.   I cite the Griffin article.  I don't -- sitting here I don't know if that's the only thing I cite in support of that.

Page 88

DAVID TABAK

Q.   Well, other than you yourself having done this in prior reports, are you aware of any other academic support for the suggestion that the number of news stories in a day is a proxy for the materiality of the news that day?

A.   Sitting here I don't know.  I could look through the literature on content analysis.  But I believe that's a fairly extensive literature on that.  And I just don't know it sitting here.

Q.   Fairly extensive literature on content analysis or fairly extensive literature in support of your proposition?

MR. HALL:  Objection.

A.   I would want to take a look.  You know, there is Krippendorf, who's written that the frequency with which the concept appears is a measure of the importance of the concept.  I've got Griffin over here.  I believe there are others.  But I just don't -- I haven't memorized them.

Page 89

DAVID TABAK

Q.   What was the first source you referred to?

A.   Krippendorf.

Q.   Krippendorf.  Is that cited in your report?

A.   I don't believe so.

Q.   Did you rely on Krippendorf in offering any of your opinions here?

A.   Well, I relied on the literature on content analysis broadly, without specifically citing anyone other than Griffin.

Q.   And you read the Griffin, et al. article?

A.   Correct.  I did.

Q.   Okay.  Isn't it true that that study suggests simply that days with any news better explain price volatility than having no news articles at all?

MR. HALL:  Objection.

Q.   Do you understand my question?

A.   Can I have it back.

Q.   I can just read it again.

A.   That's fine.

23 (Pages 86 - 89)

Page 90

DAVID TABAK

Q. Isn't it true that the study 11:27:34 suggests simply that days with any news 11:27:35 better explain price volatility than 11:27:40 having no news at all on a day? 11:27:43

MR. HALL: Objection. 11:27:45

A. No. And if you take a look at 11:27:45 the quote I have in footnote 33. 11:27:47

Q. Okay. 11:27:50

A. On page 19. 11:27:52

Q. Okay. 11:28:00

A. The quote is, five lines from 11:28:01 the bottom of the footnote, says, quote, 11:28:03 Panel A in figure 2 shows that most 11:28:05 developed markets are to the left with a 11:28:08 greater fraction of return volatilities, 11:28:11 quote, explained, end quote, by news days 11:28:14 and article counts on those news days, 11:28:17 end quote. 11:28:22

Q. Okay. 11:28:22

A. Article counts is exactly what 11:28:23 I'm doing here. 11:28:26

Q. Okay. So this quote is -- the 11:28:27 first part of that quote refers to a news 11:28:33 day versus a non-news day. Correct? 11:28:36

Page 91

DAVID TABAK

A. No. The first part of the 11:28:41 quote is about what's being explained. 11:28:45 The end of the quote talks about news 11:28:47 days and article counts on those news 11:28:49 days. 11:28:51

Q. Right. 11:28:51

Just so the record is clear 11:28:52 and the court understands your reliance 11:29:04 on Griffin. You are representing that 11:29:06 that study stands for the proposition 11:29:10 that having two articles on a given day 11:29:13 is more likely to suggest materiality 11:29:20 than having one article on that same day. 11:29:22 Correct? 11:29:24

MR. HALL: Objection. 11:29:24

A. It says here that -- 11:29:25

Q. Sir, I'm not asking you what 11:29:29 it says there. 11:29:31

A. Mm-hmm. 11:29:31

MR. HALL: Objection. 11:29:33

Q. Do you understand my question? 11:29:34 I can repeat it. 11:29:36

It is your testimony, as 11:29:39 reflected in your report, that the 11:29:42

Page 92

DAVID TABAK

Griffin article stands for the 11:29:44 proposition that having two articles on a 11:29:46 given day is more likely to suggest 11:29:48 materiality than having one article on 11:29:51 that same day? 11:29:53

MR. HALL: Objection. 11:29:54

A. Yes, because it talks about 11:29:55 article counts being more likely to 11:29:57 explain price movements. And as long as 11:30:00 we believe that price movements are 11:30:02 explained by material news, that follows. 11:30:04

Q. Okay. Are you aware that in 11:30:05 that Griffin study they used the same 11:30:19 news sources as Professor Mazumdar uses 11:30:21 here? 11:30:23

MR. HALL: Objection. 11:30:24

Q. Were you aware of that? 11:30:27

MR. HALL: Objection. 11:30:31

A. I'm not sure that's true. I 11:30:35 would have to see that. Because -- I 11:30:37 would like to see if they use Moody's 11:30:39 credit announcements, for example. 11:30:42

Q. So is your answer you're not 11:30:47 aware of that? 11:30:48

Page 93

DAVID TABAK

A. I am not aware of that. And I 11:30:50 would like to see that before, you know, 11:30:53 agreeing to that. 11:30:56

Q. Okay. Surely you're aware 11:30:57 that the Griffin study does not use 11:31:00 simply one news source, such as DJN. 11:31:02 Correct? 11:31:06

MR. HALL: Objection. 11:31:06

A. I believe that's correct. 11:31:08

Q. Okay. 11:31:08

A. Because they are looking 11:31:09 internationally. 11:31:10

Q. Okay. So back to the concept 11:31:26 that the number of news stories on a day 11:31:28 is a proxy for the materiality of the 11:31:30 news. 11:31:33

So it follows from that, I 11:31:33 take it, that a day with one news story 11:31:38 likely has less material news than a day 11:31:43 with three news stories. Correct? 11:31:48

A. Correct. 11:31:50

MR. HALL: Objection. 11:31:51

Q. And those 10 percent, 25 11:31:52 percent, 50 percent thresholds you used, 11:32:00

24 (Pages 90 - 93)

Page 94

DAVID TABAK

they're arbitrary. Right?   11:32:04

A.   I've used probably many, if   11:32:08 not all of them, in the past.  And   11:32:11 they're not, you know, completely random   11:32:12 things like, you know, 21.4 percent.  So   11:32:15 yes, which ones you use can be arbitrary,   11:32:21 but there is a reasonably limited set of   11:32:25 choices.   11:32:27

Q.   Right.   11:32:27

But an economist can make   11:32:27 different choices than 10 percent, 25   11:32:29 percent and 50 percent; correct?   11:32:31

MR. HALL:  Objection.   11:32:33

Q.   There is no magic to those   11:32:34 three cutoffs.  Isn't that right?   11:32:36

A.   That is fair.  There are some   11:32:37 others, maybe 33.3 percent.   11:32:39

Q.   Okay.  And you had mentioned   11:32:43 just a moment ago that you used all three   11:32:46 of those in prior engagements.   11:32:47

A.   Did I say I have or may have?   11:32:51

Q.   I have used probably many, if   11:32:54 not all of them, in the past.   11:32:55

A.   Okay.   11:32:57

Page 95

DAVID TABAK

Q.   So are you aware of not using   11:32:58 one of those thresholds prior to this   11:33:00 engagement?   11:33:02

MR. HALL:  Objection.   11:33:03

A.   Not offhand.  I haven't looked   11:33:04 through all of my prior reports.   11:33:06

Q.   Would it surprise you to learn   11:33:07 that you've never used a 25 percent   11:33:09 cutoff prior to this report?   11:33:11

A.   Maybe a little.  But again, I   11:33:18 haven't looked through all of my prior   11:33:22 reports.   11:33:24

Q.   Okay.  I'll just represent to   11:33:27 you you've never, or at least we've never   11:33:29 been able to find any report you've ever   11:33:31 filed where you've used a 25 percent   11:33:34 cutoff.   11:33:35

Assuming that to be true, why   11:33:37 did you use 25 percent cutoff here?   11:33:40

A.   Probably just to add to the   11:33:53 number of rows.   11:33:54

Q.   What rows?   11:33:56

A.   In the various exhibits.   11:33:57

Q.   What's the benefit of having   11:34:02

Page 96

DAVID TABAK

more rows?   11:34:04

A.   You get more things to look   11:34:06 at.  I know in some cases, you know,   11:34:08 opposing experts have argued I should do   11:34:10 other things.  So, you know, just to give   11:34:13 more information to the finder of fact.   11:34:21

Q.   Did anyone suggest to you that   11:34:23 you should use 25 percent here to add   11:34:25 another row?   11:34:27

A.   No, that would have been my   11:34:30 own thought and my own decision.   11:34:31

Q.   So other than adding another   11:34:50 row for the finder of fact, was there any   11:34:51 reason you adopted the 25 percent   11:34:55 threshold here even though you've never   11:34:58 done it in any other report before?   11:35:00

MR. HALL:  Objection.   11:35:02

A.   That would be the main reason,   11:35:03 to provide more information.   11:35:04

Q.   You just said that would be   11:35:07 the main reason.   11:35:10

A.   That would be the only reason   11:35:11 that I can think of.   11:35:12

Q.   Okay.  Again, I'm sorry, not   11:35:13

Page 97

DAVID TABAK

to belabor this.  But you just said it   11:35:21 was your decision.  Correct?   11:35:23

A.   Correct.   11:35:24

Q.   Okay.  And you equivocate in   11:35:25 your last response, you said that would   11:35:29 be the only reason I can think of.   11:35:32

Sitting here today, do you   11:35:34 know the reason you chose 25 percent?   11:35:35

MR. HALL:  Objection.   11:35:37

A.   I just think I usually don't   11:35:38 have only three rows in a block.  I'd   11:35:39 have to look at my prior reports.   11:35:42

Q.   So what are you looking at   11:35:45 when you're referring to rows?   11:35:47

A.   The DJN all, DJN top 50   11:35:49 percent, DJN top 25 percent and DJN top   11:35:52 10 percent.   11:35:56

Q.   And what exhibit is that?   11:35:56

A.   This one, it doesn't matter,   11:35:58 why don't we say 6-A.   11:36:01

Q.   And so I'm just really, I   11:36:04 apologize, I'm just trying to make sure I   11:36:07 understand this.   11:36:08

Is it the case that you just   11:36:10

25 (Pages 94 - 97)

Page 98

DAVID TABAK

used all, 50 and 10 here and you looked at the charts you generated and you felt like there weren't enough rows so you added a 25 percent cutoff?

MR. HALL: Objection.

A. I don't remember the timing of this. Whether I had decided on those four categories before or after looking at the results. I just don't remember.

Q. You do recall submitting reports in other engagements where you only had a 10 percent, 50 percent and all row, though; don't you?

MR. HALL: Objection.

A. I don't remember offhand, but I believe you if you say that's the case.

Q. Okay. If I can direct your attention to Exhibit 5-A of your report. Sorry, 6-A.

A. Okay.

Q. And starting with the -- looking at the DJN section of this chart, the lower portion. And starting with your top 10 percent.

Page 99

DAVID TABAK

Do you see that row?

A. I do.

Q. And the total number of days is 3 in the top 10 percent. Is that correct?

A. Total number of news days?

Q. Correct.

A. Yes.

Q. Now, help me out here. DJN all is 41 news days. Correct?

A. Correct.

Q. And top 10 percent would be 4.1 news days. Correct?

MR. HALL: Objection.

A. If you could cut it that way, yes.

Q. Okay. So 3 is not actually top 10 percent, it's top 7-1/2 percent; isn't it?

MR. HALL: Objection.

A. Because you can't get 4.1. Even getting 4 -- put it this way: If you got three days in a row that have the same number of news stories, either take

Page 100

DAVID TABAK

all of those days or you exclude all of those days from the top 10 percent. So your choices may, for example, be 3 or 6, for example. If days 4, 5 and 6 all had the same number of news days.

Q. Right.

So it's a misnomer to call it top 10 percent of the news days; isn't it?

MR. HALL: Objection.

Q. It's actually the top 7-1/2 percent?

A. Because you've -- well, because you can't distinguish between days that have the same number of news stories. The goal is the top 10 percent. And then you have to either include or exclude a block.

Q. I understand. I understand. I'm just saying, the math doesn't work. Calling it the top 10 percent when it's really the top 7-1/2 percent of the news days, there is a disconnect there. So I just want to make

Page 101

DAVID TABAK

sure you're comfortable in representing to the court that when you say top 10 percent, what you really mean is, within the top 10 percent, subject to how many articles we're actually talking about. Is that correct?

MR. HALL: Objection.

A. It's explained in footnote 10 that describes this. But, you know, this was the target in some sense. And if we're not going to break up a set of days with a same number of news stories, that is the result.

Q. Okay. And then just looking at the top 25 percent, that's 6 of 41. Which if my math is correct, is actually the top 15 percent. Correct?

MR. HALL: Objection.

A. That would be approximately 15 percent.

Q. So what you're calling the top 25 percent of news days is actually the top 15 percent of news days here. Is that right?

26 (Pages 98 - 101)

Page 102

DAVID TABAK

MR. HALL: Objection.    11:40:19

A.    Again, those were the    11:40:20 categories that, you know very well, I've    11:40:21 used in every report or in various    11:40:24 reports. And you're right, when we have    11:40:26 to move a block either in or out, that    11:40:27 means we're not going to get exactly 10    11:40:30 percent or 25 percent.    11:40:32

Q.    Calling something top 25    11:40:39 percent when it's actually top 15 percent    11:40:41 of the actual data is misleading; isn't    11:40:45 it?    11:40:47

MR. HALL: Objection;    11:40:48 mischaracterizes the report and his    11:40:49 testimony.    11:40:50

A.    I think the footnote explains    11:40:51 what's going on. Anyone could see what's    11:40:53 here. We could call it the target top 25    11:40:55 percent if you'd like, if that would make    11:40:57 it clearer for you.    11:40:59

Q.    And again, just to sort of    11:41:00 close this out. Top 50 percent is 15 of    11:41:02 41, which is actually the top 37 percent.    11:41:05 Right?    11:41:08

Page 103

DAVID TABAK

MR. HALL: Objection.    11:41:10

A.    That sounds correct.    11:41:10

Q.    Approximately.    11:41:12

A.    It's clearly less than 40    11:41:13 percent, I can do that math. I'll take    11:41:14 your word on it.    11:41:16

Q.    Dr. Tabak, you would agree    11:41:44 that a news item with no information    11:41:46 content related to a company should not    11:41:50 be treated as a news day when running a    11:41:53 test for market efficiency. Correct?    11:41:56

MR. HALL: Objection.    11:41:58

A.    If you're going to look at it    11:41:59 subjectively, I would exclude that. If    11:42:00 you've got a rule that says we're not    11:42:02 going to review these subjectively, then    11:42:05 you do whatever the rule says and don't    11:42:08 make an adjustment.    11:42:10

Q.    Okay. Where you're doing what    11:42:13 you call an objective exercise, and that    11:42:18 objective exercise captures reports with    11:42:21 no information content on a company, what    11:42:25 does that do to the FDT test?    11:42:29

MR. HALL: Objection.    11:42:33

Page 104

DAVID TABAK

A.    It will tend to bias it    11:42:34 against a finding of efficiency.    11:42:36

Q.    It will decrease the accuracy    11:42:38 of it. Correct?    11:42:40

MR. HALL: Objection.    11:42:40

A.    Only in one direction.    11:42:41

Q.    Understood.    11:42:42

A.    But your question was increase    11:42:44 the accuracy is, as you would say about    11:42:46 these top, you know, top 10, 25 percent,    11:42:49 misleading by itself because it only    11:42:52 decreased the accuracy in one way.    11:42:54

Q.    Well, that's not true, is it,    11:42:56 sir? Let's actually take a look    11:42:58 specifically at what you identify as a    11:43:01 news day under your objective approach.    11:43:06 January 30, 2019. Your DJN search    11:43:11 identified three articles. Okay? I'll    11:43:16 represent that to you. You can confirm    11:43:19 it in your report if you wish.    11:43:21

A.    I don't think that I have the    11:43:25 details on a day-by-day basis in the    11:43:26 report, so I don't think I can confirm it    11:43:29 sitting here.    11:43:31

Page 105

DAVID TABAK

Q.    I'll represent to you that for    11:43:32 the record, January 30, 2019, your search    11:43:33 identified three separate articles.    11:43:36 Okay?    11:43:40

A.    I will take your    11:43:40 representation.    11:43:41

Q.    So that put it in what you    11:43:42 call the top 10 percent. Is that    11:43:43 correct?    11:43:46

A.    I don't know.    11:43:46

MR. HALL: Objection.    11:43:47

A.    I will take your    11:43:47 representation on that.    11:43:48

Q.    Are you familiar with an    11:44:08 entity known as CEMIG, C-E-M-I-G?    11:44:09

A.    It doesn't ring a bell.    11:44:14

Q.    The headline on January 30th    11:44:19 from one of those news reports was that    11:44:23 Fitch ratings, "CEMIG's ratings    11:44:26 unaffected by Vale dam collapse." Okay?    11:44:29

Just based on that headline    11:44:34 alone, do you have any view as to whether    11:44:36 that report had any information content    11:44:38 concerning Vale?    11:44:42

27 (Pages 102 - 105)

Page 106

DAVID TABAK

MR. HALL: Objection.

A. The headline suggests it probably does not.

Q. And so just back to the question about your suggestion that it can only skew the results one way.

A. I did not say that. I said it tends to. We spoke earlier, if you cherry-pick you can move the results either way. But the tendency is to make it a bias against efficiency.

Q. But even if you don't cherry-pick, even if the economist is not cherry-picking, couldn't an error such as this skew the results in favor of passing an FDT test?

MR. HALL: Objection; misrepresents.

A. Yes. Putting aside what you're calling an error. I'm saying the person who's looking at these things can be cherry-picking, which tends to move one way -- to focus on. Yes, if you decide to look through all the dates,

Page 107

DAVID TABAK

yes, you will find some where what you are calling an error or a dispute about the categorization, will go in favor of efficiency and will go against efficiency.

Q. Here, though, assuming this one article, if you were to do a review of it and find that it contains no news about Vale, it would reduce the count on that day from 3 to 2. Correct?

MR. HALL: Objection.

A. Assuming that you weren't following the protocol here, but you have a new protocol where you're going to review stories, then this is the cherry-picking question. If you're going to tell me just review this one story and not all other stories to move them one way or the other, I -- you are correct. But you're cherry-picking what to review in this hypothetical.

Q. Okay. Well, thank you for that.

But I'm asking about this day.

Page 108

DAVID TABAK

We have a limited number of days we can work with, right. You've only identified --

A. There are 500 --

Q. One day, one day, in the top 10 percent, that had a statistically significant price reaction. Correct? One day. Out of 572 class period days.

MR. HALL: Objection.

Q. Right? I have that right?

A. That is correct.

Q. Okay. So with all due respect, sir, I can only work with what you've given me. On this day, one of the counts you're including as a news story is not in fact a news story.

MR. HALL: Objection.

A. But you're still missing the whole cherry-picking point. Perhaps you should look at other days that would also have been excluded that would make having two days just put this in the top. Perhaps you should look at, you know -- that is part of it.

Page 109

DAVID TABAK

You know, you have to look at all the days. You can't just take the one that is in favor of market efficiency and look at that without looking at the ones that do not support market efficiency. Such as the two other days here that do not have a statistically significant price movement. You're attacking the one day in favor of market efficiency but not addressing the two days that go the other way.

Q. Oh, no, I completely agree with you that all of the days should be addressed. I agree. I think that's the challenge we have here.

MR. JORALEMON: Let's take a quick break.

THE VIDEOGRAPHER: Off the record at 11:48.

(A recess was taken.)

THE VIDEOGRAPHER: On the record at 12 noon.

Please proceed.

MR. JORALEMON: Dr. Tabak,

28 (Pages 106 - 109)

Page 110

DAVID TABAK

thank you for your time today,    12:00:28
always a pleasure to see you.  I    12:00:29
have no further questions for you.    12:00:31
    THE WITNESS: Pleasure talking    12:00:33
with you, Mr. Joralemon.    12:00:34
    MR. HALL: Nothing for me.    12:00:36
Thank you.    12:00:37
    THE VIDEOGRAPHER: This    12:00:38
concludes today's testimony given    12:00:38
by David Tabak, as stipulated by    12:00:40
all parties.  The total number of    12:00:42
media units used was two, and will    12:00:43
be retained by Veritext Legal    12:00:45
Solutions.  We are off the record    12:00:47
at 12 noon.    12:00:49
    (Time noted:  12:00 p.m.)

Page 111

STATE OF _____ )
            ss:
COUNTY OF _____ )

    I, DAVID TABAK, the witness herein,
having read the foregoing testimony of
the pages of this deposition, do hereby
certify it to be a true and correct
transcript, subject to the corrections,
if any, shown on the attached page.

_____
    DAVID TABAK

Subscribed and sworn to before me

This _____ day of _____, 2023.

_____
    Notary Public

Page 112

    C E R T I F I C A T E
STATE OF NEW YORK   )
        : ss.
COUNTY OF NEW YORK  )

    I, ERIC J. FINZ, a Shorthand
Reporter and Notary Public within and for
the State of New York, do hereby certify:
    That DAVID TABAK, the witness whose
deposition is hereinbefore set forth, was
duly sworn by me and that such deposition
is a true record of the testimony given
by the witness.
    I further certify that I am not
related to any of the parties to this
action by blood or marriage, and that I
am in no way interested in the outcome of
this matter.
    IN WITNESS WHEREOF, I have hereunto
set my hand this 13th day of November, 2023.


            ERIC J. FINZ

Page 113

    E X H I B I T S
DESCRIPTION                    PAGE
(Tabak Exhibit 1 for            10
identification, Rebuttal Expert
Report of David I. Tabak, Ph.D.)

29 (Pages 110 - 113)

Page 114

INSTRUCTIONS TO WITNESS

Please read your deposition over carefully and make any necessary corrections. You should state the reason in the appropriate space on the errata sheet for any corrections that are made.

After doing so, please sign the errata and date it.

You are signing same subject to the changes you have noted on the errata sheet, which will be attached to your deposition.

It is imperative that you return the original errata sheet to the deposing attorney within thirty (30) days of receipt of the deposition transcript by you. If you fail to do so, the deposition transcript may be deemed to be accurate and may be used in court.

Page 115

ERRATA

I wish to make the following changes for the following reasons:

PAGE LINE

____ ____ CHANGE _____
        REASON:_____

____ ____ CHANGE _____
        REASON:_____

____ ____ CHANGE _____
        REASON:_____

____ ____ CHANGE _____
        REASON:_____

____ ____ CHANGE _____
        REASON:_____

____ ____ CHANGE _____
        REASON:_____

____ ____ CHANGE _____
        REASON:_____

____ ____ CHANGE _____
        REASON:_____

____ ____ CHANGE _____
        REASON:_____

____ ____ CHANGE _____
        REASON:_____

_____
DAVID TABAK
Subscribed and sworn to before me
this _____ day of _____, 2023.
_____

30 (Pages 114 - 115)

**[& - able]** Page 1

**&**

**&** 2:6 3:8 4:23 5:25

**1**

**1** 4:14 10:15,16 10:20 11:9,13 14:17 73:5 86:7 113:4
**1-1/2** 73:23
**10** 36:3 72:8 74:2,10 82:19 82:20,22 87:12 93:24 94:12 97:18 98:2,13 98:25 99:5,13 99:19 100:3,9 100:17,22 101:3,5,9 102:8 104:11 105:9 108:7 113:4
**10022** 3:4
**10036** 6:19
**10166** 3:9
**10:30** 87:2
**10:40** 73:4
**10th** 72:19
**11** 71:10,13
**1166** 6:17
**11:10** 73:8
**11:48** 109:20
**12** 109:23 110:16
**12:00** 110:17

**13th** 112:20
**15** 101:18,20,24 102:11,23
**16975** 112:23
**17** 10:22
**19** 1:8 4:21 90:10

**2**

**2** 11:13,20,20 14:18 73:9,23 90:14 107:11
**2-1/2** 26:19 28:25 29:2,13 29:13
**2.5** 27:11,12
**200** 2:7 3:9 4:23
**2018** 23:21
**2019** 86:12,16 104:18 105:3
**2023** 1:12 2:2 4:5 10:23 111:19 112:20 115:23
**21.4** 94:6
**23.6** 76:6
**25** 35:18 72:8 86:12,16 87:12 93:24 94:12 95:9,17,20 96:9,15 97:9 97:17 98:5 101:16,23 102:9,10,19 104:11

**25th** 72:19 87:3 87:8
**27** 11:9
**29th** 86:9

**3**

**3** 14:18 99:5,18 100:4 107:11
**30** 104:18 105:3 114:17
**30th** 105:18
**33** 90:8
**33.3** 94:18
**37** 38:19,22 74:24 102:24
**38** 43:7 45:2,6 45:17

**4**

**4** 35:12 99:23 100:5
**4.1** 99:14
**4.1.** 99:22
**40** 103:5
**41** 77:6 81:4,6 99:11 101:16 102:24
**46** 76:10

**5**

**5** 33:24 34:9,9 34:18 98:19 100:5
**50** 72:8 75:12 87:12 93:25 94:13 97:16 98:2,13 102:23

**500** 23:17 24:25 25:19 26:19 28:14 78:21 79:16 108:5
**50th** 25:7 72:18
**51** 75:17
**526** 1:8 4:21
**572** 77:6 81:6 108:9

**6**

**6** 97:21 98:20 100:4,5 101:16

**7**

**7** 77:5
**7-1/2** 99:19 100:12,23
**70** 75:23
**730** 75:24

**8**

**8** 1:12 2:2 4:5
**800** 3:4
**88** 45:2
**89** 76:14

**9**

**97.5** 24:11,21
**9:28** 2:2 4:5

**a**

**a.m.** 2:2 4:5
**abello** 3:13
**able** 30:18 78:8 95:16

**[abnormal - appearance]**

**abnormal** 33:8
  34:14
**absolutely**
  80:24
**academic** 21:17
  21:24 88:4
**accommodate**
  7:4
**account** 49:9
**accuracy** 59:25
  104:4,10,13
**accurate** 7:21
  74:16 75:2
  114:21
**accurately** 62:5
  63:8 83:7,22
**achieve** 21:11
**action** 5:6 7:25
  8:19 9:18 12:5
  112:16
**actual** 18:8,13
  49:4 50:7
  60:24 102:12
**actually** 17:20
  43:24 83:18
  84:5 99:18
  100:12 101:6
  101:17,23
  102:11,24
  104:15
**add** 64:11
  67:21,24 68:17
  68:22,25 69:8
  69:23 70:12
  95:21 96:9

**added** 67:17
  98:5
**adding** 59:24
  63:6 67:9,16
  68:18,19 69:18
  96:13
**additional** 59:6
  60:12,14,17,18
  60:23 64:2,14
  84:11
**address** 6:15,17
**addressed**
  109:15
**addresses**
  21:22
**addressing**
  109:11
**adjustment**
  103:19
**admit** 61:20
**adopted** 87:7
  96:15
**adrs** 33:20
  34:16,25 41:9
  41:10
**advance** 30:20
**affected** 43:15
**affiliations**
  5:13
**afriere** 3:12
**aggregate**
  70:15
**aggregated**
  66:6

**ago** 15:5 94:20
**agree** 4:13
  16:22 17:2,3
  21:16 43:3
  54:7 58:23
  59:22 103:8
  109:13,15
**agreeing** 93:4
**ah** 69:25
**ahead** 45:5
**al** 89:15
**alibaba** 76:14
  76:18,19
**allow** 21:14
**alluded** 23:8
**alternative**
  51:5
**amanda** 3:12
  5:21
**americas** 6:18
**amount** 73:25
**analysis** 22:6
  38:17 72:10
  88:10,14 89:11
**andrew** 3:11
  5:20
**announced**
  79:23
**announcement**
  26:2 33:2,7
  35:2,15,22
  36:22 38:14
  45:23 46:6
  47:20 48:11,13
  81:18

**announcements**
  21:19 22:3,7
  22:15 23:2,10
  23:20 24:8
  25:3,5 29:8
  30:6 31:7
  32:22 39:9,18
  39:19 42:12,15
  43:16 50:18
  54:18 55:23
  56:13 73:22
  81:8 82:13,22
  83:9,12,15,19
  84:4,13 92:23
**announces**
  84:19
**anomalous**
  28:20 47:10
**answer** 7:14
  30:9 32:7 46:7
  70:24 71:19
  76:9,13 92:24
**answered**
  63:12
**answers** 34:10
**anticipated**
  30:11
**anticipating**
  30:19
**apologize** 97:23
**appear** 43:15
  47:25 69:6,7
  69:20,22 72:10
**appearance**
  5:11

**appearances** 5:13
**appeared** 71:10
**appearing** 68:2
**appears** 11:6 68:12,25 71:6 88:21
**apple** 78:12,13
**application** 15:19
**apply** 18:5
**appreciated** 14:8
**approach** 83:6 83:18,20,22 85:19 86:4,15 87:6 104:17
**appropriate** 14:12 46:9 114:7
**approximately** 101:20 103:4
**arbitrary** 94:2 94:7
**argued** 96:5
**article** 8:13,16 8:18 60:7 61:8 61:10,12,13 87:21,22 89:15 90:18,21 91:5 91:14 92:2,5,9 107:8
**articles** 89:20 91:12 92:3 101:6 104:19

105:4
**articulately** 25:12
**articulation** 82:18
**aside** 39:10 106:20
**asked** 63:11 65:10 68:10
**asking** 31:12 34:12 56:11 65:23,24 67:6 68:7,17 91:18 107:25
**assist** 6:24
**associated** 17:22 20:3 23:11 24:8
**assume** 22:18 60:6 79:5
**assumed** 27:15
**assuming** 26:14 27:23 28:19,20 29:24 50:10,22 62:4 95:19 107:7,13
**assumption** 56:18,21
**assumptions** 56:23 57:6
**attached** 111:11 114:13
**attacking** 109:10

**attention** 11:8 11:18 14:17 38:18 43:6 45:2 98:19
**attorney** 5:15 114:17
**attorneys** 3:3,8
**audio** 4:10
**authored** 8:12
**authors** 15:4
**automatically** 19:10 85:13
**avenue** 2:7 3:4 3:9 4:24 6:18
**average** 19:24
**aware** 8:4,25 15:13 43:23 53:16,19 57:24 58:6 81:7 82:11,14,16 85:15,18,23 86:3,6,14,19 88:4 92:13,18 92:25 93:2,5 95:2

**b**

**b** 6:17 8:14 113:2
**back** 11:14 14:17 41:6 42:7 50:25 53:8 62:2 63:4 69:14 89:23 93:14 106:5

**backwards** 37:9
**bad** 78:13
**bajha** 8:14
**base** 64:3
**based** 12:15 26:3 27:10 39:23 42:12 53:11 73:20 105:22
**basically** 17:13 36:21 72:9 77:19 81:19
**basis** 47:9 73:15 104:23
**beginning** 5:14 73:9
**behalf** 5:18 6:2
**belabor** 97:2
**believe** 8:3,25 9:20 11:13 12:21 13:8 28:12,16 32:23 33:22 37:11 65:16 71:11 78:16 84:12 87:14 88:10,23 89:7 92:11 93:10 98:17
**believes** 84:6
**bell** 105:17
**bello** 3:12 5:21
**benefit** 95:25
**better** 14:13 89:19 90:4

**[beyond - class]**                                          Page 4

**beyond**  66:18
**bias**  59:14
  104:2 106:12
**bit**  46:4
**blindly**  22:22
**block**  25:24
  97:12 100:19
  102:7
**blood**  112:16
**bloomberg**
  64:8
**bottom**  35:18
  36:2 49:5
  73:25 90:13
**break**  7:3,8
  72:25 101:12
  109:18
**briefing**  13:3,6
  13:12,16,22
  14:2,6
**briefly**  9:21
**broad**  53:11
**broader**  66:13
  83:16
**broadly**  89:11
**bucket**  26:20
**bunch**  64:17
**business**  6:14
  6:17 40:9

**c**

**c**  3:2 53:12
  105:16 112:2,2
**caat**  6:2
**call**  40:22
  100:8 102:19

103:21 105:9
**called**  23:2
**calling**  18:12
  63:16,19
  100:22 101:22
  102:10 106:21
  107:3
**cammer**  23:3
**capitals**  23:25
**capture**  85:20
**captures**
  103:22
**cardoso**  3:18
  5:22
**carefully**  114:5
**cart**  84:16
**case**  4:21 14:11
  14:14 18:11
  27:21 28:13
  32:20 33:22
  44:25 48:15
  50:14 53:3
  74:11,21 75:16
  75:23 76:7,18
  76:23 77:13
  80:13 97:25
  98:17
**cases**  52:24
  53:4 96:4
**categories**  98:9
  102:4
**categorization**
  107:4
**categorized**
  17:17

**category**  17:23
  18:12,17,18,25
  19:25 20:7,11
**cause**  14:2
**caveat**  7:5
**cemig**  105:16
**cemig's**  105:20
**ceo**  79:16 85:16
  86:5
**certainly**  10:3
  20:20 27:17,19
  29:11,22 32:3
  57:2 58:4
  79:21 80:15
**certification**
  9:25 12:20
  13:4,12
**certify**  111:9
  112:8,14
**challenge**
  109:16
**chance**  19:22
**change**  33:14
  77:22,24 79:3
  79:11,15 115:6
  115:7,9,10,12
  115:13,15,16
  115:18,19
**changes**  114:12
  115:3
**chart**  74:19
  98:23
**charts**  98:3
**chase**  3:13 5:20

**check**  33:23
  37:23 66:20
  86:22
**cherry**  20:20
  21:11,13
  106:10,14,15
  106:23 107:17
  107:21 108:20
**chips**  78:11
**choices**  94:9,12
  100:4
**choose**  70:20
  71:3,4
**chose**  97:9
**christopher**
  3:10 5:17
**circular**  83:11
**cite**  87:20,22,24
**cited**  89:5
**citing**  89:12
**civ**  1:8
**cjoralemon**
  3:11
**clarify**  62:10
  66:15 68:16
**class**  6:3 9:14
  9:18,25 11:22
  12:5,19 13:4
  13:11 16:9,12
  19:15 35:19
  51:20 61:23
  73:16 74:24
  75:17,24 76:11
  76:15 77:7
  81:6,9 85:16

**[class - correct]** Page 5

86:11 108:9

**clear** 61:21 91:8

**clearer** 58:25 102:21

**clearly** 103:5

**close** 45:9 47:7 102:23

**closer** 18:17 19:4,6,11 20:9 20:12

**collapse** 80:25 86:23 87:2 105:21

**collapsed** 86:8

**colleagues** 5:20

**color** 34:2

**come** 30:23 64:12

**comes** 58:21 66:14 80:10

**comfortable** 101:2

**coming** 49:23

**commentary** 60:20 61:4

**commodities** 78:9

**commodity** 30:16 77:19 78:2

**companies** 23:18 24:12,25 25:19 26:20 28:15,15 40:14

40:22 41:20 44:19 77:23

**company** 16:8 16:17,18,20 23:25 26:4 27:4 28:4,9,21 28:21 29:5 30:3,4,12 32:24 41:4 71:18 77:18 78:21 79:16 80:18 103:10 103:23

**company's** 22:6 79:17

**competitors** 41:24 44:13 46:24

**complaint** 9:18 12:5

**complete** 7:21 11:7

**completely** 94:5 109:13

**component** 43:24

**composition** 37:13

**comprising** 47:5

**concept** 88:21 88:22 93:14

**concern** 38:4 49:17,20,22 85:14

**concerning** 9:24 105:25

**conclude** 38:10 38:15

**concluded** 24:23,23 31:20 32:8,15

**concludes** 110:10

**conclusion** 32:5 39:23

**conclusions** 24:3 34:6

**conducting** 22:5 65:24 75:9

**confidence** 64:23 65:18 67:10 68:4,14 70:21

**confirm** 34:13 104:20,24

**confirms** 21:18

**connection** 10:6 13:3 51:3 59:2

**consecutive** 27:6 28:24 30:7 31:6,23 32:11 33:2

**consider** 12:10 26:13 50:8

**considered** 11:15 39:3,11 40:7 43:13

61:5 82:13

**consistent** 81:17

**consolidated** 9:18 12:5

**constant** 26:16

**constituents** 45:14

**construct** 19:16

**constructing** 62:25 67:8

**contains** 107:9

**content** 14:3 43:20 79:10 88:10,14 89:11 103:10,23 105:24

**context** 16:3 22:8

**continue** 4:11

**control** 15:25 16:4,14

**conversations** 4:9

**convoluted** 67:5

**correct** 7:18 9:15,16 10:2 12:2,3,6,7,24 15:11,12,16,17 16:9,17,25 18:10 21:5,12 21:20 22:7,16 23:3,14 25:8 26:9,15,22

29:12 33:9,11 33:21 34:4,6 35:5 36:15 38:5,7,23,24 39:20,25 40:4 40:10 42:17,22 43:25 44:5 48:8,15,16,19 48:20 49:10,15 49:19 50:20 51:6,7,11,21,23 53:18,22,23 54:10 55:3,18 58:13,14 59:19 59:20 62:21,23 63:2 64:25 67:21 69:12 70:7,9 72:19 72:23 75:13 77:9,10 79:4,7 79:25 80:3,7 80:11,18 81:2 82:24 87:16,18 87:21 89:16 90:25 91:15 93:8,10,21,22 94:13 97:3,4 99:6,8,11,12,14 101:7,17,18 103:3,12 104:5 105:10 107:11 107:20 108:8 108:12 111:9

**corrections** 111:10 114:6,8

**correctly** 13:17 18:4 25:18 36:11 54:23

**correlation** 36:12 38:4,9 39:23 40:3,23 41:12 42:10,13 42:22 43:5 47:10 50:11

**counsel** 4:16 5:12 6:6 7:9 65:4

**count** 107:10

**counted** 65:15

**counterpoint** 84:10

**counting** 18:8 72:18

**counts** 90:18 90:21 91:5 92:9 108:16

**county** 111:4 112:4

**course** 80:6

**court** 1:2 4:20 5:2 6:5 10:13 91:9 101:3 114:21

**court's** 12:18

**credit** 54:17 55:23 56:12 92:23

**critical** 16:23

**crossed** 9:5

**crutcher** 2:6 3:8 4:23

**curiosity** 13:24

**customer** 78:7 78:8

**customers** 78:4

**cut** 25:22,23 99:16

**cutoff** 74:11 95:10,18,20 98:5

**cutoffs** 87:13 94:16

**cv** 4:21

**cweidner** 3:14

**d**

**dam** 80:25 86:7 105:21

**data** 21:14 53:13 102:12

**date** 23:23 114:10

**dated** 10:22

**dates** 25:22 26:2,7 27:6 28:23 31:23 32:11 33:2 34:15 35:2,16 36:22,23 38:14 45:23 46:7 47:20 48:11,13 54:17 55:25 81:19 106:25

**dating** 56:14

**david** 1:11 2:4 4:1,15 5:1 6:1 6:7,16 7:1 8:1 9:1 10:1,18,21 11:1 12:1 13:1 14:1 15:1 16:1 17:1 18:1 19:1 20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1 47:1 48:1 49:1 50:1 51:1 52:1 53:1 54:1 55:1 56:1 57:1 58:1 59:1 60:1 61:1 62:1 63:1 64:1 65:1 66:1 67:1 68:1 69:1 70:1 71:1 72:1 73:1 74:1 75:1 76:1 77:1 78:1 79:1 80:1 81:1 82:1 83:1 84:1 85:1 86:1 87:1 88:1 89:1 90:1 91:1 92:1 93:1 94:1 95:1 96:1 97:1 98:1 99:1 100:1 101:1

102:1 103:1
104:1 105:1
106:1 107:1
108:1 109:1
110:1,11 111:6
111:15 112:9
113:6 115:22
**day** 18:9,16,18
18:25 19:15,25
20:6,11 21:24
24:16 54:3,4,6
59:14 67:21,25
68:4 70:5,6
71:9 72:14,15
72:21 75:24
81:6 85:21
86:5,16,23
87:4,8,15 88:6
88:7 90:5,25
90:25 91:12,14
92:4,6 93:15
93:19,20
103:11 104:17
104:23,23
107:11,25
108:6,6,9,15
109:10 111:19
112:20 115:23
**days** 16:8,15,16
16:25 17:4,11
17:11,14,16,20
17:22,24 18:5
18:7,7,8,12,13
19:3,6,25 20:2
20:6,21 21:3,4

21:20 22:15
23:10,13 25:6
25:6 33:7
36:13 51:3,9,9
51:20 53:21
54:14 56:15
57:9 58:25
59:19,24 60:2
60:12,14 61:15
61:18,23,24
62:6,12 63:9
63:14,16,17,19
67:12,23,24
68:18,20,23
69:2,12,21
70:18,22 71:21
71:24 73:16,17
73:24 74:5,25
75:7,18,25
76:10,15,24,25
77:6,12 80:3
81:6,10 82:6
82:12,14,18,21
83:7,8,20,23
85:20 86:15
89:18 90:3,17
90:18 91:5,6
99:4,7,11,14,24
100:2,3,5,6,9
100:16,24
101:12,23,24
108:2,9,21,23
109:3,7,12,14
114:17

**deal** 50:23
78:12,13
**dealing** 19:14
50:9
**decertification**
9:15 11:22
**decide** 106:25
**decided** 98:8
**decides** 84:19
**decision** 12:18
23:3 51:24
96:12 97:3
**decrease** 104:4
**decreased**
104:13
**decreases** 21:4
**deemed** 16:20
114:20
**defendant** 4:17
**defendants** 2:5
3:8 5:19 14:10
22:10
**define** 51:9
**departure** 86:5
**depends** 73:21
79:9,20
**deposed** 6:21
6:21
**deposing**
114:17
**deposition** 1:11
2:4 4:15,22
111:8 112:10
112:11 114:4
114:14,18,20

**depth** 9:21
**described**
25:16
**describes**
101:10
**description**
113:3
**details** 80:13
104:23
**detect** 40:2
48:17,23
**detected** 38:9
39:24 40:24
42:9
**determine**
27:12 54:8
61:8
**determined**
42:13 47:6
**developed**
90:15
**dhall** 3:6
**difference** 21:8
**different** 18:20
18:23 19:8
20:14 47:11
53:2 65:14
68:6,24 81:23
94:12
**differently**
52:10
**difficult** 57:11
**direct** 11:8
14:16 38:18
43:6 44:25

98:18

**directing** 11:18

**direction** 19:23
21:6 104:7

**directly** 33:17
35:7

**directs** 7:13

**disclosed** 53:25
55:2,9 58:2

**disconnect**
100:25

**discussed** 80:2

**discussing**
38:21 43:9

**discussion** 61:5

**dispute** 25:10
75:14,22 76:4
107:3

**distinguish**
17:25 100:15

**district** 1:2,3
4:19,20 12:18

**djn** 51:17,21,25
52:2,11,12,19
52:23 53:6
55:12,17,21
59:18 60:15
62:7,18 64:21
66:4,13,14,19
66:22 67:20
68:2,12 70:8
81:5,10 85:19
86:14 87:6
93:7 97:16,16
97:17,17 98:23

99:10 104:18

**doing** 37:16
90:22 103:20
114:9

**donald** 3:5 5:25

**double** 33:23

**doubt** 7:10

**dow** 51:10,13
51:16 55:12
64:3 84:17

**dr** 8:13 14:24
17:15 21:16
33:13 35:14,17
36:7 37:10
65:12 73:12
103:8 109:25

**due** 68:9
108:13

**duly** 6:8 112:11

**dunbar** 15:3

**dunn** 2:6 3:8
4:23 5:18

**duplicates**
58:17

**e**

**e** 3:2,2 8:14
15:3 23:7,25
105:16 112:2,2
113:2

**earlier** 12:9
14:11 59:12
62:2 106:9

**earnings** 21:18
22:2,6,14,25
23:10,20 24:8

24:14,15 25:2
25:5,6,21 26:2
26:6 27:6 28:5
28:9,11,23
29:7,7 30:6,11
30:14,15,19
31:6,23 32:11
32:18,22 33:2
33:7 34:15,25
35:15 36:13,21
38:13 39:9,18
39:19 42:11,14
43:16 45:23
46:6 47:20
48:11,12 50:18
73:21 79:24
81:8,18 82:2
82:13,21 83:9
83:12,14,17,19
84:3,13,19

**ease** 51:15

**eastern** 4:20

**econometrics**
15:20

**economist**
27:10 62:5
63:2 69:10
84:22 94:11
106:14

**editors** 84:18

**effect** 49:4 50:7
54:5

**effective** 72:15

**effects** 45:11
47:8

**efficiency** 8:17
15:10,14,15
16:4 17:13
21:18 22:9
31:3 59:16
73:14 103:12
104:3 106:12
107:5,6 109:4
109:7,11

**efficient** 29:20

**eight** 31:5
35:16,24 81:7

**either** 16:18
19:23 23:5
26:10 34:16
35:18 37:21
57:16 60:11
69:22 70:15
99:25 100:18
102:7 106:11

**ek** 1:8 4:21

**eleventh** 71:7

**elicited** 17:20

**empirical** 60:22

**employed**
15:10

**engaged** 9:3
74:20

**engagement**
7:24 8:5,11,19
8:24 9:8 10:5,7
12:23 13:7
32:9 66:17
95:4

**engagements** 53:21 66:16,17 74:15 77:14 94:21 98:12

**engender** 18:14

**entity** 105:16

**equal** 58:22 59:4

**equivocate** 97:5

**eric** 1:15 2:8 5:3 6:9 112:6 112:24

**errata** 114:7,10 114:13,16 115:2

**error** 17:10,10 106:15,21 107:3

**esq** 3:5,10,11 3:12,13

**et** 89:14

**event** 14:12 71:12 79:17,22 80:17

**events** 22:16 23:13 27:16 79:7

**evidence** 15:6 64:4

**exact** 52:5 72:13

**exactly** 90:21 102:8

**examination** 6:11 43:10

**examine** 15:15 31:16 43:19

**examined** 6:10

**examining** 31:4

**example** 27:17 28:3 29:5 58:18 77:22 92:23 100:4,5

**exchange** 30:17

**exclude** 22:14 22:22 29:6 85:12 100:2,19 103:15

**excluded** 44:4 108:22

**excuse** 17:12

**exercise** 70:21 103:21,22

**exhibit** 10:15 10:16,20 11:2 11:9,13,20 14:17 33:24 34:9,9,18 35:12,12 97:19 98:19 113:4

**exhibits** 58:13 95:24

**existed** 58:5

**expect** 20:18,23 35:21 41:15,16 81:15 82:23

**expectation** 20:18

**experience** 73:12,20

**experienced** 23:18 24:13,25

**experiences** 27:4

**experiencing** 25:2 26:5

**expert** 9:2,3 10:17,21 15:9 31:2 73:13 113:5

**experts** 15:14 96:5

**explain** 25:12 30:3 35:9 89:19 90:4 92:10

**explained** 90:17 91:3 92:12 101:9

**explains** 102:17

**explanation** 29:18 77:11

**expressed** 35:4

**extensive** 88:11 88:13,14

**extent** 17:19 45:20 61:2 80:15

**external** 45:11 47:8

**extra** 71:8

**f**

**f** 15:3 53:12 112:2

**fact** 22:12 26:18 41:22 42:22 44:18 51:25 64:4 82:17 83:18 96:7,14 108:17

**factiva** 53:12 53:17,20 66:5 66:13,14,22

**factual** 60:25

**fail** 114:19

**fair** 14:15,15 15:18,22 21:2 23:15 26:4 31:19 38:8 50:16 62:24 75:8 94:17

**fairly** 88:11,13 88:14

**fall** 18:17 26:20

**falls** 19:3

**familiar** 12:13 105:15

**far** 48:10

**favor** 43:13 65:5 106:16 107:4 109:4,10

**fdt** 14:25 15:10 15:15,23 16:24 17:6 21:5 22:5 31:24 32:12,16 32:21 34:19

39:8,16 42:14 50:17 51:4,5 59:2 62:25 65:25 67:8 73:18 74:23 75:5,9 103:24 106:17

**feature** 28:21

**feinstein** 9:2,8 35:14,17,23 36:10,15,23 37:3,8,13 38:2 38:10,22 40:13 40:19 41:11,25 42:10,15 45:21 46:5,11,20,25 47:19 48:7 49:24 50:4,10

**felt** 98:3

**ferrillo** 15:2

**figure** 90:14

**figures** 77:9

**filed** 4:18 13:14 13:19 95:17

**financially** 5:7

**find** 17:21 35:11 42:21 43:4 84:24 95:16 107:2,9

**finder** 96:7,14

**finding** 17:13 25:13 59:15 63:14 104:3

**fine** 46:3 48:3 50:6 51:18

89:25

**finz** 1:15 2:8 5:3 6:9 112:6 112:24

**firm** 5:4

**first** 6:8 7:2 10:4 22:10 24:18 32:2,14 35:13 41:13 49:17 51:8 53:9 71:11,15 76:19 86:24 89:2 90:24 91:2

**fitch** 105:20

**five** 36:3 57:13 57:14 90:12

**fixed** 77:20 78:6

**fluke** 47:21 50:6,11

**focus** 38:2 106:24

**focusing** 36:9

**follow** 65:8

**following** 54:4 107:14 115:3,4

**follows** 6:10 92:12 93:18

**footnote** 57:12 90:8,13 101:9 102:17

**foregoing** 111:7

**form** 30:10 49:4

**forth** 79:21 112:10

**fortune** 78:21 79:16

**found** 26:18 27:2 33:6,11 38:3

**foundation** 65:22

**four** 25:6 26:2 65:16 98:9

**fox** 3:3 5:25

**fraction** 24:7 90:16

**freire** 3:11 5:21

**frequency** 88:20

**frequently** 25:20 30:13 57:16

**front** 25:15

**full** 34:11 73:25

**fully** 45:25

**fundamental** 27:20,25

**further** 110:4 112:14

**g**

**g** 105:16

**ge** 75:23

**general** 17:7 20:12 29:14 73:15 81:3

**generally** 16:11 21:19,25 24:6 30:10 77:20 78:6 85:17

**generated** 98:3

**getting** 61:22 78:3 80:12 99:23

**gibson** 2:6 3:8 4:23 5:18

**gibsondunn.c...** 3:11,12,13,14

**give** 7:21 47:13 60:11,13 70:14 73:14 96:6

**given** 25:7 26:22 29:23 41:18 45:13 67:25 72:21 73:16 91:12 92:4 108:15 110:10 112:12

**gives** 71:8 79:3

**giving** 48:25

**go** 4:13 6:25 19:23 20:21 25:24 34:21 52:25 53:8 71:23 73:24 107:4,5 109:12

**goal** 63:2,3 100:17

**goes** 16:24

**going** 4:4 10:13 12:14 52:25

64:5 67:24 69:11,19 70:5 70:7,18 73:22 74:13 84:20 85:7,12 101:12 102:8,18 103:14,17 107:15,17

**good**   4:2 5:16 5:24 6:13 30:18 71:13 72:25

**gotten**   67:4

**great**   78:12

**greater**   90:16

**griffin**   87:21,22 88:23 89:13,14 91:10 92:2,14 93:6

**group**   15:25,25 16:4,6,7,14 17:17

**guidance**   30:12

**h**

**h**   8:14,14 113:2

**half**   25:22,23 35:20 74:3

**hall**   3:5 5:24,25 16:10 21:21 22:17 24:17 26:8,23 27:8 27:14 29:3,21 30:8 31:8,25 32:13 33:10 35:6 36:17

38:6,12 39:6 40:5,16,25 41:21 42:2,18 43:2 44:15,21 45:18 46:14,22 47:16 48:9,21 49:21 50:13,21 51:12,22 52:4 52:16 53:7 54:11 55:10 56:3,25 58:3 59:3,21 60:3 62:8,22 63:11 63:24 64:9 65:2 66:9 67:14 68:5,21 69:15 70:23 72:3,22 73:19 75:4,20 76:2,8 76:12,17 77:2 77:15 78:19 79:8,13,19 80:4,8,19 81:11 82:3,15 82:25 83:10,24 84:23 85:9,22 86:18,21 87:9 87:17 88:17 89:21 90:6 91:16,21 92:7 92:17,19 93:9 93:23 94:14 95:5 96:18 97:10 98:6,15 99:15,21

100:11 101:8 101:19 102:2 102:14 103:2 103:13,25 104:6 105:12 106:2,18 107:12 108:10 108:18 110:7

**hand**   10:13 112:20

**happened**   20:19 31:10

**happening**   27:13 47:23 50:4 54:3

**happy**   7:4

**harder**   17:25 18:19,21 19:7 20:13

**headline**   105:18,22 106:3

**held**   26:16

**help**   99:10

**helpful**   46:8

**hereinbefore**   112:10

**hereunto**   112:19

**high**   61:24 76:20 80:6

**hits**   70:17

**hmm**   19:13 42:8 43:8 66:2 91:20

**holding**   28:4,9 28:15,21 29:4 30:4

**holds**   28:6,10 52:2

**horse**   84:16

**hour**   80:22

**hours**   52:21 54:2 56:9,20

**hypothetical**   19:17 107:22

**i**

**identification**   10:17 51:3 81:5 113:5

**identified**   56:15 65:5 70:14 74:24 75:17,25 76:15 81:9 83:8 104:19 105:4 108:4

**identifies**   75:6 83:19,22

**identify**   53:21 59:18,24 62:19 68:19,23 69:2 69:12,19 70:5 70:6 73:17 86:4,16 87:7 104:16

**identifying**   16:25 51:19 57:9 60:2 62:6 63:9,17 67:11

67:23 70:22
76:24 82:6
83:7 85:19
86:15
**imagine** 28:3
**impact** 41:17
**imperative**
114:15
**implication**
32:15
**importance**
88:22
**important** 52:7
79:22
**improper** 33:12
**improperly**
26:11 38:11,16
39:3,12
**improve** 71:20
**improving**
71:24
**inadvertently**
39:15
**include** 19:3
40:20,21 46:21
85:12 100:18
**included** 41:19
43:24 44:12,20
49:18 65:13
**includes** 46:19
46:19,24
**including** 19:24
20:2 66:7
108:16

**inclusion** 58:23
**incorrect** 22:14
**incorrectly**
54:23
**increase** 17:5
59:25 63:7
65:17 67:10
68:3,13 70:20
104:9
**increases** 63:13
64:23
**independent**
27:16 29:11,12
29:17 54:24
62:15
**index** 30:16
35:14,17,24
36:7,10,15,24
36:24 37:4,8
37:11,14,15,19
37:20,24 38:3
38:5,11,22
39:2,10,11
40:4,14,20
41:4,11,18,25
42:11,16,21,24
43:11,14,21
44:4,7,13,20
45:9,15,22
46:3,5,9,12,17
46:23 47:2,4
47:12,15,19,22
48:2,3,8,18,24
49:7,19,24
50:2,4,7,9,15

50:19 83:13
**indicated** 9:13
**indicates** 25:13
**individual**
34:20
**industry** 36:10
36:24 37:4,8
37:13,15 38:2
38:11,22 40:4
40:13,19 41:3
41:18,24,25
42:11,16,21
43:10,20 44:14
44:20 45:9,11
45:15 46:12,17
46:23,25,25
47:4,8,12,15,19
48:7,18,24
49:7,9,19 50:9
50:19 80:7,10
**inflated** 17:21
**information**
29:23 53:14
55:2 58:2
60:25 81:20
84:7,12 87:5
96:7,20 103:9
103:23 105:24
**informed** 51:25
**initial** 63:4
**inquiry** 15:24
54:25
**instantaneous**
55:21

**instructions**
114:2
**intended** 15:23
**interested** 5:7
112:17
**interesting**
41:2 72:4
83:25
**internationally**
93:13
**intersection**
69:5
**investigation**
55:8
**iron** 40:9,14,21
41:19,24 44:14
44:18 46:25
**irrelevant**
60:13
**issue** 34:17
62:4
**issues** 15:9 31:2
50:2,23 59:5
73:13 78:15
**item** 22:11
103:9

**j**

**j** 1:15 2:8 6:9
8:14 112:6,24
**january** 86:9
86:12,16 87:3
87:7 104:18
105:3,18
**job** 30:18

**[joined - lose]**

**joined** 5:19
**joining** 5:22
**jones** 51:10,13
  51:16 55:12
  64:3 84:18
**joralemon** 3:10
  5:16,17 6:12
  10:12,19,24
  59:12 65:9
  72:24 73:11
  109:17,25
  110:6
**journal** 59:23
  60:5,7,21 62:7
  63:7,23,25
  64:22 66:8
  67:9,18 68:3
  68:13 70:12
**judge** 12:2
**judge's** 9:23
**jump** 50:12
  52:8
**jumped** 45:5

**k**

**k** 6:17 8:14
**kaplan** 3:3 5:25
**kaplanfox.com**
  3:6
**keep** 44:7
**kilsheimer** 6:2
**kind** 61:24
**knew** 8:12
**know** 6:20 7:4
  10:3 14:7
  20:17,19 21:22

28:8 34:10
35:7 37:17,22
42:25 43:4
47:24 48:14,22
50:5 52:20
56:7 59:9 60:6
61:11,17,21
62:13 67:23
69:9,10 70:4
70:16 74:5
76:23 77:23,25
78:5,11 80:21
84:2 85:10
86:7,23 87:23
88:8,12,19
93:3 94:5,6
96:4,4,6 97:9
101:10 102:4
104:11 105:11
108:24 109:2
**knowing** 46:7
**known** 52:6
  57:14 105:16
**krippendorf**
  88:19 89:4,5,8

**l**

**l** 15:3,3
**lag** 55:16,20
**large** 24:7
  36:23
**law** 9:14 11:21
**lead** 58:24
**leadership** 79:2
  79:11

**leads** 38:14
  45:8 78:16
**learn** 37:6
  40:13 41:23
  44:12 81:20
  95:8
**leave** 83:17
**left** 90:15
**legal** 5:4
  110:14
**likelihood** 17:5
  27:13 28:25
  63:8
**likely** 16:21
  21:7 23:11
  52:12,14 54:16
  54:19 59:10
  60:17,19 62:16
  64:12,15 68:14
  84:21 91:13
  92:4,9 93:20
**limit** 72:9
**limited** 94:8
  108:2
**line** 14:7 22:11
  49:5 115:5
**lines** 90:12
**list** 11:24 12:4
**listed** 65:16
**lists** 11:20
**literature**
  21:17,25 88:9
  88:11,13,15
  89:11

**litigation** 1:7
  4:18 23:7
**little** 8:6 33:12
  36:7 40:17
  67:5 86:2
  95:11
**llp** 2:6 3:8 4:23
  6:2
**location** 4:22
**long** 71:5 92:10
**longer** 28:6
**look** 17:24 34:8
  36:18 37:12
  41:5 52:25
  61:12,14 66:22
  66:25 70:7
  72:7 88:9,18
  90:7 96:3
  97:13 103:14
  104:15 106:25
  108:21,24
  109:2,5
**looked** 11:6
  36:2,6,20 42:3
  55:4,12 58:4
  58:17 95:6,12
  98:2
**looking** 32:25
  55:6 75:11
  93:12 97:14
  98:9,23 101:15
  106:22 109:5
**looks** 74:17
**lose** 46:10 78:7

**lot** 45:22 48:12
  61:18
**lower** 20:5
  25:23 98:24

**m**

**m** 8:14 105:16
**made** 27:24
  34:8 114:8
**magic** 94:15
**magistrate**
  9:23 12:2
**main** 41:23
  44:13 46:24
  52:18 96:19,22
**major** 44:18
**make** 17:23
  18:19,21 19:11
  19:11 21:8
  56:18 84:22
  94:11 97:23
  100:25 102:20
  103:19 106:11
  108:22 114:5
  115:3
**makes** 7:11
  19:4 21:7
**making** 17:25
  56:23
**marginal** 59:9
**mark** 9:12
  43:13
**marked** 10:14
**market** 8:17
  15:9,14,15
  16:4 17:13

21:17 22:9
29:9,19 30:10
30:17 31:2
41:7 52:3,13
52:21 54:2
55:2 56:8,20
58:2 59:15
73:14 77:21
78:5 81:19
84:5,14 85:7
103:12 109:4,6
109:10
**market's** 84:21
**markets** 90:15
**marking** 73:4
**marks** 73:8
**marriage**
  112:16
**material** 16:21
  22:2 52:13
  59:10,13 60:18
  60:19 61:6
  62:13,16,20
  63:10,15,18
  64:16 65:19
  67:12,12 68:15
  71:12 80:21,23
  81:2 92:12
  93:20
**materiality**
  64:24 87:16
  88:7 91:13
  92:5 93:16
**materials** 11:15

**math** 100:21
  101:17 103:6
**matter** 4:17
  8:16 9:4,9,19
  11:19 13:7
  14:22 28:18
  97:20 112:18
**matters** 15:8
**mazumdar** 8:2
  8:10,22 17:15
  33:13 37:10
  40:4 42:20
  43:10,20 44:3
  44:12,20 45:9
  45:15 46:3,9
  46:17,23 47:4
  47:15,22 48:2
  48:3,18,24
  49:7,18 50:2,7
  50:15,19 53:17
  54:14 55:24
  56:15,23 57:8
  57:25 65:12
  67:7 82:12,20
  83:6,13 92:15
**mazumdar's**
  36:7 86:4
**mean** 18:8
  19:19 28:2
  48:2,3 55:20
  58:16 62:13
  69:3,8,18,23
  72:13 80:20
  82:4 101:4

**means** 29:17
  67:20 102:8
**meant** 15:5
  57:15,18
**measure** 88:21
**media** 4:14
  73:5,9 110:13
**memorandum**
  9:14 11:21
**memorized**
  88:25
**memory** 25:18
**mentioned**
  57:11 94:19
**met** 7:25
**metals** 37:14
**methodology**
  35:8
**microphones**
  4:6
**middle** 43:11
  45:6 86:23
**mind** 30:24
  52:8 74:8
**minds** 58:21
**mine** 80:21,22
**mining** 37:14
  40:10,14,21,21
  41:20 44:19
  77:18 80:9
**minute** 9:12
**mirror** 15:23
**mischaracteri...**
  102:15

**misclassificat...**
 21:3
**misdate**  54:14
**misdated**  54:17
 55:24,25 56:7
 56:21
**misdating**  59:5
**misleading**
 102:12 104:12
**misnomer**
 100:8
**misrepresents**
 106:19
**missed**  39:15
**missing**  48:4
 108:19
**misspecified**
 27:18,18 32:17
 32:18
**mm**  19:13 42:8
 43:8 66:2
 91:20
**mobile**  4:10
**models**  41:7
**moment**  94:20
**moody's**  54:17
 55:13,16,22
 56:12 57:2,3,4
 92:22
**morning**  4:3
 5:16,24 6:13
 87:3
**motion**  12:19
 13:4

**move**  20:21
 82:5 102:7
 106:10,23
 107:19
**moved**  41:10
**movement**
 18:15,16 19:2
 23:13 24:15
 25:5,21 26:6
 26:22 27:5
 33:4 35:23
 36:23 47:18
 81:24 109:9
**movements**
 20:3,5,8 23:19
 24:10 25:25
 81:18 92:10,11
**moves**  48:12
**moving**  45:22
 46:6 52:3 84:3
**mucury**  3:18
**mukesh**  8:13
**multiple**  24:18
 70:17,17 71:25
 72:12,17
**mute**  4:9

**n**

**n**  3:2 23:25
**nail**  19:18
**name**  4:25 6:14
 6:16
**naturally**  55:15
**nature**  40:23
 61:4

**near**  86:10
**necessarily**
 39:16 52:17
 61:16 67:15
 70:25 71:2,20
**necessary**
 114:5
**need**  7:3
**nera**  23:24
**never**  31:10,20
 32:8 37:7,21
 95:9,15,15
 96:16
**nevertheless**
 31:23 32:12
**new**  1:3,12,12
 2:7,7,10 3:4,9,9
 4:20,24,24
 6:18,18 17:11
 53:3 64:22
 68:18 81:20
 87:3 107:15
 112:3,4,8
**news**  15:7 16:8
 16:15,17,19,20
 16:25 17:4,11
 17:14,18,22,24
 18:5,7,7,8,9,12
 18:13,16,18,25
 19:3,5,24,25
 20:6,11 21:3,4
 21:20,23 22:2
 22:15 23:13
 51:3,5,9,19
 52:3,7,13,15

 53:2,6,11,17,21
 53:25 54:3,9
 54:14 55:9,25
 56:14,24 57:9
 57:13,13,17,17
 57:19,21 58:18
 58:19,24,25
 59:6,8,9,13,14
 59:18,24 60:2
 60:12,14,17,18
 60:24 61:2,6
 61:15,18,24
 62:6,12,14,14
 62:20 63:7,10
 63:15,16,17,19
 64:2,3,13,16,20
 64:24 65:6,13
 65:15,18,19
 66:18 67:10,11
 67:13,21,23,24
 67:25 68:4,11
 68:19,19,23,23
 68:24,25 69:2
 69:4,8,11,12,18
 69:19,21,21,23
 70:6,13,18,22
 71:6,7,8,21,24
 72:10,20 73:17
 73:24 74:25
 75:6,7,8,18,25
 76:10,15,25
 77:12 78:17
 80:3 81:6,9,25
 82:6,12,14,21
 83:7,8,14,20,22

84:6,14 85:19
85:20,20 86:5
86:15,16,24
87:8,14,16
88:6,7 89:19
89:20 90:3,5
90:17,18,24,25
91:4,5 92:12
92:15 93:7,15
93:17,19,20,21
99:7,11,14,25
100:6,9,16,24
101:13,23,24
103:9,11
104:17 105:19
107:9 108:16
108:17
**newswire**  51:10
**newswire's**
  84:18
**newswires**
  51:13,16
**newsworthy**
  79:7,17 80:17
**nine**  31:6,22
  32:11,25 34:15
  35:15,24 36:3
  81:8 82:12,17
**non**  16:15
  17:18,22 18:18
  19:3,5,24
  20:11 21:4
  90:25
**noon**  109:23
  110:16

**normally**  43:12
**notary**  2:9 6:9
  111:24 112:7
**note**  4:6 9:11
**noted**  35:13
  110:17 114:12
**notes**  33:21
  34:17,24 41:9
  41:10
**noticing**  5:15
**notwithstandi...**
  49:17
**november**  1:12
  2:2 4:5 112:20
**number**  20:9
  61:15 71:10
  74:2,7 87:14
  88:5 93:15
  95:22 99:4,7
  99:25 100:6,16
  101:13 108:2
  110:12
**numbers**  20:12
  24:6
**ny**  3:4

---
**o**
---

**o**  15:3
**oath**  7:18
**object**  7:9
**objection**  7:12
  16:10 21:21
  22:17 24:17
  26:8,23 27:8
  27:14 29:3,21
  30:8 31:8,25

32:13 33:10
35:6 36:17
38:6,12 39:6
40:5,16,25
41:21 42:2,18
43:2 44:15,21
45:18 46:14,22
47:16 48:9,21
49:21 50:13,21
51:12,22 52:4
52:16 53:7
54:11 55:10
56:3,25 58:3
59:3,21 60:3
62:8,22 63:11
63:24 64:9
65:2 66:9
67:14 68:5,21
69:15 70:23
72:3,22 73:19
75:4,20 76:2,8
76:12,17 77:2
77:15 78:19
79:8,13,19
80:4,8,19
81:11 82:3,15
82:25 83:10,24
84:23 85:9,22
86:18,21 87:9
87:17 88:17
89:21 90:6
91:16,21 92:7
92:17,19 93:9
93:23 94:14
95:5 96:18

97:10 98:6,15
99:15,21
100:11 101:8
101:19 102:2
102:14 103:2
103:13,25
104:6 105:12
106:2,18
107:12 108:10
108:18
**objections**  5:9
**objective**  61:17
  103:21,22
  104:17
**objects**  7:11
**obviously**
  55:11 56:5
  80:20
**occurred**  87:2
**occurring**
  72:21
**occurs**  29:16,19
**october**  10:22
**offering**  14:21
  89:9
**offhand**  95:6
  98:16
**offices**  2:6
**oh**  109:13
**okay**  8:7 9:7,22
  10:6,11 11:24
  12:8,25 13:20
  14:16,24 16:3
  16:14,22 19:15
  20:15,24 21:10

22:4,12 23:16
24:22 25:11
26:3 27:3
28:17 31:12,19
33:5,16,19
34:5 35:3,9
36:9 37:17,25
38:20,25 40:8
40:12 42:20
43:23 44:11
45:4 49:16
50:10,25 51:8
51:17 52:9
54:7,19 55:22
58:15,16 59:17
63:4 66:15
70:10 72:16
74:13 75:16
79:6 82:7
84:25 85:18,24
86:13,25 87:19
89:17 90:9,11
90:20,23 92:13
93:5,11,14
94:19,25 95:14
96:25 97:5
98:18,21 99:18
101:15 103:20
104:19 105:5
105:21 107:23
108:13
**once** 7:11
**ones** 30:23
56:17 69:21
94:7 109:6

**online** 60:5
**open** 46:4
**operational**
80:11,16
**operations**
78:23
**opined** 22:13
22:25
**opinion** 28:18
54:13 62:3
64:6
**opinions** 14:21
64:4 89:9
**opposed** 22:21
**opposing** 96:5
**oracle** 76:6
**ordered** 35:19
**ore** 40:9,14,21
40:21 41:19,24
44:14,19 46:25
**original** 41:8
69:20 114:16
**originally**
37:23
**outcome** 5:8
112:17
**outset** 69:11
**outsized** 41:17
**overall** 61:15
**overinclusion**
18:5,6,7
**own** 96:12,12

**p**

**p** 3:2,2
**p.m.** 110:17
**page** 11:6,9,13
11:20 14:18
90:10 111:11
113:3 115:5
**pages** 111:8
**panel** 90:14
**paper** 23:24
25:15
**paragraph**
14:18,20 38:19
38:22 43:7,11
45:2,6,17
**park** 2:7 3:9
4:24
**part** 37:7,8,19
37:21,24 51:24
66:11 70:15
90:24 91:2
108:25
**particular** 8:7
8:23 12:15
22:21 38:17
52:8 61:10,11
61:13 74:8
78:4
**particularly**
36:8 44:23
71:13 83:3
**parties** 4:12
13:2,11,16,22
110:12 112:15

**party** 5:6
**pass** 21:12
32:16
**passed** 31:24
32:12,21
**passing** 17:6
106:16
**past** 32:24
52:24 53:4
94:4,24
**paths** 9:5
**pause** 48:25
**pending** 7:6
**percent** 20:10
24:12 26:19
27:11,12 28:25
29:2,13,13
35:18 36:3
72:8,8,9 73:23
74:2,10,24
75:12,17,23
76:6,10,14,24
77:5 82:19,20
82:23 87:12,12
87:12 93:24,25
93:25 94:6,12
94:13,13,18
95:9,17,20
96:9,15 97:9
97:17,17,18
98:5,13,13,25
99:5,13,19,19
100:3,9,13,17
100:23,24
101:4,5,16,18

101:21,23,24
102:9,9,11,11
102:20,23,24
103:6 104:11
105:9 108:7
**percentage**
17:21 18:15,25
19:4,5 20:6
24:20 27:2
73:15 74:6,8
76:21 77:4,10
77:12
**percentages**
19:6 74:16
75:12
**percentile** 25:7
72:19
**percentiles**
36:20
**perfectly** 50:6
**performed**
14:11 17:16
**performing**
23:17
**period** 16:9,16
19:15 24:16
35:20 51:20
61:23 73:16
74:24 75:18,24
76:11,15 77:7
81:7,9 85:16
86:11 108:9
**periods** 16:12
24:19

**person** 106:22
**ph.d.** 10:18,22
113:6
**phones** 4:10
**photocopy**
33:25
**phrase** 52:6,8
**phrasing** 39:10
**pick** 4:7 20:20
45:10 47:7
59:6 71:16
83:14 106:10
106:14
**picked** 55:17
57:17 59:8
60:14 64:18,21
65:10,13,16
67:20 85:5,11
**picking** 21:11
21:13 60:17,24
61:3 65:18
71:14 106:15
106:23 107:17
107:21 108:20
**picture** 58:25
**piece** 84:12
**place** 4:12
41:13
**plaintiff** 47:12
**plaintiffs** 3:3
9:3 12:19 13:3
22:9
**planned** 79:21
**pleadings**
11:19

**please** 4:6,9
5:10,12 6:14
7:3 19:21
73:10 109:24
114:4,9
**pleasure** 110:3
110:5
**point** 7:3 41:3
46:2 57:18
84:9 85:10
108:20
**points** 57:15
**portion** 98:24
**positions** 79:4
**possibility**
26:12 29:23
49:11,13 81:21
**possible** 29:6
54:8
**possibly** 56:21
**potential** 22:15
**potentially**
55:25 56:5,6
62:13,16,19
63:9,18
**ppg** 74:21
**preparation**
75:9
**prepared** 13:14
**preparing** 10:8
12:11,17,25
43:19
**present** 3:17
**presumably**
20:8 21:14

**previous** 65:8
**previously**
12:22 22:13,24
66:5
**price** 15:6
17:20,22 18:14
18:16 19:2
20:3,4,8 23:12
23:19 24:9,15
25:4,21,25
26:6,21 27:5
28:22 30:5,16
31:5,22 32:10
33:3 77:20
78:6 81:17,24
82:4 84:3
89:19 90:4
92:10,11 108:8
109:9
**prices** 77:23,24
**primary** 53:11
**principal** 40:9
**principle** 17:4
18:4 19:12
**prior** 7:24 8:5
8:19,24 12:23
13:7 15:8
27:11 30:25
32:4,8 34:8
53:21 65:23
66:16,17 67:2
74:14 77:14
85:2 88:3
94:21 95:3,7
95:10,12 97:13

Case 1:19-cv-00526-EK-VMS   Document 132-14   Filed 11/17/23   Page 50 of 61 PageID #: 4046

**private**  4:8
**probabilities**
 63:14,22
**probably**  14:13
 24:24 53:8,10
 73:23 74:4
 78:7 94:3,23
 95:21 106:4
**problem**  47:21
 48:7,18,23
 49:3 50:14
**proceed**  6:6
 73:10 109:24
**proceeding**
 5:10
**process**  57:8
**products**  77:24
**professionally**
 9:6
**professor**  7:25
 8:10,22 9:8
 37:3 44:3
 53:16 54:13
 55:24 56:15,23
 57:8,24 67:7
 86:3 92:15
**proper**  42:24
 44:7 46:16,19
 47:14 56:14
**properly**  26:14
 27:23 28:19
 29:24 45:10
 46:13 47:7
**proposed**  15:4

**proposition**
 87:20 88:16
 91:11 92:3
**protocol**
 107:14,15
**provide**  7:12
 15:5 96:20
**provided**  51:4
 53:12
**providing**  52:2
 52:13 61:2
 84:11
**proxy**  87:15
 88:6 93:16
**public**  2:9 6:9
 111:24 112:7
**publications**
 72:20
**published**
 23:24 51:10
 55:17 56:24
**purely**  61:17
**purposes**  73:17
**push**  17:12
**put**  17:17 60:10
 69:16 99:23
 105:8 108:23
**putting**  39:10
 84:16 106:20

**q**

**qualcomm**
 76:11 78:10
**quarter**  79:24
**question**  7:6,14
 12:9 14:2

 21:23 27:9
 29:20 31:13
 34:8 38:15
 40:18,23 41:2
 41:5,12 45:7,8
 45:16,19,24
 46:5,16 47:14
 47:17 48:6
 49:6 55:19
 56:14 59:7,11
 60:8,16,23
 61:14,17 62:2
 63:5 65:7,8
 68:6,7,10,11
 69:17 71:18
 72:5 81:24,25
 83:17,25 84:4
 89:22 91:22
 104:9 106:6
 107:17
**questions**  46:11
 46:21 56:16
 65:23 70:11
 110:4
**quick**  72:25
 109:18
**quote**  14:12,13
 43:12 45:7
 47:6 52:2 90:8
 90:12,13,17,17
 90:19,23,24
 91:3,4
**quotes**  45:10

**r**

**r**  3:2 15:3,3
 23:25 112:2
**r&r**  12:16
**raise**  45:7
 46:15
**raised**  45:16
**raising**  49:6,12
 49:14 56:13,16
**random**  17:9
 94:5
**randomly**  21:9
**ranked**  25:19
**rate**  30:17
**rather**  35:20
 36:3
**ratings**  105:20
 105:20
**rationale**  23:9
**reached**  24:3
 32:5 39:22
**react**  84:21
 85:7
**reaction**  28:23
 30:5 31:5,22
 32:10 108:8
**read**  8:20 13:15
 89:14,24 111:7
 114:4
**ready**  73:2
**realization**
 80:16,21,24
 81:2
**really**  28:7 84:8
 97:22 100:23

101:4
**reason** 7:20
  22:21,23 27:20
  27:25 29:16
  30:2 47:13,18
  52:22 53:5
  75:14,22 76:4
  84:6 96:15,19
  96:22,23 97:7
  97:9 114:6
  115:6,8,9,11,12
  115:14,15,17
  115:18,20
**reasonable**
  24:21 30:18
**reasonably**
  12:13 94:8
**reasons** 29:6
  52:18 115:4
**rebuttal** 10:17
  10:21 113:5
**recall** 8:8,15,21
  10:10 12:14
  23:16,21 24:2
  24:5,11,22
  25:9 31:9,11
  31:18 32:3,4,6
  37:16 57:5
  58:9 74:20
  75:21 76:3
  85:17 98:11
**receipt** 114:18
**recently** 66:4
**recess** 73:6
  109:21

**recognize**
  10:25
**recollection**
  12:16
**recommendat...**
  9:24 10:8
  11:25 12:10
**record** 4:4,13
  5:14 6:15
  10:20 73:4,8
  91:8 105:3
  109:20,23
  110:15 112:12
**recorded** 4:15
**recording** 4:11
**reduce** 107:10
**refer** 12:12
  51:16
**reference** 27:24
**referred** 89:3
**referring** 67:2
  74:10 97:15
**refers** 90:24
**reflected** 91:25
**reframe** 20:25
**regularly** 79:23
**relate** 41:4
**related** 5:5
  32:17 71:17
  103:10 112:15
**relationship**
  35:22 49:23
**relative** 63:21
**relevant** 16:16
  35:12 60:25

  62:14,17,20
  63:10,15,19
  64:16 65:19
  68:15 71:12
**reliability** 21:4
**reliable** 58:24
  59:8 66:6
  70:13 72:17
**reliance** 91:9
**relied** 32:19
  39:4 42:16
  66:4,5,12
  89:10
**rely** 89:8
**relying** 83:17
**remember**
  22:19 24:19
  52:5 58:16
  76:20 98:7,10
  98:16
**remind** 7:2
**remove** 58:17
**repeat** 34:7
  66:23 91:23
**repeated** 58:18
**repeatedly**
  72:11,12
**report** 9:11,24
  10:7,9,18,21
  11:5,14,25
  12:9,11,15,17
  13:2,10,15,18
  13:23 14:3
  35:3 38:19
  42:23 43:7,19

  53:25 55:17
  57:11 58:10
  67:2 76:22
  82:2 84:20
  87:13 89:6
  91:25 95:10,16
  96:17 98:19
  102:5,15
  104:21,24
  105:24 113:6
**reported** 1:14
  55:13
**reporter** 2:8
  5:3 6:5 10:13
  112:7
**reporting**
  33:17
**reports** 22:8
  28:5,9,10 88:3
  95:7,13 97:13
  98:12 102:6
  103:22 105:19
**represent** 5:4
  86:25 95:14
  104:20 105:2
**representation**
  34:22 105:7,14
**represented**
  45:14
**representing**
  26:24 44:24
  91:10 101:2
**represents** 16:7
**republish**
  66:23

**reputation** 8:5
**reset** 67:4 70:2
**resolve** 46:2
**resolved** 45:25
**respect** 32:21
  33:5 53:24
  56:17 68:9
  83:9 108:14
**respectfully**
  84:15
**responds** 15:7
**response** 7:7,13
  17:20,23 85:3
  97:6
**responsible**
  47:5
**result** 21:15
  101:14
**results** 33:13
  33:15 35:5,8
  39:8 42:14
  50:17 98:10
  106:7,10,16
**retained** 31:14
  31:16 110:14
**return** 90:16
  114:16
**returning** 12:8
**returns** 33:9
  34:15,24 35:16
  35:19 36:14,19
**reuters** 64:23
**review** 8:18
  9:17,23 10:7
  12:18 13:2,6,9

13:21 57:7
58:10 61:7
103:17 107:8
107:16,18,21
**reviewed** 9:13
  10:3,4
**right** 9:25 19:9
  19:22 20:16
  23:23 24:24
  25:18 34:18
  37:25 39:13,24
  41:14 42:24
  51:14 53:15
  56:10 58:11
  64:19 65:21
  69:9 71:22
  72:21 75:19
  76:16 77:6
  78:21,24 79:24
  82:5 91:7 94:2
  94:10,16 100:7
  101:25 102:6
  102:25 108:3
  108:11,11
**ring** 105:17
**risk** 80:7,17
**risks** 80:11
**robert** 3:19
  4:25
**root** 35:10
**roughly** 36:4
**row** 96:10,14
  98:14 99:2,24
**rows** 95:22,23
  96:2 97:12,15

98:4
**rudimentary**
  74:19
**rudis** 3:19 4:25
**rule** 103:16,18
**run** 74:14
**running** 103:11

**s**

**s** 3:2 8:14 113:2
**s&p** 23:17
  24:12,24 25:19
  26:19 28:14
  37:14 47:3,4
  49:18
**s.a.** 1:7 3:18
  4:18 28:8
**sake** 51:15
**saying** 13:15
  17:15 22:22
  25:17 39:8
  48:6 50:3
  56:18 65:11
  67:17,22 68:18
  68:18,24 71:9
  79:15 82:8
  83:13,15
  100:21 106:21
**says** 21:25
  57:12 90:13
  91:17,19
  103:16,18
**scenarios** 63:22
**scientific** 15:24
**search** 70:5
  75:6,8 81:10

83:14 104:18
105:3
**searches** 53:18
**section** 12:15
  98:23
**securities** 1:7
  4:18 23:7
  24:12,25 32:20
**security** 15:7
  17:6 29:20
  31:3,15,21
  32:9,24 79:18
**see** 11:16,20
  18:16,18 19:5
  20:10,10,23
  39:5 41:16
  43:14 45:12
  55:13 82:7
  84:18 92:21,22
  93:3 99:2
  102:18 110:3
**seeing** 31:9,11
  55:7
**seem** 61:24
**seems** 42:23
  45:22 61:19
**seen** 12:22 31:3
  31:17 32:3,6
  49:25 54:6
**select** 37:15
**selected** 52:22
  53:6
**selection** 51:2
  71:21,24

**selections** 51:5
**sell** 78:8
**selling** 77:19 78:4
**sells** 78:11
**senior** 79:2,11
**sense** 73:15 81:16 84:11,22 101:11
**sensitive** 4:7
**sentence** 38:25 39:7
**separate** 105:4
**series** 70:10
**served** 13:19,22
**set** 80:10 94:8 101:12 112:10 112:20
**setting** 16:23
**seven** 33:20 34:16
**several** 9:6
**sheet** 114:8,13 114:16
**shocked** 87:6
**shocking** 86:20
**shorthand** 2:8 112:6
**show** 21:7
**shown** 111:11
**shows** 90:14
**shuts** 80:22
**sign** 114:9
**signature** 11:10 112:23

**significance** 36:19
**significant** 19:2 20:4,7 23:12 23:19 24:9,14 24:15 25:2,4 25:21,25 26:5 26:21 27:5 28:22 30:5 31:5,22 32:10 33:3,8 34:14 34:24 36:14 108:8 109:9
**signing** 114:11
**similar** 36:20 72:18
**similarly** 32:22
**simply** 50:3 89:18 90:3 93:7
**sir** 6:13 10:25 83:6 84:15 91:18 104:15 108:14
**sitting** 24:4 29:25 30:23 37:18 43:18 58:8 63:20 76:4 87:23 88:8,12 97:8 104:25
**situation** 29:15
**six** 74:5
**sjb** 1:8 4:21

**skeptical** 34:5
**skepticism** 35:4 35:10
**skew** 106:7,16
**slight** 40:6
**smaller** 74:7 77:3,13
**smoothly** 6:25
**solutions** 5:5 110:15
**sorry** 16:5 25:3 31:6,15 34:3,7 41:9,10 45:3 51:2 67:12 96:25 98:20
**sort** 66:3 72:18 72:20 102:22
**sound** 74:16 75:2,18 76:16 77:6
**sounds** 23:23 24:21 103:3
**source** 52:7 53:2,6,11 59:25 60:15 63:7 64:2,13 64:14 66:21,24 67:10 69:8,18 69:21,23 70:6 70:13 71:6,8 71:10,13 89:2 93:7
**sources** 52:15 57:13,21 58:24 59:10 60:24

64:18 65:6,17 66:7,18 67:19 68:19,23 69:2 69:4,11 70:17 71:7,25 72:12 72:17 92:15
**southern** 1:3
**space** 114:7
**speak** 9:7
**specific** 16:8,17 16:18,20 24:5 24:20 31:13 56:17 80:10
**specifically** 7:13 14:18 21:11 23:2 89:12 104:16
**specification** 47:14
**specified** 26:11 26:15 27:24 28:19 29:25 38:11,16 39:3 39:12 46:13
**speech** 79:10
**speeches** 79:3,9
**spoke** 59:11 106:9
**sponsored** 47:12
**spreadsheet** 74:18
**ss** 111:3 112:3
**stale** 58:18

**[stamp - sworn]**                                                          Page 23

**stamp**  54:9
  56:6
**stamped**  52:19
**stamps**  52:23
  53:5,25 54:21
  55:5,7 58:5
  60:5 62:4
**stand**  45:16,19
**standard**  15:19
**standing**  49:24
**stands**  15:2
  91:11 92:2
**start**  16:5 74:3
**starting**  69:13
  98:22,24
**starts**  39:7
**state**  2:10 5:10
  5:12 6:14 39:2
  52:9 111:2
  112:3,8 114:6
**stated**  23:6
**states**  1:2 4:19
**statistical**
  20:14 36:14,19
**statistically**
  18:2,20,22
  19:2 20:4,7
  23:12,19 24:9
  24:13,14 25:4
  25:20,25 26:5
  26:21 27:5
  28:22 30:5
  31:4,21 32:10
  33:3,8 34:14
  34:23 108:7

  109:8
**statistics**  28:18
**step**  16:23 42:7
  51:8 61:25
  79:3
**stephen**  8:25
  9:2
**stepped**  85:16
**steps**  57:24
**stipulate**  46:12
**stipulated**
  110:11
**stock**  23:12
  84:2
**stories**  51:9
  52:19 55:4,7
  55:12 57:13
  67:18 69:4,5,7
  69:19 72:10,14
  72:20 86:24
  87:15 88:6
  93:15,21 99:25
  100:17 101:13
  107:16,19
**story**  54:9
  62:15 64:13,15
  68:12,14 71:9
  71:15,16 93:19
  107:18 108:16
  108:17
**street**  59:23
  60:5,7,20 62:7
  63:6,23,25
  64:21 66:7
  67:9,18 68:2

  68:13 70:12
**strike**  19:16
**stripped**  36:25
  37:3,10,11,22
**strong**  64:5
**studied**  24:16
  24:18 28:15
**study**  14:12
  15:25 16:5,7
  23:17,21 24:3
  26:3 27:11
  31:14 36:11
  54:15 89:18
  90:2 91:11
  92:14 93:6
**subject**  8:15
  39:14,15 101:5
  111:10 114:11
**subjectively**
  103:15,17
**submitting**
  98:11
**subscribed**
  111:17 115:22
**substantial**
  43:4 55:20
**sufficiently**
  49:8
**suggest**  83:5,21
  91:13 92:4
  96:8
**suggesting**
  84:17 85:2
**suggestion**  88:5
  106:6

**suggests**  36:12
  89:18 90:3
  106:3
**summarize**
  14:20
**summary**  34:10
  34:19
**sumon**  8:2
**support**  9:14
  11:21 87:20,24
  88:4,15 109:6
**sure**  13:18
  19:12,21 35:11
  54:20,22 62:11
  66:24 92:20
  97:23 101:2
**surely**  84:17
  93:5
**surprise**  28:7
  37:6 40:12
  41:22 44:11,16
  81:13 82:8
  95:8
**surprised**  14:5
  14:8 42:4
  85:24 87:10
**surprises**  29:7
  29:8 30:14
  82:10
**surprising**
  44:22 83:4
**swear**  6:5
**sworn**  6:8
  111:17 112:11
  115:22

**[t - think]**                                                          Page 24

| t |
|---|

**t**  6:17 23:7
53:12 112:2,2
113:2
**tabak**  1:11 2:5
4:1,16 5:1 6:1
6:7,16,20 7:1
8:1 9:1 10:1,12
10:14,16,18,20
10:22 11:1
12:1 13:1 14:1
14:17,24 15:1
15:3 16:1 17:1
18:1 19:1 20:1
21:1,16 22:1
23:1 24:1 25:1
26:1 27:1 28:1
29:1 30:1 31:1
32:1 33:1 34:1
35:1 36:1 37:1
38:1 39:1 40:1
41:1 42:1 43:1
44:1 45:1 46:1
47:1 48:1 49:1
50:1 51:1 52:1
53:1 54:1 55:1
56:1 57:1 58:1
59:1 60:1 61:1
62:1 63:1 64:1
65:1 66:1 67:1
68:1 69:1 70:1
71:1 72:1 73:1
73:12 74:1
75:1 76:1 77:1
78:1 79:1 80:1

81:1 82:1 83:1
84:1 85:1 86:1
87:1 88:1 89:1
90:1 91:1 92:1
93:1 94:1 95:1
96:1 97:1 98:1
99:1 100:1
101:1 102:1
103:1,8 104:1
105:1 106:1
107:1 108:1
109:1,25 110:1
110:11 111:6
111:15 112:9
113:4,6 115:22
**take**  4:12 7:7
23:22 26:25
34:22 41:5
42:6 59:13
61:14,25 66:25
69:3 72:7
82:20 88:18
90:7 93:19
99:25 103:6
104:15 105:6
105:13 109:3
109:17
**taken**  2:5 4:16
73:6 109:21
**talking**  49:3
59:7 60:4
81:22 82:5
101:6 110:5
**talks**  91:4 92:8

**tangentially**
71:17
**target**  101:11
102:19
**technically**
36:18
**tell**  34:19 48:10
107:18
**ten**  19:15 57:12
57:13,21 71:6
71:11,15
**tend**  104:2
**tended**  36:22
**tendency**
106:11
**tends**  30:13
106:9,23
**terms**  33:17
78:3
**test**  14:25 15:4
15:10,15,19,23
16:24 17:6,12
17:16 20:14
21:5,12 26:11
26:14 27:17,23
29:24 31:24
32:12,16,17,21
34:19 39:8
42:14 44:10
50:17 51:4,5
59:2,15 62:25
65:25 67:8
73:18 74:23
75:5,10 103:12
103:24 106:17

**testified**  6:10
23:6
**testifying**  7:18
15:9 31:2
73:13
**testimony**  7:21
91:24 102:16
110:10 111:7
112:12
**testing**  22:25
**tests**  22:5 39:16
39:17 41:8
**teva**  23:6 75:16
**thank**  13:20
107:23 110:2,8
**thiago**  3:18
5:22
**thing**  47:25
62:9 72:6,13
87:24
**things**  6:25 7:2
22:20 23:5,5
28:5,10 55:11
58:22 59:4
64:11 67:17
71:4 81:23
94:6 96:3,6
106:22
**think**  23:4,15
23:20 24:23
25:16 29:14,15
29:25 30:2,9
33:24 41:6
46:4 52:17
54:16,19 55:23

59:6 60:10,22 61:15 66:10,12 66:21 68:10 77:9 78:3 83:11 84:8 96:24 97:7,11 102:17 104:22 104:24 109:15

**thinking** 12:14 29:9

**thinks** 84:5

**third** 3:4 61:22

**thirty** 114:17

**thought** 40:18 47:3 96:12

**three** 25:2,4,5 25:24 93:21 94:16,20 97:12 99:24 104:19 105:4

**threshold** 96:16

**thresholds** 93:25 95:3

**tied** 30:15

**time** 4:10 5:11 32:4 52:19,23 53:5,24 54:9 54:21 55:5,7 55:16 56:6 58:5 60:5,6 62:4 72:25 87:3 110:2,17

**times** 7:10 9:6 16:13 18:15

27:12 29:2,13 64:22

**timing** 54:8 57:25 98:7

**titled** 11:14

**today** 6:25 7:9 7:18,22 24:4 30:2 37:18 51:16 63:20 97:8 110:2

**today's** 110:10

**took** 57:25

**top** 35:18 36:2 64:3 72:8,8,8 75:12 82:19,20 82:22 97:16,17 97:17 98:25 99:5,13,19,19 100:3,9,12,17 100:22,23 101:3,5,16,18 101:22,24 102:10,11,19 102:23,24 104:11,11 105:9 108:6,23

**total** 99:4,7 110:12

**totally** 46:18 47:11

**trading** 54:6 72:15 73:23 87:4

**traditional** 15:24

**transcript** 111:10 114:18 114:20

**treat** 54:2,5 59:14

**treated** 21:19 84:13 103:11

**tried** 57:10 58:17

**troubling** 40:3 42:22

**true** 6:23 9:22 27:21 33:6,19 64:7,10 66:18 89:17 90:2 92:20 95:19 104:14 111:9 112:12

**try** 19:11,17,19 20:25 33:14 59:17 71:25

**trying** 62:19 97:23

**turn** 11:12

**turning** 42:20 50:25 81:4 87:11

**two** 7:10 15:4 17:25 19:6 20:11 27:6 28:23 29:10 30:6 63:13,22 81:22 91:12 92:3 108:23 109:7,11

110:13

**type** 17:9,10 18:14 30:16

**typically** 20:2 22:10 81:15

**u**

**u** 8:14

**unaffected** 105:21

**unclear** 69:17

**under** 7:18 104:17

**undercount** 17:14

**undercounting** 17:4,11

**understand** 7:15,17,19 18:3 19:12 25:17 36:11 40:8 42:9 45:20 46:2 48:5 57:20,23 78:20 80:9,13 84:9 85:4,13 87:13 89:22 91:22 97:24 100:20,20

**understanding** 8:9,9 13:17 37:2 40:11 46:8 56:22 78:25

**understands** 91:9

**understood**
20:24 39:21
104:8
**undertook** 57:8
**unexplained**
49:23
**union** 69:3
**unit** 4:14 73:5,9
**united** 1:2 4:19
**units** 110:13
**unquote** 47:6
**unrelated**
46:18
**unreliable** 21:9
**unusual** 26:7
26:10,15,17
35:25 36:5,8,8
40:7 61:19
84:24
**updates** 30:12
**upper** 25:22
**use** 42:24 46:16
51:25 52:11,23
53:5 59:23
70:18 72:16
79:12 81:5
87:11 92:22
93:6 94:7
95:20 96:9
**used** 16:11,12
35:14,17 51:20
52:24 53:17,20
57:12 59:18
66:18 70:8
74:11 92:14

93:25 94:3,20
94:23 95:9,17
98:2 102:5
110:13 114:21
**uses** 92:15
**using** 15:14
39:2,9,11
42:15 43:13
44:4 50:18
62:6,18 63:23
63:25 65:5
71:25 82:11
95:2
**usually** 97:11

**v**

**v** 23:7 53:12
**vale** 1:7 3:18
4:17 5:23
14:11 28:8
32:20 33:9
34:16 35:23
36:21,25 37:3
37:7,19,21
40:20 41:16
42:11 43:24
44:4,7 45:10
45:23 46:6,19
46:20,21 47:7
47:19 48:12
49:18,18 51:19
67:25 77:18
78:14 79:23
80:6 84:18
105:21,25
107:10

**vale's** 9:13
11:21 32:20
36:13 40:9
41:23 43:15
44:13 46:24
49:9 50:18
78:20 82:2
85:16 86:5
**valid** 50:19,24
**value** 62:14,17
62:20 63:10,15
63:18 64:16
65:19 68:15
71:12
**varies** 74:2
**various** 41:8,9
57:15 95:24
102:5
**vendor** 53:13
**verb** 24:24
**verify** 57:25
**veritext** 5:4
110:14
**versus** 21:3
90:25
**video** 4:11,15
**videographer**
3:19 4:2 5:2
6:4 73:3,7
109:19,22
110:9
**videotaped** 2:4
**view** 63:21
105:23

**viewed** 52:12
**views** 23:9
**volatilities**
90:16
**volatility** 89:19
90:4

**w**

**wall** 59:23 60:4
60:7,20 62:7
63:6,23,25
64:21 66:7
67:9,18 68:2
68:12 70:12
**want** 29:5,15
32:14 34:21
38:2 41:5 42:6
44:25 45:20
47:24 48:22
50:5,8 61:12
61:25 70:19
84:8 85:4
86:22 88:18
100:25
**wanted** 61:11
**way** 17:15
20:21 37:18
42:4 44:17
60:11 61:21
69:17 72:2
74:4,9 77:23
78:9 99:16,23
104:13 106:7
106:11,24
107:20 109:12
112:17

**[we've - zero]**                                                                    Page 27

| | |
|---|---|
| **we've**  64:17 95:15 | **y** |
| **weidner**  3:13 5:20 | **yeah**  8:20 33:24 34:12 82:8 |
| **whereof**  112:19 | **year**  24:16,19 25:3,7 26:7,22 |
| **whispering**  4:8 | **years**  27:7,19 27:22 28:24 29:10 30:7 |
| **willing**  34:22 | **york**  1:3,12,12 2:7,7,10 3:4,9,9 4:21,24,24 6:18,19 64:22 87:3 112:3,4,8 |
| **wires**  51:14 | |
| **wish**  104:21 115:3 | |
| **witness**  6:3,5 110:5 111:6 112:9,13,19 114:2 | |
| **word**  23:22 26:25 103:7 | **z** |
| **words**  41:7 43:3 69:5 | **zero**  33:6 |
| **work**  30:25 33:6 74:4,9 78:9 100:22 108:3,14 | |
| **working**  23:24 25:14 69:14 | |
| **world**  44:19 78:24 | |
| **worldwide**  78:2 78:5 | |
| **worried**  49:8 | |
| **write**  12:14 | |
| **written**  88:20 | |
| **x** | |
| **x**  1:4,10 113:2 | |

Federal Rules of Civil Procedure

Rule 30


(e)  Review By the Witness; Changes.

(1)  Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A)  to review the transcript or recording; and

(B)  if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2)  Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.


DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.