UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

```
------------------------------X Docket#
BRYAN RAUCH,                    : 19-cv-00526-EK-SJB
                               :
             Plaintiff,        :
                               :
    - versus -                 : U.S. Courthouse
                               : Brooklyn, New York
VALE S.A., et al.,             :
                               : February 26, 2024
             Defendants        : 10:22 a.m.
------------------------------X
```

TRANSCRIPT OF CIVIL CAUSE FOR ORAL ARGUMENT
BEFORE THE HONORABLE ERIC R. KOMITEE
UNITED STATES DISTRICT JUDGE

**A   P   P   E   A   R   A   N   C   E   S:**


**For the Plaintiff**:          **Donald R. Hall, Jr., Esq.**
                                **Frederic S. Fox, Esq.**
                                **Melinda D. Campbell, Esq.**
                                Kaplan Fox & Kilsheimer LLP
                                800 Third Ave, 38th Floor
                                New York, NY 10022


**For the Defendant**:          **Christopher Joralemon, Esq.**
                                **Jason Bressler, Esq.**
                                **Harrison Chase Weidner, Esq.**
                                **David M. Kusnetz, Esq.**
                                Gibson, Dunn & Crutcher LLP
                                200 Park Avenue, 48th Floor
                                New York, NY 10166


**Transcription Service**:      **Transcriptions Plus II, Inc.**
                                61 Beatrice Avenue
                                West Islip, New York 11795
                                RL.Transcriptions2@gmail.com


Proceedings recorded by electronic sound-recording,
transcript produced by transcription service

2

Proceedings

THE CLERK:  Civil Cause for Oral Argument, docket number 19-cv-526, *CAAT v. Vale S.A., et al.*

Counsel, please state your appearances for the record beginning with plaintiff's counsel.

MR. HALL:  Good morning, your Honor.  Donald Hall from Kaplan Fox & Kilsheimer on behalf of the plaintiff CAAT.

MS. CAMPBELL:  Melinda Campbell also on behalf of the lead plaintiff CAAT.

MR. FOX:  Good morning, your Honor.  Frederic Fox also on behalf of lead plaintiff CAAT.

MR. JORALEMON:  Good morning, your Honor.  Chris Joralemon; Gibson Dunn, on behalf of defendants.  I'm joined today by my colleagues Chase Weidner and Jason Bressler also of Gibson Dunn.  And if I may, your Honor, I just wanted to introduce Alex D'Ambrosio and Chago Cardoso.  They're representatives of Vale here today.  I wanted you to know who was in your courtroom.  And so he's not left out, that's David Kusnetz of Gibson Dunn between them.

THE COURT:  Okay.

MR. JORALEMON:  Thank you, your Honor.

THE COURT:  All right.  Good morning, everyone.  We're here really for a discrete purpose this morning which is just to figure out, well I'd say two things.

3

Proceedings

Thank you.

One, how we are coming out on the motion to decertify the class which I'll say I think is an uphill battle for the defendants.  But I want to make sure I understand everything I need to.

And two, just to chart the order of operations going forward as between Daubert and summary judgment, but not to I don't think have substantive argument on those issues today, certainly not unless it is directly relevant to the decertification issue.

All right.  Okay.  This is the defendant's motion to decertify so we'll begin with the defense today.

MR. JORALEMON:  Sure.  Thank you, your Honor.

If I may at the start, I'd just like to identify two things I think we all agree on that will inform the discussion today.

First, everyone agrees that reliance is a key element of plaintiff's claim here.  The investors have to have had relied on the alleged misstatements in making an investment decision.

Another principle we all agree on is that reliance is inherently an individual issue and thus the predominance requirement of Rule 23 is problematic.  So the Supreme Court adopted this presumption of classwide

Proceedings

4

reliance in the *Basic* case.

That in turn rests on the efficient market hypothesis which basically, your Honor is well aware, posits that in an efficient market for security most publicly available information is quickly and rapidly incorporated into the stock price.

Now, to get the benefit of that presumption, plaintiffs will agree they have to establish that the secured markets for the security at issue here, these are eight Vale securities, one ADR, seven notes, operated efficiently throughout the class period.  That is their burden to demonstrate efficiency because if they can't demonstrate efficiency, that presumption of reliance falls away, individual issues will predominate and the class must be decertified.  So that's the framework we're going to talk about.

Now, I recognize there are several legal issues that the Court is going to want to hear about and resolve today, but if I can for a moment just jump to the final chapter here, and it's this.  No matter how the Court resolves those legal issues, whatever path the Court takes, they all lead to the same place, and that is decertification.  And the reason that is is because the Court now has before it unassailable direct economic evidence that overwhelmingly establishes the inefficiency

5

Proceedings

of the markets for these eight Vale securities throughout the class period.

Now, what is that evidence? I'm not going to dwell on Dr. Mazumdar's résumé or his methodology. I'm happy to address that, your Honor. It's laid out in crystal detail in his reports. Suffice it to say that his methodology, plaintiff's own expert would agree, is the gold standard. This is how you go about adducing direct evidence of efficiency or inefficiency.

And what did that gold standard test reveal for the ADRs? There was zero detectable price reaction on any of the nine earnings announcement dates during the class period, zero. So I'm going to shorthand it because I'm going to stumble on this, statistically significant abnormal return is the standard. It's really just a very detectable cause and effect relationship between news and the price of the security. That --

THE COURT: Sorry, say the phrase again. Statistically abnormal?

MR. JORALEMON: Statistically significant abnormal return,

THE COURT: Which is defined to mean what?

MR. JORALEMON: So today I'll shorthand it probably just price reaction just for --

THE COURT: Price reaction relative to what?

6

Proceedings

MR. JORALEMON:  Of the security relative to the disclosure of news.  So we're not talking about the misrepresentation.  I'm just talking about any value relevant news disclosed to the public.

THE COURT:  But is it controlling for broader market movements?

MR. JORALEMON:  Yes, yes.  That is a staple of valid events that you have to control for industry and market wide factors which Dr. Mazumdar does in his work.

So just to get back to the results, no price reaction on any of the earnings dates, no price reaction on any of the production announcements.  Now, what are the production announcements?  For Vale, these are critical disclosures.  Plaintiff's own prior expert conceded that those production announcements are one of the primary drivers of Vale's top line results.  No price reaction.

Beyond those key dates there is no price reaction on 95 percent of the news days throughout the class period.  572 trading days in the class period.  In 95 percent of the days in which news was disclosed, the price didn't do anything.  So that is the definition of an --

THE COURT:  Maybe the news wasn't newsworthy though.

Transcriptions Plus II, Inc.

7

Proceedings

MR. JORALEMON:  Well, it has to be, right, it has to be value relevance.  Right.  News, Inc. in the definition of news itself is it has to be new and value relevant.  It can't just be there is a shareholder meeting.

THE COURT:  Yes, which is entirely subjective, right?  I mean to me -- you know, so this camera test was framed in 1989 or something like that.  Maybe '98.  I could be flipping the digits.

MR. JORALEMON:  Yeah.

THE COURT:  But the markets have obviously gotten a lot more efficient since then with the general explosion of information available to everybody generally.  You know, the ADSs alone had a market cap averaging 15 plus billion dollars.  I'm not sure I understand why the number of market makers is especially relevant, but 140 market makers during the class period trading volume was on average 9.9 percent of the float.

I mean I would add some other factors like what is the sophistication of the investor base?  Is it mostly retail investors or is it more sophisticated institutional investors.  I'm not sure I know that.  The bid-ask spread is narrow, which is obviously common for heavily traded equity securities in general.  And most of the float is held by outsiders rather than insiders.

8

Proceedings

MR. JORALEMON:  Right.

THE COURT:  So why is the market so inefficient?

MR. JORALEMON:  Right.  It's --

THE COURT:  You're saying that's what's observed --

MR. JORALEMON:  It's a great question.

THE COURT:   -- but like what would the reason be?

MR. JORALEMON:  It's a great question.  So I don't know.  This is an anomalous result here.  One would call those indirect factors your Honor identified, to the extent they measure efficiency, which is an open question, but let's just concede the point for a moment, they would point towards efficiency here with Vale.

But the principal test, direct test, an event study with economic regression analysis definitively demonstrates that these securities traded inefficiently.  They were not responding to news at all throughout the class period.  And that is the linchpin of the presumption of reliance.  If you just accept that they weren't responding to news, then plaintiff cannot, cannot as a matter of law demonstrate a relationship, a cause and effect relationship to the challenge statements and the price of the stock.

Transcriptions Plus II, Inc.

9

Proceedings

So not to get into the weeds, but I really have to focus for a second on their -- --

THE COURT: So the answer to the question of why would this equity market be so inefficient is we don't know?

MR. JORALEMON: So your Honor, I'm just a lawyer. I can speculate about it. I think it has something to do with exogenous factors overwhelming any news about Vale. So Vale stock I think during this class period was driven by things happening in China for the price of iron ore, things that were --

THE COURT: Yes, but that's news also. Was that omitted from the event study?

MR. JORALEMON: Well, to the --

THE COURT: Obviously demand for a company's products is one of the most important categories of news that the market is going to look for.

MR. JORALEMON: Yeah. It's not -- right. So it's not -- so in the event study are controls for industry factors. So I'm trying to give your Honor an idea of why this is. I mean the question for the Court is why was it inefficient, it's just was it.

THE COURT: So I'm not sure I have the exhibits. I do have the exhibits in front of me.

MR. JORALEMON: Yeah.

Transcriptions Plus II, Inc.

10

Proceedings

THE COURT:  Give me an example, if you would --

MR. JORALEMON:  Sure.

THE COURT:  -- of the news that we would most expect --

MR. JORALEMON:  Yeah.

THE COURT:  -- to be impactful on the stock's price that nevertheless is not --

MR. JORALEMON:  Great question, great question. The quintessential example of a news day in this type of event, your Honor, are earnings releases.  And that's true of any company.

THE COURT:  Right.

MR. JORALEMON:  Plaintiff's own expert has done extensive academic scholarship on this.  And in one of the studies, if I recall correctly, he determined that almost 98 percent of the S&P 500 companies responded in a statistically significant way to stock prices on earnings dates.

THE COURT:  Does it matter the extent to which the earnings do or do not match expectations?

MR. JORALEMON:  To some extent, yes, for sure. It's not --

THE COURT:  If the market as a whole -- I mean obviously first call earnings surveys are not necessarily representative of the market as a whole, they just

Transcriptions Plus II, Inc.

11

Proceedings

represent the collective of what the sell side thinks which could be very different from what the buy side thinks.

MR. JORALEMON:  Yeah.

THE COURT:  But assume that the market as a collective expect the company to earn precisely $1 per share and it turns out that's exactly what the company earns, there should be in a perfectly efficient world no price movement on earnings day.

MR. JORALEMON:  Right.

THE COURT:  And so does the model control for the extent to which earnings do or do not match expectations?

MR. JORALEMON:  No, your Honor.  And that's why it's so one --

THE COURT:  All right.  So I mean --

MR. JORALEMON:  That's why one earnings date is not sufficient.  If a stock doesn't respond in one earnings date, I think it's fair to say that doesn't really prove anything.  If a stock doesn't respond on nine consecutive earnings dates throughout a two and a half year period, something is wrong.  There is a disconnect here.  That's what plaintiff's own expert says.  The most likely explanation for that anomaly is the stock wasn't trading efficiently.  That's --

12

Proceedings

THE COURT:  Or that the company is smoothing their earnings to meet exactly what is expected which was a very widespread phenomenon at least in the Sarbanes-Oxley era, and who knows, maybe again.

MR. JORALEMON:  Okay.  Right.  So it's not just earnings though.  So to give you another -- I already talked about the production announcement dates.  If I may, just to tee up the FDT test, because I think that's really what Your Honor should look at here.  And it's the Ferrillo Dunbar Tabak test.  It was developed to -- it's essentially a collective event study where you take the entire class period and you separate it into news days and non-news days, some objective way of sorting that which we can talk about in a minute.

And then you look at the news days and see what was the stock doing on news days?  Was it behaving?  What's the percentage of days on which it responded?  And you look at the non-news days and see what is the percentage of days the stock is responding on non-news days because as your Honor knows, it happens all the time in the market.  It's random luck.  There are going to be movements without any news.  But then you compare those two percentages, news days and non-news days, and if there's not a statistically significant difference between them, the stock fails the FDT test.  And all that

Proceedings

13

means --

THE COURT:  But how do you define news days? Companies put out press releases all the time --

MR. JORALEMON:  Sure.

THE COURT:  -- and say like we just hired a new director in our effort to diversify the board.

MR. JORALEMON:  Right.

THE COURT:  That's not going to be -- that's news but nobody should expect that to affect the stock price.

MR. JORALEMON:  Absolutely.  Your Honor is absolutely right and that is why you have to do this collective event.  So you have to aggregate all of the news days and compare it to all of the non-news days.  So if you --

THE COURT:  No, I would argue you have to, in order to do this most accurately, you have to aggregate less than all of the news days because the more news days you include, the more you're diluting the effect of the subset of actually impactful news days.  Right?  And so the minute you decide to be over inclusive --

MR. JORALEMON:  Sure.

THE COURT:  -- and start looking out press releases about we hired this new board member, the less --

14

Proceedings

MR. JORALEMON:  I agree.

THE COURT:  -- effective your methodology.

MR. JORALEMON:  I entirely agree with that. And the converse is also true, your Honor.  The more you take news days and put them in the non-news day pile, the more likely you're going to pass the FDT test.  It's freaking that test so you take news days --

THE COURT:  Right.

MR. JORALEMON:  -- where there may or may not be a price reaction, you put it in the non-news day pile. If you do that --

THE COURT:  Right.  So the assumption is to find the outcome.  And where we are is we have dueling experts with dueling assumptions and --

MR. JORALEMON:  Okay.

THE COURT:  -- you know, tell me why one of their methodologies is so deeply flawed that --

MR. JORALEMON:  Absolutely.  Thank you, your Honor.  This is not a battle of the experts.  Let me repeat that.  This is not a battle of the experts because if it were it wouldn't be a fair fight.  Tabak's rebuttal, if I can just hone in on exactly what your Honor is focused on here, how did he go about defining news days?  Let's just look at this.  Okay?  His methodology resulted in first, January 25, 2019, that's

Transcriptions Plus II, Inc.

15

Proceedings

the date the dam collapsed, the very reason we are in this courtroom today.  All hell broke loose.  It was a tragedy.  According to their expert, that was not a news day for Vale.  There was no value relevant information released to the market about Vale on that day.  It was the morning in New York on a trading day, not --

THE COURT:  The dam collapsed what time New York time?

MR. JORALEMON:  It was at 10 a.m. in the morning.  And the news spread -- I was in London, your Honor, and I heard about it within 20 minutes of it happening.  So --

THE COURT:  So walk me through that day.  Actually, that would be interesting,

MR. JORALEMON:  Okay.

THE COURT:  What is known about the dam collapse and its consequences and at what time and what is the actual stock price reaction?

MR. JORALEMON:  Okay.  So --

THE COURT:  What day are we talking about here?

MR. JORALEMON:  It was January 25, 2019.  I know that there was a significant stock price reaction.  I don't have the specific data in front of me.  But essentially as these things, as significant events like this happen, there was waves of news released on the 25th

16

Proceedings

and then continuing for the next two weeks.

But at a minimum on the 25th, the market knew there was a serious dam accident at one of Vale's facilities.  There likely were going to be deaths and sort of a whole host of consequences flowing from that.  That much was clear during trading hours on that day.  I just don't want to get lost here.  It's not so much -- the stock reacted that day for sure.  The point is under his test, that wasn't a news day.

THE COURT:  Does he say why?

MR. JORALEMON:  No.  Well, no, because his methodology was so cramped, he was trying so hard to find some way for this stock to pass the FDT test, he had to skinny down news days to virtually nothing which I'm going to tell you about, your Honor.

How about this?  His definition of news day doesn't include in the middle of the class period Vale announced his CEO was departing.  It was unexpected.

THE COURT:  Does he have an actual definition of news days or he just has a --

MR. JORALEMON:  He simply took this wire service, Dow Jones News, and ran Vale through it.  I'm not quibbling with the methodology.

THE COURT:  That would have resulted -- presumably there were Dow Jones newswire stories on the

Transcriptions Plus II, Inc.

17

Proceedings

25th.

MR. JORALEMON:  One would think, your Honor.  I don't know why he didn't identify the 25th as a news day.

THE COURT:  I guess we'll have to hear from the -- I mean look, if it happened late enough in the day --

MR. JORALEMON:  No.  It was first thing in the morning.

THE COURT:  What's the time difference between Brazil and, or wherever this dam is located, and New York City?

MR. JORALEMON:  I think Brazil at the time was two hours ahead I believe.  I think it was two hours ahead.  So it was 10:28 in the morning in New York, your Honor, when it happened.

THE COURT:  That what?  That the --

MR. JORALEMON:  That the dam collapsed.  And like I said, I was in London and it was the afternoon when I first heard about it on my phone, breaking news.

THE COURT:  Right.

MR. JORALEMON:  Let's look at some other news days.  Unexpected departure of the CEO in the middle of the class period, not a news day according to their expert.  The departure of a CEO unexpected, that's not value relevant information released to the market?  That

18

Proceedings

makes no sense respectfully.

The earnings dates again, not to rehash this, but eight of the nine earnings dates under his methodology are not news days.  And he --

THE COURT:  And it's not that this is a timing issue where he's counting on the next day --

MR. JORALEMON:  No.

THE COURT:  -- because of some --

MR. JORALEMON:  Not at all, your Honor.  Not at all.

THE COURT:  He's just saying these are not --

MR. JORALEMON:  This is purely an effort to get as few news days as possible that you're at least passing the FDT tests under certain scenarios.  Not even all of them.  And the only way they can do that here is to end up with, if I just jump to the end, he ends up at his 10 percent cutoff three news days.  There were 572 trading days.  According to their expert, there is only three days over that entire two and a half year period where value relevant information was released to the market about Vale, and two of those three days happened after the dam collapse.

THE COURT:  Say that again?  500 and how many trading days?

MR. JORALEMON:  572 trading days, your Honor.

Transcriptions Plus II, Inc.

19

Proceedings

THE COURT:  And he says three of them --

MR. JORALEMON:  Under his 10 percent cutoff, because I'll walk through that in a second, but just to jump to the conclusion, under his 10 percent cutoff where they finally, finally pass the FDT test, it's three news days.  And there is only a price reaction on one of those news days, again, after the dam collapsed when all craziness was happening.  So think about that.

THE COURT:  Are the experts, and I'm just wildly speculating here about best practices in its methodology, but are the experts taught -- you know, what we're debating is the extent to which the market would have reacted to this news, the news that is the reason why we're here in this case.  Are the experts taught to extract from their analysis any news stories that are the stuff of the case at issue?

MR. JORALEMON:  So that can be done.  If you're going to test specifically the misrepresentation dates --

THE COURT:  Right.

MR. JORALEMON:  -- that's really, the design of that study would be to --

THE COURT:  I'm going to hear from the defendants in a but maybe that's the reason for their experts not considering the dam collapse to be a news event because it's not the control --

20

Proceedings

MR. JORALEMON:  Yeah.  I suspect that will not be the explanation, your Honor.  It's sort of more of a -- if I may, just to take a step back, what these experts are charged with doing is conducting a scientific study, but they're not looking, they're not supposed to be looking for an outcome.  They're basically saying okay, applying economic principles and these well-established tests, I'm going to test this class period and see if I can detect a cause and effect relationship between news and the security, the price of the security.

THE COURT:  Can you just tell me is there case law on the following subject?  Methodologically speaking --

MR. JORALEMON:  Yes.

THE COURT:  -- if I'm trying to test the efficiency of the market during the class period and there are two kinds of news stories, those that pertain to the actual subject matter of the case being litigated and those that don't, is it the better practice to extract the former category?  Have the cases said anything about that one way or the other?

MR. JORALEMON:  If I understand your Honor's question, I think both of those tests exist but they're both designed to detect two different things.  If the goal is to detect market efficiency, which we are talking

Transcriptions Plus II, Inc.

21

Proceedings

about today --

THE COURT:  Right.

MR. JORALEMON:  -- you don't cabin that study to the challenged misstatements, for example.  It's really -- because the premise, the entire --

THE COURT:  No, I'm asking the opposite question.

MR. JORALEMON:  Right.

THE COURT:  Cabin it to --

MR. JORALEMON:  That's a different type of end study.  That's done, and it is done regularly, to sever the link between the misstatement and the stock price.  That's what they call price reaction where it's in the world of the rebuttable presumption, anything you do to sever that link.  So let's say they get the presumption the market's sufficient, a defendant can still sever the link if it shows that the stock wasn't doing anything on the challenged misstatement dates.  When Vale comes out and says we value life, the market doesn't do anything, doesn't care about it.

Now, there is a counter to that I think here which you'll hear from plaintiffs.  So that issue is not here.

THE COURT:  I'm not --

MR. JORALEMON:  It's not part of what we're

Transcriptions Plus II, Inc.

22

Proceedings

here for today but --

THE COURT:  So I'm kind of hanging by my fingernails to understand the -- I wish I was more of a statistician than I am, and I am not at all one.  Forget about the price reaction study and let's talk just about the market efficiency studies --

MR. JORALEMON:  Got it.

THE COURT:  -- that are the basis, of the type, that are the basis for your --

MR. JORALEMON:  Yes.

THE COURT:  -- decertification motion.

MR. JORALEMON:  Yes.

THE COURT:  What is the better practice in the world of market efficiency studies?  If we're looking at whether the market was or was not efficient during the class period, should the expert be including or excluding news days or potential news days that relate to the subject matter of the litigation?

MR. JORALEMON:  Okay.  I think the answer to that, and again, share your Honor's hanging by the fingernails.  I just probably had more time to prepare for this.  My understanding --

THE COURT:  Well, you do it for a living.

MR. JORALEMON:  My understanding is this.  The expert should not consider either way whether it relates

Transcriptions Plus II, Inc.

23

Proceedings

to the case or not because that in a --

THE COURT:  So you're saying best practices, January 25, 2019, for example, if that's part of the class period here --

MR. JORALEMON:  Yes, it is.

THE COURT:  -- which I assume it is, that news should have been included as a matter of best practices.  There's no --

MR. JORALEMON:  Unquestionably.

THE COURT:  Okay.

MR. JORALEMON:  Yes.  As should have the departure of the CEO, as should have all the earnings dates, as should have all the production announcement dates.  None of these --

THE COURT:  All right.  Can we pause and hear from the -- I'll give you the last word.

MR. JORALEMON:  On that issue.  I have a lot more to cover, your Honor.  I apologize.

THE COURT:  I'm sure.  Yes.  I want to give you another let's call it 20 minutes total.

MR. JORALEMON:  Okay.

THE COURT:  You can decide how much of that is now versus rebuttal.  But let's just pause for a moment.

MR. JORALEMON:  Okay.

THE COURT:  And let me understand, before I

Proceedings

24

lose this thread --

MR. JORALEMON: Okay.

THE COURT: -- what is the plaintiff's view of why these seemingly important news days don't make it into the efficiency study.

MR. HALL: So I'll address that. And I can also address some of the other questions or we can wait for Mr. Joralemon.

THE COURT: Just that.

MR. HALL: Okay. So Mr. Joralemon is not necessarily understanding what Dr. Tabak did. So when Dr. Mazumdar used the FDT test, he looked at all of his news days. He did not attempt to determine which of those news days were material and which ones were not material, and that's something I'll get into when I have my full time.

But the objective way that Dr. Tabak does the study, the next step that Dr. Mazumdar didn't take is the theory being objectively if a news article is repeated more in the press, and that statement and that issue is discussed more, it is more material to the market. If someone --

THE COURT: So wouldn't a dam collapse, that is the whole reason we're here, meet that description?

MR. HALL: It did not in this case because of

25

Proceedings

the way the different news studies -- so what he did, he ran the same news search on the Dow Jones that Dr. Mazumdar did.  He actually used Dr. Mazumdar's search terms, so he got the same set of days.  He said here are these set of days.  It doesn't really tell me anything because I don't know which of those days are material and which are not.  And there are studies on this, he's written on this, and he's done it in other cases where if you look at which news articles are repeated the most throughout the class period and you look at the ones that are in the top --

THE COURT:  What does repeated mean?

MR. HALL:  It's picked up by more news sources. So --

THE COURT:  So the wire service, in this case Dow Jones, puts out what, a quick story and the question is how many other outlets pick up that story what, same day, at all?

MR. HALL:  Yes, same day because we're doing it on the day by day.  Both experts are working on a day-by-day basis, so it's the same day.  So if an article is not picked up and an article is picked up by eight other news sources, the objective criteria, and there's many ways to look at materiality and that's what a lot of my argument will go to, the objective way is the one that was picked

26

Proceedings

up eight times is more material to the market than the one that wasn't picked up.  So when Mr. Joralemon talks about --

THE COURT:  But you see the problem here, right?  If the stock reacts badly to the news that there's been a dam collapse -- I mean your whole theory of the case is that dam safety was a core interest for investors who followed this stock.  Right?  And that this is not a case in your view where you have a highly generic representation like we have a robust control environment and then there's some specific compliance issue.  You're trying to say there's a greater match on the generic versus specific scale between the alleged misrepresentations which are specific to dam safety and the news that reveals the alleged falsity or allegedly reveals the falsity of those statements.

And so if it's true in your world that dam safety is one of the key drivers of this stock and the debt securities as well, how could it possibly be that the Dow Jones wire service puts out the news story and no one cares?

MR. HALL:  It was not picked up as many times as other news days.  That's the only explanation (indiscernible) --

THE COURT:  How many times was it picked up?

Transcriptions Plus II, Inc.

27

Proceedings

MR. HALL:  I don't have that in front of me, your Honor.  I don't know.  But it was not picked up in the top 10 percent.  And he did, Mr. Joralemon probably talked about this, Dr. Tabak did a 10 percent and 25 percent, he did three different levels to see how many news articles were picked up in the top 10 percent of all news on those 572 days.  That's what that 10 percent category is.

THE COURT:  You see the problem, right?

MR. HALL:  I do see the problem.  I don't --

THE COURT:  The tension seems to me that if your efficient market theory is correct, then that implies that your merits theory is not correct.

MR. HALL:  Well first off, I think the reason Dr. Tabak was even doing that analysis was to point out some of the problems with Dr. Mazumdar's study.  And the key issue, and I don't want to jump into this because I know Mr. Joralemon -- is the distinction between news and non-news days which your Honor has already picked up on.  I have a presentation on that.

THE COURT:  All right.  But how can the day on which a dam collapses causing massive loss of life not be a news day?

MR. HALL:  It was a news day.  Dr. Tabak agrees it was a news day.  He does.  It just wasn't, it wasn't a

28

Proceedings

news day that was picked up as many times on that day as other days of news.

MR. JORALEMON:  So your Honor, I just have to correct the record here.  Apparently Mr. Hall doesn't understand his own expert's work.  January 25th was not a news day under David Tabak's study.  Full stop.

THE COURT:  I think we all agree on that even though --

MR. JORALEMON:  No, he's trying to say it was somehow cut out at 10 percent.  It does not get picked up in his approach and here's why, because he too narrowly defined news days.  He only looked at Dow Jones newswire.  He didn't look at multiple sources.  It's incorrect to say he relied on Mazumdar's data.  He didn't.  Professor Mazumdar correctly looked at multiple news sources, the Wall Street Journal, the Dow Jones, et cetera, et cetera.  It was a news day under Professor Mazumdar's approach.  Of course it's a news day.  That's obvious.  That's a valid test.

Tabak's attempt is so patently obvious, your Honor, the only reason it wasn't a news day in Tabak's study is because he was desperately trying to get a passing grade on the FDT test and the only way he could do that is to say there are only three real news days here not including the dam collapse or the departure of

29

Proceedings

the CEO.

THE COURT:  How does the FDT test frame the passing grade threshold?

MR. JORALEMON:  It's if there is a statistically significant difference between a percentage of price reaction on news days.  So remember, you separate news days, non-news days, calculate the --

THE COURT:  But how do you -- what statistic significance is what --

MR. JORALEMON:  If the price reaction on a news day is statistically significant, typically significantly greater than the price reaction on non-news days because the stock is going to move on non-news days but --

THE COURT:  How are we defining statistical significance?

MR. JORALEMON:  I think it's at the -- again, I'm not an economist and I apologize if I get this incorrect, but it's at the 95 percent confidence, meaning that difference can only be explained randomly 5 percent of the time.  It's likely there's a relationship there, stocks responding to news.

Here, and we totally agree with this test, and courts have recognized this as the right way to do this, and these securities, the notes and the ADRs, fail, fail, fail, fail.  Every iteration fails.  The only way they

30

Proceedings

can get a passing grade is by eliminating -- again, not to repeat myself, but to skinny down to three days out of 572 trading days news days, and on only one of those days was there a statistically significant price reaction, but it was enough 33 percent, one out of three, was enough to clear the bar because you're left with 571 non-news days.

THE COURT:  Yes.  I mean the legal realist assessment of all of this would be that you have to account for both public disclosures of news and private disclosures of news, i.e., the potential for insider trading.  And I think we all know that that potential is manifestly higher outside the United States than it is inside for a variety of reasons including sophistication of regulators and otherwise.  And that could undermine our accuracy when we tried to measure efficient reactions to news although not with something like the dam collapse here because it sounds like that was disclosed pretty much immediately.

MR. JORALEMON:  Sure.

THE COURT:  So let's just go back for a second to what I -- or let's jump ahead --

MR. JORALEMON:  Yeah.

THE COURT:  -- to what I said was the second agenda item here.  And I apologize if I should have deduced this earlier.  Wouldn't it make more sense --

31

Proceedings

you're making a very Daubert-like argument about the plaintiff's expert report.  Shouldn't we hold a Daubert hearing that includes not only the price reaction experts and damages experts and everything else, but also these market efficiency experts and you know --

MR. JORALEMON:  Your Honor, I hesitate to say great minds think alike because that would be giving myself too much credit, but I think that is a brilliant idea, your Honor.  There are overlap, significant overlap here between the loss causation infirmities in the case and the market efficiency overlap.  I think a Daubert hearing, hearing from their already discredited expert on market efficiency, Feinstein, he is their loss causation expert, and bring in David Tabak and bring in Professor Mazumdar, I think it would be incredible eliminating for your Honor to hear.

THE COURT:  I think we should get everybody here and we should block out a meaningful amount of time because I will have to have things repeated for me multiple times as we go.

MR. HALL:  Your Honor, just one point on this.  There is a distinction between all the experts that will be subject to Daubert and the two experts we're talking about today.  Neither of these experts put in merit reports.  These reports were limited to the

Proceedings

32

decertification motion.

THE COURT:  I understand but --

MR. HALL:  So I actually --

THE COURT:  -- there's a lot of overlap just conceptually in the work that these experts are all doing and I would think there would be efficiency -- if I'm going to get up to speed as best I can on the regression analyses or whatever else they're doing, I think there are efficiencies to having me do all that at once.

MR. HALL:  I understand that, but these experts are not trial experts.  That's all I'm pointing out.  And we can have them in.  I would like to --

THE COURT:  Why are they not trial experts? This is a pure --

MR. HALL:  Decertification motion.

THE COURT:  No, I understand the decertification.  But the efficiency of the market is not something you need to establish at trial?

MR. HALL:  There are other experts for that, your Honor, and we have the indirect factors.  The efficiency of a market has already been established through the indirect factors and it's now defendant's time to rebut it.

THE COURT:  So there was --

MR. HALL:  That's why we're here today.

Transcriptions Plus II, Inc.

33

Proceedings

THE COURT:  Yes.  No, I understand that.  There was all this stuff in the papers back and forth about law in the case and whatever.  Like my understanding of Rule 23, as somebody who's still relatively new to the world of class actions, is that it is incumbent on me to revisit class certification and the class definition from time to time as the evidence changes or as the evidence develops.  And so if there's a motion to decertify on the basis that you haven't established classwide reliance because you haven't demonstrated the efficiency of the market, you should be bringing I would have thought everything you have to bear on that subject in response to the decertification motion, right?  Not just Mr. Tabak.

MR. HALL:  Not 100 percent, your Honor.  I agree with what you said about your role and Rule 23.  But I think what is different about this case is what Mr. Joralemon was pointing out earlier.  *Basic v. Levinson* created the presumption of reliance.

THE COURT:  Right.

MR. HALL:  And it made clear that once the presumption is established -- which we have established that presumption.  Defendants want to ignore it.  They don't want to address it.  But we established the presumption at the earlier class certification process

Transcriptions Plus II, Inc.

34

Proceedings

through the indirect factors. That's how we were able to get the class certified through the presumption of reliance.

THE COURT: And therefore what? I'm prohibited from revisiting the issue?

MR. HALL: You're not, no, absolutely not, your Honor. However, this hearing, their job now, and they disagree about this, their burden is to rebut that presumption to show that the market was insufficient.

THE COURT: Right. So let's say they do that on the evidence that's before me right now which is the, let me not mispronounce these names, the Mazumdar report and the Tabak report. It sounds like there are some anomalies, at least from a common sense perspective, in the way that Dr. Tabak, or whatever his title is, has decided what's newsworthy and what's not, or at least some questions about that.

Let's say I decide that his report is unreliable and I credit the Mazumdar report, you might be at risk of decertification in that circumstance. I'm not saying how that would come out. But given that risk, you should be I would think in response to the arguments that we're hearing now throwing everything you can on the subject of market efficiency.

MR. HALL: But nothing has changed, your Honor.

Transcriptions Plus II, Inc.

35

Proceedings

The indirect factors have not changed and that is enough to establish market efficiency under Second Circuit law. And that is not being challenged.

THE COURT: But why under Second Circuit law -- let's say you have the world's most perfect event study, news study, that shows that yes, despite the fact that 100 plus analysts are covering this stock and the world's most sophisticated investors are trading it and -- I mean does anybody look at the 13, these Fs and Gs on these stocks and see whether they're traded by sophisticated parties on the buy side?

MR. HALL: They are traded by sophisticated parties. That actually is part of the reports that are part of the merits report that go to damages, loss causation, and the earlier efficiency reports.

THE COURT: Right. So then change your position be look, even if we lose, even if Dr. Tabak's report is stricken in its entirety, we should still win on market efficiency even without it?

MR. HALL: Absolutely, your Honor. We do not need Dr. Tabak's study. His study was in response to Dr. Mazumdar's. And I think it's critical to go back and look at what the purpose of Dr. Mazumdar's study was and what *Camera* actually said that under the law was required to do. And the language that *Waggoner*, the Second

36

Proceedings

Circuit in the *Waggoner* case set forth quoting *Camera*, is that that is looking for a cause and effect relationship, and this is something your Honor picked up, unexpected material disclosures that result in a price change.

THE COURT:  Right.  And the whole --

MR. HALL:  So but Dr. Mazumdar did not do that.

THE COURT:  -- the whole can of worms there is defining what is the universe of unexpected disclosures?  And you know, I'm hearing that --

MR. HALL:  And Dr. Mazumdar did not even attempt to do that.

THE COURT:  -- one party is too broad and the other party is too narrow.

MR. HALL:  But Dr. Mazumdar, here's what he studied.  He did not study unexpected material disclosures.  On page 24 of his report, he studied all days in the class period into news, he divided them into news or non-news based on a comprehensive search of potentially value relevant news.  And that's how he was able to say that there were 40 percent of those 572 days were news days.

THE COURT:  Right.  That sounds --

MR. HALL:  And he never looked at the --

THE COURT:  -- extraordinarily high to me, and your sample set sounds extraordinarily small to me.

37

Proceedings

So --

MR. JORALEMON:  Your Honor, if I -- I apologize --

THE COURT:  -- where does that leave us?

MR. HALL:  But your Honor, I think it's key if you would look back at the history of Mazumdar and Tabak, Tabak is actually in response to Mazumdar.  Dr. Tabak is the T in the FDT test.  He's the one who created the test with two other people.  His was critique in the use of the FDT test and the FDT test has this other step that you can take and that's what he applied.

THE COURT:  You're saying, sorry, FTD or FDT?

MR. HALL:  FDT.

MR. JORALEMON:  Your Honor, if I may, just before this thread is lost, we need to correct the record on a few things.

So first of all, your instinct is absolutely correct, your Honor.  There is significant overlap.  The Court would benefit greatly by hearing from all three of these experts at the same time because all the issues overlap.

Their loss causation expert, Feinstein, assumes market efficiency.  He doesn't do his own marketing efficiency study in the loss causation.  He just assumes it.  So if there's no market efficiency, everything else

38

Proceedings

about that study falls away.  There are a lot of other infirmities in the loss causation.

THE COURT:  Right.

MR. JORALEMON:  But that's the threshold issue as your Honor identified.

Now, you put your finger right on it.  The battle here is too many news days and, not enough news days.  Two points about that.

One, we took Tabak's criticism on the over inclusion of news days and excluded them and reran the FDT test, and all the securities still failed.  There was only five days by the way, your Honor, that he quibbled with.  He was wrong about it.  They were news days.  But we took those five days out, reran the test, they still fail.

Now, I want to respond to your Honor's intuition that it's 37 percent of the 572 days Professor Mazumdar identified as news days.  37 percent.  Your Honor instinctually thought that was high.  It's really not.  It's right in the middle of the average.  Tabak's prior reports, I just pulled his last ten reports, the PPG case, guess what, 37 percent of the class period he identified as news days.

THE COURT:  Can I just -- if I wanted to -- so this is where if I wanted to look at examples of who's

Transcriptions Plus II, Inc.

39

Proceedings

including what --

MR. JORALEMON:  Yeah.  So I think, your Honor, like the easiest --

THE COURT:  Which appendix?

MR. JORALEMON:  -- starting point would be the Mazumdar reply report.  And if you're looking -- so just if you can direct me, what specifically?

THE COURT:  I don't think I have his reply report in front of me.

MR. JORALEMON:  Okay.  So just for the record, your Honor can look at this --

THE COURT:  I may have it online.  Hold on.  Actually, is this in the online bench book?  Okay.  I'll look at it online.

MR. JORALEMON:  Okay.

THE COURT:  Hold on one second.  Let me just get there.  No.

MR. JORALEMON:  So just --

THE COURT:  If you can print a copy?

MR. JORALEMON:  Sorry.

THE COURT:  No, go ahead.

MR. JORALEMON:  No, I was just going to --

THE COURT:  So it's the reply.

MR. JORALEMON:  Yeah.  So the Mazumdar reply I think pulls this all together but Exhibit 1 of the

40

Proceedings

Mazumdar reply gives the Court a sense of what is the typical identification of news days when you're doing an event like this. And it's, you know, it's between 20 and 50 percent on average using just Dr. Tabak's prior reports. So don't take our word for it. You know, you can take plaintiff's word for it.

Now one might reasonably say well, maybe there's something different about Vale as compared to GE or Tavo or any of these other companies where there was 30, 40 percent news days. The only problem with that is Dr. Tabak was the class certification expert in the prior Vale case. Unfortunately, you know, there was another incident, your Honor. There's a parallel here. There was a case filed in 2016. Plaintiffs in that case hired Dr. Tabak to do an event study to establish market efficiency. And even Dr. Tabak in that case identified I think it was 67 news days, 17 percent of the class period there. This is Valle.

MR. HALL: I mean, your Honor, I mean focusing on the actual number of news days, your Honor, focusing --

THE COURT: All right. I have the expert -- sorry. So where -- Exhibit 1 you said.

MR. JORALEMON: Exhibit 1, your Honor, is just to give you a sample of Dr. Tabak's prior expert reports.

Transcriptions Plus II, Inc.

41

Proceedings

It's page 56 of 60 on my header.

THE COURT:  All right.  I'm there.

MR. JORALEMON:  So that first exhibit is really just to give the Court a sense of how experts go about -- what are the results --

THE COURT:  Oh, percent news days --

MR. JORALEMON:  -- of the standard -- yeah.

THE COURT:  So for Ali Baba it's 88.9 percent of days or news days?  That's --

MR. JORALEMON:  Yeah.  Apparently like a lot, there was a lot of news about Ali Baba I guess.  I'm not sure what was happening there but --

THE COURT:  That seems absurd, like facially absurd to me.

MR. JORALEMON:  Yeah.  Although I would say, your Honor -- well, a detour.  We're not --

THE COURT:  I mean it's not when you say these are news days, but the question is --

MR. JORALEMON:  Well, I was just going to say like if --

THE COURT:  What news?

MR. JORALEMON:  Hypothetically speaking --

MR. HALL:  That's the important point, your Honor.

MR. JORALEMON:  Your Honor, hypothetically

42

Proceedings

speaking, if there were a class action arising out of events taking place right now in --

THE COURT:  Sorry.  So my question is if I want to look at a descriptive list of what is the news that was counted as --

MR. JORALEMON:  Sure.

THE COURT:  Where is that?

MR. JORALEMON:  So in the Mazumdar opening report, I believe it's appendix C, he outlines his methodology including the identification of news days.

MR. HALL:  And actually page 24 to 28 he gives a narrative description of what he selected as news days and that's where the obvious problem of his report comes to light.

THE COURT:  All right.  So just point me to a page.  And I'm asking the defense.

MR. JORALEMON:  Yeah, I can describe for you, I can describe it for your Honor so you don't have to read it.  These experts unfortunately are --

THE COURT:  Is there a list of news days?

MR. JORALEMON:  Yeah.  So let me tell you the --

THE COURT:  Where is it?

MR. JORALEMON:  Well, there's the methodology, right?  The expert sort of is tasked with --

Transcriptions Plus II, Inc.

43

Proceedings

THE COURT:  So I don't have the data is what you're saying.

MR. JORALEMON:  But the data is there.  It's starting at appendix D.

THE COURT:  Appendix --

MR. JORALEMON:  It lists all the days.  It's in the opening report, your Honor.

THE COURT:  Okay.  So --3

MR. JORALEMON:  Of the Mazumdar report.

THE COURT:  Okay.  So there's the headlines.

MR. JORALEMON:  Yeah.  That's just a summary chart.  It'll show you the day and then the news headline.  We certainly can share with the Court more details to the extent they're interested in a specific date.

Would it be helpful to describe the methodology for your Honor or you just want to --

THE COURT:  Let me just look at this for a minute.

MR. JORALEMON:  Sure, sure.

(Pause in proceedings)

THE COURT:  So if I see the word dropped, that means this was excluded, right?

MR. JORALEMON:  Yes, your Honor.  This is not just a mechanical pull of news days.  Dr. Mazumdar

Transcriptions Plus II, Inc.

44

Proceedings

actually looked at the content of the article.  And to the extent it was either (A) stale, meaning the market already knew about it in a prior release, or (B), was not value relevant.  And the prime examples of that I think are Vale has to file 6Ks short in time after --

THE COURT:  Okay.

MR. JORALEMON:  -- public -- the standard is of material news, but for example, if there's a --

THE COURT:  I'm just flipping through.  I look at --

MR. JORALEMON:  Shareholder meeting, for example.

THE COURT:  Yes.

MR. JORALEMON:  That wouldn't be a news day.

THE COURT:  No, but page B-20, Vale is -- I'm looking at number 270, two seven zero, Vale made a presentation at the Financial Times Commodities of America submit.

MR. JORALEMON:  Right.

THE COURT:  Why should that be newsworthy?

MR. JORALEMON:  Well, so that, your Honor, that type of -- again, just the theory behind it, I don't remember what the content of that presentation was, but that was a gathering of potential -- and that's just potential investors to share updates on the company and

45

Proceedings

whether it's mining projects or, you know, Vale is obviously --

THE COURT:  Is the news supposed to be limited to news that is material to the stock price?

MR. JORALEMON:  Yes, absolutely.

THE COURT:  Okay.  So Reg FD says that when the company is the disclosing party, they need to, if information is material, they need to disclose it to everybody.

MR. JORALEMON:  Exactly right.

THE COURT:  And Financial Times conference, that's presumably invitation only, and I would assume costs a lot of money to attend, would not fit the bill. So by definition, that cannot be, unless Vale is violating Reg FD as a U.S. issuer --

MR. JORALEMON:  No, I think there likely was a 6K filing associated with that.  You know, there's going to be an overlap in this process and then Professor Mazumdar --

THE COURT:  Oh, I see what you're saying.  So it's not --

MR. JORALEMON:  -- just aggregated.

THE COURT:  -- it's not just a fact of the --

MR. JORALEMON:  Correct, correct.  He --

THE COURT:  Oh yes, there are SEC, there are

Transcriptions Plus II, Inc.

46

Proceedings

EDGAR archives links for every one of these things.  Got it.

MR. JORALEMON:  Your Honor is asking exactly the right question.  I just will note for the Court though plaintiff had this methodology, they had all this data, and they only quibbled with five dates.  They were wrong again, but five dates.  We removed those five dates.

THE COURT:  But why?  So if I look at the EDGAR filing associated with Valle's presentation at the FT Commodities Summit, what's it going to say that's material.

MR. JORALEMON:  Again, your Honor, we can get for the Court a copy of that or any other news day release of interest.  I will just say in all likelihood --

THE COURT:  But the point is --

MR. JORALEMON:  -- based on experience, it's reporting to the market developments at the company.  It could be a new mining project, it could be, you know, a production.  Sort of Valle is a very complex global company.  There are --

THE COURT:  When does the --

MR. JORALEMON:  Let's put it this way, let me put it to you this way, your Honor --

47

Proceedings

THE COURT:  Just for my edification, when does the -- so what filing did you say this would be?  A 6K which is the --

MR. JORALEMON:  Yeah.

THE COURT:  -- non-U.S. issue or equivalent of an 8K?

MR. JORALEMON:  Correct, correct.

THE COURT:  When does that go out relative to the presentation itself?

MR. JORALEMON:  The rule I believe says promptly, so I think it was Vale's practice -- and promptly I think is interpreted as the same day.  You can't wait --

THE COURT:  The rule is --

MR. JORALEMON:  You can't wait a trading day to file the 6K.

THE COURT:  But is that true?  I guess what's the relationship then between the rules for 6K --

MR. JORALEMON:  Yeah.  So I --

THE COURT:  -- and Reg FD?  Can you make material disclosures at the conference as long as you --

MR. JORALEMON:  Promptly file with the SEC, yeah, I believe that's the rule.

THE COURT:  And everybody at the conference can be trading on their phones before the disclosure comes

48

Proceedings

out five hours later?  I doubt it because you'd have a lot of -- like by the time the 6K went out, the news would be impounded fully in the market price.

MR. JORALEMON:  So I believe that's the rule. I mean I think it was Vale's practice.  It filed the same day.  And I think there actually is guidance from the SEC on this is that you can't wait a trading date.  I think promptly is the rule.

THE COURT:  Yes.  I think if the touchstone for everything here is materiality --

MR. JORALEMON:  Yeah.  Well, yes.

THE COURT:  -- it looks like where I'm going to come out is that Dr. Mazumdar was obviously over-inclusive and Dr. Tabak was obviously under-inclusive. And you know, I don't know exactly what to make of that.

But let's cut this short here.  You all have a better sense of sort of how I'm wrestling with this.  I do think the indirect factors give rise to a very strong presumption that the market for this stock and these debt securities was at least minimally efficient as required. But I think I need to get through the question of other than the indirect factors, what could a jury -- like reliance is an element of your case.

MR. HALL:  Correct.

THE COURT:  And the efficiency of the market is

Transcriptions Plus II, Inc.

49
Proceedings

an element of that element.

MR. HALL:  Correct.

THE COURT:  And this is all going to be relevant not only to class cert but to --

MR. HALL:  And the indirect factors would be presented at trial, your Honor, for that purpose.

But I would like to point out one --

THE COURT:  Well, is that enough though, the indirect factors?

MR. HALL:  Yes.

THE COURT:  A reasonable jury could find reliance solely on that basis even when your experts, even assuming, and this is an assumption, that your experts actual regression analysis on market efficiency shows zero correlation between, or zero statistically significant difference between market movements on news days and non-news days?

MR. HALL:  That's not (indiscernible), your Honor.  And I think that --

THE COURT:  A hypo.  Just assume, assume that's where the --

MR. HALL:  If the jury found that, that could be a problem for us at trial.  Yes, your Honor.  They would have to balance that against the indirect factors because it's not like the *Camera* factor 5 is the be all

50

Proceedings

and end all.

THE COURT:  Yes.

MR. HALL:  You have to balance it.  But I think one of the key points that has been missed in all this, and your Honor was looking at line 270, and you asked what was said at that conference, none of us will ever know because Dr. Mazumdar didn't look at what was said.

THE COURT:  Somebody can figure out what was said.

MR. HALL:  He didn't even -- I know, but his job, he did not even look at any of the 6Ks in chart B. I asked him directly at his deposition did you, other than removing stale information or administrative issues, review any of the 6Ks that determine if the information was immaterial.  He said no.  He said no.  He did not look at any of these to determine whether or not they were immaterial to the market before including them in his event study to then base his conclusions on the lack of statistically significant return.

MR. JORALEMON:  So your Honor, I just, if I may --

MR. HALL:  And he should have.

THE COURT:  Yes.

MR. HALL:  And he also --

MR. JORALEMON:  If I may --

51

Proceedings

MR. HALL:  Mr. Joralemon is going to --

THE COURT:  All right.  We're going to cut this short here --

MR. HALL:  Okay.

MR. JORALEMON:  Okay.  It's just incorrect.

THE COURT:  -- because we are going to end up talking about the Mazumdar and Tabak, reports in a more Daubert focused conversation.  I'm not saying that would necessarily be dispositive on class cert one way or the other, but I do think it makes sense from an efficiency perspective to do that when we talk about Daubert motions more generally and I think it does make sense to take up the Daubert motions before summary judgment because obviously the landscape of evidence that we're thinking about at summary judgment could theoretically change in a meaningful way.

Let's find a day which will be likely to be in April.  So through our trial that's set to begin on or about April 17th, the criminal case is I think likely to come off -- yes.  All right.  So let's say if this works for everybody 11 a.m. on -- actually, let's say 10 a.m. on Tuesday the 23rd of April.  And we'll plan to go as long as we need to go.  Tell me if anybody thinks this is a horrible idea, but I think it would make sense to have the experts here.

Transcriptions Plus II, Inc.

52

Proceedings

MR. JORALEMON:  I couldn't agree more, your Honor.

MR. HALL:  I think, your Honor, I'm not opposed to that idea.  I do think it would be helpful for your Honor to get at least plaintiff's critique of Dr. Mazumdar's report which are directly written in his report that it doesn't comply with *Camera* factor 5.

THE COURT:  Which I don't have in writing right now you're saying?

MR. HALL:  It is pointed out based in his selection of news days and non-news days in the briefing. I think it's important to look at some of the language he uses in his report versus *Camera* to be more specific about it and drill down --

THE COURT:  Just tell me exactly what you want me to do and --

MR. HALL:  Okay.  So if you look at page 24 --

THE COURT:  I'm not going to do it now.   Just tell me --

MR. HALL:  No, I understand.  Page 24 of Dr. Mazumdar's opening report where he defines what he did to look at news and non-news days.  And you can also look at his transcript.  And I'll just, without getting into any other argument, I'll just say the main --

THE COURT:  Sorry, just in two sentences or

Transcriptions Plus II, Inc.

53

Proceedings

less what am I going to read on page 24 that you say is wrong?

MR. HALL:  You're going to read that he searched for potentially value relevant days.  He did not search for unexpected material disclosures.  And even if value relevant equals unexpected material disclosures, which is the language from *Camera*, even if that's value relevant news and those two are one in the same, he includes all potential days and --

THE COURT:  Well, there's a circularity problem here.  Right?

MR. JORALEMON:  Absolutely.

THE COURT:  So the best way to decide whether a piece of news is material or not is to look at the stock price impact.  But obviously you can't do that when you're trying to decide whether the stock is efficient or not efficient.  And so you've got to come up with some other method.  And how can you do that without starting with the universe of potentially --

MR. HALL:  But then at the end when you get -- let's assume you don't get a stock price response on an earnings analysis and you've never looked at the earnings analysis.  You don't know what it says.  Which is Dr. Mazumdar, that's what he did.  Once he got the result if there was no statistical significant return on that day,

54

Proceedings

he assumed that meant it was inefficient. He didn't then go look at the material, at the earnings announcement to see if it should have --

THE COURT: So that was where I started today, right?

MR. HALL: Yeah, exactly.

THE COURT: I do agree with you that not every earnings announcement should be expected to have a material impact on the stock price. But the response to that, which I think is well taken from defense counsel, was if you cobble together a large enough sample of earnings announcements, you should expect that on balance they're going to be more impactful than days on which no news at all occurs. And so, you know, you're learning something there.

MR. HALL: And you wouldn't know that, and you wouldn't know whether or not -- because for example, if an earnings announcement has equal positive news and equal negative news --

THE COURT: I understand.

MR. HALL: -- and there's no significant return, that actually supports efficiency because that's what should happen.

THE COURT: I understand.

MR. HALL: And no one --

55

Proceedings

THE COURT: But if you have --

MR. HALL: -- their expert hasn't done that on these earnings announcements and --

THE COURT: Everybody's -- nobody's going to be 100 -- you know, the universe of news days that is neither one percent over inclusive or one percent under inclusive is not realistically achievable here. Right?

MR. HALL: Correct.

THE COURT: So then why isn't it --

MR. HALL: And that's not our case here.

THE COURT: So you know, I started out by pressing defense counsel on don't you need to go beyond the face of the earnings release to see what earnings expectations were? And the answer was well, we didn't do that. But if you cobble together a large enough sample of earnings announcements, you should reasonably expect that comparing earnings announcements days to days when all of us would agree there's no news, the stock price movement on average should be higher on --

MR. HALL: There was stock price movement. I think that's a distinction also that we fall into.

THE COURT: Right. So then --

MR. HALL: The 95 -- there was stock price movement. It just wasn't statistically significant.

THE COURT: So then including every earnings

Transcriptions Plus II, Inc.

56

Proceedings

announcement in your efficiency model seems to me to make roughly good sense, right?

MR. HALL:  You should include them.  But the question is --

THE COURT:  But you excluded them all.

MR. HALL:  We did not exclude them.

THE COURT:  Dr. Tabak --

MR. HALL:  No, he did not do an event study. His job was -- oh, sorry.  That is not what he did in this case and that's what I was trying to point out earlier.  He did a very limited report responding to the FDT part of Dr. Mazumdar's report.  We did not --

THE COURT:  Tell me in very plain English, because I am struggling to understand here, what are the criteria that he applies to come up with three news days?

MR. HALL:  He took one of the -- Dr. Mazumdar ran a Factiva search that had ten different sources. Some of them only had one or two articles in the whole time.  It was a website called Fly on the Wall Others. So what Dr. Tabak did, he said to be objective, I'm going to look at the Dow Jones newswire.  That is well known and it's one of the things that was included in Dr. Mazumdar's search also.

THE COURT:  Right.

MR. HALL:  He then took that --

57

Proceedings

THE COURT:  And he said I'm going to look at every Dow Jones news story that gets picked up by X number of other outlets.

MR. HALL:  And then he relied upon Dr. Mazumdar's regression analysis.  And the part where we get down to the one, two, or three is there is an academic literature around this --

THE COURT:  Can you just tell me what his precise test was?  I'm looking at Dow Jones news stories that get picked up by X number of other outlets within Y period of time.  What are X and Y if you know?

MR. HALL:  What's same day.

THE COURT:  Okay.

MR. HALL:  And it's just the top percentage.

THE COURT:  Top percentage of what?

MR. HALL:  Of numbers.  So let's say the number one news story got picked up eight times.  The next one was six, the next one was five, and then the next one was three.  So the top three would be the one --

THE COURT:  How could it be?  Something in his operating model went awry if the dam collapse that leads to death and destruction is not in the top whatever percent that is.

MR. HALL:  It's not in the top 10 percent of the --

Transcriptions Plus II, Inc.

58

Proceedings

THE COURT:  How could that be?

MR. JORALEMON:  It's not in any, any percentage.

MR. HALL:  And Dr. Tabak explained that to you, but it's an objective.  He doesn't control how many times they're mentioned.

THE COURT:  No, I understand that.  But we're all also trying to live in the world of common sense here and what was the stock price impact, remind me, of the January 25th event?

MR. HALL:  Like a couple of bucks I believe.

THE COURT:  Say it again?

MR. HALL:  It was a couple of dollars.

THE COURT:  Percentage terms.

MR. JORALEMON:  Your Honor, it was about 11 percent.

MR. HALL:  Yeah.

THE COURT:  Okay.  11 percent is a big move in a --

MR. HALL:  Yes.

THE COURT:  -- heavily traded stock.

MR. HALL:  And it was almost 100 percent statistically significant, yes.

THE COURT:  So how could it be that nobody's interested in that?

59
Proceedings

MR. HALL:  Your Honor, I don't know the answer. There is no answer to that.

THE COURT:  I think there's something wrong with his methodology.

MR. JORALEMON:  Exactly.  Exactly, your Honor.

THE COURT:  All right.

MR. HALL:  But the Mazumdar report you should take a deep look at and what he didn't look at is more important than what he actually looked at.

MR. JORALEMON:  Your Honor, I just have to say I genuinely appreciate your patience.  It is a pleasure to be here.  You have been extremely patient.

I just have one final point for you.  It's really planting a seed.  I don't expect you to ask anything about it or even accept it but this notion of subjective versus objective selection process for news days, you will hear from all three experts, all three, that defining at the outset an objective approach is the proper scientific way to do this.  You cannot look at the article and determine materiality and then decide whether it's a news day.  That's exactly backwards.  That's what Feinstein did and that's why the Court discredited his event study.

MR. HALL:  That is not what Dr. Feinstein did.

THE COURT:  Okay.

60

Proceedings

MR. JORALEMON:  Okay.  Well your Honor, again --

MR. HALL:  That is absolutely just not what he did.

THE COURT:  All right.  Thank you, all.  Hold on one second.  So we're going to see you I think we decided 10 a.m. on April 23rd.  We are going to have the experts.

MR. HALL:  Which experts, your Honor, would you like?

THE COURT:  I think everybody.  And if you want to stagger them so people arrive at different times -- everybody as to whom there is a Daubert challenge or who is necessary to rebut or to make the Daubert challenge to the other side's expert.

MR. HALL:  14?

MR. JORALEMON:  Right.  The challenge there, your Honor, I guess is --

MR. HALL:  I think that's 14 experts counting these two.

THE COURT:  That's how many Daubert challenges we have?  No.

MR. JORALEMON:  I think we can talk about it.

MR. HALL:  Yeah.  There's --

MR. JORALEMON:  Because there's going to be

61

Proceedings

some partial -- so if I may, your Honor, something to consider is --

THE COURT:  Yes.  Come up with a joint proposal.

MR. JORALEMON:  Okay.  So just to preview it for your Honor, I think limiting this to these issues that overlap significantly, so Professor Mazumdar, Tabak, and Feinstein.

MR. HALL:  And Dr. Hubbard.

MR. JORALEMON:  And Dr. Hubbard.  Would go a long way towards helping the Court resolve these issues. So if I may suggest we stagger it that way, your Honor, because it would require a second day I think if we were going to tackle everything.

THE COURT:  Say that again?  I'm sorry.

MR. JORALEMON:  I think if it works for the Court, we would limit the 23rd to this cluster of experts on issues of market efficiency and loss causation and damages.  There are four of them; Tabak, Feinstein, Dr. Hubbard, and Dr. Mazumdar.

We can save for another day at the Court's convenience the other --

THE COURT:  That sounds right to me --

MR. JORALEMON:  Okay.

THE COURT:  -- based on the PMC letters at

62

Proceedings

least.  All right.  Thank you, all.

            MR. JORALEMON:  Thank you, your Honor.

            THE COURT:  So just for the sake of the docket, the motion to decertify the class is denied without prejudice to renew after the Daubert motions are decided, or let's say are argued to begin.  We'll chart the path forward from April 23rd on April 23rd.

            Thank you all for your patience and we'll see you soon.

            MR. JORALEMON:  Thank you.

            MR. HALL:  Thank you, your Honor.

                        (Matter concluded)

                              -oOo-

63

## C E R T I F I C A T E

I, MARY GRECO, hereby certify that the foregoing transcript of the said proceedings is a true and accurate transcript from the electronic sound-recording of the proceedings reduced to typewriting in the above-entitled matter.

I FURTHER CERTIFY that I am not a relative or employee or attorney or counsel of any of the parties, nor a relative or employee of such attorney or counsel, or financially interested directly or indirectly in this action.

IN WITNESS WHEREOF, I hereunto set my hand this **28th** day of **February**, 2024.

_____

Transcriptions Plus II, Inc.

Transcriptions Plus II, Inc.