# Exhibit C

Page 1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK

--------------------------------*

In re:                                  Case No.:

VALE S.A. SECURITIES LITIGATION         19-CV-526-EK-SJB

--------------------------------*


STENOGRAPHIC AND VIDEO-RECORDED

DEPOSITION OF

R. GLENN HUBBARD, Ph.D.

Wednesday, September 6, 2023

9:13 a.m.


Stenographically recorded by:

Josephine H. Fassett, RPR, CCR

Job No. 6033819

Page 2

Wednesday, September 6, 2023

9:13 a.m.

T R A N S C R I P T of the stenographic and video-recorded deposition of R. GLENN HUBBARD, Ph.D., pursuant to the Federal Rules of Civil Procedure, held at the offices of Kaplan Fox & Kilsheimer LLP, 300 Third Avenue, New York, New York, on Wednesday, September 6, 2023, commencing at approximately 9:13 a.m., stenographically recorded by Josephine H. Fassett, a Registered Professional Reporter, Certified Court Reporter, and Notary Public of the states of New York and New Jersey.

Page 4

----------------------INDEX----------------------

WITNESS                         PAGE

R. GLENN HUBBARD, Ph.D.

By Mr. Hall                        7

--------------------EXHIBITS--------------------

EXHIBIT    DESCRIPTION                         PAGE

Exhibit 1    Rebuttal Expert Report of Glenn        12
             Hubbard dated April 7, 2023

Exhibit 2    May 2017 Vale S.A. Form 6-K            57

Exhibit 3    Sustainability Report 2017            65

Exhibit 4    Memorandum and Order dated             69
             5/20/2020

Page 3

APPEARANCES:

ATTORNEYS FOR LEAD PLAINTIFF COLLEGE OF APPLIED ARTS AND TECHNOLOGY PENSION PLAN AND CERTIFIED CLASS:

KAPLAN FOX & KILSHEIMER LLP
800 Third Avenue
New York, New York 10022
212.687.1980
BY: DONALD R. HALL, ESQ.
dhall@kaplanfox.com

ATTORNEYS FOR DEFENDANT VALE S.A.:

GIBSON DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York 10166
212.351.4000
BY: CHRISTOPHER M. JORALEMON, ESQ.
cjoralemon@gibsondunn.com
CHASE WEIDNER, ESQ.
cweidner@gibsondunn.com

ALSO PRESENT:

THIAGO M. CARDOSO, ESQ.,
Vale In-House Counsel
ANTON EVANGELISTA, Videographer

Page 5

HUBBARD, Ph.D.

(On the stenographic and video record 9:13 a.m.)

THE VIDEOGRAPHER: Good morning. We are going on the record at 9:13 a.m. on September 6, 2023.

Please note that the microphones are sensitive and may pick up whispering and private conversations.

Please mute your phones at this time.

Audio and video recording will continue to take place unless all parties agree to go off the record.

This is Media Unit 1 of the video-recorded deposition of Glenn Hubbard taken by counsel for Plaintiff in the matter of Vale S.A. Securities Litigation. Filed in the Southern District of New York. Case No. 19-CV-526-EK-SJB.

The location of the deposition is Kaplan Fox & Kilsheimer, 800 Third Avenue in New York City.

My name is Anton Evangelista representing Veritext, and I am the videographer. The court reporter is

2 (Pages 2 - 5)

Page 6

HUBBARD, Ph.D.

Josephine Fassett from the firm Veritext.

I am not authorized to administer an oath, I am not related to any party in this action nor am I financially interested in the outcome.

If there are any objections to proceeding, please state them at the time of your appearance.

Counsel and all present will now state their appearances and affiliations for the record, beginning with the noticing attorney.

MR. HALL: Okay. I would just like to correct that it's filed in the Eastern District of New York, not the Southern District of New York.

THE VIDEOGRAPHER: Okay. Noted.

MR. HALL: Okay. Donald Hall on behalf of Lead Plaintiff CAAT and the Certified Class with Kaplan Fox & Kilsheimer LLP.

MR. JORALEMON: Good morning everyone. Chris Joralemon, Gibson Dunn, representing Defendants in this matter here today on

Page 7

HUBBARD, Ph.D.

behalf of the witness. I'm joined by my colleague, Chase Weidner, as well as Thiago Cardoso of Vale.

THE VIDEOGRAPHER: And will the court reporter please swear in the witness and then counsel may proceed.

R. GLENN HUBBARD, Ph.D. the witness, having been duly sworn, was examined and testified under oath as follows:

EXAMINATION

BY MR. HALL:

Q. Good morning. Can you state your full name and address for the record, please.

A. Good morning. It's Robert Glenn, G-l-e-n-n. Hubbard, H-u-b-b-a-r-d. 15 Claremont -- that's C-l-a-r-e-m-o-n-t -- Avenue in New York 10027.

Q. Thank you.

Q. Have you ever had your deposition taken before?

A. Yes, sir.

Q. Multiple times, correct?

A. Yes, sir.

Q. Okay. So you're familiar with the

Page 8

HUBBARD, Ph.D.

process, but I'll just tell you a few rules so that we're on the same page today.

I will do my best not to interrupt you and speak over you. Please try the same.

We have to give verbal answers, as you're aware.

If at any time you need to break, let me know and we'll finish the pending question and then we can take a break, otherwise, we'll try to break about every hour or so.

A. That sounds good. Thank you.

Q. Is there any reason why you can't testify truthfully today?

A. No, sir.

Q. And what did you do to prepare for your deposition today?

A. Basically reviewed my reports, Professor Feinstein's reports, and met with counsel.

Q. How long did you meet with counsel?

A. We met yesterday for, I'm guessing, about three hours.

Q. Okay. And is that the same counsel that's in the room here today?

A. Yes, sir, it is.

Page 9

HUBBARD, Ph.D.

Q. Anyone else in the room and present at that meeting?

A. Yes, sir, one other individual.

Q. Was that person also a lawyer?

A. Yes, sir.

Q. Okay. Did you speak to anyone other than counsel about your deposition today?

A. Yes, the team that worked with me at Analysis Group.

Q. And who did you speak with?

A. Mr. Gold, G-o-l-d, and Mr. Nabi, N-a-b-i.

Q. Okay. So when did you first become aware of this action against Vale regarding the 2019 dam failure?

A. My recollection is I was contacted in late 2022. I think the formal retention may be early 2023, but late 2022.

Q. Okay. And who contacted you?

A. I believe it was a contact at Analysis Group.

Q. Do you recall who?

A. I think it was Mark Egland, E-g-l-a-n-d.

Q. And do you know how Mr. Egland, if

3 (Pages 6 - 9)

Page 26

HUBBARD, Ph.D.

differences in methodologies across the reports and problems and statistical interpretation.

Q. Okay. Well, let's focus on the ADRs then.

For the ADRs, you don't offer any opinions related to Dr. Feinstein's regression model for the ADRs, correct?

A. That's correct.

Q. Okay. In fact, you don't dispute that the residual price return or the abnormal return for the Vale ADRs on January 25, 2019, was $1.63, do you?

MR. JORALEMON: Object to the form.

A. I don't remember the exact number, but that's not my issue with Professor Feinstein, it's its interpretation.

Q. I understand that, but you don't dispute that there was an abnormal return of $1.63 on January 25, 2019, for Vale ADRs, correct?

MR. JORALEMON: Object to the form.

A. Sticking with his methodology, that's true, yes.

Q. Okay. And you don't dispute that that residual return on January 25, 2019, was

Page 27

HUBBARD, Ph.D.

statistically significant, correct?

MR. JORALEMON: Object to the form.

A. That's true.

Q. Okay. And you don't dispute that the abnormal return for certain of the Vale notes -- not all, so we're clear -- was statistically significant on January 25, 2019, correct?

MR. JORALEMON: Object to the form.

A. My recollection is certain is exactly one, but yes, if that's your question.

Q. Okay. You don't dispute that the residual return on February 4, 2019, for Vale ADRs was 55 cents, correct?

A. I don't recall the number, but subject to check that sounds reasonable.

Q. Okay. And you don't dispute that that residual decline on February 4, 2019, for Vale ADRs was statistically significant, correct?

MR. JORALEMON: Object to the form.

A. Correct.

Q. Okay. You don't dispute that the residual price decline for Vale ADRs on February 6, 2019, was 54 cents, correct?

MR. JORALEMON: Object to the form.

Page 28

HUBBARD, Ph.D.

A. I don't recall the number, but subject to check that sounds right.

Q. Okay. And you don't dispute that that residual decline on February 6, 2019, was statistically significant, correct?

MR. JORALEMON: Object to the form.

A. That's my recollection, yes.

Q. Okay. And you don't opine that the alleged misrepresentations and omissions in this case caused no loss to investors, correct?

MR. JORALEMON: Object to the form.

A. If I'm understanding your question, I'm not offering an affirmative damages number per se. The opinion I offer is that a portion of the damages that Professor Feinstein identified could reflect factors other than the allegations.

Q. So the reverse of that then is, is that the other portion relates to the alleged misrepresentations and the omissions in this case, correct --

MR. JORALEMON: Object to the form.

Q. -- and potentially caused losses to investors?

A. That's potentially true, yes.

Page 29

HUBBARD, Ph.D.

Q. Okay. Do you recall using the term "materialization of a disclosed risk" in your report?

A. Yes, sir.

Q. Okay. And what do you mean by that?

A. In other words, a risk factor that's known that then occurs.

So to be specific here, a safety incident, that's always a risk, but may actually occur in almost -- well, not all, but in many corporate settings there will be risks that everybody understands. They may have moderate or low probabilities, but they could occur, and I would call that a materialization of a disclosed risk.

Q. Okay. And are the risk factors that were known in this case the ones that we saw summaries of in Exhibit 4?

A. If I'm understanding your question, yes, those are disclosed risk factors, yes.

Q. Are there any other in this case that you considered in coming to your opinion?

A. There -- I'm not -- that's a very vague question. I'll try to help.

8 (Pages 26 - 29)

Page 42

HUBBARD, Ph.D.

You are taking the position that there was a disclosed risk in this case associated with -- potentially associated with loss to shareholders in this case, correct?

A. Yes, although that's a very different question than what --

Q. Actually it's not.

A. But it is economically.

Q. Can I finish? Can I, can I finish now?

A. Okay.

Q. Okay. So in coming to your decision -- let's back up.

So in coming to your decision that there was a disclosed risk in this case, did you consider anything other than what's listed in Exhibit 4?

A. That's asked and answered. I said in terms --

Q. You're doing Mr. Joralemon's job.

A. No --

Q. That's why I said let's back up, because you went to an economic -- I mean an engineering expert, which have nothing to do with my question because you're an economist, and that's what I'm

Page 43

HUBBARD, Ph.D.

asking. If I want to ask you about an engineering question, I will tell you I'm asking you. So please answer the question I just asked.

Did you consider anything other than what's in Exhibit 4 in coming to your conclusion that there was a disclosed risk in this case?

A. I think I answered that question no.

Q. Okay. So, in effect, investors in Vale would already have assessed, based on what's in Exhibit 4, the risk of a dam collapse and priced that into Vale's securities accordingly, correct?

MR. JORALEMON: Object to the form.

A. That's why I thought you asked a different question. The answer to that question is no, because I had already explained to you that investors are looking at a variety of things like existence of certifications, other things. They're trying to form an estimate of a probability which of course isn't in these 20-F disclosures.

Q. Okay. And why didn't you look at all those other things you're saying investors would look at?

MR. JORALEMON: Object to the form.

Page 44

HUBBARD, Ph.D.

A. I'm not sure why I would.

Q. Okay. But you agree that investors would have looked at a number of other public disclosures in coming to a conclusion of the risk of a dam collapse at Vale?

MR. JORALEMON: Object to the form.

A. The way you've asked it, yes, investors will consider all pieces of information they can on this and any other aspect of the valuation of Vale.

Q. And some of those other pieces of information could be more specific to dams, correct?

A. It's certainly possible.

Q. Okay. And could inform and add to the general disclosures that you list in Exhibit 4, correct, to an investor?

MR. JORALEMON: Object to the form.

A. Yes, I think that's what I meant in my previous answer.

Q. I want to -- you mentioned probability a bunch of times and you use that term in here, so let's turn to page 18, paragraph 34, of your expert report.

Page 45

HUBBARD, Ph.D.

A. I'm there.

Q. Okay. How would an investor go about assessing the probability of a safety event?

A. Well, I'm not an engineer, but I can describe a process that a financial analyst --

Q. Let's back up for a second.

Were any of those engineering probabilities actually disclosed to investors during the class period?

A. I don't recall any probability being disclosed.

Q. Okay. So I'm talking about what investors would have relied upon in assessing the probability of a safety event, in this case, which seems to be a part of what you're getting at in paragraph 34?

A. Correct. So --

Q. Okay. So why don't we focus on publicly disclosed information. And I want to know what an investor would use -- have used during the class period to assess the probability of a safety incident?

A. Okay. Let me answer that and then tie it to your complaint. So --

12 (Pages 42 - 45)

Page 46

HUBBARD, Ph.D.

Q. Just answer it, and you don't need to tie it unless it's specific to the answer.

MR. JORALEMON: He can answer however he wants to answer. Can you please --

MR. HALL: Well, he doesn't need to ramble, he needs to answer the question.

MR. JORALEMON: He's not rambling.

THE WITNESS: I'm not a rambler, sir.

MR. JORALEMON: Okay.

THE WITNESS: My whole career I've not been a rambler.

A. But the probabilities are inferred. To my knowledge, there's never a probability that's helping, like a number. There's a number in -- there's a number of numbers in the record, but to my knowledge they're not public.

An investor would look at things like certifications, statements about safety, to figure out a zone of what a likely safety event probability is. That, as I said, exactly ties to your allegations that there's a misrepresentation of that in a variety of ways. But that's how an investor would do it. So if it turns out that an investor is incorrect because there has been,

Page 47

HUBBARD, Ph.D.

let's say, some misrepresentation, then that's a problem, that should have been a change in the probability. That's what this is --

Q. Okay.

A. -- talking about.

Q. And you didn't look at anything other than what's in Exhibit 4 to determine out -- to determine whether there was sufficient information for an investor to change the probability of a safety incident, correct?

MR. JORALEMON: Object to the form. Change from what?

MR. HALL: I'm referencing the specific language he used that an investor would change their view on probability. I want to know, he didn't look at this stuff he's saying an investor would look at it.

Q. Correct?

A. That's not true. What I'm saying here is that you change the probability. I'm trying to -- that's why it was important to tie it back to your complaint.

If, for example, something had been misrepresented, you lied to me --

Page 48

HUBBARD, Ph.D.

Q. We'll get there.

A. -- but now you tell me the truth, that might change my probability and, hence, my valuation of the security. That's all I'm saying.

Q. Okay. You start paragraph 34 saying, "I would expect." What did you mean when you said "expect"?

A. In other words, I'm referring to math. So if you're trying to value a security, that value comes from changes in an investor's cash-flow expectations. It's kind of hard to argue that it misrepresented the discount rate, so they'd have to change cash-flow expectations.

Q. And what's your basis for that?

A. Econ 101, the present value of free cash flows is the value of an equity security.

Q. And what's the basis for the only way for an investor in this case to have done it would have been to assess the probability of a safety event occurring and the true probability of a safety event occurring?

A. Again, Econ 101. If you're talking about a misrepresentation, that would be the only way in which a misrepresentation would affect cash

Page 49

HUBBARD, Ph.D.

flows.

Q. Okay. You said Econ 101. I don't see any reference to any academic or econometric literature in this paragraph.

A. Well, I wrote a best-selling freshman textbook.

Q. Then why didn't you --

A. So you'll find -- well, because it's obvious. But if you require a citation, if you'll look at the Financial Economics chapter, you will find what you probably learned in college. The value of the stock is the present value of the cash flow.

Q. Well, if it's so obvious, why did you use the term "expect"?

A. Meaning that's what theory says.

Q. Can you turn to page 34, paragraph 57.

A. Okay.

Q. Do you see there's some numbered sections in the paragraph there and the first one I believe is very similar to what we were just discussing, correct?

A. Yes, sir, it's exactly that.

Q. Okay. And if you go after those

13 (Pages 46 - 49)

Page 50

HUBBARD, Ph.D.

number -- I think there's three of them -- you say, "Only the first category represents a price change due to the alleged misrepresentations." Do you see that?

A. Yes, sir.

Q. Okay. And what's your basis for saying that?

A. I think it's the same as the answer.

The only way in which the misrepresentations are affecting cash flows is through the first channel. Other channels like other disruptions or market factors, those don't have to do with misreps.

Q. And what's your basis for saying that?

A. I think it's just simple arithmetic of parsing it out. The only way a misrepresentation about a safety event can affect cash flows is through the probability of a safety event occurring, assuming we have some estimate of what the cost of cleaning it up is.

Q. And, again, you don't cite any academic or economic literature in this paragraph for that point, correct?

A. Correct.

Page 51

HUBBARD, Ph.D.

Q. If the finder of fact finds that the risk disclosures in Exhibit 4 weren't sufficient to inform investors of a disclosed risk of Dam 1, would that change your opinion that only number 1 here applies?

MR. JORALEMON: Object to the form.

A. If I understand your question, no.

Q. I'm going to hand you what's been previously marked as Ferreira 6. Unfortunately in this case all the documents are large. The good thing is there's very few of them.

A. You'll answer for the trees, not me.

Q. Well, if I didn't do it, your counsel would complain of incompleteness or something.

MR. JORALEMON: Objection.

MR. HALL: Objection, right.

I'm joking, of course.

Q. This is one of the documents that you used to reference the risk disclosures in Exhibit 4, correct?

A. Yes, sir.

Q. Okay. And did you look at any other sections of this 20-F other than the risk disclosure summaries that you list in Exhibit 4?

Page 52

HUBBARD, Ph.D.

A. Not that I recall, no.

Q. Okay. Turn to page 76.

A. Of the document or the --

Q. Of the document itself, yes. It was easier to do it that way.

A. Okay, I'm there.

Q. Okay. And you see there's a paragraph at the top, the bullet point says Brazil?

A. Yes, sir.

Q. Okay. So if you look six lines from the bottom of that paragraph, there's a sentence that starts at the end of that line "We have." Do you see that?

A. Yes, sir.

Q. Okay. Can you read that sentence out loud, please.

A. Certainly.

"We have conducted extraordinary audits on the stability conditions of our upstream dams, and no anomalies were identified."

Q. Okay. Would that statement help inform an investor as to a potential dam collapse at Vale?

MR. JORALEMON: Object to the form.

Page 53

HUBBARD, Ph.D.

A. If I'm understanding your question, it could well. That's why I referred earlier to certifications and things like that that give investors some indication about probabilities.

Q. Okay. And this is one of the alleged misrepresentations in this case, correct?

A. Correct.

Q. Okay. And what is your interpretation as an economist what this sentence would convey to investors?

MR. JORALEMON: Object to the form.

A. I think it's attempting to convey that the dams are safe within some confidence interval. I mean, nothing is ever perfect, accidents happen in the real world, but I think it's designed to convey that there's some reasonable competence and interval of safety.

Q. Okay. I'll show you what's been previously marked as Ferreira 7E.

A. Thank you.

Q. Have you seen this document before?

A. I have seen sustainability reports, yes.

Q. Have you seen this document before?

A. I believe. I can't remember every year

14 (Pages 50 - 53)

Page 54

HUBBARD, Ph.D.

I've looked at, but I believe so.

Q. Can you turn back to Appendix C of your report.

A. Okay.

Q. Okay. Where is this sustainability report from 2016 listed in the materials you considered?

A. I don't see it, but I do recall looking at some sustainability reports. But no, I don't see it here.

Q. Okay. Did you see any sustainability report referenced in this material?

A. I'm sorry, what do you mean by "this material"? Oh, in here, no.

Q. Yes. Okay. So does that mean that Appendix C is incomplete?

A. Well, I think it may depend on what it means by considered that I looked at a document, I don't know, but ...

Q. So did you consider in forming your opinion in this case anything contained in the 2016 Sustainability Report as sitting in front of you marked as Ferreira 7E?

A. No.

Page 55

HUBBARD, Ph.D.

Q. Let's turn to page 113 of the document, and the page numbers I think are in the bottom left-hand corner.

A. Okay.

Q. Okay. Can you read -- you see there's two columns at the bottom of the page with some writing. Can you read the last sentence of the last paragraph that begins "At Vale" out loud, please.

A. Okay.

"At Vale, all dams, even if no longer in operation, remained under -- remain under its responsibility and are monitored, audited, and maintained normally under the same criteria and safety levels adopted during their operation."

Q. Did you consider that statement in forming your opinions that are contained in your expert report dated April 7, 2023?

A. No. It wouldn't have been germane to me.

Q. Why wouldn't it have been germane to you?

A. I already said investors can look at a lot of things, perhaps including this, on making

Page 56

HUBBARD, Ph.D.

judgments about stability and safety. That's all I mean.

Q. Okay. And could this statement change an investor's understanding of the risk that you claim were disclosed in Exhibit 4 of your report?

MR. JORALEMON: Object to the form. You're asking him to guess like for how with the possibility?

A. I don't know. I would think if what I'm trying to form an expectation of as an investor is probability one of the safety events. I don't see a lot of value in this sentence. But if you're asking me to --

Q. You don't see -- oh, sorry. You don't see any value in saying all dams are monitored?

A. I think that's said elsewhere as well.

Q. Where?

A. Certifi -- the existence of certification.

Q. But they're not in Exhibit 4, correct?

A. No, but I think we already had this discussion that that is something analysts would consider.

Page 57

HUBBARD, Ph.D.

Q. What about investors?

A. Well, I mean investors.

Q. Okay.

A. Analysts are part of it.

Q. What about the fact that all dams were audited, would that inform an investor and form an opinion of the level of risk that's in the disclosure in Exhibit 4 to your report?

MR. JORALEMON: Object to the form.

A. It could well, but my understanding is that's part and parcel of the certification since I'm on it.

MR. HALL: I'll mark as Hubbard 2 a Vale Form 6-K for the month of May 2017.

(May 2017 Vale S.A. Form 6-K marked as Hubbard Exhibit 2, as of this date.)

BY MR. HALL:

Q. Have you seen this document before, sir?

A. I don't recall, sorry.

Q. And just for the record, I am not sure if this is a complete version or excerpts. When I found it and downloaded it, it seems like the page numbers jump around, and that will be obvious when I ask you to turn to page 216.

15 (Pages 54 - 57)

# Exhibit C

Page 1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK

--------------------------------*

In re:                               Case No.:

VALE S.A. SECURITIES LITIGATION      19-CV-526-EK-SJB

--------------------------------*


STENOGRAPHIC AND VIDEO-RECORDED

DEPOSITION OF

R. GLENN HUBBARD, Ph.D.

Wednesday, September 6, 2023

9:13 a.m.


Stenographically recorded by:

Josephine H. Fassett, RPR, CCR

Job No. 6033819

Page 2

Wednesday, September 6, 2023

9:13 a.m.

T R A N S C R I P T of the stenographic and video-recorded deposition of R. GLENN HUBBARD, Ph.D., pursuant to the Federal Rules of Civil Procedure, held at the offices of Kaplan Fox & Kilsheimer LLP, 300 Third Avenue, New York, New York, on Wednesday, September 6, 2023, commencing at approximately 9:13 a.m., stenographically recorded by Josephine H. Fassett, a Registered Professional Reporter, Certified Court Reporter, and Notary Public of the states of New York and New Jersey.

---

Page 4

----------------------INDEX-----------------------

WITNESS                                    PAGE

R. GLENN HUBBARD, Ph.D.

By Mr. Hall                                7

---------------------EXHIBITS---------------------

EXHIBIT    DESCRIPTION                          PAGE

Exhibit 1   Rebuttal Expert Report of Glenn        12
            Hubbard dated April 7, 2023

Exhibit 2   May 2017 Vale S.A. Form 6-K            57

Exhibit 3   Sustainability Report 2017             65

Exhibit 4   Memorandum and Order dated             69
            5/20/2020

---

Page 3

APPEARANCES:

ATTORNEYS FOR LEAD PLAINTIFF COLLEGE OF APPLIED ARTS
AND TECHNOLOGY PENSION PLAN AND CERTIFIED CLASS:

    KAPLAN FOX & KILSHEIMER LLP

    800 Third Avenue

    New York, New York 10022

    212.687.1980

BY: DONALD R. HALL, ESQ.

    dhall@kaplanfox.com

ATTORNEYS FOR DEFENDANT VALE S.A.:

    GIBSON DUNN & CRUTCHER LLP

    200 Park Avenue

    New York, New York 10166

    212.351.4000

BY: CHRISTOPHER M. JORALEMON, ESQ.

    cjoralemon@gibsondunn.com

    CHASE WEIDNER, ESQ.

    cweidner@gibsondunn.com

ALSO PRESENT:

    THIAGO M. CARDOSO, ESQ.,

    Vale In-House Counsel

    ANTON EVANGELISTA, Videographer

---

Page 5

HUBBARD, Ph.D.

(On the stenographic and video record 9:13 a.m.)

THE VIDEOGRAPHER: Good morning. We are going on the record at 9:13 a.m. on September 6, 2023.

Please note that the microphones are sensitive and may pick up whispering and private conversations.

Please mute your phones at this time.

Audio and video recording will continue to take place unless all parties agree to go off the record.

This is Media Unit 1 of the video-recorded deposition of Glenn Hubbard taken by counsel for Plaintiff in the matter of Vale S.A. Securities Litigation. Filed in the Southern District of New York. Case No. 19-CV-526-EK-SJB.

The location of the deposition is Kaplan Fox & Kilsheimer, 800 Third Avenue in New York City.

My name is Anton Evangelista representing Veritext, and I am the videographer. The court reporter is

---

2 (Pages 2 - 5)

**Page 6**

HUBBARD, Ph.D.

Josephine Fassett from the firm Veritext.

I am not authorized to administer an oath, I am not related to any party in this action nor am I financially interested in the outcome.

If there are any objections to proceeding, please state them at the time of your appearance.

Counsel and all present will now state their appearances and affiliations for the record, beginning with the noticing attorney.

MR. HALL: Okay. I would just like to correct that it's filed in the Eastern District of New York, not the Southern District of New York.

THE VIDEOGRAPHER: Okay. Noted.

MR. HALL: Okay. Donald Hall on behalf of Lead Plaintiff CAAT and the Certified Class with Kaplan Fox & Kilsheimer LLP.

MR. JORALEMON: Good morning everyone. Chris Joralemon, Gibson Dunn, representing Defendants in this matter here today on

**Page 7**

HUBBARD, Ph.D.

behalf of the witness. I'm joined by my colleague, Chase Weidner, as well as Thiago Cardoso of Vale.

THE VIDEOGRAPHER: And will the court reporter please swear in the witness and then counsel may proceed.

R. GLENN HUBBARD, Ph.D. the witness, having been duly sworn, was examined and testified under oath as follows:

EXAMINATION

BY MR. HALL:

Q. Good morning. Can you state your full name and address for the record, please.

A. Good morning. It's Robert Glenn, G-l-e-n-n. Hubbard, H-u-b-b-a-r-d. 15 Claremont -- that's C-l-a-r-e-m-o-n-t -- Avenue in New York 10027.

Q. Thank you.

Have you ever had your deposition taken before?

A. Yes, sir.

Q. Multiple times, correct?

A. Yes, sir.

Q. Okay. So you're familiar with the

**Page 8**

HUBBARD, Ph.D.

process, but I'll just tell you a few rules so that we're on the same page today.

I will do my best not to interrupt you and speak over you. Please try the same.

We have to give verbal answers, as you're aware.

If at any time you need to break, let me know and we'll finish the pending question and then we can take a break, otherwise, we'll try to break about every hour or so.

A. That sounds good. Thank you.

Q. Is there any reason why you can't testify truthfully today?

A. No, sir.

Q. And what did you do to prepare for your deposition today?

A. Basically reviewed my reports, Professor Feinstein's reports, and met with counsel.

Q. How long did you meet with counsel?

A. We met yesterday for, I'm guessing, about three hours.

Q. Okay. And is that the same counsel that's in the room here today?

A. Yes, sir, it is.

**Page 9**

HUBBARD, Ph.D.

Q. Anyone else in the room and present at that meeting?

A. Yes, sir, one other individual.

Q. Was that person also a lawyer?

A. Yes, sir.

Q. Okay. Did you speak to anyone other than counsel about your deposition today?

A. Yes, the team that worked with me at Analysis Group.

Q. And who did you speak with?

A. Mr. Gold, G-o-l-d, and Mr. Nabi, N-a-b-i.

Q. Okay. So when did you first become aware of this action against Vale regarding the 2019 dam failure?

A. My recollection is I was contacted in late 2022. I think the formal retention may be early 2023, but late 2022.

Q. Okay. And who contacted you?

A. I believe it was a contact at Analysis Group.

Q. Do you recall who?

A. I think it was Mark Egland, E-g-l-a-n-d.

Q. And do you know how Mr. Egland, if

3 (Pages 6 - 9)

Page 26

HUBBARD, Ph.D.

differences in methodologies across the reports and problems and statistical interpretation.

Q. Okay. Well, let's focus on the ADRs then.

For the ADRs, you don't offer any opinions related to Dr. Feinstein's regression model for the ADRs, correct?

A. That's correct.

Q. Okay. In fact, you don't dispute that the residual price return or the abnormal return for the Vale ADRs on January 25, 2019, was $1.63, do you?

MR. JORALEMON: Object to the form.

A. I don't remember the exact number, but that's not my issue with Professor Feinstein, it's its interpretation.

Q. I understand that, but you don't dispute that there was an abnormal return of $1.63 on January 25, 2019, for Vale ADRs, correct?

MR. JORALEMON: Object to the form.

A. Sticking with his methodology, that's true, yes.

Q. Okay. And you don't dispute that that residual return on January 25, 2019, was

Page 27

HUBBARD, Ph.D.

statistically significant, correct?

MR. JORALEMON: Object to the form.

A. That's true.

Q. Okay. And you don't dispute that the abnormal return for certain of the Vale notes -- not all, so we're clear -- was statistically significant on January 25, 2019, correct?

MR. JORALEMON: Object to the form.

A. My recollection is certain is exactly one, but yes, if that's your question.

Q. Okay. You don't dispute that the residual return on February 4, 2019, for Vale ADRs was 55 cents, correct?

A. I don't recall the number, but subject to check that sounds reasonable.

Q. Okay. And you don't dispute that that residual decline on February 4, 2019, for Vale ADRs was statistically significant, correct?

MR. JORALEMON: Object to the form.

A. Correct.

Q. Okay. You don't dispute that the residual price decline for Vale ADRs on February 6, 2019, was 54 cents, correct?

MR. JORALEMON: Object to the form.

Page 28

HUBBARD, Ph.D.

A. I don't recall the number, but subject to check that sounds right.

Q. Okay. And you don't dispute that that residual decline on February 6, 2019, was statistically significant, correct?

MR. JORALEMON: Object to the form.

A. That's my recollection, yes.

Q. Okay. And you don't opine that the alleged misrepresentations and omissions in this case caused no loss to investors, correct?

MR. JORALEMON: Object to the form.

A. If I'm understanding your question, I'm not offering an affirmative damages number per se. The opinion I offer is that a portion of the damages that Professor Feinstein identified could reflect factors other than the allegations.

Q. So the reverse of that then is, is that the other portion relates to the alleged misrepresentations and the omissions in this case, correct --

MR. JORALEMON: Object to the form.

Q. -- and potentially caused losses to investors?

A. That's potentially true, yes.

Page 29

HUBBARD, Ph.D.

Q. Okay. Do you recall using the term "materialization of a disclosed risk" in your report?

A. Yes, sir.

Q. Okay. And what do you mean by that?

A. In other words, a risk factor that's known that then occurs.

So to be specific here, a safety incident, that's always a risk, but may actually occur in almost -- well, not all, but in many corporate settings there will be risks that everybody understands. They may have moderate or low probabilities, but they could occur, and I would call that a materialization of a disclosed risk.

Q. Okay. And are the risk factors that were known in this case the ones that we saw summaries of in Exhibit 4?

A. If I'm understanding your question, yes, those are disclosed risk factors, yes.

Q. Are there any other in this case that you considered in coming to your opinion?

A. There -- I'm not -- that's a very vague question. I'll try to help.

8 (Pages 26 - 29)

Page 42

HUBBARD, Ph.D.

You are taking the position that there was a disclosed risk in this case associated with -- potentially associated with loss to shareholders in this case, correct?

A. Yes, although that's a very different question than what --

Q. Actually it's not.

A. But it is economically.

Q. Can I finish? Can I, can I finish now?

A. Okay.

Q. Okay. So in coming to your decision -- let's back up.

So in coming to your decision that there was a disclosed risk in this case, did you consider anything other than what's listed in Exhibit 4?

A. That's asked and answered. I said in terms --

Q. You're doing Mr. Joralemon's job.

A. No --

Q. That's why I said let's back up, because you went to an economic -- I mean an engineering expert, which have nothing to do with my question because you're an economist, and that's what I'm

Page 43

HUBBARD, Ph.D.

asking. If I want to ask you about an engineering question, I will tell you I'm asking you. So please answer the question I just asked.

Did you consider anything other than what's in Exhibit 4 in coming to your conclusion that there was a disclosed risk in this case?

A. I think I answered that question no.

Q. Okay. So, in effect, investors in Vale would already have assessed, based on what's in Exhibit 4, the risk of a dam collapse and priced that into Vale's securities accordingly, correct?

MR. JORALEMON: Object to the form.

A. That's why I thought you asked a different question. The answer to that question is no, because I had already explained to you that investors are looking at a variety of things like existence of certifications, other things. They're trying to form an estimate of a probability which of course isn't in these 20-F disclosures.

Q. Okay. And why didn't you look at all those other things you're saying investors would look at?

MR. JORALEMON: Object to the form.

Page 44

HUBBARD, Ph.D.

A. I'm not sure why I would.

Q. Okay. But you agree that investors would have looked at a number of other public disclosures in coming to a conclusion of the risk of a dam collapse at Vale?

MR. JORALEMON: Object to the form.

A. The way you've asked it, yes, investors will consider all pieces of information they can on this and any other aspect of the valuation of Vale.

Q. And some of those other pieces of information could be more specific to dams, correct?

A. It's certainly possible.

Q. Okay. And could inform and add to the general disclosures that you list in Exhibit 4, correct, to an investor?

MR. JORALEMON: Object to the form.

A. Yes, I think that's what I meant in my previous answer.

Q. I want to -- you mentioned probability a bunch of times and you use that term in here, so let's turn to page 18, paragraph 34, of your expert report.

Page 45

HUBBARD, Ph.D.

A. I'm there.

Q. Okay. How would an investor go about assessing the probability of a safety event?

A. Well, I'm not an engineer, but I can describe a process that a financial analyst --

Q. Let's back up for a second.

Were any of those engineering probabilities actually disclosed to investors during the class period?

A. I don't recall any probability being disclosed.

Q. Okay. So I'm talking about what investors would have relied upon in assessing the probability of a safety event, in this case, which seems to be a part of what you're getting at in paragraph 34?

A. Correct. So --

Q. Okay. So why don't we focus on publicly disclosed information. And I want to know what an investor would use -- have used during the class period to assess the probability of a safety incident?

A. Okay. Let me answer that and then tie it to your complaint. So --

12 (Pages 42 - 45)

Page 46

HUBBARD, Ph.D.

Q. Just answer it, and you don't need to tie it unless it's specific to the answer.

MR. JORALEMON: He can answer however he wants to answer. Can you please --

MR. HALL: Well, he doesn't need to ramble, he needs to answer the question.

MR. JORALEMON: He's not rambling.

THE WITNESS: I'm not a rambler, sir.

MR. JORALEMON: Okay.

THE WITNESS: My whole career I've not been a rambler.

A. But the probabilities are inferred. To my knowledge, there's never a probability that's helping, like a number. There's a number in -- there's a number of numbers in the record, but to my knowledge they're not public.

An investor would look at things like certifications, statements about safety, to figure out a zone of what a likely safety event probability is. That, as I said, exactly ties to your allegations that there's a misrepresentation of that in a variety of ways. But that's how an investor would do it. So if it turns out that an investor is incorrect because there has been,

Page 47

HUBBARD, Ph.D.

let's say, some misrepresentation, then that's a problem, that should have been a change in the probability. That's what this is --

Q. Okay.

A. -- talking about.

Q. And you didn't look at anything other than what's in Exhibit 4 to determine out -- to determine whether there was sufficient information for an investor to change the probability of a safety incident, correct?

MR. JORALEMON: Object to the form. Change from what?

MR. HALL: I'm referencing the specific language he used that an investor would change their view on probability. I want to know, he didn't look at this stuff he's saying an investor would look at it.

Q. Correct?

A. That's not true. What I'm saying here is that you change the probability. I'm trying to -- that's why it was important to tie it back to your complaint.

If, for example, something had been misrepresented, you lied to me --

Page 48

HUBBARD, Ph.D.

Q. We'll get there.

A. -- but now you tell me the truth, that might change my probability and, hence, my valuation of the security. That's all I'm saying.

Q. Okay. You start paragraph 34 saying, "I would expect." What did you mean when you said "expect"?

A. In other words, I'm referring to math. So if you're trying to value a security, that value comes from changes in an investor's cash-flow expectations. It's kind of hard to argue that it misrepresented the discount rate, so they'd have to change cash-flow expectations.

Q. And what's your basis for that?

A. Econ 101, the present value of free cash flows is the value of an equity security.

Q. And what's the basis for the only way for an investor in this case to have done it would have been to assess the probability of a safety event occurring and the true probability of a safety event occurring?

A. Again, Econ 101. If you're talking about a misrepresentation, that would be the only way in which a misrepresentation would affect cash

Page 49

HUBBARD, Ph.D.

flows.

Q. Okay. You said Econ 101. I don't see any reference to any academic or econometric literature in this paragraph.

A. Well, I wrote a best-selling freshman textbook.

Q. Then why didn't you --

A. So you'll find -- well, because it's obvious. But if you require a citation, if you'll look at the Financial Economics chapter, you will find what you probably learned in college. The value of the stock is the present value of the cash flow.

Q. Well, if it's so obvious, why did you use the term "expect"?

A. Meaning that's what theory says.

Q. Can you turn to page 34, paragraph 57.

A. Okay.

Q. Do you see there's some numbered sections in the paragraph there and the first one I believe is very similar to what we were just discussing, correct?

A. Yes, sir, it's exactly that.

Q. Okay. And if you go after those

13 (Pages 46 - 49)

Page 50

HUBBARD, Ph.D.

number -- I think there's three of them -- you say, "Only the first category represents a price change due to the alleged misrepresentations." Do you see that?

A. Yes, sir.

Q. Okay. And what's your basis for saying that?

A. I think it's the same as the answer.

The only way in which the misrepresentations are affecting cash flows is through the first channel. Other channels like other disruptions or market factors, those don't have to do with misreps.

Q. And what's your basis for saying that?

A. I think it's just simple arithmetic of parsing it out. The only way a misrepresentation about a safety event can affect cash flows is through the probability of a safety event occurring, assuming we have some estimate of what the cost of cleaning it up is.

Q. And, again, you don't cite any academic or economic literature in this paragraph for that point, correct?

A. Correct.

Page 51

HUBBARD, Ph.D.

Q. If the finder of fact finds that the risk disclosures in Exhibit 4 weren't sufficient to inform investors of a disclosed risk of Dam 1, would that change your opinion that only number 1 here applies?

MR. JORALEMON: Object to the form.

A. If I understand your question, no.

Q. I'm going to hand you what's been previously marked as Ferreira 6. Unfortunately in this case all the documents are large. The good thing is there's very few of them.

A. You'll answer for the trees, not me.

Q. Well, if I didn't do it, your counsel would complain of incompleteness or something.

MR. JORALEMON: Objection.

MR. HALL: Objection, right.

I'm joking, of course.

Q. This is one of the documents that you used to reference the risk disclosures in Exhibit 4, correct?

A. Yes, sir.

Q. Okay. And did you look at any other sections of this 20-F other than the risk disclosure summaries that you list in Exhibit 4?

Page 52

HUBBARD, Ph.D.

A. Not that I recall, no.

Q. Okay. Turn to page 76.

A. Of the document or the --

Q. Of the document itself, yes. It was easier to do it that way.

A. Okay, I'm there.

Q. Okay. And you see there's a paragraph at the top, the bullet point says Brazil?

A. Yes, sir.

Q. Okay. So if you look six lines from the bottom of that paragraph, there's a sentence that starts at the end of that line "We have." Do you see that?

A. Yes, sir.

Q. Okay. Can you read that sentence out loud, please.

A. Certainly.

"We have conducted extraordinary audits on the stability conditions of our upstream dams, and no anomalies were identified."

Q. Okay. Would that statement help inform an investor as to a potential dam collapse at Vale?

MR. JORALEMON: Object to the form.

Page 53

HUBBARD, Ph.D.

A. If I'm understanding your question, it could well. That's why I referred earlier to certifications and things like that that give investors some indication about probabilities.

Q. Okay. And this is one of the alleged misrepresentations in this case, correct?

A. Correct.

Q. Okay. And what is your interpretation as an economist what this sentence would convey to investors?

MR. JORALEMON: Object to the form.

A. I think it's attempting to convey that the dams are safe within some confidence interval. I mean, nothing is ever perfect, accidents happen in the real world, but I think it's designed to convey that there's some reasonable competence and interval of safety.

Q. Okay. I'll show you what's been previously marked as Ferreira 7E.

A. Thank you.

Q. Have you seen this document before?

A. I have seen sustainability reports, yes.

Q. Have you seen this document before?

A. I believe. I can't remember every year

14 (Pages 50 - 53)

Page 54

HUBBARD, Ph.D.

I've looked at, but I believe so.

Q. Can you turn back to Appendix C of your report.

A. Okay.

Q. Okay. Where is this sustainability report from 2016 listed in the materials you considered?

A. I don't see it, but I do recall looking at some sustainability reports. But no, I don't see it here.

Q. Okay. Did you see any sustainability report referenced in this material?

A. I'm sorry, what do you mean by "this material"? Oh, in here, no.

Q. Yes. Okay. So does that mean that Appendix C is incomplete?

A. Well, I think it may depend on what it means by considered that I looked at a document, I don't know, but ...

Q. So did you consider in forming your opinion in this case anything contained in the 2016 Sustainability Report as sitting in front of you marked as Ferreira 7E?

A. No.

Page 55

HUBBARD, Ph.D.

Q. Let's turn to page 113 of the document, and the page numbers I think are in the bottom left-hand corner.

A. Okay.

Q. Okay. Can you read -- you see there's two columns at the bottom of the page with some writing. Can you read the last sentence of the last paragraph that begins "At Vale" out loud, please.

A. Okay.

"At Vale, all dams, even if no longer in operation, remained under -- remain under its responsibility and are monitored, audited, and maintained normally under the same criteria and safety levels adopted during their operation."

Q. Did you consider that statement in forming your opinions that are contained in your expert report dated April 7, 2023?

A. No. It wouldn't have been germane to me.

Q. Why wouldn't it have been germane to you?

A. I already said investors can look at a lot of things, perhaps including this, on making

Page 56

HUBBARD, Ph.D.

judgments about stability and safety. That's all I mean.

Q. Okay. And could this statement change an investor's understanding of the risk that you claim were disclosed in Exhibit 4 of your report?

MR. JORALEMON: Object to the form. You're asking him to guess like for how with the possibility?

A. I don't know. I would think if what I'm trying to form an expectation of as an investor is probability one of the safety events. I don't see a lot of value in this sentence. But if you're asking me to --

Q. You don't see -- oh, sorry. You don't see any value in saying all dams are monitored?

A. I think that's said elsewhere as well.

Q. Where?

A. Certifi -- the existence of certification.

Q. But they're not in Exhibit 4, correct?

A. No, but I think we already had this discussion that that is something analysts would consider.

Page 57

HUBBARD, Ph.D.

Q. What about investors?

A. Well, I mean investors.

Q. Okay.

A. Analysts are part of it.

Q. What about the fact that all dams were audited, would that inform an investor and form an opinion of the level of risk that's in the disclosure in Exhibit 4 to your report?

MR. JORALEMON: Object to the form.

A. It could well, but my understanding is that's part and parcel of the certification since I'm on it.

MR. HALL: I'll mark as Hubbard 2 a Vale Form 6-K for the month of May 2017.

(May 2017 Vale S.A. Form 6-K marked as Hubbard Exhibit 2, as of this date.)

BY MR. HALL:

Q. Have you seen this document before, sir?

A. I don't recall, sorry.

Q. And just for the record, I am not sure if this is a complete version or excerpts. When I found it and downloaded it, it seems like the page numbers jump around, and that will be obvious when I ask you to turn to page 216.

15 (Pages 54 - 57)

Page 58

HUBBARD, Ph.D.

A. Okay. Would you like me to turn to page 216?

Q. Yes. Yes.

A. Okay.

Q. You see at the top it says Dams?

A. Yes, sir.

Q. Okay. Can you read the first paragraph out loud, please.

A. Of course.

"In May 2016, the state of Minas Gerais" -- if I'm pronouncing it correctly -- "issued a decree ordering an immediate assessment of the stability conditions of upstream dams and suspending new licensing procedures for the construction for lifting of upstream demands until the state environmental authority define new rules and procedures. Vale carried out extraordinary audits on the stability conditions of its upstream dams and no anomalies were identified. Vale has filed reports with local government authorities in September 2016. In March 2017, the state of Minas Gerais determined that dams already altered by the upstream method, but had their stability conditions verified by audit, could be altered by

Page 59

HUBBARD, Ph.D.

other constructive methods."

Q. Similar to a couple of the other statements we just read, is it fair to say that this is the type of information that would inform an investor's view of the risk associated with dams at Vale?

MR. JORALEMON: Object to the form.

A. I think that's reasonable, yes.

Q. Including the disclosed risk that you say are put forth in Exhibit 4 of your report, correct?

MR. JORALEMON: Object to the form.

A. I'm not sure. How could something narrow include something -- you lost me with the English.

Q. Well, you say the disclosed risk is set forth in Exhibit 4, correct?

MR. JORALEMON: Object to the form.

A. The category of risk is disclosed, yes.

Q. Okay. This would inform an investor's view of that category of risk, correct?

A. Yes.

Q. Okay.

A. Totally agree with that.

Page 60

HUBBARD, Ph.D.

Q. And can you turn to page 220, please.

A. Okay.

Q. Can you read out loud the fourth full paragraph which starts with the words "With regard."

A. "With regard to risk management, tailings dams are highly relevant, being subjected to periodic safety audits and also to operating and monitoring procedures to assess geotechnical stability. For more information see the item 'Dams' in the item above."

Q. And like the previous statement, this type of statement would inform investors a view of the category of risk set forth in Exhibit 4, correct?

A. It could well, yes.

Q. And the two statements we looked at in this document, what -- from an economics perspective -- what would be your understanding of what this conveys to an investor about dam safety at Vale?

MR. JORALEMON: Object to the form.

A. Well, I think it's conveying a couple of things. One. One that there are processes, risk

Page 61

HUBBARD, Ph.D.

management processes, audit processes. And second that an outcome of those processes are that dams are within some accepted zone of safety.

Q. Okay. Is it fair to say it would give an investor -- possibly could give an investor assurance that Vale was properly monitoring and maintaining the risk associated with its dams?

MR. JORALEMON: Object to the form.

A. I'm not sure about words like assurance and properly. I think what it's conveying to investors is that there is a risk management process and that process has an outcome of an acceptable level of risk. That's the way I would read it as a non-engineer.

Q. Would that type of statement from an economic perspective likely cause the market to think there was more risk or less risk associated with Vale's dams?

MR. JORALEMON: Object to the form.

A. I'm not sure more or less than what. It would cause market participants to form an expectation of risk.

Q. Okay. All right. So when they read the general disclosures in Exhibit 4, they form an

16 (Pages 58 - 61)

Page 62

HUBBARD, Ph.D.

expectation of risk, correct?

MR. JORALEMON: Object to the form.

A. I think that's only an input. In Exhibit 4 you're identifying categories of risk, that in and of itself to an investor isn't sufficient. I would look at other elements of the record, these statements and other statements we talked about.

Q. Okay. When you say it isn't sufficient, what did you mean?

A. To estimate a probability of a safety event, which is what would go into my calculation of value.

MR. JORALEMON: Is this a good time for a break?

MR. HALL: Sure, yeah, this works.

THE VIDEOGRAPHER: We are now off the record. The time on the video monitor is 10:28 a.m.

(Off the record.)

(Resumed.)

THE VIDEOGRAPHER: We are now back on the record. The time on the video monitor is 10:49 a.m.

Page 63

HUBBARD, Ph.D.

BY MR. HALL:

Q. I'm going to hand you an exhibit previously marked as Schwartzman 10E.

A. Thank you.

Q. Have you seen this document before, sir?

A. I believe I have. I've certainly seen the printed language.

Q. You can check, but I don't believe this document is listed in your exhibit of materials considered.

A. No, but it is cited by Feinstein, so I read it.

Q. Okay. Is this the type of information an investor would use in judging the likelihood of a dam collapse or safety incident at Vale?

MR. JORALEMON: Object to the form.

A. It certainly speaks to safety probabilities, although it does in a very general way, but I suppose it could be in that category, yes.

Q. What do you mean by general way?

A. In other words, it just simply refers to my management will be short if we had another accident. The use of a word impeccable as opposed

Page 64

HUBBARD, Ph.D.

to like a certification or something like that. But yes, it would be a similar category.

Q. And you're referring to the section that says, "Today the dams are impeccable," which is a quote from Mr. Schwartzman the then CEO of -- or president of Vale?

A. Yes.

Q. Okay. And up at the top you can see he -- it's in quotes -- he uses that the dams are in -- in his quote -- is impressive quality. Do you see that?

A. Yes, sir, I do see that.

Q. And from an economic perspective, is this the type of information that could lead an investor to believe that the dams are safe?

MR. JORALEMON: Object to the form.

A. I'm not sure what the word "safe" means in this context because accidents can happen, but certainly it's in the category of information that I would be using probabilities. It's softer than things like a certification that are more rigorous, but yes, it's the same category.

Q. And you mentioned the word "probabilities." This would lead an investor to

Page 65

HUBBARD, Ph.D.

believe that a safety incident related to dams is less likely, correct?

MR. JORALEMON: Object to the form.

A. I don't know what less means, so it's just enabling me -- less than what? It enables me to form a probability estimate that it's likely a small one.

Q. And you didn't form the -- withdrawn. You didn't use this document in coming to your opinion that the Dam 1 collapse was a result of the materialization of a disclosed risk?

MR. JORALEMON: Object to the form.

A. That wasn't my conclusion, but no, I didn't use this.

Q. In coming to your conclusion?

A. In coming to the conclusions I actually came to, no, I did not use this.

Q. Okay.

A. Yes. Sorry.

MR. HALL: All right. We'll mark as the next document, which I believe is Hubbard 3, a document entitled Sustainability Report 2017.

(Sustainability Report 2017 marked as

17 (Pages 62 - 65)

Page 82

HUBBARD, Ph.D.

understood exactly what D, C and E stand for. I've seen other longer expressions but none of them are D, C and E, but I think it's a certification.

Q. My understanding is you're correct --

A. Okay.

Q. -- and DCE is just a Portuguese acronym for instability.

A. Okay. Maybe that was what confused me it was in English.

Q. Yes. It's very difficult.

A. Okay.

Q. And we had those issues in this case --

A. Okay.

Q. -- going back and forth.

A. Okay.

Q. Okay. And from an economic perspective, what do you think would have happened to the price of Vale securities had it been disclosed to the market that the attainment of those DCEs or stability or certifications, I think you called them, were prioritized regardless of the real safety?

MR. JORALEMON: Object to the form.

Page 83

HUBBARD, Ph.D.

A. Putting aside, I can't judge from the sentence like what the actual problem is. The methodology I would use is, does it change my probability of an event happening times the cost of having evidence of delta probability times cost and is that going to lead to a material change in the price of Vale.

Q. Okay. Let's turn to page 270.

A. Okay.

Q. Okay. At the bottom of the page under "Measures to mitigate impacts of rupture." Do you see that?

A. Yes, sir.

Q. Okay. The first sentence says, "Despite Vale's knowledge regarding the fragile situation of B1, specific measures to reduce the impacts of eventual dam failure were limited." Do you see that?

A. Yes, I do.

Q. And from an economic perspective, what would likely have happened to the value of Vale securities if that information had been told to the market during the class period?

MR. JORALEMON: Object to the form.

Page 84

HUBBARD, Ph.D.

A. Again, leaving aside, for example, in the next paragraph, it looks like something else. I would judge the change in probability times the cost that's a dollar number is that a statistically significant change in the value of Vale.

Q. Okay. Let's turn to page 124.

A. Okay.

Q. Okay. Do you recall that some of the statements that we looked at related to dams that were released on a period refer to best international practices. Do you recall that?

A. Yes, sir.

Q. Okay. All right. So the second paragraph on that sentence says -- I mean that page.

The second sentence said, "Said results would not be in accordance with best international practices, as mentioned in Section 6.1.1." Do you see that?

A. Yes, sir, I do.

Q. What would have happened to the price of Vale securities during the class period if investors had been told that Vale was not

Page 85

HUBBARD, Ph.D.

following the best international practices?

MR. JORALEMON: Object to the form.

A. The actual numbers here I can't interpret. But the methodology I would use, if an engineer were helping me as valuation expert, would be how does that change my probability of a safety incident times the cost of the safety incident, that would be a change in value.

Q. I just have a few more. Page 256.

A. I hate to kill all those pages without a lot of questions.

Q. Page 256, please.

A. Okay.

Q. Do you recall in one of the statements earlier we referred to the public statements that Vale released an Extraordinary Audit Report. I think it was in the 2016 or 2017 Sustainability Report.

A. Yes, sir, I do recall that.

Q. So if you look back on page 255, at the beginning of the paragraph on page 255, it's talking about one of those Extraordinary Audit reports. I just want to put it in context.

A. Okay.

22 (Pages 82 - 85)

Page 86

HUBBARD, Ph.D.

Q. Okay. So now we can go back to page 256.

And you see the part, the paragraph at the top, it says, "the safety factor for the undrained condition was obtained using an inappropriate methodology for determining resistance ratio, by using data from laboratory tests which was considered unreliable by Olson."

Do you see that?

A. Yes, sir, I do.

Q. Okay. What would have been the reaction in Vale's securities prices had the market learned that the Extraordinary Audit Report that Vale discussed in its statements was obtained by using inappropriate methodologies?

MR. JORALEMON: Object to the form.

A. Well, economists would want to know how do I translate that into a change in probability that I put methodologies inappropriate, what's the actual change in probability. If I could be given that, I would say it's that change in probability times the total cost that's the change in the value.

Q. So again the delta?

Page 87

HUBBARD, Ph.D.

A. The delta, yeah.

Q. Okay. Let's go to page 51.

A. Okay.

Q. Do you see the second full paragraph there, it says, "The same happened with the external dam auditors." Again, something -- external dam auditors was something we saw referenced in some of the statements by Vale, correct?

A. Yes, sir.

Q. Okay. And this paragraph is suggesting that the dam auditors were also not able to act in a truly independent manner. Do you see that?

A. Yes, sir.

Q. Okay. What would have happened to the price of Vale's securities during the class period if the market had learned that the external dam auditors referenced by Vale were not acting in an independent manner?

MR. JORALEMON: Object to the form.

A. Well, market participants would have to understand there's a conflict of interest, does that change their estimate of the probability of a safety failure. So, again, delta probability

Page 88

HUBBARD, Ph.D.

times the cost would be the change in value.

Q. And when you take all those statements and either just those, there are others in this long document that I won't go through. But when you take all those statements together, is it possible that the change in delta could have exceeded the $2, an amount a little over $2 that Dr. Feinstein found was statistically significant in this case?

MR. JORALEMON: Object to the form. Asking for speculation.

A. I do not know one way or the other. I do know that the various numbers that have been bandied around in the record -- Mr. Stephenson and Dr. Oboni, Dr. Emerman -- has all these numbers are way south of that, but I don't have an independent recollection.

Q. But they're not economists, correct?

A. But they're generating the probabilities, yes.

Q. That's not what I asked you.

Had an investor learned of the statements we just heard that go all the way back to the beginning of the class period, is it

Page 89

HUBBARD, Ph.D.

possible that the cumulative delta that you kept referring to, the delta, could have been greater than the amount of abnormal return that Dr. Feinstein found in this case that was statistically significant?

MR. JORALEMON: Same objection.

A. The only rigorous way to answer that question would be to ask what change in probability would be required to get to that. And it would be orders of magnitude greater than any of the things I've seen in the record. So I don't know be asking me for speculation, Dr. Feinstein hasn't even bothered to speculate, but certainly the numbers in the record are way different from that.

Q. So you have no economic opinion on what that reaction in stock price might be cumulatively regarding the delta with those statements?

MR. JORALEMON: Object to the form.

A. That's not true. I told you it's the change in probability times the cost. And I said if you wanted to ask the question what change in probability would make Dr. Feinstein's whatever reasonable, you could do that, and then you could

23 (Pages 86 - 89)

Page 90

HUBBARD, Ph.D.

ask yourself is that plausible. He didn't do that, you haven't done it, and I haven't done it.

Q. Okay. First off, you don't know what I've done.

A. I'm sure you do.

Q. And you're misrepresenting what Dr. Feinstein does.

A. No, no, you said what Dr. Feinstein does, that's not --

Q. Wait a minute, wait a minute, wait a minute. No -- yes, you are.

So we don't have to get there. He will get to testify himself, so --

A. Okay.

Q. -- we don't have to characterize.

But sitting here as an economist of -- how long have you been an economist?

A. Forty-something years.

Q. Okay. Sitting here as an economist of 40 years, you have no opinion as to what the actual value of that delta would have been had the information I'd just shown you been disclosed to the market?

A. I'm saying for me as an economist I'd

Page 91

HUBBARD, Ph.D.

have to be an engineer to do that, so no, I don't. The numbers I've seen in the record are very different than what it would take to have a statistically significant price. But no, I don't.

Q. And you have no opinion of whether or not that value -- the value of that delta could be in excess of what Dr. Feinstein found was an abnormal return in this case, correct?

MR. JORALEMON: Object to the form.

A. I think it would be speculation on my part.

Q. That's not what I asked you. I didn't ask you to speculate anything. I asked you: Do you have an opinion sitting here today whether that value would be less than or greater than what Dr. Feinstein found?

A. I haven't calculated it.

Q. Okay. That's the answer I was looking for.

A. Okay. That's the one in my report. That's easy.

MR. JORALEMON: And he gave it to you 30 seconds ago.

MR. HALL: He did not give it to me 30

Page 92

HUBBARD, Ph.D.

seconds ago.

MR. JORALEMON: You just didn't like his answer. You haven't calculated it either.

BY MR. HALL:

Q. Okay. Let's go to page 53 of your report.

A. Okay.

Q. So this is the Section C which where you discussed the inflation ribbon that Dr. Feinstein uses, correct?

A. Yes, sir.

Q. And you disagree with Dr. Feinstein's use of a constant inflation ribbon in this case, correct?

A. Yes. That's a derivative of all my other disagreements with her, yes.

Q. So other than the citation to doctor -- I mean, Mr. Stephenson's report on the following page of 140, and citations to Dr. Feinstein's report, you don't cite to any other information in this section, correct?

A. I think the relevant arguments are actually in the text about the lack of possibility

Page 93

HUBBARD, Ph.D.

of changes and true probabilities in his argument and the fact that he's assuming that events disclosed years later could have been known in 2016, that's in the text, and they are footnoted.

Q. Where are the sources footnoted for those opinions?

A. Well, they're actually just facts, but they're -- I'm citing where in Feinstein's report he says it.

Q. Okay. So you cite to nothing other than Mr. Stephenson or Dr. Feinstein in this section, correct, in forming your opinion that the use of a constant inflation ribbon is inappropriate?

A. Along with basic economic logic, that's correct.

MR. HALL: Let's go off the record for a second.

THE VIDEOGRAPHER: We are now off the record. The time on the video monitor is 11:31 a.m.

(Off the record.)

(Resumed.)

THE VIDEOGRAPHER: We are now back on the record. The time on the video monitor

24 (Pages 90 - 93)