**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
----------------------------------------------------------x
                                     :

In re Vale S.A. Securities Litigation      :             No. 19 Civ. 526 (EK) (SJB)

                                       :              **ORAL ARGUMENT REQUESTED**

                                       :
----------------------------------------------------------x

## MEMORANDUM OF LAW IN OPPOSITION TO LEAD PLAINTIFF'S MOTION TO EXCLUDE EXPERT TESTIMONY OF GLENN HUBBARD

GIBSON, DUNN & CRUTCHER LLP

Christopher M. Joralemon
Akiva Shapiro
Mary Beth Maloney
David M. Kusnetz
Jason Bressler
H. Chase Weidner

200 Park Avenue
New York, NY  10166-0193
Telephone:    212.351.4000
Facsimile:    212.351.4035

*Attorneys for Defendants*

## TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................................... 1

DISCUSSION ............................................................................................................. 2

    I.     Plaintiff Notably Does Not Challenge Key Opinions of Professor Hubbard ........ 2

    II.    Plaintiff Misconstrues the Burdens of the Parties' Respective Experts ................. 4

    III.    Professor Hubbard's Opinions on Disaggregation are the Product of Reliable Principles and Methods Faithfully Applied to the Facts of this Case ................................................................................................................... 5

    IV.    The Court Also Should Reject Plaintiff's Other Specious Criticisms of Professor Hubbard ............................................................................................. 9

CONCLUSION .......................................................................................................... 12

i

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*In re BP p.l.c. Sec. Litig.*,
    2014 WL 2112823 (S.D. Tex. May 20, 2014) ............................................................6

*In re BP p.l.c. Sec. Litig.*,
    2016 WL 3090779 (S.D. Tex. May 31, 2016) ............................................................9

*Capri Sun GmbH v. Am. Beverage Corp.*,
    595 F. Supp. 3d 83 (S.D.N.Y. 2022) ......................................................................4, 5

*Chill v. Calamos Advisors LLC*,
    417 F. Supp. 3d 208 (S.D.N.Y. 2019) ........................................................................2

*Dura Pharms., Inc. v. Broudo*,
    544 U.S. 336 (2005) ....................................................................................................5

*Highland Cap. Mgmt., L.P. v. Schneider*,
    551 F. Supp. 2d 173 (S.D.N.Y. 2008) ......................................................................12

*In re Kosmos Energy Ltd. Sec. Litig.*,
    299 F.R.D. 133 (N.D. Tex. 2014) ...............................................................................1

*Kusnier v. Virgin Galactic Holdings, Inc.*,
    639 F. Supp. 3d 350 (E.D.N.Y. 2022) ........................................................................7

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
    299 F. Supp. 3d 430 (S.D.N.Y. 2018) ........................................................................2

*Menorah Mivtachim Ins. Ltd. v. Sheehan*,
    2024 WL 1613907 (2d Cir. Apr. 15, 2024) ................................................................6

*Monroe Cnty. Emps.' Ret. Sys. v. YPF Sociedad Anonima*,
    15 F. Supp. 3d 336 (S.D.N.Y. 2014) ..........................................................................8

*In re Monster Worldwide, Inc. Sec. Litig.*,
    549 F. Supp. 2d 578 (S.D.N.Y. 2008) ........................................................................1

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
    638 F. Supp. 3d 227 (E.D.N.Y. 2022) .....................................................................1, 5

*In re Pfizer Inc. Sec. Litig.*,
    819 F.3d 642 (2d Cir. 2016) .......................................................................................3

*United States v. Bilzerian*,
    926 F.2d 1285 (2d Cir. 1991) ...................................................................................12

*In re Vale S.A. Sec. Litig.*,
    2020 WL 2610979 (E.D.N.Y. May 20, 2020) ..........................................................10

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

*In re Vivendi, S.A. Sec. Litig.,*
  838 F.3d 223 (2d Cir. 2016)..................................................................................6, 7

*In re Zyprexa Prod. Liab. Litig.,*
  489 F. Supp. 2d 230 (E.D.N.Y. 2007) ......................................................................5

Defendants respectfully submit this memorandum of law in opposition to Lead Plaintiff's motion to exclude the testimony of Glenn Hubbard.

## **<u>INTRODUCTION</u>**

Glenn Hubbard is a world-renowned economist. He has served with distinction as Chairman of the Council of Economic Advisors under President George W. Bush. Ex. A (Rebuttal Expert Report of Glenn Hubbard) ¶ 3.[1] For over fifteen years, he was the Dean of the Columbia University Graduate School of Business, where he remains Dean Emeritus and the Russell L. Carson Professor of Finance and Economics. *Id.* ¶ 1. He has authored hundreds of publications and papers on a wide range of economic topics, and has performed numerous peer-reviewed market event studies. *Id.* ¶ 2–3.

Courts across the country—including most prominently within the Second Circuit—repeatedly have recognized him as a witness exceedingly qualified to provide expert testimony, including with respect to causation and damages event studies in securities fraud cases. *See, e.g.*, *In re Monster Worldwide, Inc. Sec. Litig.*, 549 F. Supp. 2d 578, 583-84 (S.D.N.Y. 2008) (citing Professor Hubbard's testimony on stock price reactions to defeat class plaintiff's motion for summary judgment); *In re Kosmos Energy Ltd. Sec. Litig.*, 299 F.R.D. 133, 153 (N.D. Tex. 2014) (denying class certification based on Professor Hubbard's "thorough event study"); *see also In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 638 F. Supp. 3d 227, 261 (E.D.N.Y. 2022)

---

[1] All references to "Ex. __" are to exhibits to the Declaration of Christopher M. Joralemon in Support of Defendants' Opposition to Plaintiff's Motion to Exclude Expert Testimony of Glenn Hubbard. "Defs.' Br." refers to Defendants' Memorandum of Law in Support of Defendants' Motion to Exclude Expert Testimony of Steven P. Feinstein. "Pl. Br." refers to Plaintiff's Memorandum of Law in Support of Lead Plaintiff's Motion to Exclude the Expert Testimony of Glenn Hubbard.

("Professor Hubbard has extensive economic and financial qualifications."); *Chill v. Calamos Advisors LLC*, 417 F. Supp. 3d 208, 253 (S.D.N.Y. 2019) (praising Professor Hubbard as "an actual expert in economics"); *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 299 F. Supp. 3d 430, 516 (S.D.N.Y. 2018) (recognizing Professor Hubbard's "formal training in economics and his extensive experience working with economic and financial data").

Defendants here engaged Professor Hubbard "to review and respond to the analysis presented" in the report on loss causation and damages prepared by Plaintiff's purported expert Steven Feinstein. Ex. A ¶ 18. Professor Hubbard concluded that Feinstein's opinions were based on unscientific methods and suffered from critical conceptual flaws that rendered his conclusions unreliable and invalid (dooming Plaintiff's entire case in the process).

Facing this litigation equivalent of an "extinction event," Plaintiff has launched a desperate survival bid by indiscriminately attacking various aspects of Professor Hubbard's analysis. Unfortunately for Plaintiff, these attacks defy bedrock principles of economics and binding case law, rest on disingenuous mischaracterizations of Professor Hubbard's opinions, and attempt to elide the very nature of Plaintiff's claim here. If anything, Plaintiff's efforts to exclude Professor Hubbard ultimately only serve to reinforce the grounds for excluding *Feinstein's* opinions. Defendants respectfully urge the Court to see Plaintiff's motion for what it is, and deny it in its entirety.

## DISCUSSION

### I.    Plaintiff Notably Does Not Challenge Key Opinions of Professor Hubbard

Despite proclaiming without justification that "[t]he Hubbard Report should be *wholly* excluded," Pl. Br. at 5 (emphasis added), Plaintiff actually does not contest—and in fact seems to agree with—several of Professor Hubbard's opinions. Most telling, Plaintiff's motion does not

2

contend with Professor Hubbard's opinion that Feinstein's analysis fails to "present a credible but-for scenario supporting his damages calculations." Ex. A ¶ 36.

By way of background, an economist hired to calculate economic loss in a securities case typically does so by constructing a "but-for world," which, all agree, contemplates a scenario in which the alleged fraud or misrepresentation does not occur. Ex. B (Report on Loss Causation and Damages of Professor Steven P. Feinstein) ¶ 189; Ex. A ¶ 32. This construct aims to determine what the price of the company's stock would have been in this but-for world, and then compares that to the price in the actual world, with the resulting delta between the two prices (if any) reflecting an approximation of fraud-related damages. *See In re Pfizer Inc. Sec. Litig.*, 819 F.3d 642, 649-50 (2d Cir. 2016).

Here, however, Feinstein created a but-for world polluted with fraud, where Vale simply announces to investors "that the company [is] engaged in a campaign to mislead the public and investors about dam safety and the other items." Ex. C (Deposition Transcript of Steven P. Feinstein) at 138:20-25. Feinstein contends that had Vale told investors of this ongoing campaign of deception (*but without actually sharing any substantive "truths"*), *see, e.g.*, Ex. B ¶ 217, investors rationally would have assumed a worst-case scenario and, as a result, the price of Vale securities would have fallen at least as much as "the security price declines that [ultimately] did occur," *id.* ¶ 219.

Feinstein's but-for world is inconsistent with reliable expert practice as well as the allegations in Plaintiff's own complaint. *See* Defs.' Br. 12–14. As Professor Hubbard correctly observed, the thrust of Plaintiff's claim here is that the dam collapse and other alleged corrective disclosures purportedly "revealed the 'truth' to investors regarding the probability of a safety in-

3

cident." Ex. A ¶ 51. In Feinstein's but-for world, however, the actual "likelihood of Dam 1 collapsing" has no bearing on his damages calculation. Ex. C at 296:20-297:12. Rather, the key to Feinstein's bogus construct simply is Vale's purported *intention* to continue to conceal "important" information from investors. Ex. A ¶ 51; *see* Defs' Br. 11-12.

Plaintiff—at least implicitly—agrees with Professor Hubbard's criticism of Feinstein's but-for world. According to Plaintiff, "if there were no fraud . . . investors would have anticipated a likely dam failure and Vale's share prices would have dropped . . . before Dam 1's collapse." Pl. Br. at 2 (emphasis added). Indeed, this articulation by Plaintiff of a proper but-for world is one in which "Vale had timely disclosed all of what Plaintiff alleges was misrepresented and concealed." Pl. Br. at 2. Plaintiff thus unintentionally concedes that its own expert's but-for world—as explained by Professor Hubbard—violates basic principles of economics because it rests on the anomalous scenario in which Vale merely informs the market it has been committing fraud and will continue doing so. *See* Ex. C at 138:20-25; *id*. at 155:20-156:7. In sum, and to state the obvious, the Court should not exclude any opinion of Professor Hubbard that Plaintiff itself endorses.[2]

## II.    Plaintiff Misconstrues the Burdens of the Parties' Respective Experts

"The task of a rebuttal expert is different from that of an affirmative expert." *Capri Sun GmbH v. Am. Beverage Corp.*, 595 F. Supp. 3d 83, 138 (S.D.N.Y. 2022) (citation and quotation marks omitted). "A rebuttal expert, by nature, criticizes the methodology and/or opinions of another," and "[t]here is no requirement that a rebuttal expert himself offer a competing analysis."

---

[2] Plaintiff also does not challenge several other opinions offered by Professor Hubbard, including, for example, his conclusion that Feinstein's analysis is invalid and unreliable as a measure of economic damages because, among other things, he fails to: (a) demonstrate that the alleged misrepresentations introduced artificial inflation into Vale Securities' prices; or (b) identify which alleged curative disclosures corrected which alleged misstatements. Ex. A ¶ 36.

4

*Id.* (citation and quotation marks omitted).  Accordingly, rebuttal experts "have a less demanding task because they have no burden to produce models or methods of their own; they need only attack those of plaintiff's expert." *Id.* (alterations adopted) (citation and quotation marks omitted).

Here, Professor Hubbard is serving as a rebuttal expert retained to review and respond to the deficient analysis offered by Plaintiff's expert Feinstein.  Plaintiff, however, apparently is unfamiliar with the well-settled law cited above, as it repeatedly argues Professor Hubbard's opinions are somehow deficient because he did not perform his own damages analysis.  *See, e.g.*, Pl. Br. at 1, 11 (contending—incorrectly—that "there is no rational basis to limit investors' damages by a calculation that [Professor Hubbard] . . . did not[] perform," and complaining that Professor Hubbard "did not conduct any study to determine whether any portion of the share price drop was caused by something other than the alleged fraud").  The Court should reject Plaintiff's unfounded criticism.  *See In re Zyprexa Prod. Liab. Litig.*, 489 F. Supp. 2d 230, 285 (E.D.N.Y. 2007) ("[D]efendants' experts . . . have no burden to produce models or methods of their own; they need only attack those of plaintiffs' experts."); *Payment Card*, 638 F. Supp. 3d at 262 ("[I]t is not necessary that Professor Hubbard perform his own empirical studies.").

**III.   Professor Hubbard's Opinions on Disaggregation are the Product of Reliable Principles and Methods Faithfully Applied to the Facts of this Case**

Plaintiff spends most of its energy challenging Professor Hubbard's opinions concerning Feinstein's failure to disaggregate all non-fraud related causes from his damages analysis.  Ex. A ¶¶ 40, 56.  Notwithstanding Plaintiff's contention that these opinions of Professor Hubbard somehow are "speculative" and "without support," Professor Hubbard's proffered testimony reflects the reliable application of standard methods guided by widely accepted principles of economics.

As a threshold matter, Plaintiff cannot dispute that it may only recover damages directly resulting from the alleged securities fraud, *see Dura Pharms., Inc. v. Broudo*, 544 U.S. 336 (2005),

and that it therefore "must disaggregate those losses caused by changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events, from disclosures of the truth behind the alleged misstatements," *Menorah Mivtachim Ins. Ltd. v. Sheehan*, 2024 WL 1613907, at *2 (2d Cir. Apr. 15, 2024) (internal quotation marks omitted). Feinstein, of course, does not even attempt to undertake this requisite disaggregation.

Where, as here, "the corrective event is the materialization of an understated risk, the stock price movement on the date of correction (*i.e.*, on the date that the risk materialized) will not equate to inflation on the date of purchase unless the probability of the risk materializing was 100 percent." *In re BP p.l.c. Sec. Litig.*, 2014 WL 2112823, at *10 (S.D. Tex. May 20, 2014). And where, again as here, the probability of the risk materializing is less than 100 percent, out-of-pocket damages must be limited to the difference between the "true" probability that an adverse event could occur and the incorrect (due to concealment) perceived probability of such an event. *See id.* at 10 & n.10.

Applying these universally recognized principles, Professor Hubbard explained that Feinstein needed to evaluate "changes to investors' cash flow expectations caused by a difference between investors' assessed probability of a safety incident occurring and the 'true' probability of a safety incident occurring." Ex. A ¶ 24. In other words, Plaintiff's damages claim must be limited to how much—if at all—the securities' prices would have changed in response to the disclosure of information concerning the "true" failure probability over the course of the Class Period. In short, Professor Hubbard opined that Feinstein erred by not measuring damages based on the alleged discrepancy between what the market knew and what Vale knew. Ex. A ¶¶ 57-58.

The Second Circuit explicitly has endorsed this approach to a proper damages calculation as outlined by Professor Hubbard. *See In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223 (2d Cir. 2016).

In *Vivendi*, shareholders alleged securities fraud claims based on the company's numerous representations that all was well financially when in reality it was experiencing a serious cash crunch. *Id.* at 232. Plaintiff's expert evaluated damages by determining "the discrepancy between what the market knew and what Vivendi knew." *Id.* at 255. To evaluate the magnitude of Vivendi's true liquidity risk at any given time (*i.e.*, what Vivendi knew), the expert examined "three quantitative proxies" and selected the most conservative one. *Id.* Through that proxy, Plaintiff's expert approximated how artificial inflation in the stock price—*i.e.*, how much investors overpaid—likely changed over the course of the class period. *Id.*

Plaintiff further challenges Professor Hubbard's disaggregation opinions by arguing he purportedly "did not cite a single authority" to support the conclusion that some—if not all—of the price declines following the Dam 1 collapse were due to materializations of disclosed risks. Pl. Br. 11. But Plaintiff is wrong once again. Professor Hubbard's opinion has plenty of support, including peer-reviewed academic literature, *see, e.g.*, Ex. A ¶¶ 25, 28, 31 nn. 42, 45, 48, his unassailable experience as an economist, *see, e.g.*, Ex. D (Deposition Transcript of Glenn Hubbard) at 48:18-50:25, and his detailed review of Vale's pre-collapse risk disclosures, post-collapse analyst reports, and news articles concerning Vale, Ex. A ¶ 56; *see also id*. ¶¶ 61-86.

Behind Plaintiff's feigned ignorance of the bases for Professor Hubbard's conclusions lurks the insinuation that it somehow would be novel for an expert to distinguish between the materialization of known versus concealed risks in assessing the causes of a securities price decline. But once again, Plaintiff cannot escape well-settled securities law, as courts routinely recognize that a plaintiff cannot seek damages based on price drops resulting from disclosed risks. *See, e.g., Kusnier v. Virgin Galactic Holdings, Inc.*, 639 F. Supp. 3d 350, 382 (E.D.N.Y. 2022) ("[N]othing . . . suggest[s] . . . the October 15, 2021 announcement was the materialization of a concealed risk

7

as opposed to a disclosed risk."); *Monroe Cnty. Emps.' Ret. Sys. v. YPF Sociedad Anonima*, 15 F. Supp. 3d 336, 358 (S.D.N.Y. 2014) ("The drop . . . likely represented the materialization of a known risk, rather than the disclosure of a concealed one.").

In one final attempt to avoid Professor Hubbard's disaggregation opinions, Plaintiff launches a fusillade of attacks complaining that his proposed methodology would be too complex, too difficult, or simply impossible to perform.  Of course, none of that is true.  Indeed, Plaintiff's criticisms merely reflect its obvious frustration with being forced to actually prove the case it brought.

For example, Plaintiff complains that "no investor actually performed" the probability calculation that Professor Hubbard explains is required to support Plaintiff's damages claim here.  Pl. Br. at 7.  But Plaintiff misses the point.  Regardless of whether investors "*explicitly* modeled" dam collapse risks, *id.*, they presumably considered and accounted for them in making investment decisions.  Indeed, Plaintiff's case rests on the theory that investors would view as material any and all risk of collapse increases, even incremental ones.  *See infra* pp. 8-11.  Plaintiff also makes much of Professor Hubbard's suggestion that he would need to enlist the assistance of an engineer to evaluate the "true" probability of dam failure here.  Pl. Br. at 6.  But once again, Plaintiff ignores its own case, a central assumption of which is that investors would have responded to highly technical information, including calculations of safety factors and probabilities of failure for geotechnical structures.  *See, e.g.*, Compl. ¶¶ 10-11, 68-104 (listing technical developments Plaintiff contends should have been disclosed); Dkt. No. 65 (Pl.s' MTD Br.) at 33 ("These facts were critical to assessing the magnitude of the risks Vale faced, but were not disclosed.").

Plaintiff offers one final red herring by arguing that "Vale never publicly disclosed any failure probabilities . . . [and thus] there would have been no factual basis for investors to perform

8

the type of detailed calculation Hubbard claims they would have performed." Pl. Br. at 7. But Plaintiff yet again misapprehends Professor Hubbard's opinions, not to mention—*yet again*—its own claims. Professor Hubbard in no sense suggests that all investors calculated *precise failure probabilities* for each Vale-owned dam. Even Feinstein conceded at deposition that investors often attribute probabilities to events without being given exact numbers. *See, e.g.*, Ex. C at 265:24-266:10. What matters is the market's *perceived* probability of failure based on the information it had been provided. Indeed, the difference between the *true* probability of failure and the *perceived* probability might be as general as the difference between a failure that is "unlikely" and "*highly unlikely.*" *See In re: BP p.l.c. Sec. Litig.*, 2016 WL 3090779, at *33 (S.D. Tex. May 31, 2016) ("[I]f BP had properly disclosed its flow rate estimates, at most, investors would have known it was *highly likely* that the containment dome would fail."). This type of analysis is not controversial; indeed, it underlies the central premise of Plaintiff's claim.

In sum, Professor Hubbard's opinions concerning Feinstein's failure to disaggregate non-fraud factors in the price decline of Vale securities at issue reflect the sound application of reliable economic principles and methods to the facts of this case. Accordingly, the Court should reject Plaintiff's attempt to exclude those opinions.

## IV.    The Court Also Should Reject Plaintiff's Other Specious Criticisms of Professor Hubbard

According to Plaintiff, Professor Hubbard's opinions also purportedly (a) adopt too narrow a view of Plaintiff's allegations and potential damages, and (b) would not assist a trier of fact, which could use its own "common knowledge and common sense" to discern the viability of an

alleged securities fraud involving the collapse of a geotechnical mining structure. Pl. Br. at 13. Defendants respectfully suggest that the Court can dispense with these arguments in short order.[3]

Taking into account *all* of Plaintiff's allegations, Professor Hubbard observed that they collectively concern investors' views on the likelihood of a safety incident occurring and the resulting impact on Vale's cash flow expectations. Ex. A ¶¶ 33, 44, 57; *see also, e.g.*, Ex. D at 46:18-23 ("An investor would look at things like certifications, statements about safety, to figure out a zone of what a likely safety event probability is. That . . . exactly ties to [Plaintiff's] allegations that there's a misrepresentation of that in a variety of ways."), 48:18-49:2, 74:22-75:21. But according to Plaintiff, the probability of a safety incident "is only one part of the allegedly mispresented information." Pl. Br. at 10. This self-defeating critique rests on Plaintiff's untenable twisting of its own allegations.

According to Plaintiff, Vale knew, but failed to publicly disclose, that "Dam 1 was not stable and had a significant probability of failure." Pl.'s MTD Br. at 3. That is how Plaintiff described its own case. *See id.* That is how the Court views Plaintiff's case. *See, e.g.*, *In re Vale S.A. Sec. Litig.*, 2020 WL 2610979, at *18 (E.D.N.Y. May 20, 2020) ("Plaintiff's claims rest . . . on Defendants' . . . misleading investors about the significant probability of a collapse occurring."). And that is how Feinstein understands Plaintiff's case. Ex. C at 253:11-20 (describing the case as

---

[3] Defendants will refrain from burdening the Court with extended responses to all of Plaintiff's superfluous critiques lobbed Professor Hubbard's way. That said, we note in passing Plaintiff's absurd complaint that Professor Hubbard does not offer sufficient support for the observation that Vale's bonds should have reacted consistently to company-specific news. Such a relationship, of course, represents the entire premise of the theory of market efficiency and the basis for the class-wide presumption of reliance currently enjoyed by Plaintiff. Also, while Plaintiff now—for the first time—concedes that Vale's Preferred ADRs are outside of the class period, it says nothing about whether individuals who received common ADRs through a conversion process are in the class, whether those individuals were damaged, whether the prices of those shares were inflated, or whether the market for those shares was efficient. Pl. Br. at 15.

being about investors being "deprived of the information . . . necessary to determine whether [a dam collapse] was going to happen or might happen or how likely it would happen"), 256:17-24, 258:18–22.  Thus, to summarize: Plaintiff objects to Professor Hubbard's characterization of its claims *even though that characterization mirrors the view of the Court, Plaintiff's own expert, and Plaintiff itself*.

Plaintiff similarly objects—without basis—to Professor Hubbard's opinion that "a portion, if not all, of the price declines following the Dam 1 collapse was due to, among other things, reduced cash flow expectations resulting from operations interruptions, output reductions, fines, and lawsuits that are to be expected given the occurrence of a safety incident."  Ex. A ¶ 56.  But here, Professor Hubbard simply is offering the uncontroversial opinion that the realization of a previously disclosed risk necessarily would include the attendant financial consequences of such realization.  In other words, in referring to the risk of a "safety incident," Professor Hubbard refers not only to the collapse of a dam but also any "***related financial consequences***."  *Id.* ¶ 57 (emphasis added).  Plaintiff's apparent misunderstanding of this point also explains away its related critique that Professor Hubbard somehow did not recognize financial consequences as falling within a "zone of risk" created by the allegedly concealed information.  Pl. Br. at 8.  But again, Plaintiff is attacking a strawman, and attempts to conflate (intentionally or otherwise) the distinction between disclosed and concealed risks.

Finally, with respect to Professor Hubbard's criticism of Feinstein's use of a constant inflation ribbon to calculate damages, Ex. A ¶¶ 87–89, Plaintiff contends that it will not help the jury, which purportedly is "capable of employing logic without Hubbard's assistance."  Pl. Br. at 13.  Of all Plaintiff's risible arguments, this one perhaps takes the cake.  In the unlikely event that

11

Plaintiff's case were to survive until trial, it would be remarkable if *even one* of the jurors understood the concept of an inflation ribbon. *See Highland Cap. Mgmt., L.P. v. Schneider*, 551 F. Supp. 2d 173, 180 (S.D.N.Y. 2008) ("[I]n complex cases involving the securities industry, expert testimony may help a jury understand unfamiliar terms and concepts." (quoting *United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991))).

<u>**CONCLUSION**</u>

For all the reasons stated above, Defendants respectfully request that the Court deny in its entirety Lead Plaintiff's motion to exclude the proffered testimony of Glenn Hubbard.

Dated: New York, New York
       May 29, 2024

GIBSON, DUNN & CRUTCHER LLP

By:  */s/ Christopher M. Joralemon*
     Christopher M. Joralemon
     Akiva Shapiro
     Mary Beth Maloney
     David M. Kusnetz
     Jason Bressler
     H. Chase Weidner

     200 Park Avenue
     New York, NY  10166-0193
     Telephone:  212.351.4000
     Facsimile:  212.351.4035

     *Attorneys for Defendants*

12