# EXHIBIT C

Page 1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK

----------------------------------x

IN RE:

VALE S.A. SECURITIES                    Case No.

LITIGATION                              19-cv-526-ERK-SJB

----------------------------------x

                    October 11, 2023

                    9:34 a.m.

        VIDEOTAPED DEPOSITION of STEVEN P. FEINSTEIN, held at the law offices of GIBSON DUNN & CRUTCHER, LLP, 200 Park Avenue, New York, New York, before Judith Thaten, a Certified Livenote Reporter and Notary Public of the State of New York.

A P P E A R A N C E S

ON BEHALF OF PLAINTIFFS

KAPLAN FOX & KILSHEIMER LLP

850 Third Avenue

New York, New York 10022

BY:   DONALD R. HALL, ESQ.

dhall@kaplanfox.com

CARIHANNA MORRISON, ESQ.

cmorrison@kaplanfox.com


ON BEHALF OF DEFENDANTS

GIBSON DUNN & CRUTCHER, LLP

200 Park Avenue

New York, New York 10166

BY:    CHRISTOPHER JORALEMON, ESQ.

cjoralemon@gibsondunn.com

ANDREW FREIRE, ESQ.

afreire@gibsondunn.com

CHASE WEIDNER, ESQ.

cweidner@gibsondunn.com

ALSO PRESENT:

THIAGO CARDOSO, Vale S.A.

TYLER QUADE, Crowninshield Financial

PHIL GLAUBERSON, Legal Video Specialist

Veritext Legal Solutions

Page 3

I N D E X

WITNESS                                                PAGE

STEVEN P. FEINSTEIN

    Examination by:

       MR. JORALEMON                                 7


E X H I B I T S

(Retained by Veritext Legal Solutions)

FEINSTEIN                                              PAGE

Exhibit 20   Report on Loss Causation and            40
             Damages, Professor Steven P.
             Feinstein, Ph.D., CFA, March 10,
             2023

Exhibit 21   Reply Report, Professor Steven P.       40
             Feinstein, Ph.D., CFA, April 7,
             2023

Exhibit 22   Report on Loss Causation and            41
             Damages, Professor Steven P.
             Feinstein, Ph.D, CFA, May 12,
             2023

Exhibit 23   Memorandum & Order                      91

Exhibit 24   Consolidated Class Action               113
             Complaint for Violations of the
             Federal Securities Laws

**Page 4**

IT IS HEREBY STIPULATED AND AGREED, by and among counsel for the respective parties hereto, that the filing, sealing and certification of the within deposition shall be and the same are hereby waived.

IT IS FURTHER STIPULATED AND AGREED that all objections, except to the form of the question, shall be reserved to the time of trial;

IT IS FURTHER STIPULATED AND AGREED that the within deposition may be signed before any Notary Public with the same force and effect as if signed and sworn to before the court.

* * * *

FEINSTEIN

VIDEOGRAPHER:  Good morning. We are going on the record at 9:34 a.m., 10/11/2023.  Please note that microphones are sensitive and may pick up whispering and private conversations.  Please mute your phones at this time and place them away from the microphones as they can interfere with the audio.

Audio and video recording will continue to take place unless all parties agree to go off the record.

This is Media Unit 1 of the video-recorded deposition of Steven Feinstein in the matter of In re Vale S.A. Securities Litigation filed in the United States District Court, Eastern District of New York 19-cv-526 (ERK) (SJB).

The location of this deposition is Gibson, Dunn &

FEINSTEIN Crutcher LLP, 200 Park Avenue New York, New York.

My name is Phil Glauberson representing Veritext, and I'm the videographer.  The court reporter is Judy Thaten from Veritext.

I'm not authorized to administer an oath.  I'm not related to any party in this action, nor am I financially interested in the outcome.

If there are any objections to proceeding, please state them at the time of your appearance.

Counsel will now state their appearances and affiliations for the record, beginning with the noticing attorney.

MR. JORALEMON:  Good morning, everyone.  Chris Joralemon from Gibson Dunn on behalf of the defendants.

I'm joined about by colleagues Chase Weidner and

FEINSTEIN

Andrew Freire, as well as Thiago Cardoso of Vale.

MR. HALL:  Donald Hall, Kaplan Fox & Kilsheimer LLP, on behalf of CAAT, and the class, and the witness.

With me today is Carihanna Morrison from Kaplan Fox and Tyler Quade from Crowninshield Financial.

VIDEOGRAPHER:  Will the court reporter please swear in the witness.

S-T-E-V-E-N  P-H-I-L-L-I-P  F-E-I-N-S-T-E-I-N,

Having been duly sworn by a Notary Public within and for the State of New York, stated an address as 56 Harvard Street, Brookline, Massachusetts 02446, was examined and testified as follows:

EXAMINATION BY MR. JORALEMON:

Q    Thank you.  Good morning, Mr. Feinstein.

A    Good morning.

Q    Is it fair to say you have

FEINSTEIN

provided deposition testimony before?

A    Yes.

Q    In fact, you provided sworn deposition testimony in this matter previously, correct?

A    Yes.

Q    Over Zoom during the pandemic?

A    That's right.

Q    Okay.  Approximately how many times have you provided deposition testimony during the course of your career?

A    Well, I don't have an exact count, but I have been doing so since 1996, so that's 27 years.  At least 100 times.

Q    Okay.  Given your experience, I assume you know the general ground rules, but I'm going to cover them anyway, just so we're all on the same page.  Okay?

First, we ask that you provide oral responses to my questions

**Page 9**

FEINSTEIN

as opposed to head nods or utterances so that the court reporter can accurately transcribe your responses.

Does that make sense?

A    Yes.

Q    We also -- I promised you, and I asked you to promise me that we try to avoid overtalking, talking over one another.  So I will wait until you finish your response before I ask my next question.  And I ask if you can wait for me to finish my question before providing a response.

Does that make sense?

A    Yes.

Q    We'll do our best to avoid it.

If you don't understand a question I ask, please indicate that.  Otherwise, we all will assume you understood the question if you provide a response; is that fair?

A    It is.

Q    Okay.  And to make this go as

FEINSTEIN

smoothly as possible, if you can answer the question I ask as opposed to providing other information, that would be appreciated.

Does that make sense?

A    I understand.

Q    Okay.  If at any time today you need a break, please let me know and we'll be happy to accommodate you. The only caveat to that being if there is a question pending, we'll ask that you provide a response before we break. Okay?

A    Okay.

Q    There may be one or two times today where your counsel will object, maybe less than that.  You understand you are required to provide a response irrespective of his objection unless he specifically directs you not to answer.

Do you understand that?

A    I do.

Q    Okay.  You understand you are testifying under oath today, correct?

                    FEINSTEIN

     A     Of course.

     Q     And in swearing that oath,
you agree to provide complete and
accurate testimony, correct?

     A     Yes, but I do understand that
that will sometimes require me to
elaborate beyond a "yes" or "no"
answer.

     Q     Okay.  That's fair enough.
          Is there any reason you
cannot give truthful and complete
testimony today?

     A     No.

     Q     Are you under any emotional
distress?

     A     No.

     Q     Under the influence of any
controlled substances?

     A     No.

     Q     Okay.
          Sir, you previously opined on
market efficiency in this matter,
correct?

     A     That's right.

FEINSTEIN

Q    Okay.  And you are familiar with the magistrate judge's report and recommendation concerning market efficiency; is that correct?

A    Yes.

Q    Okay.  You read it?

A    Yes.

Q    Okay.  And you recall that the Court found that "due to its methodologies, deficiencies, Mr. Feinstein's event study was entitled to no weight"?

MR. HALL:  Objection.

Q    Do you recall that?

A    I don't recall the exact words, but I recall that conclusion.

Q    Okay.  And you recall the Court also characterized your ability study as "generalized, unverifiable, subjective, and unexplained"?

MR. HALL:  Objection.

A    I don't recall the exact words, but I understood that the magistrate judge and the judge who

FEINSTEIN

issued the ultimate order determined that I had proved that the market for Vale Securities was an efficient market, notwithstanding concerns they had about the empirical factor, the Cammer 5 factor.

Q    The empirical factor being your event study is the only evidence you offered?

MR. HALL:  Objection.

Q    To support that empirical factor, as you say, correct?

A    There were elements of the event study that they objected to, that the magistrate judge objected to.

Q    What elements?

A    What?

Q    What elements?

A    Oh, the selection of events and the description of what events were not selected as the focus of the event study, seems to be where the focus was.

Q    Anything -- any other elements of your event study that the

Page 14

FEINSTEIN

Court objected to?

A    I don't recall that there were.  There was essentially the events, and how I explained the methodology for how the events were selected and how certain events were excluded that the Court objected to.

Not objected to.  Had concerns with that the Court then said were ultimately moot because the proposition was proved.

Q    You understand the Court rejected entirely your event study?

MR. HALL:  Objection.

A    I don't think the Court used those words.  The Court said the recommendation was a recommendation of no weight be assigned, but it was unnecessary to assign any weight --

Q    Okay.

A    -- to that particular element of the prior research.

Q    Do you recall the Court characterized your unit study

Page 15

FEINSTEIN

methodology as "black-box-like"?

Do you remember that?

MR. HALL:  Objection.

A    Yes, I recall that was in the context of describing that the Court felt the selection criteria were not articulated with enough detail.

Q    Do you recall the Court described your event study methodology as unverifiable?

MR. HALL:  Objection.

A    No.  No, I don't think the entire event study was described that way.

I thought it was the selection, the methodology and algorithm for selecting events, was what the Court felt would be difficult to replicate without greater detail, but then pointed out that defense's expert made no effort to, nonetheless, submit any countervailing empirical proof regarding market efficiency.

Q    Do you recall the Court

Page 16

FEINSTEIN

concluded that your event study methodology was standardless and subjective?

MR. HALL:  Objection.

A    I don't recall those words.

Q    Okay.  You read the opinion, though?

A    I did.  And the --
Judge Dearie's opinion as well, on class certification, who described the battle of the experts over the empirical factor as essentially about being a push, a wash; that neither side was given any weight there.

Q    Okay.  So this is a perfect example of you answering a question I didn't ask.  Okay.

I asked you if you read the report and recommendation, and then you went on to talk about things Judge Dearie said, unrelated to my question.

So if we can try to keep your responses to my questions, today will

FEINSTEIN

go a lot more smoothly.

MR. HALL:  Objection.  The witness will answer the question as the witness sees fit.  And if we can move to the report that's actually at issue instead of rehashing things that took two and a half years ago, then maybe we can move it along also.

Q    Mr. Feinstein, you are here to testify today in connection with a loss causation and damages analysis, correct?

A    That's right.

Q    Okay.  When were you retained to perform your loss causation and damages analysis?

A    I don't recall specifically, but it seems that it would be the beginning -- near the beginning of 2023, that after the market efficiency and damage model testimony, and the Court's decisions were accepting my conclusions on those matters and

Page 18

FEINSTEIN

certifying the class, there was a lull.

And then around the beginning of 2023, I was contacted and asked if I would be able to continue and do additional analyses related to loss causation and damages.

Q    Did the opinions you provide in this matter concerning loss causation and damages depend on the Court finding the markets for Vale ADRs and notes to be efficient?

MR. HALL:  Objection.

A    That's a tough one.  I don't think that's a -- to answer "yes" or "no."  I don't think the "yes" or "no" actually does justice to that question.

The events and reactions to the events that I write about in my report on loss causation damages are additional proof of market efficiency and actually could stand in for additional proof of -- empirical proof the market efficiency.

But I would say that my

FEINSTEIN

damage conclusion does depend on the fact that Vale Securities did react to information and were efficient in that sense.

Q    You had indicated earlier that you provided maybe 100 depositions before, correct?

A    Yes.

Q    Were all of those depositions in connection with loss causation and damages analysis, or did it include other topics?

MR. HALL:  Objection.

A    Definitely other topics as well.

Q    So how many times have you served as an expert on issues of loss causation and damages?

A    I don't know.  It would be somewhat less than the entire set of depositions.  I can say that half, if not more than half, of the class action security cases that I testify in don't go to that step.  They settle before a

Page 20

FEINSTEIN

deposition on loss causation and damages.

And then, of course, there are other cases that aren't class action security cases at all.  I'd have to estimate somewhere in the neighborhood of near 100 but less than 100.

Q    Okay.  And let me try and sort of narrow this down.  I understand you can't be precise about this.  I don't expect you to be.

But approximately how many times have you served as an expert in a securities class action on issues of loss causation damages?

A    Where the scope of the engagement -- and I'm asking for clear indication.

Q    Sure.

A    Where the scope of engagement specifically requested that I analyze loss causation and damages, that's your question?

FEINSTEIN

Q    Correct.

A    I don't know.  I would say in the neighborhood of 100 but less than 100.

Q    Okay.  And in any of those --

A    Well, actually, I'm sorry. Given that so many of those didn't proceed to depositions, it would be, I think, probably more than 100.

Q    Okay.

So among that universe, have you ever been retained by defendants in the securities class action to provide loss causation and damages testimony?

A    No, but I would be willing to.

Q    So all of those engagements were on behalf of plaintiffs; is that correct?

A    No.  I would characterize them as on behalf of the Court, to help the Court assist the Court in getting at the truth.

Q    Okay.  And in all of those

Page 22

FEINSTEIN

engagements, you were retained by plaintiffs to provide loss causation and damages testimony, correct?

     A    That's right.  Plaintiff or plaintiffs' counsel.

     Q    Did you receive any assistance from anyone in performing your loss causation and damages analysis here?

     A    Yes.

     Q    Who?

     A    Tyler Quade, who is here today.  He is an analyst at Crowninshield Financial Research.

          Dan Bettencourt, also an analyst and executive at Crowninshield, and Miguel Villanueva is at Crowninshield.

          That's who I recall.

     Q    Okay.

          Anyone not affiliated with Crowninshield provide assistance to you in preparing your loss causation and damages analysis?

Page 23

FEINSTEIN

A     No.

Q     Approximately how much time would you say that you and your team at Crowninshield have spent on this engagement to date?

MR. HALL:  Objection.  Just for clarification, do you mean the loss causation and damages engagement or the entire case?

Q     If you can draw a distinction between those two phases of work, that would be fine.  If not, then just an overall estimate would be fine as well.

A     Well, I was actually going to ask for the same clarification.

I know that -- I'm pretty sure you asked that question at the last deposition, so that record would have the hours spent on market efficiency.

Q     Okay.  That's fine.

A     And I did check my records before this deposition.  It was approximately 150 of my hours, not

FEINSTEIN

including the deposition preparation for this deposition.

And I did not count up the hours of my assistants, but it's typically a 3-to-1 ratio, typically. So that would be 400 or 450 hours of their time.

Q    So approximately 600 hours in total?

A    Right.

Approximately.  I want to be really clear that that's an approximation.

Q    Sure.  I understand.

Did you speak with anyone other than the Crowninshield team concerning your loss causation and damage analysis?

A    Yes.

Q    Who?

A    Counsel from Kaplan Fox.

Q    Okay.  Anyone else?

A    No.

Well, and you, of course, in

Page 25

FEINSTEIN

the last deposition.

Q    Right.  Okay.

Mr. Feinstein, I just want to clarify the scope of your proffered expertise.

You are not an expert on geotechnical structure, correct?

A    That's correct.

Q    You are not an expert on tailings dams, correct?

A    Correct.

Q    You are not an expert on corporate governance issues, correct?

A    Well, I have got some expertise on financial analysis of corporate governance issues.

I wouldn't say that's one of my chief specialties but I teach it, I have done research in it.  Working on some research in the area right now.

But it's something that I hold out as my chief area of expertise.

Q    Okay.  Are you offering any expert opinions on corporate governance

FEINSTEIN

in this matter?

A    I did.  I wrote my report that the ESG, where the G stands for governance, is important to investors.

That's an opinion of mine, and I'd be willing to share that with anyone.

Q    And you -- you're -- you want the Court to accept that you are an expert on whether investors consider ESG to be important; is that right?

MR. HALL:  Objection.

Q    I want to make sure I understand.

A    I would think so, yes.  I'm a financial analyst.  I'm a -- I teach finance.  I do research for finance. ESG is an important area of research. It's an area of research of mine currently.

And I think it's an uncontroversial opinion that I would be willing to explain.  And I think in the report, I even cite to authorities,

FEINSTEIN

published authorities, that governance issues are important to investors.

I mean, that's part of my chartered financial analyst training and part of my academic training and research.

Q     Is it your view that one needs to be an expert to make that conclusion, or is that something a layperson can conclude?

MR. HALL:  Objection.

A     I think you would need to be an expert to know what the literature says about it.  And moments ago, you expressed doubt, it seemed to me.

So I think it would require some expert -- expertise to cite to the appropriate literature to confirm that it's a generally accepted principle in financial economics that investors care about how a company is governed.

Q     Okay.

A     And that's economically material information.

FEINSTEIN

Q    Are you an expert in investment advisory services?

MR. HALL:  Objection.

A    I have expertise in the area. It's a subject that's covered in the charter of financial analyst curriculum.

I'm not an industry expert. I haven't served as an investment advisor, but I am trained in understanding roles and responsibilities of investment advisors as part of the curriculum that I mastered in order to receive the chartered financial analyst designation.

Q    Are you offering any expert opinions on investment advisory services in this matter?

A    No.

Q    Sir, do you consider yourself to be expert in organizational theory?

Well, first, do you know what "organizational theory" is?  Are you

Page 29

                    FEINSTEIN

familiar?

          MR. HALL:  Objection.

     A    Do you mean theory of the firm?  What a company is and why companies exist and why some contracts are external to the firm and others are internal?

          I mean, this is all part of my training as a Ph.D. economist.

     Q    Well, sir, let me answer your question so you are clear on what I mean by "organizational theory."

          I use that term to mean the study of organizational cultures.

          MR. HALL:  Objection.

     Q    Okay.

     A    I wouldn't cite that as one of my areas of expertise.

     Q    And you are not offering any expert opinions here on organizational theory, correct?

     A    Correct.

     Q    And you are not offering any opinions here on the geotechnical

Page 30

FEINSTEIN

causes of Dam 1's collapse, correct?

A    Correct.

Q    And you are offering no expert opinions on Vale's organizational culture, correct?

A    That's correct.

MR. HALL:  Objection.

A    That's correct.

Q    And you are offering no opinion on the voracity of plaintiffs' substantive allegations in this case, correct?

A    Correct.  I wrote in my report that I'm accepting as assumptions the factual allegations.

Q    Is it fair to say you are not offering any expert opinion on the -- on Vale's state of mind during the class period here, correct?

A    Correct.

Q    Prior to your engagement in this action, had you ever met Professor Glenn Hubbard?

A    Not personally.  I mean not

FEINSTEIN

in person.

Q    Okay.  Were you aware of Mr. Hubbard by reputation prior to your engagement here?

A    Yes.

Q    And what was your view of his reputation?

A    He is involved in a wide range of activities.  He is somewhat of a controversial figure; both because of his political views and his involvement in consulting work.  But he's held some very high-level responsible positions in politics as well as economics and academia.

Q    You had indicated you believed that he was -- he was a controversial figure because of his political views.

What do you mean by that?

A    Well, he was -- it is my understanding he is aligned with Republican candidates in the Republican Party and was considered for -- I

Page 32

                    FEINSTEIN

believe he was on the counsel of

economic advisors for a Republican.

And worked also in the Mitt Romney

campaign.  And in this era, any

pronounced political affiliation would

be somewhat controversial.

          He is known to be very pro

business and so on.

     Q    Had you ever met

Kathleen Sutcliffe prior to your

engagement here?

     A    I have not.

     Q    Were you aware of her by

reputation?

     A    No.

     Q    How about Randall Stephenson?

     A    Same answer.  I never heard

of him before.

     Q    Okay.  I meant to ask you a

moment ago.  I apologize.

          Prior to this engagement, had

you ever provided expert testimony on

behalf of the lead plaintiff here,

CAAT?

FEINSTEIN

A     I may have.  I usually don't pay much attention to who the lead plaintiff is.

I also know that sometimes who is listed on the caption is not really the lead plaintiff.  So I just do not know.

Q     Okay.

A     It's possible.  I just do not know.

Q     Okay.

A     Oh, wait.  I do recall because -- I do recall that I have.  I was involved in the Grupo Televisa case.  And one of the filings in this case identified that they were the lead plaintiff, at least at one point in time in that case.

Q     And prior to this matter, had you ever been retained by Kaplan Fox on behalf of any securities class action plaintiff?

A     Yes.

Q     How many times?

Page 34

FEINSTEIN

A    I don't recall.  Not very many, but I don't recall.

Q    Okay.

Do you recall the specific -- any other specifics cases in which Kaplan Fox retained you?

A    No.  This may have been a question you asked at the last deposition, and it's possible that I looked it up then.

But preparing for today's deposition, I didn't look it up.  So I just don't know.

Q    Do you know Franco Oboni?

A    No.

Q    So it's fair to say you've never spoken with Mr. Oboni?

A    Correct.

Q    Okay.  Did you read Mr. Oboni's -- any of Mr. Oboni's -- sorry.

Did you read any of Mr. Oboni's proffered testimony in this matter?

FEINSTEIN

A    I did, just two days ago.

Q    Okay.

A    I don't think I had looked at it before.

Q    And what was it that you looked at?

A    I was trying to figure out if he really said what Mr. Stephenson and Dr. Hubbard said he said, which was that he arrived at a specific probability estimate.

I was trying to ascertain whether that was true or not.

Q    And in trying to ascertain that you reviewed his -- an expert report he submitted here?

A    Yes.  Yes, I did.

Q    Anything else?

A    No.

Q    Who is Matthew Cain?

MR. HALL:  Objection.

A    Who is Matthew Cain?

Q    Yeah.

A    I don't know.

FEINSTEIN

Q    Have you ever met Matthew Cain?

A    I may have.  I don't know. As I sit here now, I would think not.

Q    Okay.  Are you aware that he has been proffered as an expert by plaintiffs in this matter?

A    No, I am not aware.

Q    So it's fair to say you haven't read any expert testimony provided by Mr. Cain in this matter?

A    That's right.

Q    Have you ever met Steven Emerman?

A    No.

Q    Did you review any reports or testimony provided by Mr. Emerman in this matter?

MR. HALL:  Objection.

A    No.

Q    Do you know Terry von Thaden?

A    No.

Q    Did you review any reports or testimony provided by Ms. von Thaden in

                    FEINSTEIN

this matter?

          MR. HALL:  Objection.

     A    No.

     Q    Recognizing that he's
unfortunately passed away, you knew
Harvey Pitt when he was with us; is
that right?

          MR. HALL:  Objection.

     A    I never met him, and I never
spoke to him.  But, of course, I knew
of him through the media.

     Q    Okay.

          Mr. Feinstein, what, if
anything, did you do to prepare for
your deposition today?

     A    I read the reports that I
have written and submitted in this
matter.  I read the reports submitted
by Dr. Hubbard.  And I can't recall
whether Stephenson is "Mr." or
"Dr." but Stephenson.

          Could I ask you that?  Is it
Dr. or Mr. Stephenson?

     Q    I'm not sure, actually.

Page 38

FEINSTEIN

A     Okay.  Stephenson.

And -- well, a few other reports.  Like I mentioned before, the Oboni report.  I reread the complaint. I reread certain court orders, the recommendation, R&R regarding class certification, the acceptance of that recommendation by the judge, the motion to dismiss order that preceded all of that.

I looked at a few analyst reports and news articles, and then I had a meeting, a virtual meeting with plaintiffs' counsel.

Q     Did you do anything else to prepare for today?

A     No, not that I can recall, as I sit here now.

Q     That virtual meeting with counsel was just one meeting?

A     Yes.

Q     And when did that take place?

A     On Monday.  This last Monday.

Q     Approximately how long did

Page 39

FEINSTEIN

that last?

A     Less than two hours.  I think it was about an hour and 45 minutes.

MR. HALL:  I'm efficient.

Q     I asked you a related question, so I apologize.

But other than that virtual meeting with counsel, did you speak with anyone concerning your testimony today, prior to today?

A     Well, my staff at Crowninshield.  But besides them, no.

MR. JORALEMON:  Okay.  We're going to mark your three reports, so there will be a little logistics here.

(Whereupon, a discussion was held off the record.)

MR. HALL:  Why don't we start at a higher number?  Because I think we used Feinstein 1 at the prior depo, probably.  Start at 20?

MR. JORALEMON:  Okay.  So

**Page 40**

FEINSTEIN

Feinstein Exhibit 20, which the court reporter will mark, is the March 10, 2023, opening report from Mr. Feinstein.

(Report on Loss Causation and Damages, Professor Steven P. Feinstein, Ph.D., CFA, March 10, 2023, was marked Feinstein Exhibit 20, for identification, as of this date.)

MR. JORALEMON:  Feinstein Exhibit 21 is the April 7th, 2023, reply report.

(Reply Report, Professor Steven P. Feinstein, Ph.D., CFA, April 7, 2023, was marked Feinstein Exhibit 21, for identification, as of this date.)

MR. JORALEMON:  And Feinstein Exhibit 22 is a May 12th, 2023, reply report.

(Report on Loss Causation and Damages, Professor Steven P. Feinstein, Ph.D, CFA, May 12,

**Page 41**

FEINSTEIN

2023, was marked Feinstein Exhibit 22, for identification, as of this date.)

Q    Okay.  We'll start with Exhibit 20.

Do you recognize this document, sir?

A    I do.

Q    What is it?

A    This is the report that I submitted that explains and presents my methodology findings and conclusions related to loss causation and damages in this case.

Q    And if I direct your attention to page 98 of Exhibit 20, is that your signature?

A    It is.

Q    Okay.  And if I can direct your attention to pages 2 and 3 of Exhibit 20.

A    Okay.

Q    Section 2 is labeled "Scope of Project and Report."

Page 42

FEINSTEIN

Do you see that?

A    Yes.

Q    Does this section summarize the scope of the work you were asked to perform?

A    It does.

Q    Now, if we can look at Exhibit 21.  Do you recognize this document?

A    I do.

Q    What is it?

A    This is the report I wrote responding to Mr. Stephenson's first report.

Q    On page 12, that's your signature, correct?

A    Yes.

Q    And is it fair to say that Exhibit 21 reflects your opinions in response to a request from counsel that you consider, evaluate, and respond to the arguments and conclusion in the Stephenson report?

A    Yes.

Page 43

FEINSTEIN

Q    And then looking at Exhibit 22, do you recognize this document?

A    I do.

Q    What is it?

A    This is the report I wrote responding and replying to the follow-up report of Mr. Stephenson and the report written and submitted by Dr. Hubbard, but also the report from Professor Sutcliffe.

Q    Okay.

And directing your attention to page 66, that's your signature, correct?

A    It is.

Q    And if you can look at pages 6 through 13, as -- beginning with the section titled "Conclusions," do these pages capture the conclusions you are offering in Exhibit 22?

A    Yes.

Q    Now, looking at them together, Exhibits 20, 21, and 22, does

**Page 44**

FEINSTEIN

this universe of materials reflect the

entirety of the opinions you have

reached in this matter concerning loss

causation and damages?

A    Yes.

Q    Okay.  Have you done any

additional work on this engagement,

aside from deposition preparation,

after your May 12th, 2023, report,

exhibit 22?

MR. HALL:  Objection.

A    Well, maybe this is the time

to correct something previously.

I just remembered that I, in

preparing for this deposition, I also

read the deposition transcripts from

Dr. Hubbard and Mr. Stephenson, so I

did that.

Q    Okay.

A    Those were recent

depositions.  And aside from what I did

during preparing for the deposition,

no.

Q    Okay.  Have you formed any

FEINSTEIN

opinions in this matter not contained in these three exhibits?

MR. HALL:  Objection.

A     No, I have not.

Q     Okay.

Mr. Feinstein, what does the term "artificial inflation" mean?

A     That would be the excess of -- in a security price above and beyond what the price would have been in the but-for scenario that there had been full and complete and timely disclosure of whatever was alleged to have been misrepresented and omitted.

So it's the different between the actual price and the but-for price, caused by the alleged misrepresentations and omissions.

Q     And you are aware that there are 26 alleged misstatements that were made in this case; is that right?

A     I never counted them.  I'm aware of what the misrepresentations and omissions are generally and

                    FEINSTEIN

collectively.

    Q    Would it surprise you to
learn that there are 26 remaining
alleged misstatements in this case?

    A    No, doesn't surprise me.

    Q    Okay.

         And are you aware that those
26 remaining alleged misstatements
occurred over a 28-month period?

    A    Well, that would be from
October of 2016 to January of 2019.  I
can count the months, but I will take
your word for it.

    Q    Okay.

    A    Actually, February because --
February, I believe, there's -- I think
there's alleged misrepresentations on
the dam break day as well, but that
would be in January.

    Q    Did you conduct any studies
to determine whether the price of
Vale's ADRs moved in a statistically
significant way on any of the dates of
those alleged 26 misstatements?

FEINSTEIN

MR. HALL:  Objection.

Are you referring to -- are you limiting your question to the basis for his opinion in his loss causation and damages report?

MR. JORALEMON:  I'm not sure I understand the clarification.

MR. HALL:  Well, we had a prior report that dealt with market efficiency.  And so I want to know if you meant to exclude that prior analysis.

MR. JORALEMON:  I think as a general matter, any question I ask you today is really focused on the opinions you are offering in these three exhibits concerning loss causation and damages.

If not, I will clarify.

Q     So in connection with your loss causation and damages analysis, did you conduct any studies to determine whether the price of Vale's ADRs moved in a statistically

Page 48

FEINSTEIN

significant way on any of the dates of the alleged misstatements?

MR. HALL: Objection.

A    No.  That wasn't part of the methodology for arriving at loss causation and damage opinions.

But in my earlier work, I did test every single day in the class period for statistical significance. But it wasn't directed at determining whether the misrepresentation dates themselves were significant, just what all the other days, besides the information dates of the collective event study, were focused on.  We're comparing all other days to the information dates in the collective study.

So, I mean, for this analysis, that wasn't part of the methodology.  And "this analysis" meaning the loss causation and damage and damage analysis.

Q    In conducting your market

FEINSTEIN

efficiency analysis, do you recall whether there was a statistically significant price movement on any of the alleged misstatement days?

MR. HALL: Objection.

A    I don't recall.

Q    Okay.

Back to the loss causation damages analysis, with respect to the notes, did you conduct any analysis concerning statistical significance price movement on alleged misstatement dates?

MR. HALL: Objection.

A    Designing a study of that type was not part of the methodology I employed for arriving at an understanding of loss causation and damages in this case.

Q    Okay. Sitting here today, relying on your market efficiency analysis, do you recall whether there was a statistically significant price movement in any of the notes on any of

Page 50

                    FEINSTEIN

the alleged misstatement dates?

          MR. HALL:  Objection.

     A     I don't recall one way or the other.

     Q     Okay.  Would it surprise you to learn that there was no statistically significant price movement in either the ADRs or the notes on any of the alleged misstatement dates?

          MR. HALL:  Objection.

     A     No, but to be complete, I need to answer more than just "no."

          It would not surprise me because what I understand the allegations to be in this case is that there was a deliberate and concerted effort to mislead the public into thinking that risks were managed appropriately and that the dams were reasonably safe.

          And so any statements to that effect would have been -- by the company, which are alleged to be

**Page 51**

FEINSTEIN

misrepresentations, would have been consistent with what the market already believed and its economic theory that if a statement is already consistent with what the market already believes, it generally would not elicit a statistically significant change in price.

So given the facts, as I know them, and given the allegations, that would not surprise me.

Q    So in that prior answer, you stated that the alleged misstatements would have been consistent with what the market already believed.

Do you recall that?

A    I said that.

Q    Okay.  Upon what do you base that conclusion?

MR. HALL:  Objection.

A    A number of things.  Well, the -- I accept as -- I accept -- I assume as that the factual allegations in the complaint are correct.  And the

Page 52

FEINSTEIN

factual -- one of the factual allegations is that the company engaged in a -- as the judge put it, a deliberate and concerted effort to mislead the public about dam safety.

So if the -- the allegations are, and the judge characterized the case the same way, that the public was misled into believing that the dams were reasonably safe and that the company was doing all it could to manage safety appropriately.

So any follow-on and any statement to that effect would be simply reinforcing what the market was already misled about.

Q   You lose me on that last part.

Was there something in the complaint that stated the alleged misstatements were consistent with what the market already believed?

Do you recall some allegation to that effect?

**Page 53**

FEINSTEIN

MR. HALL:  Objection.

A    Well, yes.  The judge characterized the plaintiffs' complaint as saying that if these allegations are true, then what Plaintiffs are actually alleging is there was a concerted and deliberate campaign to mislead the public.

So I think the judge's characterization of the plaintiffs' complaint was accurate.  And my analysis says that when the truth became known, the stock price fell, which tells me that the campaign must have been successful until the truth came out, which means what the market believed, until the truth came out, was that the dams were reasonably safe and impeccable, as the CEO of the company said, and that risk management was being -- being done appropriately and the company was committed to safety and stability.

(Clarification by the

Page 54

FEINSTEIN

reporter.)

Q    Is it your understanding that "reasonably safe" and "impeccable" are synonyms for one another in describing dam conditions?

MR. HALL:  Objection.

A    In this case, for all practical purposes, I mean, the company's position, and it was expressed numerous times.

I mean, you counted them.  I don't remember exactly the number.

But the company was saying repeatedly that there -- that the dams are in good shape and safety is being managed appropriately.

So maybe the spread between "reasonably safe" and "impeccable" is puffery.  But "impeccably" would at least capture that core alleged misrepresentation that they were alleging the dams to be reasonably safe.

Q    And in your testimony a

FEINSTEIN

moment ago, you would characterize the Court's conclusion that defendants engaged in a "concerted and deliberate campaign to mislead the public"; is that right?

A    Say that again.

Q    You characterize the Court's --

A    Well, I think it's maybe not an exact quote.  I think maybe they say "effort."

Q    That was quoting you.  That was your characterization --

(Unreportable cross-talk.)

(Admonishment by the court reporter.)

A    My quote might not have been exact.

Q    Understood.

But sitting here today, your testimony is that you believe the Court found that the defendants' had engaged in "a concerted and deliberate campaign to mislead the public."  Your words?

Page 56

FEINSTEIN

A    I didn't say that.  I said that the Court said that plaintiffs' allegations are that.  And if plaintiffs' allegations are true, then it follows that --

Q    Okay.

A    -- there was a deliberate and concerted effort.  And, therefore, to some extent, I am relying on the judge's characterizing encapsulating the misrepresentations, as a group, to mean that that's what the allegations are about.

Q    Mr. Feinstein, is it fair to say that every case of alleged securities fraud involves a concerted and deliberate campaign to mislead the public by defendants?

A    I don't know.  I know this one does.  I mean, I know this is what this case concerns.  I'd have to think about that.  I can't generalize about every other case, as I sit here now.

Q    So sitting here today, can

FEINSTEIN

you think of any other securities case where you were retained as an expert where you wouldn't characterize -- a securities fraud case where you wouldn't characterize the allegations as defendants engaging in concerted and deliberate campaign to mislead the public?

MR. HALL:  Objection.

A    Well, I mean, I'm not a lawyer.  I didn't go to law school. But I read enough of these complaints and judge's opinions to know that scienter is an important element of proven fraud.

But I also recall that in some cases, plaintiffs argue that if it wasn't a concerted and deliberate effort, it was negligent, and negligent to an extent that it would also be covered by the securities laws.

But I'm not a lawyer, so I don't think I am qualified to characterize all security cases in any

Page 58

FEINSTEIN

particular way.

Q    I'm not asking you to provide a legal opinion.  I am asking to draw upon your experience of, you said, over 100 securities fraud cases.

Can you think of a single one in which you -- you as an expert -- wouldn't characterize the allegations as a concerted and deliberate campaign to mislead the public?

MR. HALL:  Objection.

He didn't characterize it like that in this case.

A    Yes, I actually can think of several cases that wouldn't be characterized that way.  Either because they deal with negligence or reckless negligence or because they focus on a specific misrepresentation, like one single misrepresentation that had the effect of misleading the public importantly and materially significantly.

And so it wouldn't be

Page 59

                    FEINSTEIN

concerted and deliberate campaign, but

rather a specific misleading from a --

I mean, it's what happens.  Not every

case is about under an ongoing

concerted campaign.

        Q    Okay.  So whether it's

concerted and deliberate depends on the

length of the class period; is that

fair?

            MR. HALL:  Objection.

        A    As I sit here now, I'd have

to say -- that's using the judge's

language.  I think the -- I would be

second-guessing why the judge used that

language, but it seems reasonable that

the length had something to do with it,

and the number of representations had

something to do with it, why the judge

would use that language.

            But it seemed reasonable to

me that that was a way of

characterizing collectively,

holistically, the representations in

this case, and that that does not apply

Page 60

FEINSTEIN

to any case where there would be one

misrepresentation or reckless

negligence.

Q    And you concluded in your

reports that all of the artificial

inflation in Vale ADRs and notes were

present on day one of the class period,

correct?

MR. HALL:  Objection.

A    You want me to say "yes" or

"no," right, without elaborating?  Can

I elaborate?

Q    That's a yes-or-no question.

A    Yes.  I would say yes.

Q    I'm going to ask you more

questions, I promise.

A    Yes.  Yes, it was.

Q    Okay.

A    And that's when the campaign

started, or at least that's when the

campaign was occurring --

Q    Okay.

A    -- and enforced.

According to allegations.

FEINSTEIN

According to the allegations.

Q    Now, I just want to clarify.

Is it your opinion that all of the inflation entered into the securities upon the making of the first alleged misstatement, or did it exist prior to the making of the first misstatement?

Because that -- the first day of the class period is the first alleged misstatement.

MR. HALL:  Objection.

A    I know that as of that first date, the inflation was in the stock price.  And that conclusion is the only appropriate conclusion consistent with the allegations.

I didn't study -- I didn't do analysis and study to determine whether there may have been some of that inflation earlier.  That was simply maintained by the first alleged misrepresentation.

But what I did conclude is

**Page 62**

FEINSTEIN

that as of the time of the first misrepresentation, the inflation was there.

Q    So do you have an opinion as to whether the artificial inflation entered into the securities upon the making of the first misstatement or it already existed before the making of the first misstatement?

MR. HALL:  Objection.

A    I don't have an opinion.  I know enough facts to know that it would require more study because I do know that there is evidence that the company knew things before that first statement that were inconsistent with that first statement.

But, again, I'm not a lawyer so I don't know why they chose the start of the class period to be what it was, or it may have to do with legal concepts that I'm not fully versed in.

But -- so what I studied and concluded is that on the first day of

Page 63

FEINSTEIN

the class period, the inflation was there.

I do not have an opinion as to whether it was already -- some of it was already there previously and simply maintained by the first statement.

It may or may not have been.

Q    If the first challenged statement occurred after-hours, would that impact your answer?

MR. HALL:  Objection.

A    It could.  I'd have to look at that again.

Q    Well, wouldn't it necessarily be the case that if that first misstatement occurred after-hours, that the -- all of the inflation had to exist before the first misstatement?

MR. HALL:  Objection.

Q    The trading --

A    I mean -- well, seems like what you're saying is reasonable, that if the first statement really wasn't at a time when it would affect trading and

**Page 64**

FEINSTEIN

prices on that first day, then the first day would -- would not have inflation, and the inflation would be evident and impounded on the second day, but I don't recall.

You know, we're talking about different time zones. I don't recall. I mean, I don't recall whether it did happen after-hours.

I don't know if this is a hypothetical or actual, but it's something I could look at.

Q    Okay.

A    To be clear here, my opinion is that the inflation was there when -- immediately upon the conclusion of the first statement, whenever that may have been.

Q    And you also concluded that the artificial inflation remained constant throughout the class period, correct?

MR. HALL:  Objection.

A    Yes, because the -- well, no,

**Page 65**

FEINSTEIN

not constant throughout the entire

class period.  Constant until the --

(Unreportable cross-talk.)

Q    Until the collapse of --

A    Until the first corrective

disclosure, yes, because the campaign

did too.

Q    And your conclusion that the

artificial inflation remained constant

is based on what you purport to be a

generally accepted economic principle;

is that correct?

A    That's right.

Q    Okay.  Specifically --

A    Maybe I should clarify,

though, the previous answer just -- my

conservative estimate of the inflation

is constant.  I mean, it very well may

have been greater than my conservative

estimate, at various points in name.

In fact, I say that in my report that

it likely was greater than what my

conservative estimate is.

But holding constant at the

Page 66

FEINSTEIN

level of inflation that dissipated observably upon the corrective disclosures is a conservative estimate.

So let me just make that distinction clear.  It's not my opinion that inflation necessarily stayed constant at that level.  What I'm saying is it's a conservative estimate of inflation to hold it constant at that level.  It may have been greater at some points.

Q    Okay.  And what economic principle are you relying on in holding artificial inflation constant throughout the class period?

A    It's the --

MR. HALL:  Objection.

A    -- generally accepted financial principles of how investors in the market react to asymmetric information, rational expectations, and game theory.

It's the principle of how the markets react to asymmetric information

Page 67

FEINSTEIN

and the study of that incorporates all the literature on asymmetric information, plus the literature on rational expectation and game theory.

(Clarification by the reporter.)

A    The principles -- the generally accepted principles are the principles about how the market reacts to asymmetric information to knowing that they are -- that there is a campaign of deception, to knowing that a company or a counterparty is concealing important information from them.

There is a literature on that, how markets react to that, how people react to that, how prices react to that. And that literature is -- incorporates, comprises a vast amount of theoretical empirical research on asymmetric information but also includes principle from rational expectations, market efficiency, and

FEINSTEIN

game theory.

I just want to point out, I mean -- no, you don't want me to do that to you.

Q    Counsel probably appreciates your refraining.

(Unreportable cross-talk.)

Q    Let me ask you another question.

Isn't it the case that every alleged securities fraud involves asymmetric information?

MR. HALL:  Objection.

A    You're the lawyer.

Q    I'm not asking you a legal question.

A    I think that's a legal question.  I'd have to think about it some.  It's clearly something you've thought about.

I focused on this case for this deposition.  I can talk about this case.

But I could say some other

FEINSTEIN

cases clearly do.  But I'm not sure.
I'm not sure I could say that's a
characterization of every securities
case.

Q    I'm not asking you a legal
question.

Sir, you just testified about
what you characterize as generally
accepted economic principles.

A    Right.

Q    Not legal principles,
economic principles.

And the foundation of that
testimony was asymmetric information,
correct?

A    Yes.

Q    Now, I'm asking you, in your
experience as an economist, hundreds of
securities fraud cases, isn't it always
the case that an alleged securities
fraud involves asymmetric information
between the company and investors?

MR. HALL:  Objection.

A    Well, the way you described

Page 70

FEINSTEIN

it, sounds like that's reasonable.  I'd have to think about it to offer it as my own opinion.

I do know from studying cases, that that element is often missed by experts analyzing what damages are.  They don't take into account the reputation effects of what happens to a company when the fraud is revealed.  Sometimes in cases, experts focus on only the substance of a fraud rather than the fact of the fraud.

And economic theory says the fact of the fraud or the fact of the misrepresentations, in addition to their substance, matters too.

Q    In any of your prior expert engagements in security fraud cases, did you ever conclude that inflation did not exist on day one of the class period and remain constant throughout?

A    Yes.

MR. HALL:  Objection.

Q    Okay.

Page 71

FEINSTEIN

A    Yeah.

Q    In what scenarios, in your expert view, would inflation not exist on day one and not remain constant throughout the class period?

A    I'd have to look at those other cases.  I'd have to think about that some more.

I mean, maybe a specific example, I could tell you.  But generally, I -- I mean, I focused on this case.  I didn't focus on every other case that I know about and that I have ever done.  So it's hard to draw the comparison.

But sometimes I'll offer an opinion about an inflation ribbon, where, because of the facts of the case being somewhat uncertain or information not being available, I will offer a conservative ribbon.  I will say that we know that at each date, the ribbon could -- has to be at least this high, and that ribbon might not be constant.

Page 72

FEINSTEIN

So I might be focusing on certain substance -- you know, the substance of the fraud, rather than the fact of the fraud, for certain cases, just to offer a conservative opinion.

Or -- I will leave it at that.  I -- I'm not sure.

Q    Okay.  I apologize.  I just want to --

A    I would have to say that I have offered opinions before that the asymmetric information does compel a conclusion that artificial inflation was approximated a worst-case scenario for the company, or it was commensurate with the price movements that occurred at the end of the class period.  I have offered that opinion before in other cases when it made sense to.

You are asking why wouldn't I offer that opinion in every case.  And I can't think of an example right now where I haven't.  I'd have to look at it more closely.

Page 73

                    FEINSTEIN

    Q    Setting aside you can't recall a specific example, can you think of a reason why you wouldn't offer that in every case, that conclusion?

            MR. HALL:  Objection.

    A    Well, I mean, it would depend on the facts and circumstances of the case.  Why was the market misled?  How was the market misled?  Was there a campaign -- a concerted campaign to deceive the public?

            It would depend on those sorts of facts and circumstances.

    Q    Okay.

    A    But, I mean, it's really the -- I mean, when you think about -- well, when you think of Dr. Hubbard's or Mr. Stephenson opinion that the effect of a deliberate and concerted campaign would have no effect, or minimal or miniscule effect of the stock price, it makes you stop and pause and think what's wrong with their

FEINSTEIN

model.

And what's wrong with their model is they're not considering these important consequences of misrepresentations and omissions.  And the theory -- their common theory is quite plain, that if the market is aware of being misled, even if they don't know the precise facts that they're being misled about, it has severe consequences; they apply severe discount to the securities.

Q    Okay.  So I recognize you are not a lawyer, and I'm not asking you to offer any legal opinions.

You have referred to this notion of a "campaign" several times this morning, correct?

MR. HALL:  Objection.

Q    In your opinion as an economist who has testified in hundreds of securities fraud cases, does there need be to a minimum number of challenged misstatements for it to

Page 75

FEINSTEIN

constitute a campaign?

A     Well --

MR. HALL:  Objection.

A     Well, I think to answer your question, I need to first verify what the quote from the judge was.

I know I have it in my report.  It may have been -- I think it may have been "effort" instead of "campaign."  I don't think that's a material difference between "effort" and "campaign."

But let me first verify that in order to answer your question precisely.

Q     Okay.  Let's do this.  Let me just ask you one clarifying question. We'll take a break.  You can look at the report and we'll come back.

The final clarifying question before we break is did you construct your loss causation and damages analysis based on the Court's ruling on a motion to dismiss that there was a

**Page 76**

FEINSTEIN

campaign?

A     Well, that's why I wanted to -- let me check --

MR. HALL:  Objection.

(Unreportable cross-talk.)

Q     Irrespective of what the Court said, did you construct your analysis based on the motion to dismiss decision?

A     I took into account how the Court characterized the allegations.  I did take that into account.

Q     And just to clarify, that was in -- characterize the allegations in the motion to dismiss decision, correct?

A     Yes.

Q     Okay.

A     I took that into account.

MR. JORALEMON:  Okay.  Let's take a break.

MR. HALL:  Okay.

VIDEOGRAPHER:  This will end Media Unit 1.  Going off the

Page 77

FEINSTEIN

record at 10:44.

(Whereupon, a brief recess was taken.)

VIDEOGRAPHER:  We're back on the record at 10:57.  This will begin Media Unit 2.

Q    Okay.  I want to go back to a question I asked to you before the break.

In your opinion as an economist who has testified in hundreds of securities fraud cases, does there need to be a minimum number of challenged misstatements for it to constitute a "campaign," as you used that phrase?

MR. HALL:  Objection.

A    I -- I don't know.  I would think -- no, I don't know.  I mean, I focused on this case.  I am here to -- prepared to talk about this case.  I don't know about a bright-line number.

Q    Okay.  But it's your view that there was a campaign here,

Page 78

FEINSTEIN

correct?

A    No.

MR. HALL:  Objection.

A    No.

Q    You assumed there was a campaign and offered it in your loss causation and damages, correct?

MR. HALL:  Objection.

A    I assumed Plaintiffs' factual allegations were true.  And I observed that the judge's characterization of those allegations was accurate or a good way to characterize the allegations.

Q    Okay.  If the Court were to dismiss 24 of the 26 challenged statements, leaving just the first and the last challenged statements, would you have to change any aspect of your loss causation and damages analysis?

MR. HALL:  Objection.

A    Well, it depends on why the Court dismissed them and which ones were dismissed.

**Page 79**

FEINSTEIN

I would certainly revisit the analysis, but I wouldn't know one way or the other without more information.

Q   Okay.  Well, the Court dismisses them as inactionable under the securities laws.  So I just want to focus you on the temporal aspect of this, that the first misstatement on day one of the class period remains, and the last challenge statement in the class period remains.

Sitting here today, would that information cause you to change any aspect of your loss causation and damages analysis?

MR. HALL:  Objection.  Calls for speculation.

A   I don't know and wouldn't know until I can review why they were dismissed and revisit how the market received the statements and reacted to the statements and analysts' reports and news articles, for example, in light of the reasons why those

Page 80

FEINSTEIN

statements were dismissed.

If they were dismissed for legal reasons but they are ultimately judged to have the same economic import, it's possible it wouldn't have any effect.  But, then, I must say it's possible it would have an effect.

Something I would have to revisit.

Q    Now, we had talked a little earlier about your assumption in performing your analysis that the -- all of the challenged misstatements reinforced the market's misconception about the topics, correct?

MR. HALL:  Objection.

A    Say that again.  Reinforced the market's?

Q    Sure.  Let me try this a different way.

All of the artificial inflation existed on day one of the class period, correct?

A    Well, no.  The -- my

**Page 81**

FEINSTEIN

conclusion is actually that a ribbon that's measured as constant at the level of the inflation -- or at the level of the significant price declines that were elicited by the corrective disclosures is a reasonable and conservative measure or a construction of the inflation ribbon.  That was my conclusion.

Q    Okay.  So we're just talking about your conclusions here.

You concluded -- you're asking the Court to accept your conclusion that all of the artificial inflation in this case existed on day one, correct?

MR. HALL:  Objection.

A    Well, that the estimate, the best estimate, given the facts and the allegations of what artificial inflation was on day one was equal to the significant price declines that occurred at the end of the class period when the truth became known.

**Page 82**

FEINSTEIN

Q    Okay.  And as an economist, for you to reach that conclusion, you have to assume that each challenged statement reinforced a market misconception that existed prior to the class period, correct?

MR. HALL:  Objection.

A    I'm not sure "reinforced" is the right word.  Maybe I should say "is consistent with."

Q    Okay.

A    Or "is a component of" the effort to mislead.

Q    Did you review the 26 challenged statements that remain in this case, as part of your work on loss causation and damages?

A    In some, yes.  I reread the complaint quite carefully and the Court orders issued in this case.

So between those two things, I covered it -- covered that material.

Q    Sitting here today, do you recall the subject matter of the 26

Page 83

FEINSTEIN

challenged statements?

MR. HALL:  Objection.

A     Yes.

Q     What is it?

A     They all had to do with the -- well, with the company's understanding or review of safety and stability of the dams, and the company's commitment to safety and abidance with regulation and law.

So they -- according to the Court, if I understand the Court's decisions correctly, they all had to do with the risk of a dam collapse.

Q     So is it your understanding that each of the 26 challenged statements speaks to the risk of a dam collapse?

MR. HALL:  Objection.

A     In some way or another.

Q     Okay.

A     Yes.

I mean, they speak to things like whether the company's procedures

Page 84

FEINSTEIN

and management of risk. But in some way, they all relate to the risk of a dam collapse.

Q    And you had testified that one of the subjects of the challenged statements is company's commitment to safety.

Do you remember that?

A    Yes.

Q    Is it your understanding that that's limited to Vale's dams, or is it broader than that?

MR. HALL:  Objection.

A    I didn't need to make that distinction for my work.

I think it at least includes their management of dam safety. That's what I needed to understand for my work.

Q    You are aware that Vale has operations around the world, correct?

A    Yes.

Q    You are aware that many of those operations have nothing to do

Page 85

FEINSTEIN

with dams.  Are you aware of that?

A    Yes.

Q    Operates ports and railways.
Did you know that?

A    I looked at that.  Most of
their revenue comes from mining, not
associated operations.  I have that in
my report, that it's a single-digit
percentage came from those other
operations.

A bulk of the revenue came
from iron ore mining with a significant
other percentage from other mining.
And then single digits from those other
operations that you mentioned.

Q    And then just returning to
your recollection of the subject matter
of the challenged statements, you had
indicated one of the topics was Vale
abiding by regulations and laws.

Do you remember that?

A    Yes.

Q    Were those regulations and
laws limited to dams?

Page 86

FEINSTEIN

MR. HALL: Objection.

A    Most likely not.  You mean when the company made the statement?

Well, I mean, they certainly would relate to dams.  I mean "all" means "all," but...

Q    Limited.  My question was limited.

A    I don't think that statements -- well, in context, many of these statements -- the proper context to understand many of these statements was about dams.  Because there were questions from analysts specifically about dams because of the company's recent experience with the dam collapse.

So analysts were very concerned about dams.  And they asked very specific and pointed questions about dam safety, and some of the alleged misrepresentations and misleading statements arose in the context of those questions and answers.

Page 87

FEINSTEIN

So it could considerably apply to other things -- it could conceivably apply to other things, but it certainly applied to dams.

Q    Do you recall any of the challenged statements involving Vale sustainability policies and goals?

MR. HALL:  Objection.

A    Yes.

Q    What's your understanding of "sustainability"?  What does that mean?

A    In general -- I mean, in order to answer the question with specific regard to the alleged misrepresentations, I'd have to look at them again.

Are you asking more generally?

Q    Generally.

A    Well, it's the subject of intense research in finance, but "sustainability" means operating in a manner that would allow the company to exist in the long-term, and not succumb

Page 88

FEINSTEIN

to either events or developments that would impair the abilities of the company of the ability to sustain itself.

So companies are called sustainable when they adopt policies and procedures that will last, that will allow the company to last.

Q    Do you recall whether any of the challenged statements concerned Vale's operational risk management policies?

A    They did.  That's one of the categories given in both the judge's decision and the plaintiffs' complaint.

Q    So is it fair to say that in your -- in doing your work, you viewed all of the remaining challenged statements through the lens of Vale's dam safety; is that correct?

MR. HALL:  Objection.

A    No.

Q    Okay.  So what I'm trying to get at is these statements cover a

**Page 89**

FEINSTEIN

variety of topics we just talked about; commitment to safety, operational risk management, sustainability, the conditions of specific dams, the compliance with various laws and regulations.

Is it your understanding that they all -- they involved all these different topics or all these topics reduced to a single issue?

That's my question.

MR. HALL:  Objection.  It misrepresents the complaint in this case.

A     That's not my conclusion or view of the case and the facts.

Q     Okay.  What -- can you characterize for the Court your understanding of the nature of these 26 challenged statements that you used in conducting your analysis here?

MR. HALL:  Objection.

A     Well, as I stated before and it's in my report, the way the Court

Page 90

FEINSTEIN

characterized the complaints I thought was good characterization; that they all coalesced to indicate -- if they were true, I mean, if it's true that those things were said, and that truth concealed by those statements or omitted from those statements was true, they -- the misrepresentations and omissions coalesced to indicate that there was a deliberate and concerted effort to mislead the public and investors.

With respect to dam safety, however, what I found in my research in this case was that the dam-related safety event that occurred is what belied the misrepresentation and omissions and began to inform investors of the truth that was concealed.

Q    On the break, did you have occasion to -- you had indicated prior to break, you wanted to review the Court's motion to dismiss decision to refresh your recollection as to the

**Page 91**

FEINSTEIN

language.

Did you have an opportunity to do that?

A     I did not do that.

Q     Okay.

(Memorandum & Order, was marked Feinstein Exhibit 23, for identification, as of this date.)

MR. JORALEMON:  The court reporter has handed the witness what has been marked Feinstein Exhibit 23.  Exhibit 23 is a May 20, 2020, memorandum and order issued by the Court in this case.

Q     Do you recognize this document, sir?

A     I do.

Q     Okay.  And did you review this in connection with preparing your three reports marked as Exhibits 20, 21, and 22?

A     Yes.

Q     And can you direct me to where -- what language of the Court you

FEINSTEIN

are relying on with respect to the characterization of the alleged misstatements?

A    Well, all of the opinion, but, in particular, page 35, the conclusion, the section marked "Conclusion."

Q    Okay.  Any specific language in the conclusion that you are relying on?

A    Yes.  And so you know what I'm talking about, I will read it.

The judge wrote, "If proven, Plaintiffs' allegations would show a deliberate and concerted effort to mislead the public.  The allegations plainly reveal that Defendants fabricated their statements about Vale's safety and risk management practices, Vale's commitment to safety and sustainability, and the stability of Vale's dams."

Q    Okay.  And did you read that language in the second sentence as  the

Page 93

                    FEINSTEIN

Court categorizing the remaining

misstatements into three buckets?

          MR. HALL:  Objection.

     A    No.  The answer is no.

     Q    Okay.

     A    I'm sure that elsewhere, it's

categorized as four buckets.

     Q    Okay.  So now back to

artificial inflation.

          Did you review any

pre-class-period disclosures by Vale to

determine whether what Vale had been

saying prior to the class period

created a misconception in the market

about Vale's dam safety practices?

          MR. HALL:  Objection.

     A    Well, there's two parts to

your question.  I didn't quite

understand how the second part fit with

the first.

          I did review documents that

preceded the class period.  I don't

understand what the second part -- are

you saying for a particular purpose?

FEINSTEIN

Q    Correct.

A    And that purpose was what? Your question -- you are asking if I did for what purpose?

Q    For the purpose of determining whether there existed in the market, prior to the class period, a misconception concerning the subject matter of the subsequent misstatements?

MR. HALL:  Objection.

A    It's not an opinion I have expressed in my report, but I did see there were statements before the class period.  I do see there is allegations about what the company knew before the class period.

What I -- what I recall observing and considering was that analysts expressed the dam safety was very important to them and that they believed the company was endeavoring to have safe dams.

That's what I recall from what the situation was before the class

**Page 95**

                    FEINSTEIN

period, but that's not an opinion I

expressed in my report.

     Q    I just want to make sure I

understand your testimony.  You're --

sitting here today, you recall

pre-class-period analyst reports

indicating that dam safety was very

important to Vale?

     A    Well, to investors.  To

analysts.

     Q    Okay.

          And did you rely on those

pre-class-period analyst reports in

conducting your analysis here?

          MR. HALL:  Objection.  Asked

     and answered.

     A    It's hard to say.  I mean,

analysts were consistent in expressing

that dam safety was important.  So I

didn't see a significant break between

what they said before the class period

started and subsequent.

          And so no such break was --

if there existed or it wasn't -- even

Page 96

FEINSTEIN

if I had not read what I read from before the class period, my conclusions would stand because they're based on what I said in the report they were based on, which is analysis of what's going on in the class period.

Q    Okay.

Do you understand that for the Court to accept your conclusion that artificial inflation existed on day one of the class period, the challenged statements had to have reinforced a prior-existing market misconception about those topics?

MR. HALL:  Objection.

Q    Do you understand that?

MR. HALL:  Objection.  Asks for a legal conclusion.

A    I don't know if I agree with that.

Q    Well, do you agree with it, or you disagree with it?

MR. HALL:  Objection.

Q    As an economist -- I'm not

Page 97

FEINSTEIN

asking you for a legal conclusion -- it is it your view that in order for inflation to exist prior to a misstatement, that misstatement has to reinforce a preexisting misconception in the market?

MR. HALL:  Objection.

A     Well, I didn't opine that the inflation preceded the class period.  I opined that and concluded that the inflation was in the class period as of the time, as of and because of what began with the first misrepresentation.

Q     Just want to make sure I understand.

Is it your testimony that the inflation didn't enter Vale Securities until the first misstatement was made?

MR. HALL:  Objection.

A     That's not what I said.

Q     Okay.  Well, I'm trying to understand.

A     Well, because, apparently, it makes a difference, at least to you.

Page 98

FEINSTEIN

It makes a difference in how I explain it.

And the way I have explained and what's in my report is that the inflation was there as of and because of the first -- what began with the first misrepresentation.

According to the plaintiffs' allegations, there was a lot of information that could have and, according to plaintiff, should have been disclosed, instead of the first misrepresentation.

And my conclusion is that that's when the inflation -- that's when the -- the inflation was in the stock price then, at that time, as a result of -- well, was in the stock price as a result of that first misrepresentation.

Q    Okay.

A    I mean, there could have been full corrective disclosure at that time, which is what Plaintiffs say

**Page 99**

FEINSTEIN

would have been the correct path for the company.  The stock price would have fallen by the amount that I said was the inflation.

It would have fallen probably more, but I conservatively concluded that it would have fallen at least that much.

Q    You are aware that there was no statistically significant price movement in the Vale Securities on day one of the class period, right?

MR. HALL:  Objection.

A    I think that's the case.  And what the analysis shows is there would have been a statistically significant decline had the full truth been told at that point in time.

Q    Okay.  So that statement assumes that artificial -- not fraud-induced artificial inflation, but artificial inflation existed in the stock price at the time of the first misstatement?

**Page 100**

FEINSTEIN

MR. HALL:  Objection. Mischaracterizes the complaint, the case, and the witness's report.

A    In the comparison that I drew for arriving at my conclusion is what was the stock price in reality and what actually occurred with the misstatement, and what would the stock price have been had there been full disclosure on that same -- at that same moment.

And I concluded that had there been full disclosure, if the company had said they are not committed to safety, we've received reports that there are safety issues with the dams and so on, the stock price could have fallen and would have fallen a lot.

It would have fallen at least by the amount of the inflation that I measured.

Q    Okay.  Sir, are you offering the Court any expert opinion as to the

**Page 101**

FEINSTEIN

relationship between the market's perception of the issues addressed in the misstatements prior to the class period and the alleged misstatements?

MR. HALL:  Objection.

A    The -- I'm going to answer -- you might not like the way I'm going to answer your question, but I think it's the right way to answer the question.

The correct comparison is between what the company did do and what the company could have done alternatively.  That's the correct comparison.

You are asking me to draw a comparison between what the situation was after the first misrepresentation versus what it was the day before the first misrepresentation.

I didn't study the latter.  I did study the former.

And I drew the conclusion that if the full truth had been told at the start of the class period, the

FEINSTEIN

stock price would have fallen.  It was $1.63 plus -- I can't remember the exact amount, but $2-plus.  The measure that I gave -- well, let me be correct about this.

We're talking about the ADRs, not the notes.  $2.72.  The stock price would have fallen $2.72, at least, if the full truth had been told instead of company offering up one of the misrepresentations on that first day of the class period.  And I'm reading from page 5 of my report.

I mean, it's inconceivable that it would not have fallen on that first day had the full truth been told.  And it's inconceivable that that decline would not have been a large magnitude.

Q    I direct your attention to paragraph 97 on page 39 of Exhibit 22.  It's your second reply report.

A    Okay.

Q    In that first sentence, you

**Page 103**

FEINSTEIN

indicate that "Representations described in the company's tailings dams as impeccable and impressive -- of impressive quality will cause no discernable price movement when the misstatements are made if investors had all along believed that representation to be true."

Do you see that?

A    Yes.

Q    So in conducting your loss causation analysis here, did you assume that investors had all along believed the challenged statements to be true?

MR. HALL:  Objection.

A    No.

Q    Okay.  If --

A    The correct comparison is between what the company did say and what they could have said, not what they did say -- or what the market believed on one day versus what they believed before the class period started, in order to determine what

**Page 104**

FEINSTEIN

inflation was at the start of the class

period.

Q    Doesn't it matter what the

market believed in determining

artificial inflation?

MR. HALL:  Objection.

A    What matters more is what

they would have known had the full

truth been told and what they were led

to believe on account of the

misrepresentation and omission.

Q    Let me try it this way.

With respect to the 26

alleged misstatements, is it your

opinion that any of them were

inconsistent with what the market

believed at the start of the class

period?

MR. HALL:  Objection.

A    With respect to there being

an ongoing campaign of deception, I

would have to say no, none of them

were -- none of them informed the

market this was taking place.  All of

**Page 105**

FEINSTEIN

them were consistent with the

reinforcing that it was taking place.

Q    Okay.  Set aside the

campaign.  I'm talking specifically

about the substance of the challenged

statements.

Is it your opinion that any

of that was inconsistent with what the

market believed prior to the class

period?

MR. HALL:  Objection.

A    I don't know.  I don't know

about prior to the class period.

I would say at the start of

the class period.  They were consistent

with what the market was led to believe

at the start of the class period.

Q    Okay.  So prior to the -- do

you have any views as to what the

market believed about dam safety or

sustainability or risk management

practices prior to the class period?

MR. HALL:  Objection.

A    Well, you did ask that before

FEINSTEIN

and I will give the same answer.  The answer is yes.

They believed -- they cared, and they believed that those things were important.  That's what what's expressed.

Q    The subject matters are important, is that what you're saying?

A    Subject matter and whether -- yes, that's what I am saying.

Q    How about the voracity?

Not talking about the importance or the investors' level of care.  I'm talking about do you have any view for the Court as to what investors believed about the nature of Vale's risk management practices or dam safety or commitment to sustainability prior to the class period?

MR. HALL:  Objection.

A    That's not what my analysis was focused on and nor was it what any of the other experts in this case -- defense experts were focused on.

FEINSTEIN

My analysis focused on the difference between what they believed at the start of the class period and what they would have known if there was full disclosure at the start of the class period, not the change from before the class period to during the class period.

Q    Okay.  Did any of the 26 challenged statements contain new information provided to the market?

MR. HALL:  Objection.

A    I would have to see the list. I don't have them all memorized.

Q    Okay.  Would it matter to your analysis whether the information was new?

MR. HALL:  Objection.

A    Well, it could be relevant to the analysis but I don't think it would change the conclusion, as long as there is not proof or evidence that the market knew that they were being deceived.

**Page 108**

FEINSTEIN

Q    Did you conduct any analysis to determine whether the content of the challenged statements contained new information?

MR. HALL:  Objection.  Vague.

A    I seem to recall that they may have.  The company may have been doubling down on its representation of safety and commitment to safety and stability and conforming with rules and regulations.

But without looking at the list, I can't tell you more specific than that.

Q    Does your analysis rest on the assumption that on day one of the class period, investors viewed Vale's dams to be impeccable?

MR. HALL:  Objection.

A    No.

Q    Do you have a view as to how investors viewed Vale's dams -- the quality of Vale's dams on day one of the class period?

Page 109

FEINSTEIN

MR. HALL:  Objection.

A    Yes.

Q    And what is that?

A    That what they believed the quality of the dams was, was not what the company -- first, it's not an independent view.  This is my interpretation of the complaint.  And I have explained that I accepted, as assumptions, the factual allegations of the complaint.

So my understanding is that Plaintiffs seek to prove that what the market understood the condition of the dams to be was very different from what the company understood the condition of the dams to be.  There was asymmetric understanding and information about that.

Q    On day one of the class period?

A    On day one.

Q    Okay.  And other than the complaint, are you basing that

**Page 110**

FEINSTEIN

assumption on any other materials you have reviewed?

MR. HALL:  Objection.

A     I don't think I need to, based on anything else.  But everything else I read in this case supports that that's a reasonable assumption to make.

"Everything else" meaning the analysts reports, the news articles, the expressions of surprise when the dam break did occur, what the company's -- what the complaint says about reports the company received both before, during, and after the class period, the implications of the allegations of pressuring independent consultants to certify dams.

Those sort of things all support this assumption, which is an allegation -- which is just a factual allegation that the condition of the dams as understood by investors was different from what the company knew them to be.

**Page 111**

FEINSTEIN

Q    On day one?

A    On day one.

Q    Okay.  So you are aware that in the years preceding the class period here, three different dams collapsed in Brazil?

You are aware of that, right?

MR. HALL:  Objection.

A    Well, yes, I have seen that. I didn't spend a lot of time verifying the other two and learning about them.

But certainly, the Vale Samarco Dam, I looked at information surrounding that one and what analysts were saying about it, and what they were saying about company alleged -- company representations about dam safety, in light of the fact that the Samarco dam collapse occurred.

Q    Okay.  And you understand that one of the things that Plaintiffs allege Vale misrepresented in its statements was the probability of Dam 1 collapsing, correct?

**Page 112**

FEINSTEIN

MR. HALL:  Objection.

A    I don't recall ever seeing the company offer a probability to the public.  Maybe I'm wrong about that, but I don't recall having seen that.

Q    That wasn't my question.

You reviewed the complaint, right?

A    Yes.

Q    You understand that one of the things the complaint alleges Vale misled the public about was the probability of Dam 1 collapsing?

MR. HALL:  Objection.

A    Well, I'm not sure of the word -- I'd have to look.  But speaking of the terms of the risk of a dam collapse, I don't dispute it.  I just don't recall that the word was explicit.

(Consolidated Class Action Complaint for Violations of the Federal Securities Laws, was marked Feinstein Exhibit 24, for

**Page 113**

FEINSTEIN

identification, as of this date.)

Q     Mr. Feinstein, the court reporter has handed what's been marked Feinstein Exhibit 24.  It's an October 25th, 2019, consolidated class action complaint filed in this matter.

Do you recognize this document?

A     I do.

Q     If I can direct your attention to page 10 of the complaint, paragraph 28 -- sorry.  One second.

Sorry.  It's page 6 of the exhibit.  Paragraph 11.

Directing your attention to the first part of that sentence, could you just read it?

A     Yeah.  "Based on these and other facts alleged herein, which were known to defendants, defendants materially misrepresented or failed to disclose throughout the class period that at least one of Vale's high-hazard tailings dams, Dam 1, had a high

**Page 114**

FEINSTEIN

probability of failure."

Q    Okay.  That's all.

A    I thought your question was about a specific probability number, which -- I mean, I know they say that the real probability was -- could have been as high as 50 percent for Dam 1, but I don't recall them saying that the company had offered another probability number that was lower.

Q    Okay.  Does this -- does this refresh your recollection or confirm for you that, in their complaint, Plaintiffs are alleging that Vale misrepresented to investors the probability of failure of Dam 1?

MR. HALL:  Objection.  Misrepresents the complaint.

A    I think what this says is something different.  They concealed a high probability of failure.  They didn't represent to the public that the public was probability was some lower, specific number.

**Page 115**

FEINSTEIN

In fact, they have never offered another number, as far as I know.

Q    Do you know whether Dam 1's risk of failure changed over the class period?

MR. HALL:  Objection.

A    I don't know.

Q    Did you do any analysis to determine whether the risk of failure changed at all over the class period?

MR. HALL:  Objection.

A    I read the news articles related to that and read the complaint and the filings from -- in this case.

But I'm not an engineer.  I couldn't interpret those reports to form an opinion that the specific probability changed over time.

I did confirm that according to the allegations, the mismatch between what the public thought and what the company allegedly knew was there throughout.

**Page 116**

FEINSTEIN

Q    And you confirmed that by looking at the complaint?

A    No, I didn't say I confirmed it.

Q    Well, respectfully, your testimony is "I did confirm that according to the allegations" --

A    Yeah.

Q    -- "a mismatch between what the public thought and what the company allegedly knew was there throughout."

A    Right.  I confirmed that that's the allegation.

Q    Okay.  And how did you do that?

A    I looked at the complaint.

Q    Okay.  Anything else?

A    I looked at the filings.
Yes -- no, the complaint.

Q    Anything else?

A    Well, I mean most of it what I mention is mentioned in the complaint.  The complaint mentions that there was a study done before the class

**Page 117**

FEINSTEIN

period that stated that the --

Q    My question is what did you look at, other than the complaint.  I'm not asking you to summarize the complaint.

Did you review any of the underlying, contemporaneous documents that calculated probability of failure?

MR. HALL:  Objection.

A    I don't recall.  Let me check.

What I'm checking is to see which documents went to the original source and which I read excerpts from in the complaint.

That's what I am looking to see.  So...

No, I don't think I relied on any original source material to justify the -- the assumptions justified based on scope of the analysis.

Q    Okay.  Is it all relevant to your loss causation and damages conclusions whether the probability of

**Page 118**

FEINSTEIN

failure of Dam 1 changed over the course of the class period?

MR. HALL: Objection.

A     Well, I determined that it was not relevant, because that's not the proper way to calculate artificial inflation in this case.

Q     Okay.

A     No probability was ever offered.

Q     Okay.

A     No probability was ever learned. No probability numbers, specific metric, was ever learned because the corrective disclosures.

What was learned by the corrective disclosures is what I based the inflation ribbon on.

Q     Okay. So if the Court concludes that the risk of Dam 1 collapsing decreased over the class period, you would tell the Court that it has no impact on your causation and damages analysis, correct?

FEINSTEIN

MR. HALL:  Objection.

A    Well, I would hope that the Court would take into account that even if there was a decrease, there still wasn't any disclosure that informed the marketplace that there was a campaign, an ongoing deliberate and concerted effort to mislead them about that probability.

Q    So was that a "no"?  Is the answer "no" to my question?

I can ask the question again if you don't recall.

MR. HALL:  Objection.

A    I can't say it has no bearing on it, that it is not relevant.

It is certainly something that I would hope the Court would consider.  But they should understand what economic theory says about that particular fact and why that particular fact doesn't change the estimate of the inflation and the losses that investors suffered on account of the

**Page 120**

FEINSTEIN

misrepresentations and omissions.

I mean, it sounded -- the way the phrased the question --

Q    Respectfully, sir --

A    I think I'm still answering your question.

Q    I'm asking the question. Okay?

A    But I think I'm answering it.

MR. HALL:  He is answering the question, Chris, so you have to give him time to answer.

Answer it again.

MR. JORALEMON:  Are you kidding me?  Give him time to answer?  No.

MR. HALL:  I'm not kidding you.

Q    Let me ask you the question again.

If the Court concludes that the risk of collapse of Dam 1 decreased over the class period, you are testifying to the Court right now, you

**Page 121**

                    FEINSTEIN

would tell the Court that that has no

impact on your loss causation and

damages analysis, correct?

          That's a yes-or-no question.

     A    No.

          MR. HALL:  Objection.  Asked

     and answered.  And speculative.

     A    The answer would be no.

          I would say that it's

reasonable to look at that.  It's also

reasonable to understand how it should

be interpreted in light of the correct

economic theory that needs to be

applied to the but-for price and the

actual price, and, therefore, the

calculation of artificial inflation.

     Q    So it would have an impact on

your calculation of artificial

inflation?

          MR. HALL:  Objection.

     Misrepresents his testimony.

     A    I think that analysis should

be considered by the Court so the Court

would understand what economic theory

**Page 122**

FEINSTEIN

says about it.

Q    I'm asking you for your opinion.

If the Court concludes that the risk of collapse decreased over the class period, would you change anything about your loss causation analysis?

MR. HALL:  Objection.  Asked and answered.  And speculative.

A    Yes.

Q    What would you change?

A    Once there was evidence that showed specifically that there was a change in probability number that could have been disclosed, I will explain how that must be considered in the context of what would have remained a concerted and deliberated effort to conceal even the improved number from the public.

And that it was the fact of that concealment that would maintain the artificial inflation level where I estimated it conservatively belonged.

Q    Okay.  As an economist, what

FEINSTEIN

is your understanding of what the relationship would be between decreasing risk of collapse and artificial inflation?

MR. HALL:  Objection.

You are talking about in this case?

A    I didn't understand the question.

Q    As an economist, if the risk of Dam 1 collapsing decreased over the class period, would you expect the artificial inflation to also decrease?

MR. HALL:  Objection.

A    Well, as an economist, the correct analysis says that if the market were aware that whatever is going on behind the scenes, they're being deprived of that information, the economic effect of that deprivation would remain fairly constant, or at least have a floor of the number that I calculated derived from the observable declines of the stock price

**Page 124**

FEINSTEIN

sustained -- that the ADR price

sustained when the truth became known.

Q    Okay.

A    So I think it's relevant to

consider, but it's also relevant to

understand correctly how it plays into

the analysis but doesn't change the

number and why.

I mean, if the company had

said on that day -- well, if there have

been full corrective disclosure on that

day, stock price would have still

fallen.

Q    When you say "that day," what

day do you mean?

A    The day that you

hypothetically said that the

probability declined.

Q    What if that was continuously

improving?

MR. HALL:  Objection.

A    Inflation is going to remain

at the level that I calculate.  Each

day of the class period, as long as

**Page 125**

FEINSTEIN

there is a gap between what the company could have told people about this effort and this campaign to deceive and the market's ignorance that there was such a campaign, there is a lot of inflation in the stock price.  Leave it at that.

I calculated that number for the facts of this case.  You are asking me speculate about alternative hypotheticals that didn't happen.

Q    In that last response, you said two different things.

First, you said it's going to remain at the same level, and then you said it's going to be a lot of inflation.

When you said there is going to be a lot of inflation, did you -- were you just reiterating that you would -- your view is inflation would maintain at the same level?

A    The best estimate --

MR. HALL:  Objection.

FEINSTEIN

A    Well, the best estimate -- given -- as long as the market's being kept in the dark, and then in the hypothetical but-for world, if the market were to learn they're being kept in the dark, there is going to be a severe -- the artificial inflation will be at a severe level.

And I estimated that to be -- have a minimum of the number I gave.

There would have to be -- yeah, I will leave it at that.

Q    Well, in your view as an economist, doesn't the magnitude of the lie depend -- doesn't the magnitude of the lie impact the artificial inflation?

MR. HALL:  Objection.

A    Well, the magnitude of the lie, the alleged lie, in this case, has to do with worst-case scenarios that would be compelled to factor into the valuation of the securities if the market were to learn that they were

FEINSTEIN

being deceived intentionally.

So it's not the -- that's the probability we should be looking at. We should be looking at the severity and the nature and the likelihood of what the market would have anticipated if they knew that there was a campaign to deceive them and deprive them of this information.

Q    Okay.

A    And that stays the same, as long as there is such a campaign.

Q    Okay.  How about a securities fraud case that involves a campaign of misrepresenting the value of a company's assets.  Okay?

And in Scenario A, the company says it has $10 million in assets, when really it has $5 million of assets.  Okay.

Scenario B, same misrepresentation, same campaign; telling the public they have $10 million of assets, when they really

**Page 128**

FEINSTEIN

have zero.

MR. HALL:  Objection.

Speculative.

Q    So I'm asking your opinion as an economist for the Court's benefit, is it your testimony that given the campaign is exactly the same --

A    No, it isn't -- I'm sorry.

Q    -- from.

Okay.  Well, then, would the artificial inflation be the same, in your view, in both scenarios?

MR. HALL:  Objection.

Are you talking about the scenario between A and B, or the scenario between your hypothetical and this case?

MR. JORALEMON:  Scenario A and B.

MR. HALL:  Objection.

Q    The -- sort of, the magnitude of the lie; you lied by $5 million, or you lied, you really have no money at all and no assets.

**Page 129**

FEINSTEIN

MR. HALL:  Objection.

Q    Under your theory -- I am really just trying to understand this campaign of keeping investors in the dark.

In both Scenario A and B, that campaign exists.  The consequences of that lie are different, though.

So why would the artificial inflation be the same?

MR. HALL:  Objection.  Speculative.

A    Well, we need to focus on what the corrective disclosure could have been.

In your hypothetical, if the corrective disclosure is "We have 5 and now we're telling you the full truth, and it's 5," that would have different implications than if they said, "We've been lying to you but we are not lying to you now, and we have zero, and we can prove that we have zero" or before, "we have 5, and we can prove that we

Page 130

FEINSTEIN

have 5."

But if the corrective disclosure is "We're lying to you, and we think rationale for us to continue lying to you, and we've been lying to you for three years," or you had a security fraud case and an accounting fraud case last year, "We promised that we were going to do better, and all we can tell you at this point is that we're still lying," I think the price would fall the same, whether it was 5 or zero.

The company would lose its trust. Its reputation, its trust would be so eroded that if the market learned the company was lying, and still lying just as they had lied before, there would be severe impact on the stock price when they learned that they were being lied to, regardless of whether the truth behind the lie was 5 or zero. That's the analysis from taking into account reputation.

Page 131

FEINSTEIN

Let's take a -- could we take a break?

Q     I just want to finish that last -- does it take into account anything other than reputation?

MR. HALL:  Objection.

A     Yes.

Q     What else?

A     Well, it takes into account, like, as I added to your hypothetical, the prior experience of the company. This is a company that previously had a problem with accounting fraud.

And the lie is that "We're cleaning this up.  We're no longer to do accounting fraud.  Everything we tell you is going to be truthful."

The impact of that lie, that lie right there will be -- if the market were to learn that it was a lie -- would be the same on the stock price, regardless of what the truth was that the company was actually concealing.

**Page 132**

FEINSTEIN

As long as the market learned -- so in other words, what matters. You said what else matters. What matters is the context and the experience the company.

If this is a company that previously had problems with lies and the market learns that they're lying, maybe it's unfortunate for Vale or unfortunate for companies in general, or unfortunate for liars -- I'm not saying Vale is -- but for liars in general, the fact of the matter is economic theory, Noble Prize-winning economic theory says that the impact on reputation -- it's common sense. I mean, you could ask mothers and grandmothers this.

Whatever the truth is, once you are learned to be a liar, there is going to severe consequences, whether you are lying about a lot or more than a lot.

Q    And is it your understanding

**Page 133**

FEINSTEIN

that that's the scenario we're dealing with in this case?

MR. HALL:  Objection.

A    Well, I spoke about it, and no.  I think that's the answer to your hypothetical.  That's the analysis that has to be considered to understand your hypothetical.

The analysis to understand the inflation in this case is in my reports and the other answers to the question I offered today.

Q    Okay.  So you don't understand plaintiffs to be alleging that one of Vale's misstatements is that "we're going to be truthful with you"?

MR. HALL:  Objection.

A    No.  Well, in essence, they did say that.  They said that "We have a commitment to safety and stability, we are going to do the right thing," and that's what Plaintiffs are alleging was false.

FEINSTEIN

So if the market had learned that those things were false, the implications would be severe.  You just can't get around it.

MR. JORALEMON:  Let's take a break.

VIDEOGRAPHER:  This will end Media Unit 2.  Going off the record at 11:55.

(Whereupon, a brief recess was taken.)

VIDEOGRAPHER:  We're back on the record at 12:10.  This will begin Media Unit 3.

Q    Mr. Feinstein, are you familiar with the concept of a but-for world in the context of a loss causation damages analysis?

A    Yes.

Q    Could you explain what a "but-for world" is?

A    That would be a hypothetical scenario in which there was disclosure, full disclosure.

FEINSTEIN

Full disclosure of what was alleged to have been misrepresented or omitted.

Q    Okay.  And does that hypothetical scenario produce a but-for price?

A    Yes.

Q    And what is the "but-for price"?

A    It's the price that is consistent with a different information set; the information set including what was disclosed.

That's what an analyst or forensic analyst might estimate or might value the company and its securities to be in that alternative scenario.

Q    And is it fair to say the but-for price is what price that the security would have been had there been no alleged fraud?

A    Correct.

Q    And is it fair to say a

**Page 136**

FEINSTEIN

but-for price does not reflect the

impact of any misrepresentation, right?

MR. HALL:  Objection.

Q    Meaning --

MR. HALL:  Sorry.

MR. JORALEMON:  It wasn't a

very good question.

Q    The but-for price doesn't

include the impact of any alleged

misrepresentation, right?

MR. HALL:  Objection.

A    Well, it's calculated by

considering the impact on the actual

price of the misrepresentations.

Q    Right.  But then it removes

from the actual price any impact of the

alleged misrepresentations and you are

left with the but-for price, correct?

A    The way you are defining it,

we are going to end up with a

circularity.

It removes the artificial

inflation that was caused by the

misrepresentations and omissions.  But

**Page 137**

FEINSTEIN

you could also calculate it bottom-up rather than the top-down.

You can calculate what is the value of the security under the alternative information set that has no misrepresentations and omissions in it.

Q    Okay.  Can you describe for the Court the but-for world you created to support your analysis here?

A    Okay.  Well, I modeled the but-for world after what the market did learn when there were corrective disclosures.  So I noticed that the market was never informed about a true probability.  Only after the class period was the market informed about documents and safety issues and pressured stability reports.

What the market did learn from the corrective disclosures is that they had been deceived about risk and stability and the company's commitment.  So the but-for world appropriately would be a world in which there were

**Page 138**

                              FEINSTEIN

disclosures that told the market it was being deceived about dam risk, dam safety, commitment to stability and safety, adherence to laws and regulations and so forth.

I mean, I just want to be clear about that.  I modeled the but-for world to include the information that the market received from the corrective disclosures, which does include a specific probability estimate.

Q    Okay.  But in your but-for world, the but-for world you modeled, the market received all those disclosures on day one of the class period, correct?

MR. HALL:  Objection.

A    Oh, in the but-for world, the market allegedly could have received information that the company was engaged in a campaign to mislead the public and investors about dam safety and the other items.

**Page 139**

FEINSTEIN

Q   In the but-for world you constructed, you assumed the market did receive all of those disclosures on day one of the class period, right?

MR. HALL:  Objection.

A   I think it's semantics that we're differing -- it's a hypothetical world.  It didn't happen.  If it had happened, there wouldn't be any damages.

So the hypothetical world in which the market would have received knowledge of the company's campaign, alleged campaign.

Q   But that's the hypothetical you relied on in performing your loss causation and damages analysis, correct?

MR. HALL:  Objection.

A   Relied on?  This is a component of the computations, yes.

Q   Okay.  And how do you account for the fact that the alleged -- well, all of the alleged misstatements,

**Page 140**

FEINSTEIN

except for the first one, occurred over the course of the class period.

So how, as an economist, do you reconcile later occurring misstatements with a but-for world in which you assume the market learns information on day one of the class period?

A     Well, in this particular case, Plaintiffs allege that the company was informed about risks, fragility of Dam 1, for example, prior to the first misrepresentation.

And Plaintiffs are alleging that rather than disclosing that information, the company chose to engage in this campaign of deception.

So according to the allegations, the campaign was underway on day one.

Q     Okay.

A     And, therefore, the economic impact of the campaign was in the price on day one.

**Page 141**

FEINSTEIN

Q    Okay.  So it's your understanding -- please correct me if I'm mischaracterizing this.

It's your understanding that the allegations made by Plaintiff here are that, on day one of the class period, Vale knew of the alleged falsity of all of the future-challenged statements that it would make?

MR. HALL:  Objection.  Misrepresents his testimony.

A    No.

That's not what I said.  And that's not their allegation either.

Q    So if Vale didn't know on day one of the class period that a statement that it made in November 2018 would be false, it already was false, they hadn't made it yet, that would have no impact on your analysis here?

MR. HALL:  Objection.

A    It's hard to answer your question because it's a preposterous hypothetical.

**Page 142**

FEINSTEIN

Their allegation is that there was important information on day one that they did have.  They were in possession of that information, and yet they didn't disclose it, and, rather, they represented the condition of the company to be different than what they knew it to be.

Q    Okay.  That's what I'm focusing on, though.

So that information, whatever it is that you are describing here, does that information, in your understanding of the allegations, establish the falsity of all the challenged statements in this case?

MR. HALL:  Objection.

A    I don't know what you mean by "establish the falsity" of things that hadn't happened yet.  That's what I don't understand.

Q    Do you have an understanding of what Plaintiffs allege with respect to the information Vale possessed on

**Page 143**

FEINSTEIN

day one of the class period, and the relationship between that information and the subsequent challenged statements?

MR. HALL: Objection.

A    I have an understanding that's gleaned from both the complaint and the judge's characterization of exactly that issue.

Q    Okay.

A    That it was all part and parcel of an effort to mislead the public, starting on day one of the class period.

Q    Okay.

I'm just trying to parse this, though.

I mean, is it your understanding that they're alleging actual knowledge about the substance of subsequent misstatements, or simply the intent to lie about whatever those subsequent statements would be?

MR. HALL: Objection. Calls

**Page 144**

FEINSTEIN

for a legal conclusion.

A    It's kind of neither.  They had knowledge that they had embarked on an effort.

Q    And what's your understanding of what that effort was?

A    Just as the judge explained it.  Viewed in -- across the span of time and span of events, it appears to be, what the judge said, a concerted and -- said his understanding of the allegations is that it was an allegation that there was a concerted and deliberate effort to mislead the public about dam safety and commitment to sustainability and commitment to safety and adherence to rules and regulations.

Q    Okay.  Nowhere in the Court's decision did it say that that started on day one, though, right?

MR. HALL:  Objection.

A    I think that's the appropriate way to read the decision.

FEINSTEIN

I mean, the judge -- I think it's the appropriate way to read that conclusion.  It's the conclusion of the judge's opinion.  It's the last paragraph or the heading "Conclusion."

Q    That's how you read it in providing your opinions here, right?

A    Well, I read it that way, yes, that's true.  But I didn't, like, accept it as an assumption because the judge said it.

I valued it as a concise summary of what Plaintiffs' allegations are.  And it's Plaintiffs' allegations that I accepted assumptions.  So I was forming my own way to concisely articulate the allegations.

And then I saw the -- then I saw that the judge did the same and did a good job of it, I thought.

Q    I'm not asking you for a legal conclusion.

But do you have any understanding as to whether this is an

**Page 146**

FEINSTEIN

affirmative misrepresentations case or an omissions case?

MR. HALL:  Objection.  Calls for a legal conclusion.

A    Well, the complaint clearly says, and so does the judge's order, that it's misrepresentations and omissions.

Q    Okay.  And do you have any sense of the balance between those two types of --

MR. HALL:  Objection.  Calls for a legal conclusion.

A    Yeah.  I don't know how you quantify this balance.  They clearly alleged both.

And they cited things that could have been disclosed but, instead, were omitted.  And how those things that were omitted would have made things that were said misleading.

The complaint explained all that.

Q    As an economist, so apart

**Page 147**

                    FEINSTEIN

from this case, does it matter to you

whether a plaintiff is alleging

affirmative misrepresentations or

omissions in performing a loss

causation and damages analysis?

          MR. HALL:  Objection.

     A    Every case is different.  The

facts of the case do matter.

     Q    I'm asking you specifically

about whether a plaintiff -- does it

matter to you whether a plaintiff is

alleging an affirmative

misrepresentation or an omission when

you go about performing your loss

causation and damages analysis?

          MR. HALL:  Objection.

     A    I will just stick with the

answer I gave.  I mean, the facts of

every case are unique.  I mean, I would

like to think there was a cookie-cutter

analysis, but it's -- the analysis has

to fit the facts of the case.

          And so I take into account

whatever the facts are.  In this case,

FEINSTEIN

they're allegations misrepresentations and omissions.  It matters.

Q    When you say "it matters," it matters whether it's an affirmative misrepresentation or an omission?

A    The facts of the case matter. That's one of the facts of the case that will reasonably matter.

Q    How would your expert analysis differ if the case involved solely an alleged misrepresentation?

MR. HALL:  Objection.  Vague.

A    It is vague.  You're saying if it wasn't this case, if it were a different case?

Q    I'm not talking about this case.  I am asking you for your expert opinion.

You have said you worked on over a hundred securities fraud cases over the course of your career, right? I assume some of those case involved only alleged affirmative misrepresentations, correct?

**Page 149**

                    FEINSTEIN

    A      Probably.

    Q      You don't recall one way or
the other?

    A      Usually, there's a mix, in
most cases.  Most cases are
misrepresentations and omissions.

    Q      Do you have an understanding
of what I mean when I say an
"affirmative misrepresentation"?

            MR. HALL:  Objection.  Calls
      for a legal definition.

    A      I think I do.

    Q      What's your understanding of
what that is?

    A      Well, they said something
false.

    Q      Okay.

    A      Something false that -- well,
whether or not the market relied on it,
it's something I would look at.

    Q      Okay.  And have you ever
worked as an expert in any of these
security fraud cases where the only
thing alleged was an omission by the

**Page 150**

FEINSTEIN

defendant?

MR. HALL:  Objection.

A     Probably, but it's fairly rare.

Q     Do you have an understanding of what I mean when I say defendants alleged to have only made an omission?

A     Well, you mean hypothetically.  You know, I recall having discussions with lawyers because I didn't go to law school and I had to learn this from -- and I was curious about this issue.  I was wondering at different times and at different cases, what makes an omission relevant or not. And it was explained to me by lawyers that I think got it right.

So the answer is, yes, I think I do know what an "omission" means in a securities fraud case.

Q     What's your understanding of what it means?

A     Well, it's --

MR. HALL:  Objection.

**Page 151**

FEINSTEIN

A    -- usually attached to another statement, that some other statement may be true -- actually, I also learned some of this from reading judges' opinions.  Some of them really explain it well; that there'd be some other statement that might be factually true, but it becomes misleading in light of information that's not provided that could have been provided.

That's a little bit different from I think what the layperson's understanding of what an omission is, but that's what's been explained to me.

Q    Okay.

And so back to the but-for world.  How would you articulate the but-for disclosure you utilized in this case?

A    Well, I actually wrote this -- I have it -- I articulate it in my report.  I think it's in my May 12th report.  I'm looking for a page with a lot of underlines.

Page 152

FEINSTEIN

And, again, I'm not the one making allegations here. I'm just trying to incorporate into my economic analysis the impact of what's being alleged, the economic impact of what's being alleged, if what's being alleged is factually true.

I know where to look, in the table of contents. Here it is. Paragraph 90. Some of this could have been said at the start of the class period. Some of it could have been said later. Some of it only could have been said later, but I think paragraph 90 is informative.

A corrective disclosure at some point in the class period where the company had announced that the company's -- well, I will read what it says here. Here's a description of a but-for world.

"If the company had announced on the first day of the class period that the company's tailing dams were

**Page 153**

FEINSTEIN

not impeccable and were not of impressive quality, safety is not our top priority, we are not committed to doing what is right, we are not committed to protecting people and preserving the environment, we are engaged in deceptive conduct to deceive investors and regulators."

All I have done there is I have taken the allegations of what was said and put the word "not" in there, that would have been a fully corrective disclosure.

Q    Okay.

A    And certainly, the stock price would have plummeted.

Q    So in paragraph 90, you make reference to a but-for world described in your opening report.

Do you see that, right in the middle that paragraph?

A    Yes.  Opening LCD report.

(Clarification by the reporter.)

**Page 154**

FEINSTEIN

A    It stands for loss causation and damages report.  It was not the opening market efficiency report.

It would be the -- let's just be clear.  It's the March 10th, 2023, report.

Q    You had testified earlier that in constructing a but-for world, there is no fraud in that world, correct?  Fraud is revealed.

MR. HALL:  Objection.

A    It doesn't say "fraud" here. Fraud has a legal --

Q    No.  I'm not talking about this specific -- I'm trying to reconcile something here.

Your earlier testimony about a standard but-for world, you had indicated that it's a world in which there was no alleged fraud.

MR. HALL:  Objection.

A    Pretty sure -- well, tempted to say okay, but I try to stay away from --

**Page 155**

FEINSTEIN

Q    I'm not trying to trick you.

A    -- statements --

Q    I am just trying to get at the heart of it.

And some of these but-for disclosures you identify in paragraph 90 make sense to me because it's revealing the truth about a then-existing fact, like the dams are not impeccable.  I understand that.

What I wrestle is with where you go on to talk about -- at the bottom there, you say, "We are engaged in deceptive conduct to deceive investors and regulators."

That, to me, I read that as saying it's ongoing.

A    Right.

Q    So how you can have an ongoing fraud in a but-for world?

A    Right.

MR. HALL:  Objection.

A    I understand the philosophical tension there.  But if it

**Page 156**

FEINSTEIN

didn't include that in the corrective

disclosure, you would not be including

the information that the market did

learn when there were corrective

disclosure, and you would dramatically

underestimate damages.

So I understand that there is

a little bit of a tension there of

things being disclosed, and yet there

was a statement here about something

ongoing.  Maybe it could be replaced --

to resolve that tension, it could be a

different statement that would

appropriately inform the public about

the true reputation that the company

warranted.

Q     So this is a reputational

representation?

A     Yes.  I think when the

market, in general, does, and in this

case, when the market did learn that

they had been deceived, there are

reputational impacts that in order to

correctly estimate damages, one has to

**Page 157**

FEINSTEIN

take into account.  And this is a way

of doing it.

     Q    Wouldn't that be the case for

every securities fraud?

          MR. HALL:  Objection.  Asked

     and answered.

     A    Many.  Many.  I don't know

about all, but certainly many.

     Q    Do you always include that in

your expert work on securities fraud

cases, this reputational quantum?

          MR. HALL:  Objection.

     A    I have.  It's not the first

time.

     Q    I asked you if you always

include it.

     A    It depends on the facts and

circumstances of the case.  It's fairly

common that I do take into account that

there is a reputation effect when the

market learns that there has been an

alleged fraud.

     Q    Okay.

     A    I mean, I cite to -- I can't

FEINSTEIN

think of his name, the economist at

University of Washington, Jonathan.  I

cite -- even for this report, I cite to

the academic literature that deals with

exactly that issue.

One moment.  Let me, to be

complete, put it in the record.  This

is not a novel concept in economics and

finance.  It's a necessary component of

damage computation.

Karpoff.  Jonathan Karpoff.

I have it.  It's on page 104 of my

March 10th, 2023 --

(Clarification by the

reporter.)

THE WITNESS:  Karpoff,

K-A-R-P-O-F-F.

A     And there are other citations

to that literature in my report.

Q     Okay.  So just to wrap this

up and make sure I understand.

Is it your view that in

certain cases, maybe not all securities

fraud cases but certainly this one and

**Page 159**

FEINSTEIN

others, it's appropriate in

constructing a but-for world to include

an ongoing deception by the company?

MR. HALL: Objection.

A    I said it differently

earlier.  I said to include a factor

that represents the diminution of

reputation that is warranted by what

did happen.

Q    Okay.  And that diminution of

reputation in your opinion that's tied

to nothing more than the fact that the

company is engaged in ongoing deceptive

conduct directed towards investors?

MR. HALL: Objection.

A    Well, in this case -- I'm not

going to speak every case, but

certainly in this case also comprising

all the behavior, the unseemly behavior

that plaintiffs are alleging about your

client.  Pressuring third parties

certifiers and so forth.

Q    So is there a qualitative

assessment you are making there?  You

**Page 160**

                    FEINSTEIN

use the phrase "unseemly"?

        A      Oh --

              MR. HALL:  Objection.

        A      I just wanted to make sure --
I just wanted to make sure that there
is more in the bucket that you
described in your question than just
that it's ongoing.  That there is
behavior.

              It's not just that it's
ongoing behavior, but, well, to use the
judge's adjectives, "concerted and
deliberate."

        Q      So does the severity of the
deceptive conduct inform whether you
include this in your but-for world
creation?

              MR. HALL:  Objection.

        A      It really -- I think from
case to case, it depends on what the
market learned from the corrective
disclosures.  I will leave it at that.

              I mean, in this case, there
was surprise expressed by analysts.

**Page 161**

FEINSTEIN

And -- and that's got to be reflected somewhere in calculating damages.  In some cases, it might not be he so profound.

Q    Surprise expressed by analysts has to be accounted in damages?

A    If that's what was learned -- I mean, if the surprise is a result of the corrective disclosure, and in the but-for world would have elicited the same amount of reputation effect, that's gotta be accounted for.

Otherwise, you're missing an element of damages.

MR. JORALEMON:  Now would be a good time to break for lunch, if you are ready.

MR. HALL:  Okay.

VIDEOGRAPHER:  This will end Media Unit 3.  Going off the record at 12:38.

(Whereupon, a lunch recess was taken at 12:38 p.m.)

**Page 162**

FEINSTEIN

A F T E R N O O N   S E S S I O N

(Time noted:  1:27 p.m.)

S-T-E-V-E-N  P.  F-E-I-N-S-T-E-I-N,

Resumed, having been previously sworn by a Notary Public within and for the State of New York, was further examined and testified under oath as follows:

VIDEOGRAPHER:  We're back on the record.  The time is 1:27.

This will begin Media Unit 4.

CONTINUED EXAMINATION BY MR. JORALEMON:

Q    Mr. Feinstein, if I can direct your attention to Feinstein Exhibit 22.  This is the May 12th, 2023, reply.

A    Okay.

Q    Specifically, I believe it's page 9, paragraph 26(3).

Are you there?

A    Yes.

Q    Talking about Mr. Stephenson.

Do you see that?

A    Yes.

Q    In the second sentence of

**Page 163**

FEINSTEIN

that subparagraph, you state, "Just as the fact of a cover-up can have severe consequences beyond the impact of the content that was covered up, the company's alleged conduct to conceal the magnitude of risk will have severe valuation impact potentially greater than what would have been the economic impact of the specific concealed information alone."

Do you see that?

A    I do.

Q    In conducting your loss causation and damages analysis here, did you include an alleged cover-up by Vale as part of your calculous?

MR. HALL:  Objection.

A    Well, I mean, it depends whether you mean something different from a deliberate and concerted effort to deceive or to mislead the public.  I mean, I see them as one and the same.

And then the answer would be yes, I did include that.

**Page 164**

FEINSTEIN

Q    Okay.

Just so I'm clear, that -- what you characterize as a deliberate and concerted effort to deceive or mislead the public, the amount of damages you ascribe to that is separate and distinct from any damages traced to the actual value of the information allegedly misstated, correct?

MR. HALL:  Objection.

A    I don't think that's a fair way of characterizing the facts of the case or the analysis because the specific covered-up facts were in the disclosed at the -- upon the corrective disclosure, just that there was deception.

Q    Right.  What I'm asking -- just trying to confirm they're two separate things, though, right?

If you look at this subparagraph, the economic impact of the specific concealed information alone.

**Page 165**

FEINSTEIN

Do you see that?

A    Yes.

Q    You are drawing a distinction between that and the economic impact of the existence of a concerted and concealed effort.

They're two different things; is that correct?

MR. HALL:  Objection.  Asked and answered.

A    Well, they are conceptually two different things, but the latter subsumes the former.

The mathematical economic estimated artificial inflation of the asymmetric information subsumes the specific information that was not disclosed.

So the latter will measure all of it, whereas the former only measures some of it.

Q    Okay.  So it subsumes it, but it's not equal to it, correct?

A    That's right.

**Page 166**

FEINSTEIN

MR. HALL:  Objection.

A    Except for -- well, part of the cover-up or campaign is that there is such a cover-up or campaign.  So taking that into account, they would be equal.

Q    I thought we were on the same page, and now I'm not sure we are.

If I read this paragraph correctly, you are suggesting -- you are stating that the economic impact of the existence of a cover-up, by itself, is distinct from the economic impact of the specific concealed information alone?

MR. HALL:  Objection.

A    I don't think that's the right way to read it.

Q    Well --

A    The concealment or the cover-up includes the fact that there is a concealment or cover-up.  So it's going to have a bigger impact than just the specific metrics that may have been

**Page 167**

FEINSTEIN

covered up.  I think that's exactly what this says, that it's -- the cover-up includes not only the specific facts, the metrics that were not disclosed and were covered up, but rather -- but also include the existence of the cover-up.  So that's why it's going to be a bigger economic impact than just the metrics themselves.

Q   Okay.  Right.  I think we're on the same page now.

If there is just one misstatement -- I'm not talking about this case, just in a hypothetical.  If there is one misstatement, assume its value-relevant for investors, presumably an economist can measure the artificial inflation caused by that one misstatement, correct?

MR. HALL:  Objection.

A   Usually that's the case.

Q   Okay.  And in a scenario where there's also alleged to be this

Page 168

FEINSTEIN

cover-up concerted and deliberate effort, it's your opinion that in addition to the artificial inflation tied to the specific content of the misstatement, there will be a premium, if you will, attributable to the cover-up, correct?

MR. HALL:  Objection.

A     That's correct, actually. That's consistent with economic theory. Sometimes, you know, to provide a conservative measure of artificial flakes and damages, the measure will be reinstructed to just the specific metric, but that would be an underestimate --

Q     Okay.

A     -- of the total damages and the total artificial inflation.

Q     Okay.  So can we agree -- for purposes of the remaining questions today -- agree on a definition of that premium.  You want to call it a "cover-up premium"?  Or what would you

**Page 169**

FEINSTEIN

call it?

A   I think I called the asymmetric information effect, asymmetric information --

Q   That's a mouthful.

A   Well, it's actually --

(Unreportable cross-talk.)

A   -- a term of art that's widely used in finance research today, including Dr. Hubbard's writings.  But also include the reputation.

Q   Okay.

A   So the asymmetric information -- well, I would be happy as a shorthand, if you want to call it cover-up, so cover-up and reputation effect.  It has to be considered.

It inflated the stock price that there was a cover-up that warranted change in reputation perception.

Q   Right.  So I want to make sure I understand all the inputs -- or all the factors in that premium.

**Page 170**

FEINSTEIN

A    Right.

Q    There is the existence of the cover-up, correct?

A    Right.

Q    There is the reputational effect --

A    Right.

Q    -- on the company, right?

A    Right.

Q    Is -- the unseemly nature of the allegations, does that factor into it?

MR. HALL:  Objection.

A    Well, it's not how I computed it mathematically.  But, reasonably, investors would care about that.

Q    Okay.

And would you alluded earlier to the surprise of analyst.  Is there some sort of surprise component to this premium, how shocking it is?

MR. HALL:  Objection.

A    Well, I considered the expressions of surprise because I

**Page 171**

FEINSTEIN

wanted to see if what was alleged to have been learned from the corrective disclosures and what appeared to be what was learned from the corrective disclosures was confirmed by analyst reaction. And it was, so...

Again, it didn't feed in a specific mathematical equation, but it supported the use of this particular model.

Q    Okay. You had indicated in your reports that investors rationally assumed the worse when they become aware that a company is hiding important information, correct?

A    Yes.

Q    So under that rationale, wouldn't a company's stock price drop to its lowest ebb upon the first corrective disclosure?

MR. HALL: Objection.

A    If it's a fully corrective disclosure. In this case, there was no fully corrective disclosure.

**Page 172**

FEINSTEIN

I mean, the first one was and the second one was, so -- arguably, the third one might not have been one either.

But there never was an admission by the company that they were engaged in a deliberate and concerted effort to deceive.  They had to be inferred from things that were going on.  And that inference emerged gradually.

Q   So if -- but if investors are going to assume the worst, why does it matter if there is only a partial corrective disclosure?  Because wouldn't the worst-case assumption include, in fact, dwarf a full disclosure?

MR. HALL:  Objection.

A   No.  Upon the dam break, investors did not yet know what they learned later, that the company had pressured certifiers, that the company had information that they weren't

FEINSTEIN

disclosing; that the condition of the dams was worse than what the company was letting on.

I mean, they -- some -- some analyst reports surmised that it was just an unfortunate accident, it was only -- I mean, others didn't.  So it was an emerging realization that they had been deceived.

That's why the price -- that's why the price fell on the second and third disclosures as well, that Wall Street Journal and the Guardian reported that the company knew more about these risks than they had let on.

Q    So was it your opinion that upon the collapse of Dam 1, Vale's investors did not rationally assume the worst?

MR. HALL:  Objection.

A    Because yes -- no, no.  They weren't irrational, but they didn't assume the worst at that point because they had not yet been provided with a

**Page 174**

FEINSTEIN

fully corrective disclosure of what was going on.

Q    So is it your view that investors became partially aware that the company was hiding important information on January 25th?

A    Yeah.  I think that's the reasonable conclusion from there being a second dam collapse so soon after the first one.

And, frankly, what also supports my opinion that that's what happened is the statements made by the government officials in Brazil as well as the head of Vale.  They -- it was an emerging realization that things were worse than they been represented to be, but it was not yet fully known that they were worse than they had been represented to be.  The confidence of that conclusion was not 100 percent yet.

Q    What conclusion?

A    That confidence of

FEINSTEIN

conclusion -- the confidence in the conclusion by market participants that they were misled.

I mean, clearly, it's a reasonable thing to think, gee, I may have been misled.  I mean, how can the dams be impeccable if there is a second collapse so soon after the first one?

And that's just a reasonable thing for someone to wonder upon that news.  And the reaction from -- I think it was the president of Brazil, it's consistent with that.

It's not yet known for sure, but it's an emerging realization.

Q    Weren't all those reactions also consistent with the realization of disclosed risk?

MR. HALL:  Objection.  Vague.

A    No.  No.  No, I will show you why.

You want me to show you why?  The answer is no.

Q    I don't want to cut you off,

**Page 176**

FEINSTEIN

but we'll get to sort of the more specifics in a minute. So just want to make sure you understand my question, that I'm talking about investor reaction upon the collapse of Dam 1.

And the question was was that reaction consistent with the realization of a previously disclosed risk?

MR. HALL: Objection.

A    The answer is no.

Q    Okay.

A    It's consistent with the realization that maybe they had been misled.

Q    Why is it not consistent with the realization of a previously disclosed risk?

A    Because it extends beyond that. It extends beyond that. And the initial news that emerged was only about the event itself, that it happened, not the severity of the event that happened, which came out later.

FEINSTEIN

So the price decline -- well, I mean, it's -- I guess, it certainly is not exclusively -- the price decline certainly included the realization that maybe they had been misled about dam safety.

Q    That wasn't my question, though.  My question was why was the price decline not consistent with the realization of a previously disclosed risk?

MR. HALL:  Objection.

A    Well, as a forensic analyst, the forensic analyst looking at the evidence could observe that there was more to it than that, given the facts either we know about how it came to be or what's alleged about the facts as it came to be.

So it's possible that at the time, investors didn't know what caused the collapse, and perhaps it was just an unfortunate accident.

But then in light of the

**Page 178**

FEINSTEIN

allegations of the facts by plaintiffs, it's more consistent with what the president of Brazil said, that it was essentially an accident waiting to happen because of conditions that were different from what they were represented to be.

Q    But none of those allegations were made on January 25th, 2019.

MR. HALL:  Objection.

A    Which allegations?

Q    Well, everything you just talked about.

A    Let's have a look.  It's in one of my reports, the quotes.  Let's try the first one.

Okay.  President of Brazil -- and I'm pronouncing the name correctly -- I am on paragraph 69, page 32.

Q    Is that of Exhibit 20?

A    Yes.  In fact, this -- yeah, this is on January 25th.

He said, "We deeply regret

**Page 179**

FEINSTEIN

what happened and know that this type of accident can be avoided.  On mining issue, do not want to start blaming other for what is happening, but something is being done wrong over time."

So they're starting to realize -- the politicians, the government, as well as the market -- are realizing that the situation was not as they were led to believe it was.

And that's on July -- that's on January 25th.  It says -- that quote comes out at 3:12 p.m.

Q    So your interpretation of this quote from the president of Brazil on January 25th is that Vale had somehow misled investors?

A    Yes.  I mean, it's an emerging realization.  It says "but something is being done wrong over time."

MR. HALL:  Objection.

A    The representation before is

**Page 180**

FEINSTEIN

that they were doing everything

possible and they had a commitment to

stability and safety, and the president

of Brazil says, "Something is being

done wrong here.  I don't buy that

anymore."

Q    And does your interpretation

of what the president of Brazil said in

January 25th inform your analysis in

this case?

A    Yeah.

Q    Okay.

A    Yes, in part.

Q    Are you familiar with the

term "corrective disclosure"?

A    Hold on a second.  I think

I'm not done.  It's not complete.

Q    Well, there is no pending

question, so you are done.

MR. HALL:  Well, I think he

is not.  So if he is completing

his prior answer that you then

asked him a question in the middle

of it --

FEINSTEIN

MR. JORALEMON:  Donny, enough with the speaking objections.  I have let you go all day today. That's enough.

MR. HALL:  Well, you are considering and you trying to tell the witness when they are done with the question.  The witness says they are not done.

MR. JORALEMON:  The pending -- the last question was whether his interpretation of the president's quote has informed his analysis --

MR. HALL:  Because you interrupted his prior --

MR. JORALEMON:  -- and he said yes.

MR. HALL:  And that is because you interrupted his prior answer.

Q   Sir, are you familiar with the term "corrective disclosure"?

A   I was going to read the rest

**Page 182**

FEINSTEIN

of paragraph 70 what Mr. Schvartsman said.  But, yes, of course I am.

Q    Okay.  What is it?

A    Well, it's a disclosure that could be corrective in one or both of two senses.

Either it informs the marketplace of what they previously did not know, or it removes inflation that's caused by what the market was previously misled about it.

Q    Are you familiar with the concept of materialization of an undisclosed risk?

A    Yes.

Q    What's your understanding of that?

A    Well -- an "undisclosed risk" you said?

Q    Yes.

A    So if there is a risk of some adverse event, and it's concealed that this event is even possible, then the event happens, that would be a

**Page 183**

FEINSTEIN

realization or a materialization of a risk that was previously undisclosed.

Q   As an economist providing opinions on loss causation and damages, do you have any understanding of the relationship, if any, between corrective disclosures and realization of an undisclosed risk?

MR. HALL:  Objection.

A   Yes.

Q   Okay.  What's your understanding of that relationship?

A   I understand that this is actually a legal principle, but one that I learned from the course of my working as an economics expert, that a corrective disclosure need not be an admission of a prior misrepresentation or an announcement that a mirror -- it's a mirror image of a prior misrepresentation or an apology for a prior misrepresentation.

It could also be an event, a materialization of an event that occurs

**Page 184**

FEINSTEIN

that informs the marketplace that the conditions of the company or some conditions were not as they were understood to be.

Either of those things, either an announcement or an event inconsistent with prior misrepresentations can serve as a corrective disclosure.

Q    Okay.

So I understand your testimony that a corrective disclosure need not mirror a prior misrepresentation; is that correct?

A    The form.  The form of the corrective disclosure need not mirror the form of the misrepresentation.

Q    Okay.

A    As long as they -- well, as long as the disclosure, whatever form it takes, either corrects the misinformation or the artificial inflation.

Q    Okay.  So is it fair to say

**Page 185**

FEINSTEIN

that the content of a corrective disclosure has to correlate to the content of an alleged misrepresentation?

MR. HALL:  Objection.  Calls for a legal conclusion.

A    I don't know if I can generalize across all possible hypotheticals.

Clearly, there are a lot of events -- well, by "content" do you mean the information content of what's learned from a corrective disclosure?

Q    Correct.

A    Actually, no.  It's altogether possible for the market not to know that the event was a materialization of a risk at the time of the event for the artificial inflation caused by the misrepresentation to be dissipated by that corrective disclosure.

In other words, sometimes something adverse or negative happens

**Page 186**

FEINSTEIN

and the market doesn't know until much later that it happened and they were surprised by it because of misrepresentations.

And that kind of a corrective disclosure would dissipate the inflation but not yet inform the marketplace that they had been misled.

Q   I just want to make sure I understand.

So in this scenario you are describing here, the corrective disclosure could reveal nothing about the voracity of a challenged statement, is that what you're saying?

MR. HALL:  Objection.

A   No.  When you say "this here," do you mean this case or --

(Unreportable cross-talk.)

Q   You just described a scenario where my question -- my prior question was about the -- whether the content of a corrective disclosure needs to correlate to the content of a

FEINSTEIN

challenged statement.

And then so you gave a response, and then I was following up on that response and asking whether you're saying that a corrective disclosure need not reveal anything about the truth of a challenged statement.

MR. HALL:  Objection.

A     Well, if that kind of a corrective disclosure would be correct, it could happen.  It could happen.

If the correct disclosure removes the inflation, the artificial price inflation that was caused by under the misrepresentations.

So what often happens is an adverse event will happen, the stock will fall, and only later do people realize that they were deceived and that they should have been expecting that event.  They don't understand that at the time of the event itself.

That happens.  And that would

**Page 188**

FEINSTEIN

be a corrective disclosure that doesn't

yet or at the time of the event doesn't

yet inform the marketplace about the

information that they were deprived up.

Q    Okay.  And did that happen

here, in your opinion?

A    Yes, but incrementally.  That

is what happened here, but

incrementally.

Not everyone knew, from the

first corrective disclosure, what

plaintiffs are alleging now, and what

board reports, for example, informed

the board of Vale about after the class

period.

It wasn't yet known to what

extent the misinformation was

misleading the marketplace.

Q    Okay.  So is it your

testimony that -- well, let me ask you

a different way.

Did any of the corrective

disclosures here identified by

Plaintiff not reveal anything about the

**Page 189**

FEINSTEIN

truth of the 26 remaining misstatements in this case?

MR. HALL:  Objection.

A    In this particular case, all three of the corrective disclosures that I focus on and cite did reveal some or to some extent the truth about what had been previously misrepresented.

None of them revealed it 100 percent -- 100 percent of the misinformation or of the -- or provide 100 percent confidence that the market had learned the truth about what happened, but they all contributed to the growing realization and, as a result, caused dissipation of inflation which caused loss.

Q    So I understand, so it's your testimony that each of the corrective disclosures identified here revealed at least some truth about the various challenged statements, is that what you're saying?

**Page 190**

FEINSTEIN

A    Yes.

Q    Okay.  So when you said -- when I asked you whether it happened here and you said yes, I was referring to a scenario in which a corrective disclosure reveals nothing about the truth of a challenged statement.

So it's not your testimony that that's what happened here --

MR. HALL:  Objection.

Q    -- correct?

A    Just to be real clear, there's a lot of yeses and nos.

To be clear, every one of the corrective disclosures in this case, the three -- so January 25th, February 4th, February 6th -- did reveal to the marketplace, to some extent, that the marketplace had been misled by the misrepresentations and omissions that are alleged.

Q    All of them?

A    Yes.  All three.

Q    No, I'm sorry.  All of the

**FEINSTEIN**

challenged statements, all 26 remaining challenged statements?

A    I see them holistically.  I mean, I see the effect of them holistically, and they can be compiled into a concise characterization the way the judge did.  So I don't -- I did explain in my report that there is not necessarily a one-to-one correlation -- or, yes, a correlation or connection between misstatements -- not the case that a single misstatement is corrected by a single corrective disclosure.

It could be collectively -- the misrepresentations collectively can be incrementally corrected by the corrective disclosures collectively.  Need not be a one-to-one correspondence.

Q    Okay.  Let me try and break this down.

So it's your opinion that, collectively, the three alleged corrective disclosures revealed at

**Page 192**

FEINSTEIN

least some truth about all 26 challenged statements collectively?

MR. HALL:  Objection.

Q    The three corrective disclosures combined revealed at least some truth about every one of those 26 statements combined?

MR. HALL:  Objection.

A    I think there's a better way to say it.

Q    Tell me.

A    I think all three of the corrective disclosures revealed to the marketplace to some extent that the import -- the collective import of the misrepresentations and omissions was false.

Q    What do you mean by "collective import"?

A    What I mean is that collectively, if proven, Plaintiffs' allegations would show a deliberate and concerted efforts to mislead the public about dam safety and risk management

FEINSTEIN

practices.  That's the collective import.

All three corrective disclosures informed the marketplace, to some extent, of that.

Q   "That" being both the content of the misstatements and this plan, deliberate and concerted effort?

MR. HALL:  Objection.

A   Yes.

Q   Okay.  I want to direct your attention to your May report.  I think it's Exhibit 22.

On page 10 paragraph 27 --

A   Okay.

Q   -- in (2) of paragraph 27, you see where you -- the sentence beginning "He fails to appreciate."

Do you see that?

A   Yes.

Q   In that you state, "A series of misrepresentations and omissions can cause investors and analysts to have a wholistically false impression of a

Page 194

FEINSTEIN

company."

Do you see that?

A     Yes, I see that.

Q     Just to clarify, holistically, is that -- does that -- you have an extra W there.  Do you mean "holistically," H-O-L-I-S?  I'm just not familiar with that word, "wholistically"?

A     I will have to check it.  I thought it was right, pertaining to the whole as opposed to the individual parts.  Maybe I am wrong.

Q     Okay.  That's what you mean by that word?

A     Yes.

Q     So do you have an opinion as to how many representations there needs to be to create this holistically false impression of the company?

MR. HALL:  Objection.

A     I studied the facts and circumstances of this case intensively in order to offer these opinions.  I

**Page 195**

FEINSTEIN

didn't endeavor to produce bright-line tests that would apply to every case. Maybe I will do that next for the law review article or something.

But, no, I don't have a bright-line number of how many. I just know that it happened in this case, and that the judge thought so too.

Q     And sort of similar question, not about this case specifically but, in general, do you have an expert opinion as to how long -- or how long a period -- however many misstatements are at issue need to occur for there to be this holistically false impression of a company?

MR. HALL:  Objection.

A     Well, we're talking about time now.  Let me go back and amend my previous answer.

I would have to say at least two.  There would have to be at least two misrepresentations to say that they combine to create in concert and

**Page 196**

FEINSTEIN

holistically a false impression. Otherwise, it's just one statement.

You don't have to think in terms of it being a holistic misimpression, just an individual.

As far as time, again, I don't have a bright-line test. I would think that -- I've seen cases where the class period is two days. It would be hard to say that it was an ongoing campaign of misinformation. Although, a misrepresentation might cause two days of artificial inflation that later gets corrected readily.

I don't have a bright-line test. I would have to say it's probably more than a day. Probably more than two days. Certainly three years is in the range where it could be -- the market can be misled in a holistic sense about something.

Q    And in that sentence I just read, from paragraph 27(3) of Exhibit 22, you are not purporting to

**Page 197**

FEINSTEIN

offer a legal opinion there, are you?

A    Never.  None of my opinions here are legal opinions.  They're all economics.

I will say that I have seen the word holistically.  Maybe I'm spelling it wrong, but I've seen it in judge's opinions where they say that they would evaluate the Cammer-Krogman factors holistically, for example, or the evidence of a case holistically.  I have seen that.

I am going to go check my spelling.

Q    Turning to the specific corrective disclosure at issue here. Take a look at Exhibit 20, your opening report.  Specifically paragraph 14, paragraph 14 on page 4.

(Clarification by the reporter.)

Q    You see there you are talking about a series of corrective disclosure events in paragraph 14?

**Page 198**

FEINSTEIN

A    Yes.

Q    In the second sentence, you indicate that the corrective disclosures took the form of, among other things, a canceled Laranjeiras dam license.

Do you see that?

A    I do.

Q    That's L-A-R-A-N-J-E-I-R-A-S.

Where did you get the information that the cancelation of the Laranjeiras dam license was a corrective -- an alleged corrective disclosure here?

A    It may have been in the complaint, but my evaluation of the events indicated that that was a development that reasonably informed the marketplace that the condition of Vale's dams was not what they had been led to believe it was.

Q    I can represent to you that -- that -- the cancelation of Laranjeiras dam license does not appear

**Page 199**

FEINSTEIN

anywhere in the complaint.

A    Well, it actually happened in two phases; there was an order to cease using the dam, and then subsequently the license was revoked.

So I see the two as two steps in the same development.  And so I think you will find that it is mentioned in the complaint that dam, at least on -- for January 4th when the -- it was ordered that its use be ceased.

Q    The Laranjeiras dam?

A    Let me check.

I'm reading paragraph 87 of that report, of my report.  Exhibit 20. "According to Bloomberg, Vale said Minas Gerais State Court has ruled the company must refrain from disposing 'tailings or practicing any activity potentially capable of increasing the risks at certain mining dams.'  The suspended" -- and that included the Laranjeiras dam.

(Clarification by the

**Page 200**

FEINSTEIN

reporter.)

A      The Bloomberg article is titled "Vale Says Court Orders Halt to Largest Mine in Minas Gerais."

Then subsequently, on February 6th, paragraph 94 reports -- I relate that, "During trading hours in the US" -- this is my writing -- "the news media reported that the State of Minas Gerais had canceled Vale's licenses to operate the Jangada iron ore mine and the Laranjeiras dam."

So it's a two-stage cessation.

Q      Okay.  So if I understand you correctly, you're saying that on February 4th, there was a suspension of the Laranjeiras dam.  And on February 6th, there was a cancellation of that license.

Is that your understanding of the facts?

A      Yes.

Q      Okay.  And is it your

                    FEINSTEIN

testimony that either or both of those

events were corrective disclosures?

          MR. HALL:  Objection.

     A    I would say so.  In the

economic sense, they both informed the

marketplace that the condition of the

dams -- it informed the marketplace, to

some extent, that the conditions of the

dams were not likely of the quality

they had previously been represented to

be.

     Q    Okay.  You understand that

Plaintiffs in this case have not

alleged that the suspension or

cancellation of the Laranjeiras dam

license was a corrective disclosure?

          MR. HALL:  Objection.

     Misrepresents the case.

     A    Well, whether they did or

not, the economic analysis indicates

that it was.

     Q    Okay.  So you're offering an

independent view apart from whatever is

in the complaint that the

**Page 202**

FEINSTEIN

Laranjeiras-related developments were corrective disclosures; is that correct?

A    As I sit here now, I don't know whether it's independent or not, but it's certainly grounded in correct economic analysis.  And I stand by that opinion.

It did inform the marketplace, to some extent, that the condition of the properties was not as they had been previously reported to be.

Q    In identifying potential corrective disclosures here, did you rely on an independent assessment beyond what was stated in the complaint?

A    To some extent, yes; and to some extent, no.

I did confine the analysis to the period described in the complaint. I didn't go beyond February 6th.  I could have, but I didn't.

**Page 203**

                    FEINSTEIN

          And I also -- but I did take

into account, I was informed, to some

extent, by what plaintiffs alleged to

have been corrective.  But the decision

as to whether it was or wasn't and what

the economic implications were or were

not was entirely mine.

     Q    Did you do any independent

assessment of whether there were

corrective disclosure events beyond

those alleged in the complaint?

               MR. HALL:  Objection.

     A    Yes.

     Q    What did you do?

     A    I -- as you can see in the

Documents Reviewed and Relied Upon

list, I read articles and analyst

reports that extended beyond the class

period.  I read articles and analyst

reports and company filings that pretty

intensively covered the class period

looking for exactly that.

               I mean, that's why lawyers

hire economics experts, to help the

FEINSTEIN

Court and help them understand what events were economically material.

Q     When you say to do exactly that, you mean to look for potential additional corrective disclosures?

MR. HALL:  Objection.

A     Well, to assess the experience of the company and investors from an economic perspective, which would mean -- which would include, among others things, assessing whether there were other corrective disclosures besides the ones that they may have identified.

Q     And did you find any additional corrective disclosures beyond what was alleged in the complaint?

A     I don't offer that as an opinion in the report because the scope of the project was to look at the class period and the immediate aftermath of the class period.  But I do think some of the developments that were reported

**Page 205**

FEINSTEIN

in the news subsequent to the class period informed the marketplace to a greater degree about the experience of -- their experience, the investors' experience and the experience the company during the class period.

Q    But you are not offering that opinion in this case, correct?

A    Right.

Q    Okay.  January 25th the dam collapses, correct?

A    Right.

Q    Was the collapse of the dam a corrective disclosure, in your opinion?

A    Yes.

Q    Was it a materialization of a previously undisclosed risk in your opinion?

MR. HALL:  Objection.

A    I think we -- it's indisputable that it was a materialization of a previously -- under-disclosed risk, for sure.

I mean, the company had said

**Page 206**

FEINSTEIN

that dam breaks might happen, but they certainly didn't tell the public about the likelihood of -- they didn't correctly apprise the public about the likelihood of such a dam break.  In fact, they did everything, apparently, to deceive the marketplace about the likelihood.

Q    If I understand your prior testimony, you believe that Dam 1's collapse partially revealed to investors that Vale's previous statements were false; is that correct?

MR. HALL:  Objection.

A    Yes.

Q    Okay.  And just to clarify, when I say "Vale's previous statements," I'm talking about the 26 remaining challenged statements in this case.

Does that answer remain the same?

A    Yes.

Q    You would agree with me that

FEINSTEIN

a dam could collapse absent fraud, right?

A    Conceivably.  Of course.  I mean, I will say of course it could. Doesn't seem to be what happened here, at least according to plaintiffs.  But in a hypothetical, it could.

Q    Now, we've looked at the motion to dismiss decision earlier today.

You recall the Court in that decision stated, "That Dam 1 collapsed without more does not reveal to the public any previously undisclosed misrepresentation."

Do you remember that?

A    Yes.

Q    Okay.  And do you agree with that observation by the Court?

A    Yes, but with the emphasis on the words "without more."

I mean, what distinguishes this case from the hypothetical where there is no fraud and a dam collapse is

**Page 208**

FEINSTEIN

the "more" that's captured by those two words "without more."

Q    What's the "more" in your view, that was known on January 25th, 2019?

MR. HALL:  Objection.

A    Quite a bit.  I mean, I might not be able to give you a fully comprehensive answer, but I will give you some highlights.

One is the allegations that the company knew a lot more than they were letting on.  So all of the allegations of misinformation.  I mean, in light of that, a dam collapse is correcting a misrepresentation or a misunderstanding or misinformation.

But also what distinguishes this case from the hypothetical, where the dam collapse has nothing to do with the fraud, is the prior experience of this company with the prior dam collapse, Samarco made a focus and an emphasis on dam safety much more to the

FEINSTEIN

front of the minds -- in the front of the minds of investors and analysts. They were more focused on that issue than they likely would have been had that other dam not collapsed.

And one dam collapse, someone might reasonably say that was a hugely unfortunate accident. But two in a short amount of time starts to inform people that -- well, as it informed the president of Brazil, that something wrong is going on. Something wrong has to be investigated, and something wrong might be happening.

So part of the "more" is what Plaintiffs say they have uncovered about what the company knew, and other parts of the "more" is that the previous dam collapse and the interest in analysts and investors in dam safety.

Q    Okay. So with respect to the complaint, the complaint didn't exist on January 25th, correct?

**Page 210**

FEINSTEIN

A    That's true.

Q    Okay.  So investors on January 25th did not have access to the allegations in this case, correct?

A    Right.

Q    And you are aware that writing the motion to dismiss decision, the Court did have access to the complaint, correct?

A    That's right.

Q    And yet the Court stated that "that Dam 1 collapse without more does not reveal to the public any previously undisclosed misrepresentation," correct?

MR. HALL:  Objection.

A    Right.  And the judge did not dismiss the case because, clearly, in this case, there is more.

Q    You don't read that sentence as talking about whether the collapse of Dam 1 was a corrective disclosure?

MR. HALL:  Objection.

A    I don't, especially in

**Page 211**

                    FEINSTEIN

context.  I mean, the judge said that
the -- when the severity of the dam
collapse became known that that
information was not a corrective
disclosure.

            But the judge left in
January 25th.  Well, what happened on
January 25th?  There was a dam
collapse.

     Q     I direct your attention to
Exhibit 22.  This is your May reply.
Paragraph 128 is on page 48.

     A     I'm sorry, page 45?

     Q     Page 48 at paragraph 128.

     A     Okay.

     Q     In paragraph 128, you are
talking about a Scotia Bank analyst
revising their estimates for Vale; is
that correct?

     A     Yes.

     Q     And just to clarify here,
this was on January 25th, the same day
as the collapse.

            If you just look back a few

FEINSTEIN

paragraphs in your report, you are talking about the events of January 25th.

Do you see that?

A    I do.

Q    Okay.  In paragraph 28, you state, "Upon learning that Vale's dams were not as safe and that safety protocols were clearly not as effective as previously represented, Scotia Bank analyst decreased their estimates."

Sir, upon what basis do you conclude that Scotia Bank's analysts, on January 25th, determined that Vale's dams were not as safe as previously represented?

A    The basis is that they explained in their report that they weren't basing their change in price target on the particularities of the dam collapse or the severity of the dam collapse because they didn't yet know that.  They were basing this revision on the fact that a dam collapse had

**Page 213**

FEINSTEIN

occurred.

No reasonable person would say that condition of the dams was impeccable when one had just broken. So they clearly learned that the dams were not as safe as previously represented.

Q    Did the Scotia Bank report make any reference to prior representations by Vale concerning dam safety?

MR. HALL:  Objection.

A    I'm not sure.  I'd have to look at this report and also the prior reports.  A lot of the analysts spoke about -- well, related what the company was saying about dam safety.

Q    Okay.

A    And they may have.

Q    I will represent to you that the January 25th Scotia Bank report made no reference to any prior representations by Vale concerning dam safety protocols and their

Page 214

FEINSTEIN

effectiveness.

MR. HALL:  Objection.

A     Well -- but if they say previously that the company's doing all it can to improve dam safety, and relate that the president of the company said the dams were impeccable, if they relate that, and then they write a report about the dam break, they're recognizing that the conditions were not as represented to be.

Q     You are just guessing?

A     No.

Q     Aren't you?

A     No.

MR. HALL:  Objection.

A     No.

Q     Did you speak to anyone at Scotia Bank?

A     No.  I read the reports.

Q     Did you read the report on January 25th?

A     I read the report written on January 25th, yes.

**Page 215**

FEINSTEIN

Q    Right.

A    Yes.

Q    Okay.

Let's turn to the closure of the Brucutu mine on February 4th.

(Clarification by the reporter.)

MR. JORALEMON:

B-R-U-C-U-T-U.

A    On February 4th?

Q    Yes.  And this is alleged to be a second corrective disclosure, correct?

A    Correct.

Q    And if you look at paragraph 88, of your opening report, Exhibit 20.

A    Paragraph 88 of Exhibit 20?

Q    Correct, on page 43.

A    Oh, I am looking at 22.

Okay.

Q    In paragraph 88 you state in relevant part that "The elevated awareness of company-wide safety issues

**Page 216**

FEINSTEIN

apparently led to this costly court intervention," referring to the Brucutu mining halt.

Q    Do you see that?

A    Yes.

Q    When you say "apparently" there, upon what are you basing that --

A    Well --

Q    -- hypothesis?

A    It is explained here.  The Laranjeiras dam was not an upstream tailings mine.  Didn't have the same design as the Dam 1 that actually broke.  Nonetheless, the Court ordered it halted.

So there is really no other explanation for this, except for that there is concern and awareness of company-wide safety issues.  It's not about Dam 1 anymore.

This is clear evidence that this Court and others were now beginning to doubt the company representations about the condition of

**Page 217**

FEINSTEIN

their dams.  And it was information to the public that people close to the situation had these concerns, which is all corrective.

Q    Did you consider this Minas Gerais State Court to be close to the situation?

MR. HALL:  Objection.

A    Yes.

Q    You are aware, sir, that shortly after that February 4th decision, it was publicly reported that the Court's basis was without any technical or legal basis?

A    Well, that's my point too.

My point, too, is that the events had indicated to the marketplace that there was reason to begin to doubt the company's reputations about their dams.

Q    Understood.  But you acknowledge that the decision to halt Brucutu mining operations had no legal or technical basis.  It was

FEINSTEIN

subsequently reported within ten days of this.

MR. HALL:  Objection.

A    "Legal basis"?  I don't know what you mean by "legal basis."

Q    That was just the public report.  Did you -- were you aware of that prior to me telling you that?

A    It's inconsequential whether I was or was not.  I don't remember those words.

But it's clear evidence that there were now doubts about the company's representations about safety.  Otherwise, why would they have shut down this dam.

Or they said that's why they shut down the dam.  The basis was that they had concerns about the company's representations about safety, which is a corrective disclosure.

Q    So it's your expert opinion that it's corrective disclosure, even though the Court got it wrong, meaning

**Page 219**

                    FEINSTEIN

there was no foundation for those concerns?

            MR. HALL:  Objection.

    A    I don't know if I could accept that assumption, that premise that there was no foundation.

            The foundation was that the company -- well, the foundation -- I'd have to say that accepting the plaintiffs' allegations as true, the foundation would be that the company's representations about safety were false, and that, therefore, the authorities trying to protect the public got it right.

    Q    Even though shortly after that Court decision, it was reported that it was withdrawn, and there was no legal or technical basis for it in the first instance, you are saying that's still a corrective disclosure?

            MR. HALL:  Objection.

    A    It's -- well, it's -- for a number of reasons.

Page 220

FEINSTEIN

One is that it's clearly the kind of ramifications that would have happened had there been the but-for disclosure we were talking about this morning.  The company says don't believe what we said about dam safety.

It's pretty clear that there would have been governmental and regulatory authorities imposing halts to confirm whether or not the public was at risk.

Q    You are familiar with the phenomenon of overreaction in response to a crisis, right?

MR. HALL:  Objection.

A    Generally.  In theory.

MR. HALL:  Chris, we've been going a little over an hour.  So whenever you are ready for a break.

MR. JORALEMON:  Okay.

THE WITNESS:  Actually, could we take a break now?  There is not a question.

FEINSTEIN

MR. JORALEMON:  Just give me 30 seconds.

THE WITNESS:  All right.

MR. JORALEMON:  Two minutes. No more than two minutes.

Q    So in your expert opinion, can an overreaction in response to a crisis constitute a corrective disclosure?

MR. HALL:  Objection.

A    Gosh, the way you phrased it, I need to think about that.

Well, I mean, if we're defining "corrective disclosure" as an event that corrects a mispricing of a security and aligns the pricing of the security more with what the security price would have been had there been no misrepresentations and omissions, you'd have to consider if the reaction by the public, the government, the market upon the actual disclosure is similar to what the reaction would have been upon the but-for disclosure; in which case,

**Page 222**

                    FEINSTEIN

you wouldn't call it an overreaction,

you would call it an observation of how

the market responded to learning what

they previously didn't know.

          I mean --

     Q    I understand.

     A    -- I just want to add

valuation is a human exercise.  It's

people assessing what something is

worth, meaning it's people assessing

what other people will pay for it.  You

can't remove the human element from

that.

          What you might call an

overreaction, someone else might call a

the appropriate reaction, taking into

the account what was known and how

surprised they were.

     Q    Right.  Okay.  So I will wrap

this up.  But it sounded like what you

were saying was it may ultimately prove

to be true -- prove to be the case that

it wasn't an overreaction.  Subsequent

events would justify that reaction; is

**Page 223**

FEINSTEIN

that correct?

A    The market may reevaluate it at a later date in light of new information that the price should be different from what they evaluated at the time closer to the event itself.

Q    Okay.  Let me try it this way.

A    That's not necessarily an overreaction.

You might want to call it an overreaction, but it still would be what the marketplace determined the correct price of the security ought to be, given the facts known at the time.

Q    Okay.  Let me try this last question.

Is it your view that an expert should apply 20/20 hindsight in assessing a corrective disclosure, or should the expert limit that assessment to what you just said, the facts known at the time the corrective disclosure was made?

**Page 224**

FEINSTEIN

MR. HALL:  Objection.

A    I wouldn't call it 20/20 hindsight, but proper forensic financial analysis takes into account all information.  And some of that information may be information that's -- that the market didn't have at the time but the forensic analyst has later.

So, for example, if the market didn't know why the dam collapsed at the time, but later it's -- becomes clear to the forensic analyst and everybody else that it collapsed because of things that could have been disclosed, the forensic analyst should take that into account.

So it's not 20/20 hindsight. It's appropriately using all the tools and information at one's disposal to assess what would have been the case had there been disclosure at an earlier date to calculate the but-for price, therefore, the artificial inflation,

**Page 225**

FEINSTEIN

therefore, the inflation ribbon, and

therefore, damages.

MR. JORALEMON:  Let's take a break.

VIDEOGRAPHER:  This will end Media Unit 4.  Going off the record at 2:35.

(Whereupon, a brief recess was taken.)

VIDEOGRAPHER:  We're back on the record at 2:53.  This will begin Media Unit 5.

Q    I just want to clarify something about the dam collapse being a partial corrective disclosure.

Is it your opinion that it was a partial corrective disclosure for all Vale investors or just some?

MR. HALL:  Objection.

A    All.  Because all investors relied on market prices.  That's how information diffuses through the market to affect all the investors.

Q    Well, you had alluded earlier

**Page 226**

FEINSTEIN

to -- there being some public statements at the time suggesting that this was just a terrible accident.

Do you remember that?

A     Yes.  That it could be.  They didn't know.

Q     And is it your opinion that some percentage of Vale investors thought just that?

MR. HALL:  Objection.

A     Well, they may have.  I mean, an efficient market isn't necessarily a unanimous market.  There is divergence of opinion, but the opinions coalesced to form market prices.  So all investors were concerned about market prices.  All investors were affected by the new information that came out.

Q     So the notion that it was a partial corrective disclosure for all investors depends on the efficiency of the market for Vale securities, correct?

MR. HALL:  Objection.

**Page 227**

FEINSTEIN

A    Yes, I would have to say that.

Q    Turning to February 6th, the third corrective disclosure date specifically involving the publication of two press reports.

Do you remember that?

A    Yes.

Q    And is it your opinion that the Guardian news article was a corrective disclosure?

A    Partially corrective disclosure, yes.

Q    And is it your opinion that the February 6th Wall Street Journal article was a partial corrective disclosure?

A    Yes.

Q    And do you recall in your May report, you criticized Professor Hubbard for focusing on the specifics of the news articles?

Do you remember that?

MR. HALL:  Objection.

**Page 228**

FEINSTEIN

A    I don't know if I characterized it that way.  The May?

Q    Yeah.  Direct your attention to paragraph 153 in the May report.

A    Paragraph 163?

Q    1-5-3.

A    153.

Oh.  Well, yes, but what I mean is like the -- the specific timing and event rather than the implications of what the timing and event indicated to the marketplace.

Q    Did you say "timing and event"?

A    Right.  I mean, I write that in 152.

"Professor Hubbard contends that Professor Feinstein fails to articulate how Vale's Securities prices would respond, if at all, to information indicating Dam 1 had a leak half a year before its collapse and that one mining dam expert certified Dam 1 was stable while two others

**Page 229**

FEINSTEIN

disagreed."

He says, "Professor Feinstein fails to consider that these cancellations of Vale's licenses were the result of materializations of disclosed risks that impacted operations and would reduce output and that would have occurred given a safety incident absent any misrepresentations or omissions."

He ignores whatever I write in 153.  He ignores what these articles told the public is that the company had important information that they withheld.

So it's not the specific information or the timing of the information or the timing of the leak, but, rather, that this indicated that there very well could be a pattern of the company having information that it withheld.

Q    It's the premium you are talking about here, right, that we

**Page 230**

FEINSTEIN

discussed earlier?

MR. HALL:  Objection.

A    No.  Just that -- well, I wouldn't call it a premium, necessarily.  Just told the marketplace that that -- this is informing the marketplace that they had been deceived, and that has economic implications.

Q    I thought we were agreed that we were going to call it a premium.

MR. HALL:  Objection.

Q    For purposes of this -- well, you know what I am referring to, though, when I say "premium," right?

That aspect of your analysis that accounts for a cover-up, reputational risk to the company, the nature of the conduct as revealed, the amount of surprise that that conduct provokes, that collection of considerations that we went through earlier.

MR. HALL:  Objection.

**Page 231**

FEINSTEIN

A    All right.  The language that we're using, or maybe agreeing to use, is not very precise.  But it's a shorthand for not having to say all that, I will go with it.

Q    Okay.

A    Again, I don't like calling it a "premium" because I did explain that it's the artificial inflation has to be considered in a cohesive manner, that this is why the price was inflated.  It was inflated for among other things those reasons too.

I don't like separating it out as a separate element.  At least, I didn't do that.  I explained why the inflation was what it was, but I didn't separate it out into a core and then a premium.

Q    Understood.  Understood.

So these two news articles on February 6th, they concern events from July 2018 and September 2018, correct?

A    Yes.

**Page 232**

FEINSTEIN

Q     And in your expert opinion, how could these articles concerning events in July and September 2018 have corrected any alleged artificial inflation that existed Vale Securities prior to July 2018?

MR. HALL:  Objection.

A     Because they contribute to an understanding that the company had chosen to withhold information that was important, and that was inconsistent with their public pronouncements about safety.

If they withheld this information, one would reasonably conclude or anticipate or expect that they had withheld other information. And that's why it corrects the misrepresentations and omissions, even the ones that were before those specific events.

Go back to the liar example. Not that I am calling anyone a liar here, but if you learn that someone

**Page 233**

FEINSTEIN

lied about X, but they're also saying things about Y, you might not trust them about Y anymore, even though all you learned is that they were lying about X.

Same thing.

Q    Okay.

You recall that in the Court's motion to dismiss decision --

(Clarification by the reporter.)

Q    -- you recall that he excluded January 26th, 27th, and 28th, 2019, as corrective disclosure dates.

Do you recall that?

A    I do.

Q    And do you recall why he excluded those dates?

A    He said that they didn't informationally correct what was alleged to have been misrepresented and omitted.

And so the events of those dates told the market about the

**Page 234**

FEINSTEIN

severity of the dam collapse, but the allegations are about the anticipated -- whether a dam collapse at all would be anticipated or the likelihood it would be anticipated.

Q   And did you -- do you agree with the Court's conclusion that there were no corrective disclosures on January 26th through the 28th, 2019?

MR. HALL:  Objection.

A   Well, of course.  I mean, that's why we have judges.  Their job is to judge.

So sometimes reasonable people can see things differently, and it requires a judge or an adjudicator to determine how we're going to proceed and see the -- and interpret the facts.

Q   Right.  My question is do you see it differently than the judge?

And just to help you out here.  The Court concluded that those three dates do not qualify as corrective disclosures because they are

**Page 235**

FEINSTEIN

not necessarily indicative of any

alleged misrepresentation or fraud.

          MR. HALL:  Objection.  Calls

   for a legal conclusion.

     A     Right.

     Q     As an economist, do you agree

with that conclusion?

     A     Well, I thought about it

hard.  And I think that what the judge

is saying is that those days spoke to

the severity, which is not what was

misrepresented in this case of an

incident.  So yes.

     Q     And even if the market

subsequently learned about the nature

of the alleged misconduct here, you

still believe that any investor losses

on the 26th, 27th, and 28th should not

be part of damages here; is that

correct?

          MR. HALL:  Objection.

     A     I think -- I'm not sure I

understand.

          I looked at what happened on

Case 1:19-cv-00526-EK-VMS   Document 142-14   Filed 06/14/24   Page 237 of 381 PageID #: 5052

**Page 236**

FEINSTEIN

those days. And I think that in light of how the stock price fell on those days, that's evidence that my inflation ribbon is conservative.

Because investors -- the amount the stock price may have fallen earlier on a full corrective disclosure may have taken severity into account.

But it's a ruling I understand, and I proceeded with my analysis accordingly.

Q Absent that ruling from the Court, just in your professional opinion, would the price drops on the 26th, 27th, and 28th fairly be part of the damages calculation here?

MR. HALL: Objection.

A It's hard to say. It's something that I would have looked deeply into and try to arrive at my own conclusion, independent of that assistance from the judge.

I'm not sure when it's hypothetical, what you are asking. We

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

**Page 237**

FEINSTEIN

have the judge's opinion and we have the judge's explanation.  Maybe discussion with my colleagues at Crowninshield, we would have arrived at the same opinion.

I would say that it's -- the set of facts in this case make the forensic analyst's job easier because there is a separation, a temporal separation between when the market learned of the incident itself and then later learned of the severity.

So if there is legal reasons to separate incident occurring from severity of incident, the facts of this case make that easy to do analytically.

Q    So going back to your previous response about January 26th through 28th in the stock -- the securities losses on those days, I just want make sure I'm clear.

You did not conduct any independent assessment of whether there were corrective disclosures on that

**Page 238**

FEINSTEIN

date, is that your testimony?

MR. HALL:  Okay.

A    Of whether to consider them corrective disclosures because that had already been decided.

Q    Okay.  The Court also decided specifically what the corrective disclosures here were, correct?

A    Yes.

MR. HALL:  Objection.

Q    You didn't limit your analysis to those specifically identified corrective disclosures, did you?

A    As I testified earlier, I answered that question earlier, no.  I locked beyond.  I looked earlier.  And I considered the intervening days as well.

But it was already decided. 26, 27, 28 were not included as corrective disclosures.

Q    I'm just trying to understand why you accepted the Court's conclusion

**Page 239**

FEINSTEIN

with respect to those three dates, but not with respect to any other date.

MR. HALL:  Objection. Mischaracterizes his testimony.

A    No.  I accepted the Court's conclusions entirely.

Q    Okay.

A    I didn't just do it blindly. I mean, I looked at a whole range of days, taking into account the Court's decision, taking into account Plaintiffs' allegations.

Q    Okay.  I'm really just talking about the Laranjeiras license suspension and then cancellation.  The Court has not recognized those as corrective disclosures, Plaintiffs have not alleged them to be corrective disclosures in the complaint.

But as I understand your testimony, you independently have determined that they were corrective disclosures?

MR. HALL:  Objection.

**Page 241**

FEINSTEIN

agree that damages in a securities class action should be limited to fraud-related price declines, correct?

A    The reason I'm hesitating is I think as an economist, I would describe it differently, because "fraud" has a specific legal definition.

That's my answer.

Q    I will direct your attention to paragraph 189 in your opening report at page 82.

A    Okay.

Q    What does paragraph 189 describe?

A    The traditional measure of damages computed for Section 10B cases. And there I call it "alleged fraud" and describe that it's a function of the economically determined but-for price compared to the actual price.

So I'm not saying -- the word "alleged" is important there.

Q    And is it your testimony that

Page 242

FEINSTEIN

you applied this measure of damages here?

A    Well, it's done on a per-share basis, my calculations.

And I also explain that there are constraints on the computation provided by case and statutory law, that it's not simply the difference between -- it's not simply the -- it's not only -- it's not constrained or restricted, the damage measure -- I'm sorry.  Let me say it better.

The damage measure consistent with case law and statutory law is that damages are going to be the lesser of the change in artificial inflation over the investors' holding period and the actual investment loss suffered, subject to other constraints such as the DURA cap or the bounce-back provision of PSLRA 1995.

So the out-of-pocket measure is the basis of it, but there's some statutory amendments.

**Page 243**

FEINSTEIN

Q    Okay.  In performing your analysis here, did you use the fraud-related price declines elicited by the identified corrective disclosures to measure the amount of inflation in Vale Securities?

A    Well --

MR. HALL:  Objection.

A    -- I will -- every time we say "fraud related," I would want to add "alleged" because I'm not making a determination as to whether there was fraud or not.

But with that insertion, yes, I did.  And for reasons that I explained.

Q    And you would agree that even if the stock price decline upon disclosure combines disclosure of previously concealed risks with realizations of known risks, and only some of this information is corrective of the fraud, valuation tools can be applied to appropriately separate the

**Page 244**

FEINSTEIN

effects?

MR. HALL:  Objection.

A    Well, they can be if it's necessary to.  It might not be necessary or appropriate to, but certainly valuation tools can be applied to separate the effects, if the case is one where that information is available, either through discovery or through the nature of the corrective disclosures.

I mean, in this case, the company never said what the probability of a dam collapse was.  That wasn't the corrective disclosure at all.

I think it -- it sounds like what you are reading is something I wrote.  And it would have been prefaced by saying depending on what comes out in discovery, if appropriate, one can do that.

Q    And that caveat about discovery, does that include expert discovery, in your opinion?

**Page 245**

FEINSTEIN

A    Oh, I take expert discovery into account.  I read what defendants' experts are saying and if see if some of it makes sense.

I have modified my opinions in the past based on that.  I write in my report that I might do that.  It wasn't appropriate to do that in this case.

Q    So if I understand your testimony, subject to what you can glean from fact and expert discovery, an economist can use valuation tools to separate out the effects of the disclosure of previously concealed risks with realization of known risks, correct?

MR. HALL:  Objection.

A    Well, also depending on what the facts of the case are.  If that's the nature of what the misrepresentations or omissions are, and if that information was ever provided to the marketplace, or even

**Page 246**

FEINSTEIN

ever provided in discovery so that it's available to the forensic expert, then one could do that.

Q    Okay.

A    I could -- looks like that's what Stephenson tried to do, but he was just making up his numbers and so his conclusions are entirely unreliable, if not preposterous.  But it looks like he tried to do that and that's just evidence that the economists realized that it's possible to do it right, and he just did it wrong.

Q    Okay.  And you are aware that Plaintiffs have retained Professor Cain to provide expert testimony in this matter, right?

A    No.  I'm not.

Q    You are not aware of that?

A    I answered that earlier this morning.

Q    I asked if you knew him.

A    No.  You asked if I knew he was retained, and I said I didn't know.

**Page 247**

FEINSTEIN

Q    So you are first learning of this today?

A    Today, yes.

Q    Okay.  So I take it you haven't read his report?

A    Correct.

Q    And so you are not aware that Professor Cain stated in his expert report here that "Some portion of the analyst reductions to free cash flow projections relate to information about Plaintiffs' allegations, while some portion relates to the realization of the known risk of dam failure."

You weren't aware of that?

MR. HALL:  Objection.

A    No, I am not aware that he wrote that.

Q    Sitting here today, do you --

A    But I think if that's what he wrote, it looks like he is also falling into perhaps the same trap or error that Stephenson and Hubbard made when they didn't take into account that the

**Page 248**

FEINSTEIN

numerator of that equation, which is forecasted cash flows, would be severely comprised, impacted, when the market learned -- if the market ever learned that there was a major information asymmetry.

So, I mean, if you are representing his opinion correctly, I would have to say that that's not the correct measure of damages.

Q    I'm not asking you if it's a correct measure of damages.

I am asking you if you agree with his observation that some portion of the analyst reductions reflected the realization of the known risk of dam failure?

MR. HALL:  Objection.

A    Let me hear it again, please.

Q    Yeah.

My question -- I'm not asking you if it was -- if he is articulating a correct measure of damages.

I'm asking you if you agree

**Page 249**

FEINSTEIN

with his observation that some portion of the analyst reductions, in the wake of Dam 1's collapse, reflect that the realization of the known risk of dam failure?

MR. HALL:  Objection.

A    I would really need to see it in context.  I mean, it sounds like you are giving me an excerpt out of context of some analysis.

The appropriate model to calculate damages in this case would not need to separate out those elements.  So I don't have an opinion as to that.

But the entire decline that occurred is an indication of what the decline would have been if the market had learned the truth earlier.  The entire decline, I explained why that is.  The entire decline would include -- on January 25th, and February 4th, and February 6th would include the reductions to expected cash

Page 250

FEINSTEIN

flows for all reasons.  And that would be an indication of what the decline in the price would have been had there been timely full disclosure earlier than the dam collapse.

So I didn't need to separate it out.  I don't think it's appropriate to separate it out.  I think the combined effect of the statistically significant stock price declines should be considered and should be considered an indicator what the stock price decline would have been timely with disclosure earlier.

Q   You agree that investors during the class period knew that there was always some risk of a dam failure at Vale, correct?

MR. HALL:  Objection.

A   I would agree with that, but certainly they were misinformed about that degree, according to the plaintiffs' allegations.

Q   Right.  I was just reading

**Page 251**

FEINSTEIN

from your report.

The quote is "Investors knew that there was always some risk of dam failure before Dam 1 collapsed."

A    Where are you reading from?

Q    It's in your Stephenson rebuttal report, page 6, paragraph 20.

A    Then I write that "Knowing that dam failure and the potentially catastrophic consequences could conceivably happen is why facts, conditions, conduct, and company representations about dam safety are economically material to investors."

Q    Okay.  So --

A    So properly assessing and having the information to properly assess is important.  And investors would not have appreciated if they had learned that they were derived of that information.

Q    Focusing -- refocusing you on the existence of a disclosed risk of a dam collapse throughout the class

**Page 252**

FEINSTEIN

period --

A    Okay.

Q    -- nowhere in your opening report do you address the concept that Dam 1 collapsing was the realization of that disclosed risk, correct?

MR. HALL:  Objection.

A    Well, at this hour, it's a little bit hard to keep track of where I expressed which opinions, but --

Q    Okay.  So I will try and make this easier for you.

I will represent to you that nowhere in your opening report do you acknowledge that the collapse of Dam 1 in any way reflected the realization of a disclosed risk.  Okay.

So my question for you is why didn't you not?

MR. HALL:  Objection.  Asked and answered.

A    Because that would have severely underestimated damages.  You'd be ignoring the fact that a timely

**Page 253**

FEINSTEIN

corrective disclosure would have included the fact that investors were deprived of the information they would have needed in order to assess that risk.

Q    You just stated that it would --

A    And they were deprived -- according to the plaintiffs' allegations, they were deprived of the information needed to assess that risk that it was conceivable there could be a dam collapse was certainly disclosed, but the information necessary to determine whether it was going to happen or might happen or how likely it would happen was apparently deliberately withheld from the marketplace.

And that's what this case is about.  How does that -- and that's what economic analysis has to address, how does that program of depriving the investors affect the stock price and

**Page 254**

FEINSTEIN

the but-for price.

Q    You testified at the beginning of this answer that it would have severely underestimated damages to calculate how much of the stock drop was the realization of the disclosed risk.

Do you remember that?

A    I said that, but also we don't -- that probability was never disclosed.  It wasn't part of the corrective disclosure.

Q    Okay.  So how do you know, sitting here today, that it would severely underestimate damages if you never did the analysis?

MR. HALL:  Objection.

A    Because I know that there is a big difference between worst-case scenario of an incident, because worst-case scenario -- because this was not the worst-case scenario.

There -- even the analysts at the time were saying that the Samarco

**Page 255**

FEINSTEIN

accident or incident was much worse, in terms of pollution and quantities of tailings that were released into the environment.

Loss of life was greater, but it certainly could have been a much worse accident.  And so worst-case scenario had to have been worse than what actually did occur.

And what we -- to use what did occur, what happened to the stock price that -- to use what happened to the stock price when the -- when it became known that there was an incident to measure the inflation earlier is a lower bound.  I mean, it's used as a lower bound.

Q    You understand that plaintiffs are not alleging here that Vale concealed the existence of the risk of a dam collapse, correct?

MR. HALL:  Objection.

A    Depends on how you are defining "risk."  They clearly say that

Page 256

FEINSTEIN

the risk was -- the true risk was

concealed.  That's what they say.

Q    Right.  And what I'm sort of

getting at is the concept of the

existence of a risk and the

likelihood -- or I think you used the

phrase "magnitude."

I want to make sure I

understand what you mean when say

"magnitude of the risk."

A    To what extent it should have

been anticipated and would have been

anticipated.  They don't -- yeah.

I think Plaintiffs do

recognize that the company never said a

dam break could never happen.  But what

this case is about is that they said a

lot to conceal from the public the

conditions that would -- and the

information necessary to assess that

risk, and that that risk was so

substantially greater than what the

market was led to believe.

Q    Did you review the company's

**Page 257**

FEINSTEIN

disclosures concerning the risk of a dam collapse?

A    Which one?  You mean disclosures to the public or --

Q    Yes.

A    -- or internal documents?

Q    To the public.

A    Yes.  The sustainability reports I looked at, for example.

Q    Did you look at the annual reports?

A    Yes.

Q    Quarterly reports?

A    Yes.

Q    Did you specifically look at the risk factors where it discussed the risk of dam collapse and all the potential consequences of that?

MR. HALL:  Objection.

A    Yes.

Q    And did you also look at the risk disclosure where it talked about these things can happen as a result of negligence or some employee not doing

**Page 258**

FEINSTEIN

their job?

MR. HALL:  Objection.

A     Right.  I considered all that as part of my opinion because it made clear that this issue was economically material to the company and investors.

I wrote about that.

Q     Okay.

So what about the risk of a dam collapse -- can you summarize for me your understanding of Plaintiffs' allegation what exactly about the risk of a dam collapse was concealed by the company, not the existence of that risk, but what?

MR. HALL:  Objection.  Vague.

A     That the information they had, about how likely it was, was being concealed from the public and misrepresented to the public, is the main thing.

I mean, and as the judge characterized it, there was a deliberate and concerted effort to

Page 259

FEINSTEIN

mislead the public about that risk.

Q    Okay.  So the likelihood of the risk was misrepresented?

A    No.

Q    That was your --

A    Just the likelihood of the risk, but also that there was a campaign, an ongoing campaign to deprive people of the ability to calculate the magnitude of the risk.

Q    And what do you mean by "magnitude of the risk"?  The likelihood or something more?

A    Right.  It's not just the -- there was never a number that the company disclosed to the public that was a number that Plaintiffs are saying should have been disclosed earlier, a specific probability.

It was that they mischaracterized conditions to an extent that whatever estimate investors would have come up with would have been far too low.

**Page 260**

FEINSTEIN

And they also caused investors do not know that they were being misled and that there was more information they could have had that would have been relevant.  That there was huge information asymmetry that was being concealed.

Q    And that huge information asymmetry was about the likelihood of a dam collapse, correct?

A    Well, about a lot of factors that played -- a lot of factors related to that likelihood.

Q    Okay.

A    Whether or not the certifications, for example, were independent and honest is one thing.

I mean, the asymmetric information literature speaks to -- there is a heavy emphasis in there on the value of third-party certifications and how third-party certifications are important and material.

So I know from reading

**Page 261**

FEINSTEIN

analyst reports that analysts investors thought there were independent third-party certifications.  The plaintiffs' allegations are that these third-party certifications weren't independent and may have been coerced.

So it's not just about a number.  It's a pattern of behavior with apparent intent to conceal a wide range of conditions and behavior and conduct and priorities from the public.

Q     All of which --

A     It's not just a number.

Q     All of which speak to the likelihood of a dam collapse, correct?

MR. HALL:  Objection.

A     No.  Well, yes.  They all do. And they also speak to the reputation of the company, whatever reputation is warranted about how much you can trust the company about its representations, in general.

Q     Anything else?

A     That's that comes to mind.  I

**Page 262**

FEINSTEIN

will stand by what's written in the report.

Q    You would agree that investors during the class period had a sense of potential financial consequences that would follow a dam collapse, correct?

MR. HALL:  Objection.

A    I mean, I think you could say that at any point in time, they would have a sense of a range of consequences.

I think that's fair to say.

Q    And they would also have a sense of the potential regulatory consequences of a dam collapse?

MR. HALL:  Objection.

A    Yes.

Q    You said a few times today already that Vale never publicly disclosed a specific number quantifying the risk of collapse of Dam 1 or any other dam, right?

A    That's right.

**Page 263**

FEINSTEIN

Q    Okay.  Is it your opinion that investors were incapable -- assuming no allegations of misrepresentations, is it your opinion that Vale investors were incapable of calculating the likelihood of a dam collapse and the intended financial consequences of that?

MR. HALL:  Objection.

A    I need to know more about your question.  When you say assuming -- what did you say, "assuming no representations"?

Q    Set aside the complaint here. I'm just saying -- you keep returning to this notion that Vale never gave investors a specific number to use.

My question for you is did they need a specific number to assess the likelihood of a dam collapse and to quantify that, applying basic math?

MR. HALL:  Objection.

A    Well, they would need a much more honest, richer, and forthcoming

**Page 264**

FEINSTEIN

pattern of disclosures to do it correctly and accurately.

I mean, but when you say -- I'm still having -- I think it's ambiguous, your question.

When you say setting aside the complaint, are we setting aside the facts as they actually occurred? Or are we assuming a hypothetical where what the company said was actually true? Or are we assuming a hypothetical where the conditions were what they were, but the company was forthcoming about them?

So there's three versions of your question. I'm not sure which one to answer.

Q    Okay. I'm really just getting at the question of whether, in your opinion, investors -- let's take it out of Vale for a second. Might make it easier.

Investors in a mining company are equipped to assess the likelihood

**Page 265**

FEINSTEIN

of a catastrophic operational accident, irrespective of the company providing them with some specific number.

MR. HALL:  Objection.

A     No.  They would need, from the company, the information that they, in this case, repeatedly asked from the company, such as what is your commitment to safety and stability? What are you doing to ensure safety? Are there third-party certifications? What do the third-party certifications say?

They would need that information too.  And it would need to be distributed to them correctly and accurately.

Without that, they would know -- without that there would be a wide range of uncertainty around any point estimate they might even possibly come up with.

Q     Sir, in your view, don't investors frequently assess the

**Page 266**

FEINSTEIN

likelihood of theoretically remote events occurring at a company they invest in?

MR. HALL:  Objection.

A    If it's economically material, the remote potentially adverse incident, they usually ask the company for help and they expect honest answers.

Q    Did you perform an assessment of what the market thought the likelihood of risk of collapse was at Vale during the class period?

MR. HALL:  Objection.

A    Well, I looked to see if there ever was the kind of information provided to the marketplace that the marketplace would need, and I saw that there wasn't.  That's why I'm skeptical about Mr. Stephenson's analysis.

I would -- even if -- I would use a number if there was one, but there wasn't one provided.

No, I didn't independently

**Page 267**

FEINSTEIN

try to compute that probability.

Ultimately, given the facts of this

case and what was disclosed with the

corrective disclosures, I determined it

was not necessary to do so.

Q    Did counsel provide you with

any assumptions for your report

concerning the risk of Dam 1 collapsing

during the class period?

MR. HALL:  Objection.

A    I asked if there was -- I

asked if there was that information

available.  I observed that in the

complaint, there was a report that

could be -- that the company was

informed that it could be as high as

50 percent.

There was a couple of places

that said that based on a safety

metric, that it was basically a coin

toss whether there would be a dam

collapse or not.  That a Geoconsultore

evaluation determined the risk was so

high that the metrics that they

**Page 268**

                    FEINSTEIN

provided would -- could be interpreted

as requiring a Level 3 emergency

evacuation.

          I mean, I asked what they

knew about it, but I didn't have the

information to assess that probability.

I was quite sure that the probability

that Mr. Stephenson used is incorrect,

and I explained that in my report.  It

has to be too low.

     Q     Are you done?

     A     Yeah.

     Q     All this information you just

described that counsel provided you or

you think you read in your complaint,

did you rely on any of it in performing

your analysis here?

          The coin toss, for example,

did that factor into your analysis

here?

     A     It factored into the -- not

the number, not the metric, but that

there was evidence of elevated risk

that the company knew about that they

**Page 269**

FEINSTEIN

were withholding from the start of the class period.  That's something I relied on.

Q    And you -- your understanding is the allegation there was 50 percent risk of the dam collapsing throughout the class period?  Is that your testimony?

MR. HALL:  Objection.

A    No.  No, that's also not what the plaintiff said.  They said there was some data available that could be interpreted that way, not that that was a firm opinion or allegation or assertion.

THE WITNESS:  Can we take a break now?

MR. JORALEMON:  Yes.  Sure.

VIDEOGRAPHER:  This will end Media Unit 5.  Going off the record at 3:41.

(Whereupon, a brief recess was taken.)

VIDEOGRAPHER:  We're back on

**Page 270**

FEINSTEIN

the record at 3:55.  This will begin Media Unit 6.

Q    Professor Feinstein, you attribute 100 percent of the loss on January 25th, 2019, to the alleged fraud here, correct?

A    That's not exactly precise. I use the drop that occurred on that day as an indication of what the inflation was earlier.

Q    Okay.

A    So, in effect, investors did lose that money, but that magnitude of that drop gauges -- helps me gauge what the inflation was and how much money -- how much the stock price would have fallen earlier on an earlier corrective disclosure or an earlier but-for disclosure.

Q    Okay.  So rephrase. 100 percent of the investor losses that day you include in your damages here, correct?

MR. HALL:  Objection.

FEINSTEIN

A    Again, I think the better way to say is that the inflation that I estimated is commensurate with 100 percent of the loss suffered that day.

Q    Okay.  And if I understand your prior testimony, you -- with respect to the loss suffered that day, January 25th, you took no steps to disaggregate how much of that loss was attributable to the realization of a disclosed risk, correct?

MR. HALL:  Objection.

A    Well, the econometric -- the economic model doesn't call for that disaggregation.  The economic model uses that drop as a gauge of a floor, minimum amount, that the stock price would have fallen if investors had learned earlier that they were being deprived of the information to anticipate that event.

Q    Why was it a gauge of a floor for the minimum amount?

**Page 272**

FEINSTEIN

A    Because had investors known earlier that there was this campaign to mislead them about risk, they would have thought, hmm, what the company is hiding from us must be pretty severe. Otherwise, it would be rational for them to disclose to us rather than keep us in the dark about it, given that we would bake into our pricing of the securities a worst-case scenario.

So seeing what the stock price fell on January 25th tells you a floor for what a worst-case scenario would look like. And, therefore, that is a gauge of what the price drop would have been had they learned earlier they were being deceived.

Q    So is it your testimony that the loss on January 25th reflects investors' pricing in a worst-case scenario of the company?

A    No, not at all.

MR. HALL:  Objection.

THE WITNESS:  Sorry.

**Page 273**

FEINSTEIN

A    Not at all.  It's a floor. Worst-case scenario would have been much worse.  So this is a conservative estimate of a worst-case.  I mean, this is much lower and, therefore, a conservative estimate of a worst-case estimate.

Q    Okay.

A    Together with the other two declines from the other two corrective disclosures.

Q    I was getting confused by the floor/ceiling, which way you are going.

So in your expert opinion, there is -- there can be variation in this principle of what a worst-case scenario is that investors assume. There is a range of worst-case scenarios?

MR. HALL:  Objection.

A    Well, from the perspective of the forensic financial analyst who has to estimate what investors would have believed or would have forecasted,

**Page 274**

FEINSTEIN

yeah, there is a range and then there is a correct number.

Forensic financial analyst has to ascertain what the investors at the time would have considered to be a worst-case scenario and what the economic implications of it would be.

How much -- when we see how much the stock price did fall upon the actual event, and we know that that's not the worst-case scenario, we know we have a floor, a conservative estimate of what they would have done to the stock price if they had learned earlier they were being deprived of the information they needed.

Q    So then -- it's a misnomer then, isn't it?  It's not really a worst-case scenario that investors are pricing in?

MR. HALL:  Objection.

A    No, no.  I'm saying they would have priced in a worst-case scenario.

Page 275

                    FEINSTEIN

          My estimate of what that

number is is way low.  It's a

conservative estimate.

     Q    So it's not a worst-case

scenario?

          MR. HALL:  Objection.

     A    It's much better than a

worst-case scenario.  It's not as bad

as a -- it's a conservative estimate.

It's a floor for what the worst-case

scenario might have been.

          We know that the accident

could have been worse.  But we know

that investors -- well, and so we know

that they probably would have priced in

a more severe discount had they known

what came to be known.

     Q    Right.  But upon what are you

basing that?  It just sounds like

speculation to me.

          I'm trying to understand -- I

apologize.  I know it's late.  I could

be dense at times.

          I understand the general

**Page 276**

FEINSTEIN

economic principle that you are articulating.  That in the absence of information, investors will price in a worst-case scenario.  They don't know what they don't know.

A     Well, could I interrupt?

MR. HALL:  Objection.

A     It's not just the absence of information.  It's the knowledge they're being deprived of the information.

Q     Okay.

A     Had they become aware of that gain theory, rational expectations, market efficiency, asymmetric information theory tells you that it would have been rational to figure that if we're being deprived of this information intentionally, the situation must be much worse, must be pretty bad.  And they would price in a severe discount.

Q     Right.

A     So it's not speculation to

**Page 277**

FEINSTEIN

say that I'm going to ground my estimate of what they would have estimated.  The forensic financial analyst has to estimate what they would have estimated.  Okay.

And it's not pure speculation because I know what happened to the stock price when they did learn the truth, and it fell.  And so I use that as an estimate as the basis for the estimate.  And I can tell you it's a conservative estimate.

Q    Okay.  But applying that principle here on January 25th, why wouldn't it have been reasonable for investors to assume that multiple Vale dams were on the verge of collapse?

A    That's a good question.  I know the answer to that, though.

Because they did not yet know that they were being deprived of information.  They started -- like I told you earlier, they -- this realization came about slowly and may

**Page 278**

FEINSTEIN

not have been complete, even after the

full three events.

They began to suspect it, and

we saw the quote from the president of

Brazil where it seems that he began to

suspect it, but they hadn't finished

concluding it.

Q     Okay.

A     That's why.

Q     Other than the quote from the

president of Brazil, upon what do you

base your conclusion that on

January 25th, investors began to

suspect that they may be deprived of

information?

A     I have got pages of quotes

from the analysts after the event where

they're expressing surprise.  So

they're not saying, like, "Oh, we were

apprised of this risk and then it

happened.  Oh, well."  They didn't say

that.

They said, "We're very

surprised.  We're very surprised,

FEINSTEIN

given" -- they even said, "Given what the company told us they were doing to mitigate risks, we're very surprised in light of that."

Q    Okay.

A    And that tells me that they were starting to suspect that maybe they were fed misinformation.

Q    Okay.  Expressions of surprise?

A    Yes, mostly.  But also where they say, "We're surprised because we understood the company was trying to mitigate these risks.  We were told that the company was mitigating these risks."

Q    Okay.  So back now to the realization of disclosed risks.  What happens to that in your analysis?

Does it just get dwarfed by this worst-case scenario articulation?

Because you would agree with me that some percentage of the losses on January 25th reflected that the

**Page 280**

FEINSTEIN

realization of a disclosed risk, correct?

MR. HALL:  Objection.

A     Well, I think you are looking at the analysis either backward or inside out.

To calculate damages, we need to assess what the stock price would have done had there been disclosure as an earlier date.  It would have fallen. It would have fallen a lot.

It would have fallen a lot, commensurate with how much it did fall, notwithstanding that some components of that might be a realization of disclosed risk, and some component would be realization of undisclosed risk.

The bundle is a good measure of the consequences that would have been anticipated by investors had they learned earlier they were being intentionally deprived of this information.

**Page 281**

FEINSTEIN

Q    Okay.  So do you have an opinion as to what would have happened on January 25th with respect to Vale Securities if Vale never had made -- and didn't even make any of the alleged misrepresentations, there is no corrective disclosure.  There is no affirmative statements made.  They just didn't exist.

As an economist, do you have a view as to what would happen to the securities on the day of the collapse?

MR. HALL:  Objection. Speculation.

A    Well, let me first make sure I understand the hypothetical correctly.  So you're saying conditions of the company would have been as bad as they turned out to be.

That's what you're saying?

Q    Correct.

A    But the company just remained silent about it?

Q    Correct.

**Page 282**

FEINSTEIN

A    That's not what happened.  I didn't analyze that, specifically.

Instead, what I analyzed is what would have happened if they had made -- if they had fulfilled -- what Plaintiffs were saying was an obligation to disclose, if they had fulfilled that obligation to disclose by disclosing the full truth on an earlier date.

I didn't analyze what would have happened in the case of your hypothetical.

Q    I understand.  And I'm just asking, as an economist, do you have a view -- do you have an expectation as to what would have happened to the stock -- to the securities price?

Would it have fallen by the same amount?  By less?  By more?

Or do you just not know?

MR. HALL:  Objection.

A    I don't know.  I'm tempted -- somewhere between I don't know and I

**Page 283**

FEINSTEIN

have some idea.  It would be easier for me to say "I don't know."

But given that what we know on January 25th also is that the market learned about the incident but not the severity of the incident, and they had not yet fully learned that they had been deprived, I think it would fallen less, given that, had there been absolute silence.

But I think that's an irrelevant -- well, I know you are going to say it's relevant, but I think it's an irrelevant hypothetical, because the allegation is also that there was a duty to disclose once the company was speaking on these matters.

And I calculated what the economic impact would have been if they had fulfilled that duty to disclose.

Q    Okay.

A    But there would be probably less reputational damage.

Q    Okay.  Let's talk numbers for

**Page 284**

FEINSTEIN

a minute.

You recall seeing the figures .01 percent and .03 percent annual failure rates?

A    I saw them --

MR. HALL:  Objection.

A    -- in Mr. Stephenson's report.

Q    Okay.

And you recall in your reply to Mr. Stephenson, you concluded that those figures are not likely correct?

A    Yes.  I said that.

Q    Okay.

Upon what basis did you offer that conclusion that they were not likely, correct?

A    Well, my recollection is that his numbers were about one dam alone when he spoke of those numbers.  And this case is about -- well, the alleged misrepresentations were about practices, policies, disclosures pertaining to all the company's

Page 285

FEINSTEIN

properties.

But also it's just with .01 or .03 percent, so 3 out of 10,000, it just seems unlikely that you then have two major events in such a short time frame.

Q    Any other reason for your conclusion that those figures are not likely correct?

A    Yes.

Q    What are you looking at?

A    I have pages written about it in my April 7th report, all the way from paragraph 28 to 38 on exactly that topic.

The heading in my report is "The Probability Magnitude that Mr. Stephenson Asserts to be True is Unrealistically Low," and 10 or 11 paragraphs there with reasons.

Q    Okay.  I think you testified earlier you are not a geotechnical risk expert, correct?

A    Correct.

**Page 286**

FEINSTEIN

Q     And that you yourself didn't calculate the probability of failure for Dam 1, correct?

A     Correct.

Q     Are you aware that those .01 percent and .03 percent failure rates are in the complaint?

A     Well, the number is.  But I think the interpretation of the number is different in the complaint than it is in Mr. Stephenson's report.

And I explain that, too, in my report.

Q     Okay.

A     .03 is mentioned because it's outside the tolerable range.  I don't think pointing out that it's outside the tolerable range means that anyone is asserting that that's the correct number, for example.

Q     Is it your understanding that Plaintiff has asserted that that's not the correct number here?

MR. HALL:  Objection.

**Page 287**

FEINSTEIN

A    That's my understanding, that Plaintiff is not asserting that .03 percent was the correct and true probability of dam failure.

Q    And upon what are you basing that?

A    They told me.  I mean, I asked.

And also, I read the documents.  And reading them correctly, that's not what they say.

By "Plaintiffs telling me," I mean Plaintiffs' counsel.

Q    Now, you had testified a moment ago one of the basis for your conclusion that those figures are incorrect was the close-in-time failure of Fundão Dam, correct?

A    Right.  I mean, if it really was remote -- I mean, Mr. Stephenson characterizes both of these numbers as being remote possibilities.  It's hard to fathom that two extremely remote events would happen so close in time.

FEINSTEIN

So -- two similar and remote events would occur.

Q     Are you familiar with the concept of "erroneous probabilistic reasoning"?

MR. HALL:  Objection.

A     Not by name, but I know what "erroneous" means, and I know what "probability" means, and I know what "reasoning" means.

Q     Okay.  You had indicated that earlier you reviewed a report by Dr. Oboni in this case, correct?

A     Yes.

Q     Okay.  Do you recall in that review, that Dr. Oboni stated that "Rare events can happen two years in a row or even twice or more in the same year"?

A     Well, they could, but it's got low probability.

And I just want to have in the record, Bayesian statistics is something that also has to be brought

**Page 289**

FEINSTEIN

to bear here, Bayesian statistical

reasoning, which is that you can update

your understanding of a situation based

on things that are realized.

And two remote events are

conceivable.  But they would suggest

that the probabilities were not remote,

based on Bayesian statistical

reasoning.

Q    Are you an expert in Bayesian

statistical reasoning?

A    Yes.

Q    Okay.  Are you offering an

opinion in this matter on Bayesian

statistical reasoning?

MR. HALL:  Objection.

A    Well, I did offer the

opinion.  I want to read it exactly as

I wrote it.

Paragraph 36, "The

0.03 percent probability figure is

likely far too low because it is not

reasonably compatible with the company

experiencing two catastrophic dam

**Page 290**

FEINSTEIN

failures within such a short amount of time."

So that's a conclusion -- I mean, it's expressed here kind in lay terms.  But the formal statistical analysis of -- essentially, I'm doing implicitly here, and everyone does it. That's the whole idea of Bayesian reasoning, is it's the way people generally update their prior understandings based on things they observe.

Bayesian reasoning supports that conclusion.

Q    Did you do any statistical analysis in support of your observation in paragraph 7 -- 36 of --

(Clarification by the reporter.)

Q    I asked if you did any statistical analysis in support of your observations in paragraph 36 of Exhibit 21?

MR. HALL:  Objection.

**Page 291**

FEINSTEIN

A    Well, I reviewed statistical analyses in other documents and confirms that there would be a low probability of two events happening if the probabilities were so remote.

Q    Did you identify those documents --

A    Yes.

Q    -- in appendices to Exhibit 21?

A    I'm pretty sure I did.

(Clarification by the reporter.)

Q    Let's take a look at page 13.

A    Well, I don't recall.

I mean, I remember thinking about this, whether it would be possible or probable, and arrived at the conclusion that it wouldn't be.

Q    Is this something you just did in your head?

MR. HALL:  Objection.

A    I think -- I know I saw some other analysis of it.  I don't recall

FEINSTEIN

where I saw it.  Maybe it was in
Mr. Oboni's report, or maybe it was
Mr. Stephenson's.

Q    Okay.  So assuming for sake
of discussion that the .03 percent was
an accurate articulation of the
probability of failure of Dam 1, would
that information impact, in any way,
your loss causation or damages analysis
here?

MR. HALL:  Objection.

A    Makes you wonder if it was so
remote, why the company engaged in a
campaign to keep it secret.

So your hypothetical,
assuming it's correct, is a little hard
to swallow.  Doesn't seem to be
consistent with the facts that the
company did, apparently, or at least
allegedly, kept that number secret.
And that seems to run contrary -- the
opinion or characterization that it's a
remote probability is inconsistent with
the company's behavior.

**Page 293**

FEINSTEIN

I don't think it would change anything as far as the calculation, because whatever reason it is that the company chose to keep it secret, whether because they thought .03 was just too high to disclose or because they thought .03 would force the government to shut down their mines and their dams, or because the company thought it was much higher than .03, whatever the reason was, if the market knew they were doing that, keeping it secret and withheld from them, they would have imposed the severe price discount on the securities that I explained.

So the answer is, no, it wouldn't change the calculation of damages.

Q    Is it your understanding that the allegations are that the company engaged in a campaign to keep the .03 percent figure secret?

MR. HALL:  Objection.

**Page 294**

FEINSTEIN

A     Well, no, because I never said it was 0.03.  I said that I don't think that 0.3 [sic] is a reasonable number.  So, clearly, that's not my opinion --

(Clarification by the reporter.)

A     -- is that's that the campaign was intended to keep a number of 0.03 percent concealed.

What I'm saying is that a good characterization of the allegations is what the judge wrote, that if proven, plaintiffs' allegations would show a deliberate and concerted effort to mislead the public.

The allegations plainly reveal that defendants fabricated their statements about Vale's safety and risk management practices, Vale's commitment to safety and sustainability, and the stability of Vale dams.

And then I proceeded to calculate damages based on those

**Page 295**

FEINSTEIN

allegations.

Q    Okay.  So my question was really just recalling your prior answer.

You stated "Makes you wonder if it was so remote," which referring to the .03, "why the company engaged in a campaign to keep it secret."

Do you remember saying that?

A    That was all in the context of the hypothetical --

Q    Understood.

A    -- that you put on table.

Q    Understood.

A    So if that hypothetical was true, it would make you wonder why did they need to keep it secret.

Well, there are a couple of good reasons.  I mean, not good reasons but good explanations.

But they don't -- the fact would remain that they did.  I mean, under your hypothetical, if that's what they were concealing -- well, under

**Page 296**

                    FEINSTEIN

your hypothetical, that would be what

they were concealing.  That's what I

mean to say.

          That's your hypothetical.

Your hypothetical is they were

concealing a 0.03 percent probability.

Makes you wonder why they want to do

that.

     Q    I'm sorry, that wasn't my

hypothetical.  My hypothetical simply

was assume that that figure is

accurate.

     A    Well, I'm assuming that, and

I'm assuming Plaintiffs' allegations

that there was this deliberate and

concerted effort to keep that number

and the facts away from the public.

     Q    Okay.

          Isn't the true likelihood of

Dam 1 collapsing during the period

relevant, in any way, to your loss

causation and damages analysis?

          MR. HALL:  Objection.

     A    Sure, it's relevant, but it

**Page 297**

FEINSTEIN

doesn't --

Q    How is it relevant?

A    It's relevant, but because it's overridden by the estimations and anticipations of the economic agents in this economy, it turns out that it doesn't feed into the computation formula for damages.

It's relevant, but it doesn't -- it's not an argument in the correct equation.

MR. JORALEMON:  Okay.

Take a quick five-minute break, go through my notes.

MR. HALL:  Sure.

VIDEOGRAPHER:  This will end Media Unit 6.  Going off the record at 4:23.

(Whereupon, a brief recess was taken.)

VIDEOGRAPHER:  We're back on the record at 4:36.  This will begin Media Unit 7.

Q    Professor Feinstein, is it

**Page 298**

FEINSTEIN

your opinion that there was full corrective disclosure of the alleged wrongdoing here as of February 6th, 2019?

MR. HALL:  Objection.

A    No, that's not my opinion.

Q    Okay.  So it's your opinion, just corollary to that, that there was only a partial corrective disclosure as of February 6th, 2019?

Is that your opinion?

MR. HALL:  Objection.

A    No, that is not my opinion.

Q    Okay.  What is your opinion with respect to the degree of corrective disclosure as of February 6th?

A    Well, the January 25th was a corrective -- a partially corrective disclosure.  So was February 4th.  And February 6th may have been full; it may have been partial.  Doesn't matter.

The damages were sustained on account of those three corrective

**Page 299**

FEINSTEIN

disclosures.  That was my conclusion.

Whether there may have been other corrective disclosures later, I can't opine one way or the other.

Q    Well, do you have an opinion, as an economist, whether the alleged fraud was fully revealed as of February 6th?

MR. HALL:  Objection.

A    I am pretty sure that not all elements of it were because some investigations were conducted subsequently that uncovered more elements of what's considered alleged fraud.

Q    Okay.

Could I have you look at paragraph 68 of your May reply report Exhibit 22.  Are you there?

A    Yes.

Q    Okay.  I want to ask about one sentence.

Specifically, what do you mean when you say, "It is incumbent on

**Page 300**

FEINSTEIN

the finance expert to consider the valuation effects of an honest but-for disclosure that provided the same previously concealed information as the actual corrective disclosure"?

A   What I mean there is that in order to capture and measure the damages that were actually sustained, one would have to consider a but-for disclosure that revealed to the marketplace what was, in fact, revealed to the marketplace by the actual corrective disclosures.

And I don't think Professor Hubbard did that.

Q   And the actual corrective disclosure here took place on January 25th, February 4th, and February 6th; is that right?

MR. HALL:  Objection.

A   That's right.

Q   Okay.

You agree with the general proposition that something that is

**Page 301**

FEINSTEIN

often true is not necessarily true in a particular case?

MR. HALL:  Objection.

A    If you forgive me, I just really would like to add to my last answer and just make sure it's clear, because I am thinking about -- that it might appear unclear on the record.

That the piece of the corrective disclosure that Mr. Hubbard -- that Dr. Hubbard leaves out from the actual disclosure is that the market began to learn they were deliberately misinformed by defendants. And that's the piece that he doesn't consider.  Okay.

So I thought that has to also be included.  That information would also have to be included in the but-for disclosure.  Okay.

Q    Okay.

A    Not -- I just want to make sure that it's not that -- the actual dam break is not what has to be in the

**Page 302**

FEINSTEIN

but-for disclosure, but the realization that the market was arriving at, that they had been misled about the dam break.

And to your second -- to the question that you asked, of course something can be true.  It's hard to generalize about every potential scenario on something that might be generally true might not, in some cases, be specifically true in a particular case.

So that's why attention to facts and circumstances of a specific case are necessary.

Q    Okay.  So I want to apply that proposition to materiality, economic materiality.

You would agree as an economist, that certain topics that generally are economically material to investors are not necessarily economically material in a particular case, correct?

**Page 303**

FEINSTEIN

MR. HALL:  Objection.

A    That's a little bit more --
that's a harder leap to accept.  I
mean, if the literature is pretty
clear -- the literature on valuation
strives to determine what information
investors care about and what
information investors would not care
about.

So, of course, the generally
accepted principles are going to be
what generally apply.  But in order to
say that any particular case is an
exception, you'd have to do some
analysis and prove that it's an
exception.  And short of proving it's
an exception, you should be able to
apply the generally accepted general
principle.

So, yeah, I mean, it's
always -- I mean, that was one of his
criticisms.  He said that, yes,
everything I said about what's
economically material is generally

**Page 304**

FEINSTEIN

economic material, but I didn't prove that they apply in this case as being economically material.

But I would think that's once it's been proved by the literature to be generally economically material, then the burden is anyone who thinks it's not in a particular case --

(Clarification by the reporter.)

A   But if the literature says that's something is generally economically material, then for someone to say it doesn't apply, that it generally accepted and generally applicable principle doesn't apply, the burden would have to be on the person who wants you to believe it's not applicable to say that there is some exception to the rule.

So I think it is sufficient to point out that the literature says that asymmetric information matters or that governance matters to conclude

**Page 305**

FEINSTEIN

that it reasonably matters in this case.

Q    Did you do any analysis with respect to the content of the challenged statements here to determine whether Vale investors specifically viewed that information as material?

MR. HALL:  Objection.

Q    I'm not talking about economic articles.  I'm talking about real-world assessment of --

A    I think you asked me that earlier, and I said that -- I pointed out that analysts spoke about them and analysts expressed surprise on account of what they had heard.

So the answer is yes.

Q    Other than analyst reports, did you do any other assessment to determine the materiality of the content of the challenged statements?

MR. HALL:  Objection.

A    Well, I mean, just using the comments of the president of Brazil as

**Page 306**

FEINSTEIN

what an observer might take away from the events that occurred is another thing I looked and was compelling.

So I would -- I looked at news articles.  I looked at analyst reports to see what other people were saying and thinking and concluding about these facts.

And that was -- everything there was confirmatory at what's generally economically material was, indeed, economically material in this case.

Q    Just a point of clarification, that was the former president of Brazil.

A    Okay.

Q    At the time, I think he was president, but he is now the former president.  Little does he appreciate how prominently he is featured today.

MR. JORALEMON:  With that, I have no further questions.

I thank you for your time

**Page 307**

today, Professor.

MR. HALL:  I have no questions.

VIDEOGRAPHER:  This will end Media Unit 7 and concludes the deposition of Steven Feinstein. We're going off the record at 4:47, 10/11/2023.

(Time noted: 4:47 p.m.)

**Page 308**

**A C K N O W L E D G E M E N T**

STATE OF NEW YORK  )
                   ) ss.:
COUNTY OF NEW YORK )

I, STEVEN P. FEINSTEIN, certify, I have read the transcript of my testimony taken under oath in my deposition of October 11, 2023; that the transcript is a true, complete and correct record of what was asked, answered and said during this deposition, and that the answers on the record as given by me are true and correct.

- - - - - - - - - - - - - - - - -
                STEVEN P. FEINSTEIN

Sworn and subscribed to before me

this_____ day of_____, _____.


_____
      Notary Public

**Page 309**

C E R T I F I C A T I O N

STATE OF NEW YORK  )

                   ) ss.:

COUNTY OF NEW YORK )

         I, JUDITH THATEN, Shorthand Reporter and Notary Public within and for the State of New York, do hereby certify:

         That STEVEN P. FEINSTEIN, the witness whose deposition is hereinbefore set forth, was duly sworn by me and that this transcript of such examination is a true record of the testimony given by such witness.

         I further certify that I am not related to any of the parties to this action by blood or marriage and that I am in no way interested in the outcome of this matter.

         IN WITNESS WHEREOF, I have hereunto set my hand this 13th day of October, 2023.

         - - - - - - - - - - - -

                   JUDITH THATEN

**Page 310**

INSTRUCTIONS TO WITNESS

Please read your deposition over carefully and make any necessary corrections.  You should state the reason in the appropriate space on the errata sheet for any corrections that are made.

After doing so, please sign the errata sheet and date it.

You are signing same subject to the changes you have noted on the errata sheet, which will be attached to your deposition.

It is imperative that you return the original errata sheet to the deposing attorney within thirty(30) days of receipt of the deposition transcript by you. If you fail to do so, the deposition transcript may be deemed to be accurate and may be used in court.

**Page 311**

**E R R A T A**

I wish to make the following changes,

for the following reasons:

PAGE LINE

___  ___   CHANGE:_____

REASON:_____

___  ___   CHANGE:_____

REASON:_____

___ ___   CHANGE:_____

REASON:_____

___ ___   CHANGE: _____

REASON:_____

___ ___   CHANGE: _____

REASON:_____

___ ___   CHANGE: _____

REASON:_____

_____    _____

   WITNESS' SIGNATURE           DATE

**[& - 24]**                                                                        Page 1

## &

**&**   1:12 2:4,10
3:16 5:25 7:5
91:7

## 0

**0.03**   289:22
294:11 296:7
**0.03.**   294:3
**0.3**   294:4
**01**   284:4 285:3
286:7
**02446**   7:19
**03**   284:4 285:4
286:7,16 287:4
292:6 293:6,8
293:11,24
295:8

## 1

**1**   5:16 24:6
39:22 76:25
111:24 112:14
113:25 114:8
114:17 118:2
118:21 120:23
123:12 140:13
173:18 176:6
207:13 210:13
210:23 216:14
216:21 228:22
228:25 251:5
252:6,16
262:23 267:9
286:4 292:8
296:21

**1's**   30:2 115:5
206:11 249:4
**1-5-3**   228:7
**1.63**   102:3
**10**   3:12 40:4,8
113:12 127:19
127:25 193:15
285:20
**10,000**   285:4
**10/11/2023**   5:4
307:9
**100**   8:17 19:7
20:8,9 21:4,5
21:10 58:6
174:22 189:12
189:12,14
270:5,22 271:5
**10022**   2:5
**10166**   2:11
**104**   158:13
**10:44**   77:2
**10:57**   77:6
**10b**   241:18
**10th**   154:6
158:14
**11**   1:8 113:15
285:20 308:8
**113**   3:17
**11:55**   134:10
**12**   3:15 40:25
42:16
**128**   211:13,15
211:17
**12:10**   134:14

**12:38**   161:23
161:25
**12th**   40:21
44:10 151:23
162:15
**13**   43:19
291:15
**13th**   309:21
**14**   197:19,20,25
**150**   23:25
**152**   228:17
**153**   228:5,8
229:13
**163**   228:6
**17436**   309:23
**189**   241:12,15
**19**   1:5 5:22
**1995**   242:22
**1996**   8:17
**1:27**   162:3,10

## 2

**2**   41:21,24 77:7
102:4 134:9
193:17
**2.72**   102:9
**2.72.**   102:8
**20**   3:11 39:24
40:2,10 41:6
41:17,22 43:25
91:14,21
178:22 197:18
199:16 215:18
215:19 251:8
**20/20**   223:20
224:3,19

**200**   1:13 2:10
6:2
**2016**   46:12
**2018**   141:18
231:24,24
232:4,7
**2019**   46:12
113:6 178:10
208:6 233:15
234:10 270:6
298:5,11
**2020**   91:14
**2023**   1:8 3:12
3:14,16 17:22
18:4 40:4,9,13
40:17,21 41:2
44:10 154:6
158:14 162:16
308:9 309:22
**21**   3:13 40:13
40:18 42:9,20
43:25 91:22
290:24 291:11
**22**   3:14 40:21
41:3 43:3,22
43:25 44:11
91:22 102:22
162:15 193:14
196:25 211:12
215:21 299:20
**23**   3:16 91:8,13
91:13
**24**   3:17 78:17
112:25 113:5

**[25th - absence]**

**25th** 113:6 174:7 178:10 178:24 179:14 179:18 180:10 190:17 205:11 208:5 209:25 210:4 211:8,9 211:23 212:4 212:15 213:22 214:23,25 249:23 270:6 271:10 272:13 272:20 277:15 278:14 279:25 281:4 283:5 298:19 300:19
**26** 45:21 46:4,9 46:25 78:17 82:15,25 83:17 89:20 104:14 107:10 162:19 189:2 191:2 192:2,7 206:19 238:22
**26th** 233:14 234:10 235:19 236:16 237:19 240:16
**27** 8:17 193:15 193:17 196:24 238:22
**27th** 233:14 235:19 236:16 240:16

**28** 46:10 113:13 212:7 238:22 285:15
**28th** 233:14 234:10 235:19 236:16 237:20 240:16
**2:35** 225:8
**2:53** 225:12

**3**

**3** 24:6 41:21 134:15 161:22 162:19 196:24 268:3 285:4
**30** 221:3 310:14
**32** 178:21
**35** 92:6
**36** 289:21 290:18,23
**38** 285:15
**39** 102:22
**3:12** 179:15
**3:41** 269:22
**3:55** 270:2

**4**

**4** 162:11 197:20 225:7
**40** 3:11,13
**400** 24:7
**41** 3:14
**43** 215:20
**45** 39:4 211:14

**450** 24:7
**48** 211:13,15
**4:23** 297:19
**4:36** 297:23
**4:47** 307:9,10
**4th** 190:18 199:11 200:18 215:6,11 217:12 249:24 298:21 300:19

**5**

**5** 13:7 102:14 127:20 128:23 129:18,20,25 130:2,13,23 225:13 269:21
**50** 114:8 267:18 269:6
**526** 1:5 5:22
**56** 7:18

**6**

**6** 43:19 113:14 251:8 270:3 297:18
**600** 24:9
**66** 43:15
**68** 299:19
**69** 178:20
**6th** 190:18 200:7,20 202:24 227:4 227:16 231:23 249:24 298:4 298:11,18,22

299:9 300:20

**7**

**7** 3:6,13 40:17 290:18 297:24 307:6
**70** 182:2
**7th** 40:13 285:14

**8**

**82** 241:13
**850** 2:5
**87** 199:15
**88** 215:17,19,23

**9**

**9** 162:19
**90** 152:11,16 153:18 155:8
**91** 3:16
**94** 200:7
**97** 102:22
**98** 41:17
**9:34** 1:9 5:4

**a**

**a.m.** 1:9 5:4
**abidance** 83:11
**abiding** 85:21
**abilities** 88:3
**ability** 12:19 88:4 259:10
**able** 18:5 208:9 303:18
**above** 45:10
**absence** 276:3 276:9

**[absent - agents]**                                                      Page 3

**absent** 207:2
229:10 236:13
**absolute**
283:11
**academia**
31:16
**academic** 27:6
158:5
**accept** 26:10
51:23,23 81:14
96:10 145:11
219:6 303:4
**acceptance**
38:8
**accepted** 27:20
65:12 66:19
67:9 69:10
109:10 145:16
238:25 239:6
303:12,19
304:16
**accepting**
17:24 30:15
219:10
**access** 210:4,9
**accident** 173:7
177:24 178:5
179:3 209:9
226:4 255:2,8
265:2 275:13
**accommodate**
10:10
**account** 70:9
76:11,13,20
104:11 119:4

119:25 130:25
131:5,10
139:23 147:24
157:2,20 166:6
203:3 222:18
224:5,18 236:9
239:11,12
245:3 247:25
298:25 305:16
**accounted**
161:7,14
**accounting**
130:8 131:14
131:17
**accounts**
230:18
**accurate** 11:5
53:12 78:13
292:7 296:13
310:16
**accurately** 9:4
264:3 265:18
**acknowledge**
217:23 252:16
**action** 3:17
6:11 19:23
20:6,16 21:14
30:23 33:22
112:22 113:7
241:3 309:17
**activities** 31:10
**activity** 199:20
**actual** 45:17
64:12 121:16
136:14,17

143:21 164:9
221:23 241:22
242:19 274:11
300:6,13,17
301:13,24
**actually** 17:7
18:17,22 21:7
23:15 37:25
46:16 53:6
58:15 81:2
100:9 131:24
151:4,21
168:10 169:7
183:15 185:16
199:3 216:14
220:23 255:10
264:9,11 300:9
**add** 222:8
243:12 301:6
**added** 131:11
**addition** 70:16
168:4
**additional** 18:6
18:21,23 44:8
204:6,17
**address** 7:18
252:5 253:23
**addressed**
101:3
**adherence**
138:5 144:18
**adjectives**
160:13
**adjudicator**
234:17

**administer** 6:9
**admission**
172:7 183:19
**admonishment**
55:16
**adopt** 88:7
**adr** 124:2
**adrs** 18:11
46:23 47:25
50:9 60:7
102:7
**adverse** 182:23
185:25 187:19
266:8
**advisor** 28:11
**advisors** 28:13
32:3
**advisory** 28:3
28:19
**affect** 63:25
225:24 253:25
**affected** 226:18
**affiliated** 22:22
**affiliation** 32:6
**affiliations**
6:17
**affirmative**
146:2 147:4,13
148:5,24
149:10 281:9
**afreire** 2:13
**aftermath**
204:23
**agents** 297:6

**ago** 17:9 27:15
  32:21 35:2
  55:2 287:16
**agree** 5:14 11:4
  96:20,22
  168:21,23
  206:25 207:19
  234:7 235:7
  241:2 243:18
  248:14,25
  250:16,21
  262:4 279:23
  300:24 302:20
**agreed** 4:2,7,10
  230:11
**agreeing** 231:3
**algorithm**
  15:18
**aligned** 31:23
**aligns** 221:17
**allegation**
  52:24 110:21
  110:22 116:14
  141:15 142:2
  144:14 258:13
  269:6,15
  283:16
**allegations**
  30:12,16 50:17
  51:11,24 52:3
  52:7 53:5 56:4
  56:5,13 57:6
  58:9 60:25
  61:2,18 76:12
  76:15 78:11,13

78:15 81:21
  92:15,17 94:15
  98:10 109:11
  110:17 115:22
  116:8 140:20
  141:6 142:15
  144:13 145:14
  145:15,18
  148:2 152:3
  153:11 170:12
  178:2,9,12
  192:23 208:12
  208:15 210:5
  219:11 234:3
  239:13 247:13
  250:24 253:11
  261:5 263:4
  293:22 294:14
  294:15,18
  295:2 296:15
**allege** 111:23
  140:11 142:24
**alleged** 45:14
  45:18,21 46:5
  46:9,18,25
  48:3 49:5,13
  50:2,10,25
  51:14 52:21
  54:21 56:16
  61:7,12,23
  68:12 69:21
  86:23 87:15
  92:3 101:5
  104:15 111:17
  113:20 126:21

135:3,23
  136:10,18
  139:15,24,25
  141:8 146:17
  148:12,24
  149:25 150:8
  152:6,7,7
  154:21 157:23
  163:6,16
  167:25 171:2
  177:19 185:4
  190:22 191:24
  198:14 201:15
  203:4,12
  204:18 215:12
  232:5 233:22
  235:3,17
  239:19 241:19
  241:24 243:12
  270:6 281:6
  284:22 298:3
  299:7,15
**allegedly**
  115:24 116:12
  138:21 164:10
  292:21
**alleges** 112:12
**alleging** 53:7
  54:23 114:15
  133:15,24
  140:15 143:20
  147:3,13
  159:21 188:13
  255:20

**allow** 87:24
  88:9
**alluded** 170:19
  225:25
**alternative**
  125:11 135:18
  137:6
**alternatively**
  101:14
**altogether**
  185:17
**ambiguous**
  264:6
**amend** 195:20
**amendments**
  242:25
**amount** 67:21
  99:4 100:22
  102:4 161:13
  164:6 209:10
  230:21 236:7
  243:6 271:19
  271:25 282:21
  290:2
**analyses** 18:6
  291:3
**analysis** 17:13
  17:18 19:12
  22:10,25 24:19
  25:16 47:13,22
  48:21,22,24
  49:2,10,11,23
  53:13 61:20
  75:24 76:9
  78:21 79:3,16

**[analysis - applicable]**                                              Page 5

80:13 89:22
95:15 96:6
99:16 103:13
106:22 107:2
107:17,21
108:2,16
115:10 117:22
118:25 121:4
121:23 122:8
123:17 124:8
130:24 133:7
133:10 134:19
137:10 139:18
141:21 147:6
147:16,22,22
148:11 152:5
163:15 164:14
180:10 181:15
201:21 202:8
202:22 224:5
230:17 236:12
238:13 243:3
249:11 253:23
254:17 266:21
268:18,20
279:20 280:6
290:7,17,22
291:25 292:10
296:23 303:16
305:4
**analyst**   22:14
22:17 26:17
27:5 28:7,16
38:12 95:7,14
135:15,16

170:20 171:6
173:6 177:14
177:15 203:18
203:20 211:18
212:12 224:9
224:15,18
247:11 248:16
249:3 261:2
273:23 274:4
277:5 305:19
306:6
**analyst's**   237:9
**analysts**   79:23
86:15,19 94:20
95:11,19
110:10 111:15
160:25 161:7
193:24 209:3
209:21 212:14
213:16 254:24
261:2 278:18
305:15,16
**analytically**
237:17
**analyze**   20:23
282:3,12
**analyzed**   282:4
**analyzing**   70:7
**andrew**   2:12
7:2
**announced**
152:19,23
**announcement**
183:20 184:7

**annual**   257:11
284:4
**answer**   10:2,21
11:9 17:4
18:15 29:11
32:18 50:14
51:13 63:11
65:17 75:5,15
87:14 93:5
101:7,9,10
106:2,3 119:12
120:13,14,17
121:9 133:6
141:23 147:19
150:19 163:24
175:24 176:12
180:23 181:22
195:21 206:22
208:10 241:10
254:4 264:18
277:20 293:18
295:5 301:7
305:18
**answered**
95:17 121:8
122:10 157:7
165:11 238:17
246:21 252:22
308:11
**answering**
16:17 120:6,10
120:11
**answers**   86:25
133:12 266:10
308:12

**anticipate**
232:17 271:23
**anticipated**
127:7 234:4,5
234:6 256:13
256:14 280:22
**anticipations**
297:6
**anymore**   180:7
216:21 233:4
**anyway**   8:22
**apart**   146:25
201:24
**apologize**   32:21
39:7 72:9
275:23
**apology**   183:22
**apparent**
261:10
**apparently**
97:24 206:7
216:2,7 253:18
292:20
**appear**   198:25
301:9
**appearance**
6:15
**appearances**
6:17
**appeared**   171:4
**appears**   144:10
**appendices**
291:10
**applicable**
304:17,20

**[applied - asserting]**                                    Page 6

**applied** 87:5
  121:15 242:2
  243:25 244:8
**apply** 59:25
  74:12 87:3,4
  195:3 223:20
  302:17 303:13
  303:19 304:3
  304:15,17
**applying**
  263:22 277:14
**appreciate**
  193:19 306:21
**appreciated**
  10:5 251:20
**appreciates**
  68:6
**apprise** 206:5
**apprised**
  278:21
**appropriate**
  27:19 61:17
  144:25 145:3
  159:2 222:17
  244:6,21 245:9
  249:12 250:8
  310:5
**appropriately**
  50:21 52:13
  53:22 54:17
  137:24 156:15
  224:20 243:25
**approximated**
  72:15

**approximately**
  8:11 20:14
  23:3,25 24:9
  24:12 38:25
**approximation**
  24:14
**april** 3:13
  40:13,17
  285:14
**area** 25:21,23
  26:19,20 28:5
**areas** 29:19
**arguably** 172:3
**argue** 57:18
**argument**
  297:11
**arguments**
  42:23
**arose** 86:24
**arrive** 236:21
**arrived** 35:11
  237:5 291:19
**arriving** 48:6
  49:18 100:7
  302:3
**art** 169:9
**article** 195:5
  200:3 227:11
  227:17
**articles** 38:13
  79:24 110:10
  115:14 203:18
  203:20 227:23
  229:13 231:22
  232:3 305:11

  306:6
**articulate**
  145:18 151:18
  151:22 228:20
**articulated**
  15:8
**articulating**
  248:23 276:3
**articulation**
  279:22 292:7
**artificial** 45:8
  60:6 62:6
  64:21 65:10
  66:15 72:14
  80:22 81:15,21
  93:10 96:11
  99:21,22,23
  104:6 118:7
  121:17,19
  122:23 123:5
  123:14 126:8
  126:17 128:12
  129:10 136:23
  165:16 167:20
  168:4,13,20
  184:23 185:20
  187:15 196:14
  224:25 231:10
  232:5 242:17
**ascertain** 35:13
  35:15 274:5
**ascribe** 164:7
**aside** 44:9,22
  73:2 105:4
  263:15 264:7,8

**asked** 9:8 16:19
  18:4 23:18
  34:9 39:6 42:5
  77:9 86:20
  95:16 121:7
  122:9 157:6,16
  165:10 180:24
  190:4 246:23
  246:24 252:21
  265:8 267:12
  267:13 268:5
  287:9 290:21
  302:7 305:13
  308:11
**asking** 20:19
  58:3,4 68:16
  69:6,18 72:21
  74:15 81:14
  87:18 94:4
  97:2 101:16
  117:5 120:8
  122:3 125:10
  128:5 145:22
  147:10 148:18
  164:19 187:5
  236:25 248:12
  248:14,22,25
  282:16
**asks** 96:18
**aspect** 78:20
  79:8,15 230:17
**asserted** 286:23
**asserting**
  286:20 287:3

**[assertion - basic]**                                                    Page 7

| | | | |
|---|---|---|---|
| **assertion** 269:16 | 273:18 277:17 296:12 | 113:16 162:14 193:13 211:11 | **b** |
| **asserts** 285:19 | **assumed** 78:6 | 228:4 241:11 | **b** 3:8 127:22 |
| **assess** 204:8 | 78:10 139:3 | 302:14 | 128:16,20 |
| 224:22 251:19 | 171:14 | **attorney** 6:19 | 129:7 215:10 |
| 253:5,12 | **assumes** 99:21 | 310:13 | **back** 49:9 |
| 256:21 263:20 | **assuming** 263:4 | **attributable** | 75:20 77:5,8 |
| 264:25 265:25 | 263:13,13 | 168:7 271:12 | 93:9 134:13 |
| 268:7 280:9 | 264:10,12 | **attribute** 270:5 | 151:17 162:9 |
| **assessed** 240:19 | 292:5,17 | **audio** 5:11,12 | 195:20 211:25 |
| **assessing** | 296:14,15 | **authorities** | 225:11 232:23 |

assertion
269:16
asserts 285:19
assess 204:8
224:22 251:19
253:5,12
256:21 263:20
264:25 265:25
268:7 280:9
assessed 240:19
assessing
204:12 222:10
222:11 223:21
251:17
assessment
159:25 202:17
203:10 223:22
237:24 266:11
305:12,20
assets 127:17
127:20,21,25
128:25
assign 14:20
assigned 14:19
assist 21:23
assistance 22:8
22:23 236:23
assistants 24:5
associated 85:8
assume 8:20
9:21 51:24
82:4 103:13
140:7 148:23
167:17 172:14
173:19,24

273:18 277:17
296:12
assumed 78:6
78:10 139:3
171:14
assumes 99:21
assuming 263:4
263:13,13
264:10,12
292:5,17
296:14,15
assumption
80:12 108:17
110:2,8,20
145:11 172:17
219:6
assumptions
30:16 109:11
117:21 145:16
267:8
asymmetric
66:21,25 67:3
67:11,23 68:13
69:15,22 72:13
109:18 165:17
169:4,5,14
260:19 276:16
304:24
asymmetry
248:7 260:7,10
attached 151:2
310:11
attention 33:3
41:17,21 43:14
102:21 113:12

113:16 162:14
193:13 211:11
228:4 241:11
302:14
attorney 6:19
310:13
attributable
168:7 271:12
attribute 270:5
audio 5:11,12
authorities
26:25 27:2
219:15 220:10
authorized 6:8
available 71:21
244:10 246:3
267:14 269:13
avenue 1:13 2:5
2:10 6:2
avoid 9:9,17
avoided 179:3
aware 31:3
32:14 36:6,9
45:20,24 46:8
74:9 84:21,24
85:2 99:10
111:4,8 123:18
171:15 174:5
210:7 217:11
218:8 246:15
246:20 247:8
247:16,18
276:14 286:6
awareness
215:25 216:19

**b**
b 3:8 127:22
128:16,20
129:7 215:10
back 49:9
75:20 77:5,8
93:9 134:13
151:17 162:9
195:20 211:25
225:11 232:23
237:18 242:21
269:25 279:18
297:22
backward
280:6
bad 275:9
276:22 281:19
bake 272:10
balance 146:11
146:16
bank 211:18
212:11 213:9
213:22 214:20
bank's 212:14
base 51:19
278:13
based 65:11
75:24 76:9
96:4,6 110:6
113:19 117:21
118:18 245:7
267:20 289:4,9
290:12 294:25
basic 263:22

**[basically - cain]** Page 8

**basically**
267:21
**basing** 109:25
212:20,24
216:8 275:20
287:6
**basis** 47:5
212:13,18
217:14,15,25
218:5,6,19
219:20 242:5
242:24 277:11
284:16 287:16
**battle** 16:12
**bayesian**
288:24 289:2,9
289:11,15
290:9,14
**bear** 289:2
**bearing** 119:16
**began** 90:19
97:14 98:7
278:4,6,14
301:14
**beginning** 6:18
17:21,21 18:3
43:19 193:19
216:24 254:4
**behalf** 2:4,9
6:22 7:6 21:19
21:22 32:24
33:22
**behavior**
159:20,20
160:10,12

261:9,11
292:25
**belied** 90:18
**believe** 32:2
46:17 55:22
104:11 105:17
162:18 179:12
198:22 206:11
220:7 235:18
256:24 304:19
**believed** 31:18
51:4,16 52:23
53:18 94:22
103:8,14,23,24
104:5,18
105:10,21
106:4,5,17
107:3 109:5
273:25
**believes** 51:6
**believing** 52:10
**belonged**
122:24
**benefit** 128:6
**best** 9:17 81:20
125:24 126:2
**bettencourt**
22:16
**better** 130:10
192:10 242:13
271:2 275:8
**beyond** 11:8
45:11 163:4
176:20,21
202:18,24

203:11,19
204:18 238:18
**big** 254:20
**bigger** 166:24
167:9
**bit** 151:12
156:9 208:8
252:10 303:3
**black** 15:2
**blaming** 179:4
**blindly** 239:9
**blood** 309:17
**bloomberg**
199:17 200:3
**board** 188:14
188:15
**bottom** 137:2
155:14
**bounce** 242:21
**bound** 255:17
255:18
**box** 15:2
**brazil** 111:7
174:15 175:13
178:4,18
179:17 180:5,9
209:12 278:6
278:12 305:25
306:17
**break** 10:9,13
46:19 75:19,22
76:22 77:10
90:21,23 95:21
95:24 110:12
131:3 134:7

161:18 172:21
191:21 206:6
214:10 220:21
220:24 225:5
256:17 269:18
297:15 301:25
302:5
**breaks** 206:2
**brief** 77:3
134:11 225:9
269:23 297:20
**bright** 77:23
195:2,7 196:8
196:16
**broader** 84:13
**broke** 216:15
**broken** 213:5
**brookline** 7:18
**brought** 288:25
**brucutu** 215:6
216:3 217:24
**bucket** 160:7
**buckets** 93:3,8
**bulk** 85:12
**bundle** 280:20
**burden** 304:8
304:18
**business** 32:9
**buy** 180:6

**c**

**c** 2:2 215:10
308:2 309:2,2
**caat** 7:6 32:25
**cain** 35:21,23
36:3,12 246:16

[cain - case]                                                                          Page 9

247:9
calculate   118:7
  124:24 137:2,4
  224:24 249:13
  254:6 259:11
  280:8 286:3
  294:25
calculated
  117:9 123:24
  125:9 136:13
  283:19
calculating
  161:3 263:7
calculation
  121:17,19
  236:17 293:3
  293:19
calculations
  242:5
calculous
  163:17
call   168:24
  169:2,16 222:2
  222:3,15,16
  223:12 224:3
  230:5,12
  241:19 271:16
called   88:6
  169:3
calling   231:8
  232:24
calls   79:17
  143:25 146:4
  146:13 149:11
  185:6 235:4

cammer   13:7
  197:10
campaign   32:5
  53:8,15 55:5
  55:24 56:18
  57:8 58:10
  59:2,6 60:20
  60:22 65:7
  67:13 73:12,12
  73:22 74:18
  75:2,11,13
  76:2 77:16,25
  78:7 104:22
  105:5 119:7
  125:4,6 127:8
  127:13,15,23
  128:8 129:5,8
  138:23 139:14
  139:15 140:18
  140:20,24
  166:4,5 196:12
  259:9,9 272:3
  292:15 293:23
  294:10 295:9
cancelation
  198:12,24
canceled   198:6
  200:11
cancellation
  200:20 201:16
  239:16 240:9
cancellations
  229:5
candidates
  31:24

cap   242:21
capable   199:21
caption   33:6
capture   43:21
  54:21 300:8
captured   208:2
cardoso   2:17
  7:3
care   27:21
  106:15 170:17
  303:8,9
cared   106:4
career   8:14
  148:22
carefully   82:20
  310:4
carihanna   2:7
  7:9
case   1:5 23:10
  30:12 33:16,17
  33:19 41:15
  45:22 46:5
  49:20 50:17
  52:9 54:8
  56:16,22,24
  57:2,5 58:14
  59:5,25 60:2
  63:16 68:11,22
  68:24 69:5,21
  71:13,14,19
  72:15,22 73:5
  73:10 77:21,22
  81:16 82:17,21
  89:15,17 90:16
  91:15 99:15

100:4 106:24
110:7 115:16
118:8 123:8
125:10 126:21
126:22 127:15
128:18 130:8,9
133:3,11
140:11 142:17
146:2,3 147:2
147:8,9,20,23
147:25 148:7,8
148:11,15,16
148:18,23
150:21 151:20
156:22 157:4
157:19 159:17
159:18,19
160:21,21,24
164:14 167:16
167:23 171:24
172:17 180:11
186:19 189:3,5
190:16 191:12
194:24 195:3,8
195:11 197:12
201:14,19
205:9 206:21
207:24 208:20
210:5,19,20
221:25 222:23
224:22 235:13
237:8,17
240:24 242:8
242:15 244:9
244:13 245:10

[case - characterization]                                                    Page 10

245:21 249:13
253:21 254:20
254:22,23
255:8 256:18
265:8 267:4
272:11,14,21
273:3,5,7,17,19
274:7,12,20,24
275:5,9,11
276:5 279:22
282:13 284:22
288:14 301:3
302:13,16,25
303:14 304:3,9
305:3 306:14

**cases** 19:24
20:5,6 34:6
57:18,25 58:6
58:16 69:2,20
70:6,11,19
71:8 72:5,20
74:23 77:13
148:21 149:6,6
149:24 150:15
157:12 158:24
158:25 161:4
196:9 241:18
302:12

**cash** 247:11
248:3 249:25

**catastrophic**
251:11 265:2
289:25

**categories**
88:15

**categorized**
93:8

**categorizing**
93:2

**causation** 3:11
3:14 17:13,17
18:7,10,20
19:11,19 20:2
20:17,24 21:15
22:3,9,24 23:9
24:18 40:6,23
41:14 44:5
47:6,19,22
48:7,23 49:9
49:19 75:23
78:8,21 79:15
82:18 103:13
117:24 118:24
121:3 122:8
134:19 139:18
147:6,16 154:2
163:15 183:5
292:10 296:23

**cause** 79:14
103:5 193:24
196:13

**caused** 45:18
136:24 167:20
177:22 182:11
185:21 187:16
189:18,19
260:2

**causes** 30:2

**caveat** 10:11
244:23

**cease** 199:4

**ceased** 199:12

**ceiling** 273:14

**ceo** 53:20

**certain** 14:7
38:6 72:3,5
158:24 199:22
302:21

**certainly** 79:2
86:5 87:5
111:13 119:18
153:16 157:9
158:25 159:19
177:3,5 196:19
202:7 206:3
244:7 250:22
253:14 255:7

**certification**
4:4 16:11 38:8

**certifications**
260:17,22,23
261:4,6 265:12
265:13

**certified** 1:14
228:24

**certifiers**
159:23 172:24

**certify** 110:18
308:6 309:8,15

**certifying** 18:2

**cessation**
200:15

**cfa** 3:12,13,15
40:8,16,25

**challenge** 79:11

**challenged**
63:9 74:25
77:15 78:17,19
80:14 82:4,16
83:2,17 84:6
85:19 87:7
88:11,19 89:21
96:13 103:15
105:6 107:11
108:4 141:9
142:17 143:4
186:15 187:2,8
189:24 190:8
191:2,3 192:3
206:20 305:6
305:22

**change** 51:8
78:20 79:14
107:7,22
119:23 122:7
122:12,15
124:8 169:21
212:20 242:17
293:2,19 311:7
311:9,11,13,15
311:17

**changed** 115:6
115:12,20
118:2

**changes** 310:10
311:3

**characterizati...**
53:11 55:14
69:4 78:12

90:3 92:3 143:9 191:7 292:23 294:13

**characterize** 21:21 55:2,8 57:4,6,25 58:9 58:13 69:9 76:15 78:14 89:19 164:4

**characterized** 12:19 14:25 52:8 53:4 58:17 76:12 90:2 228:3 258:24

**characterizes** 287:22

**characterizing** 56:11 59:23 164:13

**charter** 28:7

**chartered** 27:5 28:16

**chase** 2:13 6:25

**check** 23:23 76:4 117:12 194:11 197:14 199:14

**checking** 117:13

**chief** 25:19,23

**chose** 62:20 140:17 293:5

**chosen** 232:11

**chris** 6:21 120:12 220:18

**christopher** 2:11

**circularity** 136:22

**circumstances** 73:9,15 157:19 194:24 302:15

**citations** 158:19

**cite** 26:25 27:18 29:18 157:25 158:4,4 189:7

**cited** 146:18

**cjoralemon** 2:12

**clarification** 23:8,16 47:8 53:25 67:6 153:24 158:15 197:21 199:25 215:7 233:11 290:19 291:13 294:7 304:10 306:16

**clarify** 25:5 47:20 61:3 65:16 76:14 194:5 206:17 211:22 225:14

**clarifying** 75:18,21

**class** 3:17 7:6 16:11 18:2

19:23 20:5,16 21:14 30:20 33:22 38:7 48:9 59:9 60:8 61:11 62:21 63:2 64:22 65:3 66:16 70:21 71:6 72:18 79:10,12 80:24 81:24 82:7 93:12,14 93:23 94:8,14 94:17,25 95:7 95:14,22 96:3 96:7,12 97:10 97:12 99:13 101:4,25 102:13 103:24 104:2,18 105:10,14,16 105:18,23 106:20 107:4,7 107:8,9 108:18 108:25 109:21 110:15 111:5 112:22 113:6 113:23 115:6 115:12 116:25 118:3,22 120:24 122:7 123:13 124:25 137:16 138:17 139:5 140:3,8 141:7,17 143:2 143:15 152:12

152:18,24 188:15 196:10 203:19,22 204:22,24 205:2,7 241:3 250:17 251:25 262:5 266:14 267:10 269:3,8

**cleaning** 131:16

**clear** 20:19 24:13 29:12 64:15 66:6 138:8 154:6 164:3 190:13 190:15 216:22 218:13 220:8 224:14 237:22 258:6 301:7 303:6

**clearly** 68:20 69:2 146:6,16 175:5 185:11 210:19 212:10 213:6 220:2 255:25 294:5

**client** 159:22

**close** 217:3,7 287:18,25

**closely** 72:25

**closer** 223:7

**closure** 215:5

**cmorrison** 2:7

**coalesced** 90:4 90:10 226:15

**[coerced - company]**                                    Page 12

**coerced**  261:7
**cohesive**
  231:11
**coin**  267:21
  268:19
**collapse**  30:2
  65:5 83:15,19
  84:4 86:18
  111:20 112:19
  120:23 122:6
  123:4 173:18
  174:10 175:9
  176:6 177:23
  205:14 206:12
  207:2,25
  208:16,21,24
  209:7,20
  210:13,22
  211:4,10,24
  212:22,23,25
  225:15 228:23
  234:2,4 244:15
  249:4 250:6
  251:25 252:16
  253:14 255:22
  257:3,18
  258:11,14
  260:11 261:16
  262:8,17,23
  263:8,21
  266:13 267:23
  277:18 281:13
**collapsed**  111:6
  207:13 209:6
  224:13,16

  251:5
**collapses**
  205:12
**collapsing**
  111:25 112:14
  118:22 123:12
  252:6 267:9
  269:7 296:21
**colleagues**  6:25
  237:4
**collection**
  230:22
**collective**  48:15
  48:18 192:16
  192:20 193:2
**collectively**
  46:2 59:23
  191:15,16,18
  191:24 192:3
  192:22
**combine**
  195:25
**combined**
  192:6,8 250:10
**combines**
  243:20
**come**  75:20
  259:24 265:23
**comes**  85:7
  179:15 244:20
  261:25
**commensurate**
  72:16 271:4
  280:14

**comments**
  305:25
**commitment**
  83:10 84:7
  89:3 92:21
  106:19 108:10
  133:22 137:23
  138:4 144:16
  144:17 180:3
  265:10 294:21
**committed**
  53:23 100:16
  153:4,6
**common**  74:7
  132:17 157:20
**companies**  29:6
  88:6 132:11
**company**  27:22
  29:5 50:25
  52:3,12 53:20
  53:23 54:14
  62:15 67:14
  69:23 70:10
  72:16 86:4
  87:24 88:4,9
  94:16,22 99:3
  100:16 101:12
  101:13 102:11
  103:20 108:8
  109:7,17
  110:14,24
  111:17,18
  112:4 114:10
  115:24 116:11
  124:10 125:2

  127:19 130:15
  130:18 131:12
  131:13,24
  132:6,7 135:17
  138:22 140:12
  140:17 142:8
  152:19,23
  156:16 159:4
  159:14 170:9
  171:15 172:7
  172:23,24
  173:3,15 174:6
  184:3 194:2,21
  195:17 199:19
  203:21 204:9
  205:7,25
  208:13,23
  209:18 213:17
  214:8 215:25
  216:20,24
  219:9 220:6
  229:14,22
  230:19 232:10
  244:14 251:13
  256:16 258:7
  258:15 259:17
  261:20,22
  264:11,14,24
  265:3,7,9
  266:3,9 267:16
  268:25 272:5
  272:22 279:3
  279:14,16
  281:19,23
  283:18 289:24

**[company - concerted]** Page 13

292:14,20
293:5,10,22
295:8
**company's**
54:10 83:7,10
83:25 84:7
86:16 103:3
110:13 127:17
137:23 139:14
152:20,25
163:6 171:19
214:5 217:20
218:15,20
219:12 256:25
284:25 292:25
**compared**
241:22
**comparing**
48:17
**comparison**
71:16 100:6
101:11,15,17
103:19
**compatible**
289:24
**compel** 72:13
**compelled**
126:23
**compelling**
306:4
**compiled** 191:6
**complaint** 3:17
38:5 51:25
52:21 53:4,12
82:20 88:16

89:14 100:3
109:9,12,25
110:13 112:8
112:12,23
113:7,12
114:14,19
115:15 116:3
116:17,20,24
116:24 117:4,6
117:16 143:8
146:6,23
198:17 199:2
199:10 201:25
202:19,23
203:12 204:19
209:24,24
210:10 239:20
240:2 263:15
264:8 267:15
268:16 286:8
286:11
**complaints**
57:13 90:2
**complete** 11:4
11:12 45:13
50:13 158:8
180:18 278:2
308:10
**completing**
180:22
**compliance**
89:6
**component**
82:13 139:22
158:10 170:21

280:17
**components**
280:15
**comprehensive**
208:10
**comprised**
248:4
**comprises**
67:21
**comprising**
159:19
**computation**
158:11 242:7
297:8
**computations**
139:22 240:19
**compute** 267:2
**computed**
170:15 241:18
**conceal** 122:19
163:6 256:19
261:10
**concealed** 90:7
90:20 114:21
163:10 164:24
165:7 166:15
182:23 243:21
245:16 255:21
256:3 258:14
258:20 260:8
294:11 300:5
**concealing**
67:15 131:25
295:25 296:3,7

**concealment**
122:22 166:21
166:23
**conceivable**
253:13 289:7
**conceivably**
87:4 207:4
251:12
**concept** 134:17
158:9 182:14
252:5 256:5
288:5
**concepts** 62:23
**conceptually**
165:12
**concern** 216:19
231:23
**concerned**
86:20 88:11
226:17
**concerning**
12:4 18:9
24:18 39:10
44:4 47:18
49:12 94:9
213:11,24
232:3 257:2
267:9
**concerns** 13:5
14:10 56:22
217:4 218:20
219:3
**concert** 195:25
**concerted**
50:18 52:5

53:7 55:4,24
56:9,17 57:7
57:19 58:10
59:2,6,8 73:12
73:21 90:11
92:16 119:8
122:18 144:11
144:14 160:13
163:21 164:5
165:6 168:2
172:8 192:24
193:9 258:25
294:16 296:17
**concise** 145:13
191:7
**concisely**
145:17
**conclude** 27:11
61:25 70:20
212:14 232:17
304:25
**concluded** 16:2
60:5 62:25
64:20 81:13
97:11 99:7
100:14 234:23
284:12
**concludes**
118:21 120:22
122:5 307:6
**concluding**
278:8 306:8
**conclusion**
12:17 19:2
27:10 42:23

51:20 55:3
61:16,17 64:17
65:9 72:14
73:6 81:2,10
81:15 82:3
89:16 92:7,8
92:10 96:10,19
97:2 98:15
100:7 101:23
107:22 144:2
145:4,4,6,23
146:5,14 174:9
174:22,24
175:2,3 185:7
234:8 235:5,8
236:22 238:25
278:13 284:17
285:9 287:17
290:4,15
291:20 299:2
**conclusions**
17:25 41:13
43:20,21 81:12
96:3 117:25
239:7 246:9
**condition**
109:15,17
110:22 142:7
173:2 198:20
201:7 202:12
213:4 216:25
**conditions** 54:6
89:5 178:6
184:3,4 201:9
214:11 251:13

256:20 259:22
261:11 264:13
281:18
**conduct** 46:21
47:23 49:11
108:2 153:8
155:15 159:15
160:16 163:6
230:20,21
237:23 251:13
261:12
**conducted**
299:13
**conducting**
48:25 89:22
95:15 103:12
163:14
**confidence**
174:21,25
175:2 189:14
**confine** 202:22
**confirm** 27:19
114:13 115:21
116:7 164:20
220:11
**confirmatory**
306:11
**confirmed**
116:2,4,13
171:6
**confirms** 291:4
**conforming**
108:11
**confounding**
240:21

**confused**
273:13
**connection**
17:12 19:11
47:21 91:20
191:11
**consequences**
74:5,12 129:8
132:22 163:4
251:11 257:19
262:7,13,17
263:9 280:21
**conservative**
65:18,20,24
66:4,9 71:22
72:6 81:8
168:13 236:5
273:4,7 274:13
275:4,10
277:13
**conservatively**
99:7 122:24
**consider** 26:11
28:22 42:22
119:20 124:6
217:6 221:21
229:4 238:4
300:2,10
301:17
**considerably**
87:2
**considerations**
230:23
**considered**
31:25 121:24

[considered - correct]                                                    Page 15

122:17 133:8
169:18 170:24
231:11 238:19
250:12,12
258:4 274:6
299:15
**considering**
74:4 94:19
136:14 181:7
**consistent**  51:3
51:5,15 52:22
61:17 82:11
95:19 105:2,16
135:12 168:11
175:14,18
176:8,14,17
177:10 178:3
240:22 242:14
292:19
**consolidated**
3:17 112:22
113:6
**constant**  64:22
65:2,3,10,19,25
66:8,10,15
70:22 71:5,25
81:3 123:22
**constitute**  75:2
77:16 221:9
**constrained**
242:11
**constraints**
242:7,20
**construct**  75:22
76:8

**constructed**
139:3
**constructing**
154:9 159:3
**construction**
81:8
**consultants**
110:18
**consulting**
31:13
**contacted**  18:4
**contain**  107:11
**contained**  45:2
108:4
**contemporan...**
117:8
**contends**
228:18
**content**  108:3
163:5 168:5
185:2,4,12,13
186:23,25
193:7 305:5,22
**contents**
152:10
**context**  15:6
86:11,12,25
122:17 132:5
134:18 211:2
249:9,10
295:11
**continue**  5:13
18:5 130:5
**continued**
162:12

**continuously**
124:20
**contracts**  29:6
**contrary**
292:22
**contribute**
232:9
**contributed**
189:16
**controlled**
11:19
**controversial**
31:11,19 32:7
**conversations**
5:8
**cookie**  147:21
**core**  54:21
231:19
**corollary**  298:9
**corporate**
25:14,17,25
**correct**  8:6
10:25 11:5,24
12:5 13:13
17:14 19:8
21:2,20 22:4
25:8,9,11,12,14
29:22,23 30:2
30:3,6,7,9,13
30:14,20,21
34:19 42:17
43:16 44:14
51:25 60:9
64:23 65:13
69:16 74:19

76:17 78:2,8
80:16,24 81:17
82:7 84:22
88:21 94:2
99:2 101:11,14
102:5 103:19
111:25 118:25
121:4,13
123:17 135:24
136:19 138:18
139:19 141:3
148:25 154:11
164:10 165:9
165:24 167:21
168:8,10 170:4
171:16 184:15
185:15 187:12
187:14 190:12
202:4,7 205:9
205:12 206:14
209:25 210:5
210:10,16
211:20 215:14
215:15,20
223:2,15
226:24 231:24
233:21 235:21
238:9 241:4
245:18 247:7
248:11,13,24
250:19 252:7
255:22 260:11
261:16 262:8
270:7,24
271:13 274:3

**[correct - court]** Page 16

| | | | |
|---|---|---|---|
| 280:3 281:22 | 188:12,23 | **correctly** 83:14 | **course** 8:13 |
| 281:25 284:13 | 189:6,21 190:6 | 124:7 156:25 | 11:2 20:4 |
| 284:18 285:10 | 190:16 191:14 | 166:11 178:20 | 24:25 37:11 |
| 285:24,25 | 191:18,25 | 200:17 206:5 | 118:3 140:3 |
| 286:4,5,20,24 | 192:5,14 193:4 | 248:9 264:3 | 148:22 182:3 |
| 287:4,19 | 197:17,24 | 265:17 281:18 | 183:16 207:4,5 |
| 288:14 292:17 | 198:4,14,14 | 287:11 | 234:12 302:7 |
| 297:12 302:25 | 201:3,17 202:3 | **corrects** 184:22 | 303:11 |
| 308:10,14 | 202:16 203:5 | 221:16 232:19 | **court** 1:2 4:13 |
| **corrected** | 203:11 204:6 | **correlate** 185:3 | 5:21 6:6 7:12 |
| 191:13,17 | 204:13,17 | 186:25 | 9:3 12:10,19 |
| 196:15 232:5 | 205:15 210:23 | **correlation** | 14:2,8,10,13,16 |
| **correcting** | 211:5 215:13 | 191:10,11 | 14:17,24 15:6 |
| 208:17 | 217:5 218:22 | **corresponden...** | 15:9,19,25 |
| **corrections** | 218:24 219:22 | 191:20 | 18:11 21:22,23 |
| 310:4,6 | 221:9,15 | **costly** 216:2 | 21:23 26:10 |
| **corrective** 65:6 | 223:21,24 | **counsel** 4:3 | 38:6 40:3 |
| 66:3 81:6 | 225:16,18 | 6:16 10:17 | 55:16,22 56:3 |
| 98:24 118:16 | 226:21 227:5 | 22:6 24:22 | 76:8,12 78:16 |
| 118:18 124:12 | 227:12,13,17 | 32:2 38:15,21 | 78:24 79:5 |
| 129:15,18 | 233:15 234:9 | 39:9 42:21 | 81:14 82:20 |
| 130:3 137:13 | 234:25 236:8 | 68:6 267:7 | 83:13 89:19,25 |
| 137:21 138:11 | 237:25 238:5,8 | 268:15 287:14 | 91:10,15,25 |
| 152:17 153:13 | 238:14,23 | **count** 8:16 24:4 | 93:2 96:10 |
| 156:2,5 160:22 | 239:18,19,23 | 46:13 | 100:25 106:16 |
| 161:11 164:16 | 240:14,24 | **counted** 45:23 | 113:3 118:20 |
| 171:3,5,21,23 | 243:5,23 | 54:12 | 118:23 119:4 |
| 171:25 172:16 | 244:11,16 | **counterparty** | 119:19 120:22 |
| 174:2 180:16 | 253:2 254:13 | 67:14 | 120:25 121:2 |
| 181:24 182:6 | 267:5 270:18 | **countervailing** | 121:24,24 |
| 183:8,18 | 273:11 281:8 | 15:23 | 122:5 137:9 |
| 184:10,13,17 | 298:3,10,17,20 | **county** 308:4 | 199:18 200:4 |
| 185:2,14,23 | 298:20,25 | 309:4 | 204:2 207:12 |
| 186:6,13,24 | 299:4 300:6,14 | **couple** 267:19 | 207:20 210:9 |
| 187:6,12 188:2 | 300:17 301:11 | 295:19 | 210:12 216:2 |

**[court - damages]**                                    Page 17

216:15,23
217:7 218:25
219:18 234:23
236:14 238:7
239:17 240:12
240:13 310:17
**court's**  17:24
55:3,9 75:24
83:13 90:24
128:6 144:20
217:14 233:10
234:8 238:25
239:6,11 240:3
240:23
**cover**  8:21
88:25 163:3,16
166:4,5,13,22
166:23 167:4,8
168:2,8,25
169:17,17,20
170:4 230:18
**covered**  28:6
57:22 82:23,23
163:5 164:15
167:2,6 203:22
**create**  194:20
195:25
**created**  93:15
137:9
**creation**  160:18
**crisis**  220:15
221:9
**criteria**  15:7
**criticisms**
303:23

**criticized**
227:21
**cross**  55:15
65:4 68:8 76:6
169:8 186:20
**crowninshield**
2:18 7:10
22:15,17,19,23
23:5 24:17
39:13 237:5
**crutcher**  1:12
2:10 6:2
**culture**  30:6
**cultures**  29:15
**curious**  150:13
**currently**  26:21
**curriculum**
28:8,14
**cut**  175:25
**cutter**  147:21
**cv**  1:5 5:22
**cweidner**  2:14

**d**

**d**  3:2 308:2
**dam**  30:2 46:19
52:6 54:6
83:15,18 84:4
84:18 86:17,22
88:21 90:14,16
93:16 94:20
95:8,20 105:21
106:18 110:12
111:14,18,20
111:24 112:14
112:18 113:25

114:8,17 115:5
118:2,21
120:23 123:12
138:3,3,24
140:13 144:16
172:21 173:18
174:10 176:6
177:6 192:25
198:7,13,25
199:5,10,13,24
200:13,19
201:16 205:11
205:14 206:2,6
206:11 207:2
207:13,25
208:16,21,23
208:25 209:6,7
209:20,21
210:13,23
211:3,9 212:22
212:22,25
213:11,18,24
214:6,10
216:12,14,21
218:17,19
220:7 224:12
225:15 228:22
228:24,25
234:2,4 244:15
247:15 248:17
249:4,5 250:6
250:18 251:4,5
251:10,14,25
252:6,16
253:14 255:22

256:17 257:3
257:18 258:11
258:14 260:11
261:16 262:7
262:17,23,24
263:7,21 267:9
267:22 269:7
284:20 286:4
287:5,19
289:25 292:8
296:21 301:25
302:4
**damage**  17:23
19:2 24:19
48:7,23,24
158:11 242:12
242:14 283:24
**damages**  3:11
3:15 17:13,18
18:7,10,20
19:12,19 20:3
20:17,24 21:15
22:4,9,25 23:9
40:7,24 41:14
44:5 47:6,19
47:22 49:10,20
70:8 75:23
78:8,21 79:16
82:18 117:24
118:25 121:4
134:19 139:11
139:18 147:6
147:16 154:3
156:7,25 161:3
161:8,16

**[damages - decreasing]**                                                                    Page 18

163:15 164:7,8
168:14,19
183:5 225:3
235:20 236:17
241:2,18 242:2
242:16 248:11
248:13,24
249:13 252:24
254:5,16
270:24 280:8
292:10 293:20
294:25 296:23
297:9 298:24
300:9
**dams**  25:11
50:21 52:10
53:19 54:15,23
83:9 84:12
85:2,25 86:6
86:14,16,20
87:5 89:5
92:23 94:23
100:18 103:4
108:19,23,24
109:6,16,18
110:18,23
111:6 113:25
152:25 155:10
173:3 175:8
198:21 199:22
201:8,10 212:8
212:16 213:4,6
214:8 217:2,21
277:18 293:10
294:23

**dan**  22:16
**dark**  126:4,7
129:6 272:9
**data**  269:13
**date**  23:6 40:11
40:19 41:4
61:15 71:23
91:9 113:2
223:4 224:24
227:5 238:2
239:3 280:11
282:11 310:8
311:21
**dates**  46:24
48:2,12,15,18
49:14 50:2,11
233:15,19,25
234:24 239:2
**day**  46:19 48:9
60:8 61:10
62:25 64:2,3,6
70:21 71:5
79:10 80:23
81:16,22 96:12
99:12 101:19
102:12,17
103:23 108:17
108:24 109:21
109:23 111:2,3
124:11,13,15
124:16,17,25
138:17 139:4
140:8,21,25
141:7,16 142:3
143:2,14

144:22 152:24
181:4 196:18
211:23 270:10
270:23 271:6,9
281:13 308:19
309:21
**days**  35:2 48:14
48:17 49:5
196:10,14,19
218:2 235:11
236:2,4 237:21
238:19 239:11
240:9 310:14
**deal**  58:18
**dealing**  133:2
**deals**  158:5
**dealt**  47:10
**dearie**  16:22
**dearie's**  16:10
**deceive**  73:13
125:4 127:9
153:8 155:15
163:22 164:5
172:9 206:8
**deceived**
107:25 127:2
137:22 138:3
156:23 173:10
187:21 230:9
272:18
**deception**
67:13 104:22
140:18 159:4
164:18

**deceptive**  153:8
155:15 159:14
160:16
**decided**  238:6,7
238:21
**decision**  76:10
76:16 88:16
90:24 144:21
144:25 203:5
207:10,13
210:8 217:13
217:23 219:18
233:10 239:12
**decisions**  17:24
83:14
**decline**  99:18
102:19 177:2,4
177:10 243:19
249:17,19,21
249:22 250:3
250:14
**declined**
124:19
**declines**  81:5
81:23 123:25
241:4 243:4
250:11 273:11
**decrease**  119:5
123:14
**decreased**
118:22 120:23
122:6 123:12
212:12
**decreasing**
123:4

**[deemed - different]**

**deemed** 310:16
**deeply** 178:25
  236:21
**defendant**
  150:2
**defendants** 2:9
  6:23 21:13
  55:3,23 56:19
  57:7 92:18
  113:21,21
  150:7 245:3
  294:19 301:15
**defense** 106:25
**defense's** 15:21
**deficiencies**
  12:11
**defining** 136:20
  221:15 255:25
**definitely** 19:15
**definition**
  149:12 168:23
  241:9
**degree** 205:4
  250:23 298:16
**deliberate**
  50:18 52:5
  53:8 55:4,24
  56:8,18 57:8
  57:19 58:10
  59:2,8 73:21
  90:11 92:16
  119:8 144:15
  160:14 163:21
  164:4 168:2
  172:8 192:23

193:9 258:25
  294:16 296:16
**deliberated**
  122:19
**deliberately**
  253:19 301:15
**dense** 275:24
**depend** 18:10
  19:2 73:8,14
  126:16
**depending**
  244:20 245:20
**depends** 59:8
  78:23 157:18
  160:21 163:19
  226:22 255:24
**depo** 39:23
**deposing**
  310:13
**deposition** 1:11
  4:5,11 5:17,25
  8:2,5,12 20:2
  23:19,24 24:2
  24:3 25:2
  34:10,13 37:16
  44:9,16,17,23
  68:23 307:7
  308:8,12
  309:10 310:3
  310:11,14,16
**depositions**
  19:7,10,22
  21:9 44:22
**deprivation**
  123:21

**deprive** 127:9
  259:10
**deprived**
  123:20 188:5
  253:4,9,11
  271:22 274:16
  276:11,19
  277:22 278:15
  280:24 283:9
**depriving**
  253:24
**derived** 123:24
  251:21
**describe** 137:8
  241:7,16,20
**described**
  15:10,14 16:11
  69:25 103:3
  153:19 160:8
  186:21 202:23
  268:15
**describing** 15:6
  54:5 142:13
  186:13
**description**
  13:21 152:21
**design** 216:14
**designation**
  28:17
**designing**
  49:16
**detail** 15:8,20
**determination**
  243:13

**determine**
  46:22 47:24
  61:20 93:13
  103:25 108:3
  115:11 234:18
  253:16 303:7
  305:6,21
**determined**
  13:2 118:5
  212:15 223:14
  239:23 241:21
  267:5,24
**determining**
  48:11 94:7
  104:5
**development**
  198:19 199:8
**developments**
  88:2 202:2
  204:25
**dhall** 2:6
**differ** 148:11
**difference**
  75:12 97:25
  98:2 107:3
  242:9 254:20
**different** 45:16
  64:8 80:21
  89:10 109:16
  110:24 111:6
  114:21 125:14
  129:9,20
  135:12 142:8
  147:8 148:16
  150:15,15

**[different - discussion]**                                    Page 20

151:12 156:14
163:20 165:8
165:13 178:7
188:22 223:6
286:11
**differently**
159:6 234:16
234:21 241:7
**differing**  139:8
**difficult**  15:19
**diffuses**  225:23
**digit**  85:9
**digits**  85:15
**diminution**
159:8,11
**direct**  41:16,20
91:24 102:21
113:11 162:14
193:12 211:11
228:4 241:11
**directed**  48:11
159:15
**directing**  43:14
113:16
**directs**  10:21
**disaggregate**
271:11
**disaggregation**
271:17
**disagree**  96:23
**disagreed**
229:2
**discernable**
103:6

**disclose**  113:23
142:6 272:8
282:8,9 283:17
283:21 293:7
**disclosed**  98:13
122:16 135:14
146:19 156:10
164:16 165:19
167:6 175:19
176:9,19
177:11 205:24
224:17 229:7
251:24 252:7
252:18 253:14
254:7,12
259:17,19
262:22 267:4
271:13 279:19
280:2,17
**disclosing**
140:16 173:2
282:10
**disclosure**
45:14 65:7
98:24 100:12
100:15 107:6
119:6 124:12
129:15,18
130:4 134:24
134:25 135:2
151:19 152:17
153:14 156:3,6
161:11 164:17
171:21,24,25
172:16,19

174:2 180:16
181:24 182:5
183:18 184:10
184:13,17,21
185:3,14,23
186:7,14,24
187:7,12,14
188:2,12 190:7
191:14 197:17
197:24 198:15
201:17 203:11
205:15 210:23
211:6 215:13
218:22,24
219:22 220:5
221:10,15,23
221:25 223:21
223:24 224:23
225:16,18
226:21 227:5
227:12,14,18
233:15 236:8
240:14,24
243:20,20
244:16 245:16
250:5,15 253:2
254:13 257:23
270:19,20
280:10 281:8
298:3,10,17,21
300:4,6,11,18
301:11,13,21
302:2
**disclosures**
66:4 81:7

93:12 118:16
118:18 137:14
137:21 138:2
138:11,17
139:4 155:7
160:23 171:4,6
173:13 183:8
188:24 189:6
189:22 190:16
191:18,25
192:6,14 193:5
198:5 201:3
202:3,16 204:6
204:13,17
234:9,25
237:25 238:5,9
238:14,23
239:18,20,24
243:6 244:12
257:2,5 264:2
267:5 273:12
284:24 299:2,4
300:14
**discount**  74:13
275:17 276:23
293:16
**discovery**
244:10,21,24
244:25 245:2
245:13 246:2
**discussed**  230:2
257:17
**discussion**
39:18 237:4
292:6

**discussions**
150:11
**dismiss** 38:10
75:25 76:9,16
78:17 90:24
207:10 210:8
210:19 233:10
**dismissed**
78:24,25 79:21
80:2,3
**dismisses** 79:6
**disposal** 224:21
**disposing**
199:19
**dispute** 112:19
**dissipate** 186:7
**dissipated** 66:2
185:22
**dissipation**
189:18
**distinct** 164:8
166:14
**distinction**
23:11 66:6
84:16 165:4
**distinguishes**
207:23 208:19
**distress** 11:16
**distributed**
265:17
**district** 1:2,2
5:21,22
**divergence**
226:14

**document** 41:8
42:10 43:4
91:17 113:9
**documents**
93:22 117:8,14
137:18 203:17
257:7 287:11
291:3,8
**doing** 8:16
52:12 88:18
153:5 157:3
180:2 214:5
257:25 265:11
279:3 290:7
293:13 310:7
**donald** 2:6 7:4
**donny** 181:2
**doubling** 108:9
**doubt** 27:16
216:24 217:19
**doubts** 218:14
**dr** 35:10 37:20
37:22,24 43:11
44:18 73:19
169:11 288:14
288:17 301:12
**dramatically**
156:6
**draw** 23:11
58:4 71:15
101:16
**drawing** 165:4
**drew** 100:6
101:23

**drop** 171:19
254:6 270:9,15
271:18 272:16
**drops** 236:15
**due** 12:10
**duly** 7:16
309:11
**dunn** 1:12 2:10
5:25 6:22
**dura** 242:21
**duty** 283:17,21
**dwarf** 172:18
**dwarfed**
279:21

**e**

**e** 2:2,2 3:2,8
7:15,15,15,15
162:2,2,4,4,4,4
198:10 308:2,2
308:2 309:2
311:2
**earlier** 19:6
48:8 61:22
80:12 154:8,18
159:7 170:19
207:10 224:23
225:25 230:2
230:24 236:8
238:16,17,18
246:21 249:20
250:5,15
255:16 259:19
270:11,18,18
270:19 271:21
272:3,17

274:15 277:24
280:11,23
282:11 285:23
288:13 305:14
**easier** 237:9
252:13 264:23
283:2
**eastern** 1:2
5:21
**easy** 237:17
**ebb** 171:20
**econometric**
271:15
**economic** 32:3
51:4 65:12
66:13 69:10,13
70:14 80:5
119:21 121:14
121:25 123:21
132:15,16
140:23 152:4,6
163:9 164:23
165:5,15
166:12,14
167:9 168:11
201:6,21 202:8
203:7 204:10
230:9 253:23
271:16,17
274:8 276:2
283:20 297:6
302:19 304:2
305:11
**economically**
27:24 204:3

241:21 251:15
258:6 266:6
302:22,24
303:25 304:4,7
304:14 306:12
306:13
**economics**
27:21 31:15
158:9 183:17
197:5 203:25
**economist**
29:10 69:19
74:22 77:12
82:2 96:25
122:25 123:11
123:16 126:15
128:6 140:4
146:25 158:2
167:19 183:4
235:7 241:6
245:14 281:11
282:16 299:7
302:21
**economists**
246:12
**economy** 297:7
**effect** 4:12
50:24 52:15,25
58:22 73:21,22
73:23 80:7,8
123:21 157:21
161:13 169:4
169:18 170:7
191:5 250:10
270:13

**effective**
212:10
**effectiveness**
214:2
**effects** 70:9
244:2,8 245:15
300:3
**efficiency**
11:23 12:5
15:24 17:22
18:21,24 23:21
47:11 49:2,22
67:25 154:4
226:22 276:16
**efficient** 13:4
18:12 19:4
39:5 226:13
**effort** 15:22
50:19 52:5
55:12 56:9
57:20 75:10,12
82:14 90:12
92:16 119:9
122:19 125:4
143:13 144:5,7
144:15 163:21
164:5 165:7
168:3 172:9
193:9 258:25
294:17 296:17
**efforts** 192:24
**either** 50:9
58:17 88:2
141:15 172:5
177:18 182:8

184:6,7,22
201:2 244:10
280:6
**elaborate** 11:8
60:13
**elaborating**
60:12
**element** 14:22
57:15 70:6
161:16 222:13
231:16
**elements** 13:14
13:17,19,25
249:15 299:12
299:15
**elevated** 215:24
268:24
**elicit** 51:7
**elicited** 81:6
161:12 243:4
**embarked**
144:4
**emerged**
172:11 176:22
**emergency**
268:3
**emerging** 173:9
174:17 175:16
179:21
**emerman** 36:15
36:18
**emotional**
11:15
**emphasis**
207:21 208:25

260:21
**empirical** 13:6
13:8,12 15:23
16:13 18:23
67:22
**employed**
49:18
**employee**
257:25
**encapsulating**
56:11
**endeavor** 195:2
**endeavoring**
94:22
**enforced** 60:24
**engage** 140:18
**engaged** 52:3
55:4,23 138:23
153:8 155:14
159:14 172:8
292:14 293:23
295:8
**engagement**
20:19,22 23:6
23:10 30:22
31:5 32:12,22
44:8
**engagements**
21:18 22:2
70:19
**engaging** 57:7
**engineer**
115:17
**ensure** 265:11

**[enter - excerpts]**                                          Page 23

**enter**  97:18
**entered**  61:5
  62:7
**entire**  15:14
  19:21 23:10
  65:2 249:17,21
  249:22
**entirely**  14:14
  203:8 239:7
  246:9
**entirety**  44:3
**entitled**  12:13
**environment**
  153:7 255:5
**equal**  81:22
  165:24 166:7
**equation**  171:9
  248:2 297:12
**equipped**
  264:25
**era**  32:5
**erk**  1:5 5:23
**eroded**  130:17
**errata**  310:6,7
  310:10,13
**erroneous**
  288:5,9
**error**  247:23
**esg**  26:4,12,19
**especially**
  210:25
**esq**  2:6,7,11,12
  2:13
**essence**  133:20

**essentially**  14:4
  16:13 178:5
  290:7
**establish**
  142:16,20
**estimate**  20:7
  23:14 35:12
  65:18,21,24
  66:4,9 81:19
  81:20 119:23
  125:24 126:2
  135:16 138:13
  156:25 259:23
  265:22 273:5,7
  273:8,24
  274:13 275:2,4
  275:10 277:3,5
  277:11,12,13
**estimated**
  122:24 126:10
  165:16 271:4
  277:4,6
**estimates**
  211:19 212:12
**estimations**
  297:5
**evacuation**
  268:4
**evaluate**  42:22
  197:10
**evaluated**
  223:6
**evaluation**
  198:17 267:24

**event**  12:12
  13:9,15,22,25
  14:14 15:10,14
  16:2 48:16
  90:17 176:23
  176:24 182:23
  182:24,25
  183:24,25
  184:7 185:18
  185:20 187:19
  187:23,24
  188:3 221:16
  223:7 228:11
  228:12,15
  240:20 271:23
  274:11 278:18
**events**  13:20,21
  14:5,6,7 15:18
  18:18,19 88:2
  144:10 185:12
  197:25 198:18
  201:3 203:11
  204:3 212:3
  217:18 222:25
  231:23 232:4
  232:22 233:24
  266:3 278:3
  285:6 287:25
  288:2,18 289:6
  291:5 306:3
**everybody**
  224:15
**evidence**  13:9
  62:15 107:23
  122:13 177:16

  197:12 216:22
  218:13 236:4
  246:12 268:24
**evident**  64:5
**exact**  8:15
  12:16,23 55:11
  55:19 102:4
**exactly**  54:13
  128:8 143:10
  158:6 167:2
  203:23 204:4
  258:13 270:8
  285:15 289:19
**examination**
  3:5 7:21
  162:12 309:12
**examined**  7:19
  162:7
**example**  16:17
  71:11 72:23
  73:3 79:24
  140:13 188:14
  197:11 224:11
  232:23 257:10
  260:17 268:19
  286:21
**except**  4:8
  140:2 166:3
  216:18
**exception**
  303:15,17,18
  304:21
**excerpt**  249:10
**excerpts**
  117:15

**excess** 45:9
**exclude** 47:12
**excluded** 14:8
  233:14,19
  240:13,15
**exclusively**
  177:4
**executive** 22:17
**exercise** 222:9
**exhibit** 3:11,13
  3:14,16,17
  40:2,9,13,18,21
  41:2,6,17,22
  42:9,20 43:3
  43:22 44:11
  91:8,13,13
  102:22 112:25
  113:5,15
  162:15 178:22
  193:14 196:25
  197:18 199:16
  211:12 215:18
  215:19 290:24
  291:11 299:20
**exhibits** 43:25
  45:3 47:18
  91:21
**exist** 29:6 61:7
  63:19 70:21
  71:4 87:25
  97:4 209:24
  281:10
**existed** 62:9
  80:23 81:16
  82:6 94:7

95:25 96:11
99:23 232:6
**existence** 165:6
  166:13 167:8
  170:3 251:24
  255:21 256:6
  258:15
**existing** 96:14
  155:10
**exists** 129:8
**expect** 20:13
  123:13 232:17
  266:9
**expectation**
  67:5 282:17
**expectations**
  66:22 67:25
  276:15
**expected**
  249:25
**expecting**
  187:22
**experience** 8:19
  58:5 69:19
  86:17 131:12
  132:6 204:9
  205:4,5,6,6
  208:22
**experiencing**
  289:25
**expert** 15:22
  19:18 20:15
  25:7,10,13,25
  26:11 27:9,14
  27:18 28:2,9

28:18,23 29:21
30:5,18 32:23
35:16 36:7,11
57:3 58:8
70:18 71:4
100:25 148:10
148:18 149:23
157:11 183:17
195:12 218:23
221:7 223:20
223:22 228:24
232:2 244:24
245:2,13 246:3
246:17 247:9
273:15 285:24
289:11 300:2
**expertise** 25:6
  25:16,23 27:18
  28:5 29:19
**experts** 16:12
  70:7,11 106:24
  106:25 203:25
  245:4
**explain** 26:24
  98:2 122:16
  134:21 151:7
  191:9 231:9
  242:6 286:13
**explained** 14:5
  98:4 109:10
  144:8 146:23
  150:17 151:15
  212:19 216:11
  231:17 243:17
  249:21 268:10

293:17
**explains** 41:12
**explanation**
  216:18 237:3
**explanations**
  295:21
**explicit** 112:21
**expressed**
  27:16 54:11
  94:13,20 95:3
  106:7 160:25
  161:6 252:11
  290:5 305:16
**expressing**
  95:19 278:19
**expressions**
  110:11 170:25
  279:10
**extended**
  203:19
**extends** 176:20
  176:21
**extent** 56:10
  57:21 188:18
  189:8 190:20
  192:15 193:6
  201:9 202:11
  202:20,21
  203:4 256:12
  259:23
**external** 29:7
**extra** 194:7
**extremely**
  287:24

**[f - feinstein]**                                                   Page 25

**f**

**f**  7:15 158:18
  158:18 162:2,4
  309:2
**fabricated**
  92:19 294:19
**fact**  8:4 19:3
  65:22 70:13,15
  70:15 72:5
  111:19 115:2
  119:22,23
  122:21 132:14
  139:24 155:10
  159:13 163:3
  166:22 172:18
  178:23 206:7
  212:25 245:13
  252:25 253:3
  295:22 300:12
**factor**  13:6,7,8
  13:13 16:13
  126:23 159:7
  170:12 268:20
**factored**
  268:22
**factors**  169:25
  197:11 257:17
  260:12,13
**facts**  51:10
  62:13 71:19
  73:9,15 74:10
  81:20 89:17
  113:20 125:10
  147:9,19,23,25
  148:7,8 157:18

164:13,15
167:5 177:17
177:19 178:2
194:23 200:23
223:16,23
234:19 237:8
237:16 245:21
251:12 264:9
267:3 292:19
296:18 302:15
306:9
**factual**  30:16
  51:24 52:2,2
  78:10 109:11
  110:21
**factually**  151:8
  152:8
**fail**  310:15
**failed**  113:22
**fails**  193:19
  228:19 229:4
**failure**  114:2
  114:17,22
  115:6,11 117:9
  118:2 247:15
  248:18 249:6
  250:18 251:5
  251:10 284:5
  286:3,7 287:5
  287:18 292:8
**failures**  290:2
**fair**  7:25 9:23
  11:10 30:17
  34:17 36:10
  42:19 56:15

59:10 88:17
135:20,25
164:12 184:25
262:14
**fairly**  123:22
  150:4 157:19
  236:16
**fall**  130:13
  187:20 274:10
  280:14
**fallen**  99:4,6,8
  100:20,20,21
  102:2,9,16
  124:14 236:7
  270:18 271:20
  280:11,12,13
  282:20 283:9
**falling**  247:22
**false**  133:25
  134:3 141:19
  141:19 149:17
  149:19 192:18
  193:25 194:20
  195:16 196:2
  206:14 219:14
**falsity**  141:9
  142:16,20
**familiar**  12:2
  29:2 134:17
  180:15 181:23
  182:13 194:9
  220:13 288:4
**far**  115:3 196:7
  259:25 289:23
  293:3

**fathom**  287:24
**featured**
  306:22
**february**  46:16
  46:17 190:18
  190:18 200:7
  200:18,20
  202:24 215:6
  215:11 217:12
  227:4,16
  231:23 249:24
  249:24 298:4
  298:11,18,21
  298:22 299:9
  300:19,20
**fed**  279:9
**federal**  3:18
  112:24
**feed**  171:8
  297:8
**feinstein**  1:11
  3:4,10,12,13,15
  5:1,18 6:1 7:1
  7:23 8:1 9:1
  10:1 11:1 12:1
  13:1 14:1 15:1
  16:1 17:1,11
  18:1 19:1 20:1
  21:1 22:1 23:1
  24:1 25:1,4
  26:1 27:1 28:1
  29:1 30:1 31:1
  32:1 33:1 34:1
  35:1 36:1 37:1
  37:14 38:1

**[feinstein - figure]**                                           Page 26

| | | | |
|---|---|---|---|
| 39:1,22 40:1,2 | 120:1 121:1 | 189:1 190:1 | 259:1 260:1 |
| 40:5,8,9,12,16 | 122:1 123:1 | 191:1 192:1 | 261:1 262:1 |
| 40:18,20,25 | 124:1 125:1 | 193:1 194:1 | 263:1 264:1 |
| 41:1,2 42:1 | 126:1 127:1 | 195:1 196:1 | 265:1 266:1 |
| 43:1 44:1 45:1 | 128:1 129:1 | 197:1 198:1 | 267:1 268:1 |
| 45:7 46:1 47:1 | 130:1 131:1 | 199:1 200:1 | 269:1 270:1,4 |
| 48:1 49:1 50:1 | 132:1 133:1 | 201:1 202:1 | 271:1 272:1 |
| 51:1 52:1 53:1 | 134:1,16 135:1 | 203:1 204:1 | 273:1 274:1 |
| 54:1 55:1 56:1 | 136:1 137:1 | 205:1 206:1 | 275:1 276:1 |
| 56:15 57:1 | 138:1 139:1 | 207:1 208:1 | 277:1 278:1 |
| 58:1 59:1 60:1 | 140:1 141:1 | 209:1 210:1 | 279:1 280:1 |
| 61:1 62:1 63:1 | 142:1 143:1 | 211:1 212:1 | 281:1 282:1 |
| 64:1 65:1 66:1 | 144:1 145:1 | 213:1 214:1 | 283:1 284:1 |
| 67:1 68:1 69:1 | 146:1 147:1 | 215:1 216:1 | 285:1 286:1 |
| 70:1 71:1 72:1 | 148:1 149:1 | 217:1 218:1 | 287:1 288:1 |
| 73:1 74:1 75:1 | 150:1 151:1 | 219:1 220:1 | 289:1 290:1 |
| 76:1 77:1 78:1 | 152:1 153:1 | 221:1 222:1 | 291:1 292:1 |
| 79:1 80:1 81:1 | 154:1 155:1 | 223:1 224:1 | 293:1 294:1 |
| 82:1 83:1 84:1 | 156:1 157:1 | 225:1 226:1 | 295:1 296:1 |
| 85:1 86:1 87:1 | 158:1 159:1 | 227:1 228:1,19 | 297:1,25 298:1 |
| 88:1 89:1 90:1 | 160:1 161:1 | 229:1,3 230:1 | 299:1 300:1 |
| 91:1,8,12 92:1 | 162:1,13,14 | 231:1 232:1 | 301:1 302:1 |
| 93:1 94:1 95:1 | 163:1 164:1 | 233:1 234:1 | 303:1 304:1 |
| 96:1 97:1 98:1 | 165:1 166:1 | 235:1 236:1 | 305:1 306:1 |
| 99:1 100:1 | 167:1 168:1 | 237:1 238:1 | 307:7 308:6,16 |
| 101:1 102:1 | 169:1 170:1 | 239:1 240:1,25 | 309:9 |
| 103:1 104:1 | 171:1 172:1 | 241:1 242:1 | **feinstein's** |
| 105:1 106:1 | 173:1 174:1 | 243:1 244:1 | 12:12 |
| 107:1 108:1 | 175:1 176:1 | 245:1 246:1 | **fell**  53:14 |
| 109:1 110:1 | 177:1 178:1 | 247:1 248:1 | 173:12 236:3 |
| 111:1 112:1,25 | 179:1 180:1 | 249:1 250:1 | 272:13 277:10 |
| 113:1,3,5 | 181:1 182:1 | 251:1 252:1 | **felt**  15:7,19 |
| 114:1 115:1 | 183:1 184:1 | 253:1 254:1 | **figure**  31:11,19 |
| 116:1 117:1 | 185:1 186:1 | 255:1 256:1 | 35:8 276:18 |
| 118:1 119:1 | 187:1 188:1 | 257:1 258:1 | 289:22 293:24 |

**[figure - fraud]**

296:12

**figures** 284:3
284:13 285:9
287:17

**filed** 5:20 113:7

**filing** 4:4

**filings** 33:16
115:16 116:19
203:21

**final** 75:21

**finance** 26:18
26:18 87:22
158:10 169:10
300:2

**financial** 2:18
7:11 22:15
25:16 26:17
27:5,21 28:7
28:16 66:20
224:5 262:6
263:8 273:23
274:4 277:4

**financially** 6:11

**find** 199:9
204:16

**finding** 18:11

**findings** 41:13

**fine** 23:13,14
23:22

**finish** 9:11,13
131:4

**finished** 278:7

**firm** 29:5,7
269:15

**first** 8:24 28:24
42:14 61:6,8
61:10,11,14,23
62:2,8,10,16,17
62:25 63:7,9
63:16,19,24
64:2,3,18 65:6
75:6,14 78:18
79:9 93:21
97:14,19 98:7
98:8,13,20
99:24 101:18
101:20 102:12
102:17,25
109:7 113:17
125:15 140:2
140:14 152:24
157:14 171:20
172:2 174:11
175:9 178:17
188:12 219:21
247:2 281:16

**fit** 17:5 93:20
147:23

**five** 297:14

**flakes** 168:14

**floor** 123:23
271:18,24
272:14 273:2
273:14 274:13
275:11

**flow** 247:11

**flows** 248:3
250:2

**focus** 13:22,23
58:19 70:12
71:13 79:8
129:14 189:7
208:24

**focused** 47:16
48:16 68:22
71:12 77:21
106:23,25
107:2 209:4

**focusing** 72:2
142:11 227:22
251:23

**follow** 43:9
52:14 262:7

**following** 187:4
311:3,4

**follows** 7:20
56:6 162:8

**force** 4:12
293:8

**forecasted**
248:3 273:25

**forensic** 135:16
177:14,15
224:4,9,14,17
237:9 246:3
273:23 274:4
277:4

**forgive** 301:5

**form** 4:8
115:19 184:16
184:16,18,21
198:5 226:16

**formal** 290:6

**formed** 44:25

**former** 101:22
165:14,21
306:16,20

**forming** 145:17

**formula** 297:9

**forth** 138:6
159:23 309:11

**forthcoming**
263:25 264:15

**found** 12:10
55:23 90:15

**foundation**
69:14 219:2,7
219:8,9,12

**four** 93:8

**fox** 2:4 7:5,9
24:22 33:21
34:7

**fragility** 140:13

**frame** 285:7

**franco** 34:15

**frankly** 174:12

**fraud** 56:17
57:5,16 58:6
68:12 69:20,22
70:10,12,13,15
70:19 72:4,5
74:23 77:13
99:22 127:15
130:8,9 131:14
131:17 135:23
148:21 149:24
150:21 154:10

**[fraud - going]** Page 28

154:11,13,14
154:21 155:21
157:5,11,23
158:25 207:2
207:25 208:22
235:3 241:4,8
241:19 243:4
243:11,14,24
270:7 299:8,16
**free** 247:11
**freire** 2:12 7:2
**frequently**
265:25
**front** 209:2,2
**fulfilled** 282:6
282:9 283:21
**full** 45:13 98:24
99:18 100:11
100:15 101:24
102:10,17
104:9 107:6
124:12 129:19
134:25 135:2
172:18 236:8
250:5 278:3
282:10 298:2
298:22
**fully** 62:23
153:13 171:23
171:25 174:2
174:19 208:9
283:8 299:8
**function**
241:20

**fundão** 287:19
**further** 4:7,10
162:7 306:24
309:15
**future** 141:9

**g**

**g** 26:4 308:2
**gain** 276:15
**game** 66:23
67:5 68:2
**gap** 125:2
**gauge** 270:15
271:18,24
272:16
**gauges** 270:15
**gee** 175:6
**general** 8:20
47:15 87:13
132:11,14
156:21 195:12
261:23 275:25
300:24 303:19
**generalize**
56:23 185:9
302:9
**generalized**
12:20
**generally** 27:20
45:25 51:7
65:12 66:19
67:9 69:9
71:12 87:19,20
220:17 290:11
302:11,22
303:11,13,19

303:25 304:7
304:13,16,16
306:12
**geoconsultore**
267:23
**geotechnical**
25:8 29:25
285:23
**gerais** 199:18
200:5,11 217:7
**getting** 21:23
256:5 264:20
273:13
**gibson** 1:12
2:10 5:25 6:22
**gibsondunn.c...**
2:12,13,14
**give** 11:12
106:2 120:13
120:16 208:9
208:10 221:2
**given** 8:19
16:15 21:8
51:10,11 81:20
88:15 126:3
128:7 177:17
223:16 229:9
267:3 272:9
279:2,2 283:4
283:10 308:13
309:13
**giving** 249:10
**glauberson**
2:19 6:4

**glean** 245:13
**gleaned** 143:8
**glenn** 30:24
**go** 5:14 9:25
17:2 19:25
57:12 77:8
147:15 150:12
155:13 181:4
195:20 197:14
202:24 231:6
232:23 297:15
**goals** 87:8
**going** 5:3 8:21
23:15 39:15
60:16 76:25
96:7 101:7,8
123:19 124:23
125:15,17,19
126:7 130:10
131:18 132:22
133:17,23
134:9 136:21
159:18 161:22
166:24 167:9
172:10,14
174:3 181:25
197:14 209:13
220:19 225:7
230:12 234:18
237:18 242:16
253:16 269:21
273:14 277:2
283:14 297:18
303:12 307:8

**good**  5:2 6:20
7:22,24 54:16
78:14 90:3
136:8 145:21
161:18 277:19
280:20 294:13
295:20,20,21
**gosh**  221:12
**gotta**  161:14
**governance**
25:14,17,25
26:5 27:2
304:25
**governed**  27:22
**government**
174:15 179:10
221:22 293:9
**governmental**
220:9
**gradually**
172:12
**grandmothers**
132:19
**greater**  15:20
65:20,23 66:11
163:8 205:4
255:6 256:23
**ground**  8:20
277:2
**grounded**
202:7
**group**  56:12
**growing**  189:17
**grupo**  33:15

**guardian**
173:14 227:11
**guess**  177:3
**guessing**  59:15
214:13

**h**

**h**  3:8 7:15
194:8
**half**  17:9 19:22
19:23 228:23
240:6
**hall**  2:6 7:4,4
12:14,22 13:11
14:15 15:4,12
16:5 17:3
18:13 19:14
23:7 26:13
27:12 28:4
29:3,16 30:8
35:22 36:20
37:3,9 39:5,20
44:12 45:4
47:2,9 48:4
49:6,15 50:3
50:12 51:21
53:2 54:7
57:10 58:12
59:11 60:10
61:13 62:11
63:12,20 64:24
66:18 68:14
69:24 70:24
73:7 74:20
75:4 76:5,23
77:18 78:4,9

78:22 79:17
80:17 81:18
82:8 83:3,20
84:14 86:2
87:9 88:22
89:13,23 93:4
93:17 94:11
95:16 96:16,18
96:24 97:8,20
99:14 100:2
101:6 103:16
104:7,20
105:12,24
106:21 107:13
107:19 108:6
108:20 109:2
110:4 111:9
112:2,15
114:18 115:8
115:13 117:10
118:4 119:2,15
120:11,18
121:7,21 122:9
123:6,15
124:22 125:25
126:19 128:3
128:14,21
129:2,12 131:7
133:4,19 136:4
136:6,12
138:19 139:6
139:20 141:11
141:22 142:18
143:6,25
144:23 146:4

146:13 147:7
147:17 148:13
149:11 150:3
150:25 154:12
154:22 155:23
157:6,13 159:5
159:16 160:4
160:19 161:20
163:18 164:11
165:10 166:2
166:17 167:22
168:9 170:14
170:23 171:22
172:20 173:21
175:20 176:11
177:13 178:11
179:24 180:21
181:6,16,20
183:10 185:6
186:17 187:10
189:4 190:11
192:4,9 193:10
194:22 195:18
201:4,18
203:13 204:7
205:20 206:15
208:7 210:17
210:24 213:13
214:3,17 217:9
218:4 219:4,23
220:16,18
221:11 224:2
225:20 226:11
226:25 227:25
230:3,13,25

**[hall - hours]**                                                   Page 30

| | | | |
|---|---|---|---|
| 232:8 234:11 | **halts** 220:10 | **happy** 10:10 | **hiding** 171:15 |
| 235:4,22 | **hand** 309:21 | 169:15 | 174:6 272:6 |
| 236:18 238:3 | **handed** 91:11 | **hard** 71:15 | **high** 31:14 |
| 238:11 239:4 | 113:4 | 95:18 141:23 | 71:24 113:24 |
| 239:25 240:11 | **happen** 64:10 | 196:11 235:10 | 113:25 114:8 |
| 243:9 244:3 | 125:12 139:9 | 236:19 252:10 | 114:22 267:17 |
| 245:19 247:17 | 159:10 178:6 | 287:23 292:17 | 267:25 293:7 |
| 248:19 249:7 | 187:13,13,19 | 302:8 | **higher** 39:21 |
| 250:20 252:8 | 188:6 206:2 | **harder** 303:4 | 293:11 |
| 252:21 254:18 | 251:12 253:17 | **harvard** 7:18 | **highlights** |
| 255:23 257:20 | 253:17,18 | **harvey** 37:7 | 208:11 |
| 258:3,17 | 256:17 257:24 | **hazard** 113:24 | **hindsight** |
| 261:17 262:9 | 281:12 287:25 | **head** 9:2 | 223:20 224:4 |
| 262:18 263:10 | 288:18 | 174:16 291:22 | 224:19 |
| 263:23 265:5 | **happened** | **heading** 145:6 | **hire** 203:25 |
| 266:5,15 | 139:10 142:21 | 285:17 | **hmm** 272:5 |
| 267:11 269:10 | 174:14 176:24 | **hear** 248:20 | **hold** 25:23 |
| 270:25 271:14 | 176:25 179:2 | **heard** 32:18 | 66:10 180:17 |
| 272:24 273:21 | 186:3 188:9 | 305:17 | **holding** 65:25 |
| 274:22 275:7 | 189:16 190:4 | **heart** 155:5 | 66:14 242:18 |
| 276:8 280:4 | 190:10 195:8 | **heavy** 260:21 | **holistic** 196:5 |
| 281:14 282:23 | 199:3 207:6 | **held** 1:12 31:13 | 196:22 |
| 284:7 286:25 | 211:8 220:4 | 39:19 | **holistically** |
| 288:7 289:17 | 235:25 255:12 | **help** 21:22 | 59:24 191:4,6 |
| 290:25 291:23 | 255:13 277:8 | 203:25 204:2 | 194:6,8,20 |
| 292:12 293:25 | 278:22 281:3 | 234:22 266:9 | 195:16 196:2 |
| 296:24 297:16 | 282:2,5,13,18 | **helps** 270:15 | 197:7,11,12 |
| 298:6,13 | **happening** | **hereinbefore** | **honest** 260:18 |
| 299:10 300:21 | 179:5 209:15 | 309:10 | 263:25 266:9 |
| 301:4 303:2 | 291:5 | **hereto** 4:3 | 300:3 |
| 305:9,23 307:3 | **happens** 59:4 | **hereunto** | **hope** 119:3,19 |
| **halt** 200:4 | 70:10 182:25 | 309:20 | **hour** 39:4 |
| 216:4 217:23 | 185:25 187:18 | **hesitating** | 220:19 252:9 |
| **halted** 216:16 | 187:25 279:20 | 241:5 | **hours** 23:20,25 |
| | | | 24:5,7,9 39:3 |

63:10,17 64:10
200:8
**hubbard**  30:24
31:4 35:10
37:20 43:11
44:18 227:22
228:18 247:24
300:16 301:12
301:12
**hubbard's**
73:19 169:11
**huge**  260:7,9
**hugely**  209:8
**human**  222:9
222:13
**hundred**
148:21
**hundreds**
69:19 74:22
77:12
**hypothesis**
216:10
**hypothetical**
64:12 126:5
128:17 129:17
131:11 133:7,9
134:23 135:6
139:8,12,16
141:25 167:16
207:8,24
208:20 236:25
264:10,13
281:17 282:14
283:15 292:16
295:12,16,24

296:2,5,6,11,11
**hypothetically**
124:18 150:10
**hypotheticals**
125:12 185:10

**i**

**idea**  283:2
290:9
**identification**
40:10,19 41:3
91:9 113:2
**identified**
33:17 188:24
189:22 204:15
238:14 243:5
**identify**  155:7
291:7
**identifying**
202:15
**ignorance**
125:5
**ignores**  229:12
229:13
**ignoring**
252:25
**image**  183:21
**immediate**
204:23
**immediately**
64:17
**impact**  63:11
118:24 121:3
121:18 126:17
130:20 131:19
132:16 136:3

136:10,14,17
140:24 141:21
152:5,6 163:4
163:8,10
164:23 165:5
166:12,14,24
167:10 283:20
292:9
**impacted**  229:7
248:4
**impacts**  156:24
**impair**  88:3
**impeccable**
53:20 54:4,19
103:4 108:19
153:2 155:11
175:8 213:5
214:8
**impeccably**
54:20
**imperative**
310:12
**implications**
110:16 129:21
134:4 203:7
228:11 230:10
274:8
**implicitly**
290:8
**import**  80:6
192:16,16,20
193:3
**importance**
106:14

**important**  26:5
26:12,19 27:3
57:15 67:15
74:5 94:21
95:9,20 106:6
106:9 142:3
171:16 174:6
229:15 232:12
241:24 251:19
260:24
**importantly**
58:23
**imposed**
293:15
**imposing**
220:10
**impounded**
64:5
**impression**
193:25 194:21
195:16 196:2
**impressive**
103:4,5 153:3
**improve**  214:6
**improved**
122:20
**improving**
124:21
**inactionable**
79:6
**incapable**
263:3,6
**incident**  229:10
235:14 237:12
237:15,16

**[incident - information]**                                              Page 32

254:21 255:2
255:15 266:8
283:6,7
**include** 19:12
136:10 138:9
138:12 156:2
157:10,17
159:3,7 160:17
163:16,25
167:7 169:12
172:18 204:11
244:24 249:23
249:25 270:23
**included** 177:5
199:23 238:22
253:3 301:19
301:20
**includes** 67:24
84:17 166:22
167:4
**including** 24:2
135:13 156:3
169:11
**inconceivable**
102:15,18
**inconsequent...**
218:10
**inconsistent**
62:17 104:17
105:9 184:8
232:12 292:24
**incorporate**
152:4
**incorporates**
67:2,21

**incorrect** 268:9
287:18
**increasing**
199:21
**incrementally**
188:8,10
191:17
**incumbent**
299:25
**independent**
109:8 110:17
201:24 202:6
202:17 203:9
236:22 237:24
260:18 261:3,7
**independently**
239:22 266:25
**indicate** 9:20
90:4,10 103:2
198:4
**indicated** 19:6
31:17 85:20
90:22 154:20
171:12 198:18
217:18 228:12
229:20 288:12
**indicates**
201:21
**indicating** 95:8
228:22
**indication**
20:20 249:18
250:3 270:10
**indicative**
235:2

**indicator**
250:13
**indisputable**
205:22
**individual**
194:13 196:6
**induced** 99:22
**industry** 28:9
**inference**
172:11
**inferred** 172:10
**inflated** 169:19
231:13,13
**inflation** 45:8
60:7 61:5,15
61:22 62:3,6
63:2,18 64:4,4
64:16,21 65:10
65:18 66:2,7
66:10,15 70:20
71:4,18 72:14
80:23 81:4,9
81:16,22 93:10
96:11 97:4,10
97:12,18 98:6
98:16,17 99:5
99:22,23
100:22 104:2,6
118:8,19
119:24 121:17
121:20 122:23
123:5,14
124:23 125:7
125:18,20,22
126:8,18

128:12 129:11
133:11 136:24
165:16 167:20
168:4,20
182:10 184:24
185:21 186:8
187:15,16
189:18 196:14
224:25 225:2
231:10,18
232:6 236:4
242:17 243:7
255:16 270:11
270:16 271:3
**influence** 11:18
**inform** 90:19
156:15 160:16
180:10 186:8
188:4 202:10
209:10
**information**
10:4 19:4
27:25 48:15,18
66:22,25 67:4
67:11,15,23
68:13 69:15,22
71:20 72:13
79:4,14 98:11
107:12,17
108:5 109:19
111:14 123:20
127:10 135:12
135:13 137:6
138:10,22
140:8,17 142:3

[information - involved]                                           Page 33

142:5,12,14,25
143:3 151:10
156:4 163:11
164:9,24
165:17,18
166:15 169:4,5
169:15 171:16
172:25 174:7
185:13 188:5
198:12 211:5
217:2 223:5
224:6,7,7,21
225:23 226:19
228:22 229:15
229:18,19,22
232:11,16,18
240:21 243:23
244:9 245:24
247:12 248:7
251:18,22
253:4,12,15
256:21 258:18
260:5,7,9,20
265:7,16
266:17 267:13
268:7,14
271:22 274:17
276:4,10,12,17
276:20 277:23
278:16 280:25
292:9 300:5
301:19 303:7,9
304:24 305:8
**informational...**
  233:21

**informative**
  152:16
**informed**
  104:24 119:6
  137:15,17
  140:12 181:14
  188:14 193:5
  198:19 201:6,8
  203:3 205:3
  209:11 267:17
**informing**
  230:7
**informs**  182:8
  184:2
**initial**  176:22
**inputs**  169:24
**insertion**
  243:15
**inside**  280:7
**instance**  219:21
**instructions**
  310:2
**intended**  263:8
  294:10
**intense**  87:22
**intensively**
  194:24 203:22
**intent**  143:23
  261:10
**intentionally**
  127:2 276:20
  280:24
**interest**  209:20
**interested**  6:12
  309:18

**interfere**  5:11
**internal**  29:8
  257:7
**interpret**
  115:18 234:19
**interpretation**
  109:9 179:16
  180:8 181:13
  286:10
**interpreted**
  121:13 268:2
  269:14
**interrupt**  276:7
**interrupted**
  181:17,21
**intervening**
  238:19
**intervention**
  216:3
**invest**  266:4
**investigated**
  209:14
**investigations**
  299:13
**investment**
  28:3,10,13,19
  242:19
**investor**  176:5
  235:18 270:22
**investors**  26:5
  26:11 27:3,21
  66:20 69:23
  90:13,19 95:10
  103:7,14
  106:14,17

108:18,23
110:23 114:16
119:24 129:5
138:24 153:9
155:16 159:15
167:18 170:17
171:13 172:13
172:22 173:19
174:5 177:22
179:19 193:24
204:9 205:5
206:13 209:3
209:21 210:3
225:19,21,24
226:9,17,18,22
236:6 242:18
250:16 251:3
251:15,19
253:3,25 258:7
259:23 260:3
261:2 262:5
263:3,6,18
264:21,24
265:25 270:13
271:20 272:2
272:21 273:18
273:24 274:5
274:20 275:15
276:4 277:17
278:14 280:22
302:23 303:8,9
305:7
**involved**  31:9
33:15 89:9
148:11,23

**involvement**
31:12
**involves** 56:17
68:12 69:22
127:15
**involving** 87:7
227:6
**iron** 85:13
200:12
**irrational**
173:23
**irrelevant**
283:13,15
**irrespective**
10:20 76:7
265:3
**issue** 17:7
89:11 143:10
150:14 158:6
179:4 195:15
197:17 209:4
258:6
**issued** 13:2
82:21 91:15
**issues** 19:18
20:16 25:14,17
27:3 100:18
101:3 137:18
215:25 216:20
**items** 138:25

**j**

**j** 198:10
**jangada** 200:12
**january** 46:12
46:20 174:7

178:10,24
179:14,18
180:10 190:17
199:11 205:11
208:5 209:25
210:4 211:8,9
211:23 212:4
212:15 213:22
214:23,25
233:14 234:10
237:19 249:23
270:6 271:10
272:13,20
277:15 278:14
279:25 281:4
283:5 298:19
300:19
**job** 145:21
234:13 237:9
258:2
**joined** 6:24
**jonathan** 158:3
158:12
**joralemon** 2:11
3:6 6:20,21
7:21 39:14,25
40:12,20 47:7
47:14 76:21
91:10 120:15
128:19 134:6
136:7 161:17
162:12 181:2
181:11,18
215:9 220:22
221:2,5 225:4

269:19 297:13
306:23
**journal** 173:14
227:16
**judge** 12:25,25
13:16 16:10,22
38:9 52:4,8
53:3 59:15,19
75:7 92:14
144:8,11 145:2
145:12,20
191:8 195:9
210:18 211:2,7
234:14,17,21
235:10 236:23
258:23 294:14
**judge's** 12:3
53:10 56:11
57:14 59:13
78:12 88:15
143:9 145:5
146:7 160:13
197:9 237:2,3
**judged** 80:5
**judges** 151:6
234:13
**judith** 1:14
309:6,24
**judy** 6:7
**july** 179:13
231:24 232:4,7
**justice** 18:17
**justified** 117:21
**justify** 117:20
222:25

**k**

**k** 158:18 308:2
**kaplan** 2:4 7:5
7:9 24:22
33:21 34:7
**kaplanfox.com**
2:6,7
**karpoff** 158:12
158:12,17
**kathleen** 32:11
**keep** 16:24
252:10 263:16
272:8 292:15
293:5,23
294:10 295:9
295:18 296:17
**keeping** 129:5
293:13
**kept** 126:4,6
292:21
**kidding** 120:16
120:18
**kilsheimer** 2:4
7:5
**kind** 144:3
186:6 187:11
220:3 266:17
290:5
**knew** 37:6,11
62:16 94:16
107:24 110:24
115:24 116:12
127:8 141:8
142:9 173:15
188:11 208:13

209:18 246:23
246:24 250:17
251:3 268:6,25
293:13
**know**   8:20 10:9
19:20 21:3
23:17 27:14
28:24 33:5,8
33:11 34:14,15
35:25 36:4,22
47:12 51:10
56:20,20,21
57:14 61:14
62:13,13,14,20
64:7,11 70:5
71:14,23 72:3
74:10 75:8
77:19,20,23
79:3,19,20
85:5 92:12
96:20 105:13
105:13 114:6
115:4,5,9
141:16 142:19
146:15 150:10
150:20 152:9
157:8 168:12
172:22 177:18
177:22 179:2
182:10 185:8
185:18 186:2
195:8 202:6
212:23 218:5
219:5 222:5
224:12 226:7

228:2 230:15
246:25 254:14
254:19 260:3
260:25 263:11
265:20 274:11
274:12 275:13
275:14,15,23
276:5,6 277:8
277:20,21
282:22,24,25
283:3,4,13
288:8,9,10
291:24
**knowing**   67:11
67:13 251:9
**knowledge**
139:14 143:21
144:4 276:10
**known**   32:8
53:14 81:25
104:9 107:5
113:21 124:3
174:19 175:15
188:17 208:5
211:4 222:18
223:16,23
243:22 245:17
247:15 248:17
249:5 255:15
272:2 275:17
275:18
**krogman**
197:10

**l**

**l**   7:15,15 194:8
198:10 308:2
**labeled**   41:24
**language**   59:14
59:16,20 91:2
91:25 92:9,25
231:2
**laranjeiras**
198:6,13,25
199:13,24
200:13,19
201:16 202:2
216:12 239:15
**large**   102:19
**largest**   200:5
**late**   275:23
**law**   1:12 57:12
83:11 150:12
195:4 242:8,15
242:15
**laws**   3:18 57:22
79:7 85:21,25
89:6 112:24
138:5
**lawyer**   57:12
57:23 62:19
68:15 74:15
**lawyers**   150:11
150:17 203:24
**lay**   290:5
**layperson**
27:11
**layperson's**
151:13

**lcd**   153:23
**lead**   32:24 33:3
33:7,17
**leak**   228:22
229:19
**leap**   303:4
**learn**   46:4 50:7
126:6,25
131:21 137:13
137:20 150:13
156:5,22
232:25 277:9
301:14
**learned**   118:14
118:15,17
130:17,21
132:3,21 134:2
151:5 160:22
161:9 171:3,5
172:23 183:16
185:14 189:15
213:6 233:5
235:16 237:12
237:13 248:5,6
249:20 251:21
271:21 272:17
274:15 280:23
283:6,8
**learning**
111:12 212:8
222:4 247:2
**learns**   132:9
140:7 157:22
**leave**   72:7
125:7 126:13

**[leave - looking]**                                          Page 36

160:23
**leaves** 301:12
**leaving** 78:18
**led** 104:10
  105:17 179:12
  198:22 216:2
  256:24
**left** 136:19
  211:7
**legal** 2:19,19
  3:9 58:4 62:22
  68:16,18 69:6
  69:12 74:16
  80:4 96:19
  97:2 144:2
  145:23 146:5
  146:14 149:12
  154:14 183:15
  185:7 197:2,4
  217:15,24
  218:5,6 219:20
  235:5 237:14
  241:8
**length** 59:9,17
**lens** 88:20
**lesser** 242:16
**letting** 173:4
  208:14
**level** 31:14 66:2
  66:8,11 81:4,5
  106:14 122:23
  124:24 125:16
  125:23 126:9
  268:3

**liar** 132:21
  232:23,24
**liars** 132:12,13
**license** 198:7
  198:13,25
  199:6 200:21
  201:17 239:15
  240:8
**licenses** 200:12
  229:5
**lie** 126:16,17,21
  126:21 128:23
  129:9 130:23
  131:15,19,20
  131:22 143:23
**lied** 128:23,24
  130:19,22
  233:2
**lies** 132:8
**life** 255:6
**light** 79:25
  111:19 121:13
  151:10 177:25
  208:16 223:4
  236:2 279:5
**likelihood**
  127:6 206:4,6
  206:9 234:6
  256:7 259:3,7
  259:14 260:10
  260:14 261:16
  263:7,21
  264:25 266:2
  266:13 296:20

**likely** 65:23
  86:3 201:10
  209:5 253:17
  258:19 284:13
  284:18 285:10
  289:23
**limit** 223:22
  238:12
**limited** 84:12
  85:25 86:8,9
  241:3
**limiting** 47:4
**line** 77:23
  195:2,7 196:8
  196:16 311:6
**list** 107:14
  108:14 203:18
**listed** 33:6
**literature**
  27:14,19 67:3
  67:4,17,20
  158:5,20
  260:20 303:5,6
  304:6,12,23
**litigation** 1:5
  5:20
**little** 39:16
  80:11 151:12
  156:9 220:19
  252:10 292:17
  303:3 306:21
**livenote** 1:14
**llp** 1:13 2:4,10
  6:2 7:5

**location** 5:24
**locked** 238:18
**logistics** 39:17
**long** 38:25
  87:25 107:22
  124:25 126:3
  127:13 132:2
  184:20,21
  195:13,13
**longer** 131:16
**look** 34:13 42:8
  43:18 63:13
  64:13 71:7
  72:24 75:19
  87:16 112:17
  117:4 121:11
  149:21 152:9
  164:22 178:15
  197:18 204:5
  204:22 211:25
  213:15 215:16
  257:11,16,22
  272:15 291:15
  299:18
**looked** 34:11
  35:4,7 38:12
  85:6 111:14
  116:17,19
  207:9 235:25
  236:20 238:18
  239:10 257:10
  266:16 306:4,5
  306:6
**looking** 43:2,24
  108:13 116:3

**[looking - market]**                                    Page 37

117:17 127:4,5
151:24 177:15
203:23 215:21
280:5 285:12
**looks** 246:6,10
247:22
**lose** 52:18
130:15 270:14
**loss** 3:11,14
17:13,17 18:6
18:9,20 19:11
19:18 20:2,17
20:24 21:15
22:3,9,24 23:9
24:18 40:6,23
41:14 44:4
47:5,18,22
48:6,23 49:9
49:19 75:23
78:7,21 79:15
82:17 103:12
117:24 121:3
122:8 134:18
139:17 147:5
147:15 154:2
163:14 183:5
189:19 242:19
255:6 270:5
271:5,9,11
272:20 292:10
296:22
**losses** 119:24
235:18 237:21
270:23 279:24

**lot** 17:2 98:10
100:20 111:11
125:6,17,20
132:23,24
151:25 185:11
190:14 208:13
213:16 256:19
260:12,13
280:12,13
**low** 259:25
268:11 275:3
285:20 288:22
289:23 291:4
**lower** 114:11
114:24 255:17
255:18 273:6
**lowest** 171:20
**lull** 18:2
**lunch** 161:18
161:24
**lying** 129:22,22
130:4,6,6,12,18
130:18 132:9
132:23 233:5

**m**

**m** 308:2
**made** 15:22
45:22 72:20
86:4 97:19
103:7 141:6,18
141:20 146:21
150:8 174:14
178:10 208:24
213:23 223:25
247:24 258:5

281:5,9 282:6
310:6
**magistrate**
12:3,25 13:16
**magnitude**
102:20 126:15
126:16,20
128:22 163:7
256:8,11
259:11,13
270:14 285:18
**main** 258:22
**maintain**
122:22 125:23
**maintained**
61:23 63:7
**major** 248:6
285:6
**make** 9:5,15,25
10:6 26:14
27:9 66:5
84:15 95:4
97:15 110:8
141:10 153:18
155:8 158:22
160:5,6 169:23
176:4 186:10
213:10 237:8
237:17,22
252:12 256:9
264:23 281:6
281:16 295:17
301:7,23 310:4
311:3

**makes** 73:24
97:25 98:2
150:16 245:5
292:13 295:6
296:8
**making** 61:6,8
62:8,9 152:3
159:25 243:12
246:8
**manage** 52:13
**managed** 50:20
54:17
**management**
53:21 84:2,18
88:12 89:4
92:20 105:22
106:18 192:25
294:21
**manner** 87:24
231:11
**march** 3:12
40:4,8 154:6
158:14
**mark** 39:15
40:3
**marked** 40:9
40:17 41:2
91:8,12,21
92:7 112:25
113:4
**market** 11:23
12:4 13:3,5
15:24 17:22
18:21,24 23:20
47:11 48:25

**[market - mean]** Page 38

49:22 51:3,6
51:16 52:16,23
53:17 66:21
67:10,25 73:10
73:11 74:8
79:21 82:5
93:15 94:8
96:14 97:7
103:22 104:5
104:17,25
105:10,17,21
107:12,24
109:15 123:18
126:6,25 127:7
130:17 131:21
132:2,9 134:2
137:12,15,17
137:20 138:2
138:10,16,21
139:3,13 140:7
149:20 154:4
156:4,21,22
157:22 160:22
175:3 179:10
182:11 185:17
186:2 189:14
196:21 221:22
222:4 223:3
224:8,12
225:22,23
226:13,14,16
226:17,23
233:25 235:15
237:11 248:5,5
249:19 256:24

266:12 276:16
283:5 293:12
301:14 302:3
**market's** 80:15
80:19 101:2
125:5 126:3
**marketplace**
119:7 182:9
184:2 186:9
188:4,19
190:19,20
192:15 193:5
198:20 201:7,8
202:11 205:3
206:8 217:18
223:14 228:13
230:6,8 245:25
253:20 266:18
266:19 300:12
300:13
**markets** 18:11
66:25 67:18
**marriage**
309:17
**massachusetts**
7:19
**mastered** 28:15
**material** 27:25
75:12 82:23
117:20 204:3
251:15 258:7
260:24 266:7
302:22,24
303:25 304:2,4
304:7,14 305:8

306:12,13
**materiality**
302:18,19
305:21
**materialization**
182:14 183:2
183:25 185:19
205:17,23
**materializati...**
229:6
**materially**
58:23 113:22
**materials** 44:2
110:2
**math** 263:22
**mathematical**
165:15 171:9
**mathematically**
170:16
**matter** 5:18 8:5
11:23 18:9
26:2 28:20
33:20 34:25
36:8,12,19
37:2,19 44:4
45:2 47:15
82:25 85:18
94:10 104:4
106:10 107:16
113:7 132:14
147:2,9,12
148:7,9 172:15
246:18 289:15
298:23 309:19

**matters** 17:25
70:17 104:8
106:8 132:4,4
132:5 148:3,4
148:5 283:18
304:24,25
305:2
**matthew** 35:21
35:23 36:3
**mean** 23:8 27:4
29:4,9,13,14
30:25 31:21
45:8 48:20
54:9,12 56:13
56:21 57:11
59:4 63:22
64:9 65:19
68:4 71:10,12
73:8,17,18
77:20 83:24
86:3,5,6 87:12
87:13 90:5
95:18 98:23
102:15 114:6
116:22 120:3
124:10,16
132:18 138:7
142:19 143:19
145:2 147:19
147:20 149:9
150:7,9 157:25
160:24 161:10
163:19,20,23
172:2 173:5,8
175:5,7 177:3

179:20 185:13
186:19 191:5
192:19,21
194:7,15
203:24 204:5
204:11 205:25
207:5,23 208:8
208:15 211:2
218:6 221:14
222:6 226:12
228:10,16
234:12 239:10
244:13 248:8
249:9 255:17
256:10 257:4
258:23 259:12
260:19 262:10
264:4 268:5
273:5 287:8,14
287:20,21
290:5 291:17
295:20,23
296:4 299:25
300:7 303:5,21
303:22 305:24

**meaning** 48:23
110:9 136:5
218:25 222:11

**means** 53:17
86:7 87:23
150:21,23
286:19 288:9
288:10,11

**meant** 32:20
47:12

**measure** 81:8
102:4 165:20
167:19 168:13
168:14 241:17
242:2,12,14,23
243:6 248:11
248:13,24
255:16 280:20
300:8

**measured** 81:3
100:23

**measures**
165:22

**media** 5:16
37:12 76:25
77:7 134:9,15
161:22 162:11
200:10 225:7
225:13 269:21
270:3 297:18
297:24 307:6

**meeting** 38:14
38:14,20,21
39:9

**memorandum**
3:16 91:7,14

**memorized**
107:15

**mention** 116:23

**mentioned** 38:4
85:16 116:23
199:10 286:16

**mentions**
116:24

**met** 30:23
32:10 36:2,14
37:10

**methodologies**
12:11

**methodology**
14:6 15:2,10
15:17 16:3
41:13 48:6,22
49:17

**metric** 118:15
168:16 267:21
268:23

**metrics** 166:25
167:5,10
267:25

**microphones**
5:5,10

**middle** 153:22
180:24

**miguel** 22:18

**million** 127:19
127:20,25
128:23

**minas** 199:18
200:5,11 217:7

**mind** 30:19
261:25

**minds** 209:2,3

**mine** 26:6,20
200:5,13 203:8
215:6 216:13

**mines** 293:9

**minimal** 73:23

**minimum**
74:24 77:14
126:11 271:19
271:25

**mining** 85:7,13
85:14 179:3
199:22 216:4
217:24 228:24
264:24

**miniscule**
73:23

**minute** 176:3
284:2 297:14

**minutes** 39:4
221:5,6

**mirror** 183:20
183:21 184:14
184:17

**mischaracteri...**
259:22

**mischaracteri...**
100:3 239:5
240:2

**mischaracteri...**
141:4

**misconception**
80:15 82:6
93:15 94:9
96:15 97:6

**misconduct**
235:17

**misimpression**
196:6

**misinformation**
184:23 188:18

189:13 196:12
208:15,18
279:9
**misinformed**
250:22 301:15
**mislead** 50:19
52:6 53:8 55:5
55:25 56:18
57:8 58:11
82:14 90:12
92:17 119:9
138:23 143:13
144:15 163:22
164:6 192:24
259:2 272:4
294:17
**misleading**
58:22 59:3
86:24 146:22
151:9 188:19
**misled** 52:10,17
73:10,11 74:9
74:11 112:13
175:4,7 176:16
177:6 179:19
182:12 186:9
190:21 196:21
260:4 302:4
**mismatch**
115:22 116:10
**misnomer**
274:18
**mispricing**
221:16

**misrepresent...**
48:12 54:22
58:20,21 60:3
61:24 62:3
90:18 97:14
98:8,14,21
101:18,20
104:12 127:23
136:3,11
140:14 147:14
148:6,12
149:10 183:19
183:22,23
184:15,18
185:5,22
196:13 207:16
208:17 210:15
235:3
**misrepresent...**
45:19,24 46:18
51:2 56:12
70:16 74:6
86:23 87:16
90:9 102:12
120:2 136:15
136:18,25
137:7 146:2,8
147:4 148:2,25
149:7 184:9
186:5 187:17
190:21 191:16
192:17 193:23
195:24 221:20
229:10 232:20
245:23 263:5

281:7 284:23
**misrepresented**
45:15 111:23
113:22 114:16
135:3 189:10
233:22 235:13
258:21 259:4
**misrepresenti...**
127:16
**misrepresents**
89:14 114:19
121:22 141:12
201:19
**missed** 70:7
**missing** 161:15
**misstated**
164:10
**misstatement**
49:5,13 50:2
50:11 61:7,9
61:12 62:8,10
63:17,19 79:9
97:5,5,19
99:25 100:10
167:15,17,21
168:6 191:13
**misstatements**
45:21 46:5,9
46:25 48:3
51:14 52:22
74:25 77:15
80:14 92:4
93:3 94:10
101:4,5 103:7
104:15 133:16

139:25 140:6
143:22 189:2
191:12 193:8
195:14
**misunderstan...**
208:18
**mitigate** 279:4
279:15
**mitigating**
279:16
**mitt** 32:4
**mix** 149:5
**model** 17:23
74:2,4 171:11
249:12 271:16
271:17
**modeled**
137:11 138:8
138:15
**modified** 245:6
**moment** 32:21
55:2 100:13
158:7 287:16
**moments** 27:15
**monday** 38:24
38:24
**money** 128:24
270:14,16
**month** 46:10
**months** 46:13
**moot** 14:11
**morning** 5:2
6:20 7:22,24
74:19 220:6
246:22

Case 1:19-cv-00526-EK-VMS   Document 142-14   Filed 06/14/24   Page 353 of 381
PageID #: 5168

**[morrison - number]** Page 41

| | | | |
|---|---|---|---|
| **morrison** 2:7 7:9 | **near** 17:21 20:8 | 257:25 | **nos** 190:14 |
| **mothers** 132:18 | **necessarily** 63:15 66:7 191:10 223:10 226:13 230:6 235:2 301:2 302:23 | **negligent** 57:20 57:20 | **notary** 1:15 4:11 7:16 162:6 308:22 309:7 |
| **motion** 38:9 75:25 76:9,16 90:24 207:10 210:8 233:10 | | **neighborhood** 20:8 21:4 | **note** 5:5 |
| **mouthful** 169:6 | **necessary** 158:10 244:5,6 253:15 256:21 267:6 302:16 310:4 | **neither** 16:14 144:3 | **noted** 162:3 307:10 310:10 |
| **move** 17:6,10 | | **never** 32:18 34:18 37:10,10 45:23 115:2 137:15 172:6 197:3 244:14 254:11,17 256:16,17 259:16 262:21 263:17 281:5 294:2 | **notes** 18:12 49:11,25 50:10 60:7 102:8 297:15 |
| **moved** 46:23 47:25 | | | |
| **movement** 49:4 49:13,25 50:9 99:12 103:6 | **need** 10:9 27:13 50:14 74:24 75:6 77:14 84:15 110:5 129:14 183:18 184:14,17 187:7 191:19 195:15 221:13 249:8,14 250:7 263:11,20,24 265:6,15,16 266:19 280:8 295:18 | | **noticed** 137:14 |
| | | | **noticing** 6:19 |
| **movements** 72:17 | | | **notion** 74:18 226:20 263:17 |
| **multiple** 277:17 | | **new** 1:2,13,13 1:15 2:5,5,11 2:11 5:22 6:3,3 7:17 107:11,18 108:4 162:6 223:4 226:19 308:3,4 309:3 309:4,8 | **notwithstandi...** 13:5 280:15 |
| **mute** 5:8 | | | **novel** 158:9 |
| **n** | | | **november** 141:18 |
| **n** 2:2 3:2 7:15 7:15,15 162:2 162:2,2,4,4,4 198:10 308:2,2 309:2 | **needed** 84:19 253:5,12 274:17 | **news** 38:13 79:24 110:10 115:14 175:12 176:22 200:10 205:2 227:11 227:23 231:22 306:6 | **number** 39:21 51:22 54:13 59:18 74:24 77:14,23 114:5 114:11,25 115:3 122:15 122:20 123:23 124:9 125:9 126:11 195:7 219:25 259:16 259:18 261:9 261:14 262:22 263:18,20 265:4 266:23 |
| **name** 6:4 65:21 158:2 178:19 288:8 | **needs** 27:9 121:14 186:24 194:19 | | |
| **narrow** 20:11 | **negative** 185:25 | **noble** 132:15 | |
| **nature** 89:20 106:17 127:6 170:11 230:20 235:16 244:11 245:22 | **negligence** 58:18,19 60:4 | **nods** 9:2 | |

Veritext Legal Solutions

212-267-6868          www.veritext.com          516-608-2400

**[number - objection]**                                                                  Page 42

268:23 274:3
275:3 286:9,10
286:21,24
292:21 294:5
294:10 296:17
**numbers**
118:14 246:8
283:25 284:20
284:21 287:22
**numerator**
248:2
**numerous**
54:11

**o**

**o**   158:18 162:2
162:2,2 194:8
308:2 309:2
**oath**   6:9 10:25
11:3 162:7
308:8
**object**   10:17
**objected**   13:15
13:16 14:2,8,9
**objection**   10:20
12:14,22 13:11
14:15 15:4,12
16:5 17:3
18:13 19:14
23:7 26:13
27:12 28:4
29:3,16 30:8
35:22 36:20
37:3,9 44:12
45:4 47:2 48:4
49:6,15 50:3

50:12 51:21
53:2 54:7
57:10 58:12
59:11 60:10
61:13 62:11
63:12,20 64:24
66:18 68:14
69:24 70:24
73:7 74:20
75:4 76:5
77:18 78:4,9
78:22 79:17
80:17 81:18
82:8 83:3,20
84:14 86:2
87:9 88:22
89:13,23 93:4
93:17 94:11
95:16 96:16,18
96:24 97:8,20
99:14 100:2
101:6 103:16
104:7,20
105:12,24
106:21 107:13
107:19 108:6
108:20 109:2
110:4 111:9
112:2,15
114:18 115:8
115:13 117:10
118:4 119:2,15
121:7,21 122:9
123:6,15
124:22 125:25

126:19 128:3
128:14,21
129:2,12 131:7
133:4,19 136:4
136:12 138:19
139:6,20
141:11,22
142:18 143:6
143:25 144:23
146:4,13 147:7
147:17 148:13
149:11 150:3
150:25 154:12
154:22 155:23
157:6,13 159:5
159:16 160:4
160:19 163:18
164:11 165:10
166:2,17
167:22 168:9
170:14,23
171:22 172:20
173:21 175:20
176:11 177:13
178:11 179:24
183:10 185:6
186:17 187:10
189:4 190:11
192:4,9 193:10
194:22 195:18
201:4,18
203:13 204:7
205:20 206:15
208:7 210:17
210:24 213:13

214:3,17 217:9
218:4 219:4,23
220:16 221:11
224:2 225:20
226:11,25
227:25 230:3
230:13,25
232:8 234:11
235:4,22
236:18 238:11
239:4,25
240:11 243:9
244:3 245:19
247:17 248:19
249:7 250:20
252:8,21
254:18 255:23
257:20 258:3
258:17 261:17
262:9,18
263:10,23
265:5 266:5,15
267:11 269:10
270:25 271:14
272:24 273:21
274:22 275:7
276:8 280:4
281:14 282:23
284:7 286:25
288:7 289:17
290:25 291:23
292:12 293:25
296:24 298:6
298:13 299:10
300:21 301:4

**[objection - okay]**                                                    Page 43

303:2 305:9,23
**objections**  4:8
  6:13 181:3
**obligation**
  282:8,9
**oboni**  34:15,18
  38:5 288:14,17
**oboni's**  34:21
  34:21,24 292:3
**observable**
  123:24
**observably**
  66:3
**observation**
  207:20 222:3
  248:15 249:2
  290:17
**observations**
  290:23
**observe**  177:16
  290:13
**observed**  78:11
  267:14
**observer**  306:2
**observing**
  94:19
**occasion**  90:22
**occur**  110:12
  195:15 255:10
  255:12 288:3
**occurred**  46:10
  63:10,17 72:17
  81:24 90:17
  100:9 111:20
  140:2 213:2

229:9 249:18
264:9 270:9
306:3
**occurring**
  60:22 140:5
  237:15 266:3
**occurs**  183:25
**october**  1:8
  46:12 113:6
  308:8 309:21
**offer**  70:3
  71:17,21 72:6
  72:22 73:5
  74:16 112:4
  194:25 197:2
  204:20 284:16
  289:18
**offered**  13:10
  72:12,19 78:7
  114:10 115:3
  118:11 133:13
**offering**  25:24
  28:18 29:20,24
  30:4,10,18
  43:22 47:17
  100:24 102:11
  201:23 205:8
  289:14
**offices**  1:12
**officials**  174:15
**oh**  13:20 33:13
  138:20 160:3
  215:21 228:9
  245:2 278:20
  278:22

**okay**  8:11,19
  8:23 9:25 10:8
  10:14,15,24
  11:10,21 12:2
  12:7,9,18
  14:21 16:7,16
  16:18 17:16
  20:10 21:6,11
  21:25 22:21
  23:22 24:23
  25:3,24 27:23
  29:17 31:3
  32:20 33:9,12
  34:4,20 35:3
  36:6 37:13
  38:2 39:14,25
  41:5,20,23
  43:13 44:7,20
  44:25 45:6
  46:7,15 49:8
  49:21 50:6
  51:19 56:7
  59:7 60:19,23
  64:14 65:15
  66:13 70:25
  72:9 73:16
  74:14 75:17
  76:19,21,23
  77:8,24 78:16
  79:5 81:11
  82:2,12 83:22
  88:24 89:18
  91:6,19 92:9
  92:24 93:6,9
  95:12 96:8

97:22 98:22
99:20 100:24
102:24 103:18
105:4,19
107:10,16
109:24 111:4
111:21 114:3
114:12 116:15
116:18 117:23
118:9,12,20
120:9 122:25
124:4 127:11
127:14,17,21
128:11 133:14
135:5 137:8,11
138:14 139:23
140:22 141:2
142:10 143:11
143:16 144:20
146:10 149:18
149:22 151:16
153:15 154:24
157:24 158:21
159:11 161:20
162:17 164:2
165:23 167:12
167:24 168:18
168:21 169:13
170:18 171:12
176:13 178:18
180:13 182:4
183:12 184:11
184:19,25
188:6,20 190:3
191:21 193:12

**[okay - opposed]**                                                    Page 44

193:16 194:15
200:16,25
201:13,23
205:11 206:17
207:19 209:23
210:3 211:16
212:7 213:19
215:4,22
220:22 222:20
223:8,17 231:7
233:8 238:3,7
239:8,14
240:17 241:14
243:2 246:5,15
247:5 251:16
252:3,12,18
254:14 258:9
259:3 260:15
263:2 264:19
270:12,21
271:7 273:9
276:13 277:6
277:14 278:9
279:6,10,18
281:2 283:22
283:25 284:10
284:15 285:22
286:15 288:12
288:16 289:14
292:5 295:3
296:19 297:13
298:8,15
299:17,22
300:23 301:17
301:21,22

302:17 306:18
**omission**
  104:12 147:14
  148:6 149:25
  150:8,16,20
  151:14
**omissions**
  45:19,25 74:6
  90:10,19 120:2
  136:25 137:7
  146:3,9 147:5
  148:3 149:7
  190:22 192:17
  193:23 221:20
  229:11 232:20
  245:23
**omitted**   45:15
  90:8 135:4
  146:20,21
  233:23
**once**   122:13
  132:20 283:17
  304:5
**one's**   224:21
**ones**   78:24
  204:14 232:21
**ongoing**   59:5
  104:22 119:8
  155:18,21
  156:12 159:4
  159:14 160:9
  160:12 196:11
  259:9
**opening**   40:4
  153:20,23

154:4 197:18
  215:17 241:12
  252:4,15
**operate**   200:12
**operates**   85:4
**operating**
  87:23
**operational**
  88:12 89:3
  265:2
**operations**
  84:22,25 85:8
  85:11,16
  217:24 229:8
**opine**   97:9
  299:5
**opined**   11:22
  97:11
**opinion**   16:7,10
  26:6,23 30:11
  30:18 47:5
  58:4 61:4 62:5
  62:12 63:4
  64:15 66:6
  70:4 71:18
  72:6,19,22
  73:20 74:21
  77:11 92:5
  94:12 95:2
  100:25 104:16
  105:8 115:19
  122:4 128:5
  145:5 148:19
  159:12 168:3
  173:17 174:13

188:7 191:23
  194:18 195:13
  197:2 202:9
  204:21 205:9
  205:15,19
  218:23 221:7
  225:17 226:8
  226:15 227:10
  227:15 232:2
  236:15 237:2,6
  240:3 244:25
  248:9 249:15
  258:5 263:2,5
  264:21 269:15
  273:15 281:3
  289:15,19
  292:23 294:6
  298:2,7,8,12,14
  298:15 299:6
**opinions**   18:8
  25:25 28:19
  29:21,25 30:5
  42:20 44:3
  45:2 47:17
  48:7 57:14
  72:12 74:16
  145:8 151:6
  183:5 194:25
  197:3,4,9
  226:15 245:6
  252:11
**opportunity**
  91:3
**opposed**   9:2
  10:3 194:13

**[oral - pending]**                                                    Page 45

**oral** 8:25
**order** 3:16 13:2
  28:15 38:10
  75:15 87:14
  91:7,14 97:3
  103:25 146:7
  156:24 194:25
  199:4 240:23
  253:5 300:8
  303:13
**ordered** 199:12
  216:15
**orders** 38:6
  82:21 200:4
**ore** 85:13
  200:13
**organizational**
  28:23,25 29:13
  29:15,21 30:6
**original** 117:14
  117:20 310:13
**ought** 223:15
**outcome** 6:12
  309:18
**output** 229:8
**outside** 286:17
  286:18
**overall** 23:14
**overreaction**
  220:14 221:8
  222:2,16,24
  223:11,13
**overridden**
  297:5

**overtalking** 9:9
**own** 70:4
  145:17 236:21

**p**

**p** 1:11 2:2,2 3:4
  3:11,13,15
  7:15,15 40:7
  40:16,24
  158:18 162:4
  308:6,16 309:9
**p.m.** 161:25
  162:3 179:15
  307:10
**page** 3:3,10
  8:23 41:17
  42:16 43:15
  92:6 102:14,22
  113:12,14
  151:24 158:13
  162:19 166:9
  167:13 178:21
  193:15 197:20
  211:13,14,15
  215:20 241:13
  251:8 291:15
  311:6
**pages** 41:21
  43:19,21
  278:17 285:13
**pandemic** 8:9
**paragraph**
  102:22 113:13
  113:15 145:6
  152:11,16
  153:18,22

  155:8 162:19
  166:10 178:20
  182:2 193:15
  193:17 196:24
  197:19,20,25
  199:15 200:7
  211:13,15,17
  212:7 215:17
  215:19,23
  228:5,6 241:12
  241:15 251:8
  285:15 289:21
  290:18,23
  299:19
**paragraphs**
  212:2 285:21
**parcel** 143:13
**park** 1:13 2:10
  6:2
**parse** 143:17
**part** 27:4,6
  28:14 29:9
  48:5,21 49:17
  52:19 82:17
  93:20,24
  113:17 143:12
  163:17 166:3
  180:14 209:16
  215:24 235:20
  236:16 254:12
  258:5
**partial** 172:15
  225:16,18
  226:21 227:17
  298:10,23

**partially** 174:5
  206:12 227:13
  298:20
**participants**
  175:3
**particular**
  14:22 58:2
  92:6 93:25
  119:22,22
  140:10 171:10
  189:5 301:3
  302:13,24
  303:14 304:9
**particularities**
  212:21
**parties** 4:3 5:14
  159:22 309:16
**parts** 93:18
  194:14 209:19
  240:21
**party** 6:10
  31:25 260:22
  260:23 261:4,6
  265:12,13
**passed** 37:6
**past** 245:7
**path** 99:2
**pattern** 229:21
  261:9 264:2
**pause** 73:25
**pay** 33:3
  222:12
**pending** 10:12
  180:19 181:12

**[people - plaintiffs]** Page 46

**people** 67:19
125:3 153:6
187:20 209:11
217:3 222:10
222:11,12
234:16 259:10
290:10 306:7
**percent** 114:8
174:22 189:12
189:12,14
267:18 269:6
270:5,22 271:5
284:4,4 285:4
286:7,7 287:4
289:22 292:6
293:24 294:11
296:7
**percentage**
85:10,14 226:9
279:24
**perception**
101:3 169:22
**perfect** 16:16
**perform** 17:17
42:6 266:11
**performing**
22:8 80:13
139:17 147:5
147:15 243:2
268:17
**period** 30:20
46:10 48:10
59:9 60:8
61:11 62:21
63:2 64:22

65:3 66:16
70:22 71:6
72:18 79:10,12
80:24 81:24
82:7 93:12,14
93:23 94:8,15
94:17 95:2,7
95:14,22 96:3
96:7,12 97:10
97:12 99:13
101:5,25
102:13 103:24
104:3,19
105:11,14,16
105:18,23
106:20 107:4,7
107:8,9 108:18
108:25 109:22
110:16 111:5
113:23 115:7
115:12 117:2
118:3,23
120:24 122:7
123:13 124:25
137:17 138:18
139:5 140:3,9
141:8,17 143:2
143:15 152:13
152:18,24
188:16 195:14
196:10 202:23
203:20,22
204:23,24
205:3,7 242:18
250:17 252:2

262:5 266:14
267:10 269:3,8
296:21
**person** 31:2
213:3 304:18
**personally**
30:25
**perspective**
204:10 273:22
**pertaining**
194:12 284:25
**ph.d** 3:15 40:25
**ph.d.** 3:12,13
29:10 40:8,16
**phases** 23:12
199:4
**phenomenon**
220:14
**phil** 2:19 6:4
**philosophical**
155:25
**phones** 5:9
**phrase** 77:17
160:2 256:8
**phrased** 120:4
221:12
**pick** 5:6
**piece** 301:10,16
**pitt** 37:7
**place** 5:9,13
38:23 104:25
105:3 300:18
**places** 267:19
**plain** 74:8

**plainly** 92:18
294:18
**plaintiff** 22:5
32:24 33:4,7
33:18,23 98:12
141:6 147:3,11
147:12 188:25
269:12 286:23
287:3
**plaintiffs** 2:4
21:19 22:3,6
30:11 36:8
38:15 53:4,6
53:11 56:3,5
57:18 78:10
88:16 92:15
98:9,25 109:14
111:22 114:15
133:15,24
140:11,15
142:24 145:14
145:15 159:21
178:2 188:13
192:22 201:14
203:4 207:7
209:17 219:11
239:13,18
246:16 247:13
250:24 253:10
255:20 256:15
258:12 259:18
261:5 282:7
287:13,14
294:15 296:15

**[plan - previously]**                                                Page 47

**plan** 193:8
**played** 260:13
**plays** 124:7
**please** 5:4,8
  6:14 7:13 9:20
  10:9 141:3
  248:20 310:3,7
**plummeted**
  153:17
**plus** 67:4 102:3
  102:4
**pocket** 242:23
**point** 33:18
  68:3 99:19
  130:11 152:18
  173:24 217:16
  217:17 262:11
  265:22 304:23
  306:15
**pointed** 15:21
  86:21 305:14
**pointing**
  286:18
**points** 65:21
  66:12
**policies** 87:8
  88:7,13 284:24
**political** 31:12
  31:20 32:6
**politicians**
  179:9
**politics** 31:15
**pollution** 255:3
**portion** 247:10
  247:14 248:15

249:2
**ports** 85:4
**position** 54:10
**positions** 31:14
**possessed**
  142:25
**possession**
  142:5
**possibilities**
  287:23
**possible** 10:2
  33:10 34:10
  80:6,8 177:21
  180:3 182:24
  185:9,17
  246:13 291:19
**possibly** 265:22
**potential**
  202:15 204:5
  257:19 262:6
  262:16 302:9
**potentially**
  163:8 199:21
  251:10 266:7
**practical** 54:9
**practices** 92:21
  93:16 105:23
  106:18 193:2
  284:24 294:21
**practicing**
  199:20
**pre** 93:12 95:7
  95:14
**preceded** 38:10
  93:23 97:10

**preceding**
  111:5
**precise** 20:12
  74:10 231:4
  270:8
**precisely** 75:16
**preexisting**
  97:6
**prefaced**
  244:19
**premise** 219:6
**premium** 168:6
  168:24,25
  169:25 170:22
  229:24 230:5
  230:12,16
  231:9,20
**preparation**
  24:2 44:9
**prepare** 37:15
  38:17
**prepared** 77:22
**preparing**
  22:24 34:12
  44:16,23 91:20
**preposterous**
  141:24 246:10
**present** 2:16
  60:8
**presents** 41:12
**preserving**
  153:7
**president**
  175:13 178:4
  178:18 179:17

  180:4,9 209:12
  214:7 278:5,12
  305:25 306:17
  306:20,21
**president's**
  181:14
**press** 227:7
**pressured**
  137:19 172:24
**pressuring**
  110:17 159:22
**presumably**
  167:19
**pretty** 23:17
  154:23 203:21
  220:8 272:6
  276:22 291:12
  299:11 303:5
**previous** 65:17
  195:21 206:13
  206:18 209:20
  237:19
**previously** 8:6
  11:22 44:14
  63:6 131:13
  132:8 162:5
  176:9,18
  177:11 182:9
  182:12 183:3
  189:9 201:11
  202:13 205:18
  205:23 207:15
  210:14 212:11
  212:16 213:7
  214:5 222:5

**[previously - professor]**                                                    Page 48

243:21 245:16
300:5
**price** 45:10,11
  45:17,17 46:22
  47:24 49:4,13
  49:24 50:8
  51:9 53:14
  61:16 72:17
  73:24 81:5,23
  98:18,20 99:3
  99:11,24 100:8
  100:11,19
  102:2,8 103:6
  121:15,16
  123:25 124:2
  124:13 125:7
  130:12,21
  131:23 135:7
  135:10,11,21
  135:21 136:2,9
  136:15,17,19
  140:24 153:17
  169:19 171:19
  173:11,12
  177:2,4,10
  187:16 212:20
  221:19 223:5
  223:15 224:24
  231:12 236:3,7
  236:15 241:4
  241:21,22
  243:4,19 250:4
  250:11,13
  253:25 254:2
  255:13,14

270:17 271:19
272:13,16
274:10,15
276:4,22 277:9
280:9 282:19
293:15
**priced** 274:24
  275:16
**prices** 64:2
  67:19 225:22
  226:16,18
  228:20
**pricing** 221:17
  272:10,21
  274:21
**principle** 27:20
  65:12 66:14,24
  67:24 183:15
  273:17 276:2
  277:15 303:20
  304:17
**principles**
  66:20 67:8,9
  67:10 69:10,12
  69:13 303:12
**prior** 14:23
  30:22 31:4
  32:11,22 33:20
  39:11,23 47:10
  47:13 51:13
  61:8 70:18
  82:6 90:22
  93:14 94:8
  96:14 97:4
  101:4 105:10

105:14,19,23
106:20 131:12
140:13 180:23
181:17,21
183:19,21,23
184:8,14
186:22 206:10
208:22,23
213:10,15,23
218:9 232:7
271:8 290:11
295:4
**priorities**
  261:12
**priority** 153:4
**private** 5:7
**prize** 132:15
**pro** 32:8
**probabilistic**
  288:5
**probabilities**
  289:8 291:6
**probability**
  35:12 111:24
  112:4,14 114:2
  114:5,7,10,17
  114:22,24
  115:20 117:9
  117:25 118:10
  118:13,14
  119:10 122:15
  124:19 127:4
  137:16 138:12
  244:14 254:11
  259:20 267:2

268:7,8 285:18
286:3 287:5
288:10,22
289:22 291:5
292:8,24 296:7
**probable**
  291:19
**probably** 21:10
  39:23 68:6
  99:6 149:2
  150:4 196:18
  196:18 275:16
  283:23
**problem**
  131:14
**problems** 132:8
**procedures**
  83:25 88:8
**proceed** 21:9
  234:18
**proceeded**
  236:11 294:24
**proceeding**
  6:14
**produce** 135:6
  195:2
**professional**
  236:14
**professor** 3:11
  3:13,15 30:23
  40:7,15,24
  43:12 227:21
  228:18,19
  229:3 246:16
  247:9 270:4

297:25 300:15
307:2
**proffered**  25:5
34:24 36:7
**profound**  161:5
**program**
253:24
**project**  41:25
204:22
**projections**
247:12
**prominently**
306:22
**promise**  9:8
60:17
**promised**  9:7
130:9
**pronounced**
32:6
**pronounceme...**
232:13
**pronouncing**
178:19
**proof**  15:24
18:21,23,23
107:23
**proper**  86:12
118:7 224:4
**properly**
251:17,18
**properties**
202:12 285:2
**proposition**
14:12 300:25
302:18

**protect**  219:15
**protecting**
153:6
**protocols**
212:10 213:25
**prove**  109:14
129:24,25
222:22,23
303:16 304:2
**proved**  13:3
14:12 304:6
**proven**  57:16
92:14 192:22
294:15
**provide**  8:25
9:22 10:13,19
11:4 18:8
21:14 22:3,23
58:3 168:12
189:13 246:17
267:7
**provided**  8:2,4
8:12 19:7
32:23 36:12,18
36:25 107:12
151:11,11
173:25 242:8
245:25 246:2
266:18,24
268:2,15 300:4
**providing**  9:14
10:4 145:8
183:4 265:3
**proving**  303:17

**provision**
242:22
**provokes**
230:22
**pslra**  242:22
**public**  1:15
4:12 7:16
50:19 52:6,9
53:9 55:5,25
56:19 57:9
58:11,22 73:13
90:12 92:17
112:5,13
114:23,24
115:23 116:11
122:20 127:24
138:24 143:14
144:16 156:15
162:6 163:22
164:6 192:24
206:3,5 207:15
210:14 217:3
218:7 219:16
220:11 221:22
226:2 229:14
232:13 256:19
257:5,8 258:20
258:21 259:2
259:17 261:12
294:17 296:18
308:22 309:7
**publication**
227:6
**publicly**  217:13
262:21

**published**  27:2
**puffery**  54:20
**pure**  277:7
**purport**  65:11
**purporting**
196:25
**purpose**  93:25
94:3,5,6
**purposes**  54:9
168:22 230:14
**push**  16:14
**put**  52:4 153:12
158:8 295:14

**q**

**quade**  2:18
7:10 22:13
**qualified**  57:24
**qualify**  234:24
**qualitative**
159:24
**quality**  103:5
108:24 109:6
153:3 201:10
**quantify**
146:16 263:22
**quantifying**
262:22
**quantities**
255:3
**quantum**
157:12
**quarterly**
257:14
**question**  4:8
9:12,13,20,22

**[question - realizations]**                                    Page 50

10:3,12 16:17
16:23 17:4
18:17 20:25
23:18 29:12
34:9 39:7 47:4
47:15 60:14
68:10,17,19
69:7 75:6,15
75:18,21 77:9
86:8 87:14
89:12 93:19
94:4 101:9,10
112:7 114:4
117:3 119:12
119:13 120:4,7
120:8,12,20
121:5 123:10
133:13 136:8
141:24 160:8
176:4,7 177:8
177:9 180:20
180:24 181:9
181:12 186:22
186:22 195:10
220:25 223:18
234:20 238:17
248:22 252:19
263:12,19
264:6,17,20
277:19 295:3
302:7
**questions** 8:25
16:25 60:17
86:15,21,25
168:22 306:24

307:4
**quick** 297:14
**quite** 74:8
82:20 93:19
208:8 268:8
**quote** 55:11,18
75:7 179:14,17
181:14 251:3
278:5,11
**quotes** 178:16
278:17
**quoting** 55:13

**r**

**r** 2:2,6 158:18
162:2 198:10
198:10 215:10
309:2 311:2,2
**r&r** 38:7
**railways** 85:4
**ramifications**
220:3
**randall** 32:17
**range** 31:10
196:20 239:10
261:11 262:12
265:21 273:19
274:2 286:17
286:19
**rare** 150:5
288:18
**rates** 284:5
286:8
**rather** 59:3
70:13 72:4
137:3 140:16

142:6 167:7
228:11 229:20
240:22 272:8
**ratio** 24:6
**rational** 66:22
67:5,24 272:7
276:15,18
**rationale** 130:5
171:18
**rationally**
171:13 173:19
**reach** 82:3
**reached** 44:4
**react** 19:3
66:21,25 67:18
67:19,19
**reacted** 79:22
**reaction** 171:7
175:12 176:6,8
221:21,24
222:17,25
**reactions** 18:18
175:17
**reacts** 67:10
**read** 12:7 16:7
16:19 34:20,23
36:11 37:17,19
44:17 57:13
92:13,24 96:2
96:2 110:7
113:18 115:14
115:15 117:15
144:25 145:3,7
145:9 152:20
155:17 166:10

166:19 181:25
196:24 203:18
203:20 210:21
214:21,22,24
245:3 247:6
268:16 287:10
289:19 308:7
310:3
**readily** 196:15
**reading** 102:13
151:5 199:15
244:18 250:25
251:6 260:25
287:11
**ready** 161:19
220:20
**real** 114:7
190:13 305:12
**reality** 100:8
**realization**
173:9 174:17
175:16,18
176:9,15,18
177:5,11
179:21 183:2,8
189:17 245:17
247:14 248:17
249:5 252:6,17
254:7 271:12
277:25 279:19
280:2,16,18
302:2
**realizations**
243:22

realize 179:9
  187:21
realized 246:12
  289:5
realizing
  179:11
really 24:13
  33:7 35:9
  47:16 63:24
  73:17 127:20
  127:25 128:24
  129:4 151:6
  160:20 216:17
  239:14 249:8
  264:19 274:19
  287:20 295:4
  301:6
reason 11:11
  73:4 217:19
  241:5 285:8
  293:4,12 310:5
  311:8,10,12,14
  311:16,18
reasonable
  59:16,21 63:23
  70:2 81:7
  110:8 121:11
  121:12 174:9
  175:6,10 213:3
  234:15 277:16
  294:4
reasonably
  50:22 52:11
  53:19 54:4,19
  54:23 148:9

170:16 198:19
  209:8 232:16
  289:24 305:2
reasoning
  288:6,11 289:3
  289:10,12,16
  290:10,14
reasons 79:25
  80:4 219:25
  231:14 237:14
  243:16 250:2
  285:21 295:20
  295:20 311:4
rebuttal 251:8
recall 12:9,15
  12:16,17,18,23
  14:3,24 15:5,9
  15:25 16:6
  17:19 22:20
  33:13,14 34:2
  34:3,5 37:20
  38:18 49:2,7
  49:23 50:4
  51:17 52:24
  57:17 64:6,8,9
  73:3 82:25
  87:6 88:10
  94:18,24 95:6
  108:7 112:3,6
  112:20 114:9
  117:11 119:14
  149:3 150:10
  207:12 227:20
  233:9,13,16,18
  284:3,11

288:16 291:16
  291:25
recalling 295:4
receipt 310:14
receive 22:7
  28:15 139:4
received 79:22
  100:17 110:14
  138:10,16,21
  139:13
recent 44:21
  86:17
recess 77:3
  134:11 161:24
  225:9 269:23
  297:20
reckless 58:18
  60:3
recognize 41:7
  42:9 43:3
  74:14 91:16
  113:8 256:16
recognized
  239:17
recognizing
  37:5 214:11
recollection
  85:18 90:25
  114:13 284:19
recommendat...
  12:4 14:18,18
  16:20 38:7,9
reconcile 140:5
  154:17

record 5:3,15
  6:18 23:19
  39:19 77:2,6
  134:10,14
  158:8 161:23
  162:10 225:8
  225:12 269:22
  270:2 288:24
  297:19,23
  301:9 307:8
  308:10,13
  309:13
recorded 5:17
recording 5:12
records 23:23
reduce 229:8
reduced 89:11
reductions
  247:11 248:16
  249:3,25
reevaluate
  223:3
reference
  153:19 213:10
  213:23
referred 74:17
referring 47:3
  190:5 216:3
  230:15 295:7
reflect 44:2
  136:2 249:4
reflected 161:2
  248:16 252:17
  279:25

**reflects** 42:20
  272:20
**refocusing**
  251:23
**refrain** 199:19
**refraining** 68:7
**refresh** 90:25
  114:13
**regard** 87:15
**regarding**
  15:24 38:7
**regardless**
  130:22 131:23
**regret** 178:25
**regulation**
  83:11
**regulations**
  85:21,24 89:7
  108:12 138:6
  144:19
**regulators**
  153:9 155:16
**regulatory**
  220:10 262:16
**rehashing** 17:8
**reinforce** 97:6
**reinforced**
  80:15,18 82:5
  82:9 96:14
**reinforcing**
  52:16 105:3
**reinstructed**
  168:15
**reiterating**
  125:21

**rejected** 14:14
**relate** 84:3 86:6
  200:8 214:7,9
  247:12
**related** 6:10
  18:6 39:6
  41:14 90:16
  115:15 202:2
  213:17 241:4
  243:4,11
  260:13 309:16
**relates** 247:14
**relationship**
  101:2 123:3
  143:3 183:7,13
**released** 255:4
**relevant** 107:20
  117:23 118:6
  119:17 124:5,6
  150:16 167:18
  215:24 240:18
  260:6 283:14
  296:22,25
  297:3,4,10
**relied** 117:19
  139:17,21
  149:20 203:17
  225:22 269:4
**rely** 95:13
  202:17 268:17
**relying** 49:22
  56:10 66:14
  92:2,10
**remain** 70:22
  71:5 82:16

123:22 124:23
  125:16 206:22
  295:23
**remained** 64:21
  65:10 122:18
  281:23
**remaining** 46:4
  46:9 88:19
  93:2 168:22
  189:2 191:2
  206:20
**remains** 79:10
  79:12
**remember** 15:3
  54:13 84:9
  85:22 102:3
  207:17 218:11
  226:5 227:8,24
  254:9 291:17
  295:10
**remembered**
  44:15
**remote** 266:2,7
  287:21,23,24
  288:2 289:6,8
  291:6 292:14
  292:24 295:7
**remove** 222:13
**removes** 136:16
  136:23 182:10
  187:15
**repeatedly**
  54:15 265:8
**rephrase**
  270:21

**replaced**
  156:12
**replicate** 15:20
**reply** 3:13
  40:14,15,22
  102:23 162:16
  211:12 284:11
  299:19
**replying** 43:8
**report** 3:11,13
  3:14 12:3
  16:20 17:6
  18:20 26:3,25
  30:15 35:17
  38:5 40:4,6,14
  40:15,22,23
  41:11,25 42:13
  42:15,24 43:7
  43:9,10,11
  44:10 47:6,10
  65:22 75:9,20
  85:9 89:25
  94:13 95:3
  96:5 98:5
  100:5 102:14
  102:23 151:23
  151:24 153:20
  153:23 154:3,4
  154:7 158:4,20
  191:9 193:13
  197:19 199:16
  199:16 204:21
  212:2,19 213:9
  213:15,22
  214:10,22,24

215:17 218:8
227:21 228:5
241:12 245:8
247:6,10 251:2
251:8 252:5,15
262:3 267:8,15
268:10 284:9
285:14,17
286:12,14
288:13 292:3
299:19

**reported**
173:15 200:10
202:13 204:25
217:13 218:2
219:18

**reporter**  1:14
6:6 7:13 9:3
40:3 54:2
55:17 67:7
91:11 113:4
153:25 158:16
197:22 200:2
215:8 233:12
290:20 291:14
294:8 304:11
309:6

**reports**  36:17
36:24 37:17,19
38:4,13 39:15
60:6 79:23
91:21 95:7,14
100:17 110:10
110:14 115:18
133:12 137:19

171:13 173:6
178:16 188:14
200:7 203:19
203:21 213:16
214:21 227:7
257:10,12,14
261:2 305:19
306:7

**represent**
114:23 198:23
213:21 252:14

**representation**
103:8 108:9
156:19 179:25

**representations**
59:18,24 103:2
111:18 194:19
213:11,24
216:25 218:15
218:21 219:13
251:14 261:22
263:14

**represented**
142:7 174:18
174:21 178:8
201:11 212:11
212:17 213:8
214:12

**representing**
6:5 248:9

**represents**
159:8

**republican**
31:24,24 32:3

**reputation**  31:4
31:8 32:15
70:9 130:16,25
131:6 132:17
156:16 157:21
159:9,12
161:13 169:12
169:17,21
261:19,20

**reputational**
156:18,24
157:12 170:6
230:19 283:24

**reputations**
217:20

**request**  42:21

**requested**
20:23

**require**  11:7
27:17 62:14

**required**  10:19

**requires**
234:17

**requiring**
268:3

**reread**  38:5,6
82:19

**research**  14:23
22:15 25:20,21
26:18,19,20
27:7 67:22
87:22 90:15
169:10

**reserved**  4:9

**resolve**  156:13

**respect**  49:10
90:14 92:2
104:14,21
142:24 209:23
239:2,3 271:9
281:4 298:16
305:5

**respectfully**
116:6 120:5

**respective**  4:3

**respond**  42:22
228:21

**responded**
222:4

**responding**
42:14 43:8

**response**  9:11
9:14,23 10:13
10:19 42:21
125:13 187:4,5
220:14 221:8
237:19

**responses**  8:25
9:4 16:25

**responsibilities**
28:13

**responsible**
31:14

**rest**  108:16
181:25

**restricted**
242:12

**result**  98:19,20
161:10 189:18

**[result - run]**                                                    Page 54

229:6 257:24
**resumed**  162:5
**retained**  3:9
  17:16 21:13
  22:2 33:21
  34:7 57:3
  246:16,25
**return**  310:12
**returning**
  85:17 263:16
**reveal**  92:18
  186:14 187:7
  188:25 189:7
  190:19 207:14
  210:14 294:19
**revealed**  70:11
  154:11 189:11
  189:22 191:25
  192:6,14
  206:12 230:20
  299:8 300:11
  300:12
**revealing**  155:9
**reveals**  190:7
**revenue**  85:7
  85:12
**review**  36:17
  36:24 79:20
  82:15 83:8
  90:23 91:19
  93:11,22 117:7
  195:5 256:25
  288:17
**reviewed**  35:16
  110:3 112:8

203:17 288:13
291:2
**revising**  211:19
**revision**  212:24
**revisit**  79:2,21
  80:10
**revoked**  199:6
**ribbon**  71:18
  71:22,23,25
  81:2,9 118:19
  225:2 236:5
**richer**  263:25
**right**  8:10
  11:25 17:15
  22:5 24:11
  25:3,21 26:12
  36:13 37:8
  45:22 55:6
  60:12 65:14
  69:11 72:23
  82:10 99:13
  101:10 111:8
  112:9 116:13
  120:25 131:20
  133:23 136:3
  136:11,16
  139:5 144:22
  145:8 148:22
  150:18 153:5
  153:21 155:19
  155:22 164:19
  164:21 165:25
  166:19 167:12
  169:23 170:2,5
  170:8,9,10

194:12 205:10
205:13 207:3
210:6,11,18
215:2 219:16
220:15 221:4
222:20 228:16
229:25 230:16
231:2 234:20
235:6 240:5
246:13,18
250:25 256:4
258:4 259:15
262:24,25
275:19 276:24
287:20 300:20
300:22
**risk**  53:21
  83:15,18 84:2
  84:3 88:12
  89:3 92:20
  105:22 106:18
  112:18 115:6
  115:11 118:21
  120:23 122:6
  123:4,11
  137:22 138:3
  163:7 175:19
  176:10,19
  177:12 182:15
  182:19,22
  183:3,9 185:19
  192:25 205:18
  205:24 220:12
  230:19 247:15
  248:17 249:5

250:18 251:4
251:24 252:7
252:18 253:6
253:12 254:8
255:22,25
256:2,2,6,11,22
256:22 257:2
257:17,18,23
258:10,13,16
259:2,4,8,11,13
262:23 266:13
267:9,24
268:24 269:7
271:13 272:4
278:21 280:2
280:17,19
285:23 294:20
**risks**  50:20
  140:12 173:16
  199:22 229:7
  243:21,22
  245:17,17
  279:4,15,17,19
**roles**  28:12
**romney**  32:4
**row**  288:19
**rule**  304:21
**ruled**  199:18
**rules**  8:21
  108:11 144:18
**ruling**  75:24
  236:10,13
**run**  292:22

**[s - securities]**                                                    Page 55

| s | | | |
|---|---|---|---|
| **s**  2:2 3:8 7:15 7:15 162:2,2,2 162:4,4 194:8 198:10 | 232:14 251:14 265:10,11 267:20 294:20 294:22 | 123:17 127:19 132:16 146:7 152:21 167:3 179:14,21 | **scope**  20:18,22 25:5 41:24 42:5 117:22 204:21 |

**s**  2:2 3:8 7:15
7:15 162:2,2,2
162:4,4 194:8
198:10

**s.a.**  1:5 2:17
5:19

**safe**  50:22
52:11 53:19
54:4,19,24
94:23 212:9,16
213:7

**safety**  52:6,13
53:23 54:16
83:8,10 84:8
84:18 86:22
88:21 89:3
90:14,17 92:20
92:21 93:16
94:20 95:8,20
100:17,18
105:21 106:19
108:10,10
111:19 133:22
137:18 138:4,5
138:24 144:16
144:18 153:3
177:7 180:4
192:25 208:25
209:22 212:9
213:12,18,25
214:6 215:25
216:20 218:15
218:21 219:13
220:7 229:9

232:14 251:14
265:10,11
267:20 294:20
294:22

**sake**  292:5

**samarco**
111:14,20
208:24 254:25

**saw**  145:19,20
266:19 278:5
284:6 291:24
292:2

**saying**  53:5
54:14 63:23
66:9 93:14,25
106:9,11
111:16,17
114:9 132:13
148:14 155:18
186:16 187:6
189:25 200:17
213:18 219:21
222:22 233:2
235:11 241:23
244:20 245:4
254:25 259:18
263:16 274:23
278:20 281:18
281:21 282:7
294:12 295:10
306:8

**says**  27:15
53:13 70:14
110:13 114:20
119:21 122:2

123:17 127:19
132:16 146:7
152:21 167:3
179:14,21
180:5 181:10
200:4 220:6
229:3 304:12
304:23

**scenario**  45:12
72:15 127:18
127:22 128:16
128:17,19
129:7 133:2
134:24 135:6
135:19 167:24
186:12,21
190:6 254:21
254:22,23
255:9 272:11
272:14,22
273:3,18 274:7
274:12,20,25
275:6,9,12
276:5 279:22
302:10

**scenarios**  71:3
126:22 128:13
273:20

**scenes**  123:19

**school**  57:12
150:12

**schvartsman**
182:2

**scienter**  57:15

**scope**  20:18,22
25:5 41:24
42:5 117:22
204:21

**scotia**  211:18
212:11,14
213:9,22
214:20

**sealing**  4:4

**second**  59:15
64:5 92:25
93:20,24
102:23 113:13
162:25 172:3
173:12 174:10
175:8 180:17
198:3 215:13
264:22 302:6

**seconds**  221:3

**secret**  292:15
292:21 293:5
293:14,24
295:9,18

**section**  41:24
42:4 43:20
92:7 241:18

**securities**  1:5
3:18 5:19 13:4
19:3 20:16
21:14 33:22
56:17 57:2,5
57:22 58:6
61:6 62:7
68:12 69:4,20
69:21 74:13,23

**[securities - side]**                                         Page 56

77:13 79:7
97:18 99:12
112:24 126:24
127:14 135:18
148:21 150:21
157:5,11
158:24 226:23
228:20 232:6
237:21 241:2
243:7 272:11
281:5,13
282:19 293:16
**security**  19:24
20:6 45:10
57:25 70:19
130:8 135:22
137:5 149:24
221:17,18,18
223:15
**see**  42:2 94:13
94:15 95:21
103:10 107:14
117:13,18
153:21 162:23
163:12,23
165:2 171:2
191:4,5 193:18
193:20 194:3,4
197:23 198:8
199:7 203:16
212:5 216:5
234:16,19,21
240:15 245:4
249:8 266:16
274:9 306:7

**seeing**  112:3
272:12 284:3
**seek**  109:14
**seem**  108:7
207:6 292:18
**seemed**  27:16
59:21
**seems**  13:23
17:20 59:16
63:22 278:6
285:5 292:22
**seen**  111:10
112:6 196:9
197:6,8,13
**sees**  17:5
**selected**  13:22
14:7
**selecting**  15:18
**selection**  13:20
15:7,17
**semantics**
139:7
**sense**  9:5,15
10:6 19:5
72:20 132:17
146:11 155:8
196:22 201:6
245:5 262:6,12
262:16
**senses**  182:7
**sensitive**  5:6
**sentence**  92:25
102:25 113:17
162:25 193:18
196:23 198:3

210:21 299:23
**separate**  164:7
164:21 231:16
231:19 237:15
243:25 244:8
245:15 249:14
250:7,9
**separating**
231:15
**separation**
237:10,11
**september**
231:24 232:4
**series**  193:22
197:24
**serve**  184:9
**served**  19:18
20:15 28:10
**services**  28:3
28:20
**set**  19:21 105:4
135:13,13
137:6 237:8
263:15 309:10
309:21
**setting**  73:2
264:7,8
**settle**  19:25
**several**  58:16
74:18
**severe**  74:12,12
126:8,9 130:20
132:22 134:4
163:3,7 272:6
275:17 276:23

293:15
**severely**  248:4
252:24 254:5
254:16
**severity**  127:5
160:15 176:24
211:3 212:22
234:2 235:12
236:9 237:13
237:16 283:7
**shape**  54:16
**share**  26:7
242:5
**sheet**  310:6,8
310:10,13
**shocking**
170:22
**short**  209:10
285:6 290:2
303:17
**shorthand**
169:16 231:5
309:6
**shortly**  217:12
219:17
**show**  92:15
175:21,23
192:23 294:16
**showed**  122:14
**shows**  99:16
**shut**  218:16,19
293:9
**sic**  294:4
**side**  16:14

**[sign - spoke]** Page 57

**sign** 310:7
**signature** 41:18
  42:17 43:15
  309:23 311:21
**signed** 4:11,12
**significance**
  48:10 49:12
**significant**
  46:24 48:2,13
  49:4,24 50:8
  51:8 81:5,23
  85:13 95:21
  99:11,17
  250:11
**significantly**
  58:24
**signing** 310:9
**silence** 283:11
**silent** 281:24
**similar** 195:10
  221:23 288:2
**simply** 52:16
  61:22 63:6
  143:22 242:9
  242:10 296:11
**single** 48:9 58:7
  58:21 85:9,15
  89:11 191:13
  191:14
**sir** 11:22 28:22
  29:11 41:8
  69:8 91:17
  100:24 120:5
  181:23 212:13
  217:11 265:24

**sit** 36:5 38:19
  56:24 59:12
  202:5
**sitting** 49:21
  55:21 56:25
  79:13 82:24
  95:6 247:20
  254:15
**situation** 94:25
  101:17 179:11
  217:4,8 276:21
  289:4
**sjb** 1:5 5:23
**skeptical**
  266:20
**slowly** 277:25
**smoothly** 10:2
  17:2
**solely** 148:12
**solutions** 2:19
  3:9
**somewhat**
  19:21 31:10
  32:7 71:20
**soon** 174:10
  175:9
**sorry** 21:7
  34:22 113:13
  113:14 128:9
  136:6 190:25
  211:14 242:13
  272:25 296:10
**sort** 20:11
  110:19 128:22
  170:21 176:2

  195:10 256:4
**sorts** 73:15
**sounded** 120:3
  222:21
**sounds** 70:2
  244:17 249:9
  275:20
**source** 117:15
  117:20
**space** 310:5
**span** 144:9,10
**speak** 24:16
  39:9 83:24
  159:18 214:19
  261:15,19
**speaking**
  112:17 181:3
  283:18
**speaks** 83:18
  260:20
**specialist** 2:19
**specialties**
  25:19
**specific** 34:5
  35:11 58:20
  59:3 71:10
  73:3 86:21
  87:15 89:5
  92:9 108:14
  114:5,25
  115:19 118:15
  138:12 154:16
  163:10 164:15
  164:24 165:18
  166:15,25

  167:4 168:5,15
  171:9 197:16
  228:10 229:17
  232:22 241:8
  259:20 262:22
  263:18,20
  265:4 302:15
**specifically**
  10:21 17:19
  20:23 65:15
  86:15 105:5
  122:14 147:10
  162:18 195:11
  197:19 227:6
  238:8,13
  257:16 282:3
  299:24 302:12
  305:7
**specifics** 34:6
  176:3 227:22
**speculate**
  125:11
**speculation**
  79:18 275:21
  276:25 277:7
  281:15
**speculative**
  121:8 122:10
  128:4 129:13
**spelling** 197:8
  197:15
**spend** 111:11
**spent** 23:5,20
**spoke** 37:11
  133:5 213:16

**[spoke - stock]**                                              Page 58

235:11 284:21
305:15
**spoken** 34:18
**spread** 54:18
**ss** 308:4 309:4
**stability** 53:24
83:9 92:22
108:11 133:22
137:19,23
138:4 180:4
265:10 294:23
**stable** 228:25
**staff** 39:12
**stage** 200:14
**stand** 18:22
96:4 202:8
262:2
**standard**
154:19
**standardless**
16:3
**stands** 26:4
154:2
**start** 39:20,23
41:5 62:21
101:25 104:2
104:18 105:15
105:18 107:4,6
152:12 179:4
269:2
**started** 60:21
95:23 103:25
144:21 277:23
**starting** 143:14
179:8 279:8

**starts** 209:10
**state** 1:15 6:14
6:16 7:17
30:19 162:6
163:2 193:22
199:18 200:10
212:8 215:23
217:7 308:3
309:3,7 310:5
**stated** 7:17
51:14 52:21
89:24 117:2
202:18 207:13
210:12 247:9
253:7 288:17
295:6
**statement** 51:5
52:15 62:16,18
63:7,10,24
64:18 79:11
82:5 86:4
99:20 141:18
151:3,4,8
156:11,14
186:15 187:2,9
190:8 196:3
**statements**
50:23 78:18,19
79:22,23 80:2
82:16 83:2,18
84:7 85:19
86:11,12,13,24
87:7 88:11,20
88:25 89:21
90:7,8 92:19

94:14 96:13
103:15 105:7
107:11 108:4
111:24 141:10
142:17 143:5
143:24 155:3
174:14 189:24
191:2,3 192:3
192:8 206:14
206:19,20
226:3 281:9
294:20 305:6
305:22
**states** 1:2 5:21
**stating** 166:12
**statistical**
48:10 49:12
289:2,9,12,16
290:6,16,22
291:2
**statistically**
46:23 47:25
49:3,24 50:8
51:8 99:11,17
250:10
**statistics**
288:24
**statutory** 242:8
242:15,25
**stay** 154:24
**stayed** 66:7
**stays** 127:12
**step** 19:25
**stephenson**
32:17 35:9

37:21,22,24
38:2 42:24
43:9 44:18
73:20 162:22
246:7 247:24
251:7 268:9
284:12 285:19
287:21
**stephenson's**
42:14 266:21
284:8 286:12
292:4
**steps** 199:7
271:10
**steven** 1:11 3:4
3:11,13,15
5:18 36:15
40:7,16,24
307:7 308:6,16
309:9
**stick** 147:18
**stipulated** 4:2,7
4:10
**stock** 53:14
61:15 73:24
98:18,19 99:3
99:24 100:8,10
100:19 102:2,8
123:25 124:13
125:7 130:20
131:22 153:16
169:19 171:19
187:19 236:3,7
237:20 243:19
250:11,13

**[stock - sustained]**                                                    Page 59

253:25 254:6
255:12,14
270:17 271:19
272:12 274:10
274:15 277:9
280:9 282:19
**stop** 73:24
**street** 7:18
173:14 227:16
**strives** 303:7
**structure** 25:8
**studied** 62:24
194:23
**studies** 46:21
47:23
**study** 12:12,20
13:9,15,23,25
14:14,25 15:10
15:14 16:2
29:15 48:16,19
49:16 61:19,20
62:14 67:2
101:21,22
116:25
**studying** 70:5
**subject** 28:6
82:25 85:18
87:21 94:9
106:8,10
242:20 245:12
310:9
**subjective**
12:21 16:4
**subjects** 84:6

**submit** 15:23
**submitted**
35:17 37:18,19
41:12 43:10
**subparagraph**
163:2 164:23
**subscribed**
308:18
**subsequent**
94:10 95:23
143:4,22,24
205:2 222:24
240:9
**subsequently**
199:5 200:6
218:2 235:16
299:14
**substance**
70:12,17 72:3
72:4 105:6
143:21
**substances**
11:19
**substantially**
256:23
**substantive**
30:12
**subsumes**
165:14,17,23
**successful**
53:16
**succumb** 87:25
**suffered** 119:25
242:19 271:5,9

**sufficient**
304:22
**suggest** 289:7
**suggesting**
166:11 226:3
**summarize**
42:4 117:5
258:11
**summary**
145:14
**support** 13:12
110:20 137:10
290:17,22
**supported**
171:10
**supports** 110:7
174:13 290:14
**sure** 20:21
23:18 24:15
26:14 37:25
47:7 69:2,3
72:8 80:20
82:9 93:7 95:4
97:15 112:16
154:23 158:22
160:5,6 166:9
169:24 175:15
176:4 186:10
205:24 213:14
235:23 236:24
237:22 256:9
264:17 268:8
269:19 281:16
291:12 296:25
297:16 299:11

301:7,24
**surmised** 173:6
**surprise** 46:3,6
50:6,15 51:12
110:11 160:25
161:6,10
170:20,21,25
230:21 278:19
279:11 305:16
**surprised**
186:4 222:19
278:25,25
279:4,13
**surrounding**
111:15
**suspect** 278:4,7
278:15 279:8
**suspended**
199:23
**suspension**
200:18 201:15
239:16 240:8
**sustain** 88:4
**sustainability**
87:8,12,23
89:4 92:22
105:22 106:19
144:17 257:9
294:22
**sustainable**
88:7
**sustained** 124:2
124:3 298:24
300:9

**[sutcliffe - thank]**                                                Page 60

**sutcliffe** 32:11 43:12

**swallow** 292:18

**swear** 7:13

**swearing** 11:3

**sworn** 4:13 7:16 8:4 162:5 308:18 309:11

**synonyms** 54:5

**t**

**t** 3:8 7:15,15 162:2,4,4 215:10 308:2 309:2,2 311:2

**table** 152:10 295:14

**tailing** 152:25

**tailings** 25:11 103:3 113:25 199:20 216:13 255:4

**take** 5:13 38:23 46:13 70:8 75:19 76:13,22 119:4 131:2,2 131:5 134:6 147:24 157:2 157:20 197:18 203:2 220:24 224:18 225:4 245:2 247:5,25 264:21 269:17 291:15 297:14 306:2

**taken** 77:4 134:12 153:11 161:25 225:10 236:9 269:24 297:21 308:7

**takes** 131:10 184:22 224:5

**talk** 16:21 55:15 65:4 68:8,23 76:6 77:22 155:13 169:8 186:20 283:25

**talked** 80:11 89:2 178:14 257:23

**talking** 9:9 64:7 81:11 92:13 102:7 105:5 106:13,15 123:7 128:15 148:17 154:15 162:22 167:15 176:5 195:19 197:23 206:19 210:22 211:18 212:3 220:5 229:25 239:15 240:4,5 305:10 305:11

**target** 212:21

**teach** 25:19 26:17

**team** 23:4 24:17

**technical** 217:15,25 219:20

**televisa** 33:15

**tell** 71:11 108:14 118:23 121:2 130:11 131:18 181:7 192:12 206:3 277:12

**telling** 127:24 129:19 218:9 287:13

**tells** 53:15 272:13 276:17 279:7

**temporal** 79:8 237:10

**tempted** 154:23 282:24

**ten** 218:2

**tension** 155:25 156:9,13

**term** 29:14 45:8 87:25 169:9 180:16 181:24

**terms** 112:18 196:5 255:3 290:6

**terrible** 226:4

**terry** 36:22

**test** 48:9 196:8 196:17

**testified** 7:19 69:8 74:22 77:12 84:5 154:8 162:7 238:16 254:3 285:22 287:15

**testify** 17:12 19:24

**testifying** 10:25 120:25

**testimony** 8:2,5 8:13 11:5,13 17:23 21:15 22:4 32:23 34:24 36:11,18 36:25 39:10 54:25 55:22 69:15 95:5 97:17 116:7 121:22 128:7 141:12 154:18 184:13 188:21 189:21 190:9 201:2 206:11 238:2 239:5,22 241:25 245:12 246:17 269:9 271:8 272:19 308:7 309:13

**tests** 195:3

**thaden** 36:22 36:25

**thank** 7:22 306:25

**[thaten - time]**                                                                 Page 61

thaten   1:14 6:7
  309:6,24
theoretical
  67:22
theoretically
  266:2
theory   28:23,25
  29:4,13,22
  51:4 66:23
  67:5 68:2
  70:14 74:7,7
  119:21 121:14
  121:25 129:3
  132:15,16
  168:11 220:17
  276:15,17
thiago   2:17 7:3
thing   133:23
  149:25 175:6
  175:11 233:7
  240:5,6 258:22
  260:18 306:4
things   16:21
  17:8 51:22
  62:16 82:22
  83:24 87:3,4
  90:6 106:5
  110:19 111:22
  112:12 125:14
  134:3 142:20
  146:18,20,22
  156:10 164:21
  165:8,13
  172:10 174:17
  184:6 198:6

204:12 224:16
231:14 233:3
234:16 240:7
257:24 289:5
290:12
think   14:16
  15:13 18:15,16
  21:10 26:16,22
  26:24 27:13,17
  35:4 36:5 39:3
  39:22 46:17
  47:14 53:10
  55:10,11 56:22
  57:2,24 58:7
  58:15 59:14
  68:18,19 70:3
  71:8 72:23
  73:4,18,19,25
  75:5,9,11
  77:20 84:17
  86:10 99:15
  101:9 107:21
  110:5 114:20
  117:19 120:6
  120:10 121:23
  124:5 130:5,12
  133:6 139:7
  144:24 145:2
  147:21 149:13
  150:18,20
  151:13,23
  152:15 156:20
  158:2 160:20
  164:12 166:18
  167:2,12 169:3

174:8 175:6,12
180:17,21
192:10,13
193:13 196:4,9
199:9 204:24
205:21 221:13
235:10,23
236:2 240:13
241:6 244:17
247:21 250:8,9
256:7,15
262:10,14
264:5 268:16
271:2 280:5
283:9,12,14
285:22 286:10
286:18 291:24
293:2 294:4
300:15 304:5
304:22 305:13
306:19
thinking   50:20
  291:17 301:8
  306:8
thinks   304:8
third   2:5
  159:22 172:4
  173:13 227:5
  260:22,23
  261:4,6 265:12
  265:13
thirty   310:14
thought   15:16
  68:21 90:2
  114:4 115:23

116:11 145:21
166:8 194:12
195:9 226:10
230:11 235:9
261:3 266:12
272:5 293:6,8
293:11 301:18
three   39:15
  45:3 47:18
  91:21 93:3
  111:6 130:7
  189:6 190:17
  190:24 191:24
  192:5,13 193:4
  196:19 234:24
  239:2 264:16
  278:3 298:25
tied   159:12
  168:5
time   4:9 5:9
  6:15 10:8 23:3
  24:8 33:19
  44:13 62:2
  63:25 64:8
  97:13 98:18,25
  99:19,24
  111:11 115:20
  120:13,16
  144:10 157:15
  161:18 162:3
  162:10 177:22
  179:7,23
  185:19 187:24
  188:3 195:20
  196:7 209:10

**[time - two]**                                                        Page 62

223:7,16,24
224:9,13 226:3
243:10 254:25
262:11 274:6
285:6 287:18
287:25 290:3
306:19,25
307:10
**timely** 45:13
250:5,14
252:25
**times** 8:12,18
10:16 19:17
20:15 33:25
54:11 74:18
150:15 262:20
275:24
**timing** 228:10
228:12,14
229:18,19
**titled** 43:20
200:4
**today** 7:8 10:8
10:17,25 11:13
16:25 17:12
22:14 37:16
38:17 39:11,11
47:16 49:21
55:21 56:25
79:13 82:24
95:6 133:13
168:23 169:10
181:4 207:11
247:3,4,20
254:15 262:20

306:22 307:2
**today's** 34:12
**together** 43:25
273:10
**told** 99:18
101:24 102:10
102:17 104:10
125:3 138:2
229:14 230:6
233:25 277:24
279:3,15 287:8
**tolerable**
286:17,19
**took** 17:8 76:11
76:20 198:5
271:10 300:18
**tools** 224:20
243:24 244:7
245:14
**top** 137:3 153:4
**topic** 285:16
**topics** 19:13,15
80:16 85:20
89:2,10,10
96:15 302:21
**toss** 267:22
268:19
**total** 24:10
168:19,20
**tough** 18:14
**towards** 159:15
**traced** 164:8
**track** 252:10
**trading** 63:21
63:25 200:8

**traditional**
241:17
**trained** 28:11
**training** 27:5,6
29:10
**transcribe** 9:4
**transcript**
308:7,9 309:12
310:15,16
**transcripts**
44:17
**trap** 247:23
**trial** 4:9
**trick** 155:2
**tried** 246:7,11
**true** 35:14 53:6
56:5 78:11
90:5,5,8 103:9
103:15 137:15
145:10 151:4,9
152:8 156:16
210:2 219:11
222:23 256:2
264:12 285:19
287:4 295:17
296:20 301:2,2
302:8,11,12
308:9,13
309:12
**trust** 130:16,16
233:3 261:21
**truth** 21:24
53:13,16,18
81:25 90:6,20
99:18 101:24

102:10,17
104:10 124:3
129:19 130:23
131:23 132:20
155:9 187:8
189:2,8,15,23
190:8 192:2,7
249:20 277:10
282:10
**truthful** 11:12
131:18 133:17
**try** 9:9 16:24
20:10 80:20
104:13 154:24
178:17 191:21
223:8,17
236:21 252:12
267:2
**trying** 35:8,13
35:15 88:24
97:22 129:4
143:17 152:4
154:16 155:2,4
164:20 181:7
219:15 238:24
275:22 279:14
**turn** 215:5
**turned** 281:20
**turning** 197:16
227:4
**turns** 297:7
**twice** 288:19
**two** 10:16 17:8
23:12 35:2
39:3 82:22

**[two - unit]** Page 63

93:18 111:12
125:14 146:11
164:20 165:8
165:13 182:7
195:23,24
196:10,13,19
199:4,7,7
200:14 208:2
209:9 221:5,6
227:7 228:25
231:22 240:7,9
240:20 273:10
273:11 285:6
287:24 288:2
288:18 289:6
289:25 291:5
**tyler** 2:18 7:10
22:13
**type** 49:17
179:2
**types** 146:12
**typically** 24:6,6

**u**

**u** 215:10,10,10
**ultimate** 13:2
**ultimately**
14:11 80:4
222:22 267:3
**unanimous**
226:14
**uncertain**
71:20
**uncertainty**
265:21

**unclear** 301:9
**uncontrovers...**
26:23
**uncovered**
209:17 299:14
**under** 10:25
11:15,18 59:5
79:6 129:3
137:5 162:7
171:18 187:17
205:24 295:24
295:25 308:8
**underestimate**
156:7 168:17
254:16
**underestimated**
252:24 254:5
**underlines**
151:25
**underlying**
117:8
**understand**
9:19 10:7,18
10:22,24 11:6
14:13 20:11
24:15 26:15
47:8 50:16
83:13 84:19
86:13 93:20,24
95:5 96:9,17
97:16,23
111:21 112:11
119:20 121:12
121:25 123:9
124:7 129:4

133:8,10,15
142:22 155:11
155:24 156:8
158:22 169:24
176:4 183:14
184:12 186:11
187:23 189:20
200:16 201:13
204:2 206:10
222:7 235:24
236:11 238:24
239:21 245:11
255:19 256:10
271:7 275:22
275:25 281:17
282:15
**understanding**
28:12 31:23
49:19 54:3
83:8,16 84:11
87:11 89:8,20
109:13,19
123:2 132:25
141:3,5 142:15
142:23 143:7
143:20 144:6
144:12 145:25
149:8,14 150:6
150:22 151:14
182:17 183:6
183:13 200:22
232:10 258:12
269:5 286:22
287:2 289:4
293:21

**understandings**
290:12
**understood**
9:22 12:24
55:20 109:15
109:17 110:23
184:5 217:22
231:21,21
279:14 295:13
295:15
**underway**
140:20
**undisclosed**
182:15,19
183:3,9 205:18
207:15 210:15
280:18
**unexplained**
12:21
**unfortunate**
132:10,11,12
173:7 177:24
209:9
**unfortunately**
37:6
**unique** 147:20
**unit** 5:16 14:25
76:25 77:7
134:9,15
161:22 162:11
225:7,13
269:21 270:3
297:18,24
307:6

**[united - view]** Page 64

| | | | |
|---|---|---|---|
| **united** 1:2 5:20 | **used** 14:16 | 213:11,24 | **variety** 89:2 |
| **universe** 21:12 | 39:22 59:15 | 225:19 226:9 | **various** 65:21 |
| 44:2 | 77:16 89:21 | 226:23 232:6 | 89:6 189:23 |
| **university** | 169:10 255:17 | 243:7 250:19 | **vast** 67:21 |
| 158:3 | 256:7 268:9 | 255:21 262:21 | **verge** 277:18 |
| **unnecessary** | 310:17 | 263:6,17 | **verify** 75:6,14 |
| 14:20 | **uses** 271:18 | 264:22 266:14 | **verifying** |
| **unrealistically** | **using** 59:13 | 277:17 281:4,5 | 111:11 |
| 285:20 | 199:5 224:20 | 294:23 305:7 | **veritext** 2:19 |
| **unrelated** | 231:3 305:24 | **vale's** 30:5,19 | 3:9 6:5,7 |
| 16:22 | **usually** 33:2 | 46:23 47:24 | **versed** 62:23 |
| **unreliable** | 149:5 151:2 | 84:12 88:12,20 | **versions** 264:16 |
| 246:9 | 167:23 266:8 | 92:20,21,23 | **versus** 101:19 |
| **unreportable** | **utilized** 151:19 | 93:16 106:18 | 103:23 |
| 55:15 65:4 | **utterances** 9:2 | 108:18,23,24 | **video** 2:19 5:12 |
| 68:8 76:6 | | 113:24 133:16 | 5:17 |
| 169:8 186:20 | **v** | 173:18 198:21 | **videographer** |
| **unseemly** | | 200:11 206:13 | 5:2 6:6 7:12 |
| 159:20 160:2 | **v** 7:15 162:4 | 206:18 212:8 | 76:24 77:5 |
| 170:11 | **vague** 108:6 | 212:15 228:20 | 134:8,13 |
| **unverifiable** | 148:13,14 | 229:5 294:20 | 161:21 162:9 |
| 12:20 15:11 | 175:20 258:17 | 294:21 | 225:6,11 |
| **update** 289:3 | **vale** 1:5 2:17 | **valuation** | 269:20,25 |
| 290:11 | 5:19 7:3 13:4 | 126:24 163:8 | 297:17,22 |
| **upstream** | 18:11 19:3 | 222:9 243:24 | 307:5 |
| 216:12 | 60:7 84:21 | 244:7 245:14 | **videotaped** |
| **use** 29:14 59:20 | 85:20 87:7 | 300:3 303:6 | 1:11 |
| 160:2,12 | 93:12,13 95:9 | **value** 127:16 | **view** 27:8 31:7 |
| 171:10 199:12 | 97:18 99:12 | 135:17 137:5 | 71:4 77:24 |
| 231:3 243:3 | 111:13,23 | 164:9 167:18 | 89:17 97:3 |
| 245:14 255:11 | 112:12 114:15 | 260:22 | 106:16 108:22 |
| 255:13 263:18 | 132:10,13 | **valued** 145:13 | 109:8 125:22 |
| 266:23 270:9 | 141:8,16 | **variation** | 126:14 128:13 |
| 277:10 | 142:25 163:17 | 273:16 | 158:23 174:4 |
| | 174:16 179:18 | | 201:24 208:5 |
| | 188:15 199:17 | | |
| | 200:4 211:19 | | |

**[view - worked]**                                              Page 65

223:19 265:24
281:12 282:17
**viewed**  88:18
108:18,23
144:9 305:8
**views**  31:12,20
105:20
**villanueva**
22:18
**violations**  3:17
112:23
**virtual**  38:14
38:20 39:8
**von**  36:22,25
**voracity**  30:11
106:12 186:15

**w**

**w**  194:7 308:2
**wait**  9:10,13
33:13
**waiting**  178:5
**waived**  4:6
**wake**  249:3
**wall**  173:14
227:16
**want**  24:12
25:4 26:9,14
47:11 60:11
61:3 68:3,4
72:10 77:8
79:7 95:4
97:15 131:4
138:7 168:24
169:16,23
175:23,25

176:3 179:4
186:10 193:12
222:8 223:12
225:14 237:22
243:11 256:9
288:23 289:19
296:8 299:22
301:23 302:17
**wanted**  76:3
90:23 160:5,6
171:2
**wants**  304:19
**warranted**
156:17 159:9
169:21 261:21
**wash**  16:14
**washington**
158:3
**way**  15:15
46:24 48:2
50:4 52:9 58:2
58:17 59:22
69:25 78:14
79:3 80:21
83:21 84:3
89:25 98:4
101:8,10
104:13 118:7
120:3 136:20
144:25 145:3,9
145:17 149:3
157:2 164:13
166:19 188:22
191:7 192:10
221:12 223:9

228:3 240:16
252:17 269:14
271:2 273:14
275:3 285:14
290:10 292:9
296:22 299:5
309:18
**we've**  100:17
129:21 130:6
207:9 220:18
**weidner**  2:13
6:25
**weight**  12:13
14:19,20 16:15
**went**  16:21
117:14 230:23
**whereof**  309:20
**whispering**  5:7
**wholistically**
193:25 194:10
**wide**  31:9
215:25 216:20
261:10 265:21
**widely**  169:10
**willing**  21:16
26:7,24
**winning**  132:15
**wish**  311:3
**withdrawn**
219:19
**withheld**
229:16,23
232:15,18
253:19 293:14

**withhold**
232:11
**withholding**
269:2
**witness**  3:3 7:7
7:14 17:4,5
91:11 158:17
181:8,9 220:23
221:4 269:17
272:25 309:9
309:14,20
310:2 311:21
**witness's**  100:4
**wonder**  175:11
292:13 295:6
295:17 296:8
**wondering**
150:14
**word**  46:14
82:10 112:17
112:20 153:12
194:9,16 197:7
241:23
**words**  12:17,24
14:17 16:6
55:25 132:3
185:24 207:22
208:3 218:12
**work**  23:12
31:13 42:5
44:8 48:8
82:17 84:16,20
88:18 157:11
**worked**  32:4
148:20 149:23

**[working - zoom]**                                                    Page 66

| | | |
|---|---|---|
| **working** 25:20 183:17 **world** 84:22 126:5 134:18 134:22 137:9 137:12,24,25 138:9,15,15,20 139:2,9,12 140:6 151:18 152:22 153:19 154:9,10,19,20 155:21 159:3 160:17 161:12 305:12 **worse** 171:14 173:3 174:18 174:20 255:2,8 255:9 273:4 275:14 276:21 **worst** 72:15 126:22 172:14 172:17 173:20 173:24 254:20 254:22,23 255:8 272:11 272:14,21 273:3,5,7,17,19 274:7,12,20,24 275:5,9,11 276:5 279:22 **worth** 222:11 **wrap** 158:21 222:20 **wrestle** 155:12 | **write** 18:19 214:10 228:16 229:12 245:7 251:9 **writing** 200:9 210:8 **writings** 169:11 **written** 37:18 43:10 214:24 262:2 285:13 **wrong** 73:25 74:3 112:5 179:6,22 180:6 194:14 197:8 209:13,13,14 218:25 246:14 **wrongdoing** 298:4 **wrote** 26:3 30:14 42:13 43:7 92:14 151:21 244:19 247:19,22 258:8 289:20 294:14 | 178:23 180:12 228:4 248:21 256:14 268:13 274:2 303:21 **year** 130:9 228:23 288:20 **years** 8:17 17:9 111:5 130:7 196:20 288:18 **yeses** 190:14 **york** 1:2,13,13 1:15 2:5,5,11 2:11 5:22 6:3,3 7:17 162:6 308:3,4 309:3 309:4,8 |

|  **x**  |
|---|
| **x** 1:3,7 3:2,8 233:2,6 |

|  **y**  |
|---|
| **y** 233:3,4 **yeah** 35:24 71:2 113:19 116:9 126:13 146:15 174:8 |

|  **z**  |
|---|
| **zero** 128:2 129:23,24 130:14,23 **zones** 64:8 **zoom** 8:8 |

Federal Rules of Civil Procedure

Rule 30

(e)  Review By the Witness; Changes.

(1)  Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A)  to review the transcript or recording; and

(B)  if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2)  Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the

foregoing transcript is a true, correct and complete

transcript of the colloquies, questions and answers

as submitted by the court reporter. Veritext Legal

Solutions further represents that the attached

exhibits, if any, are true, correct and complete

documents as submitted by the court reporter and/or

attorneys in relation to this deposition and that

the documents were processed in accordance with

our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining

the confidentiality of client and witness information,

in accordance with the regulations promulgated under

the Health Insurance Portability and Accountability

Act (HIPAA), as amended with respect to protected

health information and the Gramm-Leach-Bliley Act, as

amended, with respect to Personally Identifiable

Information (PII). Physical transcripts and exhibits

are managed under strict facility and personnel access

controls. Electronic files of documents are stored

in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.