# EXHIBIT D

Page 1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK

-------------------------------*

In re:                                    Case No.:

VALE S.A. SECURITIES LITIGATION      19-CV-526-EK-SJB

-------------------------------*


STENOGRAPHIC AND VIDEO-RECORDED

DEPOSITION OF

R. GLENN HUBBARD, Ph.D.

Wednesday, September 6, 2023

9:13 a.m.


Stenographically recorded by:

Josephine H. Fassett, RPR, CCR

Job No. 6033819

Page 2

Wednesday, September 6, 2023

9:13 a.m.

T R A N S C R I P T  of the stenographic and video-recorded deposition of R. GLENN HUBBARD, Ph.D., pursuant to the Federal Rules of Civil Procedure, held at the offices of Kaplan Fox & Kilsheimer LLP, 300 Third Avenue, New York, New York, on Wednesday, September 6, 2023, commencing at approximately 9:13 a.m., stenographically recorded by Josephine H. Fassett, a Registered Professional Reporter, Certified Court Reporter, and Notary Public of the states of New York and New Jersey.

APPEARANCES:

ATTORNEYS FOR LEAD PLAINTIFF COLLEGE OF APPLIED ARTS

AND TECHNOLOGY PENSION PLAN AND CERTIFIED CLASS:

    KAPLAN FOX & KILSHEIMER LLP

    800 Third Avenue

    New York, New York 10022

    212.687.1980

BY:  DONALD R. HALL, ESQ.

    dhall@kaplanfox.com


ATTORNEYS FOR DEFENDANT VALE S.A.:

    GIBSON DUNN & CRUTCHER LLP

    200 Park Avenue

    New York, New York 10166

    212.351.4000

BY:  CHRISTOPHER M. JORALEMON, ESQ.

    cjoralemon@gibsondunn.com

    CHASE WEIDNER, ESQ.

    cweidner@gibsondunn.com


ALSO PRESENT:

    THIAGO M. CARDOSO, ESQ.,

    Vale In-House Counsel

    ANTON EVANGELISTA, Videographer

Page 4

----------------------INDEX----------------------

WITNESS                                          PAGE

R. GLENN HUBBARD, Ph.D.

   By Mr. Hall                                    7


---------------------EXHIBITS---------------------

EXHIBIT      DESCRIPTION                         PAGE

Exhibit 1    Rebuttal Expert Report of Glenn      12
             Hubbard dated April 7, 2023

Exhibit 2    May 2017 Vale S.A. Form 6-K          57

Exhibit 3    Sustainability Report 2017           65

Exhibit 4    Memorandum and Order dated           69
             5/20/2020

Page 5

HUBBARD, Ph.D.

(On the stenographic and video record 9:13 a.m.)

THE VIDEOGRAPHER:  Good morning.  We are going on the record at 9:13 a.m. on September 6, 2023.

Please note that the microphones are sensitive and may pick up whispering and private conversations.

Please mute your phones at this time.

Audio and video recording will continue to take place unless all parties agree to go off the record.

This is Media Unit 1 of the video-recorded deposition of Glenn Hubbard taken by counsel for Plaintiff in the matter of Vale S.A. Securities Litigation. Filed in the Southern District of New York. Case No. 19-CV-526-EK-SJB.

The location of the deposition is Kaplan Fox & Kilsheimer, 800 Third Avenue in New York City.

My name is Anton Evangelista representing Veritext, and I am the videographer.  The court reporter is

**Page 6**

HUBBARD, Ph.D.

Josephine Fassett from the firm Veritext.

I am not authorized to administer an oath, I am not related to any party in this action nor am I financially interested in the outcome.

If there are any objections to proceeding, please state them at the time of your appearance.

Counsel and all present will now state their appearances and affiliations for the record, beginning with the noticing attorney.

MR. HALL:  Okay.  I would just like to correct that it's filed in the Eastern District of New York, not the Southern District of New York.

THE VIDEOGRAPHER:  Okay.  Noted.

MR. HALL:  Okay.  Donald Hall on behalf of Lead Plaintiff CAAT and the Certified Class with Kaplan Fox & Kilsheimer LLP.

MR. JORALEMON:  Good morning everyone. Chris Joralemon, Gibson Dunn, representing Defendants in this matter here today on

HUBBARD, Ph.D.

behalf of the witness.  I'm joined by my

colleague, Chase Weidner, as well as Thiago

Cardoso of Vale.

THE VIDEOGRAPHER:  And will the court

reporter please swear in the witness and

then counsel may proceed.

R. GLENN HUBBARD, Ph.D.

the witness, having been duly sworn, was examined

and testified under oath as follows:

EXAMINATION

BY MR. HALL:

Q.   Good morning.  Can you state your full

name and address for the record, please.

A.   Good morning.  It's Robert Glenn,

G-l-e-n-n.  Hubbard, H-u-b-b-a-r-d.  15

Claremont -- that's C-l-a-r-e-m-o-n-t -- Avenue in

New York 10027.

Q.   Thank you.

Have you ever had your deposition taken

before?

A.   Yes, sir.

Q.   Multiple times, correct?

A.   Yes, sir.

Q.   Okay.  So you're familiar with the

HUBBARD, Ph.D.

process, but I'll just tell you a few rules so that we're on the same page today.

I will do my best not to interrupt you and speak over you.  Please try the same.

We have to give verbal answers, as you're aware.

If at any time you need to break, let me know and we'll finish the pending question and then we can take a break, otherwise, we'll try to break about every hour or so.

A.   That sounds good.  Thank you.

Q.   Is there any reason why you can't testify truthfully today?

A.   No, sir.

Q.   And what did you do to prepare for your deposition today?

A.   Basically reviewed my reports, Professor Feinstein's reports, and met with counsel.

Q.   How long did you meet with counsel?

A.   We met yesterday for, I'm guessing, about three hours.

Q.   Okay.  And is that the same counsel that's in the room here today?

A.   Yes, sir, it is.

**Page 9**

HUBBARD, Ph.D.

Q.   Anyone else in the room and present at that meeting?

A.   Yes, sir, one other individual.

Q.   Was that person also a lawyer?

A.   Yes, sir.

Q.   Okay.  Did you speak to anyone other than counsel about your deposition today?

A.   Yes, the team that worked with me at Analysis Group.

Q.   And who did you speak with?

A.   Mr. Gold, G-o-l-d, and Mr. Nabi, N-a-b-i.

Q.   Okay.  So when did you first become aware of this action against Vale regarding the 2019 dam failure?

A.   My recollection is I was contacted in late 2022.  I think the formal retention may be early 2023, but late 2022.

Q.   Okay.  And who contacted you?

A.   I believe it was a contact at Analysis Group.

Q.   Do you recall who?

A.   I think it was Mark Egland, E-g-l-a-n-d.

Q.   And do you know how Mr. Egland, if

Page 10

HUBBARD, Ph.D.

that's the person, became aware of the matter?

A.   I do not.  I would presume through counsel, but I don't know.

Q.   And when did you first speak to counsel in this action?

A.   That I don't recall.  Sometime, obviously, not long after being retained, but I don't really remember a window.

Q.   And when you were retained, what was your understanding what your engagement into this matter was going to concern?

A.   It would be as a rebuttal to plaintiffs' experts.

Q.   Any specific topics or issues that you were informed of that would be part of your report?

A.   Well, the topics that I outlined in the report that came to be, which would be the damages estimates from Professor Feinstein and Mr. Pitt.

Q.   Okay.  Did you review any documents before you were retained in this litigation related to this case?

A.   My recollection is, when I was first contacted I reviewed the complaint.  That would be

HUBBARD, Ph.D.

my practice.  But I don't recall other documents before retention.

Q.   Okay.  And did you speak to anyone regarding retention in this matter before you were retained about being retained in this matter?

A.   If I'm understanding your question, only the contact at Analysis Group.

Q.   Okay.  Do you know someone by the name of Walter Torous?

A.   By reputation.  I don't know him personally.

Q.   Have you ever spoken to Walter Torous?

A.   I have not, to my knowledge.

Q.   Do you know someone by the name of Sumon Mazumdar?

A.   I do.

Q.   And have you spoken to Mr. Mazumdar about this case?

A.   Not about this case, but I've known him for years, yes.

Q.   Okay.

MR. HALL:  Let's mark as the first exhibit Hubbard 1.  And this will be a copy of the Rebuttal Expert Report of Glenn

Page 12

HUBBARD, Ph.D.

Hubbard dated April 7, 2023.

(Rebuttal Expert Report of Glenn

Hubbard dated April 7, 2023, marked as

Hubbard Exhibit 1, as of this date.)

BY MR. HALL:

Q.   Have you seen this before?

A.   Yes, sir.

Q.   And this is the report you discussed that you reviewed yesterday in preparation for this deposition, correct?

A.   Yes, sir.  Among other things, but yes.

Q.   Okay.  In your review of the report yesterday, did you learn of anything that you wished to correct in your report?

A.   No, sir.

Q.   Okay.  Do you have anything that you wish to add to your report?

A.   I'm not sure what that means. Obviously, since I put this report up, Professor Feinstein has another report, so I obviously have views about that that aren't in this, if that's what you're asking.

Q.   No, I'm asking -- well, my first question was:  Did you have any mistakes that were

Page 13

HUBBARD, Ph.D.

corrected --

A.    Correct.

Q.    -- in this report?  And you answered no.

A.    Correct.

Q.    So my second question was:  Is there anything as of yesterday that you would like to add to this report?

A.    To this report for its purpose, no.

Q.    Okay.  If you can turn to page 9 of your report.

A.    Okay.

Q.    Which has a heading called Assignment. Do you see that?

A.    Yes, sir.

Q.    And paragraph 18 talks about what you were retained to do, correct?

A.    Yes, sir.  It reprises the answer I gave --

Q.    Yes.

A.    -- to your earlier question.

Q.    Was there anything else, in addition to paragraph 18, that you were retained to do in this report?

A.    No, sir.

Page 14

HUBBARD, Ph.D.

Q.   Okay.  How many hours did you spend preparing this report?

A.   I don't recall for the report.  I'm guessing between 130 to 150, but that's an estimate.

Q.   And I'm assuming other individuals at Analysis Group, or Analyst Group, also worked on preparing this report?

A.   Yes.  They worked on some of the calculations, references and so on.

But yes, they would have spent time as well as myself.

Q.   Do you know how much additional time Analysis Group has billed in this matter?

MR. JORALEMON:  Object to the form.

A.   I don't, because they bill separately from me.

Q.   Okay.  Do you have any idea of how many hours they've spent, others at Analysis Group?

A.   I think that's the same question.  I'll interpret it as such, so it'll still be no, I don't.

Q.   I reframed because your counsel objected.

Page 15

HUBBARD, Ph.D.

A.   Okay.

Q.   Okay.  Paragraph 20 references Appendix C and materials you reviewed.  If we could turn to Appendix C, which is kind of towards the last third or so of the document.

A.   I'm there.

Q.   Okay.  Do you see there are a few pages that says Appendix C, Materials Considered.  Do you see that, two pages?

A.   Yes, sir, I do.

Q.   Okay.  Are these all the materials you considered in preparing your report?

A.   Other than general knowledge or expertise, yes.

Q.   And how did you select the materials to be considered in this report?

A.   It's probably useful to go by category in doing that.

Q.   Okay.

A.   Legal documents were essentially the complaint and the expert reports that I needed to review.

Under the produced documents, I think this is merely for factual purposes in the

Page 16

HUBBARD, Ph.D.

introductory section I had about the dam

decommissioning.

The analyst reports were the universe of

analyst reports that I could find in English.

And the books referred to academic,

books and journal articles referred to academic

references.

The publicly available data from

Bloomberg, Refinitiv, S&P Capital IQ, we used to

construct prices.

Q.   Okay.  But how did this material get

selected; did you select it or did someone else

select it?

A.   Oh, no, I selected it.  The economic

materials, for example, were from my arguments.  I

asked for all analyst reports that were in English

during the periods of interest and then obviously

the expert reports.

Q.   Did you review additional analyst

reports other than the ones listed here?

A.   If I'm understanding your question, the

analyst reports I reviewed were the universe that

were in English, which should be described here.

Q.   Okay.  But that's only -- I mean, the

HUBBARD, Ph.D.

reason I'm asking is, there are very limited amount of analyst reports actually listed, and then you have a catchall in addition to those previously produced in this matter by Professor Feinstein.

A.   Yeah, but the catchall is instructed.

So, in other words, he had many.  I found some others.  There are a couple of exhibits in the report that outline the differences in the two sets.  So yes, I reviewed his as well.

Q.   Okay.  That's my point.

And in addition to the ones Professor Feinstein had produced, the ones listed here are the only additional ones you reviewed?

A.   Yes, sir.

Q.   Okay.  And let's go by category, I guess.

In the legal documents, did you personally review and read those documents?

A.   Generally speaking, yes.  I skimmed more the technical documents for things that I needed.

For example, Dr. Stark, who has an expertise far different from my own, is really just to get information about tailings dams and

Page 18

HUBBARD, Ph.D.

upstream and things like that that are not in my information set, so I can't claim to have read the entire report --

Q.   Right.

A.   -- as well as I did Professor Feinstein's.

Likewise, Dr. Oboni was really to get a sense of some probability estimates.

But I think other than that, yes, I read them completely.

Q.   Okay.  And the produced document, did you read that document completely?

A.   I doubt it.

Q.   Okay.

A.   I asked the team working with me to get me information for the construction of that Introductory section of the report which came from there, but no, I would not have read that entire report.

Q.   The same question for the analyst reports, the ones listed and the ones referenced that Dr. Feinstein or Professor Feinstein produced.  Did you read all those analyst reports?

A.   I would not have read all of them cover

Page 19

                    HUBBARD, Ph.D.

to cover.  I was focused on the quotes that

Professor Feinstein had, and my adding to those

quotes for completeness, and then adding to the

set of analysts, but no, not cover to cover.

        Q.    Okay.  I'll ask the same question about

the books and academic publications.

        A.    Well, some of them I wrote.

        Q.    Yes.

        A.    So I think it's fair to say I'm familiar

with them.  And yes, the others I have read.

        Q.    Okay.  I could have assumed that --

        A.    Yes, right.

        Q.    -- but I figured I wouldn't.

              The other publicly available documents,

did you read all those documents personally?

        A.    I wouldn't have read them cover to

cover.  Their utility was really to get particular

pieces of information like in the 20-Fs the risk

language.  Just information about the notes from

the note documents, so I wouldn't have read them

cover to cover.

        Q.    Other than the risk language in the

20-Fs, did you review them for any other relevant

information?

Page 20

HUBBARD, Ph.D.

A.    I don't believe so.

Q.    Okay.  You mentioned risk statements in the 20-F's.  If you flip a couple pages forward, there's an Exhibit 4.

A.    4.  Okay.

Q.    And that goes on for six pages, I believe.  Do you see that?

A.    Yes, sir.

Q.    Okay.  Are these the risk disclosure you were just referring to from the 20-Fs?

A.    Yes, sir.  And I described them in the text --

Q.    Yeah.

A.    -- but they're printed here.

Q.    And did you select these disclosures yourself or did someone else select them for you?

A.    I selected the categories of risk disclosures that I was looking for, and the team working under my direction selected these.

Q.    Okay.  Other than reading -- some complete and some skimming -- the materials listed in Appendix C, what else did you do to inform your understanding of the facts and issues relevant to this matter for your report?

**Page 21**

HUBBARD, Ph.D.

A.    If I'm understanding your question, the only thing missing would have been general knowledge and expertise as a financial economist I'm not a mining specialist or anything like that. I was here really to look at Professor Feinstein's and Mr. Pitt's work, so I think that plus general expertise was it.

Q.    Okay.  Who prepared the first draft of your report?

A.    I did.

Q.    Okay.  Did you receive suggested edits from anyone?

A.    I certainly received input from my team at Analysis Group, for example, on the exhibits. And I'm sure -- everybody always suggested edits. I'm sure I would have gotten suggested edits from them, yes.

Q.    Anyone outside of Analysis Group?

A.    Not to my knowledge.  My only contact was with Analysis Group.

Q.    Do you know if Analysis Group received edits to the draft report from anyone outside of Analysis Group?

A.    I don't know, but I do know that I saw

Page 22

HUBBARD, Ph.D.

any suggested edit to make a judgment.

Q.   Okay.  If we go to Appendix B, which is the appendix before the one we were just looking at.

A.   Yes, sir, I'm there.

Q.   It's testimony as an expert witness from 2019 to 2023.  Do you see that?

A.   Yes, sir.

Q.   Okay.  This report was submitted on April 7, 2023.

A.   Correct.

Q.   Have you provided any other testimony as an expert witness since April 7, 2023?

A.   I don't believe so, no.

Q.   Okay.  Is it fair to say that this report concerns loss causation and damages in this matter?

A.   I think that's fair, yes.

Q.   Okay.  How many times have you provided testimony related to loss causation and damages? An estimate, I know there's many.

A.   Several.

Q.   Okay.

A.   Many securities cases and valuation

Page 23

HUBBARD, Ph.D.

cases.

Q.   Right.   How many of those were you retained by counsel for defendants in the matters?

A.   For loss causation, I would say overwhelmingly -- I remember some plaintiffs, but overwhelmingly defense.

Q.   What plaintiffs do you remember?

A.   The Merrill Lynch Funds-McKesson matter, I was with the plaintiffs in that matter.   The Lieff Cabraser law firm comes to mind.

But generally for loss causation, it would be defendants.   About 20, 25 percent of the cases here are plaintiffs, but they're about topics other than loss causation.

Q.   Correct.   So other than the case you just referenced, have you been retained by plaintiff's counsel in any class action securities litigation to provide a report or testimony related to loss causation and damages?

A.   I don't think so.   Not as a class, no.

Q.   Okay.   You heard the term event study?

A.   Yes, sir.

Q.   You didn't prepare an event study in coming to your opinions as part of this report,

Page 24

HUBBARD, Ph.D.

correct?

A.   That's correct.   I wasn't asked to do so.

Q.   Okay.   Do you know why not?

MR. JORALEMON:   Object to the form.

A.   I'm not typically speculating on my assignment.   I wasn't asked to do so.   I was asked to comment on the work of Professor Feinstein and Mr. Pitt.

Q.   Okay.   And one way to comment on that would have been to perform your own event study, correct?

MR. JORALEMON:   Object to the form.

A.   I don't think so, considering that's not really the bulk of the criticism that I raise, but --

Q.   Okay.

A.   -- I suppose I could have.

Q.   Okay.   And you didn't perform any regression models as part of your report in this case, correct?

A.   That's correct, I wasn't asked to do so.

Q.   Okay.   Did you review the regression models Dr. Feinstein submitted in this case as

Page 25

HUBBARD, Ph.D.

part of his expert report dated March 10, 2023?

A.   Yes, sir.  You'll have to remind me which report that is because he has --

Q.   His initial --

A.   His initial report?

Q.   His merits report.

A.   Yes.

Q.   Yes.  And do you agree that his model related to the Vale ADRs properly controls for market sector and current effects?

MR. JORALEMON:  Object to the form.

A.   If I'm understanding your question, I wasn't asked to look at that.  It's not an unreasonable approach that errors Professor Feinstein made have more to do with Econ 101 than they do with statistics.

Q.   I'm trying to get to what you don't disagree with about the report.  We will get to what you do disagree about the report.

But you don't offer any opinions disagreeing with the way Dr. Feinstein constructed his regression models in this case, correct?

A.   That's not true, of course.  When we get to the discussion of notes, I talk about

Page 26

HUBBARD, Ph.D.

differences in methodologies across the reports

and problems and statistical interpretation.

Q.   Okay.  Well, let's focus on the ADRs

then.

For the ADRs, you don't offer any

opinions related to Dr. Feinstein's regression

model for the ADRs, correct?

A.   That's correct.

Q.   Okay.  In fact, you don't dispute that

the residual price return or the abnormal return

for the Vale ADRs on January 25, 2019, was $1.63,

do you?

MR. JORALEMON:  Object to the form.

A.   I don't remember the exact number, but

that's not my issue with Professor Feinstein, it's

its interpretation.

Q.   I understand that, but you don't dispute

that there was an abnormal return of $1.63 on

January 25, 2019, for Vale ADRs, correct?

MR. JORALEMON:  Object to the form.

A.   Sticking with his methodology, that's

true, yes.

Q.   Okay.  And you don't dispute that that

residual return on January 25, 2019, was

Page 27

HUBBARD, Ph.D.

statistically significant, correct?

MR. JORALEMON:  Object to the form.

A.    That's true.

Q.    Okay.  And you don't dispute that the abnormal return for certain of the Vale notes -- not all, so we're clear -- was statistically significant on January 25, 2019, correct?

MR. JORALEMON:  Object to the form.

A.    My recollection is certain is exactly one, but yes, if that's your question.

Q.    Okay.  You don't dispute that the residual return on February 4, 2019, for Vale ADRs was 55 cents, correct?

A.    I don't recall the number, but subject to check that sounds reasonable.

Q.    Okay.  And you don't dispute that that residual decline on February 4, 2019, for Vale ADRs was statistically significant, correct?

MR. JORALEMON:  Object to the form.

A.    Correct.

Q.    Okay.  You don't dispute that the residual price decline for Vale ADRs on February 6, 2019, was 54 cents, correct?

MR. JORALEMON:  Object to the form.

Page 28

HUBBARD, Ph.D.

A.   I don't recall the number, but subject to check that sounds right.

Q.   Okay.  And you don't dispute that that residual decline on February 6, 2019, was statistically significant, correct?

MR. JORALEMON:  Object to the form.

A.   That's my recollection, yes.

Q.   Okay.  And you don't opine that the alleged misrepresentations and omissions in this case caused no loss to investors, correct?

MR. JORALEMON:  Object to the form.

A.   If I'm understanding your question, I'm not offering an affirmative damages number per se. The opinion I offer is that a portion of the damages that Professor Feinstein identified could reflect factors other than the allegations.

Q.   So the reverse of that then is, is that the other portion relates to the alleged misrepresentations and the omissions in this case, correct --

MR. JORALEMON:  Object to the form.

Q.   -- and potentially caused losses to investors?

A.   That's potentially true, yes.

Page 29

HUBBARD, Ph.D.

Q.   Okay.  Do you recall using the term "materialization of a disclosed risk" in your report?

A.   Yes, sir.

Q.   Okay.  And what do you mean by that?

A.   In other words, a risk factor that's known that then occurs.

So to be specific here, a safety incident, that's always a risk, but may actually occur in almost -- well, not all, but in many corporate settings there will be risks that everybody understands.  They may have moderate or low probabilities, but they could occur, and I would call that a materialization of a disclosed risk.

Q.   Okay.  And are the risk factors that were known in this case the ones that we saw summaries of in Exhibit 4?

A.   If I'm understanding your question, yes, those are disclosed risk factors, yes.

Q.   Are there any other in this case that you considered in coming to your opinion?

A.   There -- I'm not -- that's a very vague question.  I'll try to help.

Page 30

HUBBARD, Ph.D.

If you're asking about things like are there certifications, is that what you're asking?

Q.   No.  You said that the materialization of a disclosed risk is based on known risk, I can't remember your exact words, but disclosures.

A.   Yes, sir.

Q.   So I'm asking you what risk disclosures in this case did you rely upon in coming to your opinion that part of the loss associated with this case was based on the materialization of a disclosed risk.

A.   Asked that way I would say the 20-F filings, yes.

Q.   Anything else?

A.   The existence of certifications obviously means that the safety is an element of a risk.

Q.   The existence of what certifications are you referring to?

A.   In other words, there are certifications of stability and safety, so the fact that those exist obviously means there's some risk.

Q.   Okay.  Did you review any of those in this case?

Page 31

HUBBARD, Ph.D.

A.    I'm not an engineer.  Unlike Professor Feinstein, I won't play one.

Q.    Okay.  Are you an economist?

A.    I am.

Q.    Okay.  What economic literature did you rely upon coming to the case that Dam 1 here was the material -- that the collapse of Dam 1 here was the materialization of a disclosed risk?

A.    I don't believe that's what I said in the report.  I said the collapse of Dam 1 is a collapse in the actual world that can be the materialization of a disclosed risk.  I believe that's what I said.

Q.    Okay.  Let's go to page 21 of your report then.

A.    Okay.  I'm there.

Q.    Okay.  On page 21, at the top, do you see you say from "the portion of --" you talk about "the portion attributable to the materialization of disclosed risk (as represented by Dam 1 collapse and related financial consequences)."

A.    Right, but it goes on to say, "which could have occurred absent."  In other words, it

Page 32

HUBBARD, Ph.D.

is possible that a collapse of the dam is simply an unforeseen event.  We don't know.  You cannot infer from a safety event that something untoward has happened.  That's really all that this is saying.

Q.   Okay.  But throughout this report you claim that Dr. Feinstein did not separate out the portion of the drop associated with the materialization of a disclosed risk, correct?

A.   Correct.  Meaning, he didn't do the affirmative part of going from your allegations in the complaint to a change in risk.

Q.   Okay.  What are you considering in this case, the part that wasn't separated out, that was associated with materialization of a disclosed risk?

A.    If I'm understanding your question, and giving the answer I just gave, there are two buckets of information.  One would be a change in risk perception.  That would be from the allegation.  Maybe something was wrong and there should be a change in probabilities of the safety event.  Another bucket is simply that an accident happens.

Page 33

HUBBARD, Ph.D.

My view is that Professor Feinstein did none of the work in the former bucket; hence, could not have isolated the former from the latter.

Q.   Okay.  Let's turn to page 41 of paragraph 66 of your report.

A.   Okay.

Q.   Can you read the last sentence of paragraph 66 aloud, please.

A.   Yes.  "However, these sources relayed information that was unrelated to the Alleged Misrepresentations and reflected materializations of disclosed risks as represented by the Dam 1 collapse and related financial consequences."

Q.   Okay.  What do you mean by "reflected materializations of disclosed risk as represented by the Dam 1 collapse and related financial consequences"?

A.   Well, this, of course, is a comment on the news articles, and my reading of those news articles is that they're commenting on the consequences of a dam collapsing, not the consequences of problems in risk management or safety or any of the items raised by Professor

Page 34

HUBBARD, Ph.D.

Feinstein.

Q.   And what is your point for illustrating that that's what they're commenting on?

MR. JORALEMON:  Object to the form.

A.   To say that his commentary was inaccurate, the mere mention of a dam collapse by an analyst does not mean that the analyst is pointing to any of the allegations that you raise, you plaintiffs raise in the complaint.  My reading of those commentaries is that it's focused on the consequences of a dam collapse in the actual world.

Q.   And is it your opinion that the dam collapse in this case is unrelated to the allegations of misrepresentations and omissions in this case?

MR. JORALEMON:  Object to the form.

A.   That of course is a question for the court, not for me.

What I would say is that -- go back to my two buckets -- if the court were to find liability in some way, which is, of course, what I'm assuming in looking at damages, you would have to separate those two buckets.  So if you believe

Page 35

HUBBARD, Ph.D.

that some of the elements in the allegations in the plaintiffs' complaint are operative, then you would want to look at changes in risk and the financial consequences of those.  The balance of effects being just the actual collapse in the real world, but of course Professor Feinstein didn't do any of that.

Q.   So you say.

A.   Well, point it to me in his report.

Q.   It's in his report.

So you say here, "these sources relayed information that was unrelated to the Alleged Misrepresentations."  What do you mean by that?

A.   I'll try again, because I think I said it.

It's the commentary was on the consequences of a dam collapse in the actual world.  In other words --

Q.   Correct.

A.   -- a dam collapse is a bad thing.

Q.   Okay.

A.   It's financial damage.  People lose their lives.  So that's the nature of the commentary.

Page 36

HUBBARD, Ph.D.

Q.    So commenting about Vale's dam collapse in your opinion is unrelated to the alleged misrepresentations in this matter?

MR. JORALEMON:  Object to the form.

A.    In my view -- again, I'm not the one doing all this exegesis -- I'm commenting on --

Q.    You're the one who wrote this sentence.

A.    I thought you were going to let me finish sentences.

Q.    I am, if you answer the question.  But you wrote this sentence, all I'm asking is what you meant.

A.    I'll wait until you're done.

Q.    I'm asking what you meant when you wrote this sentence.

A.    What I meant -- if we can restore the previous politeness that you and I had.

Q.    If you can answer the question, I will.

A.    I'll wait until you calm done.

Q.    No, you should stop commenting about my asking a question and answer the question.  So go ahead and answer the question.

MR. JORALEMON:  Which one?

A.    Now I've already forgotten it.

Page 37

HUBBARD, Ph.D.

Q.   The initial one.

A.   Why don't you ask it again.

Q.   So you say here that sources -- the sources relayed information that was unrelated -- withdrawn.

So is it your opinion based on this sentence in paragraph 66 that the sources you're referring to, which you said discussed the Dam 1 collapse, are unrelated to the alleged misrepresentations in this matter?

MR. JORALEMON:  Object to the form.

A.   Yes.  And to illustrate that, for example, on page 5 of my report, paragraph 11, I list your allegations.  Those allegations are not the subject of the commentary to which Professor Feinstein is referring.  That's what that means.

Q.   Okay.  Let's go back to Exhibit 4, which are the risk disclosures in the 20-Fs.

A.   I'm there.

Q.   Okay.  Other than reference to the prior collapse at Samarco, where do any of these risk disclosures reference dam safety?

A.   Well, since I'm right on the first page, if I look at the bottom bullet, in the middle,

Page 38

HUBBARD, Ph.D.

"accidents or incidents involving our mines and related infrastructure such as dams dot dot dot."

Q.   And that's repeated, I think, in most of the other ones.

A.   Yeah.  I mean, it's a common --

Q.   Okay.

A.   -- risk statement, yeah.

Q.   Okay.  Common boilerplate, in fact, isn't it?

MR. JORALEMON:  Object to the form.

A.   I don't know if it's boilerplate.  It's repeated.

Q.   Okay.

A.   It's a common -- it is a risk.

Q.   Okay.  Any other references to dams other than that sentence that is throughout a few of the disclosures?

A.   There are different uses of dams in different sentences, but they all are sort of the same thing, a dam's operational risks are potentially important.

Q.   Okay.  And what about these statements put investors on notice of the risk of a dam's collapsing?

Page 39

HUBBARD, Ph.D.

MR. JORALEMON:  Object to the form.

A.    I mean, you could mean one of two things by that question, so I'll try both and you tell me which way you're headed.

There's clearly a risk of a dam collapse and intended damage, that's what this is saying.

If your question is about what is the probability --

Q.    My question is not about that.

A.    Okay.  Then I'll stick with the first one.

Q.    Yeah, the first one is the answer.

So when you use the term "disclosed risk" in the phrase "materialization of the disclosed risk," you're talking about this type of disclosure here?

A.    Yes, sir.

Q.    Okay.  Are you talking about any other disclosure in this case other than the ones referenced in Exhibit 4?

A.    For the existence of the risk?

Q.    Yes.

A.    No, sir.

Q.    Okay.  Now, these were public

Page 40

                    HUBBARD, Ph.D.

statements, correct?

        A.    Yes, sir, they're in filings.

        Q.    Yeah.  And given that, would the market

have priced this disclosed risk into the value of

Vale securities?

        A.    The market participant should price all

available information into the price of Vale

securities.

        Q.    So the risk of a dam collapsing based on

this language in Exhibit 4 had already been priced

into the Vale securities at the time of the dam

collapse, correct?

        A.    That's not the way we put it as an

economist.

        Q.    How would you put it?

        A.    So market participants would price the

likelihood or risk profile of safety events.  This

would be an input into such an estimate, so it's

certification and other things, but a market

participant is trying to guess what's the chance

that something bad will happen and, hence, create

financial harm for the company and the communities

in which it operates.

        Q.    You use the term there that "this would

Page 41

HUBBARD, Ph.D.

be an input into such an estimate," and you're referring to a safety event, I believe.  What other inputs would there be?

A.   I was answering for the safety event per se.  I was thinking, if you're a market participant, basically when you're forming an estimate of a price, you're forming an estimate of expected values of future cash flows that were discounted in some way, then you do.  So you're trying to ask yourself what's the probability now or in the future of some kind of a safety event. There's a variety of things you can be looking at to form your judgment, but that's the judgment that you're making.

Q.   Okay.  And as part of your report, did you seek to understand how the market gauged that risk in this case?

A.   I'm not sure I follow the question.  I do refer to the commentary from the technical experts about probabilities that might be associated with safety certifications because I'm not an engineer, but I'm not offering my own independent estimate.

Q.   That's not what I'm asking.

Page 42

HUBBARD, Ph.D.

You are taking the position that there was a disclosed risk in this case associated with -- potentially associated with loss to shareholders in this case, correct?

A.   Yes, although that's a very different question than what --

Q.   Actually it's not.

A.   But it is economically.

Q.   Can I finish?  Can I, can I finish now?

A.   Okay.

Q.   Okay.  So in coming to your decision -- let's back up.

So in coming to your decision that there was a disclosed risk in this case, did you consider anything other than what's listed in Exhibit 4?

A.   That's asked and answered.  I said in terms --

Q.   You're doing Mr. Joralemon's job.

A.   No --

Q.   That's why I said let's back up, because you went to an economic -- I mean an engineering expert, which have nothing to do with my question because you're an economist, and that's what I'm

HUBBARD, Ph.D.

asking.  If I want to ask you about an engineering question, I will tell you I'm asking you.  So please answer the question I just asked.

Did you consider anything other than what's in Exhibit 4 in coming to your conclusion that there was a disclosed risk in this case?

A.   I think I answered that question no.

Q.   Okay.  So, in effect, investors in Vale would already have assessed, based on what's in Exhibit 4, the risk of a dam collapse and priced that into Vale's securities accordingly, correct?

MR. JORALEMON:  Object to the form.

A.   That's why I thought you asked a different question.  The answer to that question is no, because I had already explained to you that investors are looking at a variety of things like existence of certifications, other things. They're trying to form an estimate of a probability which of course isn't in these 20-F disclosures.

Q.   Okay.  And why didn't you look at all those other things you're saying investors would look at?

MR. JORALEMON:  Object to the form.

HUBBARD, Ph.D.

A.    I'm not sure why I would.

Q.    Okay.  But you agree that investors would have looked at a number of other public disclosures in coming to a conclusion of the risk of a dam collapse at Vale?

MR. JORALEMON:  Object to the form.

A.    The way you've asked it, yes, investors will consider all pieces of information they can on this and any other aspect of the valuation of Vale.

Q.    And some of those other pieces of information could be more specific to dams, correct?

A.    It's certainly possible.

Q.    Okay.  And could inform and add to the general disclosures that you list in Exhibit 4, correct, to an investor?

MR. JORALEMON:  Object to the form.

A.    Yes, I think that's what I meant in my previous answer.

Q.    I want to -- you mentioned probability a bunch of times and you use that term in here, so let's turn to page 18, paragraph 34, of your expert report.

**Page 45**

HUBBARD, Ph.D.

A.    I'm there.

Q.    Okay.  How would an investor go about assessing the probability of a safety event?

A.    Well, I'm not an engineer, but I can describe a process that a financial analyst --

Q.    Let's back up for a second.

Were any of those engineering probabilities actually disclosed to investors during the class period?

A.    I don't recall any probability being disclosed.

Q.    Okay.  So I'm talking about what investors would have relied upon in assessing the probability of a safety event, in this case, which seems to be a part of what you're getting at in paragraph 34?

A.    Correct.  So --

Q.    Okay.  So why don't we focus on publicly disclosed information.  And I want to know what an investor would use -- have used during the class period to assess the probability of a safety incident?

A.    Okay.  Let me answer that and then tie it to your complaint.  So --

Page 46

HUBBARD, Ph.D.

Q.   Just answer it, and you don't need to tie it unless it's specific to the answer.

MR. JORALEMON:  He can answer however he wants to answer.  Can you please --

MR. HALL:  Well, he doesn't need to ramble, he needs to answer the question.

MR. JORALEMON:  He's not rambling.

THE WITNESS:  I'm not a rambler, sir.

MR. JORALEMON:  Okay.

THE WITNESS:  My whole career I've not been a rambler.

A.   But the probabilities are inferred.  To my knowledge, there's never a probability that's helping, like a number.  There's a number in -- there's a number of numbers in the record, but to my knowledge they're not public.

An investor would look at things like certifications, statements about safety, to figure out a zone of what a likely safety event probability is.  That, as I said, exactly ties to your allegations that there's a misrepresentation of that in a variety of ways.  But that's how an investor would do it.  So if it turns out that an investor is incorrect because there has been,

Page 47

HUBBARD, Ph.D.

let's say, some misrepresentation, then that's a problem, that should have been a change in the probability.  That's what this is --

Q.    Okay.

A.    -- talking about.

Q.    And you didn't look at anything other than what's in Exhibit 4 to determine out -- to determine whether there was sufficient information for an investor to change the probability of a safety incident, correct?

MR. JORALEMON:  Object to the form.  Change from what?

MR. HALL:  I'm referencing the specific language he used that an investor would change their view on probability.  I want to know, he didn't look at this stuff he's saying an investor would look at it.

Q.    Correct?

A.    That's not true.  What I'm saying here is that you change the probability.  I'm trying to -- that's why it was important to tie it back to your complaint.

If, for example, something had been misrepresented, you lied to me --

Page 48

HUBBARD, Ph.D.

Q.   We'll get there.

A.   -- but now you tell me the truth, that might change my probability and, hence, my valuation of the security.  That's all I'm saying.

Q.   Okay.  You start paragraph 34 saying, "I would expect."  What did you mean when you said "expect"?

A.   In other words, I'm referring to math. So if you're trying to value a security, that value comes from changes in an investor's cash-flow expectations.  It's kind of hard to argue that it misrepresented the discount rate, so they'd have to change cash-flow expectations.

Q.   And what's your basis for that?

A.   Econ 101, the present value of free cash flows is the value of an equity security.

Q.   And what's the basis for the only way for an investor in this case to have done it would have been to assess the probability of a safety event occurring and the true probability of a safety event occurring?

A.   Again, Econ 101.  If you're talking about a misrepresentation, that would be the only way in which a misrepresentation would affect cash

Page 49

HUBBARD, Ph.D.

flows.

Q.   Okay.  You said Econ 101.  I don't see any reference to any academic or econometric literature in this paragraph.

A.   Well, I wrote a best-selling freshman textbook.

Q.   Then why didn't you --

A.   So you'll find -- well, because it's obvious.  But if you require a citation, if you'll look at the Financial Economics chapter, you will find what you probably learned in college.  The value of the stock is the present value of the cash flow.

Q.   Well, if it's so obvious, why did you use the term "expect"?

A.   Meaning that's what theory says.

Q.   Can you turn to page 34, paragraph 57.

A.   Okay.

Q.   Do you see there's some numbered sections in the paragraph there and the first one I believe is very similar to what we were just discussing, correct?

A.   Yes, sir, it's exactly that.

Q.   Okay.  And if you go after those

Page 50

HUBBARD, Ph.D.

number -- I think there's three of them -- you say, "Only the first category represents a price change due to the alleged misrepresentations." Do you see that?

A. Yes, sir.

Q. Okay. And what's your basis for saying that?

A. I think it's the same as the answer.

The only way in which the misrepresentations are affecting cash flows is through the first channel. Other channels like other disruptions or market factors, those don't have to do with misreps.

Q. And what's your basis for saying that?

A. I think it's just simple arithmetic of parsing it out. The only way a misrepresentation about a safety event can affect cash flows is through the probability of a safety event occurring, assuming we have some estimate of what the cost of cleaning it up is.

Q. And, again, you don't cite any academic or economic literature in this paragraph for that point, correct?

A. Correct.

Page 51

HUBBARD, Ph.D.

Q.    If the finder of fact finds that the risk disclosures in Exhibit 4 weren't sufficient to inform investors of a disclosed risk of Dam 1, would that change your opinion that only number 1 here applies?

MR. JORALEMON:  Object to the form.

A.    If I understand your question, no.

Q.    I'm going to hand you what's been previously marked as Ferreira 6.  Unfortunately in this case all the documents are large.  The good thing is there's very few of them.

A.    You'll answer for the trees, not me.

Q.    Well, if I didn't do it, your counsel would complain of incompleteness or something.

MR. JORALEMON:  Objection.

MR. HALL:  Objection, right.

I'm joking, of course.

Q.    This is one of the documents that you used to reference the risk disclosures in Exhibit 4, correct?

A.    Yes, sir.

Q.    Okay.  And did you look at any other sections of this 20-F other than the risk disclosure summaries that you list in Exhibit 4?

Page 52

HUBBARD, Ph.D.

A.    Not that I recall, no.

Q.    Okay.  Turn to page 76.

A.    Of the document or the --

Q.    Of the document itself, yes.  It was easier to do it that way.

A.    Okay, I'm there.

Q.    Okay.  And you see there's a paragraph at the top, the bullet point says Brazil?

A.    Yes, sir.

Q.    Okay.  So if you look six lines from the bottom of that paragraph, there's a sentence that starts at the end of that line "We have."  Do you see that?

A.    Yes, sir.

Q.    Okay.  Can you read that sentence out loud, please.

A.    Certainly.

"We have conducted extraordinary audits on the stability conditions of our upstream dams, and no anomalies were identified."

Q.    Okay.  Would that statement help inform an investor as to a potential dam collapse at Vale?

MR. JORALEMON:  Object to the form.

Page 53

HUBBARD, Ph.D.

A.    If I'm understanding your question, it could well.  That's why I referred earlier to certifications and things like that that give investors some indication about probabilities.

Q.    Okay.  And this is one of the alleged misrepresentations in this case, correct?

A.    Correct.

Q.    Okay.  And what is your interpretation as an economist what this sentence would convey to investors?

MR. JORALEMON:  Object to the form.

A.    I think it's attempting to convey that the dams are safe within some confidence interval. I mean, nothing is ever perfect, accidents happen in the real world, but I think it's designed to convey that there's some reasonable competence and interval of safety.

Q.    Okay.  I'll show you what's been previously marked as Ferreira 7E.

A.    Thank you.

Q.    Have you seen this document before?

A.    I have seen sustainability reports, yes.

Q.    Have you seen this document before?

A.    I believe.  I can't remember every year

Page 54

HUBBARD, Ph.D.

I've looked at, but I believe so.

Q.    Can you turn back to Appendix C of your report.

A.    Okay.

Q.    Okay.  Where is this sustainability report from 2016 listed in the materials you considered?

A.    I don't see it, but I do recall looking at some sustainability reports.  But no, I don't see it here.

Q.    Okay.  Did you see any sustainability report referenced in this material?

A.    I'm sorry, what do you mean by "this material"?  Oh, in here, no.

Q.    Yes.  Okay.  So does that mean that Appendix C is incomplete?

A.    Well, I think it may depend on what it means by considered that I looked at a document, I don't know, but ...

Q.    So did you consider in forming your opinion in this case anything contained in the 2016 Sustainability Report as sitting in front of you marked as Ferreira 7E?

A.    No.

Page 55

HUBBARD, Ph.D.

Q.   Let's turn to page 113 of the document, and the page numbers I think are in the bottom left-hand corner.

A.   Okay.

Q.   Okay.  Can you read -- you see there's two columns at the bottom of the page with some writing.  Can you read the last sentence of the last paragraph that begins "At Vale" out loud, please.

A.   Okay.

"At Vale, all dams, even if no longer in operation, remained under -- remain under its responsibility and are monitored, audited, and maintained normally under the same criteria and safety levels adopted during their operation."

Q.   Did you consider that statement in forming your opinions that are contained in your expert report dated April 7, 2023?

A.   No.  It wouldn't have been germane to me.

Q.   Why wouldn't it have been germane to you?

A.   I already said investors can look at a lot of things, perhaps including this, on making

Page 56

HUBBARD, Ph.D.

judgments about stability and safety.  That's all I mean.

Q.  Okay.  And could this statement change an investor's understanding of the risk that you claim were disclosed in Exhibit 4 of your report?

MR. JORALEMON:  Object to the form.

You're asking him to guess like for how with the possibility?

A.  I don't know.  I would think if what I'm trying to form an expectation of as an investor is probability one of the safety events.  I don't see a lot of value in this sentence.  But if you're asking me to --

Q.  You don't see -- oh, sorry.

You don't see any value in saying all dams are monitored?

A.  I think that's said elsewhere as well.

Q.  Where?

A.  Certifi -- the existence of certification.

Q.  But they're not in Exhibit 4, correct?

A.  No, but I think we already had this discussion that that is something analysts would consider.

Case 1:19-cv-00526-EK-VMS    Document 142-15    Filed 06/14/24    Page 58 of 127 PageID #: 5254

HUBBARD, Ph.D.

Q.    What about investors?

A.    Well, I mean investors.

Q.    Okay.

A.    Analysts are part of it.

Q.    What about the fact that all dams were audited, would that inform an investor and form an opinion of the level of risk that's in the disclosure in Exhibit 4 to your report?

MR. JORALEMON:  Object to the form.

A.    It could well, but my understanding is that's part and parcel of the certification since I'm on it.

MR. HALL:  I'll mark as Hubbard 2 a Vale Form 6-K for the month of May 2017.

(May 2017 Vale S.A. Form 6-K marked as Hubbard Exhibit 2, as of this date.)

BY MR. HALL:

Q.    Have you seen this document before, sir?

A.    I don't recall, sorry.

Q.    And just for the record, I am not sure if this is a complete version or excerpts.  When I found it and downloaded it, it seems like the page numbers jump around, and that will be obvious when I ask you to turn to page 216.

Page 58

HUBBARD, Ph.D.

A.    Okay.  Would you like me to turn to page 216?

Q.    Yes.  Yes.

A.    Okay.

Q.    You see at the top it says Dams?

A.    Yes, sir.

Q.    Okay.  Can you read the first paragraph out loud, please.

A.    Of course.

"In May 2016, the state of Minas Gerais" -- if I'm pronouncing it correctly -- "issued a decree ordering an immediate assessment of the stability conditions of upstream dams and suspending new licensing procedures for the construction for lifting of upstream demands until the state environmental authority define new rules and procedures.  Vale carried out extraordinary audits on the stability conditions of its upstream dams and no anomalies were identified.  Vale has filed reports with local government authorities in September 2016.  In March 2017, the state of Minas Gerais determined that dams already altered by the upstream method, but had their stability conditions verified by audit, could be altered by

Page 59

HUBBARD, Ph.D.

other constructive methods."

Q.   Similar to a couple of the other statements we just read, is it fair to say that this is the type of information that would inform an investor's view of the risk associated with dams at Vale?

MR. JORALEMON:  Object to the form.

A.   I think that's reasonable, yes.

Q.   Including the disclosed risk that you say are put forth in Exhibit 4 of your report, correct?

MR. JORALEMON:  Object to the form.

A.   I'm not sure.  How could something narrow include something -- you lost me with the English.

Q.   Well, you say the disclosed risk is set forth in Exhibit 4, correct?

MR. JORALEMON:  Object to the form.

A.   The category of risk is disclosed, yes.

Q.   Okay.  This would inform an investor's view of that category of risk, correct?

A.   Yes.

Q.   Okay.

A.   Totally agree with that.

Page 60

HUBBARD, Ph.D.

Q.   And can you turn to page 220, please.

A.   Okay.

Q.   Can you read out loud the fourth full paragraph which starts with the words "With regard."

A.   "With regard to risk management, tailings dams are highly relevant, being subjected to periodic safety audits and also to operating and monitoring procedures to assess geotechnical stability.  For more information see the item 'Dams' in the item above."

Q.   And like the previous statement, this type of statement would inform investors a view of the category of risk set forth in Exhibit 4, correct?

A.   It could well, yes.

Q.   And the two statements we looked at in this document, what -- from an economics perspective -- what would be your understanding of what this conveys to an investor about dam safety at Vale?

MR. JORALEMON:  Object to the form.

A.   Well, I think it's conveying a couple of things.  One.  One that there are processes, risk

Page 61

HUBBARD, Ph.D.

management processes, audit processes.  And second

that an outcome of those processes are that dams

are within some accepted zone of safety.

Q.   Okay.  Is it fair to say it would give

an investor -- possibly could give an investor

assurance that Vale was properly monitoring and

maintaining the risk associated with its dams?

MR. JORALEMON:  Object to the form.

A.   I'm not sure about words like assurance

and properly.  I think what it's conveying to

investors is that there is a risk management

process and that process has an outcome of an

acceptable level of risk.  That's the way I would

read it as a non-engineer.

Q.   Would that type of statement from an

economic perspective likely cause the market to

think there was more risk or less risk associated

with Vale's dams?

MR. JORALEMON:  Object to the form.

A.   I'm not sure more or less than what.  It

would cause market participants to form an

expectation of risk.

Q.   Okay.  All right.  So when they read the

general disclosures in Exhibit 4, they form an

Page 62

HUBBARD, Ph.D.

expectation of risk, correct?

MR. JORALEMON:  Object to the form.

A.   I think that's only an input.  In Exhibit 4 you're identifying categories of risk, that in and of itself to an investor isn't sufficient.  I would look at other elements of the record, these statements and other statements we talked about.

Q.   Okay.  When you say it isn't sufficient, what did you mean?

A.   To estimate a probability of a safety event, which is what would go into my calculation of value.

MR. JORALEMON:  Is this a good time for a break?

MR. HALL:  Sure, yeah, this works.

THE VIDEOGRAPHER:  We are now off the record.  The time on the video monitor is 10:28 a.m.

(Off the record.)

(Resumed.)

THE VIDEOGRAPHER:  We are now back on the record.  The time on the video monitor is 10:49 a.m.

Page 63

HUBBARD, Ph.D.

BY MR. HALL:

Q.   I'm going to hand you an exhibit previously marked as Schwartzman 10E.

A.   Thank you.

Q.   Have you seen this document before, sir?

A.   I believe I have.  I've certainly seen the printed language.

Q.   You can check, but I don't believe this document is listed in your exhibit of materials considered.

A.   No, but it is cited by Feinstein, so I read it.

Q.   Okay.  Is this the type of information an investor would use in judging the likelihood of a dam collapse or safety incident at Vale?

MR. JORALEMON:  Object to the form.

A.   It certainly speaks to safety probabilities, although it does in a very general way, but I suppose it could be in that category, yes.

Q.   What do you mean by general way?

A.   In other words, it just simply refers to my management will be short if we had another accident.  The use of a word impeccable as opposed

Page 64

HUBBARD, Ph.D.

to like a certification or something like that. But yes, it would be a similar category.

Q.   And you're referring to the section that says, "Today the dams are impeccable," which is a quote from Mr. Schwartzman the then CEO of -- or president of Vale?

A.   Yes.

Q.   Okay.  And up at the top you can see he -- it's in quotes -- he uses that the dams are in -- in his quote -- is impressive quality.  Do you see that?

A.   Yes, sir, I do see that.

Q.   And from an economic perspective, is this the type of information that could lead an investor to believe that the dams are safe?

MR. JORALEMON:  Object to the form.

A.   I'm not sure what the word "safe" means in this context because accidents can happen, but certainly it's in the category of information that I would be using probabilities.  It's softer than things like a certification that are more rigorous, but yes, it's the same category.

Q.   And you mentioned the word "probabilities."  This would lead an investor to

Page 65

HUBBARD, Ph.D.

believe that a safety incident related to dams is less likely, correct?

MR. JORALEMON:  Object to the form.

A.    I don't know what less means, so it's just enabling me -- less than what?  It enables me to form a probability estimate that it's likely a small one.

Q.    And you didn't form the -- withdrawn.

You didn't use this document in coming to your opinion that the Dam 1 collapse was a result of the materialization of a disclosed risk?

MR. JORALEMON:  Object to the form.

A.    That wasn't my conclusion, but no, I didn't use this.

Q.    In coming to your conclusion?

A.    In coming to the conclusions I actually came to, no, I did not use this.

Q.    Okay.

A.    Yes.  Sorry.

MR. HALL:  All right.  We'll mark as the next document, which I believe is Hubbard 3, a document entitled Sustainability Report 2017.

(Sustainability Report 2017 marked as

Page 66

HUBBARD, Ph.D.

Hubbard Exhibit 3, as of this date.)

BY MR. HALL:

Q.   Have you seen this document before, sir?

A.   I don't recall.

Q.   Okay.  Did you use this document in coming to your -- in forming your opinions set forth in your report in this case?

A.   No.

Q.   Okay.  Can you turn to page 66, please.

A.   Okay.

Q.   Okay.  Do you see on the right-hand side of the page it says Dam and Mineral Residues Management?

A.   Yes, sir.

Q.   Can you read the first sentence under that heading, please.

A.   "Vale maintains the management of its dams in permanent alignment and updating with the good and strictest international practices, standards of which exceed the legal requirements."

Q.   And, again, that's the type of information an investor would use to inform their understanding of the overall likelihood of risk of a safety event related to dams, correct?

Page 67

HUBBARD, Ph.D.

MR. JORALEMON:  Object to the form.

A.   Yes, insofar as it speaks to risk management practices of the company.

Q.   Okay.  Can you turn to page 67.

A.   Okay.

Q.   On the left-hand side column, can you read the second paragraph from the bottom, it says "In addition."

A.   "In addition to applying best practices pertaining to dam safety management, Vale submits its structures to audits conducted by specialized external consultants, and rigorously complies strictly with applicable legislation."

Q.   And, again, this is the type of information that would inform an investor's opinion of the likelihood of the safety that related to Vale's dams?

MR. JORALEMON:  Object to the form.

A.   Yes, through risk management practice assessment.

Q.   And over to the right-hand side of the page under Managed Structures, you see where it says, "At the end of the year, the area ended with another cycle of external dams auditing, in which

Page 68

HUBBARD, Ph.D.

100 percent of the audited structures were certified."  Do you see that sentence?

A.    Yes, sir.

Q.    And that would be the same type of information that would inform an investor's opinion of the likelihood of a dam safety incident at Vale?

A.    Yes, sir.

Q.    Going back to your report for a second. Turn to page 32, paragraph 54.

A.    Okay.

Q.    In the first sentence there you say, "I understand from counsel that the Court has found that the Dam 1 collapse, open quote, did not reveal to the public any previously undisclosed misrepresentations, closed quote."  Do you see that?

A.    Yes, sir.

Q.    How did you get your understanding from counsel related to that quote?

A.    Exactly as it says, that's what counsel told me.  I can't interpret a legal opinion.

Q.    Did you read the opinion?

A.    I probably did, but, again, I'm not a

Page 69

HUBBARD, Ph.D.

lawyer.

Q.   Well, did you check that the quote was accurate and it didn't leave out any words?

A.   I'm sure I did, yes.

Q.   Okay.

MR. HALL:   I'll mark as the next exhibit Hubbard 4 a Memorandum and Order dated 5/20/2020 in this action.

(Memorandum and Order dated 5/20/2020 marked as Hubbard Exhibit 4, as of this date.)

BY MR. HALL:

Q.   I believe you've turned to page 33.

A.   Yes, sir.

Q.   Okay.   You're ahead of me.

A.   No, I saw it cited and so.

Q.   All right.   Do you see the top of that page?

A.   Yes.   Okay.

Q.   Okay.   Does that appear to be the sentence that you're quoting in your report at paragraph 54?

A.   Yes.

Q.   Okay.   Can you read that sentence to me,

Page 70

HUBBARD, Ph.D.

please.

A.    "Therefore, that Dam 1 collapsed, without more, does not reveal to the public any undisclosed misrepresentation."

Q.    Okay.  And your quote leaves out the words "without more," correct?

MR. JORALEMON:  Object to the form.

A.    It appears to, although that's certainly what it means, that's what my report's about.

Q.    Well, there's a difference in a blanket statement that says that a dam collapse does not reveal to the public any previously undisclosed misrepresentation as opposed to one that says without more it doesn't do that, correct?

MR. JORALEMON:  Object to the form.

A.    I certainly agree it may be.  That's why I said this morning the fact of the dam collapse need not tell you, so that's certainly my view.

Q.    Okay.  Can you read the rest of that paragraph?

A.    Mine or the --

Q.    Oh, sorry.  Page 33 of the report.

A.    Okay.

Q.    Yeah.  Sorry.

Page 71

HUBBARD, Ph.D.

A.   "It may, however, constitute a materialization of the risk.  Dam's 1 collapse was within the 'zone of risk' concealed by Vale's misrepresentations as to the likelihood of a Vale dam collapsing.  And, the resultant loss -- a decline in stock price -- was foreseeable."

Q.   Is that, those two sentences, consistent with the opinions you set forth in your report and your opinion?

A.   I honestly don't understand those two sentences, maybe because I'm not a lawyer.  If what the Court is saying is that it could be one or it could be the other, I'd agree, that's -- that's true.

Q.   Okay.

A.   It would have to be argued and shown. But I don't understand with respect the Court's writing.

Q.   Okay.  Turn to page 26 of the Court's order.

A.   Okay.

Q.   Which I believe that may or may not have been what the Court was referring to "without more."

Page 72

HUBBARD, Ph.D.

Q.   Do you see the paragraph that says, that begins with, "Vale's general warnings about operational risk do not change this assessment"?

A.   Yes, sir.

Q.   And you can read whatever part of the order you want, I'm going to focus on the last full sentence before the sustainability report where it says, "While Vale generally warned."  Do you see that?

A.   Yes.

Q.   Can you read that out loud, that sentence, please.

A.   "While Vale generally warned investors about the possibility of a dam collapse and breach of risk management protocols, see complaint, paragraphs 139 and 179-180, it also made representations as to the strength of its safety and risk management practices."

Q.   And then it goes on to quote from the 2017 Sustainability Report, which we just looked at, correct?

A.   Yes, sir.

Q.   Do you disagree with this statement by the Court?

Page 73

HUBBARD, Ph.D.

MR. JORALEMON:  Object to the form. You asked the witness to read from a decision on a Motion to Dismiss.  He's not a lawyer.  Are you asking him as an economist whether he agrees with a legal opinion?

MR. HALL:  My understanding is he's only here as an economist.

MR. JORALEMON:  Right.

MR. HALL:  This is a document that he cited and that he said he reviewed.

MR. JORALEMON:  Yes.

MR. HALL:  So I'm asking him his understanding what --

MR. JORALEMON:  Well, you didn't ask his understanding.

MR. HALL:  Whether he agrees.  I'm asking if he agrees with what is said in that sentence.

MR. JORALEMON:  The legal conclusion --

Q.    You can answer.

MR. JORALEMON:  Well, you're not here to offer a legal opinion, so.

Page 74

HUBBARD, Ph.D.

A.   As an economist, I would agree.  And I think we have been over this morning some statements that could give reassurances about probabilities.

Q.   Okay.

A.   So if that's what you're asking, whether that has any import in the law, I can't say.

Q.   I'm not asking you that.  You are here only as an economist.

A.   Yeah.

Q.   So we just looked at statements -- and you can refresh your recollection if you want -- but in the 20-F and the 2016 Sustainability Report and the May 30, 2017, 6-K, and the news article quoting President Schwartzman of Vale, and the 2017 Sustainability Report, and all those statements related to different aspects of Vale's processes, audits, and general safety procedures related to their dams, correct?

A.   Yes, sir, I would agree with that.

Q.   Okay.  What would happen to the stock price if during the class period those statements were shown to be false --

MR. JORALEMON:  Object to the form.

Page 75

HUBBARD, Ph.D.

Q.   -- and Vale disclosed the true situation that was different than what was stated in those documents.

MR. JORALEMON:  Object to the form.

A.   Well, depending on what you mean by truthfully, I would think about it if I were trying to judge the effect on the price, as I had in mind some probability of a safety event based on my understanding of certifications, management statements, 20-F, whatever.  I now believe that probability has changed.

And so what I would do is say, well, in terms of a value effect, I could look at the change in probability times the cost should an event occur, and that would be the value effect on Vale.

And then as an analyst or investor, I would ask myself, is that an important change in the overall present value of the cash flows of Vale.  That's how I would think about it.

Q.   And no part of your opinion attempts to determine what the likely change in price of Vale's ADRs and some certain other notes would have been during the period had these statements

Page 76

HUBBARD, Ph.D.

been shown to be false, correct?

MR. JORALEMON:  Object to the form.

A.    Not quite.  I mean, I comment on how you would do that and I make reference to Mr. Stephenson's work, which does that kind of a calculation, but I didn't offer an affirmative one myself.

Q.    And Mr. Stephenson, the information in his report, was that ever made public?

A.    No.

Q.    Was the information in the footnote that you cite to him, was that ever made public?

A.    No, I think I said that to you this morning.

Q.    Okay.

A.    Of course it's what the market had in mind.

Q.    Okay.  Okay.

Okay.  Can you turn to page 55 of your report, please.

A.    Okay.

Q.    And there's a footnote at the bottom, Footnote 140, correct?

A.    Yes, sir, there is a footnote.

Page 77

HUBBARD, Ph.D.

Q.   Is that the information related to Mr. Stephenson you were referring to?

A.   Yes.  I think I cite him more than once about differences in probabilities.  But yes, something like that.

Q.   Okay.  Did you ever talk to Mr. Stephenson?

A.   I've never met him.

Q.   Okay.

Okay.  Do you know what he references in that footnote, "Ten dams in the Attention Zone," do you know what that is?

A.   I think, and I'm not an engineer, there's something as low as reasonably possible, ALARP.

Q.   Yeah.

A.   That is, defines an attention zone, which to me as an economist I think of as a confidence interval about safety.

Q.   Okay.

A.   That's what I think he's referring to, but I'm not an engineer so that's all I can guess.

Q.   And is this referring to 10 dams that are in an -- above what Vale thinks is an

Page 78

HUBBARD, Ph.D.

appropriate probability level?

MR. JORALEMON:  Object to the form.

A.   I don't recall that one way or the other.

Q.   Okay.  So he says at the end, "one would expect the failure probabilities and thus the potential financial consequences associated with these 10 dams to decrease."  Do you see that?

A.   Yes, sir.

Q.   Okay.  Were you relying on that part of this quote to come to your opinion in your reports?

A.   No.  The opinion in my report is simply about changes in probability times the cost.  It's unrelated to that statement.

Q.   Then why did you cite it?

A.   Well, because he's talking about failure probabilities and financial consequences.  I'm not offering an affirmative number.

Q.   No, I understand that.  But you're using it, aren't you, to indicate that there was a possible change in probabilities and failure probabilities during the period, correct?

A.   If it's possible, sure.

Page 79

HUBBARD, Ph.D.

Q.   Okay.   And does Mr. Stephenson in this quote say that there was a change in failure probabilities?

MR. JORALEMON:  Object to the form.

A.   I don't -- that's not my reading of his conclusion.

Q.   Okay.  Okay.

Okay.  I'm handing you what has been previously marked as Bartholomew 4E.

A.   Okay.  Thank you.

Q.   Have you seen this document before?

A.   I don't recall ever having seen this document, no.

Q.   All right.  You can see on the front page that it's an Advisory Committee Report for the Board of Directors of Vale dated February 2020, correct?

A.   Yes, sir.

Q.   Okay.  Can you turn to page 22, please, and --

A.   Okay.

Q.   Actually, I think for the most part they correspond to the top Bates number, but page 22, do you see there's a section Principal

Page 80

HUBBARD, Ph.D.

Observations Related to Assessment of Safety and Stability?

A.   Yes, sir.

Q.   Okay.  And do you see that it says, "The chronologic -- chronology of B1's stability analyses reveals that the fragile situation at the dam and the need to adopt mitigation measures were known."  Do you see that?

A.   Yes, sir, I see that.

Q.   Okay.  Turn to page 49 also.

A.   49.  Okay.

Q.   In the Conclusions section, the second paragraph under that you'll see it says, "The Assessment Team also concluded that since at least 2003, Vale possessed information which indicated the fragility of B1."  Do you see that?

A.   Yes, sir, I do.

MR. JORALEMON:  "At B1".

Q.   "At B1."  Sorry.  Sorry.  At B1.

Based on your economic understanding, what would have happened to Vale's securities prices had the market learned during the class period or before the class period that Vale possessed information which indicated a fragility

Page 81

HUBBARD, Ph.D.

of B1?

MR. JORALEMON:  Object to the form.

A.   I can give you only an economic version of the answer because I'm not able to translate words like fragility into economics, but --

Q.   That's what I asked.

A.   But basically what I would be doing is the exercise I described before.  So I would say now I think the probability of an event is higher. And so the delta in the probability from what I expected before times the expected cost would give me some measure of value to search.

Q.   Okay.  Let's turn back to page 43.

A.   Okay.

Q.   Okay.  And in the middle of the page in that large paragraph, I think it's the second sentence, it says, "In the context of B1, regulatory compliance and the attainment of DCEs were prioritized, regardless of the real safety situation at the dam."  Do you see that?

A.   Yes, sir.

Q.   Okay.  Do you have any understanding what DCEs is referring to?

A.   They're a certification, but I've never

Page 82

HUBBARD, Ph.D.

understood exactly what D, C and E stand for.

I've seen other longer expressions but none of

them are D, C and E, but I think it's a

certification.

Q.    My understanding is you're correct --

A.    Okay.

Q.    -- and DCE is just a Portuguese acronym

for instability.

A.    Okay.  Maybe that was what confused me

it was in English.

Q.    Yes.  It's very difficult.

A.    Okay.

Q.    And we had those issues in this case --

A.    Okay.

Q.    -- going back and forth.

A.    Okay.

Q.    Okay.  And from an economic perspective,

what do you think would have happened to the price

of Vale securities had it been disclosed to the

market that the attainment of those DCEs or

stability or certifications, I think you called

them, were prioritized regardless of the real

safety?

MR. JORALEMON:  Object to the form.

Page 83

HUBBARD, Ph.D.

A.   Putting aside, I can't judge from the sentence like what the actual problem is.  The methodology I would use is, does it change my probability of an event happening times the cost of having evidence of delta probability times cost and is that going to lead to a material change in the price of Vale.

Q.   Okay.  Let's turn to page 270.

A.   Okay.

Q.   Okay.  At the bottom of the page under "Measures to mitigate impacts of rupture."  Do you see that?

A.   Yes, sir.

Q.   Okay.  The first sentence says, "Despite Vale's knowledge regarding the fragile situation of B1, specific measures to reduce the impacts of eventual dam failure were limited."  Do you see that?

A.   Yes, I do.

Q.   And from an economic perspective, what would likely have happened to the value of Vale securities if that information had been told to the market during the class period?

MR. JORALEMON:  Object to the form.

Page 84

HUBBARD, Ph.D.

A.   Again, leaving aside, for example, in the next paragraph, it looks like something else. I would judge the change in probability times the cost that's a dollar number is that a statistically significant change in the value of Vale.

Q.   Okay.  Let's turn to page 124.

A.   Okay.

Q.   Okay.  Do you recall that some of the statements that we looked at related to dams that were released on a period refer to best international practices.  Do you recall that?

A.   Yes, sir.

Q.   Okay.  All right.  So the second paragraph on that sentence says -- I mean that page.

The second sentence said, "Said results would not be in accordance with best international practices, as mentioned in Section 6.1.1."  Do you see that?

A.   Yes, sir, I do.

Q.   What would have happened to the price of Vale securities during the class period if investors had been told that Vale was not

Page 85

HUBBARD, Ph.D.

following the best international practices?

MR. JORALEMON:  Object to the form.

A.    The actual numbers here I can't interpret.  But the methodology I would use, if an engineer were helping me as valuation expert, would be how does that change my probability of a safety incident times the cost of the safety incident, that would be a change in value.

Q.    I just have a few more.  Page 256.

A.    I hate to kill all those pages without a lot of questions.

Q.    Page 256, please.

A.    Okay.

Q.    Do you recall in one of the statements earlier we referred to the public statements that Vale released an Extraordinary Audit Report.  I think it was in the 2016 or 2017 Sustainability Report.

A.    Yes, sir, I do recall that.

Q.    So if you look back on page 255, at the beginning of the paragraph on page 255, it's talking about one of those Extraordinary Audit reports.  I just want to put it in context.

A.    Okay.

Page 86

HUBBARD, Ph.D.

Q.   Okay.   So now we can go back to page 256.

And you see the part, the paragraph at the top, it says, "the safety factor for the undrained condition was obtained using an inappropriate methodology for determining resistance ratio, by using data from laboratory tests which was considered unreliable by Olson."

Do you see that?

A.   Yes, sir, I do.

Q.   Okay.   What would have been the reaction in Vale's securities prices had the market learned that the Extraordinary Audit Report that Vale discussed in its statements was obtained by using inappropriate methodologies?

MR. JORALEMON:   Object to the form.

A.   Well, economists would want to know how do I translate that into a change in probability that I put methodologies inappropriate, what's the actual change in probability.   If I could be given that, I would say it's that change in probability times the total cost that's the change in the value.

Q.   So again the delta?

Page 87

HUBBARD, Ph.D.

A.    The delta, yeah.

Q.    Okay.  Let's go to page 51.

A.    Okay.

Q.    Do you see the second full paragraph there, it says, "The same happened with the external dam auditors."  Again, something -- external dam auditors was something we saw referenced in some of the statements by Vale, correct?

A.    Yes, sir.

Q.    Okay.  And this paragraph is suggesting that the dam auditors were also not able to act in a truly independent manner.  Do you see that?

A.    Yes, sir.

Q.    Okay.  What would have happened to the price of Vale's securities during the class period if the market had learned that the external dam auditors referenced by Vale were not acting in an independent manner?

MR. JORALEMON:  Object to the form.

A.    Well, market participants would have to understand there's a conflict of interest, does that change their estimate of the probability of a safety failure.  So, again, delta probability

Page 88

HUBBARD, Ph.D.

times the cost would be the change in value.

Q.   And when you take all those statements and either just those, there are others in this long document that I won't go through.  But when you take all those statements together, is it possible that the change in delta could have exceeded the $2, an amount a little over $2 that Dr. Feinstein found was statistically significant in this case?

MR. JORALEMON:  Object to the form.

Asking for speculation.

A.   I do not know one way or the other.  I do know that the various numbers that have been bandied around in the record -- Mr. Stephenson and Dr. Oboni, Dr. Emerman -- has all these numbers are way south of that, but I don't have an independent recollection.

Q.   But they're not economists, correct?

A.   But they're generating the probabilities, yes.

Q.   That's not what I asked you.

Had an investor learned of the statements we just heard that go all the way back to the beginning of the class period, is it

Page 89

HUBBARD, Ph.D.

possible that the cumulative delta that you kept

referring to, the delta, could have been greater

than the amount of abnormal return that

Dr. Feinstein found in this case that was

statistically significant?

MR. JORALEMON:  Same objection.

A.    The only rigorous way to answer that

question would be to ask what change in

probability would be required to get to that.  And

it would be orders of magnitude greater than any

of the things I've seen in the record.  So I don't

know be asking me for speculation, Dr. Feinstein

hasn't even bothered to speculate, but certainly

the numbers in the record are way different from

that.

Q.    So you have no economic opinion on what

that reaction in stock price might be cumulatively

regarding the delta with those statements?

MR. JORALEMON:  Object to the form.

A.    That's not true.  I told you it's the

change in probability times the cost.  And I said

if you wanted to ask the question what change in

probability would make Dr. Feinstein's whatever

reasonable, you could do that, and then you could

Page 90

HUBBARD, Ph.D.

ask yourself is that plausible.  He didn't do that, you haven't done it, and I haven't done it.

Q.   Okay.  First off, you don't know what I've done.

A.   I'm sure you do.

Q.   And you're misrepresenting what Dr. Feinstein does.

A.   No, no, you said what Dr. Feinstein does, that's not --

Q.   Wait a minute, wait a minute, wait a minute.  No -- yes, you are.

So we don't have to get there.  He will get to testify himself, so --

A.   Okay.

Q.   -- we don't have to characterize.

But sitting here as an economist of -- how long have you been an economist?

A.   Forty-something years.

Q.   Okay.  Sitting here as an economist of 40 years, you have no opinion as to what the actual value of that delta would have been had the information I'd just shown you been disclosed to the market?

A.   I'm saying for me as an economist I'd

Page 91

HUBBARD, Ph.D.

have to be an engineer to do that, so no, I don't.
The numbers I've seen in the record are very
different than what it would take to have a
statistically significant price.  But no, I don't.

Q.   And you have no opinion of whether or
not that value -- the value of that delta could be
in excess of what Dr. Feinstein found was an
abnormal return in this case, correct?

MR. JORALEMON:  Object to the form.

A.   I think it would be speculation on my
part.

Q.   That's not what I asked you.  I didn't
ask you to speculate anything.  I asked you:  Do
you have an opinion sitting here today whether
that value would be less than or greater than what
Dr. Feinstein found?

A.   I haven't calculated it.

Q.   Okay.  That's the answer I was looking
for.

A.   Okay.  That's the one in my report.
That's easy.

MR. JORALEMON:  And he gave it to you
30 seconds ago.

MR. HALL:  He did not give it to me 30

Page 92

HUBBARD, Ph.D.

seconds ago.

MR. JORALEMON:  You just didn't like his answer.  You haven't calculated it either.

BY MR. HALL:

Q.   Okay.  Let's go to page 53 of your report.

A.   Okay.

Q.   So this is the Section C which where you discussed the inflation ribbon that Dr. Feinstein uses, correct?

A.   Yes, sir.

Q.   And you disagree with Dr. Feinstein's use of a constant inflation ribbon in this case, correct?

A.   Yes.  That's a derivative of all my other disagreements with her, yes.

Q.   So other than the citation to doctor -- I mean, Mr. Stephenson's report on the following page of 140, and citations to Dr. Feinstein's report, you don't cite to any other information in this section, correct?

A.    I think the relevant arguments are actually in the text about the lack of possibility

HUBBARD, Ph.D.

of changes and true probabilities in his argument

and the fact that he's assuming that events

disclosed years later could have been known in

2016, that's in the text, and they are footnoted.

Q.   Where are the sources footnoted for

those opinions?

A.   Well, they're actually just facts, but

they're -- I'm citing where in Feinstein's report

he says it.

Q.   Okay.  So you cite to nothing other than

Mr. Stephenson or Dr. Feinstein in this section,

correct, in forming your opinion that the use of a

constant inflation ribbon is inappropriate?

A.   Along with basic economic logic, that's

correct.

MR. HALL:  Let's go off the record for

a second.

THE VIDEOGRAPHER:  We are now off the

record.  The time on the video monitor is

11:31 a.m.

(Off the record.)

(Resumed.)

THE VIDEOGRAPHER:  We are now back on

the record.  The time on the video monitor

**Page 94**

HUBBARD, Ph.D.

is 11:41 a.m.

MR. HALL:  I have no further questions.

MR. JORALEMON:  Thank you everyone.  I have no questions for the witness.  Thank you, Dr. Hubbard.

MR. HALL:  Thank you.

THE WITNESS:  Thank you.  Thank you.

THE VIDEOGRAPHER:  That concludes the testimony today of Mr. Glenn Hubbard.  We are now off the record.  The time on the video monitor is 11:42 a.m.

(Off the record.)

(Stenographic and video-recorded deposition adjourned 11:42 a.m.)

Page 95

C E R T I F I C A T E

I, JOSEPHINE H. FASSETT, a Registered Professional Reporter, Certified Court Reporter, and Notary Public of the states of New York and New Jersey, do hereby certify that the witness, whose stenographically recorded deposition is hereinbefore set forth, was first duly sworn by me on the date indicated, and that the foregoing stenographically recorded deposition is a true and accurate record of the testimony given by such witness.

I FURTHER CERTIFY that I am not employed by nor related to any of the parties to this action by blood or marriage, and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have subscribed my hand this 11th day of September 2023.

_____

JOSEPHINE H. FASSETT, RPR, CCR
NCRA License No. 32148
CCR License No. 30XI00098400
New York Notary Public
New Jersey Notary Public

Page 96

CERTIFICATION OF WITNESS

I, R. GLENN HUBBARD, Ph.D., hereby certify that I have read the transcript of my testimony taken under oath in my stenographically recorded deposition on September 6, 2023, and that the transcript is a true, complete and accurate record of my testimony, and that the answers on the record as given by me are true and correct, subject to the changes and/or corrections, if any, shown on the attached page.

_____
                    R. GLENN HUBBARD, Ph.D.

Subscribed and sworn to before me this_____ day of_____, 2023.

_____
                    Notary Public State of

**Page 97**

                         **ERRATA SHEET**

**CASE:  VALE S.A. SECURITIES LITIGATION**

**DATE:  SEPTEMBER 6, 2023**

**NAME:  R. GLENN HUBBARD, Ph.D.**

**PAGE LINE(s)          CHANGE              REASON**

_____|_____|_____|_____

_____|_____|_____|_____

_____|_____|_____|_____

_____|_____|_____|_____

_____|_____|_____|_____

_____|_____|_____|_____

_____|_____|_____|_____

_____|_____|_____|_____

_____|_____|_____|_____


                    _____
                         **R. GLENN HUBBARD, Ph.D.**


**Subscribed and sworn to before me this_____ day**

**of_____, 2023.**


_____     _____

        **Notary Public**            **My Commission Expires**

**[& - 65]**                                                    Page 1

**&**

**&**  2:8 3:5,13
5:21 6:21

**1**

**1**  4:10 5:14
11:24 12:5
31:7,8,11,22
33:14,18 37:9
51:4,5 65:11
68:15 70:3
71:3
**1.63**  26:12,19
**10**  25:2 77:24
78:9
**100**  68:2
**10022**  3:7
**10027**  7:18
**101**  25:16
48:16,23 49:3
**10166**  3:15
**10:28**  62:20
**10:49**  62:25
**10e**  63:4
**11**  37:14
**113**  55:2
**11:31**  93:21
**11:41**  94:2
**11:42**  94:13,16
**11th**  95:18
**12**  4:10
**124**  84:8
**130**  14:5
**139**  72:17
**140**  76:24
92:21

**15**  7:16
**150**  14:5
**179-180**  72:17
**18**  13:16,23
44:24
**19**  1:6 5:19

**2**

**2**  4:12 57:14,17
88:8,8
**20**  15:3 19:19
19:24 20:4,11
23:13 30:13
37:19 43:20
51:24 74:14
75:11
**200**  3:14
**2003**  80:16
**2016**  54:7,23
58:11,22 74:14
85:18 93:5
**2017**  4:12,13
57:15,16 58:22
65:24,25 72:21
74:15,17 85:18
**2019**  9:16 22:8
26:12,20,25
27:8,13,18,24
28:5
**2020**  79:18
**2022**  9:18,19
**2023**  1:12 2:2
2:10 4:11 5:6
9:19 12:2,4
22:8,11,14
25:2 55:19

95:18 96:7,18
97:4,21
**21**  31:15,18
**212.351.4000**
3:16
**212.687.1980**
3:8
**216**  57:25 58:3
**22**  79:20,24
**220**  60:2
**25**  23:13 26:12
26:20,25 27:8
**255**  85:21,22
**256**  85:10,13
86:3
**26**  71:20
**270**  83:9

**3**

**3**  4:13 65:23
66:2
**30**  74:15 91:24
91:25
**300**  2:9
**30xi00098400**
95:22
**32**  68:11
**32148**  95:22
**33**  69:14 70:23
**34**  44:24 45:17
48:6 49:18

**4**

**4**  4:14 20:5,6
27:13,18 29:19
37:18 39:21

40:11 42:17
43:6,11 44:17
47:8 51:3,21
51:25 56:6,22
57:9 59:11,18
60:15 61:25
62:5 69:8,11
**40**  90:21
**41**  33:6
**43**  81:14
**4880**  95:20
**49**  80:11,12
**4e**  79:10

**5**

**5**  37:14
**5/20/2020**  4:15
69:9,10
**51**  87:3
**526**  1:6 5:19
**53**  92:7
**54**  27:24 68:11
69:23
**55**  27:14 76:20
**57**  4:12 49:18

**6**

**6**  1:12 2:2,10
4:12 5:6 27:24
28:5 51:10
57:15,16 74:15
96:7 97:4
**6.1.1.**  84:20
**6033819**  1:22
**65**  4:13

**[66 - answered]**                                                                    Page 2

**66**  33:7,10 37:8
  66:10
**67**  67:5
**69**  4:14

**7**

**7**  4:5,11 12:2,4
  22:11,14 55:19
**76**  52:3
**7e**  53:20 54:24

**8**

**800**  3:6 5:21

**9**

**9**  13:10
**9:13**  1:13 2:3
  2:11 5:3,5

**a**

**a.m.**  1:13 2:3
  2:11 5:3,5
  62:20,25 93:21
  94:2,13,16
**able**  81:5 87:13
**abnormal**
  26:11,19 27:6
  89:4 91:9
**above**  60:12
  77:25
**absent**  31:25
**academic**  16:6
  16:7 19:7 49:4
  50:22
**acceptable**
  61:14
**accepted**  61:4

**accident**  32:24
  63:25
**accidents**  38:2
  53:15 64:19
**accordance**
  84:19
**accurate**  69:4
  95:11 96:8
**acronym**  82:8
**act**  87:13
**acting**  87:19
**action**  6:5 9:15
  10:6 23:18
  69:9 95:14
**actual**  31:12
  34:12 35:6,18
  83:3 85:4
  86:21 90:22
**actually**  17:3
  29:10 42:8
  45:9 65:17
  79:23 92:25
  93:8
**add**  12:18 13:8
  44:16
**adding**  19:3,4
**addition**  13:22
  17:4,13 67:9
  67:10
**additional**
  14:14 16:20
  17:15
**address**  7:14
**adjourned**
  94:16

**administer**  6:3
**adopt**  80:8
**adopted**  55:16
**adrs**  25:10 26:4
  26:6,8,12,20
  27:13,19,23
  75:24
**advisory**  79:16
**affect**  48:25
  50:18
**affecting**  50:11
**affiliations**
  6:11
**affirmative**
  28:14 32:12
  76:7 78:20
**ago**  91:24 92:2
**agree**  5:13 25:9
  44:3 59:25
  70:17 71:14
  74:2,21
**agrees**  73:6,18
  73:19
**ahead**  36:23
  69:16
**alarp**  77:16
**alignment**
  66:19
**allegation**
  32:22
**allegations**
  28:17 32:12
  34:9,16 35:2
  37:15,15 46:22

**alleged**  28:10
  28:19 33:12
  35:13 36:3
  37:10 50:4
  53:6
**aloud**  33:10
**altered**  58:23
  58:25
**amount**  17:3
  88:8 89:4
**analyses**  80:7
**analysis**  9:10
  9:21 11:8 14:8
  14:15,20 21:15
  21:19,21,22,24
**analyst**  14:8
  16:4,5,17,20,23
  17:3 18:21,24
  34:8,8 45:6
  75:18
**analysts**  19:5
  56:24 57:5
**anomalies**
  52:21 58:20
**answer**  13:18
  32:19 36:11,19
  36:22,23 39:13
  43:4,15 44:21
  45:24 46:2,3,4
  46:5,7 50:9
  51:13 73:23
  81:5 89:8
  91:19 92:4
**answered**  13:4
  42:18 43:8

**[answering - basic]**                    Page 3

**answering** 41:5
**answers** 8:6
  96:9
**anton** 3:25 5:23
**appear** 69:21
**appearance** 6:9
**appearances**
  3:2 6:11
**appears** 70:9
**appendix** 15:4
  15:5,9 20:23
  22:3,4 54:3,17
**applicable**
  67:14
**applied** 3:3
**applies** 51:6
**applying** 67:10
**approach**
  25:15
**appropriate**
  78:2
**approximately**
  2:11
**april** 4:11 12:2
  12:4 22:11,14
  55:19
**area** 67:24
**argue** 48:13
**argued** 71:17
**argument** 93:2
**arguments**
  16:16 92:24
**arithmetic**
  50:16

**article** 74:15
**articles** 16:7
  33:21,22
**arts** 3:3
**aside** 83:2 84:2
**asked** 16:17
  18:16 24:3,8,8
  24:23 25:14
  30:13 42:18
  43:4,14 44:8
  73:3 81:7
  88:22 91:13,14
**asking** 12:23,24
  17:2 30:2,3,8
  36:12,15,22
  41:25 43:2,3
  56:8,14 73:5
  73:14,19 74:7
  74:9 88:12
  89:13
**aspect** 44:10
**aspects** 74:18
**assess** 45:22
  48:20 60:10
**assessed** 43:10
**assessing** 45:4
  45:14
**assessment**
  58:13 67:21
  72:4 80:2,15
**assignment**
  13:13 24:8
**associated**
  30:10 32:9,16
  41:22 42:3,4

  59:6 61:8,18
  78:8
**assumed** 19:12
**assuming** 14:7
  34:24 50:20
  93:3
**assurance** 61:7
  61:10
**attached** 96:12
**attainment**
  81:19 82:21
**attempting**
  53:13
**attempts** 75:22
**attention** 77:12
  77:18
**attorney** 6:13
**attorneys** 3:3
  3:12
**attributable**
  31:20
**audio** 5:11
**audit** 58:25
  61:2 85:17,23
  86:14
**audited** 55:14
  57:7 68:2
**auditing** 67:25
**auditors** 87:7,8
  87:13,19
**audits** 52:19
  58:19 60:9
  67:12 74:19
**authorities**
  58:21

**authority** 58:17
**authorized** 6:3
**available** 16:9
  19:15 40:8
**avenue** 2:9 3:6
  3:14 5:21 7:17
**aware** 8:7 9:15
  10:2

**b**

**b** 7:16,16 9:13
  22:3
**b1** 80:17,19,20
  80:20 81:2,18
  83:17
**b1's** 80:6
**back** 34:21
  37:18 42:13,22
  45:7 47:22
  54:3 62:23
  68:10 81:14
  82:16 85:21
  86:2 88:24
  93:24
**bad** 35:21
  40:22
**balance** 35:5
**bandied** 88:15
**bartholomew**
  79:10
**based** 30:5,11
  37:7 40:10
  43:10 75:9
  80:21
**basic** 93:15

**[basically - change]**                                                                 Page 4

**basically** 8:18 41:7 81:8
**basis** 48:15,18 50:7,15
**bates** 79:24
**beginning** 6:12 85:22 88:25
**begins** 55:9 72:3
**behalf** 6:20 7:2
**believe** 9:21 20:2,8 22:15 31:10,13 34:25 41:3 49:22 53:25 54:2 63:7,9 64:16 65:2,22 69:14 71:23 75:11
**best** 8:4 49:6 67:10 84:12,19 85:2
**bill** 14:17
**billed** 14:15
**blanket** 70:11
**blood** 95:15
**bloomberg** 16:10
**board** 79:17
**boilerplate** 38:9,12
**books** 16:6,7 19:7
**bothered** 89:14
**bottom** 37:25 52:12 55:3,7

67:8 76:23 83:11
**brazil** 52:9
**breach** 72:15
**break** 8:8,10,11 62:16
**bucket** 32:24 33:3
**buckets** 32:20 34:22,25
**bulk** 24:16
**bullet** 37:25 52:9
**bunch** 44:23

**c**

**c** 2:5 7:17 15:4 15:5,9 20:23 54:3,17 82:2,4 92:10 95:2,2
**caat** 6:20
**cabraser** 23:11
**calculated** 91:18 92:4
**calculation** 62:13 76:7
**calculations** 14:11
**call** 29:15
**called** 13:13 82:22
**calm** 36:20
**capital** 16:10
**cardoso** 3:23 7:4

**career** 46:11
**carried** 58:18
**case** 1:5 5:19 10:23 11:19,20 23:16 24:22,25 25:23 28:11,20 29:18,22 30:9 30:11,25 31:7 32:15 34:15,17 39:20 41:18 42:3,5,15 43:7 45:15 48:19 51:11 53:7 54:22 66:8 82:14 88:10 89:5 91:9 92:15 97:3
**cases** 22:25 23:2,14
**cash** 41:9 48:12 48:14,16,25 49:14 50:11,18 75:20
**catchall** 17:4,7
**categories** 20:18 62:5
**category** 15:18 17:17 50:3 59:20,22 60:15 63:20 64:3,20 64:23
**causation** 22:17,21 23:5 23:12,15,20

**cause** 61:17,22
**caused** 28:11 28:23
**ccr** 1:21 95:21 95:22
**cents** 27:14,24
**ceo** 64:6
**certain** 27:6,10 75:24
**certainly** 21:14 44:15 52:18 63:7,18 64:20 70:9,17,19 89:14
**certifi** 56:20
**certification** 40:20 56:21 57:12 64:2,22 81:25 82:5 96:2
**certifications** 30:3,16,19,21 41:22 43:18 46:19 53:4 75:10 82:22
**certified** 2:13 3:4 6:21 68:3 95:5
**certify** 95:7,13 96:4
**chance** 40:21
**change** 32:13 32:20,23 47:3 47:10,13,16,21 48:4,14 50:4

**[change - condition]** Page 5

51:5 56:4 72:4
75:15,19,23
78:23 79:3
83:4,7 84:4,6
85:7,9 86:19
86:21,22,23
87:24 88:2,7
89:9,22,23
97:6
**changed** 75:12
**changes** 35:4
48:11 78:15
93:2 96:11
**channel** 50:12
**channels** 50:12
**chapter** 49:11
**characterize**
90:16
**chase** 3:19 7:3
**check** 27:16
28:3 63:9 69:3
**chris** 6:24
**christopher**
3:17
**chronologic**
80:6
**chronology**
80:6
**citation** 49:10
92:19
**citations** 92:21
**cite** 50:22 76:13
77:4 78:17
92:22 93:11

**cited** 63:12
69:17 73:12
**citing** 93:9
**city** 5:22
**civil** 2:7
**cjoralemon**
3:18
**claim** 18:3 32:8
56:6
**claremont** 7:17
**class** 3:4 6:21
23:18,21 45:10
45:21 74:23
80:23,24 83:24
84:24 87:17
88:25
**cleaning** 50:21
**clear** 27:7
**clearly** 39:6
**closed** 68:17
**collapse** 31:8
31:11,12,22
32:2 33:15,18
34:7,12,15
35:6,18,21
36:2 37:10,22
39:6 40:13
43:11 44:6
52:23 63:16
65:11 68:15
70:12,18 71:3
72:15
**collapsed** 70:3
**collapsing**
33:23 38:25

40:10 71:6
**colleague** 7:3
**college** 3:3
49:12
**column** 67:7
**columns** 55:7
**come** 78:12
**comes** 23:11
48:11
**coming** 23:25
29:23 30:9
31:7 42:12,14
43:6 44:5
65:10,16,17
66:7
**commencing**
2:10
**comment** 24:9
24:11 33:20
76:4
**commentaries**
34:11
**commentary**
34:6 35:17,25
37:16 41:20
**commenting**
33:22 34:4
36:2,7,21
**commission**
97:23
**committee**
79:16
**common** 38:6,9
38:15

**communities**
40:23
**company** 40:23
67:4
**competence**
53:17
**complain** 51:15
**complaint**
10:25 15:22
32:13 34:10
35:3 45:25
47:23 72:16
**complete** 20:22
57:22 96:8
**completely**
18:11,13
**completeness**
19:4
**compliance**
81:19
**complies** 67:13
**concealed** 71:4
**concern** 10:12
**concerns** 22:17
**concluded**
80:15
**concludes**
94:10
**conclusion** 43:6
44:5 65:14,16
73:22 79:7
**conclusions**
65:17 80:13
**condition** 86:6

[conditions - dam]                                                                    Page 6

**conditions**
   52:20 58:14,19
   58:25
**conducted**
   52:19 67:12
**confidence**
   53:14 77:20
**conflict**  87:23
**confused**  82:10
**consequences**
   31:23 33:15,19
   33:23,24 34:12
   35:5,18 78:8
   78:19
**consider**  42:16
   43:5 44:9
   54:21 55:17
   56:25
**considered**
   15:9,13,17
   29:23 54:8,19
   63:11 86:9
**considering**
   24:15 32:14
**consistent**  71:8
**constant**  92:15
   93:14
**constitute**  71:2
**construct**  16:11
**constructed**
   25:22
**construction**
   18:17 58:16
**constructive**
   59:2

**consultants**
   67:13
**contact**  9:21
   11:8 21:20
**contacted**  9:17
   9:20 10:25
**contained**
   54:22 55:18
**context**  64:19
   81:18 85:24
**continue**  5:12
**controls**  25:10
**conversations**
   5:9
**convey**  53:10
   53:13,17
**conveying**
   60:24 61:11
**conveys**  60:21
**copy**  11:24
**corner**  55:4
**corporate**
   29:12
**correct**  6:15
   7:23 12:11,15
   13:3,5,17
   22:12 23:16
   24:2,3,13,22,23
   25:23 26:8,9
   26:20 27:2,8
   27:14,19,21,24
   28:6,11,21
   32:10,11 35:20
   40:2,13 42:5
   43:12 44:14,18

   45:18 47:11,19
   49:23 50:24,25
   51:21 53:7,8
   56:22 59:12,18
   59:22 60:16
   62:2 65:3
   66:25 70:7,15
   72:22 74:20
   76:2,24 78:24
   79:18 82:6
   87:10 88:19
   91:9 92:12,16
   92:23 93:13,16
   96:10
**corrected**  13:2
**corrections**
   96:11
**correctly**  58:12
**correspond**
   79:24
**cost**  50:21
   75:15 78:15
   81:12 83:5,6
   84:5 85:8
   86:23 88:2
   89:22
**counsel**  3:24
   5:16 6:10 7:7
   8:19,20,23 9:8
   10:4,5 14:24
   23:4,18 51:14
   68:14,21,22
**couple**  17:9
   20:4 59:3
   60:24

**course**  25:24
   33:20 34:19,23
   35:7 43:20
   51:18 58:10
   76:17
**court**  1:2 2:13
   5:25 7:5 34:20
   34:22 68:14
   71:13,24 72:25
   95:5
**court's**  71:18
   71:20
**cover**  18:25
   19:2,5,5,17,18
   19:22,22
**create**  40:22
**criteria**  55:15
**criticism**  24:16
**crutcher**  3:13
**cumulative**
   89:2
**cumulatively**
   89:18
**current**  25:11
**cv**  1:6 5:19
**cweidner**  3:20
**cycle**  67:25

   **d**

**d**  7:16 9:12,24
   82:2,4
**dam**  9:16 16:2
   31:7,8,11,22
   32:2 33:14,18
   33:23 34:7,12
   34:14 35:18,21

36:2 37:9,23
39:6 40:10,12
43:11 44:6
51:4 52:23
60:21 63:16
65:11 66:13
67:11 68:7,15
70:3,12,18
71:6 72:15
80:8 81:21
83:18 87:7,8
87:13,18
**dam's** 38:21,24
71:3
**damage** 35:23
39:7
**damages** 10:19
22:17,21 23:20
28:14,16 34:24
**dams** 17:25
38:3,16,19
44:13 52:20
53:14 55:12
56:17 57:6
58:6,14,20,23
59:7 60:8,12
61:3,8,19 64:5
64:10,16 65:2
66:19,25 67:18
67:25 74:20
77:12,24 78:9
84:11
**data** 16:9 86:8
**date** 12:5 57:17
66:2 69:12

95:9 97:4
**dated** 4:11,14
12:2,4 25:2
55:19 69:9,10
79:17
**day** 95:18
96:17 97:20
**dce** 82:8
**dces** 81:19,24
82:21
**decision** 42:12
42:14 73:4
**decline** 27:18
27:23 28:5
71:7
**decommissio...**
16:3
**decrease** 78:9
**decree** 58:13
**defendant** 3:12
**defendants**
6:25 23:4,13
**defense** 23:7
**define** 58:17
**defines** 77:18
**delta** 81:11
83:6 86:25
87:2,25 88:7
89:2,3,19
90:22 91:7
**demands** 58:16
**depend** 54:18
**depending** 75:6
**deposition** 1:10
2:6 5:15,20

7:20 8:17 9:8
12:11 94:16
95:8,11 96:7
**derivative**
92:17
**describe** 45:6
**described**
16:24 20:12
81:9
**description** 4:9
**designed** 53:16
**despite** 83:15
**determine** 47:8
47:9 75:23
**determined**
58:23
**determining**
86:7
**dhall** 3:10
**difference**
70:11
**differences**
17:10 26:2
77:5
**different** 17:24
38:19,20 42:6
43:15 74:18
75:3 89:15
91:4
**difficult** 82:12
**direction** 20:20
**directors** 79:17
**disagree** 25:19
25:20 72:24
92:14

**disagreeing**
25:22
**disagreements**
92:18
**disclosed** 29:3
29:15,21 30:5
30:12 31:9,13
31:21 32:10,16
33:14,17 39:14
39:16 40:5
42:3,15 43:7
45:9,12,20
51:4 56:6
59:10,17,20
65:12 75:2
82:20 90:23
93:4
**disclosure**
20:10 39:17,20
51:25 57:9
**disclosures**
20:16,19 30:6
30:8 37:19,23
38:18 43:21
44:5,17 51:3
51:20 61:25
**discount** 48:13
**discounted**
41:10
**discussed** 12:9
37:9 86:15
92:11
**discussing**
49:23

[discussion - event]                                                      Page 8

**discussion**
   25:25 56:24
**dismiss**  73:4
**dispute**  26:10
   26:18,24 27:5
   27:12,17,22
   28:4
**disruptions**
   50:13
**district**  1:2,3
   5:18 6:16,17
**doctor**  92:19
**document**  15:6
   18:12,13 52:4
   52:5 53:22,24
   54:19 55:2
   57:19 60:19
   63:6,10 65:10
   65:22,23 66:4
   66:6 73:11
   79:12,14 88:5
**documents**
   10:21 11:2
   15:21,24 17:19
   17:20,22 19:15
   19:16,21 51:11
   51:19 75:4
**doing**  15:19
   36:7 42:20
   81:8
**dollar**  84:5
**donald**  3:9 6:19
**dot**  38:3,3,3
**doubt**  18:14

**downloaded**
   57:23
**dr**  17:23 18:8
   18:23 24:25
   25:22 26:7
   32:8 88:9,16
   88:16 89:5,13
   89:24 90:8,9
   91:8,17 92:11
   92:14,21 93:12
   94:7
**draft**  21:9,23
**drop**  32:9
**due**  50:4
**duly**  7:9 95:9
**dunn**  3:13 6:24

**e**

**e**  7:16,17 9:24
   82:2,4 95:2,2
**earlier**  13:21
   53:3 85:16
**early**  9:19
**easier**  52:6
**eastern**  1:3
   6:15
**easy**  91:22
**econ**  25:16
   48:16,23 49:3
**econometric**
   49:4
**economic**  16:15
   31:6 42:23
   50:23 61:17
   64:14 80:21
   81:4 82:18

   83:21 89:17
   93:15
**economically**
   42:9
**economics**
   49:11 60:19
   81:6
**economist**  21:4
   31:4 40:15
   42:25 53:10
   73:6,9 74:2,10
   77:19 90:17,18
   90:20,25
**economists**
   86:18 88:19
**edit**  22:2
**edits**  21:12,16
   21:17,23
**effect**  43:9 75:8
   75:14,16
**effects**  25:11
   35:6
**egland**  9:24,25
**either**  88:4 92:5
**ek**  1:6 5:19
**element**  30:17
**elements**  35:2
   62:7
**emerman**  88:16
**employed**
   95:13
**enables**  65:6
**enabling**  65:6
**ended**  67:24

**engagement**
   10:11
**engineer**  31:2
   41:23 45:5
   61:15 77:14,23
   85:6 91:2
**engineering**
   42:23 43:2
   45:8
**english**  16:5,17
   16:24 59:16
   82:11
**entire**  18:4,19
**entitled**  65:23
**environmental**
   58:17
**equity**  48:17
**errata**  97:2
**errors**  25:15
**esq**  3:9,17,19
   3:23
**essentially**
   15:21
**estimate**  14:6
   22:22 40:19
   41:2,8,8,24
   43:19 50:20
   62:12 65:7
   87:24
**estimates**  10:20
   18:9
**evangelista**
   3:25 5:23
**event**  23:22,24
   24:12 32:3,4

**[event - filings]**                                                    Page 9

32:24 41:3,5
41:12 45:4,15
46:20 48:21,22
50:18,19 62:13
66:25 75:9,16
81:10 83:5
**events** 40:18
56:12 93:3
**eventual** 83:18
**everybody**
21:16 29:13
**evidence** 83:6
**exact** 26:15
30:6
**exactly** 27:10
46:21 49:24
68:22 82:2
**examination**
7:11
**examined** 7:9
**example** 16:16
17:23 21:15
37:14 47:24
84:2
**exceed** 66:21
**exceeded** 88:8
**excerpts** 57:22
**excess** 91:8
**exegesis** 36:7
**exercise** 81:9
**exhibit** 4:9,10
4:12,13,14
11:24 12:5
20:5 29:19
37:18 39:21

40:11 42:17
43:6,11 44:17
47:8 51:3,21
51:25 56:6,22
57:9,17 59:11
59:18 60:15
61:25 62:5
63:3,10 66:2
69:8,11
**exhibits** 4:8
17:9 21:15
**exist** 30:23
**existence** 30:16
30:19 39:22
43:18 56:20
**expect** 48:7,8
49:16 78:7
**expectation**
56:11 61:23
62:2
**expectations**
48:12,14
**expected** 41:9
81:12,12
**expert** 4:10
11:25 12:3
15:22 16:19
22:7,14 25:2
42:24 44:25
55:19 85:6
**expertise** 15:15
17:24 21:4,8
**experts** 10:14
41:21

**expires** 97:23
**explained**
43:16
**expressions**
82:3
**external** 67:13
67:25 87:7,8
87:18
**extraordinary**
52:19 58:18
85:17,23 86:14

**f**

**f** 30:13 43:20
51:24 74:14
75:11 95:2
**f's** 20:4
**fact** 26:10
30:22 38:9
51:2 57:6
70:18 93:3
**factor** 29:7
86:5
**factors** 28:17
29:17,21 50:13
**facts** 20:24
93:8
**factual** 15:25
**failure** 9:16
78:7,18,23
79:3 83:18
87:25
**fair** 19:10
22:16,19 59:4
61:5

**false** 74:24 76:2
**familiar** 7:25
19:10
**far** 17:24
**fassett** 1:21
2:12 6:2 95:4
95:21
**february** 27:13
27:18,23 28:5
79:17
**federal** 2:7
**feinstein** 10:20
12:21 17:6,14
18:23,23 19:3
24:9,25 25:16
25:22 26:16
28:16 31:3
32:8 33:2 34:2
35:7 37:17
63:12 88:9
89:5,13 90:8,9
91:8,17 92:11
93:12
**feinstein's** 8:19
18:7 21:6 26:7
89:24 92:14,21
93:9
**ferreira** 51:10
53:20 54:24
**figure** 46:19
**figured** 19:14
**filed** 5:18 6:15
58:21
**filings** 30:14
40:3

**[financial - glenn]**                                                    Page 10

**financial**  21:4
  31:22 33:15,18
  35:5,23 40:23
  45:6 49:11
  78:8,19
**financially**  6:5
**find**  16:5 34:22
  49:9,12
**finder**  51:2
**finds**  51:2
**finish**  8:9 36:10
  42:10,10
**firm**  6:2 23:11
**first**  9:14 10:5
  10:24 11:23
  12:24 21:9
  37:24 39:11,13
  49:21 50:3,12
  58:8 66:16
  68:13 83:15
  90:4 95:9
**flip**  20:4
**flow**  48:12,14
  49:14
**flows**  41:9
  48:17 49:2
  50:11,18 75:20
**focus**  26:4
  45:19 72:7
**focused**  19:2
  34:11
**follow**  41:19
**following**  85:2
  92:20

**follows**  7:10
**footnote**  76:12
  76:23,24,25
  77:12
**footnoted**  93:5
  93:6
**foregoing**
  95:10
**foreseeable**
  71:7
**forgotten**  36:25
**form**  4:12
  14:16 24:6,14
  25:12 26:14,21
  27:3,9,20,25
  28:7,12,22
  34:5,18 36:5
  37:12 38:11
  39:2 41:14
  43:13,19,25
  44:7,19 47:12
  51:7 52:25
  53:12 56:7,11
  57:7,10,15,16
  59:8,13,19
  60:23 61:9,20
  61:22,25 62:3
  63:17 64:17
  65:4,7,9,13
  67:2,19 70:8
  70:16 73:2
  74:25 75:5
  76:3 78:3 79:5
  81:3 82:25
  83:25 85:3

  86:17 87:21
  88:11 89:20
  91:10
**formal**  9:18
**former**  33:3,4
**forming**  41:7,8
  54:21 55:18
  66:7 93:13
**forth**  59:11,18
  60:15 66:8
  71:9 82:16
  95:9
**forty**  90:19
**forward**  20:4
**found**  17:9
  57:23 68:14
  88:9 89:5 91:8
  91:17
**fourth**  60:4
**fox**  2:8 3:5 5:21
  6:21
**fragile**  80:7
  83:16
**fragility**  80:17
  80:25 81:6
**free**  48:16
**freshman**  49:6
**front**  54:23
  79:15
**fs**  19:19,24
  20:11 37:19
**full**  7:13 60:4
  72:8 87:5
**funds**  23:9

**further**  94:3
  95:13
**future**  41:9,12

**g**

**g**  7:16 9:12,24
**gauged**  41:17
**general**  15:14
  21:3,7 44:17
  61:25 63:19,22
  72:3 74:19
**generally**  17:21
  23:12 72:9,14
**generating**
  88:20
**geotechnical**
  60:10
**gerais**  58:12,23
**germane**  55:20
  55:22
**getting**  45:16
**gibson**  3:13
  6:24
**gibsondunn.c...**
  3:18,20
**give**  8:6 53:4
  61:5,6 74:4
  81:4,12 91:25
**given**  40:4
  86:21 95:12
  96:10
**giving**  32:19
**glenn**  1:11 2:6
  4:4,10 5:15 7:8
  7:15 11:25
  12:3 94:11

**[glenn - impeccable]**                                                                 Page 11

96:4,15 97:5 97:18

**go** 5:13 15:18 17:17 22:3 31:15 34:21 36:22 37:18 45:3 49:25 62:13 86:2 87:3 88:5,24 92:7 93:17

**goes** 20:7 31:24 72:20

**going** 5:5 10:12 32:12 36:9 51:9 63:3 68:10 72:7 82:16 83:7

**gold** 9:12

**good** 5:4 6:23 7:13,15 8:12 51:11 62:15 66:20

**gotten** 21:17

**government** 58:21

**greater** 89:3,11 91:16

**group** 9:10,22 11:8 14:8,8,15 14:20 21:15,19 21:21,22,24

**guess** 17:18 40:21 56:8 77:23

**guessing** 8:21 14:5

**h**

**h** 1:21 2:12 7:16 95:4,21

**hall** 3:9 4:5 6:14,19,19 7:12 11:23 12:6 46:6 47:14 51:17 57:14,18 62:17 63:2 65:21 66:3 69:7,13 73:8,11,14,18 91:25 92:6 93:17 94:3,8

**hand** 51:9 55:4 63:3 66:12 67:7,22 95:17

**handing** 79:9

**happen** 40:22 53:15 64:19 74:22

**happened** 32:5 80:22 82:19 83:22 84:23 87:6,16

**happening** 83:5

**happens** 32:25

**hard** 48:12

**harm** 40:23

**hate** 85:11

**headed** 39:5

**heading** 13:13 66:17

**heard** 23:22 88:24

**held** 2:8

**help** 29:25 52:22

**helping** 46:15 85:6

**hereinbefore** 95:8

**higher** 81:10

**highly** 60:8

**honestly** 71:11

**hour** 8:11

**hours** 8:22 14:2 14:20

**house** 3:24

**hubbard** 1:11 2:6 4:4,11 5:1 5:15 6:1 7:1,8 7:16 8:1 9:1 10:1 11:1,24 12:1,2,4,5 13:1 14:1 15:1 16:1 17:1 18:1 19:1 20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1 47:1 48:1 49:1 50:1 51:1 52:1

53:1 54:1 55:1 56:1 57:1,14 57:17 58:1 59:1 60:1 61:1 62:1 63:1 64:1 65:1,23 66:1,2 67:1 68:1 69:1 69:8,11 70:1 71:1 72:1 73:1 74:1 75:1 76:1 77:1 78:1 79:1 80:1 81:1 82:1 83:1 84:1 85:1 86:1 87:1 88:1 89:1 90:1 91:1 92:1 93:1 94:1 94:7,11 96:4 96:15 97:5,18

**i**

**idea** 14:19

**identified** 28:16 52:21 58:20

**identifying** 62:5

**illustrate** 37:13

**illustrating** 34:3

**immediate** 58:13

**impacts** 83:12 83:17

**impeccable** 63:25 64:5

**import** 74:8

**important** 38:22 47:22 75:19

**impressive** 64:11

**inaccurate** 34:7

**inappropriate** 86:7,16,20 93:14

**incident** 29:10 45:23 47:11 63:16 65:2 68:7 85:8,9

**incidents** 38:2

**include** 59:15

**including** 55:25 59:10

**incomplete** 54:17

**incompleteness** 51:15

**incorrect** 46:25

**independent** 41:24 87:14,20 88:18

**index** 4:2

**indicate** 78:22

**indicated** 80:16 80:25 95:10

**indication** 53:5

**individual** 9:4

**individuals** 14:7

**infer** 32:4

**inferred** 46:13

**inflation** 92:11 92:15 93:14

**inform** 20:23 44:16 51:4 52:22 57:7 59:5,21 60:14 66:23 67:16 68:6

**information** 17:25 18:3,17 19:19,20,25 32:20 33:12 35:13 37:5 40:8 44:9,13 45:20 47:9 59:5 60:11 63:14 64:15,20 66:23 67:16 68:6 76:9,12 77:2 80:16,25 83:23 90:23 92:22

**informed** 10:16

**infrastructure** 38:3

**initial** 25:5,6 37:2

**input** 21:14 40:19 41:2 62:4

**inputs** 41:4

**insofar** 67:3

**instability** 82:9

**instructed** 17:7

**intended** 39:7

**interest** 16:18 87:23

**interested** 6:5 95:16

**international** 66:20 84:13,19 85:2

**interpret** 14:22 68:23 85:5

**interpretation** 26:3,17 53:9

**interrupt** 8:4

**interval** 53:14 53:18 77:20

**introductory** 16:2 18:18

**investor** 44:18 45:3,21 46:18 46:24,25 47:10 47:15,18 48:19 52:23 56:11 57:7 60:21 61:6,6 62:6 63:15 64:16,25 66:23 75:18 88:23

**investor's** 48:11 56:5 59:6,21 67:16 68:6

**investors** 28:11 28:24 38:24

43:9,17,23 44:3,8 45:9,14 51:4 53:5,11 55:24 57:2,3 60:14 61:12 72:14 84:25

**involving** 38:2

**iq** 16:10

**isolated** 33:4

**issue** 26:16

**issued** 58:13

**issues** 10:15 20:24 82:14

**it'll** 14:22

**item** 60:11,12

**items** 33:25

**j**

**january** 26:12 26:20,25 27:8

**jersey** 2:14 95:7,23

**job** 1:22 42:20

**joined** 7:2

**joking** 51:18

**joralemon** 3:17 6:23,24 14:16 24:6,14 25:12 26:14,21 27:3 27:9,20,25 28:7,12,22 34:5,18 36:5 36:24 37:12 38:11 39:2 43:13,25 44:7 44:19 46:4,8

**[joralemon - logic]** Page 13

46:10 47:12
51:7,16 52:25
53:12 56:7
57:10 59:8,13
59:19 60:23
61:9,20 62:3
62:15 63:17
64:17 65:4,13
67:2,19 70:8
70:16 73:2,10
73:13,16,21,24
74:25 75:5
76:3 78:3 79:5
80:19 81:3
82:25 83:25
85:3 86:17
87:21 88:11
89:7,20 91:10
91:23 92:3
94:5
**joralemon's**
42:20
**josephine** 1:21
2:12 6:2 95:4
95:21
**journal** 16:7
**judge** 75:8 83:2
84:4
**judging** 63:15
**judgment** 22:2
41:14,14
**judgments** 56:2
**jump** 57:24

**k**

**k** 4:12 57:15,16
74:15
**kaplan** 2:8 3:5
5:21 6:21
**kaplanfox.com**
3:10
**kept** 89:2
**kill** 85:11
**kilsheimer** 2:9
3:5 5:21 6:22
**kind** 15:5 41:12
48:12 76:6
**know** 8:9 9:25
10:4 11:9,11
11:15 14:14
21:22,25,25
22:22 24:5
32:3 38:12
45:20 47:17
54:20 56:10
65:5 77:11,13
86:18 88:13,14
89:13 90:4
**knowledge**
11:14 15:14
21:4,20 46:14
46:17 83:16
**known** 11:20
29:8,18 30:5
80:9 93:4

**l**

**l** 7:16,17 9:12
9:24

**laboratory**
86:8
**lack** 92:25
**language** 19:20
19:23 40:11
47:15 63:8
**large** 51:11
81:17
**late** 9:18,19
**law** 23:11 74:8
**lawyer** 9:5 69:2
71:12 73:5
**lead** 3:3 6:20
64:15,25 83:7
**learn** 12:14
**learned** 49:12
80:23 86:13
87:18 88:23
**leave** 69:4
**leaves** 70:6
**leaving** 84:2
**left** 55:4 67:7
**legal** 15:21
17:19 66:21
68:23 73:6,21
73:25
**legislation**
67:14
**level** 57:8 61:14
78:2
**levels** 55:16
**liability** 34:23
**license** 95:22
95:22

**licensing** 58:15
**lied** 47:25
**lieff** 23:11
**lifting** 58:16
**likelihood**
40:18 63:15
66:24 67:17
68:7 71:5
**likely** 46:20
61:17 65:3,7
75:23 83:22
**likewise** 18:8
**limited** 17:2
83:18
**line** 52:13 97:6
**lines** 52:11
**list** 37:15 44:17
51:25
**listed** 16:21
17:3,14 18:22
20:22 42:16
54:7 63:10
**literature** 31:6
49:5 50:23
**litigation** 1:6
5:17 10:22
23:19 97:3
**little** 88:8
**lives** 35:24
**llp** 2:9 3:5,13
6:22
**local** 58:21
**location** 5:20
**logic** 93:15

**[long - merits]** Page 14

**long** 8:20 10:8 88:5 90:18
**longer** 55:12 82:3
**look** 21:6 25:14 35:4 37:25 43:22,24 46:18 47:7,17,18 49:11 51:23 52:11 55:24 62:7 75:14 85:21
**looked** 44:4 54:2,19 60:18 72:21 74:12 84:11
**looking** 20:19 22:4 34:24 41:13 43:17 54:9 91:19
**looks** 84:3
**lose** 35:23
**loss** 22:17,21 23:5,12,15,20 28:11 30:10 42:4 71:6
**losses** 28:23
**lost** 59:15
**lot** 55:25 56:13 85:12
**loud** 52:17 55:9 58:9 60:4 72:12
**low** 29:14 77:15

**lynch** 23:9

**m**

**m** 3:17,23 7:17
**made** 25:16 72:17 76:10,13
**magnitude** 89:11
**maintained** 55:15
**maintaining** 61:8
**maintains** 66:18
**make** 22:2 76:5 89:24
**making** 41:15 55:25
**managed** 67:23
**management** 33:24 60:7 61:2,12 63:24 66:14,18 67:4 67:11,20 72:16 72:19 75:10
**manner** 87:14 87:20
**march** 25:2 58:22
**mark** 9:24 11:23 57:14 65:21 69:7
**marked** 12:4 51:10 53:20 54:24 57:16 63:4 65:25

69:11 79:10
**market** 25:11 40:4,7,17,20 41:6,17 50:13 61:17,22 76:17 80:23 82:21 83:24 86:13 87:18,22 90:24
**marriage** 95:15
**material** 16:12 31:8 54:13,15 83:7
**materialization** 29:3,15 30:4 30:11 31:9,13 31:21 32:10,16 39:15 65:12 71:3
**materializati...** 33:13,17
**materials** 15:4 15:9,12,16 16:16 20:22 54:7 63:10
**math** 48:9
**matter** 5:17 6:25 10:2,12 11:5,6 14:15 17:5 20:25 22:18 23:9,10 36:4 37:11 95:16
**matters** 23:4
**mazumdar** 11:16,18

**mckesson** 23:9
**mean** 16:25 29:6 33:16 34:8 35:14 38:6 39:3,3 42:23 48:7 53:15 54:14,16 56:3 57:3 62:11 63:22 75:6 76:4 84:16 92:20
**meaning** 32:11 49:17
**means** 12:19 30:17,23 37:17 54:19 64:18 65:5 70:10
**meant** 36:13,15 36:17 44:20
**measure** 81:13
**measures** 80:8 83:12,17
**media** 5:14
**meet** 8:20
**meeting** 9:3
**memorandum** 4:14 69:8,10
**mention** 34:7
**mentioned** 20:3 44:22 64:24 84:20
**mere** 34:7
**merely** 15:25
**merits** 25:7

**merrill** 23:9
**met** 8:19,21
  77:9
**method** 58:24
**methodologies**
  26:2 86:16,20
**methodology**
  26:22 83:4
  85:5 86:7
**methods** 59:2
**microphones**
  5:7
**middle** 37:25
  81:16
**minas** 58:11,22
**mind** 23:11
  75:9 76:18
**mine** 70:22
**mineral** 66:13
**mines** 38:2
**mining** 21:5
**minute** 90:11
  90:11,12
**misrepresent...**
  46:22 47:2
  48:24,25 50:17
  70:5,14
**misrepresent...**
  28:10,20 33:13
  34:16 35:14
  36:4 37:11
  50:4,11 53:7
  68:17 71:5
**misrepresented**
  47:25 48:13

**misrepresenti...**
  90:7
**misreps** 50:14
**missing** 21:3
**mistakes** 12:25
**mitigate** 83:12
**mitigation** 80:8
**model** 25:9
  26:8
**models** 24:21
  24:25 25:23
**moderate** 29:13
**monitor** 62:19
  62:24 93:20,25
  94:13
**monitored**
  55:14 56:17
**monitoring**
  60:10 61:7
**month** 57:15
**morning** 5:4
  6:23 7:13,15
  70:18 74:3
  76:15
**motion** 73:4
**multiple** 7:23
**mute** 5:10

**n**

**n** 2:5 7:16,16
  7:17 9:13,24
**nabi** 9:12
**name** 5:23 7:14
  11:9,15 97:5
**narrow** 59:15

**nature** 35:24
**ncra** 95:22
**need** 8:8 46:2,6
  70:19 80:8
**needed** 15:22
  17:22
**needs** 46:7
**never** 46:14
  77:9 81:25
**new** 1:3 2:9,9
  2:14,14 3:7,7
  3:15,15 5:18
  5:22 6:16,17
  7:18 58:15,17
  95:6,6,23,23
**news** 33:21,21
  74:15
**non** 61:15
**normally** 55:15
**notary** 2:13
  95:6,23,23
  96:20 97:23
**note** 5:7 19:21
**noted** 6:18
**notes** 19:20
  25:25 27:6
  75:24
**notice** 38:24
**noticing** 6:12
**number** 26:15
  27:15 28:2,14
  44:4 46:15,15
  46:16 50:2
  51:5 78:20
  79:24 84:5

**numbered**
  49:20
**numbers** 46:16
  55:3 57:24
  85:4 88:14,16
  89:15 91:3

**o**

**o** 7:17 9:12
**oath** 6:4 7:10
  96:6
**object** 14:16
  24:6,14 25:12
  26:14,21 27:3
  27:9,20,25
  28:7,12,22
  34:5,18 36:5
  37:12 38:11
  39:2 43:13,25
  44:7,19 47:12
  51:7 52:25
  53:12 56:7
  57:10 59:8,13
  59:19 60:23
  61:9,20 62:3
  63:17 64:17
  65:4,13 67:2
  67:19 70:8,16
  73:2 74:25
  75:5 76:3 78:3
  79:5 81:3
  82:25 83:25
  85:3 86:17
  87:21 88:11
  89:20 91:10

**[objected - outside]**                                                         Page 16

**objected**  14:25
**objection**  51:16
  51:17 89:7
**objections**  6:7
**oboni**  18:8
  88:16
**observations**
  80:2
**obtained**  86:6
  86:15
**obvious**  49:10
  49:15 57:24
**obviously**  10:8
  12:20,21 16:18
  30:17,23
**occur**  29:11,14
  75:16
**occurred**  31:25
**occurring**
  48:21,22 50:20
**occurs**  29:8
**offer**  25:21
  26:6 28:15
  73:25 76:7
**offering**  28:14
  41:23 78:20
**offices**  2:8
**oh**  16:15 54:15
  56:15 70:23
**okay**  6:14,18
  6:19 7:25 8:23
  9:7,14,20
  10:21 11:4,9
  11:22 12:13,17
  13:10,12 14:2

14:19 15:2,3,8
15:12,20 16:12
16:25 17:12,17
18:12,15 19:6
19:12 20:3,6
20:10,21 21:9
21:12 22:3,10
22:16,20,24
23:22 24:5,11
24:18,20,24
26:4,10,24
27:5,12,17,22
28:4,9 29:2,6
29:17 30:24
31:4,6,15,17,18
32:7,14 33:6,8
33:16 35:22
37:18,21 38:7
38:9,14,16,23
39:11,19,25
41:16 42:11,12
43:9,22 44:3
44:16 45:3,13
45:19,24 46:10
47:5 48:6 49:3
49:19,25 50:7
51:23 52:3,7,8
52:11,16,22
53:6,9,19 54:5
54:6,12,16
55:5,6,11 56:4
57:4 58:2,5,8
59:21,24 60:3
61:5,24 62:10
63:14 64:9

65:19 66:6,10
66:11,12 67:5
67:6 68:12
69:6,16,20,21
69:25 70:6,20
70:24 71:16,20
71:22 74:6,22
76:16,19,19,20
76:22 77:7,10
77:11,21 78:6
78:11 79:2,8,8
79:9,11,20,22
80:5,11,12
81:14,15,16,23
82:7,10,13,15
82:17,18 83:9
83:10,11,15
84:8,9,10,15
85:14,25 86:2
86:12 87:3,4
87:12,16 90:4
90:15,20 91:19
91:21 92:7,9
93:11
**olson**  86:9
**omissions**
  28:10,20 34:16
**once**  77:4
**ones**  16:21
  17:13,14,15
  18:22,22 29:18
  38:5 39:20
**open**  68:15
**operates**  40:24

**operating**  60:9
**operation**
  55:13,16
**operational**
  38:21 72:4
**operative**  35:3
**opine**  28:9
**opinion**  28:15
  29:23 30:10
  34:14 36:3
  37:7 51:5
  54:22 57:8
  65:11 67:17
  68:7,23,24
  71:10 73:7,25
  75:22 78:12,14
  89:17 90:21
  91:6,15 93:13
**opinions**  23:25
  25:21 26:7
  55:18 66:7
  71:9 93:7
**opposed**  63:25
  70:14
**order**  4:14 69:8
  69:10 71:21
  72:7
**ordering**  58:13
**orders**  89:11
**outcome**  6:6
  61:3,13 95:16
**outline**  17:10
**outlined**  10:18
**outside**  21:19
  21:23

**[overall - plaintiff's]**                                                    Page 17

**overall**  66:24
  75:20
**overwhelmin...**
  23:6,7
**own**  17:24
  24:12 41:23

| **p** |

**p**  2:5
**page**  4:3,9 8:3
  13:10 31:15,18
  33:6 37:14,24
  44:24 49:18
  52:3 55:2,3,7
  57:23,25 58:3
  60:2 66:10,13
  67:5,23 68:11
  69:14,19 70:23
  71:20 76:20
  79:16,20,24
  80:11 81:14,16
  83:9,11 84:8
  84:17 85:10,13
  85:21,22 86:3
  87:3 92:7,21
  96:12 97:6
**pages**  15:8,10
  20:4,7 85:11
**paragraph**
  13:16,23 15:3
  33:7,10 37:8
  37:14 44:24
  45:17 48:6
  49:5,18,21
  50:23 52:8,12
  55:9 58:8 60:5

67:8 68:11
69:23 70:21
72:2 80:14
81:17 84:3,16
85:22 86:4
87:5,12
**paragraphs**
  72:17
**parcel**  57:12
**park**  3:14
**parsing**  50:17
**part**  10:16
  23:25 24:21
  25:2 30:10
  32:12,15 41:16
  45:16 57:5,12
  72:6 75:22
  78:11 79:23
  86:4 91:12
**participant**
  40:7,21 41:7
**participants**
  40:17 61:22
  87:22
**particular**
  19:18
**parties**  5:12
  95:14
**party**  6:4
**pending**  8:9
**pension**  3:4
**people**  35:23
**percent**  23:13
  68:2

**perception**
  32:21
**perfect**  53:15
**perform**  24:12
  24:20
**period**  45:10,22
  74:23 75:25
  78:24 80:24,24
  83:24 84:12,24
  87:17 88:25
**periodic**  60:9
**periods**  16:18
**permanent**
  66:19
**person**  9:5 10:2
**personally**
  11:12 17:20
  19:16
**perspective**
  60:20 61:17
  64:14 82:18
  83:21
**pertaining**
  67:11
**ph.d.**  1:11 2:7
  4:4 5:1 6:1 7:1
  7:8 8:1 9:1
  10:1 11:1 12:1
  13:1 14:1 15:1
  16:1 17:1 18:1
  19:1 20:1 21:1
  22:1 23:1 24:1
  25:1 26:1 27:1
  28:1 29:1 30:1
  31:1 32:1 33:1

34:1 35:1 36:1
37:1 38:1 39:1
40:1 41:1 42:1
43:1 44:1 45:1
46:1 47:1 48:1
49:1 50:1 51:1
52:1 53:1 54:1
55:1 56:1 57:1
58:1 59:1 60:1
61:1 62:1 63:1
64:1 65:1 66:1
67:1 68:1 69:1
70:1 71:1 72:1
73:1 74:1 75:1
76:1 77:1 78:1
79:1 80:1 81:1
82:1 83:1 84:1
85:1 86:1 87:1
88:1 89:1 90:1
91:1 92:1 93:1
94:1 96:4,15
97:5,18
**phones**  5:10
**phrase**  39:15
**pick**  5:8
**pieces**  19:19
  44:9,12
**pitt**  10:20
  24:10
**pitt's**  21:7
**place**  5:12
**plaintiff**  3:3
  5:16 6:20
**plaintiff's**
  23:18

**[plaintiffs - professor]** Page 18

**plaintiffs** 10:13 23:6,8,10,14 34:10 35:3
**plan** 3:4
**plausible** 90:2
**play** 31:3
**please** 5:7,10 6:8 7:6,14 8:5 33:10 43:4 46:5 52:17 55:10 58:9 60:2 66:10,17 70:2 72:13 76:21 79:20 85:13
**plus** 21:7
**point** 17:12 34:3 35:10 50:24 52:9
**pointing** 34:9
**politeness** 36:18
**portion** 28:15 28:19 31:19,20 32:9
**portuguese** 82:8
**position** 42:2
**possessed** 80:16,25
**possibility** 56:9 72:15 92:25
**possible** 32:2 44:15 77:15 78:23,25 88:7

89:2
**possibly** 61:6
**potential** 52:23 78:8
**potentially** 28:23,25 38:22 42:4
**practice** 11:2 67:20
**practices** 66:20 67:4,10 72:19 84:13,20 85:2
**preparation** 12:10
**prepare** 8:16 23:24
**prepared** 21:9
**preparing** 14:3 14:9 15:13
**present** 3:22 6:10 9:2 48:16 49:13 75:20
**president** 64:7 74:16
**presume** 10:3
**previous** 36:18 44:21 60:13
**previously** 17:5 51:10 53:20 63:4 68:16 70:13 79:10
**price** 26:11 27:23 40:7,8 40:17 41:8 50:3 71:7

74:23 75:8,23 82:19 83:8 84:23 87:17 89:18 91:5
**priced** 40:5,11 43:11
**prices** 16:11 80:23 86:13
**principal** 79:25
**printed** 20:15 63:8
**prior** 37:21
**prioritized** 81:20 82:23
**private** 5:9
**probabilities** 29:14 32:23 41:21 45:9 46:13 53:5 63:19 64:21,25 74:5 77:5 78:7 78:19,23,24 79:4 88:21 93:2
**probability** 18:9 39:9 41:11 43:20 44:22 45:4,11 45:15,22 46:14 46:21 47:4,10 47:16,21 48:4 48:20,21 50:19 56:12 62:12 65:7 75:9,12 75:15 78:2,15

81:10,11 83:5 83:6 84:4 85:7 86:19,21,22 87:24,25 89:10 89:22,24
**probably** 15:18 49:12 68:25
**problem** 47:3 83:3
**problems** 26:3 33:24
**procedure** 2:8
**procedures** 58:15,18 60:10 74:19
**proceed** 7:7
**proceeding** 6:8
**process** 8:2 45:6 61:13,13
**processes** 60:25 61:2,2,3 74:19
**produced** 15:24 17:5,14 18:12,24
**professional** 2:12 95:5
**professor** 8:18 10:20 12:20 17:5,13 18:6 18:23 19:3 21:6 24:9 25:15 26:16 28:16 31:2 33:2,25 35:7 37:16

**[profile - reference]**

**profile** 40:18
**pronouncing**
  58:12
**properly** 25:10
  61:7,11
**protocols** 72:16
**provide** 23:19
**provided** 22:13
  22:20
**public** 2:14
  39:25 44:4
  46:17 68:16
  70:4,13 76:10
  76:13 85:16
  95:6,23,23
  96:20 97:23
**publications**
  19:7
**publicly** 16:9
  19:15 45:19
**purpose** 13:9
**purposes** 15:25
**pursuant** 2:7
**put** 12:20 38:24
  40:14,16 59:11
  85:24 86:20
**putting** 83:2

**q**

**quality** 64:11
**question** 8:9
  11:7 12:25
  13:6,21 14:21
  16:22 18:21
  19:6 21:2
  25:13 27:11

28:13 29:20,25
32:18 34:19
36:11,19,22,22
36:23 39:4,8
39:10 41:19
42:7,24 43:3,4
43:8,15,15
46:7 51:8 53:2
89:9,23
**questions** 85:12
  94:4,6
**quite** 76:4
**quote** 64:6,11
  68:15,17,21
  69:3 70:6
  72:20 78:12
  79:3
**quotes** 19:2,4
  64:10
**quoting** 69:22
  74:16

**r**

**r** 1:11 2:5,5,6
  3:9 4:4 7:8,16
  7:17 95:2 96:4
  96:15 97:5,18
**raise** 24:16
  34:9,10
**raised** 33:25
**ramble** 46:7
**rambler** 46:9
  46:12
**rambling** 46:8
**rate** 48:13

**ratio** 86:8
**reaction** 86:12
  89:18
**read** 17:20 18:3
  18:10,13,19,24
  18:25 19:11,16
  19:17,21 33:9
  52:16 55:6,8
  58:8 59:4 60:4
  61:15,24 63:13
  66:16 67:8
  68:24 69:25
  70:20 72:6,12
  73:3 96:5
**reading** 20:21
  33:21 34:10
  79:6
**real** 35:6 53:16
  81:20 82:23
**really** 10:9
  17:24 18:8
  19:18 21:6
  24:16 32:5
**reason** 8:13
  17:2 97:6
**reasonable**
  27:16 53:17
  59:9 89:25
**reasonably**
  77:15
**reassurances**
  74:4
**rebuttal** 4:10
  10:13 11:25
  12:3

**recall** 9:23 10:7
  11:2 14:4
  27:15 28:2
  29:2 45:11
  52:2 54:9
  57:20 66:5
  78:4 79:13
  84:10,13 85:15
  85:20
**receive** 21:12
**received** 21:14
  21:22
**recollection**
  9:17 10:24
  27:10 28:8
  74:13 88:18
**record** 5:2,5,13
  6:12 7:14
  46:16 57:21
  62:8,19,21,24
  88:15 89:12,15
  91:3 93:17,20
  93:22,25 94:12
  94:14 95:11
  96:8,9
**recorded** 1:9
  1:20 2:6,11
  5:15 94:15
  95:8,11 96:6
**recording** 5:11
**reduce** 83:17
**refer** 41:20
  84:12
**reference** 37:21
  37:23 49:4

**[reference - resumed]**                                         Page 20

51:20 76:5
**referenced**
  18:22 23:17
  39:21 54:13
  87:9,19
**references**
  14:11 15:3
  16:8 38:16
  77:11
**referencing**
  47:14
**referred** 16:6,7
  53:3 85:16
**referring** 20:11
  30:20 37:9,17
  41:3 48:9 64:4
  71:24 77:3,22
  77:24 81:24
  89:3
**refers** 63:23
**refinitiv** 16:10
**reflect** 28:17
**reflected** 33:13
  33:16
**reframed** 14:24
**refresh** 74:13
**regard** 60:6,7
**regarding** 9:15
  11:5 83:16
  89:19
**regardless**
  81:20 82:23
**registered** 2:12
  95:4

**regression**
  24:21,24 25:23
  26:7
**regulatory**
  81:19
**related** 6:4
  10:23 22:21
  23:20 25:10
  26:7 31:22
  33:15,18 38:3
  65:2 66:25
  67:18 68:21
  74:18,20 77:2
  80:2 84:11
  95:14
**relates** 28:19
**relayed** 33:11
  35:12 37:5
**released** 84:12
  85:17
**relevant** 19:24
  20:24 60:8
  92:24
**relied** 45:14
**rely** 30:9 31:7
**relying** 78:11
**remain** 55:13
**remained** 55:13
**remember** 10:9
  23:6,8 26:15
  30:6 53:25
**remind** 25:3
**repeated** 38:4
  38:13

**report** 4:10,13
  10:17,19 11:25
  12:3,9,13,15,18
  12:20,21 13:4
  13:8,9,11,24
  14:3,4,9 15:13
  15:17 17:10
  18:4,18,20
  20:25 21:10,23
  22:10,17 23:19
  23:25 24:21
  25:2,4,6,7,19
  25:20 29:4
  31:11,16 32:7
  33:7 35:10,11
  37:14 41:16
  44:25 54:4,7
  54:13,23 55:19
  56:6 57:9
  59:11 65:24,25
  66:8 68:10
  69:22 70:23
  71:9 72:8,21
  74:14,17 76:10
  76:21 78:14
  79:16 85:17,19
  86:14 91:21
  92:8,20,22
  93:9
**report's** 70:10
**reporter** 2:13
  2:13 5:25 7:6
  95:5,5
**reports** 8:18,19
  15:22 16:4,5

16:17,19,21,23
  17:3 18:22,24
  26:2 53:23
  54:10 58:21
  78:13 85:24
**representations**
  72:18
**represented**
  31:21 33:14,17
**representing**
  5:24 6:24
**represents** 50:3
**reprises** 13:18
**reputation**
  11:11
**require** 49:10
**required** 89:10
**requirements**
  66:21
**residual** 26:11
  26:25 27:13,18
  27:23 28:5
**residues** 66:13
**resistance** 86:8
**respect** 71:18
**responsibility**
  55:14
**rest** 70:20
**restore** 36:17
**result** 65:12
**resultant** 71:6
**results** 84:18
**resumed** 62:22
  93:23

**[retained - securities]**                                    Page 21

**retained** 10:8
  10:10,22 11:6
  11:6 13:17,23
  23:4,17
**retention** 9:18
  11:3,5
**return** 26:11,11
  26:19,25 27:6
  27:13 89:4
  91:9
**reveal** 68:16
  70:4,13
**reveals** 80:7
**reverse** 28:18
**review** 10:21
  12:13 15:23
  16:20 17:20
  19:24 24:24
  30:24
**reviewed** 8:18
  10:25 12:10
  15:4 16:23
  17:11,15 73:12
**ribbon** 92:11
  92:15 93:14
**right** 18:5
  19:13 23:3
  28:3 31:24
  37:24 51:17
  61:24 65:21
  66:12 67:22
  69:18 73:10
  79:15 84:15
**rigorous** 64:23
  89:8

**rigorously**
  67:13
**risk** 19:19,23
  20:3,10,18
  29:3,7,10,16,17
  29:21 30:5,5,8
  30:12,18,23
  31:9,13,21
  32:10,13,17,21
  33:17,24 35:4
  37:19,22 38:8
  38:15,24 39:6
  39:15,16,22
  40:5,10,18
  41:18 42:3,15
  43:7,11 44:5
  51:3,4,20,24
  56:5 57:8 59:6
  59:10,17,20,22
  60:7,15,25
  61:8,12,14,18
  61:18,23 62:2
  62:5 65:12
  66:24 67:3,20
  71:3,4 72:4,16
  72:19
**risks** 29:12
  33:14 38:21
**robert** 7:15
**room** 8:24 9:2
**rpr** 1:21 95:21
**rules** 2:7 8:2
  58:17
**rupture** 83:12

**s**

**s** 2:5 97:6
**s&p** 16:10
**s.a.** 1:6 3:12
  4:12 5:17
  57:16 97:3
**safe** 53:14
  64:16,18
**safety** 29:9
  30:17,22 32:4
  32:23 33:25
  37:23 40:18
  41:3,5,12,22
  45:4,15,22
  46:19,20 47:11
  48:20,22 50:18
  50:19 53:18
  55:16 56:2,12
  60:9,21 61:4
  62:12 63:16,18
  65:2 66:25
  67:11,17 68:7
  72:18 74:19
  75:9 77:20
  80:2 81:20
  82:24 85:8,8
  86:5 87:25
**samarco** 37:22
**saw** 21:25
  29:18 69:17
  87:8
**saying** 32:6
  39:7 43:23
  47:18,20 48:5
  48:6 50:7,15

  56:16 71:13
  90:25
**says** 15:9 49:17
  52:9 58:6 64:5
  66:13 67:8,24
  68:22 70:12,14
  72:2,9 78:6
  80:5,14 81:18
  83:15 84:16
  86:5 87:6
  93:10
**schwartzman**
  63:4 64:6
  74:16
**se** 28:14 41:6
**search** 81:13
**second** 13:6
  45:7 61:2 67:8
  68:10 80:13
  81:17 84:15,18
  87:5 93:18
**seconds** 91:24
  92:2
**section** 16:2
  18:18 64:4
  79:25 80:13
  84:20 92:10,23
  93:12
**sections** 49:21
  51:24
**sector** 25:11
**securities** 1:6
  5:17 22:25
  23:18 40:6,9
  40:12 43:12

**[securities - speaks]** Page 22

80:22 82:20
83:23 84:24
86:13 87:17
97:3
**security** 48:5
48:10,17
**see** 13:14 15:8
15:10 20:8
22:8 31:19
49:3,20 50:5
52:8,14 54:9
54:11,12 55:6
56:12,15,16
58:6 60:11
64:9,12,13
66:12 67:23
68:3,17 69:18
72:2,10,16
78:9 79:15,25
80:5,9,10,14,17
81:21 83:13,18
84:21 86:4,10
87:5,14
**seek** 41:17
**seems** 45:16
57:23
**seen** 12:7 53:22
53:23,24 57:19
63:6,7 66:4
79:12,13 82:3
89:12 91:3
**select** 15:16
16:13,14 20:16
20:17

**selected** 16:13
16:15 20:18,20
**selling** 49:6
**sense** 18:9
**sensitive** 5:8
**sentence** 33:9
36:8,12,16
37:8 38:17
52:12,16 53:10
55:8 56:13
66:16 68:3,13
69:22,25 72:8
72:13 73:20
81:18 83:3,15
84:16,18
**sentences** 36:10
38:20 71:8,12
**separate** 32:8
34:25
**separated**
32:15
**separately**
14:17
**september** 1:12
2:2,10 5:6
58:22 95:18
96:7 97:4
**set** 18:3 19:5
59:17 60:15
66:7 71:9 95:9
**sets** 17:11
**settings** 29:12
**several** 22:23
**shareholders**
42:5

**sheet** 97:2
**short** 63:24
**show** 53:19
**shown** 71:17
74:24 76:2
90:23 96:11
**side** 66:12 67:7
67:22
**signature** 95:20
**significant** 27:2
27:8,19 28:6
84:6 88:9 89:6
91:5
**similar** 49:22
59:3 64:3
**simple** 50:16
**simply** 32:2,24
63:23 78:14
**sir** 7:22,24 8:15
8:25 9:4,6 12:8
12:12,16 13:15
13:18,25 15:11
17:16 20:9,12
22:6,9 23:23
25:3 29:5 30:7
39:18,24 40:3
46:9 49:24
50:6 51:22
52:10,15 57:19
58:7 63:6
64:13 66:4,15
68:4,9,19
69:15 72:5,23
74:21 76:25
78:10 79:19

80:4,10,18
81:22 83:14
84:14,22 85:20
86:11 87:11,15
92:13
**sitting** 54:23
90:17,20 91:15
**situation** 75:2
80:7 81:21
83:16
**six** 20:7 52:11
**sjb** 1:6 5:19
**skimmed** 17:21
**skimming**
20:22
**small** 65:8
**softer** 64:21
**sorry** 54:14
56:15 57:20
65:20 70:23,25
80:20,20
**sort** 38:20
**sounds** 8:12
27:16 28:3
**sources** 33:11
35:12 37:4,5,8
93:6
**south** 88:17
**southern** 5:18
6:16
**speak** 8:5 9:7
9:11 10:5 11:4
**speaking** 17:21
**speaks** 63:18
67:3

| | | | |
|---|---|---|---|
| **specialist** 21:5 | **statement** 38:8 | **stick** 39:11 | **suppose** 24:19 |
| **specialized** 67:12 | 52:22 55:17 | **sticking** 26:22 | 63:20 |
| **specific** 10:15 | 56:4 60:13,14 | **stock** 49:13 | **sure** 12:19 |
| 29:9 44:13 | 61:16 70:12 | 71:7 74:22 | 21:16,17 41:19 |
| 46:3 47:15 | 72:24 78:16 | 89:18 | 44:2 57:21 |
| 83:17 | **statements** | **stop** 36:21 | 59:14 61:10,21 |
| **speculate** 89:14 | 20:3 38:23 | **strength** 72:18 | 62:17 64:18 |
| 91:14 | 40:2 46:19 | **strictest** 66:20 | 69:5 78:25 |
| **speculating** | 59:4 60:18 | **strictly** 67:14 | 90:6 |
| 24:7 | 62:8,8 74:4,12 | **structures** | **suspending** |
| **speculation** | 74:18,23 75:11 | 67:12,23 68:2 | 58:15 |
| 88:12 89:13 | 75:25 84:11 | **study** 23:22,24 | **sustainability** |
| 91:11 | 85:15,16 86:15 | 24:12 | 4:13 53:23 |
| **spend** 14:2 | 87:9 88:3,6,24 | **stuff** 47:17 | 54:6,10,12,23 |
| **spent** 14:12,20 | 89:19 | **subject** 27:15 | 65:24,25 72:8 |
| **spoken** 11:13 | **states** 1:2 2:14 | 28:2 37:16 | 72:21 74:14,17 |
| 11:18 | 95:6 | 96:10 | 85:18 |
| **stability** 30:22 | **statistical** 26:3 | **subjected** 60:8 | **swear** 7:6 |
| 52:20 56:2 | **statistically** | **submits** 67:11 | **sworn** 7:9 95:9 |
| 58:14,19,24 | 27:2,7,19 28:6 | **submitted** | 96:17 97:20 |
| 60:11 80:3,6 | 84:6 88:9 89:6 | 22:10 24:25 | |
| 82:22 | 91:5 | **subscribed** | **t** |
| **stand** 82:2 | **statistics** 25:17 | 95:17 96:17 | |
| **standards** | **stenographic** | 97:20 | **t** 2:5,5 7:17 |
| 66:21 | 1:9 2:5 5:2 | **sufficient** 47:9 | 95:2,2 |
| **stark** 17:23 | 94:15 | 51:3 62:7,10 | **tailings** 17:25 |
| **start** 48:6 | **stenographic...** | **suggested** | 60:8 |
| **starts** 52:13 | 1:20 2:11 95:8 | 21:12,16,17 | **take** 5:12 8:10 |
| 60:5 | 95:10 96:6 | 22:2 | 88:3,6 91:4 |
| **state** 6:8,10 | **stephenson** | **suggesting** | **taken** 5:16 7:20 |
| 7:13 58:11,17 | 76:9 77:3,8 | 87:12 | 96:5 |
| 58:22 96:20 | 79:2 88:15 | **summaries** | **talk** 25:25 |
| **stated** 75:3 | 93:12 | 29:19 51:25 | 31:19 77:7 |
| | **stephenson's** | **sumon** 11:15 | **talked** 62:9 |
| | 76:6 92:20 | | **talking** 39:16 |
| | | | 39:19 45:13 |
| | | | 47:6 48:23 |

**[talking - turn]**                                                                  Page 24

78:18 85:23
**talks**  13:16
**team**  9:9 18:16
  20:19 21:14
  80:15
**technical**  17:22
  41:20
**technology**  3:4
**tell**  8:2 39:4
  43:3 48:3
  70:19
**ten**  77:12
**term**  23:22
  29:2 39:14
  40:25 44:23
  49:16
**terms**  42:19
  75:14
**testified**  7:10
**testify**  8:14
  90:14
**testimony**  22:7
  22:13,21 23:19
  94:11 95:12
  96:5,9
**tests**  86:9
**text**  20:13
  92:25 93:5
**textbook**  49:7
**thank**  7:19 8:12
  53:21 63:5
  79:11 94:5,6,8
  94:9,9
**theory**  49:17

**thiago**  3:23 7:3
**thing**  21:3
  35:21 38:21
  51:12
**things**  12:12
  17:22 18:2
  30:2 39:3
  40:20 41:13
  43:17,18,23
  46:18 53:4
  55:25 60:25
  64:22 89:12
**think**  9:18,24
  14:21 15:24
  18:10 19:10
  21:7 22:19
  23:21 24:15
  35:15 38:4
  43:8 44:20
  50:2,9,16
  53:13,16 54:18
  55:3 56:10,18
  56:23 59:9
  60:24 61:11,18
  62:4 74:3 75:7
  75:21 76:14
  77:4,14,19,22
  79:23 81:10,17
  82:4,19,22
  85:18 91:11
  92:24
**thinking**  41:6
**thinks**  77:25
**third**  2:9 3:6
  5:21 15:6

**thought**  36:9
  43:14
**three**  8:22 50:2
**tie**  45:24 46:3
  47:22
**ties**  46:21
**time**  5:10 6:8
  8:8 14:12,14
  40:12 62:15,19
  62:24 93:20,25
  94:12
**times**  7:23
  22:20 44:23
  75:15 78:15
  81:12 83:5,6
  84:4 85:8
  86:23 88:2
  89:22
**today**  6:25 8:3
  8:14,17,24 9:8
  64:5 91:15
  94:11
**together**  88:6
**told**  68:23
  83:23 84:25
  89:21
**top**  31:18 52:9
  58:6 64:9
  69:18 79:24
  86:5
**topics**  10:15,18
  23:15
**torous**  11:10,13
**total**  86:23

**totally**  59:25
**towards**  15:5
**transcript**  96:5
  96:8
**translate**  81:5
  86:19
**trees**  51:13
**true**  25:24
  26:23 27:4
  28:25 47:20
  48:21 71:15
  75:2 89:21
  93:2 95:11
  96:8,10
**truly**  87:14
**truth**  48:3
**truthfully**  8:14
  75:7
**try**  8:5,10
  29:25 35:15
  39:4
**trying**  25:18
  40:21 41:11
  43:19 47:21
  48:10 56:11
  75:8
**turn**  13:10 15:5
  33:6 44:24
  49:18 52:3
  54:3 55:2
  57:25 58:2
  60:2 66:10
  67:5 68:11
  71:20 76:20
  79:20 80:11

**[turn - video]**                                                                 Page 25

81:14 83:9
84:8
**turned** 69:14
**turns** 46:24
**two** 15:10
17:11 32:19
34:22,25 39:3
55:7 60:18
71:8,11
**type** 39:16 59:5
60:14 61:16
63:14 64:15
66:22 67:15
68:5
**typically** 24:7

**u**

**u** 7:16
**under** 7:10
15:24 20:20
55:13,13,15
66:16 67:23
80:14 83:11
96:6
**understand**
26:18 41:17
51:8 68:14
71:11,18 78:21
87:23
**understanding**
10:11 11:7
16:22 20:24
21:2 25:13
28:13 29:20
32:18 53:2
56:5 57:11

60:20 66:24
68:20 73:8,15
73:17 75:10
80:21 81:23
82:6
**understands**
29:13
**understood**
82:2
**undisclosed**
68:16 70:5,13
**undrained** 86:6
**unforeseen**
32:3
**unfortunately**
51:10
**unit** 5:14
**united** 1:2
**universe** 16:4
16:23
**unreasonable**
25:15
**unrelated**
33:12 34:15
35:13 36:3
37:5,10 78:16
**unreliable** 86:9
**untoward** 32:4
**updating** 66:19
**upstream** 18:2
52:20 58:14,16
58:19,24
**use** 39:14 40:25
44:23 45:21
49:16 63:15,25

65:10,15,18
66:6,23 83:4
85:5 92:15
93:13
**used** 16:10
45:21 47:15
51:20
**useful** 15:18
**uses** 38:19
64:10 92:12
**using** 29:2
64:21 78:21
86:6,8,15
**utility** 19:18

**v**

**vague** 29:24
**vale** 1:6 3:12,24
4:12 5:17 7:4
9:15 25:10
26:12,20 27:6
27:13,18,23
40:6,8,12 43:9
44:6,11 52:24
55:9,12 57:15
57:16 58:18,20
59:7 60:22
61:7 63:16
64:7 66:18
67:11 68:8
71:5 72:9,14
74:16 75:2,17
75:21 77:25
79:17 80:16,24
82:20 83:8,22
84:7,24,25

85:17 86:14
87:9,19 97:3
**vale's** 36:2
43:12 61:19
67:18 71:4
72:3 74:18
75:24 80:22
83:16 86:13
87:17
**valuation** 22:25
44:10 48:5
85:6
**value** 40:5
48:10,11,16,17
49:13,13 56:13
56:16 62:14
75:14,16,20
81:13 83:22
84:6 85:9
86:24 88:2
90:22 91:7,7
91:16
**values** 41:9
**variety** 41:13
43:17 46:23
**various** 88:14
**verbal** 8:6
**verified** 58:25
**veritext** 5:24
6:2
**version** 57:22
81:4
**video** 1:9 2:6
5:2,11,15
62:19,24 93:20

**[video - zone]**                                                                      Page 26

93:25 94:13,15
**videographer**
3:25 5:4,25
6:18 7:5 62:18
62:23 93:19,24
94:10
**view** 33:2 36:6
47:16 59:6,22
60:14 70:19
**views** 12:22

**w**

**wait** 36:14,20
90:11,11,11
**walter** 11:10,13
**want** 35:4 43:2
44:22 45:20
47:17 72:7
74:13 85:24
86:18
**wanted** 89:23
**wants** 46:5
**warned** 72:9,14
**warnings** 72:3
**way** 24:11
25:22 30:13
34:23 39:5
40:14 41:10
44:8 48:18,25
50:10,17 52:6
61:14 63:20,22
78:4 88:13,17
88:24 89:8,15
95:15
**ways** 46:23

**wednesday**
1:12 2:2,10
**weidner** 3:19
7:3
**went** 42:23
**whereof** 95:17
**whispering** 5:8
**window** 10:9
**wish** 12:18
**wished** 12:15
**withdrawn**
37:6 65:9
**witness** 4:3 7:2
7:6,9 22:7,14
46:9,11 73:3
94:6,9 95:7,12
95:17 96:2
**word** 63:25
64:18,24
**words** 17:8
29:7 30:6,21
31:25 35:19
48:9 60:5
61:10 63:23
69:4 70:7 81:6
**work** 21:7 24:9
33:3 76:6
**worked** 9:9
14:8,10
**working** 18:16
20:20
**works** 62:17
**world** 31:12
34:13 35:7,19
53:16

**writing** 55:8
71:19
**wrong** 32:22
**wrote** 19:8 36:8
36:12,15 49:6

**y**

**yeah** 17:7
20:14 38:6,8
39:13 40:4
62:17 70:25
74:11 77:17
87:2
**year** 53:25
67:24
**years** 11:21
90:19,21 93:4
**yesterday** 8:21
12:10,14 13:7
**york** 1:3 2:9,10
2:14 3:7,7,15
3:15 5:18,22
6:16,17 7:18
95:6,23

**z**

**zone** 46:20 61:4
71:4 77:12,18

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.