**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| IN RE VALE S.A. SECURITIES LITIGATION | Case No.: 19-cv-526-EK-SJB |

**LEAD PLAINTIFF'S REPLY MEMORANDUM OF LAW IN FURTHER
SUPPORT OF LEAD PLAINTIFF'S MOTION TO EXCLUDE
THE EXPERT TESTIMONY OF GLENN HUBBARD**

**June 14, 2024**

## TABLE OF CONTENTS

**Page(s)**

TABLE OF AUTHORITIES ................................................................................................. ii

I.      PRELIMINARY STATEMENT ................................................................................. 1

II.     HUBBARD'S TESTIMONY SHOULD BE EXCLUDED .......................................... 1

      A.      Defendants' Rebuttal Expert Testimony is Subject to the Same
        Admissibility Standards as All Other Expert Testimony...................................... 1

      B.      Defendants Failed To Provide Any Basis for Hubbard's Testimony
        Concerning Disaggregation of a Hypothetical Price Impact ................................. 3

      C.      Defendants Failed to Refute the Critical Flaws and Irrelevance of
        Hubbard's Testimony Concerning Materialization of a "Disclosed" Risk............. 6

      D.      Hubbard's Entire Report Should Be Excluded ...................................................... 8

III.    CONCLUSION.......................................................................................................... 8

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Capri Sun GmbH v. Am. Beverage Corp.*,
595 F. Supp. 3d 83 (S.D.N.Y. 2022)........................................................................ 2

*Faulkner v. Arista Recs. LLC*,
46 F. Supp. 3d 365 (S.D.N.Y. 2014)........................................................................ 2

*In re BGC Partners, Inc. Deriv. Litig.*,
2022 WL 3581641 (Del. Ch. Aug. 19, 2022) .......................................................... 1

*In re Motors Liquidation Co.*,
576 B.R. 325 (Bankr. S.D.N.Y. 2017)...................................................................... 1

*In re Panera Bread Co.*,
2020 WL 506684 (Del. Ch. Jan. 31, 2020).............................................................. 1

*In re Vivendi Universal, S.A. Sec. Litig.*,
634 F. Supp. 2d 352 (S.D.N.Y. 2009).................................................................. 3, 4

*In re Vivendi Universal, S.A. Sec. Litig.*,
765 F. Supp. 2d 512 (S.D.N.Y. 2011)...................................................................... 4

*In re Vivendi, S.A. Sec. Litig.*,
838 F.3d 223 (2d Cir. 2016)..................................................................................... 4

*Kusnier v. Virgin Galactic Holdings, Inc.*,
639 F. Supp. 3d 350 (E.D.N.Y. 2022) ..................................................................... 5

*Lentell v. Merrill Lynch & Co.*,
396 F.3d 161 (2d Cir. 2005)................................................................................. 5, 7

*LinkCo, Inc. v. Fujitsu Ltd.*,
2002 WL 1585551 (S.D.N.Y. July 16, 2002) .......................................................... 8

*Minasian v. Standard Chartered Bank, PLC*,
109 F.3d 1212 (7th Cir. 1997) ............................................................................. 1, 2

*Monroe Cnty. Employees' Ret. Sys. v. YPF Sociedad Anonima*,
15 F. Supp. 3d 336 (S.D.N.Y. 2014)........................................................................ 5

*Scott v. Chipotle Mexican Grill, Inc.*,
315 F.R.D. 33 (S.D.N.Y. 2016) ............................................................................... 8

**Other Authorities**

W. Keeton et al., *Prosser and Keeton on the Law of Torts* § 110. ................................................. 3

Restatement (Second) of Torts § 549 (Am. Law Inst. 1965)............................................................ 3

## I.    PRELIMINARY STATEMENT

Defendants expend more than a page of their opposition brief touting Glenn Hubbard's credentials—which were not challenged—rather than addressing the significant issues Plaintiff raised regarding the reliability and relevance of Hubbard's opinions. But credentials are not a substitute for a reliable analysis or relevant testimony, and Hubbard's testimony exemplifies "how vital it is that judges not be deceived by the assertions of experts who offer credentials rather than analysis." *Minasian v. Standard Chartered Bank, PLC,* 109 F.3d 1212, 1216 (7th Cir. 1997). Moreover, Hubbard's expert experience is far from "unassailable." A cursory review of his record reveals numerous cases in which his opinions have been excluded or criticized. *See, e.g.*, *In re BGC Partners, Inc. Deriv. Litig.*, 2022 WL 3581641, at *32-37 (Del. Ch. Aug. 19, 2022) (excluding Hubbard's comparable companies, regression, and DCF analyses as unreliable and "uninformative"); *In re Panera Bread Co.*, 2020 WL 506684, at *42-43 (Del. Ch. Jan. 31, 2020) (excluding his analysis as "not useful and, frankly, not credible"); *In re Motors Liquidation Co.*, 576 B.R. 325, 447–48 (Bankr. S.D.N.Y. 2017) (rejecting his opinions for being based on "isolated, subjective" evidence and an "extraordinary assumption").

Defendants' meager, partial defense of Hubbard's testimony falls far short of their burden to establish admissibility by a preponderance of the evidence and rebut Plaintiff's showing that his opinions are unreliable, speculative, and irrelevant to any disputed issue.

## II.    HUBBARD'S TESTIMONY SHOULD BE EXCLUDED

### A.    Defendants' Rebuttal Expert Testimony is Subject to the Same Admissibility Standards as All Other Expert Testimony

Defendants argue that Hubbard is not required to present any model or study in support of his testimony because his job as a rebuttal expert is only to poke holes in Plaintiff's expert's analysis. Defs.' Br. 4-5. But even rebuttal experts must present sufficient facts and data to support

1

their opinions and demonstrate by a preponderance of evidence that their opinions are reliable and relevant. "[T]he standard for a rebuttal expert witness is the same as for any expert witness, though the expert's testimony should be to 'explain, repel, counteract or disprove evidence' presented by the expert to whom he or she is responding." *Faulkner v. Arista Recs. LLC*, 46 F. Supp. 3d 365, 386 (S.D.N.Y. 2014) (citation omitted). In other words, "rebuttal experts must still meet *Daubert*'s threshold standards regarding the qualifications of the expert, sufficiency of the data, reliability of the methodology, and relevance of the testimony." *Capri Sun GmbH v. Am. Beverage Corp.*, 595 F. Supp. 3d 83, 139 (S.D.N.Y. 2022).

Hubbard's testimony is deficient not solely because he failed to back it up with a study of his own, but because he failed to back it up with *anything*—he "did not gather any data on the subject, survey the published literature, or do any of the other things that a genuine expert does before forming an opinion," *Minasian*, 109 F.3d at 1216—*and* his testimony is contrary to the evidence and the law, as discussed further in Sections B and C, below, and in Plaintiff's opening brief. Although Defendants argue that Hubbard's opinions are supported by academic literature, they cite only three paragraphs of his report, from a general section about the basic elements of out-of-pocket damages and loss causation. Defs.' Br. at 7. There is *no* academic support for Hubbard's controversial claims that the only proper damages measure is an assessment of changes in cash flow expectations based on the true versus the misrepresented probability of dam failure, or that the financial impacts of dam failure cannot be considered fraud-related. *See* Fox Decl. Ex. A at Section IV.B. (no supporting citations for opinion that damages must be assessed by failure probability delta); *id*. at Section V (no supporting citations for loss causation and damages opinions); Fox Decl. Ex. C at 48:6-23 (claiming "Econ. 101" as the basis for his opinions).[1]

---

[1] Citations to the "Fox Decl." refer to the Declaration of Frederic S. Fox in Support of Lead Plaintiff's Motion to Exclude The Expert Testimony of Glenn Hubbard dated April 19, 2024.

2

**B.      Defendants Failed To Provide Any Basis for Hubbard's Testimony Concerning Disaggregation of a Hypothetical Price Impact**

Defendants argue that Hubbard's testimony about disaggregating the hypothetical price effects of a disclosed risk is based on sound law and facts, and that Feinstein did not even attempt to disaggregate non-fraud related price effects from damages. None of these arguments withstand even minimal scrutiny.

Feinstein took the usual, appropriate measures to identify any confounding news or events that might need to be disaggregated on the corrective event dates and found none. Defs.' Ex. C at ¶¶197-198, ¶¶200-201, ¶¶203-204, ¶¶206-212. Defendants have not identified any news Feinstein missed, and do not dispute that 100% of the share price drops on the corrective event dates are attributable to the news Feinstein identified. Just like in *In re Vivendi Universal, S.A. Sec. Litig.*, 634 F. Supp. 2d 352, 370 (S.D.N.Y. 2009), "defendants do not point to an obvious competing cause on each of the eleven [corrective event] days. Instead, defendants make the novel argument that plaintiffs have failed to disaggregate damages caused by the risk from damages caused by the materialization of the risk." And just like in *Vivendi*, their arguments should be rejected here for a host of reasons: (1) "Defendants cite no case law for this argument, and the Court has not found any;" (2) "all the pieces were there" to cause the crisis early in the class period; (3) tort law on proximate causation allows both out-of-pocket damages and "pecuniary loss suffered otherwise as a consequence of the recipient's reliance upon the misrepresentation";[2] and (4) "Defendants are essentially arguing that plaintiffs should bear a risk they did not assume and that was intentionally concealed from them." 634 F. Supp. 2d at 371.

---

[2] Restatement (Second) of Torts § 549 (Am. Law Inst. 1965). Judge Holwell also noted that "Prosser and Keeton concurs, noting that plaintiffs can recover for 'losses which might be expected to follow from the fraud and from events that are reasonably foreseeable.'" 634 F. Supp. 2d at 371 (quoting W. Keeton et al., *Prosser and Keeton on the Law of Torts* § 110, at 767).

3

Nevertheless, Defendants claim that Hubbard's analysis is consistent with caselaw because a later decision in *Vivendi* endorses limiting damages to the discrepancy between the true and perceived failure probability. Defs.' Br. 6-7 (citing *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223 (2d Cir. 2016)). Not so. First, their argument is based on a discussion of how the inflation ribbon was constructed to ramp damages around the magnitude of the fraud at various points in the class period—a different issue.[3] On the issue here—whether the total amount of inflation removed by the corrective events should be attributed to the fraud—*Vivendi* endorsed attributing the total inflation to the fraud, just as Feinstein did here. 838 F.3d at 254 ("The sum of the nine negative-return days . . . was the maximum loss that investors suffered due to the market's lack of knowledge about Vivendi's true liquidity risk, which is to say the maximum artificial inflation that entered Vivendi's stock price and subsequently dissipated as the market found out about the truth."). *Vivendi* thus supports Feinstein's analysis.

Additionally, the *Vivendi* Court affirmed the district court's denial of judgment as a matter of law on loss causation grounds, approving the rejection of defendants' arguments that losses were not proximately caused by the fraud. 838 F.3d at 260-263; *see also, In re Vivendi Universal, S.A. Sec. Litig.*, 765 F. Supp. 2d 512, 555 (S.D.N.Y. 2011) (rejecting loss causation arguments that are "duplicative of arguments made at summary judgment and in defendants' motion *in limine* to exclude Dr. Nye's testimony."). Contrary to their claim, *Vivendi* undermines Defendants' arguments.

Defendants also claim that Hubbard's opinion is based on caselaw concerning the materialization of disclosed versus concealed risks (Defs.' Br. 7), but Defendants have yet to

---

[3] *Vivendi*'s holding about the inflation ribbon is also unhelpful to Defendants. In *Vivendi*, the proxy used by plaintiff's expert to estimate the true liquidity risk was the degree to which purchase accounting benefits contributed to EBITDA, which varied during the class period. Here, the potential proxies for dam risk, such as Dam 1's constant failing stability test scores throughout the Class Period, support the constant inflation applied by Feinstein.

4

acknowledge the relevant Second Circuit ruling on this point.[4] *Lentell* provides that a loss should be apportioned between a disclosed and concealed risk if "substantial indicia of the risk that materialized are unambiguously apparent on the face of the disclosures alleged to conceal the very same risk." *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 177 (2d Cir. 2005). Defendants assiduously avoid this precedent because it obliterates their argument that any portion of Plaintiff's loss need be apportioned to a "disclosed" risk of dam failure. Most of the alleged misrepresentations here did not contain *any* dam-related risk disclosures, and the risk disclosures in Vale's annual reports gave no indication (and certainly not "substantial indicia") that any of Vale's dams had failed stability tests, had unacceptable failure probabilities, or were not following international standards for dam safety management.

Defendants' purported factual basis for Hubbard's disaggregation opinion fares no better. Forced to concede that investors (and Hubbard) could not and did not model specific dam failure probabilities, Defendants now claim that what they really meant is that investors assessed the risk in broad terms like "unlikely" or "likely." Defs.' Br. at 9. Although this new interpretation is consistent with Plaintiff's view (*see* Pl.'s Br. at 7), its attribution to Hubbard is dubious considering his testimony that he needs an engineer's help to assess the failure probability. Fox Decl. Ex. C at 85:4-9. But even if it were correct, Defendants fail to explain how Hubbard expects such *qualitative* assessments to be plugged into the discounted cash flow analysis he opines must form the basis of any damages. *See* Fox Decl. Ex. A at ¶34 ("…I would expect the Alleged

---

[4] Instead, Defendants cite two opinions on motions to dismiss for the proposition that plaintiffs cannot base loss causation or damages on price drops caused by disclosed risks. Defs.' Br. 7-8. In both of those cases, there was media reporting of the specific allegedly concealed issue prior to an alleged corrective disclosure. *See*, *Monroe Cnty. Employees' Ret. Sys. v. YPF Sociedad Anonima*, 15 F. Supp. 3d 336, 357–58 (S.D.N.Y. 2014) (rejecting claim that an April disclosure first revealed the concealed risks "given the media coverage throughout January, February, and March" of the same issue); *Kusnier v. Virgin Galactic Holdings, Inc.*, 639 F. Supp. 3d 350, 381–82 (E.D.N.Y. 2022) (rejecting October 2021 alleged corrective disclosure because February 2021 corrective disclosure revealed the same design defect). These cases are plainly inapposite.

Misrepresentations . . . to have resulted in changes to investors' cash flow expectations caused by a difference between investors' assessed probability of a safety incident occurring and the 'true' probability of a safety incident occurring[.]"); Fox Decl. Ex. C at 48:9-14 (in paragraph 34 of his report, "*I'm referring to math.* So if you're trying to value a security, that value comes from changes in an investor's cash-flow expectations. It's kind of hard to argue that it misrepresented the discount rate, so they'd have to change cash-flow expectations.") (emphasis added). Hubbard never explains how any qualitative probabilities should be translated into his "math," and therefore has not provided a fully-specified model that fits the facts of the case.

Finally, even Defendants' own experts do not agree on Hubbard's absurd damages model. While Hubbard testified that his imagined risk assessment would affect cash flows, not the discount rate, Stephenson's report says quite the opposite: cash flows are only adjusted for costs "that are known or reasonably anticipated or confirmed by company management," whereas future risks or costs with an unknown value "will increase the discount rate to be applied to the DCF analysis[.]" *See* attached Decl. of Frederic S. Fox in Further Supp. of Pl.'s Mot. Exclude Hubbard ("Fox Reply Decl.") at Ex. A ¶42.[5] Again, Hubbard's model simply does not fit with the facts of how investors (and analysts) viewed Vale's risks.

### C.    Defendants Failed to Refute the Critical Flaws and Irrelevance of Hubbard's Testimony Concerning Materialization of a "Disclosed" Risk

Defendants barely address Hubbard's failure to adhere to the applicable loss causation standard, that "a misstatement or omission is the 'proximate cause' of an investment loss if the

---

[5] An analysis by another of Plaintiff's finance experts, Matthew Cain, bears out Stephenson's statement about risks impacting discount rates. Specifically, Cain reviewed the valuation adjustments analysts made after Dam 1 collapsed and found significant adjustments to the discount rate applied to Vale, and a conservative range of valuation impacts of -$3.4 billion to -$19.6 billion. *See* Fox Reply Decl. at Ex. B ¶27. Notably, the median of that range is -$11.8 billion, which, divided by Vale's 5.2 billion outstanding shares equals a per share impact of $2.26—close to the total artificial inflation of $2.72 per ADR under the traditional damages measure (for all three corrective events). Thus, even if damages were analyzed based on a discounted cash flow method, there is no reason to expect a different result.

risk that caused the loss was within the zone of risk *concealed* by the misrepresentations and omissions." *Lentell*, 396 F.3d at 173. In fact, "zone of risk" is used in only one sentence in Defendants' entire brief. They do not dispute that Hubbard's opinion does not address the zone of risk at all, or that he did not consider the alleged misstatements in reaching his opinions, or analyze the zone of risk created by them. *See* Pl.'s Br. at 8-9. Accordingly, they have failed to rebut that Hubbard's opinion is irrelevant because it does not address the relevant issue: whether the allegedly misrepresented and concealed zone of risk includes the probability of Vale incurring the financial impacts of a dam failure. It is not a "strawman" argument (Defs.' Br. 11); relevance is one of the three core requirements of admissibility, and it is missing here.

Defendants' only response is to try to explain away Hubbard's incoherent categorization of the financial consequences of a dam failure as non-fraud related even though the dam failure itself is within the zone of risk that was allegedly misrepresented. Their explanation is belied by the plain text of Hubbard's report. In Defendants' retelling, Hubbard's references to a "safety incident" includes the risk of the related financial consequences. Defs.' Br. 11. But Hubbard's Report clearly enumerates three ways Vale's share prices are impacted by Dam 1's failure, and states that "[o]nly the first category" (concerning the failure probability differential) "represents a price change due to the Alleged Misrepresentations." Fox Decl. Ex. A at ¶57. If that were not clear enough, Hubbard explicitly describes the financial consequences of dam failure as non-fraud related: "potential legal and financial liabilities and cash flow uncertainties due to, for example, operations interruptions and output reductions *resulting from the materialization of the disclosed risk that a dam could collapse* (i.e., the materialization of a previously disclosed risk)." *Id*. (emphasis added). Defendants' belated explanation that Hubbard actually meant to include the financial consequences of dam failure within the zone of risk of dam failure simply does not hold

water. And if it were true, it would strip Hubbard's report of the only stated rationale for attributing any part of the share price drop after Dam 1's collapse to a non-fraud related cause.

### D.  Hubbard's Entire Report Should Be Excluded

Defendants disingenuously suggest that Plaintiff agrees with Hubbard's critique of Feinstein's but-for world (Defs.' Br. 2), but Plaintiff explicitly criticized *Hubbard's* failure to grapple with the but-for world because he ignored the fact that "Vale's share prices would already be substantially lower *prior* to Dam 1's collapse" if "Vale had timely and truthfully disclosed what Plaintiff alleges was misrepresented and concealed[.]" Pl.'s Br. at 12. Thus, Plaintiff's motion can hardly be read as an endorsement of the four paragraphs in Hubbard's report (¶¶50-53) concerning the but-for world. Moreover, Hubbard's but-for world criticism was part of his opinion that Feinstein's damages analysis did not isolate the impact of the alleged fraud because it did not analyze the disparity between expected and true dam failure probabilities, which Plaintiff challenged as speculative, unreliable, and irrelevant. *See generally*, Pl.'s Br. at 5-12.

In any event, Hubbard's criticism that Feinstein's "vague" description of the but-for world "does not tie to Plaintiff's assertion[s] in the Complaint" (Fox Decl. Ex. A at ¶51) "does no more than counsel for [Defendants] will do in argument, *i.e.*, propound a particular interpretation" of the allegations and evidence. *LinkCo, Inc. v. Fujitsu Ltd.,* 2002 WL 1585551, at *2 (S.D.N.Y. July 16, 2002); *Scott v. Chipotle Mexican Grill, Inc.*, 315 F.R.D. 33, 48 (S.D.N.Y. 2016) ("[N]o expert may supplant the role of counsel in making argument at trial, and the role of the jury in interpreting the evidence."). And his testimony is contradicted by Feinstein's description of the but-for world, which simply inverts the alleged misrepresentations. *See* Defs.' Ex. D ¶90. Like the rest of Hubbard's report, his but-for world critique should be excluded.

### III.  CONCLUSION

For these reasons, Plaintiff's motion to exclude Hubbard's testimony should be granted.

Dated: June 14, 2024

**KAPLAN FOX & KILSHEIMER LLP**

/s/ *Frederic S. Fox*
Frederic S. Fox
Donald R. Hall
Melinda Campbell
Aaron Schwartz
Brandon Fox
Carihanna Morrison
Chang Hahn
800 Third Avenue, 38th Floor
New York, NY 10022
Telephone: (212) 687-1980
Facsimile: (212) 687-7714

*Lead Counsel for Lead Plaintiff and the Class*