# EXHIBIT B

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| In Re VALE S.A. SECURITIES LITIGATION | ) | C.A. No. 19-cv-526-RJD-SJB |
| | ) | |
| | ) | |
| | ) | |
| | ) | |

**Rebuttal Expert Report of Matthew D. Cain**

April 7, 2023

CONFIDENTIAL

## TABLE OF CONTENTS

I.      INTRODUCTION..................................................................................................................1

II.     QUALIFICATIONS .............................................................................................................1

III.    SUMMARY OF OPINIONS...............................................................................................3

IV.     FLAWS IN THE STEPHENSON REPORT .....................................................................4

        A.      SUMMARY OF MR. STEPHENSON'S ANALYSES AND
                OPINIONS..................................................................................................................4

        B.      FLAW 1: MR. STEPHENSON DOES NOT CONSIDER ALL OF
                PLAINTIFF'S ALLEGATIONS ...............................................................................6

        C.      FLAW 2: MR. STEPHENSON IGNORES EVIDENCE THAT
                ANALYSTS AND INVESTORS VIEWED INFORMATION
                RELATING TO PLAINTIFF'S ALLEGATIONS AS VALUE-
                RELEVANT. ...........................................................................................................10

        D.      FLAW 3: MR. STEPHENSON FAILS TO QUANTIFY THE
                VALUATION IMPACT OF ANALYST REVISIONS CAUSED
                BY INFORMATION RELATING TO PLAINTIFF'S
                ALLEGATIONS.......................................................................................................15

Appendix A. ................................................................................................................................18

Appendix B. ................................................................................................................................20

Exhibit 1......................................................................................................................................25

Confidential

## I.      INTRODUCTION

1.      I have been asked by counsel for Plaintiff, in the case styled *In Re. Vale S.A. Securities Litigation*,[1] to respond to the expert report of Randal Stephenson dated March 10, 2023 (the "Stephenson Report"). My time is billed at an hourly rate of $950 per hour for my work on this matter.  I am being assisted in this matter by staff from Cypress Associates LLC who have worked under my direction and supervision.  My compensation and that of the staff of Cypress Associates is in no way contingent on the outcome of this case or upon any opinions that I express.  The materials I have considered in forming my opinions are summarized in **Appendix A,** attached hereto.

2.      The analysis and opinions contained in this report are based on information available as of the date of the report.  I reserve the right to amend, refine, or supplement this report in the event that I become aware of additional information, evidence, arguments, or analyses which bear on my work on this matter.

## II.     QUALIFICATIONS

3.      I hold a Ph.D. in Finance and I am a Senior Fellow at the Berkeley Center for Law and Business at the University of California, Berkeley.  I teach courses, deliver guest lectures, participate in academic seminars, and conduct research in various topic areas related to finance, economics, accounting, law, and business.  My research focuses on a variety of topics, including empirical corporate finance, corporate governance, board independence, mergers and acquisitions, hostile takeovers, shareholder lawsuits, negotiations, financial contracting, disclosures of financial information, and shareholder activism.  I previously held a fellowship

---

[1] *In Re VALE S.A. Securities Litigation* Consolidated Class Action Complaint (the "Complaint").

Confidential                                    1

with the Harvard Law School Program on Corporate Governance, where I participated in research seminars and related activities.

4.    I worked at the U.S. Securities and Exchange Commission ("SEC") between 2014 and 2018 as a Financial Economist.  During that time, I provided economic analysis and expert witness testimony on behalf of the SEC in a wide variety of enforcement investigations, settlement negotiations and litigation, including cases alleging accounting fraud, revenue recognition practices, and disclosure violations.  I also served as an advisor to SEC Commissioner Robert J. Jackson, Jr., during which time I assisted with enforcement oversight and policymaking decisions, research, and speechwriting on a wide range of topics, including securities violations, revenue recognition practices, and corporate governance issues. Additionally, while employed at the SEC as a Financial Economist, I continued to work on and publish academic research, for which I was awarded the Chairman's Award for Economic Research.

5.    Prior to working at the SEC, I was an Assistant Professor of Finance at the University of Notre Dame.  I taught courses in Mergers and Acquisitions to both undergraduate and graduate students, and I also conducted empirical research on various finance, legal, accounting, and economic topics.  I have been engaged in academic research for over a decade and continue to publish in law reviews and peer-reviewed academic journals across these disciplines.

6.    Prior to working at Notre Dame, I received a Ph.D. in Finance from Purdue University in 2007.  Prior to those studies, I worked as an analyst in Debt Capital Markets at National City Bank, where I assisted companies in raising syndicated loans and private

Confidential                                          2

placements of debt and equity for use in funding mergers, acquisitions, and other general corporate purposes.  I received a B.S. in Finance from Grove City College in 2001.

7.     In addition to teaching at UC Berkeley, Notre Dame and Purdue, I have delivered guest lectures to undergraduate and graduate students at Vanderbilt University, Arizona State University, Cornell University, and UC Berkeley School of Law.  I have also presented my academic research at numerous academic, governmental, and professional institutions, as listed in my curriculum vitae, which is attached as **Appendix B**.

8.     I have published research in leading peer-reviewed finance, accounting, law, and economics journals, including the Journal of Financial Economics, Journal of Law and Economics, Journal of Accounting and Economics, Journal of Empirical Legal Studies, and Journal of Financial and Quantitative Analysis.  **Appendix B** further details my publications and previous testimony.

9.     In connection with my work, I have called upon the knowledge and experience gained during my professional career.  My opinions are based on my experience and expertise in finance, economics, financial reporting, and my understanding of the allegations and facts set forth in this lawsuit and are not intended to represent legal conclusions or opinions.

## III.    SUMMARY OF OPINIONS

10.     Mr. Stephenson explains that company-specific risks affect investors' valuations of a company, for example via the discount rate in a discounted cash flow (DCF) valuation analysis, through projected financials such as revenues or free cash flows in a DCF model, or through a valuation multiple in a comparable company trading multiples analysis.[2] Mr. Stephenson

---

[2] Stephenson Report, at ¶¶ 40-42.

concludes that: "The information that Plaintiff alleges was omitted would not have affected a reasonable investor's valuation of Vale."[3]

11.  Based on my experience and analysis of the materials I have reviewed in this matter, my opinions are as follows:

a) Mr. Stephenson does not consider all of Plaintiff's allegations, but instead carries out his analyses using only a few minor points contained within Plaintiff's allegations.

b) Mr. Stephenson neglects to consider evidence that analysts and investors viewed information relating to Plaintiff's allegations as value-relevant.

c) Despite opining that risks affect investors' valuations of a company, Mr. Stephenson fails to quantify the valuation impact of analysts' revisions to Vale's discount rate or trading multiple caused by information relating to Plaintiff's allegations. These revisions have an estimated valuation impact of in the billions of U.S. dollars, contradicting Mr. Stephenson's opinion that information relating to Plaintiff's allegations would not have affected a reasonable investor's valuation of Vale.

12.  The remainder of my report is organized as follows: **Section IV.A** summarizes Mr. Stephenson's analyses and opinions. I explain the flaws in his opinions in **Sections IV.B-D**.

## IV.  FLAWS IN THE STEPHENSON REPORT

### A.  Summary of Mr. Stephenson's Analyses and Opinions

13.  In the Stephenson Report, Mr. Stephenson provides a general overview of valuation methodologies for mining companies and how risk is captured in the valuation of mining companies. He explains that company-specific risks affect investors' valuations of a company, for example via the discount rate in a discounted cash flow (DCF) valuation analysis, through

---

[3] *Id.*, at ¶ 22.

Confidential                                              4

projected financials such as revenues or free cash flows in a DCF model, or through a valuation multiple in a comparable company trading multiples analysis.[4]

14.    Mr. Stephenson also explains that risk disclosures in company SEC filings and earnings calls, including those pertaining to safety events and dam failures, are typically reviewed and considered by investors, and that potential dam failures are a known and disclosed risk of investing in mining companies generally.[5] He acknowledges that Vale specifically disclosed and discussed certain risks relating to the failure of the Samarco tailings dam in SEC filings[6] and in investor calls and presentations.[7] Mr. Stephenson further acknowledges that these types of risks are important to investors as evidenced by multiple analysts' discussions of tailings dam safety, risks and liabilities, and failures.[8]

15.    However, Mr. Stephenson concludes that the information Plaintiff alleges was omitted by Defendants would not have significantly affected investors' valuation of Vale. He supports this conclusion by: a) opining that the difference between a failure risk of 1 in 10,000 versus 3 in 10,000 is negligible, translating to roughly $0.004 per share of Vale's stock price;[9] b) opining that the expected valuation impact of all ten dams in the Attention Zone failing based on their respective failure probabilities would be $0.002 per share of Vale's stock price;[10] and

---

[4] Stephenson Report, at ¶¶ 40-42.

[5] Stephenson Report, at ¶¶ 46-57.

[6] *Id.*, at ¶ 48.

[7] *Id.*, at ¶ 50.

[8] *Id.*, at ¶¶ 54-57.

[9] *Id.*, at ¶¶ 61-64. Assumes a financial impact of dam failure of $6.8 billion; multiplied by failure risk of 3 in 10,000 or 0.03%, equals $2 Million; divided by 5.1 billion shares outstanding equals $0.004 per share. Using different assumptions in ¶ 70, Mr. Stephenson calculates a per-share valuation impact of $0.00006 per share.

[10] Stephenson Report, at ¶ 71.

Confidential                                              5

opining that the "Factor of Safety" for an individual dam is not a relevant metric for typical investors and that no analysts discussed this metric in their reports on Vale.[11]

### B.    Flaw 1: Mr. Stephenson Does Not Consider All of Plaintiff's Allegations

16.    Mr. Stephenson's conclusions are flawed because he bases them on an incomplete analysis of Plaintiff's allegations. For example, the Complaint does not merely allege that Defendants should have only disclosed failure probabilities of 3 in 10,000 instead of 1 in 10,000 or a certain Factor of Safety regarding Dam 1 or other dams in the Attention Zone. Instead, my understanding of the relevant information that Plaintiff alleges was misrepresented and/or omitted includes the following:

17.    Plaintiff alleges that throughout the Class Period, Defendants misrepresented and failed to disclose material information regarding the stability of Vale's dams and the nature of Vale's dam safety and risk management practices. Specifically, the Complaint alleges four categories of material misrepresentations and omissions: (1) Defendants misrepresented the stability of Dam 1 and the risk of a catastrophic dam collapse;[12] (2) Defendants misrepresented Vale's dam safety management[13] and risk management[14] policies and practices; (3) Defendants misrepresented Vale's commitment to safety and sustainability, repeatedly touting that "life

---

[11] *Id.*, at ¶ 74.

[12] *See e.g.*, Complaint, at ¶ 150 ("In 2016, 145 dams were audited in the ferrous metals area, and the respective statements of stability conditions were filed within the deadline"); ¶ 174 (Schvartsman commenting on dam conditions in April 2018: "…today the dams are impeccable"); ¶ 189 ("…100% of the audited structures were certified to be in stable condition, physically and hydraulically."); ¶ 195 ("…all the structures in the Ferrous area are completely normal and stability-certified by the audit completed in September 2017"); ¶ 199 (Dam 1 "had a Safety Factor in accordance with the world's best practices and above the reference of the Brazilian Standard").

[13] *See e.g.*, Complaint, at ¶ 150 (detailed description of dam safety management practices and policies in 2016 Sustainability Report); ¶¶ 188-189, 191, 195 (descriptions of dam safety management in 2017 Sustainability Report).

[14] *See e.g.*, Complaint, at ¶ 138 ("We mitigate operational risk with new controls and improvement of existing ones, new mitigation plans and transfer of risk through insurance.").

Confidential                                6

matters most" and "safety is our top priority;"[15] and (4) Defendants Ferreira, Schvartsman, and Siani falsely certified that Vale's 2016 and 2017 Annual Reports disclosed all fraud and did not contain any untrue statement of material facts or any material omissions.[16]

18.    Plaintiff alleges that these statements were materially false or misleading because:

a) Vale was concealing Dam 1's instability by obtaining stability condition statements based on unreliable data that numerous experts advised Vale not to use[17] or standards for the factor of safety that were far below international best practices and expert recommendations.[18] Additionally, in some instances, Vale edited the draft audit reports of outside auditors[19] or pressured the auditors in order to obtain false stability condition statements.[20] These stability condition statements were a regulatory requirement and were not only submitted to the appropriate authority to avoid penalties but touted by the Company to investors.[21]

b) When Dam 1's stability was analyzed using only reliable data in accordance with Vale's experts' recommendations, the results were consistently far below the safety

---

[15] *See e.g.*, Complaint, at ¶ 127 (Ferreira: "[W]e are driven by our commitment to safety to people and to preserve the environment" and stating that post-Mariana, "we stood by our commitment to do what is right."); ¶ 129 ("Sustainability is one of Vale's strategic pillars" with "[z]ero harm targeted throughout all operations" and "significant progress achieved," including a 17% reduction of health and safety incidents with high potential impact).

[16] Complaint, at ¶¶ 145, 187.

[17] Silva Ex. 8 (memorandum by Scott Olson finding Dam 1's laboratory data should not be used for liquefaction analysis); Silva Ex. 15 at p. 11 (expert panel recommendation to discontinue the use of laboratory data for liquefaction analyses); Vale_Dam1_00302918_T.0001 (report analyzing Dam 1's field and laboratory data and recommending use of only field data in liquefaction studies).

[18] Silva Ex. 15 at p. 15 (expert panel recommendation to adopt factor of safety standards including 1.3 or greater for tests in the undrained (liquefaction triggering, yield shear strengths) condition); Lemos Ex. 6-E at p.7 (expert panel recommendation that Vale adopt factor of safety standard of 1.3 or greater for undrained condition).

[19] Vale_Dam1_00079086 at 148-149 (discussing edits to Dam 1's 2017 Regular Safety Inspection Report); Vale_Dam1_00293486_English at p. 44 (redlined 2017 Regular Safety Inspection Report for Dam 1); Silva Exs. 20-E and 22-E (edits to Dam 1's draft Periodic Dam Safety Review report).

[20] Vale_Dam1_00079086 at pp. 190-193; Vale_Dam1_00291548 at pp. 17-20; Silva Ex. 21-E.

[21] See fn. 12, *supra*.

Confidential                                        7

factor standard that "auditors and world practices recommend[ed],"[22] which Vale claimed to apply. Specifically, these tests calculated the following safety factors: (1) a range from 0.93 to 1.16 in July 2016;[23] (2) 1.06 in November 2017;[24] (3) 1.09 in May 2018;[25] and (4) 1.09 in September 2018.[26] A safety factor equal to 1 implies a dam failure probability of approximately 50% because it indicates that the dam's ability to resist pressure is equal to the pressure being exerted on the dam.[27]

c) On July 7, 2016, while a liquefaction study of Dam 1 was underway, Defendant Poppinga ordered an immediate shutdown of Dam 1 due to a "doubt that arose" regarding the dam and asked subordinates "to assess reinforcement measures that can be implemented in a preventive manner."[28] Internal emails confirm that the decision was based on a conversation with the contractor performing the liquefaction study, Paulo Abrao of the firm Geoconsultoria.[29] Geoconsultoria's liquefaction study found extremely low factors of safety—in the range of 0.93 to 1.16.[30] Brazil's Ministry of Economy concluded that "Vale, after the issuance and awareness of this liquefaction study prepared by Geoconsultoria, should have triggered the Emergency Action Plan

---

[22] Siani Ex. 5-E at p. 18.

[23] Expert Report of Steven H. Emerman, Ph.D. ("Emerman Rep.") at pp. 68-69; Silva Ex. 11-E at p. 10.

[24] Complaint, at ¶ 88; Emerman Rep. at p. 80; Vale_Dam1_00162143 at p. 44.

[25] Complaint, at ¶ 91; Vale_Dam1_00079086 at p. 199; see also, Silva Ex. 24-E (final report dated August 24, 2018).

[26] Complaint, at ¶ 94; Vale_Dam1_00000374_T.0001 at 0015.

[27] Complaint, at ¶ 56; Emerman Rep. at p. 30 ("A value FS = 1.0 (cusp of catastrophic failure) could be interpreted to mean . . . that the probability of catastrophic failure (the probability that the true value of the factor of safety FS is less than 1.0) is 50%.").

[28] Complaint, at ¶¶ 68-69; Poppinga Ex. 22-E.

[29] Poppinga Ex. 22-E.

[30] Emerman Rep. at pp. 68-69; Silva Ex. 11-E at p. 10.

Confidential                                8

for Mining Dams . . . at level 3, for the adoption of corrective measures in the same"[31] That is the highest level of emergency, requiring evacuation.[32]

d) Additionally, Vale conducted risk analyses of its high potential damage dams during the Class Period. Those studies indicated that in November 2017, seven dams had failure probabilities that were at or above the risk tolerance level applied by Vale's Geotechnical Risk Management group.[33] By June 2018, there were ten dams at or above that level.[34] Dam 1's highest failure probability in both studies was due to the risk of liquefaction, with estimated fatalities as high as 215 (without warning).[35]

e) After the collapse of Dam 1, an independent committee of Vale's Board of Directors conducted an investigation into the causes of the collapse, including evidence regarding the July 2016 decision to close Dam 1, and found: "In view of the information previously presented in this Report, it appears that **Vale was aware of the insufficient and fragile condition of stability at B1**. Furthermore, the evidence suggests that the determination of the shutdown did not occur due to a change in the process of beneficiation of ore for dry processing or due to information gaps about the dam, **but possibly because of a related structural safety concern at B1**."[36]

---

[31] Vale_Dam1_00187219_English at p. 153.

[32] Complaint, at ¶ 10(a); Vale_Dam1_00079086 at pp. 273-274.

[33] Vale_Dam1_00129246 at p. 18.

[34] Vale_Dam1_00064432 at p. 23.

[35] Vale_Dam1_00065199_English at p. 102 ("The highest probability of rupture found for Dam I was obtained for liquefaction failure mode (1x10-4)[.]"); Vale_Dam1_00129246 at p. 14 (loss of life without alert at or above 200); Vale_Dam1_00069607 at p. 7 ("[T]he most probable failure mode for Dam I **liquefaction with a failure probability equal to $3x10^{-4}$.**") (emphasis in original) and p. 10 (estimated fatalities).

[36] Vale_Dam1_00079086 at p. 264 (emphasis in original).

Confidential                                          9

19.   Mr. Stephenson's analyses did not consider the full set of Plaintiff's allegations. For example, taking Mr. Stephenson's per-share valuation analysis and instead using an alleged 50% failure rate (which falls within several of the Factor of Safety ranges contained within Plaintiff's allegations above), would produce a financial impact of $3.4 billion, or $0.67 per Vale share.[37] In summary, Mr. Stephenson's opinion that "information that Plaintiff alleges was omitted would not have affected a reasonable investor's valuation of Vale" is ultimately irrelevant because he neglects to consider and evaluate all of the information that Plaintiff alleges was misrepresented and/or omitted.

### C.   Flaw 2: Mr. Stephenson Ignores Evidence that Analysts and Investors Viewed Information Relating to Plaintiff's Allegations as Value-Relevant.

20.   In the Stephenson Report, Mr. Stephenson explains that company-specific risks affect investors' valuations of a company, for example via the discount rate in a discounted cash flow (DCF) valuation analysis, through projected financials such as revenues or free cash flows in a DCF model, or through a valuation multiple in a comparable company trading multiples analysis.[38] I also agree that company-specific risks are an important valuation consideration among investors and that these risks can be accounted for in valuation analyses. Yet in constructing an overly narrow word search for "Factor of Safety" or "Safety Factor" among analyst reports, Mr. Stephenson fails to identify and consider evidence that analysts and investors viewed information relating to Plaintiff's allegations as value-relevant.

21.   If Plaintiff's allegations are correct, then Vale misled investors regarding the Company's dam safety management and risk management policies and practices. As Mr.

---

[37] $6.8 billion multiplied by 50% failure probability equals $3.4 billion. $3.4 billion divided by 5.1 billion shares equals $0.67 per share.

[38] Stephenson Report, at ¶¶ 40-42.

Stephenson acknowledges in the Stephenson Report, these types of risks and practices affect a company's valuation through their impact on projected financials such as revenues, cash flows and EBITDA, capital expenditures, cost of equity, cost of debt, discount rates, and valuation multiples.[39] In order to evaluate whether investors and analysts considered the alleged misstatements and/or omissions to be value-relevant, one would need to do more than simply search for the terms "Safety Factor" and "Factor of Safety" in analyst reports. Plaintiff's allegations would necessarily lead to foreseeable financial consequences and valuation impacts, including mining permits, operations, production capacity, revenues, cash flows and EBITDA, capital expenditures, discount rates, and valuation multiples. Mr. Stephenson fails to consider this evidence in his key word search of analyst reports.

22.    Professor Feinstein documents numerous examples of Vale disclosures in SEC filings, as well as analysts and investors discussing the value-relevance of these types of information disclosures in his report.[40] For brevity I do not repeat them here, but note that they clearly demonstrate the flaws in Mr. Stephenson's conclusion that "information that Plaintiff alleges was omitted would not have affected a reasonable investor's valuation of Vale." I further note that Professor Feinstein documents negative and statistically significant declines in Vale's securities prices upon the revelation of the information that Plaintiff alleges was misrepresented and/or omitted to investors, further demonstrating the importance of this information to investors' valuation of Vale.[41]

---

[39] *Id.*, at ¶¶ 31; 36-42; 45.

[40] Report on Loss Causation and Damages, Professor Steven P. Feinstein, Ph.D., CFA, March 10, 2023 ("Feinstein Report"), at ¶¶ 44-98; 123-125.

[41] Feinstein Report, at ¶¶ 126-187.

Confidential                                          11

23.    Moreover, numerous analysts discussed the import of information relating to Plaintiff's allegations, both in terms of new concerns regarding safety issues, as well as the impact of this information on financial metrics such as production, capital expenditures, discount rates, etc. For example:

> **_BTGPactual_**: ...Since Samarco, **_Vale invested in a series of measures to inspect and ensure that existing operations were safe, so we were truly caught by surprise with this event_**...In our view, this incident will end up lifting risk perception surrounding the case and should continue pressuring the stock for a while… Considering this is the second incident in a few years, our view is that pressure from society could rise to unprecedented highs to guarantee safer operations for the industry and communities going forward. Clearly, **_the question that now appears is: can we run tailings dams safely, especially those close to communities?_**... We would also expect an energetic response from management on investigating all tailings dams in operation, and we are unsure on what the new production guidance will look like.[42]

> **_Barclays_**: The market has dramatically de-rated Vale shares in the aftermath of the Feijão dam tragedy on Friday. We consider a variety of financial impacts on Vale's NPV: fines announced, closure of Feijão mine, total environmental liability, indefinite delay to Samarco restarting and an assumed **_10% de-rating of the equity to reflect heightened ESG risk on stock-specific volatility and beta… Overall therefore we would expect increased volatility, higher discount rate and specific ESG-driven selling to lead to Vale de-rating_**.[43]

> **_Santander_**: DCF valuation. On new forecasts and an **_increase in the assumption for weighted average cost of capital (WACC) to 11.1% from 9.7% given company specific risks_**, we are reducing our 2019E target price to US$16/ADR (R$60.80/share) from US$19/ADR (R$71.30/share). **_Our valuation model does not incorporate payments and costs for repairs/indemnities of the Brumadinho dam breach_**.[44]

> **_UBS_**: What will be or what are investors already asking? 1. What is the short term iron ore production risk, if any? 2. Is there an overhang risk to the outstanding >US$40bn Samarco civil claim settlement? 3. What is the overhang risk to the timing of Samarco's restart? 4. As this is the second major spill, is the monetary and legal overhang risk higher than Samarco? 5. **_What is the future risk to Vale's production that's supported by tailings dams_** (e.g. Southern Systems)? 6. **_Other than regular inspections, what measures, if any, did management take on Vale's entire tailings complex, e.g._**

---

[42] BTGPactual, "Vale: Tailings Dam Failure; More questions than answers….," January 27, 2019 (emphasis added).

[43] Barclays, "Vale: Picking up the pieces," January 28, 2019 (emphasis added).

[44] Santander, "Vale: Incorporating the Impacts of Recent Developments; Visibility Remains Low," February 8, 2019 (emphasis added).

*reinforced concrete installations, post Samarco?* 7. What is the overhang risk to management??[45]

*BMO Capital Markets*: Reflecting this, we are downgrading Vale shares to Market Perform, but note that non-financial considerations could lead to substantial near-term selling pressures on the stock. Considerations include, a) morale positions, b) ESG score based selling, c) *concerns regarding other dams in Vale's portfolio*, and d) *the impact of increased safety checks on ongoing operations* and repercussions with regard to sustaining production levels.[46]

*HSBC*: We are downgrading Vale to Hold as we expect the fallout from this accident to act as a significant headwind in the coming months, with potential impact on production, lawsuits, remediation charges and other unknown liabilities… We have incorporated USD3.5bn in additional liabilities related to the dam failure, *as well as increasing our discount rate (from 8.9% to 9.4%) in order to capture increased uncertainty surrounding Vale's liabilities and production*.[47]

*Citi*: Vale announced today that the company will end the use of upstream tailings dams in Brazil. *This is an important step and appropriate, in our view. Most important, this should improve safety.* Upstream dams are generally considered less stable than downstream; and both Feijao and Samarco were upstream. Chile bans the use of upstream due to seismic risk, although they are legal in all other countries we are aware of. Brazil regulators had already discussed ending use of upstream dams post-Samarco. Vale is likely getting ahead of future regulation which seems prudent.[48]

*Societe Generale*: The collapse of the Brumadinho dam so soon after a similar disaster at Vale's 50%-owned Samarco in late 2015 will have lasting consequences for the company, in terms of image, financial impact and future mining processes. *We are adjusting our estimates to take into account the impact of lost iron ore production and the financial costs associated with these closures and the necessary investments required to eliminate future potential similar risks*.[49]

*BB Investimentos*: About the assumptions on Vale's valuation. We stressed our model with the new data available in order to incorporate the possible outcomes from the disaster that has *translated into a higher risk perception on Vale's shares*… CAPEX: *we*

---

[45] UBS, "Vale: Erratum: What are investors asking?" January 27, 2019 (emphasis added).

[46] BMO Capital Markets, "Vale S.A.: Downgrade to Market Perform; Failed Dam Certified Safe but Concerns Abound," January 28, 2019 (emphasis added).

[47] HSBC, "Vale: [Correction] Downgrade to Hold: Another dam collapses," January 27, 2019 (emphasis added).

[48] Citi, "Vale: Alert: Feijao Dam Tragedy – Vale To End Use Of Upstream Tailings Dams," January 29, 2019 (emphasis added).

[49] Societe Generale, "Vale: Resilient in the face of tragedy," March 7, 2019 (emphasis added).

Confidential                                             13

*consider an addition of US$ 1.4 bn in capex* to be disbursed throughout the next 3 years, starting in the 2H of this year…[50]

**_Deutsche Bank_**: Overall our Vale NPV has reduced $7.8bn or $1.51/sh impacted by assumed liabilities, *capex for decommissioning of further tailings dams* and timing of cashflow. Our PT set at ~1x NPV has decreased from $15.0/sh to $13.5/sh. While this PT shows moderate upside to the current share price, we believe it will take at least 12 months and possibly longer before the market is willing to pay *fair value for Vale given the overhang from regulatory risk/uncertainty*. We maintain a Hold and do not see favorable risk/reward at this point in time.[51]

**_RBC Capital_**: The uncertainty facing the company remains elevated in our view. Potential impact from ESG focused investors, uncertainty around growth potential, current operational cost and productivity outlook under potentially revised regulations, and (rightly or wrongly) whether management will be able navigate the Brumadinho tailings disaster, sees us *decrease our target multiple for Vale from 4.5x EV/EBITDA to 3.5x EV/EBITDA*. On a fundamental basis, Vale's single-country, and single commodity concentration already see our base risking at the lower end of peers, however we now expect a further discount will be applied. We reduce our target NAV multiple from 0.8x to 0.7x. We decrease our target price to $9.00/t from $11.00 and re-iterate our Underperform recommendation.[52]

24.    As can be seen from the analyst commentary summarized above, analysts and investors clearly viewed information relating to Plaintiff's allegations as value-relevant. Mr. Stephenson neglects to consider this evidence when reaching his conclusions based on narrow word searches among analyst reports for "Factor of Safety" and "Safety Factor".  In the following section, I demonstrate that analyst revisions caused by information relating to Plaintiff's allegations can be easily quantified and demonstrates the value-relevance of such information.

---

[50] BB Investimentos, "Vale: New comments on Brumadinho disaster and new assumptions," February 1, 2019 (emphasis added).

[51] Deutsche Bank, "Vale: Feijao update: Revising price and volumes – remaining a fluid situation," January 30, 2019 (emphasis added).

[52] RBC Capital, "Vale S.A.: Fallout from Brumadinho weighs on investment Case," February 4, 2019 (emphasis added).

**D.      Flaw 3: Mr. Stephenson Fails to Quantify the Valuation Impact of Analyst Revisions Caused by Information Relating to Plaintiff's Allegations**

25.     I agree with Mr. Stephenson's opinion that company-specific risks affect investors' valuations of a company, for example via the discount rate in a discounted cash flow (DCF) valuation analysis, through projected financials such as revenues or free cash flows in a DCF model, or through a valuation multiple in a comparable company trading multiples analysis.[53] As summarized above, numerous analysts revised their ratings, recommendations, valuations, and discussions of Vale as a result of the information relating to Plaintiff's allegations. Yet Mr. Stephenson fails to evaluate and quantify the value-relevance of such revisions when forming his opinions. In this section, I demonstrate that a conservative valuation analysis of analyst revisions to Vale's discount rate or trading multiple as a result of information relating to Plaintiff's allegations translates into valuation impacts worth billions of U.S. dollars. This quantification is conservative because it does not consider analyst reductions to free cash flow projections (potential lower production and revenues, increased capital expenditures, etc.).[54]

26.     To illustrate this, consider the valuation model changes by Santander in an analyst report on February 8, 2019: "On new forecasts and an increase in the assumption for weighted average cost of capital (WACC) to 11.1% from 9.7% given company specific risks, we are reducing our 2019E target price to US$16/ADR (R$60.80/share) from US$19/ADR (R$71.30/share). Our valuation model does not incorporate payments and costs for

---

[53] Stephenson Report, at ¶¶ 40-42.

[54] Some portion of analyst reductions to free cash flow projections relates to information about Plaintiff's allegations while some portion relates to the realization of the risk of dam failure. For example, following the Dam 1 failure, several analysts included in their valuation models an extra $10 billion for liabilities relating to this failure. My estimates in this section are conservative because they do not include any valuation reductions relating to the portion of reduced free cash flow projections relating to Plaintiff's allegations.

repairs/indemnities of the Brumadinho dam breach."[55] Santander increased the discount rate on Vale in its DCF model by 140 basis points, and further noted that its updated valuation model did not include direct costs relating to the Dam 1 failure. In this section, I quantify the valuation impact of this increase in the discount rate, holding all other DCF model inputs constant, to assess the value-relevance of information relating to Plaintiff's allegations.

27.    **Exhibit 1** presents the valuation impacts from several analysts' valuation models based on their updated discount rates (for DCF analysis) or updated valuation multiples (for trading multiples valuation analysis). As can be seen in this exhibit, the valuation impacts range from -$3.4 billion to -$19.6 billion. For example, the value impact from Santander's discount rate change, which explicitly does <u>not</u> include direct costs of the Dam 1 failure, has a value impact of -$16.4 billion. This translates into a per-share value impact for Vale of $3.15 (based on 5.2 billion shares outstanding on the valuation date).[56]

28.    Mr. Stephenson opines that company-specific risks affect investors' valuations of a company, for example via the discount rate in a discounted cash flow (DCF) valuation analysis, through projected financials such as revenues or free cash flows in a DCF model, or through a valuation multiple in a comparable company trading multiples analysis.[57] Quantifying this value impact demonstrates that information relating to Plaintiff's allegations was clearly value-relevant for analysts and investors. This evidence thus refutes Mr. Stephenson's opinion that "The

---

[55] Santander, "Vale: Incorporating the Impacts of Recent Developments; Visibility Remains Low," February 8, 2019, page 7.

[56] As quoted above and based on a different valuation date of December 31, 2019, Santander estimated a target price per share for Vale of $16, down $3 per share from its prior estimate of $19.

[57] Stephenson Report, at ¶¶ 40-42.

information that Plaintiff alleges was omitted would not have affected a reasonable investor's valuation of Vale."[58]

Respectfully submitted,

Matthew D. Cain

---

[58] *Id.*, at ¶ 22.

**APPENDIX A.**

# Documents Considered

**Court Documents and Expert Reports:**

Expert Report of Randal Stephenson, Related Exhibits, and Backup Materials

Expert Report of Steven H. Emerman, Ph.D. and Related Exhibits

*In Re VALE S.A. Securities Litigation* Consolidated Class Action Complaint

Lemos Exhibit 6-E

Poppinga Exhibit 22-E

Siani Exhibit 5-E

Silva Exhibits 8, 11, 15, 20-E, 21-E, 22-E, 24-E

Report on Loss Causation and Damages, Professor Steven P. Feinstein, Ph.D., and Related Exhibits

**Production Documents:**

Vale_Dam1_00000374_T.0001

Vale_Dam1_00064432

Vale_Dam1_00065199_English

Vale_Dam1_00069607

Vale_Dam1_00079086

Vale_Dam1_00129246

Vale_Dam1_00162143

Vale_Dam1_00187219_English

Vale_Dam1_00291548

Vale_Dam1_00293486_English

Vale_Dam1_00302918_T.0001

**Equity Research Reports**

Bank of America, "Vale: News Flow a Risk, but Long-Term FCF Story Intact; Resuming at Neutral," February 5, 2019.

Barclays, "Vale: Picking up the pieces," January 28, 2019.

BB Investimentos, "Vale: New comments on Brumadinho disaster and new assumptions," February 1, 2019.

Confidential                                                18

BMO Capital Markets, "Vale S.A.: Downgrade to Market Perform; Failed Dam Certified Safe but Concerns Abound," January 28, 2019.

BTGPactual, "Vale: A Sensible Plan in Place," January 30, 2019.

BTGPactual, "Vale: Tailings Dam Failure; More questions than answers….," January 27, 2019.

BTG Pactual, "Vale: US$100bn market cap? Yes, conviction levels still high," January 7, 2019.

Citi, "Vale: Alert: Feijao Dam Tragedy – Vale To End Use Of Upstream Tailings Dams," January 29, 2019.

Citi, "Vale: Alert: Tragedy Strikes Again," January 27, 2019.

Citi, "Vale: Lowering Iron Ore Production Forecasts and Target Price," February 7, 2019.

Deutsche Bank, "Vale: Feijao update: Revising price and volumes – remaining a fluid situation," January 30, 2019.

HSBC, "Vale: [Correction] Downgrade to Hold: Another dam collapses," January 27, 2019.

Itau BBA, "Vale: The Aftermath of Brumadinho – Our Base-Case Scenario," January 29, 2019.

JP Morgan, "Vale: Management Plan Starts to Address Key Uncertainties - Positive," January 29, 2019.

JP Morgan, "Vale: Model Update," January 17, 2019.

Morgan Stanley, "Vale: Feijao Dam Accident Update," January 27, 2019.

Morgan Stanley, "Vale: Feijao Dam Accident Update #2," January 30, 2019.

RBC Capital, "Vale S.A.: Fallout from Brumadinho weighs on investment Case," February 4, 2019.

Santander, "Vale: Incorporating the Impacts of Recent Developments; Visibility Remains Low," February 8, 2019.

Societe Generale, "Vale: Resilient in the face of tragedy," March 7, 2019.

UBS, "Vale: Erratum: What are investors asking?" January 27, 2019.

**All other data and documents cited or referred to within this report.**

**APPENDIX B.**

## Matthew D. Cain, Ph.D.                                          April 2023

E-mail: mdcain@outlook.com                                    Homepage
Mobile: 574-485-8065                                                SSRN

### Education

Ph.D., Finance, August 2007                 Purdue University, West Lafayette, IN
B.S., Finance, May 2001                     Grove City College, Grove City, PA

### Professional and Academic Experience

*Senior Fellow*, Berkeley Center for Law and Business, 2019-Present

*Visiting Scholar*, Vanderbilt Law School, 2021-2022

*Senior Visiting Scholar*, Berkeley Law School, University of California, 2019-2021

*Visiting Research Fellow*, Harvard Law School Program on Corporate Governance, 2018-2019

*Advisor to Commissioner Robert J. Jackson, Jr.*, U.S. Securities and Exchange Commission, 2018

*Economic Fellow / Financial Economist*, Office of Litigation Economics, Division of Economic and Risk Analysis, U.S. Securities and Exchange Commission, 2014-2018

*Assistant Professor of Finance*, Mendoza College of Business, University of Notre Dame, Notre Dame, IN, 2008-2014

*Visiting Faculty*, Krannert School of Management, Purdue University, West Lafayette, IN, 2007-2008

*Analyst*, Debt Capital Markets, National City Bank, Cleveland, OH, 2001-2003

### Publications in the Last Ten Years

Does Voluntary Financial Disclosure Matter? The Case of Fairness Opinions in M&A (with Adam B. Badawi and Steven Davidoff Solomon), *Journal of Law and Economics*, forthcoming.

Retail Shareholder Participation in the Proxy Process: Monitoring, Engagement and Voting (with Alon Brav and Jonathon Zytnick), *Journal of Financial Economics* 144, 492-522 (2022).

Does *Revlon* Matter? An Empirical and Theoretical Study (with Sean J. Griffith, Robert J. Jackson, Jr., and Steven Davidoff Solomon), *California Law Review* 108, 1683-1731 (2020).

Intermediation in Private Equity: The Role of Placement Agents (with Stephen B. McKeon and Steven Davidoff Solomon), *Journal of Financial and Quantitative Analysis* 55, 1095-1116 (2020).

Confidential                    20

Mootness Fees (with Jill E. Fisch, Steven Davidoff Solomon, and Randall S. Thomas), *Vanderbilt Law Review* 72, 1777-1816 (2019).

The Myth of Morrison: Securities Fraud Litigation Against Foreign Issuers (with Robert Bartlett, Jill E. Fisch, and Steven Davidoff Solomon), *The Business Lawyer* 74, 967-1013 (2019).

The Shifting Tides of Merger Litigation (with Jill E. Fisch, Steven Davidoff Solomon, and Randall S. Thomas), *Vanderbilt Law Review* 71, 603-640 (2018).

Do Takeover Laws Matter? Evidence from Five Decades of Hostile Takeovers (with Stephen B. McKeon and Steven Davidoff Solomon), *Journal of Financial Economics* 124, 464-485 (2017).

CEO Personal Risk-Taking and Corporate Policies (with Stephen B. McKeon), *Journal of Financial and Quantitative Analysis* 51, 139-164 (2016).

How Corporate Governance Is Made: The Case of the Golden Leash (with Jill E. Fisch, Sean J. Griffith, and Steven Davidoff Solomon), *University of Pennsylvania Law Review* 164, 649-702 (2016).

A Great Game: The Dynamics of State Competition and Litigation (with Steven Davidoff Solomon), *Iowa Law Review* 100, 465-500 (2015).

Broken Promises: Private Equity Bidding Behavior and the Value of Reputation (with Antonio J. Macias and Steven Davidoff Solomon), *Journal of Corporation Law* 40, 565-598 (2015).

Information Production by Investment Banks: Evidence from Fairness Opinions (with David J. Denis), *Journal of Law and Economics* 56, 245-280 (2013).


**Presentations**

- All Indiana Conference
- American Bar Association, Business Law, Private Equity M&A Subcommittee meeting
- American Finance Association, annual meetings
- American Law and Economics Association, Stanford Law School
- American Law and Economics Association, University of Chicago
- Argentum Centre for Private Equity Symposium, Bergen, Norway
- Argentum Conference and Symposium on "Private Equity: The Road Ahead," Stockholm, Sweden
- Arizona State University College of Law
- Berkeley Center for Law and Business
- The Brattle Group
- Conference on Empirical Legal Studies, Yale Law School
- Cornell University, finance class guest lectures
- Cornerstone Research
- Financial Management Association, annual meeting
- George Washington University Law School
- Indiana University
- Institute for Law and Economics, University of Pennsylvania

- Ohio State
- Ohio University
- Oxera, London
- Penn State
- Purdue Alumni Conference
- Purdue University
- U.C. Berkeley M&A Roundtable, New York
- U.C. Berkeley School of Law
- U.S. Securities and Exchange Commission
- University of Arizona
- University of Colorado
- University of Florida
- University of Georgia
- University of Kentucky
- University of North Carolina at Chapel Hill
- University of Notre Dame
- University of Oregon
- University of Pittsburgh
- Vanderbilt University Law School
- Virginia Commonwealth University
- Virginia Tech
- Western Finance Association, annual meeting

**Journal Referee**: *Review of Financial Studies*, *Journal of Financial and Quantitative Analysis*, *Journal of Corporate Finance*, *Journal of Banking and Finance, European Financial Management, Journal of Empirical Legal Studies, Financial Management, North American Journal of Economics and Finance, International Review of Law & Economics, Managerial and Decision Economics*, *Annals of Finance, Journal of Economics and Business*

**Teaching Experience**

UC Berkeley School of Law
   LAW 246.31:  Economic Expert Witnesses: Depositions and Testimony, Spring 2022-2023
   LAW 251.52:  Economics of Corporate and Securities Litigation, Fall: 2020-2022

University of Notre Dame, Mendoza College of Business
   FIN 70400:  Corporate Restructuring, Mergers & Acquisitions (MBA Elective), Fall: 2008-2013
   FIN 40410:  Mergers and Acquisitions, Fall: 2008-2013

Purdue University, Krannert School of Management
   MGMT 412: Financial Markets and Institutions, Spring: 2006 & 2008
   MGMT 610: Financial Management I (MBA Core), Fall: 2007

**Expert Testimony in the Last Four Years**

- *In re: CBL & Associates Properties, Inc. Securities Litigation*, Case No. 1:19-cv-00181-JRG-CHS (E.D. Tenn.). Deposition October 2022.

- *Delaware County Employees Retirement System, et al. v. AdaptHealth Corp. f/k/a DFB Healthcare Acquisitions Corp., et al.*, Case No. 2:21-cv-03382-HB (E.D. Pa.). Deposition February 2023.

- *In re: QuantumScape Securities Class Action Litigation*, Case No. 3:21-cv-00058-WHO (N.D. Ca.). Deposition September 2022.

- *Bond v. Clover Health Investments, Corp., et al.*, Case No. 3:21-cv-00096 (M.D. Tenn.). Deposition August 2022.

- *Zachary E. Gerut, v. Biospecifics Technologies Corp. and Endo International PLC*, Case No. 01-21-0002-2009 (Amer. Arb. Assoc.). Arbitration March 2022.

- *In re: Under Armour Securities Litigation*, Case No. RDB-17-388 (D. Md.). Deposition December 2021.

- *Securities and Exchange Commission v. Anatoly Hurgin, et al.*, Case No. 1:19-cv-05705 (S.D. Ny). Deposition December 2021.

- *In re: Oracle Corporation Derivative Litigation*, Case No. 2017-0337-SG (Del. Chancery). Deposition November 2021. Trial July-August 2022.

- *John Alberici, et al. v. Recro Pharma, Inc., et al.*, Case No. 2:18-cv-02279-MMB (E.D. Pa.). Deposition October 2021.

- *Securities and Exchange Commission v. Christopher Clark and William Wright*, Case No. 1:20-cv-01529 (E.D. Va.). Trial December 2021.

- *In re: Purdue Pharma L.P., et al., Debtors* (Chapter 11), Case No. 19-23649 (RDD) (U.S. Bankruptcy Court, S.D. Ny). Confirmation Hearing August 2021.

- *Abu Dhabi Investment Authority v. Mylan N.V. and Mylan Inc.*, Case No. 1:20-cv-01342 (S.D. Ny). Deposition August 2021.

- *International Brotherhood of Electrical Workers Local 98 Pension Fund, et al. v. Deloitte & Touche, LLP and Deloitte LLP*, Case No. 3:19-cv-3304 (D. Sc.). Deposition September 2021.

- *Securities and Exchange Commission v. James Wallace Nall, III, et al.*, Case No. 2:19-cv-702-TFM-C (S.D. Al.). Deposition June 2021.

- *Mark Stoyas, et al., v. Toshiba Corporation*, Case No. 2:15-cv-04194-DDP(JCx) (C.D. Ca.). Deposition May 2021.

- *Plymouth County Retirement System, et al. v. Patterson Companies, Inc., et al.*, Case No. 0:18-cv-00871-MJD-HB (D. Mn.). Deposition March 2021.

Confidential                                        23

- *In re Novo Nordisk Securities Litigation*, Case No. 3:17-cv-00209-BRM-LHG (D. Nj.). Deposition February 2021.

- *Securities and Exchange Commission v. Avent*, Case No. 1:16-cv-02459-WMR (N.D. Ga.). Jury Trial August 2019.

**EXHIBIT 1.**

**Valuation Impact – Summary**

*($ in millions)*

| | | | | |
|---|---|---|---|---|
| **DCF Valuation Impact - Change in Discount Rate** | | | | |
| Date | Analyst | Δ in Discount Rate | Impact on Enterprise Value | Reasons for Change |
| 1/27/2019 | HSBC | -0.5% | ($11,424) | "We are downgrading Vale to Hold as we expect the fallout from this accident to act as a significant headwind in the coming months, with potential impact on production, lawsuits, remediation charges and other unknown liabilities. ...We have incorporated USD3.5bn in additional liabilities related to the dam failure, as well as increasing our discount rate (from 8.9% to 9.4%) in order to capture increased uncertainty surrounding Vale's liabilities and production." |
| 1/29/2019 | JP Morgan | -1.5% | ($13,763) | "Lastly, we increase our equity risk premium by 1.5% to incorporate higher risks and uncertainties related to the Brumadinho incident." |
| 1/30/2019 | Banco BTG Pactual | -1.0% | ($14,174) | "Given that we now have a reasonable basis to start the revision process, we have decided to adjust our valuation model. (1) We are cutting total iron ore volumes by 20-25Mt through 2021 (more aggressive than Vale's current "guidance"); (2) slightly increasing our IO curve to US$70/t through 2020 (from US$67/t); (3) slightly reducing quality premiums given the recent erosion; (4) adjusting our capex for the R$5bn decommissioning of upstream dams + US$1/t of additional maintenance capex (for conservative reasons); (5) increasing our discount rate to reflect higher risk premiums and cost of debt; (6) arbitrarily assuming US$5bn outflows for fines/other items; (7) assuming 0 dividends in 2019 and returning to some dividends in 2020 and beyond. Given all the revisions described above, we are making relevant adjustments to our TP and cutting EBITDA estimates over 3-4 years by 15%-20% on average. It's still important to say that there is very little visibility on several parameters in our model, which reduces our conviction materially. We now see the stock at 4.1x EBITDA 19, and would expect the process of de-rating to persist in the interim. We are assuming dividends are suspended in 2019." |

Notes:
Analysis reflects valuation impact of a change in discount rate or a change in the EV/EBITDA multiple only, holding all other model assumptions constant.

**Exhibit 1: Valuation Impact – Summary**

*($ in millions)*

| | | Δ in Discount Rate | Impact on Enterprise Value | |
|---|---|---|---|---|
| | | | **DCF Valuation Impact - Change in Discount Rate** | |
| Date | Analyst | | | Reasons for Change |
| 1/30/2019 | Morgan Stanley | -0.3% | ($3,788) | "Minimal impact on EBITDA...and valuation. *Excluding* any payments or liabilities related to the tragic Feijao dam accident, the market cap loss from the announced decommissioning plans should be small. Our DCF valuation is now US$18.5/share (vs. US$18.9 before) and our multiple valuation approach using 11.1x - 1/2 std. deviation above the historical average P/E multiple due to our commodities team's 2020 iron ore forecast (US$57.3) below their long-term forecasts (US$62.6) - on our new 2020e EPS is US$14.3 (vs US$15.1)... We are putting our price target under review given the uncertainty around the Feijao dam failure and the ultimate amount of liabilities that the company could potentially face..." |
| 2/5/2019 | Bank of America | -1.5% | ($19,585) | "Our US$13 (R$48) 12-month price objective is based on SOTP DCF which assumes a 15% discount to our 5.5x 2019E EV/EBITDA multiple, 150bp added to our WACC for DCF calculation purposes (terminal growth 2.5% and WACC of 10.8%) in addition to the US$5B outlay assumed. The discount seems deserved for mainly due to: 1) a less attractive dividend yield/buyback thesis near term, 2) potential change in investor base given lack of dividend and ESG concerns, and 3) continued uncertainty over volume and costs." |
| 2/8/2019 | Santander | -1.4% | ($16,391) | "We believe the many uncertainties that appear in Vale's investment case for the coming months, coupled with the dam breach in Brazil, the second in a three-year period, reduces the potential for a re-rating in company's valuation multiples and increases the likelihood of an increase in the discount to the peers, at least for the short term. On new forecasts and an increase in the assumption for weighted average cost of capital (WACC) to 11.1% from 9.7% given company specific risks, we are reducing our 2019E target price to US$16/ADR (R$60.80/share) from US$19/ADR (R$71.30/share). Our valuation model does not incorporate payments and costs for repairs/indemnities of the Brumadinho dam breach." |

Notes:

Analysis reflects valuation impact of a change in discount rate or a change in the EV/EBITDA multiple only, holding all other model assumptions constant.

**Exhibit 1: Valuation Impact – Summary**

*($ in millions)*

| | | Δ in EBITDA Multiple | Impact on Enterprise Value | |
|---|---|---|---|---|
| **Valuation Impact - Change in EV/EBITDA Multiple** | | | | |
| Date | Analyst | | | Reasons for Change |
| 1/29/2019 | Itau BBA | -0.2x | ($3,358) | "We updated our Vale model to incorporate our base case scenario, and we reduced our YE19 target price to USD 15.5/VALE (BRL 58/VALE3) from USD 17/VALE (BRL 71/VALE3)… Our base-case scenario. For this exercise, we separate the negative impact from the Brumadinho dam accident for Vale into three main areas: i) the compensation for lost lives, damage repairs and environmental remediation actions; ii) a multiple de-rating; and iii) regulatory changes forcing the end of wet-processing operations in Brazil (not considered in our base case). For the compensation, our base case assumes that total fines and compensation for the accident would reach BRL 17 billion, more than the total expected compensation for the Samarco accident in 2015 (BRL 15 billion), despite the fact that the mine waste volume spillover in that case was four times larger than at Brumadinho. We are also incorporating a 0.2x EV/EBITDA de-rating for Vale to account for lower earnings predictability, the risk of management change and a reduced investor base, as ESG and dividend investors are unlikely to buy the stock in the short term." |
| 2/4/2019 | RBC Capital | -1.0x | ($14,620) | We update our forecasts for the above production profile, remove Samarco restart from our numbers (which was only marginally profitable over the 2020-22 years anyhow). We add the new price deck and make the $10bn adjustment for provisional litigation impacts. The uncertainty facing the company remains elevated in our view. Potential impact from ESG focused investors, uncertainty around growth potential, current operational cost and productivity outlook under potentially revised regulations, and (rightly or wrongly) whether management will be able navigate the Brumadinho tailings disaster, sees us decrease our target multiple for Vale from 4.5x EV/EBITDA to 3.5x EV/EBITDA. On a fundamental basis, Vale's single-country, and single commodity concentration already see our base risking at the lower end of peers, however we now expect a further discount will be applied. We reduce our target NAV multiple from 0.8x to 0.7x. We decrease our target price to $9.00/t from $11.00 and re-iterate our Underperform recommendation. |

Notes:

Analysis reflects valuation impact of a change in discount rate or a change in the EV/EBITDA multiple only, holding all other model assumptions constant.

**Exhibit 1: Valuation Impact – Summary**

*($ in millions)*

| | | | | Valuation Impact - Change in EV/EBITDA Multiple |
|---|---|---|---|---|
| Date | Analyst | Δ in EBITDA Multiple | Impact on Enterprise Value | Reasons for Change |
| 2/5/2019 | Bank of America | -0.8x | ($13,586) | "Our US$13 (R$48) 12-month price objective is based on SOTP DCF which assumes a 15% discount to our 5.5x 2019E EV/EBITDA multiple, 150bp added to our WACC for DCF calculation purposes (terminal growth 2.5% and WACC of 10.8%) in addition to the US$5B outlay assumed. The discount seems deserved for mainly due to: 1) a less attractive dividend yield/buyback thesis near term, 2) potential change in investor base given lack of dividend and ESG concerns, and 3) continued uncertainty over volume and costs." |
| 2/7/2019 | Citi | -0.5x | ($7,000) | "We reduce our target price on Vale to $12/sh based on new estimates, a lower multiple (5x 2021E) and allowances for Brumadinho costs ($10bn). We remain Neutral given the high level of uncertainty and near-term headline risk. Our Bull-Bear target price range is very wide at $8 to $16/sh. The higher iron ore price results in increased operating-EBITDA in 2019-20E for Vale even allowing for lower volumes and higher operating costs. The company should generate operating-FCF and we have no concerns on leverage or liquidity. Yet, longer-term Vale may carry structurally higher operating costs and faces very significant non-operating costs associated with Brumadinho (including remediation, capex, and penalties)." |

Notes:

Analysis reflects valuation impact of a change in discount rate or a change in the EV/EBITDA multiple only, holding all other model assumptions constant.

**Exhibit 1: Valuation Impact: Change in Discount Rate – HSBC (January 27, 2019)**

*($ in millions)*

| Implied Tax Rate Calculation | 2019E | 2020E | Terminal |
|---|---|---|---|
| EBT | $12,489 | $10,991 | |
| Income Tax | ($2,069) | ($2,090) | |
| *Implied Tax Rate* | *-16.6%* | *-19.0%* | |

| DCF | 2019E | 2020E | Terminal |
|---|---|---|---|
| Adj. EBIT | $13,422 | $11,326 | |
| Taxes @ Implied Tax Rate | ($2,224) | ($2,154) | |
| After-tax Income | $11,198 | $9,172 | |
| | | | |
| Plus: D&A | $3,760 | $3,776 | |
| Less: Capital Expenditures | ($4,000) | ($4,200) | |
| Less: Change in Working Capital[1] | | | |
| Unlevered Free Cash Flow | $10,958 | $8,748 | $9,011 |

| | | Implied Enterprise Value[4] | |
|---|---|---|---|
| Discount Rate[2] | 9.4% | | |
| Perpetuity Growth Rate[2] | 3.0% | WACC[2] | PGR |
| | | | 3.0% |
| Sum of Present Value of FCF[3] | $18,122 | | |
| Present Value of Terminal Value[3] | $123,042 | 8.9% | $152,589 |
| Implied Enterprise Value | $141,165 | 9.4% | $141,165 |
| | | *Variance* | *-0.5%*  *($11,424)* |

Notes:

FY2019E and FY2020E projections source: HSBC, "Vale: [Correction] Downgrade to Hold: Another dam collapses," January 27, 2019, page 2.

(1)   Working capital projections were not disclosed.

(2)   Source: HSBC, "Vale: [Correction] Downgrade to Hold: Another dam collapses," January 27, 2019, page 9.

(3)   Free cash flow discounted to January 1, 2019 using mid-year convention. Terminal value calculated based on a perpetuity growth model.

(4)   Analysis reflects valuation impact of a change in discount rate only, holding all other model assumptions constant. DCF analysis based on available data in the report. The long-term free cash flow projections used in HSBC's actual model were not disclosed.

**Exhibit 1: Valuation Impact: Change in Discount Rate – JP Morgan (January 29, 2019)**

*($ in millions)*

| | 2019E | 2020E | Terminal |
|---|---|---|---|
| Adj. EBIT | $11,610 | $9,759 | |
| *Tax Rate* | *-20.0%* | *-20.0%* | |
| Taxes @ Tax Rate | ($2,322) | ($1,952) | |
| After-tax Income | $9,288 | $7,807 | |
| | | | |
| Plus: D&A | $3,505 | $3,559 | |
| Less: Capital Expenditures | ($4,400) | ($4,915) | |
| Less: Change in Working Capital | $109 | $118 | |
| Unlevered Free Cash Flow | $8,502 | $6,569 | $6,733 |

| | | | Implied |
|---|---|---|---|
| Discount Rate[1] | 11.7% | | **Implied** |
| Perpetuity Growth Rate[2] | 2.5% | | **Enterprise Value[4]** |

| | | WACC[5] | PGR |
|---|---|---|---|
| Sum of Present Value of FCF[3] | $13,609 | | 2.5% |
| Present Value of Terminal Value[3] | $61,997 | 10.2% | $89,369 |
| Implied Enterprise Value | $75,606 | 11.7% | $75,606 |
| | ***Variance*** | ***-1.5%*** | ***($13,763)*** |

Notes:

FY2019E and FY2020E projections source: JP Morgan, "Vale: Management Plan Starts to Address Key Uncertainties - Positive," January 29, 2019, page 6.

(1)   Source: JP Morgan, "Vale: Management Plan Starts to Address Key Uncertainties - Positive," January 29, 2019, page 5.

(2)   Report did not state a perpetuity growth rate, but a previous report used a 2.5% perpetuity growth rate. *See* JP Morgan, "Vale: Model Update," January 17, 2019, page 2.

(3)   Free cash flow discounted to January 1, 2019 using mid-year convention. Terminal value calculated based on a perpetuity growth model.

(4)   Analysis reflects valuation impact of a change in discount rate only, holding all other model assumptions constant. DCF analysis based on available data in the report. The long-term free cash flow projections used in JP Morgan's actual model were not disclosed.

(5)   WACC sensitivity based on the following quote: "Lastly, we increase our equity risk premium by 1.5% to incorporate higher risks and uncertainties related to the Brumadinho incident." *See* JP Morgan, "Vale: Management Plan Starts to Address Key Uncertainties - Positive," January 29, 2019, page 2.

Confidential                                                  30

**Exhibit 1: Valuation Impact: Change in Discount Rate – BTG Pactual (January 30, 2019)**

*($ in millions)*

| Implied Tax Rate Calculation | 2019E | 2020E | Terminal |
|---|---|---|---|
| EBT | $11,651 | $11,208 | |
| Income Tax | ($2,330) | ($2,802) | |
| *Implied Tax Rate* | *-20.0%* | *-25.0%* | |

| DCF | 2019E | 2020E | Terminal |
|---|---|---|---|
| Adj. EBIT | $13,319 | $12,846 | |
| Taxes @ Implied Tax Rate | ($2,664) | ($3,212) | |
| After-tax Income | $10,655 | $9,635 | |
| | | | |
| Plus: D&A | $3,410 | $3,574 | |
| Less: Capital Expenditures | ($6,083) | ($6,039) | |
| Less: Change in Working Capital | ($3) | ($180) | |
| Unlevered Free Cash Flow | $7,979 | $6,990 | $7,164 |

|  | 10.0% |
|---|---|
| Perpetuity Growth Rate[2] | 2.5% |

**Implied Enterprise Value[4]**

| | WACC[5] | PGR |
|---|---|---|
| | | 2.5% |
| | 9.0% | $110,639 |
| | 10.0% | $96,464 |
| *Variance* | *-1.0%* | *($14,174)* |

| Sum of Present Value of FCF[3] | $13,666 |
|---|---|
| Present Value of Terminal Value[3] | $82,798 |
| Implied Enterprise Value | $96,464 |

Notes:

FY2019E and FY2020E projections source: BTG Pactual, "Vale: A Sensible Plan in Place," January 30, 2019, page 3.

(1) Source: BTG Pactual, "Vale: A Sensible Plan in Place," January 30, 2019, page 3.

(2) Report did not state a perpetuity growth rate. Assumed a perpetuity growth rate of 2.5%.

(3) Free cash flow discounted to January 1, 2019 using mid-year convention. Terminal value calculated based on a perpetuity growth model.

(4) Analysis reflects valuation impact of a change in discount rate only, holding all other model assumptions constant. DCF analysis based on available data in the report. The long-term free cash flow projections used in BTG's actual model were not disclosed.

(5) Earlier report used a WACC of 9.0%. *See* BTG Pactual, "Vale: US$100bn market cap? Yes, conviction levels still high," January 7, 2019, page 4.

Confidential

**Exhibit 1: Valuation Impact: Change in Discount Rate – Morgan Stanley (January 30, 2019)**

*($ in millions)*

|  | 2019E | 2020E | 2021E | Terminal |
|---|---|---|---|---|
| Adj. EBIT | $11,988 | $10,136 | $11,294 | |
| *Tax Rate* | *-31.0%* | *-29.0%* | *-30.0%* | |
| Taxes @ Tax Rate | ($3,716) | ($2,939) | ($3,388) | |
| After-tax Income | $8,272 | $7,197 | $7,906 | |
| | | | | |
| Plus: D&A | $3,710 | $3,910 | $3,908 | |
| Less: Capital Expenditures | ($5,617) | ($4,992) | ($5,013) | |
| Less: Change in Working Capital | $120 | ($237) | $34 | |
| Unlevered Free Cash Flow | $6,485 | $5,878 | $6,835 | $6,971 |

| | | Implied |
|---|---|---|
| Discount Rate[1] | 9.4% | |
| Perpetuity Growth Rate[1] | 2.0% | Enterprise Value[3] |

| | | Implied Enterprise Value[3] | |
|---|---|---|---|
| | | WACC[4] | PGR |
| | | | 2.0% |
| Sum of Present Value of FCF[2] | $16,796 | | |
| Present Value of Terminal Value[2] | $75,258 | 9.1% | $95,842 |
| Implied Enterprise Value | $92,054 | 9.4% | $92,054 |
| | | *Variance* **-0.3%** | **($3,788)** |

Notes:

FY2019E - FY2021E projections source: Morgan Stanley, "Vale: Feijao Dam Accident Update #2," January 30, 2019, page 8.

(1)   Source: Morgan Stanley, "Vale: Feijao Dam Accident Update #2," January 30, 2019, page 6.

(2)   Free cash flow discounted to January 1, 2019 using mid-year convention. Terminal value calculated based on a perpetuity growth model.

(3)   Analysis reflects valuation impact of a change in discount rate only, holding all other model assumptions constant. DCF analysis based on available data in the report. The long-term free cash flow projections used in Morgan Stanley's actual model were not disclosed.

(4)   Earlier report used a WACC of 9.1%. *See* Morgan Stanley, "Vale: Feijao Dam Accident Update," January 27, 2019, page 5.

Confidential                                                                32

**Exhibit 1: Valuation Impact: Change in Discount Rate – Bank of America (February 5, 2019)**

*($ in millions)*

|  | 2019E | 2020E | Terminal |
|---|---|---|---|
| Adj. EBIT | $13,115 | $12,762 | |
| *Tax Rate* | *-27.4%* | *-32.4%* | |
| Taxes @ Tax Rate | ($3,594) | ($4,135) | |
| After-tax Income | $9,521 | $8,627 | |
| | | | |
| Plus: D&A | $3,353 | $3,722 | |
| Less: Capital Expenditures | ($4,890) | ($4,720) | |
| Less: Change in Working Capital | $532 | ($176) | |
| Unlevered Free Cash Flow | $8,516 | $7,453 | $7,639 |

| | | Implied |
|---|---|---|
| Discount Rate[1] | 10.8% | **Enterprise Value[3]** |
| Perpetuity Growth Rate[1] | 2.5% | |

| | | WACC[4] | PGR |
|---|---|---|---|
| Sum of Present Value of FCF[2] | $14,481 | | 2.5% |
| Present Value of Terminal Value[2] | $78,918 | 9.3% | $112,984 |
| Implied Enterprise Value | $93,399 | 10.8% | $93,399 |
| | | *Variance*  -1.5% | ($19,585) |

Notes:

FY2019E and FY2020E projections source: Bank of America, "Vale: News Flow a Risk, but Long-Term FCF Story Intact; Resuming at Neutral," February 5, 2019, page 2.

(1)  Source: Bank of America, "Vale: News Flow a Risk, but Long-Term FCF Story Intact; Resuming at Neutral," February 5, 2019, page 5.

(2)  Free cash flow discounted to January 1, 2019 using mid-year convention. Terminal value calculated based on a perpetuity growth model.

(3)  Analysis reflects valuation impact of a change in discount rate only, holding all other model assumptions constant. DCF analysis based on available data in the report. The long-term free cash flow projections used in Bank of America's actual model were not disclosed.

(4)  WACC sensitivity based on the following quote, "Our US$13 (R$48) 12-month price objective is based on SOTP DCF which assumes a 15% discount to our 5.5x 2019E EV/EBITDA multiple, 150bp added to our WACC for DCF calculation purposes (terminal growth 2.5% and WACC of 10.8%) in addition to the US$5B outlay assumed." *See* Bank of America, "Vale: News Flow a Risk, but Long-Term FCF Story Intact; Resuming at Neutral," February 5, 2019, page 5.

**Exhibit 1: Valuation Impact: Change in Discount Rate – Santander (February 8, 2019)**

*($ in millions)*

| | 2019E | 2020E | 2021E | 2022E | 2023E | 2024E | 2025E | 2026E | Terminal |
|---|---|---|---|---|---|---|---|---|---|
| Free Cash Flow[1] | $11,803 | $8,410 | $8,569 | $8,695 | $9,072 | $8,894 | $8,649 | $8,395 | $8,605 |
| | | | | | | | | | |
| Discount Rate[2] | | 11.1% | | | | | | | |
| Perpetuity Growth Rate[3] | | 2.5% | | | | | | | |
| | | | | | | | | | |
| Sum of Present Value of FCF[4] | | $49,791 | | | | | | | |
| Present Value of Terminal Value[4] | | $45,435 | | | | | | | |
| Implied Enterprise Value[5] | | $95,226 | | | | | | | |

| Implied Enterprise Value[6] | |
|---|---|
| WACC[2] | PGR |
| | 2.5% |
| 9.7% | $111,617 |
| 11.1% | $95,226 |
| *Variance*  -1.4% | ($16,391) |

Notes:

(1) Santander valuation model did not incorporate payments and costs for repairs/indemnities of the Brumadinho dam breach. Source: Santander, "Vale: Incorporating the Impacts of Recent Developments; Visibility Remains Low," February 8, 2019, page 7.

(2) Source: Santander, "Vale: Incorporating the Impacts of Recent Developments; Visibility Remains Low," February 8, 2019, page 7.

(3) Source: Santander, "Vale: Incorporating the Impacts of Recent Developments; Visibility Remains Low," February 8, 2019, page 10.

(4) Free cash flow discounted to January 1, 2019 using mid-year convention. Terminal value calculated based on a perpetuity growth model.

(5) Note the enterprise value differs from the value on page 7 of the Santander report as a result of a different valuation date.

(6) Analysis reflects valuation impact of a change in discount rate only, holding all other model assumptions constant. DCF analysis based on available data in the report.

Confidential

**Exhibit 1: Valuation Impact: Change in EV/EBITDA Multiple**

*($ in millions)*

| Itau BBA (Jan. 29, 2019)[1] | 2019E | 2020E | 2021E | Bank of America (Feb. 5, 2019)[3] | 2019E | 2020E | 2021E |
|---|---|---|---|---|---|---|---|
| EV/EBITDA Multiple De-Rating | -0.2x | | | EV/EBITDA (previous) | 5.5x | | |
| EBITDA | 16,788 | | | Discount | -15% | | |
| **Variance** | **($3,358)** | | | EV/EBITDA (new) | 4.7x | | |
| | | | | EBITDA | $16,468 | | |
| | | | | Implied Enterprise Value | $76,988 | | |
| | | | | Implied Enterprise Value - Previous | $90,574 | | |
| | | | | **Variance** | **($13,586)** | | |

| RBC (Feb. 4, 2019)[2] | 2019E | 2020E | 2021E | Citi (Feb. 7, 2019)[4] | 2019E | 2020E | 2021E |
|---|---|---|---|---|---|---|---|
| EV/EBITDA (previous) | | 4.5x | | EV/EBITDA (previous) | | | 5.5x |
| EV/EBITDA (new) | | 3.5x | | EV/EBITDA (new) | | | 5.0x |
| EBITDA | | $14,620 | | EBITDA | | | $14,000 |
| Implied Enterprise Value | | $51,170 | | Implied Enterprise Value | | | $70,000 |
| Implied Enterprise Value - Previous | | $65,790 | | Implied Enterprise Value - Previous | | | $77,000 |
| **Variance** | | **($14,620)** | | **Variance** | | | **($7,000)** |

Notes:

Analysis reflects valuation impact of a change in the EV/EBITDA multiple only, holding all other model assumptions constant.

(1) Source: Itau BBA, "Vale: The Aftermath of Brumadinho – Our Base-Case Scenario," January 29, 2019.

(2) Source: RBC Capital Markets, "Vale: Fallout from Brumadinho Weighs on Investment Case," February 4, 2019.

(3) Source: Bank of America, "Vale: News Flow a Risk, but Long-Term FCF Story Intact; Resuming at Neutral," February 5, 2019.

(4) Source: Citi, "Vale: Lowering Iron Ore Production Forecasts and Target Price," February 7, 2019 and previous EV/EBITDA multiple from Citi, "Vale: Alert: Tragedy Strikes Again," January 27, 2019.

Confidential