**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

----------------------------------------------------------x

In re Vale S.A. Securities Litigation

:
:
:
:
:
:
:
:

No. 19 Civ. 526 (EK) (SJB)

**<u>ORAL ARGUMENT REQUESTED</u>**

----------------------------------------------------------x

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'**
**MOTION TO EXCLUDE EXPERT TESTIMONY OF STEVEN P. FEINSTEIN**

GIBSON, DUNN & CRUTCHER LLP

Christopher M. Joralemon
Akiva Shapiro
Mary Beth Maloney
David M. Kusnetz
Jason Bressler
H. Chase Weidner

200 Park Avenue
New York, NY  10166-0193
Telephone:    212.351.4000
Facsimile:    212.351.4035

*Attorneys for Defendants*

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ...................................................................................................................... 1

LEGAL STANDARDS ............................................................................................................... 2

DISCUSSION .............................................................................................................................. 4

    I.       Feinstein Does Not Employ Reliable Principles and Methods to Calculate Artificial Inflation ....................................................................................................... 4

    II.     Feinstein Does Not Reliably Apply Sound Principles and Methods to the Facts of the Case in Developing his Damages Opinions ....................................... 7

          A.     Feinstein Fails to Disaggregate Investment Losses Caused by the Materialization of Previously Disclosed Risks ........................................... 8

          B.     Feinstein Impermissibly Speculates About the Alleged Corrective Events .................................................................................................... 9

    III.    Feinstein's Unreliable Opinions All Stem from an Illogical "But-For" World that Ignores Basic Economic Principles and Well-Settled Law ............... 11

CONCLUSION.......................................................................................................................... 15

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Acticon AG v. China N.E. Petrol. Holdings Ltd.*,
   692 F.3d 34 (2d Cir. 2012)......................................................................................................4

*Affiliated Ute Citizens v. United States*,
   406 U.S. 128 (1972) ...............................................................................................................4

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
   303 F.3d 256 (2d Cir. 2002)...................................................................................................13

*Ark. Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.*,
   77 F.4th 74 (2d Cir. 2023) ...................................................................................................6, 9

*Boucher v. U.S. Suzuki Motor Corp.*,
   73 F.3d 18 (2d Cir. 1996).......................................................................................................3

*In re BP p.l.c. Sec. Litig.*,
   2014 WL 2112823 (S.D. Tex. May 20, 2014) .........................................................................9

*Bricklayers & Trowel Trades Int'l Pension Fund v. Credit Suisse First Bos.*,
   853 F. Supp. 2d 181 (D. Mass. 2012), *aff'd*, 752 F.3d 82 (1st Cir. 2014)...............................7

*City of Providence v. Bats Glob. Mkts., Inc.*,
   2022 WL 902402 (S.D.N.Y. Mar. 28, 2022) ...............................................................7, 11, 12

*Daubert v. Merrell Dow Pharm., Inc.*,
   509 U.S. 579 (1993)...............................................................................................................2

*Dura Pharms., Inc. v. Broudo*,
   544 U.S. 336 (2005)............................................................................................................7, 9

*Gen. Elec. Co. v. Joiner*,
   522 U.S. 136 (1997)...........................................................................................................3, 10

*Hunt v. CNH Am. LLC*,
   511 F. App'x 43 (2d Cir. 2013) .............................................................................................12

*In re Kirkland Lake Gold Ltd. Sec. Litig.*,
   2024 WL 1342800 (S.D.N.Y. Mar. 29, 2024) .........................................................................7

*Kumho Tire Co., Ltd. v. Carmichael*,
   526 U.S. 137 (1999)...............................................................................................................2

*In re Longfin Corp. Sec. Class Action Litig.*,
   2020 WL 4345731 (S.D.N.Y. July 29, 2020) ..........................................................................4

*Menorah Mivtachim Ins. Ltd. v. Sheehan*,
   2024 WL 1613907 (2d Cir. Apr. 15, 2024) .............................................................................7

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*In re Mortg. Elec. Registration Sys. (Mers) Litig.*,
   2016 WL 3976427 (D. Ariz. July 25, 2016) ...................................................................10

*In re Mylan N.V. Sec. Litig.*,
   666 F. Supp. 3d 266, 287 (S.D.N.Y. 2023), *aff'd sub nom*, *Menorah
   Mivtachim Ins. Ltd. v. Sheehan*, 2024 WL 1613907 (2d Cir. Apr. 15, 2024) ...........3

*In re Omnicom Grp., Inc. Sec. Litig.*,
   597 F.3d 501 (2d Cir. 2010) ...............................................................................3, 9

*In re Onglyza (Saxagliptin) & Kombiglyze (Saxagliptin & Metformin) Prod. Liab.
   Litig.*,
   93 F.4th 339 (6th Cir. 2024) ........................................................................................2

*In re Pfizer Inc. Sec. Litig.*,
   819 F.3d 642 (2d Cir. 2016) ..................................................................................4, 12

*R.F.M.A.S., Inc. v. So*,
   748 F. Supp. 2d 244 (S.D.N.Y. 2010) .........................................................................13

*Rodriguez v. DraftKings Inc.*,
   2021 WL 5282006 (S.D.N.Y. Nov. 12, 2021) ..............................................................4

*S.E.C. v. Airborne Wireless Network*,
   2023 WL 5935627 (S.D.N.Y. Sept. 12, 2023) ............................................................14

*S.E.C. v. Ripple Labs, Inc.*,
   2023 WL 5670711 (S.D.N.Y. Mar. 6, 2023) ...............................................................14

*S.E.C. v. Tourre*,
   950 F. Supp. 2d 666 (S.D.N.Y. 2013) .........................................................................14

*Sapp v. Marcum*,
   2023 WL 3965718 (M.D. Fla. June 13, 2023) ............................................................14

*United States v. Bilzerian*,
   926 F.2d 1285 (2d Cir. 1991) ......................................................................................14

*United States v. Williams*,
   506 F.3d 151 (2d Cir. 2007) ..........................................................................................2

*In re Vale S.A. Sec. Litig.*,
   2020 WL 2610979 (E.D.N.Y. May 20, 2020) ...............................................................8

*In re Vale S.A. Sec. Litig.*,
   2022 WL 122593 (E.D.N.Y. Jan. 11, 2022) ..................................................................5

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

*In re Vivendi, S.A. Sec. Litig.*,
  838 F.3d 223 (2d Cir. 2016)......................................................................................4, 7, 13

**Rules**

Fed. R. Evid. 702 ....................................................................................................2, 3

Pursuant to Rule 702 of the Federal Rules of Evidence, Defendants respectfully submit this memorandum of law in support of their motion to exclude the testimony of Steven P. Feinstein.

## INTRODUCTION

How does an avaricious plaintiff maximize its potential payday in a securities class action? Easy. Hire a mercenary economist—unrestrained by reliable principles and methods—to calculate "damages" in three simple steps: (1) total up *every penny* of all security price declines occurring on alleged "corrective event" dates; (2) slap an "artificial inflation" label on all of those investment losses; and (3) carry that so-called inflation all the way back to *Day One* and keep it pinned at the maximum level for *every day* throughout the entire class period. ***This is exactly what Plaintiff and its "expert" Feinstein have done here.***

Plaintiff's case nominally seeks redress for twenty-six different alleged misstatements by Vale over nearly two-and-a-half years concerning a range of topics, including, for example, general safety-related pronouncements, the adoption of new risk monitoring systems, certain dam conditions, and compliance with newly enacted Brazilian laws. Feinstein simply assumes—again, as he must to boost Plaintiff's windfall quest—that prior to the start of the class period every Vale investor *already believed* all of the allegedly false information subsequently disclosed by Vale, and thus all such information *already was incorporated into the price* of Vale's securities on the first day of the class period, including, incredibly, the content of future statements addressing topics and issues that had not yet even come into existence.

Building on this shameless construct that ignores the laws of space and time (to say nothing of universally recognized principles of economics), Feinstein proceeds to thumb his nose at well-settled securities law by explicitly refusing to disaggregate "non-fraud" price declines on the three corrective event dates that survived Vale's Rule 12 motion. Most glaringly, he fails to recognize

that some—if not all—of the losses he blindly calls "artificial inflation" actually reflect the materialization of known risks concerning a dam accident and its attendant consequences previously and repeatedly disclosed by Vale throughout the class period.  Feinstein then compounds this fatal error by offering bald speculation that all the alleged corrective events (ranging from the dam collapse itself to the temporary cessation of operations at an unrelated mine) somehow "wholistically" [sic] revealed the falsity of all twenty-six challenged statements.

In short, Feinstein's opinions do not come close to satisfying the admissibility requirements of Rule 702.  They are unmoored from any recognized scientific methods, sound principles of economics, black-letter securities law, the undisputed facts of this case, and even Plaintiff's own allegations.  The Court should exclude his proffered testimony in its entirety.

## LEGAL STANDARDS

**Admissibility of Expert Testimony**

Federal Rule of Evidence 702 assigns to district courts "a gatekeeping role" to "ensur[e] that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993); *see also Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999) (noting that this "gatekeeping obligation . . . applies to all expert testimony").  The proponent of the expert bears the burden of demonstrating that the proffered testimony "will help the trier of fact to understand the evidence or to determine a fact in issue," and that "[1] the testimony is based on sufficient facts or data; [2] the testimony is the product of reliable principles and methods; and [3] the expert's opinion reflects a reliable application of the principles and methods to the facts of the case."  Fed. R. Evid. 702; *see also United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007); *In re Onglyza (Saxagliptin) & Kombiglyze (Saxagliptin & Metformin) Prod. Liab. Litig.*, 93 F.4th 339, 348 n.7 (6th Cir. 2024)

2

("Rule 702's recent amendments . . . were drafted to correct some court decisions incorrectly holding 'that the critical questions of the sufficiency of an expert's basis, and the application of the expert's methodology, are questions of weight and not admissibility.'" (citing Fed. R. Evid. 702 advisory committee's note to 2023 amendments)).  A court must exclude "speculative or conjectural" opinions, *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996), as well as proffered testimony supported "only by the [expert's] *ipse dixit*," *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

**Plaintiff's Claim Under Section 10(b) of the Exchange Act**

As relevant here, Plaintiff largely—if not exclusively—relies on the proffered testimony of Feinstein in an attempt to meet its burden of proof on two critical elements of a securities fraud claim:  (1) loss causation; and (2) economic loss.  *In re Mylan N.V. Sec. Litig.*, 666 F. Supp. 3d 266, 287 (S.D.N.Y. 2023), *aff'd sub nom*, *Menorah Mivtachim Ins. Ltd. v. Sheehan*, 2024 WL 1613907 (2d Cir. Apr. 15, 2024).

*Loss Causation* – To prove loss causation, a plaintiff must show "a sufficient connection between the fraudulent conduct and the losses suffered." *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 510 (2d Cir. 2010) (cleaned up).  An economist tasked with making this connection typically conducts an event study, which includes examining "corrective" events that purportedly revealed the truth previously concealed by the alleged misstatements, thereby reducing or eliminating the "artificial inflation" in a security's price. *See, e.g.*, Ex. A (Rebuttal Expert Report of Glenn Hubbard) ¶¶ 25–32, 103.[1]  An economist determining loss causation must isolate the portion of losses, if any, caused by the revelation of a previously concealed truth, as opposed to losses caused by any "confounding factors" such as the disclosure of company-specific news that

---

[1] Citations to "Ex. _" are to the accompanying the Declaration of Christopher M. Joralemon.

3

is not "corrective," including, for example, price movements caused by the realization of previously disclosed risks. *Id.* ¶ 30.

*Economic Loss* – "Economic loss in Section 10(b) cases is traditionally determined by the use of the 'out -of-pocket' measure for damages," *In re Longfin Corp. Sec. Class Action Litig.*, 2020 WL 4345731, at *3 (S.D.N.Y. July 29, 2020), which measures "the difference between the fair value of all that the" plaintiff "received and the fair value of what he would have received had there been no fraudulent conduct," *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 155 (1972). Concomitantly, "plaintiffs in securities fraud cases can recover only losses actually caused by the fraud." *Rodriguez v. DraftKings Inc.*, 2021 WL 5282006, at *5 (S.D.N.Y. Nov. 12, 2021). Thus, an economist hired to calculate economic loss in a securities case must determine the "but-for" price that an investor would have paid had the issuer not made the challenged statements. *See In re Pfizer Inc. Sec. Litig.*, 819 F.3d 642, 649 (2d Cir. 2016).

## DISCUSSION

### I.    Feinstein Does Not Employ Reliable Principles and Methods to Calculate Artificial Inflation

In the context of a securities fraud claim, artificial inflation refers to the difference between the price an investor paid for a security and what it would have paid for that security absent any misrepresentation by the issuer. *See Acticon AG v. China N.E. Petrol. Holdings Ltd.*, 692 F.3d 34, 41 (2d Cir. 2012). A plaintiff bears the burden of proffering admissible expert evidence to establish such inflation, and also must demonstrate through its expert "how that inflation entered the stock or, more aptly, *when.*" *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 255 (2d Cir. 2016).

As a first step, and for obvious reasons, an expert typically conducts an event study to determine whether the security at issue experienced any statistically significant price movement on dates on which the issuer made the alleged misstatements. Ex. A ¶¶ 26–30, 36, 38, 40. Here,

4

however, Feinstein declined to take this standard step. *Id.* ¶¶ 36, 40.  This is not surprising given his prior flawed work as Plaintiff's class certification expert.[2]  Indeed, Feinstein *already knew* that Vale ADRs did not experience statistically significant positive price reactions on any of the fifteen distinct dates on which Vale made the twenty-six purported misstatements.  *See* Ex. B (Deposition Transcript of Steven P. Feinstein) at 46:21-50:14.

In an attempt to sidestep this uncomfortable truth, Feinstein simply assumes that *all* the alleged artificial inflation Plaintiff seeks to redress in this case existed on the first day of the class period.  Ex. C (Report on Loss Causation and Damages of Professor Steven P. Feinstein) ¶ 224; Ex. D (Reply Report on Loss Causation and Damages of Professor Steven P. Feinstein) ¶ 100.  He then further assumes that every penny of the purported inflation remained in all Vale securities throughout the entire class period until the dam collapsed on January 25, 2019.  Ex. D ¶ 96; *see also* Ex. B at 64:20-65:8, 124:23-125:8.  Feinstein's incredible assumptions concerning this primordial and ever-persistent artificial inflation find no basis in law or in fact.  When confronted at his deposition, he offered the testimonial equivalent of a shoulder shrug: "I do not have an opinion as to whether [the inflation] was already – some of it was already there previously and simply maintained by the first statement.  It may or may not have been."  Ex. B at 63:4-8.

At the rotten core of this absurd expert testimony resides Plaintiff's eleventh-hour pivot to an "inflation maintenance" theory of loss causation.  Faced with an unfavorable evidentiary record on Vale security price reactions, Plaintiff apparently now contends that the twenty-six alleged

---

[2] The Court already has rejected Feinstein's prior event study offered to establish market efficiency as "black box-like, unverifiable, standardless, and subjective." *In re Vale S.A. Sec. Litig.*, 2022 WL 122593, at *11 (E.D.N.Y. Jan. 11, 2022).  Feinstein nevertheless relies here on this discredited work to assume that all the Vale securities traded in efficient markets. Ex. C ¶¶ 13, 99–100.  Of course, that is incorrect, and represents yet another reason to exclude Feinstein's loss causation/damages opinions. *See* ECF No. 132.

misstatements merely prevented the dissipation of artificial inflation that already existed in the price of Vale's securities *before the class period even started*. *See Ark. Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.*, 77 F.4th 74, 80 (2d Cir. 2023) (explaining that inflation maintenance occurs when a "misrepresentation prevents preexisting inflation in a stock price from dissipating, but does not cause a price uptick").

Plaintiff's last-ditch theory cannot survive even a cursory review of the record here. For example, neither Plaintiff nor Feinstein can explain why, on October 27, 2016 (the first day of the class period), all Vale investors purportedly believed that the condition of all Vale dams was "impeccable" or "impressive" (as later allegedly represented by Vale in one of the challenged statements), particularly given that, less than a year earlier, a different upstream tailings dam in Brazil had experienced a tragic collapse. ECF No. 47, Consolidated Complaint ("Compl.") ¶¶ 54, 174; *see also* Ex. B at 102:25-105:18, 208:19-209:15, 289:24-290:2; Ex. D ¶¶ 38.iv, 96–97. Indeed, Feinstein himself described that prior tragedy as a "catastrophic" event attributable to Vale. *See, e.g.*, Ex. D ¶ 38.iv; Ex. B at 289:24-290:2.

Nor does Feinstein even attempt to evaluate whether the *true* risk of a collapse or the *perceived* risk of a collapse changed throughout the class period. As discussed in more detail below (*see infra* p.9), the delta between those two figures equals the amount of artificial inflation—if any—in Vale securities. *See, e.g.*, Ex. A ¶¶ 57–58. If the *true* risk of collapse changed at all during the class period, then the amount of artificial inflation should have changed as well. The same would be true if the *perceived* risk of collapse changed at all during the class period.[3] But Feinstein

---

[3] Feinstein also does not consider how the perceived or actual risk of collapse might change when, to take just a few examples, Vale announced: (1) significant progress in reducing the number of safety incidents with "high potential impact," Compl. ¶ 129; (2) that it improved and would adopt new dam risk management systems, *see, e.g., id.* ¶¶ 151, 188; or (3) that independent auditors certified its tailings dams as stable, *see, e.g., id.* ¶¶ 135, 150, 157, 189, 191, 195, 199.

ignores all of it. He simply opines that artificial inflation remained constant throughout the class period and justifies that blind assumption with the speculative conclusion that there must have been at least *some* undisclosed "gap" between true and perceived risk. Ex. B at 124:23-125:7; *see also* Ex. C ¶¶ 21–22, 219; Ex. B at 64:20-68:2.

Ultimately, "Feinstein's contention," as other courts recently have concluded, "fatally misunderstands the analytical framework for inflation-maintenance cases." *In re Kirkland Lake Gold Ltd. Sec. Litig.*, 2024 WL 1342800, at *10 (S.D.N.Y. Mar. 29, 2024); *see also Vivendi*, 838 F.3d at 255 (cautioning that expert assumption of maximum inflation at beginning of class period in the face of changing circumstances during class period would "overstate the degree to which [the company's] stock was inflated"). The critical conceptual flaws that infect Feinstein's unsupported—and unsupportable—opinions concerning artificial inflation mandate the exclusion of his testimony in its entirety.

## II. Feinstein Does Not Reliably Apply Sound Principles and Methods to the Facts of the Case in Developing his Damages Opinions

No less an authority than the United States Supreme Court has made clear that a plaintiff may only recover damages directly resulting from the alleged securities fraud. *See Dura Pharms., Inc. v. Broudo*, 544 U.S. 336 (2005). Heeding this directive, courts universally recognize that a plaintiff must disaggregate stock price declines resulting from all non-fraud related events. *See, e.g., Menorah Mivtachim*, 2024 WL 1613907, at *2 (confirming just this week that disaggregation step is not optional). To that end, "[a]n event study that fails to disaggregate the effects of confounding factors *must* be excluded." *Bricklayers & Trowel Trades Int'l Pension Fund v. Credit Suisse First Bos.*, 853 F. Supp. 2d 181, 190 (D. Mass. 2012) (emphasis added), *aff'd sub nom. Bricklayers & Trowel Trades Int'l Pension Fund v. Credit Suisse Sec. (USA) LLC*, 752 F.3d 82 (1st Cir. 2014); *see also City of Providence v. Bats Glob. Mkts., Inc.*, 2022 WL 902402, at *13

(S.D.N.Y. Mar. 28, 2022) (excluding expert opinion that "fail[s] to control for other causes of the loss the expert purported to measure").

Feinstein, however, rejects this controlling precedent. *See, e.g.*, Ex. B at 271:15-17 ("[T]he economic model doesn't call for that disaggregation."). Instead, he brazenly *aggregates* all security price declines on all three currently viable corrective event dates and labels them—*ipse dixit*—artificial inflation dissipation. *See id.* at 280:15-25 (insisting that "[t]he bundle" of causes of the price decline "is a good measure" of artificial inflation); *see also* Ex. C ¶¶ 18–21, 26. In so doing, he ignores the factors indicating that some, if not all, of the price declines actually stemmed from the materialization of previously known risks of a dam accident and its attendant consequences. *See, e.g.*, Ex. A ¶¶ 54–86. Feinstein further fails to explain how the alleged "corrective" events actually exposed the purported falsity of any of the twenty-six statements at issue.

### A.    Feinstein Fails to Disaggregate Investment Losses Caused by the Materialization of Previously Disclosed Risks

As Judge Dearie has explained here: "that Dam I collapsed, without more, does not reveal to the public any previously undisclosed misrepresentation," but "[i]t may . . . constitute a materialization of the risk." *In re Vale S.A. Sec. Litig.*, 2020 WL 2610979, at *18 (E.D.N.Y. May 20, 2020). Of course, as Plaintiff itself must concede, Vale never somehow guaranteed that none of its dams would falter. Indeed, Feinstein himself acknowledges "[n]obody has alleged that the existence of the risk [of collapse] was concealed." Ex. E (Reply Report of Professor Steven P. Feinstein) ¶ 21. To the contrary, Vale repeatedly and explicitly warned investors of such eventualities. *See, e.g.*, Ex. A, Ex. 4 at 3 (cautioning that "the mining industry is generally subject to significant risks and hazards, including . . . incidents involving dams [and] failure of other operational structures;" "[a]ccidents . . . involving our mines, industrial facilities and related infrastructure, such as dams;" "accident[s] or [] breach[es] of operating and maintenance standards [that]

8

could result in significant environmental and social impacts, damage to or destruction of mineral properties or production facilities, personal injury, . . . death of employees, . . . environmental damage, delays in production, monetary losses and possible legal liability").

Where "the corrective event is the materialization of an understated risk," "the stock price movement on the date of correction (*i.e.*, on the date that the risk materialized) will not equate to inflation on the date of purchase unless the probability of the risk materializing was 100 percent." *In re BP p.l.c. Sec. Litig.*, 2014 WL 2112823, at *10 (S.D. Tex. May 20, 2014). And thus where, as here, the probability of the risk materializing is less than 100 percent, out-of-pocket damages must be limited to the difference between the actual probability that an adverse event could occur and the allegedly misrepresented lower probability. *See, e.g.*, Ex. A ¶¶ 57–58. This bedrock principle of securities law precludes litigants from recouping 100 percent of losses in "understated risk" cases, as allowing them to do so would improperly transform Section 10(b) claims into "broad insurance against market losses." *Omnicom Grp.*, 597 F.3d at 510 (quoting *Dura Pharms.*, 544 U.S. at 345).

### B.    Feinstein Impermissibly Speculates About the Alleged Corrective Events

Feinstein opines that all "the corrective disclosures revealed to the marketplace to some extent that . . . the collective import of the misrepresentations and omissions was false." Ex. B at 192:13-18. In making this pronouncement, however, Feinstein failed to conduct "a searching review of the record." *Goldman*, 77 F.4th at 105, *see id.* at 104–05 ("[A]lthough market commentary can provide insight into the kind of information investors would rely upon in making investment decisions . . . commentary touching upon only the same subject matter . . . cannot be enough."). Indeed, when asked to explain what he means by the "collective import" of the alleged misrepre-

9

sentations, Feinstein provided a circular response: "that collectively, if proven, Plaintiffs' allegations would show a deliberate and concerted effort[] to mislead the public about dam safety and risk management practices."  Ex. B at 192:21-193:2.

So, at Feinstein's sky-high level of abstraction, the "collective import" of the misrepresentations was that they were misleading, and the corrective disclosures purportedly demonstrated to the market that they were misleading.  But Feinstein fails to explain what, in reality, *specifically* was conveyed to the market through the challenged statements or how that allegedly misleading information was corrected.  *See, e.g.*, *id.* 194:18-196:22.  He just vaguely asserts that "the corrective disclosures revealed . . . precisely what the alleged misrepresentations and omissions concealed."  Ex. D ¶¶ 63–64.  But his word alone will not do.  *See Joiner*, 522 U.S. at 146 (affirming exclusion of testimony where expert opinion was "connected to existing data only by . . . *ipse dixit*").  The analyst reports and news articles cited by Feinstein do not suggest investors were calling into question the veracity of any challenged statement by Vale or that any analysts thought they had been misled by the company.  *See, e.g.*, Ex. A ¶¶ 66–86; Ex. B 212:7-215:4.  And without focusing at all on the specific content of any of the challenged statements, Feinstein fails to connect those statements to any information disclosed on the corrective event dates.

Feinstein also impermissibly adds corrective events Plaintiff did not even allege, such as the suspension and cancellation of the Laranjeiras dam license on February 4 and 6, respectively.  Ex. C ¶¶ 87, 94, 98; Ex. B at 198:3-203:8, 239:9-240:17; *In re Mortg. Elec. Registration Sys. (Mers) Litig.*, 2016 WL 3976427, at *7 (D. Ariz. July 25, 2016) ("Plaintiffs cannot supplement their complaint . . . via an expert report.").  As for corrective disclosures Plaintiff did allege, Feinstein merely speculates that the Brucutu mine closure was a by-product of learning the concealed truth.  Ex. D ¶ 137 (noting closure was "apparently" a result of new learnings).  But analyst reports

10

Feinstein cites suggest otherwise. *See, e.g.*, Ex. C ¶ 125 ("The main risk for Vale, in our view, is the forced shutdown of mining operations by a court decision without a legal/technical basis, similar to events surrounding the Brucutu mine."); *see also Bats*, 2022 WL 902402, at *1 (excluding opinion "not sufficiently tied to the facts of the case").  As abundantly demonstrated above, Feinstein's inclusion of non-fraud-related investment losses in Plaintiff's purported damages confirms that his testimony does not rest on reliable principles and methods, nor do his opinions reflect a reliable application of any accepted principles and methods to the facts of the case.  The Court should exclude his testimony in its entirety.

### III.    Feinstein's Unreliable Opinions All Stem from an Illogical "But-For" World that Ignores Basic Economic Principles and Well-Settled Law

Tasked with defending the indefensible, Feinstein invents an unprecedented theory that—if ever accepted by a court—effectively would relieve plaintiffs of establishing loss causation and transform virtually all securities fraud cases into guarantees against investment losses.

Feinstein's fantastical journey begins with his so-called "information asymmetry" theory.  *See* Ex. C ¶ 21 & n.11.  According to Feinstein, investors will "assume the worst" if they discover that "important" information is being withheld from them by an issuer.  *Id.* ¶¶ 21, 219; Ex. D ¶¶ 26.iii, 108, 119.  Feinstein then takes this premise and purports to construct a "but-for world," which he claims is a hypothetical world without "fraud or misrepresentation."  Ex. C ¶ 189.  But it is nothing of the sort.  In Feinstein's world, Vale apprises investors "that the company [is] engaged in a campaign to mislead the public and investors about dam safety and other items."  Ex. B at 138:20-25; *see id.* at 155:20-156:7.  When the market learns that important information is being concealed, it purportedly assumes the "worst-case scenario," causing Vale's securities to

plummet.  According to Feinstein, because this cataclysmic scenario must be worse than the consequences of a single dam collapsing, the price decline from the hypothetical disclosure would be *at least* as severe as what actually occurred.  *See id.* 274:4-275:12.

Of course, none of this withstands scrutiny.

*First,* Feinstein's "but-for" world runs afoul of well-settled securities law, which requires him to construct a world in which "the alleged wrongful conduct [had] not occurred."  *Pfizer*, 819 F.3d at 649 (quotation marks and citation omitted).  But Feinstein considered a world in which the allegedly wrongful conduct still occurred *and was continuing to occur*.  Indeed, Feinstein himself seems to understand that his "but-for" world cannot be squared with valid expert practice.  *See* Ex. C ¶ 189 (acknowledging that a but-for world is supposed to be without fraud or misrepresentation); Ex. B at 156:8-12 ("I understand that there is a little bit of a tension there of things being disclosed, and yet there was a statement here about something ongoing.").  In short, the Court should reject this "unsupported and internally inconsistent" but-for construct offered by Feinstein.  *Hunt v. CNH Am. LLC*, 511 F. App'x 43, 47 (2d Cir. 2013) (quotation marks and citation omitted).

*Second*, Feinstein's "but-for" world is "not sufficiently tied to the facts of the case."  *Bats*, 2022 WL 902402, at *1.  It rests on the hypothetical disclosure that Vale withheld important information from investors and would continue to do so, but Feinstein could not even say if investors *ever* fully learned during the class period that important information was being withheld from them.  *See, e.g.*, Ex. B at 171:18-172:12; 277:23-278:3 ("[T]his realization came about slowly and may not have been complete . . . after the full three events.").  If investors never fully learned information was being withheld, as Feinstein says, then his but-for disclosure is not (as he claims) "modeled . . . after what the market . . . learn[ed]" from the corrective disclosures.  *Id*. at 137:11-14.  This "failure to apply his stated methodology reliably to the facts of the case" provides the

Court with yet another basis to exclude his opinions. *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 269 (2d Cir. 2002) (quotation marks omitted).

*Third*, Feinstein's bald assertion that investors "slowly" came to realize that Vale was withholding important information is based on "little more than speculation." *R.F.M.A.S., Inc. v. So*, 748 F. Supp. 2d 244, 273 (S.D.N.Y. 2010). At deposition, Feinstein repeatedly pointed to a statement by the President of Brazil and gestured broadly towards analyst reports in support of his assertion. *See, e.g.*, Ex. B at 278:11-279:17. But the President did not say he believed he was being misled. Ex C ¶ 69. And nor do the other sources cited by Feinstein support in any way this notion of a "slowly emerging realization." *See id.* ¶¶ 67–74, 87–97; Ex. A ¶ 65 & n.95, Ex. 5.

*Fourth*, Feinstein's farcical construct cannot be squared with binding case law. Courts look to "the relationship between the plaintiff's investment loss and the information misstated or concealed." *Vivendi*, 838 F.3d at 261 (quotation marks and citation omitted). In particular, "the *subject* of the fraudulent statement or omission [must be] the cause of the actual loss suffered," and "if the connection is attenuated, or if the plaintiff fails to demonstrate a causal connection between the content of the alleged misstatements or omissions and the harm actually suffered, a fraud claim will not lie." *Id.* (quotation marks omitted). Feinstein's methodology is not tethered to the "subject" or the "content" of the challenged statements or to the "information misstated or concealed." *Id.* Instead, it hinges on the "information asymmetry" created by a hypothetical disclosure of an "ongoing fraud" involving "important information." This "campaign" (as Feinstein describes it) does all the work in his but-for world, and the actual "subject" of the allegedly fraudulent statement and the "information misstated or concealed" are essentially beside the point. *See*

13

*Sapp v. Marcum*, 2023 WL 3965718, at *5 (M.D. Fla. June 13, 2023) (excluding expert opinion based on use of methodology "contrary to the law").[4]

*Finally*, if accepted, Feinstein's proposed new paradigm for modeling loss causation and damages in securities cases would practically eliminate loss causation as an element and transform class actions into insurance policies against all investment losses. The underlying facts of a case essentially would be rendered irrelevant, as all a plaintiff would need to do (besides hiring Feinstein) is point to at least two alleged material misstatements (*i.e.*, a "campaign" of deception about "important" information), and then demand as "damages" the full amount of all investment losses occurring on alleged corrective event dates. *Accord* Ex. B at 56:15-60:4, 194:18-196:22 (explaining that his "campaign" theory merely requires two alleged misstatements coupled with scienter); *see also id.* 72:21-25. No court has ever admitted such a spurious gambit proffered by a loss causation/damages expert. And hopefully no court ever will.

---

[4] Feinstein also improperly opines that the alleged misstatements were "economically material" to investors. Ex. C ¶ 108. Such an opinion is an impermissible legal conclusion. *See, e.g.*, *S.E.C. v. Tourre*, 950 F. Supp. 2d 666, 678 (S.D.N.Y. 2013) ("No party would doubt—one hopes—that an expert cannot testify as to whether the specific information at issue in a case is or is not 'material.'"); *S.E.C. v. Airborne Wireless Network*, 2023 WL 5935627, at *6 (S.D.N.Y. Sept. 12, 2023) ("An expert cannot testify as to whether the specific information at issue in a case is or is not 'material.'"); *S.E.C. v. Ripple Labs, Inc.*, 2023 WL 5670711, at *7 (S.D.N.Y. Mar. 6, 2023) ("[O]pinions as to the materiality of important disclosures is a legal conclusion that would usurp 'the role of the jury in applying th[e] law to the facts before it.'" (quoting *United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991))). Nor does Feinstein's transparent attempt to frame his opinion as limited to "economic" materiality somehow render it admissible. *See Tourre*, 950 F. Supp. 2d at 678.

## CONCLUSION

For all the reasons stated above, Defendants respectfully request that the Court grant their motion to exclude—in its entirety—the proffered testimony of Steven P. Feinstein.

GIBSON, DUNN & CRUTCHER LLP

By:  /s/ Christopher M. Joralemon
    Christopher M. Joralemon
    Akiva Shapiro
    Mary Beth Maloney
    David M. Kusnetz
    Jason Bressler
    H. Chase Weidner

    200 Park Avenue
    New York, NY  10166-0193
    Telephone:  212.351.4000
    Facsimile:  212.351.4035

    *Attorneys for Defendants*

15