# EXHIBIT A

*Confidential*

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In Re VALE S.A. SECURITIES LITIGATION | No. 19-cv-526-LDH-SJB |

**REBUTTAL EXPERT REPORT OF GLENN HUBBARD**

**April 7, 2023**

*Confidential*

# TABLE OF CONTENTS

I.    Introduction ...........................................................................................................................1

    A.    Qualifications .............................................................................................................1

    B.    Background .................................................................................................................3

        1.    Collapse of Dam 1 of Vale's Córrego do Feijão Mine ............................. 3

        2.    Summary of Allegations ........................................................................... 5

        3.    Vale Securities ......................................................................................... 7

    C.    Assignment ................................................................................................................9

II.   Overview of Professor Feinstein's Opinions ......................................................................10

III.  Summary of Opinions .........................................................................................................11

IV.   Overview of Loss Causation and Damages Analyses in Section 10(b) Matters ................14

    A.    Principles of Loss Causation and Economic Damages .............................................14

    B.    Overview of Assessing Alleged Artificial Inflation in Vale Securities .................17

V.    Professor Feinstein's Opinions Regarding Loss Causation and Damages Are Based On Unscientific Methods .......................................................................................19

        1.    ESG practices ......................................................................................... 21

        2.    Effective risk management ...................................................................... 23

        3.    Company conduct and reputation damage ............................................... 23

        4.    Revenue and cash flow ........................................................................... 25

VI.   Professor Feinstein's Damages Analysis Is Unreliable Because His Damages Analysis Fails to Isolate the Price Impact of the Alleged Fraud on the Vale Securities ............................................................................................................................27

    A.    Professor Feinstein's Damages Analysis Is Unreliable Because He Fails to Articulate or Perform Any Economic Analysis to Determine Investors' Assessment of the Probability of a Safety Incident Occurring or What Disclosures Vale Should Have Made Absent the Alleged Misrepresentations ......................................................................................................28

    B.    Professor Feinstein's Damages Analysis Is Unreliable Because He Fails to Isolate Vale Securities' Price Declines Attributable to the Alleged Fraud from the Price Declines Attributable to the Materialization of a Disclosed Risk, as Represented by the Dam 1 Collapse and Related Financial Consequences ..............................................................................................................32

        1.    Professor Feinstein fails to disaggregate the price declines attributable to the materialization of a disclosed risk, as represented by the Dam 1 collapse and related financial consequences, from his alleged artificial inflation ....................................................................... 34

*Rebuttal Expert Report of Glenn Hubbard*

i

*Confidential*

2.    My review of news articles and analysts' commentary indicates that some, if not all, of Vale Securities' price declines following the Dam 1 collapse are attributable to the materialization of the disclosed risk of a dam safety incident and related financial consequences ........................................................................ 37

C.    Professor Feinstein's Constant "Inflation Ribbon" Is Economically Unreasonable and Based on Speculative Assumptions ........................................53

VII.    Professor Feinstein Fails to Explain Inconsistencies in His Event Study for the Vale Notes..................................................................................................60

VIII.    Professor Feinstein Does Not Provide a Mechanism to Assess any Economic Harm for investors in Vale's Preferred ADRs....................................................66

IX.    Mr. Pitt Fails to Provide A Proper Analysis of Economic Harm ....................................69

*Confidential*

## I.   INTRODUCTION

### A.   Qualifications

1.   I am the Dean Emeritus of the Graduate School of Business at Columbia University, where I hold the Russell L. Carson Professorship in Finance and Economics.  In addition, I am a Professor of Economics in the Department of Economics of the Faculty of Arts and Sciences.  At the National Bureau of Economic Research, I am a Research Associate in programs on corporate finance, public economics, industrial organization, monetary economics, and economic fluctuations and growth.  I am also a visiting scholar at the American Enterprise Institute in programs on tax policy and financial markets.  Since 2006, I have been the Co-chair of the Committee on Capital Markets Regulation dedicated to developing efficient capital markets and ensuring the stability of the financial system.  Prior to joining the Columbia faculty as Professor of Economics and Finance in 1988, I taught in the Department of Economics at Northwestern University.  I have also served as Visiting Professor of Business Administration at Harvard Business School, John M. Olin Visiting Professor at the University of Chicago, Visiting Professor and Research Fellow of the Energy and Environmental Policy Center at Harvard University's John F. Kennedy School of Government, and John M. Olin Fellow at the National Bureau of Economic Research.  I hold A.M. and Ph.D. degrees in Economics from Harvard University, and B.A. and B.S. degrees in Economics from the University of Central Florida, *summa cum laude*.

2.   My professional work has centered on problems in finance, public economics, industrial organization, monetary economics, and natural resource economics.  I have served as a director on the boards of several companies, including currently as the Chairman of the Board for

*Rebuttal Expert Report of Glenn Hubbard*
1

*Confidential*

MetLife, Inc.  As an economist, I have examined the evolution and behavior of a wide range of firms and industries.  As part of my research, I have conducted peer reviewed event studies.[1]  I have also conducted event studies that look at, among other things, the issue of economic materiality in several litigation matters.

3.      I have authored more than 100 research articles, edited a number of books, and authored leading textbooks on money and financial markets, intermediate macroeconomics, and principles of economics.  From 2001 to 2003, I served as Chairman of the President's Council of Economic Advisers; over that period, I also served as Chairman of the Economic Policy Committee for the Organization for Economic Cooperation and Development ("OECD") in Paris.  From 1991 to 1993, I served as Deputy Assistant Secretary (Tax Analysis) of the U.S. Department of the Treasury, where I was responsible for economic analysis of tax policy, the administration's revenue estimates, and healthcare policy issues.  I have also been an adviser or consultant to the Board of Governors of the Federal Reserve System, Social Security Administration, Congressional Budget Office, Federal Reserve Bank of New York, Internal Revenue Service, International Trade Commission, National Science Foundation, U.S. Department of Energy, and U.S. Department of the Treasury.

4.      My *curriculum vitae*, which is attached as **Appendix A**, provides more biographical details and lists my writings.  **Appendix B** lists the testimony that I have provided as an expert witness within the past four years.

---

[1]    *See, e.g.*, Hubbard, Glenn and Darius Palia, "Benefits of Control, Managerial Ownership, and the Stock Returns of Acquiring Firms," *RAND Journal of Economics*, Vol. 26, No. 4, 1995, pp. 782-792.  *See also,* Hubbard, Glenn and Darius Palia, "A Reexamination of the Conglomerate Merger Wave in the 1960s: An Internal Capital Markets View," *The Journal of Finance*, Vol. 54, No. 3, 1999, pp. 1131-1152.

*Confidential*

**B.**   **Background**

*1.*   *Collapse of Dam 1 of Vale's Córrego do Feijão Mine*

5.   Vale S.A. ("Vale" or the "Company") is a global mining company headquartered in Brazil.  As of December 31, 2018, Vale was one of the world's largest producers of iron ore, iron ore pellets, and nickel.[2]  The Company generated approximately $36.6 billion in net operating revenue in 2018, of which over 75 percent was attributable to iron-related ("ferrous") minerals.[3]

6.   The mining process involves extracting valuable minerals or metals from mined ore, which results in a waste byproduct known as "tailings."[4]  Tailings usually take the form of a liquid slurry of mineral particles that requires storage.[5]  Vale commonly deposits tailings in storage facilities (*i.e.*, "tailings dams"), which grow in size over the life of the mine as new layers of byproduct are added in an operation that is referred to as "raising."[6]

7.   I understand that tailings dams may have various wall construction designs, including downstream, upstream, or centerline.[7]  In the upstream construction method, the dam is built through successive raisings of the deposited tailings, which is carried out against the flow of water (*i.e.,* upstream).[8]

---

[2]   Vale, Form 20-F for the fiscal year ending December 31, 2018, p. 1.

[3]   Vale, Form 20-F for the fiscal year ending December 31, 2018, p. 8.

[4]   Global Tailings Review, "About Tailings," available at https://globaltailingsreview.org/about-tailings/.

[5]   Global Tailings Review, "About Tailings," available at https://globaltailingsreview.org/about-tailings/.

[6]   Vale, "Dams," available at https://www.vale.com/fi/dams.

[7]   Vale, "Dams," available at https://www.vale.com/fi/dams; *See also* Expert Report of Dr. Timothy D. Stark, P.E., D.GE, F.ASCE, March 10, 2023, ¶¶ 53-59.

[8]   Vale, "Dams," available at https://www.vale.com/fi/dams; *See also* Expert Report of Dr. Timothy D. Stark, P.E., D.GE, F.ASCE, March 10, 2023, ¶¶ 53-59.

*Confidential*

8.      I understand that following the failure of the Fundão Dam—which was owned and operated by Samarco Mineração S.A. ("Samarco"), a joint venture between BHP Group Limited (formerly known as BHP Billiton) and Vale—near the town of Mariana in November 2015,[9] Vale began the process of stopping its remaining upstream dams from receiving new materials from mining activity (*i.e.*, "inactive") and adopting measures to gradually fully dismantle them (*i.e.*, "decommissioning" its upstream dams).[10]

9.      Dam 1 was an upstream tailings dam of Vale's Córrego do Feijão mine near the town of Brumadinho in Brazil's Minas Gerais region.  On January 25, 2019, Dam 1 collapsed and released a flow of tailings, causing approximately 270 fatalities and significant environmental impacts.[11]  I understand that at the time of the accident, all 19 of Vale's upstream dams had been deactivated, nine dams had been decommissioned upon due approval by the relevant authorities,[12] and although Dam 1 had not yet been decommissioned, Vale was planning to do so.[13]

---

[9]   Consolidated Class Action Complaint*, In re Vale S.A. Securities Litigation*, Case No. 19-cv-526-RJD-SJB, October 25, 2019 ("Complaint"), ¶¶ 4, 58; BHP, "Change of name to BHP Group," November 19, 2018, available at https://www.bhp.com/news/media-centre/releases/2018/11/change-of-name-to-bhp-group.

[10]   Vale, "Vale clarifies that the decision to decommission all upstream dams was made in 2016," February 1, 2019, available at https://www.vale.com/fr/w/vale-clarifies-that-the-decision-to-decommission-all-upstream-dams-was-made-in-2016.

[11]   Complaint, ¶ 3.

[12]   Vale, "Vale clarifies that the decision to decommission all upstream dams was made in 2016," February 1, 2019, available at https://www.vale.com/fr/w/vale-clarifies-that-the-decision-to-decommission-all-upstream-dams-was-made-in-2016.

[13]   Vale, "Córrego Feijão Mine – Dam 1 Study of Variants of Decommissioning Technical Report," November 22, 2018 (Vale_Dam1_00298811_T.0001 – Vale_Dam1_00298811_T.0075).

Confidential

*2.    Summary of Allegations*

10.    I understand that the present action was brought by Colleges of Applied Arts and Technology Pension Plan ("CAAT" or "Plaintiff") against Vale and several company executives (collectively "Defendants") on behalf of a class consisting of all persons who purchased Vale's American Depository Receipts ("Vale ADRs") and/or seven senior unsecured debt securities with various maturity dates and coupons ("Vale Notes") on the New York Stock Exchange ("NYSE") or other U.S. exchanges or in a U.S. transaction between October 27, 2016 and February 6, 2019 ("Class Period").[14]  The Vale ADRs and Vale Notes are collectively referred to as "Vale Securities" and are described in greater detail below.

11.    Plaintiff alleges that Defendants: "materially misrepresented or failed to disclose throughout the Class Period that: (1) at least one of Vale's high-hazard tailings dams, Dam 1, had a high probability of failure; (2) Vale's dam risk management and sustainability practices and policies were insufficient and/or insufficiently implemented in light of the known risks to human life and the environment posed by Dam 1; (3) Vale systematically acted to get Stability Condition Statements for dams that were not stable and did not meet Vale's own purported safety standards; and (4) at least as early as 2018, Vale's third-party dam safety auditor had a financial conflict of interest, and issued Stability Condition Statements under fear of economic reprisal from Vale."[15]

---

[14]    Complaint, ¶¶ 2, 35-41, 221; ECF No. 116, *In re Vale S.A. Securities Litigation*, Case No. 19-cv-526-RJD-SJB, March 31, 2022.  I understand that the Court has dismissed Plaintiff's allegation that statements on July 28, 2016 were a misrepresentation and the operative Class Period begins on October 27, 2016.  *See* Memorandum & Order, *In re Vale S.A. Securities Litigation*, Case No. 19-cv-526-RJD-SJB, May 20, 2020 ("Ruling on the Motion to Dismiss").

[15]    Complaint, ¶ 11.

*Confidential*

12.    In particular, Plaintiff alleges that Defendants disseminated "materially false and misleading statements" in filings with the U.S. Securities and Exchange Commission ("SEC"), press releases, and other public commentary during the Class Period ("Alleged Misrepresentations")[16] that artificially inflated the Vale Securities' prices.[17] According to the Complaint and the Ruling on the Motion to Dismiss,[18] I understand that these Alleged Misrepresentations occurred on 14 dates prior to the collapse of Dam 1 on January 25, 2019,[19] as well as on January 28, 2019,[20] the first trading day following the collapse of Dam 1.

13.    Plaintiff further alleges that this artificial inflation in Vale Securities' prices dissipated through a series of corrective disclosures ("Alleged Corrective Disclosures") that occurred on three dates ("Alleged Corrective Dates"):[21]

  i.   **January 25, 2019**: "On Friday, January 25, 2019, Dam 1 collapsed at 12:28 P.M. local time (11:28 A.M. E.S.T.). News of the devastating dam failure quickly spread via numerous media outlets…."[22]

---

[16]    Complaint, § V.

[17]    *See, e.g.*, Complaint, ¶¶ 201, 215.

[18]    Ruling on the Motion to Dismiss.

[19]    Complaint, § V; Ruling on the Motion to Dismiss, § II. Plaintiff Alleges Material Misrepresentations or Omissions.

[20]    Plaintiff alleges that: "in a January 28, 2019 form 6-K filing, Defendants continued to claim that Dam 1 had a Safety Factor that was 'in accordance with the world's best practices and above the reference of the Brazilian Standard.'" *See* Complaint, ¶ 27.

[21]    In addition, Plaintiff alleges that corrective disclosures occurred on January 28, 2019 as: "[s]ignificant news concerning the Dam 1 breach, its impacts, and investigations continued to emerge over the weekend of January 26-27, 2019, and on Monday January 28, 2019." Complaint, ¶¶ 206-209. I understand that in the Ruling on the Motion to Dismiss, the Court ruled that disclosures between January 26, 2019 and January 28, 2019 are "not necessarily indicative of any alleged misrepresentation or fraud" and thus do not qualify as corrective disclosures. *See* Ruling on the Motion to Dismiss, p. 33.

[22]    Complaint, ¶ 25.

*Confidential*

ii. **February 4, 2019**: "On February 4, 2019, *Bloomberg* reported that Vale said it was 'temporarily halting some operations at its Brucutu mine . . . in compliance with a Brazilian court order . . . .'"[23]

iii. **February 6, 2019**: "Additionally, on February 6, 2019, material news emerged that Vale had been forewarned by employees and inspectors that Dam 1 was at a high risk of rupture."[24]

    a. "*The Guardian* reported in an article, '"That's going to burst": Brazilian dam workers say they warned of disaster,' that at least three Vale employees had raised concerns about the possibility of a Dam 1 rupture following the emergence of significant water leaks along the dam face in July 2018."[25]

    b. "Additionally, *The Wall Street Journal* reported that Vale was warned by its auditor, TÜV SÜD, in a September 2018 report that 'faulty water drainage and monitoring systems represented a potential risk of failure' at Dam 1."[26]

14. Plaintiff claims that investors suffered economic harm: "[d]ue to Defendants' misstatements and omissions, and the precipitous decline in the market value of Vale's Securities."[27]

### 3. *Vale Securities*

15. The Vale ADRs trade on the New York Stock Exchange under the symbol "VALE" and represent one common share of the Company's stock.[28] Prior to November 2017, Vale also had preferred ADRs outstanding, which represented preferred shares of the Company's stock and traded under the symbol "VALE.P."[29] As I describe in more detail in **Section VIII**, between

---

[23]  Complaint, ¶ 28.

[24]  Complaint, ¶ 29.

[25]  Complaint, ¶ 29.

[26]  Complaint, ¶ 29.

[27]  Complaint, ¶ 30.

[28]  Complaint, ¶ 35; Vale, Form 20-F for the fiscal year ending December 31, 2021, cover page.

[29]  Vale, Form 20-F for the fiscal year ending December 31, 2016, p. 119. Plaintiff does not mention the preferred ADRs as an at-issue security in the Complaint.

*Confidential*

June 2017 and November 2017, Vale's preferred shares were converted into common shares at a ratio of 0.9342 common share per preferred share, and the preferred shares and preferred ADRs ceased to exist.[30]  Prior to the conversion, there were over 595 million preferred ADRs outstanding.[31]

16.    In **Exhibit 1**, I show the price of the Vale ADRs between October 27, 2016 and May 6, 2019 (*i.e.*, the Class Period plus the relevant 90-day period under the Private Securities Litigation Reform Act of 1995 ("PSLRA"), which I describe in **Section VIII**).[32]  **Exhibit 1** demonstrates that the price of Vale ADRs at the end of the Class Period was higher than the price at the beginning of the Class Period.

17.    As I show in **Exhibit 2**, the Vale Notes are a set of seven fixed income securities issued between 2006 and 2016 with maturities of five years, ten years, or thirty years.  **Exhibit 3** demonstrates that, based on TRACE pricing data produced in this litigation, the volume-weighted average price ("VWAP") of the Vale Notes generally increased between the beginning and end of the Class Period.

---

[30]    Vale completed a voluntary conversion in August 2017 and a mandatory conversion in November 2017.  *See* Vale, Form 20-F for the fiscal year ending December 31, 2017, pp. 6, F-94.

[31]    Vale, "Offer to Exchange Any or All Outstanding American Depositary Shares Representing Preferred Shares of Vale S.A. for American Depository Shares Representing Common Shares of Vale S.A. [and] Offer to Convert Any or All Outstanding Preferred Shares Represented by American Depository Shares of Vale S.A. into Common Shares of Vale S.A.," June 28, 2017 ("Vale Voluntary Conversion Offer"), p. 11.

[32]    As I describe in **Section VIII**, the PSLRA provides for a limitation on damages such that damages shall not exceed the difference between the price a plaintiff purchased the subject security and the average trading price of the security in the 90-day period following the dissemination of corrective information to the market.

*Confidential*

### C.    Assignment

18.    I have been retained by Gibson, Dunn & Crutcher LLP ("Counsel"), counsel for Defendants, to review and respond to the analysis presented in the Expert Report on Loss Causation and Damages of Professor Steven P. Feinstein, Ph.D., CFA dated March 10, 2023 ("Feinstein Report"); and certain opinions expressed in the Expert Report of Harvey L. Pitt dated March 9, 2023 ("Pitt Report").[33]

19.    I am being compensated for my time in this matter at my standard billing rate of $1,750 per hour.  Employees of Analysis Group, Inc. working under my direction have assisted me in preparing this report.  I also receive a portion of the fees received by Analysis Group, Inc. for work performed in conjunction with my assignment in this matter.  My compensation in this matter is not contingent upon my findings or the outcome of this litigation.

20.    The materials that I, and those working under my direction, have considered for my analysis are listed in **Appendix C** of this Report.  My work on this matter is ongoing, and I may review additional materials or conduct further analysis, including but not limited to analyzing and responding to additional expert reports or testimony offered by Plaintiff or its experts.  I reserve the right to update, refine, or revise my opinion.

---

[33]    Mr. Pitt opines: "[o]n January 25, 2019, as an immediate result of the Dam's collapse, Vale Securities declined over eight percent.  By February, international mainstream media began detailing the horrific details of the collapse as given by workers of the Mine and Dam, and Vale Securities declined nearly an additional ten percent.  As alleged, when the truth regarding the risk of Vale's tailing dams and its inadequate dam maintenance and safety certifications was disclosed, and the concealed risks materialized, the price of Vale Securities ultimately lost nearly twenty-five percent."  Pitt Report, p. 28.

*Confidential*

## II.    OVERVIEW OF PROFESSOR FEINSTEIN'S OPINIONS

21.    Professor Feinstein states that he was asked: "to assess whether Class members suffered losses as a result of the alleged misrepresentations and omissions described in the Complaint … [and] compute damages, if any, suffered by Class members from their investments during the Class Period in the Vale Securities."[34]

22.    Professor Feinstein opines that the Alleged Misrepresentations caused the prices of the Vale Securities to be artificially inflated over the course of the Class Period, and investors sustained losses (*i.e.*, suffered damages) when the artificial inflation dissipated following the Alleged Corrective Disclosures.[35]  He asserts that: "[t]he corrective disclosure events informed the market that, contrary to what the market was led to believe, the Company's dams were not stable, the Company was not managing risks effectively, the Company was not committed to safety and sustainability, and as a result the Company was exposed to the adverse consequences of its decisions and conduct, including financial ramifications, and regulatory, litigation, and enforcement actions."[36]

23.    Professor Feinstein conducts an event study analysis to estimate the purported amount of artificial inflation, measured as: "all of the residual price declines in the Vale Securities" (after accounting for market and industry effects) on the Alleged Corrective Dates.[37]  Professor Feinstein estimates an "inflation ribbon," or "time series of artificial inflation caused by the

---

[34]    Feinstein Report, ¶ 6.

[35]    Feinstein Report, ¶ 11.

[36]    Feinstein Report, ¶ 12.

[37]    Feinstein Report, ¶¶ 15, 19, 26.

*Confidential*

alleged fraud,"[38] for each of the Vale Securities and Class Period dates based on the residual returns obtained from his event study analyses. He assumes that the entirety of this purported artificial inflation entered Vale Securities' prices as of the beginning of the Class Period on October 27, 2016, arguing that Vale could have revealed "the truth about dam conditions" at that time and: "that it was determined to withhold from the public accurate information about dam conditions and the Company's conduct."[39] He finds that investors in the Vale ADRs suffered losses of up to $2.72 per ADR,[40] and investors in the Vale Notes suffered losses ranging from $0.00 to $7.17 per $100 of par value.[41]

## III.    SUMMARY OF OPINIONS

24.    From an economic perspective, Plaintiff's experts Professor Feinstein and Mr. Pitt have not shown that purchasers of the Vale Securities during the Class period suffered any cognizable damages in this matter. Below is a summary of the research and analyses I have conducted to date in arriving at this opinion:

- *From an economic perspective, an appropriate analysis of damages needs to isolate the artificial inflation, if any, resulting from the alleged wrongdoing versus other factors.* Given the allegations in this case, from an economic perspective, I would expect the Alleged Misrepresentations, assuming they misled investors, to have resulted in changes to investors' cash flow expectations caused by a difference between investors' assessed probability of a safety incident occurring and the "true" probability of a safety incident occurring (which Plaintiff alleges was higher than what investors assessed as a result of the Alleged Misrepresentations). Therefore, assuming the allegations are true, an appropriate damages analysis must isolate the artificial inflation, if any, resulting from this incremental difference between investors' assessment of the probability of a safety

---

[38]    Feinstein Report, ¶ 194.

[39]    Feinstein Report, ¶ 24.

[40]    Feinstein Report, ¶ 213 and Exhibit 9.

[41]    Feinstein Report, ¶¶ 230, 235, 239, 243, 247, 251, 254 and Exhibits 13a-13f. Professor Feinstein's analysis shows that investors in one of the notes, TAN3, suffered no quantifiable damages.

*Confidential*

incident occurring given the Alleged Misrepresentations and their assessment of what the "true" probability of a safety incident occurring would have been absent the Alleged Misrepresentations (*i.e.*, the damages analysis must isolate the impact of the alleged fraud).  To isolate the price impact of the alleged fraud, an appropriate damages analysis must account for and disaggregate any price declines on the Alleged Corrective Dates due to causes unrelated to the alleged fraud including a materialization of disclosed risk (*i.e.,* the collapse of Dam 1).  **(Section IV).**

- *Professor Feinstein's opinions regarding loss causation and damages are based on unscientific methods.*  The "Financial Principles Establish that the Alleged Misrepresentations and Omissions Were Economically Material" section of the Feinstein Report is composed of large blocks of quotes from academic studies that discuss the importance of (1) environmental, social, and governance ("ESG") practices, (2) effective risk management, (3) company conduct and reputational damage, and (4) revenue and cash flow to firm value, and the negative valuation impact to a firm when the market learns about weaknesses in these areas.  However, none of the statements Professor Feinstein excerpts from these articles supports his use of the articles—namely, to establish that the Alleged Misrepresentations introduced artificial inflation into Vale Securities' prices.  Professor Feinstein's "analysis" ignores the critical element of empirically *demonstrating* the existence of inflation, as opposed to *assuming* such inflation based on the alleged importance of the subject matter **(Section V).**

- *Professor Feinstein's damages analysis suffers from several critical conceptual flaws that, from an economic perspective, render his conclusions unreliable and invalid as a measure of economic damages in this case:*

  o Professor Feinstein's damages analysis is unreliable because he fails to articulate or provide any economic analysis regarding either investors' assessed probability of a safety incident occurring given the Alleged Misrepresentations or the "true" probability of a safety incident occurring that investors would have assessed in the absence of the Alleged Misrepresentations at any time during the Class Period.  In addition, apart from several vague statements with the benefit of hindsight, he fails to articulate what disclosures Vale should have made absent the Alleged Misrepresentations.  **(Section VI.A).**

  o Professor Feinstein's damages analysis is unreliable because he fails to isolate the price impact of the alleged fraud.  Specifically, Professor Feinstein fails to consider that a safety incident—in this matter the Dam 1 collapse—represented a materialization of disclosed risk, which could have occurred absent any alleged misrepresentations or omissions, and that impacted Vale Securities' prices on the Alleged Corrective Dates.  **(Section VI.B).**

  o Professor Feinstein's calculation of a constant "inflation ribbon" is economically unreasonable and based on speculative assumptions.  Professor Feinstein's analysis is in effect premised on the inappropriate and unsupported assumption that, but for the Alleged Misrepresentations, investors would have assessed the

*Confidential*

"true" risk of Dam 1 collapsing, *ex ante*, to be 100 percent starting at the beginning of the Class Period. In addition, Professor Feinstein fails to articulate how different Alleged Misrepresentations would introduce artificial inflation in the price of the Vale Securities during the Class Period or how his damages analysis would be affected if the finder of fact determines that some of the Alleged Misrepresentations were not misrepresentations or otherwise not actionable. **(Section VI.C).**

- *Professor Feinstein fails to explain inconsistencies in his event study for the Vale Notes.* Professor Feinstein does not explain why the various Vale Notes reacted differently to the Alleged Corrective Disclosures. Furthermore, Professor Feinstein's event study results are sensitive to his choice of regression model specification. These conflicting results call into question the reliability of his event study model and his prior conclusion in the Feinstein Market Efficiency Report that the market for the Vale Notes was efficient during the Class Period. **(Section VII).**

- *Professor Feinstein does not provide a mechanism to assess any economic harm for investors in Vale's preferred ADRs.* Despite the fact that the Vale preferred ADRs were outstanding during part of the Class Period, Professor Feinstein does not discuss loss causation or damages associated with the preferred ADRs in the Feinstein Report. Further, he did not establish market efficiency for the preferred ADRs in the Feinstein Market Efficiency Report. Nowhere in Professor Feinstein's report does he describe whether individuals who purchased and/or held preferred ADRs during the Class Period and had those ADRs converted to common ADRs were damaged. To the extent Plaintiff may argue that holders of the preferred ADRs "purchased" common ADRs at inflated prices in the conversion, these investors also would have "sold" a preferred ADR on the same day, presumably also at an inflated price that Professor Feinstein has not determined. Ignoring the potential benefit a class member had from "selling" a preferred ADR at an inflated price while assuming that same class member was damaged through the "purchase" of a common ADR through the conversion could lead to an unjustified windfall. However, even if Professor Feinstein had analyzed inflation per share for the preferred ADRs and Plaintiff establishes that the conversion is effectively a "purchase" at an inflated price, such class members would still suffer no damages based on the PSLRA. **(Section VIII).**

- *Mr. Pitt fails to provide a proper analysis of economic harm.* To the extent Mr. Pitt is asserting that the alleged materialization of concealed risks caused the 25 percent decline in Vale's ADR price he describes, he has performed no analysis to link the decline in price to any allegedly concealed risks. Similar to Professor Feinstein, Mr. Pitt provides no analysis of the portion of the price decline he references that is attributable to factors unrelated to the alleged fraud such as the occurrence of a materialization of a disclosed risk. From an economic perspective, Mr. Pitt's opinion regarding the cause of the declines in Vale's ADR price without any analysis is misleading at best and not appropriate for the purposes of determining loss causation associated with the Alleged Misrepresentations. **(Section IX).**

*Confidential*

## IV.    OVERVIEW OF LOSS CAUSATION AND DAMAGES ANALYSES IN SECTION 10(B) MATTERS

### A.    Principles of Loss Causation and Economic Damages

25.    Economists in Section 10(b) matters typically calculate damages to investors under the "out-of-pocket" measure.  From an economic perspective, out-of-pocket damages are based on the amount, if any, by which the security price was inflated by the alleged misrepresentations or omissions.  An investor suffers potential out-of-pocket damages if the investor purchased a security at an inflated price because of false or misleading statements or omissions, and the market subsequently learns the allegedly concealed truth and the security's price declines as a result of the revelation of the truth.[42]

26.    If an investor owns the shares through the end of the class period when the alleged misrepresentations are disclosed, then damages per share are typically measured as inflation per share at the time of the investor's purchase.[43]  In other words, damages are the difference between how much the investor paid in the actual world and what they would have paid had the truth been known at the time of purchase.  If an investor, for example, purchased a security when its price was inflated by $5, then damages would be $5 per share if the investor held that share until the end of the class period (setting aside any "bounce-back" in the subsequent 90 days).

27.    If an investor either purchases or sells shares during the period in which the truth regarding the prior allegedly false or misleading misrepresentations is disclosed, the damages calculation has to account for this by calculating damages as inflation per share at the time of

---

[42]    Gold, Kevin, Eric Korman, and Ahmer Nabi, "Federal Securities Acts and Areas of Expert Analysis," Chapter 27, *Litigation Services Handbook*, Sixth Edition (eds. Roman Weil, Daniel Lentz, and Elizabeth Evans), John Wiley & Sons, Inc., 2017 ("Federal Securities Acts and Areas of Expert Analysis"), p. 15.

[43]    Federal Securities Acts and Areas of Expert Analysis, p. 15.

*Confidential*

purchase less the inflation, if any, remaining at the time of sale.[44]  That is, suppose an investor purchased shares when a security's price was inflated by $5 and sold these shares after a corrective disclosure reduced inflation by $1 to $4, but the truth regarding the alleged misrepresentations has not yet been fully revealed.  Damages for that investor would be $1 per share (inflation at purchase minus inflation at sale), not $5, because all inflation had not yet been removed from the security's price.

28.    To assess potential damages, an economist therefore needs first to identify and select event(s) of interest (*i.e.*, dates either when the alleged misrepresentations were made or when information corrective of the alleged misrepresentation was disclosed).[45]  In particular, the information released on a given date needs to be examined to determine whether the information was newly disclosed or stale, corrective of the allegedly concealed truth, unrelated to the allegedly concealed truth, or related to, but not corrective of, the allegedly concealed truth.

29.    The next step is to assess whether the correction of the misrepresentations—or revelation of the omitted material information—caused the investor's loss (that is, there must be "loss causation").  Events that reveal the allegedly concealed truth, and therefore reduce or eliminate the inflation in the share price, are typically referred to as "corrective" or "curative" disclosures.[46]  Determining loss causation from an economic perspective requires isolating the portion of losses, if any, caused by the revelation of previously concealed or omitted truth, as

---

[44]   Federal Securities Acts and Areas of Expert Analysis, p. 15.

[45]   MacKinlay, A. Craig, "Event Studies in Economics and Finance," *Journal of Economic Literature*, Vol. 35, March 1997, pp. 14-15.

[46]   Federal Securities Acts and Areas of Expert Analysis, p. 12.

*Confidential*

opposed to the portion caused by other factors. These other factors may include, for example, price movements caused by market or industry forces.

30.    As a final step, assuming that the event study demonstrates that some portion of the price movement on a potential corrective disclosure date cannot be explained by industry or market factors, a proper loss causation analysis should assess whether the price movement could be caused by any other so-called "confounding factors," such as the disclosure of other company-specific news that does not reveal new information about the allegedly concealed truth. These factors may include, for example, price movements caused by the realization of a previously disclosed risk—which could have occurred absent any misrepresentations or omissions—and thus, would be unrelated to the alleged fraud. The revelation of such information requires additional analysis to quantify the portion, if any, of the company-specific price change (*i.e.*, the price change after removing market and industry factors) that relates to the revelation of the corrective information versus the information unrelated to the alleged fraud. Any such analysis needs to be scientifically rigorous.

31.    Assuming that, after these steps are completed, an economist demonstrates loss causation, an appropriate damages analysis uses reasonable assumptions to determine the "but-for" price that an investor would have paid had the market known the truth that allegedly should have been disclosed.[47] This but-for price is used to estimate the inflation per share in the security price over the relevant period. Assumptions included in the analysis should incorporate supportable expectations based on commonly accepted methods grounded by economic and financial

---

[47]    Federal Securities Acts and Areas of Expert Analysis, p. 12.

*Confidential*

principles.[48]  Such methods should reflect the case facts regarding the events and circumstances that would have prevailed in the absence of the alleged material misrepresentations or omissions. The but-for price is typically determined by estimating the "inflation per share" and subtracting that "inflation" from the actual security price.[49]

32.    To summarize, from an economic perspective, an appropriate damages analysis must isolate the artificial inflation, if any, caused by the revelation of previously concealed or omitted truth, as opposed to the portion caused by other factors unrelated to the alleged fraud (including the materialization of previously disclosed risks).  An appropriate damages analysis must also rely on reasonable assumptions and methods grounded by economic and financial principles to determine the "but-for" price that an investor would have paid had the market known the truth that allegedly should have been disclosed (*i.e.,* the damages analysis must be based on a credible "but-for" scenario).  As I discuss below, Professor Feinstein's analysis lacks these necessary elements.

**B.    Overview of Assessing Alleged Artificial Inflation in Vale Securities**

33.    Generally speaking, the price of a security reflects investors' expectations regarding the future cash flows generated by the company that issued the security.  In turn, any change in the price of a security represents a change in investors' expectations regarding future cash flows that

---

[48]    Evans, Elizabeth, Daniel Lentz, and Roman Weil, "A Dispute Resolution Primer," Chapter 1, *Litigation Services Handbook*, Sixth Edition (eds. Roman Weil, Daniel Lentz, and Elizabeth Evans), John Wiley & Sons, Inc., 2017, pp. 2-4; Branch, Douglas, Saleema Damji, and Daniel Lentz, "Testimony Considerations," Chapter 3, *Litigation Services Handbook*, Sixth Edition (eds. Roman Weil, Daniel Lentz, and Elizabeth Evans), John Wiley & Sons, Inc., 2017, pp. 7-9; Allen, Mark, Robert Hall, and Victoria Lazear, "Reference Guide on Estimation of Economic Damages," *Reference Manual on Scientific Evidence*, Third Edition, Federal Judicial Center, National Research Council of the National Academies, Washington: The National Academies Press, 2011, 425–502, p. 432.

[49]    Federal Securities Acts and Areas of Expert Analysis, p. 12.

*Confidential*

may arise due to changes regarding the likelihood of the cash flows and/or changes in the amount and timing of those cash flows.

34.     In this case, I would expect the Alleged Misrepresentations, assuming they misled investors, to have resulted in changes to investors' cash flow expectations caused by a difference between investors' assessed probability of a safety incident occurring and the "true" probability of a safety incident occurring (which Plaintiff alleges was higher than what investors assessed as a result of the Alleged Misrepresentations).  Therefore, assuming the allegations are true, an appropriate damages analysis must isolate the artificial inflation, if any, resulting from this incremental difference between investors' assessment of the probability of a safety incident occurring given the Alleged Misrepresentations and their assessment of what the "true" probability of a safety incident occurring would have been absent the Alleged Misrepresentations (*i.e.*, the damages analysis must isolate the impact of the alleged fraud).

35.     To isolate the price impact of the alleged fraud, an appropriate damages analysis must account for and disaggregate any price declines on the Alleged Corrective Dates due to causes unrelated to the alleged fraud.  Assuming the allegations in this matter are true, I would expect that the distinct potential causes for Vale Securities' price declines on the Alleged Corrective Dates include changes in investors' expectations of cash flows related to the following:

   i.   The correction of the alleged artificial inflation caused by Vale allegedly misrepresenting a probability lower than the "true" probability of a safety incident, such as a dam collapse, occurring (*i.e.*, the correction of the alleged fraud).  That is, the alleged artificial inflation due to the difference between (1) the "true" probability of a dam collapsing had Vale made the correct disclosures at the beginning of the Class Period and (2) the investors' assessed probability of a dam collapse given the Alleged Misrepresentations.

*Confidential*

ii. The business interruptions and liabilities resulting from the materializations of the disclosed risks of a dam failure (as represented by the Dam 1 collapse on January 25, 2019 and related financial consequences), which could have occurred regardless of any Alleged Misrepresentation. That is, even absent the Alleged Misrepresentation, there was a probability that a dam collapse could occur.

iii. Other factors, such as market or industry shocks unrelated to the alleged fraud.

36.    As I discuss in the sections that follow, Professor Feinstein's analysis is invalid and unreliable as a measure of economic damages in this case (even assuming liability) because, among other things, he fails to: demonstrate that the Alleged Misrepresentations introduced artificial inflation into Vale Securities' prices; assess which Alleged Corrective Disclosures corrected which Alleged Misstatements; isolate and disaggregate the portion of Vale Securities' price declines, if any, attributable to the alleged fraud versus attributable to the materialization of a disclosed risk; and present a credible but-for scenario supporting his damages calculations.

## V.    PROFESSOR FEINSTEIN'S OPINIONS REGARDING LOSS CAUSATION AND DAMAGES ARE BASED ON UNSCIENTIFIC METHODS

37.    Professor Feinstein asserts, and I agree, that: "analysis of loss causation also typically comprises empirical analysis, to determine whether the revelation of the previously concealed truth did observably cause a security price decline."[50]  Despite this acknowledgment, Professor Feinstein reaches opinions about loss causation by misapplying the point of the academic studies upon which he relies.

38.    The "Financial Principles Establish that the Alleged Misrepresentations and Omissions Were Economically Material" section of the Feinstein Report is composed of large blocks of quotes from academic studies that discuss the importance of (1) environmental, social, and

---

[50]    Feinstein Report, ¶ 102.

*Confidential*

governance ("ESG") practices, (2) effective risk management, (3) company conduct and reputational damage, and (4) revenue and cash flow to firm value, and the negative valuation impact to a firm when the market learns about weaknesses in these areas.[51]  However, none of the statements Professor Feinstein excerpts from these articles supports his use of the articles— namely, to purportedly establish that the Alleged Misrepresentations introduced artificial inflation into Vale Securities' prices.  Nonetheless, based on his citation to these academic studies, Professor Feinstein arrives at his conclusion that: "[a]ccording to established financial principles and published empirical research, the alleged misrepresentations and omissions would have inflated Vale's value on account of [these topics]."[52]

39.      A review of academic studies is not a reliable or economically rigorous basis for establishing that the Alleged Misrepresentations artificially inflated Vale Securities' prices during the Class Period.  Professor Feinstein's approach can be boiled down to a simple, yet false, syllogism: certain information is "important";[53] the Alleged Misrepresentations related to such information; therefore, the Alleged Misrepresentations artificially inflated the Vale Securities' prices.  This "analysis" ignores the critical element of empirically *demonstrating* the existence of inflation, as opposed to *assuming* such inflation based on the alleged importance of certain subjects as a general matter.

40.      Even if the Alleged Misrepresentations were material—which Professor Feinstein has not demonstrated—as I discuss in greater detail throughout my report, Professor Feinstein has

---

[51]    Feinstein Report, Section VI.B.1.

[52]    Feinstein Report, ¶ 122.

[53]    *See, e.g.*, Feinstein Report, ¶ 99.

*Confidential*

performed no economic analysis to identify and disaggregate the portion of Vale Securities' price declines allegedly attributable to the Alleged Misrepresentations from the portion attributable to the materialization of disclosed risk (as represented by the Dam 1 collapse and related financial consequences), which could have occurred absent any misrepresentations or omissions. Furthermore, Professor Feinstein has not demonstrated that the Alleged Corrective Disclosures revealed the "truth" regarding these topics (*i.e.,* ESG practices, effective risk management, company conduct and reputational damage, and revenue and cash flow) that was previously allegedly misrepresented. In other words, Professor Feinstein has failed to show that the Alleged Misrepresentations introduced artificial inflation into Vale Securities' prices, that the Alleged Corrective Disclosures actually corrected any Alleged Misrepresentations, or what portion of the price declines in Vale Securities on the Alleged Corrective Dates is attributable to the correction of any misrepresentations or omissions as opposed to a materialization of previously disclosed risks.

### 1.    *ESG practices*

41.    Professor Feinstein references two articles from the Chartered Financial Analyst ("CFA") curriculum to support his claim that: "a company's ESG strategy, policies, initiatives, and conduct are economically material."[54] Broadly speaking, I do not disagree with the articles Professor Feinstein references. However, Professor Feinstein's discussion of these articles is, in and of itself, insufficient to demonstrate that any purported ESG-related Alleged Misrepresentations resulted in the introduction of artificial inflation in the prices of Vale Securities. In fact, the excerpts Professor Feinstein provides convey an important point that ESG

---

[54]    Feinstein, Report, ¶ 111.

*Confidential*

concerns may not impact all securities, and thus special care must be taken to determine whether a security's price is influenced by ESG-related news.  For example, an excerpt from Safieddine, *et al.* (2019) to which Professor Feinstein cites states that: "[t]he materiality of ESG factors, particularly environmental and social factors, in investment analysis often differs meaningfully among sectors."[55]  Similarly, an excerpt from Kidd, *et al.* (2020) states that: "[e]valuating how ESG factors *potentially* affect a company *may provide* analysts with a broader perspective."[56] Notwithstanding that the ESG-related excerpts to which Professor Feinstein cites state that ESG-related news do not impact every company or even every industry similarly, the fact that ESG-related statements may be material in certain instances is insufficient to demonstrate that the Alleged Misrepresentations were material.  For example, Professor Feinstein has not shown that investors would consider many of the vague or generic Alleged Misrepresentations related to ESG (*e.g.*, "[w]e are committed to becoming a sustainability benchmark"[57] or "[f]irst of all, and most importantly, safety is our top priority"[58]) to be material.  In addition, as I discuss below, Professor Feinstein performs no economic analysis to disaggregate the portion of Vale Securities' price declines, if any, attributable to the purported correction of ESG-related Alleged Misrepresentations from the portion attributable to the materialization of disclosed risk, as represented by the Dam 1 collapse and related financial consequences that would have occurred absent the Alleged Misrepresentations.

---

[55]    Feinstein Report, ¶ 113.

[56]    Feinstein, Report, ¶ 113 (emphasis added).

[57]    Feinstein Report, ¶ 63; Complaint, ¶ 184.

[58]    Feinstein Report, ¶ 57; Complaint, ¶ 161.

*Confidential*

### 2.   *Effective risk management*

42.     Professor Feinstein again quotes articles from the CFA curriculum to support his conclusion that: "a company's ability to measure, manage, and mitigate risk does impact the value of the company's securities."[59]  Again, I do not disagree with the analysis that Professor Feinstein references.  However, Professor Feinstein's citation to this work is not sufficient to demonstrate that any purported risk management-related Alleged Misrepresentations resulted in the introduction of artificial inflation in Vale Securities' prices.  For example, an excerpt Professor Feinstein provides from Chance and Edleson (2020) indicates that, while risk management is important, it impacts companies in the "long-term."[60]  However, Professor Feinstein performs no economic analysis to disaggregate the portion of Vale Securities' price declines, if any, attributable to misrepresentations regarding "long-term" risk management from the portion attributable to the materialization of disclosed risk, as represented by the Dam 1 collapse and related financial consequences that would have occurred absent the Alleged Misrepresentations.

### 3.   *Company conduct and reputation damage*

43.     Professor Feinstein cites CFA curriculum and academic articles as support for his statement that: "the ramifications of a fraud and investor deception extend well beyond the direct dollar amount of the fraud, but also cause further loss on account of damage to a company's business and prospects."[61]  While this point may be true in certain circumstances, Professor

---

[59]   Feinstein Report, ¶ 114.

[60]   Feinstein Report, ¶ 114.

[61]   Feinstein Report, ¶ 116.

*Confidential*

Feinstein fails to demonstrate how this general principle applies in this matter—namely, how purported reputational damage from the Alleged Corrective Disclosures, if any, impacted Vale Securities' prices. In particular, Professor Feinstein fails to acknowledge that, as I show in **Exhibit 4**, Vale disclosed to investors before and during the Class Period that Vale was susceptible to the risk of reputational damage resulting from the occurrence of a safety event.[62] As I discuss in greater detail below, he has not identified and disaggregated the price declines attributable to the realization of a previously disclosed risk of a safety event—including the previously disclosed potential for reputational harm arising from a safety incident—from the price declines, if any, attributable to reputational harm from concealing the purported "truth." This point is particularly important because, even if one could show a company had poor governance, the excerpts Professor Feinstein provides suggest that reputational damage does not always occur. For example, an excerpt from Kidd, *et al.* (2020) states that: "companies with ineffective corporate governance *may experience* reputational damage."[63] In this case in particular, purported reputational harm, if any, occurred in tandem with the realization of a previously disclosed risk (*i.e.*, the Dam 1 collapse), yet Professor Feinstein fails to separate the effects of these (and other potential factors) contributing to any price declines. A February 7, 2019 analysts' report published by Morgan Stanley and cited by Professor Feinstein illustrates this issue by linking "reputational uncertainty" to "an event of this magnitude" (*i.e.,* the Dam 1 collapse).[64]

---

[62] "Notwithstanding our standards, policies and controls, our operations remain subject to incidents or accidents that could adversely affect our business or reputation." *See* Vale, Form 20-F for the fiscal year ending December 31, 2015, p. 8.

[63] Feinstein Report, ¶ 116 (emphasis added).

[64] Feinstein Report, ¶ 125.

*Confidential*

44.     Professor Feinstein additionally claims that: "transparency with respect to material information and risk exposures, and proper conduct that is consistent with professed commitments, are important factors that affect the value of a company's securities."[65] Consistent with my view of the other work Professor Feinstein cites, while I generally agree with the studies to which Professor Feinstein refers, discussing this work is not sufficient to demonstrate that any purported transparency-related Alleged Misrepresentations resulted in the introduction of artificial inflation in Vale Securities' prices.  Further, as I discuss in greater detail below, Professor Feinstein performs no analysis to disaggregate the price declines attributable to the materialization of disclosed risk, as represented by the Dam 1 collapse and related financial consequences and which could have occurred absent any misrepresentations or omissions, from price declines, if any, attributable to the purported revelation of the "truth."

### 4.     Revenue and cash flow

45.     Professor Feinstein claims that: "[a]ccording to fundamental principles of finance and valuation, revenue and cash flow are key determinants of a company's value and the value of a company's securities."[66]  He additionally states that: "revenue is an important determinant of a company's value, and consequently the value of a company's securities"[67] and "the academic literature attest[s] to the central role of cash flow in valuation."[68]  These are all generally accepted statements that reflect basic economic and finance principles, and I do not disagree with general points in the studies to which Professor Feinstein refers in support of these principles.

---

[65]   Feinstein Report, ¶ 117.

[66]   Feinstein Report, ¶ 119.

[67]   Feinstein Report, ¶ 120.

[68]   Feinstein Report, ¶ 121.

*Confidential*

However, as I discuss in greater detail below, Professor Feinstein has performed no economic analysis to disaggregate changes in expectations regarding future cash flows (and thus, declines in Vale Securities' prices in the aftermath of Dam 1's collapse) attributable to the alleged concealment, *ex ante,* of the likelihood of a safety event occurring (*i.e.*, the alleged fraud in this case) from the changes in expectations in future cash flows (and thus prices) attributable to the changes in expected future cash flows given that such a risk has materialized, *ex post* (as represented by the Dam 1 collapse and related financial consequences), which could have occurred even absent any misrepresentations or omissions. In other words, by assuming that the entirety of the residual price declines in the Vale Securities (after accounting for market and industry effects) on the Alleged Corrective Dates equal the artificial inflation (and, thus, damages) stemming from the alleged misconduct, Professor Feinstein's damages analysis inappropriately assumes without support that, but for the Alleged Misrepresentations, investors would have assessed the "true" risk of Dam 1 collapsing to be 100 percent starting at the beginning of the Class Period.

46.     Thus, from an economic perspective, Professor Feinstein's review of academic studies on various topics he finds pertinent to this case in and of itself is not a reliable or scientifically rigorous basis for establishing that the Alleged Misrepresentations artificially inflated Vale Securities' prices during the Class Period. Professor Feinstein's "analysis" of the work he considers ignores the critical element of demonstrating empirically the existence of inflation, which I discuss in the sections that follow.

*Confidential*

## VI.    PROFESSOR FEINSTEIN'S DAMAGES ANALYSIS IS UNRELIABLE BECAUSE HIS DAMAGES ANALYSIS FAILS TO ISOLATE THE PRICE IMPACT OF THE ALLEGED FRAUD ON THE VALE SECURITIES

47.    As I understand the allegations in this case, Plaintiff claims that the Alleged Misrepresentations resulted in a difference between investors' assessed probability of a safety incident occurring (such as the Dam 1 collapse) during the Class Period and the "true" probability investors would have assessed absent the alleged fraud (*i.e.*, Plaintiff's theory of harm).[69]  While Professor Feinstein claims that his damages analysis estimates the artificial inflation that purportedly resulted from the Alleged Misrepresentations,[70] his damages analysis suffers from several critical conceptual flaws that, from an economic perspective, render his conclusions unreliable and invalid as a measure of economic damages in this case even assuming liability.  As I discuss in greater detail below, these flaws include:

i.   Professor Feinstein's damages analysis is unreliable because he fails to articulate or provide any economic analysis regarding either investors' assessed probability of a safety incident occurring given the Alleged Misrepresentations or the "true" probability of a safety incident occurring that investors would have assessed in the absence of the Alleged Misrepresentations at any time during the Class Period.  In addition, apart from making several vague statements with the benefit of hindsight, he fails to articulate what disclosures Vale should have made absent the Alleged Misrepresentations.

ii.  Professor Feinstein's damages analysis is untethered to Plaintiff's theory of harm because he fails to isolate the price impact of the alleged fraud on the Vale Securities. Specifically, Professor Feinstein fails to consider that a safety incident—in this matter the Dam 1 collapse—represented a materialization of disclosed risk, which could have occurred absent any alleged misrepresentations or omissions, and that impacted Vale Securities' prices on the Alleged Corrective Dates.  In fact, Professor Feinstein does not even mention Vale's risk disclosures regarding the possibility of the occurrence of a safety event that I discuss below and fails to consider the possibility of such risks materializing in his damages analysis.  Instead of isolating the impact on Vale Securities' prices from investors theoretically assessing a higher probability of a safety incident occurring—which is the subject of the Alleged Misrepresentations—Professor Feinstein

---

[69]    *See, e.g.*, Complaint, ¶¶ 10-11, 126, 128, 130.

[70]    Feinstein Report, ¶¶ 11, 13.

*Confidential*

inappropriately includes the *ex post* price declines from a safety incident that have already occurred as part of his damages. In doing so, Professor Feinstein fails to isolate any price impact as a result of the alleged fraud from the portion of Vale Securities' price declines attributable to the materialization of a disclosed risk.

iii. Professor Feinstein's calculation of a constant "inflation ribbon" is economically unreasonable and based on speculative assumptions. For example, in concluding that the entire declines in Vale Securities' prices on the Alleged Corrective Dates (after controlling for market and industry factors) are corrective of the Alleged Misrepresentations, Professor Feinstein's analysis is in effect premised on the inappropriate and unsupported assumption that, but for the Alleged Misrepresentations, investors would have assessed the "true" risk of Dam 1 collapsing, *ex ante*, to be 100 percent starting at the beginning of the Class Period. In addition, he fails to articulate how different Alleged Misrepresentations would introduce artificial inflation in the price of the Vale Securities during the Class Period.

**A.  Professor Feinstein's Damages Analysis Is Unreliable Because He Fails to Articulate or Perform Any Economic Analysis to Determine Investors' Assessment of the Probability of a Safety Incident Occurring or What Disclosures Vale Should Have Made Absent the Alleged Misrepresentations**

48.    As I discuss previously, in order to assess artificial inflation based on Plaintiff's allegations in this matter, an economist must evaluate what Vale Securities' prices would have been during the Class Period given investors' assessment of the "true" probability of a safety incident occurring, such as the Dam 1 collapse, absent the Alleged Misrepresentations, instead of the probability investors actually assessed given the Alleged Misrepresentations. Artificial inflation in a Vale Security is the difference in price attributable to the incremental difference between these two probabilities. However, Professor Feinstein fails to articulate or provide any economic analysis of either probability, and as a result, his analysis is untethered to Plaintiff's theory of harm and is unreliable.

49.    Specifically, Professor Feinstein fails to articulate or perform any economic analysis to determine investors' assessment during the Class Period of the probability of a safety incident occurring given the Alleged Misrepresentations. He also fails to articulate or perform any

*Confidential*

economic analysis to determine investors' assessment of the probability of a safety incident occurring absent the Alleged Misrepresentations. Without determining both—let alone either—Professor Feinstein's analysis is insufficient to evaluate the price impact on the Vale Securities caused by the Alleged Misrepresentations, which purportedly concealed the "true" probability of a safety incident occurring.

50.    Professor Feinstein also fails to articulate credibly what disclosures Vale, absent the Alleged Misrepresentations, should have made prior to the Dam 1 collapse. Establishing a reasonable but-for scenario based on the facts of the case is necessary to determine how investors would have assessed the "true" probability of a safety incident occurring, an element necessary for determining artificial inflation under Plaintiff's theory of harm. In other words, Professor Feinstein does not adequately explain how the prices of the Vale Securities became inflated as a result of any of the Alleged Misrepresentations, as well as how this inflation changed as new Alleged Misrepresentations occurred. Professor Feinstein instead offers only various vague statements regarding what Vale should have disclosed to investors. For example, Professor Feinstein states the following:

   i.   "Had the Company instead disclosed that it was determined to withhold from the public accurate information about dam conditions and the Company's conduct, the impact on the prices of the Vale Securities would have been even worse";[71]

   ii.  "Had investors been apprised that the Company's public assurances about dam stability, commitment to safety, and related conduct were untrue, and that the true conditions of the dams was being withheld, it is indisputable that investors would have severely discounted the Vale Securities";[72]

---

[71]    Feinstein Report, ¶ 24 (emphasis added).

[72]    Feinstein Report, ¶ 217 (emphasis added).

*Confidential*

   iii. "[H]ad investors been apprised at the start of or during the Class Period that important information was being misrepresented and concealed about dam stability and the Company's related conduct, the market's assessment of dam stability and Company conduct would have been far worse";[73] and

   iv. "In the but-for scenario in which investors were apprised at the start of or during the Class Period that the Company was misrepresenting dam stability and its conduct thereto, investors would also have considered the wide range of potential consequences stemming from what they would have rationally assessed true dam conditions and Company conduct to be."[74]

51.    While vague, Professor Feinstein appears to be claiming that Vale should have corrected the Alleged Misrepresentations by disclosing that it was withholding and/or misrepresenting information related to the "true" probability of a safety incident occurring and that it would continue to withhold such information.  However, such a hypothetical but-for disclosure does not tie to Plaintiff's assertion in the Complaint that the Alleged Corrective Disclosures in this matter did the opposite—namely, they revealed the "truth" to investors regarding the probability of a safety incident.  For example, in the Complaint, Plaintiff states (and to which Professor Feinstein cites[75]):

> "[t]he truth about the risk of Vale's tailing dams and its inadequate dam maintenance and safety certifications was disclosed through a series of disclosures beginning with the news of the Dam 1 collapse on January 25, 2019 and concluding with related news on February 6, 2019."[76]

---

[73]   Feinstein Report, ¶ 219 (emphasis added).

[74]   Feinstein Report, ¶ 221 (emphasis added).

[75]   Feinstein Report, ¶ 29.

[76]   Complaint, ¶ 203.  Plaintiff makes similar statements about the Alleged Corrective Disclosures revealing the "truth" to investors throughout the Complaint.  For example, Plaintiff states: "the statements described in paragraph 125 were materially false and misleading because they misrepresented or failed to disclose that: (1) at least one of Vale's high-hazard tailings dams, Dam 1, had a high probability of failure; (2) Vale's dam risk management and sustainability practices and policies were insufficient and/or insufficiently implemented in light of the known risks to human life and the environment posed by Dam 1; (3) Vale systematically acted to get Stability Condition Statements for dams that were not stable and/or did not meet Vale's own purported safety standards.  Having elected to speak about Vale's upstream tailings dams, Defendants violated their duties to disclose these material facts so as to render Defendants' statements not misleading." *See* Complaint, ¶ 126. *See also, e.g.*, Complaint, ¶¶ 128, 130, 134, 136, 141, 144.

52.    In other words, whereas Professor Feinstein appears to be arguing that a hypothetical but-for disclosure would entail disclosing Vale's purported *intention* to continue to conceal allegedly material information regarding, among other things, the likelihood of a dam collapse, Plaintiff appears to be arguing that a hypothetical but-for disclosure—vis-à-vis the Alleged Corrective Disclosures—would reveal the "true" likelihood of a dam collapse.  Setting aside that neither Plaintiff's nor Professor Feinstein's contentions account for the materialization of a disclosed risk, Professor Feinstein appears to present a but-for scenario that is inconsistent with the allegations in the Complaint.

53.    Additionally, these statements regarding what Vale should have disclosed to investors contain only vague references to misconduct, such as withholding "information about dam conditions" and "related conduct," and none of these statements articulates information regarding investors' assessments of the probability of a safety incident occurring either given the Alleged Misrepresentations or absent the Alleged Misrepresentations, which are both necessary elements for evaluating the claims in this case.  Instead, as I discuss in detail in the following sections, Professor Feinstein assumes inappropriately and without support that, but for the Alleged Misrepresentations, investors would have assessed the "true" risk of Dam 1 collapsing, *ex ante*, to be 100 percent starting at the beginning of the Class Period.

*Confidential*

**B.** **Professor Feinstein's Damages Analysis Is Unreliable Because He Fails to Isolate Vale Securities' Price Declines Attributable to the Alleged Fraud from the Price Declines Attributable to the Materialization of a Disclosed Risk, as Represented by the Dam 1 Collapse and Related Financial Consequences**

54.     I understand from counsel that the Court has found that the Dam 1 collapse "[did] not reveal to the public any previously undisclosed misrepresentation."[77]  Additionally, the Court's statements regarding certain post-collapse disclosures could suggest an acknowledgement that the change in Vale Securities' prices immediately after the collapse could be due to the materialization of disclosed risks.[78]  From an economic perspective, I agree.  In particular, my review of the available documentary evidence—including numerous news articles and analysts' reports—indicates that some portion, if not all, of Vale Securities' price declines on the Alleged Corrective Date is attributable to the materialization of disclosed risk, as represented by the collapse of Dam 1 and related financial consequences.  Professor Feinstein, however, does not even mention Vale's risk disclosures regarding the occurrence of a safety event and fails to consider the realizations of these disclosures in his damages analysis.  In other words, Professor Feinstein fails to engage with what a materialization of disclosed risk means in the context of analyzing Vale Securities' price declines related to the financial consequences given the Dam 1 collapse.

55.     In addition, Professor Feinstein provides no economic analysis to demonstrate that any of his "residual price declines" on the Alleged Corrective Dates are attributable to a corrective disclosure and not the materialization of a disclosed risk.  In particular, Professor Feinstein fails

---

[77]     Ruling on the Motion to Dismiss, p. 33.

[78]     Ruling on the Motion to Dismiss, pp. 32-33.

*Confidential*

to articulate or provide any analysis—economic or otherwise—to show that any of the Alleged Corrective Disclosures are corrective at all, as opposed to, for example, informing investors regarding the materialization of disclosed risk, as represented by the Dam 1 collapse and related financial consequences. In other words, Professor Feinstein fails to show that the Alleged Corrective Disclosures corrected the Alleged Misrepresentations. As a result, Professor Feinstein's damages analysis is untethered to Plaintiff's theory of harm because he fails to isolate the price declines on the Alleged Corrective Dates attributable to the alleged fraud from the portion of Vale Securities' price declines attributable to the materialization of a disclosed risk.

56.      Specifically, Professor Feinstein states that the "corrective disclosures explain all of the residual price declines in the Vale Securities" (after accounting for market and industry effects) on the Alleged Corrective Dates and claims these price declines equal the artificial inflation (and, thus, damages) stemming from the alleged misconduct.[79] However, Professor Feinstein ignores that a portion, if not all, of the price declines following the Dam 1 collapse was due to, among other things, reduced cash flow expectations resulting from operations interruptions, output reductions, fines, and lawsuits that are to be expected given the occurrence of a safety incident (in this case, the collapse of Dam 1). This reduction in expected future cash flows (and in turn, the decline in security prices) thus represents materializations of disclosed risks that could occur given a safety event even absent any misrepresentations or omissions. In other words, as I discuss below, Professor Feinstein fails to recognize that Vale Securities' prices would have declined following the Dam 1 collapse *regardless* of whether the Alleged Misrepresentations were made and thus his damages analysis inappropriately counts "all" of these price declines (net

---

[79]   Feinstein Report, ¶ 15.

Confidential

of market and industry effects) as damages, as opposed to just the portions that are not attributable to the materialization of a known and disclosed risk.

        *1.*      *Professor Feinstein fails to disaggregate the price declines attributable to the materialization of a disclosed risk, as represented by the Dam 1 collapse and related financial consequences, from his alleged artificial inflation*

57.      As I discuss above, under Plaintiff's theory of harm, I would expect Vale Securities' price movements on the Alleged Corrective Dates to reflect changes in investors' expectations of cash flows related to: (1) the difference between the "true" probability of a safety event, such as a dam collapse occurring, that investors would assess absent the Alleged Misrepresentations and investors' assessed probability of a dam collapse given the Alleged Misrepresentations; (2) potential legal and financial liabilities and cash flow uncertainties due to, for example, operations interruptions and output reductions resulting from the materialization of the disclosed risk that a dam could collapse (*i.e.*, the materialization of a previously disclosed risk); and (3) other factors such as market and industry shocks. Only the first category represents a price change due to the Alleged Misrepresentations. An appropriate damages analysis thus must isolate the portion of Vale Securities' price declines on the Alleged Disclosure Dates due to the alleged fraud from any price declines resulting from the materializations of previously disclosed risks and market and industry factors.[80] Professor Feinstein purports to disaggregate price movements attributable to market and industry factors through his event study analyses,[81] but he fails to consider Vale's risk disclosures and associated price movements attributable to the

---

[80]     For example, Plaintiff's expert, Dr. Oboni, states that: "risks cannot ever be totally eliminated (zero risk is an illusion) even in highly controlled industries." Expert Report of Dr. Franco Oboni, Ph.D., dated March 10, 2023 ("Oboni Report"), p. 17.

[81]     *See, e.g.*, Feinstein Report, ¶¶ 129, 134-136.

*Confidential*

materialization of a disclosed risk of a safety incident occurring, as represented by the Dam 1 collapse and related financial consequences.

58.    In this case, analyzing the portion of Vale Securities' price declines attributable to the materialization of a disclosed risk, as represented by the Dam 1 collapse and related financial consequences, is particularly important because such price declines likely exceeded the declines, if any, attributable to investors updating their assessed probability of a safety incident occurring to the "true" probability that had allegedly been concealed.  For example, Plaintiff claims that Vale's purported risk tolerance for a dam failure in a given year was 0.01 percent (*i.e.*, $1 \times 10^{-4}$)[82] whereas Plaintiff alleges that internal documents report that the probability of failure for Dam 1 was 0.03 percent (*i.e.*, $3 \times 10^{-4}$) or less,[83] a difference in probability of 0.02 percentage points (*i.e.,* 0.0002).  In contrast to what Plaintiff asserts, Professor Feinstein inappropriately assumes that, but for the Alleged Misrepresentations, investors would have assessed the "true" risk of Dam 1 collapsing, *ex ante*, to be 100 percent, far exceeding the 0.03 percent that Plaintiff asserts as the purportedly "true" probability of failure.[84]  Despite this contradiction, Professor Feinstein performs no analysis to determine how any potential changes in investors' assessment of the

---

[82]    *See, e.g.*, Complaint, ¶¶ 74.

[83]    Complaint, ¶¶ 74, 77-78.

[84]    I understand that Dr. Oboni presents a "corrected value" of $1.12 \times 10^{-3}$ (0.112 percent) for Dam 1's probability of failure (Oboni Report, pp. 51-52), which I understand that Defendants' expert, Professor Stark, is addressing. Dr. Oboni's analysis does not affect my conclusion that Professor Feinstein inappropriately assumes that, but for the Alleged Misrepresentations, investors would have assessed the "true" risk of Dam 1 collapsing, *ex ante*, to be 100 percent.

*Confidential*

probability of a safety incident occurring would impact Vale Securities' prices.[85]  In addition, he performs no analysis to determine and separate out the portion of his residual price declines attributable to the materialization of the disclosed risk, as represented by the Dam 1 collapse and related financial consequences, which could have occurred absent the Alleged Misrepresentations.

59.     In his Rebuttal Report on Market Efficiency dated June 4, 2021 ("Feinstein Market Efficiency Rebuttal Report"), Professor Feinstein acknowledged he could separate out the declines in Vale Securities' prices attributable to the materialization of disclosed risks in a damages analysis, and indicated it was important to do so correctly.[86]  Specifically, he states:

> [E]ven if the stock price decline upon disclosure combines disclosure of previously concealed risks with realizations of risks, and only some of this information is corrective of the fraud, valuation tools can be applied to appropriately separate the effects. …I agree that the damages expert should exercise care to execute the analysis correctly.[87]

60.     However, nowhere in the Feinstein Report do I see that he has applied any "valuation tools" to disaggregate Vale Securities' price declines attributable to the materialization of risk, as represented by the Dam 1 collapse and related financial consequences, from those attributable to

---

[85]   To the contrary, I understand that Defendants' expert, Mr. Stephenson, found that: "[t]he information that Plaintiff alleges was omitted would not have affected a reasonable investor's valuation of Vale.  The Complaint alleges that Dam 1's probability of failure in a given year was 3 in 10,000, or three times Vale's purported maximum risk tolerance.  Put another way, the Complaint alleges that the probability of Dam 1 not failing was 99.97 percent each year. In my experience as an investment banking professional, such a probability of a dam failure would have been considered a remote and unlikely event by reasonable investors and would not have meaningfully impacted their assessments of the value of Vale Securities." Expert Report of Randal Stephenson, March 10, 2023 ("Stephenson Report"), ¶ 22.
I also understand that Mr. Stephenson found that: "[t]he Oboni Report presents a 'corrected value' of $1.12 \times 10^{-3}$ (0.112 percent) for Dam 1's probability of failure, or a probability of non-failure of Dam 1 at 99.888 percent. … [E]ven assuming Dr. Oboni's calculation is accurate, his estimate of Dam 1's failure probability (0.112 percent) would not have been regarded by investors as meaningfully impactful to their valuations of Vale's Securities." *See* Expert Rebuttal Report of Randal Stephenson, April 7, 2023, ¶¶ 30-31.

[86]   Feinstein Market Efficiency Rebuttal Report, ¶ 128.

[87]   Feinstein Market Efficiency Rebuttal Report, ¶ 128.

*Confidential*

the correction of the alleged fraud.  Rather, Professor Feinstein simply assumes without basis

that the entire residual price declines on the Alleged Corrective Dates were corrective of the

Alleged Misrepresentations.

> 2.    *My review of news articles and analysts' commentary indicates that some, if not all, of Vale Securities' price declines following the Dam 1 collapse are attributable to the materialization of the disclosed risk of a dam safety incident and related financial consequences*

61.    Professor Feinstein acknowledges that: "the Court found that the events during the period

26-28 January 2019 do not qualify as corrective disclosures because they are 'not necessarily

indicative of any alleged misrepresentation or fraud.'" [88]   However, while he excludes the price

declines during this period from his damages analysis, he inappropriately assumes that, in

contrast to news articles and analysts' commentary he cites, no portions of Vale Securities' price

declines on the Alleged Corrective Dates were attributable to the specific consequences given

that a safety risk had materialized, as represented by the collapse of Dam 1.  As I discuss below,

these specific consequences include, for example, potential legal and financial liabilities, and

cash flow uncertainties due to operations interruptions and output reductions (*e.g.*, the temporary

---

[88]    Feinstein Report, ¶ 133.  Professor Feinstein discusses events from January 26 to February 1, 2019 collectively in his section titled, "26 January through 1 February 2019: Additional Details about the Nature, Extent, Causes, and Ramifications of the Dam 1 Collapse Emerge."  According to the Feinstein Report, these events included: (1) Brazil's national mining agency ordering Vale to halt operations at the Córrego de Feijão iron ore mining facility, (2) government authorities freezing approximately $3 billion of Vale's assets, (3) Vale announcing it suspended dividends, buybacks, and executive bonuses, (4) several analysts' reports reassessing the valuation of Vale and its securities, (5) Moody's placing Vale's credit ratings under review for a downgrade, and (6) a news article stating that the company that certified the safety of Dam 1 had worked for Vale as both a consultant and safety evaluator, raising questions over a conflict of interests.  *See* Feinstein Report, ¶¶ 75-86.

*Confidential*

suspension of the Brucutu mine[89]) that are to be expected given a safety event occurring even absent any alleged misrepresentations or omissions and are similar in nature to disclosures that occurred between January 26, 2019 and February 1, 2019 that Professor Feinstein excluded from his damages analysis at least in part because the Court found the events that occurred during part of the period not to be corrective. Below, I discuss Vale's disclosures regarding the risks of dam collapse, and news articles and analysts' commentary—including those discussed by Professor Feinstein—indicating the materializations of disclosed risk, as represented by the Dam 1 collapse and related financial consequences, adversely impacted Vale Securities' prices on the Alleged Corrective Dates.

      a.      Vale disclosed to investors that dam incidents and the resulting financial consequences were risks

62. In filings with the SEC before and throughout the Class Period, Vale specifically disclosed safety-related incidents, such as dam failures, as risks to the company's operations and stated that, if those risks materialize, they could negatively impact Vale. For example, Vale's Form 20-F for the fiscal year ending December 31, 2015 (filed in March 2016) included the following disclosures:

> Our business is subject to a number of operational risks that may adversely affect our results of operations, such as: …Accidents or incidents involving our mines and related infrastructure, such as dams, plants, railroads, ports and ships.[90]

---

[89] Professor Feinstein cites to an analysts' report issued by Itaú BBA on February 15, 2019 that characterizes the Brucutu mine suspension as the result of a court order without a technical basis: "The main risk for Vale, in our view, is the forced shutdown of mining operations by a court decision without a legal/technical basis, similar to events surrounding the Brucutu mine." *See* Feinstein Report, ¶ 125. I also note that Professor Feinstein provides no evidence suggesting that the closure was due to the revelation of the purported "truth" that had allegedly been concealed.

[90] Vale, Form 20-F for the fiscal year ending December 31, 2015, p. 7.

*Confidential*

> Our operations involve the use, handling, storage, discharge and disposal of hazardous substances into the environment and the use of natural resources, and the mining industry is generally subject to significant risks and hazards, including fire, explosion, toxic gas leaks, spilling of polluting substances or other hazardous materials, rockfall incidents in mining operations and incidents involving mobile equipment or machinery. This could occur by accident or by breach of operating and maintenance standards, and could result in a significant environmental impact, damage to or destruction of mineral properties or production facilities, personal injury or death, environmental damage, delays in production, monetary losses and possible legal liability. Notwithstanding our standards, policies and controls, our operations remain subject to incidents or accidents that could adversely affect our business or reputation.[91]

63.    Similar disclosures were made in all Forms 20-F filed from 2016 to 2019 (**Exhibit 4**). Vale's Forms 6-K also noted that investors should review, among other things, the "Risk Factors" in Forms 20-F that specify "risks and uncertainties" about future events or results.[92]

64.    However, Professor Feinstein does not mention Vale's risk disclosures regarding the occurrence of a safety event, despite citing to Vale's Forms 20-F throughout the Feinstein Report,[93] and fails to consider the realizations of these disclosures in his damages analysis.  In other words, as I discuss in detail in the following section, Professor Feinstein fails to engage with what a materialization of disclosed risk means in the context of analyzing Vale Securities' price declines on the Alleged Corrective Dates.

---

[91]    Vale, Form 20-F for the fiscal year ending December 31, 2015, p. 8.

[92]    *See, e.g.*, "Vale's Performance in 3Q2018," Form 6-K filed on October 25, 2018, p. 3.

[93]    *See, e.g.*, Feinstein Report, Sections V.D.5 and V.D.14.

*Confidential*

      b.      The news and analysts' commentary on the Alleged Corrective Dates that Professor Feinstein discusses indicate Vale Securities' prices were impacted by the materializations of disclosed risks, as represented by the Dam 1 collapse and related financial consequences

65.     Professor Feinstein fails to articulate how the Alleged Corrective Disclosures were corrective of the Alleged Misrepresentations, as opposed to updating investors regarding the materialization of a disclosed risk, as represented by the Dam 1 collapse and related financial consequences.  While Professor Feinstein claims his damages analysis considers: "i) the nature of the information disclosed on [the Alleged Corrective Dates], which partially corrected the prior alleged misrepresentations and omissions, ii) financial valuation principles and analyst and media commentary, [and] iii) the absence of any economically material confounding news,"[94] he does not list and fails to consider any effect from the materialization of disclosed risk, as represented by the Dam 1 collapse and related financial consequences—a risk that Vale disclosed and that could have occurred even absent any misrepresentation or omission.  Specifically, as I discuss in detail below, Professor Feinstein identifies news articles and analysts' commentary on the Alleged Corrective Dates that convey information specific to the Dam 1 collapse and the potential financial consequences that would be expected from such a safety incident given that a safety event materialized—including those related to potential legal and financial liabilities and cash flow uncertainties due to, for example, operations interruptions and output reductions—rather than solely any purported updated investor understanding of the broader risks of Vale's dam portfolio, as Professor Feinstein assumes.  The news and analysts' reports on which Professor Feinstein relies upon in Section V.D of the Feinstein Report indicate that Vale Securities' price changes on the Alleged Corrective Dates likely reflected

---

[94]    Feinstein Report, ¶¶ 162, 165, 168.

*Confidential*

materializations of disclosed risks, which would have occurred absent any misrepresentations or omissions and thus would be unrelated to the alleged fraud. In addition to the examples I discuss for each of the Alleged Corrective Dates below, I provide quotes from the analysts' reports referenced by Professor Feinstein in the Feinstein Report that indicate analysts attributed Vale Securities' price movements to consequences arising from the materialization of a safety event (*i.e.,* the Dam 1 collapse and related financial consequences) that would have occurred even absent the Alleged Misrepresentations.[95]

i.    January 25, 2019

66.    To support his claims that "[b]eginning on 25 January 2019, events unfolded that belied the Company's representations, the alleged misrepresentations, about dam conditions, safety, and the Company's commitments and conduct,"[96] Professor Feinstein discusses several news items and analysts' reports related to the Dam 1 collapse that occurred on that day. However, these sources relayed information that was unrelated to the Alleged Misrepresentations and reflected materializations of disclosed risks as represented by the Dam 1 collapse and related financial consequences.

67.    Specifically, Professor Feinstein identifies that: "[d]uring U.S. trading hours on 25 January 2019, *Agence France Presse* tweeted that Dam 1's collapse had caused several deaths"[97] and that, after trading had closed: "*The Wall Street Journal* reported that seven bodies had been

---

[95]    I include in **Exhibit 5** all quotes from analysts' reports written on or after January 25, 2019 (*i.e.,* the first Alleged Corrective Date) that are referenced by Professor Feinstein in the Feinstein Report.

[96]    Feinstein Report, ¶ 67.

[97]    Feinstein Report, ¶ 69.

*Confidential*

recovered as of Friday evening, with around 200 people still missing."[98]  Professor Feinstein also points to a "credit watch" from S&P stating: "the CreditWatch placement reflects the contingent risks Vale will face following the dam failure in Brumadinho, which resulted in several deaths and devastated territories in the region."[99]

68.  As an initial matter, Professor Feinstein's conclusion that, "[b]eginning on 25 January 2019, events unfolded that belied the Company's representations, the alleged misrepresentations, about dam conditions, safety, and the Company's commitments and conduct"[100] was the sole cause of the residual price declines in the Vale Securities that day is contradicted by his own statement that the ADR price decline was caused by: "the information conveyed by the Company, news media, and analysts about the collapse of Dam 1."[101]  In other words, Professor Feinstein acknowledges that, consistent with my review, information communicated to investors on January 25, 2019 was specific about the Dam 1 collapse, which could have occurred even absent any Alleged Misrepresentations, and reflected the realization of a disclosed risk.

69.  In addition, the analysts' commentary Professor Feinstein identifies similarly indicates that Vale Securities' prices declined because of the financial consequences expected from the Dam 1 collapse—which represents a materialization of disclosed risk that would have occurred absent the Alleged Misrepresentations—and contradict Professor Feinstein's various claims that they indicate the price declines corrected the alleged fraud.  As I discuss above, the Alleged Misrepresentations purportedly concealed the information investors required to assess the "true"

---

[98]  Feinstein Report, ¶ 70.

[99]  Feinstein Report, ¶ 71.

[100]  Feinstein Report, ¶ 67.

[101]  Feinstein Report, ¶ 200.

*Confidential*

probability of a safety incident occurring, which Professor Feinstein fails to articulate; notwithstanding this conceptual flaw, the news articles and analysts' commentary Professor Feinstein claims are corrective of the alleged fraud instead reflect discussion of the materialization of disclosed risk, as represented by the Dam 1 collapse and related financial consequences.

70.     For example, Professor Feinstein claims: "[t]hat is, upon learning that Vale's dams were not as safe, and that safety protocols were clearly not as effective as previously represented, Scotiabank analysts decreased their valuation of the Company's securities significantly."[102] However, Professor Feinstein appears to support his claim of what Scotiabank learned with a statement that actually indicates Scotiabank lowered its price target because of the expected financial consequences of the Dam 1 collapse: "Scotiabank reduced its Vale ADR price target to $17.00 from $19.50, while noting, 'It is still too early to quantify the social, environmental and economic impact of this unfortunate accident.'"[103]  This statement and analysis from Scotiabank is consistent with what would be expected given a safety incident occurring.  However, Professor Feinstein does not explain why any of Scotiabank's reactions can be attributed to its purported learning that: "Vale's dams were not as safe, and that safety protocols were clearly not as effective as previously represented."[104]

71.     Professor Feinstein also claims: "[a]nalysts articulated the reasons why lax or ineffective safety protocols and greater risk of dam collapses would adversely impact the Company's

---

[102]   Feinstein Report, ¶ 73.

[103]   Feinstein Report, ¶ 72.

[104]   Feinstein Report, ¶ 73.

*Confidential*

financial position and value."[105]  To purportedly support his claim, Professor Feinstein references a series of analysts' reports that discuss how the expected financial consequences of the Dam 1 collapse, given that it had occurred, would adversely impact Vale Securities' prices, including operations interruptions, fines, and decreases in iron ore production:

> JPMorgan offered that the Dam 1 collapse could lead to "higher scrutiny over the regulatory framework of the mining industry, … lead to further delays in granting new licenses, but also lifting existing permits." JPMorgan added, "Financial fines will also likely be imposed.  In the case of Samarco, an initial settlement totaled R$11-13 billion, but we estimate that it has since been lifted to as much as ~R$20 billion."

> "The full extent of the damage and the potential impact on iron ore markets are not clear. While we hope the reports of fatalities are inaccurate, we do believe this is a material negative for Vale and a positive for other iron ore miners due to upside risk to prices resulting from less supply" (Professor Feinstein quoting a Jeffries analysts' report).

> "…Accident likely to result in higher compliance from authorities. The tragedy is likely to generate higher scrutiny over the regulatory framework of the mining industry, especially over the usage of dams. The company produced ~60% of its iron ore through operations that rely on dams (as of 2016) and had already been shifting new output into dry processing (aiming 70% of dry production by 2025). The accident could lead to further delays in granting new licenses, but also lifting existing permits. … Financial fines will also likely be imposed. In the case of Samarco, an initial settlement totaled R$11-13 billion, but we estimate that it has since been lifted to as much as ~R$20 billion" (Professor Feinstein quoting a JP Morgan analysts' report).[106]

72.     However, Professor Feinstein fails to demonstrate how these excerpts indicate the Dam 1 collapse was corrective of the Alleged Misrepresentations, as opposed to updating investors regarding the materialization of a disclosed risk, as represented by the Dam 1 collapse and related financial consequences.  For example, despite these excerpts specifically detailing how the financial consequences expected from the Dam 1 collapse (*e.g.*, "higher scrutiny over the

---

[105]   Feinstein Report, ¶ 74.

[106]   Feinstein Report, ¶ 74.

*Confidential*

regulatory framework" and "financial fines" [107]) negatively impacted analysts' assessments of Vale, Professor Feinstein fails to demonstrate how these excerpts relate to the alleged fraud.

ii.    February 4, 2019

73.    Professor Feinstein claims the suspension of Vale's Brucutu mine on February 4, 2019 by: "court order informed investors that the Company's condition, commitment, and conduct with respect to dam safety were reasonably not what the public had previously been led to believe."[108]  He further claims that: "[t]he elevated awareness about Company-wide safety issues…apparently led to this costly court intervention."[109]  However, the news articles and analysts' commentary Professor Feinstein references indicate this claim is speculative at best and most likely untrue.

74.    Professor Feinstein's primary news support is an excerpt from a *Bloomberg* article: "Vale says a Minas Gerais state court has ruled the Company must refrain from 'disposing tailings or practicing any activity potentially capable of increasing the risks' at certain mining dams."[110] This quote merely states the court ordered Vale to cease any activities that would potentially increase risk *following the collapse of Dam 1* but, in contrast to what Professor Feinstein implies, provides no information about previous statements regarding "the Company's condition, commitment, and conduct with respect to dam safety."  I have seen nothing in the Feinstein Report suggesting that the closure was due to the revelation of the purported "truth" that had allegedly been concealed.  The article goes on to state that the: "Co[mpany] says there is no

---

[107]    Feinstein Report, ¶ 74.

[108]    Feinstein Report, ¶ 88.

[109]    Feinstein Report, ¶ 88.

[110]    Feinstein Report, ¶ 87.

*Confidential*

technical basis nor risk assessment to justify the decision to suspend the operation,"[111] directly contradicting Professor Feinstein's premise and suggesting this suspension may be a consequence of the Dam 1 collapse that would have occurred regardless of the Alleged Misrepresentations.  One of the analysts' reports, to which Professor Feinstein quotes, reiterated this 12 days later on February 15: "[t]he main risk for Vale, in our view, is the forced shutdown of mining operations by a court decision without a legal/technical basis, similar to events surrounding the Brucutu mine."[112]

75.    The analysts' commentary to which Professor Feinstein refers for this day indicates concerns with the materialization of disclosed risks related to operations interruptions and output reductions resulting from the suspension.  For example:

> Morgan Stanley analysts stated that "we believe Vale would not be able to offset these volumes by ramping up output elsewhere," and "we believe the iron ore market will likely price in a bigger and/or longer potential impact to Vale's iron ore output than we first thought."
>
> "The estimated impact of the decision of a temporary halt of the Laranjeiras dam and the Brucutu mine (part of the Minas Centrais complex in the Southeastern System) is 30 Mpta. In our model we assume 28 Mtpa production from Minas Centrais. … While we expect Vale to appeal the court's decision, we note that risks to our recently reduced production estimates look skewed to the downside. … Less leeway to maintain production close to Vale's original 400 Mtpa target" (Professor Feinstein quoting a Scotiabank analysts' report).
>
> "We understand the tailings dam that supports the Brucutu operation is built by the downstream method, which is a different construction system than the upstream structures used in the failed Feijão and Samarco dams. We understand the court ruling is temporary and believe Vale will likely appeal such decision. … While the situation around the Brucutu mine suspension remains fluid, we believe the iron ore market will like price in a bigger and/or longer potential impact to Vale's iron ore output than we first thought. The stoppage of Brucutu, if it extended for a significant amount of time, would materially reduce the 37Mt supply surplus our commodity team

---

[111]  "Vale Says Court Orders Halt to Largest Mine in Minas Gerais," *Bloomberg*, February 4, 2019.

[112]  Feinstein Report, ¶ 125.

originally forecast for 2019 (prior to the Feijão dam failure)" (Professor Feinstein quoting a Morgan Stanley analysts' report).[113]

76.     However, Professor Feinstein fails to demonstrate that any of the excerpts he provides indicate the suspension of the Brucutu mine was corrective, as opposed to updating investors regarding the materialization of a disclosed risk, as represented by the Dam 1 collapse and related financial consequences.  For example, despite these excerpts specifically detailing how the reduced output from the suspension of the Brucutu mine operation negatively impacted analysts' assessments of Vale,[114] Professor Feinstein fails to demonstrate how these excerpts relate to the alleged fraud.  Further, the news articles and analysts' reports to which Professor Feinstein cites state that there is no technical basis for the court's decision to suspend the Brucutu mining operation,[115] indicating an updated understanding of the safety of Vale's dams may not have been the cause of the suspension and therefore would not be corrective to investors under Professor Feinstein's theory of harm.

### iii.  February 6, 2019

77.     Professor Feinstein claims that two articles published by *The Guardian* and *The Wall Street Journal*: "informed investors that certain alleged misrepresentations were indeed false and that the Company concealed important information about its dam conditions, commitment to

---

[113]   Feinstein Report, ¶ 89.

[114]   For example, the excerpts Professor Feinstein provides from the analysts' reports in Feinstein Report, ¶ 89, state: "we believe Vale would not be able to offset these volumes by ramping up output elsewhere"; "[w]hile we expect Vale to appeal the court's decision, we note that risks to our recently reduced production estimates look skewed to the downside. … Less leeway to maintain production close to Vale's original 400 Mtpa target"; and "[t]he stoppage of Brucutu, if it extended for a significant amount of time, would materially reduce the 37Mt supply surplus our commodity team originally forecast for 2019."

[115]   "Vale Says Court Orders Halt to Largest Mine in Minas Gerais," *Bloomberg*, February 4, 2019 ("Co[mpany] says there is no technical basis nor risk assessment to justify the decision to suspend the operation"); Feinstein Report, ¶ 125 ("'[t]he main risk for Vale, in our view, is the forced shutdown of mining operations by a court decision without a legal/technical basis, similar to events surrounding the Brucutu mine'").

*Confidential*

safety, and conduct."[116]  Professor Feinstein states these two articles: "reported that Vale mine workers had observed a leak at Dam 1 that caused them to believe the dam 'was going to burst at any time'"[117] and "'two independent mining dam experts who reviewed the report with the Journal said the dam shouldn't have been certified' given facts known by Vale about Dam 1,"[118] respectively.  However, Professor Feinstein fails to articulate how Vale Securities' prices would respond, if at all, to information indicating Dam 1 had a leak half a year before its collapse[119] and that one mining dam expert certified Dam 1 was stable, while two others disagreed with the certification in the absence of a safety event.[120]  In other words, Professor Feinstein fails to articulate whether these news stories were even corrective at all, given he does not disaggregate the price impact of a hypothetical disclosure providing this same information prior to the Dam 1 collapse from the price impact of the disclosures after the dam had already collapsed.

78.      Professor Feinstein additionally claims the decision by the state of Minas Gerais to cancel: "Vale's licenses to operate the Jangada iron ore mine and the Laranjeiras dam," which "was critical to operations at the Brucutu mine,"[121] "further informed investors that the Company's condition, commitment, and conduct with respect to dam safety was not what the public was previously led to believe."[122]  However, Professor Feinstein's claim is speculative, and he provides no evidence or analysis that the state's decision was the result of the revelation

---

[116]  Feinstein Report, ¶ 95.

[117]  Feinstein Report, ¶ 93.

[118]  Feinstein Report, ¶ 95.

[119]  Feinstein Report, ¶ 93.

[120]  Feinstein Report, ¶ 95.

[121]  Feinstein Report, ¶ 94.

[122]  Feinstein Report, ¶ 94.

*Confidential*

of the purported "truth" that was allegedly concealed.  The state may have taken this action following a safety incident whether or not Vale's prior disclosures were misleading.  Further, Professor Feinstein fails to consider that these cancelations of Vale's licenses were the result of materializations of disclosed risks that impacted operations and would reduce output, and that would have occurred given a safety incident absent any misrepresentations or omissions. Analysts' commentary that Professor Feinstein quotes indicates precisely that—there were concerns regarding operations interruptions and reduced output given the Dam 1 incident.  For example:

> "We see this as a negative development for two main reasons: (a) while Brucutu/Laranjeiras is already shut down, the new measure means one additional hurdle that has to be bridged before Vale can resume operations at the complex; (b) this also increases concerns that the effect on Vale's overall volumes could be stronger in the short term. … The company can appeal the decision" (Professor Feinstein quoting a JP Morgan analysts' report).

> "At the end of the day, what is at stake here is: the timing of return of the Brucutu mine.  Previously, our impression was that this would be a matter of a couple of weeks to resolve; now that call is less likely (although still possible).  Unfortunately, doubts on the operational outlook for Vale will remain a key overhang and a question mark given the risk that other assets are at some point halted too" (Professor Feinstein quoting a BTG Pactual analysts' report).

> "We believe the news once again puts into evidence the overhang generated by Vale's exposure to potentially unfavorable decisions taken by Brazilian regulatory bodies and the Public Prosecutors Office as a response to the disaster.  Vale will appeal against this decision but our confidence in the company achieving a reversal of this decision in the short-term has been reduced with the license to operate the dam now cancelled.  In addition, there is still much uncertainty surrounding the ultimate financial implications which in our view, reduces the visibility and transparency of Vale's investment thesis going forward" (Professor Feinstein quoting a Credit Suisse analysts' report).[123]

---

[123]   Feinstein Report, ¶ 98.

*Confidential*

79.     Despite analysts' concerns regarding operations interruptions and reduced output, Professor Feinstein fails to demonstrate that any of the excerpts he provides indicate the news events related to the license cancelations were corrective, as opposed to updating investors regarding the materialization of disclosed risk, as represented by the operations interruptions and reduced output.

80.     In addition, Professor Feinstein presents no analysis to determine what portion of Vale's price decline on February 6, 2019 was due to the information in the news articles about conditions at Dam 1 in 2018 or the suspension of Vale's licenses announced that day.

        c.      Analysts' commentary within the month following the Dam 1 collapse similarly indicates analysts attributed Vale Securities' price movements to the materializations of disclosed risks, as represented by the Dam 1 collapse and related financial consequences

81.     In addition to the materials cited in the Feinstein Report, I reviewed all analysts' reports on Vale published between January 25, 2019 (the day of the Dam 1 collapse) and February 25, 2019 (a month following the collapse) available to me.[124]  My review of these analysts' reports indicates that their analyses, similar to those I discussed previously, reflect revised expectations based on the materializations of disclosed risks related to the Dam 1 collapse, including the impact of the collapse on Vale's output, fines, liabilities, and possible government action.  I provide a list of excerpts from these analysts' reports in **Exhibit 6** that include information related to these topics.

---

[124]  I reviewed all analysts' reports considered by Professor Feinstein.  I obtained additional English-language analysts' reports available on S&P Capital IQ and Refinitiv for the period January 25, 2019 to February 25, 2019 that were not in Professor Feinstein's reliance materials and that S&P Capital IQ and Refinitiv considered to be not auto-generated.

*Confidential*

82.    Several analysts revised their valuations of Vale to incorporate their expectations regarding fines and liabilities resulting from Dam 1's collapse, which, from an economic perspective, are not unexpected following the materialization of a safety risk, even absent any misrepresentations or omissions.  For example, BTG assumed: "US$5bn outflows for fines/other items";[125] Itaú BBA included: "BRL 17 billion in fines and environmental compensation";[126] and HSBC estimated the liability to total USD $8 billion: "derived using Samarco's liability and adjusted for expected additional liabilities associated with the Feijao dam failure."[127]

83.    Analysts' commentary also indicated uncertainty regarding what specifically the future cash flow implications would be of the materialized risk with respect to fines and additional regulatory scrutiny.  For example, on January 28, 2019, analysts for Bank of America stated: "[t]he full repercussions of Friday's dam collapse tragedy remain unknowable, and as such we do not expect shares to trade on fundamentals."[128]  The next day on January 29, 2019, Bank of America analysts stated:

> [W]e do not expect shares to trade on fundamentals and given dramatically changing conditions in the early stages of this crisis.  Costs, fines, and frozen funds had totaled over US $3 B in initial days following the dam breach.  The human toll, with fatalities looks likely to exceed 300 people, also making liability calculations particularly challenging.[129]

---

[125]    BTG Pactual, "A Sensible Plan in Place," January 30, 2019, p. 2.

[126]    Itaú BBA, "The Aftermath of Brumadinho – Our Base-Case Scenario," January 29, 2019, p. 1.

[127]    HSBC, "[Correction] Rising ESG risk favours Rio Tinto over Vale," January 29, 2019, p. 9.

[128]    Bank of America, "Move to Under Review as dam tragedy likely to eclipse fundamentals," January 28, 2019, p. 1. *See also* Morgan Stanley, "Uncertainties Continue to Arise from the FeijãoDam Accident; Downgrade to EW," February 7, 2019, p. 1.

[129]    Bank of America, "Tailings dam decommissioning adds more costs to Vale, a boon for global pellet price," January 29, 2019, p. 1.

*Confidential*

84.     Liabilities were estimated to be potentially in the billions of dollars (*e.g.*, HSBC analysts "assume[d] USD3.5bn liability from the accident"[130] on January 27, 2019 and then increased their estimate to $8 billion two days later on January 29, 2019[131]) and were even described in a BMO analysts' report to be "unknown," which also stated: "[w]ithout pre-judging blame, there is likely to be a financial liabilities associated with restitution and rehabilitation. For reference, the total cost of Samarco is currently estimated at US $5.4B."[132]

85.     Analysts also considered increased governmental action and scrutiny, which is not unexpected given that a tragedy occurred.  For example, analysts for JP Morgan stated: "[t]he tragedy is likely to generate higher scrutiny over the regulatory framework of the mining industry, especially over the usage of dams."[133]  Despite evidence that analysts were expecting substantial financial consequences to Vale as a result of the materialization of a disclosed risk, as represented by the Dam 1 collapse and related financial consequences, Professor Feinstein provides no economic analysis to disaggregate the portion of Vale Securities' price declines on the Alleged Corrective Dates that was attributable to the financial consequences resulting from the Dam 1 collapse *given* that it had occurred, *ex post*—and which could have occurred absent the Alleged Misrepresentations—versus any alleged concealment of the likelihood that such a tragedy was going to occur, *ex ante*.

86.     Analysts also adjusted their price targets for Vale, indicating changes to Vale Securities' prices, based on their assessments of output related to the Dam 1 collapse.  For example, Citi

---

[130]   HSBC, "[Correction] Downgrade to Hold: Another dam collapses," January 27, 2019, p. 1.

[131]   HSBC, "[Correction] Rising ESG risk favours Rio Tinto over Vale," January 29, 2019, p. 9.

[132]   BMO Capital Markets, "Information to Consider for Quantifying Brumadinho Impact on Vale," January 28, 2019, p. 1.

[133]   JP Morgan, "Tailing Spill from Dam Failure at Feijao Mine – ALERT," January 25, 2019, p. 1.

*Confidential*

analysts stated in their report dated February 7, 2019: "For Vale, we reduce iron ore production to 360mt in 2019-20E (from 400mt) on the assumption that the Brucutu mine remains closed. Pellets are reduced to 50mt (from 60mt)."[134]  Barclays analysts (who revised their target price for Vale from $16.25 to $13.40) stated in a report dated January 30, 2019 that: "[t]he production cuts… are planned to be at least partially offset by higher output in the Northern system where Vale has 50mt spare capacity. However, it is likely to take time to mobilize and ramp-up (6 months+) so should provide temporary support for the iron ore price over coming quarters – potentially up to 20mt of lost supply for 2019."[135]

### C.    Professor Feinstein's Constant "Inflation Ribbon" Is Economically Unreasonable and Based on Speculative Assumptions

87.    As part of his damages analysis "[t]o compute damages for all Class members,"[136] Professor Feinstein: "compute[s] an inflation ribbon, which is the time series of artificial inflation caused by the alleged fraud."[137]  The "inflation ribbon" he constructs is constant over the Class Period (prior to the Alleged Corrective Disclosures), meaning that *all* of the artificial inflation from each of the Alleged Misrepresentations purportedly entered Vale Securities' prices on October 27, 2016 (*i.e.*, the start of the Class Period) and remained unchanged until January

---

[134]    Citi, "Lowering Iron Ore Production Forecasts and Target Price," February 7, 2019, p. 1.

[135]    Barclays, "Vale to shut 40mtpa capacity, positive for RIO/BHP/AAL and Ferrexpo," January 30, 2019, p. 1.

[136]    Feinstein Report, ¶ 194.

[137]    Feinstein Report, ¶ 194.

*Confidential*

25, 2019 (*i.e.*, the first Alleged Corrective Date).[138]  There are several fundamental conceptual problems that render Professor Feinstein's use of a constant inflation ribbon unreliable from an economic perspective.

88.     First, Professor Feinstein does not articulate how each, if any, of the Alleged Misrepresentations introduced artificial inflation into the price of Vale Securities (*i.e.,* how the Alleged Misrepresentations impacted investors' expectations regarding future cash flows).[139]  In addition, Professor Feinstein provides no explanation as to how or why the purported artificial inflation remained unchanged over time even as new Alleged Misrepresentations occurred.

89.     Second, Professor Feinstein's assertion that all of the artificial inflation entered Vale Securities' prices at the start of the Class Period and remained unchanged until the first Alleged Corrective Disclosure implicitly relies on the unsupported assumption that the "true" probability of a safety incident occurring (such as the Dam 1 collapse) remained unchanged throughout the Class Period.  Any changes in the "true" probability would result in changes to the alleged artificial inflation (*i.e.*, the difference between investors' assessed probability of a safety event occurring given the Alleged Misrepresentations and the "true" probability investors would have

---

[138]  "Had there been such disclosure at the start of the Class Period, the $2.72 decline in the price of the Vale ADR that occurred at the end of the Class Period would have occurred at the start of the Class Period.  Therefore, the $2.72 per ADR represents the amount of artificial inflation in the Vale ADR price on 27 October 2016." *See* Feinstein Report, ¶ 224.  Professor Feinstein also states that the Vale Notes contained between $2.37 and $7.17 of artificial inflation per $100 of par value since the start of the Class Period (except for the TAN3 note, which Professor Feinstein finds to have no artificial inflation).  *See* Feinstein Report, ¶¶ 230, 235, 239, 243, 247, 251, 254.

[139]  While Professor Feinstein states that he was asked: "to assess whether Class members suffered losses as a result of the alleged misrepresentations and omissions described in the Complaint," he provides no discussion regarding which statements were misrepresented or how each Alleged Misrepresentation introduced artificial inflation into the Vale Securities.  *See* Feinstein Report, ¶ 6.  Relatedly, in Section V.D, Professor Feinstein presents "Relevant Events and Timeline" but fails to demonstrate how the individual Alleged Misrepresentations impacted Vale Securities' prices or misled investors.  *See* Feinstein Report, Section V.D.

*Confidential*

assessed absent the Alleged Misrepresentations). However, Professor Feinstein fails to evaluate whether and/or how the "true" probability of a safety incident changed over the Class Period.[140]

90.    Third, Professor Feinstein fails to articulate *which* Alleged Misrepresentations were corrected by *which* Alleged Corrective Disclosures. In other words, he provides no mechanism for determining what artificial inflation would be if certain Alleged Misrepresentations or Alleged Corrective Disclosures were found not to be relevant. If the finder of fact determines that some of the Alleged Misrepresentations were not misrepresentations or otherwise not actionable, Professor Feinstein's damages as presented do not allow for an evaluation of how artificial inflation would change; to the contrary, his analysis in effect assumes, without support, that artificial inflation would not change regardless of the set of Alleged Misrepresentations for which Plaintiff can establish liability and tie to the Alleged Corrective Disclosures. For example, if the trier of fact determines that Alleged Misrepresentations related to ESG practices, effective risk management, corporate conduct and reputational harm, and/or revenue and cash flow are unrelated to the fraud, Professor Feinstein's damages would be unchanged.

91.    Fourth, Professor Feinstein's assumption of a constant inflation ribbon is based on speculative assumptions that are inconsistent with the facts of the case; therefore, his assumption of constant inflation does not represent a credible but-for scenario. For example, Professor Feinstein's analysis assumes that information revealed on February 6, 2019 by *The Guardian* and *The Wall Street Journal* corrected a portion of the artificial inflation that was introduced at the

---

[140]    To the contrary, for example, Mr. Stephenson states that: "[i]n addition, the October 2018 GRG Presentation showed that Vale was monitoring the risks of the ten dams in the Attention Zone, conducting further assessments of those dams, and developing actions to reduce the risks. … As Vale implemented risk reduction measures, including decommissioning, for dams in the Attention Zone as of October 2018, one would expect the failure probabilities and thus the potential financial consequences associated with these ten dams to decrease." Stephenson Report, ¶ 72.

*Confidential*

beginning of the Class Period.  However, these two news articles disclosed information regarding a dam leak and technical report submission that occurred in July 2018 and September 2018, respectively, and could not correct any alleged artificial inflation introduced by Alleged Misrepresentations made before July 2018.  Further, to the extent the price declines on February 6, 2019 were due to these disclosures, it is speculative to assume that "the dam leak[ing] water near its base" in July 2018 reported by *The Guardian* and the purported disagreement regarding Dam 1's stability among dam experts reported by *The Wall Street Journal* would have caused the same price declines absent the Dam 1 collapse.[141]

92.     As another example, Plaintiff alleges that: "at least as early as 2018, Vale's third-party dam safety auditor had a financial conflict of interest, and issued Stability Condition Statements under fear of economic reprisal from Vale."[142]  However, it is not possible that any Alleged Misrepresentations related to Vale obtaining allegedly fraudulent Stability Condition Statements in 2018 could have inflated Vale Securities' prices as of the beginning of the Class Period in 2016 because those purportedly fraudulent Stability Condition Statements had not yet been obtained.

93.     Similarly, Professor Feinstein's analysis in effect assumes that, absent the Alleged Misrepresentations, investors would have assessed the "true" probability of the Dam 1 collapse to be 100 percent as of the start of the Class Period and would have also known, among other things, that, given the Dam 1 collapse, the operations of the Brucutu mine would be suspended. These assumptions are not only speculative, but they are also biased by hindsight, particularly

---

[141]   Feinstein Report, ¶ 93.

*Confidential*

given that these events materialized over two years *after* the beginning of the Class Period.

Professor Feinstein fails to articulate how these events were knowable *ex ante* and/or what a

hypothetical but-for disclosure would be absent the Alleged Misrepresentations (as discussed

above).  At best, Professor Feinstein makes a speculative attempt to justify this assumption:

> While investors could not have known in advance the specifics of the ultimate dam collapse and its precise consequences, the forensic analyst's best estimate now of how investors would have repriced the Vale Securities had the truth been uncovered sooner, are the significant declines in valuation that did occur when the corrective disclosure events did reveal the previously concealed truth.  The realization is the best estimate of the midpoint of the range of potential outcomes that investors would have anticipated. Therefore, based on the fundamental principles of market efficiency and rational expectations, because investors generally do not make systematic errors in forecasting when they are equipped with full truthful information, one can estimate that investors would have centered their forecasts on a valuation that reflected the ultimate outcome.[143]

94.     However, this assertion is based on a flawed and unsupported premise that investors

would have expected the occurrence of a near-term safety event absent the Alleged

Misrepresentations.  Professor Feinstein's assumption that, absent the Alleged

Misrepresentations, investors would have assessed, *ex ante*, the price impacts that ultimately

materialized is unsupported and speculative and thus inconsistent with a credible but-for scenario

that, from an economic perspective, must underlie an appropriate analysis of damages.

95.     Fifth, notwithstanding the critical flaws discussed above, Professor Feinstein's claim that

his constant inflation ribbon is a "conservative" estimate is invalid because it is based on

speculative assumptions and vague references to academic literature regarding asymmetric

information that he fails to tie to his assertions.  For example, Professor Feinstein states:

---

[143] Feinstein Report, ¶ 222-23.

*Confidential*

> Had the truth about dam conditions been revealed at the start of the Class Period, the result would have been catastrophic for the Company and its investors at that time. Specifically, revelation of the truth about dam conditions at the outset would have devastated Vale's outlook, its ability to continue to operate mines, its iron ore production, its access to relatively inexpensive capital, its restructuring efforts, and would have increased the costs of doing business. Given the mix of news at the start of the Class Period, such a revelation would reasonably have resulted in a *greater* loss of security value at the start of the Class Period than what occurred near and at the end of the Class Period on account of the recent [Samarco] dam collapse, the fact that Vale's realized earnings and cash flow during the Class Period would not have occurred, and the Company's restructuring efforts would have been stymied. Had the Company instead disclosed that it was determined to withhold from the public accurate information about dam conditions and the Company's conduct, the impact on the prices of the Vale Securities would have been even worse.[144]

96.     Professor Feinstein's claim is speculative in that it relies entirely on his unsupported assertions that Vale's operations would have been "devastated" and, similarly, that "it is indisputable that investors would have severely discounted the Vale Securities" had the alleged fraud been disclosed early in the Class Period in the absence of the occurrence of a safety event.[145]  Ignoring that Professor Feinstein has not articulated a but-for disclosure in the absence of the Alleged Misrepresentations, I have seen no evidence that a hypothetical but-for disclosure early in the Class Period, in the absence of an actual safety incident, would have resulted in such extremes as Professor Feinstein postulates.  Additionally, as I discuss in Section VI.A, Professor Feinstein's assertion that, but for the Alleged Misrepresentations, Vale would have "disclosed that it was determined to withhold from the public accurate information about dam conditions and the Company's conduct"[146] is not tied to Plaintiff's theory of harm.

---

[144]   Feinstein Report, ¶ 24.

[145]   Feinstein Report, ¶ 217.

[146]   Feinstein Report, ¶ 24.

*Confidential*

97.    Professor Feinstein also attempts to support his assertion that his constant inflation ribbon is "conservative" by pointing to: "the seminal work of Nobel laureates George Akerlof, Michael Spence, and Joseph Stiglitz."[147]  In particular, Professor Feinstein discusses several vague and seemingly unrelated statements regarding informational asymmetries and adverse selection[148] to conclude:

> Based on generally accepted economic principles, had investors been apprised at the start of or during the Class Period that important information was being misrepresented and concealed about dam stability and the Company's related conduct, the market's assessment of dam stability and Company conduct would have been far worse than what analysts and investors were led to believe. With such knowledge that information was being misrepresented or concealed, investors would have priced into the Vale Securities their resultant negative assessments of dam stability, Company conduct, and the adverse ramifications thereof. Because generally accepted economic principles dictate that when investors are aware that information is being misrepresented or concealed they rationally assume the worst, the valuation effects of learning at the start of or during the Class Period that dam stability and Company conduct were being misrepresented and concealed would have been commensurate with the security price declines that did occur when investors ultimately did learn through corrective disclosure events that dam stability and Company conduct had been misrepresented and concealed.[149]

98.    However, Professor Feinstein provides no economic analysis demonstrating how the work of George Akerlof, Michael Spence, and Joseph Stiglitz supports or even relates to these

---

[147]    Feinstein Report, ¶ 218.

[148]    Feinstein Report, ¶ 218, n.156 ("For more than two decades, research on incentives and market equilibrium in situations with asymmetric information has been a prolific part of economic theory. …  The modern theory of markets with asymmetric information rests firmly on the work of this year's [Nobel] prizewinners: George Akerlof, Michael Spence, and Joseph Stiglitz"; "Akerlof showed how informational asymmetries can produce adverse selection in markets.  When lenders or car buyers have imperfect information, borrowers with weak repayment prospects or sellers of low quality cars may thus crowd out everyone else from their side of the market, stifling mutually advantageous transactions"; "There are many markets in which buyers use some market statistic to judge the quality of prospective purchases.  In this case there is incentive for sellers to market poor quality merchandise, since the returns for good quality accrue mainly to the entire group whose statistic is affected rather than to the individual seller. As a result there tends to be a reduction in the average quality of goods and also in the size of the market.")

[149]    Feinstein Report, ¶ 219.

*Confidential*

unfounded claims, and he appears to provide no other support for claiming his assertions are based on: "generally accepted economic principles."[150]

99.    Thus, for these reasons, Professor Feinstein's assumption of a constant "inflation ribbon" is economically unreasonable and does not represent a credible but-for scenario.

## VII.    PROFESSOR FEINSTEIN FAILS TO EXPLAIN INCONSISTENCIES IN HIS EVENT STUDY FOR THE VALE NOTES

100.    Even accepting Professor Feinstein's flawed approach in calculating inflation per share based on the entire residual price declines on the Alleged Corrective Dates, Professor Feinstein's event study results for the Vale Notes contain several inconsistencies that call into question his conclusions of loss causation in the Feinstein Report and the conclusion of market efficiency he proffered in the Feinstein Market Efficiency Report.[151]

101.    An event study is a statistical method that economists use to infer security price reaction to a specific disclosure or event.  On a given day, a wide range of information, including market-specific, industry-specific, and company-specific news, can affect the price of a security issued by a publicly traded company.  Statistical significance in hypothesis testing indicates the likelihood that an observed event occurred due to chance.  An event that is statistically significant at the five percent level, which is a common statistical threshold in academic research, indicates a 95 percent likelihood that the observed effect did not occur by chance.[152]

---

[150]    Feinstein Report, ¶ 219.

[151]    Corrected Expert Report on Market Efficiency of Professor Steven P. Feinstein, Ph.D., CFA, February 18, 2021 ("Feinstein Market Efficiency Report"), ¶¶ 20-21.  I understand that the Court has found that the Vale Securities traded in an efficient market during the Class Period.  I am not providing an opinion on whether the market for Vale Securities was, in fact, efficient during the Class Period.  *See* Report & Recommendation, *In re Vale S.A. Securities Litigation*, Case No. 19-cv-526-RJD-SJB, January 11, 2022.

[152]    Federal Securities Acts and Areas of Expert Analysis, p. 11.

*Confidential*

Therefore, financial economists use an event study to isolate the part of the price movement that is potentially attributable to the disclosure events.

102.    Professor Feinstein describes his event study analysis for the Vale Securities as: "involv[ing] running a regression to determine how the price of a company's security typically behaved in relation to the overall stock market and its industry sector, and then using the regression model to determine how much of each event day's actual return is explained by those market and sector effects.  The portion of the security return that is attributable to market and sector factors is called the explained return.  The explained return is then subtracted from the actual return to isolate the residual return, which is the security's return after controlling for market and industry sector effects."[153]  Afterwards, Professor Feinstein conducts a statistical analysis called a "*t*-test" to determine whether the residual returns of the Vale Securities were statistically significant, which would support that they were "caused by company-specific information" if the event study is appropriately specified.[154]  He also uses statistical significance as part of his determination of whether the Alleged Misrepresentations caused losses to investors in a given Vale Security on a given Alleged Corrective Date.[155]

103.    While Professor Feinstein acknowledges that "the price of bonds will not always react to new company information in the same manner as does the stock," and "[w]hen new information is released that causes a price reaction in the common stock of a company, the appropriate price reaction in the company's bonds may sometimes be in the opposite direction or no reaction at all," he does not provide an explanation for why there may be a different reaction to the same

---

[153]   Feinstein Report, ¶¶ 135-136.

[154]   Feinstein Report, ¶ 156.

[155]   Feinstein Report, ¶¶ 180-188

*Confidential*

information among various Vale Notes.[156]  As I discuss below, **Exhibit 7,** where I reproduce the statistical significance levels from the Feinstein Report for each of the Vale Notes, shows that some Vale Notes have a statistically significant price reaction on a given Alleged Corrective Date while others do not.  Professor Feinstein is silent on this point, and in the absence of any analysis on his part, these conflicting results call into question the reliability of his event study model and his prior conclusion in the Feinstein Market Efficiency Report that the market for the Vale Notes was efficient during the Class Period.

104.    As a first example, Professor Feinstein finds that six of the seven Vale Notes had residual returns that are not statistically significant (at the 95 percent level)[157] on February 4, 2019.  In other words, only one Vale Note (out of seven) had a statistically significant residual return on February 4, 2019—TAP8.[158]  TAP8 is a ten-year note maturing in 2026 with a 6.25 percent coupon.[159]  Professor Feinstein does not provide any explanation as to why only one Vale Note out of seven reacted to the Alleged Corrective Disclosure on this date and/or why the Vale Notes would react differently to the Alleged Corrective Disclosure, especially in light of some Vale Notes having longer times to maturity and others having shorter times to maturity than TAP8.[160]  In other words, Professor Feinstein does not address why he believes that allegedly concealed

---

[156]  Feinstein Report, ¶ 228.

[157]  In the subsequent discussion, I refer to a result as "statistically significant" if it is statistically significant at the 95 percent level.

[158]  **Exhibit 7**.

[159]  **Exhibit 7**.

[160]  In addition, some Vale Notes have a higher coupon rate than TAP8 while others have a lower rate.  *See* **Exhibit 7**.

*Confidential*

information revealed on February 4, 2019 "caused losses to investors" on that day for investors holding TAP8, but not for investors in the other Vale Notes.[161]

105.    Relatedly, Professor Feinstein reports but does not comment on the following inconsistent results for February 6, 2019 for three of the Vale Notes with similar remaining time to maturities:[162]

- The residual returns of the TAE3, a 30-year Vale Note maturing in 2034 with an 8.25% coupon, are *not* statistically significant;
- The residual returns of the TAH6, a 30-year Vale Note maturing in 2036 with a 6.875% coupon, are statistically significant;
- The residual returns of the TAK9, a 30-year Vale Note maturing in 2039 with a 6.875% coupon, are *not* statistically significant.

106.    Professor Feinstein has not described any structural differences or other characteristics of these bonds, all of which were between approximately 15 and 25 years to maturity at the time of the Alleged Corrective Dates, that could potentially explain these observed differences in statistical significance.[163]  Similarly, he fails to address why nearly half of the Vale Notes (three of the seven) did not exhibit statistically significant price movements on February 6, 2019.[164] Nor does he attempt to explain why he believes the allegedly concealed information caused losses only to investors in the other four of the seven Vale Notes on February 6, 2019.

107.    Professor Feinstein also concedes that investors in one of the Vale Notes, TAN3, incurred no "quantifiable damages" because:

---

[161]   Feinstein Report, ¶ 176.

[162]   **Exhibit 7**.

[163]   **Exhibit 7**.

[164]   The three Vale Notes without statistically significant price movements are: TAN3 (5-Year Note maturing in 2021 with a 5.875 percent coupon), TAE3 (30-Year Note maturing in 2034 with an 8.25 percent coupon), and TAK9 (30-Year Note maturing in 2039 with a 6.875 percent coupon).

*Confidential*

The TAN3 Notes did not trade on 25 January 2019, the first corrective disclosure date, nor did it experience a statistically significant decline on either 4 February 2019 or 6 February 2019, the final two corrective disclosure dates.[165]

108.    Professor Feinstein calls this conclusion "conservative" because due to TAN3 not trading on January 25, 2019, he could not measure whether that note experienced a statistically significant decline on that day.[166]  However Professor Feinstein has provided no explanation why TAN3 did not trade on January 25, 2019, the day of Dam 1's collapse and a day that he deems to be corrective.  The lack of trading on this day calls into question whether the market for this Vale Note was efficient.

109.    Furthermore, Professor Feinstein's event study results are sensitive to his choice of regression model specification, further calling into question the reliability of his conclusions.  In particular, the TAM5 10-Year Note maturing in 2022 with a 4.375 percent coupon exhibited a statistically significant price movement on February 6, 2019 in the Feinstein Report, but not in the Feinstein Market Efficiency Report, as I show in **Exhibit 8**.  The models use the same variables, but Professor Feinstein runs the event study regressions in the Feinstein Report on "daily returns covering the one-year period prior to the first corrective disclosure" (*i.e.,* from January 25, 2018 through January 24, 2019), whereas he runs the event study regressions in the Feinstein Market Efficiency Report over the full Class Period (*i.e.*, October 27, 2016 through February 6, 2019).[167]  Professor Feinstein fails to demonstrate why he switched the time period of his regression or why the approach used in the Feinstein Report is superior to the approach

---

[165]  Feinstein Report, ¶26.vii.

[166]  Feinstein Report, ¶26.vii.

[167]  Feinstein Report, ¶ 145; Feinstein Market Efficiency Report, ¶ 270 and Exhibits 11a-12g.  Professor Feinstein's model in the Feinstein Market Efficiency Report does not include returns on January 25, 2019, January 28, 2019, February 4, 2019, or February 6, 2019 when estimating the regression coefficients, standard errors, and *t*-statistics.

*Confidential*

used in the Feinstein Market Efficiency Report, which would be particularly important given that his new specification results in higher inflation per note for the TAM5 Vale Note. While the Feinstein Report notes that "[t]he choice of using the period prior to the tested event date for the regression estimation period is a widely used and generally accepted practice in event study analysis," Professor Feinstein is silent on how this estimation period compares to his prior approach of "using all available daily returns covering the entire portion of the Class Period when the respective security was traded" in the Feinstein Market Efficiency Report.[168] Had Professor Feinstein used the specification from his Market Efficiency Report, he would not have reached the conclusion that: "the alleged misrepresentations and omissions caused losses to investors in the TAM5 Note" on February 6, 2019.[169] Relatedly, the maximum per share inflation for the TAM5 Note would drop from \$2.37 to \$1.80 (a decrease of 24 percent) had he used the results from his Market Efficiency Report.[170]

110.    Taken together, the aforementioned inconsistencies in Professor Feinstein's event study results for the Vale Notes call into question whether his event study model is reliable and, consequently, whether the Alleged Corrective Disclosures on February 4, 2019 and February 6, 2019 were indeed corrective of any purported misrepresentations that caused losses to investors. Another potential explanation for the divergent results is that contrary to Professor Feinstein's prior conclusion, the market for the Vale Notes is not efficient. In other words, Professor Feinstein has not explained or provided any analysis showing why Vale Notes having differing reactions to the same information is consistent with market efficiency.

---

[168]   Feinstein Report, ¶ 145; Feinstein Market Efficiency Report, ¶ 270.

[169]   Feinstein Report, ¶ 181.

[170]   **Exhibit 8**.

*Confidential*

## VIII.  PROFESSOR FEINSTEIN DOES NOT PROVIDE A MECHANISM TO ASSESS ANY ECONOMIC HARM FOR INVESTORS IN VALE'S PREFERRED ADRS

111.    As discussed above, during a portion of the Class Period, Vale also had outstanding preferred ADRs that represented preferred shares of the Company.  These preferred shares, including shares underlying ADRs, were converted to common shares at a ratio of 0.9342 common share per preferred share in a series of two transactions.[171]  First, approximately 85 percent of Vale's total outstanding preferred shares were converted into common shares as part of a voluntary conversion from June 28, 2017 through August 11, 2017.[172]  The remaining preferred shares were converted to common shares on November 27, 2017 (*i.e.*, the last trading day of the preferred ADRs was November 24, 2017) as part of a mandatory conversion approved by Vale's shareholders in October 2017.[173]  Thus, after November 27, 2017, Vale's preferred shares and preferred ADRs ceased to exist.[174]

112.    Despite these Vale securities being outstanding during part of the Class Period, Professor Feinstein does not discuss loss causation or damages for preferred ADRs in the Feinstein Report. Nowhere in Professor Feinstein's report does he describe whether individuals who purchased and/or held preferred ADRs during the Class Period and had those ADRs converted to common ADRs were damaged.  In particular, he has not established what price inflation, if any, had accrued in this security prior to the voluntary conversion from June 2017 to August 2017 or the mandatory conversion in November 2017.  Furthermore, he did not establish market efficiency

---

[171]  Vale Voluntary Conversion Offer, p. 1.

[172]  Vale Voluntary Conversion Offer, p. 1; Vale, Form 20-F for the fiscal year ending December 31, 2017, p. 6.

[173]  Vale, Form 20-F for the fiscal year ending December 31, 2017, pp. 6, 119.  *See also* Citibank, N.A, "Notice to Holders of Preferred American Depository Shares of Vale S.A., November 27, 2017, available at https://depositaryreceipts.citi.com/adr/common/file.aspx?idf=4309.

[174]  Vale, Form 20-F for the fiscal year ending December 31, 2017, pp. 6, 119.

*Confidential*

for preferred ADRs in the Feinstein Market Efficiency Report. To the extent Plaintiff may argue that holders of the preferred ADRs "purchased" common ADRs at inflated prices in the conversion, these investors also would have "sold" a preferred ADR on the same day, presumably also at an inflated price that Professor Feinstein has not determined. Ignoring the potential benefit a class member had from "selling" a preferred ADR at an inflated price while assuming that same class member was damaged through the "purchase" of a common ADR through the conversion could lead to a windfall. Professor Feinstein's report has not described any mechanism to calculate potential damages for such class members.

113.    However, even if Professor Feinstein had analyzed inflation per share for the preferred ADRs and Plaintiff establishes that the conversion to common is effectively a "purchase" at an inflated price, such class members would still suffer no damages based on the PSLRA, which Professor Feinstein acknowledges: "provides the following limitation on recoverable damages relating to a 90-day 'bounce-back rule'":

> [T]he award of damages to the plaintiff shall not exceed the difference between the purchase or sale price paid or received, as appropriate, by the plaintiff for the subject security and the mean trading price of that security during the 90-day period beginning on the date on which the information correcting the misstatement or omission that is the basis for the action is disseminated to the market.[175]

114.    In other words, under the terms of the PSLRA, investors who purchased Vale Securities at a price below the "bounce-back" price would not be awarded damages, regardless of whether they purchased their Vale Securities at an inflated price. Professor Feinstein also notes that:

---

[175]    Feinstein Report, ¶ 191; 15 U.S.C. §78u-4(e)-(1).

*Confidential*

> For Class members who sell within the 90-day period referred to in the statute, the PSLRA limitation on damages is 'the difference between the purchase or sale price paid or received' and 'the mean trading price of the security during the period beginning immediately after dissemination of information correcting the misstatement or omission and ending on the date on which' the security is sold.[176]

115.    He finds that the mean per-ADR trading price during the 90-day period beginning on February 6, 2019 is $12.78.[177]  In **Exhibit 9**, I calculate the rolling average price between February 6, 2019 and each trading date on which an investor could have sold Vale Securities within the 90-day "bounce-back" period.[178]  I find that the minimum price of all possible periods is $11.27.[179]

116.    In **Exhibit 10**, I plot the Vale's common and preferred ADR prices during the Class Period and compare the common ADR price to the minimum PSLRA "bounce-back" price of $11.27.  As the price of the common ADR was below $11.27 both over the voluntary conversion period (June 28, 2017 through August 11, 2017) and at the time of the mandatory conversion after November 24, 2017, preferred shareholders would not be eligible to receive damages even if the conversion from preferred ADRs to common ADRs were to be treated as a "purchase" of Vale common ADRs at an inflated price. That is, even assuming that Defendants are found liable and Plaintiff asserts preferred ADR holders who converted to common ADRs during the Class

---

[176]    Feinstein Report, ¶ 192.

[177]    Feinstein Report, ¶ 193.

[178]    For investors who did not sell Vale Securities during the "bounce-back" period, the time interval encompasses the full 90-day period.

[179]    This occurs using the two-day period of February 6, 2019 and February 7, 2019.

*Confidential*

Period "purchased" Vale common ADRs at inflated prices, such purchases would have no damages under the PSLRA given their timing.[180]

## IX.    MR. PITT FAILS TO PROVIDE A PROPER ANALYSIS OF ECONOMIC HARM

117.    In discussing the collapse of Dam 1, Mr. Pitt opines:

> On January 25, 2019, as an immediate result of the Dam's collapse, Vale Securities declined over eight percent.  By February, international mainstream media began detailing the horrific details of the collapse as given by workers of the Mine and Dam, and Vale Securities declined nearly an additional ten percent.  As alleged, when the truth regarding the risk of Vale's tailing dams and its inadequate dam maintenance and safety certifications was disclosed, and the concealed risks materialized, the price of Vale Securities ultimately lost nearly twenty-five percent.[181]

118.    To the extent that Mr. Pitt is asserting that the alleged materialization of concealed risks caused the 25 percent decline in Vale's ADR price, he has performed no analysis to link the decline in price to any allegedly concealed risks.  Similar to Professor Feinstein, Mr. Pitt provides no analysis of the portion of the 25 percent price decline he references that is attributable to factors unrelated to the alleged fraud such as the occurrence of a materialization of a disclosed risk (*e.g.*, the collapse of Dam 1) which could have occurred even in the absence of any misrepresentation or omission.

---

[180]    **Exhibit 10** also demonstrates that many class members purchased common ADRs at prices below the minimum PSLRA "bounce-back" price of $11.27 (*e.g.,* during certain periods in 2016 and 2017).  Such class members would have no damages under the PSLRA even if the finder of fact concludes they purchased their shares with inflation.  To the extent that investors purchased any of the Vale Notes at a price below each note's minimum PSLRA "bounce-back" price, such class members would also have no damages under the PSLRA even if the finder of fact concludes they purchased the securities with inflation.  As shown in **Exhibit 3**, for each of the Vale Notes, there were portions of the Class Period during which the price of each Vale Note was below the respective minimum price during the PSLRA "bounce-back" period.

[181]    Pitt Report, p. 28.

*Confidential*

119.    In addition, while Mr. Pitt does not perform any analysis of the factors contributing to the Vale ADRs' price decline following the collapse Dam 1, by ascribing the price decline on January 25, 2019 to the "immediate result of the Dam's collapse," Mr. Pitt appears to concede that the price decline on that day was due (at least in part) to the materialization of a disclosed risk as opposed to a corrective disclosure.

120.    To summarize, from an economic perspective, Mr. Pitt's opinion regarding the cause of the declines in Vale's ADR price without any analysis is misleading at best and not appropriate for the purposes of determining loss causation associated with the Alleged Misrepresentations.

_____

Glenn Hubbard

April 7, 2023

*Confidential*
**April 2023**

**APPENDIX A**
**ROBERT GLENN HUBBARD**

Graduate School of Business
Columbia University
572 Kravis Hall
665 West 130th Street
New York, NY 10027

Phone: 212.854.2888
Fax: 212.864.6184
Email: rgh1@gsb.columbia.edu
Web: www.glennhubbard.net

***Curriculum Vitae***

## PERSONAL DATA

Born:             In Orlando, Florida.
Marital Status:    Married, two children.

## FIELDS OF SPECIALIZATION

Public Economics, Corporate Finance and Financial Institutions, Macroeconomics, Industrial Organization, Natural Resource Economics, Public Policy.

## EDUCATION

Ph.D., Economics, Harvard University, May 1983.
Dissertation: *Three Essays on Government Debt and Asset Markets*, supervised by Benjamin M. Friedman, Jerry A. Hausman, and Martin S. Feldstein.

A.M., Economics, Harvard University, May 1981.

B.A., B.S., Economics, University of Central Florida, June 1979, *summa cum laude*.

## HONORS AND AWARDS

Doctorate, *Honoris Causa*, Niagara University, 2022.

John H. Makin Fellowship, American Enterprise Institute, 2019-2020.

NACD Directorship 100, 2019.

Distinguished Eagle Scout Award, National Boy Scouts of America, November 2017.

Visionary Award, Council for Economic Education, 2016.

Silver Beaver Award, Boy Scouts of America, 2014.

Medal of Honor, Foreign Policy Association, 2014.

Homer Jones Lecture, Federal Reserve Bank of St. Louis, 2013.

Fiftieth Anniversary Award of Scholarship, University of Central Florida, 2013.

Franklin Delano Roosevelt Distinguished Service Award, Greater New York Council, Boy Scouts of America, 2012.

Bloomberg Markets, 50 Most Influential Members of the Global Financial Community, 2012.

National Association of Corporate Directors, Directorship 100: People to Watch, 2011.

Joint American Economic Association/American Finance Association Distinguished Speaker, 2008.

Cairncross Lecture, University of Oxford, 2007.

Fellow of the National Association of Business Economists, 2005.

William F. Butler Memorial Award, New York Association of Business Economists Award, 2005.

Exceptional Service Award, The White House, 2002.

Michelle Akers Award for Distinguished Service, University of Central Florida, 2001.

Alumni Hall of Fame, University of Central Florida, 2000.

Best Paper Award for Corporate Finance, Western Finance Association, 1998.

Exceptional Service Award, U.S. Department of the Treasury, 1992.

Distinguished Alumnus Award, University of Central Florida, 1991.

John M. Olin Fellowship, National Bureau of Economic Research, 1987-1988.

Teaching Commendations, Graduate School of Business, Columbia University.

Northwestern University Associated Student Government Teaching Awards, announced in 1985, 1986, and 1987.

Graduate Distinctions: National Science Foundation Fellowship, Alfred P. Sloan Foundation Fellowship.

Undergraduate Distinctions: National Merit Scholarship, National Society of Professional Engineers Award, Florida Society of Professional Engineers Award, National Council of Teachers of English Award, Omicron Delta Kappa, Financial Management Association Honor Society.

## POSITIONS HELD

| | |
|---|---|
| 2019-present | Dean Emeritus, Graduate School of Business, Columbia University |
| 2004-2019 | Dean, Graduate School of Business, Columbia University |
| 2019-present | Academic Director, Chazen Institute for Global Business, Graduate School of Business, Columbia University |
| 2019-2021 | Co-Director, Richman Center for Law, Business, and Public Policy |
| 1994-present | Russell L. Carson Professor of Economics and Finance, Graduate School of Business, Columbia University |
| 1997-present | Professor of Economics, Faculty of Arts and Sciences, Columbia University |
| 2019-present | Co-Chair, Task Force on Financial Stability, Brookings Institution |
| 2017-present | Co-Chair, Aspen Institute Future of Work Initiative National Advisory Council |
| 2017-present | Member, Aspen Institute Economic Strategy Group |
| 2007-2017 | Panel of Economic Advisors, Federal Reserve Bank of New York (also 1993-2001) |
| 2003-2012 | Featured commentator, *Nightly Business Report* |
| 2003-2010 | Featured commentator, *Marketplace* |
| 2003-present | Visiting Scholar American Enterprise Institute (also 1995-2001) |
| 1999-2004 | Co-Director, Columbia Business School Entrepreneurship Program |
| 2004-2005 | Viewpoint Columnist, *Business Week* |
| 2004-2006 | Member, Panel of Economic Advisors, Congressional Budget Office |
| 2001-2003 | Chairman, President's Council of Economic Advisers |
| 2001-2003 | Chairman, Economic Policy Committee, Organization for Economic Cooperation and Development |
| 2001-2003 | Member, White House National Economic Council and National Security Council |
| 2001-2003 | Member, President's Council on Science and Technology |
| 1997-1998 | Visiting Professor of Business Administration, Harvard Business School |
| 1995-2001 | Visiting Scholar and Director of Tax Policy Program, American Enterprise Institute |
| 1994-1997 | Senior Vice Dean, Graduate School of Business, Columbia University |
| 1994 | MCI Fellow, American Council for Capital Formation |
| 1994 | John M. Olin Visiting Professor, Center for the Study of Economy and the State, University of Chicago |
| 1991-1993 | Deputy Assistant Secretary (Tax Analysis), U.S. Department of the Treasury |
| 1988-present | Professor of Economics and Finance, Graduate School of Business, Columbia University |
| 1987-1988 | John M. Olin Fellow in residence at the National Bureau of Economic Research |
| 1983-1988 | Assistant Professor of Economics, Northwestern University, with half-time research appointment in the Center for Urban Affairs and Policy Research |
| 1985 | Visiting Scholar, Center for Business and Government, John F. Kennedy School of Government, Harvard University |

*Confidential*

| | |
|---|---|
| 1981-1983 | Teaching Fellow (Department of Economics) and Resident Tutor in Economics (Dunster House), Harvard University |

DIRECTORSHIPS

| | |
|---|---|
| 2021-present | TotalEnergies SE |
| 2019-present | MetLife (Chairman of the Board) |
| 2007-present | MetLife (Independent director) |
| 2022-present | BlackRock Fixed Income Funds (Chairman of the Board) |
| 2004-present | BlackRock Fixed Income Funds |
| 2004-2020 | ADP, Inc. |
| 2004-2014 | KKR Financial Corporation (Lead independent director) |
| 2004-2008 | Duke Realty Corporation |
| 2006-2008 | Capmark Financial Corporation; Information Services Group |
| 2004-2006 | Dex Media/R.H. Donnelley |
| 2003-2005 | ITU Ventures |
| 2000-2001 | Angel Society, LLC; Information Technology University, LLC |

## CONSULTING OR ADVISORY RELATIONSHIPS

| | |
|---|---|
| 2022-present | Vale S.A. |
| 2019-present | Growth Catalyst Partners |
| 2016-2020 | 55 Capital |
| 2014-present | Fiscal Note |
| 2007-present | Consulting or Speaking Engagements at Some Point: U.S. Department of Justice, Internal Revenue Service, 1-800-Flowers, Abbott, Access Midstream, Advance Auto Parts, Advent, Airgas, Alibaba, AlixPartners, Alternative Investment Group, Amazon, American Century, America's Health Insurance Plans, AMVAC, ApexBrasil, Republic of Argentina, Association for Corporate Growth, Atlantic Point, AXA, Banco Bradesco, Bank of America, Bank of New York Mellon, Barclays Services Corporation, BBVA Compass, BGC, BNP Paribas, Brevan Howard, Calamos, Capital Research, Carlyle Group, Christofferson Robb, CIBC, Citigroup, Commonfund, Compagnie Financiere Tradition, ComScore, Coty, Credit Suisse, Dell, Deutsche Bank, FactSet, Donald Fewer, Fidelity, Flutter, Franklin Resources, Freddie Mac, Gartner, Goldman Sachs, Good, Government of Greece, Great-West, Sue Ann Hamm, Hanson, The Hartford, HFF, Huntsman Corp., Insurance Information Institute, Intel, Investcorp, Jarden, JP Morgan Chase, Key Bank, Kosmos, Lincoln National, Loews, Lotte, LVMH, Macquarie, Mastercard, Mattel, Medtronic, Microsoft, Morgan Stanley, Mylan, NAI, NAREIT, NASCAR, National Rural Utilities Cooperative Finance Corporation, Nationwide, Adam Neumann, New York Bankers Association, NextEra, NMS Group, Nuveen, Ocwen, Oracle, Pandora, Panera, Patriarch, Pension Real Estate Association, Pershing Square, PNC, Principal Management Corporation, Prium, Promontory, Rabobank, Real Estate Roundtable, Related Properties, Republic of Argentina, Reynolds American, Rio Tinto, Royal Bank of Canada, Royal Bank of Scotland, Robinhood, Rural/Metro, Samsung, Sarshar, SCE&G, Steven Scott, Sears, SIG, Sinclair, Solera, SunTrust, Telia Sonera, Tesco, Trust Company of the West, Tullett Prebon, Visa, Walter Energy, William Walters, Wells Fargo, Wilmington Trust, Zillow |
| 2005-2009 | Arcapita |
| 2005-2010 | Nomura Holdings America |
| 2008 | Laurus Funds |
| 2005-2008 | Chart Venture Partners |
| 2003-2009 | Ripplewood Holdings |

## POSTS IN NON-PROFIT ORGANIZATIONS

| | |
|---|---|
| 2021-present | Trustee, Fifth Avenue Presbyterian Church, New York |

| | |
|---|---|
| 2020-present | Member, Board of Directors, Resources for the Future |
| 2019-present | Member, Grant Advisory Committee, Smith Richardson Foundation |
| 2019-present | Member, Task Force on Inclusive Capitalism |
| 2019-present | Co-Chair, Financial Stability Task Force |
| 2006-present | Co-Chair, Committee on Capital Markets Regulation |
| 2003-present | Member, Manhattan District Council Board, Boy Scouts of America |
| 2012-present | Trustee, Committee for Economic Development |
| 2004-2019 | Member, Advisory Board, National Center on Addiction and Substance Abuse |
| 2017-2020 | Trustee, Fifth Avenue Presbyterian Church, New York |
| 2012-2015 | Trustee, Fifth Avenue Presbyterian Church, New York |
| 2010-2011 | Co-Chair, The Study Group on Corporate Boards |
| 2008-2011 | Elder, Fifth Avenue Presbyterian Church |
| 2008-2010 | Chairman, Economic Club of New York |
| 2006-2008 | Member, Board of Directors, Resources for the Future |
| 2003-2008 | Trustee, Tax Foundation |
| 2004-2010 | Trustee, Economic Club of New York |
| 2004-2007 | Trustee, Fifth Avenue Presbyterian Church, New York |

PROFESSIONAL ACTIVITIES

| | |
|---|---|
| 1987-present | Research Associate, National Bureau of Economic Research (Monetary Economics, Corporate Finance, Public Economics, Economic Fluctuations, Industrial Organization) |
| 2007-present | Life Member, Council on Foreign Relations |
| 2017-2018 | Member, U.S.-China Economic and Security Review Commission |
| 2003 | Member, Committee of Visitors, National Science Foundation |
| 2000 | Panelist, Graduate Fellowship Selection Committee, National Science Foundation |
| 1999-2001 | Director, Project on Nonprofit Organizations, National Bureau of Economic Research |
| 1997-2001 | Member, COSSA-Liaison Committee, American Economic Association |
| 1993-2001 | Board of Advisors, Institutional Investor Project, School of Law, Columbia University |
| 1995-1999 | Member, Board of Academic Consultants, American Law Institute |
| 1997 | Member, Grants Panel for Integrative Graduate Education and Research Training Program, National Science Foundation |
| 1994-1996 | Member, Economics Grants Panel, National Science Foundation |
| 1993-1996 | Member, Federal Taxation and Finance Committee, National Tax Association |
| 1990-1995 | Co-organized research program on International Aspects of Taxation at the National Bureau of Economic Research, Cambridge, Massachusetts |
| 1995 | Member, Program Committee, American Economic Association Meeting |
| 1983-1987 | Faculty Research Fellow, National Bureau of Economic Research |
| 1983-1986 | Adjunct Faculty Research Fellow, Energy and Environmental Policy Center, John F. Kennedy School of Government, Harvard University, Cambridge, Massachusetts |
| 1986, 1988, 1994, 2020 | Member of the Brookings Panel on Economic Activity |
| 1985, 1987 | Special guest of the Brookings Panel on Economic Activity |

| 1990-1991 | Organized research program on Environmental Economics and Public Policy at the National Bureau of Economic Research, Cambridge, Massachusetts |
|---|---|
| 1988-1990 | Co-organized research program on Dynamic Models of Firms and Industries at the National Bureau of Economic Research, Cambridge, Massachusetts |
| 1985-1989 | Organized research program and workshops on contracting in financial markets at the Summer Institute, National Bureau of Economic Research, Cambridge, Massachusetts |
| 1988 | Organized Economic Fluctuations program on Industrial Economics and Macroeconomics, National Bureau of Economic Research, Stanford, California |
| 1986-1988 | Organized research program and workshop on links between macroeconomics and industrial organization at the Summer Institute, National Bureau of Economic Research, Cambridge, Massachusetts |
| 1991 | Member, Program Committee, Econometric Society Winter Meetings |
| 1982-1983 | Member, Energy Modeling Forum VII Study Group, Stanford University, Stanford, California |
| 1981-present | Consultant on research projects with private corporations and government and international agencies, including the Internal Revenue Service, Social Security Administration, U.S. Department of Energy, U.S. Department of State, U.S. Department of Treasury, and U.S. International Trade Commission; National Science Foundation; The World Bank; Board of Governors of the Federal Reserve System; Federal Reserve Bank of New York; Congressional Budget Office |
| Member: | American Economic Association, American Finance Association, Association for Public Policy and Management, Econometric Society, International Association of Energy Economists, National Tax Association, the Royal Economic Society, and the Institute for Management Science |
| Referee: | American Economic Review; Canadian Journal of Economics; Columbia Journal of World Business; Econometrica; Economic Journal; Energy Economics; Energy Journal; International Finance; International Tax and Public Finance; Journal of Business; Journal of Business and Economic Statistics; Journal of Economic History; Journal of Economic Literature; Journal of Finance; Journal of Financial Economics; Journal of Financial Intermediation; Journal of Financial and Quantitative Analysis, Journal of Financial Services Research; Journal of Industrial Economics; Journal of International Money and Finance; Journal of Law and Economics; Journal of Macroeconomics; Journal of Money, Credit, and Banking; Journal of Monetary Economics; Journal of Political Economy; Journal of Public Economics; Journal of Regulatory Economics; Journal of Small Business Finance; Management Science; National Tax Journal; Quarterly Journal of Economics; Quarterly Review of Economics and Finance; RAND Journal of Economics; Review of Economic Dynamics; Review of Economic Studies; Review of Economics and Statistics; Review of Financial Economics; Scandinavian Journal of Economics; Southern Economic Journal; National Science Foundation; C.V. Starr Center for Applied Economics (New York University); Addison-Wesley Publishing Company; Ballinger Press; Cambridge University Press; Harvard Business School Press; MIT Press; W.W. Norton; Oxford University Press |
| Associate Editor: | Journal of Applied Corporate Finance |
| Former Associate Editor: | Federal Reserve Bank of New York Economic Policy Review; International Finance; International Tax and Public Finance; Journal of Industrial Economics; Journal of Macroeconomics; Journal of Small Business Finance; National Tax Journal |

## PUBLICATIONS AND PAPERS

### Edited Volumes

*Transition Costs of Fundamental Tax Reform* (with K.A. Hassett), Washington, D.C.: AEI Press, 2001.

*Inequality and Tax Policy* (with K.A. Hassett), Washington, D.C.: AEI Press, 2001.

*Effects of Taxation on Multinational Corporations* (with M. Feldstein and J.R. Hines), Chicago: University of Chicago Press, 1995.

*Taxing Multinational Corporations* (with M. Feldstein and J. R. Hines), Chicago: University of Chicago Press, 1995.

*Studies in International Taxation* (with A. Giovannini and J. B. Slemrod), Chicago: University of Chicago Press, 1993.

*Financial Markets and Financial Crises*, Chicago: University of Chicago Press, 1991.

*Asymmetric Information, Corporate Finance, and Investment*, Chicago: University of Chicago Press, 1990.

## Books

*The Wall and the Bridge,* New Haven, CT: Yale University Press, 2022.

*Balance* (with T. Kane), Simon and Schuster, 2013.

*Healthy, Wealthy, and Wise* (with J.F. Cogan and D.P. Kessler), Hoover Institution Press and AEI Press, 1st ed., 2005; 2nd ed., 2011.

*Seeds of Destruction* (with P. Navarro), FT Publishing, 2010.

*The Mutual Fund Industry: Competition and Investor Welfare* (with M.F. Koehn, S.I. Ornstein, M. Van Audenrode, and J. Royer), New York: Columbia Business School Publishing, 2010.

*The Aid Trap: Hard Truths About Ending Poverty* (with W. Duggan), Columbia Business School Publishing, 2009.

## Textbooks

*Principles of Economics* (with A.P. O'Brien), Pearson Prentice Hall, 1st ed., 2006; 2nd ed., 2008; 3rd ed., 2010; 4th ed., 2013; 5th ed., 2015; 6th ed., 2017; 7th ed., 2019; 8th ed., 2021.

*Money, Banking, and the Financial System* (with A.P. O'Brien), Pearson Prentice Hall, 1st ed., 2012; 2nd ed., 2013; 3rd ed., 2016; 4th ed., 2021.

*Macroeconomics* (with A.P. O'Brien and M. Rafferty), Pearson Prentice Hall, 1st ed., 2012; 2nd ed., 2014; 3rd ed., 2018.

*Money, the Financial System, and the Economy,* Reading: Addison-Wesley Publishing Company, 1st ed., 1994; 2nd ed., 1997; 3rd ed., 2000; 4th ed., 2002; 5th ed., 2004; 6th ed., 2007.

## Publications

### Articles

"Stakeholders, Shareholders, and the Purpose of the Corporation" (with S. Bhagat), *Journal of Law, Economics and Policy* 17 (October 2022).

"The Elasticity of Taxable Income in the Presence of Intertemporal Income Shifting" (with A. Gorry and A. Mathur), *National Tax Journal* 74 (March 2021): 45-73.

"Has the Paycheck Protection Program Succeeded?" (with M. Strain), *Brookings Papers on Economic Activity* (Fall 2020): 335-390.

"Establishing Credible Rules for Fed Emergency Lending" (with C. Calomiris, D. Holtz-Eakin, A.H. Meltzer, and H.S. Scott), *Journal of Financial Economic Policy* 8 (2017): 260-267.

"The Response of Deferred Executive Compensation to Changes in Tax Rates" (with A. Gorry, K.A. Hassett, and A. Mathur), *Journal of Public Economics* 151 (2017): 28-40.

"Country Characteristics and the Incidence of Capital Income Taxation on Wages:  An Empirical Assessment" (with C. Azemar), *Canadian Journal of Economics* 48 (2015): 1762-1802.

"Taxing Capital's Gains: Capital's Ideas and Tax Policy in the Twenty-First Century", *National Tax Journal*, 68 (2015): 409-424.

Reforming the Tax Preference for Employer Health Insurance" (with J. Bankman, J.F. Cogan, and D.P. Kessler), *Tax Policy and the Economy*, volume 26, Cambridge, University of Chicago Press, 2012.

"The Effect of Tax Preferences on Health Spending" (with J.F. Cogan and D.P. Kessler), *National Tax Journal*, 64 (2011): 795-816.

"The Effect of Medicare Coverage for the Disabled on the Market for Private Insurance" (with J.F. Cogan and D.P. Kessler), *Journal of Health Economics* 29 (2010): 418-428.

"The Effect of Massachusetts' Health Reform on Employer-Sponsored Insurance Premiums" (with J.F. Cogan and D.P. Kessler), *Forum for Health Economics and Policy*, 2010.

"The Mortgage Market Meltdown and House Prices" (with C. Mayer), *The B.E. Journal of Economic Analysis & Policy* 9: Issue 3 (Symposium), Article 8 (2009).

"Competition in the Mutual Fund Industry: Evidence and Implications for Policy" (with J. Coates), *Journal of Corporation Law*, 33 (Fall 2007).

"Evaluating Effects of Tax Preferences on Health Care Spending and Federal Revenues" (with J.F. Cogan and D.P. Kessler), in J.M. Poterba, ed., *Tax Policy and the Economy*, volume 21, Cambridge: MIT Press, 2007.

"To Bundle or Not to Bundle: Firms' Choices Under Pure Building" (with A. Saha and J. Lee), *International Journal of the Economics of Business* 14 (2007): 59-83.

"The Economic Effects of Federal Participation in Terrorism Risk" (with B. Deal and P. Hess), Risk Management and Insurance Review 8 (2005): 177-209.

"The Effects of Progressive Income Taxation on Job Turnover" (with W.M. Gentry), *Journal of Public Economics* 88 (September 2004): 2301-2322.

"Business, Knowledge, and Global Growth", *Capitalism and Society*, 1 (2006).

"Precautionary Savings and the Governance of Nonprofit Organizations" (with R. Fisman), *Journal of Public Economics*, 2005.

"Government Debt and Interest Rates" (with E. Engen), in M. Gertler and K. Rogoff, *NBER Macroeconomics Annual 2004*, Cambridge: MIT Press, 2005.

"Entrepreneurship and Household Saving" (with W.M. Gentry), *Advances in Economic Analysis and Policy*, 4 (2004).

*"*Taxing Multinationals" (with M. Devereux), *International Taxation and Public Finance* 10(2003):469-487*.*

"The Effect of the Tax Reform Act of 1986 on the Location of Assets in Financial Services Firms" (with R. Altshuler), *Journal of Public Economics* 87 (January 2003):109-127.

"The Role of Nonprofit Endowments" (with R. Fisman), in E. Glaeser, ed., *The Governance of Not-For-Profit Organizations*, Chicago: University of Chicago Press, 2003.

"Are There Bank Effects in Borrowers' Costs of Funds?: Evidence from a Matched Sample of Borrowers and Banks" (with K.N. Kuttner and D.N. Palia), *Journal of Business* 75 (October 2002): 559-581.

"The Share Price Effects of Dividend Taxes and Tax Imputation Credits" (with T.S. Harris and D. Kemsley), *Journal of Public Economics* 79 (March 2001): 569-596.

"Tax Policy and Entrepreneurial Entry" (with W.M. Gentry), *American Economic Review* 90 (May 2000).: 283-287.

"Understanding the Determinants of Managerial Ownership and the Link Between Ownership and Performance" (with C.P. Himmelberg and D. Palia), *Journal of Financial Economics* 53 (1999): 353-384.

"A Reexamination of the Conglomerate Merger Wave in the 1960s" (with D. Palia), *Journal of Finance* 54 (June 1999): 1131-1152.

"Inflation and the User Cost of Capital: Does Inflation Still Matter?" (with D. Cohen and K.A. Hassett), in M. Feldstein, ed., *The Costs and Benefits of Achieving Price Stability*, Chicago: University of Chicago Press, 1999.

"Are Investment Incentives Blunted by Changes in Prices of Capital Goods?: International Evidence" (with K.A. Hassett), *International Finance* 1 (October 1998): 103-125.

"Capital-Market Imperfections and Investment," *Journal of Economic Literature* 36 (March 1998): 193-225.

"Fundamental Tax Reform and Corporate Financial Policy" (with W.M. Gentry), in J.M. Poterba, ed., *Tax Policy and the Economy*, volume 12, Cambridge: MIT Press, 1998.

"Distributional Implications of Introducing a Broad-Based Consumption Tax" (with W.M. Gentry), in J.M. Poterba, ed., *Tax Policy and the Economy*, volume 11, Cambridge: MIT Press, 1997.

"How Different Are Income and Consumption Taxes?," *American Economic Review* 87 (May 1997): 138-142.

"Tax Policy and Investment," (with K.A. Hassett), in A.J. Auerbach, ed., *Fiscal Policy: Lessons from Economic Research*, Cambridge: MIT Press, 1997.

"Assessing the Effectiveness of Saving Incentives" (with J. Skinner), *Journal of Economic Perspectives* 10 (Fall 1996): 73-90.

"The Political Economy of Branching Restrictions and Deposit Insurance: A Model of Monopolistic Competition Among Small and Large Banks" (with N. Economides and D. Palia), *Journal of Law and Economics* 39 (October 1996): 667-704.

"Tax Reforms and Investment: A Cross-Country Comparison" (with J.G. Cummins and K.A. Hassett), *Journal of Public Economics* 62 (1996): 237-273.

"Benefits of Control, Managerial Ownership, and the Stock Returns of Acquiring Firms" (with D. Palia), *RAND Journal of Economics* 26 (Winter 1995): 782-792.

"Executive Pay and Performance: Evidence from the U.S. Banking Industry" (with D. Palia), *Journal of Financial Economics* 39 (1995): 105-130.

"Tax Policy, Internal Finance, and Investment: Evidence from the Undistributed Profits Tax of 1936-1937" (with C. Calomiris), *Journal of Business* 68 (October 1995): 443-482.

"A Reconsideration of Investment Behavior Using Tax Reforms as Natural Experiments" (with J.G. Cummins and K.A. Hassett), *Brookings Papers on Economic Activity* (1994:2): 1-59.

"Precautionary Saving and Social Insurance" (with J. Skinner and S. Zeldes), *Journal of Political Economy* 105 (April 1995): 360-399.

"Expanding the Life-Cycle Model: Precautionary Saving and Public Policy" (with J. Skinner and S. Zeldes), *American Economic Review* 84 (May 1994): 174-179.

"The Tax Sensitivity of Foreign Direct Investment: Evidence from Firm-Level Panel Data" (with J. Cummins), in M. Feldstein, J.R. Hines, and R.G. Hubbard, eds., *Effects of Taxation on Multinational Corporations*, Chicago: University of Chicago Press, 1995.

"International Adjustment Under the Classical Gold Standard: Evidence for the U.S. and Britain, 1879- 1914" (with C. Calomiris), in T. Bauoumi, B. Eichengreen, and M. Taylor, eds., *Modern Perspectives on the Gold Standard*, Cambridge: Cambridge University Press, 1995.

"Internal Finance and Firm-Level Investment" (with A. Kashyap and T. Whited), *Journal of Money, Credit, and Banking* 27 (August 1995): 683-701.

"Do Tax Reforms Affect Investment?" (with J.G. Cummins and K.A. Hassett), in J.M. Poterba, ed., *Tax Policy and the Economy*, vol. 9, Cambridge: MIT Press, 1995.

"The Importance of Precautionary Motives for Explaining Individual and Aggregate Saving" (with J. Skinner and S. Zeldes), *Carnegie-Rochester Conference Series on Public Policy* 40 (June 1994): 59-126.

"Corporate Financial Policy, Taxation, and Macroeconomic Risk" (with M. Gertler), *RAND Journal of Economics* 24 (Summer 1993): 286-303.

"Internal Net Worth and the Investment Process: An Application to U.S. Agriculture" (with A. Kashyap), *Journal of Political Economy* 100 (June 1992): 506-534.

"Long-Term Contracting and Multiple-Price Systems" (with R. Weiner), *Journal of Business* 65 (April 1992): 177-198.

"Efficient Contracting and Market Power: Evidence from the U.S. Natural Gas Industry" (with R. Weiner), *Journal of Law and Economics* 34 (April 1991): 25-67.

"Interest Rate Differentials, Credit Constraints, and Investment Fluctuations" (with M. Gertler and A. Kashyap), in R.G. Hubbard, ed., *Financial Markets and Financial Crises*, Chicago: University of Chicago Press, 1991.

"Taxation, Corporate Capital Structure, and Financial Distress" (with M. Gertler), in L.H. Summers, ed., *Tax Policy and the Economy*, volume 4, Cambridge: MIT Press, 1990.

**Robert Glenn Hubbard**

"Firm Heterogeneity, Internal Finance, and Credit Rationing" (with C. Calomiris), *Economic Journal* 100 (March 1990): 90-104.

"Coming Home to America: Dividend Repatriations in U.S. Multinationals" (with J. Hines), in A. Razin and J.B. Slemrod, eds., *Taxation in the Global Economy*, Chicago: University of Chicago Press, 1990.

"Price Flexibility, Credit Availability, and Economic Fluctuations: Evidence from the U.S., 1894-1909" (with C. Calomiris), *Quarterly Journal of Economics* 104 (August 1989): 429-452.

"Financial Factors in Business Fluctuations" (with M. Gertler), in Federal Reserve Bank of Kansas City, *Financial Market Volatility--Causes, Consequences, and Policy Responses*, 1989.

"Contracting and Price Adjustment in Commodity Markets: Evidence from Copper and Oil" (with R. Weiner), *Review of Economics and Statistics* 71 (February 1989): 80-89.

"Financing Constraints and Corporate Investment" (with S. Fazzari and B.C. Petersen), *Brookings Papers on Economic Activity*, 1988:1: 141-195; Reprinted in Z.J. Acs, ed., *Small Firms and Economic Growth*, Cheltenham, U.K.: Edward Elgar Publishing Ltd., 1995.

"Investment, Financing Decisions, and Tax Policy" (with S. Fazzari and B.C. Petersen), *American Economic Review* 78 (May 1988): 200-205.

"Market Structure and Cyclical Fluctuations in U.S. Manufacturing" (with I. Domowitz and B.C. Petersen), *Review of Economics and Statistics* 70 (February 1988): 55-66.

"Capital Market Imperfections and Tax Policy Analysis in the Life-Cycle Model" (with K. Judd), Annales d' *Economie et de Statistique* 9 (January-March 1988): 111-139.

"Social Security and Individual Welfare: Precautionary Saving, Borrowing Constraints, and the Payroll Tax" (with K. Judd), *American Economic Review* 77 (September 1987): 630-646.

"Oligopoly Supergames: Some Empirical Evidence on Prices and Margins" (with I. Domowitz and B.C. Petersen), *Journal of Industrial Economics* 36 (June 1987): 379-398.

"Uncertain Lifetimes, Pensions, and Individual Saving," in Zvi Bodie, John B. Shoven, and David A. Wise (eds.), *Issues in Pension Economics,* Chicago: University of Chicago Press, 1987, pp. 175-205.

"The Farm Debt Crisis and Public Policy" (with C. Calomiris and J. Stock), *Brookings Papers on Economic Activity*, 1986:2: 441-479.

"Liquidity Constraints, Fiscal Policy, and Consumption" (with K. Judd), *Brookings Papers on Economic Activity*, 1986:1: 1-50.

"The Intertemporal Stability of the Concentration-Margins Relationship" (with I. Domowitz and B.C. Petersen), *Journal of Industrial Economics* 35 (September 1986): 13-34.

"Pension Wealth and Individual Saving: Some New Evidence," *Journal of Money, Credit, and Banking* 18 (May 1986): 167-178.

"Supply Shocks and Price Adjustment in the World Oil Market," *Quarterly Journal of Economics* 101 (February 1986): 85-102.

"Regulation and Long-Term Contracts in U.S. Natural Gas Markets" (with R. Weiner), *Journal of Industrial Economics* 35 (September 1986): 51-71.

"Business Cycles and the Relationship Between Concentration and Price-Cost Margins" (with I. Domowitz and B.C. Petersen), *RAND Journal of Economics* 17 (Spring 1986): 1-17.

"Inventory Optimization in the U.S. Petroleum Industry: Empirical Analysis and Implications for Energy Emergency Policy" (with R. Weiner), *Management Science 32* (July 1986): 773-790.

"Social Security, Liquidity Constraints, and Pre-Retirement Consumption," *Southern Economic Journal* 51 (October 1985): 471-484.

"Personal Taxation, Pension Wealth, and Portfolio Composition," *Review of Economics and Statistics* 67 (February 1985): 53-60.

"Industry Margins and the Business Cycle: Some New Microeconomic Evidence" (with I. Domowitz and B.C. Petersen), *Economics Letters* 19 (1985): 73-77.

"Oil Supply Shocks and International Policy Coordination" (with R. Weiner), *European Economic Review* 30 (February 1986): 91-106.

"Do IRAs and Keoghs Increase Saving?," *National Tax Journal* 37 (March 1984): 43-54.

*The Financial Impacts of Social Security: A Study of Effects on Household Wealth Accumulation and Allocation, in Monograph Series in Finance and Economics*, New York University, 1983.

### *Writings on Public Policy*

*Report of the Task Force on Financial Stability* (with Donald Kohn, *et al.*), Brookings Institution, 2021.

"Rule of Law and Purpose of the Corporation" (with S. Bhagat), *Corporate Governance* (April 16, 2021).

"The Wall and the Bridge," *National Affairs* (Fall 2020).

"What Can Be Done at the National Level  to Boost the Economic Well-Being of Middle- and Lower-Income Americans," in E. Ludwig, ed., *The Vanishing American Dream*, New York: Disruption Books, 2020.

"Should the Modern Corporation Maximize Shareholder Value?" (with S. Bhagat), *AEI Economic Perspectives,* September 2020.

"The $64,000 Question: Living in the Age of Technological Possibility or Showing Possibility's Age?," in J. Diamond and G. Zodrow, eds., *Prospects for Economic Growth*, Cambridge: Cambridge University Press, forthcoming.

"Promoting Economic Recovery After COVID-19" (with J. Furman, T. Geithner, and M. Kearney), Aspen Economic Study Group, 2020.

"A Business Fiscal Response to a COVID-19 Recession" (with M. Strain), *AEI Ideas,* 2020.

"How Treasury Should Implement Loans to Large Businesses" (with M. Strain), *AEI Ideas,* 2020.

"If Congress Must Have Revenue Tests, Make Them Backward-Looking" (with M. Strain), *AEI Ideas,* 2020.

"Building the Car While Driving It: Suggestions for Reforming the Paycheck Protection Program" (with M. Strain), *AEI Ideas,* 2020.

"If 'It' Happened Again: A Roadmap for Regulatory Reform," in Sharyn O'Halloran and Thomas Groll, eds., *After the Crash: Financial Crises and Regulatory Responses,* New York: Columbia University Press, 2019.

"A Policy Agenda to Develop Human Capital for the Modern Economy" (with A. Goolsbee and A. Ganz), in Melissa S. Kearney and Amy Ganz, eds*., Expanding Economic Opportunity for More Americans*, Washington, D.C.: Aspen Institute, 2019.

 "Supporting Work, Inclusion, and Mass Prosperity," in M. Strain ed., *The U.S. Labor Market: Questions and Challenges for Public Policy.*  Washington, D.C.: AEI Press, 2016.

"Financial Regulatory Reform: A Progress Report," Federal Reserve Bank of St. Louis *Review* (May/June 2013): 181-197

"Consequences of Government Deficits and Debt," *International Journal of Central Banking* (January 2012).

"Putting Economic Ideas Back into Innovation Policy," in J. Lerner and S. Stern, eds., *The Rate and Direction of Inventive Activity Revisited.*  Chicago: University of Chicago Press, 2012.

"Back to the Future: The Marshall Plan" (with W. Duggan), in C. Schramm, ed.
Entrepreneurship and Expeditionary Economics, Kansas City: Kauffman Foundation (2011): 8-19.

"The Morning After: A Road Map for Financial Regulatory Reform," in R. B. Porter, R. R. Glauber, and J.J. Healey, eds., *New Directions in Financial Services Regulation*, Cambridge: MIT Press (2011): 77-98.

"The Best Business Education Ever," *BizEd* 6:5 (2007).

"An Action Plan for US Capital Markets," *International Finance* 10:1 (2007): 91-99.

"Nondestructive Creation," *strategy+business* 27 (Summer 2007): 30-35.

"The Productivity Riddle," *strategy+business* 45 (Winter 2006): 28-33.

"Overview of the Japanese Deficit Question," *(with T. Ito),* in *"Tackling Japan's Fiscal Challenges: Strategies to Cope with High Public Debt and Population Aging*, *Palgrave*, Macmillan (October 31, 2006).

"The U.S. Current Account Deficit and Public Policy," *Journal of Policy Modeling* 28 (2006): 665-671.

"Making Markets Work," (with J.F. Cogan and D.P. Kessler), *Health Affairs* 24 (November/December 2005): 1447-1457.

*How Capital Markets Enhance Economic Performance and Facilitate Job Creation* (with W.C. Dudley), New York: Goldman Sachs Markets Institute, 2004.

"Would a Consumption Tax Favor the Rich?," In A.J. Auerbach and K.A. Hassett, eds., *Toward Fundamental Tax Reform*. Washington, D.C.: AEI Press, 2005.

"The Economist as Public Intellectual," *Journal of Economic Education* 35 (Fall 2004): 391-394.

"Success Taxes, Entrepreneurship, and Innovation," (with W.M. Gentry), in *Innovation and the Economy*, volume 5, forthcoming.

"Tax Policy and International Competitiveness," *Taxes-The Tax Magazine* (March 2004): 233-241.

"Capital-Market Imperfections, Investment, and the Monetary Transmission Mechanism," in Heinz Hermann, ed., *Investing for the Future*. Frankfurt: Deutsche Bundesbank, 2001.

"The Growth of Institutional Stock Ownership: A Promise Unfulfilled," (with F.R. Edwards), *Journal of Applied Corporate Finance* 13 (Fall 2000): 92-104.

"Telecommunications, the Internet, and the Cost of Capital," in Ingo Vogelsang and Benjamin Compaine, eds., *The Internet Upheaval*, Cambridge: MIT Press, 2000.

"Federal Deposit Insurance: Economic Efficiency or Politics?" (with N. Economides and D. Palia), *Regulation* 22 (1999): 15-17.

*Institutional Investors and Corporate Behavior* (with G. R. Downes, Jr. and E. Houminer), Washington, D.C., American Enterprise Institute, 1999.

*The Magic Mountain: Is There a Budget Surplus?* (with K.A. Hassett), Washington, D.C.: American Enterprise Institute, 1999.

*Medical School Financing and Research: Problems and Policy Options*, Washington, D.C.: American Enterprise Institute, 1999.

"The Golden Goose: Understanding (and Taxing) the Saving of Entrepreneurs," in Gary D. Libecap, ed., *Advances in the Study of Entrepreneurship, Innovation, and Growth*, volume 10, Greenwich: JAI Press, 1998.

"U.S. Tax Policy and Multinational Corporations: Incentives, Problems, and Directions for Reform," in Dale W. Jorgenson and James M. Poterba, eds., *Borderline Case: International Tax Policy, Corporate Research and Development, and Investment*, Washington, D.C.: National Research Council, 1998.

"Distributional Tables and Tax Policy," in David F. Bradford, ed., *Distributional Analysis of Tax Policy*, Washington, D.C.: AEI Press, 1995.

"Is There a 'Credit Channel' for Monetary Policy?," *Federal Reserve Bank of St. Louis Review* 77 (May/June 1995): 63-77.

"U.S. Tax Policy and Foreign Direct Investment: Incentives, Problems, and Reform," *Tax Policy and Economic Growth,* Washington, D.C.: American Council for Capital Formation, 1995.

"The Use of 'Distribution Tables' in the Tax Policy Process," *National Tax Journal* 46 (December 1993): 527-537.

"Securities Transactions Taxes: Tax Design, Revenue, and Policy Considerations," *Tax Notes* (November 22, 1993): 985-1000.

"Corporate Tax Integration: A View from the Treasury Department," *Journal of Economic Perspectives* (Winter 1993): 115-132; reprinted in P. Roberti, ed., *Financial Markets and Capital Income Taxation in a Global Economy*, Amsterdam: North-Holland, 1998.

"The President's 1992 Health Care White Paper: An Economic Perspective," *National Tax Journal* 45 (September 1992): 347-356.

"Household Income Changes Over Time: Some Basic Questions and Facts," *Tax Notes* (August 24, 1992).

"Household Income Mobility During the 1980s: A Statistical Assessment Based on Tax Return Data" (with J. Nunns and W. Randolph), *Tax Notes* (June 1, 1992).

"Debt Renegotiation," *Institutional Investor* 24 (June 1990).

"Petroleum Regulation and Public Policy" (with R. Weiner), in Leonard Weiss and Michael Klass (eds.), *Regulatory Reform: What Actually Happened,* Boston: Little, Brown, and Company, 1986.

"Natural Gas: The Regulatory Transition" (with R. Braeutigam), in Leonard Weiss and Michael Klass (eds.), *Regulatory Reform: What Actually Happened*, Boston: Little, Brown, and Company, 1986.

"Natural Gas Contracting in Practice: Evidence from the United States" (with R. Weiner), in Michael Hoel and Bruce Wolman (eds.), *Natural Gas Markets and Contracts, Contributions to Economic Analysis Series*, North-Holland, 1986.

"Contracting and Regulation Under Uncertainty: The Natural Gas Market" (with R. Weiner), in John P. Weyant and Dorothy B. Sheffield (eds.), *The Energy Industries in Transition: 1985-2000*, Boulder: Westview Press, 1985.

"Oil and OECD Economies: Measuring Stockpile Coordination Benefits" (with J. Marquez and R. Weiner), in Mark Baier (ed.), *Energy and Economy: Global Interdependencies*, Bonn: Gesellschaft für Energiewissenschaft und Energiepolitik, 1985.

"Managing the Strategic Petroleum Reserve: Energy Policy in a Market Setting" (with R. Weiner), *Annual Review of Energy* 10 (1985): 339-359.

"Modeling Oil Price Fluctuations and International Stockpile Coordination" (with R. Weiner), *Journal of Policy Modeling* 7 (Summer 1985): 339-359.

"Crude Oil Trading and Price Stability" (with R. Weiner), in William F. Thompson and David J. De Angelo (eds.), *World Energy Markets: Stability or Cyclical Change*, Boulder: Westview Press, 1985.

"Energy Price Shocks, Inflation, and Economic Activity: Simulation Results of the Hubbard-Fry Model", in Bert Hickman and Hillard Huntington (eds.), *Macroeconomic Impact of Oil Supply Shocks: Report of the Energy Modeling Forum VII Project*, 1985.

"Drawing Down the Strategic Petroleum Reserve: The case for Selling Futures Contracts" (with S. Devarajan), in Alvin Alm and Robert Weiner (eds.), *Oil Shock: Policy Response and Implementation*, Cambridge: Ballinger Press, 1983.

"Government Stockpiles in a Multi-Country World: Coordination versus Competition" (with R. Weiner), in Alvin Alm and Robert Weiner (eds.), *Oil Shock: Policy Response and Implementation*, Cambridge: Ballinger Press, 1983.

"The 'Sub-Trigger' Crisis: An Economic Analysis of Flexible Stock Policies" (with R. Weiner), *Energy Economics* 5 (July 1983): 178-189.

"Temporary Tax Reductions as Responses to Oil Shocks," in Alvin Alm and Robert Weiner (eds.), *Oil Shock: Policy Response and Implementation*, Cambridge: Ballinger Press, 1983.

"Policy Analysis with Your Hands Tied: The Case of Disruption Tariff Under Oil Price Controls," in Fred S. Roberts (ed.), *Energy Modeling IV: Planning for Energy Disruptions*, Institute of Gas Technology, 1982.

### Comments, Notes, and Reviews

"Comment" on D. Elmendorf, "'Dynamic Scoring': Why and How to Include Macroeconomic Effects in Budget Estimates for Legislative Proposals," *Brookings Papers on Economic Activity* (Fall 2015): 134-138.

"Comment" on A.J. Auerbach, "The Choice Between Income and Consumption Tax: A Primer," in A.J. Auerbach and D. Shaviro, eds., *Key Issues in Public Finance: Essays In Honor of David Bradford,* forthcoming.

"Pay Without Performance: A Market Equilibrium Critique," *Journal of Corporation Law* 30 (Summer 2005): 717-720.

"Financing Constraints and Corporate Investment: Response to Kaplan and Zingales," *Quarterly Journal of Economics* 115 (May 2000): 695-705.

"Comment" on Charles Handlock, Joel Houston, and Michael Ryngaert, "The Role of Managerial Incentives in Bank Acquisitions," *Journal of Banking and Finance* 23 (1999): 250-254.

"Comment" on D.H. Moss, "Courting Disaster?: The Transformation of Federal Disaster Policy Since 1903," in K.A. Froot, ed., *The Financing of Catastrophic Risk*, Chicago: University of Chicago Press, 1999.

"Market for Corporate Control" (with D. Palia), in P. Newman, ed., *The New Palgrave Dictionary of Economics and the Law*, London: Macmillan, 1998.

"Comment" on Joseph Peek and Eric Rosengren, "Do Monetary Policy and Regulatory Policy Affect Bank Loans?" in *Is Bank Lending Important for the Transmission of Monetary Policy?* Federal Reserve Bank of Boston, Conference Series (Proceedings) 39 (1995): 47-79.

"Introduction," in M. Feldstein, J.R. Hines, and R.G. Hubbard, eds., *Effects of Taxation on Multinational Corporations*, Chicago: University of Chicago Press, 1995.

"Introduction," in M. Feldstein, J.R. Hines, and R.G. Hubbard, eds., *Taxing Multinational Corporations*, Chicago: University of Chicago Press, 1995.

"Investment Under Uncertainty: Keeping One's Options Open," *Journal of Economic Literature* 32 (December 1994): 1794-1807.

"Introduction," in A. Giovannini, R.G. Hubbard, and J. Slemrod, eds., *Studies in International Taxation*, Chicago: University of Chicago Press, 1993.

"Comment" on G. Peter Wilson, "The Role of Taxes in Location and Source Decisions," in A. Giovannini, R.G. Hubbard, and J.B. Slemrod, eds., *Studies in International Taxation*, Chicago: University of Chicago Press, 1993.

"Market Structure and Cyclical Fluctuations in U.S. Manufacturing: Reply" (with I. Domowitz and B.C. Petersen), *Review of Economics and Statistics*, 1993.

"Introduction," in R.G. Hubbard, ed., *Financial Markets and Financial Crises*, Chicago: University of Chicago Press, 1991.

"Introduction," in R.G. Hubbard, ed., *Asymmetric Information, Corporate Finance, and Investment*, Chicago: University of Chicago Press, 1990.

"Comment" on Alberto Giovannini and James R. Hines, Jr., "Capital Flight and Tax Competition: Are There Viable Solutions to Both Problems?," in A. Giovannini and C. Mayer, eds., *European Financial Integration*, London: Centre for Economic Policy Research, 1990.

"Comment" on Roger H. Gordon and Jeffrey K. MacKie-Mason, "Effects of the Tax Reform Act of 1986 on Corporate Financial Policy and Organizational Form," in J.B. Slemrod, ed., *Do Taxes Matter?: Economic Impacts of the Tax Reform Act of 1986*, Cambridge: MIT Press, 1990.

"Comment" on James M. Poterba, "Tax Policy and Corporate Saving," *Brookings Papers on Economic Activity*, 1987:2.

"Comment" on Robert E. Hall, "Market Structure and Macro Fluctuations," *Brookings Papers on Economic Activity, 1986*:2.

"Comment" on Alan S. Blinder and Angus Deaton, "The Time-Series Consumption Function Revisited," *Brookings Papers on Economic Activity*, 1985:2.

"Comment" on Benjamin S. Friedman and Mark Warshawsky, "The Cost of Annuities: Implications for Saving Behavior and Bequests," in Zvi Bodie, John Shoven, and David Wise (eds.), *Pensions in the U.S. Economy*, Chicago: University of Chicago Press, 1987.

"Energy Security: Book Reviews," *Energy Journal* 4 (April 1983).

"When the Oil Spigot is Suddenly Turned Off: Some Further Thoughts" (with R. Weiner), *Journal of Policy Analysis and Management* 2 (Winter 1983).

### *Submitted Papers and Working Papers*

"Did Pandemic Unemployment Benefits Reduce Employment?: Evidence from Early State-level Expirations in June 2021" (with H. J. Holzer and M. R. Strain), Working Paper No. 29575, National Bureau of Economic Research, December 2021.

"Tax Policy and Wage Growth" (with W. M. Gentry), Working Paper, Columbia University, 2001.

"Investor Protection, Ownership, and Investment" (with C.P. Himmelberg and I. Love), Working Paper, Columbia University, 2000.

"Incentive Pay and the Market for CEOs: An Analysis of Pay-for-Performance Sensitivity" (with C.P. Himmelberg), Working Paper, Columbia University, 2001.

"Noncontractible Quality and Organizational Form in the U.S. Hospital Industry," (with K.A. Hassett), Working Paper, Columbia University, 1999.

"Corporate Payouts and the Tax Price of Corporate Retentions: Evidence from the Undistributed Profits Tax of 1936-37" (with P. Reiss), Working Paper No. 3111, National Bureau of Economic Research, September 1989.

"Market Structure, Durable Goods, and Cyclical Fluctuations in Markups" (with I. Domowitz and B. Petersen), Working Paper, Northwestern University, 1987.

"Finite Lifetimes, Borrowing Constraints, and Short-Run Fiscal Policy" (with K. Judd), Working Paper No. 2158, National Bureau of Economic Research, 1987.

*GRANTS RECEIVED*

"Corporate Board Study Group," Rockefeller Foundation, 2009.

"Institutional Investors, Boards of Directors, and Corporate Governance," Korn/Ferry, 1997.

"An Economic Analysis of Saving Incentives," Securities Industry Association, 1994, with Jonathan Skinner.

"Securities Transactions Taxes: Tax Design, Revenue, and Policy Considerations," Catalyst Institute, 1993.

"Precautionary Saving in the U.S. Economy," Bradley Foundation, 1989-1990, with Jonathan Skinner and Stephen Zeldes.

"Taxation, Corporate Leverage, and Financial Distress," Garn Institute for Finance, 1989-1990.

"Precautionary Saving in a Dynamic Model of Consumption and Labor Supply," National Science Foundation (Economics Group SES-8707997), 1987-1989, with Jonathan Skinner and Stephen Zeldes.

"Industrial Behavior and the Business Cycle: A Panel Data Study of U.S. Manufacturing," National Science Foundation (Economics Group SES-8420152), 1985-1987, with Ian Domowitz and Bruce Petersen.

"Efficient Contracting and Market Power: Evidence from the U.S. Natural Gas Market," Transportation Center, Northwestern University, Summer 1985.

"Constructing a Panel Data Base for Studies of U.S. Manufacturing," University Research Grants Committee, Northwestern University, 1985-1986.

"Economic Analysis of Multiple-Price Systems: Theory and Application, "National Science Foundation (Regulatory Analysis and Policy Group, SES-8408805), 1984-1985.

"Contracting and Price Adjustment in Product Markets," University Research Grants Committee, Northwestern University, 1983-1984.


## PAPERS PRESENTED

*University Seminars*

Bard College, University of Bergamo, Butler Community College, University of California (Berkeley), University of California (Los Angeles), University of California (San Diego), Carleton, University of Chicago, Columbia, University of Dubuque, Emory, University of Florida, University of Central Florida, Florida Atlantic University, George Washington, Georgetown, Georgia Southern University, Harvard, Hendrix College, University of Illinois, Indiana University, Johns Hopkins, Laval, Lehigh, University College (London), University of Kentucky, London School of Economics, MIT, University of Maryland, University of Miami, Miami University, University of Michigan, University of Minnesota, National Defense University, New York University, Northwestern, Oxford, University of Notre Dame, University of Pennsylvania, Princeton, Rice, University of Rochester, Stanford, Syracuse, University of Miami, University of Texas, Texas Tech University, Tufts, University of Virginia, University of Wisconsin (Madison), University of Wisconsin (Milwaukee), Virginia Tech, and Yale.


*Conference Papers Presented*

American Council for Capital Formation, Washington, D.C., June 1994.

**Robert Glenn Hubbard**

**April 2023**

American Economic Association, New Orleans, 2023; Boston, 2022; San Diego, 2020; Atlanta, 2019; Philadelphia, 2018; Chicago, 2017; San Francisco, 2016; Boston, 2015; Philadelphia, 2014; San Diego, 2013; Chicago, 2012; New Orleans, 2008; Chicago, 2007; Boston, 2006; Philadelphia, 2005; San Diego, January 2004; Atlanta, January 2002; New Orleans, January 2001; Boston, January 2000; New York, January 1999; New Orleans, January 1997; San Francisco, January 1996; Washington, D.C., January 1995; Boston, January 1994; Anaheim, January 1993; Washington, D.C., December 1990; Atlanta, December 1989; New York, December 1988; Chicago, December 1987; New Orleans, December 1985; Dallas, December 1984.

American Enterprise Institute, Conference on Economic Policy, 2019; Conference on Corporate Taxation, 2016; Conference on Private Equity, 2007; Conference on Corporate Taxation, 2006; Conference on Multinational Corporations, 2004, 2003; Conference on Multinational Corporations, February 1999; Conference on Income Inequality, January 1999; Conference on Transition Costs of Fundamental Tax Reform, November 1998; Conference Series on Social Insurance Reform, 1997-1998; Conference Series on Fundamental Tax Reform, 1995-1998; Conference on Distributional Analysis of Tax Policies, Washington, D.C., December 1993.

American Finance Association, New Orleans, January 2008; San Diego, January 2004; Boston, January 2000; New York, January 1999; New Orleans, January 1997.

Association of Environmental and Resource Economists, Dallas, December 1984; San Francisco, December 1983.

Association of Public Policy Analysis and Management, New Orleans, October 1984; Philadelphia, October 1983.

Bipartisan Commission on Entitlement and Tax Reform, Washington, D.C., June 1994.

Brookings Panel on Economic Activity, September 2020, September 2015, September 1994, April 1988, September 1987, September 1986, April 1986, September 1985.

Centre for Economic Policy Research Conference on Capital Taxation and European Integration, London, September 1989.

Conference on International Perspectives on the Macroeconomic and Microeconomic Implications of Financing Constraints, Centre for Economic Policy Research, Bergamo, Italy, October 1994.

Congressional Research Service Conference for New Members of Congress, Williamsburg, January 1999.

Congressional Research Service Conference for Members of the Ways and Means Committee, Baltimore, October 2001.

Deutsche Bundesbank Conference on Investing for the Future, Frankfurt, Germany, May 2000.

Eastern Economic Association, Boston, March 1988; Boston, February 1983.

Econometric Society, New Orleans, January 1997; San Francisco, January 1996; Washington, D.C., January 1995; New Orleans, January 1992; Washington, December 1990; Atlanta, December 1989; New York, December 1988; Chicago, December 1987; New Orleans, December 1986; New York, December 1985; Boston, August 1985; Madrid, September 1984; San Francisco, December 1983; Pisa, August 1983.

Energy Modeling Forum, Stanford University, August 1983; February 1983; August 1982.

European Commission, Conference on Taxation of Financial Instruments, Milan, June 1998.

European Institute for Japanese Studies, Tokyo, September 2002; March 2002.

Federal Reserve Bank of Boston, Annual Economic Conference, North Falmouth, Massachusetts, June 1995.

Federal Reserve Bank of Kansas City Symposium on "Financial Market Volatility – Causes, Consequences, and Policy Responses," Jackson Hole, Wyoming, August 1988; Comment on Rogoff, August 2004.

Federal Reserve Bank of New York, Conference on Consolidation of the Financial Services Industry, New York, March 1998.

Federal Reserve Bank of Philadelphia Conference on Economic Policy, Philadelphia, November 2007; November 2001.

Federal Reserve Bank of St. Louis, Conference on Economic Policy, St. Louis, October 1994.

Harvard Law School U. S.-Japan Symposium, Tokyo, December 2003; Washington, D. C., September 2002; Tokyo, December 2001.

Hoover Institution, Conference on Fundamental Tax Reform, December 1995.

**Robert Glenn Hubbard**

**April 2023**

The Institute of Gas Technology, Washington, D.C., May 1982.

The Institute of Management Science/Operations Research Society of America, Orlando, November 1983; Chicago, April 1983.

International Association of Energy Economists, Boston, November 1986; Philadelphia, December 1985; Bonn, June 1985; San Francisco, November 1984; Washington, D.C., June 1983; Denver, November 1982; Cambridge (England), June 1982; Houston, November 1981.

International Conference on the Life Cycle Model, Paris, June 1986.

International Institute of Public Finance, Innsbruck, August 1984.

International Seminar on Public Economics, Amsterdam, April 1997.

National Academy of Sciences, February 1997.

National Association of Business Economists, Washington, March 2015; Orlando, September 2003; Washington, September 2002; New York, September 2001; Boston, September 1996; Dallas, September 1992; New Orleans, October 1987.

National Bureau of Economic Research - IMEMO Conference on the American Economy, Moscow, August 1989.

National Bureau of Economic Research Summer Institute, August 2014; August 2012; August 2009; August 2006; August 2005; July-August 2003; July-August 2000; July-August 1999; July-August 1998; August 1997; July 1995; July 1994; July 1993; August 1992; July-August 1991; July-August 1990; July-August 1989; July-August 1988; July-August 1987; July-August 1986; July 1985; July 1984; July 1983.

National Bureau of Economic Research Conference on Asymmetric Information, Corporate Finance, and Investment, Cambridge, May 1989.

National Bureau of Economic Research Conference on Chinese Economic Reform, Shanghai, China, July 2000.

National Bureau of Economic Research Conference on Financial Crises, Key Biscayne, March 1990.

National Bureau of Economic Research Conference on Government Expenditure Programs, Cambridge, November 1986.

National Bureau of Economic Research Conference on Indian Economic Reform, Rajasthan, India, December 1999.

National Bureau of Economic Research Conference on Innovation Policy, Washington, D.C., April 2004, April 2003.

National Bureau of Economic Research Conference on International Taxation, Washington, D.C., April 1994; Cambridge, January 1994; New York, September 1991; Nassau, Bahamas, February 1989.

National Bureau of Economic Research, Macroeconomic Annual Conference, Cambridge, MA, April 2004.

National Bureau of Economic Research Conference on Macroeconomics and Industrial Organization, Cambridge, July 1988; Cambridge, July 1987; Cambridge, July 1986; Chicago, November 1985.

National Bureau of Economic Research Conference on Nonprofit Organizations, Cheeca Lodge, January 2002; Cambridge, October 2001.

National Bureau of Economic Research Conference on Pensions, Baltimore, March 1985; San Diego, April 1984.

National Bureau of Economic Research Conference on Productivity, March 1988; March 1987.

National Bureau of Economic Research Conference on Public Economics, Cambridge, April 1999, April 1994, April 1993, November 1991, April 1991, March 1988, November 1987, March 1987.

National Bureau of Economic Research Conference on Tax Policy and the Economy, Washington, D.C., October 2001, November 1998, November 1996, November 1994, November 1991, November 1989.

National Bureau of Economic Research Trans-Atlantic Public Economics Seminar, London, May 2002; Gerzensee, May 2000; Turin, May 1994.

Organization for Economic Cooperation and Development, Economic Policy Committee Meeting, Paris, November 2002, April 2002, November 2001, April 2001.

**Robert Glenn Hubbard**

National Tax Association/Tax Institute of America, Washington, D.C., June 2000; Atlanta, October 1999; Arlington, May 1992; Seattle, October 1983.

Organization for Economic Cooperation and Development, Ministerial Meeting, Paris, May 2002, May 2001.

Princeton Center for Economic Policy Conference, October 2000, October 1995.

Sveriges Riksbank/Stockholm School of Economics Conference on Asset Markets and Monetary Policy, Stockholm, Sweden, June 2000.

U.S. House of Representatives, Budget Committee, June 2001.

U.S. House of Representatives, Committee on Ways and Means, Washington, D.C., June 2006; June 2005; June 1999; April 1997, June 1996, July 1992.

U.S. Joint Economic Committee, Washington, D.C., February 2003, October 2002, October 2001, May 2001.

U.S. Senate Committee on Banking, Housing, and Urban Affairs, Washington, D.C., October 2001, May 2001.

U.S. Senate Committee on Budget, February 2003, September 2001.

U.S. Senate Committee on Commerce, Science, and Technology, July 2002.

U.S. Senate Committee on Finance, Washington, D.C., February 2003, February 2002, February 1997, January 1995, January 1992, December 1981.

*Confidential*

## APPENDIX B

## ROBERT GLENN HUBBARD

### *Testimony as an expert witness 2019 – 2023*

*The City of Philadelphia, et al., v. Bank of America Corporation, et al.,* In the United States District Court for the Southern District of New York, Case No.: 19-cv-1608 (JMF).  Provided deposition testimony 2023.

*Aurelius Capital Master, LTD., et al. v. The Republic of Argentina,* No. 19 Civ. 351, In the United States District Court for the Southern District of New York. Provided deposition testimony 2023.

*Palladian Partners, L.P. and others v. The Republic of Argentina and another*, Case Number FL-2019-000010, in the Commercial Court, Queen's Bench Division of the High Court of Justice of England and Wales.  Provided trial testimony 2022.

*In Re Dell Technologies Inc. Class V Stockholders Litigation,* Consol. C.A. No. 2018-0816-JTL, In the Court of the Chancery of the State of Delaware.  Provided deposition testimony 2022.

*In the Matter of: Certain Laptops, Desktops, Servers, Mobile Phones, Tablets, and Components Thereof*, Investigation No. 337-TA-1280, United States International Trade Commission, Washington, D.C. Provided deposition testimony 2022.

*Rebecca J. Scott, et al. v. Steven R. Scott, et al., American Arbitration Association Case No. 01-20-0000-1588.*  Provided arbitration testimony 2022.

*Preston Hollow Capital LLC v. Nuveen LLC, et al,* C.A. No. N19C-10-107-MMJ-CCLD, in the Superior Court of the State of Delaware.  Provided deposition testimony 2022.

*Novolex Holdings, LLC v. Newell Brands Inc.,* C.A. No. N19C-10-223-PRW-CCLD, in the Superior Court of the State of Delaware. Provided deposition testimony 2021.

*In the Matter of the Otto Bremer Trust,* Court File No. 62-C9-61-315222, in the State of Minnesota District Court, County of Ramsey, Second Judicial District.  Provided trial testimony 2021.

*Rebecca J. Scott, et al. v. Carl S. Rosen, Esq., et al.,* Case No. 20-000868 CACE, in the District Court of the 17th Judicial Circuit of Florida in and for Broward County. Provided deposition testimony 2021.

*Medtronic, Inc. & Consolidated Subsidiaries v. Commissioner of Internal Revenue,* Docket No. 6944-11, in the United States Tax Court.  Provided trial testimony 2021.

*Confidential*

*Huntsman International, LLC v. Albemarle Corporation, et al.,* American Arbitration Association, AAA Case No. 01-17-001-4588.  Provided deposition testimony 2021. Provided trial testimony 2021.

*In Re: WeWork Litigation,* C.A. No. 2020-0258, in the Court of the Chancery of the State of Delaware.  Provided deposition testimony 2021.

*In Re: BGC Partners, Inc. Derivative Litigation,* C.A. No. 2018-0722-AGB, in the Court of Chancery of the State of Delaware. Provided deposition testimony 2021. Provided trial testimony 2021.

*BCIM Strategic Value Master Fund, LP v. HFF, Inc., a Delaware Corporation,* C.A. No. 2019-0558-JTL, in the Court of Chancery of the State of Delaware. Provided deposition testimony 2021. Provided trial testimony 2021.

*Bandera Master Fund LP, et al. v. Boardwalk Pipeline Partners, LP, et al.,* C.A. No. 2018-0372-JTL, In the Court of Chancery of the State of Delaware.  Provided deposition testimony 2020. Provided trial testimony 2021.

*In Re:  Advance Auto Parts, Inc. Securities Litigation,* Civil Action No. 1:18-cv-00212-RGA, In the United States District Court, District of Delaware.  Provided deposition testimony 2020 and 2021.

*National ATM Council, Inc., et al. v. Visa Inc., et al.,* Case No. 1:11-cv-01803 in the United States District Court, District of Columbia. Provided deposition testimony 2020.

*Lynne Bartron, et al. v. Visa Inc., et al.,* Case No. 1:11-cv-1831, Case No. 1:11-cv-1882 in the United States District Court, District of Columbia. Provided deposition testimony 2020.

*Peter Burke, et al. v. Visa Inc., et al.,* Case No. 1:11-cv-1882 in the United States District Court, District of Columbia. Provided deposition testimony 2020.

*Securities and Exchange Commission v. Rio Tinto PLC,* Case No. 1:17-cv-07994 in the United States District Court, Southern District of New York.  Provided deposition testimony 2020.

*Forescout Technologies, Inc. v. Ferrari Group Holdings, L.P. and Ferrari Merger Sub, Inc.,* Case No. 2020-0385-SG, In the Court of Chancery of the State of Delaware.  Provided deposition testimony 2020.

*Medtronic, Inc. & Consolidated Subsidiaries v. Commissioner of Internal Revenue,* Docket No. 6944-11, in the United States Tax Court.  Provided deposition testimony 2020.

*Brach Family Foundation Inc. v. AXA Equitable Life Insurance Company,* Case no. 16-CV-740 (JMF), in the United States District Court, Southern District of New York.  Provided deposition testimony 2019.

*Confidential*

*In Re:  Appraisal of Capital Bank Financial Corp.,* C.A. No. 2018-0226-TMR, In the Court of Chancery of the State of Delaware.  Provided deposition testimony 2019.

*In Re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation*, Case No. 05-md-1720, in the United States District Court, Eastern District of New York. Provided deposition testimony 2019.

*Jeffrey Laydon, on behalf of himself and all others similarly situated v. The Bank of Tokyo-Mitsubishi UFJ, Ltd., et al.,* Case No. 12-cv-3419, in the United States District Court, for the Southern District of New York. Provided deposition testimony 2019.

*Oaktree Principal Fund V, LP, et al. v. Warburg Pincus LLC; et al.,* Case No. 2:15-cv-08574-PSG-MRW, in the United States District Court, Central District of California, Western Division. Provided deposition testimony 2019.

*In re: Appraisal of Panera Bread Company,* Case No. 2017-0593-MTZ, In the Court of Chancery of the State of Delaware.  Provided deposition testimony 2019. Provided trial testimony 2019.

*Joan Obeslo, et al. v. Great-West Capital Management, LLC, et al.,* Civil Action No. 16-cv-230-CMA-MJW consolidated with No. 16-cv-01215 and No. 16-cv-03162, in the United States District Court, District of Colorado.  Provided deposition testimony 2018. Provided trial testimony 2020.

*Kortright Capital Partners LP, et al. v. Investcorp Investment Advisors Limited,* Case No. 16cv7619, United States District Court, Southern District of New York.  Provided deposition testimony 2018.  Provided trial testimony 2019.

# Appendix C
## Materials Considered

### *Legal Documents*

15 U.S. Code § 78u-4(e)-(1)

Consolidated Class Action Complaint, *In re Vale S.A. Securities Litigation* , Case No. 19-cv-526-RJD-SJB, October 25, 2019

Corrected Expert Report on Market Efficiency of Professor Steven P. Feinstein, Ph.D., CFA, February 18, 2021, all materials cited therein and produced therewith

ECF No. 116, *In re Vale S.A. Securities Litigation* , Case No. 19-cv-526-RJD-SJB, March 31, 2022

Expert Rebuttal Report of Randal Stephenson, April 7, 2023

Expert Rebuttal Report on Market Efficiency of Professor Steven P. Feinstein, Ph.D., CFA, June 4, 2021, all materials cited therein

Expert Report of Dr. Timothy D. Stark, P.E., D.GE, F.ASCE, March 10, 2023

Expert Report of Dr. Franco Oboni, Ph.D., dated March 10, 2023

Expert Report of Harvey L. Pitt, March 9, 2023

Expert Report of Randal Stephenson, March 10, 2023

Expert Report on Loss Causation and Damages of Professor Steven P. Feinstein, Ph.D., CFA, March 10, 2023, all materials cited therein and produced therewith

Memorandum & Order, *In re Vale S.A. Securities Litigation* , Case No. 19-cv-526-RJD-SJB, May 20, 2020

Report & Recommendation, *In re Vale S.A. Securities Litigation* , Case No. 19-cv-526-RJD-SJB, January 11, 2022

### *Produced Documents*

| | Bates Stamp |
|---|---|
| Vale, "Córrego Feijão Mine – Dam 1 Study of Variants of Decommissioning Technical Report," November 22, 2018 | Vale_Dam1_00298811_T.0001 – T.0075 |

### *Vale Analysts' Reports (in addition to those previously produced in this matter by Professor Feinstein)*

Bank of America, "Move to Under Review as dam tragedy likely to eclipse fundamentals," January 28, 2019

Bank of America, "Dam breach tragic and a setback, yet not Samarco Scale," January 25, 2019

Bank of America, "Iron ore and the Vale tragedy: Market confusion on impact," February 4, 2019

Bank of America, "News flow a risk, but long-term FCF story intact; Resuming at Neutral," February 5, 2019

Bank of America, "Tailings dam decommissioning adds more cost to Vale, a boon for global pellet price," January 29, 2019

Bank of America, "Triple-digit iron ore prices to offset lost output, but further closure risk very real," February 11, 2019

Bank of America, "VALE iron ore supply situation changing quickly = upside risks to iron ore," February 7, 2019

BB Banco de Investimento, "Brumadinho's tailings dam failure," January 28, 2019

Citi, "Alert: Brucutu mine halted (~30mpty)," February 4, 2019

Citi, "Alert: Daily (2/8/2019)," February 8, 2019

Citi, "Alert: Feijao Dam Tragedy - Vale To End Use Of Upstream Tailings Dams," January 29, 2019

Citi, "Alert: Tragedy Strikes Again," January 27, 2019

Citi, "Alert: Vale Declares Force Majeure," February 5, 2019

Citi, "Lowering Iron Ore Production Forecasts and Target Price," February 7, 2019

Macquarie, "Vale production cut boosts the outlook," January 30, 2019

Macquarie, "Vale reports iron ore dam burst at mine in Minas Gerais," January 28, 2019

### *Books and Academic Publications*

Allen, Mark, Robert Hall, and Victoria Lazear, "Reference Guide on Estimation of Economic Damages," *Reference Manual on Scientific Evidence* , Third Edition, Federal Judicial Center, National Research Council of the National Academies, Washington: The National Academies Press, 2011

Branch, Douglas, Saleema Damji, and Daniel Lentz, "Testimony Considerations," Chapter 3, *Litigation Services Handbook* , Sixth Edition (eds. Roman Weil, Daniel Lentz, and Elizabeth Evans), John Wiley & Sons, Inc., 2017

Evans, Elizabeth, Daniel Lentz, and Roman Weil, "A Dispute Resolution Primer," Chapter 1, *Litigation Services Handbook* , Sixth Edition (eds. Roman Weil, Daniel Lentz, and Elizabeth Evans), John Wiley & Sons, Inc., 2017

# Appendix C
## Materials Considered

***Books and Academic Publications (continued)***

Gold, Kevin, Eric Korman, and Ahmer Nabi, "Federal Securities Acts and Areas of Expert Analysis," Chapter 27, *Litigation Services Handbook* , Sixth Edition (eds. Roman Weil, Daniel Lentz, and Elizabeth Evans), John Wiley & Sons, Inc., 2017

Hubbard, Glenn and Darius Palia, "A Reexamination of the Conglomerate Merger Wave in the 1960s: An Internal Capital Markets View," *The Journal of Finance* , Vol. 54, No. 3, 1999

Hubbard, Glenn and Darius Palia, "Benefits of Control, Managerial Ownership, and the Stock Returns of Acquiring Firms," *RAND Journal of Economics* , Vol. 26, No. 4, 1995

MacKinlay, A. Craig, "Event Studies in Economics and Finance," *Journal of Economic Literature* , Vol. 35, March 1997

***Other Publicly Available Documents***

BHP, "Change of name to BHP Group," November 19, 2018, available at https://www.bhp.com/news/media-centre/releases/2018/11/change-of-name-to-bhp-group

Citibank, N.A, "Notice to Holders of Preferred American Depository Shares of Vale S.A., November 27, 2017, available at https://depositaryreceipts.citi.com/adr/common/file.aspx?idf=4309

Global Tailings Review, "About Tailings," available at https://globaltailingsreview.org/about-tailings/

Vale, "Dams," available at https://www.vale.com/fi/dams

Vale, Form 20-F for the fiscal year ending December 31, 2015

Vale, Form 20-F for the fiscal year ending December 31, 2016

Vale, Form 20-F for the fiscal year ending December 31, 2017

Vale, Form 20-F for the fiscal year ending December 31, 2018

Vale, Form 20-F for the fiscal year ending December 31, 2021

Vale, "Offer to Exchange Any or All Outstanding American Depositary Shares Representing Preferred Shares of Vale S.A. for American Depository Shares Representing Common Shares of Vale S.A. [and] Offer to Convert Any or All Outstanding Preferred Shares Represented by American Depository Shares of Vale S.A. into Common Shares of Vale S.A.," June 28, 2017

Vale Overseas Limited, "US$1,000,000,000 4.375% Guaranteed Notes due 2022," prospectus supplement dated January 4, 2012

Vale Overseas Limited, "US$1,000,000,000 4.625% Guaranteed Notes due 2020 and US$750,000,000 6.875% Guaranteed Notes due 2039," prospectus supplement dated September 8, 2010

Vale Overseas Limited, "US$1,000,000,000 6.250% Guaranteed Notes due 2026," prospectus supplement dated August 3, 2016

Vale Overseas Limited, "US$1,000,000,000 6.250% Guaranteed Notes due 2026," prospectus supplement dated February 6, 2017

Vale Overseas Limited, "US$1,000,000,000 6.875% Guaranteed Notes due 2039," prospectus supplement dated November 3, 2009

Vale Overseas Limited, "US$1,250,000,000 4.375% Guaranteed Notes due 2022," prospectus supplement dated March 28, 2012

Vale Overseas Limited, "US$1,250,000,000 5.875% Guaranteed Notes due 2021," prospectus supplement dated June 7, 2016

Vale Overseas Limited, "US$1,250,000,000 6.250% Guaranteed Notes due 2017 [and] US$2,500,000,000 6.875% Guaranteed Notes due 2036," prospectus supplement dated November 16, 2006

Vale Overseas Limited, "US$1,500,000,000 5.625% Guaranteed Notes due 2042," prospectus supplement dated September 4, 2012

Vale Overseas Limited, "US$300,000,000 8.25% Guaranteed Notes due 2034," prospectus supplement dated October 26, 2005

Vale Overseas Limited, "US$500,000,000 8.25% Guaranteed Notes due 2034," prospectus supplement dated January 9, 2004

"Vale Says Court Orders Halt to Largest Mine in Minas Gerais," *Bloomberg* , February 4, 2019

"Vale's Performance in 3Q2018," Form 6-K filed on October 25, 2018

Vale, "Vale clarifies that the decision to decommission all upstream dams was made in 2016," February 1, 2019, available at https://www.vale.com/fr/w/vale-clarifies-that-the-decision-to-decommission-all-upstream-dams-was-made-in-2016

***Publicly Available Data***

Bloomberg

Refinitiv Eikon

S&P Capital IQ

**Exhibit 1**
**Price of the Vale ADRs**
*October 1, 2016 – May 6, 2019*



**Note:**
[1] I understand that the Class Period is from October 27, 2016 through February 6, 2019 and the PSLRA "Bounce-Back" Period is from February 6, 2019 through May 6, 2019.
**Sources:**
Complaint; ECF No. 116, *In re Vale S.A. Securities Litigation*, Case No. 19-cv-526-RJD-SJB, March 31, 2022; 15 U.S.C. §78u-4(e)-(1); Bloomberg.

**Exhibit 2**
**Summary of the Vale Notes**

| Vale Note | CUSIP | Coupon | Issue Date[1] | Maturity Date | Term | Rank | Moody's Rating at Issuance | Years to Maturity as of Feb. 6, 2019 | Amount Issued[2] |
|---|---|---|---|---|---|---|---|---|---|
| TAN3 | 91911TAN3 | 5.875% | 6/7/2016 | 6/10/2021 | 5 Years | Senior Unsecured | Ba3 | 2.3 | $1,250,000,000 |
| TAM5 | 91911TAM5 | 4.375% | 1/4/2012 | 1/11/2022 | 10 Years | Senior Unsecured | Baa2 | 2.9 | $2,250,000,000 |
| TAP8 | 91911TAP8 | 6.250% | 8/3/2016 | 8/10/2026 | 10 Years | Senior Unsecured | Ba3 | 7.5 | $2,000,000,000 |
| TAE3 | 91911TAE3 | 8.250% | 1/9/2004 | 1/17/2034 | 30 Years | Senior Unsecured | Ba2 | 14.9 | $800,000,000 |
| TAH6 | 91911TAH6 | 6.875% | 11/16/2006 | 11/21/2036 | 30 Years | Senior Unsecured | Baa3 | 17.8 | $2,500,000,000 |
| TAK9 | 91911TAK9 | 6.875% | 11/3/2009 | 11/10/2039 | 30 Years | Senior Unsecured | Baa2 | 20.8 | $1,750,000,000 |
| EAA3 | 91912EAA3 | 5.625% | 9/4/2012 | 9/11/2042 | 30 Years | Senior Unsecured | Baa2 | 23.6 | $1,500,000,000 |
| | | | | | | | | **Total** | **$12,050,000,000** |

**Note:**

[1] Issue Dates correspond to the dates of the Prospectus Supplements of when the Notes were issued. Amount Issued includes subsequent issuances of the TAM5, TAP8, TAE3, and TAK9 Notes.

**Sources:**

Complaint; S&P Capital IQ;

Prospectus Supplements: Vale Overseas Limited, "US$1,250,000,000 5.875% Guaranteed Notes due 2021," prospectus supplement dated June 7, 2016; Vale Overseas Limited, "US$1,000,000,000 4.375% Guaranteed Notes due 2022," prospectus supplement dated January 4, 2012; Vale Overseas Limited, "US$1,250,000,000 4.375% Guaranteed Notes due 2022," prospectus supplement dated March 28, 2012; Vale Overseas Limited, "US$1,000,000,000 6.250% Guaranteed Notes due 2026," prospectus supplement dated August 3, 2016; Vale Overseas Limited, "US$1,000,000,000 6.250% Guaranteed Notes due 2026," prospectus supplement dated February 6, 2017; Vale Overseas Limited, "US$500,000,000 8.25% Guaranteed Notes due 2034," prospectus supplement dated January 9, 2004; Vale Overseas Limited, "US$300,000,000 8.25% Guaranteed Notes due 2034," prospectus supplement dated October 26, 2005; Vale Overseas Limited, "US$1,250,000,000 6.250% Guaranteed Notes due 2017 [and] US$2,500,000,000 6.875% Guaranteed Notes due 2036," prospectus supplement dated November 16, 2006; Vale Overseas Limited, "US$1,000,000,000 6.875% Guaranteed Notes due 2039," prospectus supplement dated November 3, 2009; Vale Overseas Limited, "US$1,000,000,000 4.625% Guaranteed Notes due 2020 and US$750,000,000 6.875% Guaranteed Notes due 2039," prospectus supplement dated September 8, 2010; Vale Overseas Limited, "US$1,500,000,000 5.625% Guaranteed Notes due 2042," prospectus supplement dated September 4, 2012.

*Confidential*

**Exhibit 3**
**Price of the At-Issue Vale Notes**
*October 1, 2016 – May 6, 2019*



**Notes:**

[1] This exhibit shows the volume-weighted average prices (VWAP) of the Vale Notes as produced in the Feinstein Report.

[2] I understand that the Class Period is from October 27, 2016 through February 6, 2019 and the PSLRA "Bounce-Back" Period is from February 6, 2019 through May 6, 2019.

**Sources:**

Complaint; ECF No. 116, *In re Vale S.A. Securities Litigation*, Case No. 19-cv-526-RJD-SJB, March 31, 2022; 15 U.S.C. §78u-4(e)-(1); "Vale_7Notes_DailyVol_2016_2019_930400Trades.xlsx."

**Exhibit 4**
**Select Risk Disclosures in Forms 20-F**
*2016 – 2019*

| Filing Date | Page(s) | Disclosure |
|---|---|---|
| 3/31/2016 | p. 3 | The failure of a tailings dam of Samarco Mineração S.A. (''Samarco'') in Minas Gerais could negatively impact our business. On November 5, 2015, one of Samarco's tailings dams (Fundão) failed unexpectedly, releasing muddy tailings downstream, reaching and flooding certain communities and causing environmental damage to the surrounding area. As a result of the failure of the Fundão tailings dam, our Alegria mine, located near the dam, is operating with a dry beneficiation process at a lower mine productivity, and a conveyor belt connecting our Fábrica Nova mine to our Timbopeba beneficiation plant was damaged, decreasing production at the Mariana mining complex in the Brazilian state of Minas Gerais. In addition, we have interrupted the sale of run of mine (ROM) from our Fazendão mine to Samarco. We are still exploring alternatives for these mines; however if we are unable to find adequate alternatives, this may negatively affect our overall production. |
|  | p. 5 | Disagreements or disputes with local groups, including indigenous groups, could cause delays or interruptions to our operations, adversely affect our reputation or otherwise hamper our ability to develop our reserves and conduct our operations… As one of Samarco's shareholders, our reputation, particularly in the affected communities, has been adversely affected by the failure of Samarco's tailings dam in 2015. |
|  | p. 6 | Our projects are subject to risks that may result in increased costs or delay in their implementation. We are investing to maintain and further increase our production capacity and logistics capabilities and to expand the scope of the minerals we produce. We regularly review the economic viability of our projects. As a result of this review, we may decide to postpone, suspend or interrupt the implementation of certain projects. Our projects are also subject to a number of risks that may adversely affect our growth prospects and profitability, including the following:... • We may face unexpected weather conditions or other *force majeure* events... • There may be accidents or incidents during project implementation... |
|  | p. 7 | Operational problems could materially and adversely affect our business and financial performance. Ineffective project management and operational breakdowns might require us to suspend or curtail operations, which could generally reduce our productivity. Operational breakdowns could entail failure of critical plant and machinery. There can be no assurance that ineffective project management or other operational problems will not occur. Any damages to our projects or delays in our operations caused by ineffective project management or operational breakdowns could materially and adversely affect our business and results of operations. Our business is subject to a number of operational risks that may adversely affect our results of operations, such as: • Unexpected weather conditions or other force majeure events... • Accidents or incidents involving our mines and related infrastructure, such as dams, plants, railroads, ports and ships... • Disruptions to or unavailability of critical information technology systems or services resulting from accidents or malicious acts... Our business could be adversely affected by the failure of our counterparties to perform their obligations... Some of our investments are controlled by joint venture partners or have separate and independent management. These investments may not fully comply with our standards, controls and procedures, including our health, safety, environment and community standards. Failure by any of our partners or joint ventures to adopt adequate standards, controls and procedures could lead to higher costs, reduced production or environmental, health and safety incidents or accidents, which could adversely affect our results and reputation. |

**Exhibit 4**
**Select Risk Disclosures in Forms 20-F**
*2016 – 2019*

| Filing Date | Page(s) | Disclosure |
|---|---|---|
| 3/31/2016 | p. 8 | Our business is subject to environmental, health and safety incidents. Our operations involve the use, handling, storage, discharge and disposal of hazardous substances into the environment and the use of natural resources, and the mining industry is generally subject to significant risks and hazards, including fire, explosion, toxic gas leaks, spilling of polluting substances or other hazardous materials, rockfall incidents in mining operations and incidents involving mobile equipment or machinery. This could occur by accident or by breach of operating and maintenance standards, and could result in a significant environmental impact, damage to or destruction of mineral properties or production facilities, personal injury or death, environmental damage, delays in production, monetary losses and possible legal liability. Notwithstanding our standards, policies and controls, our operations remain subject to incidents or accidents that could adversely affect our business or reputation... In response to the failure of Samarco's tailings dam in Minas Gerais, additional environmental and health and safety laws and regulations may be forthcoming in Brazil and authorities may impose more stringent conditions in connection with the licensing process of our projects and operations. Also, we may encounter delays in the receipt of environmental operating license for other tailings dams. |
| 4/10/2017 | pp. 3 – 4 | Our obligations and potential liabilities arising from the failure of a tailings dam owned by Samarco Mineração S.A. (''Samarco'') in Minas Gerais could negatively impact our business, our financial conditions and our reputation.  In November 2015, the Fundão tailings dam owned by Samarco failed, causing environmental damage in the surrounding area. The failure of Samarco's tailings dam has adversely affected and will continue to affect our business, but the full impact is still uncertain and cannot be estimated. Below is a discussion of the main effects of the dam failure on our business... • Risk of additional environmental damages. Samarco continues to reinforce and improve its dams to contain the remaining tailings. Failure to contain the remaining tailings could cause additional environmental damages, additional impacts on our operations, and additional claims, fines and proceedings against Samarco and against us. Failure to contain the remaining tailings could also impact the feasibility and timing for the restart of Samarco's operations. • Other impacts. We may encounter delays in the receipt of environmental operating license for other tailings dams, and Brazilian authorities may impose more stringent conditions in connection with the licensing process of our projects and operations. Also, as one of Samarco's shareholders, our reputation has been adversely affected by the failure of Samarco's tailings dam. |
|  | p. 7 | Our projects are subject to risks that may result in increased costs or delay in their implementation We are investing to maintain and further increase our production capacity and logistics capabilities. We regularly review the economic viability of our projects. As a result of this review, we may decide to postpone, suspend or interrupt the implementation of certain projects. Our projects are also subject to a number of risks that may adversely affect our growth prospects and profitability, including the following:... • We may face unexpected weather conditions or other force majeure events... • There may be accidents or incidents during project implementation... |

*Confidential*

**Exhibit 4**
**Select Risk Disclosures in Forms 20-F**
*2016 – 2019*

| Filing Date | Page(s) | Disclosure |
|---|---|---|
| | pp. 7 – 8 | Operational problems could materially and adversely affect our business and financial performance. Ineffective project management and operational breakdowns might require us to suspend or curtail operations, which could generally reduce our productivity. Operational breakdowns could entail failure of critical plant and machinery. There can be no assurance that ineffective project management or other operational problems will not occur. Any damages to our projects or delays in our operations caused by ineffective project management or operational breakdowns could materially and adversely affect our business and results of operations. Our business is subject to a number of operational risks that may adversely affect our results of operations, such as: • Unexpected weather conditions or other force majeure events... • Accidents or incidents involving our mines, industrial facilities and related infrastructure, such as dams, plants, railway and railway bridges, ports and ships... • Changes in market conditions or regulations may affect the economic prospects of an operation and make it inconsistent with our business strategy... • Disruptions to or unavailability of critical information technology systems or services resulting from accidents or malicious acts. |
| 4/10/2017 | p. 8 | Our business could be adversely affected by the failure of our counterparties to perform their obligations. Some of our investments are controlled by partners or have separate and independent management. These investments may not fully comply with our standards, controls and procedures, including our health, safety, environment and community standards. Failure by any of our partners or joint ventures to adopt adequate standards, controls and procedures could lead to higher costs, reduced production or environmental, health and safety incidents or accidents, which could adversely affect our results and reputation. |
| | p. 9 | Our business is subject to environmental, health and safety incidents. Our operations involve the use, handling, storage, discharge and disposal of hazardous substances into the environment and the use of natural resources, and the mining industry is generally subject to significant risks and hazards, including fire, explosion, toxic gas leaks, spilling of polluting substances or other hazardous materials, rockfalls, incidents involving dams, failure of other operational structures and incidents involving mobile equipment, vehicles or machinery. This could occur by accident or by breach of operating and maintenance standards, and could result in a significant environmental and social impacts, damage to or destruction of mineral properties or production facilities, personal injury, illness or death of employees, contractors or community members close to operations, environmental damage, delays in production, monetary losses and possible legal liability. Additionally, in remote localities, our employees may be exposed to tropical and contagious diseases that may affect their health and safety. Notwithstanding our standards, policies and controls, our operations remain subject to incidents or accidents that could adversely affect our business, stakeholders or reputation. |

*Confidential*

**Exhibit 4**
**Select Risk Disclosures in Forms 20-F**
*2016 – 2019*

| Filing Date | Page(s) | Disclosure |
|---|---|---|
| 4/10/2017 | p. 10 | In response to the failure of Samarco's tailings dam in Minas Gerais, additional environmental and health and safety laws and regulations may be forthcoming in Brazil and authorities may impose more stringent conditions in connection with the licensing process of our projects and operations. Also, we may encounter delays in the receipt of environmental operating license for other tailings dams. |
| 4/13/2018 | pp. 17 – 18 | Our obligations and potential liabilities arising from the failure of a tailings dam owned by Samarco Mineração S.A. (''Samarco'') in Minas Gerais could negatively impact our business, our financial conditions and our reputation. In November 2015, the Fundão tailings dam owned by Samarco failed, causing environmental damage in the surrounding area. The failure of Samarco's tailings dam has adversely affected and will continue to affect our business, and the full impact is still uncertain and cannot be estimated. Below is a discussion of the main effects of the dam failure on our business... • Risk of additional environmental damages. Failure to contain the remaining tailings in Samarco's dams could cause additional environmental damages, additional impacts on our operations, and additional claims, fines and proceedings against Samarco and against us. Failure to contain the remaining tailings could also impact the feasibility and timing for the restart of Samarco's operations. • Other impacts. We may encounter delays in the receipt of environmental and other licenses for our tailings dams and other facilities, and Brazilian authorities may impose more stringent conditions in connection with the licensing process of our projects and operations. Also, as one of Samarco's shareholders, our reputation has been adversely affected by the failure of Samarco's tailings dam. |
| | p. 21 | Our projects are subject to risks that may result in increased costs or delay in their implementation. We are investing to maintain and further increase our production capacity and logistics capabilities. We regularly review the economic viability of our projects. As a result of this review, we may decide to postpone, suspend or interrupt the implementation of certain projects. Our projects are also subject to a number of risks that may adversely affect our growth prospects and profitability, including the following:... • We may face unexpected weather conditions or other force majeure events... • Changes in market conditions or regulations may make a project less profitable than expected at the time we initiated work on it. • There may be accidents or incidents during project implementation... |
| | pp. 21 – 22 | Operational problems could materially and adversely affect our business and financial performance. Ineffective project management and operational breakdowns might require us to suspend or curtail operations, which could generally reduce our productivity. Operational breakdowns could entail failure of critical plant and machinery. There can be no assurance that ineffective project management or other operational problems will not occur. Any damages to our projects or delays in our operations caused by ineffective project management or operational breakdowns could materially and adversely affect our business and results of operations. Our business is subject to a number of operational risks that may adversely affect our results of operations, such as: • Unexpected weather conditions or other force majeure events... • Accidents or incidents involving our mines, industrial facilities and related infrastructure, such as dams, plants, railway and railway bridges, ports and ships... • Changes in market conditions or regulations may affect the economic prospects of an operation and make it inconsistent with our business strategy... • Disruptions to or unavailability of critical information technology systems or services resulting from accidents or malicious acts. |

**Exhibit 4**
**Select Risk Disclosures in Forms 20-F**
*2016 – 2019*

| Filing Date | Page(s) | Disclosure |
|---|---|---|
| 4/13/2018 | p. 22 | Our business could be adversely affected by the failure of our counterparties, joint venture partners or joint ventures we do not control to perform their obligations… Some of our investments are controlled by partners or have separate and independent management. These investments may not fully comply with our standards, controls and procedures, including our health, safety, environment and community standards. Failure by any of our partners or joint ventures to adopt adequate standards, controls and procedures could lead to higher costs, reduced production or environmental, health and safety incidents or accidents, which could adversely affect our results and reputation. |
| | p. 24 | Our business is subject to environmental, health and safety incidents. Our operations involve the use, handling, storage, discharge and disposal of hazardous substances into the environment and the use of natural resources, and the mining industry is generally subject to significant risks and hazards, including fire, explosion, toxic gas leaks, spilling of polluting substances or other hazardous materials, rockfalls, incidents involving dams, failure of other operational structures and incidents involving mobile equipment, vehicles or machinery. This could occur by accident or by breach of operating and maintenance standards, and could result in a significant environmental and social impacts, damage to or destruction of mineral properties or production facilities, personal injury, illness or death of employees, contractors or community members close to operations, environmental damage, delays in production, monetary losses and possible legal liability. Additionally, in remote localities, our employees may be exposed to tropical and contagious diseases that may affect their health and safety. Notwithstanding our standards, policies and controls, our operations remain subject to incidents or accidents that could adversely affect our business, stakeholders or reputation... Our business may be adversely affected by social, environmental and health and safety regulation, including regulations pertaining to climate change... In response to the failure of Samarco's tailings dam in Minas Gerais, additional environmental and health and safety laws and regulations may be forthcoming in Brazil and authorities may impose more stringent conditions in connection with the licensing process of our projects and operations. Also, we may encounter more stringent requirements for and delays in the receipt of environmental operating license for other tailings dams. |
| 4/18/2019 | pp. 22 – 23 | Our obligations and potential liabilities arising from the failure of a tailings dam owned by Samarco in Minas Gerais could negatively impact our business, our financial conditions and our reputation. In November 2015, the Fundão tailings dam owned by Samarco failed, causing fatalities and environmental damage in the surrounding area. The failure of Samarco's tailings dam has adversely affected and will continue to affect our business, and the full impact is still uncertain and cannot be estimated. Below is a discussion of the main effects of the dam failure on our business... • Risk of additional environmental damages. Failure to contain the remaining tailings in Samarco's dams could cause additional environmental damages, additional impacts on our operations, and additional claims, fines and proceedings against Samarco and against us. Failure to contain the remaining tailings could also impact the feasibility and timing for the restart of Samarco's operations. • Other impacts. We may encounter delays in the receipt of environmental and other licenses for our tailings dams and other facilities, and Brazilian authorities may impose more stringent conditions in connection with the licensing process of our projects and operations. Also, as one of Samarco's shareholders, our reputation has been adversely affected by the failure of Samarco's tailings dam. |
| | p. 26 | Disagreements with local communities could adversely impact our business and reputation. Disputes with communities where we operate may arise from time to time. Accidents or incidents involving mines, industrial facilities and related infrastructure, such as the failure of Dam I, may significantly impact the communities where we operate. |

*Confidential*

**Exhibit 4**
**Select Risk Disclosures in Forms 20-F**
*2016 – 2019*

| Filing Date | Page(s) | Disclosure |
|---|---|---|
| 4/18/2019 | pp. 27 – 28 | Our projects are subject to risks that may result in increased costs or delay in their implementation. We are investing to maintain and further increase our production capacity and logistics capabilities. We regularly review the economic viability of our projects. As a result of this review, we may decide to postpone, suspend or interrupt the implementation of certain projects. Our projects are also subject to a number of risks that may adversely affect our growth prospects and profitability, including the following:... • We may face unexpected weather conditions or other force majeure events... • Changes in market conditions or regulations may make a project less profitable than expected at the time we initiated work on it. • There may be accidents or incidents during project implementation... |
| | pp. 28 – 29 | Operational problems could materially and adversely affect our business and financial performance. Ineffective project management and operational breakdowns might require us to suspend or curtail operations, which could generally reduce our productivity. Operational breakdowns could entail failure of critical plant and machinery. There can be no assurance that ineffective project management or other operational problems will not occur. Any damages to our projects or delays in our operations caused by ineffective project management or operational breakdowns could materially and adversely affect our business and results of operations. Our business is subject to a number of operational risks that may adversely affect our results of operations, such as: • Unexpected weather conditions or other force majeure events... • Accidents or incidents involving our mines, industrial facilities and related infrastructure, such as dams, plants, railway and railway bridges, ports and ships... • Changes in market conditions or regulations may affect the economic prospects of an operation and make it inconsistent with our business strategy... • Disruptions to or unavailability of critical information technology systems or services resulting from accidents or malicious acts... |
| | pp. 29 – 30 | Our business could be adversely affected by the failure of our counterparties, joint venture partners or joint ventures we do not control to perform their obligations… Some of our investments are controlled by partners or have separate and independent management. These investments may not fully comply with our standards, controls and procedures, including our health, safety, environment and community standards. Failure by any of our partners or joint ventures to adopt adequate standards, controls and procedures could lead to higher costs, reduced production or environmental, health and safety incidents or accidents, which could adversely affect our results and reputation. |
| | p. 31 | Our business is subject to environmental, health and safety incidents. Our operations involve the use, handling, storage, discharge and disposal of hazardous substances into the environment and the use of natural resources, resulting in significant risks and hazards, including fire, explosion, toxic gas leaks, spilling of polluting substances or other hazardous materials, rockfalls, incidents involving dams, failure of other operational structures, as well as activities involving mobile equipment, vehicles or machinery and other potentially fatal incidents and accidents. Incidents may occur due to deficiencies in identifying and assessing risks or in implementing sound risk management, and once these risks materialize, they could result in significant environmental and social impacts, damage to or destruction of mines or production facilities, personal injury, illness and fatalities, involving employees, contractors or community members near our operations, as well as delays in production, monetary losses and possible legal liability. Additionally, in remote localities, our employees may be exposed to tropical and contagious diseases that may affect their health and safety. Notwithstanding our standards, policies, controls and monitoring procedures, our operations remain subject to incidents or accidents that could adversely impact our business, stakeholders or reputation. |

**Sources:** Vale, Forms 20-F for the fiscal years ended December 31, 2015 – December 31, 2018.

**Exhibit 5**
**References to Analysts' Reports in the Feinstein Report**
*January 25, 2019 – February 25, 2019*

| | | Quotes from Feinstein Report | Location in Feinstein Report |
|---|---|---|---|
| **BMO Capital Markets** | 1/25/2019 | "Whilst lost production might be a longer-term concern, the initial market fears are likely to focus on the risk of a second major event, like Samarco, and the associated liabilities." | ¶ 74. |
| | | "There is little information at this time; indeed, the company itself cannot confirm whether it is a tailings or water dam, or what operation it is associated with. The location puts it within the Southeastern System, which represents 25% of Vale's fines production, although we note the market will likely question if it is a second Samarco, pending more information. … Whilst lost production might be a longer-term concern, the initial market fears are likely to focus on the risk of a second major event, like Samarco, and the associated liabilities." | ¶ 74. |
| | 1/28/2019 | BMO downgraded Vale shares to "Market Perform" from "Outperform", and reduced its price target to $13 from $15. | ¶ 83. |
| | | BMO stated that "the impact on Vale is difficult to quantify" and that "the stock could experience significant downward pressure near term." | ¶ 83. |
| | | "We are downgrading Vale shares to Market Perform on the failure of an inactive tailings dam. There are reasons to think that the impact on Vale could be substantial given this is the second failure in three years and the significant loss of life as a result of this event. However, with the dam independently certified as safe as recently as September 26, 2018, the impact on Vale is difficult to quantify. Financial considerations may not come into the picture, however, and it is possible that the stock could experience significant downward pressure near term. … we are downgrading Vale shares to Market Perform, but note that non-financial considerations could lead to substantial near-term selling pressures on the stock." | ¶ 83. |
| | 2/6/2019 | "Following the suspension of its Brucutu mine, Vale has declared force majeure on some of its iron ore and pellets sales contracts. Vale has not indicated the volume of material impacted; Brucutu produces 30Mtpa of fines, but Vale remains hopeful that the suspension will be temporary and lifted on appeal. … Following the court order requiring Vale to stop production from its Brucutu mine, Vale has declared force majeure on some of its iron ore and pellets sales contracts. As a reminder, Brucutu is part of the Minas Centrais operations (Southeastern system) and produces approximately 30Mt of iron ore fine per annum. Vale previously declared that the Laranjeiras dam associated to the Brucutu mine is a downstream tailings dam and it will contest the court decision suggesting that the suspension could be temporary. Vale has not indicated the volume of material impacted by the declaration of force majeure." | ¶ 209. |
| | | "Vale also announced that it is bringing forward determination to increase the share of dry processing to 70% by 2023 (vs. 2025 previously). … The company also highlighted its plans to increase dry processing to 70% by 2023. Back in September 2016, Vale was targeting an increase from 40% to 70% by 2025 (including an increase from 20% to 50% in Minas Gerais) and targeting 100% at Mariana and Paraopeba operations. Vale will also invest around US$390M in the implementation of dry stacking disposal from its wet processing operations." | ¶ 210. |

*Confidential*

**Exhibit 5**
**References to Analysts' Reports in the Feinstein Report**
*January 25, 2019 – February 25, 2019*

| | | Quotes from Feinstein Report | Location in Feinstein Report |
|---|---|---|---|
| **BTG Pactual** | 1/27/2019 | "The trend of moving to dry processing technologies (not dependent on tailings dams) seems irreversible to us - the good thing is that Vale is already well advanced here." | ¶ 210. |
| | | BTG Pactual had written that the move to dry processing was a "good thing" and that Vale was advanced in that move. | ¶ 210. |
| | 2/6/2019 | "Unfavorable news flow persists; Situation at Brucutu deteriorates… Vale has just informed the market that the SEMAD (State Secretary for Environment and Sustainable Development) has just canceled the provisional operating license of the Laranjeiras tailings dam, which supported the Brucutu mine. This is another twist to the recent suspension of the mining operations at Brucutu, which account for iron ore production of around 30Mtpa (~8% of Vale's total output). At the end of the day, what is at stake here is: the timing of return of the Brucutu mine. Previously, our impression was that this would be a matter of a couple of weeks to resolve; now that call is less likely (although still possible). Unfortunately, doubts on the operational outlook for Vale will remain a key overhang and a question mark given the risk that other assets are at some point halted too." | ¶ 98. |
| **Credit Suisse** | 1/31/2019 | "Dry stacking is also currently being analyzed by the company and could be evaluated as a potential strategy to also reduce their exposure to tailings dams as a whole." | ¶ 210. |
| | | Credit Suisse noted that dry stacking would reduce Vale's exposure to the risks associated with tailings dams. | ¶ 210. |
| | 2/6/2019 | "Tonight Vale announced that the State Secretary for Environment and Sustainable Development (SEMAD) canceled the Provisional Operational Authorization of the Laranjeiras dam, and ordered the suspension of operations at the Jangada mine. The news comes two days after the Brazilian Public Prosecutors Office ordered the temporary stoppage of this very same dam along with seven others. Vale initially believed the decision could be reverted in the short term, as the dam had all the necessary licenses in place and was built using the downstream method. … We believe the news once again puts into evidence the overhang generated by Vale's exposure to potentially unfavorable decisions taken by Brazilian regulatory bodies and the Public Prosecutors Office as a response to the disaster. Vale will appeal against this decision but our confidence in the company achieving a reversal of this decision in the short-term has been reduced with the license to operate the dam now cancelled. In addition, there is still much uncertainty surrounding the ultimate financial implications which in our view, reduces the visibility and transparency of Vale's investment thesis going forward. We believe that risk perception on the back of this decision has been heightened begging the question on whether other operations might be impacted in a similar way. Additionally, we now have less comfort with Vale's ability to offset production losses with its near 50Mt of spare capacity and are reflecting this with the changes into our model outlined below." | ¶ 98 |
| | | "It is worth mentioning that operations at Jangada were already halted as a result of the suspension of operations at the Feijao mine so should not lead to any additional volumes loss other than what was already announced." | ¶ 211 |

**Exhibit 5**
**References to Analysts' Reports in the Feinstein Report**
*January 25, 2019 – February 25, 2019*

| | | Quotes from Feinstein Report | Location in Feinstein Report |
|---|---|---|---|
| **HSBC** | 1/27/2019 | HSBC stated that while the production loss from the mine was modest, the total liability would "likely be at least as large as the USD3.2bn Samarco liability" due primarily to the higher death toll. | ¶ 82. |
| | | HSBC downgraded the Vale ADR to "Hold", and reduced its price target to $14.50 from $18.00. | ¶ 82. |
| | | "The collapsed dam had a capacity of 12m m³ of tailings compared with 50m m³ at Samarco. The 37 deaths, which is likely to increase given the several hundred people still unaccounted for, exceed the 17 related to Samarco. The liability for the Samarco accident totaled USD3.2bn while the Brazilian court system has frozen BRL11bn so far from Vale over the weekend for this incident. … A small mine but a huge impact: Purely from a production standpoint, the direct impact is likely to be negligible for the iron ore market and for Vale, as the Feijao mine produced 7.8mt in 2017, just 2% of total production at Vale. But the total liability will likely be at least as large as the USD3.2bn Samarco liability given the more significant death toll and because this is the second dam collapse in three years related to Vale while this mine has been inspected and certified by Vale, third-party inspection companies and the Brazilian government in the past several months. We are also concerned about secondary effects such as a halt in all of Vale's Brazilian iron ore operations that produce tailings, to enable additional inspections (predominantly the Southern and SE systems, which produced 195mt in 2017), revocation of operating licenses, criminal prosecution and lawsuits in Brazil and the US." | ¶ 83 |
| | 2/7/2019 | "Negative headlines continue to swirl: According to a Wall Street Journal article (6 February 2019), TUV SUD, the firm responsible for the Brumadinho dam inspection, informed Vale in a report that the dam would be at a high risk of failure if the water was not properly drained. The 128-page report, dated September 2018, also pointed to faulty monitoring systems aimed at water level control, as well as a number of drainage tubes clogged by vegetation, potentially causing water to build up inside the dam, which can cause liquefaction, where the tailings (which are used as part of the dam) turn almost into a fluid. While TUV SUD ultimately certified the dam as stable, independent mining experts cited by the Journal reported that the signs were enough to deny a stability report, particularly given that there was little information known about the dam, such as its foundation, before Vale bought it in 2001. … A third article (Guardian, 06 February 2019) cites mine worker testimonies pointing to water leaking through a crack in July 2018, which needed to be repaired, as well as a general perception of imminent collapse. A very adverse development, if confirmed: The flow of information has been extremely negative since the accident, as expected. While we do not know the authenticity of the accusations and media reports, the ramifications, if confirmed, could be much worse than what we have estimated, and could imply increased lawsuits and liabilities, more arbitrary mine stoppages and increased pressure for a management shake-up. As the uncertainty over Vale's liability related to the Brumadinho tailings dam accident continues to increase, we expect the shares to decouple from their fundamentals until more clarity is attained." | ¶ 96. |

**Exhibit 5**
**References to Analysts' Reports in the Feinstein Report**
*January 25, 2019 – February 25, 2019*

| | | Quotes from Feinstein Report | Location in Feinstein Report |
|---|---|---|---|
| **Itaú BBA** | 2/15/2019 | "The main risk for Vale, in our view, is the forced shutdown of mining operations by a court decision without a legal/technical basis, similar to events surrounding the Brucutu mine. In the worst case scenario, Vale could eventually be forced to halt production of 160 mtpy corresponding to the entirety of the company's operations in Minas Gerais that rely on tailing dams For example, said volume reduction (160 million tons) would reduce Vale's EBITDA by nearly USD 5 billion, or 30 of EBITDA in 2019. Although the Brumadinho accident spilled nearly four times less tailings than Samarco, it is still hard to assess the final impact on Vale given its repetitive nature, the higher number of casualties and much greater media repercussion. In our view, these factors could influence the government's decision regarding the size of fines/compensation. Vale's multiples could be de rated, as the accident may reduce FCF predictability in the short term and force a change of Vale's senior management team, which is well regarded by the market Moreover, Vale could also suffer from a reduction of its potential shareholder base (ESG and dividend investors) for example, Vale has been removed from the ISE (Corporate Sustainability Index) portfolio in B 3 while Robeco has blacklisted Vale due to ethical concerns." | ¶ 125. |
| **Jefferies** | 1/25/2019 | Jefferies stated that "the full extent of the damage and the potential impact on iron ore markets are not clear," but that the event was "a material negative for Vale." | ¶ 72. |
| | | "The full extent of the damage and the potential impact on iron ore markets are not clear. While we hope the reports of fatalities are inaccurate, we do believe this is a material negative for Vale and a positive for other iron ore miners due to upside risk to prices resulting from less supply." | ¶ 74 |
| | 1/27/2019 | Jefferies downgraded Vale to "Hold" from "Buy" and reduced its Vale ADR price target to $14 from $18, noting that the Dam 1 collapse would "likely to be an overhang on the Vale share price for an extended period." | ¶ 83. |
| | | "We recommend that investors buy shares of Fortescue, Rio, BHP and Anglo American for exposure to higher-than-expected iron ore prices while we downgrade Vale to Hold given risks related to the dam failure. Vale tailings dam failure: We have reduced our iron ore production forecasts for Vale by a somewhat arbitrary 10mtpa following the tailings dam tragedy of this past Friday as supply from Vale's >27mtpa Paraopeba Complex in its Southern System will likely be significantly affected by the disaster. Stringent safety inspections could affect production from other mines in Brazil as well. The overall impact of the dam failure is nearly impossible to quantify for now and rescue operations are the clear priority. Supply disruptions resulting from this incident will very likely tighten the iron ore market, which is already relatively strong. … Vale has been one of our preferred stocks in the global mining sector, and its shares remain very inexpensive. However, the news from last Friday is a negative to the Vale investment case and likely to be an overhang on the Vale share price for an extended period. We therefore downgrade Vale from Buy to Hold and lower our target price for Vale shares from $18/sh to $14/sh." | ¶ 83. |

**Exhibit 5**
**References to Analysts' Reports in the Feinstein Report**
*January 25, 2019 – February 25, 2019*

| | | Quotes from Feinstein Report | Location in Feinstein Report |
|---|---|---|---|
| **J.P. Morgan (continued on next page)** | 1/25/2019 | JPMorgan offered that the Dam 1 collapse could lead to "higher scrutiny over the regulatory framework of the mining industry, … lead to further delays in granting new licenses, but also lifting existing permits." | ¶ 74. |
| | | "Mine production of 7.8mt in '17A. The Feijão mine produced 7.8mt of iron ore in 2017 (~2% of total) and is part of a larger complex in the Southern System (responsible for ~27% of total production that year). The mine reportedly used two dams to manage the waste of iron ore production, one of which collapsed earlier today. … Accident likely to result in higher compliance from authorities. The tragedy is likely to generate higher scrutiny over the regulatory framework of the mining industry, especially over the usage of dams. The company produced ~60% of its iron ore through operations that rely on dams (as of 2016) and had already been shifting new output into dry processing (aiming 70% of dry production by 2025). The accident could lead to further delays in granting new licenses, but also lifting existing permits. … Financial fines will also likely be imposed. The company has stated that its efforts are focused on containing the damage, protecting the population and repairing the region. Financial fines will also likely be imposed. In the case of Samarco, an initial settlement totaled R$11-13 billion, but we estimate that it has since been lifted to as much as ~R$20 billion." | ¶ 74. |
| | | "Accident likely to result in higher compliance from authorities. The tragedy is likely to generate higher scrutiny over the regulatory framework of the mining industry, especially over the usage of dams. The company produced ~60% of its iron ore through operations that rely on dams (as of 2016) and had already been shifting new output into dry processing (aiming 70% of dry production by 2025). The accident could lead to further delays in granting new licenses, but also lifting existing permits. Financial fines likely to be imposed. The company has stated that its efforts are focused on containing the damage, protecting the population and repairing the region. Financial fines will also likely be imposed. In the case of Samarco, an initial settlement totaled R$11-13 billion, but we estimate that it has since been lifted to as much as ~R$20 billion." | ¶ 74. |

Page 5 of 8

**Exhibit 5**
**References to Analysts' Reports in the Feinstein Report**
*January 25, 2019 – February 25, 2019*

| | | Quotes from Feinstein Report | Location in Feinstein Report |
|---|---|---|---|
| **J.P. Morgan (continued)** | 1/27/2019 | JPMorgan compared the Dam 1 collapse to the Samarco Mariana Dam collapse in 2015, and forecasted that "resumption of operations should be far away on the horizon, as Samarco hasn't operated since its incident in 2015." | ¶ 81. |
| | | Nonetheless, JPMorgan stated that "the bigger impacts should come from higher scrutiny over the mining industry regulatory framework, likely resulting in higher compliance for ongoing operations and future permits." | ¶ 81. |
| | 1/29/2019 | "Decommissioning calls for no interference of mining activities around the dams. Therefore, nine mines in the complexes of Vargem Grande and Paraopebas will be temporarily shut down. Together they represent 40Mtpy of ore capacity. Two pellet plants – Fábrica and Vargem Grande – will also be shut down during the decommissioning. While the pellet production can't be compensated by other operations, Vale expects to be able to partially compensate for the lost ore volumes with production from other mines. We assume 75% of the lost fines will be compensated by other mines. We also model deterioration in production mix (fewer pellets) and lower realize price or higher costs from the mines that will replace the ones being shut down." | ¶ 125. |
| | 1/31/2019 | JPMorgan stated that "Vale had been vocal about the benefits of dry stacking and making moves in that direction." [*Referencing dry processing and dry stacking]* | ¶ 210. |
| | | "Vale had been vocal about the benefits of dry stacking and making moves in that direction. The company had guided that it planned on having 70% of its production using dry processing by 2025 (from ~40% in 2016), partially due to the ramp-up in Carajás, but also with the conversion of existing operations." | ¶ 210. |
| | 2/6/2019 | The Laranjeiras dam was critical to operations at the Brucutu mine. That Vale would now need to obtain a new license for the Laranjeiras dam in order to resume operations at the Brucutu mine erected a second hurdle for Vale to clear before it could resume mining there. | ¶ 94 |
| | | JPMorgan cited "more negative headlines" as the driver behind the price decline in Vale ADRs on 6 February 2019. | ¶ 97. |
| | | "The Minas Gerais' State environmental organization (SEMAD) canceled the license that allowed Vale to operate the Laranjeiras Dam, in the Brucutu mining complex. This is the same dam that was ordered to be temporarily shut by the Minas Gerais Public Prosecution Office on Monday (Temporary Halt of Brucutu Mine). We see this as a negative development for two main reasons: (a) while Brucutu/Laranjeiras is already shut down, the new measure means one additional hurdle that has to be bridged before Vale can resume operations at the complex; (b) this also increases concerns that the effect on Vale's overall volumes could be stronger in the short term. … The company can appeal the decision. However, the resumption of Brucutu now needs to clear two hurdles: (a) the reversal of the preliminary ruling by the Public Prosecution Office and (b) the granting of the license of the Laranjeiras dam." | ¶ 98 |
| | | "Court's decision to suspend Brucutu mine led to force majeure: Vale in its exchange filing highlighted that the court order temporarily suspending the company's Brucutu mines had led to the force majeure declaration." | ¶ 209. |
| | | JPMorgan noted that the suspension of the Jangada mine was neither material nor relevant to Vale. | ¶ 211. |

**Exhibit 5**
**References to Analysts' Reports in the Feinstein Report**
*January 25, 2019 – February 25, 2019*

| | | Quotes from Feinstein Report | Location in Feinstein Report |
|---|---|---|---|
| **Macquarie** | 1/28/2019 | "Given that this is the second dam burst linked to Vale, we would expect more stringent remediation requirements and tougher penalties to be applied." | ¶ 83. |
| | | "Vale's equity rerating story was in part a reputational one which has now been dealt a body blow." | ¶ 83. |
| | | "The extent of the environmental damage is unknown although the volume released by this dam failure is roughly a quarter that of Samarco, so it is likely to be less severe. However, given that this is the second dam burst linked to Vale, we would expect more stringent remediation requirements and tougher penalties to be applied. As such we have cut our valuation by US$4bn to allow for potential remediation costs and penalties, which lowers our NAV by 8%. … However, Vale's equity re-rating story was in part a reputational one which has now been dealt a body blow. We expect the stock to give up some of these gains, at least while the uncertainty lingers." | ¶ 125. |
| **Morgan Stanley** | 1/25/2019 | Morgan Stanley analysts wrote, "this new unfortunate incident is likely to generate material scrutiny." | ¶ 72. |
| | 2/4/2019 | Morgan Stanley analysts stated that "we believe Vale would not be able to offset these volumes by ramping up output elsewhere," and "we believe the iron ore market will likely price in a bigger and/or longer potential impact to Vale's iron ore output than we first thought." | ¶ 89. |
| | 2/4/2019 | "Impact on our views? The above mentioned production halt would come on top of the 40Mt announced by the company (here) due to the decommissioning process of all its upstream tailings dams in the next three years. We believe Vale would not be able to offset these volumes by ramping up output elsewhere. We understand the tailings dam that supports the Brucutu operation is built by the downstream method, which is a different construction system than the upstream structures used in the failed Feijão and Samarco dams. We understand the court ruling is temporary and believe Vale will likely appeal such decision. … While the situation around the Brucutu mine suspension remains fluid, we believe the iron ore market will like price in a bigger and/or longer potential impact to Vale's iron ore output than we first thought. The stoppage of Brucutu, if it extended for a significant amount of time, would materially reduce the 37Mt supply surplus our commodity team originally forecast for 2019 (prior to the Feijão dam failure)." | ¶ 89. |
| | 2/7/2019 | "We think an event of this magnitude is likely to create an overhang on the stock multiple, at least in the near term. This is likely to be driven by a combination of 1) reputational uncertainty and heightened environmental risk, 2) uncertainty around the ultimate financial ramifications (e.g. liabilities related to the tragic incident), and 3) the impact of higher capex/costs as a result of increased safety standards. The long-term multiple implications are unclear, with much hinging on the company's efforts to regain the trust of key stakeholders and evidence that there wasn't any wrongdoing or negligence on its part." | ¶ 125. |

*Confidential*

**Exhibit 5**
**References to Analysts' Reports in the Feinstein Report**
*January 25, 2019 – February 25, 2019*

| | | Quotes from Feinstein Report | Location in Feinstein Report |
|---|---|---|---|
| **Scotiabank** | 1/25/2019 | Scotiabank reduced its Vale ADR price target to $17.00 from $19.50, while noting, "It is still too early to quantify the social, environmental and economic impact of this unfortunate accident." | ¶ 72. |
| | 2/4/2019 | "The estimated impact of the decision of a temporary halt of the Laranjeiras dam and the Brucutu mine (part of the Minas Centrais complex in the Southeastern System) is 30 Mpta. In our model we assume 28 Mtpa production from Minas Centrais. … While we expect Vale to appeal the court's decision, we note that risks to our recently reduced production estimates look skewed to the downside. … Less leeway to maintain production close to Vale's original 400 Mtpa target. As we noted before, Vale's production capacity stands at 450 Mtpa. We understand that the company can minimize the impact of a projected 40 Mtpa output cut from the company's decision to decommission upstream tailings dams. We currently forecast a marginal decrease in production to 390 Mtpa - 395 Mtpa in 2019-2021. However, if Brucutu's mine stays closed for long - or if further legal action limits or stops mining operations at other sites – Vale's iron ore production may fall below our current estimates." | ¶ 89. |
| | 2/7/2019 | "The decision of the State Secretary for Environment and Sustainable Development (SEMAD) to cancel Vale's provisional operational authorization for the Laranjeiras tailings dam reduces the likelihood of a fast restart at Vale's Brucutu mine, we think. While a quick solution is still possible, our base case has changed and we now assume Brucutu mine remains closed for the rest of 2019. Vale's proposed closures to reduce risks based on a technical analysis and following a decommissioning plan for upstream dams looks to us to be a better alternative to closing mines without solid support. However, risk that production at Brucutu is further delayed or even that other mines may be impacted should not be ruled out, as public opinion may favor more action from the authorities against the miner. We hope the authorities can find a way to increase safety at mining locations and to reduce environmental risks without a major – and possibly unnecessary – economic impact on the affected communities and the state of Minas Gerais." | ¶ 98. |
| **UBS** | 2/6/2019 | "Timeline: Uncertain. Prior to the dam license cancellation, we understood Vale was working on getting the suspension lifted as soon as possible." | ¶ 98. |
| | | "The company declared force majeure on shipments related to the Brucutu mine earlier this week followed by the State of Minas Gerais cancelling the Brucutu dam license." | ¶ 209. |

**Note:**
[1] The above lists quotes from the Feinstein Report referencing analysts' reports between January 25, 2019 and February 25, 2019.  I note that there are no references to analysts' reports in this period after February 15, 2019.

**Source:**
Feinstein Report.

**Exhibit 6**
**Excerpts from Analysts' Reports Indicating Analysts Considered the Materialization of Disclosed Risk When Assessing Vale Securities' Prices**
*January 25, 2019 – February 25, 2019*

| Contributor | Date | Prior Target Price | Current Target Price | Target Price Change | Select Excerpts |
|---|---|---|---|---|---|
| | 01/25/2019 | $17.00 | $16.50 | down | As of this publication details were limited but we attempt to frame the repercussions on Vale. Although it is too early to speculate on the financial impact of the event, generally such incidents result in clean-up costs, potential restitution, and possible further financial penalties. Vale can offset lost production at the affected mine with spare capacity, if allowed to and not restricted by the government. However, the incident could result in public backlash, and could spark calls for greater oversight, limiting its ability to operate and potentially restart Samarco, which had been slated to resume operations as early as late 2019E. Other older mines could also face greater scrutiny, in our view. |
| | 01/28/2019 | | [3] | | The full repercussions of Friday's dam collapse tragedy remain unknowable, and as such we do not expect shares to trade on fundamentals, and move to Under Review. Shares may instead trade with headlines of the fallout from the tragedy.<br><br>Samarco was widely considered Brazil's worst mining environmental disaster in history. In terms of iron ore impact, we expect potentially less immediate disruption to Vale's production as the affected Feijão mine is smaller. However, it is impossible to know the full fatality count, or the full financial impact from victim restitution, fines, remediation, and other costs. Early fines were announced and the federal prosecutors office was already calling for stricter punishment due to its second violation. We believe this breach could also delay Samarco restart plans. S&P put Vale on negative watch. Vale's board has decided to suspend its dividend and buyback programs. |
| | 01/29/2019 | | [3] | | We moved Vale to Under Review following last Friday's dam collapse as we do not expect shares to trade on fundamentals and given dramatically changing conditions in the early stages of this crisis. Costs, fines, and frozen funds had totalled [*sic*] over US$3B in initial days following the dam breach. The human toll, with fatalities looks likely to exceed 300 people, also making liability calculations particularly challenging. |
| Bank of America[2] (continued on next page) | 02/04/2019 | | N/A | | [This report is a Global Metals & Mining Industry Overview and does not provide a target price for Vale.]<br><br>On Friday, January 25th, VALE suffered a tragedy at its Feijão mine in Brumadinho. A tailings dam, which was no longer in use, collapsed, resulting in an uncontrolled release of c. 1 million cu m of tailings (mud). To date, the official death toll is now over 100 with still hundreds of people missing. VALE has announced plans to decommission all 10 of its tailings dams that were constructed by the upstream method over three years. As part of this plan, the facilities where the dams are located, all told c. 40 Mtpa of iron ore capacity may need to be shut down temporarily while the work is carried out. Benchmark iron ore has risen c. $11/t to $87 since the dam breach. Our current FY19 iron ore price forecast 67.50 assumes US$75/t in Q1, $65/t thereafter. Bottom line: Subject to no further changes / government actions or reactions, we see fairly limited impact on the iron ore market near term (next 1-2 quarters). We see a bigger relative impact on pellets - hence our recent upgrade of Ferrexpo, an iron ore pellet pure play.<br><br>We think that some market observers are (incorrectly) assuming a full and immediate 40 Mtpa reduction in output. As it stands, we think this is incorrect. We spoke with management to clarify. ... Subject to no change in approach from the Brazilian authorities, near term we should see limited impact on tonnes produced save 8 Mtpa from Feijiao itself. This lost production can be partially offset by other mines. (Aside: in our view, there is a good chance that the Feijiao mine never restarts although still needs to be remediated. This is 8 Mtpa of production capacity that could be permanently lost.) In the medium term VALE will temporarily reduce production by up to 40 Mtpa while it decommissions unused tailings dams (of this 40, 8 is Feijiao). So, assuming the work happens simultaneously, there is 40 Mtpa to make up, at a max, at that time. ... The biggest impact is on pellets. Mtpa of pellet feed could be impacted but also important, we think there is now a good chance that Samarco stays offline for even longer than might have been anticipated by the market (assumed restart in 2020?). |

*Confidential*

**Exhibit 6**

**Excerpts from Analysts' Reports Indicating Analysts Considered the Materialization of Disclosed Risk When Assessing Vale Securities' Prices**

*January 25, 2019 − February 25, 2019*

| Contributor | Date | Prior Target Price | Current Target Price | Target Price Change | Select Excerpts |
|---|---|---|---|---|---|
| **Bank of America[2] (continued on next page)** | 02/05/2019 | $16.50 | $13.00 | down | We resume coverage with a Neutral rating, from Under Review, which reflects a miner still in crisis mode, with a growing death toll and more fines and operating repercussions. Q4 results were delayed until March 27, and the dividend and buyback halted. Yet early chatter of holding Vale senior management accountable faded. We budget US$5B for cash outlays for added capex and fines, in line with the 2015 Samarco dam breach, despite likely smaller environmental damage. Decommissioning 10 idle tailings dams can incur added inefficiencies and costs but pellet prices help offset, so we kept 2020E EBITDA at $16.48B vs a prior $16.45B and consensus of US$16.5B. The impact can be more modest in 2019E as remediation requires environmental licenses, which we assume in Q4E.<br><br>Monday's news of management's decision to accelerate decommissioning at its 13Mt Vargem Grande complex, part of the 40Mt it planned to idle, will test its claims of offsetting lost output with added S11D tons, possibly 20Mt in 2019E. Mgmt seems prepared to contest Monday's injunction on producing at its 30Mt/yr Brucutu mine. We also see added volume from Rio, BHP, and Fortescue. Pellet price premiums can be stickier, in our view.<br><br>Among positives, we see Vale compensating for some lost output and benefiting from higher pellet and iron ore prices. We see FCF >US$6B in 2019E and assume it reinstates the dividend by 2020E. Yet negatives include a growing death toll, risk of more fines and headlines of mines forced to idle.<br><br>Shares last traded at about 4.7x 2019E. We think the discount seems deserved mainly due to: 1) a less attractive dividend yield/buyback thesis near term; 2) potential change in investor base given lack of dividend and ESG concerns; and 3) continued uncertainty over volume and costs.<br><br>We believe Vale will review all its mining and logistics plans in order to optimize its mix of production following the accident. Some of the mines closed while the tailings dams are remediated may not restart. We expect near-term productivity losses, but over time production costs could fall and grades improve.<br><br>While it remains too soon to estimate the total value of penalties, fines and remediation costs, we note as a reference that the Samarco accident cost R$12.6B according to Vale reports, split evenly between partners Vale and BHP. We expect the impact on environmental to be much smaller in the Brumadinho case, given its 12M m$^3$ capacity vs ~32M m$^3$ from Mariana (aka Samarco). Yet the late January dam accident has a higher death told, [*sic*] so far at 134 and with 199 people still missing, compared with 19 deaths in Mariana. So far state prosecutors from Minas Gerais had frozen R$11B of Vale's funds, while the Secretary of Labor had blocked R$1.6B. Federal Environmental group Ibama issued a R$250M fine and Minas Gerais issued a ~R$100M penalty. Vale also reported it would "donate" R$100K for each victim's family, on top of any potential indemnities due. |

*Confidential*

**Exhibit 6**

**Excerpts from Analysts' Reports Indicating Analysts Considered the Materialization of Disclosed Risk When Assessing Vale Securities' Prices**

*January 25, 2019 – February 25, 2019*

| Contributor | Date | Prior Target Price | Current Target Price | Target Price Change | Select Excerpts |
|---|---|---|---|---|---|
| Bank of America[2] (continued) | 02/07/2019 | $13.00 | $13.00 | no change | Since our last iron ore update, the situation in Brazil has continued to evolve, quickly. The Feijao mine (8 Mtpa), where the tragedy of January 25th occurred, is offline and likely to remain so for the foreseeable future. Vale announced that it would bring forward its temporary halt at the Vargem Grande Complex (c. 13 Mtpa), which was part of 40 Mtpa to have been shut down "over time" for tailings dam "recharacterization". Then, a court in Minas Gerais, ordered the shut-down of the Brucutu complex (30 Mtpa), which was NOT included in this 40 Mtpa planned shutdown. According to press reports, Semad, the local ministry of the environment, has now cancelled the tailings dam license for Brucutu. We expect Vale to appeal this decision. In total then, we today have c. 51 Mtpa of production offline as opposed to just 8 Mtpa offline in the days following the accident. |
| | 02/11/2019 | $13.00 | $12.00 | down | Wednesday's news of the Brucutu mine's provisional license being revoked by local authorities changed the dialogue in our minds, with Vale no longer in the driver's seat able to determine its production. Until this point, Vale's closures were self-imposed or pre-emptive. As such, we are less convinced it can offset lost volume with production elsewhere plus we see risk of further capacity made to close by concerned local authorities. We expect our new list of capacity affected by Brazil closures to grow.

We cut our price objective to $12 from $13, to reflect an additional 30Mt forced shut at its Brucutu mine.

FCF should remain above US$6B annually even assuming steeper costs and fines, and we expect a resumed dividend in 2020E. Management has progressed in key initiatives, specifically deleveraging, capital discipline and a turnaround plan for underperforming assets. Uncertainty around financial and production risk after the Brumadinho dam tragedy can weigh on shares.

Vale has said it will work to reverse the [Brucutu mine closure], and has said the tailing dams at the region were up to code, not using the upstream method of the Brumadinho mine that burst. However, we believe any resolution could be protracted and further forced closures are possible.

Our valuation analysis assumes US$5B total fines/penalties. Further penalties and closures are a risk to the thesis. We assume Vale resumes paying a dividend in 2020E, and accumulates a strong cash position in the interim. Wednesday's forced mine closure is a game changer to Vale's thesis, in our view, and as such we think valuation discounts are deserved. |

*Confidential*

**Exhibit 6**
**Excerpts from Analysts' Reports Indicating Analysts Considered the Materialization of Disclosed Risk When Assessing Vale Securities' Prices**
*January 25, 2019 – February 25, 2019*

| Contributor | Date | Prior Target Price | Current Target Price | Target Price Change | Select Excerpts |
|---|---|---|---|---|---|
| Barclays | 01/28/2019 | $16.25 | $16.25 | no change | The market has dramatically de-rated Vale shares in the aftermath of the Feijão dam tragedy on Friday. We consider a variety of financial impacts on Vale's NPV: fines announced, closure of Feijão mine, total environmental liability, indefinite delay to Samarco restarting and an assumed 10% de-rating of the equity to reflect heightened ESG risk on stock-specific volatility and beta.<br><br>The implication is the market has priced in $6.2bn NPV of additional liabilities: that is equivalent to almost 3x Samarco's environmental liability or $753m of incremental costs pre-tax per annum or $1.9/t of production over the next 15 years. Government and regulatory responses will be critical to determining the true value impact. |
| | 01/30/2019 | $16.25 | $16.25 | no change | Vale has announced plans to decommission all tailings dams built using the upstream method.<br><br>The production cuts are in the Southern system and are planned to be at least partially offset by higher output in the Northern system where Vale has 50mt spare capacity. However, it is likely to take time to mobilize and ramp-up (6 months+) so should provide temporary support for the iron ore price over coming quarters – potentially up to 20mt of lost supply for 2019.<br><br>The impact on the pellet market is more material and permanent (3 years); this combined with permitting risk for Anglo's Minas Rio tailings dam and Samarco's 2020 restart should be very positive for pellet premiums and particularly Ferrexpo (OW) – every 10% move in iron ore fines delivers 27% on 2019 EPS and pellet premiums 17%. |
| | 02/07/2019 | $16.25 | $13.40 | down | Iron ore supply issues continue for Vale[.] Overnight the operating licence [*sic*] for Vale's 30mtpa Brucutu mine's tailings dam was cancelled by SEMAD (Brazil state secretary for the environment). Vale had expected Brucutu to restart operations within weeks given the dam is built using the downstream method. It is now likely to be shut down for a significant period of time, in our view. SEMAD also suspended the LO for the Jangada mine (9mtpa), which had ceased production since the Feijao tragedy as it sits adjacent to Feijao in the Paraopeba complex. We expect positive iron ore and equity price reaction to this news as the market can now begin to attach meaningful duration to the iron ore supply outages to date. Vale iron ore operations currently off-line: Corrego de Feijao (Paraopebas), Vargem Grande beneficiation plants, Brucutu; Vale iron operations likely to be closed: Rest of Vargem Grande complex, Rest of Paraopebas complex. |

*Confidential*

**Exhibit 6**

**Excerpts from Analysts' Reports Indicating Analysts Considered the Materialization of Disclosed Risk When Assessing Vale Securities' Prices**

*January 25, 2019 – February 25, 2019*

| Contributor | Date | Prior Target Price | Current Target Price | Target Price Change | Select Excerpts |
|---|---|---|---|---|---|
| **BB - Banco de Investimento** | 01/28/2019 | $21.00 | $21.00 | no change | In addition to the suspension of dividends payment already announced by Vale, considered one of the most expected upside to shareholders, the main risks we see arising in the short-term regards: (i) provisions for compensation, directly affecting the BS of the company, (ii) other operational and non-operational expenses, which could impact negatively the company's cash generation, and (iii) the possible, but not probable, revocation of other company's licenses to operate. That said, we see the previous fundamentals of the industry still maintained. Likewise, due to the lack of information on the financial impacts on the company and considering that the incident does not affect expressively the operational capacity of Vale, we maintain our TP 2019 for VALE3 at R$ 73.5 (VALE US$ 21.0), though downgrading our recommendation to Market Perform, while we wait for the further information. |
| | 02/01/2019 | $21.00 | $16.00 | down | We stressed our model with the new data available in order to incorporate the possible outcomes from the disaster that has translated into a higher risk perception on Vale's shares.<br><br>• Production capacity: we are still considering the 400 Mt in IO production for 2019, though we have adjusted the mix of premium products in order to better reflect the removal of pellet feeds and the probable entrance of high silica products in the portfolio;<br>• Cash Cost: we believe cash cost to slightly increase in reason of the poorer mix and the increase in products from South and Southeast systems where costs are higher;<br>• CAPEX: we consider an addition of US$ 1.4 bn in capex to be disbursed throughout the next 3 years, starting in the 2H of this year;<br>• Other expenses: we decided to include in our model disbursements with indemnities of around US$ 3.5 bn, based on the amount already announced and on what we observed after Samarco's dam failure;<br>• Iron ore prices: we are working with IO 62% prices at US$ 68/t in 2019 and US$ 57/t in the LT. |

*Confidential*

**Exhibit 6**

**Excerpts from Analysts' Reports Indicating Analysts Considered the Materialization of Disclosed Risk When Assessing Vale Securities' Prices**

*January 25, 2019 – February 25, 2019*

| Contributor | Date | Prior Target Price | Current Target Price | Target Price Change | Select Excerpts |
|---|---|---|---|---|---|
| **BMO Capital Markets (continued on next page)** | 01/25/2019 | $15.00 | $15.00 | no change | Bloomberg is reporting the failure of a dam operated by Vale in Brumadinho, Belo Horizonte. There is little information at this time; indeed, the company itself cannot confirm whether it is a tailings or water dam, or what operation it is associated with. The location puts it within the Southeastern System, which represents 25% of Vale's fines production, although we note the market will likely question if it is a second Samarco, pending more information.<br><br>Whilst lost production might be a longer-term concern, the initial market fears are likely to focus on the risk of a second major event, like Samarco, and the associated liabilities. |
| | 01/28/2019 | $15.00 | $13.00 | down | We are downgrading Vale shares to Market Perform on the failure of an inactive tailings dam. There are reasons to think that the impact on Vale could be substantial given this is the second failure in three years and the significant loss of life as a result of this event. However, with the dam independently certified as safe as recently as September 26, 2018, the impact on Vale is difficult to quantify. Financial considerations may not come into the picture, however, and it is possible that the stock could experience significant downward pressure near term.<br><br>[W]e are downgrading Vale shares to Market Perform, but note that non-financial considerations could lead to substantial near-term selling pressures on the stock. Considerations include, a) moral positions, b) ESG score based selling, c) concerns regarding other dams in Vale's portfolio, and d) the impact of increased safety checks on ongoing operations and repercussions with regard to sustaining production levels. However, the fact that this is an old and unused facility raises questions around how much culpability lies with Vale if the dam did indeed satisfy regulatory requirements. At the same time, one should question the implications for the pricing of systemic risk within the mining industry, especially with regard to legacy assets constructed to historical norms. |

Page 6 of 42

*Confidential*

**Exhibit 6**

**Excerpts from Analysts' Reports Indicating Analysts Considered the Materialization of Disclosed Risk When Assessing Vale Securities' Prices**

*January 25, 2019 − February 25, 2019*

| Contributor | Date | Prior Target Price | Current Target Price | Target Price Change | Select Excerpts |
|---|---|---|---|---|---|
| BMO Capital Markets (continued on next page) | 01/28/2019 | $13.00 | $15.00 | up | We have identified eight main areas for consideration: 1) Financial liability, restitution and rehabilitation costs – Without pre-judging blame, there is likely to be a [*sic*] financial liabilities associated with restitution and rehabilitation. For reference, the total cost of Samarco is currently estimated at US$5.4B. 2) Impact on production and sales – At this point we assume a relatively limited impact given the small number of upstream dams and the ability to find alternative deposition sites. 3) Preventative costs – With 17 dams of 151 in Vale's iron ore portfolio being of upstream construction, we tentatively estimate that replacing them all might cost as much as US$3B over a multi-year period. 4) Suspension of shareholder returns – Although the balance sheet is in relatively good shape, suspending shareholder returns seems a prudent response given the unknown liabilities and in respect to the individuals affected. 5) ESG considerations – Putting aside any financial impact, some shareholders may no longer wish, or be able, to own Vale from an ESG perspective. 6) Credit risk – The uncertain level of liability could impact Vale's credit worthiness, limiting its borrowing capacity. 7) Eliminating Samarco's valuation – We have US$2.8B in our NPV for Samarco having assumed an evention [*sic*] restart, which now appears a relatively remote prospect. 8) Increases systemic risk – Not specific to Vale, it is quite possible that the market could begin to apply higher risks to the industry as a whole, or at least to the operators of old projects that have upstream tailings dams.<br><br>We cannot see any explicit impact from the 2015 Samarco disaster in Vale's ESG scores. However, it is quite likely that some investors may take a subjective view that they can no longer own Vale from an ESG perspective, creating selling pressure on the stock. |
| | 01/30/2019 | $13.00 | $13.00 | no change | Despite the production cuts and after applying high level estimates of restitution costs, Vale shows the greatest improvement in earnings amongst the peers. However, we think investors will largely look past this, with many applying an ESG rather than financial overlay given the horrendous human cost of the disaster.<br><br>Production Changes: Vale announced it will decommission its 10 remaining upstream tailings dams (all inactive) for a cost of ~ US$1.3B over three years. For safety and speedy decommissioning, Vale is halting mining in the vicinity of the dams ~ 9 operations in 2 complexes of the Southern System. Consequently, Vale anticipates a 40Mtpa reduction in iron ore output, including ~11Mtpa of pellets. Whilst we expect compensating increases from other operations, we assume this is not immediate, adding 13Mt and 15Mt to our estimates for 2020E and 2021E.<br><br>A First Pass Estimate of Restitution Costs and Fines: We have included R$5B (~US $1.3B) for dam decommissioning over three years, and ~US$5.5B for the restitution costs plus fines, which is simply taking the same charge as for Samarco. This is provisional in nature; as previously noted, Samarco was more of an environmental disaster, whereas Brumadinho has a significantly greater human cost. Conversely, there are question marks on the level of liability given the dam was independently certified as safe and met all regulatory requirements. |

*Confidential*

**Exhibit 6**

**Excerpts from Analysts' Reports Indicating Analysts Considered the Materialization of Disclosed Risk When Assessing Vale Securities' Prices**

*January 25, 2019 – February 25, 2019*

| Contributor | Date | Prior Target Price | Current Target Price | Target Price Change | Select Excerpts |
|---|---|---|---|---|---|
| **BMO Capital Markets (continued on next page)** | 01/30/2019 | $13.00 | $13.00 | no change | Following Vale's announcement that it is suspending production of 40Mtpa of iron ore production, we have raised our 62%Fe iron ore price forecast to US$78/t for 2019 (from US$63/t previously) and US$70/t in 2020-21 (+11-16%). Incorporating new iron ore prices, we are lifting the iron ore miners' 2019 and 2020 earnings estimates by 29% and 15% on average, and EBITDA estimates by 21% and 11%. Despite the production cuts, Vale shows the greatest upside to estimates, even after incorporating provisional restitution costs and fines. |
|  | 01/30/2019 | $13.00 | $13.00 | no change | [This report is a BMO Global Commodities Research Flash Report and provides commentary on iron ore, not on Vale.] |
|  | 01/31/2019 | $13.00 | $13.00 | no change | [This report is a BMO Metals Brief and covers the commodity market only.] |
|  | 02/05/2019 | $13.00 | $13.00 | no change | Vale has been ordered to suspend eight operations in Minas Gerais, potentially impacting at least 30Mtpa fines production in addition to the 40Mpta previously announced. The court order is inconsistent with dam construction types or uses, leaving it open for Vale to appeal; we are therefore making no changes to forecasts at this time. However, should this result in sustained production cuts, higher equilibrium iron ore prices of US$83/75/t in 2019/20 (+6/+7%) would be net positive, boosting EBITDA by +3/+4%. We have already included fines, restitution and decommissioning costs of US$6.8B in our estimates. |
|  | 02/05/2019 | $13.00 | $13.00 | no change | [This report is a BMO Metals Brief and covers the commodity market only.] |
|  | 02/06/2019 | $13.00 | $13.00 | no change | Following the suspension of its Brucutu mine, Vale has declared force majeure on some of its iron ore and pellets sales contracts. Vale has not indicated the volume of material impacted; Brucutu produces 30Mtpa of fines, but Vale remains hopeful that the suspension will be temporary and lifted on appeal. Vale also announced that it is bringing forward determination to increase the share of dry processing to 70% by 2023 (vs. 2025 previously).<br><br>Following the court order requiring Vale to stop production from its Brucutu mine, Vale has declared force majeure on some of its iron ore and pellets sales contracts. As a reminder, Brucutu is part of the Minas Centrais operations (Southeastern system) and produces approximately 30Mt of iron ore fine per annum. Vale previously declared that the Laranjeiras dam associated to the Brucutu mine is a downstream tailings dam and it will contest the court decision suggesting that the suspension could be temporary. Vale has not indicated the volume of material impacted by the declaration of force majeure.<br><br>In a separate announcement, Vale reminded the market that it decided to retire and rehabilitate all upstream tailings dams post Samarco and that this process was ongoing at the time of the Brumadinho failure. |

*Confidential*

**Exhibit 6**

**Excerpts from Analysts' Reports Indicating Analysts Considered the Materialization of Disclosed Risk When Assessing Vale Securities' Prices**

*January 25, 2019 – February 25, 2019*

| Contributor | Date | Prior Target Price | Current Target Price | Target Price Change | Select Excerpts |
|---|---|---|---|---|---|
| BMO Capital Markets (continued) | 02/08/2019 | $13.00 | $13.00 | no change | [This report is a BMO Metals & Mining - International Research Flash Report and provides commentary on evacuations related to dam concerns.] |
| | 02/13/2019 | $13.00 | $13.00 | no change | Vale announced it will restart its operations at the Tubarão Port Complex after a week of suspended operations. Four pelletizing plants were forced to shut down on February 7 due to an alleged environmental transgression unrelated to Brumadinho. Tubarão plants produced around 12Mt of pellets in 2018E (14Mt in 2019E). We had expected only a temporary suspension and had made no changes to our forecasts. We estimate only 250kt of pellet production was lost. |
| | 02/15/2019 | $13.00 | $13.00 | no change | Whilst we expect a limited impact on Vale it could add some short-term stress to the iron ore market which is still navigating through the impact of the Brumadinho dam tragedy. |
| | 02/18/2019 | $13.00 | $13.00 | no change | Vale has announced it has evacuated 200 people downstream of the B3/B4 dam at the Mar Azul mine to level 2 as a precautionary measure. The B3/B4 is not in use and Vale expects no impact to production; however, this could add to pressures to suspend all production from operations associated with the remaining upstream dams in Vale's portfolio (as per our base case forecasts).<br><br>Our base forecasts assume that Vale is compelled to suspend production at all operations associated with upstream dams but that Brucutu is allowed to restart. |
| | 02/22/2019 | $13.00 | $13.00 | no change | Below are topical points and questions to facilitate discussions among those in attendance [at the Global Metals & Mining Conference].<br> • Updates on Brumadinho: Could you please provide an update on the situation at Brumadinho and across your Southern and Southeastern systems? Please comment on the political engagement with the Bolsonaro government. What impact will the planned compensating production restarts have on average grades and qualities, and how quickly can this be brought online?<br> • Brucutu: Please comment on the appeals process. What is the impact of the suspension of Brucutu on pellet output?...<br> • Restarting Samarco: How has the Brumadinho tragedy affected negotiations on Samarco? How aligned are Vale and BHP with regard to restart plans, timing, and legal and social sensitivities? |

*Confidential*

**Exhibit 6**

**Excerpts from Analysts' Reports Indicating Analysts Considered the Materialization of Disclosed Risk When Assessing Vale Securities' Prices**

*January 25, 2019 − February 25, 2019*

| Contributor | Date | Prior Target Price | Current Target Price | Target Price Change | Select Excerpts |
|---|---|---|---|---|---|
| BTG Pactual (continued on next page) | 01/27/2019 | $20.00 | $20.00 | no change | Economically, the mine site impacted accounted for less than 2% of Vale's total output, but again there are bigger structural questions ahead and there will be noise from all fronts on liabilities (although some figures may appear groundless, so far). In our view, this incident will end up lifting risk perception surrounding the case and should continue pressuring the stock for a while. The trend of moving to dry processing technologies (not dependent on tailings dams) seems irreversible to us - the good thing is that Vale is already well advanced here. The sell-off on Friday has already wiped out more than US$6bn in equity value for the company (which compares to a provision of R$5.2bn regarding Samarco in its books, for example). So, mathematically, one could assume the damage is already well-priced in. On the other hand, the situation now is very different (human aspect), and we believe the regulatory response will likely be more aggressive. Put simply, the intangible aspect (at this point unquantifiable) of this incident is what concerns us most, and at the end of the day the entire mining industry will need to re-think the current model. We would also expect an energetic response from management on investigating all tailings dams in operation, and we are unsure on what the new production guidance will look like. So, a tough call to bottom-fish at this point. We would wait for a better entry point ahead as the stock should most likely remain pressured until there is more clarity on the outlook |
| | 01/30/2019 | $20.00 | $14.00 | down | Unfortunately, we still believe Vale shares are set to remain de-rated for a while, until confidence is fully restored. There are doubts on several fronts: regulation, fines, future volumes, capex, dividend policy, to name a few. (1) We are cutting total iron ore volumes by 20-25Mt through 2021 (more aggressive than Vale's current "guidance"); (2) slightly increasing our IO curve to US$70/t through 2020 (from US$67/t); (3) slightly reducing quality premiums given the recent erosion; (4) adjusting our capex for the R$5bn decommissioning of upstream dams + US$1/t of additional maintenance capex (for conservative reasons); (5) increasing our discount rate to reflect higher risk premiums and cost of debt; (6) arbitrarily assuming US$5bn outflows for fines/other items; (7) assuming 0 dividends in 2019 and returning to some dividends in 2020 and beyond. Given all the revisions described above, we are making relevant adjustments to our TP and cutting EBITDA estimates over 3-4 years by 15%-20% on average. It's still important to say that there is very little visibility on several parameters in our model, which reduces our conviction materially. |
| | 02/04/2019 | $14.00 | $14.00 | no change | Unfortunately, following the Brumadinho tragedy we believe the trend of multiple rerating and recoupling with Australian peers was interrupted, for a while. With so many doubts on the horizon on key variables: cash outflows, regulation, dividend policy, capital allocation, management - we would expect the stock to trade at relatively discounted levels and at a steep discount to DCF-based models. In other words, we believe this is the same as saying the equity risk premium for Vale is now at a new level and could depress valuations. |

*Confidential*

**Exhibit 6**

**Excerpts from Analysts' Reports Indicating Analysts Considered the Materialization of Disclosed Risk When Assessing Vale Securities' Prices**

*January 25, 2019 – February 25, 2019*

| Contributor | Date | Prior Target Price | Current Target Price | Target Price Change | Select Excerpts |
|---|---|---|---|---|---|
| **BTG Pactual (continued)** | 02/06/2019 | $14.00 | $14.00 | no change | Vale has just informed the market that the SEMAD (State Secretary for Environment and Sustainable Development) has just canceled the provisional operating license of the Laranjeiras tailings dam, which supported the Brucutu mine. This is another twist to the recent suspension of the mining operations at Brucutu, which account for iron ore production of around 30Mtpa (~8% of Vale's total output). At the end of the day, what is at stake here is: the timing of return of the Brucutu mine. Previously, our impression was that this would be a matter of a couple of weeks to resolve; now that call is less likely (although still possible). Unfortunately, doubts on the operational outlook for Vale will remain a key overhang and a question mark given the risk that other assets are at some point halted too. We maintain our view that this remains a low visibility call, and will continue trading decoupled from NPV models and yearly FCF yields (de-rating to persist).<br><br>It's still important to say that there is very little visibility on several parameters in our model, which materially reduces our conviction. We now see the stock at 4.1x EBITDA 19, and would expect the process of de-rating to persist in the interim. We are assuming dividends are suspended in 2019. We rate Vale Buy as we still see upside, even punishing the stock from several angles, but recognize momentum will remain unfavorable and the stock should continue trading at depressed levels (decoupled from fundamentals). |
| | 02/13/2019 | $14.00 | $14.00 | no change | Vale just informed the market that its operations at the Tubarao port complex (its 2nd largest iron terminal / location of several pellet plants) are now returning. Since last Thursday (February 7th), its supply stocking area, pelletizing plants 1-4 and coal port services had been interrupted. Vale has agreed to invest to improve waste water treatment and air quality control – with total investments undisclosed, at this point. We welcome this announcement and continue praising management's "crisis response", which has been notable. These are still times of very limited visibility and Vale remains a "special situation" story from an investment case perspective. While it's virtually impossible to quantify the negative intangible effects from the Brumadinho tragedy, we do see upside in the name from a quantitative approach (DCF-based). Our conviction remains low on the valuation parameters. |

*Confidential*

**Exhibit 6**

**Excerpts from Analysts' Reports Indicating Analysts Considered the Materialization of Disclosed Risk When Assessing Vale Securities' Prices**

*January 25, 2019 – February 25, 2019*

| Contributor | Date | Prior Target Price | Current Target Price | Target Price Change | Select Excerpts |
|---|---|---|---|---|---|
| CFRA Research | 01/28/2019 | $18.00 | $12.00 | down | Although we are confident Vale has the liquidty [*sic*] and balance sheet to deal with the pending liabilities, the bull thesis (i.e. strong free cash flow and enhanced cash returns) has been eliminated and investor appetite for Vale will likely suffer for an extended period of time.<br><br>Our 12-month target price of $12 values Vale at an EV/EBITDA of 4.2x our 2019 EBITDA estimate, a premium to Vale's three-year average forward EV/EBITDA of 6.2x, given the uncertainty and overhang from the Jan. 2019 disaster at a tailings dam in Brumadinho.<br><br>Vale has suspended the dividend and share repurchase program. Court orders have already frozen nearly US$2.9 billion of Vale assets pending damages and the environmental agency fined Vale over US$66 million. Vale had a similar accident at one of its J.V. mines (Samarco), which cost Vale billions of dollars in damages. We liked Vale's attractive cash returns to shareholders and a renewed focus on capital discipline. However, this new tragedy adds a large amount of uncertainty and we expect negative sentiment towards Vale for an extended period of time. |
| | 01/29/2019 | $12.00 | $12.00 | no change | Our 12-month target price of $12 values Vale at an EV/EBITDA of 4.2x our 2019 EBITDA estimate, a premium to Vale's three-year average forward EV/EBITDA of 6.2x, given the uncertainty and overhang from the Jan. 2019 disaster at a tailings dam in Brumadinho. |

*Confidential*

**Exhibit 6**

**Excerpts from Analysts' Reports Indicating Analysts Considered the Materialization of Disclosed Risk When Assessing Vale Securities' Prices**

*January 25, 2019 – February 25, 2019*

| Contributor | Date | Prior Target Price | Current Target Price | Target Price Change | Select Excerpts |
|---|---|---|---|---|---|
| Citi | 01/27/2019 | $16.00 | $16.00 | no change | The financial impact on Vale is likely to be very significant. The environmental impact appears less than Samarco, but the human cost appears far worse. Samarco fines totaled ~R$20bn with NPV of ~$13bn (US$3-4bn). Note: Vale lost ~US$6bn of market cap on Friday. Prosecutors have already frozen some Vale funds and there is talk of re-opening Samarco litigation. We can only guess at this point as to how tough of a line the Brazil authorities take. Dividend payments seem impossible. Vale may face management change. Funds with ESG restrictions may not be able to own the stock. |
| | 01/29/2019 | $16.00 | $16.00 | no change | Vale announced today that the company will end the use of upstream tailings dams in Brazil. This is an important step and appropriate, in our view. Most important, this should improve safety.... Vale is likely getting ahead of future regulation which seems prudent.<br><br>Vale estimates a total cost of R$5bn or US$1.3bn. This is well within our estimated range of $2-10bn of possible incremental capex for Vale to decommission dams, strengthen dams and invest in more dry processing capacity. |
| | 02/04/2019 | $16.00 | $16.00 | no change | [The news that Vale's Brucutu mine has been halted as per the court order] highlights the "tail risk" around Vale / Brazilian iron ore production following Brumadinho. We emphasize that the range of possible outcomes is very wide both in terms of Vale's iron ore production and financial impact. ... We remain at Neutral on Vale.<br><br>Key risks (both positive and negative) for Vale include: 1) changes to taxation and regulatory policies; 2) metals price volatility; and 3) currency volatility. If the impact from the above risks turns out to be greater/less than estimated, the shares could fail to reach our target price or could exceed it. |
| | 02/05/2019 | $16.00 | $16.00 | no change | We remain Neutral rated on Vale. We emphasize that the range of possible outcomes is very wide, both in terms of Vale's iron ore production and financial impact. |
| | 02/07/2019 | $16.00 | $12.00 | down | Following the Brumadihno dam tragedy we lower our iron ore production forecasts for Vale. … Significant uncertainly exists and the range of outcomes remains very wide. For Vale, we reduce iron ore production to 360mt in 2019-20E (from 400mt) on the assumption that the Brucutu mine remains closed. Pellets are reduced to 50mt (from 60mt).<br><br>We reduce our target price on Vale to $12/sh based on new estimates, a lower multiple (5x 2021E) and allowances for Brumadihno costs ($10bn).<br><br>Yet, longer-term Vale may carry structurally higher operating cists and faces very significant non-operating costs associated with Brumadinho (including remediation, capex, and penalties).<br><br>Brumadihno costs may include:<br>• Immediate recovery costs. Likely a several hundred million dollars.<br>• Fines / Long-term recovery costs. These were NPV of US$3-4bn for Samarco (R$20bn paid over time). So far there is no indication of how Brazil authorities are thinking about Brumadinho. The environmental damage appears lower but the human cost is far higher.<br>• Incremental Capex. This includes additional capex on dams and potentially more investment into dry processing. This could range anywhere from zero to many billions (180mt wet processing x $50/t = $9bn, but we have no good basis on which to assess this yet). |
| | 02/08/2019 | $12.00 | $12.00 | no change | We remain Neutral on Vale seeing too much uncertainty and headline risk. Feedback from investors remains bifurcated by geography – foreigners remain cautious, locals looking for value in the stock.<br><br>Our target price on the ADR Ordinary shares of VALE (NYSE ticker: VALE) is US$12.00 based on 5.0x EBITDA on Citi's 2021E assumptions, with a US$10bn allowance for Brumadinho. This multiple is 10-20% below global peers since we expect Vale to trade at a discount given current uncertainties. |

Page 13 of 42

*Confidential*

**Exhibit 6**
**Excerpts from Analysts' Reports Indicating Analysts Considered the Materialization of Disclosed Risk When Assessing Vale Securities' Prices**
*January 25, 2019 – February 25, 2019*

| Contributor | Date | Prior Target Price | Current Target Price | Target Price Change | Select Excerpts |
|---|---|---|---|---|---|
| Credit Suisse (continued on next page) | 01/27/2019 | $18.50 | $18.50 | no change | A recent report published on [*sic*] November 2018 by the National Waters Agency in Brazil (ANA) classified 45 dams as vulnerable to potential breaches. None of these belonged to Vale and the dam that led to this accident was in fact classified as low risk. At this point it does not seem to be the base case that the government will force a suspension of other operations but we acknowledge that the uncertainty on this could remain an important overhang for the stock.<br><br>However, we acknowledge that there are still many unanswered questions and the investigation into the causes and overall impacts will still take many months to be concluded (and potential class actions could follow). This could reduce the propensity of the market to revisit Vale's investment case until more clarity on these factors is obtained. |
| | 01/28/2019 | $18.50 | $18.50 | no change | [This report is a comment and provides only "daily highlights" from the LatAm Metals&Mining and Pulp&Paper sectors.] |
| | 01/29/2019 | $18.50 | $18.50 | no change | This evening Vale announced it will halt operations in Minas Gerais state in order to decommission all of its 10 dams built by the upstream method similar to the one at its Feijao operation which suffered a breach last Friday.<br><br>We consider this a sensible move and an important step to begin to alleviate investor concerns over the risk of a potential accident of this nature happening again in the future. Given Vale's spare capacity of near 50Mt we feel there should be a good amount of flexibility to mitigate production losses and thus offset the negative impact from downwards earnings revisions. The reality is that there should still be many chapters to this story yet and a final resolution still looks far away. Additionally, the likely possibility that negative news flow could continue to appear in the coming weeks could also reduce investor appetite to bottom fish. However, we believe that Vale's price action in the past few days has already been quite harsh with the stock dropping – 22.75% (-USD17.4bn in market cap) and seems to reflect a scenario that is much more negative than what the base case today suggests. |
| | 01/31/2019 | $18.50 | $18.50 | no change | The remaining 10 were in the process of being decommissioned but after the Feijao dam also suffered a breach, Vale took steps to accelerate the decommissioning of its remaining 10 inactive upstream dams in a strategy that will require R$5bn in capex over the next three years.<br><br>It is important to note that Vale should only shut down these operations once the licenses are obtained which means that if all operations are shut down at the same time, it could lead to a curtailment at these sites of up to 40Mtpa of iron ore production (including 11Mtpa of pellets).<br><br>Dry stacking is also currently being analyzed by the company and could be evaluated as a potential strategy to also reduce their exposure to tailings dams as a whole. |

*Confidential*

**Exhibit 6**

**Excerpts from Analysts' Reports Indicating Analysts Considered the Materialization of Disclosed Risk When Assessing Vale Securities' Prices**

*January 25, 2019 − February 25, 2019*

| Contributor | Date | Prior Target Price | Current Target Price | Target Price Change | Select Excerpts |
|---|---|---|---|---|---|
| | 02/04/2019 | $18.50 | $18.50 | no change | This afternoon, Vale informed the market about a decision by the 22nd Civil Court of Belo Horizonte which determines that the company "refrain from disposing tailings or practicing any activity potentially capable of increasing the risks of the Laranjeiras, Menezes II, Capitão do Mato, Dique B, Taquaras, Forquilha I, Forquilha II and Forquilha III dams". [*sic*] According to Vale, the temporary halt of the Laranjeiras dam at the Brucutu mine (Minas Centrais complex) could have an impact of ~30 mtpy.<br><br>[W]e find it too early to price in a full 30Mtpy loss at this point as the final production impact is still unclear given that (i) Vale had ~50Mtpy of spare capacity before the incident; (ii) the original decommissioning plan would reduce output by a maximum of 40Mtpy, meaning that at each point in time the impact could be lower depending on the timing of the licenses needed for decommissioning the dams; and (iii) Vale is appealing the decision, with the possibility of reverting it in the short-term, mitigating potential operational impacts. Vale also informed that it sees no technical basis or risk assessment to justify the decision and will adopt the appropriate legal measures to revert it. |
| | 02/05/2019 | $18.50 | $18.50 | no change | [This report is a comment and provides only "daily highlights" from the LatAm Metals&Mining and Pulp&Paper sectors.] |
| **Credit Suisse (continued on next page)** | 02/06/2019 | $18.50 | $15.50 | down | Tonight Vale announced that the State Secretary for Environment and Sustainable Development (SEMAD) canceled the Provisional Operational Authorization of the Laranjeiras dam, and ordered the suspension of operations at the Jangada mine. The news comes two days after the Brazilian Public Prosecutors Office ordered the temporary stoppage of this very same dam along with seven others. Vale initially believed the decision could be reverted in the short term, as the dam had all the necessary licenses in place and was built using the downstream method. ... We continue to rate Vale Outperform, but our conviction has been reduced. As a result of the changes described in this report, we are cutting our target price to USD15.5/ADR (from USD18.5/ADR). We are still maintaining our Outperform rating on the name (although with much less conviction) as we see a 28% upside from our valuation metrics, while our 2019 EBITDA decreased by 9%, to USD13.3bn. Risks to our investment case are: (i) lower commodity prices; (ii) negative decisions by Brazilian regulatory bodies that could impair further iron ore production; (iii) additional fines related to the Brumadinho dam failure.<br><br>We believe the news once again puts into evidence the overhang generated by Vale's exposure to potentially unfavorable decisions taken by Brazilian regulatory bodies and the Public Prosecutors Office as a response to the disaster. Vale will appeal against this decision but our confidence in the company achieving a reversal of this decision in the short-term has been reduced with the license to operate the dam now cancelled. In addition, there is still much uncertainty surrounding the ultimate financial implications which in our view, reduces the visibility and transparency of Vale's investment thesis going forward. We believe that risk perception on the back of this decision has been heightened begging the question on whether other operations might be impacted in a similar way. Additionally, we now have less comfort with Vale's ability to offset production losses with its near 50Mt of spare capacity and are reflecting this with the changes into our model outlined below.<br><br>Changes to our model: As a consequence of these recent developments we are making several changes to our model as follows: (i) 30Mt cut to iron ore fines production into perpetuity related to the Brucutu stoppage; (ii) 8Mt cut to iron ore fines production for 2019 related to the Jangada and Feijão mines stoppages and then assuming these operations resume in 2020; (iii) 11Mtpy iron ore pellets production cut for 2019-21 and a corresponding 12Mt increase in iron ore fines production related to the change in sales mix brought on by the accelerated decommissioning process; (iv) zero dividend payment for 2019; (v) BRL5bn (USD1.3bn) additional capex for the next three years related to the decommissioning process; (vi) cBRL13bn (USD3.5bn) fine, related to the current portion of Vale's funds that are frozen and fines applied by environmental agencies; (vii) a 4.0x EV/EBITDA 2019 target multiple in our valuation methodology (90% DCF and 10% target multiple), which corresponds to the lowest multiple Vale has traded in the last ten years, as a way to incorporate a higher risk perception associated with potential regulatory changes and additional imposed impacts on production. |

*Confidential*

**Exhibit 6**

**Excerpts from Analysts' Reports Indicating Analysts Considered the Materialization of Disclosed Risk When Assessing Vale Securities' Prices**

*January 25, 2019 – February 25, 2019*

| Contributor | Date | Prior Target Price | Current Target Price | Target Price Change | Select Excerpts |
|---|---|---|---|---|---|
| Credit Suisse (continued) | 02/20/2019 | $15.50 | $15.50 | no change | The decision taken by the ANM today once again puts into evidence that Vale is still very much exposed to additional unfavorable decisions taken by the regulators in regards to its operations. We expect the decision to have no additional impacts for Vargem Grande, as this operation was already stalled for the decommissioning of the nearby dam. However, in our view, for Fabrica there could be additional production losses in addition to the 3Mtpa already disclosed if Vale is not successful in appealing to restart its concentration and pelletizing plants. For the time being, we continue to expect a 38Mt production loss in 2019, but we believe the risk is growing that the ultimate production loss could be larger than this. However, we highlight that higher iron ore prices remain an important offsetting factor for potential volumes loss (if they are sustainable at current levels). We provide a sensitivity of EBITDA to volumes and iron ore prices below.<br><br>Risks to our US$15.5 target price and Outperform rating for Vale are Global currencies, monetary policies, liquidity, and S&D could all impact prices. A structural decline in commodities prices would be against our Outperform rating. Chinese demand surprising on the downside or capacity previously shutdown coming back to the market would trigger a more pronounced recovery in commodities prices. Also, Commodity prices; fuel and energy price; freight rates; inflation in the price of equipment needed to expand operations, FX related risks, environmental and regulatory framework in Brazil. |
| | 02/21/2019 | $15.50 | $15.50 | no change | This morning Vale announced that it signed yesterday (February 20) a preliminary agreement with the Attorney General's Office of Minas Gerais, the Public Prosecution and the Defender's Offices of Minas Gerais, the Federal Government Attorney General's Office, the Federal Public Prosecution Office and the Public Defender's Office as well as with the communities impacted by the breach of Dam I of the Feijao mine. The agreement involves the initiation of indemnification payments in response to the dam breach and the payment of emergency aid to inhabitants of the Brumadinho municipality (perhaps as many as 40,000 by some estimates) and surrounding locations. The payments will be made through monthly installments equivalent to 1 minimum wage per adult, 1/2 minimum wage per teenager and 1/4 minimum wage per child, starting from January 25th, 2019 for a period of one year. In addition, Vale also agreed to settle a fine imposed by Semad (Minas Gerais Agency for Environment and Sustainable Development) in the amount of R$99mn.<br><br>We take this announcement as a key de-risking event for the company as it is an important step forward in reducing uncertainties surrounding the ultimate financial implications for Vale as a result of the Brumadinho tragedy. The amount of entities involved in this agreement and the fact that they derive from both a federal and state level also provide us with a good level of reassurance that the main parties with decision making power in the matter appear to be on board and working towards obtaining a solution -- a positive. It is worth mentioning though that the agreement does not include potential environmental reparation expenses, additional compensation for the direct victims of the tragedy (and their families) and any resulting compensation to other businesses that had their activities impacted. However, we take this as an important development that begins to shed light on one of the key uncertainties surrounding Vale's investment case right now: financial impacts from the tragedy. Therefore, we would expect a positive reaction to the announcement. |

*Confidential*

**Exhibit 6**

**Excerpts from Analysts' Reports Indicating Analysts Considered the Materialization of Disclosed Risk When Assessing Vale Securities' Prices**

*January 25, 2019 – February 25, 2019*

| Contributor | Date | Prior Target Price | Current Target Price | Target Price Change | Select Excerpts |
|---|---|---|---|---|---|
| **Deutsche Bank** | 01/30/2019 | $15.00 | $13.50 | down | In line with our recent publications on iron ore (see here for our most recent note), we have updated our Vale model with the following key assumption revisions: 1. Production of 385mt in 2019 (previous assumption 395mt) and 395mt in 2020 (previously 400mt), but at a lower average iron ore grade overall with a reduced pellet contribution likely, 2. $68/t average price for 62% iron ore in 2019 (+10% from $62/t previously) and $65/t (+10% from $58/t previously) in 2020, 3. Reduced pellet production in 2019/2020 and a push out of the Samarco restart to 2H21, 4. An assumed 18 months of no dividend/capital management. Until the government response becomes clearer, we expect iron ore prices to remain supported on supply disruption risks but we continue to expect iron ore prices to fade through 2019, but now at a higher level than previously projected. Overall our Vale NPV has reduced $7.8bn or $1.51/sh impacted by assumed liabilities, capex for decommissioning of further tailings dams and timing of cashflow. Our PT set at ~1x NPV has decreased from $15.0/sh to $13.5/sh. While this PT shows moderate upside to the current share price, we believe it will take at least 12 months and possibly longer before the market is willing to pay fair value for Vale given the overhang from regulatory risk/uncertainty.<br><br>The sizeable production cut (40mt/yr) figure announced by Vale, equivalent to our entire supply growth for 2019, triggered an initial surge in iron ore prices. On closer inspection, the details of the plan suggest this is an overreaction with limited initial volume losses. Nonetheless, we increase our iron ore 62% fines forecast for 2019 ($68/t) and 2020 ($65/t) due primarily to an elevated supply-disruption risk premium in the post-Feijao dam disaster environment. We expect iron ore prices to moderate, but at a higher level than previously projected. Policy risks to Vale and other Brazilian operations still exist. Whilst the realization that Vale's plan to keep its guidance on fines close to 400Mt will offer a negative jolt in the context of the annual 40Mt production cut figure, we equally think it is wrong to assume this ends the risk of supply losses. Vale still faces the risk of operational penalties from the authorities and its plan not being accepted. More broadly, a more challenging environment for licensing in Brazil is inevitable.<br><br>Samarco timing: We believe that there will now be higher scrutiny on Samarco and there could be risk to the 2020 start up in our view.<br><br>NPV/PT impact: Incorporating the above changes, our NPV has reduced $7.8bn or $1.51/sh. Our PT set at ~1x NPV has decreased from $15.0/sh to $13.5/sh. While this PT shows moderate upside to the current share price, we believe it will take at least 12 months and possibly longer before the market is willing to pay fair value for Vale given overhang from regulatory risk/uncertainty. We maintain a Hold and do not see favorable risk/reward at this point in time. |
| | 02/05/2019 | $13.50 | $13.50 | no change | We maintain a Hold on Vale - the company is set to benefit from higher iron ore prices offsetting production outages (scenarios below) but the overall liability related to the Feijao tailings failure and the final regulatory response related to Vale's production remain areas of uncertainty. At this stage we have not further revised our Vale forecasts to include any impact from Brucutu as we wait to see the likely outage time period (we currently assume total production of 385mt in 2019 vs ~400mt last guidance). At the current elevated iron ore price, we are also watching to see for a production response from other producing regions e.g. India. To put volume vs price in context for Vale, if the company was to only produce 360mt in 2019 vs ~400mt existing guidance, based on a calculated ~$48/t EBITDA margin before the recent iron ore price reaction, we calculate a ~$5.3/t (vs the $11.3/t appreciation in the iron ore price over the time frame) higher iron ore price is required in 2019 (ignoring liabilities, closure/reopen costs and decommissioning impacts). |

**Exhibit 6**

**Excerpts from Analysts' Reports Indicating Analysts Considered the Materialization of Disclosed Risk When Assessing Vale Securities' Prices**

*January 25, 2019 – February 25, 2019*

| Contributor | Date | Prior Target Price | Current Target Price | Target Price Change | Select Excerpts |
|---|---|---|---|---|---|
| HSBC (continued on next page) | 01/27/2019 | $18.00 | $14.50 | down | The collapsed dam had a capacity of 12m m³ of tailings compared with 50m m³ at Samarco. The 37 deaths, which is likely to increase given the several hundred people still unaccounted for, exceed the 17 related to Samarco. The liability for the Samarco accident totaled USD3.2bn while the Brazilian court system has frozen BRL11bn so far from Vale over the weekend for this incident.<br><br>A small mine but a huge impact: Purely from a production standpoint, the direct impact is likely to be negligible for the iron ore market and for Vale, as the Feijao mine produced 7.8mt in 2017, just 2% of total production at Vale. But the total liability will likely be at least as large as the USD3.2bn Samarco liability given the more significant death toll and because this is the second dam collapse in three years related to Vale while this mine has been inspected and certified by Vale, third-party inspection companies and the Brazilian government in the past several months. We are also concerned about secondary effects such as a halt in all of Vale's Brazilian iron ore operations that produce tailings, to enable additional inspections (predominantly the Southern and SE systems, which produced 195mt in 2017), revocation of operating licenses, criminal prosecution and lawsuits in Brazil and the US.<br><br>We are downgrading Vale to Hold as we expect the repercussions of the collapse to affect operations with potential mine closures, lawsuits, remediation charges and other liabilities. We assume USD3.5bn liability from the accident, derived using Samarco's liability, though the actual amount may differ substantially... and could take years to recover. Our target price falls to USD14.50 (from USD18.00). It implies 2.4% downside, and we downgrade Vale to Hold (from Buy).<br><br>The share price move of -8.1% on 25 January 2019 is in line with its movement in 2015, though from the peak on Friday the drop is closer to 11.6%, implying a negative USD9.2bn impact on market cap. While the USD9.2bn is likely more than the cost of the environmental liability of the dam collapse, implying the market is overly punishing the company from a financial standpoint, we believe that the indirect costs, such as lawsuits from affected individuals, investors and lost production from halted/closed operations, while unknown, could be substantial. |
| | 01/29/2019 | $14.50 | $13.25 | down | Potential for contagion: Following the disaster at Vale, we believe that ESG risk has risen for exposure to iron ore production based in Brazil. For BHP and Vale this tailings dam failure may negatively impact negotiations over outstanding issues at Samarco, in our view. BHP and VALE established the Renova clean-up and compensation fund and settled a USD5.4bn civil claim with local authorities last year. However, a restart of operations has been continuously delayed due to license issues. Given the latest events, a restart seems unlikely in the foreseeable future.<br><br>According to various media reports (Reuters, Bloomberg, 28 January), the mood in Brazil has soured towards Vale, given the extent of the disaster to date. The direct cost of dealing with this tragedy and associated turn in sentiment are very real issues for Vale to grapple with. There is also potential for secondary effects such as a halt in all of Vale's Brazilian iron ore operations that produce tailings. The Brazilian authorities will likely engage in numerous, detailed inspections, mainly in the Southern and SE systems which predominantly use the wet beneficiation process, and which produced 195mt in 2017. Should these occur, we would expect a further rally in the iron ore price, as this production represents c14% of total 2019e iron ore supply. It is likely that the market would favour [*sic*] stocks with limited or no Brazilian iron ore exposure (such as Rio Tinto) under this scenario, which supports our RIO over VALE call amongst the majors.<br><br>This TP includes an assumed USD8bn liability from the accident, derived using Samarco's liability and adjusted for expected additional liabilities associated with the Feijao dam failure, though this is our best guess at the moment, and the actual amount may differ substantially. We maintain a Hold rating on Vale as we expect the fallout from this accident to act as a significant headwind in the coming months, with potential impact on production, lawsuits, remediation charges and other unknown liabilities. |

*Confidential*

**Exhibit 6**

**Excerpts from Analysts' Reports Indicating Analysts Considered the Materialization of Disclosed Risk When Assessing Vale Securities' Prices**

*January 25, 2019 – February 25, 2019*

| Contributor | Date | Prior Target Price | Current Target Price | Target Price Change | Select Excerpts |
|---|---|---|---|---|---|
| HSBC (continued) | 01/31/2019 | $13.25 | $13.25 | no change | We still believe in the company's overall strategy and value of its premium products, but the increased uncertainty on a variety of issues post this accident keeps us cautious for now.<br><br>This TP includes an assumed USD8bn liability from the accident, derived using Samarco's liability and adjusted for expected additional liabilities associated with the Feijão dam failure; we note that this is our best guess at the moment, and the actual amount may differ substantially. We maintain our Hold rating on Vale as we expect the fallout from this accident to act as a significant headwind in the coming months, with potential impact on production, lawsuits, remediation charges and other unknown liabilities. |
| | 02/01/2019 | $13.25 | $13.25 | no change | [This report is a disclosure correction to previous reports.] |
| | 02/07/2019 | $13.25 | $13.25 | no change | Negative headlines continue to swirl: According to a Wall Street Journal article (6 February 2019), TUV SUD, the firm responsible for the Brumadinho dam inspection, informed Vale in a report that the dam would be at a high risk of failure if the water was not properly drained. The 128-page report, dated September 2018, also pointed to faulty monitoring systems aimed at water level control, as well as a number of drainage tubes clogged by vegetation, potentially causing water to build up inside the dam, which can cause liquefaction, where the tailings (which are used as part of the dam) turn almost into a fluid. While TUV SUD ultimately certified the dam as stable, independent mining experts cited by the Journal reported that the signs were enough to deny a stability report, particularly given that there was little information known about the dam, such as its foundation, before Vale bought it in 2001.<br><br>A third article (Guardian, 06 February 2019) cites mine worker testimonies pointing to water leaking through a crack in July 2018, which needed to be repaired, as well as a general perception of imminent collapse.<br><br>A very adverse development, if confirmed: The flow of information has been extremely negative since the accident, as expected. While we do not know the authenticity of the accusations and media reports, the ramifications, if confirmed, could be much worse than what we have estimated, and could imply increased lawsuits and liabilities, more arbitrary mine stoppages and increased pressure for a management shake-up.<br><br>As the uncertainty over Vale's liability related to the Brumadinho tailings dam accident continues to increase, we expect the shares to decouple from their fundamentals until more clarity is attained.<br><br>We remain cautious due to the increased uncertainty on a variety of issues, including the potential liability for the company. ... In our view, negative headlines will continue in the short term, creating headwinds and decoupling the stock from its fundamentals. |

*Confidential*

**Exhibit 6**

**Excerpts from Analysts' Reports Indicating Analysts Considered the Materialization of Disclosed Risk When Assessing Vale Securities' Prices**

*January 25, 2019 – February 25, 2019*

| Contributor | Date | Prior Target Price | Current Target Price | Target Price Change | Select Excerpts |
|---|---|---|---|---|---|
| Itaú BBA (continued on next page) | 01/27/2019 | $17.00 | $17.00 | no change | Negative news flow could weigh down Vale's short-term price performance. We acknowledge that this tragic accident could weigh down Vale's short-term share price performance, given that: i) authorities may decide to scrutinize the structural condition of other tailing dams, temporarily halting production at other mines; ii) Vale will have to offer compensation for the potential damage caused by the accident; iii) this event might delay the restarting of Samarco's operations (previously expected for 2020), if authorities decide to review the security standards adopted for wet-processing of mine waste in Brazil; iv) obtaining operating and environmental licenses for mining operations might become more difficult; and v) rebuilding the tailing dam will require capex. |
| | 01/28/2019 | | N/A | | [This is a Credit Research report and does not provide a target price.]<br><br>Asset freeze requests currently amount to BRL 12.6 billion (USD ~3.3 billion). As of 3Q18, Vale had a cash position of BRL 24 billion. Fines levied for environmental damage have reached BRL 450 million.<br><br>According to Broadcast, General Augusto Heleno (head of the Institutional Security Office of Brazil) stated that the licensing protocols for tailing dams must be changed and urged that all dams potentially at risk undergo a new series of inspections.<br><br>Jan. 26: S&P placed Vale's BBB- rating on CreditWatch for possible downgrade in view of the contingency risks (operational and financial) associated with the accident. The agency mentioned that Vale could be downgraded by one or more notches depending on the extent of the impact. We are waiting for announcements by Moody's and Fitch regarding any changes to their respective Baa3 and BBB+ ratings. |
| | 01/29/2019 | $17.00 | $15.50 | down | Our model incorporates BRL 17 billion in fines and environmental compensation and a 0.2x EV/EBITDA multiple de-rating following the accident ... We maintain our outperform recommendation on Vale.<br><br>[W]e separate the negative impact from the Brumadinho dam accident for Vale into three main areas: i) the compensation for lost lives, damage repairs and environmental remediation actions; ii) a multiple de-rating; and iii) regulatory changes forcing the end of wet-processing operations in Brazil (not considered in our base case). For the compensation, our base case assumes that total fines and compensation for the accident would reach BRL 17 billion, more than the total expected compensation for the Samarco accident in 2015 (BRL 15 billion), despite the fact that the mine waste volume spillover in that case was four times larger than at Brumadinho. We are also incorporating a 0.2x EV/EBITDA de-rating for Vale to account for lower earnings predictability, the risk of management change and a reduced investor base, as ESG and dividend investors are unlikely to buy the stock in the short term.<br><br>Moreover, Vale could lose nearly USD 5 billion/year if all wet-processing plants (160 million tons) were forced to shut down, and it could take 2-3 years to switch production to dry-processing given the license processing, capex and ramp-up periods. |
| | 01/30/2019 | | N/A | | [This is a Credit Research report and does not provide a target price.]<br><br>It is too early to say whether this will be enough to prevent a potential loss of investment-grade status (as suggested by the recent actions by the ratings agencies), or whether ESG-driven investors would refrain from excluding the company from their investable universe.<br><br>Despite the weak recent performance of the bonds across the VALEBZ curve (we would not rule out some positive reaction to the announced plan in today's trading), we prefer to stay on the sidelines for now due to the many lingering unknowns in the story. These include: i) risk of investment-grade loss; ii) the outcome of the federal police probe into the causes for the dam burst; iii) the lengthy and sometimes convoluted judicial discussions to determine compensations and fines to be levied on the company; iv) potential class actions filed by the ADR investors; v) the change in sector regulations and industry safety protocols that will likely be proposed by the government; vi) potential scrutiny by the SEC or the DOJ, in addition to the ongoing investigations by the Brazilian authorities; vii) a somewhat hardened stance by several branches of the federal and state government towards the company, expressed in their recent statements to the press and stemming from their (genuine) concern about preventing future accidents; and viii) increased headline noise over the existing dams that potentially threaten the inhabitants and authorities in at-risk areas. |

*Confidential*

**Exhibit 6**

**Excerpts from Analysts' Reports Indicating Analysts Considered the Materialization of Disclosed Risk When Assessing Vale Securities' Prices**

*January 25, 2019 – February 25, 2019*

| Contributor | Date | Prior Target Price | Current Target Price | Target Price Change | Select Excerpts |
|---|---|---|---|---|---|
| **Itaú BBA (continued on next page)** | 01/30/2019 | $15.50 | $15.50 | no change | The strategy to speed up the decommissioning of inactive upstream tailing dams will likely have a limited impact on Vale's EBITDA, as the production loss in the Southern system could be offset by marginal increases in capacity in the Northern and Southeastern systems. Indeed, Vale's EBITDA could decline only slightly, reflecting: i) a small decline in sales volumes; ii) a worse sales mix, with reduced pellet production; and iii) higher costs, as production could be increased at higher-cost/lower-quality mines that were previously running below capacity. On FCF, we could see a marginal decline in EBITDA and increased investments (BRL 5 billion over three years, likely concentrated in the short term). A potential increase in iron ore and (particularly) pellet prices could be a mitigating factor for this marginal reduction in EBITDA and FCF. Lastly, the impact of the production cuts will only be felt after Vale has obtained environmental licenses for the dams' decommissioning. |
| | 02/05/2019 | | N/A | | [This is a Credit Research report and does not provide a target price.]<br><br>Vale announced that it has decided to accelerate the temporary suspension of production at its Vargem Grande Complex concentration plants (~13 million tons/year of iron ore out of the previously announced estimated total of 40 million tons/year).<br><br>On January 25, Vale reported a tragic accident in the city of Brumadinho, Minas Gerais, where a breach in an inactive tailing dam at the company's Feijão mine spilled 12-13 million m³ of mine waste. For comparison, 55 million m³ of waste was spilled in the 2015 Samarco accident.<br><br>Vale reported in a material fact that the Court of Minas Gerais (22nd Civil Court of Belo Horizonte) ordered that, among other measures, the company must suspend the disposal of tailings as well as any other activities that could increase the failure risk of the Laranjeiras, Menezes II, Capitão do Mato, Dique B, Taquaras, Forquilha I, Forquilha II and Forquilha III dams, as requested by the Public Prosecutor's Office of Minas Gerais (MPMG).<br><br>Three of the dams included in the court order (Forquilha I, Forquilha II and Forquilha III) were already inactive and are part of the decommissioning plan announced on January 29, as they were built by the upstream method. |
| | 02/06/2019 | $15.50 | $15.50 | no change | Recent developments in our view significantly increase the risk of other mining operations being forced to shut down by a court decision without technical or legal basis, leading to a reduction in Vale's iron ore shipments over the next few years. As noted in our previous report, "The Aftermath of Brumadinho – Our Base-Case Scenario," the forced shutdown of operations is the largest risk for Vale, followed by fines/compensations for the accident and a potential multiple de-rating. According to our calculations, if Vale's iron ore sales decrease to 320 million tons (from our base case of 390 million tons), and assuming a 10% increase in iron ore production cash cost per ton, Vale's 2019 EBITDA would drop to USD 13.2 billion (from USD 16.8 billion originally). That said, we note that the negative impact of lower volumes could be offset by higher iron ore prices of USD 76/ton, vs. our conservative projection of USD 64/ton. |

*Confidential*

**Exhibit 6**

**Excerpts from Analysts' Reports Indicating Analysts Considered the Materialization of Disclosed Risk When Assessing Vale Securities' Prices**

*January 25, 2019 − February 25, 2019*

| Contributor | Date | Prior Target Price | Current Target Price | Target Price Change | Select Excerpts |
|---|---|---|---|---|---|
| Itaú BBA (continued) | 02/15/2019 | | N/A | | [This report provides a guide to the Dam 1 collapse and does not provide a target price.]<br><br>However, the Vale-Brumadinho case caused significantly greater repercussions [than Samarco] (as shown on the right), given: i) the elevated number of casualties (325 lives); ii) the recurring nature of this type of accident for Vale; and iii) the initial sense that the mining industry does not have full control of the dams it operates (the Brumadinho dam collapsed despite being inactive and not having received any tailings since 2016). In our view, these factors make it increasingly difficult to assess the financial impact of the accident on Vale.<br><br>In our view, the main risks for Vale following the Brumadinho dam burst can be summarized in three main topics: operational risk, fines/compensation and reputational risk. In our view, there is little clarity on how these risks will evolve.<br><br>The main risk for Vale, in our view, is the forced shutdown of mining operations by a court decision without a legal/technical basis, similar to events surrounding the Brucutu mine.<br><br>Vale's multiples could be de-rated, as the accident may reduce FCF predictability in the short term and force a change of Vale's senior management team, which is well regarded by the market. Moreover, Vale could also suffer from a reduction of its potential shareholder base (ESG and dividend investors) – for example, Vale has been removed from the ISE (Corporate Sustainability Index) portfolio in B3, while Robeco has blacklisted Vale due to ethical concerns.<br><br>Iron ore production run rate has fallen by nearly 50 million tons per year, so far. First, Vale announced a fast-track decommissioning program for all ten remaining upstream tailing dams. Once fully implemented, this program will reduce Vale's production by 40 million tons, which it may be able to offset by restarting mines in the Southeastern system, increasing third party purchases and inventory reduction. Following the accident, Vale has shut down operations at the Feijão (8 million tons) and Vargem Grande mines (13 million tons). All considered, we believe that the net impact may be only 20 million tons per year. Additionally, SEMAD (Environmental Secretary of the State of Minas Gerais) cancelled the licenses of eight tailing dams, which forced the shutdown of the Brucutu mine (30 million tons).<br><br>A total of BRL 12.6 billion in assets have been frozen – currently, BRL 12.6 billion (USD 3.3 billion) of Vale's assets have been frozen by Brazilian courts following the dam burst. The company was also summoned to make a judicial deposit of BRL 7.4 billion in compliance with two orders from the Public Prosecutor's Office of the State of Minas Gerais. Fines reached BRL 450million. This compared to BRL 12-20 billion in compensation and fines that Samarco will pay for the accident in 2015 (final compensation has yet to be defined).<br><br>The stabilization of iron ore production volumes is key for us to assess the financial impact on Vale. In addition to its efforts to mitigate the social impact of the accident, Vale is focusing on stabilizing its iron ore production. Vale's diversified production base and large number of mines and logistics systems provide important flexibility to partially compensate targeted production losses. This is an important competitive advantage over other mining companies such as Samarco, CSN and Gerdau, among others.<br><br>Although Preliminary, We Believe the Stock Reaction Seems Excessive. Vale has lost BRL 55 billion (~USD 15 billion) in market cap since the Brumadinho dam accident on January 25, as investors priced in the negative impact of fines/compensation arising from the dam collapse, potential impacts on ongoing operations and a multiple de-rating following the decrease in visibility of short-term results Additionally, Vale's bond prices also dropped 7 pp and its most liquid bond yields widened from 4.5% to 5.5% in USD. Vale's bonds were trading at a premium to investment grade companies in Brazil, but are now trading in line with companies that have investment grade status from only one agency. After the dam collapse, Vale's bond curve widened by ~60 bps and is now trading relatively flat to the average of the investment grade names in Brazil, most of which have only been granted this status by S&P and Fitch. |

Page 22 of 42

*Confidential*

**Exhibit 6**

**Excerpts from Analysts' Reports Indicating Analysts Considered the Materialization of Disclosed Risk When Assessing Vale Securities' Prices**

*January 25, 2019 – February 25, 2019*

| Contributor | Date | Prior Target Price | Current Target Price | Target Price Change | Select Excerpts |
|---|---|---|---|---|---|
| Jefferies | 01/25/2019 | $18.00 | $18.00 | no change | The full extent of the damage and the potential impact on iron ore markets are not clear. While we hope the reports of fatalities are inaccurate, we do believe this is a material negative for Vale and a positive for other iron ore miners due to upside risk to prices resulting from less supply. |
|  | 01/27/2019 | $18.00 | $14.00 | down | We have reduced our iron ore production forecasts for Vale by a somewhat arbitrary 10mtpa following the tailings dam tragedy of this past Friday as supply from Vale's >27mtpa Paraopeba Complex in its Southern System will likely be significantly affected by the disaster. Stringent safety inspections could affect production from other mines in Brazil as well. The overall impact of the dam failure is nearly impossible to quantify for now and rescue operations are the clear priority. Supply disruptions resulting from this incident will very likely tighten the iron ore market, which is already relatively strong.<br><br>Vale has been one of our preferred stocks in the global mining sector, and its shares remain very inexpensive. However, the news from last Friday is a negative to the Vale investment case and likely to be an overhang on the Vale share price for an extended period. We therefore downgrade Vale from Buy to Hold and lower our target price for Vale shares from $18/sh to $14/sh.<br><br>While the environmental impact of this incident is expected to be much lower than the impact of Samarco, the human impact may be worse, unfortunately<br><br>The financial impact of Friday's dam failure is impossible to quantify at present, but it is likely to be significant. We would also expect some production disruptions and more stringent safety inspections in the Brazilian iron ore industry. We have reduced our production forecasts for the Paraopeba complex by 10mtpa so that our model incorporates some supply disruption from this incident, but it will take time before we know the true impact on supply and the total cost to Vale. |
|  | 01/29/2019 | $14.00 | $14.00 | no change | Vale will temporarily suspend production from mines in its Vargem Grande complex and its Paraopebas complex while it is decommissioning these dams. It will also temporarily stop production at its Fabrica and Vargem Grande pellet plants. The production stoppages will end when the project is complete. In the meantime, Vale expects to offset the 40 million tonnes per year of lost production from these operations with increased production from its other mines. We consider this news to be neutral to the iron ore price. We believe the decommissioning of these dams is a prudent move by Vale; reducing the risk of another dam collapse is well worth the $1.3bn Vale will spend to decommission these structures. |
|  | 02/04/2019 | $14.00 | $14.00 | no change | Media reports indicate that Vale has been ordered by a Brazilian court to suspend production at its 30mtpa Brucutu mine in Minas Gerais. The company has not yet commented on this news. If it is accurate, this would be an incremental supply shock to the iron ore market and would support prices at higher than expected levels.<br><br>A closure of Brucutu would be a negative for Vale and a positive for other iron ore miners, in our view. |

*Confidential*

**Exhibit 6**
**Excerpts from Analysts' Reports Indicating Analysts Considered the Materialization of Disclosed Risk When Assessing Vale Securities' Prices**
*January 25, 2019 – February 25, 2019*

| Contributor | Date | Prior Target Price | Current Target Price | Target Price Change | Select Excerpts |
|---|---|---|---|---|---|
| JP Morgan (continued on next page) | 01/25/2019 | $20.00 | $20.00 | no change | Mine production of 7.8mt in '17A. The Feijão mine produced 7.8mt of iron ore in 2017 (~2% of total) and is part of a larger complex in the Southern System (responsible for ~27% of total production that year). The mine reportedly used two dams to manage the waste of iron ore production, one of which collapsed earlier today. The causes of the accident have not been disclosed yet. The environmental organization Ibama reported that the tailings of Feijão totaled 1m m$^3$.<br><br>Accident likely to result in higher compliance from authorities. The tragedy is likely to generate higher scrutiny over the regulatory framework of the mining industry, especially over the usage of dams. The company produced ~60% of its iron ore through operations that rely on dams (as of 2016) and had already been shifting new output into dry processing (aiming 70% of dry production by 2025). The accident could lead to further delays in granting new licenses, but also lifting existing permits.<br><br>Financial fines will also likely be imposed. In the case of Samarco, an initial settlement totaled R$11-13 billion, but we estimate that it has since been lifted to as much as ~R$20 billion[.] |
| | 01/27/2019 | $20.00 | $20.00 | no change | Production impacts should be small as Feijão mine produced 7.8Mt of iron ore in 2017 (~2% of total production). The company is expected to be impacted by fines and higher scrutiny over current operations and future project licensing.<br><br>The fire department has confirmed 37 casualties so far (vs 19 in Mariana) and hundreds are still missing.<br><br>[T]he bigger impacts should come from higher scrutiny over the mining industry regulatory framework, likely resulting in higher compliance for ongoing operations and future permits.<br><br>On Saturday, the national environmental agency (IBAMA) fined Vale R$250mn (~USD66mn) for 5 infraction notices amounting to R$50mn each. The Minas Gerais Environmental Agency (Semad) also fined the company R$99.1mn. In addition, the Ministry of Mines and Energy (MME) has ordered the suspension of operations at the mine site and prosecutors have ordered the freezing of R$11bn from Vale's accounts for damage repairs. Additional costs are expected to come from reimbursements to local communities, additional fines, and possible security-related lawsuits from investors. In case of Samarco, the lawsuits filed were settled in a deal reached with the government, public institutions and eventually the Federal Prosecution Service (MPF). The initial compensation totaled R$11-13bn, but we estimate that it has since been lifted to as much as ~R$20bn. However, the financial impacts of Brumadinho will potentially be smaller given the size of the tailings disposed. |
| | 01/28/2019 | $20.00 | $20.00 | no change | Since news of the accident broke, Vale lost ~$19B in value. While uncertainties still mount, the number one question that we are getting from investors is where is a floor for Vale's share price? In this report we try to build and quantify a worst case scenario where all wet processing would be shut down. We don't believe in this scenario as it seems extremely harsh.<br><br>We also acknowledge that uncertainties are still quite high and that newsflow may still be negative for Vale. However, our analysis suggests that market reaction was already quite harsh. |

Page 24 of 42

**Exhibit 6**

**Excerpts from Analysts' Reports Indicating Analysts Considered the Materialization of Disclosed Risk When Assessing Vale Securities' Prices**

*January 25, 2019 – February 25, 2019*

| Contributor | Date | Prior Target Price | Current Target Price | Target Price Change | Select Excerpts |
|---|---|---|---|---|---|
| **JP Morgan (continued on next page)** | 01/29/2019 | $20.00 | $16.50 | down | Only a few days after the Brumadinho accident, Vale's management has announced an aggressive plan to fix the risks that may still exist at other dams in Vale's portfolio. The company will immediately decommission 10 upstream dams that remain in its systems – the same type as of Fundão and Brumadinho – which are deemed riskier. The process will call for R$5B capex in a 3 year period and will force Vale to shut down up to 40Mtpy of ore capacity and 11Mtpy of pellets. However, Vale expects to be able to partially compensate for the lost ore volumes (not pellets) with production from other mines. The announcement addresses key uncertainties surrounding Vale – potential lost volumes, required capex to adjust operations and timing of adjustment. We see this as quite supportive and expect a positive reaction to the announcement. <br><br> Uncertainties are still around… but management is starting to address them. Investors have asked us many questions about Vale, many still unanswered. However, the announcement by Vale's management starts to address some of them. Now investors have a framework to think about volumes, required capex and timing of necessary adjustments. In our view, this is very positive news. We still need to understand the reaction from authorities and other constituencies for this plan. And of course, the issue of potential clean up, compensation and penalties is still not defined. Vale also announced today that a class action was initiated in NY. There are no details but this is an example of the uncertainties that are still around. <br><br> [W]e increase our equity risk premium by 1.5% to incorporate higher risks and uncertainties related to the Brumadinho incident. <br><br> We believe the stock price after the Brumadinho accident has priced in a very harsh worst case scenario. Finally, Vale shares remain cheaper on average vs. peers. <br><br> Consequences from the accident at Brumadinho dam, such as fines and penalties, may also be material. |

Page 25 of 42

*Confidential*

**Exhibit 6**

**Excerpts from Analysts' Reports Indicating Analysts Considered the Materialization of Disclosed Risk When Assessing Vale Securities' Prices**

*January 25, 2019 – February 25, 2019*

| Contributor | Date | Prior Target Price | Current Target Price | Target Price Change | Select Excerpts |
|---|---|---|---|---|---|
| JP Morgan (continued on next page) | 01/30/2019 | $16.50 | $16.50 | no change | Effect on volumes expected to be small. Decommissioning calls for no interference of mining activities around the dams. Therefore, nine mines in the complexes of Vargem Grande and Paraopebas will be temporarily shut down. Together they represent 40Mtpy of ore capacity. Two pellet plants – Fábrica and Vargem Grande – will also be shut down during the decommissioning. While the pellet production can't be compensated by other operations, Vale expects to be able to partially compensate for the lost ore volumes with production from other mines. We assume 75% of the lost fines will be compensated by other mines. We also model deterioration in production mix (fewer pellets) and lower realized price or higher costs from the mines that will replace the ones being shut down. |
| | 01/31/2019 | $16.50 | $16.50 | no change | Investors have been largely focused on the financial impacts on Vale. After easing the woes regarding operational constraints with a proactive action plan..., the attention has shifted to the contingencies. We believe that several headlines related to potential liabilities will continue to come in the next weeks and months, but is still early to assess what could be the final tally of compensation and reparation needs, in addition to the financial fines to be imposed on the company.<br><br>Vale had been vocal about the benefits of dry stacking and making moves in that direction. The company had guided that it planned on having 70% of its production using dry processing by 2025 (from ~40% in 2016), partially due to the ramp-up in Carajás, but also with the conversion of existing operations.<br><br>We believe the stock price after the Brumadinho accident has priced in a very harsh worst case scenario. Finally, Vale shares remain cheaper on average vs. peers. |
| | 02/04/2019 | $16.50 | $16.50 | no change | However, the Laranjeiras dam in the Brucutu complex is an active downstream tailings dam, and the civil action forces the operations to shut down. The impact of the production stoppage is ~30Mtpa of iron ore. According to Vale, there is no technical basis nor risk assessment to justify the decision to suspend the mine's production as operations were complaint [*sic*] with regulatory standards, and the company should appeal to the decision. |
| | 02/06/2019 | $16.50 | $17.00 | up | Today Vale's shares were down 4.9% (IBOV -3.7%), driven among other things by more negative headlines. The Minas Gerais environmental authorities cancelled the license of the Laranjeiras dam.... This dam is critical for the operations of Brucutu, a large 30Mtpy mine in Vale's Minas Centrais system. We decided to adjust our model again, becoming even more conservative on volumes.<br><br>Right now, Vale has already stopped 51.5Mtpy of capacity. The company has the ability to compensate for some of these volumes, but the final number is uncertain.<br><br>The iron ore markets are watching the developments at Vale very closely. Iron ore prices have spiked ~15% since Brumadinho's accident in an amazing $11/t run.<br><br>Vale is likely to be a bumpy ride as we believe that short-term stock prices will still be affected by news flow. However, given the harsh stock price reaction since the crisis started, we continue to see upside in Vale's shares. |

*Confidential*

**Exhibit 6**

**Excerpts from Analysts' Reports Indicating Analysts Considered the Materialization of Disclosed Risk When Assessing Vale Securities' Prices**

*January 25, 2019 – February 25, 2019*

| Contributor | Date | Prior Target Price | Current Target Price | Target Price Change | Select Excerpts |
|---|---|---|---|---|---|
| | 02/06/2019 | | N/A | | [This report covers the iron ore and steel market and does not provide a target price.]<br><br>Vale (covered by J.P. Morgan analyst Rodolfo Angele) has declared force majeure on some of its iron ore and pellet shipments following the Brucutu mine suspension. According to Rodolfo, the production stoppage has a 30MT impact, though Vale has not disclosed the volume or duration of force majeure.<br><br>Court's decision to suspend Brucutu mine led to force majeure: Vale in its exchange filing highlighted that the court order temporarily suspending the company's Brucutu mines had led to the force majeure declaration. |
| JP Morgan (continued) | 02/06/2019 | | N/A | | [This report is an Alert and does not provide a target price.]<br><br>Today another negative headline for Vale hit the tape at the end of the day. The Minas Gerais' State environmental organization (SEMAD) canceled the license that allowed Vale to operate the Laranjeiras Dam, in the Brucutu mining complex. This is the same dam that was ordered to be temporarily shut by the Minas Gerais Public Prosecution Office on Monday ... (Temporary Halt of Brucutu Mine). We see this as a negative development for two main reasons: (a) while Brucutu/Laranjeiras is already shut down, the new measure means one additional hurdle that has to be bridged before Vale can resume operations at the complex; (b) this also increases concerns that the effect on Vale's overall volumes could be stronger in the short term. Vale can appeal this decision.<br><br>SEMAD also requested the suspension of Jangada mine. This mine was already shut down as it was part of Feijão complex. Jangada provided run of mine to the Feijão operation and it was part of the 8.5Mtpy of capacity that was taken offline because of the accident. So this suspension is not relevant/material for Vale.<br><br>The company can appeal the decision. However, the resumption of Brucutu now needs to clear two hurdles: (a) the reversal of the preliminary ruling by the Public Prosecution Office and (b) the granting of the license of the Laranjeiras dam. |
| | 02/20/2019 | $17.00 | $17.00 | no change | Vale announced that the Brazilian National Mining Agency (ANM) determined the immediate shut down of the Fabrica and Vargem Grande mine complexes. Both operations were already part of the accelerated decommissioning plan of Vale and are part of the 40Mtpy number disclosed by the company as potential maximum lost volumes.<br><br>We estimate maximum net potential effect of 15.5Mt. Both Fabrica and Vargem Grande were already operating below full capacity. Vargem Grande had 13Mt already proactively shut down by Vale and Fabrica another 3M. Adding these to the 8.5Mt from Feijao and Jangada that were directly affected by the accident, we estimate that today, 24.5Mt out of the 40M are already shut down. The ANM determination may bring that number to 40M – we will seek further clarification with Vale tomorrow. So this may mean an additional effect of another 15.5Mt. Vale also expects to potentially revert this decision with ANM. |

*Confidential*

**Exhibit 6**
**Excerpts from Analysts' Reports Indicating Analysts Considered the Materialization of Disclosed Risk When Assessing Vale Securities' Prices**
*January 25, 2019 – February 25, 2019*

| Contributor | Date | Prior Target Price | Current Target Price | Target Price Change | Select Excerpts |
|---|---|---|---|---|---|
| **Macquarie** | 01/28/2019 | $15.40 | $12.10 | down | The direct impact on Vale's production (and earnings) is likely to be limited. The Barragem I dam was being decommissioned and the Paraopeba complex of which the Feijão mine forms part of only contributed ~7% of the company's 2018 iron ore output. However, all of Vale's tailings dams will be under increased scrutiny, and there is a potential for some suspensions while technical inspections take place. Furthermore, we think Vale may ease back on some of the complexes which rely heavily on wet processing, as a means to conserve the life of their existing tailings dam capacity. We have cut our production forecasts by ~18Mt in 2019 and by ~10Mt over the medium term.<br><br>However, given that this is the second dam burst linked to Vale, we would expect more stringent remediation requirements and tougher penalties to be applied. As such we have cut our valuation by US$4bn to allow for potential remediation costs and penalties, which lowers our NAV by 8%[.]<br><br>The extent of the environmental damage is unknown although the volume released by this dam failure is roughly a quarter that of Samarco, so it is likely to be less severe. However, given that this is the second dam burst linked to Vale, we would expect more stringent remediation requirements and tougher penalties to be applied. As such we have cut our valuation by US$4bn to allow for potential remediation costs and penalties, which lowers our NAV by 8%.<br><br>We have cut our 2019E EPS by 5% and 2020E EPS by 4% due to lower production forecasts. We recognise [*sic*] that there is potentially some offset from higher iron ore prices.<br><br>The impact to earnings is likely to be limited. Furthermore given the balance sheet strength and robust cash generation, the company can cover the remediation cost with ease. However, Vale's equity re-rating story was in part a reputational one which has now been dealt a body blow. We expect the stock to give up some of these gains, at least while the uncertainty lingers.<br><br>Given that this is the second large scale dam breach in Vale's history post the November 2015 Samarco disaster, the level of scrutiny is likely to be very high. The relatively minor (in comparison) pipe failures / dam leaks in the beginning of 2018 at Minas Rio and Alunorte highlighted the sensitivity in Brazil with a combination of asset closures, rehabilitation programs and fines. We think it is reasonable to expect asset closures in the l [*sic*] province of Minas Gerais state for dam technical inspections, certainly in the near term. |
| | 01/28/2019 | | N/A | | [The report lists key points from the commodities market.] |
| | 01/30/2019 | $12.10 | $12.10 | no change | Vale to decommission tailings dams: All nine of these upstream dams are currently inactive and will be commissioned over the next three years at a cost of US$1.3b. Vale has announced that it will halt all operations around these dams while the decommissioning process is completed. The operations include Abóboras, Vargem Grande, Capitão do Mato and Tamanduá operations, in the Vargem Grande complex; and the Jangada, Fábrica, Segredo, João Pereira and Alto Bandeira operations, in the Paraopebas complex, also including the stoppage of the Fábrica and Vargem Grande pelletizing plants.<br><br>The expected reduction in iron-ore production from Vale is likely to have a positive impact on the iron-ore market in the short-term medium-term with Vale's long-term production outlook post the decommissioning uncertain. |

Page 28 of 42

*Confidential*

**Exhibit 6**

**Excerpts from Analysts' Reports Indicating Analysts Considered the Materialization of Disclosed Risk When Assessing Vale Securities' Prices**

*January 25, 2019 − February 25, 2019*

| Contributor | Date | Prior Target Price | Current Target Price | Target Price Change | Select Excerpts |
|---|---|---|---|---|---|
| **Morgan Stanley (continued on next page)** | 01/25/2019 | $17.00 | $17.00 | no change | After the Samarco accident a few years ago, we think this new unfortunate incident is likely to generate material scrutiny.<br><br>Vale has confirmed a dam break but not confirmed which mine was affected. We expect the stock to be under material pressure in the coming days.<br><br>The Parabopebas complex produced 26.3Mt of iron ore in 2017, with the Córrego do Feijão mine contributing with 7.8Mt. At this stage, it is unclear if just this 8Mt of iron ore will be affected or if output from the wider Parabopebas complex may be affected as well. For context, the volume of the global seaborne iron ore export market is c. 124Mt/month including 31Mt/month from Brazil.<br><br>Risks to our ratings, price targets, and earnings estimates include political and macro risks, a sharp slowdown in the global economy or China, slower–than–expected demand for metals, an abrupt decline in metal prices, increases in costs, failure to deliver growth plans, long-lasting strikes, changes in mining and environmental regulations, adverse litigation outcomes. |
| | 01/25/2019 | | N/A | | [This is a Metal & Rock report and does not provide a target price.]<br><br>Vale has confirmed a dam break but not confirmed which mine is affected. The Parabopeba complex produced 26.3Mt of iron ore in 2017 c. 7% of Vale's total product on of 366.5Mt with the Córrego do Feijão mine producing 7.8Mt. At this stage it is unclear if just this 7.8Mt of iron ore will be impacted or production from the wider Parabopeba complex will be affected as well. |
| | 01/27/2019 | $17.00 | $17.00 | no change | Vale lost ~US$7.4bn in market value after news that one of its tailings dams failed on Friday; this represents ~12x the very preliminary estimate of the impact we calculate the company may face based on: 1) a very small — if any — potential EBITDA loss and, 2) possible environmental/legal liabilities of ~R$2.4bn. Clearly, there are still too many unknowns to have any certainty on the potential liabilities. |
| | 01/30/2019 | $17.00 | $17.00 | no change | The company's proactive measures to decommission "upstream" tailings dams should have minimal impact on EBITDA/valuation. Boost in iron ore prices likely only temporary, but pellet prices may benefit for longer. We stay Overweight Vale after the sell-off, but put our price target under review.<br><br>We are putting our price target under review given the uncertainty around the Feijão dam failure and the ultimate amount of liabilities that the company could potentially face. However, we remain Overweight as we still believe the stock may have overreacted... during the sell-off following last Friday's tragic events. |
| | 02/04/2019 | | N/A | | [This report covers the iron ore market and does not provide a target price.]<br><br>Vale can maintain output: Vale proposes to decommission its 10 'upstream' designed tailing dams (all inactive) over 3 years during which the associated mines will be suspended impacting c.40Mtpa of production (incl. the 8Mtpa Feijão mine itself) all in Vale's Southern System (MSe 83Mt in 2018).<br><br>On balance it appears technically feasible for Vale to maintain 2019 production at the 2018 level of 385Mt (MSe) vs our original forecast of 388Mtpa assuming the company has the bandwidth to focus on this. We note there is some risk that Vale's production ramps can't keep up with the pace of its suspensions creating a temporary gap.<br><br>Beyond Vale: Further Brazilian iron ore production could be at risk as the government of Minas Gerais has issued a resolution that mining companies should decommission all upstream tailings dams – c.9% of the 698 dams in the state are upstream structures. |

*Confidential*

**Exhibit 6**

**Excerpts from Analysts' Reports Indicating Analysts Considered the Materialization of Disclosed Risk When Assessing Vale Securities' Prices**

*January 25, 2019 – February 25, 2019*

| Contributor | Date | Prior Target Price | Current Target Price | Target Price Change | Select Excerpts |
|---|---|---|---|---|---|
| | 02/04/2019 | $17.00 | $17.00 | no change | According to a local newspaper, following a request from the Federal Prosecutors Office (MPF) located in Minas Gerais (MG), a Brazilian Court ordered Vale to halt production at its Brucutu mine. ... The above mentioned production halt would come on top of the 40Mt announced by the company ... due to the decommissioning process of all its upstream tailings dams in the next three years. We believe Vale would not be able to offset these volumes by ramping up output elsewhere. We understand the tailings dam that supports the Brucutu operation is built by the downstream method, which is a different construction system than the upstream structures used in the failed Feijão and Samarco dams. We understand the court ruling is temporary and believe Vale will likely appeal such decision.<br><br>While the situation around the Brucutu mine suspension remains fluid, we believe the iron ore market will like price in a bigger and/or longer potential impact to Vale's iron ore output than we first thought. The stoppage of Brucutu, if it extended for a significant amount of time, would materially reduce the 37Mt supply surplus our commodity team originally forecast for 2019 (prior to the Feijão dam failure). |
| Morgan Stanley (continued on next page) | 02/07/2019 | | [4] | | We downgrade Vale shares to Equal-weight and remove our PT as we lack clarity on what multiple the market will assign to the shares in the near term. While much uncertainty remains following the tragic dam collapse, we have tried to gauge the impact by drawing on precedent environmental incidents — namely the Volkswagen (VW) emissions scandal and the BP/Deepwater Horizon oil spill — to provide context around valuation implications, financial costs and liabilities, and corporate governance considerations. ... Why not Underweight? The stock has already lost US$18 billion in market cap, or 24% since the day before the accident, which is far more than our estimate of the potential liabilities ... and therefore suggests the market is already pricing in an EV/EBITDA multiple de-rating of ~1x. ... Could Vale's accident lead to a long-term multiple de-rating? We think an event of this magnitude is likely to create an overhang on the stock multiple, at least in the near term. This is likely to be driven by a combination of 1) reputational uncertainty and heightened environmental risk, 2) uncertainty around the ultimate financial ramifications (e.g. liabilities related to the tragic incident), and 3) the impact of higher capex/costs as a result of increased safety standards. The long-term multiple implications are unclear, with much hinging on the company's efforts to regain the trust of key stakeholders and evidence that there wasn't any wrongdoing or negligence on its part.<br><br>The environmental impact of the Feijão accident is expected to be smaller (the dam had ~12.7M m$^3$ of tailings volume and had been inactive for 3 years), but the human impact could be much higher than in the Samarco case as the administrative buildings of the Feijão plant were located under the dam and the accident happened during working hours. ... In the case of Vale, Brazilian authorities have already blocked ~US$3.4B of funds from the company for environmental and socioeconomic remediation. The company may not need to disburse the entire amount, but the blocked funds are already higher than Samarco's total liabilities. In our view, because this is the second time Vale's name has been associated with a dam accident (even though the company was not directly responsible for Samarco's operations), authorities may feel a need to be more severe in blocking the company's assets. That said, Brazilian law does not prescribe punitive damages, which means the courts cannot apply extra penalties on Vale because of its association with the prior Samarco accident. As a result, the process to determine Vale's financial liabilities for the Feijão accident will likely be similar to what happened in the Samarco case.<br><br>[I]n addition to determining the overall impact of this incident on fundamentals and valuation, these shareholders will need to determine if they remain comfortable owning the stock given the negative environmental and social impact of this event, and the potential incremental risk going forward. While Vale was not directly involved in the Samarco incident 3 years ago (e.g. Vale and BHP didn't actually run the company), we believe that its association with it could create additional pressure to justify a continued investment in Vale shares. |

*Confidential*

**Exhibit 6**

**Excerpts from Analysts' Reports Indicating Analysts Considered the Materialization of Disclosed Risk When Assessing Vale Securities' Prices**

*January 25, 2019 – February 25, 2019*

| Contributor | Date | Prior Target Price | Current Target Price | Target Price Change | Select Excerpts |
|---|---|---|---|---|---|
| Morgan Stanley (continued on next page) | 02/07/2019 | | [4] | | We believe the cancellation of the Laranjeiras dam operational license will likely delay a potential Brucutu mine restart (~30Mtpy capacity). Further, we understand that if Vale's appeal against the public civil action were granted, the company would still need to request a new license to operate the Laranjeiras dam before restarting operations at Brucutu. In our view, the loss of the Laranjeiras operational license increases the uncertainty around the company's near-term outlook, which will likely continue to weigh on the stock.<br><br>Potential risks - upside: China steel output growth surprises to the upside and leads to higher-than-expected IO prices; Vale has to make lower than expected payments for the Samarco and Feijão accidents. Potential risks - downside: Global growth slows down led by China; lower global demand for commodities; Vale has to make larger than expected payments for the Samarco and Feijão accidents. |
| | 02/08/2019 | | [4] | | Quickly moving into deficit: Cuts to Vale's supply are happening quicker than we initially expected and the iron ore market is becoming increasingly tight. The iron ore price has hit $90/t and another lift when China's buyers return from Lunar New Year is likely. We estimate that a cumulative 51Mtpa of Vale's production is suspended currently out of total production of 385Mt in 2018 (MSe). The suspensions include 21Mtpa (8Mtpa Feijão + 13Mtpa Vargem Grande) of the 40Mtpa Vale will be suspending in the Southern System during decommissioning of its 'upstream' tailings dams. A quick return to production of 30Mtpa Brucutu in the Southeastern System appears unlikely as the licence to operate the mine's 'downstream' dam has been canceled. Meanwhile three areas of Vale's Tubarao port have been closed on grounds of environmental pollution but as yet it's unclear how much capacity is affected. Although Vale has stated that it will partly offset lost production we don't believe a full offset is possible in the near term as production cuts kicked in quickly and maintaining 2018 levels looks increasingly challenging. |
| | 02/11/2019 | | [4] | | What's new #3: The judicial secrecy on the civil action to stop Vale's dams (Laranjeiras, Menezes II, Capitão do Mato, Dique B, Taquara, Forquilha I-III, and Vargem Grande) was lifted. To recapitulate, Minas Gerais prosecutors requested the judicial authorities to order Vale to shut down dams located in zones close to urban areas and requested the company to execute safety actions (e.g. I. present updated stability report of the dams mentioned in the civil action; II. present an action plan that guarantee total stability and safety of these dams; III. execute all necessary measures to guarantees the safety of the dams; and IV. hire and independent firm to inspect repairs and reinforcement work executed in the dams).<br><br>Implications: We believe authorities (e.g. Public prosecutors, environmental agencies, local governments) are taking extra precautions to make sure Vale is in full compliance with absolutely all regulations and, upon any doubts or missing information, they are ordering the stoppage of operations until those questions or concerns are resolved. We expect these conditions will likely remain for a few more days or weeks, which will likely keep market uncertainty elevated. |
| | 02/11/2019 | | [4] | | [This is a metal&ROCK report discussing nickel's rebound.] |

*Confidential*

**Exhibit 6**

**Excerpts from Analysts' Reports Indicating Analysts Considered the Materialization of Disclosed Risk When Assessing Vale Securities' Prices**

*January 25, 2019 – February 25, 2019*

| Contributor | Date | Prior Target Price | Current Target Price | Target Price Change | Select Excerpts |
|---|---|---|---|---|---|
| | 02/13/2019 | | [4] | | We believe the restart of operations at Tubarão port is in line with our view that authorities are taking extra precautions to make sure Vale is in full compliance with absolutely all regulations. We see the news as positive for the company as it shows Vale's operations at Tubarão port complex were complying with the environmental regulation. The latest development will likely reduce uncertainty — at least to some extent — around iron ore prices and pellet premium. |
| **Morgan Stanley (continued)** | 02/25/2019 | | [4] | | Also, on February 15, the ANM published a new resolution that orders the decommissioning of all upstream dams — in line with prior regulations issued by Minas Gerais state... — and prohibits the construction of those types of structures. Further, the resolution sets up a series of measures to increase the safety of tailings dams (e.g., relocate installations built in the Self Rescue Zone, implement solutions to reduce the amount of water discarded in the dam structures, implement a system to monitor, without interruption, the structure of dams classified in the category of high potential damage). We believe mining companies that own tailings dam [*sic*] will need to increase investments in the safety of their dams on the back of the new regulations. The companies owning upstream dams, or dams of unknown construction methods, are required to execute additional investments to reinforce the structure of these dams and, in the future, decommission them. We understand the cost of decommissioning a dam is ~R\$65/m$^3$. We are cutting our iron ore production assumptions for Vale on the back of 1) the new issued regulations, 2) new information released by the company on production halts (~75Mtpy are currently shut down), and 3) the company's risk document disclosed in the public civil action. Our new production estimates are: 351Mt in 2019 (vs. 385Mt before), 386Mt in 2020 (vs. 396Mt), and (all unchanged) 400Mt in 2021, 400Mt in 2022, 398Mt in 2023, 395Mt in 2024, and 392Mt in 2025. |

**Exhibit 6**

**Excerpts from Analysts' Reports Indicating Analysts Considered the Materialization of Disclosed Risk When Assessing Vale Securities' Prices**

*January 25, 2019 – February 25, 2019*

| Contributor | Date | Prior Target Price | Current Target Price | Target Price Change | Select Excerpts |
|---|---|---|---|---|---|
| Morningstar Equity Research[5] | 01/30/2019 | $9.40 | $9.40 | no change | [This report presents pricing and rating data as of January 30, 2019 and research and estimates as of December 11, 2018.] |
| | 01/31/2019 | $9.40 | $8.80 | down | Failure of the tailings dam at Vale's Corrego de Feijao iron ore mine in Brazil in January 2019 will bring environmental and humanitarian liabilities for Vale, and potentially impact its social licence [*sic*] in the near to medium term. |
| | 01/31/2019 | $9.40 | $8.80 | down | We lower our fair value estimate by 6% to USD 8.80 for Vale. Expected higher iron ore prices due to the reduced production from the tailings dam failure are only a partial offset to the expected liabilities and lower sales volumes. Our lower fair value estimate incorporates 25 million tonne per year reductions in our sales volume's forecasts to 370 million tonnes in 2019, 380 million tonnes in 2020 and 390 million tonnes in 2021 respectively, normalising [*sic*] to an unchanged 425 million tonnes by 2023.  The reductions represent approximate 6% declines for the next three years versus our prior forecasts and nearly 2% of global traded iron ore supply. The reductions factor in some regulatory and reputational challenges which could slow Vale's ability to ramp up output elsewhere to compensate. We've also incorporated a USD 5 billion pre-tax liability for the disaster, spread over the next three years. This uses the estimated cost of the Samarco disaster as a guide and Vale's planned USD 1.3 billion of tailings dam remediation costs. There is significant uncertainty around the likely quantum and timing of any cash flows for remediation, compensation and damages. |

*Confidential*

**Exhibit 6**
**Excerpts from Analysts' Reports Indicating Analysts Considered the Materialization of Disclosed Risk When Assessing Vale Securities' Prices**
*January 25, 2019 − February 25, 2019*

| Contributor | Date | Prior Target Price | Current Target Price | Target Price Change | Select Excerpts |
|---|---|---|---|---|---|
| RBC Capital Markets (continued on next page) | 01/25/2019 | $11.00 | $11.00 | no change | The dam is located in Brumadinho which is part of the Belo Horizonte Metropolitan region, at the mine Feijao, and forms part of Vale's Southern System operations (three mines, two ports). The Southern System as a whole accounts for roughly 25% of the group's iron ore production. Although at this stage it is uncertain whether this would impact fines or pellet production, if any at all. Vale has now confirmed this breach and its priority is to preserve and protect the employees and members of the community.<br><br>We continue to take a cautious approach on Vale shares and this dam failure could add to the challenges facing the company, but at this juncture it is too early to tell on any impact. We continue to monitor the situation. |
| | 01/28/2019 | $11.00 | $11.00 | no change | It is certainly too early to quantify any financial impact (as the company rightly focuses its efforts on assistance) but we fear the potential liabilities for a disaster so similar to the one in 2015 will likely be heightened. The inspection of Vale's remedial processes for dam maintenance will likely come under investigation. We would also expect that environmental permitting in Brazil, following Samarco, Alunorte and now Brumadinho will become even more stringent, potentially impacting growth plans. We would expect that beyond the c. 7mtpa produced at the Feijao mine as part of the Parapoeba Complex in the Southern System, that production is likely to remain unaffected in the medium-term (RBCe 2019 398mt) and that tonnages will likely be made up elsewhere in the country. We do see potential that Vale's overall production may lag in the coming months as the company refocuses on safety. So although short-term iron ore prices may rise on sentiment, with our forecast for a surplus of 59mt for 2019, we continue to believe fundamental pressure on iron ore prices is likely to remain. |
| | 01/30/2019 | $11.00 | $11.00 | no change | We continue to see significant challenges for Vale in the near-term. The potential litigation and liability exposure remains theoretically unlimited and questions around the fundamental position of the company and management remain a serious question, in our view. |
| | 02/04/2019 | $11.00 | $9.00 | down | Vale has announced as a response to the Brumadinho tailings disaster that it will shut ~40mtpa of supply or 2% of the global seaborne market. Contrary to general sentiment, this will not happen immediately, as it will take some 3-4 months (RBCe) for Vale to generate logistics and then for the government to approve these plans. In addition, increased production elsewhere from Vale drives a more modest net loss. We see 20mt less net production in 2019 and 26mt less in 2020 with volumes normalising [*sic*] in 2021.<br><br>Vale on the otherhand ... sees significant compression in market pricing as uncertainty around liabilities, growth, management and other Brumadinho related impacts cause substantial issues around the investment case and we move our target price to $9.00 from $11.00 previously.<br><br>We have updated our forecasts for the recent news from Vale on material changes to its production profile in the aftermath of the Brumadinho tailings disaster. The removal of c. 40mt of material from Vale's Southern System (the majority from mid-year, and which returns progressively through 2022) is offset by increasing Southern and Southeastern system production. The loss of a restarted 16-20 mt Samarco operation from our base case production profile, in conjunction with other small global adjustments, reduces our previously anticipated surplus, but still leaves it in place. |

*Confidential*

**Exhibit 6**

**Excerpts from Analysts' Reports Indicating Analysts Considered the Materialization of Disclosed Risk When Assessing Vale Securities' Prices**

*January 25, 2019 – February 25, 2019*

| Contributor | Date | Prior Target Price | Current Target Price | Target Price Change | Select Excerpts |
|---|---|---|---|---|---|
| **RBC Capital Markets (continued)** | 02/04/2019 | $11.00 | $9.00 | down | As we explore in this note, the potential range for liabilities related to Brumadinho remains wide ranging. Samarco has thus far cost $4.6bn; although this is a different tragedy, we think liabilities could potentially be higher... We place a $10bn estimated liability in our base case, although highlight it is still very early. On the positive side, the response of Vale's management in this crisis has been much more pro-active than post-Samarco as the company navigates this difficult time. <br><br> The investment case for Vale is materially altered following this second tailings disaster, in our view. Fundamentally, the combination of concentrated country risk, and downside risks from Chinese demand leave the company in an unfavourable position. The addition of uncertain liabilities, suspension of the dividend, a potential loss of ESG conscious investors, uncertain operational and growth outlook in the face of uncertain regulation changes leave us continuing to recommend alternative exposures in the space. We reduce our target 24-month forward EV/EBITDA multiple to 3.5x (peer group range 4.0x-6.0x) and move our target P/NAV to 0.7x. This lowers our price target to $9.00 from $11.00 and we maintain our Underperform rating. <br><br> The reaction in Brazil has been expectedly full of outrage and anger. Local Brazilian courts have frozen ~R11.3bn ($3billion) of Vale funds. <br><br> In our view, the likelihood of punitive public or civil penalties is high, although still not quantifiable, and in all likelihood, unquantifiable for some time. Any additional regulatory impact on [sic] forward operational impacts that we've not explicitly quantified would also be included in what we stress is a broad and early stage estimation that will likely be volatile over the coming months. <br><br> The uncertainty facing the company remains elevated in our view. Potential impact from ESG focused investors, uncertainty around growth potential, current operational cost and productivity outlook under potentially revised regulations, and (rightly or wrongly) whether management will be able navigate the Brumadinho tailings disaster, sees us decrease our target multiple for Vale from 4.5x EV/EBITDA to 3.5x EV/EBITDA. On a fundamental basis, Vale's single-country, and single commodity concentration already see our base risking at the lower end of peers, however we now expect a further discount will be applied. We reduce our target NAV multiple from 0.8x to 0.7x. We decrease our target price to $9.00/t from $11.00 and re-iterate our Underperform recommendation. |
| | 02/04/2019 | $9.00 | $9.00 | no change | Our view: In what can only be characterised [sic] as a fast moving situation, Vale has been ordered to temporarily suspend production at Brucutu mine in Minas Gerais. According to an article published by O'Globo, the mine produces 30mt of iron ore per year and, unlike Brumadinho, it uses a conventional rather than an upstream tailings dam. The article suggests that Vale will appeal against this decision which prevents the company from using the Brucutu tailings pipeline until further investigation takes place. This was not one of the mines that will be impacted by Vale's remedial tailings restoration program. <br><br> Vale reports Brucutu within the Minas Centrais part of the Southeastern System. Minas Centrais also includes production from Agua Limpa. CRU estimates that ~30mt capacity comes from the mine (the system reported between 38-41mt over the past 3 years) but there is no definitive information on capacity utilisation [sic]. We understand the Brucutu mine provides the feed for the Tubarao 8 plant (which we estimate produced 7.3mt of pellets in 2018). <br><br> This would be the first operational constraint imposed by a court following the Brumadinho tailings disaster. There is no further information at this point around what has specifically caused the court order and Vale has formulated a legal response and is appealing. |
| | 02/06/2019 | $9.00 | $9.00 | no change | [This report covers the markets for iron ore and other natural resources.] |

**Exhibit 6**

**Excerpts from Analysts' Reports Indicating Analysts Considered the Materialization of Disclosed Risk When Assessing Vale Securities' Prices**

*January 25, 2019 − February 25, 2019*

| Contributor | Date | Prior Target Price | Current Target Price | Target Price Change | Select Excerpts |
|---|---|---|---|---|---|
| Santander | 01/28/2019 | $19.00 | $19.00 | no change | In our view, there are still many uncertainties regarding the potential financial impact of the accident of the dam breach that occurred last Friday in Brumadinho... Although the stock looks cheap in some scenarios, visibility is currently low in our view.<br><br>The lack of visibility regarding potential liabilities should be an overhang for the stock in the next months, in our view.<br><br>We believe that the Feijão mine accident could result in more discussions of changes in the licensing process, making it more difficult to obtain licenses and exposing existing capacity to overutilization. In addition, the level of surveillance on the company's operations could increase, in our view. |
| | 01/29/2019 | $19.00 | $19.00 | no change | Vale confirmed that it will decommission all of its tailings dams that are all inactive and it will halt approximately 10% of its annual production in order to accelerate the process. In the short term, we expect a positive impact in iron ore prices to reflect a lower global supply until the company gradually replaces the halted production with iron ore produced in other mines. We estimate for every US$5/ton increase in prices the company generates US$1.8 billion in addition [*sic*] EBITDA. We view positively this initiative, but believe many uncertainties regarding potential liabilities persist.<br><br>The company has ten inactive tailing dams… that use the same method as the Feijao mine. We welcome the company's announcement regarding the priority of implementing the decommissioning process over the next three years. In order to start the process, the company needs environmental licenses, which could take up to 45 days, and the decommissioning will be done by third-party engineering companies that will be hired. The total investment required is approximately R$5 billion. |
| | 02/08/2019 | $19.00 | $16.00 | down | Net/Net: We believe some uncertainties in Vale's investment case persist after the Brumadinho dam breach two weeks ago, particularly with respect to the amount of compensation related to the disaster.<br><br>Valuation looks cheap, but by how much? We estimate Vale's iron ore supply in 2019 at 365MM/tons (vs. 400MM/ton previously), following recent announcements of production interruptions at different mines. As a result, we are raising our 2019E iron ore price estimate to US$80/ton from US$65/ton, an effect that financially should help to partially offset the company's lower production.<br><br>Value of potential compensations/indemnities are still unknown: The company has provided support to victims of the accident and has already been fined ~R$350million. The Brazilian justice department has frozen R$12.6 billion of the company's cash. We still have low visibility regarding amounts the company may have to disburse related to indemnities and compensations.<br><br>Uncertainties surround Vale's iron ore production over the short term: After the dam breach in Brumadinho on January 25, Vale stopped iron ore production in: (i) the Feijão mine (~8.0Mtpy), (ii) the Vargem Grande complex (~13.0Mtpy), and (iii) last Wednesday, the Brucutu mine (~30.0MM/tons). Although the company could increase iron ore production in other systems, for the short term, we estimate an iron ore supply disruption of 50.0Mtpy (12.5% of its annual production) in the seaborne market, which has already seen an effect on spot iron ore prices.<br><br>[D]espite a drop of more than US$20 billion of market capitalization since the accident (which we believe more than prices in the worst case), we still see near-term share pressure given: (i) suspension of the dividend on January 27, and (ii) funds that follow ESG (environment, social and governance) standards that are still doing their internal analysis. |

*Confidential*

**Exhibit 6**

**Excerpts from Analysts' Reports Indicating Analysts Considered the Materialization of Disclosed Risk When Assessing Vale Securities' Prices**

*January 25, 2019 – February 25, 2019*

| Contributor | Date | Prior Target Price | Current Target Price | Target Price Change | Select Excerpts |
|---|---|---|---|---|---|
| **Scotiabank (continued on next page)** | 01/25/2019 | $19.50 | $17.00 | down | It is still too early to quantify the social, environmental and economic impact of this unfortunate accident. We are not making changes to our estimates at this point. However, we have cut our one-year price target to US$17.00 from US$19.50 as we have increased the expected discount to NAV to 30% from 20%.The lower P/ NAV multiple (0.70x) we now use to determine our price target reflects our reduced confidence about an expected near-term re-rating following today's accident.<br><br>We don't anticípate [*sic*] a major impact to Vale's iron ore production at this point... We understand that the Feijão mine (part of Vale's Southern System) produces 7-8 Mtpa or [*sic*] iron ore (less than 2% of Vale's 2019 production guidance). We note that Vale's total capacity stands at 450 Mtpa, suggesting that the company may ramp-up production at other locations if it decides to stick to their production target.<br><br>[A]s in the Samarco case, we anticípate [*sic*] Brazilian prosecutors to take legal action against the company. After the Samarco accident in November 2015, Brazilian public prosecutors presented a R$155 billion (US$44 billion) civil suit against Samarco, Vale and BHP related to the accident. At that time, we estimated the settlement's NPV, which included reparatory and compensatory programs, to range between R$6.5B and R$8.3B.<br><br>[T]he future licensing process to operate mines may become stricter. A number of recent accidents related to iron ore mines in Brazil (Samarco, Minas Rio and now Feijão) may result in stricter revisions before granting mining licenses. If this accident delays the reopening of Samarco (we model a restart in 1H/20) the pellets market should remain tight and the pellet premium is likely to stay high for longer than we currently envision. |
| | 01/31/2019 | $17.00 | $17.00 | no change | The low P/NAV multiple (0.70x) we use to determine our price target reflects our reduced confidence about an expected near-term re-rating following the tailings dam failure at the Feijão mine in Brumandinho, Minas Gerais (we used a P/NAV multiple of 0.80x before the accident). |
| | 02/04/2019 | $17.00 | $17.00 | no change | The estimated impact of the decision of a temporary halt of the Laranjeiras dam and the Brucutu mine (part of the Minas Centrais complex in the Southeastern System) is 30 Mpta. In our model we assume 28 Mtpa production from Minas Centrais.… While we expect Vale to appeal the court's decision, we note that risks to our recently reduced production estimates look skewed to the downside.<br><br>Less leeway to maintain production close to Vale's original 400 Mtpa target. As we noted before, Vale's production capacity stands at 450 Mtpa. We understand that the company can minimize the impact of a projected 40 Mtpa output cut from the company's decision to decommission upstream tailings dams. We currently forecast a marginal decrease in production to 390 Mtpa - 395 Mtpa in 2019-2021. However, if Brucutu's mine stays closed for long - or if further legal action limits or stops mining operations at other sites - Vale's iron ore production may fall below our current estimates. In contrast, while we believe that today's price spike may prove temporary, we flag upside risks to our near-term iron ore and pellet price forecasts. |

*Confidential*

**Exhibit 6**

**Excerpts from Analysts' Reports Indicating Analysts Considered the Materialization of Disclosed Risk When Assessing Vale Securities' Prices**

*January 25, 2019 – February 25, 2019*

| Contributor | Date | Prior Target Price | Current Target Price | Target Price Change | Select Excerpts |
|---|---|---|---|---|---|
| **Scotiabank (continued)** | 02/07/2019 | $17.00 | $16.00 | down | The decision of the State Secretary for Environment and Sustainable Development (SEMAD) to cancel Vale's provisional operational authorization for the Laranjeiras tailings dam reduces the likelihood of a fast restart at Vale's Brucutu mine, we think. While a quick solution is still possible, our base case has changed and we now assume Brucutu mine remains closed for the rest of 2019. Vale's proposed closures to reduce risks based on a technical analysis and following a decommissioning plan for upstream dams looks to us to be a better alternative to closing mines without solid support. However, risk that production at Brucutu is further delayed or even that other mines may be impacted should not be ruled out, as public opinion may favor more action from the authorities against the miner. We hope the authorities can find a way to increase safety at mining locations and to reduce environmental risks without a major – and possibly unnecessary – economic impact on the affected communities and the state of Minas Gerais.<br><br>Our 2019-2020 EBITDA estimates increased 5%-6% due to higher iron ore prices, despite lower output. However, we have cut our P/NAV multiple due to increased legal and operational uncertainty. PT cut to US$16.00.<br><br>Brucutu mine reopening is subject to a reversal of the preliminary ruling and the granting of the operational license for the Laranjeiras dam. Vale has noted that the Laranjeiras dam uses the conventional method (in contrast to the upstream method) and it sees no justification for the cancellation of the provisional operational authorization. The production impact while Brucutu mine is offline is approximately 30 Mtpa. We have lowered our 2019 iron ore production estimate by 9% to 357 Mt on the back of the Brucutu mine closure and Vale's decision to close immediately Vargem Grande (13 Mtpa) as part of its upstream dam decommissioning program.<br><br>We arrive at our new one-year price target of US$16.00 per ADS (down from US$17.00) by applying a 35% discount to our NAVPS estimate. The lower P/NAV multiple (0.65x vs. 0.70x) we use to determine our price target reflects our reduced confidence about an expected near-term re-rating following the tailings dam failure at the Feijão mine. In our view, legal and operational uncertainty have increased, affecting investors' confidence on Vale. |

Page 38 of 42

**Exhibit 6**

**Excerpts from Analysts' Reports Indicating Analysts Considered the Materialization of Disclosed Risk When Assessing Vale Securities' Prices**

*January 25, 2019 – February 25, 2019*

| Contributor | Date | Prior Target Price | Current Target Price | Target Price Change | Select Excerpts |
|---|---|---|---|---|---|
| UBS (continued on next page) | 01/27/2019 | $15.00 | $15.00 | no change | We stop short of making any recommendations on the back of this very tragic event. |
| | 01/29/2019 | $15.00 | $15.00 | no change | Vale's management says it intends to partly offset a projected 40mtpa production cut by raising volumes in other mining systems.<br><br>In other news, Sustainalytics (used by fund managers to rank companies based on ESG) has reportedly downgraded its environmental rating on Vale, according to Financial Times. During our US investor meetings this week, investors cautioned of capital outflow risk driven by ESG/CSR concerns given this is Vale's second major tailings dam spill.<br><br>Moody's has placed Vale under review for a downgrade, thus following similar measures by S&P and Fitch. |
| | 01/29/2019 | $15.00 | $15.00 | no change | One of three of our primary iron ore supply concerns from the Vale dam breach may have been mitigated. Platts reports that the iron-ore cargo intensive MRS Railway Line (which had a segment damaged in the dam rupture) could resume operations later Tuesday. And that the resumption could ease fears that iron ore supply from CSN and Trafigura would be affected .... Our two remaining supply concerns are 1) production risk from any required changes to Vale's tailings operations; and 2) a potential Samarco re-start delay. As for the latter, investors we spoke with over the past couple of days seem to be [*sic*] believe that Samarco won't restart this year. |
| | 01/30/2019 | $15.00 | $15.00 | no change | In order to decommission Vale's 10 remaining upstream dams ..., management will close 40mtpa of adjacent mining operations for safety reasons and to speed up dam closures. The 40mtpa comprises of 27-28mt of iron ore fines + 11mt of pellets (12-13mt of pellet feed). We understand the replacement will consist of 40mtpa of iron ore fines (no pellets) from Vale's other mines. |
| | 02/05/2019 | $15.00 | $15.00 | no change | [This report discusses Vale's monthly iron ore shipping quantities up to December 2018.] |

*Confidential*

**Exhibit 6**

**Excerpts from Analysts' Reports Indicating Analysts Considered the Materialization of Disclosed Risk When Assessing Vale Securities' Prices**

*January 25, 2019 – February 25, 2019*

| Contributor | Date | Prior Target Price | Current Target Price | Target Price Change | Select Excerpts |
|---|---|---|---|---|---|
| UBS (continued on next page) | 02/06/2019 | $15.00 | $15.00 | no change | Based on our recent investors conversations (~30 total, 10 in Brazil and 20 globally), we observe the following: Approximately 80% of Brazilian investors we have spoken to since Vale's tailings spill have shown interest in buying Vale into weakness. Approximately 20% are holding back for now. Approximately, 30% of global investors we have spoken to share local investors buying interest, while 70% cite it as either 1) too early; or 2) not feasible due to ESG concerns. Those assessing it's too early highlight the risk of capital outflows from dividends funds or due to ESG and/or credit downgrade concerns, or just overall negative newsflow.<br><br>The company declared force majeure on shipments related to the Brucutu mine earlier this week followed by the State of Minas Gerais cancelling the Brucutu dam license.<br><br>40mt at Brumadinho. Vale announced its intention to temporarily reduce and replace up to 40mtpa of iron ore production this year to accelerate the decommissioning of the company's 10 remaining and inactive upstream tailings dams. ... 30mt at Brucutu. The 22nd Civil Court of Comarca of Belo Horizonte suspended the tailings discharge, including at the Laranjeira dam which services the 30mt Brucutu mine, earlier this week. .... Timeline: Uncertain. Prior to the dam license cancellation, we understood Vale was working on getting the suspension lifted as soon as possible. As for the 40mt announcement, we reiterate that Vale has the ability to replace most, if not all, of the affected production volumes. ... As for the 30mt announcement, management has declared force majeure followed by the State of Minas Gerais reportedly cancelling Vale's dam license. The license cancellation leaves downside risk to our production target for Vale, although likely to continuously support iron ore prices, all things equal. |
| | 02/08/2019 | $15.00 | $12.00 | down | We lower our price target to US$12 from US$15/sh on recent production disruptions and potentially higher replacement costs, partially offset by a higher iron ore price. While the >US$20bn equity value decline is encouraging some investor buying interest (as it implies an even larger capital outflow discounted back), we assess the lack of clarity pertaining to production and licenses from here supports a Neutral rating. We estimate that an increase in recovery production from Vale's non-affected mining complexes should drive iron ore prices back down to US$65/t by 2021 from US$94/t currently. Hence an increase in production could offset an overall price correction.<br><br>We estimate that Vale has ~50mt (Feijao 8mtpa + Vergem Grande 13mtpa + Brucutu 30mtpa) of annualised [*sic*] production down at the moment. The company declared force majeure on shipments related to the Brucutu mine earlier this week followed by the State of Minas Gerais cancelling the Brucutu dam license. Vale cites there is no technical and/or legal basis for the cancellation. Our global Materials team has revised up iron ore prices for 2019-20, while keeping 2021 onwards unchanged. ...<br><br>We lower our DCF-derived price target, as we reduce our 2019-20 production forecast by 10-20mt. We further incorporate a US$2-3/t mining cost increase to account for higher-cost replacement production in the Southern/Southeastern Systems. This is partially offset by a lift in iron ore prices to US$74/t from US$65/t in 2019 and to US$70/t from US$66/t in 2020. Our 2021-22 forecast is unchanged at US$65-64/t.<br><br>We estimate that Vale has ~50mt of annualised [sic] production down at the moment. The company declared force majeure on shipments related to the Brucutu mine earlier this week followed by the State of Minas Gerais cancelling the Brucutu dam license. Vale cites there is no technical and/or legal basis for the cancellation.<br><br>Vale continues to trade at a discount to spot iron ore prices at ~US$57/t versus spot of US$95/t and our US$74/t forecast into 2019. However, this possibly reflects cost uncertainties pertaining to Vale's regulatory and mining costs from here coupled with possibly lower average selling prices from higher silica replacement production. |

*Confidential*

**Exhibit 6**

**Excerpts from Analysts' Reports Indicating Analysts Considered the Materialization of Disclosed Risk When Assessing Vale Securities' Prices**

*January 25, 2019 – February 25, 2019*

| Contributor | Date | Prior Target Price | Current Target Price | Target Price Change | Select Excerpts |
|---|---|---|---|---|---|
| **UBS (continued)** | 02/15/2019 | | N/A | | [This report covers dam failures in general and does not provide a target price.]<br><br>We hosted an expert call with Lindsay Newland Bowker, Chief Compiler & Executive Director of the World Mine Tailings Failures (WMTF) group ... The WMTF predicts there will be 17 more catastrophic tailings failures worldwide from 2020-2029 (with a severity comparable to Brumadinho) if there is not a radical change in public resource governance and industry practice. The WMTF believes tailings and waste management risks and liabilities are largely unrecognised [*sic*] by investors.<br><br>The cost to decommission is high with for example Vale estimating the cost to decommission its 10 remaining inactive upstream dams in Brazil at ~$1.3bn (R5bn)... This will be a challenge for smaller producers. However the cost of a dam failure can be exceptionally high both financially & in terms of social, environmental & reputational damage as in Brazil. |
| | 02/25/2019 | $12.00 | $12.00 | no change | There has been a sharp revision in investors' perception of the most important issues to Vale's investment case since H218. Over 80% of respondents now cite Regulation/Country risk as the most important issues following the tailings dam spill. |

*Confidential*

**Exhibit 6**

**Excerpts from Analysts' Reports Indicating Analysts Considered the Materialization of Disclosed Risk When Assessing Vale Securities' Prices**

*January 25, 2019 – February 25, 2019*

| Contributor | Date | Prior Target Price | Current Target Price | Target Price Change | Select Excerpts |
|---|---|---|---|---|---|
| **Validea** | 01/25/2019 | | N/A | | [This is a Validea Guru Stock Report that rates Vale stock according to a quantitative methodology.] |
| **Zacks Equity Research** | 02/11/2019 | | $13.00 | | [This report does not provide target price history.]<br><br>Despite the setbacks caused by the dam collapse, Vale will benefit from its focus on investment in projects like Gelado and Salobo III in the long term. Lower debt levels and strong cash generation will also drive growth. Its shares have performed in-line with the industry over the past year. Its estimates have gone up lately, The company also has a positive record of earnings surprises in the last few quarters.<br><br>On Jan 25, the Corrego do Feijao iron ore mine in Brazil operated by Vale, collapsed and killing [*sic*] an estimated 100 people in Brazil's deadliest mining disaster ever. The company has already had $3 billion in assets blocked by the courts to ensure there is money set aside to cover the financial impact. Lawyers are lining up civil suits. Vale has suspended its dividend and stopped all share buybacks. It has also eliminated executive bonuses. This is the second major tailings dam disaster for the company, which suffered a similar, albeit smaller, breach at the Samarco Mine less than four years ago. Vale has also announced that it is taking up to 10% of its production off line and decommissioning 10 tailings dams.<br><br>Vale has been ordered by a Brazilian court to suspend production at its 30mtpa Brucutu mine in Minas Gerais.<br><br>In addition to this, high environmental cleanup expenses required after the closing of a mine also prevents shutdowns. |

**Notes:**

[1] Analysts' reports reviewed include 122 analysts' reports produced by Plaintiff's expert, Professor Feinstein, or obtained from CapIQ and Refinitiv, that were published from January 25, 2019 to February 25, 2019. From CapIQ and Refinitiv, I reviewed all additional English-language reports that these databases considered to be not auto-generated. Through these criteria, I excluded the following contributors: Sadif Investment Analytics , Eleven Financial, ValuEngine, Wright Reports, Jefferson Research & Management, S&P Global Compustat, Trefis, and BuySellSignals.

[2] Bank of America refers to its target price as "price objective."

[3] Bank of America started withholding a target price for Vale due to uncertainty following the Dam 1 collapse.

[4] Morgan Stanley started withholding a target price for Vale due to uncertainty following the Dam 1 collapse.

[5] Morningstar Equity Research does not provides a target price. Instead, it reports a fair value estimate for Vale's stock, which are used in this exhibit.

[6] I list excerpts that include information related to the materialization of disclosed risk, as represented by the Dam 1 collapse and related financial consequences. These excerpts include analysts' commentary regarding expectations of output, fines, liabilities, and government action.

**Sources:**

[1] Vale Analysts' Reports, January 25, 2019 – February 25, 2019.

*Confidential*

**Exhibit 7**
**Professor Feinstein's Event Study Results for the Vale Notes**
*Feinstein Report, March 10, 2023*

| Vale Note | Coupon | Maturity Date | Term | Years to Maturity as of February 6, 2019 | Statistically Significant at 95% Confidence Level? | | |
| | | | | | January 25, 2019 | February 4, 2019 | February 6, 2019 |
|---|---|---|---|---|---|---|---|
| TAN3 | 5.875% | 6/10/2021 | 5 Years | 2.3 | | | |
| TAM5 | 4.375% | 1/11/2022 | 10 Years | 2.9 | ✓ | | ✓ |
| TAP8 | 6.250% | 8/10/2026 | 10 Years | 7.5 | ✓ | ✓ | ✓ |
| TAE3 | 8.250% | 1/17/2034 | 30 Years | 14.9 | ✓ | | |
| TAH6 | 6.875% | 11/21/2036 | 30 Years | 17.8 | ✓ | | ✓ |
| TAK9 | 6.875% | 11/10/2039 | 30 Years | 20.8 | ✓ | | |
| EAA3 | 5.625% | 9/11/2042 | 30 Years | 23.6 | ✓ | | ✓ |

**Sources:**
**Exhibit 2**; Feinstein Report, Exhibits 10a-g.

## Exhibit 8
## Comparison of Professor Feinstein's Event Study Results: TAM5 Note
*Feinstein Market Efficiency Report (February 18, 2021) and Feinstein Report (March 10, 2023)*

| | Feinstein Report | | | | | Feinstein Market Efficiency Report | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Prior Day VWAP | Residual Return | t-statistic | Statistically Significant at 95% Level? | Dollar Residual Return | Prior Day VWAP | Residual Return | t-statistic | Statistically Significant at 95% Level? | Dollar Residual Return |
| | | | | | If [D] = Yes: | | | | | If [D] = Yes: |
| Date | [A] | [B] | [C] | [D] | $[E] = [A] \times (\exp([B]) - 1)$ | [A] | [B] | [C] | [D] | $[E] = [A] \times (\exp([B]) - 1)$ |
| January 25, 2019 | $102.15 | -1.70% | -6.12 | Yes | ($1.72) | $102.15 | -1.78% | -6.05 | Yes | ($1.80) |
| February 4, 2019 | $100.77 | -0.25% | -0.91 | No | $0.00 | $100.77 | -0.26% | -0.90 | No | $0.00 |
| February 6, 2019 | $100.63 | -0.65% | -2.34 | Yes | ($0.65) | $100.63 | -0.55% | -1.86 | No | $0.00 |
| | | | | | **($2.37)** | | | | | **($1.80)** |

**Note:**

[1] For the other Vale Notes, statistical significance at the 95% level remained unchanged between the Feinstein Market Efficiency Report and the Feinstein Report.

**Sources:**

Feinstein Market Efficiency Report, Exhibit 12b; Feinstein Report, Exhibit 10b.

# Exhibit 9
# Vale ADR Rolling PSLRA "Bounce-Back" Prices
*February 6, 2019 – May 6, 2019*

| Date | Vale ADR Closing Price | Rolling PSLRA "Bounce-Back" Price |
|---|---|---|
| 2/6/2019 | $11.36 | $11.36 |
| **2/7/2019** | **$11.17** | **$11.27** |
| 2/8/2019 | $11.39 | $11.31 |
| 2/11/2019 | $11.22 | $11.29 |
| 2/12/2019 | $11.85 | $11.40 |
| 2/13/2019 | $12.00 | $11.50 |
| 2/14/2019 | $12.14 | $11.59 |
| 2/15/2019 | $12.33 | $11.68 |
| 2/19/2019 | $12.19 | $11.74 |
| 2/20/2019 | $12.23 | $11.79 |
| 2/21/2019 | $12.03 | $11.81 |
| 2/22/2019 | $12.50 | $11.87 |
| 2/25/2019 | $12.55 | $11.92 |
| 2/26/2019 | $12.52 | $11.96 |
| 2/27/2019 | $12.49 | $12.00 |
| 2/28/2019 | $12.48 | $12.03 |
| 3/1/2019 | $12.39 | $12.05 |
| 3/4/2019 | $12.42 | $12.07 |
| 3/5/2019 | $12.66 | $12.10 |
| 3/6/2019 | $12.49 | $12.12 |
| 3/7/2019 | $12.60 | $12.14 |
| 3/8/2019 | $12.59 | $12.16 |
| 3/11/2019 | $12.99 | $12.20 |
| 3/12/2019 | $13.05 | $12.24 |
| 3/13/2019 | $13.28 | $12.28 |
| 3/14/2019 | $13.15 | $12.31 |
| 3/15/2019 | $13.20 | $12.34 |
| 3/18/2019 | $13.28 | $12.38 |
| 3/19/2019 | $13.70 | $12.42 |
| 3/20/2019 | $13.49 | $12.46 |
| 3/21/2019 | $13.46 | $12.49 |
| 3/22/2019 | $12.82 | $12.50 |
| 3/25/2019 | $12.86 | $12.51 |
| 3/26/2019 | $13.02 | $12.53 |
| 3/27/2019 | $12.67 | $12.53 |
| 3/28/2019 | $12.63 | $12.53 |
| 3/29/2019 | $13.06 | $12.55 |
| 4/1/2019 | $13.58 | $12.57 |
| 4/2/2019 | $13.47 | $12.60 |
| 4/3/2019 | $13.34 | $12.62 |
| 4/4/2019 | $13.47 | $12.64 |
| 4/5/2019 | $13.39 | $12.66 |

**Exhibit 9**
**Vale ADR Rolling PSLRA "Bounce-Back" Prices**
*February 6, 2019 – May 6, 2019*

| Date | Vale ADR Closing Price | Rolling PSLRA "Bounce-Back" Price |
|---|---|---|
| 4/8/2019 | $13.82 | $12.68 |
| 4/9/2019 | $13.57 | $12.70 |
| 4/10/2019 | $13.56 | $12.72 |
| 4/11/2019 | $13.40 | $12.74 |
| 4/12/2019 | $13.24 | $12.75 |
| 4/15/2019 | $13.28 | $12.76 |
| 4/16/2019 | $13.57 | $12.77 |
| 4/17/2019 | $13.27 | $12.78 |
| 4/18/2019 | $13.32 | $12.79 |
| 4/22/2019 | $13.06 | $12.80 |
| 4/23/2019 | $13.17 | $12.81 |
| 4/24/2019 | $12.56 | $12.80 |
| 4/25/2019 | $12.68 | $12.80 |
| 4/26/2019 | $12.82 | $12.80 |
| 4/29/2019 | $12.78 | $12.80 |
| 4/30/2019 | $12.78 | $12.80 |
| 5/1/2019 | $12.38 | $12.79 |
| 5/2/2019 | $12.36 | $12.79 |
| 5/3/2019 | $12.79 | $12.79 |
| 5/6/2019 | $12.52 | $12.78 |

| | |
|---|---|
| **Minimum Rolling PSLRA "Bounce-Back" Price** | **$11.27** |
| **Date** | **2/7/2019** |

**Note:** The Rolling PSLRA "Bounce-Back" price is the mean of the closing prices between February 6, 2019 and each respective day.

**Source**: Bloomberg.



**Exhibit 10**
**Vale Common and Preferred ADR Prices**
*October 1, 2016 – May 6, 2019*

**Sources:**
Complaint; ECF No. 116, *In re Vale S.A. Securities Litigation*, Case No. 19-cv-526-RJD-SJB, March 31, 2022; 15 U.S.C. § 78u-4(e)-(1); Bloomberg; Vale, Form 20-F for the fiscal year ending December 31, 2017, pp. 6, 119; Vale, "Offer to Exchange Any or All Outstanding American Depositary Shares Representing Preferred Shares of Vale S.A. for American Depository Shares Representing Common Shares of Vale S.A. [and] Offer to Convert Any or All Outstanding Preferred Shares Represented by American Depository Shares of Vale S.A. into Common Shares of Vale S.A.," June 28, 2017.