# EXHIBIT D

*Confidential*

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| |
|---|
| In Re VALE S.A. SECURITIES LITIGATION |

No. 19-cv-526-RJD-SJB

REPLY REPORT ON LOSS CAUSATION AND DAMAGES

PROFESSOR STEVEN P. FEINSTEIN, PH.D., CFA

May 12, 2023

*Confidential*

## TABLE OF CONTENTS

I.      INTRODUCTION AND SUMMARY OF PRIOR WORK IN THIS MATTER ...............1

II.     SCOPE OF PROJECT AND REPORT ........................................................................4

III.    CONCLUSIONS..........................................................................................................6

IV.     CRITIQUE OF THE STEPHENSON REBUTTAL REPORT ....................................13

        A.      Areas of Agreements........................................................................................13

        B.      Mr. Stephenson Wrongly Asserts That I Have Not Described the But-For
                Disclosure; Mr. Stephenson Mischaracterizes Lead Plaintiff's Allegations
                and Conceptualizes a Too Minimal But-For Disclosure.......................................15

        C.      The Probability Magnitude That Mr. Stephenson Asserts to Be True Is
                Unrealistically Low..........................................................................................17

V.      CRITIQUE OF THE HUBBARD REBUTTAL REPORT .............................................19

        A.      Uncontested Opinions and Areas of Apparent Agreement....................................19

        B.      Professor Hubbard Proffers Unsupported and Erroneous Opinions about
                Analytic Methodology .....................................................................................24

                1.      Exact Probabilities .................................................................................25

                2.      One-to-One Mapping of Misrepresentations and Corrective
                        Disclosures................................................................................................26

                3.      But-For Disclosures Need Not Be Identical to the Actual
                        Corrective Disclosures ................................................................................28

        C.      Professor Hubbard's Characterization of Lead Plaintiff's Allegations Is
                Too Narrow and Incomplete; He Fails to Consider the Economic Impact
                of All the Allegations.......................................................................................29

                1.      The Correct But-For Scenario Is Articulated in the Feinstein LCD
                        Report.......................................................................................................29

                2.      Professor Hubbard's Far Too Narrow Characterization of Lead
                        Plaintiff's Allegations Leads to His Incorrect But-For Scenario...............30

                3.      Professor Hubbard Misreads the Complaint and the Feinstein LCD
                        Report.......................................................................................................33

        D.      The Alleged Misrepresentations and Omissions Are Economically
                Material and Responsible for Artificial Inflation in the Vale Securities'
                Prices.............................................................................................................34

                1.      Abundant Evidence Establishes the Economic Materiality of the
                        Alleged Misrepresentations and Omissions................................................34

                2.      Abundant Evidence Establishes That the Misrepresentations and
                        Omissions Caused Artificial Inflation in the Vale Security Prices............37

*Confidential*

E.      My Inflation Ribbon Was Computed Correctly and Is Supported by the Facts of the Case, the Academic Literature, and Proper Analysis .........................39

    1.      The Artificial Inflation Dissipated by the Corrective Disclosure Events Was in the Vale Securities' Prices at the Start of the Class Period .............................................................................................................39

    2.      The Inflation Ribbon Presented in the Feinstein LCD Report Does Not Assume a 100% Probability of Dam 1 Failure ...................................42

F.      Professor Hubbard Misinterprets the Corrective Disclosures and Repeatedly Makes the Same Mistake in His Event-By-Event Analysis................43

    1.      25 January 2019 .....................................................................................46

    2.      4 February 2019 .....................................................................................52

    3.      6 February 2019 .....................................................................................55

G.      Differences in Vale Notes' Price Reactions Does Not Indicate Inefficiency ........61

H.      The Vale Preferred ADRs..........................................................................................64

VI.     PROFESSOR SUTCLIFFE'S CRITICISMS OF THE FEINSTEIN LCD REPORT ARE MERITLESS ..........................................................................................65

VII.    LIMITING FACTORS AND OTHER ASSUMPTIONS.......................................................66

*Confidential*

## I. INTRODUCTION AND SUMMARY OF PRIOR WORK IN THIS MATTER

1. As reported in my expert report dated 18 February 2021 ("Feinstein Report") and my rebuttal report dated 4 June 2021 ("Feinstein Rebuttal Report"), I conducted analyses to assess the efficiency of the markets in which the Vale Securities traded during the period from 27 October 2016 through 6 February 2019, inclusive (the "Class Period"). I concluded that the Vale Securities traded in efficient markets throughout the Class Period.

2. I also explained in the Feinstein Report that the standard out-of-pocket damage model is consistent with Lead Plaintiff's theory of liability and can be applied commonly to compute Section 10(b) damages for all Class members.

3. I understand that in its Report and Recommendation decision dated 11 January 2022, the Court in this matter accepted the conclusions regarding market efficiency and the common damage model, and recommended that Lead Plaintiff's motion for class certification be granted.[1] I understand that on 31 March 2022, the Report and Recommendation was adopted by Judge Dearie. I understand that Defendants' petition for an appeal of the ruling was denied on 7 September 2022.

4. On 10 March 2023, I submitted the Report on Loss Causation and Damages ("Feinstein LCD Report"). As explained in that report, I determined that, based on my analysis and the assumption that Lead Plaintiff will prove its factual allegations, Class members suffered losses as a result of the alleged misrepresentations and omissions.[2] I quantified the Section 10(b) damages Class members sustained per Vale Security as a result of the alleged misrepresentations and omissions.

---

[1] *Report & Recommendation*, dated 11 January 2022; and *Memorandum and Order*, dated 31 March 2022.

[2] Feinstein LCD Report, ¶11.

*Confidential*

5.    Specifically, in the Feinstein LCD Report, I explained:

   i.    The alleged misrepresentations, omissions, and deceptive conduct, which misled investors about the stability of the Company's dams, the Company's ability to manage risks, and the Company's commitment to safety and sustainability were economically material to investors.[3]

   ii.   Vale's positive misrepresentations and omissions about the stability of its dams, sufficient and effective management of risks related to the dams, and conduct consistent with its professed commitment to safety and sustainability caused the prices of the Vale Securities to be artificially inflated.[4]

   iii.  The corrective disclosure events near and at the end of the Class Period informed the market that the Company had not been forthcoming with honest information about the stability of its dams and management of associated risks. The corrective disclosures informed the market that, contrary to what the market was led to believe, the dams were not stable, the Company was not managing risks sufficiently and effectively, the Company was not committed to safety and sustainability, and as a result the Company was exposed to the adverse consequences of its decisions and conduct, including financial ramifications, and regulatory, litigation, and enforcement actions.[5]

   iv.   Investors who purchased or otherwise acquired Vale Securities during the Class Period suffered economic losses that were caused by the alleged misrepresentations, omissions, and deceptive conduct.[6]

6.    I quantified the Section 10(b) damages Class members sustained per Vale Security on their investments as follows:

---

[3] Feinstein LCD Report, ¶12.

[4] Feinstein LCD Report, ¶13.

[5] Feinstein LCD Report, ¶12.

[6] Feinstein LCD Report, ¶16.

*Confidential*

i. The artificial inflation in the market price of the Vale ADR from the start of the Class Period until 25 January 2019 was $2.72 per ADR. Investors in the Vale ADR suffered losses of up to $2.72 per ADR.

ii. The TAP8 Notes were artificially inflated by $6.49 per $100 of par value at the start of the Class Period. Investors in the TAP8 Notes suffered losses of up to $6.49 per $100 of par value.

iii. The TAM5 Notes were artificially inflated by $2.37 per $100 of par value at the start of the Class Period. Investors in the TAM5 Notes suffered losses of up to $2.37 per $100 of par value.

iv. The TAE3 Notes were artificially inflated by $5.95 per $100 of par value at the start of the Class Period. Investors in the TAE3 Notes suffered losses of up to $5.95 per $100 of par value.

v. The TAH6 Notes were artificially inflated by $7.17 per $100 of par value at the start of the Class Period. Investors in the TAH6 Notes suffered losses of up to $7.17 per $100 of par value.

vi. The TAK9 Notes were artificially inflated by $6.68 per $100 of par value at the start of the Class Period. Investors in the TAK9 Notes suffered losses of up to $6.68 per $100 of par value.

vii. The EAA3 Notes were artificially inflated by $6.53 per $100 of par value at the start of the Class Period. Investors in the EAA3 Notes suffered losses of up to $6.53 per $100 of par value.

viii. Investors in the TAN3 Notes suffered no quantifiable damages from their investments in the TAN3 Notes.

7. Following the Feinstein LCD Report, I submitted a reply report dated 7 April 2023 ("Feinstein Reply Report"). The Feinstein Reply Report addressed the arguments in the Expert Report of Randal Stephenson, dated 10 March 2023, submitted by Defendants in this matter (the "Stephenson Report") on the same day I submitted the Feinstein LCD Report.

*Confidential*

8. Mr. Stephenson opined that the alleged misrepresentations and omissions caused only negligible damages because they had no meaningful impact on the valuation of Vale and its securities.[7] Mr. Stephenson asserted that investors were already aware of a risk of dam failure throughout the Class Period, and that the provision to investors of certain risk statistics would have constituted full disclosure. He contended that the Company allegedly concealing the true risk of a dam catastrophe and the Company's exaggerations about its management of such risks had no meaningful impact on investors' valuation of Vale and its securities, and therefore caused at most, *de minimis* damages.[8]

9. As I explained in the Feinstein Reply Report, the Stephenson Report provided no valid basis for revising my conclusions on loss causation and damages.[9] Mr. Stephenson's conclusions were based on a mischaracterization of Lead Plaintiff's allegations, a misunderstanding of the case facts, and faulty logic.[10] Mr. Stephenson failed to consider that it would have mattered greatly to investors if they knew the Company was misrepresenting the risk of catastrophe and its conduct related thereto. Mr. Stephenson did not consider the valuation impact of the concealed information asymmetry – the fact that the Company wished to hide from investors its true condition and conduct, unbeknownst to investors until the corrective disclosures revealed that fact.

## II. SCOPE OF PROJECT AND REPORT

10. Kaplan Fox & Kilsheimer LLP, Lead Counsel for the Lead Plaintiff, asked me to consider, evaluate, and respond to the arguments and conclusions in the following three expert reports subsequently submitted on behalf of Defendants in this matter (collectively, "Defendants' Experts' Reports"): i) Expert Rebuttal Report of Randal Stephenson, dated 7

---

[7] Full disclosure according to Mr. Stephenson would have been an announcement that "Dam 1's probability of failure was 3 in 10,000, or three times Vale's purported maximum risk tolerance; that ten dams including Dam 1 had a failure probability in Vale's Attention Zone, and that Dam 1's undrained Factor of Safety allegedly was greater than purported best practices." The word "greater" in this quote from the Stephenson Report is probably a typo. Presumably, Mr. Stephenson intended to say "lower" than best practices, as this is what Lead Plaintiff alleged. (Stephenson Report, ¶76).

[8] Stephenson Report, ¶¶22 and 76.

[9] Feinstein Reply Report, ¶¶12-15.

[10] Feinstein Reply Report, ¶¶12-15.

4

*Confidential*

April 2023 (the "Stephenson Rebuttal Report"); ii) Rebuttal Expert Report of Glenn Hubbard, dated 7 April 2023 (the "Hubbard Rebuttal Report"); and iii) Rebuttal Expert Report of Kathleen M. Sutcliffe, Ph.D., dated 7 April 2023 (the "Sutcliffe Rebuttal Report").

11.     The stated scope of each of Defendants' Experts' reports are as follows:

i.      Mr. Stephenson was asked to "review and respond to certain opinions included in the: (1) Report on Loss Causation and Damages by Professor Steven P. Feinstein, Ph.D., CFA ('Feinstein Report'); (2) Expert Report of Dr. Franco Oboni, Ph.D. ('Oboni Report'); and (3) Expert Report of Harvey L. Pitt ('Pitt Report'), all of which were submitted on behalf of Plaintiff."[11]

ii.     Professor Hubbard was asked to "review and respond to the analysis presented in the Expert Report on Loss Causation and Damages of Professor Steven P. Feinstein, Ph.D., CFA dated March 10, 2023 ('Feinstein Report'); and certain opinions expressed in the Expert Report of Harvey L. Pitt dated March 9, 2023 ('Pitt Report')."[12]

iii.    Professor Sutcliffe was asked to "respond to portions of the Oboni Report, Pitt Report, and Feinstein Report that relate to Vale's organizational safety and risk management practices."[13]

12.     My present reply report presents my responses to the Stephenson Rebuttal Report, the Hubbard Rebuttal Report, and the Sutcliffe Rebuttal Report.

13.     I reviewed and relied upon all of the data and documents cited and listed in my previous reports. Additional data and documents considered are listed in Exhibit-1 of this report. My credentials and compensation are presented in the Feinstein Report.

14.     My work on this matter is ongoing. I reserve the right to amend, refine, or supplement my analyses and opinions in the event that I become aware of additional information, evidence, arguments, or analyses that bear on my work in this matter.

---

[11] Stephenson Rebuttal Report, ¶3.

[12] Hubbard Rebuttal Report, ¶18.

[13] Sutcliffe Rebuttal Report, ¶3.

*Confidential*

III.    **CONCLUSIONS**

15.    None of Defendants' Experts' Reports provides any basis for revising my findings and conclusions regarding loss causation and damages. None of Defendants' Experts' Reports proves that any losses sustained by investors were caused by factors other than the alleged misrepresentations, omissions, and deceptive conduct. They levy no valid challenge to my analyses or conclusions.

16.    My analyses conform to widely used and generally accepted methodologies, are grounded in fundamental principles of economics, and are correctly executed. My loss causation analysis compels the conclusion that the alleged misrepresentations and omissions caused investor losses. The alleged misrepresentations and omissions artificially inflated the prices of Vale Securities. The corrective disclosure events dissipated that artificial inflation, causing the prices of the Vale Securities to fall, and thereby caused investor losses.

17.    The quantification of damages presented in the Feinstein LCD Report is scientific, consistent with market efficiency, and accords with Lead Plaintiff's allegations, facts of the case, and generally accepted valuation principles. I properly considered whether there was confounding information disclosed simultaneously with the corrective disclosures. I found none that contributed to the price declines in the Vale Securities on the corrective disclosure event dates.

18.    As I explained in the Feinstein LCD Report, the alleged misrepresentations, omissions, and deceptive conduct, which misled investors about the stability of the Company's dams, the Company's ability to manage risks, and the Company's commitment to safety and sustainability were economically material to investors.[14]

19.    Vale's positive misrepresentations and omissions about the stability of its dams, sufficient and effective management of risks related to the dams, and conduct consistent with its professed commitment to safety and sustainability caused the prices of the Vale Securities to be artificially inflated.[15]

---

[14] Feinstein LCD Report, ¶12.

[15] Feinstein LCD Report, ¶13.

*Confidential*

20.     The corrective disclosure events near and at the end of the Class Period informed the market that, contrary to what the market was led to believe, the Company's dams were not stable, the Company was not managing risks sufficiently and effectively, the Company was not committed to safety and sustainability, and as a result the Company was exposed to the adverse consequences of its decisions and conduct, including financial ramifications, and regulatory, litigation, and enforcement actions.[16] The corrective events also informed investors that the Company had been concealing information about these highly important conditions and conduct.

21.     Investors who purchased or otherwise acquired Vale Securities during the Class Period suffered economic losses that were caused by the alleged misrepresentations, omissions, and deceptive conduct.[17]

22.     Mr. Stephenson and Professor Hubbard mischaracterize Lead Plaintiff's allegations as being limited to the Company concealing one particular *a priori* estimate of the one dam that ultimately burst. Mr. Stephenson and Professor Hubbard fixate on a 0.03% estimate for the probability of failure of Dam 1, offered by Potamos Engineering and Hydrology, Ltd., and they incorrectly assume that concealment of this figure was the end all of the alleged misrepresentations and omissions. Mr. Stephenson and Professor Hubbard mistakenly contend that this estimate was the only estimate of the failure of Dam 1 known to the Company, inappropriately overlook that other assessments of dam failure were much greater, and blindly accept that this figure was the correct probability estimate.[18] They mistakenly overlook that the allegations of misrepresentations and omissions comprised much more, including that the Company allegedly misrepresented its commitment to safety and sustainability, the stability of the Company's dams, the sufficiency and effectiveness of the Company's risk management, that the Company engaged in inappropriate conduct to have dams certified, and critically, that the Company sought to conceal from investors important information about dam safety and the Company's condition and conduct related thereto.

---

[16] Feinstein LCD Report, ¶12.

[17] Feinstein LCD Report, ¶16.

[18] Complaint, ¶70; Stephenson Report, FNs 109 and 115; and Hubbard Rebuttal Report, ¶58.

23.    As explained in the Feinstein LCD Report, what the market was able to learn from the collapse of Dam 1, coming so soon after the Samarco Mariana Dam collapse, was not that the true probability of a dam failure was 0.03%, but rather that the Company's condition and conduct could not have been as the Company was representing, and the true probability of a dam failure must have been significantly greater than what the market was previously led to believe. Mr. Stephenson and Professor Hubbard fail to consider that the Company to this day has not disclosed an indisputable quantification of the dam failure probability, further establishing that the information conveyed by the corrective disclosures in this case was not that the true probability was 0.03%, but rather that the Company's conduct and condition were not consistent with prior (mis)representations.

24.    The Stephenson Rebuttal Report provides no valid basis for revising my conclusions on loss causation and damages. Mr. Stephenson does not dispute any of the financial principles described in the Feinstein LCD Report, which address the valuation impact of the alleged misrepresentations and omissions. Specifically, he does not dispute that information related to a company's ESG practices, effective risk management, reputation, and financial performance (e.g., revenue and cash flow) are economically material information that can impact investors' valuation of a company and its securities.[19]

25.    However, Mr. Stephenson mischaracterizes Lead Plaintiff's allegations, misunderstands case facts, and applies faulty logic. He erroneously asserts that I have not stated what economically material information could have been disclosed prior to Dam 1's collapse.[20] I specifically stated that, assuming Lead Plaintiff's factual allegations, the Company could have informed investors at any point during the Class Period that the Company was concealing what it knew about the condition of its dams and its dam risk management, among other related conditions and conduct.[21]

---

[19] Stephenson Rebuttal Report, ¶¶9, 11, and 15-17.

[20] Stephenson Rebuttal Report, ¶¶6-21.

[21] Feinstein LCD Report, ¶219.

*Confidential*

26.     As explained in the Feinstein Reply Report,[22] and enumerated below, Mr. Stephenson's opinions provide no valid basis for revising my conclusions on loss causation and damages.

    i.    Mr. Stephenson mistakes market awareness of the existence of a risk with full knowledge of the magnitude of the risk. With respect to this case specifically, Mr. Stephenson mistakes the market's awareness of the risk that a dam could fail – that such an adverse event is within the realm of possibility – with full and complete disclosure of the Company's condition and conduct regarding dam safety, which according to Lead Plaintiff was far different than what the market was led to believe.

    ii.    In both the Stephenson Report and the Stephenson Rebuttal Report, Mr. Stephenson overlooks that the Company allegedly engaged in misconduct to conceal the true condition of its dams and Company behavior regarding dam safety. Full disclosure would therefore also have had to inform investors of the Company's intent and efforts to mislead investors. Mr. Stephenson's characterization of full disclosure is far too narrow and does not accord with Lead Plaintiff's allegations.

    iii.    Mr. Stephenson disregards that generally accepted economic principles about asymmetric information dictate a severe valuation discount when investors are aware that information is concealed or intentionally misrepresented. Just as the fact of a cover-up can have severe consequences beyond the impact of the content that was covered up, the Company's alleged conduct to conceal the magnitude of risk will have severe valuation impact, potentially greater than what would have been the economic impact of the specific concealed information alone. According to generally accepted economic principles, investors rationally assume the worst when they become aware that a company is hiding important information.

    iv.    Mr. Stephenson mischaracterizes and/or misunderstands the corrective disclosures in this case. Contrary to Mr. Stephenson's opinions, the corrective disclosures did not tell investors a specific number quantifying the probability of Dam 1 collapse. Rather, the corrective disclosures informed investors that risks were far greater than what they were led to believe, and that the Company was not being transparent and

---

[22] Feinstein Reply Report, ¶¶12-13.

*Confidential*

truthful about its dam safety, conduct, and conditions. Any announcement or event that revealed these truths to investors would have been more far-reaching than the hypothetical corrective disclosure Mr. Stephenson considered, and would accordingly have had a much more severe valuation impact than the minimal impact Mr. Stephenson describes.

27. The Hubbard Rebuttal Report similarly provides no valid basis for revising my conclusions on loss causation and damages. Professor Hubbard purports to identify deficiencies in my loss causation and damages analysis presented in the Feinstein LCD Report, but his criticisms are misguided or erroneous:

   i. According to Professor Hubbard, I did not demonstrate that the alleged misrepresentations introduced artificial inflation into the prices of the Vale Securities.[23] But, he is wrong. I proved that the alleged misrepresentations and omissions were economically material, and I explained that in an efficient market, positive misrepresentations introduce or maintain artificial inflation.[24] Professor Hubbard disregards the abundant evidence establishing the economic materiality of the alleged misrepresentations and omissions. Properly considering the facts and factors that Professor Hubbard inappropriately disregards compels the conclusion that the alleged misrepresentations and omissions did introduce and maintain artificial inflation in the prices of the Vale Securities.

   ii. According to Professor Hubbard, I did not assess which corrective disclosures corrected which alleged misstatements.[25] Professor Hubbard is wrong to assert that every quantum of artificial inflation can and must be linked to one and only one specific misrepresentation. He fails to appreciate that a series of misrepresentations and omissions can cause investors and analysts to have a wholistically false impression of a company and therefore overvalue the company and its securities. Professor Hubbard also fails to appreciate that corrective disclosures can come in

---

[23] Hubbard Rebuttal Report, ¶36.

[24] Feinstein LCD Report, ¶100.

[25] Hubbard Rebuttal Report, ¶36.

*Confidential*

the form of events that reveal that the company's conditions and conduct are inconsistent with the previously misrepresented and omitted information. By being starkly inconsistent with prior misrepresentations, a disclosure event may partially correct a single fraudulent misrepresentation or omission, or a combined set of fraudulent misrepresentations and omissions that portrayed the Company falsely. As a result, each corrective disclosure may pertain to multiple misrepresentations, and conversely, each misrepresentation can be incrementally corrected by multiple corrective disclosures. To insist that each disclosure must be tied individually, uniquely, and solely to a specific misrepresentation, or that each misrepresentation must be tied to a unique corrective disclosure not only is an unsupported legal opinion, but it underscores a misunderstanding of how securities markets work. The market will update valuation in accordance with the truth when events reveal a company's true condition and conduct. In this case, the corrective disclosures revealed that Vale was unlike or inconsistent with the alleged fraudulent misrepresentations and omissions.

iii. According to Professor Hubbard, the residual security price declines following the corrective disclosure events were in part caused by materializations of publicly known risks, and those same price declines would have occurred even if there were no alleged misrepresentations and omissions.[26] Professor Hubbard is wrong. Professor Hubbard's mistake here, which leads him to this erroneous conclusion, is that he misunderstands or mischaracterizes Lead Plaintiff's allegations. On 25 January 2019, the market did not only learn that a dam had burst. On that date, investors began to learn from this event that the Company had been misinforming the market about dam safety and Vale's related condition and conduct. Had investors been previously apprised that the Company was engaging in deceptive practices, was intent on concealing the magnitude of risk, and deliberately withheld information about its condition and conduct, the valuation of Vale's securities would already have been depressed by an amount commensurate with the decline that did occur when the deception unraveled.

---

[26] Hubbard Rebuttal Report, ¶36.

11

*Confidential*

iv.   Professor Hubbard repeatedly but incorrectly claims throughout his report that the only corrective disclosure that was possible was the revelation of an incremental increase in the probability of failure of Dam 1.[27] Underlying Professor Hubbard's argument is the fundamental mistake of incorrectly limiting Lead Plaintiff's allegations, and disregarding that Lead Plaintiff alleges that the Company possessed material adverse information and engaged in "a deliberate and concerted effort to mislead the public."[28] As he does not comprehensively address Lead Plaintiff's full set of allegations, he applies the wrong economic analysis and levies misguided criticism. What Professor Hubbard overlooks is that if a company conceals adverse information about its condition and conduct, and deprives investors of the necessary facts to properly assess risk, the market prices of the company's securities will be artificially inflated by a substantial amount. The valuation would be significantly greater than what it would be if investors were to learn that the company was withholding important information from them. If the market were to learn that the company was withholding important information from them, the market's valuation of the company and its securities would be significantly lower. The realization that important information was and is being withheld can stem from an announcement, or from an event such as a dam failure, operational shutdown, or loss of an operating license. With such corrective disclosure, the artificial inflation dissipates, the security prices decline, and investors suffer losses. This scenario is what the Lead Plaintiff alleges happened in this case when Dam 1 broke and the truth about the Company's misconduct emerged. The devastation of the dam break caused monetary loss, of course, but according to economic principles, investors would have anticipated and priced in such loss, or even greater loss, if they had known they were being intentionally deceived about the likelihood and potential consequences of devastating events.

---

[27] See, e.g., Hubbard Rebuttal Report, ¶¶24, 34, 35, 40, 41, 42, 44, 45, 47, 56, 58, 61, 65, 68, 69, 78, and 82.

[28] MTD Order, p. 35.

*Confidential*

v.    Professor Hubbard writes that I did not articulate a credible but-for scenario.[29] Professor Hubbard is wrong. I explained the but-for scenario in the Feinstein LCD Report, and reiterate. Had the Company told investors at the start of the Class Period that Vale was denying them accurate information about the safety and stability of its dams, that Vale was concealing the truth about how dam risks were managed, that the Company engaged in misconduct, and that Vale was not truly committed to safety and sustainability, generally accepted economic principles about asymmetric information dictate that investors would have repriced the Vale Securities significantly lower. In this but-for scenario, which is consistent with Lead Plaintiff's allegations, the market would have applied a valuation discount commensurate with the diminution of value that later did occur when the market did become aware that the Company's condition and conduct were not what the public had been told. Investors would have severely reduced the Vale Securities' valuations to account for the concealment of important information, for the lack of reliable data, and the realization that Company representations on these important matters were misrepresentations. The valuation impact would have been especially severe given that a deadly dam collapse had just occurred a year before.

## IV.    CRITIQUE OF THE STEPHENSON REBUTTAL REPORT

### A.    Areas of Agreements

28.    There are a few areas of agreement between my opinion and that of Mr. Stephenson.[30] In both of his reports, Mr. Stephenson does not challenge that Vale Securities traded in efficient markets throughout the Class Period. Mr. Stephenson also does not question that the prices of the Vale Securities fell by statistically significant amounts on the corrective disclosure event dates. Nor does Mr. Stephenson contest the applicability of a common damage model to compute Section 10(b) damages for all Class members.

---

[29] Hubbard Rebuttal Report, ¶36.

[30] Feinstein Reply Report, ¶¶16-18.

29.  In the Stephenson Rebuttal Report, Mr. Stephenson agrees with the following points that I established:

  i.  It is well established in the finance literature that a company's ESG strategy, policies, initiatives, and conduct are economically material and affect the value of a company's securities.[31]

  ii.  It is well established in the finance literature that a company's ability to measure, manage, and mitigate risk does impact the value of the company's securities.[32]

  iii.  It is well established in the finance literature that revenue and cash flow are key determinants of a company's value and the value of a company's securities.[33]

30.  In the Stephenson Rebuttal Report, Mr. Stephenson does not dispute the following points that I established:

  i.  It is well established in the finance literature that the ramifications of a fraud and investor deception can extend well beyond the direct dollar amount of the fraud, but also can cause further loss on account of damage to a company's business and prospects.[34]

  ii.  It is well established in the finance literature that transparency with respect to material information and risk exposures, and proper conduct that is consistent with professed commitments, are economically material and affect the value of a company's securities.[35]

---

[31] Stephenson Rebuttal Report, ¶9.

[32] Stephenson Rebuttal Report, ¶11.

[33] Stephenson Rebuttal Report, ¶17.

[34] Stephenson Rebuttal Report, ¶¶15-16.

[35] Stephenson Rebuttal Report, ¶¶15-16.

*Confidential*

**B.    Mr. Stephenson Wrongly Asserts That I Have Not Described the But-For Disclosure; Mr. Stephenson Mischaracterizes Lead Plaintiff's Allegations and Conceptualizes a Too Minimal But-For Disclosure**

31.    Mr. Stephenson incorrectly contends that "Prof. Feinstein [did] not address what contemporaneously available information could have or should have been disclosed prior to Dam 1's collapse."[36] Mr. Stephenson also incorrectly asserts, "Nor [did Professor Feinstein] address whether such information, in the absence of an actual collapse, would have meaningfully impacted investors' valuations of Vale Securities."[37] Mr. Stephenson overlooks my articulation of the but-for disclosures, which mirror Lead Plaintiff's allegations of what could and should have been disclosed, and reflect what the market did ultimately learn from the corrective disclosure events. For example, Lead Plaintiff states that the Company's representation that it was committed to safety and sustainability was false. It follows that a correct statement would have been that the Company is not committed to safety and sustainability. It is indisputable that such a but-for disclosure "would have meaningfully impacted investor's valuations of Vale Securities."

32.    Mr. Stephenson ignores that the full but-for disclosure is carefully articulated in the Feinstein LCD Report, the Feinstein Reply Report, and herein. The but-for disclosure would have been an earlier announcement telling investors everything that was ultimately learned from the actual corrective disclosures that was being previously concealed. Had Vale told investors that the Company was denying them accurate information about the safety and stability of its dams, that Vale was concealing the truth about how dam risks were managed, and that Vale was not truly committed to safety and sustainability, generally accepted economic principles about asymmetric information dictate that investors would have repriced the Vale Securities significantly lower,[38] applying a discount commensurate

---

[36] Stephenson Rebuttal Report, ¶6.

[37] Stephenson Rebuttal Report, ¶6.

[38] The Nobel Prize in Economics was twice awarded for developing the principles about behavior and pricing under conditions of asymmetric information ("The Market for 'Lemons': Quality Uncertainty and the Market Mechanism," by George Akerlof, *The Quarterly Journal of Economics*, vol. 84, no. 3, 1970; and "Markets with Asymmetric Information: The Contributions of George Akerlof, Michael Spence and Joseph Stiglitz," by Karl-Gustaf Lofgren et al., *The Scandinavian Journal of Economics*, vol. 104, no. 2, 2002); and ("Improvements to Auction Theory and Inventions of New Auction Formats," The Committee for the Prize in Economic Sciences in Memory of Alfred Nobel, 12 October 2020, describing the award to Paul Milgrom in 2020 for his work addressing asymmetric information,

15

*Confidential*

with the diminution of value that later occurred when the market did become aware that the Company's condition and conduct were not what the public had been told.[39] Investors would have severely reduced the valuations of the Vale Securities to account for the concealment of important information, the lack of reliable data, and the realization that Company representations on these important matters were misrepresentations.[40]

33. Mr. Stephenson overlooks that the but-for disclosure would have informed investors that the Company was intent on deceiving investors, concealing the truth about Company condition and conduct with respect to dam safety, and depriving investors of the necessary facts to properly assess the true risk of dam failure. This is what allegedly was concealed and what investors did ultimately learn from the corrective disclosure events, and so this is what would correctly constitute a but-for prior full disclosure.

34. Mr. Stephenson's narrow characterization of the but-for disclosure is at odds with the Court's MTD Order, to which my articulated but-for scenario corresponds. The Court notes that Lead Plaintiff's allegations "plainly reveal that Defendants fabricated their statements about Vale's safety."

> "If proven, Plaintiff's allegations would show a deliberate and concerted effort to mislead the public. The allegations plainly reveal that Defendants fabricated their statements about Vale's safety and risk management practices, Vale's commitment to safety and sustainability, and the stability of Vale's dams."
> **MTD Order, p. 35.**

35. The valuation impact of the market learning of a deliberate information asymmetry of this kind is significant, not *de minimis*. Mr. Stephenson fails to consider, or even mention, how information asymmetry impacts the prices of securities and the market itself. Mr. Stephenson failed to consider how the market's uncertainty arising from the corrective events impacted the Vale Security prices. Mr. Stephenson's too restrictive characterization of the alleged misrepresentations and omissions, resulting in an inaccurate

---

which cited, among others, "Rational Expectations, Information Acquisition, and Competitive Bidding," by Paul Milgrom, *Econometrica*, vol. 49, no. 4, 1981).

[39] Feinstein LCD Report, ¶22.

[40] Feinstein LCD Report, ¶22.

*Confidential*

mischaracterization of the full disclosure but-for scenario, is one defect that produces Mr. Stephenson's erroneous opinion that inflation and damages were negligible.[41]

### C.    The Probability Magnitude That Mr. Stephenson Asserts to Be True Is Unrealistically Low

36.    In the Stephenson Rebuttal Report, Mr. Stephenson presents an abbreviation of the flawed probability analysis he first presented in the Stephenson Report.[42] This flawed analysis was also relied upon by Defendants' expert Professor Hubbard.[43] Mr. Stephenson suggests that the damages analysis depends on evaluating a spread between the market's perceived probability of dam failure and a different number the Company should have announced. Mr. Stephenson asserts that any inflation in the prices of the Vale Securities was entirely due to the market assessing the probability of dam failure to be 0.01% rather than 0.03%. Not only is this characterization of the allegations and the but-for scenario incorrect and too limited, but the 0.01% and 0.03% probability figures that Mr. Stephenson bases his opinion on are not likely correct. Professor Hubbard exhorts in favor of a similar, flawed approach to assess damages (though he does not actually conduct that analysis).[44]

37.    As explained in the Feinstein Reply Report, Mr. Stephenson baselessly opines that the market assessed the dam failure rate to be precisely 0.01% prior to the end of the Class Period. While this number may have been what the Company deemed to be an acceptable maximum level of risk, Mr. Stephenson has no basis to assert that the market believed this maximum acceptable risk level was the actual probability or the best risk level the Company was able to achieve given the Company's professed commitment to safety (which Lead Plaintiff alleges turned out to be misrepresented). Given the Company's representations, the market may have assessed a lower risk level than 0.01% annual failure rate per dam, rendering Mr. Stephenson's conclusion erroneous.

---

[41] Stephenson Rebuttal Report, ¶21.

[42] Stephenson Report, ¶¶58-75; and Stephenson Rebuttal Report, ¶21.

[43] Hubbard Rebuttal Report, ¶¶58 and 89.

[44] Hubbard Rebuttal Report, ¶58.

38.    Mr. Stephenson makes the unsubstantiated leap to assume that 0.03% is the correct maximum probability figure that would have honestly informed investors of the true probability of Dam 1 collapsing. As explained in the Feinstein LCD Report and Feinstein Reply Report, there are several reasons why blind acceptance of the 0.03% figure is faulty.

i.    Because the Company allegedly made false statements to the public about dam safety, it raises the prospect that perhaps the Company made similar false statements about conduct and commitment to the engineering firms auditing dam risk. The engineering companies may have arrived at the 0.03% figure on account of misrepresentations and omissions, and that number may therefore be unreliably too low.

ii.    While Mr. Stephenson accepts certain evidence and statements from the Complaint, he disregards others. For example, the Complaint states that there were "extremely low factors of safety and a roughly 50% probability of dam failure."[45] Mr. Stephenson ignores the 50% probability figure yet concludes that "had the allegedly 'true' probability of failure and factor of safety been released to the investors, it would not have meaningfully affected reasonable investors' valuations of Vale Securities."[46,47]

iii.    To this day, the Company has not endorsed, validated, nor publicly announced the 0.03% figure as being the correct probability of a dam break.

---

[45] Complaint, ¶¶70, 128, 130, 152, 162, 165, 169 and 173; and Stephenson Report, FNs 109 and 115.

[46] Stephenson Report, FNs 109 and 115; and Stephenson Rebuttal Report, ¶35.

[47] "Additionally, the October 2018 International PIESEM panel included an extended discussion of risk management. In the final report from the panel, it emphasized how 'undesirable' it was for the Company to have tailings dams in the 'attention zone' of $10^{-3}$ to $10^{-4}$ for an extended period of time 'because of the relatively high level of risk that this implies, especially from a portfolio perspective if multiple VALE projects are in this zone.' By way of example, the report noted that if half of Vale's dam portfolio were at a risk of $10^{-3}$ and the other half were at $10^{-4}$, then the probability of at least one failure across the portfolio of 137 dams is 7% per year, equal to 53% in ten years. Add in one very high-risk dam ($10^{-1}$), and the odds jump to 16% per year or 83% in ten years. Thus, the riskiness of Vale's entire portfolio of dams was dramatically impacted by Dam 1 being considered riskier than $10^{-4}$—and it was one of several dams that Vale had in this risk category" (Complaint, ¶79, FN 24); and "On December 18, 2015, a little over a month after the Mariana dam collapse, Vale obtained a risk analysis for Dam 1 from Pimenta de Ávila Consultoria. The analysis indicated a range of failure probabilities using different methodologies, with results as high as a 50% failure probability for Dam 1. However, the analyses were based on geotechnical measurements made in 2006, therefore the consultant advised that Vale should collect new data and reassess" (Complaint, ¶63).

18

*Confidential*

iv. The 0.03% probability figure is not reasonably compatible with the Company experiencing two catastrophic dam failures within a short amount of time. The Samarco Mariana Dam collapsed on 5 November 2015 and Dam 1 collapsed 3.2 years later on 25 January 2019. If a 0.03% probability of a dam collapse was so "remote" as to be of no interest to investors, as Mr. Stephenson asserts, then it would have been extremely unlikely for the same "remote" event to occur twice in a short time span.

39. As explained in the Feinstein LCD Report, it is instructive that what the market was able to learn from the collapse of Dam 1, coming so soon after the Samarco Mariana Dam collapse, was not that the true probability of a dam failure was 0.03%, but rather that the Company's condition and conduct could not have been as the Company had represented, and the true probability of a dam failure must have been significantly greater. It is also noteworthy that the Company to this day has not disclosed any indisputable quantification of the dam failure probability, further establishing that the information conveyed by the corrective disclosures in this case was not that the true probability was 0.03%, but rather that conduct and condition were not how they were represented by the Company.

40. That Mr. Stephenson accepts the 0.03% dam risk figure as precise and correct, and assumes that providing that number to the public would have constituted the entirety of full disclosure, ignoring Lead Plaintiff's allegations regarding the Company's commitment and conduct, renders his opinion unreliable, if not demonstrably incorrect.

41. That Professor Hubbard accepts and relies upon Mr. Stephenson's faulty analysis and erroneous conclusions renders Professor Hubbard's analysis and conclusions unreliable too.

## V.    CRITIQUE OF THE HUBBARD REBUTTAL REPORT

### A.    Uncontested Opinions and Areas of Apparent Agreement

42. Professor Hubbard does not contest the following conclusions and opinions I presented in my prior reports:

*Confidential*

i.       The out-of-pocket damages methodology is consistent with the Lead Plaintiff's theory of liability.

ii.      The out-of-pocket damages methodology can be applied commonly to compute Section 10(b) damages for all Class members. In fact, Professor Hubbard implicitly agrees with this conclusion in his description of how damages should be computed.

iii.    My regression model for the Vale ADRs properly controls for market, sector, and currency effects.

iv.    My regression model for the Vale Notes properly controls for market, sector, currency, and benchmark bond effects.

43.     Professor Hubbard agrees with the following opinions I presented.

i.       It is well established in the finance literature that a company's ESG strategy, policies, initiatives, and conduct are economically material.[48,49]

ii.      It is well established in the finance literature that a company's ability to measure, manage, and mitigate risk impacts the value of the company's securities.[50]

iii.    It is well established in the finance literature that the ramifications of a fraud and investor deception can extend well beyond the direct dollar amount of the fraud, and can cause further loss on account of damage to a company's business and prospects.[51]

---

[48] "I understand that materiality has a legal definition in matters such as this one. As the term is used in financial analysis and in this report, 'economic materiality' means the importance of information, announcements, and/or events to investors and the market, such that these items would affect the valuation of a security and investors' demand for the security. Whether specific information is important for valuation purposes is a central focus of financial economics. Therefore, the question of economic materiality, given this definition, is squarely within the realm of financial economics and consequently within my area of expertise and the purview of a finance expert" (Feinstein LCD Report, FN 135).

[49] Hubbard Rebuttal Report, ¶41.

[50] Hubbard Rebuttal Report, ¶42.

[51] Hubbard Rebuttal Report, ¶43.

*Confidential*

iv. It is well established in the finance literature that transparency with respect to material information and risk exposure, and proper conduct that is consistent with professed commitments, are important factors that affect the value of a company's securities.[52]

v. It is well established in the finance literature that revenue and cash flow are key determinants of a company's value and the value of a company's securities.[53]

vi. Events that reveal the concealed adverse truth may reduce or eliminate artificial inflation in the prices of securities, which may precipitate a security price decline and thereby cause investor losses.[54]

44. Professor Hubbard also acknowledges the fact that following the Dam 1 collapse on 25 January 2019, *Agence France Presse* tweeted that Dam 1's collapse had caused several deaths.[55] Professor Hubbard does not dispute that *Bloomberg* noted, "Samarco's inability to restart operations after more than three years doesn't bode well for the Feijao mine's future, which belongs to a bigger system of Vale-operated mines, which may also come under greater scrutiny in the wake of Friday's spill."[56] Professor Hubbard does not dispute that the President of Brazil stated, "'We deeply regret what happened and know that this type of accident can be avoided … something is being done wrong over time.'"[57] Professor Hubbard does not dispute that analyst reaction was negative, despite their not yet knowing the extent of the damage. Professor Hubbard does not dispute that Scotiabank reduced its Vale ADR price target from $19.50 to $17.00 per ADR.[58]

---

[52] Hubbard Rebuttal Report, ¶44.

[53] Hubbard Rebuttal Report, ¶45.

[54] Hubbard Rebuttal Report, ¶29.

[55] "#Breaking Brazil Dam Collapses Causing 'Several Deaths': Emergency Service," AFP News Agency, *Twitter*, 25 January 2019 11:14 AM.

[56] "Iron Miner Vale Suffers Dam Rupture, Echoing 2015 Brazil Tragedy," by R.T. Watson, *Bloomberg*, 25 January 2019 1:09 PM.

[57] "Bolsonaro: On the Mining Issue, Something Is Being Done Wrong," by Simone Iglesias, *Bloomberg*, 25 January 2019 3:12 PM.

[58] "Re-Rating to Pause as Second Tailings Dam Failure Likely to Dampen Confidence; Cutting Price Target," by Alfonso Salazar and Christian Landi, Scotiabank, analyst report, 25 January 2019, p. 1.

*Confidential*

45.    Professor Hubbard does not dispute that the residual price decline in Vale ADRs on 25 January 2019 was $1.63.[59] Professor Hubbard does not dispute that this residual ADR price decline is statistically significant.[60] Professor Hubbard does note dispute that the residual price declines for the TAP8 Notes, TAM5 Notes, TAE3 Notes, TAH6 Notes, TAK9 Notes, and EAA3 Notes on 25 January 2019 were each statistically significant.

46.    Professor Hubbard does not dispute that with public attention focused on dam safety concerns after the Dam 1 collapse, a Brazilian court ordered Vale to halt some operations at the Company's Brucutu mine – impacting approximately 30 million tons of iron ore production per year.[61,62] Professor Hubbard does not dispute that "Vale says a Minas Gerais state court has ruled the Company must refrain from 'disposing tailings or practicing any activity potentially capable of increasing the risks' at certain mining dams."[63] Professor Hubbard does not dispute that Vale halted some of its operations to comply "with a Brazilian ***court order issued to help improve safety*** after one of Vale's tailings dam in Minas Gerais state collapsed in late January, killing more than 130 people and leveling part of a town."[64] Professor Hubbard does not dispute that following the news of the production halt, analyst commentary was skeptical and negative.

47.    Professor Hubbard does not dispute that the residual price decline on Vale ADRs on 4 February 2019 was $0.55.[65] Professor Hubbard does not dispute that this residual ADR price decline was statistically significant.[66] Professor Hubbard does not dispute that the residual TAP8 Note price decline was statistically significant that day. Professor Hubbard

---

[59] Feinstein LCD Report, ¶¶199-201.

[60] Feinstein LCD Report, ¶¶199-201.

[61] "Court Orders Vale to Halt Largest Mine in Minas Gerais: Globo," by Patricia Lara, *Bloomberg*, 4 February 2019 9:31 AM.

[62] Prior to the start of trading on 4 February 2019, *Bloomberg*, citing *Globo*, issued a headline-only article of the news that a court had ordered Vale to halt the Company's largest mine in Minas Gerais ("*Court Orders Vale to Halt Largest Mine in Minas Gerais: Globo," *Bloomberg*, 4 February 2019 9:03 AM).

[63] "Vale Says Court Orders Halt to Largest Mine in Minas Gerais," by R.T. Watson, *Bloomberg*, 4 February 2019 12:54 PM.

[64] "Vale Iron-Mine Halt Poses Risk of 'Incremental Supply Shock' (1)," by R.T. Watson, *Bloomberg*, 4 February 2019 2:20 PM (emphasis added).

[65] Feinstein LCD Report, ¶¶202-204.

[66] Feinstein LCD Report, ¶¶202-204.

*Confidential*

concedes that the "reduced output from the suspension of the Brucutu mine operation negatively impacted analysts' assessments of Vale."[67]

48.     Professor Hubbard does not dispute that on 6 February 2019 it was reported that Vale mine workers had observed a leak at Dam 1 that caused them to believe the dam "was going to burst at any time."[68] Professor Hubbard cites in the Hubbard Rebuttal Report the *Wall Street Journal* article published about Vale on 6 February 2019, and he does not dispute the article's account that a safety report, "provided to the mine's owner Vale SA months before the disaster" "had warned its owner that faulty water drainage and monitoring systems represented a potential risk of failure."[69] Nor does Professor Hubbard dispute the *Wall Street Journal* article's reporting that "two independent mining dam experts who reviewed the [safety] report with the Journal said the dam shouldn't have been certified" given what the inspectors and Vale knew about it when it was inspected.[70] Professor Hubbard does not dispute that on 6 February 2019, the news media reported that, with uncertainty and attention to dam safety elevated by the events, the state of Minas Gerais canceled Vale's licenses to operate the Jangada iron ore mine and the Laranjeiras dam.[71] Professor Hubbard does not dispute that citing these revelations, and citing ramifications of heightened uncertainty and concern over dam safety, which included operational interruptions at the Company's mines, analyst commentary was skeptical and negative.

49.     Professor Hubbard does not dispute that the Vale ADR residual price decline on 6 February 2019 was $0.54.[72] Professor Hubbard does not dispute that the residual ADR price decline was statistically significant.[73] Professor Hubbard does not dispute that the residual price

---

[67] Hubbard Rebuttal Report, ¶76.

[68] Feinstein LCD Report, ¶¶14, 93, and 131; and "'That's Going to Burst': Brazilian Dam Workers Say They Warned of Disaster," by Dom Phillips, *The Guardian*, 6 February 2019 12:30 AM.

[69] Feinstein LCD Report, ¶¶14, 95, and 131; and "Inspectors of Vale Dam in Brazil Issued Warning Before Collapse," by Patricia Kowsmann and Scott Patterson, *The Wall Street Journal*, 6 February 2019 3:37 PM.

[70] Feinstein LCD Report, ¶¶14, 95, and 131; and "Inspectors of Vale Dam in Brazil Issued Warning Before Collapse," by Patricia Kowsmann and Scott Patterson, *The Wall Street Journal*, 6 February 2019 3:37 PM.

[71] Feinstein LCD Report, ¶¶14, 94, and 131; and "*Dam License for Vale's Brucutu Mine Canceled by Minas Gerais," *Bloomberg*, 6 February 2019 1:06 PM; and "Vale Operating Licenses for Jangada mine, Laranjeiras Dam Canceled," by Tatiana Bautzer and Jeffrey Benkoe, *Reuters*, 6 February 2019 2:48 PM.

[72] Feinstein LCD Report, ¶¶202-212.

[73] Feinstein LCD Report, ¶¶202-212.

23

*Confidential*

declines for the TAP8 Note, TAM5 Note, TAH6 Note, and EAA3 Note were also statistically significant. Professor Hubbard concedes that analysts were concerned about the operational "interruptions and reduced output given the Dam 1 incident."[74]

50. Professor Hubbard agrees that market declines at and near the end of the Class Period were reactions to the adverse events and their ramifications.

51. It is not clear whether or not Professor Hubbard disputes that among the ramifications of the dam collapse were heightened uncertainty and concern over dam safety, which stemmed from the Dam 1 collapse, though this clearly was the case. It would appear, nonetheless, from the facts and opinions that Professor Hubbard does accept or does not dispute that he should concur that the alleged misrepresentations and omissions about the stability of the dams, sufficient and effective management of risks related to the dams, and the Company's commitment to safety and sustainability caused at least some investor loss.

52. It is noteworthy that Professor Hubbard does not opine that the misrepresentations and omissions caused no losses. Rather, he limits his expressed opinion to be that my analysis does not prove that investors suffered cognizable damages. But, as explained below, he is wrong.

### B.  Professor Hubbard Proffers Unsupported and Erroneous Opinions about Analytic Methodology

53. Professor Hubbard conducts no independent analysis to assess loss causation or quantify damages. While he acknowledges facts and accepts findings and conclusions that compel a conclusion of loss causation, he refrains from offering that conclusion, or even a conclusion to the contrary. Instead, he restricts his scope to a critique of my analysis.

54. While Professor Hubbard does not even attempt to assess loss causation, he is adamant that there is only one true way to do so. His criticism, generally, is that I did not conduct my loss causation analysis the same way he would have. Tellingly, he neglects to implement the methodology that he erroneously contends must be applied.

---

[74] Hubbard Rebuttal Report, ¶78.

*Confidential*

55. In §IV of the Hubbard Rebuttal Report, Professor Hubbard enumerates analytical steps that he believes are critically necessary to establish loss causation and measure damages. Unsurprisingly, Professor Hubbard argues that I failed to perform each step satisfactorily to his liking.

### 1. Exact Probabilities

56. Emblematic of his too restrictive characterization of the case allegations in Professor Hubbard's critique is his assertion that I "fail[ed] to articulate or provide any economic analysis regarding either investors' assessed probability of a safety incident occurring given the Alleged Misrepresentations or the 'true' probability of a safety incident occurring that investors would have assessed in the absence of the Alleged Misrepresentations at any time during the Class Period."[75] Professor Hubbard is wrong to assert that the appropriate damages analysis in this matter requires the economic damages expert to quantify exactly these probabilities. As I discuss in detail in §V.C below, Lead Plaintiff in this case fully articulated what information could have been disclosed at the start of the Class Period. The finance expert's responsibility is to understand the allegations (apparently a responsibility neglected by Professor Hubbard) and then determine the impact on the security prices of the concealed and then revealed information. The finance expert can assist the court by explaining whether the subject information is economically material, then by conducting qualitative and quantitative analysis to determine whether the concealment of the information artificially inflated the security price, and then by determining whether the corrective disclosures dissipated the artificial inflation thereby causing the security price to decline.

57. Lead Plaintiff alleges that the Company misrepresented its commitment to safety and sustainability, the stability of its dams, the sufficiency and effectiveness of its risk management, engaged in inappropriate conduct to have dams certified, and critically, sought to conceal from investors important information about dam safety and the Company's condition and conduct related thereto. Given this scope of the allegations, Professor Hubbard's insistence that proper loss causation and damages analysis in this case

---

[75] Hubbard Rebuttal Report, ¶¶24 and 47.

is narrowly confined to the assessment and comparison of safety incident probabilities is inappropriate and incorrect.

58.     Lead Plaintiff did not allege that an exact probability different from the market's exact assessed probability is all that was concealed. Lead Plaintiff did not allege that all that was learned from the corrective events at the end of the Class Period was that their prior assessed probability differed from a newly disclosed exact probability. Also, the facts of the case do not accord with Professor Hubbard's assertion, because an exact probability of dam collapse was never disclosed at the end of the Class Period when the corrective disclosures occurred. In fact, an exact probability of dam collapse has never been validated, endorsed, or publicly announced by Defendants, even to the present day.

59.     Professor Hubbard's criticism is misguided. Clearly, a spread between a prior announced probability and a later learned number is not what this case is about.

### 2.    One-to-One Mapping of Misrepresentations and Corrective Disclosures

60.     Professor Hubbard also incorrectly asserts that my analysis of loss causation and damages is deficient because I failed "to articulate *which* Alleged Misrepresentations were corrected by *which* Alleged Corrective Disclosures."[76] He argues that my proposed damages approach does not provide a "mechanism for determining what artificial inflation would be if certain Alleged Misrepresentations or Alleged Corrective Disclosures were found not to be relevant. If the finder of fact determines that some of the Alleged Misrepresentations were not misrepresentations or otherwise not actionable, Professor Feinstein's damages as presented do not allow for an evaluation of how artificial inflation would change; to the contrary, his analysis in effect assumes, without support, that artificial inflation would not change regardless of the set of Alleged Misrepresentations for which Plaintiff can establish liability and tie to the Alleged Corrective Disclosures."[77]

61.     Professor Hubbard's surmising about what a trier of fact might find is pure speculation. So is his conjecture that under his incomplete hypothetical it must be the case that artificial inflation cannot be evaluated or would not change. My analysis appropriately assumes that

---

[76] Hubbard Rebuttal Report, ¶90.

[77] Hubbard Rebuttal Report, ¶90.

*Confidential*

Lead Plaintiff will prove the allegations and liability. It is inappropriate for Professor Hubbard to assume otherwise.[78] Should Lead Plaintiff not prove the allegations or liability, the reasons for that determination, as well as the alternative facts proved can certainly be considered in order to revise estimated damages, if necessary.

62. Moreover, Professor Hubbard is wrong to assert that each quantum of artificial inflation is necessarily attributable solely to a specific misrepresentation. He fails to appreciate that a series of misrepresentations and omissions can cause investors and analysts to have a wholistically false impression of a Company and therefore overvalue the Company and its securities.

63. In the same vein, Professor Hubbard fails to appreciate that corrective disclosures can come in the form of events that reveal that the Company's conditions and conduct are inconsistent with the previously misrepresented and omitted information. By being starkly inconsistent with prior misrepresentations, a disclosure event may partially correct a single fraudulent misrepresentation or omission, or a combined set of fraudulent misrepresentations and omissions, which portrayed the Company falsely. As a result, each corrective disclosure may pertain to multiple misrepresentations, and conversely, each misrepresentation can be incrementally corrected by multiple corrective disclosures. To insist that each disclosure must be tied individually and uniquely to a specific misrepresentation, or that each misrepresentation must be tied to a unique corrective disclosure not only is an unsupported legal opinion, but it underscores a misunderstanding of how securities markets work. The market will update valuation in accordance with the truth when events reveal true conditions and conduct to be unlike or inconsistent with the fraudulent misrepresentations and omissions. This is what happened in the instant case, as I explained in the Feinstein LCD Report.

64. The corrective disclosures in this case caused the prices of the Vale Securities to fall because they incrementally revealed to investors that the Company's dams were not stable, the Company was not managing risks effectively, the Company was not committed to safety and sustainability, and as a result the Company was exposed to the adverse consequences of its decisions and conduct, including financial ramifications, and

---

[78] "Reference Guide on Estimation of Economic Damages," by Mark Allen et al., *Reference Manual on Scientific Evidence*, 3rd ed., 2011.

*Confidential*

regulatory, litigation, and enforcement actions. The corrective events informed investors that the Company was not being honest and forthcoming with investors about these highly important conditions and conduct. What the corrective disclosures revealed was precisely what the alleged misrepresentations and omissions concealed.

### 3. But-For Disclosures Need Not Be Identical to the Actual Corrective Disclosures

65.     Professor Hubbard criticizes my analysis because he erroneously contends that my analysis assumes that the corrective disclosure events could and should have been disclosed before they happened.[79] With this criticism, Professor Hubbard fails to comprehend that a corrective disclosure that provides truth to the market can take many forms. I explained that the Company could have made announcements at the start of or during the Class Period that would have revealed the same concealed truths that were ultimately conveyed by the corrective disclosure events. I explained how and why the announcements the Company could have made would have had the same estimated economic effect as the corrective disclosure events that did occur. Just as a corrective disclosure need not be a mirror image of the misrepresentation it corrects, a postulated but-for disclosure need not be a mirror image of the actual corrective events.

66.     With respect to the specific events Professor Hubbard alludes to in his criticism, the Lead Plaintiff does not contend that the Company could have disclosed verbatim at the start of the Class Period that Dam 1 was leaking water near its base or that the Company obtained fraudulent Stability Condition Statements. Rather, the allegation is that the Company could have divulged from the start that it was intent on concealing its condition and conduct, and that it was not really committed to safety and sustainability. Economic principles about asymmetric information dictate that if the market had heard that announcement, it would have been rational for investors to assess the Company's conduct and conditions to be severely compromised, and rational for investors to anticipate an adverse outcome.

---

[79] Hubbard Rebuttal Report, ¶91.

*Confidential*

**C.** **Professor Hubbard's Characterization of Lead Plaintiff's Allegations Is Too Narrow and Incomplete; He Fails to Consider the Economic Impact of All the Allegations**

**1.** **The Correct But-For Scenario Is Articulated in the Feinstein LCD Report**

67. In the Feinstein LCD Report, I explained that the Company could have informed investors at the start of the Class Period that it was allegedly intent on deceiving investors, concealing the truth about Company condition and conduct with respect to dam safety, and depriving investors of the necessary facts to properly assess the true risk of dam failure. The following excerpt from the Feinstein LCD Report articulates the relevant but-for world in the instant matter.[80]

> "Therefore, had the Company told investors at the start of the Class Period that Vale was denying them accurate information about the safety and stability of its dams, that Vale was concealing the truth about how dam risks were managed, and that Vale was not truly committed to safety and sustainability, generally accepted economic principles about asymmetric information dictate that investors would have repriced the ADRs significantly lower, applying a discount commensurate with the diminution of value that later occurred when the market did become aware that the Company's condition and conduct were not what the public had been told. Investors would have severely reduced the ADR's valuation to account for the concealment of important information and the lack of reliable data, and the realization that Company representations on these important matters were misrepresentations."
> **Feinstein LCD Report, ¶22.**

68. Professor Hubbard exhorts that the but-for scenario articulated in the Feinstein LCD report is not "credible."[81] He is wrong. It may not have been comfortable for the Company to confess its misconduct, but the truth is not always comfortable. It is incumbent on the finance expert to consider the valuation effects of an honest but-for disclosure that provided the same previously concealed information as the actual corrective disclosure. In the instant case, among this information was awareness of the Company's misconduct and the

---

[80] This excerpt also refutes Mr. Stephenson's incorrect contention that I did not articulate a but-for scenario (Stephenson Rebuttal Report, ¶6).

[81] Hubbard Rebuttal Report, ¶¶32, 36, 94, and 99.

*Confidential*

information asymmetry. The market learned that it was being deceived and therefore did not know as much about the Company's condition and conduct as it had previously believed. The but-for scenario must convey these elements. Mine does; Professor Hubbard's does not. It is inappropriate to model the but-for disclosure based just on what would be comfortable for the Company, made comfortable by omitting what the Company would be reluctant to admit.

### 2. Professor Hubbard's Far Too Narrow Characterization of Lead Plaintiff's Allegations Leads to His Incorrect But-For Scenario

69. Despite his accurately excerpting Lead Plaintiff's allegations in ¶11 of the Hubbard Rebuttal Report,[82] Professor Hubbard disregards most of Lead Plaintiff's alleged misrepresentations and omissions when he concocts what he asserts to be a proper but-for scenario. His characterization of the allegations is far too limited, and consequently his incorrect conceptualization of what would have constituted full disclosure in the but-for world is incomplete.

70. Professor Hubbard contends that the alleged misrepresentations and omissions amount to *only* the "incremental difference between investors' assessment of the probability of a safety incident occurring given the Alleged Misrepresentations and their assessment of what the 'true' probability of a safety incident occurring would have been absent the Alleged Misrepresentations."[83]

71. Professor Hubbard argues that the but-for scenario is one in which the Company tells the market a specific true probability of a dam collapse.[84] He goes so far as to accept that that number was exactly 0.03%, consistent with Mr. Stephenson's assertion.[85]

---

[82] Hubbard Rebuttal Report, ¶11.

[83] Hubbard Rebuttal Report, ¶¶24 and 34.

[84] Hubbard Rebuttal Report, ¶35.

[85] Hubbard Rebuttal Report, ¶58 and FN 85.

*Confidential*

72. However, the limited but-for disclosure that Professor Hubbard concocts is incorrect as it is inconsistent with the scope of what Lead Plaintiff actually alleges was concealed by Defendants during the Class Period, and also with what the corrective disclosure events did and did not reveal.

73. The corrective disclosures apprised investors that the Company was intent on concealing its condition and conduct related to dam safety, and that according to Lead Plaintiff, the Company was not really committed to safety and sustainability. The corrective disclosures did not provide a specific point estimate for the probability of a dam collapse.

74. Professor Hubbard concurs that the but-for scenario must be consistent with what was allegedly concealed and what was ultimately revealed by the actual corrective disclosures.[86] Therefore, the but-for scenario would have to have informed investors that the Company was intent on concealing from investors the truth about Company conditions, conduct, and lack of commitment with respect to safety and sustainability. This correct conceptualization of the but-for announcement is far broader and has greater economic repercussions than the narrowly limited one Professor Hubbard conceives.

75. Professor Hubbard's misunderstanding of Lead Plaintiff's allegations is also at odds with the Court in this matter. The Court emphasized that Lead Plaintiff's allegations "plainly reveal that Defendants fabricated their statements about Vale's safety and risk management practices, Vale's commitment to safety and sustainability, and the stability of Vale's dams."

> "If proven, Plaintiff's allegations would show a deliberate and concerted effort to mislead the public. The allegations plainly reveal that Defendants fabricated their statements about Vale's safety and risk management practices, Vale's commitment to safety and sustainability, and the stability of Vale's dams."
> **MTD Order, p. 35.**

76. The Court further described the alleged inconsistencies between Vale's representations (the alleged misrepresentations and omissions) and Vale's deceitful conduct.

---

[86] Hubbard Rebuttal Report, ¶¶31-32, 34-35, 48, 50-51, and 57.

*Confidential*

"Plaintiff substantially alleges that Defendants repeatedly and knowingly represented that Vale dams were stable, risks were properly monitored, and safety and sustainability were prioritized, when in actuality Defendants disregarded persistent red flags and acted to obtain DCEs in spite of them." **MTD Order, p. 16.**

"Yet Plaintiff alleges many misrepresentations and nondisclosures in pleading that Defendants made representations about Vale's dam quality, commitment to safety and sustainability, and risk management and safety policies and practices that were plainly inconsistent with known facts." **MTD Order, p. 17.**

"Vale's omission of alleged facts suggesting that there were known issues with dams and that DCEs were unduly influenced and certified for dams with insufficient factors of safety obviously paint an incomplete and misleading picture about the stability of Vale dams." **MTD Order, p. 26.**

77. Critically, Professor Hubbard's assertion that the artificial inflation in the prices of the Vale Securities is limited to the difference between "investors' assessment of the probability of a safety incident occurring given the Alleged Misrepresentations and their assessment of what the 'true' probability of a safety incident occurring would have been absent the Alleged Misrepresentations" is wrong.[87] First, Professor Hubbard eschews the facts of the case as alleged by Lead Plaintiff by ignoring the breadth of the misconduct in which Defendants allegedly engaged.

78. Professor Hubbard errs in substituting the breadth of Lead Plaintiff's allegations with the unrealistic characterization that Lead Plaintiff's case can be reduced to a single statistic. This error is especially profound given that the Company to this day has not produced to the public that statistic – a validated probability of a dam collapse that they endorse. Such a statistic is not what the market learned from the corrective disclosures, so it cannot be the end all of the but-for announcement. Rather, the market learned that the Company's condition and conduct were not as had been represented, and the Company had been intent on keeping that information from the public. The valuation impact of the market learning of a deliberate information asymmetry of this kind is significant.

---

[87] Hubbard Rebuttal Report, ¶¶24 and 34.

79.    Professor Hubbard acknowledges that it is important that the hypothetical but-for announcement ties to what the Lead Plaintiff alleges was concealed by the misrepresentations and omissions and later revealed by the corrective disclosures.[88] He criticizes me for purportedly not doing so.[89] But, it is Professor Hubbard who makes this mistake, not me. What was concealed and later revealed was that the Company was not being transparent about dam safety, conditions were far worse than what had been portrayed, and the Company engaged in deceitful conduct to cover up deficiencies and deprive the public of necessary information, among other things. Professor Hubbard assumes it was only a single probability statistic that was concealed, and that the dam break and follow-on events revealed that number (they did not). The but-for scenario Professor Hubbard describes excludes most of what Lead Plaintiff alleges was concealed, and it substitutes in an item (characterized as being of *de minimis* importance by Mr. Stephenson) that was never actually disclosed.

80.    In paragraph 48 of his Report, Professor Hubbard writes, "Artificial inflation in a Vale Security is the difference in price attributable to the incremental difference between these two probabilities." No, Professor Hubbard is wrong. Artificial inflation must also include the inflation caused by the Company's deception, misconduct, and its efforts to conceal important information. This error is a major flaw in Professor Hubbard's analysis, laid bare by his direct but incorrect assertion.

### 3.    Professor Hubbard Misreads the Complaint and the Feinstein LCD Report

81.    In paragraph 51 of the Hubbard Rebuttal Report, Professor Hubbard misinterprets that in the Complaint, Lead Plaintiff contends that the corrective disclosures revealed to investors exclusively "the probability of a safety incident," and that this information effectively corrected all alleged misrepresentations and omissions. Professor Hubbard cites my citation to the Complaint excerpted in paragraph 29 of the Feinstein LCD report to suggest that I concur.

---

[88] Hubbard Rebuttal Report, ¶¶31 and 51.

[89] Hubbard Rebuttal Report, ¶51.

*Confidential*

82.     But, Professor Hubbard misreads my report and the Complaint. While the corrective disclosure events did reveal the truth, that truth was not a single probability number. The revealed "truth about the risk of Vale's tailing dams and its inadequate dam maintenance and safety certifications"[90] was not a single probability statistic (which actually was never disclosed), but rather extends to the Company engaging in deception and misconduct, the Company's waivered commitment to safety and sustainability, and dubious safety conditions. These things matter; they cannot be ignored.

83.     Among the realities the market learned from the corrective disclosures, contrary to Professor Hubbard's conceptualization, is that the market did not know the true probability of dam collapse, and that the Company engaged in deception and misconduct to intentionally deprive the market of the necessary information to assess it. The uncertainty about how safe the dams really were, which came out of the actual corrective disclosure events, would also have followed a but-for disclosure. Professor Hubbard's conceptualized but-for scenario omits this essential element.

84.     Neither I nor the Lead Plaintiff ever wrote that what was alleged to have been concealed by the misrepresentations and omissions, and what was ultimately conveyed by the dam break and follow-on corrective disclosures was a single probability statistic. Rather, the but-for scenario articulated in the Feinstein LCD Report is modeled to capture what was concealed by the alleged misrepresentations and omissions, and what investors did ultimately learn from the actual corrective disclosure events, which included that they were being kept in the dark about the risk of dam failure.

**D.      The Alleged Misrepresentations and Omissions Are Economically Material and Responsible for Artificial Inflation in the Vale Securities' Prices**

**1.      Abundant Evidence Establishes the Economic Materiality of the Alleged Misrepresentations and Omissions**

85.     In §VI.B.1 of the Feinstein LCD Report, I provide quotes from the finance literature that make clear that the subject matter of the alleged misrepresentations and omissions are

---

[90] Complaint, ¶203; Feinstein LCD Report, ¶29; and Hubbard Rebuttal Report, ¶51.

*Confidential*

highly economically material according to generally accepted principles of finance.[91] In addition, in §V.D and §VI.B.3 of the Feinstein LCD Report, I provide quotes from the Company and analysts, respectively, that attest to the economic materiality of the subject matter of the alleged misrepresentations and omissions.[92] I also conducted empirical analysis that found that the correction of the alleged misrepresentations and omissions caused the Vale Securities' prices to fall.[93]

86.   Nonetheless, Professor Hubbard chooses to remain stubbornly unconvinced that the alleged misrepresentations and omissions were economically material. He writes that the abundant evidence I set forth is insufficient.[94] Even though statements by Defendants[95] and the Court[96] attest to the economic materiality, Professor Hubbard states he is unsatisfied the evidence is strong enough. He resists accepting a proposition that is virtually self-evident and should be uncontroversial. Professor Hubbard apparently disputes that dam safety is important for a mining company.

87.   As explained in the Feinstein LCD Report, the asymmetry of important information between the Company and the public, borne of the misrepresentations and omissions, was itself economically material. In his published work, Professor Hubbard professes that information asymmetries are indeed economically material. For example, he has written, "Equity is a residual claim on firms, so that asymmetries of information should figure prominently in the decisions of buyers of common stock issues;"[97] and "The classic argument (due to Akerlof 1970) is that some sellers with inside information about the quality of an asset will be unwilling to accept the terms offered by a less informed buyer.

---

[91] Feinstein LCD Report, ¶¶108-109.

[92] Feinstein LCD Report, ¶¶44-98 and 123-125.

[93] Feinstein LCD Report, §§VI.B.4-6.

[94] Hubbard Rebuttal Report, ¶¶24, 40-42, 44, 50, and 88.

[95] Feinstein LCD Report, §V.D.

[96] MTD Order, pp. 21-22.

[97] *Asymmetric Information, Corporate Finance, and Investment*, by The University of Chicago Press, edited by R. Glenn Hubbard, National Bureau of Economic Research, 1990, p. 9.

*Confidential*

This may cause the market to break down, or at least force the sale of the asset at a price lower than it would command if all buyers and sellers had full information."[98]

88.    Professor Hubbard is wrong to eschew the academic and professional finance literature (and he apparently disavows his own work), which embodies peer-reviewed research and generally accepted principles. If he disagrees with my conclusions on the economic materiality of the alleged misrepresentations and omissions, then he disagrees with the literature.

89.    The alleged misrepresentations and omissions were objective (but allegedly false) statements of fact, not subjective puffery. They were far-reaching, important, and related to conditions and conduct that mattered to investors. The broad reach of the alleged misrepresentations makes them more material, and not less material as Professor Hubbard suggests.[99]

90.    One way to demonstrate that the alleged misrepresentations were highly valuation relevant is to test their economic materiality analytically. The test, derived from the inversion analytics of German mathematician Carl Gustav Jacob Jacobi,[100] and espoused by Charles Munger,[101] is to recast the statements at issue in the negative, and then assess whether the resulting ***unexpected*** announcement on the same topic would grab investors' attention and likely move the security price. If, consistent with the but-for world described in the Feinstein LCD Report,[102] the Company had announced on the first day of the Class Period that the Company's tailings dams were "***not*** impeccable" and were "***not*** of impressive quality," "Safety is ***not*** our top priority," or "We are ***not*** committed to doing what is right," or "we are ***not*** committed to protecting people and preserving the environment," or "we are engaged in deceptive conduct to deceive investors and regulators," investors would

---

[98] *Asymmetric Information, Corporate Finance, and Investment*, by The University of Chicago Press, edited by R. Glenn Hubbard, National Bureau of Economic Research, 1990, p. 2.

[99] Hubbard Rebuttal Report, ¶¶40-46.

[100] "Bulletin of the American Mathematical Society; Current Tendencies of Mathematical Research," by Edward Van Vleck, vol. 23, no. 1, 1916, pp. 3 and 11. "The great mathematician Jacobi is said to have inculcated upon his students the dictum: Man muss immer umkehren. One must always seek a converse, turn a thought the other end to." "*Man muss* immer umkehren" is loosely translated to "invert, always invert."

[101] *Damn Right! Behind the Scenes with Berkshire Hathaway Billionaire Charlie Munger*, by Janet Lowe, John Wiley & Sons, Inc., 2000.

[102] Feinstein LCD Report, ¶¶22-24, and 217-224.

*Confidential*

have taken notice, analysts would have paid attention, and there definitely would have been discernable price effects. If the unexpected opposite of an alleged misrepresentation and omission is material, so is the expected affirmative.

91. In sum, Professor Hubbard's opinion that my analysis was insufficient to prove that the alleged misrepresentations and omissions were economically material is off base. My conclusion that the alleged misrepresentations and omissions were economically material is supported by principles in the finance literature, Company statements, analyst commentary, and statistical proof that the corrective disclosure events caused the Vale Security prices to fall.

92. Professor Hubbard must be disregarding the import of the academic and professional finance literature, Company statements, and analyst commentary that attest to economic materiality, and the empirical findings in the Feinstein LCD Report, to offer the nonsensical opinion that this body of evidence is insufficient to establish the economic materiality of the alleged misrepresentations and omissions.

### 2. Abundant Evidence Establishes That the Misrepresentations and Omissions Caused Artificial Inflation in the Vale Security Prices

#### a. The Role of Literature in Concert with Empirical Testing

93. The Vale Securities traded in efficient markets. Abundant evidence establishes that the alleged misrepresentations and omissions were economically material. It follows that Vale's positive misrepresentations and omissions about the stability of its dams, risk management, commitment to safety and sustainability, and their conduct caused the prices of the Vale Securities to be artificially inflated.

94. Professor Hubbard faults my analysis for purportedly not "empirically *demonstrating* the existence of inflation."[103] Professor Hubbard opines that "Professor Feinstein's review of academic studies on various topics he finds pertinent to this case *in and of itself* is not a

---

[103] Hubbard Rebuttal Report, ¶¶24 and 39.

reliable or scientifically rigorous basis for establishing that the Alleged Misrepresentations artificially inflated Vale Securities' prices during the Class Period."[104]

95.    Professor Hubbard's criticism is incorrect because I do prove empirically that the misrepresentations and omissions caused artificial inflation. The event study analysis I conducted shows that the correction of the alleged misrepresentations and omissions caused the prices of the Vale Securities to decline. Thus, the misrepresentations and omissions had caused artificial inflation.

### b.    Front-End and Back-End Testing

96.    If Professor Hubbard is suggesting that in order to prove there was artificial inflation it is necessary to prove empirically that the misrepresentations and omissions caused observable increases in the security prices ***when made***, he is wrong again. With such a suggestion, Professor Hubbard fails to consider that misstatements consistent with market expectations would maintain prices, whereas information inconsistent with prior market expectations would be expected to cause a change.[105] In the instant case, the misrepresentations and omissions allegedly deceived analysts and investors by concealing important information, such that one would not expect statistically significant security price movements at the time of the misrepresentations and omissions, or over the duration of the concealment. Instead, the concealment maintained the mix of public information as it was previously, so the price impact would be maintenance of the price level where it was previously. Thus, by keeping the prices of the Vale Securities from falling, the alleged misrepresentations and omissions introduced artificial inflation by propping up the prices. That support fell away when events and announcements ultimately corrected the misrepresentations and omissions.

---

[104] Hubbard Rebuttal Report, ¶46 (emphasis added).

[105] See, e.g., "Event Studies in Securities Litigation: Low Power, Confounding Effects, And Bias," by Alon Brav and J.B. Heaton, *Washington University Law Review*, vol. 93, no. 2, 2015.

*Confidential*

97.    Specifically, representations describing the Company's tailings dams as "impeccable"[106] and of "impressive"[107] quality will cause no discernable price movement when the (mis)statements are made if investors had all along believed the representation to be true. This is similarly the case for statements such as "Safety is our top priority"[108] or "We are driven by our commitment to safety to people and to preserve the environment,"[109] or "Since [the Mariana Dam collapse], we stood by our commitment to do what is right."[110] The reason these statements did not observably move the prices of the Vale Securities when made is because they were consistent with what investors thought must have been true. It cannot be reasonably disputed that if the Company had said the opposite, those admissions would have caused a price decline.

### E.    My Inflation Ribbon Was Computed Correctly and Is Supported by the Facts of the Case, the Academic Literature, and Proper Analysis

#### 1.    The Artificial Inflation Dissipated by the Corrective Disclosure Events Was in the Vale Securities' Prices at the Start of the Class Period

98.    Professor Hubbard contends that my use of a constant inflation ribbon is unreasonable and speculative.[111] He claims that I provided "no explanation as to how or why the purported artificial inflation remained unchanged over time even as new Alleged Misrepresentations occurred."[112] However, I did detail how the inflation ribbon was constructed and explain the rationale for a constant inflation ribbon.

99.    The inflation ribbon presented in the Feinstein LCD Report is based on generally accepted principles of finance and valuation, on analysis of Company statements, news articles,

---

[106] "Today the State of the Dams is 'Impeccable', Says the President of Vale," by Renato Rostás, *Valor Econômico*, 10 April 2018.

[107] "Today the State of the Dams is 'Impeccable', Says the President of Vale," by Renato Rostás, *Valor Econômico*, 10 April 2018.

[108] "Vale SA Day NY," *Thomson Reuters*, conference call, 6 December 2017.

[109] "Q3 2016 Vale SA Earnings Call," *Thomson Reuters*, conference call, 27 October 2016.

[110] "Q3 2016 Vale SA Earnings Call," *Thomson Reuters*, conference call, 27 October 2016.

[111] Hubbard Rebuttal Report, ¶24.

[112] Hubbard Rebuttal Report, ¶88.

analyst reports, and on event study analysis, which considered and accounted for market effects, sector effects, and potentially confounding information.[113]

100. As I explained in the Feinstein LCD Report, the total decline experienced at the end of the Class Period is a conservative estimate of how much the prices would have fallen at the start of or during the Class Period if the market had learned then that they were being misled. Consequently, estimating artificial inflation to be constant at that conservative level is a reasonable and conservative estimation.

101. Lead Plaintiff alleges that the market was misled by Defendants' misrepresentations and omissions from the start of the Class Period.[114] Subsequent alleged misrepresentations made during the Class Period served to confirm the misinformation in the market and maintain the artificial inflation.

102. When Professor Hubbard wrote, "Professor Feinstein provides no explanation as to how or why the purported artificial inflation remained unchanged over time even as new Alleged Misrepresentations occurred,"[115] he must have overlooked the following detailed explanation in the Feinstein LCD Report:

> "I estimate conservatively that the $2.72 per ADR artificial inflation that was ultimately dissipated by the corrective disclosures at the end of the Class Period **was in the market price of the Vale ADR since the start of the Class Period**, remaining at that level until the time of the first corrective disclosure (the collapse of Dam 1 on 25 January 2019). **This determination is based on the generally accepted economic principle** that investors severely discount securities when they become aware that important information is withheld from them. In such situations, rational investor behavior is generally to value the security as if the worst-case scenario were expected. Rational investors would reason that if the valuation given the true conditions was greater than a pricing to worst, the subject company would reveal rather than conceal the true information.
>
> Therefore, had the Company told investors at the start of the Class Period that Vale was denying them accurate information about the safety and stability of its dams, that Vale was concealing the truth about how dam risks were managed, and that Vale was not truly committed to safety and sustainability, generally accepted economic principles about asymmetric

---

[113] Feinstein LCD Report, ¶¶11-24.

[114] Feinstein LCD Report, ¶¶21-24, 131, and 213-224.

[115] Hubbard Rebuttal Report, ¶88.

*Confidential*

information dictate that investors would have repriced the ADRs significantly lower, applying a discount commensurate with the diminution of value that later occurred when the market did become aware that the Company's condition and conduct were not what the public had been told. Investors would have severely reduced the ADR's valuation to account for the concealment of important information and the lack of reliable data, and the realization that Company representations on these important matters were misrepresentations.

The generally accepted principle that investors severely discount security prices when they become aware that important information is being withheld holds generally, but would hold even more strongly during the Class Period in the instant case given the Company's recent experience of a dam collapse just one year prior to the start of the Class Period. The allegedly misrepresented and omitted information in the instant case was of the utmost importance to Vale investors during the Class Period.

**Had the truth about dam conditions been revealed at the start of the Class Period, the result would have been catastrophic for the Company and its investors at that time.** Specifically, revelation of the truth about dam conditions at the outset would have devastated Vale's outlook, its ability to continue to operate mines, its iron ore production, its access to relatively inexpensive capital, its restructuring efforts, and would have increased the costs of doing business. **Given the mix of news at the start of the Class Period, such a revelation would reasonably have resulted in a *greater* loss of security value at the start of the Class Period than what occurred near and at the end of the Class Period** on account of the recent prior dam collapse, the fact that Vale's realized earnings and cash flow during the Class Period would not have occurred, and the Company's restructuring efforts would have been stymied. Had the Company instead disclosed that it was determined to withhold from the public accurate information about dam conditions and the Company's conduct, the impact on the prices of the Vale Securities would have been even worse, as investors would have imposed a severe valuation penalty on account of the information asymmetry."

**Feinstein LCD Report, ¶¶21-24 (bold and underline emphasis added).**

103. Professor Hubbard fails to appreciate that the artificial inflation ribbon in this matter is appropriately constant prior to the first corrective disclosure because the measured economic effect of the corrective disclosure events is a conservative estimate of the economic effect of the information that Defendants possessed and could have relinquished to the market at any time over the duration of the Class Period.

41

*Confidential*

104. The Feinstein LCD Report also explains that while artificial inflation was constant from the start of the Class Period, it fell as the corrective disclosure events informed investors that they had been misled.[116]

### 2.    The Inflation Ribbon Presented in the Feinstein LCD Report Does Not Assume a 100% Probability of Dam 1 Failure

105. According to Professor Hubbard, the appropriate measure of artificial inflation in the prices of the Vale Securities is "the difference between investors' assessed probability of a safety event occurring given the Alleged Misrepresentations and the 'true' probability investors would have assessed absent the Alleged Misrepresentations."[117] Professor Hubbard contends that my inflation ribbon relies on the assumptions that i) the "true" probability of a safety incident occurring remained unchanged throughout the Class Period,[118] and ii) but for the alleged misrepresentations and omissions, investors would have assessed the true risk of Dam 1 collapsing to be 100%.[119] These assertions are false. With this criticism, Professor Hubbard mischaracterizes Lead Plaintiff's allegations and misunderstands my analysis.

106. I do not assume that the probability of Dam 1 collapsing was 100%, nor that a but-for disclosure would have informed investors that there was a 100% probability of Dam 1 collapsing. Rather, because the actual corrective disclosure events informed investors that they did know a probability of a safety event, and that the Company was intentionally concealing from them necessary information to assess a probability, economic principles dictate that investors would have priced in a discount to reflect a worst-case scenario.

107. Implicit in Professor Hubbard's criticism is not only his miscomprehension of the proper analysis, but his misconception that only Dam 1 could have collapsed, and the damage caused by the collapse of Dam 1 was a worst-case scenario for the Company. Not only were other dams at risk, but the devastation from the Dam 1 collapse could conceivably have been much worse.

---

[116] Feinstein LCD Report, ¶¶11, 21, and 25.

[117] Hubbard Rebuttal Report, ¶89.

[118] Hubbard Rebuttal Report, ¶89.

[119] Hubbard Rebuttal Report, ¶93.

*Confidential*

108.    The magnitude of artificial inflation estimated in the Feinstein LCD Report does not assume that the collapse specifically of Dam 1 was inevitable, or that the Company could and should have disclosed with certainty that Dam 1 was going to collapse. With full but-for disclosure, the Vale Security prices would have fallen by an amount commensurate with the declines experienced when Dam 1 collapsed and the other corrective disclosures transpired. This is not because the market would have known with certainty that Dam 1 was destined to fail, but rather because the economic effect of the disclosed truths (including the information asymmetry) would have been commensurate or even greater. I explain that the economic effect of the actual dam collapse is therefore a conservative estimate of the valuation discount that would have been applied if the market was informed that the risk of dam collapse was much worse than had been represented, the Company was not committed to safety and sustainability, the Company had engaged in deceptive misconduct, and the Company was intentionally depriving the market of necessary information to assess dam risk. Economic principles dictate a severe discount.

109.    Moreover, the extent of the death and destruction from a dam collapse could conceivably have been much greater than the damage that ultimately did occur when Dam 1 collapsed. Consequently, the valuation impact of the actual dam break, and the follow-on corrective disclosures, is a reasonable, if not conservative, measure of what would have been the valuation effect of what investors would have anticipated given a but-for disclosure at the start of or during the Class Period.

    **F.    Professor Hubbard Misinterprets the Corrective Disclosures and Repeatedly Makes the Same Mistake in His Event-By-Event Analysis**

110.    As explained in the Feinstein LCD Report, I determined that residual price declines in the Vale Securities following the corrective disclosure events were statistically significant.[120] The residual security price return is the portion of the security's price movement after controlling for U.S. market, Brazilian market, industry sector, and currency impacts, and, in the case of the Vale Notes, the impact of a benchmark bond. I therefore concluded that Company-specific information caused the statistically significant residual price declines of the Vale Securities.

---

[120] Feinstein LCD Report, ¶126; §§ VI.B.4-6; and Exhibit-10a through Exhibit-10g.

43

*Confidential*

111.   I performed a comprehensive review of the Company-specific news on each corrective disclosure date.[121] I evaluated the relationship of the news to the alleged misrepresentations and omissions to determine how much of each price decline was caused by disclosures correcting the alleged misrepresentations and omissions as opposed to unrelated confounding information. From these analyses, I determined that the entire statistically significant residual security price decline following each corrective disclosure event for each Vale Security was caused by new information that corrected the alleged misrepresentations and omissions.

112.   The financial ramifications of the Dam 1 collapse and the other corrective disclosures, which Professor Hubbard contends were confounding information, were not unrelated to the allegations and corrective disclosures. They starkly informed the market of the degree to which it had been previously misinformed, and the scale of the deception.

113.   Regarding the corrective disclosures and elicited Vale Security price movements, Professor Hubbard postulates:

> "I would expect Vale Securities' price movements on the Alleged Corrective Dates to reflect changes in investors' expectations of cash flows related to: (1) the difference between the 'true' probability of a safety event, such as a dam collapse occurring, that investors would assess absent the Alleged Misrepresentations and investors' assessed probability of a dam collapse given the Alleged Misrepresentations; (2) potential legal and financial liabilities and cash flow uncertainties due to, for example, operations interruptions and output reductions resulting from the materialization of the disclosed risk that a dam could collapse (i.e., the materialization of a previously disclosed risk); and (3) other factors such as market and industry shocks. Only the first category represents a price change due to the Alleged Misrepresentations. An appropriate damages analysis thus must isolate the portion of Vale Securities' price declines on the Alleged Disclosure Dates due to the alleged fraud from any price declines resulting from the materializations of previously disclosed risks and market and industry factors."
> **Hubbard Rebuttal Report, ¶57.**

---

[121] Feinstein LCD Report, §§ VII.B.–D.

44

*Confidential*

114. Professor Hubbard's list omits the economic effects of the market learning that the Company engaged in deception and misconduct, the Company wished to deprive investors of the necessary information to assess risk, and the increased uncertainty and concern over how safe the Company's dams really were.

115. Item-1 of Professor Hubbard's list is a reiteration of his misconception that this entire case can be reduced to a discrepancy in a single safety event statistic. I addressed above how this is a critical error.

116. As for item-3, Professor Hubbard does not dispute that my event study regression analysis correctly accounts for and excludes from damages the impact of market and sector effects.

117. Professor Hubbard contends that I failed to account for his item-2 in my computation of damages.[122] That is, Professor Hubbard contends that the Dam 1 collapse "represented a materialization of disclosed risk, which could have occurred absent any alleged misrepresentations or omissions," and I should have disaggregated the purported price impact of a materialization of the risk from the price declines in the Vale Securities.[123] Professor Hubbard repeats this incorrect assertion frequently throughout his report.[124]

118. There are numerous mistakes in Professor Hubbard's argument. First, he characterizes the risk as having been disclosed, but the allegations are that the Company engaged in deception to conceal the risk.

119. Second, Professor Hubbard fails to appreciate here what I explained in the Feinstein LCD Report (which he did not dispute), that with the proper but-for disclosure, rational investors would have priced into the Vale Securities a discount to account for anticipation of a worst-case scenario. That is, they might not have known with 100% certainty that Dam 1 would collapse, or that any dam would necessarily collapse, but given the information asymmetry that they would have been aware of, the proper valuation would have called for a significant discount to reflect a bad outcome.

---

[122] Hubbard Rebuttal Report, ¶57.

[123] Hubbard Rebuttal Report, ¶24.

[124] See, e.g., Hubbard Rebuttal Report, ¶¶24, 34, 35, 40, 41, 42, 44, 45, 47, 56, 58, 61, 65, 68, 69, 78, and 82.

120.    The financial ramifications Professor Hubbard refers to in his item-2 are part and parcel of the disaster itself, so they would have already been accounted for in investors' prior discounting in the but-for scenario. That is, the disaster would have confirmed investors' prior fears. In fact, the toll from the collapse of Dam 1 reasonably was not as bad as what investors would have priced for. As the actual outcome could have been worse than what ultimately transpired, and given that investors are not systematically wrong in an efficient market, it follows that the economic impact of the events that did occur provides a conservative estimate of the economic impact of what investors would have anticipated.

121.    Professor Hubbard also fails to consider that I *excluded* from damages the security price declines caused by the 26-28 January 2019 news informing investors of the magnitude of the toll and of financial ramifications from the Dam 1 collapse. Consistent with the Court's MTD Order, which determined that the ramifications the market learned about during the 26-28 January 2019 period are "not necessarily indicative of any alleged misrepresentation or fraud,"[125] I excluded from my quantification of damages all of the statistically significant price decline that occurred over that period.

### 1.    25 January 2019

122.    Professor Hubbard fails to appreciate that for investors and analysts it was important to know whether the Company was transparent and truthful about its conditions and conduct. The disclosure events informed the market that the answer was "no." As explained in the Feinstein LCD Report, beginning on 25 January 2019, events unfolded that belied the Company's representations – the alleged misrepresentations – about dam conditions, safety, and the Company's commitment and conduct. The events informed the market that the truth about these matters had been concealed.

123.    Professor Hubbard puts forth an incorrect account of what happened on 25 January 2019, and argues that the events were not corrective of the misrepresentations and omissions, but rather a surprising and unforeseen materialization of a disclosed risk. He is wrong. The market had not previously been apprised that the Company was misrepresenting and

---

[125] MTD Order, p. 33.

*Confidential*

omitting important information about its conduct and condition. A review of the events proves Professor Hubbard wrong.

124.    On 25 January 2019, the Company and news media reported that Dam 1 had collapsed.[126] *Agence France Presse* tweeted that Dam 1's collapse had caused several deaths.[127] *Bloomberg* noted, "Samarco's inability to restart operations after more than three years doesn't bode well for the Feijao mine's future, which belongs to a bigger system of Vale-operated mines, which may also come under greater scrutiny in the wake of Friday's spill."[128] The President of Brazil, Jair Bolsonaro, stated, "'this type of accident can be avoided … something is being done wrong over time.'"[129]

125.    In the Feinstein LCD Report, I explained that the Dam 1 collapse was a partially corrective disclosure because the news of the event began to inform the market that the Company's dams were not as stable as the Company had represented, that the Company had not been as committed to safety and sustainability as it had previously proclaimed, and that risks were not as effectively managed and disclosed as the Company had previously represented. That is, the event began to reveal precisely what Lead Plaintiff alleges was concealed by the alleged misrepresentations and omissions. Investors learned that the truth about these matters had been concealed.

126.    Even though the public did not yet have specific details as of 25 January 2019, investors and analysts appreciated that there would likely be negative consequences from the dam collapse, just as the market would have anticipated negative consequences from a timely affirmative disclosure before the dam break that Company dams were unstable, risks were not being managed sufficiently and effectively, and the Company's conduct was inconsistent with transparency and commitment to safety and sustainability.

---

[126] "*Vale-Operated Dam in Belo Horizonte Region Breaks: Globo," *Bloomberg*, 25 January 2019 10:45 AM; and Vale S.A., Form 6-K, filed 25 January 2019, accepted 3:41 PM.

[127] "#Breaking Brazil Dam Collapses Causing 'Several Deaths': Emergency Service," AFP News Agency, *Twitter*, 25 January 2019 11:14 AM.

[128] "Iron Miner Vale Suffers Dam Rupture, Echoing 2015 Brazil Tragedy," by R.T. Watson, *Bloomberg*, 25 January 2019 1:09 PM.

[129] "Bolsonaro: On the Mining Issue, Something Is Being Done Wrong," by Simone Iglesias, *Bloomberg*, 25 January 2019 3:12 PM.

*Confidential*

127.   Analyst reaction was negative, despite their not yet knowing the extent of the damage. Analysts specifically stated that they had incomplete information and wished to know more. Amidst the uncertainty, Scotiabank reduced its Vale ADR price target from $19.50 to $17.00, and noted, "It is still too early to quantify the social, environmental and economic impact of this unfortunate accident."[130] Jefferies stated that "the full extent of the damage and the potential impact on iron ore markets are not clear. While we hope the reports of fatalities are inaccurate, we do believe this is a material negative for Vale."[131] Morgan Stanley analysts wrote, "After the Samarco incident a few years ago, we think this new unfortunate incident is likely to generate material scrutiny."[132]

128.   That is, upon learning that Vale's dams were not as safe, and that safety protocols were clearly not as effective as previously represented, Scotiabank analysts decreased their valuation of the Company's securities significantly, even before they knew the full extent of the damage from the dam break that began to inform them that the prior representations were likely false.

129.   Analysts articulated the reasons why lax or ineffective safety protocols and greater risk of dam collapses would adversely impact the Company's financial position and value. BMO stated that "whilst lost production might be a longer-term concern, the initial market fears are likely to focus on the risk of a second major event, like Samarco, and the associated liabilities."[133] JPMorgan offered that the Dam 1 collapse could lead to "higher scrutiny over the regulatory framework of the mining industry, … lead to further delays in granting new licenses, but also lifting existing permits."[134]

---

[130] "Re-Rating to Pause as Second Tailings Dam Failure Likely to Dampen Confidence; Cutting Price Target," by Alfonso Salazar and Christian Landi, Scotiabank, analyst report, 25 January 2019, p. 1.

[131] "Another Tailings Dam Failure," by Christopher LaFemina et al., Jefferies, analyst report, 25 January 2019, p. 1.

[132] "Dam Breaks in Minas Gerais; Shares Under Pressure," by Carlos De Alba et al., Morgan Stanley, analyst report, 25 January 2019, p. 1.

[133] "Press Reports of Dam Failure," by Edward Sterck et al., BMO, analyst report, 25 January 2019, p. 1.

[134] "Tailing Spill from Dam Failure at Feijão Mine - ALERT," by Rodolfo Angele and Julio Arantes, JPMorgan, analyst report, 25 January 2019, p. 1.

*Confidential*

130.   RBC wrote, "Although information remains at a headline stage (Reuters, Bloomberg) unconfirmed reports of casualties from mud slides caused by the dam break suggest ***this could be another unfortunate issue with tailings management***."[135] Eleven Financial Research wrote, "Although somewhat premature to estimate the extent of the damage, the rupture of the Dam 1 at Mina Feijão has a direct impact on the community and ***once again, VALE finds itself in the position of responsible for environmental, social and economic damages***."[136] BMO wrote, "From a liability perspective, in Vale's favour is that the Brumadinho dam was certified as safe only four months ago and reportedly met all regulatory requirements. ***However, this does not mean that a system management failure did not occur, with controlling of water levels critical to the safe operation of upstream constructed dams of this type***."[137]

> "***Another tailings dam failure in Brazil; the certainty that change is needed***… We are truly saddened to write about the second dam disaster in less than 4-years in Brazil, but we are obliged to pursue this task. While the failure of its tailings dam at the Feijao mine is smaller in scale when compared to Samarco (a fraction of the volume of tailings leaked), unfortunately this time around the human aspect appears to be much more significant (with dozens of victims already confirmed). ***Since Samarco, Vale invested in a series of measures to inspect and ensure that existing operations were safe, so we were truly caught by surprise with this event. At this point, there are more questions than answers: what were the causes? will future regulation change? What will Vale's energetic response look like? how to quantify liabilities? future production levels?*** … ***In our view, this incident will end up lifting risk perception surrounding the case and should continue pressuring the stock for a while***."
>
> **"Tailings Dam Failure; More Questions Than Answers," by Leonardo Correa and Gerard Roure, BTG Pactual, analyst report, 27 January 2019, p. 1 (emphasis added).**

---

[135] "VALE: Headlines Suggest a Vale Dam in Minas Gerais Has Breached," by Tyler Broda and Barbora Baluskova, RBC, analyst report, 25 January 2019 11:42 AM, p. 1 (emphasis added).

[136] "Nova Tragédia em Minas Gerais," by Adeodato Netto, Eleven Financial, analyst report, 25 January 2019, p. 1 (emphasis added; and text translated from Portuguese to English using Google Translate).

[137] "Information to Consider for Quantifying Brumadinho Impact on Vale," by Edward Sterck et al., BMO, analyst report, 28 January 2019, p. 3 (emphasis added).

*Confidential*

"We are more concerned about the environmental and contingent liability aspect, as *this is another dam failure related to Vale*, coming just over 3 years after the collapse of the Samarco dam. At first glance, we believe the implications could be better in terms of environment and operations but significantly worst in terms of casualties, credibility and reputation.

*Among the most concerning issues, is that Vale did a thorough review and sign-off of all of Vale's dams after the Samarco dam collapsed in 2015. The Feijao dam received a 'Stability Condition' report in September 2018 from TUV SUD (private), a German engineering safety company, with the Brazilian National Mining Agency (ANM) inspecting the dam in January 2019.* While the exact cause of the collapse is unknown at the moment, we believe this accident is significantly worse than the dam collapse three years ago at Samarco due to the number of deaths which are likely be significantly higher this time and the fact that, *despite more stringent safety inspections, yet another dam collapse occurred just weeks after being certified. For Vale specifically, we believe there could be additional US lawsuits to contend with*.

…

*[W]e believe there are significant unknown and unquantifiable risks. The dam collapsed despite certification from Vale, 3rd party companies and government regulators in the previous months. We believe all tailings dams will need to be reexamined* in the wake of this tragedy, and that all options, including (1) a halt of all of the company's Brazilian iron ore operations, at least the ones that are water dependent / use tailings dams (predominantly the Southern and Southeastern systems, which produced 195mt in 2017) (2) cancelation or suspension of some operating permits and (3) potential criminal charges, are possible.

*We believe Vale's management and governmental authorities will need to explain the exact cause of this new accident, just months after declaring all of its mines safe.* As this dam is 100% owned by Vale (vs Samarco being a 50/50 JV), we believe there could significantly more liabilities and lawsuits for Vale to have to contend with. Furthermore, Feijao was not included in a recent ANA (National Water Agency) report that included 45 dams with failure risk."

**"[Correction] Downgrade to Hold: Another Dam Collapses," by Jonathan Brandt et al., HSBC, analyst report, 27 January 2019, p. 7 (emphasis added).**

"ESG risk in mining has again reared its unwelcome head. With regards to Vale's tailings dam failure, all three letters of the acronym are affected. The environment has been damaged, people have lost their lives and doubts over governance have been voiced in the media."

**"[Correction] Rising ESG Risk Favours Rio Tinto over Vale," by Derryn Maade et al., HSCBC, analyst report, 29 January 2019, p. 4.**

50

*Confidential*

131.    In the Feinstein LCD Report, I explained that I searched and assessed whether there was any confounding information that contributed to the price declines in the Vale Securities. I determined that all the statistically significant per security residual declines on 25 January 2019 were caused by new Company-specific information that partially corrected the misrepresentations and omissions.[138] Professor Hubbard does not dispute that Vale Securities' prices fell by statistically significant amounts following the reports of Dam 1's collapse.

132.    Professor Hubbard asserts that certain news and analyst commentary I identified in the Feinstein LCD Report "relayed information that was unrelated to the Alleged Misrepresentations and reflected materializations of disclosed risks as represented by the Dam 1 collapse and related financial consequences."[139] That is, according to Professor Hubbard, the specific details of the Dam 1 failure event were new information that were not corrective of any prior alleged misrepresentations or omissions.

133.    As an initial matter, two of the three news sources Professor Hubbard points to were released after the close of trading on 25 January 2019, so any impact on the prices of the Vale Securities stemming from those particular news sources was excluded from my estimate of damages.[140]

134.    Additionally, what Professor Hubbard characterizes as unrelated confounding details were actually part and parcel of the disaster event itself – the economic effect of which investors would have built into their valuation discounts had there been the prior but-for disclosure described in the Feinstein LCD Report. As the price would have already fallen with a prior but-for disclosure, it is not true that the price would have fallen again on the news of the details if the Company had made the prior but-for disclosure.

135.    Professor Hubbard makes a similar erroneous argument for each of the other corrective disclosure events.

---

[138] Feinstein LCD Report, ¶200.

[139] Hubbard Rebuttal Report, ¶66.

[140] Hubbard Rebuttal Report, ¶67; and Feinstein LCD Report, ¶70.

*Confidential*

### 2.    4 February 2019

136.    As reported by *Bloomberg* on 4 February 2019, with dam safety concerns now elevated, a Brazilian court ordered Vale to halt some operations at the Company's Brucutu mine – impacting approximately 30 million tons of iron ore production per year.[141,142] According to *Bloomberg*, "Vale says a Minas Gerais state court has ruled the Company must refrain from 'disposing tailings or practicing any activity potentially capable of increasing the risks' at certain mining dams."[143] *Bloomberg* further reported, "The move is in compliance with a Brazilian ***court order issued to help improve safety*** after one of Vale's tailings dam in Minas Gerais state collapsed in late January, killing more than 130 people and leveling part of a town."[144]

137.    In the Feinstein LCD Report, I explained that the elevated concern and uncertainty over Company-wide safety issues, which timely forthcoming disclosures would have provided at the start of the Class Period according to the Lead Plaintiff, apparently led to this costly court intervention.[145] Moreover, this court order informed investors that the Company's condition, commitment, and conduct with respect to dam safety were reasonably not what the public had previously been led to believe.

138.    This development would not have been a surprise to investors if the Company had earlier made the but-for disclosure described in the Feinstein LCD Report. Had the Company disclosed it was not complying with safety protocols, there reasonably would have been substantially similar and costly legal and regulatory action. Therefore, this development is not unrelated confounding information, which according to Professor Hubbard had nothing

---

[141] "Court Orders Vale to Halt Largest Mine in Minas Gerais: Globo," by Patricia Lara, *Bloomberg*, 4 February 2019 9:31 AM.

[142] Prior to the start of trading on 4 February 2019, *Bloomberg*, citing *Globo*, issued a headline-only article of the news that a court had ordered Vale to halt the Company's largest mine in Minas Gerais ("*Court Orders Vale to Halt Largest Mine in Minas Gerais: Globo," *Bloomberg*, 4 February 2019 9:03 AM).

[143] "Vale Says Court Orders Halt to Largest Mine in Minas Gerais," by R.T. Watson, *Bloomberg*, 4 February 2019 12:54 PM.

[144] "Vale Iron-Mine Halt Poses Risk of 'Incremental Supply Shock' (1)," by R.T. Watson, *Bloomberg*, 4 February 2019 2:20 PM (emphasis added).

[145] "Vale Says Court Orders Halt to Largest Mine in Minas Gerais," by R.T. Watson, *Bloomberg*, 4 February 2019 12:54 PM; "Vale Iron-Mine Halt Poses Risk of 'Incremental Supply Shock' (1)," by R.T. Watson, *Bloomberg*, 4 February 2019 2:20 PM; Complaint, ¶28; and MTD Order, p. 33.

to do with the alleged fraud, and which he contends would have elicited a security price decline even without the alleged fraud. With the prior but-for disclosure, a substantially similar development would have been anticipated by the market, and thus fully incorporated into the Vale Security valuations earlier. One cannot dispute that an admission of poor conditions, poor risk management, waivered commitment, and misconduct would have precipitated legal and regulatory action disrupting Vale's operations. If the security prices were lower earlier to accord with the anticipated actions, those prices would not fall again when the news of the legal and regulatory actions emerged.

139.    The Minas Gerais state court order more fully informed investors about the extent of the Company's safety issues, and that the Company's condition, commitment, and conduct with respect to dam safety were not what the public had previously been led to believe. This information is precisely what Lead Plaintiff alleges could have been disclosed by Defendants affirmatively since the start of the Class Period. Costly suspensions of mining would reasonably have been an inextricable consequence of heightened concern over Company-wide safety issues, conditions, and conduct upon an affirmative admission at the start of the Class Period, just as it was on this corrective disclosure date.

140.    In response to the court order issued to help improve safety, Credit Suisse wrote, "Apart from a possible impact in iron ore volumes, this news puts in evidence the overhang created by decisions from the Brazilian Public Prosecutors involving future operational halts and/or fines."[146] RBC noted that the Brucutu mine uses a conventional rather than an upstream tailings dam and commented, "We maintain our Underperform rating on Vale in this heightened uncertainty and $9.00 per share target price."[147] RBC further stated, "Potential Brumadinho liabilities are wide ranging."[148]

---

[146] Preliminary Assessment of Brucutu Operational Halt," by Caio Ribeiro et al., Credit Suisse, analyst report, 4 February 2019, p. 1.

[147] "Vale Ordered to Suspend Production at Brucutu," by Tyler Broda and Barbora Baloskova, RBC, analyst report, 4 February 2019, p. 1.

[148] "Fallout from Brumadinho Weighs on Investment Case," by Tyler Broda et al., RBC, analyst report, 4 February 2019, p. 1.

*Confidential*

141.    Morgan Stanley analysts stated that "we believe Vale would not be able to offset these volumes by ramping up output elsewhere," and "we believe the iron ore market will likely price in a bigger and/or longer potential impact to Vale's iron ore output than we first thought."[149]

142.    In a report titled, "More Twists and Turns Expected Following Brucutu Mine Outage," Deutsche Bank wrote that the "***Brucutu outage creates further uncertainty***, fluid situation."[150] Itaú BBA wrote:

> "Vale reported in a material fact that the Court of Minas Gerais (22nd Civil Court of Belo Horizonte) ordered that, among other measures, the company must suspend the disposal of tailings as well as any other activities that could increase the failure risk of the Laranjeiras, Menezes II, Capitão do Mato, Dique B, Taquaras, Forquilha I, Forquilha II and Forquilha III dams, as requested by the Public Prosecutor's Office of Minas Gerais (MPMG)."
> **"Vale: Dam Accident Update (III)," by Ciro Matuo et al., Itaú BBA, analyst report, 5 February 2019, p. 2.**

143.    In the Feinstein LCD Report, I explained that I searched and assessed whether there was any confounding information that contributed to the price declines in the Vale Securities. I determined that all of the statistically significant per security residual declines on 4 February 2019 were caused by new Company-specific information that partially corrected the misrepresentations and omissions.[151] Professor Hubbard does not dispute that the Vale Securities prices fell by statistically significant amounts following the Brazilian court's order to "help improve safety" by halting some operations at the Company's Brucutu mine.

144.    Professor Hubbard contends, "Professor Feinstein fails to demonstrate that any of the excerpts he provides indicate the suspension of the Brucutu mine was corrective, as opposed to updating investors regarding the materialization of a disclosed risk, as represented by the Dam 1 collapse and related financial consequences."[152] That is,

---

[149] "Feijão Dam Accident Update #3," by Carlos De Alba et al., Morgan Stanley, analyst report, 4 February 2019, p. 1.

[150] "More Twists and Turns Expected Following Brucutu Mine Outage," by Chris Terry et al., Deutsche Bank, analyst report, 5 February 2019, p. 1 (emphasis added).

[151] Feinstein LCD Report, ¶203.

[152] Hubbard Rebuttal Report, ¶76.

*Confidential*

according to Professor Hubbard, the specific details of the developments following the Dam 1 failure were new information that were not corrective of any prior alleged misrepresentations or omissions.

145. Again, what Professor Hubbard characterizes as unrelated confounding developments are actually corrective in two senses. They partially corrected the misinformation in the market borne of the alleged misrepresentations and omissions. And, they corrected the artificial inflation the misrepresentations and omissions imparted.

146. The specific development may have been new news, but this news would not have been a surprise to investors if the Company had earlier made the but-for disclosure described in the Feinstein LCD Report. Had the Company disclosed it was not complying with safety protocols, there reasonably would have been substantially similar and costly legal and regulatory action. Professor Hubbard is wrong to contend this development had nothing to do with the alleged fraud. Without the alleged fraud, the development would not have elicited a security price decline. With a prior but-for disclosure, a substantially similar development would have been anticipated by the market, and thus would have been priced into the Vale Security prices earlier. If those prices were lower to reflect anticipation of a similar event, the prices would not fall again when this news emerged.

### 3.     6 February 2019

147. On 6 February 2019, *The Guardian* reported that before the Dam 1 collapse, Vale mine workers had observed a leak at Dam 1 that caused them to believe the dam "was going to burst at any time."[153] *The Wall Street Journal* reported, "two independent mining dam experts who reviewed the report with the Journal said the dam shouldn't have been certified" given facts known by Vale about Dam 1.[154] These exposés informed investors that certain alleged misrepresentations were indeed false and that the Company concealed important information about its dam conditions, commitment to safety, and conduct.

---

[153] "'That's Going to Burst': Brazilian Dam Workers Say They Warned of Disaster," by Dom Phillips, *The Guardian*, 6 February 2019 12:30 AM.

[154] "Inspectors of Vale Dam in Brazil Issued Warning Before Collapse," by Patricia Kowsmann and Scott Patterson, *The Wall Street Journal*, 6 February 2019 3:37 PM.

*Confidential*

148. Additionally, on 6 February 2019, the news media reported that the state of Minas Gerais had canceled Vale's licenses to operate the Jangada iron ore mine and the Laranjeiras dam.[155] The Laranjeiras dam was critical to operations at the Brucutu mine.[156] That Vale would now need to obtain a new license for the Laranjeiras dam in order to resume operations at the Brucutu mine erected a second hurdle for Vale to clear before it could resume mining there.[157] The state's decision further informed investors that the Company's condition, commitment, and conduct with respect to dam safety was not what the public was previously led to believe.

149. As I explained in the Feinstein LCD Report, the 6 February 2019 developments were a corrective disclosure because they informed the market that the Company had not been transparent, honest, and forthcoming when it made representations about dam stability, management of risks, and its conduct and commitment with respect to safety and sustainability.[158] Analyst commentary confirms as much.

> "We hope the authorities can find a way to increase safety at mining locations and to reduce environmental risks without a major – and possibly unnecessary – economic impact on the affected communities and the state of Minas Gerais. … We arrive at our new one-year price target of US$16.00 per ADS (down from US$17.00) by applying a 35% discount to our NAVPS estimate. The lower P/NAV multiple (0.65x vs. 0.70x) we use to determine our price target reflects our reduced confidence about an expected near-term re-rating following the tailings dam failure at the Feijão mine. In our view, legal and operational uncertainty have increased, affecting investors' confidence on Vale (as reference, we used a P/NAV multiple of 0.80x before the accident)."
> **"Time to Reconsider Iron Ore Output and Price Levels," by Alfonso Salazar and Christian Landi, Scotiabank, analyst report, 7 February 2019, pp. 1 and 2.**

---

[155] "*Dam License for Vale's Brucutu Mine Canceled by Minas Gerais," *Bloomberg*, 6 February 2019 1:06 PM; and "Vale Operating Licenses for Jangada mine, Laranjeiras Dam Canceled," by Tatiana Bautzer and Jeffrey Benkoe, *Reuters*, 6 February 2019 2:48 PM.

[156] "Laranjeiras Dam License Revoked – Negative – Alert," by Rodolfo Angele and Julio Arantes, JPMorgan, analyst report, 6 February 2019, p. 1.

[157] "Laranjeiras Dam License Revoked – Negative – Alert," by Rodolfo Angele and Julio Arantes, JPMorgan, analyst report, 6 February 2019, p. 1.

[158] Feinstein LCD Report, ¶131.

*Confidential*

"The long-term multiple implications are unclear, with much hinging on the company's efforts to regain the trust of key stakeholders and evidence that there wasn't any wrongdoing or negligence on its part.

…

We would expect Vale management to focus on regaining the trust of its customers, shareholders, and the communities in which it operates. In what will likely be ongoing negative press coverage, we would further expect the company to be as proactive as possible in repairing its reputational damage, a big part of which is acknowledging and apologizing for any wrongdoing.

…

The company has also been very active in deploying resources to support the victims and the affected areas. However, comments pointing to inadequate regulatory standards can suggest a lack of accountability. It's important to note that precedent environmental failures have also shed light on unsatisfactory regulatory requirements. In the case of the BP oil spill, regulatory efforts by the Minerals Management System (MMS), the bureau in charge of regulating offshore oil production, was deemed to be largely ineffective given a lack of sufficient resources, and a lack of regulatory power, with minimal fines that were unlikely to dissuade risky behavior. But that was not the primary area of focus of either shareholders or the public.

…

In light of these events, we wouldn't be surprised to see revisions and further improvements to the company's internal risk management practices."

**"Uncertainties Continue to Arise from the Feijão Dam Accident; Downgrade to EW," by Carlos De Alba et al., Morgan Stanley, analyst report, 7 February 2019, pp. 1, 4, and 5 (emphasis added).**


"The judicial secrecy on the civil action to stop Vale's dams (Laranjeiras, Menezes II, Capitão do Mato, Dique B, Taquara, Forquilha I-III, and Vargem Grande) was lifted. To recapitulate, Minas Gerais prosecutors requested the judicial authorities to order Vale to shut down dams located in zones close to urban areas and requested the company to execute safety actions (e.g. I. present updated stability report of the dams mentioned in the civil action; II. present an action plan that guarantee total stability and safety of these dams; III. execute all necessary measures to guarantees the safety of the dams; and IV. hire and independent firm to inspect repairs and reinforcement work executed in the dams). The judge responsible for the civil action had originally ordered judicial secrecy to avoid panic in the communities that live nearby the dams. However, as in the Public Prosecutors of Minas Gerais' view, Vale had not followed the exceptional safety measures determined by the courts, the court decided to lift the civil action secrecy. Implications: We believe authorities (e.g. Public prosecutors, environmental agencies, local governments) are taking extra precautions to make sure Vale is in full compliance with absolutely all

57

*Confidential*

regulations and, upon any doubts or missing information, they are ordering the stoppage of operations until those questions or concerns are resolved. We expect these conditions will likely remain for a few more days or weeks, which will likely keep market uncertainty elevated."
**"Feijão Dam Accident Update #5," by Calos De Alba et al., Morgan Stanley, analyst report, 11 February 2019, pp. 1-2.**

"We note, however, that this case could be different [from the Samarco Mariana Dam collapse], given: i) the much larger number of casualties; ii) the recurring nature following the Samarco accident; and iii) the sense that additional accidents could happen. As a result, the media repercussion was much greater and could lead to a tougher Government approach to fines/compensation."
**"A Full Guide to the Brumadinho Dam Collapse; Our Views, Analysis and Sensitivities," by Marcos Assumpção et al., Itaú BBA, analyst report, 15 February 2019, p. 16.**

150.    HSBC wrote that *The Guardian* and *The Wall Street Journal* revelations could bring additional adverse consequences for Vale.[159]

"According to a WSJ article, Vale overlooked audit firm report citing risk of dam failure[.] The article adds up to other negative headlines, bringing increased uncertainty and, if confirmed, adverse ramifications[.]
…
Negative headlines continue to swirl: According to a *Wall Street Journal* article (6 February 2019), TUV SUD, the firm responsible for the Brumadinho dam inspection, informed Vale in a report that the dam would be at a high risk of failure if the water was not properly drained. The 128-page report, dated September 2018, also pointed to faulty monitoring systems aimed at water level control, as well as a number of drainage tubes clogged by vegetation, potentially causing water to build up inside the dam, which can cause liquefaction, where the tailings (which are used as part of the dam) turn almost into a fluid. While TUV SUD ultimately certified the dam as stable, independent mining experts cited by the Journal reported that the signs were enough to deny a stability report, particularly given that there was little information known about the dam, such as its foundation, before Vale bought it in 2001.

---

[159] "Hold: Negative Headlines Keep Coming In," by Jonathan Brandt et al., HSBC, analyst report, 7 February 2019, p. 1.

*Confidential*

> In addition, according to a local media article (*Globo*, 6 February 2019), which cited testimony from two TUV SUD engineers to Federal Police, one of the engineers responsible for the dam stability certification felt pressured by a Vale director to sign off the dam clearance at the risk of losing the contract. The article also mentions that Vale and TUV SUD employees exchanged emails on January 23 and 24 (one day before the incident), pointing to discrepant data obtained by instruments in the January 10 revision as well as the malfunctioning of 5 piezometers (instruments for measuring pressure). A third article (*Guardian*, 06 February 2019) cites mine worker testimonies pointing to water leaking through a crack in July 2018, which needed to be repaired, as well as a general perception of imminent collapse.
> …
> Reiterate Hold rating with a TP of USD13.25: We remain cautious due to the increased uncertainty on a variety of issues, including the potential liability for the company. We have incorporated liabilities of USD8bn into our valuation. In our view, negative headlines will continue in the short term, creating headwinds and decoupling the stock from its fundamentals."
> **"Hold: Negative Headlines Keep Coming In," by Jonathan Brandt et al., HSBC, analyst report, 7 February 2019, p. 1.**

151. In the Feinstein LCD Report, I explained that I searched and assessed whether there was any confounding information that contributed to the price declines in the Vale Securities. I determined that all of the statistically significant residual price declines on 6 February 2019 were caused by new Company-specific information that partially corrected the misrepresentations and omissions.[160] Professor Hubbard does not dispute that the Vale Securities prices fell by statistically significant amounts following *The Guardian* and *The Wall Street Journal* revelations and the state of Minas Gerais' decision to cancel Vale's license to operate the Laranjeiras dam.

152. Professor Hubbard contends that: i) "Professor Feinstein fails to articulate how Vale Securities' prices would respond, if at all, to information indicating Dam 1 had a leak half a year before its collapse and that one mining dam expert certified Dam 1 was stable, while two others disagreed with the certification in the absence of a safety event";[161] and ii) "Professor Feinstein fails to consider that these cancelations of Vale's licenses were the result of materializations of disclosed risks that impacted operations and would reduce

[160] Feinstein LCD Report, ¶¶206-212.

[161] Hubbard Rebuttal Report, ¶77.

*Confidential*

output, and that would have occurred given a safety incident absent any misrepresentations or omissions."[162] Professor Hubbard again argues that the specific details of these developments following the Dam 1 failure were new information that were not corrective of any prior alleged misrepresentations or omissions.

153. Professor Hubbard errs by focusing on the specifics of the news articles, rather than the fact that the articles conveyed to the public that the Company had been lying about its condition, commitment, and conduct. As I explained in §V.B above, the Lead Plaintiff does not contend that the Company could have disclosed verbatim at the start of the Class Period that Dam 1 was leaking water near its base. Rather, the allegation is that the Company could have divulged from the start that it was intent on keeping concealed its condition and conduct, and that it was not really committed to safety and sustainability. This is what the market learned from the news articles on 6 February 2019. The market could have learned these pertinent facts earlier from the but-for disclosure I described in the Feinstein LCD Report. But, because there was no such but-for disclosure, the Vale Security prices remained inflated until these news articles provided that truth that dissipated artificial inflation.

154. If the Company had made the but-for disclosures at the start of the Class Period, the specific revelations in the news articles and the cancellation of the Laranjeiras license would not have been surprising to investors. Had the Company disclosed it was not committed to safety and sustainability, was not complying with safety protocols, that the condition of its dams was not as good as represented, the Vale Security prices would have fallen then to reflect that understanding, and the prices would not have fallen again if and when the articles were published and the license was cancelled. In fact, as I explained in the Feinstein LCD Report, license cancellations reasonably would have happened earlier as a result of the but-for disclosure, causing even more financial loss to the Company, and a greater decline in the Vale Security prices than what did occur later.[163]

---

[162] Hubbard Rebuttal Report, ¶78.

[163] Feinstein LCD Report, ¶24.

155.   Professor Hubbard is wrong to contend that the news articles and license cancellation had nothing to do with the alleged fraud. They had everything to do with the alleged fraud. They conveyed what the Company could have disclosed at the start of the Class Period with the but-for announcement.

### G.   Differences in Vale Notes' Price Reactions Does Not Indicate Inefficiency

156.   Regarding my event study for the Vale Notes, Professor Hubbard observes, "some Vale Notes have a statistically significant price reaction on a given Alleged Corrective Date while others do not."[164] Professor Hubbard argues, that in his opinion, such event study results call into question the reliability of the event study and whether the market for the Vale Notes was efficient during the Class Period.[165] Professor Hubbard cites no authority, economic or legal, to support his opinion that a company's different debt securities must react in exactly the same fashion in order for an event study to be reliable or in order for the market for such securities to be efficient. Despite their similarities, the Vale Notes did have differentiating characteristics, which result in differences in their valuations.

157.   Moreover, my determination of market efficiency was based on numerous factors, not solely the empirical tests. Among these factors are volume, institutional ownership, float, and the Notes' listings on the NYSE. Given these specific factors, it is clear that if there were any economically significant mispricings, the developed market's mechanisms were in place to exploit and correct those discrepancies. Professor Hubbard may believe the prices were incorrect, but the market participants producing the equilibrium did not to any appreciable degree.

158.   Importantly, one cannot determine from a nonsignificant price response whether or not the security in general fails to capture the new information. A nonsignificant result is an indeterminate result. Nonsignificance can result from volatility obscuring the price reaction caused by the news, it does not mean the price did not react to the news. Professor Hubbard is wrong to suggest otherwise.

---

[164] Hubbard Rebuttal Report, ¶103.

[165] Hubbard Rebuttal Report, ¶103.

*Confidential*

159. Professor Hubbard notes that only one Note fell statistically significantly on 4 February 2019. Professor Hubbard states, "Professor Feinstein does not address why he believes that allegedly concealed information revealed on February 4, 2019 'caused losses to investors' on that day for investors holding TAP8, but not for investors in the other Vale Notes."[166]

160. The reason is simple. TAP8 fell significantly, while the others did not. While all of the Notes may have had a negative reaction to the news, somewhat obscured or countervailed by random volatility, it is conservative to ascribe to damages only losses that are so pronounced as to be above a threshold for statistical significance despite the effects of volatility. It would be justified under many situations to ascribe all observed price declines to damages, even those that are not greater than the threshold for statistical significance. To provide a conservative measure of damages in this case, however, I did not do so.

161. Professor Hubbard points to seemingly inconsistent results for 6 February 2019 for three of the Vale Notes with similar maturities.

> "Professor Feinstein has not described any structural differences or other characteristics of these bonds, all of which were between approximately 15 and 25 years to maturity at the time of the Alleged Corrective Dates, that could potentially explain these observed differences in statistical significance. Similarly, he fails to address why nearly half of the Vale Notes (three of the seven) did not exhibit statistically significant price movements on February 6, 2019. Nor does he attempt to explain why he believes the allegedly concealed information caused losses only to investors in the other four of the seven Vale Notes on February 6, 2019."
> **Hubbard Rebuttal Report, ¶106.**

162. As explained in the Feinstein Rebuttal Report, each of the Vale Notes has its own unique features, coupon rates, and time to maturity. These differences, as well as random volatility, allow for a range of independent movement.[167] A 25-year maturity bond reacts differently than does a 15-year bond to interest rates and company news. Differences in coupon rates also matter. For example, if investors believe it is very likely a bond issuer will satisfy its obligations over the next 15 years, but are less confident about a 25-year timeframe, then the bonds will have substantially different price reactions to adverse news. Similarly, bonds

---

[166] Hubbard Rebuttal Report, ¶104.

[167] Feinstein Rebuttal Report, ¶114.

*Confidential*

with higher coupon rates derive more of their value from near-term coupons and less from the distant principal payment, as compared to bonds with lower coupon rates.

163.   Professor Hubbard has provided no proof or analysis suggesting that the pricing of the Notes violated fundamental principles of bond pricing. And with good reason. The measured characteristics of the market for the Vale Notes was such that if bond valuation principles had been violated by any of these Notes to any appreciable degree, market participants could have quickly capitalized on the discrepancy, and in the process, quickly restore correct pricing.

164.   Professor Hubbard observes that the TAN3 Notes did not trade on 25 January 2019 and thus I could not measure whether there was a statistically significant decline that day for that Note. Professor Hubbard argues that I provided no explanation for why the TAN3 Note did not trade that day, and the lack of trading "calls into question" whether the market for this Vale Note was efficient. Professor Hubbard fails to consider that holders of a security sustain a loss when news erodes the security's value, regardless of whether the loss is realized and recorded by a trade, or alternatively, the security is held and not traded. Just because the holders of any particular security chose not to trade on any particular day does not call into question the efficiency of the security's market. Moreover, as explained in the Feinstein Report, it is a well understood feature of bond markets that bonds trade less frequently than do stocks.[168]

165.   As the thorough analysis in the Feinstein Report demonstrates, the market in which the TAN3 Notes traded was a well-developed and efficient market. That existing TAN3 Note investors chose to hold rather than sell the TAN3 Note on 25 January 2019 is intriguing, but it is no reason to question market efficiency in light of the evidence establishing market efficiency.

166.   Professor Hubbard observes that the TAM5 Note was not deemed statistically significant by the test presented in the Feinstein Report but was statistically significant in the Feinstein LCD Report. Professor Hubbard acknowledges that the regression models are different, but states that I did not explain why the regression specification changed.[169]

---

[168] Feinstein Report, ¶225.

[169] Hubbard Rebuttal Report, ¶109.

167.  The purpose of the event study in the Feinstein Report was to test for market efficiency over the course of the entire Class Period. The event study specification of using the entire Class Period is well suited for that purpose. However, the purpose of the event studies in the Feinstein LCD report was to quantify as precisely as possible the residual dollar loss, if any, caused by the corrective disclosures. To be quantitatively precise, I focused the regression on the one-year period prior to the corrective disclosures so as to best measure the Note price dynamics and volatility over a control period that was more closely contemporaneous with the events of interest.

168.  Moreover, as Defendants' Expert Dr. Torous explained in the Torous Report, the Class Period spans 572 trading days during which "noteworthy events known to affect public corporations, such as the departure of Vale's CEO, occurred … ."[170] The potential changes to Vale Note price dynamics that may have been caused by such "noteworthy events" that occurred prior to my one-year estimation period are eliminated from my regression model in the Feinstein LCD Report, resulting in a more precise estimation of dollar damages.

## H.     The Vale Preferred ADRs

169.  Professor Hubbard observes that Vale had outstanding preferred securities during the Class Period.[171] Professor Hubbard takes issue with my not addressing the market efficiency, loss causation, and damages with respect to the preferred securities. Specifically, Professor Hubbard states:

> "Despite these Vale securities being outstanding during part of the Class Period, Professor Feinstein does not discuss loss causation or damages for preferred ADRs in the Feinstein Report. Nowhere in Professor Feinstein's report does he describe whether individuals who purchased and/or held preferred ADRs during the Class Period and had those ADRs converted to common ADRs were damaged. In particular, he has not established what price inflation, if any, had accrued in this security prior to the voluntary conversion from June 2017 to August 2017 or the mandatory conversion in November 2017. Furthermore, he did not establish market efficiency for preferred ADRs in the Feinstein Market Efficiency Report. To the extent Plaintiff may argue that holders of the preferred ADRs 'purchased' common ADRs at inflated prices in the conversion, these investors also would have

---

[170] Torous Report, ¶37.

[171] Hubbard Rebuttal Report, ¶111.

*Confidential*

'sold' a preferred ADR on the same day, presumably also at an inflated price that Professor Feinstein has not determined. Ignoring the potential benefit a class member had from 'selling' a preferred ADR at an inflated price while assuming that same class member was damaged through the 'purchase' of a common ADR through the conversion could lead to a windfall. Professor Feinstein's report has not described any mechanism to calculate potential damages for such class members."
**Hubbard Rebuttal Report, ¶112.**

170.  As Professor Hubbard acknowledges, the "Plaintiff does not mention the preferred ADRs as an at-issue security in the Complaint."[172] Consequently, there was no reason to conduct loss causation and damages analysis for those securities, or market efficiency analysis. As the preferred ADRs are not a part of this case, they were beyond the scope of the engagement.

## VI.   PROFESSOR SUTCLIFFE'S CRITICISMS OF THE FEINSTEIN LCD REPORT ARE MERITLESS

171.  Professor Sutcliffe incorrectly criticizes my analysis for purportedly "draw[ing] conclusions with respect to Vale's safety and risk management practices."[173] Professor Sutcliffe is mistaken. I do not draw any independent factual conclusions about safety standards and risk management practices. Rather, as I stated clearly in my report, that I assumed Lead Plaintiff's allegations about these matters are true.

172.  I explained that I was relying on the assumption that the Lead Plaintiff will prove its factual claims. On page 4 of her report, Professor Sutcliffe acknowledges that I provided this disclaimer "at the beginning" of my report. Professor Sutcliffe cites my disclaimer again on page 28 of her report. She even excerpts a direct quote of the disclaimer from my LCD Report into her report, "Professor Feinstein, as Plaintiff's loss causation and damages expert, notes that for purposes of his analyses he 'assumed Lead Plaintiff will be able to prove their factual allegations.'"[174]

---

[172] Hubbard Rebuttal Report, FN 29.

[173] Sutcliffe Rebuttal Report, ¶49.

[174] Sutcliffe Rebuttal Report, ¶49.

*Confidential*

173.    Further, she notes that I cite to authority in the literature for the appropriateness of assuming Lead Plaintiff's factual allegations: "Additionally, Professor Feinstein includes a footnote indicating that it is a generally accepted practice in loss causation and damages analysis to assume factual allegations."[175]

174.    Clearly, by Professor Sutcliffe's own account, her criticism that I independently verified Lead Plaintiff's allegations or reached my own conclusions about Vale's safety and risk management practices, or claimed to do so, is erroneous.

## VII.    LIMITING FACTORS AND OTHER ASSUMPTIONS

175.    This report is furnished solely for the purpose of court proceedings in the above referenced matter and may not be used or referred to for any other purpose. The analysis and opinions contained in this report are based on information available as of the date of this report. I reserve the right to supplement or amend this report if additional information becomes available to me.

Steven P. Feinstein, Ph.D., CFA

---

[175] Sutcliffe Rebuttal Report, FN 118.

66

**Exhibit-1**
**Documents and Other Information Considered**
**In Addition to Those Cited in the Feinstein Report, Feinstein Rebuttal Report, Feinstein**
**LCD Report, and Feinstein Reply Report**

## CASE DOCUMENTS

- Expert Rebuttal Report of Randal Stephenson, dated 7 April 2023.
- Rebuttal Expert Report of Glenn Hubbard, dated 7 April 2023.
- Rebuttal Expert Report of Kathleen M. Sutcliffe, Ph.D., dated 7 April 2023.
- Reply Report, Professor Steven P. Feinstein, Ph.D., CFA, dated 7 April 2023.

## NEWS ARTICLE

- "Vale Iron-Mine Halt Poses Risk of 'Incremental Supply Shock' (1)," by R.T. Watson, *Bloomberg*, 4 February 2019 2:20 PM.

## ACADEMIC AND PROFESSIONAL LITERATURE

- *Asymmetric Information, Corporate Finance, and Investment*, by The University of Chicago Press, edited by R. Glenn Hubbard, National Bureau of Economic Research, 1990.
- "Bulletin of the American Mathematical Society; Current Tendencies of Mathematical Research," by Edward Van Vleck, vol. 23, no. 1, 1916.
- *Damn Right! Behind the Scenes with Berkshire Hathaway Billionaire Charlie Munger*, by Janet Lowe, John Wiley & Sons, Inc., 2000.

## DATA AND DATABASES

- Bloomberg
- CRSP (Center for Research in Security Prices)
- EDGAR
- Factiva
- Federal Reserve Economic Data
- FINRA TRACE
- Refinitiv Eikon
- S&P

## OTHER

- Any other documents cited in the report.