# EXHIBIT E

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

|  |
|---|
| In Re VALE S.A. SECURITIES LITIGATION |

No. 19-cv-526-RJD-SJB

REPLY REPORT

PROFESSOR STEVEN P. FEINSTEIN, PH.D., CFA

April 7, 2023

**TABLE OF CONTENTS**

I.    INTRODUCTION AND SCOPE ........................................................................................1

II.   CONCLUSIONS............................................................................................................4

III.  CRITIQUE OF THE STEPHENSON REPORT ............................................................6

      A.    Areas of Agreement ..........................................................................................6

      B.    Existence Versus Magnitude of Dam Failure Risk................................................6

      C.    Mr. Stephenson's But-For World Is Inconsistent With Lead Plaintiff's Allegations and the Facts of the Case ....................................................................7

      D.    The Probability Magnitude That Mr. Stephenson Asserts to Be True Is Unrealistically Low..............................................................................................9

IV.   LIMITING FACTORS AND OTHER ASSUMPTIONS..................................................12

## I.    INTRODUCTION AND SCOPE

1.    As reported in my expert report dated 18 February 2021 ("Feinstein Report") and my rebuttal report dated 4 June 2021 ("Feinstein Rebuttal Report"), I conducted analyses to assess the efficiency of the markets in which the Vale Securities traded during the period from 27 October 2016 through 6 February 2019, inclusive (the "Class Period"). I concluded that the Vale Securities traded in efficient markets throughout the Class Period.

2.    I also explained in the Feinstein Report that the standard out-of-pocket damage model is consistent with Lead Plaintiff's theory of liability and can be applied commonly to compute Section 10(b) damages for all Class members.

3.    I understand that in its Report and Recommendation decision dated 11 January 2022, the Court in this matter accepted the conclusions regarding market efficiency and the common damage model, and recommended that Lead Plaintiff's motion for class certification be granted.[1] On 31 March 2022, the Report and Recommendation was adopted by Judge Dearie. Defendants' subsequent petition for an appeal of the ruling was denied on 7 September 2022.

4.    On 10 March 2023, I submitted the Report on Loss Causation and Damages ("Feinstein LCD Report"). As explained in that report, I determined, based on my analysis and the assumption that Lead Plaintiff will prove its factual allegations, that Class members suffered losses as a result of the alleged misrepresentations and omissions.[2] I also quantified the Section 10(b) damages Class members sustained per share as a result of the alleged misrepresentations and omissions.

---

[1] *Report & Recommendation*, dated 11 January 2022; and *Memorandum and Order*, dated 31 March 2022.

[2] Feinstein LCD Report, ¶11.

1

5.    Specifically, in the Feinstein LCD Report, I explained that:

    i.    The alleged misrepresentations, omissions, and deceptive conduct, which misled investors about the stability of the Company's dams, the Company's ability to manage risks, and the Company's commitment to safety and sustainability were economically material to investors.[3]

    ii.    Vale's positive misrepresentations and omissions about the stability of its dams, sufficient and effective management of risks related to the dams, and conduct consistent with its professed commitment to safety and sustainability caused the prices of the Vale Securities to be artificially inflated.[4]

    iii.    The corrective disclosure events near and at the end of the Class Period informed the market that, contrary to what the market was led to believe, the Company's dams were not stable, the Company was not managing risks sufficiently and effectively, the Company was not committed to safety and sustainability, and as a result the Company was exposed to the adverse consequences of its decisions and conduct, including financial ramifications, and regulatory, litigation, and enforcement actions.[5]

    iv.    Investors who purchased or otherwise acquired Vale Securities during the Class Period suffered economic losses that were caused by the alleged misrepresentations, omissions, and deceptive conduct.[6]

6.    I quantified the Section 10(b) damages Class members sustained per security on their investments in the Vale Securities as follows:

    i.    The artificial inflation in the market price of Vale ADR from the start of the Class Period until 25 January 2019, was $2.72 per ADR. Investors in the Vale ADR suffered losses of up to $2.72 per ADR.

---

[3] Feinstein LCD Report, ¶12.

[4] Feinstein LCD Report, ¶13.

[5] Feinstein LCD Report, ¶12.

[6] Feinstein LCD Report, ¶16.

ii.     The TAP8 Notes were artificially inflated by $6.49 per $100 of par value at the start of the Class Period. Investors in the TAP8 Notes suffered losses of up to $6.49 per $100 of par value.

iii.    The TAM5 Notes were artificially inflated by $2.37 per $100 of par value at the start of the Class Period. Investors in the TAM5 Notes suffered losses of up to $2.37 per $100 of par value.

iv.     The TAE3 Notes were artificially inflated by $5.95 per $100 of par value at the start of the Class Period. Investors in the TAE3 Notes suffered losses of up to $5.95 per $100 of par value.

v.      The TAH6 Notes were artificially inflated by $7.17 per $100 of par value at the start of the Class Period. Investors in the TAH6 Notes suffered losses of up to $7.17 per $100 of par value.

vi.     The TAK9 Notes were artificially inflated by $6.68 per $100 of par value at the start of the Class Period. Investors in the TAK9 Notes suffered losses of up to $6.68 per $100 of par value.

vii.    The EEA3 Notes were artificially inflated by $6.53 per $100 of par value at the start of the Class Period. Investors in the EEA3 Notes suffered losses of up to $6.53 per $100 of par value.

viii.   Investors in the TAN3 Notes suffered no quantifiable damages from their investments in the TAN3 Notes.

7.      On 10 March 2023, Defendants in this matter submitted the Expert Report of Randal Stephenson (the "Stephenson Report"). Mr. Stephenson proffers the opinion that the misrepresentations and omissions in this case had a *de minimis* impact on the prices of the Vale Securities during the Class Period. Based on his assertions that investors were already aware of a risk of dam failure throughout the Class Period, and that the provision to investors of certain risk statistics would have constituted full disclosure, Mr. Stephenson opines that the alleged misrepresentations and omissions had no meaningful effect on "investors' valuation of Vale."[7] With no impact on valuation, the alleged misrepresentations and omissions would have caused negligible damages.

---

[7] Stephenson Report, ¶¶22 and 76.

3

8. Full disclosure according to Mr. Stephenson would have been an announcement that "Dam 1's probability of failure was 3 in 10,000, or three times Vale's purported maximum risk tolerance; that ten dams including Dam 1 had a failure probability in Vale's Attention Zone, and that Dam 1's undrained Factor of Safety allegedly was greater than purported best practices."[8]

9. Kaplan Fox & Kilsheimer LLP, Lead Counsel for the Lead Plaintiff, asked me to consider, evaluate, and respond to the arguments and conclusions in the Stephenson Report. This reply report presents my responses to the Stephenson Report.

10. I reviewed and relied upon all of the data and documents cited and listed in my previous reports. Additional data and documents considered are listed in Exhibit-1 of this report. My credentials and compensation are presented in the Feinstein LCD Report.

11. That my current report may not address all of the arguments expressed in the Stephenson Report should not be considered tacit acceptance of any of his opinions. My work on this matter is ongoing. I reserve the right to amend, refine, or supplement my analyses and opinions in the event that I become aware of additional information, evidence, arguments, or analyses that bear on my work in this matter.

## II.   CONCLUSIONS

12. The Stephenson Report provides no valid basis for revising my conclusions on loss causation and damages. Mr. Stephenson's conclusions are based on a mischaracterization of Lead Plaintiff's allegations, a misunderstanding of the case facts, and faulty logic.

13. Specifically,

    i.    Mr. Stephenson mistakes market awareness of the existence of a risk with knowledge of the magnitude of the risk. With respect to this case specifically, Mr. Stephenson mistakes the market's awareness of the risk that a dam could fail – that such an adverse event is within the realm of possibility – with full and complete disclosure of the Company's condition and conduct regarding dam safety, which

---

[8] The word "greater" in this quote from the Stephenson Report is probably a typo. Presumably, Mr. Stephenson intended to say "lower" than best practices, as this is what Lead Plaintiff alleged. Stephenson Report, ¶76.

4

according to Lead Plaintiff was far different than what the market was led to believe.

ii. Mr. Stephenson overlooks that the Company allegedly engaged in misconduct to conceal the true condition of its dams and Company behavior regarding dam safety. Full disclosure would therefore also have had to inform investors of the Company's intent and efforts to conceal from investors the true degree of risk. Mr. Stephenson's characterization of full disclosure is far too narrow and does not accord with Lead Plaintiff's allegations.

iii. Mr. Stephenson disregards that generally accepted economic theory about asymmetric information dictates a severe valuation impact when investors are aware that information is concealed or intentionally misrepresented. Just as a cover-up can have severe consequences beyond the impact of what was covered up, the Company's alleged conduct to conceal the magnitude of risk will have severe valuation impact, potentially greater than what would have been the economic impact of the concealed information. According to generally accepted economic theory, investors rationally assume the worst when they become aware that a company is hiding important information.

iv. Mr. Stephenson mischaracterizes and/or misunderstands the corrective disclosures in this case. Contrary to Mr. Stephenson's opinions, the corrective disclosures did not provide to investors specific metrics regarding dam risk. Rather, the corrective disclosures informed investors that the true risks were far greater than what they were led to believe, and that the Company was not being transparent and truthful about its dam safety conduct and conditions. Any announcement or event that revealed these truths to investors would have been more far-reaching than the hypothetical corrective disclosure Mr. Stephenson considered, and would accordingly have had a much more severe valuation impact than the minimal impact Mr. Stephenson describes.

14. My analyses conform to widely used and generally accepted methodologies, are grounded in fundamental principles of economics, and are correctly executed. My loss causation analysis compels the conclusion that the alleged misrepresentations and omissions caused investor losses. The alleged misrepresentations and omissions artificially inflated the prices

5

of Vale Securities, and the corrective disclosure events dissipated that artificial inflation, causing the prices of the Vale Securities to fall and thereby causing investor losses.

15. The quantification of damages presented in the Feinstein LCD Report and summarized above is correct, and accords with Lead Plaintiff's allegations, facts of the case, and generally accepted valuation principles.

## III. CRITIQUE OF THE STEPHENSON REPORT

### A. Areas of Agreement

16. Mr. Stephenson does not challenge that Vale Securities traded in efficient markets throughout the Class Period.

17. Mr. Stephenson does not question that the prices of the Vale Securities fell by statistically significant amounts on the corrective disclosure event dates.

18. Mr. Stephenson does not contest the applicability of a common damage model to compute Section 10(b) damages for all Class Members.

### B. Existence Versus Magnitude of Dam Failure Risk

19. Mr. Stephenson asserts that the impact of the alleged misrepresentations and omissions on the valuation of Vale was negligible, because, among other reasons, investors were always aware that there was some risk of dam failure.[9]

20. This observation is irrelevant and the argument is illogical. Of course investors knew that there was always some risk of dam failure. Knowing that dam failure and the potentially catastrophic consequences could conceivably happen is why facts, conditions, conduct, and Company representations about dam safety are economically material to investors.

21. Consistent with generally accepted financial economic principles, the value of Vale securities depends on, among other things, the market's assessment of the magnitude of this risk. Nobody has alleged that the *existence* of the risk was concealed. Rather, Plaintiff alleges that facts relating to the *magnitude* of the risk were deliberately concealed.

---

[9] Stephenson Report, ¶22.

6

**C.** **Mr. Stephenson's But-For World Is Inconsistent With Lead Plaintiff's Allegations and the Facts of the Case**

22. As explained in the Feinstein LCD Report, had Vale told investors that the Company was denying them accurate information about the safety and stability of its dams, that Vale was concealing the truth about how dam risks were managed, and that Vale was not truly committed to safety and sustainability, generally accepted economic principles about asymmetric information dictate that investors would have repriced the Vale Securities significantly lower,[10] applying a discount commensurate with the diminution of value that later occurred when the market did become aware that the Company's condition and conduct were not what the public had been told.[11] Investors would have severely reduced the valuations of the Vale Securities to account for the concealment of important information, the lack of reliable data, and the realization that Company representations on these important matters were misrepresentations.[12]

23. Despite correctly excerpting Lead Plaintiff's allegations in ¶17 of the Stephenson Report,[13] Mr. Stephenson disregards many of Lead Plaintiff's alleged misrepresentations and omissions, and he is far too limited in his construction of what would have constituted prior full disclosure in the but-for world in which there would have been fulsome and timely disclosure. The but-for world of full disclosure that Mr. Stephenson concocts is inconsistent with the scope of what Lead Plaintiff alleges was concealed during the Class Period.

---

[10] The Nobel Prize in Economics was twice awarded for developing the principles about behavior and pricing under conditions of asymmetric information. "The Market for 'Lemons': Quality Uncertainty and the Market Mechanism," by George Akerlof, *The Quarterly Journal of Economics*, vol. 84, no. 3, 1970; and "Markets with Asymmetric Information: The Contributions of George Akerlof, Michael Spence and Joseph Stiglitz," by Karl-Gustaf Lofgren et al., *The Scandinavian Journal of Economics*, June 2002; and "Improvements to Auction Theory and Inventions of New Auction Formats," The Committee for the Prize in Economic Sciences in Memory of Alfred Nobel, 12 October 2020, describing the award to Paul Milgrom in 2020 for his work addressing asymmetric information, which cited, among others, "Rational Expectations, Information Acquisition, and Competitive Bidding," by Paul Milgrom, *Econometrica*, vol. 49, no. 4, 1981.

[11] Feinstein LCD Report, ¶22.

[12] Feinstein LCD Report, ¶22.

[13] Stephenson Report, ¶17.

24. Specifically, Mr. Stephenson contends that the omitted information is **only** "that Dam 1's probability of failure was 3 in 10,000, or three times Vale's purported maximum risk tolerance [and] that ten dams including Dam 1 had a failure probability in Vale's Attention Zone."[14] Based on his narrow interpretation of the Lead Plaintiff's allegations, Mr. Stephenson opines that "the information that Plaintiff alleges was omitted would not have affected a reasonable investor's valuation of Vale." According to Mr. Stephenson:

> "Had Vale disclosed the allegedly omitted information (that Dam 1's probability of failure was 3 in 10,000, or three times Vale's purported maximum risk tolerance; that ten dams including Dam 1 had a failure probability in Vale's Attention Zone, and that Dam 1's undrained Factor of Safety allegedly was [lower] than purported best practices), investors' valuation of Vale would still not have meaningfully changed."
> **Stephenson Report, ¶76.**

25. Mr. Stephenson overlooks that the but-for disclosure would have informed investors that the Company was intent on deceiving investors, concealing the truth about Company condition and conduct with respect to dam safety, and depriving investors of the necessary facts to properly assess the true risk of dam failure. This is what investors did ultimately learn from the corrective disclosure events, and so this is what would correctly constitute a but-for prior full disclosure.

26. The Court emphasizes that Lead Plaintiff's allegations "plainly reveal that Defendants fabricated their statements about Vale's safety."

> "If proven, Plaintiff's allegations would show a deliberate and concerted effort to mislead the public. The allegations plainly reveal that Defendants fabricated their statements about Vale's safety and risk management practices, Vale's commitment to safety and sustainability, and the stability of Vale's dams."
> **MTD Order, p. 35.**

27. The valuation impact of the market learning of a deliberate information asymmetry of this kind is significant, not *de minimis*. Mr. Stephenson's too restrictive mischaracterization of the alleged misrepresentations and omissions, resulting in an inaccurate characterization of

---

[14] Stephenson Report, ¶76.

the full disclosure but-for world, is one defect that produces Mr. Stephenson's erroneous opinion that inflation and damages were negligible.

**D.     The Probability Magnitude That Mr. Stephenson Asserts to Be True Is Unrealistically Low**

28.  Mr. Stephenson's analysis depends on evaluating a spread between the perceived probability of dam failure and a different number the Company should have announced. Mr. Stephenson asserts that any inflation in the prices of the Vale Securities was entirely due to the market assessing the probability of dam failure at 0.01% rather than 0.03%. Not only is this characterization of the allegations and the but-for scenario incorrect and too limited, but the 0.01% and 0.03% probability figures that Mr. Stephenson bases his opinion on are not likely correct.

29.  First, Mr. Stephenson has no basis for asserting that the market assessed the dam failure rate to be precisely 0.01% prior to the end of the Class Period. While this number may have been what the Company deemed to be an acceptable maximum level of risk, Mr. Stephenson has no basis to assert that the market believed this maximum acceptable risk level was the best risk level the Company was able to achieve given the Company's professed commitment to safety (which Lead Plaintiff alleges turned out to be misrepresented). Given the Company's representations, the market may have assessed a lower risk level than 0.01% annual failure rate per dam, rendering Mr. Stephenson's conclusion erroneous.

30.  Mr. Stephenson finds the 0.03% probability figure in the "Geotechnical Risk Management" report produced by two engineering firms retained in February 2017 by Vale. The Complaint notes that the 0.03% estimated probability of dam failure reported by the engineering firms is substantially greater than the 0.01% figure that Vale set as its maximum acceptable risk level.

31.  While the 0.03% figure is sufficient to establish that the Company knew the risk was far out of the bounds it considered acceptable, it is an unsubstantiated leap for Mr. Stephenson to assume that this 0.03% is the correct maximum probability figure that would have honestly informed investors of the true dam collapse probability.

32.  Given that the Company allegedly made false statements to the public about dam safety, it raises the prospect that perhaps the Company made similar false statements about conduct

and commitment to the two engineering firms auditing dam risk. The engineering companies may have arrived at the 0.03% figure on account of misrepresentations and omissions, and that number may therefore be unreliably too low. Nonetheless, Mr. Stephenson accepts the 0.03% figure as absolutely correct without question.

33. The 0.03% probability figure is not the only figure mentioned in the Complaint and supported by evidence the Plaintiff presents. Other much higher probability figures for dam failure are discussed in the Complaint[15] and noted by Mr. Stephenson in his report,[16] but Mr. Stephenson chooses to (or was instructed to) ignore the higher numbers.

34. Mr. Stephenson selectively accepts certain evidence and statements from the Complaint, but disregards others. For example, the Complaint states that there were "extremely low factors of safety and a roughly 50% probability of dam failure."[17] Mr. Stephenson rejects the 50% probability figure rather than appropriately accepting Plaintiff's allegations.

> "The Complaint also alleges that 'Defendants knew or recklessly disregarded, inter alia, that Poppinga had closed Dam 1 in July 2016 when it received liquefaction analyses indicating extremely low factors of safety and a roughly 50% probability of dam failure.' Complaint, ¶ 162. I understand from counsel that another expert will address the allegedly low factors of safety and "a roughly 50% probability of dam failure" in his report."
> **Stephenson Report, FN 109.**

> "I note that Plaintiff also alleges that 'Geoconsultoria's findings suggested a roughly 50% probability of dam failure and should have caused Vale to trigger an 'emergency level 3' under its PAEBM for Dam 1, requiring evacuation of the area and other measures.' (Complaint, ¶ 70). I understand from counsel that another expert will address this allegation."
> **Stephenson Report, FN 115.**

35. Other data and evidence dismissed by Mr. Stephenson include the following:

> "Additionally, the October 2018 International PIESEM panel included an extended discussion of risk management. In the final report from the panel, it emphasized how "undesirable" it was for the Company to have tailings

---

[15] Complaint, ¶70.

[16] Stephenson Report, FN 109; and Stephenson Report, FN 115.

[17] Complaint, ¶162 and Stephenson Report, FN 109.

dams in the "attention zone" of 10-3 to 10-4 for an extended period of time "because of the relatively high level of risk that this implies, especially from a portfolio perspective if multiple VALE projects are in this zone." By way of example, the report noted that if half of Vale's dam portfolio were at a risk of 10-3 and the other half were at 10-4, then the probability of at least one failure across the portfolio of 137 dams is 7% per year, equal to 53% in ten years. Add in one very high-risk dam (10-1), and the odds jump to 16% per year or 83% in ten years. Thus, the riskiness of Vale's entire portfolio of dams was dramatically impacted by Dam 1 being considered riskier than 10-4—and it was one of several dams that Vale had in this risk category."
**Complaint, ¶79, FN 24.**

"On December 18, 2015, a little over a month after the Mariana dam collapse, Vale obtained a risk analysis for Dam 1 from Pimenta de Ávila Consultoria. The analysis indicated a range of failure probabilities using different methodologies, with results as high as a 50% failure probability for Dam 1. However, the analyses were based on geotechnical measurements made in 2006, therefore the consultant advised that Vale should collect new data and reassess."
**Complaint, ¶63.**

36.    The 0.03% probability figure is likely far too low, because it is not reasonably compatible with the Company experiencing two catastrophic dam failures within such a short amount of time. The Samarco Mariana Dam collapsed on 5 November 2015 and Dam 1 collapsed 3.2 years later on 25 January 2019. If a 0.03% probability of a dam collapse was so "remote" as to be of no interest to investors, as Mr. Stephenson asserts, then it would have been extremely unlikely for the same "remote" event to occur twice in a short time span.

37.    It is instructive that what the market was able to learn from the collapse of Dam 1, coming so soon after the collapse of Samarco's Mariana Dam, was not that the true probability of a dam failure was 0.03%, but rather that the Company's condition and conduct could not have been as the Company had represented, and must have been significantly greater. It is also noteworthy that the Company to this day has not disclosed an indisputable quantification of the dam failure probability, further establishing that the information conveyed by the corrective disclosures in this case was not that the true probability was 0.03%, but rather that conduct and condition were not how they were represented by the Company.

11

38. That Mr. Stephenson accepts the 0.03% dam risk figure as precise and correct, and assumes that providing that number to the public would have constituted the entirety of full disclosure, ignoring Lead Plaintiff's allegations regarding the Company's commitment and conduct, renders his opinion unreliable, if not demonstrably incorrect.

## IV.     LIMITING FACTORS AND OTHER ASSUMPTIONS

39. This report is furnished solely for the purpose of court proceedings in the above referenced matter and may not be used or referred to for any other purpose. The analysis and opinions contained in this report are based on information available as of the date of this report. I reserve the right to supplement or amend this report if additional information becomes available to me.


Steven P. Feinstein, Ph.D., CFA

12

**Exhibit-1**

**Documents and Other Information Considered**
**In Addition to Those Cited in the Feinstein Report, Feinstein Rebuttal Report, and**
**Feinstein LCD Report**

**CASE DOCUMENTS**

- Expert Report of Randal Stephenson, dated 10 March 2023.
- Report on Loss Causation and Damages, Professor Steven P. Feinstein, Ph.D, CFA, dated 10 March 2023.

**DATA AND DATABASES**

- Bloomberg
- CRSP (Center for Research in Security Prices)
- EDGAR
- Factiva
- Federal Reserve Economic Data
- FINRA TRACE
- Refinitiv Eikon
- S&P

**OTHER**

- Any other documents cited in the report.

13