**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE VALE S.A. SECURITIES LITIGATION | Case No.: 19-cv-526-EK-SJB |

**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION
TO EXCLUDE THE EXPERT TESTIMONY OF STEVEN FEINSTEIN**

**May 29, 2024**

## **TABLE OF CONTENTS**

**Page(s)**

TABLE OF AUTHORITIES...............................................................................................iii

I.      PRELIMINARY STATEMENT.......................................................................... 1

II.     LEGAL STANDARD ......................................................................................... 3

III.    ARGUMENT....................................................................................................... 4

       A.    Feinstein Employs Reliable Principles and Methods to Calculate Artificial Inflation ................................................................................... 4

       B.    Feinstein Reliably Applies Accepted Principles and Methods to the Alleged Facts in Forming His Loss Causation and Damages Opinions ................. 8

           1.    There Is No Factual or Legal Support For Defendants' Claim That Feinstein Should Have Removed a Hypothetical Price Drop For Materialization of a Disclosed Risk of Dam Failure............................ 9

           2.    Feinstein Thoroughly Reviewed the Corrective Events, Which Are Strongly Connected to the Alleged Misrepresentations......................11

       C.    Feinstein's But-For World Is Firmly Rooted in Economic Principles and the Facts of This Case ....................................................................... 12

       D.    Feinstein Does Not Offer Any Legal Opinions In This Case .............................. 15

IV.     CONCLUSION.................................................................................................. 15

ii

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Andrews v. Brethren Mut. Ins. Co.*,
  2023 WL 6690710 (M.D. Pa. Oct. 12, 2023) ............................................................... 4

*Baker v. SeaWorld, Ent., Inc.*,
  423 F. Supp. 3d 878 (S.D. Cal. 2019) ...................................................................... 15

*Boucher v. U.S. Suzuki Motor Corp.*,
  73 F.3d 18 (2d Cir. 1996) ......................................................................................... 12

*Cargo Logistics Int'l, LLC v. Overseas Moving Specialists, Inc.*,
  2024 WL 1158811 (E.D.N.Y. Mar. 18, 2024) ............................................................ 3

*Daubert v. Merrell Dow Pharm., Inc.*,
  509 U.S. 579 (1993) .......................................................................................... *passim*

*DoubleLine Capital LP v. Odebrecht Fin., Ltd.*,
  2024 WL 1115944 (S.D.N.Y. Mar. 14, 2024)............................................................. 4

*Glickenhaus & Co. v. Household Int'l, Inc.*,
  787 F.3d 408 (7th Cir. 2015) ..................................................................................... 5

*Hasemann v. Gerber Prod. Co.*,
  2024 WL 1282368 (E.D.N.Y. Mar. 25, 2024) ............................................................ 4

*In re BP p.l.c. Sec. Litig.*,
  2014 WL 2112823 (S.D. Tex. May 20, 2014) ............................................................ 9

*In re Kirkland Lake Gold Ltd. Sec. Litig.*,
  2024 WL 1342800 (S.D.N.Y. Mar. 29, 2024) ............................................................ 7

*In re Omega Healthcare Invs., Inc. Sec. Litig.*,
  563 F. Supp. 3d 259 (S.D.N.Y. 2021)....................................................................... 10

*In re Omnicom Grp., Inc. Sec. Litig.*,
  597 F.3d 501 (2d Cir. 2010) ...................................................................................... 9

*In re Pfizer Inc. Sec. Litig.*,
  819 F.3d 642 (2d Cir. 2016) ............................................................................. *passim*

*In re SLM Corp. Sec. Litig.*,
  2012 WL 209095 (S.D.N.Y. Jan. 24, 2012) ............................................................. 15

*In re Under Armour Sec. Litig.*,
2024 WL 1635680 (D. Md. Apr. 16, 2024) ........................................................................... 6, 15

*In re Vale S.A. Sec. Litig.*,
2020 WL 2610979 (E.D.N.Y. May 20, 2020) .......................................................................... 2

*In re Vivendi Universal, S.A. Sec. Litig.*,
634 F. Supp. 2d 352 (S.D.N.Y. 2009)................................................................................... 10

*In re Vivendi, S.A. Sec. Litig.*,
838 F.3d 223 (2d Cir. 2016) .................................................................................... 5, 6, 7, 14

*Kortright Cap. Partners LP v. Investcorp Inv. Advisers Ltd.*,
2018 WL 6329396 (S.D.N.Y. Dec. 4, 2018) ......................................................................... 14

*Kumho Tire Co., Ltd. v. Carmichael*,
526 U.S. 137 (1999) .............................................................................................................. 3

*Lentell v. Merrill Lynch & Co.*,
396 F.3d 161 (2d Cir. 2005) .............................................................................................. 2, 10

*Monroe Cnty. Employees' Ret. Sys. v. S. Co.*,
332 F.R.D. 370 (N.D. Ga. 2019) ........................................................................................... 7

*Sjunde AP-Fonden v. Gen. Elec. Co.*,
2023 WL 6314939 (S.D.N.Y. Sept. 28, 2023)...................................................................... 6, 8

**Rules**

Fed. R. Evid. 702 .......................................................................................................... 1, 2, 4

## I.    PRELIMINARY STATEMENT

Aside from its overheated rhetoric, Defendants' motion to exclude the expert opinions of Steven Feinstein is most notable for what it *does not* argue. Defendants do not dispute that Feinstein is qualified to opine as an expert on loss causation and damages, nor could they.[1] Defendants do not dispute that Feinstein's testimony concerns relevant subjects. And they do not dispute that loss causation is "typically" studied by performing an event study of the corrective events. Defs.' Br. at 3. Indeed, they do not even claim there are any technical flaws in Feinstein's event study. Instead, Defendants argue that Feinstein's analysis is "unreliable" because they disagree with his *conclusions* based on three broad factual disputes about what Plaintiff alleges and intends to prove.

Defendants' arguments are not only wrong, but none of them is a proper basis for excluding Feinstein's testimony. In deciding a motion to exclude under Rule 702, the Court's focus "must be solely on principles and methodology, not on the conclusions that they generate." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 595 (1993). Proponents of expert evidence "do not have to demonstrate to the judge by a preponderance of the evidence that the assessments of their experts are correct, they only have to demonstrate by a preponderance of the evidence that their opinions are reliable." Fed. R. Evid. 702 Advisory Committee's Note to 2000 Amendment (citation and quotation marks omitted). Although Defendants dress up their arguments in the language of reliability, their claims all violate this core tenet of Rule 702.

*First*, Defendants argue that Feinstein used an "unreliable method" to calculate artificial inflation because he concluded that the full amount of inflation was in Vale's share prices from

---

[1] Feinstein has a Ph.D. from Yale University in Economics with a concentration in Finance. Defs.' Ex. C at Ex. 3. He teaches finance at Babson College, is a Chartered Financial Analyst, has published extensively in his field (*id.*), and provided testimony on these topics in more than 100 securities fraud cases (Defs.' Ex. B at 20:14-21:10).

1

the start of the Class Period until the first corrective event. Defs.' Br. 4-7. But Defendants conceded that his method—conducting an event study of the corrective events—is the usual procedure for calculating artificial inflation. Defs.' Br. 3. And Feinstein modeled damages and the inflation ribbon (*i.e.*, the time series of artificial inflation throughout the Class Period) based on Plaintiff's theory of the case. There is nothing "unreliable" or flawed in an expert modeling damages based on what the plaintiff intends to prove. *See In re Pfizer Inc. Sec. Litig.*, 819 F.3d 642, 660 (2d Cir. 2016) (reversing exclusion of expert damages analysis that "assum[ed] that [P]laintiffs will be able to prove their liability allegations."). And Rule 702 does not "authorize a trial court to exclude an expert's testimony on the ground that the court believes one version of the facts and not the other." Fed. R. Evid. 702 Advisory Committee's Note to 2000 Amendment.

*Second*, Defendants claim that Feinstein did not reliably apply accepted methods because his loss causation and damages study did not "disaggregate" the effects of a theoretical "materialization of a disclosed risk" from the price effects of the corrective events. Defs.' Br. 8. Their argument defies logic and binding precedent, and again, challenges Feinstein's conclusions (*i.e.*, that there was no confounding news to disaggregate from the fraud-related news), rather than his method. Specifically, Defendants' argument ignores the repeated instruction of the Second Circuit that "a misstatement or omission is the 'proximate cause' of an investment loss if the risk that caused the loss was within the zone of risk *concealed* by the misrepresentations and omissions." *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173 (2d Cir. 2005).[2] It also ignores the ruling in *this* case, that "Dam's 1 collapse was within the 'zone of risk' concealed by Vale's misrepresentations as to the likelihood of a Vale dam collapsing. And, the resultant loss—a decline in stock price—was foreseeable." *In re Vale S.A. Sec. Litig.*, 2020 WL 2610979, at *18 (E.D.N.Y.

---

[2] All emphasis in the original unless otherwise noted.

2

May 20, 2020). To accept Defendants' argument would require finding that a fraud which allegedly concealed the risk of *dam failure* did not also conceal the risk of incurring the *financial costs of dam failure* (which they contend are solely the product of the "materialization of a disclosed risk"). Defendants' only "factual" basis for this fantastical argument is the bald speculation of an expert whose testimony should be excluded on that and other grounds.

*Finally*, Defendants argue that Feinstein's damages analysis is flawed because he concluded that "information asymmetry"—the academic term for investors learning that they "did not know as much about the Company's condition and conduct as [they] had previously believed," Defs.' Ex. D at ¶68—should factor into his concept of the but-for world (a hypothetical world with full disclosure). Again, Defendants do not challenge Feinstein's *method*—modeling the but-for world on what was revealed by the corrective events—and they cannot argue that information asymmetry is not an accepted concept in the field of finance since their own expert acknowledged its validity in past writing. Defendants simply disagree with the conclusion that it applies here, where the corrective events revealed that the Company's public assurances about dam stability, commitment to safety, and related conduct were untrue, and that investors lacked material information about Vale dam conditions and management. Their argument is wrong, but in any event, it is one for the jury. As further described below, Defendants' motion should be denied in its entirety.

## II.    LEGAL STANDARD

"The *Daubert* inquiry for reliability is a 'flexible one' and does not 'constitute a definitive checklist or test.'" *Cargo Logistics Int'l, LLC v. Overseas Moving Specialists, Inc*., 2024 WL 1158811, at *5 (E.D.N.Y. Mar. 18, 2024) (citing *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141, 150 (1999)). "[I]n accordance with the liberal admissibility standards of the Federal Rules of Evidence, only serious flaws in reasoning or methodology will warrant exclusion." *Id*.

3

"Reliability does not require that the 'opinion is supported by the best methodology or unassailable research.' An opinion may be reliable 'even though the judge thinks the opinion is incorrect.'" *Andrews v. Brethren Mut. Ins. Co.*, 2023 WL 6690710, at *6 (M.D. Pa. Oct. 12, 2023) (internal citations omitted). "[I]f an expert's testimony falls within 'the range where experts might reasonably differ,' the duty of determining the weight and sufficiency of the evidence on which the expert relied lies with the jury, rather than the trial court . . . . Moreover, 'exclusion remains the exception rather than the rule.'" *DoubleLine Capital LP v. Odebrecht Fin., Ltd*., 2024 WL 1115944, at *6 (S.D.N.Y. Mar. 14, 2024) (internal citations omitted).

"Where only part of an expert's testimony meets the Rule 702 standard of admissibility, the court should limit the expert's testimony, rather than 'throw the good out with the bad.'" *Hasemann v. Gerber Prod. Co.*, 2024 WL 1282368, at *10 (E.D.N.Y. Mar. 25, 2024) (quoting *Pfizer*, 819 F.3d at 665).

## III.    ARGUMENT

### A.    Feinstein Employs Reliable Principles and Methods to Calculate Artificial Inflation

Defendants argue that Feinstein's damages study is unreliable because he modeled damages based on Plaintiff's allegations. Specifically, Feinstein's supposed sins are that: (1) he skipped a step by not studying whether the alleged misrepresentations caused share price increases; (2) he assumed that the full value of the fraud-induced inflation was present in Vale share prices at the beginning of the Class Period; and (3) he did not assess changes in actual or perceived dam risks. These arguments are meritless.

First, Feinstein did not skip any steps in performing his loss causation and damages analysis. "Consistent with what has now become 'standard operating procedure in federal securities litigation,'" Feinstein "performed an event study to determine whether, and the extent to

4

which, [Vale]'s stock price was artificially high (*i.e.*, inflated) during the Class Period due to the market's misapprehension of [Vale]'s true . . . risk." *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 253 (2d Cir. 2016); Defs.' Ex. C at ¶¶19, 26, 194-198. He did that by "observ[ing] what happens when the truth is finally disclosed and us[ing] that to work backward, on the assumption that the lie's positive effect on the share price is equal to the additive inverse of the truth's negative effect." *Id.* at 255 (quoting *Glickenhaus & Co. v. Household Int'l, Inc.*, 787 F.3d 408, 415 (7th Cir. 2015)).

Defendants concede that using an event study to measure artificial inflation based on the corrective events is the "typical[]" procedure, but claim that Feinstein also should have examined whether the alleged misrepresentations caused significant price increases or otherwise demonstrated how the artificial inflation entered the stock. Defs.' Br. 4. That is not required by law or economic principles. Feinstein's "method of measuring actual inflation, without reference to the timing or nature of a defendant's alleged misstatements, is commonly employed by experts who provide testimony on loss causation and/or damages in securities-fraud cases." *Vivendi*, 838 F.3d at 259-260. Feinstein is not required to prove, or even assess, how the inflation initially entered share prices. *Pfizer*, 819 F.3d at 660.[3]

Next, Defendants argue that Feinstein's application of a constant level of inflation in Vale's share prices from the start of the Class Period until the first corrective event has "no basis in law or in fact." Defs.' Br. 5. They are wrong on both counts. Starting with the facts, Feinstein properly modeled damages based on Plaintiff's allegations and theory of the case. Plaintiff intends to prove that Defendants' false and misleading statements about dam stability and risk management caused

---

[3] As the Second Circuit has explained, share prices can be inflated prior to the first alleged misrepresentation because "a falsehood can exist in the market (and thereby cause artificial inflation) for reasons unrelated to fraudulent conduct." *Vivendi*, 838 F.3d at 256. Here, Defendants made statements prior to the Class Period assuring investors that all of Vale's dams were safe. *See* footnote 4, *infra*. Such statements could cause share prices to trade at elevated levels without fraud (*i.e.*, without Defendants' knowledge that the statements were or became false at some later time).

5

Vale share prices to trade at inflated levels until the truth about those matters was revealed by the collapse of Dam 1 and subsequent corrective events. "[U]nder Plaintiff[']s inflation-maintenance theory, the inflation caused by [Vale]'s misrepresentations and omissions is 'equal to the value of the truth ... because had [its] statement[s] been truthful, the stock price would have done what it did do once the truth was revealed.'" *Pfizer*, 819 F.3d at 660 (reversing exclusion of expert damages analysis that "assum[ed] that [P]laintiffs will be able to prove their liability allegations," under a price maintenance theory of inflation); *Vivendi*, 838 F.3d at 256 (affirming admission of expert analysis that "operated on the assumption that Plaintiffs would be able to prove at trial all the necessary elements to succeed on their private 10b–5 action.").[4]

Moreover, where, as here, it is alleged that the discrepancy between what the market was being told and what Defendants knew was substantially the same from the start of the class period until the first corrective event,[5] it is commonly accepted to apply the full amount of inflation for that period. For example, in *Pfizer*, like here, the expert's "model ... fits Plaintiffs' allegations that ... [Pfizer] made dozens of misrepresentations which effectively repeated the same false message to the market ... and served to maintain Pfizer's stock price at a constant, inflated level." 819 F.3d at 660; *see also*, *Sjunde AP-Fonden v. Gen. Elec. Co.*, 2023 WL 6314939, at *16 (S.D.N.Y. Sept.

---

[4] Defendants argue that investors would not have believed Vale's dams were impeccable at the start of the Class Period given the failure of Samarco's Fundão dam in November 2015. Defs.' Br. 6. First, their argument goes to whether Plaintiff can prove liability, not Feinstein's reliability. *Pfizer*, 819 F.3d at 661. Second, they are wrong. Immediately after the Fundão failure, Vale reassured investors in the strongest terms that all of Vale's dams were safe. For instance, at the Vale Day event on December 4, 2015, Defendant Siani said, "Vale has operated for 73 years with absolute standards of safety. We have never had a single incident in our dams before." Likewise, Defendant Poppinga said: "immediately before the accident, we had inspected all of our dams routinely, with the authorities of Brazil, and everything was in order. Right after the accident, we did an extraordinary and additional inspection and saw that, again, everything was in order." Decl. of Frederic S. Fox Supp. Pl.'s Opp. To Defs.' Mot. Exclude Feinstein ("Fox Decl.") Ex. A at 1, 19. This supports Plaintiff's theory of inflation maintenance.

[5] Plaintiff alleges and the evidence shows that the magnitude of the fraud was constant throughout the Class Period until Dam 1 collapsed, because critical stability issues existed the entire time: (1) Dam 1 had failing stability test scores (Compl. ¶¶70, 88, 94; *see also*, *id*. at ¶118 (state finding that Dam 1 "operated with a safety factor . . . insufficient to attest to the safety of the structure")); (2) several Vale dams had unacceptable failure probabilities (*id*. at ¶¶74-80); and (3) Vale was not following best practices or applying international standards for dam safety management (*id*. at ¶¶87-96).

6

28, 2023) (finding expert's application of constant inflation level from start of class period satisfied *Daubert*); *In re Under Armour Sec. Litig.*, 2024 WL 1635680, at \*7–8 (D. Md. Apr. 16, 2024) (application of constant level of inflation throughout the class period "was sufficiently reliable for purposes of *Daubert*."). In sum, Feinstein's damages model is firmly grounded in the law and the facts alleged by Plaintiff.

Defendants cite *Vivendi* to argue that assuming the maximum inflation on the first day of the class period may overstate the amount of inflation. Defs.' Br. 7. But in *Vivendi*, the expert found that "the discrepancy between what the market knew and what Vivendi knew was at its widest" on a date midway through the class period, so he applied maximum inflation to that date, and lesser amounts before and after. 838 F.3d at 255. By contrast, here, the evidence shows that the discrepancy between what the market was told and what Vale knew was roughly the same for the entire Class Period: Defendants repeated assurances that Vale's dams were stable and strictly managed despite knowing that that Dam 1 had failing stability test scores and that multiple dams had unacceptable failure probabilities *throughout the entire period*.[6] Under the rationale in *Vivendi*, constant inflation is appropriate in these circumstances.[7]

Finally, Defendants argue that Feinstein should have evaluated whether the true risk of dam collapse and the perceived risk of dam collapse changed at any point during the Class Period. But neither Feinstein nor Defendants' expert, Hubbard, are engineers capable of making such an assessment. Defs.' Ex. B at 115:17-25 ("I'm not an engineer. I couldn't interpret those reports to

---

[6] *See* footnote 5, *supra*.

[7] Defendants also cited *In re Kirkland Lake Gold Ltd. Sec. Litig.*, 2024 WL 1342800, at \*10 (S.D.N.Y. Mar. 29, 2024) for a criticism of Feinstein's purported understanding of inflation-maintenance cases. However, that case concerned an issue not presented here—no statistically-significant price drop after a corrective disclosure—and Feinstein's comment that non-significance was "not proof of no price impact." 2024 WL 1342800, at \*10. The comment was a valid observation that "[n]on-significance means *indeterminate* with respect to finding the cause of a stock price movement; it does not mean that there was no decline or that the decline was necessarily caused by factors other than the corrective disclosure." *Monroe Cnty. Employees' Ret. Sys. v. S. Co.*, 332 F.R.D. 370, 393 (N.D. Ga. 2019) (emphasis added).

form an opinion that the specific probability changed over time. I did confirm that according to the allegations, the mismatch between what the public thought and what the company allegedly knew was there throughout."); Fox Decl. Ex. B at 85:4-9 (Hubbard needs engineer's expertise to assess dam failure probability). Moreover, it is standard, accepted practice for an expert to model damages based on what a party intends to prove at trial, just like Feinstein did here. Defendants' arguments that the evidence is contrary to Plaintiff's claims are liability arguments, not reasons for finding Feinstein's analysis unreliable or unhelpful. *Pfizer*, 819 F.3d at 661 (rejecting arguments as "reasons why Plaintiffs' claim may be legally or factually deficient, [but] not justifications for concluding that, in the context of Plaintiffs' theory, [the expert]'s testimony is unreliable or unhelpful to the jury."); *Sjunde AP-Fonden*, 2023 WL 6314939, at *16 ("To the extent that Defendants contend that there is evidence in the record to the contrary" regarding constant inflation, "the remedy is not exclusion, but '[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof.'") (quoting *Daubert*, 509 U.S. at 596).

**B.    Feinstein Reliably Applies Accepted Principles and Methods to the Alleged Facts in Forming His Loss Causation and Damages Opinions**

Defendants claim that Feinstein did not reliably apply accepted methods because his loss causation and damages study did not "disaggregate" the effects of a theoretical "materialization of a disclosed risk" from the price effects of the corrective events. Defs.' Br. 8. But Feinstein extensively reviewed the news on the corrective event dates for any confounding information that might need to be disaggregated and found none.[8] Defendants do not identify any confounding news Feinstein missed; instead, they dispute whether, as a legal matter, 100% of the drop caused by the corrective events was *proximately caused* by the fraud. That is a liability argument, not an

---

[8] Feinstein reviewed all Vale-specific news and analyst reports on each date to determine whether there was other significant positive or negative information which may have impacted share prices. Defs.' Ex. C at ¶¶197-198, ¶¶200-201, ¶¶203-204, ¶¶206-212. He did not find any such news, and Defendants have not identified any.

argument for expert exclusion under Rule 702.

Further, Defendants' argument is wrong. It studiously avoids the applicable legal standard for determining whether a loss is proximately caused by an alleged fraud, and is based on nothing but speculation by an expert whose testimony should be excluded on that and other grounds.

1.    **There Is No Factual or Legal Support For Defendants' Claim That Feinstein Should Have Removed a Hypothetical Price Drop For Materialization of a Disclosed Risk of Dam Failure**

Defendants criticize Feinstein's damages study for violating a rule they made up, which they incredibly call a "bedrock principle of securities law," that out-of-pocket damages must be reduced when "the probability of the risk materializing is less than 100 percent." Defs.' Br. 9. This purportedly "bedrock principle" rests on *one out-of-circuit decision* that is plainly inapposite, as it concerned a claim for consequential damages, not the out-of-pocket damages claimed here. *See In re BP p.l.c. Sec. Litig.*, 2014 WL 2112823, at *10 (S.D. Tex. May 20, 2014). The *BP* Court rejected the damages model because it did not calculate inflation (or out-of-pocket damages) *at all*, *id*. at *12, not because it *incorrectly* calculated the amount of inflation, as Defendants argue here.

Defendants also cite *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 510 (2d Cir. 2010) for the unremarkable proposition that plaintiffs must prove loss causation (Defs.' Br. 9), but they utterly ignore *Omnicom*'s articulation of the relevant standard for determining whether a misrepresentation is the legal cause of an investor's loss: "A misrepresentation is the 'proximate cause' of an investment loss if the risk that caused the loss was within the zone of risk *concealed* by the misrepresentations...." 597 F.3d at 513 (internal quotation marks omitted). It is no mystery why they ignore this standard—they cannot plausibly argue that a fraud which allegedly concealed the risk of *dam failure* did not also conceal the risk of incurring the *financial costs of dam failure* (which they contend are solely the product of the "materialization of a disclosed risk" (*see* Defs.' Ex. A at ¶56)).

9

Courts in this circuit have rejected the notion that a plaintiff must "disaggregate" the supposed materialization of a "disclosed" risk under circumstances like these. For instance, in *In re Vivendi Universal, S.A. Sec. Litig.*, 634 F. Supp. 2d 352, 370–71 (S.D.N.Y. 2009), Judge Holwell rejected "the novel argument that plaintiffs have failed to disaggregate damages caused by the risk from damages caused by the materialization of the risk" because, among other reasons, "it is hard to see how price declines allegedly caused by the materialization of the risk should not be incorporated into plaintiffs' damages," and "[n]ot imposing liability . . . might be a windfall for fraudsters."[9] *See also*, *In re Omega Healthcare Invs., Inc. Sec. Litig.*, 563 F. Supp. 3d 259, 269–70 (S.D.N.Y. 2021) (apportionment between disclosed and concealed risks was not necessary because there were not "'substantial indicia' of the risks concealed by the alleged fraud that were 'unambiguously apparent' on the face of the challenged disclosures") (quoting *Lentell*, 396 F.3d at 177).[10]

Even if there were caselaw supporting Defendants' made-up rule, which there is not, they have no evidence that any part of the stock drop on January 25, 2019 is properly attributed to anything but the alleged fraud. Their expert, Hubbard, merely speculated that some portion of the drop "could" have occurred without the alleged fraud due to the financial impacts of a safety incident.[11] He did not conduct any study to quantify or otherwise support that speculation, and he

---

[9] Like in *Vivendi*, where the expert opined that "all the pieces were there" to cause the liquidity crisis early in the class period, 634 F. Supp. 2d at 371, Plaintiff's expert on tailings dams here has opined that the failure to carry out a host of well-known safety practices made Dam 1's failure an "accident waiting to happen." Fox Decl. Ex. C at 61-62, 64.

[10] Defendants weakly cite Vale's boilerplate risk disclosures in annual reports to argue that some part of the drop caused by the collapse of Dam 1 must be apportioned to the disclosed risk of dam failure. Defs.' Br. 8. The applicable caselaw says otherwise. Under binding precedent, apportionment of losses between disclosed and concealed risks is only an issue when "substantial indicia of the risk that materialized are unambiguously apparent on the face of the disclosures alleged to conceal the very same risk". *Lentell*, 396 F.3d at 177. Most of the alleged misrepresentations here did not contain *any* dam-related risk disclosures, and the risk disclosures in Vale's annual reports gave no indication (and certainly not "substantial indicia") that any of Vale's dams had known stability issues or unacceptable failure probabilities. There is thus no basis to apportion losses between disclosed and concealed risks here.

[11] Defs.' A at ¶47(ii) (". . . the Dam 1 collapse . . . represented a materialization of disclosed risk, which *could* have occurred absent any alleged misrepresentations or omissions . . . .") (emphasis added).

ignored the fact that if there were no fraud, Vale's share prices would have already dropped significantly when the market was informed that several of Vale's dams had unacceptable failure probabilities, that Dam 1 was unstable, and that Vale was not following international standards for dam safety management, among other things.[12] This *ipse dixit* speculation should not only be disregarded by the Court, but should be excluded as unreliable and irrelevant, as further described in Plaintiff's motion to exclude Hubbard's testimony.

### 2.    Feinstein Thoroughly Reviewed the Corrective Events, Which Are Strongly Connected to the Alleged Misrepresentations

Defendants wrongly contend that Feinstein "speculates" about the corrective events and did not conduct a searching review of them. Defs.' Br. 9. Their claim is flatly wrong. Feinstein's report describes his thorough review of news and analyst reports on the corrective event dates, and quotes extensively from those materials. *See, e.g*., Defs.' Ex. C at ¶¶67-98; *id*. at ¶113 ("I reviewed a wide variety of information sources, including Company announcements, Company conference call transcripts, news articles, press releases, analyst reports, and SEC filings to determine when information correcting the alleged misrepresentations and omissions was disseminated.").[13] Feinstein plainly did not "speculate" about the alleged corrective events.

---

[12] Moreover, had the stability concerns regarding Dam 1 been revealed at the start of the Class Period, Vale may have been forced to take drastic measures to prevent or mitigate the dam's collapse—as it has been forced to do for other unstable dams since Dam 1's collapse. Those measures include evacuating downstream communities and building supplemental berms or dams to minimize damage in the event of a dam break. Thus, in the but-for world where Vale earlier disclosed the problems with Dam 1, there may have been *no catastrophic failure at all*.

[13] Concerning the collapse of Dam 1 on January 25, 2019, Feinstein noted, *inter alia*, that: (1) Brazilian president Jair Bolsonaro commented that "this type of accident can be avoided" and "something is being done wrong over time" (Defs.' Ex. C at ¶69); (2) local residents did not hear any sirens or warnings, and Defendant Schvartsman reportedly apologized for the Company not having done enough (*id*. at ¶70); and (3) analysts commented it was "a material negative for Vale" but that "[i]t is still too early to quantify the social, environmental and economic impact of this unfortunate accident" (*id*. at ¶¶72-74). Regarding the February 4, 2019 event, Brucutu mining operations were halted because Vale "must refrain from 'disposing tailings or practicing any activity potentially capable of increasing the risks'" at the mine's only active dam, Laranjeiras. *Id*. at ¶87; *see also, id*. at ¶¶89-90 (analyst reactions and other news). Regarding the final event on February 6, 2019, Feinstein detailed the relevant articles in *The Guardian* and *The Wall Street Journal*, and analyst commentary that "[w]hile we do not know the authenticity of the accusations and media reports, the ramifications, if confirmed, could be much worse than what we have estimated[.]" *Id*. at ¶¶93, 95-97.

But even if Defendants were right, their argument goes to the weight, not the admissibility, of Feinstein's testimony. Damages experts are permitted to calculate damages on the assumption that the plaintiff will prove its allegations. *See Pfizer*, 819 F.3d at 659; *Daubert,* 509 U.S. at 591 (discussing the requirement that the expert testimony " 'fit [s]' " the plaintiff's theory of the case). Courts only exclude expert testimony where the expert's assumptions "are 'so unrealistic and contradictory as to suggest bad faith' or to be in essence an 'apples and oranges comparison' . . . . [O]ther contentions that the assumptions are unfounded 'go to the weight, not the admissibility, of the testimony.' " *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996) (citations omitted).[14]

## C.    Feinstein's But-For World Is Firmly Rooted in Economic Principles and the Facts of This Case

Defendants argue that Feinstein's damages testimony should be excluded because he purportedly "invent[ed] an unprecedented theory" by concluding that the impact of "information asymmetry"—*i.e.*, investors learning that they "did not know as much about the Company's condition and conduct as [they] had previously believed," Defs.' Ex. D at ¶68—should be incorporated in his concept of the but-for world. But Defendants do not dispute that it is proper to model the but-for world on what was revealed by the corrective events, and that is what Feinstein did. Defs.' Ex. B at 137:8-14 ("I modeled the but-for world after what the market did learn when there were corrective disclosures."). Moreover, contrary to Defendants' claim, Feinstein did not invent the theory of information asymmetry,[15] and Defendants' own expert has acknowledged that "asymmetries of information should figure prominently in the decisions of buyers of common

---

[14] Defendants also claim that Feinstein added a corrective event on February 4, 2019 concerning suspension of Laranjeiras dam operations. Not so. The Laranjeiras dam was the operational dam of the Brucutu mine, so Feinstein's reference concerned the same event cited in paragraph 210 of the Complaint.

[15] Defs.' Ex. C at ¶218 (citing seminal work of Nobel laureates on information asymmetry).

12

stock issues." *Asymmetric Information, Corporate Finance, and Investment*, The University of Chicago Press, edited by R. Glenn Hubbard, National Bureau of Economic Research, 1990, p. 9. Thus, there is no dispute that information asymmetries impact stock valuations. Defendants' arguments against Feinstein's conclusions about the but-for world are meritless.

*First*, Defendants argue that the but-for world is inconsistent with the law because it is a world in which Vale has committed, and is still committing, some wrongdoing. Defs.' Br. 12. But Feinstein's job was to construct a world in which the alleged misrepresentations were cured; he was not required to create a world in which Vale engaged in no misconduct or was properly managing dam safety.[16] For instance, in the but-for world, Vale may still be pressuring auditors to certify unstable dams and failing to adhere to international standards—the point of the but-for world is to imagine that they *disclosed* these facts. That is what Feinstein did.

*Second*, Defendants argue that Feinstein's but-for world is not sufficiently tied to the facts because he testified that investors "slowly" realized that important information was being withheld from them. But the Complaint alleges the corrective events occurred over the course of almost two weeks, with the final event containing the first direct assertion that Vale knew and withheld important information about Dam 1. "Slowly" is a fair characterization of these allegations. Defendants also claim that this slow realization is just speculation, but the corrective events and commentary Feinstein references support his statement. Defs.' Ex. C at ¶¶67-98; *see supra* n.13.

Next, Defendants wrongly claim that Feinstein's but-for world violates case law requiring that the subject or content of the alleged misrepresentations be the cause of the actual loss suffered. Defs.' Br. 13. But, to the contrary, in Feinstein's but-for world, investors learned "that the Company's tailings dams were '***not*** impeccable' and were '***not*** of impressive quality,' 'Safety is

---

[16] *See* Defs.' Ex. B at 134:21-135:4 (the but-for world is "a hypothetical scenario in which there was . . . [f]ull disclosure of what was alleged to have been misrepresented and omitted.").

13

*not* our top priority,' or 'We are *not* committed to doing what is right,' or 'we are *not* committed to protecting people and preserving the environment' or "we are engaged in deceptive conduct to deceive investors and regulators,'"—the inverse of the alleged misrepresentations. Defs.' Ex. D ¶90; Defs.' Ex. B at 151:17-153:14 ("All I have done there is taken the allegations of what was said and put the word 'not' in there, that would have been a fully corrective disclosure."). Thus, the but-for world is strongly connected to the substance of the misrepresentations and corrective events.

For these reasons, Defendants' final, hyperbolic argument that accepting Feinstein's but-for world "would practically eliminate loss causation as an element," is unmoored from the law and the facts, and should be rejected. Defendants also falsely assert that the damages model takes "the full amount of all investment losses occurring on alleged corrective event dates" as damages. Defs.' Br. 14. In fact, damages were limited to the artificial inflation on the corrective event dates, which is the standard way of measuring damages. *See Pfizer*, 819 F.3d at 649 ("[I]f concealed information reached the market through multiple corrective disclosures, the sum of the residual returns associated with those disclosures provides evidence about the amount of artificial inflation in the company's stock after the fraud but before those corrections.").

In summary, Feinstein's testimony does not break any new ground in loss causation or damages law or practice, and there is no basis to exclude his testimony. Indeed, "the directness of the causal connection between alleged misrepresentation and harm . . . are matters to resolve at trial[.]" *Kortright Cap. Partners LP v. Investcorp Inv. Advisers Ltd.*, 2018 WL 6329396, at \*5 (S.D.N.Y. Dec. 4, 2018); *see also*, *Vivendi*, 838 F.3d at 255–56 (plaintiffs' expert estimated the "maximum" amount of inflation and "[i]t was up to the *jury* to determine how much, if any, of the artificial inflation identified by [plaintiff's expert] was caused by Vivendi's alleged fraud[.]").

14

### D.      Feinstein Does Not Offer Any Legal Opinions In This Case

Defendants argue that Feinstein's use of the term "economic materiality" transforms some of his opinions into legal conclusions. Defs.' Br. n.4. Defendants' argument should be rejected because it "confuses 'economic materiality' with the meaning of materiality under the securities laws." *In re SLM Corp. Sec. Litig.*, 2012 WL 209095, at *5 (S.D.N.Y. Jan. 24, 2012). "'[M]ateriality' has a specific meaning for economists, who use scientific methods to determine whether a misrepresentation or omission impact[ed] the stock price in a significant fashion." *Id*. Indeed, Defendants' own expert states that he, too, has performed expert analyses of "the issue of economic materiality in several litigation matters." Defs.' Ex. A ¶2. Feinstein uses the term in accordance with its meaning in his field (Defs.' Ex. C at 51, n.135), and references academic literature that is undisputed.[17] *Baker v. SeaWorld, Ent., Inc.*, 423 F. Supp. 3d 878, 898-99 (S.D. Cal. 2019) (admitting testimony where "Feinstein discusses the concept of economic materiality with support from economic authorities that Defendants do not challenge.").

Nevertheless, if the Court finds the phrase "economic materiality" risks confusion with the legal issue of materiality, Plaintiff requests that the Court instruct Feinstein to describe his opinions as "economic importance" rather than excluding them. *In re Under Armour Sec. Litig.*, 2024 WL 1635680, at *8 (instructing expert to rephrase opinion to "economic importance" from "economic materiality" to avoid confusion).

### IV.      CONCLUSION

Defendants' motion to exclude the expert testimony of Steven Feinstein should be denied.

Dated: May 29, 2024                                     **KAPLAN FOX & KILSHEIMER LLP**

                                                        /s/ *Frederic S. Fox*
                                                        Frederic S. Fox
                                                        Donald R. Hall

---

[17] *See* Defs.' Ex. A at ¶41; *id*. at ¶44 (". . . I generally agree with the studies to which Professor Feinstein refers").

15

Melinda Campbell
Aaron Schwartz
Brandon Fox
Carihanna Morrison
Chang Hahn
800 Third Avenue, 38th Floor
New York, NY 10022
Telephone: (212) 687-1980
Facsimile: (212) 687-7714

*Lead Counsel for Lead Plaintiff and the Class*

16