UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

BRYAN RAUCH, *individually*   *   Case No.  19-CV-00526(EK)
 *and on behalf of all*       *
 *others similarly situated,* *
                              *
            Plaintiff,        *   Brooklyn, New York
                              *   August 5, 2024
     v.                       *
                              *
VALE, S.A., et al.,           *
                              *
            Defendants.       *
                              *

* * * * * * * * * * * * * * * *

TRANSCRIPT OF CIVIL CAUSE FOR HEARING
BEFORE THE HONORABLE ERIC R. KOMITEE
UNITED STATES DISTRICT JUDGE

APPEARANCES:

| | |
|---|---|
| For the Movant,<br> The Colleges of<br> Applied Arts and<br> Technology Pension<br> Plan: | DONALD R. HALL, JR., ESQ.<br>MELINDA DIERRE CAMPBELL, ESQ.<br>FREDERIC S. FOX, ESQ.<br>800 Third Avenue<br>New York, NY  10022 |
| For the Defendant: | CHRISTOPHER JORALEMON, ESQ.<br>HARRISON CHASE WEIDNER, ESQ.<br>DAVID KUSNETZ, ESQ.<br>JASON BRESSLER, ESQ.<br>ANDREW FREIRE, ESQ.<br>Gibson, Dunn & Crutcher, LLP<br>200 Park Avenue<br>New York, NY  10166 |

Proceedings recorded by electronic sound recording, transcript produced by transcription service.

**Fiore Reporting and Transcription Service, Inc.**
**Shelton, CT 06484 (203)732-6461**

2

(Proceedings commenced at 10:40 a.m.)

THE CLERK:  Civil cause for civil hearing, Docket Number 19CV526, CAAT v. Vale S.A., et al.

Counsel, please state your appearances for the record, beginning with plaintiff's counsel.

MR. HALL:  Donald Hall from Kaplan, Fox, and Kilsheimer LLP on behalf of CAAT.

MS. CAMPBELL:  Melinda Campbell on behalf of CAAT.

MR. FOX:  Good morning, Your Honor.  Frederic Fox, Kaplan Fox, also on behalf of CAAT.

MR. JORALEMON:  Good morning, Your Honor.

THE COURT:  Good morning.

MR. JORALEMON:  Christopher Joralemon from Gibson Dunn.  Nice to see you again.  I'm joined at counsel table by my colleagues, Chase Weidner, David Kusnetz, Jason Bressler, and Andrew Freire.

THE COURT:  Good morning to you all as well.

All right.  We're here on the defendant's motion primarily today, and so I'd like to begin with defense counsel, please.

MR. JORALEMON:  Sure.  So --

THE COURT:  And the Feinstein issues.

MR. JORALEMON:  Okay.  Terrific.  So for the Court's convenience, the parties have discussed the order of events today, subject to the Court's preferences, and we thought it

3

made sense to start with Professor Feinstein, and then Professor Hubbard, and then we'll deal with the market efficiency issues after that, Doctors Marzendar (ph) and Tabak (ph).

THE COURT:  Sounds good to me.

MR. JORALEMON:  Okay.  Should we start with oral argument, or --

THE COURT:  Yes.

MR. JORALEMON:  Okay.  Terrific.

THE COURT:  Or -- yeah, if you would imagine that on the Feinstein issues you've got, you know, te4nr 15 minutes to lay them out and --

MR. JORALEMON:  Terrific.  Thank you, Your Honor.

So I want to start with the -- really, the overarching key point here, and that is the Court's gate-keeping rule.  I cannot overstate the importance of the Court's gate-keeping function here.

This is not your standard battle of the experts where that goes to weight, that goes to weight, let a jury decide it.

This is the quintessential admissibility question, and that's -- this sort of fits in nicely with the recent amendments to Rule 702, where the committee basically said, courts too often have been treating these things as weight issues when in fact they're admissibility issues.  So they

4

tightened up Rule 702.  That is exactly what this case is.

There are two big problems and a lot of subproblems with Feinstein's entire analysis.  The first one is disaggregation.

The federal securities laws do not ensure investors against all losses from a realized risk, simply because they claim that the company misrepresented the degree of that risk.  In other words, in an understated risk case, which is what this is, a plaintiff must disaggregate the portion of loss attributable to the risk that plaintiff admittedly assumed when making the investment.

So that's the first issue, disaggregation.  It's really --

THE COURT:  Sorry, say that again about the assumption of risk?

MR. JORALEMON:  Yeah, in an --

THE COURT:  You have to remove the risk that the plaintiff knowingly assumed, meaning whatever the --

MR. JORALEMON:  That -- right.

THE COURT:  -- the disclosure was.

MR. JORALEMON:  In an understated risk case.  A plaintiff must disaggregate the portion of loss attributable to the risk that plaintiff admittedly assumed when making the investment.  So when you have an understated risk case --

THE COURT:  So how should they have done that in the

5

perfect world?

MR. JORALEMON:  Yeah.  I mean, Professor Hubbard can speak to this more, but I'll just give you a broad overview of one way they could have done that, is to have assessed the market's view throughout the class period -- and it may have changed throughout the class period -- the market's view of the likelihood of a collapse of a dam at Vale.

Taking into account the fact that seven dams had collapsed in the 20 years preceding this event in Brazil, including months before the class period, a dam at Vale was a joint venture in, taking into account all the risk disclosures, taking into account all the challenge statements here, come up, sort of -- markets are very good at pricing risk.

THE COURT:  What's the method?

MR. JORALEMON:  The method simply is --

THE COURT:  It's just modeling the stock?

MR. JORALEMON:  -- assign -- the expert has to assign a probability of risk of -- that the market perceived.

THE COURT:  How?

MR. JORALEMON:  Taking into account all the evidence I just suggested, Your Honor.

THE COURT:  But by what method?

MR. JORALEMON:  Well, ultimately, this leads to the discounted cash.  If you're going to -- if you want to jump to

6

the damages, it's going to be the delta between perceived risk and actual risk.

So for actual risk, you actually -- you can look at the underlying evidence that was developed in the case.  And here, there's abundant evidence of contemporaneously what experts would Vale itself, it's --

THE COURT:  Right.  So just let me, like, throw out some numbers, and then we'll back into them.

MR. JORALEMON:  Sure.  Yeah.

THE COURT:  Let's say that somebody reading the plaintiff's disclosures, which assume for the sake of argument are -- sorry, the defendant's disclosures -- assume for the sake of argument are way too complacent on the subject of this risk, would -- the reasonable or sophisticated investor would think, okay, there's a 5 percent risk of a dam collapse in the next, you know, period X.

MR. JORALEMON:  Yeah.

THE COURT:  And assume the actual risk is 50 percent.

MR. JORALEMON:  Correct.  Okay.

THE COURT:  So ten times the perceived risk.  A., how is their damages expert going to get to the five percent and 50 percent numbers?  And B., how are they going to use those to back out some part of the dollar value of the stock?

MR. JORALEMON:  Okay.  So the last part is quite

easy, it's just math.  When you -- when the risk -- the risk is realized, so it materializes, and here the dam collapsed, the price drop reflecting that --

THE COURT:  Right.

MR. JORALEMON:  -- materialization, you have to discount it by the delta between the five percent and the --

THE COURT:  Yeah.

MR. JORALEMON:  -- 50 --

THE COURT:  Although there's a time value to all this, so presumably you have to have a view on when the dam is going to collapse.

MR. JORALEMON:  Correct.  Exactly right, Your Honor. But this is very doable, and it's done all the time.

THE COURT:  Okay.

MR. JORALEMON:  It's done all the time in the markets, and it's done all the time by economic experts.

THE COURT:  So how do you get to the --

MR. JORALEMON:  Yeah, so let's --

THE COURT:  -- 5 and the 50?

MR. JORALEMON:  -- start with the 50.  The 50 percent I think is quite easy.  You look at the contemporaneous evidence that's been developed on this record. There is reams and reams of data about the risk of collapse you have.

It's sort of the -- the numbers are a little bit

8

mind-boggling, Your Honor, but Vale and this independent panel of experts were contemporaneously assessing that risk with numbers.

THE COURT: But that -- I think you're saying the financial expert needs input there from a dam or mine safety expert.

MR. JORALEMON: Certainly in consultation with a geotechnical expert, which here we have. Each side has more than one geotechnical expert. But the economist, after the fact, certainly has access to the necessary information to calculate that latter component, the actual risk.

With respect to the -- so the first risk, the perceived risk, I'll go back to what I said before. It's -- it is -- they take into account how the market was pricing that risk, and it will depend on what the market believed at the time these misstatements were made.

So were there prior dam collapses? Is this -- if we have 7 in 20 years, this is not a once in a lifetime event. This is happening with increasing frequency.

Two, Vale's making these misrepresentations about its safety practices, and, you know, the plaintiffs in their complaint, they said themselves are alleging that Vale under represented, not concealed, under represented the risk of collapse.

Take into account what analysts were saying about

the risk of collapse and the potential consequences of that. All that is available information, and the expert comes up with a percentage, whether it's 5 percent or 1 percent or 50 percent, that's --

THE COURT:  Why do you have to go to the *BP* case from Texas to get this point across?  I would have imagined that this is the kind of alleged flaw in a damages analysis that comes up all the time.  What are the best --

MR. JORALEMON:  So it's a great question, Your Honor.

THE COURT:  -- Second Circuit authorities?

MR. JORALEMON:  The *BP* case is the best on-point example of this, because this is exactly -- it tracks exactly with what the issue is here, and the court in that *BP* case said, plaintiff, your damages analysis doesn't do this, so I have to reject that damages analysis in its entirety, and that's what the court did there.

So it really hasn't come up in many cases.  And I think the reason for that, Your Honor, is these types of case -- an event-driven risk case, where the risk of that event materializing is under disclosed, don't progress to summary judgment or to trial very often.  So happens in the *BP* case, it sort of got to summary judgment, and that's why we have that opinion.

But pivoting for a second, Your Honor, the concept,

10

you are exactly right.  This concept of disaggregation between disclosed and under disclosed risk is in -- it's throughout academic papers.

Plaintiff's own market efficiency expert, David Tabak, and you're going to hear about this later today, published an article exactly on this issue, and he agrees 100 percent with the points we're making here on this notion of disaggregation.  I'm sure it comes as a surprise to him.  He didn't know he was going to have to talk about that today, but that's a perfect example, Your Honor, of economists have never -- never questioned --

THE COURT:  Where in the papers do you see his agreement cited?  Remind me.

MR. JORALEMON:  So the name of the article by Dr. Tabak is Risk Disclosures and Damages, Measurement, and Securities Fraud Cases.  We have copies we can hand out if helpful, Your Honor.  But I'll just summarize for you --

THE COURT:  Is that -- where would I look in the record to see this article cited?

MR. JORALEMON:  So that's not in the record.  As we were preparing for this hearing, we just -- there are -- we cite to a number of academic papers, and it's in Professor Hubbard's rebuttal report.

THE COURT:  But not this paper?

MR. JORALEMON:  Not this paper.

11

THE COURT:  Okay, then yes, please do hand it up.

MR. JORALEMON:  Okay.  The other side has copies?

MR. HALL:  Not yet, Your Honor.

THE COURT:  Okay.

MR. JORALEMON:  So as Your Honor will see, Dr. Tabak, in this article basically says that there's going to be a difference when you have an understated risk case and that risk materializes.

There's a difference between artificial inflation, you know, what -- how is the stock mispriced when the risk was undisclosed, and the drop in the stock after the risk has materialized.

And he says, it's a necessary step that an expert must take to calculate -- to estimate the probability at the earlier dates that the risk would eventually be realized, and then use that probability estimate --

THE COURT:  Where are you looking in here?

MR. JORALEMON:  So if you're on -- it's the -- if you look at the docket entry, it's Page 4 of 6, Your Honor. There's a bunch of subheadings and Professor Tabak outlines 4 steps.  And just jumping down to the first column, estimate the probability at earlier dates that the risk would eventually be realized.

I think it's a very helpful article, Your Honor.  It sort of walks through the steps.  And these are exactly the

12

steps we're contending Professor Feinstein needed to make here, but he didn't, and he explicitly acknowledges he didn't.

THE COURT:  Right.  Okay.

MR. JORALEMON:  Okay.

THE COURT:  But why does that -- I may be jumping ahead here, but --

MR. JORALEMON:  Yeah.

THE COURT:  -- I'm finding it less than crystal clear how we get from this methodological problem that you're articulating to decertification of the class, or whatever the ultimate remedy would be.  I see this, as I've indicated a little bit in the past, more as a *Daubert* issue than a *Comcast* issue.

MR. JORALEMON:  Right.

THE COURT:  I do see, however, in the *BP* case, the move that that judge makes, if I understand it correctly, is that he says, look, they didn't do the real assessment of perceived risk versus actual risk.  They just assumed that, you know, the Deepwater Horizon explosion, you know, that's the magnitude of the risk.

And then the plaintiffs came back in that case and said, well, if they had disclosed the true risk of an explosion, none of us would have bought the stock at all, and therefore, 100 percent of our losses from the explosion are cognizable as consequential damages, or whatever.

13

And the judge, if I understand him correctly, then says, well, now you're moving outside of a fraud on the market environment.

MR. JORALEMON:  Right.

THE COURT:  And so, if -- you know, if you would have sought to prove that, you wouldn't have bought the stock at all, not that you would have bought it at a different price, that that is going to need to be demonstrated on an individual basis and not a class-wide basis.  And so that's the problem of, you know, individualized proof being required.

Do we -- I don't understand what the analog here would be.

MR. JORALEMON:  Sure.  So there -- Your Honor is absolutely right, and there are two separate issues here.  So we're first dealing with the Rule 702 issue for this.  He refuses to disaggregate.  That is fatal full stop.  Your Honor cannot admit this damages model that doesn't disaggregate.

THE COURT:  Okay.

MR. JORALEMON:  That goes right --

THE COURT:  But so then what?  If I just write an opinion that says the damages model is excluded under Rule 702 --

MR. JORALEMON:  Right.

THE COURT:  -- what happens next in the case?

MR. JORALEMON:  So I mean, from our perspective, the

14

case is effectively over.  We would have to move for summary judgment, not only on plaintiff's lack of damages evidence, but there are going to be other issues we would tee up.

But if I can jump to the second part of this, Your Honor?

THE COURT:  And the summary judgment motion would be damages is an element of the liability claim?

MR. JORALEMON:  Well, Professor Feinstein also claims to rely entirely on Professor Feinstein's report for loss causation, which is a -- I haven't even gotten to that issue with his report yet.  So it would also be lack of loss causation.

THE COURT:  But you don't know exactly what the loss is to know whether there's loss causation or not.

MR. JORALEMON:  Correct.  But his analysis, which reflected loss causation, is also fatally flawed.  We haven't talked about that yet.  We're just talking --

THE COURT:  But for different reasons.

MR. JORALEMON:  Yeah.

THE COURT:  Okay.

MR. JORALEMON:  We're just talking about disaggregation.  So Your Honor is absolutely right.  Damages, this gets thrown out, this damages model.

If Your Honor admits this report, then they have a *Comcast* problem.  So they can pick their poison.  Either --

15

THE COURT:  What's the *Comcast* problem?

MR. JORALEMON:  The *Comcast* problem is the way he defines damages here, it requires an individualized inquiry. If you're saying -- so we haven't -- I'm jumping ahead a little bit -- Professor Feinstein's but-for world, where he defines what the world would look like if Vale had revealed the truth, it's based on what's called information asymmetry.

And what he says is, in short, if investors learn that they're in the dark about something, they're going to assume the worst-case scenario.  Whatever that is.  He doesn't define worst case scenario.  He doesn't say the worst-case scenario was realized here.  He simply says, whatever it was, it would have been worse than the stock price drop, therefore they get all the price stock drop.

I appreciate Your Honor's crinkling of the eyes.  It doesn't make any sense.  It doesn't -- it goes directly against basic principles of economics in establishing a but-for world.  The truth is revealed.

You measure what the artificial inflation would have been had the truth been revealed.  Not this hypothetical worst-case scenario where you don't know what investors would do.  He simply says, it would have been bad.  Some investors wouldn't have bought the stock at all.  Some investors would have bought it at a 10 percent discount.  Some investors would have bought it at a 50 percent discount.

16

If that's his but-for construct, how can you have --

THE COURT:  Okay.

MR. JORALEMON:  -- class-wide damages?  You can't.

So should I jump now to the but-for world to sort of talk more about that, Your Honor?

THE COURT:  Hold on just one second.

MR. JORALEMON:  Yeah.

(Pause)

THE COURT:  Where in his report is he saying that some investors would have assumed 100 percent risk, some investors would have assumed 10 percent, like the thing you just said?

MR. JORALEMON:  Well, he never goes so far as to define a worst-case scenario, Your Honor.  He simply says --

THE COURT:  But -- so what makes you think it varies from investor to investor?

MR. JORALEMON:  Well, he was deposed as well and I asked him if he defined a worst-case scenario, and how -- you know, how would investors respond to this?  And he didn't know.

He simply -- his rejoinder simply is, whatever it is, whatever it would have been, it would have been worse than the drop on the day of the collapse and the subsequent drops.  Therefore, therefore, I don't have to engage in this but-for --

17

THE COURT:  But he doesn't actually say explicitly that different investors would have priced that risk differently.

MR. JORALEMON:  Well, no, he doesn't.  When we put him on the stand, he's going to have to answer that and there's only one answer he can have to that.  I mean, I look forward to his response.

THE COURT:  Why?  Why can't you say the market would have priced the risk at X, and then it applies equally to all investors?

MR. JORALEMON:  Well, again, it sort of depends. When you have this undefined worst-case scenario, Your Honor would have one definition of that.  I would have a different definition.  And whether I would --

THE COURT:  No, but the market comes to a consensus, and that's why -- that's why we have the fraud on the market theory.  I think you're saying --

MR. JORALEMON:  Exactly.

THE COURT:  -- that his theory is inherently inconsistent with a fraud on the market theory.  That was the case in *BP* --

MR. JORALEMON:  Right.

THE COURT:  -- because you're saying -- because the plaintiff's class was saying not that the market would have found a different clearing price in light of true information,

18

but rather our clients wouldn't have bought the stock at all. And again, then you're stepping outside fraud on the market and you need individual testimony from every investor that know they wouldn't have bought the stock.

Where --

MR. JORALEMON:  Well, again --

THE COURT:  -- where does that happen here?

MR. JORALEMON:  -- he doesn't -- that's the problem. It's one of the many problems inherent in his but-for world of this worst-case scenario -- undefined worst-case scenario, because surely, he must -- he doesn't wrestle with it, so surely, he must concede that some investors, however you want to define the worst-case scenario if you reach a consensus on what the worst case scenario is, some investors in Vale would not buy the stock.  I think we all can stipulate to that, correct?

THE COURT:  No.  I mean, maybe some investors wouldn't buy the stock, but he doesn't have to invoke that, and neither do the plaintiffs.  They can just say, in the worst-case scenario, whatever that is, the stock would have traded at a 90 percent discount.

MR. JORALEMON:  Right.  But that would include --

THE COURT:  And we're still adhering to the fraud on the market theory and we want that 90 percent discount to be -- he could say this in theory.  He may not be saying this in

his report --

MR. JORALEMON:  Yeah.

THE COURT:  -- and then he's got a disclosure problem.

MR. JORALEMON:  Yeah.

THE COURT:  But I don't understand -- you know, the difference, it seems to me, between this case and the *BP* case is that there you had the plaintiffs saying explicitly, forget the fraud on the market theory, we wouldn't have bought the stock at all.  And that, the district judge there correctly, I think, said, that is not susceptible of class-wide proof.  But you don't have a similar concession from the plaintiffs here.

MR. JORALEMON:  Well, we do.  If I remember correctly, the *BP* case, the reason for that, and the court's conclusion that this essentially is individualized inquiry is they were seeking the entire consequences of the collapse, the entire stock price drop.  It's not that they came out and sort of --

THE COURT:  Right.

MR. JORALEMON:  -- it's --

THE COURT:  But there's an intermediate step there.  The reason they were entitled to that, in their view, is that nobody would have bought the stock at all, right?  Let me just --

20

MR. JORALEMON:  Yeah.

THE COURT:  -- get to this myself.

MR. JORALEMON:  So it's a little more nuanced.  The plaintiffs didn't go that far, because I think they would -- realized they'd walked into a *Comcast* problem there.  But what they're saying -- what they were seeking there was, all of the damages flowing from the misconduct.  So they were invoking tort principles to basically say, this is within the umbrella of damages.

But the Court correctly noted that if you want everything, if you want the entire stock price drop on the day of the realized risk, then you have to show that you wouldn't have bought the stock.  The Court -- that's the Court's conclusion based on plaintiff's attempt to collect everything.  And that's exactly what plaintiffs are doing here.  It's --

THE COURT:  Hold on one second.  Let me just read this.

(Pause)

THE COURT:  No.  So I'm looking at -- well, it's Page 8 of the Westlaw pagination section.  Oh, there are internal pages.

(Pause)

THE COURT:  So at least Page 10.  Probably Page 12 or something.

But plaintiffs argue that the defendant's process

21

safety misstatements were a proximate cause of all, all their post-explosion investment losses, because plaintiffs were deprived of the opportunity to avoid the increased risk by divesting prior to the explosion.

In other words, none of the plaintiffs would have owned the stock at all.  So that's --

MR. JORALEMON:  Prior to the explosion, though, that's -- the sort of -- you see the nuance there?  It's not that they never would have bought the stock.  The Court's basically saying --

THE COURT:  Well, it's the same thing.  Right?

MR. JORALEMON:  It can be the same thing, depending on the investor's decision.

So, Your Honor, I agree with everything you're saying, but I think maybe I can expedite this.  Plaintiffs, in their opposition to our Rule 702 against Professor Feinstein, make that exact same argument.  They basically are saying, we get all the drop on the day the dam collapsed because tort law -- they cite the tort law, just like plaintiffs did in *BP*.

THE COURT:  Right.

MR. JORALEMON:  That they get all the, quote, pecuniary loss suffered otherwise as a consequence of the recipient's reliance on this --

THE COURT:  I think -- I think what you're saying, and I think it's right, is the plaintiffs may not be saying,

22

explicitly, that we wouldn't have bought the stock at all, or we would have sold it in its entirety before any loss materialized.  Instead, they're just presenting a damages model that assumes all those facts to be true.

MR. JORALEMON:  Exactly right.

THE COURT:  And so that -- Okay.  Hold on a second.

(Pause)

THE COURT:  Okay.

MR. JORALEMON:  Okay.  With the Court's indulgence, two points of clarification, Your Honor, I think will be helpful.

One is -- and the Court, please cut me off if you already understand this.  But plaintiff is going to get up and argue *Lintell* (ph).  He's like, wait a minute, what about the Second Circuit case in *Lintell*, where they basically talked about zone of risk?  And, you know, that sounds much more -- a lot more liberty you could take here.

The problem with that is *Lintell* is irrelevant to this issue.  *Lintell*, Your Honor, is a Rule 12 motion dealing with plaintiff's pleading standard for loss causation.  That is entirely distinct from the question of, at the expert stage where they retain the damages expert to calculate damages, does that calculation pass muster under Rule 702?  Those --

THE COURT:  Or the class certification stage.

MR. JORALEMON:  Or the class certification.  Exactly

23

right, Your Honor.

THE COURT:  So what happens in *Lintell*, do we know?

MR. JORALEMON:  Well, in *Lintell*, the case was dismissed on 12B grounds because plaintiff failed to articulate a loss causation standard.  But again --

THE COURT:  Right, but then it goes back.

MR. JORALEMON:  Yeah, I think it's sort of -- it's state -- yeah, the Second Circuit basically affirmed, if I remember correctly.

MR. HALL:  No, the Second -- we were counsel in that case, Your Honor.  The Second Circuit reversed the case later settled.

MR. JORALEMON:  Okay.

THE COURT:  But was there --

MR. HALL:  We did not get to this stage of litigation in *Lintell*.

THE COURT:  It didn't get to this stage.

MR. HALL:  It did not get to this stage in litigation.

THE COURT:  All right.  So there wasn't this fight at the class certification slash 702.

MR. HALL:  Correct, Your Honor.

MR. JORALEMON:  Because it was a totally different issue.

THE COURT:  Okay.

24

MR. JORALEMON:  I mean, the point really is the zone of risk, this notion of the zone of risk, concerns a plaintiff's pleading standard for loss causation in a securities case.  It does not --

THE COURT:  Right.

MR. JORALEMON:  -- speak at all to the damages issued before your Court.  And if the Court finds it useful, the *Miller* case, it's a Fourth Circuit case.  The site is 364 F 3rd 223. Cited in the BP decision.  Really helpful on illuminating this distinction, Your Honor, between damages and causation burdens.

And then just one other point of clarification on *BP*.  You recall, there are two decisions, Your Honor.  The first one was class cert, where the court rejected the class based on this grab of the entire job.

THE COURT:  I'm sorry, what?  Which case?

MR. JORALEMON:  *BP*.

THE COURT:  Right.

MR. JORALEMON:  There was a subsequent decision at summary judgment stage where the court applied that same standard, where plaintiff failed to disaggregate.  He knocked out those corrected disclosure dates where they didn't disaggregate, because the damages model didn't support them collecting any money on those corrective disclosure dates.

So there's -- so the court applied it both in the

class cert context and in the summary judgment context, that principle.

THE COURT:  Why did the case continue past the denial of class certification?

MR. JORALEMON:  They -- they -- well, there was a pre-explosion class and a post-explosion.  So it got skinnied down.  It was a post-explosion class --

THE COURT:  I see.

MR. JORALEMON:  -- and then there was summary judgment.

The issue now, if I can --

THE COURT:  Let me turn to --

MR. JORALEMON:  Yeah.

THE COURT:  -- plaintiffs on the Feinstein issue.

MR. HALL:  Yes, Your Honor.

So I think -- let's start with the disaggregation.  And I think the key here is, is that we have two different methodologies of calculating damages.  As you just heard, theirs is probability at the time, versus real probability.  And you take that delta and you plug it into a mathematical formula.

THE COURT:  And you concede that you have not run that calculation.

MR. HALL:  We have not run that calculation.  And as Your Honor pointed out, professor Hubbard said he couldn't

26

even do it himself with -- he would need the help of an engineer.  There is no basis in the record to --

THE COURT:  But why is that a problem?

MR. HALL:  Well, because he's --

THE COURT:  Right?  Securities analysts hire engineers when they want to, you know, price that risk for themselves.

MR. HALL:  Well, that is true, Your Honor, if you have the information.  All the information that Mr. Joralemon was talking about is information that was learned through the litigation.  There was no information that would allow you to have a mathematical probability at the time of -- during the class period.

THE COURT:  I thought one of the reports that Vale had internally had actually pegged the risk of this dam collapsing at 50 percent.

MR. HALL:  Correct.

THE COURT:  So --

MR. HALL:  But that was not made public, Your Honor, so there was no way that a shareholder could --

THE COURT:  Well, but now you know what the truth is, so you could say -- I mean, you'd have to figure out what the market's perception of the risk was and that would be very hard, I think, to do, but not impossible, perhaps.  And then you'd just say, okay, the market, you know, was pricing the

27

risk of any dam collapsing at X, and we know the true value for at least this dam was Y, and Y equals 50 percent.

MR. HALL:  And their own investment banking expert that's not part of this hearing but that they put forward as an expert in investment in mines, says that's not how people value mines.  That's in his report.  I can pull out the cite for Your Honor.

And you're right, and I think --

THE COURT:  What do you mean?

MR. HALL:  -- what would be helpful, to explain to you how we do calculate damages because --

THE COURT:  So we're not valuing a mine here, right? We're valuing a stock, right?  Or an ABR, ABS.

MR. HALL:  A mining company.

THE COURT:  Yeah, exactly.

MR. HALL:  We're valuing a mining company.

THE COURT:  And the value of the company, you know, generally speaking, is the discounted value of all of its future cash flows.  And if the dam's going to collapse, that's going to have cash flow implications, right?

And, you know, you're going to have fines, and you're going to have whatever else you're going to have, and you're going to have a hit to your profits, because that operation will go out of operation.  And that -- isn't that just what securities analysts do, is they --

28

MR. HALL:  Not according to their own expert as it relates to dam risk?

THE COURT:  Where -- show me where --

MR. HALL:  Due to -- that's what I'm getting.

THE COURT:  -- where are you're pointing to their own expert here.  And hold on a second.

MR. HALL:  Yep.

THE COURT:  I've got to open my bench book here.

(Pause)

THE COURT:  So where are we looking?

MR. HALL:  If you go to Docket Entry 142-4, and on Page 5 of 6.

THE COURT:  Whose report is this?

MR. HALL:  This is expert reporter, Randall Stephenson, March 10, 2023.  And this is an excerpt.

THE COURT:  Can we print that?

Okay.  What does it say?

MR. HALL:  Paragraph 45, he talks about -- he -- it's a paragraph talking about risk and how that affects financial valuation, and the last two -- last couple sentences there he says, "In my experience, investors do not consider the above-mentioned risk to be likely."  Talking about dam risk.  "Therefore, the mere remote possible of occurrence of an improbable safety and health incident for a major mining company is typically not explicitly modeled in the expected

29

cash flows."

And he reaffirmed that in his --

THE COURT: Right. But if the -- if the -- because people typically -- I mean, maybe that's true and maybe it's not true. But if it's true, it would be on his assumption, because these are highly unusual events, like a nuclear power plant exploding or something.

But if a truthful disclosure had been made, let's say they put out an 8K or whatever the foreign issue or equivalent is, and that said, by the way, we've been advised that there is a 50 percent risk that Dam 1 will collapse, people would have started modeling it then. No?

MR. HALL: Well, but even if Your Honor is correct about that, I don't necessarily know that that's correct. It would be speculation, because there's nothing to support that that's what they would do, Mr. Dralaman (ph) and Mr. Hubbard --

THE COURT: I mean, but just, let's use our common sense for a second.

MR. HALL: I am. So Dr. Hubbard --

THE COURT: Like, imagine a nuclear power company --

MR. HALL: Right, but Dr. Hubbard requires the first --

THE COURT: -- that comes out with a disclosure and says, by the way, our nuclear plant is 50 percent likely to,

30

you know, release radiation --

MR. HALL:  Correct.  That's why I said assume that -- assume that they would do that once you got that information.

Dr. Hubbard's probability difference requires that during the class period, with the fraud existing, that's how they were doing it, because you have to compare that number to the actual number.

THE COURT:  Right.  Okay.  So I think --

MR. HALL:  And that's how you judge these types of security fraud cases.  If you look through, you're not going to find it.  That's why Mr. Dralaman can't give you examples of it.

THE COURT:  He did give me an example in the *BP* case, which I'm saying, it's surprising to me that we have to look out of circuit for the best example.  But that's an example.

But why -- so it sounds to me like what you're arguing is that the perceived risk was zero, because, as you say, even the defense expert has told us that securities analysts don't model this risk, because it happens so seldomly.  So that's the perceived risk, maybe.  The perceived risk equals zero.

You've got a report that says that at least at one point during the class period here -- thank you -- the real

31

risk of a Dam 1 collapse was 50 percent.  You know what the cost of this eventuality is if it comes to pass, because that's, you know, what happens when the dam actually collapses, maybe on day one, maybe over time following that collapse.  Pricing a 50 percent risk of that dollar loss, and that's the amount by which the class overpaid.  It doesn't seem that hard to me.

MR. HALL:  That would be one -- that would be one way to calculate it.  However, that is not the standard normal way to calculate damages.  What you do is you look at but-for world --

THE COURT:  So give me a case where the facts line up with this, because, as I understand it -- I -- here's what I think is the problem you have, at the risk of stating what is probably already obvious from this discussion.

I do believe that what the law here calls for is a calculation of the difference to which this stock price was discounted by the perceived risk, on the one hand, and the amount by which the stock price would have been discounted had the real risk been disclosed.  Right?

So if this is a $50 stock where the risk is perceived to be zero, and it's a $30 stock when the risk is truthfully known to be 50 percent -- I'm just making up numbers here -- you know, the plaintiff who bought at 50 is entitled to the $20 difference.  That's what I think the law

calls for.  I could be wrong.

But what your models calculate is a perceived risk of zero and an actual risk of 100.

MR. HALL:  That's not true, your honor.  And I do -- I agree with part of what you said.

THE COURT:  Why?  Once the dam collapses, the risk of a dam collapse equals 100 percent, right, because it's already happened, and you take --

MR. HALL:  At that time.

THE COURT:  -- the loss from that event.

MR. HALL:  Right.  But -- I agree with you in part, in that you're looking at that difference of the share price in the real world versus the but-for world.  The critical difference is, is what is the but-for world, and what would investors' perception have been of that?  And the but-for world here, which contrary to Mr. Dralaman, Dr. Feinstein lays out a Part 22 -- I believe it was 22 of his report -- and he lists -- yeah, this is Paragraph 22.  It's Docket Entry 143-5, Page 11 of 194.

THE COURT:  Yeah, but this is --

MR. HALL:  And -- because this is how -- generally the way the securities cases --

THE COURT:  This is the information asymmetry thing that we're looking at in Paragraph 22?

MR. HALL:  Yes.

33

THE COURT:  Okay, so let me tell you what I think is the problem with that.  I don't know where this assumption comes from.

His but-for world is a but-for world in which the company goes to investors and says, ladies and gentlemen, we hereby disclose that we are denying you accurate information about the safety and stability of our dams.  That's the hypothetical disclosure.  And from that, he says, investors would assume the worst.

But let me just finish what I think is odd here, and maybe problematic.  The but-for world is where the truth is disclosed, not some strange half-truth about we're concealing accurate information from you, but we're not going to tell you what we're concealing.  Why isn't the but-for world just, here's the real risk?

MR. HALL:  So the but-for world in this case -- if you look at what the misleading statements and the omissions were at the beginning of the class period, and you look for the inverse of that, which is I told you one thing, now I'm going to tell you -- so they would said, we are committed to safety.  So now they would say, we are not committed to safety.  They would say, we stand by to do the right thing as it relates to dam.  This is in response to the comment about the prior dam collapse that was a year earlier.

They would now tell you we're not doing the right

thing.  They would also tell you that Dam 1, as your honor has already suggested, was ready for an imminent failure.  They would tell you that not only Dam 1, but they had a portfolio of the dams that were unstable, and that they had also calculated themselves, internally, that there would be one dam collapse every five years.

THE COURT:  What's the legal authority that would support this information asymmetry but-for world where the --

MR. HALL:  So let me continue.  I was getting to that.

THE COURT:  -- corrective disclosure is, we are not giving you accurate information?

MR. HALL:  It's not accurate information.  We haven't given you all the information.  That's what asymmetry -- asymmetry --

THE COURT:  Well, Paragraph 22 -- I'm quoting from Paragraph 22 of the Feinstein report, where his but-for world is, had the company told investors at the start of the class period that Vale was denying them accurate information about the safety and stability of its dams.  Where does the legal authority for that but-for come from?

MS. HAMILTON:  Well, when they -- when they tell them that we have a dam portfolio with dams that are unstable, more than Dam 1.  They're not giving them all the information. You know that the company has more information than you have

35

at that point in time.  It may not be fraud that they're not giving you the additional information, but it's still asymmetrical information at that point in time.

Additionally, one of the things that happened in this case, one of the disclosures was from a third party.

THE COURT:  What is the legal -- I'm asking for a case that would support this information asymmetry theory that he's come up with, that investors would assume the worst and essentially come up with their own --

MR. HALL:  That's based on academic articles and economic principals that Dr. Feinstein cites in his reports that in a term of uncertainty, especially for a company where -- that just had a dam collapse one year before, if investors --

THE COURT:  But why --

MR. HALL:  -- were told that Dam 1 was for imminent failure, they had other dams in their portfolio that were unstable, they weren't abiding by international standards, they had calculated the dam class in one in five.

The question isn't a mathematical formula.  It's what would the investors have done, and how would they have reacted, and how would that have impacted the value of the stock at that time?

And with that news, just like in the *Vivendi* case, there they looked for the pinnacle of the problem.

36

Unfortunately for defendants, the pinnacle of the problem here was on day one, and it stayed like that throughout the entire class period. It did not rise and fall. Defendants cite *Vivendi*. They say that it rose and that that somehow supports them that it can't be a constant inflation.

But there, the expert itself said the apex of the fraud was in the middle of the class period. So that's when *Vivendi* then took -- they took all the drops at that time, the corrective disclosure drops, added them together, and at the apex, that was the inflation in the stock. It wasn't some perceived risk, some other discounted cash flow. It was that, now you had full information. That was where the biggest fraud had occurred. That was the apex.

Here, we are arguing, and we think we can prove, and Dr. Feinstein is able to assume, legally, that we prove our liability case, and we want to prove our liability case that on Dam 1, the conditions were so bad at Vale that investors would assume the worst for a company that a year earlier had a dam collapse --

THE COURT: What does assume the worst mean?

MR. HALL: That there would be a dam collapse. That it --

THE COURT: 100 percent risk of a dam collapse.

MR. HALL: That another dam collapse was going to happen. Yes, because Vale had predicted --

37

THE COURT: Right.

MR. HALL: -- one in five.

THE COURT: And why would -- and they'd assume 100 percent why, because the actual risk was 100 percent, or because they found out the company was lying to them and therefore they would --

MR. HALL: Well, they found out the company wasn't taking dam safety seriously, like they said they were. That's what they would have learned.

THE COURT: But no risk is ever zero percent or 100 percent. You -- I mean --

MR. HALL: Well, they would have calculated -- this is what an -- how an investor would have reacted in a but-for world to the corrective information. We know how they --

THE COURT: They would have priced in the risk of this dam collapse at --

MR. HALL: Yeah.

THE COURT: -- 100 percent?

MR. HALL: And we know how -- and we know exactly how they responded when the dam did collapse, which was $2.72 over the --

THE COURT: Right. But at that point, you're not in the probabilistic world anymore.

MR. HALL: Right. But so economic principles, and there's articles that Dr. Feinstein will mention that state

38

that in this area of uncertainty, if you don't know that the --

THE COURT: Is Dr. Feinstein, he's here and ready to talk about this?

MR. HALL: He's here. Yeah. Yeah.

MR. JORALEMON: Your Honor, if I may just --

MR. HALL: All experts --

THE COURT: It is --

MR. HALL: -- all four experts are here.

MR. JORALEMON: Just briefly, Your Honor, if I can try to clarify?

MR. HALL: No, I think I -- I think I -- Mr. Joralemon had his time.

MR. JORALEMON: Your Honor, just --

MR. HALL: I'm going to continue answering.

THE COURT: Yeah, hold up.

MR. JORALEMON: -- I haven't spoken about the but-for world at all yet.

MR. HALL: But -- but --

THE COURT: Hold -- hold on one second.

MR. HALL: So here it's about what would the reasonable investor done with that new information.

THE COURT: What legal support do you -- so the case law -- this is a legal question and not an academic --

MR. HALL: The *Vivendi*. The *Vivendi* in the Second

39

Circuit.

THE COURT:  Says what?

MR. HALL:  The *Vivendi* says that in that case -- it's not what it says, it's what the facts of that case were. The facts of that case were -- is the expert --

THE COURT:  Are you saying our cash flow position is great and in fact their cash flow --

MR. HALL:  Right.

THE COURT:  -- position --

MR. HALL:  Liquidity issues, liquidity crisis. Their expert estimated that the pinnacle, meaning the worst possible time during the class period, was in the middle of the class period.

And what the court there allowed, *Vivendi* allowed to take all the corrective disclosures once you've isolated them for company-specific moves, and you've taken out market indexes and all that, just what Dr. Feinstein did here, added up the total of those disclosures, and that was the artificial inflation at the apex of the fraud.

And the difference between us and *Vivendi* is we are -- have proof, and we think we can prove to a jury that the apex of our fraud was on day one.

THE COURT:  I don't think you're -- so, I'm looking at page -- for some reason, these printouts of the cases I have are kind of inconsistent with respect to page numbers.  I

40

think this is Page 255 of the *Vivendi* opinion.

MR. HALL:  Yes, I'm at 255 --

THE COURT:  It's the paragraph that starts with, a better method, Nigh (ph) reasons.

MR. HALL:  Actually, it's the paragraph above that. It starts, a key question.

THE COURT:  Well, look at the paragraph I'm pointing you to.  "A better method, Nigh reason, would be to modify -- model inflation as increasing over time."

And then I'm skipping to the next -- to two sentences down.   "Without a direct measure, this expert, Mr. Nigh, turned to potential proxy methods, examined three quantitative proxies for the magnitude of *Vivendi*'s true liquidity risk at any given time."

MR. HALL:  That's because -- you have to read the paragraph above where you started, Your Honor, because what the difference is -- what I said the difference was, is shown in that paragraph.

There, since the apex was in the middle of the period, Dr. Nigh had to come up with a way of how it started at the beginning and got to the apex, which -- and at the apex, you can read on that page, they got all --

THE COURT:  The apex is in the middle of the class period?

MR. HALL:  -- of the corrective disclosure, the

entire artificial inflation.

THE COURT:  Right, but your --

MR. HALL:  Namely, the full --

THE COURT:  -- so your apex is when?

MR. HALL:  Day one.  Our argument, in our liability case, is that on day one of the class period, they should have disclosed --

THE COURT:  Tell me why the apex is -- so apex, meaning the point at which the risk of a dam collapse is the highest?

MR. HALL:  It's where the fraud is at the highest, and in this, where the liquidity related information was the highest in *Vivendi*.

THE COURT:  Sorry, define apex for me in the Vale context.

MR. HALL:  The point at which investors would have had enough information that they would have assumed 100 percent chance of a dam collapse eventually.

THE COURT:  Okay.  And doesn't the word "eventually" matter?

MR. HALL:  Well, they don't know if it's going to be today or tomorrow or a year later.  They just know it's going to happen.  So if they're buying the stock, economic principles dictate --

THE COURT:  And isn't the -- I mean, let's ask your

expert this question.

MR. JORALEMON:  Your --

THE COURT:  Isn't the stock going to be priced differently if the 100 percent chance is of a dam collapse within the next five years versus within the next six months?

MR. HALL:  We'd have to ask him.  My understanding of economic principles --

THE COURT:  Well, let's ask him.

MR. HALL:  -- economic -- when we get him on the stand, we can ask him.  Economic --

THE COURT:  Let's put him on the stand for this.  Just I want to understand.

MR. JORALEMON:  Your Honor, if I -- a few points of --

THE COURT:  Yeah.

MR. JORALEMON:  While he's walking up.  I'll be very brief.

THE COURT:  Let's bring him up.

MR. JORALEMON:  Yeah.  *Vivendi* -- the issue in *Vivendi* was 100 percent risk.  That's why the Court didn't require disaggregation.  If there's 100 percent risk, it's not risk at all.  It's actually just an undisclosed fact.  That's why you get all the drop.  They're conflating --

THE COURT:  Why is the risk in *Vivendi* 100 percent?  Because they just physically cannot manufacture enough cash?

MR. JORALEMON:  They had no money.  Right.  Right.

THE COURT:  Yeah.  Okay.

MR. JORALEMON:  So the distinction here, and what Mr. Hall -- this is news to us now.  He's all of a sudden now alleging there's 100 percent risk of collapse on day one.  They have never --

THE COURT:  Well --

MR. JORALEMON:  -- anywhere said that.

THE COURT:  -- that's why we're getting into the definition of apex.

MR. HALL:  Yeah.  Yeah.

MR. JORALEMON:  The reason --

THE COURT:  All right.

MR. JORALEMON:  Okay.

THE COURT:  Let's pause there.

MR. JORALEMON:  Okay.

THE COURT:  Let's swear the witness.

THE CLERK:  If you'd raise your right hand.

MR. HALL:  I -- go ahead.

STEVEN FEINSTEIN, MOVANT'S WITNESS, SWORN

THE COURT:  Good morning.

THE WITNESS:  Good morning.

THE COURT:  Thank you for being with us.

THE CLERK:  State your name, sir.

THE WITNESS:  Your Honor, can I clarify a few points?

44

These are preliminary.

THE CLERK:  Can you state --

THE COURT:  We're making a record here, so first we need the spelling of your name.

THE WITNESS:  Okay.

THE COURT:  But yes, by all means, I would very much like for you to clarify.  Can you spell your name for the --

THE WITNESS:  Steven, S-T-E-V-E-N.  Feinstein, F as in Frank, E-I-N-S-T-E-I-N.

THE COURT:  Yeah.  I mean, your lawyer can ask questions, or he can invite you to clarify the points.  I will be chiming in with questions, as you probably can predict at this point.

MR. HALL:  I would rather him more directly answer your question --

THE COURT:  Yeah.

MR. HALL:  -- because I may state your question wrong, in order to answer your questions.

THE COURT:  So --

THE WITNESS:  I would --

THE COURT:  So the specific question I was trying to work through was when we say the apex is at day one of the class period, what do we mean when we say apex?  But if you want to back up and start --

THE WITNESS:  Sure.

45

THE COURT:  -- you know, prior to that.

THE WITNESS:  I would like to do that.
So the discussion so far has been about a spread between a perceived probability, which I call the induced probability induced by the alleged misrepresentations and omissions --

THE COURT:  Right.

THE WITNESS:  -- and a true probability.  And they're saying that the damages -- the inflation, which then leads to damages, has to be a function of that true probability, which they are contending would have, in the but-for world, been disclosed to investors.

But my point, and I testified about this earlier in deposition, that doesn't fit the facts of the case.  The market has never -- the company has never produced to investors a true probability, not during the course of the class period, not after the class period, not even during the pendency of this case have they said this is what the true probability was.

So the better paradigm --

THE COURT:  But so assume that, as a legal matter, the burden of establishing damages rests with the plaintiffs and that even if the defendants haven't -- wait, I mean -- you know, so if the damages model is true probability versus perceived or induced probability, it is incumbent on the plaintiffs to tell us what the true probability was.

If I understand your model correctly, you're using a

perceived probability of zero and a true probability of 100. Is that --

THE WITNESS:  Not quite.

THE COURT:  Okay.

THE WITNESS:  Let's talk about the perceived probability first.  It may have been greater than zero, but whatever it was would have already been impounded into the stock price.  Let's say it was five percent or 10 percent or even 15.  If that's what the perceived induced probability was, the stock price and the ADR price would have already been discounted for that probability of risk.

THE COURT:  Right.

THE WITNESS:  And when the dam did break, the stock price is not going to fall again for that probability, because it's already been discounted for that probability.  So I analyzed the induced probability and came to two conclusions. One is that --

THE COURT:  But did you --

THE WITNESS:  Okay.

THE COURT:  So did you -- does your model peg the true probability at 100 percent?

THE WITNESS:  Essentially.  And I'll explain why. It's -- I wouldn't call it the true probability.  I would call it the but-for probability, meaning it's the assessment that rational investors would have of risk that they would impound

into the stock price.

And they might not know for sure it's 100 percent, but given the facts that plaintiffs are alleging could have been disclosed to the market and would have and should have been disclosed, that's the conclusion that the market would have come up with, that they need to discount that stock price by the eventuality of a dam break.

We know from the event study at the end that that's $2.72, so that discount would have been imposed at the beginning. And I just want to be real clear about that point. I don't --

THE COURT: Yeah. Why?

THE WITNESS: I don't know if it's 100 percent. They would not know for sure if it was 100 percent. But they would know -- and this is -- I think they took the asymmetric information thing a little bit out of context.

They would have known what they didn't know. They would know -- okay, the two affirmative misrepresentations at the start of the class period were that we stand by our commitment for safety and we stand by our commitment to do what's right with -- when we have stand -- we have stood by our commitment to do what's right.

THE COURT: Well, and they also had disclosures that we're operating in a dangerous industry where accidents happen --

48

THE WITNESS:  Right.

THE COURT:  -- and there's a history of accidents and --

THE WITNESS:  That's right.

THE COURT:  Okay.  Can I -- let me just pose a hypothetical world, which will be a lot simpler than the world we're in now.  Imagine a rocket company that is formed for the purpose of carrying out one single mission.  All right?  They're going to bring this heavy payload to the moon.

And the government's going to pay them, if they're successful in getting to the moon, a billion dollars.  And if they're not successful in getting to the moon, the government's going to pay them zero --

THE WITNESS:  Okay.

THE COURT:  -- for whatever reason.  And the company, you know, puts out a prospectus that says, look, rocket launches are really risky, and we don't know exactly what's going to happen, but we're very committed to safety, and we've modeled this every which way, and, you know, we believe the probability of a explosion here is vanishingly small.

In fact, there are internal emails in the company saying, let's not do this.  There's a 50 percent risk that this rocket is going to explode on -- you know, in the launch.

You know, the launch is going to happen tomorrow, and they're going to get paid a billion dollars the day after.  So

49

if there's 100 percent chance of success, the company's basically worth, you know, a billion dollars minus whatever expenses.

THE COURT: Let's say we could somehow establish that the market perceived the risk of this rocket explosion to be five percent.

THE WITNESS: Okay.

THE COURT: And the true risk we know, from the engineers inside whose emails went undisclosed, was 50 percent. Assume the law requires that we calculate the stock losses by reference to the true probability of 50 percent, not the 100 percent, you know, probability that we know after the rocket actually explodes. How does your model do that here? Are you --

THE WITNESS: I follow.

THE COURT: Are you assuming as a factual matter that investors would have priced in a 100 percent risk of a dam collapse? And if so, where does that assumption come from?

THE WITNESS: Okay. I am. To distinguish the example, which is a nice example for understanding what's called the perfect information model from the real -- this case, which is an imperfect information model, we should take into account that it was not just dam one --

THE COURT: Right.

THE WITNESS: -- that was at issue. The company had a portfolio of dams that were unsafe and allegedly failed

50

certifications before the start of the class period and that they were not abiding by international standards.  And they had this document that said that they were -- they came to the conclusion that they would experience one dam break every five years.  And, frankly, if it was -- and they were not --

THE COURT:  And that went undisclosed.

THE WITNESS:  Undisclosed.  Right.

THE COURT:  Right.

THE WITNESS:  And all of that would have been disclosed in the but-for scenario.  And if it wasn't disclosed with this announcement that I described in my report, it could have been announced by a whistleblower or third party.  And that fits the facts of this case, because the information about what the condition and conduct of the company was did come from third parties in this case in  *The Wall Street Journal* and *Guardian* exposés at the end.  So during the course of the class period, we don't need, in the but-for world, for it to be the company admitting to all of this.

THE COURT:  Right.

THE WITNESS:  It could have been a whistleblower or a third party.

And economic theory, economic experience tells us that the stock price would have plummeted if that information came out.  But coming --

THE COURT:  If the information that we expected a dam

51

collapse every five years would have come out?

THE WITNESS:  That plus that they had a portfolio of unsafe dams that had failed certifications and that dam one was --

THE COURT:  So how would the stock price have reacted?

THE WITNESS:  I -- the market would have come to the realization that the company they're dealing with is one where they should expect a dam collapse in the ordinary course of business now and then, and they would understand that that does have cash flow implications: lower revenue, higher costs.

THE COURT:  Right.

THE WITNESS:  They would price the stock at the start of the class period to reflect that discount.  And economic theory says that if the discount is already in the stock price at the start of the class period, it's not going to come out later.

THE COURT:  But what -- how do we calculate the magnitude of the discount, is my question.

THE WITNESS:  Well, I think plaintiff -- my understanding -- and I've assumed plaintiff's factual obligations.

They're -- they intend to prove that it was an eventuality, that the market would have learned that they can't trust this company to do what needed to be done to prevent

52

another dam collapse.  That, in fact, there -- there's some documentation I saw in this case that said that the condition of the dams was so precarious that it would have taken diligent effort to prevent a dam collapse, and the market would have been apprised that that was not taking place.  So yes, the market --

THE COURT:  And does the --

THE WITNESS:  Okay.  I'm saying that the -- all right.

THE COURT:  So if I'm just -- you know --

THE WITNESS:  Sure.

THE COURT:  -- if we're a junior analyst at a, you know, broker dealer --

THE WITNESS:  Right.

THE COURT:  -- I have a model in front of me that has a bunch of assumptions about cash flows.  How does the model change, precisely?

I would have expected to see you do something like that junior analyst would have done and said, okay, now I'm pricing in the risk of -- you know, I think the median dollar cost of a dam collapse to our earnings, in our, you know, payment of fines, whatever it is, is X, and the median expected time for that to happen is Y, six months out or a year out or whatever, and, you know, then the model reacts the way it reacts.  But you took the dollar value of the loss that we see

53

after the actual collapse.  And why?

THE WITNESS:  Okay.

THE COURT:  Like --

THE WITNESS:  Well, the dollar value after the actual collapse tells us what the market -- what investors assess the correct impact of a dam collapse to be on the stock price.  And I contend that the severity of the --

THE COURT:  But does it matter which dam it is, if it's a bigger dam or a smaller dam?  Like --

THE WITNESS:  Oh, that's a great question.  I'll tell you why in this case it actually does not.  Because on January 25, 2019, the market just learned that it was a dam collapse. They did not yet have the information about how severe it was. They didn't know.  There was speculation.  Maybe it's a big problem; maybe it's a small problem.

It was only on January 28th that the severity of the collapse became known to the market.  And I did not include that second January 28th decline of about $2.40 in the damages. I understood that this case is about the risk of a dam collapse.

And, therefore, I took the January 25th drop where the market began to learn that the first dam collapse was not a complete accident and was the result of conditions and conduct, and, therefore, the risk was elevated, and not the January 28th where the severity was learned.  So that --

54

THE COURT:  Do you know how many --

THE WITNESS:  -- that's excluded from the damages, January 28th's $2.40 drop.

THE COURT:  Do we know how many dams this company was managing?

THE WITNESS:  Yes.  It's in the documentation, and then there was also --

THE COURT:  How many --

THE WITNESS:  I don't --

THE COURT:  -- are we talking about?

THE WITNESS:  Well, I remember there's -- many. There was many.  And there was a portfolio of more than ten that they knew were in trouble.

THE COURT:  More than ten that they knew were in trouble.  Okay.  All right.

Does the -- I don't have any more questions at this point.

MR. JORALEMON:  Yeah.  I have a lot, Your Honor, so --

THE COURT:  Pick your favorite --

MR. JORALEMON:  Okay.

THE COURT:  -- you know, five or ten, and take five or ten minutes here.

MR. JORALEMON:  Should I go to the podium or, you know, would you like me to stay here?

55

THE COURT:  Wherever you want to be is fine with me.

MR. JORALEMON:  I'm going to go to podium, because I might need the ELMO for a second.

THE COURT:  Okay.  But think of yourself as, you know, operating within a 10 or 15-minute time constraint here.

MR. JORALEMON:  Yeah.

THE WITNESS:  But could I add one more thing, please?

THE COURT:  Yes, please.

THE WITNESS:  Well, with the rocket example, I mean, if the market knew that this company didn't know how to launch rockets or wasn't committed to launching rockets correctly, I don't think its stock price would have -- I mean, I can't imagine people would be buying --

THE COURT:  Right.  But that's where the rubber meets the road here --

THE WITNESS:  Right.

THE COURT:  -- is whether this is a sizable but still not certain risk or a certain risk.  And I'm just trying to understand the basis for assuming --

THE WITNESS:  Well --

THE COURT:  -- the latter rather than the former.

THE WITNESS:  Well, the -- I --the investors would know what they didn't know.  They would know that -- for example, that they can't rely on certifications, because they would have learned that the company, according to plaintiffs,

56

was pressuring inspectors to certify unsafe dams.  So they would know what they didn't know.

And in that environment of extreme risk and the dearth of information, the prudent thing would be to discount the stock price with a discount that reflected a dam collapse.  The --

THE COURT:  See, I think what you're saying -- you're making an empirical, you know, financial analytical point.  But I think there's also law on this topic.  Like just to give you an example, so I used to have to assess all the time as a lawyer whether a particular misstatement in a company's financials was material or not material.

And I would, you know, interview securities analysts for that purpose.  And I would say to them, hey, if you knew that this number was false, how would it affect your evaluation of the company?  Would it move the needle, or would it not?

And oftentimes, the reaction you would get was, well, I don't care that much about that number in the abstract.  It's not going to -- it doesn't have a -- it's not going to move the needle on my model.  But if I knew that this company was the kind of company that lied in its financial statements, even about immaterial things, I would sell the stock immediately.

I don't -- that may be how things work in practice on Wall Street.  I don't know for a fact, and we're going to talk to the lawyers, that that's how the law works.  I think the law

57

of damages tells us, assume that the misstatement had been corrected. The but-for world is not one where everybody knows the company lies. It's just where that number's been fixed. But let's leave it at that for now.

MR. JORALEMON: Thank you. It's a bit of a moving target here, Your Honor. I just want to try and clarify a few points. You've heard Mr. Hall and now Mr. Feinstein both say that in this but-for world, there's 100 percent perceived and actual probability of collapse. This is new information.

Tab 3, Your Honor, has --

THE COURT: Save the argument. While we have the witness on the stand --

MR. JORALEMON: Yeah. Sure.

THE COURT: -- let's just --

EXAMINATION BY MR. JORALEMON:

Q    Professor Feinstein, you recall submitting a report on May 12, 2023, in this case? It was your third report?

A    Yes.

Q    Okay. And that was in response to Professor Hubbard's criticisms, correct?

A    I believe so.

MR. JORALEMON: Okay. If I could direct your attention to page 42, Your Honor, tab 3. The heading is the Inflation Ribbon --

THE COURT: Do you want to put the report in front of

58

the witness?

THE WITNESS:  I don't --

THE COURT:  And we'll all look at it together.  And if you have an extra copy for me?  There are so many reports in this case that --

MR. JORALEMON:  Yeah.

THE WITNESS:  How do I do this?

THE COURT:  -- even though I have them digitally in front of me --

MR. JORALEMON:  So it's tab 3 of the hard copy.

THE COURT:  Oh, it's in this?  So tab 3.  Okay.

MR. JORALEMON:  Okay.  So at page 42, Your Honor.

THE COURT:  I mean, I knew -- maybe I'm not sure how I knew that, but I think I knew coming into today that the plaintiff's model was pricing at a 100 percent risk of dam collapse, so --

MR. JORALEMON:  Well, if you see Professor Feinstein's report, he says -- it actually doesn't do that. The Inflation Ribbon presented in the Feinstein LCD report does not assume 100 percent probability of dam one failure.  If you look at paragraph 106: "I do not assume that the probability of dam one collapsing was 100 percent, nor that a but-for disclosure would have informed investors that there was 100 percent probability of dam one collapsing."

That is not the model they've submitted here,

59

notwithstanding Mr. Hall's representation --

THE COURT:  Well, I don't know that this is inconsistent with what the professor just said.  He's -- I mean, maybe this is a metaphysical distinction, but he's not assuming that the actual risk as a matter of physics that the dam would collapse was 100 percent.  He's assuming that if -- and you'll correct me if I'm wrong --

THE WITNESS:  That's exactly right, where you're going.

THE COURT:  -- that investors -- if they knew that the company was holding -- withholding from them the information they would need to accurately frame that risk, that investors would have assumed a 100 percent risk.  But this doesn't contradict that latter assertion.

MR. JORALEMON:  Well, Your Honor, again, the but-for world addresses the issue -- a world without fraud, right?  So there's still --

THE COURT:  Well, right.  But that's a legal question.

MR. JORALEMON:  Yeah.  They still have --

THE COURT:  We're here --

MR. JORALEMON:  -- the disaggregation problem.

THE COURT:  Yeah.

MR. JORALEMON:  Okay.

THE COURT:  Let's stick to the --

60

MR. JORALEMON: So let's talk about the but-for world.

BY MR. JORALEMON:

Q   Sir, you'll agree with me that in a but-for world, an expert creates a hypothetical scenario in which there is full disclosure of what is alleged to have been represented, correct?

A   Yes. But that disclosure does not have to come from the company itself. The but-for world is -- we're dealing with the same company that's in the real world, the same conduct and condition that's in the real world. The but-for world, however, has transparency where people understand what the company's conduct and condition are, which includes that they're dishonest, perhaps.

Q   So let me ask -- let me follow up on that. So in your construct, the but-for world necessarily must end the fraud, correct?

A   No. Oh, no. Yes. Yes. Yes. It would be a truth on the market world.

Q   Right. So in other words --

A   That would be -- it would be -- the but-for world would have no fraud, because the market would be apprised of what plaintiffs are alleging should have been disclosed. But that information doesn't have to come from the company itself.

Q   Understood.

61

A    It can come from a third party.  If there's truth on the market, then there's no fraud on the market.  So there'd be no fraud in that but-for world.  But it would be the same company with the same condition -- conditions and the same conduct.

THE COURT:  Yeah.  I think we're all on the same page here.

MR. JORALEMON:  Okay.  But you -- Your Honor, I just really want to -- I just really want to crystallize this point.  Professor Feinstein's but-for world includes both the revelation that there's been a misrepresentation and an ongoing deception about the actual truth concerning that misrepresentation.  There's an ongoing fraud.

THE WITNESS:  No.

MR. JORALEMON:  Well, let me direct your attention to page --

THE COURT:  Can you explain why the answer is no?

THE WITNESS:  Because regardless -- because in the but-for world, there would be full transparency.  The transparency can come from a third-party source, an exposé, as actually did happen in this case, from the newspapers or a whistleblower.

So my understanding -- I'm not a lawyer, but my understanding is that even if the company continued to pressure inspectors to certify dams, even if the company insisted falsely that they were doing everything right, if the market

62

was apprised of the truth, that would not be fraud. And the price would plummet to reflect --

THE COURT: Oh, sorry. Yeah. I thought we were talking about the factual assumptions here.

MR. JORALEMON: We are.

THE COURT: I want to stick to just what are the factual assumptions, and we can fight later about --

MR. JORALEMON: Thank you. I totally agree, Your Honor.

THE COURT: -- whether they match up with the law.

BY MR. JORALEMON:

Q    So you recall being opposed in this matter?

A    Yes.

Q    And I asked you to define your but-for world. Do you remember that?

A    A number of times.

Q    Yes.

A    And then you honed in on one aspect without honing in on the rest of the disclosures that I described.

Q    Yeah. I just want to hone in on this one aspect for the Court's benefit. You say, "In the but-for world, the market allegedly could have received information that the company was engaged in a campaign to mislead the public and investors about dam safety and other issues." Do you recall that testimony?

A    Yes.

63

Q    Okay.  Sir --

A    But that doesn't mean that there was a continuing fraud if there had been exposure, if there was transparency in that market that told investors what this company was actually doing.

Q    Well, where does that factual assumption come from in your but-for world?  You've defined it as an ongoing campaign of deception.  And that's why you can invoke information asymmetry.  Isn't that correct?

A    No.  There would be information asymmetry with the disclosure of everything plaintiffs are contending could have and should have been disclosed.

For example, the market would know that the company does not stand by its commitment to do what's right with respect to dam safety.  And the market would know that the company does not prioritize safety.

The market would know that they didn't know what the company was doing on a day-to-day basis that could cause the dam collapse.  Or, frankly, they would know that they could not trust the company to be doing what needed to be done to prevent a dam collapse.  And the response to that, according to economic principles, is it would be prudent to price the stock building in a discount that represented the expectation of a collapse.

Q    Okay.

64

THE COURT:  Say more about where that comes from. Like why -- does Warren Buffett say that?  I mean, why do you assume the 100 percent eventuality just because you now truthfully know that the company doesn't care one way or the other?

THE WITNESS:  Well, I mean, this -- it's -- the factual context is this would have been right after -- a year after a major dam collapse.

The market would have learned that it's not -- that at least dam one was in precarious position.  And my understanding is plaintiffs intend to prove that it was -- the risk was that -- such that there would be an impending collapse.  They would learn that there was a portfolio of these --

THE COURT:  Plaintiffs intend to prove 100 percent chance of a dam collapse?

MR. HALL:  No.

THE WITNESS:  That's my understanding that -- my understanding is that they were going to -- yes, that -- well, that they would -- my understanding is that they do intend to prove that the -- that this was not just a random event, but the company wasn't doing what needed to be done to prevent a dam collapse.  And so if the market knew this, they would expect a dam collapse.

MR. HALL:  Your Honor, could I just -- I think maybe

you were asking for academic or financial, economic support for that proposition, not the facts of this case. If that's true, I think Dr. Feinstein cites some of that in his report that he could point you to.

THE COURT: Yeah. I mean, as long as we're at it, do you intend to prove --

THE WITNESS: It's --

THE COURT: -- that the physical risk of dam collapse was 100 percent?

MR. HALL: We intend to prove that the information -- we intend to prove that the information was so bad at the company, had investors known, investors would have assumed. Not that there was a mathematical probability. That is where we're getting lost here.

THE COURT: I agree.

MR. HALL: And we're getting lost in it because of a misstatement by counsel. And I have an answer to Your Honor's question about the zone of risk. It has been used in a second circuit case on summary judgment: *Vivendi*. And then there's also *Castellano v. Young*, which is at 257 F.3d 171. Both of those apply the zone of risk --

THE COURT: Well, let's have separate brief -- let's have three-page letters from both sides on that topic.

MR. HALL: Okay.

MR. JORALEMON: Sounds good. So just -- I really

just want to nail down this disconnect, Your Honor.

BY MR. JORALEMON:

Q    You have information asymmetry that leads investors to assume a worst-case scenario, correct?  Professor?

A    It's not just -- I mean, that was a component of it.

Q    Okay.

A    The investors would know that they didn't know everything and that they couldn't know everything because of the company's condition and conduct.  For example, that they were -- that the certifications were unreliable.

But they also would have known that dam three was in such bad shape that it would have warranted a level three emergency that would have required evacuation, that there -- dam three wasn't the only dam in trouble, that there was a portfolio of dams in trouble --

Q    Fair.

A    -- and so on.  And that the company itself had arrived at the conclusion that dam breaks were going to happen from time to time, one in every five years.

THE COURT:  So can I --

BY MR. JORALEMON:

Q    If you -- sir, if you can just for the --

THE COURT:  Let me just jump in here for a second. On the topic of academic support, if one of the premises of your analysis is that when investors -- and I'm going to

paraphrase this and probably get it wrong, but when investors become aware, A, that they're not being given full information about dam collapse risks from this company and, B, that the company doesn't actually care that much, as you put it, about dam collapse risk, investors would -- the prudent step at that point is to assume that a dam collapse will occur rather than try to peg the probability as a matter of physics.  Where does that come from in the literature as best you can point me?

THE WITNESS:  Well, it -- well, I cited articles in my report.  There's Akerlof and Milgrom who talk about how -- it's essentially a game theory theoretic that if information is --

THE COURT:  Milgrom.  And who was the other one?

THE WITNESS:  Akerlof.  Nobel Prize winning research and papers from both of them.  Akerlof.

THE COURT:  How do you spell the second person's name?

THE WITNESS:  Akerlof is A-C-K-E-R-L-O-F-F (sic).

THE COURT:  Okay.

THE WITNESS:  And Akerlof uses the used car market as an example.  He explains that it's an example that's easy for people to understand.  And --

THE COURT:  And he says what?  That if I know I can't get accurate information about whether this carburetor's going to break, I just assume that the carburetor's going to break?

68

THE WITNESS:  No.  He says that if -- let's say -- well, he says that -- well, essentially, that he -- him and follow-on research on this, if -- let's say you're going to buy a car and you know the problem's had a -- the car's had a problem with its brakes in the past.  And you ask the seller, can -- you know, have you fixed the brake problem?  Do you -- is there -- can I see the maintenance records?  And the seller says, no, I'm not going to show you the maintenance records. Reasonable inference from there is that this is a bad car that's going to need its brakes fixed.

So it's -- you can infer from game theory, using game theory, what the counterparty doesn't want to disclose to you. And in this case, I believe that what investors would have inferred from the company's behavior, if what could have been disclosed would have been disclosed, is that the situation was so dire that it would be appropriate to price in a dam collapse.

THE COURT:  But how do you square that then with the fact, in this case, that one of the reports shows a 50 percent chance of this dam collapsing?

THE WITNESS:  I think -- well, one of the other experts in this case, Obani (ph), said that the company itself didn't even know how to measure the dam risk, that they were making all kinds of mistakes.

THE COURT:  But assume the people who wrote that 50

69

percent figure knew what they were talking about.

THE WITNESS:  Okay.  Well, let's say there's -- I think they -- I think -- I can't remember the exact number, but it was somewhere in the neighborhood of ten other dams that were also similarly unstable.  And that would be like flipping a coin ten times and getting heads every time.  It's just not going to happen.  I mean, it would with a tiny probability, but it's infinitesimal.

So if the market knew that there was a portfolio of troubled dams, the company wasn't taking dam safety seriously, and this 50 percent number came out, I think they would come to the conclusion that the prudent way to price the stock was to price it at dam collapse.  They would know that this is the kind of company that's going to have dam breaks from time to time.

BY MR. JORALEMON:

Q    Professor Feinstein, when the dam collapsed on January 25, 2019, investors did not assume a worst-case scenario, correct?

A    I don't know what you mean by the question.  The dam had collapsed at that point in time.  And the --

Q    Was the stock priced -- did the stock price drop reflect a worst-case-scenario assumption by investors?

A    Well --

THE COURT:  Well, here we're talking about two different things.

70

THE WITNESS:  With respect to the dam collapse, yes. With respect to the causes of the dam collapse that included the company's more pervasive condition and their conduct surrounding dam safety, no.

Those -- information about the more pervasive widespread problem came out on February 4th.  And information about the company's conduct that led to the dam collapse came out on February 6th.  And the stock fell appropriately on both of those occasions.

BY MR. JORALEMON:

Q    Right.  So adding together all those three corrective event dates -- the 25th, the 4th, and the 6th -- is it your testimony that the collective drop in the securities prices represented the market's worst-case-scenario price?

A    It represented that they -- in the but-for -- all right. Maybe I didn't understand your question.  Could I hear it again, please?

Q    Yeah.  Is it your testimony that the stock price drops -- there's three corrective event dates remaining in this case, correct?  You understand that?

A    Yes.

Q    Is it your testimony that the price drops on the 25th, the 4th, and the 6th collectively represent the market's worst-case-scenario pricing?

A    No.  The February -- January 25th reflects the economic

impact of a dam collapse.  And February 4th reflects the new knowledge that it's a broader problem than just one dam.  And February 6th reflects that the company was not prioritizing dam safety and doing what needed to be done.

Q    Is it your view that the market received full disclosure of the issues here during the class period?

A    I know we talked about this during the deposition.

THE COURT:  Yeah.  Let's --

THE WITNESS:  There -- oh.

THE COURT:  -- cut this here.

MR. JORALEMON:  Sure.

THE COURT:  Do we have Dr. Hubbard here with us as well?

MR. JORALEMON:  We do, Your Honor.

THE COURT:  Okay.  Can we -- let's hear a response to this.

Thank you.  We may call you back, but Mr. -- Dr. Feinstein, you can step down at this point.

MR. HALL:  Your Honor, while Dr. Hubbard's coming up, I just want to point out that Your Honor's referenced a 50 percent dam -- it's not -- and I don't want to get into it, but just caution you that it's not a 50 percent as you think when you flip a coin.  It's as likely to happen as not.  Because in an -- in dam safety, that rating, in that metric they gave, that 50 percent is so extreme that it's more -- it sounds -- it

72

is worse than it sounds.  That's all I want to point out.  And, obviously, we don't have those experts here to --

THE COURT:  Okay.  But you're not going to argue that there was a hundred percent probability of a dam collapse.  Instead you're --

MR. HALL:  Not from a physical standpoint.

THE COURT:  Not from the perspective of physics.  You are going to argue that given the problems in defendant's disclosure, securities analysts would have priced in a hundred percent probability of a dam collapse.

MR. HALL:  Yes, Your Honor.

THE COURT:  And so what we're having here is a dispute about how securities analysis works and Dr. Feinstein I think just told us that the authority for modeling -- for assuming a hundred percent risk of a dam collapse comes from some game theory papers by Milgrum and others.

And what I'm most interested in hearing from Dr. Hubbard is your take on this -- you know, what is the best understanding of how securities analysis would account for the evidence we have here.

MR. HUBBARD:  So I get sworn in first?

THE COURT:  Yes, please.

DR. ROBERT HUBBARD, MOVANT'S WITNESS, SWORN

THE CLERK: Can you state your first and last name for the record.

73

THE WITNESS:  Robert, R-O-B-E-R-T, Hubbard, H-U-B-B--A-R-D.  But I go by my middle name, Glenn, G-L-E-N-N.

So to your question, Your Honor, I think there's really two parts to this.

One goes back to the discussion of disaggregation and how you get to the hundred percent.

So I think the discussion's correctly teed up and you tee it up, that the ex-ante risk was -- so whatever people thought the probability was in the price.

And so when the price drops upon materialization of an event, that's really three possible things.  One is industry and market factors on a given day.  One is fraud.  That is, people learn something about the probability and another is dam collapses are costly.

And so when you do an event study, which is what Professor Feinstein did, you take out the market and industry factors.  So we're left with the other two.  So it's the sum of the fraud, that as I learned the probability's higher than before, or the materialization of disclosed risks.

By a matter of arithmetic, taking the entire damage -- the entire drop as damage, you are saying that the ex-ante probability is a hundred percent.  I mean, you yourself pointed that out. I think it's spot on.

Asymmetric information is a red herring here. Asymmetric information is a classic probably in corporate

74

finance.  This has been my work for 40 years. I'm one of the creators of some of these models, but that said, asymmetric information is relevant to this case only because plaintiffs and plaintiff's expert have not used an economic concept of a but-for world.

The but-for world in the reference manual that both Professor Feinstein and I cite says that it's the price you would have paid had you known the real or actual value.  That is, you knew the truth.

THE COURT:  So I understand with the even study -- and this is going to be a remedial question, that you need to extract whatever part of the price drop reflects broader prices factors on a given day and just the ordinary costs of a dam collapse.

How does that work? Is it you take the price collapse, you remove the value of these other things and whatever is left is the fraud loss or --

THE WITNESS:  Yes, sir.  Before I get to the -- if I might give an example, it might help here.

Suppose that I'm telling the market that my company is going to earn 500 million dollars this quarter, when I know full well that I'm actually only going to earn a hundred million this quarter and that will ultimately be disclosed the but-for disclosure is not 500 million.  The but-for disclosure is it's 100 million.

75

THE COURT:  Right.

THE WITNESS:  So to your question, the full drop is in all likelihood principally about the cost of a dam collapse. The change in probability is from a number that was probably close to zero.

You have technical experts in the record who are going to say that the ex-ante probabilities were small to mid in range.  You'll have to sort all that out.

But yes, you were spot on.  You would take those differences in probabilities times the cost.  One of the experts in this proceeding, Mr. Stephenson, will advise you to look at set of cash flows.

As a financial economist I can say well, you could actually look at the stock price drop.  That's pricing and everything, if you like.  But only that portion that's due to the change in probabilities is damages.  The rest is due to a very unfortunate event that when a dam collapses in the real world, it's very costly to Vale and its shareholders.

THE COURT:  Why -- so the second and third factors in your event study are tied up with each other, right?

If I've got fraudulent disclosure that says trust us, the probability of dam collapse is zero, then I'm pricing in zero dollars not only for fraud, whatever that means, but also zero dollars in dam collapse costs, if I believe that.

THE WITNESS:  That's correct, sir.  So what that

76

would mean is let's suppose that you could -- 20 percent. Let's make a number up.

Suppose the market thought it was zero based on my statements, it's actually 20 percent. Then in fact of that stock price drop, if that's what you're going to take as the totality of the loss in value to Vale and its shareholders, only 20 percent would be the misrepresentation.

THE COURT: Right.

THE WITNESS: Obviously, in the actual world, when a dam collapses a dam has collapsed. I mean, that's -- it becomes known.

THE COURT: So how does the event study -- if you could just walk me through the event study quickly.

THE WITNESS: Sure. What the even study can't by itself answer your question -- so what is the event study going to do.

The event study says there's news, let's say, on a given day, and the stock price changes. It goes up or it goes down.

The first thing economists do is filter out the market or industry so we're not looking at this unrelated to this case. And then what's important to financial economists is to sort out so-called confounding factors from the news.

And here the principal confounding factors, the one we've been talking about this morning, is the fact that in the

77

actual world when a dam collapses you lose a lot of money for fines and litigation and everything else.

So the event study alone can't do that for you. You then would have to separate it and the way I would argue to separate it would be to ask yourself had you known the full set of information, all those things that were in the file drawers at Vale, had the same analysts seen that, what would they and the technical experts they hire, have estimated the probability have been? So that's a calculation you're going to have to add.

But in order to take the full price drop you have to assume a hundred percent.

THE COURT:  And then you would do what with that calculation?

THE WITNESS:  Sorry, sir?

THE COURT:  And then you do what with that calculation?

THE WITNESS:  Well, in a forensic exercise, like a court proceeding, that would be useful to I would argue a finder of fact in deciding what is the actual damage here, as opposed to it's really bad when a dam collapses.

So essentially what you would be doing is saying here's the bar of the stock price drop holding --

THE COURT:  Right.  And that's an alternative to the event study?

78

THE WITNESS:  No, no.  The event study gives me the drop.

THE COURT:  Right.

THE WITNESS:  And then what that approach does is says okay, I can allocate --

THE COURT:  Oh, I see.

THE WITNESS:  -- between it's really bad when a dam collapses or if market participants had known everything in this file draw --

THE COURT:  So the events that he tells us -- here's the cost of the dam collapsing --

THE WITNESS:  Correct.  The only way the event study maps into damages per what the plaintiff's expert is arguing is if you're assuming a hundred percent probability, or put more correctly a revision of a probability from zero to 100.

THE COURT:  So we learn from the event study that the actual cost of the dam collapse net of broader market movements or whatever is X.

THE WITNESS:  So large --

THE COURT:  Call it 500 million dollars.

And we want to decide, now that we know that, what would have been the stock price impact had the truth been known on day one.  That requires us to go out and hire a geologist and say okay, what was the -- or a dam safety expert.  What was the real probability of this dam collapse and peg that at say

20 or 50 percent, or whatever, and then we just take 20 or 50 percent of the cost and we model that into our DCF.

THE WITNESS:  More or less that's correct, Your Honor.

I think it's not so much that an analyst, that you asked about, necessarily has the skills to estimate those probabilities, which by the way -- just an economist's understanding of it, we're really talking about the multiplication of two probabilities.

So there's a probability that an impulse happens and then a probability, given an impulse that you have a dam collapse.

So suppose you have an earthquake, that's an impulse. How structurally good is the dam.

So it's probably not the case that an analyst can do that or I as a financial economist can do that --

THE COURT:  No, but they hire experts.

THE WITNESS:  But they hire people who do that.  And the real question is not so much the specific number, but if they had all the information that was in this file drawer and all the memos, how would they have revised their expectations? That's what I would argue you should be looking for.

THE COURT:  Okay.  But at that point you're outside of the confines of the event study.

THE WITNESS:  Right.  The event study's telling you

80

the total.

So plaintiffs have said you can take a hundred percent of that.  My own suggestion to you is that you could take the portion of that that's truly damages.  In other words, what the revision of the probabilities were and that would be up to you to decide.

THE COURT:  Right.  So in what you think is the perfect world of expertise here, we would be hearing from somebody who performed an event study, a dam safety expert or whoever would be opining on what the real risk was and we would also have somebody who's got a model to price in the DCF impact of that byproduct.

THE WITNESS:  Well, the last part of I would argue is fairly simple.  You could do one of two approaches.

You could have taken the stock price drop in the event study and then multiply the delta probability calculations to that.

One of the other experts is going to argue using a set of cash flows.  You could do that.  Either one strikes me as okay.

The record that I have seen, so you will see, does have estimates from both sides of these probabilities.  So it's not the case that you have to make up a probability. It's in the record.

THE COURT:  Right.

81

THE WITNESS:  And you can decide which one it is.

THE COURT:  So why -- I think you're saying that Dr. Feinstein's damages calculation defies the state of the art.

THE WITNESS:  Well, it does in two important respects.  From an economist perspective I can't speak to the law.  One is that it's not a but-for world the way economists use that term.  Because when economists speak of a but-for world, we're talking about if you had knowledge of the actual or real value, that's literally the language in the document that both of us cite, I cite a number of academic references as well. So there's that.

The second is the problem of application of asymmetric information. As I told you, asymmetric information is a fact of life in corporate finance.

The only reason it's come up here -- and by the way, having done securities cases for decades, I've never seen this argument before.

The only reason it's come up here is this obscure but-for world that says I'm going to tell you that I'm not going to tell you the truth.

THE COURT:  Right.

THE WITNESS:  That's not a but-for world.

THE COURT:  Right.  That's my example of the analyst who says --

THE WITNESS:  Correct.

82

THE COURT:  But we have -- I realize I'm leaving you hanging here a little bit here at the podium.

MR. HALL:  I don't have very many questions, whenever you break, but once you break I do have a few questions for Dr. Hubbard.

THE COURT:  The question is I don't have to strike -- it's not a binary question that we strike an expert's entire report or entire -- or not.

If I find that there's some mismatch between the law of securities damages and this, you know, vision of the but-for world, why isn't the remedy just, look, there's still sufficient information in the record from -- as Dr. Hubbard just indicated, from which both sides can fight over what the real probability of the dam risk is.

And you don't even need to be an expert to perform that step in the analysis, where you substitute a 20 percent risk or 50 percent risk for a hundred percent risk and, therefore, we'll go to trial on that slight modification.

MR. JORALEMON:  Just so I'm clear, Your Honor, you would have to strike the entirety of his damages analysis, Professor Feinstein's damages opinions.

THE COURT:  Right.  You have to strike the one line where he says it's a hundred percent risk, or you'd have to discount that one number by 50 percent, or whatever.

MR. HALL:  Or the jury could come to its own

83

conclusion the probability.

MR. JORALEMON:  So you'd -- I understand how this would work.  If his damages model is not consistent with the law requiring this aggregation, then you throw out the entire damages model.  That's what the *BP* court did in the summary judgment decision following up on its class decertification.

MR. HALL:  That's a --

MR. JORALEMON:  So --

THE COURT:  All right.  We'll save this for afterwards.

MR. HALL:  That's not true.

MR. JORALEMON:  But there's a second problem, Your Honor, is we haven't gotten to the causation issues with this analysis.  They're relying on him for causation too.

THE COURT:  All right.  You want to ask five minutes of questions here?  You want to clean up --

MR. HALL:  Yes, because I think something crystal --

THE COURT:  Sorry. I'm talking to the lawyer behind you.

MR. HALL:  Oh, okay.

THE COURT:  Mr. Weidner.

MR. HALL:  Oh, I didn't realize he was back there. Okay.  Go ahead.

THE COURT:  Is there anything that I've --

MR. WEIDNER:  I just have one question.

84

THE COURT:  Yes.  Please.

EXAMINATION BY MR. WEIDNER:

Q    Professor Hubbard, you said you'd never seen this model before. Is that right?

A    Yes, that's correct.

Q    And is there anything unique about the facts of this case with respect to this model?

A     No.  None whatsoever.

Q    Is there anything preventing this --

THE COURT:  Sorry.  Which model are we talking about?

THE WITNESS: I assume you're asking about asymmetric information the way you ask that question.

Q    That's correct.  Is there anything preventing this asymmetric information model leading to a hundred percent recovery from applying in any and every case?

A    I suppose if the logic were correct here, it could be correct anywhere. It's just false here.

Q    Thank you.

THE COURT:  Okay.  Do you have any questions?

MR. HALL:  Yes, just a couple.  And I don't have any exhibits so I will sit here.

EXAMINATION BY MR. HALL:

Q    I just want to clarify, Dr. Hubbard, you said there was two parts to the drop after the dam collapse.  One could be fraud and one could be the I think cost of the dam collapse.

85

A    Yes, sir.  Just in the actual world of expense about a dam collapse.

Q    And you're saying that the dam collapse cost should be disaggregated, correct?

A    The estimate that Professor Feinstein has -- is the sum of those two things.  So yes, you would need to --

Q    So you say you have a lot of experience in securities litigation, fraud cases, correct?

A    Yes, sir.

Q    Okay.  Have you ever heard of the zone of risk theory in the Second Circuit?

A    You'd have to explain it to me in economic terms. I'm not a lawyer.

Q    I don't want to get into the law, but if the law were that the cost of a dam collapse were within the foreseeable risk of concealing information related to safety of dams, then there would be no reason to disaggregate, correct, from a legal perspective.

A    Well, I can't answer anything from a legal perspective, but what I can say is the premise of your question I think is the probability sufficiently high that you can count that. That's an empirical question, not a legal one.

Q    No, it's not.  So if one is concealing information related to how safe their dams are, it's foreseeable that a dam could collapse. And when a dam collapses it's also foreseeable that

there are costs associated with that, correct?

A    Well, if you ask me from an economic perspective, that doesn't make sense.

So, for example, if the true probability were five percent and I've been telling you one percent, there's simply no way that something is foreseeable at that point.

Q    I'm not talking about probabilities.  And I understand you want to keep going there.

So if you can -- what is the economic basis to separate those two parts out?

A    Well, it's very simple. It goes back to the theory of event studies and confounding factors.  It goes back to the litigation services handbook.  The reference for scientific analysis, reference manual for scientific analysis. All of those references are in my report.

Q    Okay.  But if it's determined -- if the court determines that you don't have to separate it out, then there would be no reason to disaggregate, correct?

THE COURT:  You're getting into the law here.

A    I would say it would be wrong from an economic perspective, but I can't advise the court on the law.

MR. HALL:  Okay.  That's all.

THE COURT:  All right.  Thank you very much.  You can step down.  Good to have you with us, both experts.

THE COURT:  So explain the zone of risk analysis that

87

you're doing in this case.

MR. HALL:  So the way I understand zone of risk, and it has been -- I cited two cases to Your Honor.  It has been used in a summary judgment context.  But basically --

THE COURT:  In *Vivendi* and in other --

MR. HALL:  In *Castellano*, which is 257 F.3d 171.  Those are the two we could find sitting here, Your Honor.

But the zone of risk is that if I'm concealing a risk, and this comes from *Lintell*, which was a 12(b) motion, if I'm concealing a risk, then when that risk materializes I can be held responsible for all the damages that were within that zone of risk.

And so this is really I think where this disaggregation difference comes.

THE COURT:  Focus on the word concealment for a moment.  You don't dispute that there was some risk factor disclosure in Vale's SEC filings that said there is a risk.

I think what you're saying is that they understated the risk, not that they concealed it outright.

MR. HALL:  Correct.  And actually, just to clarify, there's three times in Dr. Hubbard's Exhibit 4 that he references that language. And it's not about dam safety. It's that they could have accidents on incidents and they list out things.  And one of the things says including dams.  So that's what that disclosure is.

88

I think as Dr. Feinstein spoke earlier, that would have been priced into the stock.

THE COURT:  Point me to the place in *Vivendi* where --

MR. HALL:  *Vivendi* was --

THE COURT:  This is the same *Vivendi* opinion --

MR. HALL:  Yes.

THE COURT:  As we looked at for damages?

MR. HALL:  I had it.  Yeah, I'll let Ms. Campbell find it quickly.  She found it for me earlier.

Okay.  See quick.

This is star 260, lost causation, correct.

THE COURT:  Okay.  But that's not damages.

MR. HALL:  Right, but this is about whether or not you have to disaggregate. That's why it didn't get to damages. If the zone of risk applies the way we think it applies, then the cost associated with a dam collapse or within that zone of risk, and there's not reason to disaggregate and, therefore, you wouldn't have the damages issues that we just spent time talking about.

THE COURT:  I don't understand why you can make such a neat equivalence between how you think about this for loss causation and how you think about it for damages.

For loss causation, as I said I think at the get go to Mr. Joralemon, you say?

MR. HALL:  Yes.

89

THE COURT:  You can establish loss causation without a precise loss figure.

MR. HALL:  Correct.

THE COURT:  But you can't establish damages without a methodology for actually calculating damages.

MR. HALL:  Correct.  But part of the loss causation analysis is to remove confounding information.  And so the question here -- the real question here on this disaggregation is are the financial consequences of a dam collapse confounding information in this case or part of the zone of risk that was misrepresented.

THE COURT:  What's the actual language in this *Vivendi* opinion that you want me to focus on?

MR. HALL:  Well, it's just in the loss causation section, down toward the bottom of the first paragraph, they're talking about *Lintell* and the foreseeable result and the zone of risk.  And then they go on to stay, put more simply, proof of loss causation requires and demonstrates.

So in this case they're accepting the zone of risk by honing in like the second -- the next page, honing in on the phrase materialization of the risk from *Lintell*.

And if you keep reading down, it's a long discussion. You will see that the court agrees with that.

THE COURT:  Do you think this *BP* case that the defendant has cited is wrongly decided?

MR. HALL:  Actually, I don't think it's relevant to this case, because I think they both -- Mr. Joralemon and I believe Your Honor may have misspoken.

My reading of that case is it was kicked on class certification for individual issues of reliance, not because of damages.

The individual issues of reliance came from the pre-explosion class members' theory of damages, but the kick there really was that they weren't using the out-of-pocket measure of damages.  They were using consequential damages and they wanted to take everything that happened after and they said that each class member would adjudge whether to buy the stock or not, which is not what we're talking about here.

We're talking about what the market price would have been if there had been truth on the market.

THE COURT:  The market price would have priced in a hundred percent discount for this risk of dam --

MR. HALL:  That's our theory.

But we're not talking about whether an investor would have bought or not bought. It's what price they would have bought it at because the market would adjust it for the new information.

So I would submit that --

THE COURT:  Okay.

MR. HALL:  -- the *BP* case just isn't even on point.

91

THE COURT:  All right. I'm going to leave this here --

MR. JORALEMON:  Two quick points.

THE COURT:  I'm going to --

MR. JORALEMON:  30 seconds.

THE COURT:  Tell me what they're about.

MR. JORALEMON:  Yeah.

There are two -- I'm sorry.  There are two *BP* decisions.  One was to certify a new class.  The second on applying the same disaggregation principles, knocking out the expert's damages calculation.  Mr. Hall seems to forget that second step.

And in that first decision the court found *Vivendi* uninstructive for purposes of disaggregation.  That's in footnote 9 of the first decision.

MR. HALL:  The Fifth Circuit found that the Second Circuit was uninstructed.

THE COURT:  No, no, no.  Not that it was wrongly decided, but that it was not applicable --

MR. JORALEMON:  And the reason it was uninstructives is because it was a hundred percent risk of a liquidity crisis.

MR. HALL:  Under a different factual pattern.

THE COURT:  They say that explicitly in footnote 9?

MR. JORALEMON:  Yes, Your Honor.

MR. HALL:  Yes.  Based on a different factual

92

pattern.

THE COURT:  The *BP* case doesn't -- it has footnote numbers in the text, but it -- for some reason the footnotes don't actually show up.  It's not there.

All right. Let's talk about what is to come.

I -- we've had a number of moments here where I've sort of called for additional briefing.

The one I want to make clear that I'm not sure that I have already is that I do want to understand what happens.

If I am unpersuaded that the state of the art in financial analysis, economic analysis, securities analysis, whatever we're dealing with here, does not support the assumption as an empirical matter that securities analysts would necessarily discount, would assume the risk of a dam collapse to be a hundred percent, simply because they can't get accurate information, what happens next in this case?

I started to posit a theory which is that we would lose that part of the expert analysis here, but you wouldn't need expert analysis to fill in the gaps.

And by the way, we might lose that part of the expert analysis not as a matter of financial economic or securities assessment or Rule 702, but rather because of a mismatch between the law of damages and the calculation we have.

I think it's going to be a stretch to conclude that the but-for world is one in which the investors know that the

93

company's lying to them about dam safety but they don't know how much the company is lying to them about dam safety.

I think the but-for world as a legal matter is probably a world of truthful disclosure about the accurate risk of a dam collapse and we just won't have testimony about that at trial.

So what happens if we lose that part of the expert analysis?  It seems imminently possible, based even on what Dr. Hubbard just said, that you could fill in that gap without the need for additional experts and indeed that you could fill in that gap with evidence that is already in the record, things like the 50 percent risk report or whatever.

The defense position on this is no, you have to strike the expert report and the expert's testimony in its entirety.

That's one question. I've listed some others. I trust you all to have written those down accurately and in real time and I think we'll leave it at that.

But is there any confusion from the plaintiff's perspective -- let's say we're going to cap this letter at ten pages and let's say it's going to be due two weeks from Friday.

MR. HALL:  So I'd still like to ask one clarifying question because if plaintiff prove -- and this may answer part of Your Honor's question, but we definitely need to get this in writing in a letter, if plaintiff's convinced a jury and the

94

jury finds that investors would have assumed a dam collapse -- and that's our liability finding, and now the question is what are the damages.

THE COURT:  Right.

MR. HALL:  That -- we talk about it in the papers. Defendants can give their position.  My understanding is experts are able to assume that we're successful of that proof. And I'm just positing an example.

THE COURT:  Yes, but there's still law on the method of calculating damages.

MR. HALL:  That's where I'm going now, Your Honor, and this gets to something that Dr. Hubbard was very helpful on, which is we know what a hundred percent is so let's assume that if the jury finds it was a hundred percent, then we should get a hundred percent of what the drop was.

THE COURT:  The jury finds that the risk of the actual dam collapse was a hundred percent?

MR. HALL:  That investors would have assumed it were a hundred percent.

THE COURT:  I don't know that that's the law.  The law calculated damages --

MR. HALL:  No, this is not about a calculation --

THE COURT:  Let me just finish the sentence.

That the law of calculating damages says that we compare the real world of perceived or induced risk to the

actual world of actual risk on that same subject.

MR. HALL: Right.

THE COURT: Again, my thing that investors would have said look, I don't trust the company. I just going to walk away from the investment entirely, I don't think that's the methodology.

MR. HALL: We will address this in the letter, Your Honor, but a jury could find based on the evidence that we think is sufficient enough --

THE COURT: Yeah, but you're going to cite cases that say here is exactly what we mean when we describe a but-for world. And it's going to come down to that.

Is my request clear enough? Do you have any clarifying questions on this?

MR. JORALEMON: It's quite clear, Your Honor. The *Sunday Ticket* decision that just came out I think is directly on point here and that tells you everything you need to know about what happens here.

THE COURT: All right. Thank you, all. This has been illuminating for me.

MR. JORALEMON: So are we going to deal with market efficiency?

THE COURT: I think I have everything I need on market efficiency.

MR. JORALEMON: Okay.

96

THE COURT:  I'm sorry if we had experts come in on that subject, especially from far away.

MR. JORALEMON:  Sure.

So just to remind Your Honor we didn't do any supplemental briefing with respect to the Class D cert. So there's no pending motion.

THE COURT:  Right.

MR. JORALEMON:  So we can renew our motion and --

THE COURT:  Well, let's -- if I need to do something on that basis, I'll do something on that basis. I think I need to sort through what is left of these damages analyses before we go back to the question of class certification.

MR. JORALEMON:  Okay.  Makes sense.  Thank you, Your Honor.

THE COURT:  Thank you, all.  Court is adjourned.

Thank you, all.

(Proceedings concluded at 12:32 p.m.)

97

I, CHRISTINE FIORE, court-approved transcriber and certified electronic reporter and transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.

*Christine Fiore*

_____                    August 6, 2024

Christine Fiore, CERT

    Transcriber

98

INDEX


WITNESSES

FOR THE MOVANT:                                                    PAGE

STEVEN FEINSTEIN

Examination by the Court                                            42

Examination by Mr. Joralemon                                        57


DR. ROBERT HUBBARD

Examination by the Court                                            73

Examination by Mr. Weidner                                          84

Examination by Mr. Hall                                             85