

Frederic S. Fox
Kaplan Fox & Kilsheimer LLP
800 Third Avenue, 38th Floor
New York, NY 10022
Telephone: 212.687.1980
Fax: 212.687.7714
ffox@kaplanfox.com

*Via ECF*                                             August 23, 2024

Hon. Eric R. Komitee
United States District Court
for the New York Eastern District
225 Cadman Plaza East
Brooklyn, NY 11201

 RE:     *In re: Vale S.A. Securities Litigation*, No. 19-cv-526 (EK) (E.D.N.Y.)

Dear Judge Komitee:

On behalf of Lead Plaintiff, I write pursuant to the Court's August 5, 2024 minute entry ordering supplemental letters on loss causation and damages. At the August 5, 2024 hearing, Defendants argued that Dr. Feinstein's entire report should be excluded because he did not disaggregate from his damages calculations what they claim is the non-fraud related portion of the share price drop caused by Dam 1's collapse. According to Defendants, the only fraud-related drop is the product of the price drop and the delta between the perceived and true risk of dam failure.

Their arguments are wrong because: (1) loss causation law defines the scope of recoverable losses and does not require the disaggregation Defendants urge; (2) in a proper but-for world, the specificity of the truthful disclosures must match that of the alleged misstatements, meaning specific probabilities would not be disclosed; and (3) Dr. Feinstein's entire report is reliable and relevant, warranting admission under Fed. R. Evid. 702 and *Daubert*. "[P]roponents 'do not have to demonstrate to the judge by a preponderance of the evidence that the assessments of their experts are correct, they only have to demonstrate by a preponderance of evidence that their opinions are reliable... The evidentiary requirement of reliability is lower than the merits standard of correctness.'" Fed. R. Evid. 702 Advisory Committee's Note to 2023 Amendment, quoting *In re Paoli R.R. Yard PCB Litigation*, 35 F.3d 717, 744 (3d Cir. 1994). But even if the Court were to find against Plaintiff on any of these points, the proper remedy under *Pfizer* would be to strike only the part of Dr. Feinstein's opinion that the Court finds unreliable. Defendants have not challenged the reliability of his event study, and although they dispute his assumption that 100% of the share price inflation was caused by the alleged fraud, a jury could multiply the risk probability differential Defendants advocate, if necessary, to calculate damages using Dr. Feinstein's study.

## 1. *Plaintiff's Losses from the Failure of Dam 1 Satisfy This Circuit's Test For Proving Loss Causation*

In a case claiming losses under a materialization of the risk theory, "plaintiffs can prove loss causation by showing 'that the loss was foreseeable and caused by the materialization of the risk concealed by the fraudulent statement.'" *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 513 (2d Cir. 2010) (citation omitted). "A misrepresentation is 'the 'proximate cause' of an



investment loss if the risk that caused the loss was within the ***zone of risk*** concealed by the misrepresentations.'"[1] *Id*.

Defendants erroneously argued that the "zone of risk" concept is a pleading standard only, but *Omnicom* was an appeal of summary judgment in a materialized risk case, showing that the "zone of risk" is the standard of proof for a plaintiff's legally recoverable losses. *See also*, *Castellano v. Young & Rubicam, Inc.,* 257 F.3d 171 (2d Cir. 2001) (analyzing zone of risk at summary judgment); *In re Vivendi Universal, S.A. Sec. Litig.*, 634 F. Supp. 2d 352, 363 (S.D.N.Y. 2009) (same).

They further argue that any share price drop related to the costs of Dam 1's failure are not fraud-related. They are wrong. Under *Omnicom*, a plaintiff can prove its loss was caused by the fraud by showing the loss was: (1) foreseeable, i.e., that the risk that caused the loss was within the misrepresented zone of risk; and (2) caused by the materialization of that risk. Both are satisfied here.

### a. *Plaintiff's Losses Were Proximately Caused By The Failure of Dam 1*

The failure of Dam 1 and attendant share price drop are clearly within the misrepresented zone of risk. The Second Circuit has explained the zone of risk as follows:

> If the significance of the truth is such as to cause a reasonable investor ***to consider seriously a zone of risk that would be perceived as remote or highly unlikely by one believing the fraud***, and the loss ultimately suffered is within that zone, then a misrepresentation or omission as to that information may be deemed a foreseeable or proximate cause of the loss.

*Castellano,* 257 F.3d at 188 (reversing summary judgment where alleged misrepresentation misled plaintiff "as to the zone of risk that [the company] might soon enter into a major corporate transaction," which was "the very risk to which [the plaintiff] fell victim"); *see also*, *In re Lehman Bros. Sec. & Erisa Litig.*, 131 F. Supp. 3d 241, 265 (S.D.N.Y. 2015) (denying summary judgment where collapse of Lehman was within zone of risk misrepresented by transactions that made balance sheet look healthier than it arguably was). The "zone of risk" test covers the issue of the risk's probability by specifying that the misrepresentations cause investors to perceive the risk as "remote or highly unlikely" when the truth would have made them consider the risk "seriously."

That test is easily met here. Defendants repeatedly assured investors that "[a]ll of Vale's iron ore dams are safe and operating within normal limits," and that "100% of Vale's iron ore dams have their Stability [] Declaration issued by the External Auditors."[2] They claimed that Vale was employing the "strictest international practices, standards of which exceed the legal requirements" for dam safety management.[3] And they said that "since [the Fundão failure], we stood by our commitment to do what is right" and were "driven by our commitment to safety to

---

[1] All emphasis added unless otherwise noted.

[2] Vale's ESG Webinar Dec. 11, 2018 at 28 (both quotes); *see also*, Vale's 2016 Sustainability Report at 112; Vale's 2017 Sustainability Report at 69.

[3] 2017 Sustainability Report at 66.



people and to preserve the environment."[4] Investors believed their statements. As one analyst commented when Dam 1 failed: "Since [the Fundão failure], Vale invested in a series of measures to inspect and ensure that existing operations were safe, so *we were truly caught by surprise with this event*." Feinstein Reply Rep. at ¶130, ECF No. 143-6. In short, the alleged misrepresentations led investors to perceive the risk of another dam break as *remote or highly unlikely*.

But Vale's own Board Report of its internal investigation found that during the period at issue: (1) Vale knew Dam 1 was "fragile," with a safety factor "very close to 1, indicating, therefore, a situation of *imminent failure*"; (2) "regulatory compliance and the attainment of [stability certifications] were prioritized, regardless of the real safety situation at the dam"; (3) "[d]espite Vale's knowledge regarding the fragile situation of [Dam 1], specific measures to reduce the impacts of eventual dam failure were limited"; (4) external auditors were "not able to act in a truly independent manner"; and (5) Vale's "leaders . . . communicate[d] and disseminate[d] the idea that production must come above all other priorities" and there was a "general understanding that 'risk is not our problem'."[5] Further, Vale estimated a failure rate for their 17 upstream dams of one dam failure every five years. If investors had been informed of what Defendants knew, at a minimum, they would have "*consider[ed] seriously*" the risk of another dam failure in the immediate future. *Castellano*, 257 F.3d at 188.

The record has developed substantially in Plaintiff's favor since the motion to dismiss stage, when Judge Dearie found that "Dam's 1 collapse was within the 'zone of risk' concealed by Vale's misrepresentations as to the likelihood of a Vale dam collapsing. And, the resultant loss— a decline in stock price—was foreseeable." *In re Vale S.A. Sec. Litig.*, 2020 WL 2610979, at *18 (E.D.N.Y. May 20, 2020). Defendants have not challenged this conclusion.

### b. *Dr. Feinstein's Study Shows Plaintiff's Losses Were Caused By The Materialized Risk*

The second part of the loss causation test is satisfied because Dr. Feinstein's event study shows Plaintiff's losses were caused by the materialization of the misrepresented risk of dam failure. As Your Honor correctly stated, "[y]ou can establish loss causation without a precise loss figure." Hr'g Tr. at 89:1-2. To prove that the alleged fraud caused plaintiff's losses, a plaintiff need only show that the loss is "attributable in part to the alleged fraud." *Gould v. Winstar Commc'ns, Inc.*, 692 F.3d 148, 161-162 (2d Cir. 2012); *see also*, *AUSA Life Ins.*, 206 F.3d 202, 215 (2d Cir. 2000) (alleged misconduct must be a "substantial factor in the sequence of responsible causation") (quotation omitted); *In re Lehman Bros.*, 131 F. Supp. 3d at 262 (plaintiffs need not show "that their entire loss was caused by the misstatements and omissions" so long as they can show that an "ascertainable portion of that loss was due to the fraud.").

Dr. Feinstein's uncontested event study disaggregates the only agreed upon non-fraud related price impacts—the impacts of market and industry factors—demonstrating the amount of the share price drop due solely to Dam 1's failure (and for the two subsequent corrective events).

---

[4] Vale 2016-Q3 Earnings Call Tr., Oct. 27, 2016, at 4.

[5] Independent Investigation Report for the Board of Directors of Vale S.A. ("Board Report"), Vale_Dam1_00079086 at 22, 24-25, 43; 270; 51, and 410, respectively.



It thus shows "the total amount of actual inflation . . . [which] is the maximum amount of loss potentially caused by [Vale's] alleged misstatements." *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 260 (2d Cir. 2016). This study satisfies the second part of the loss causation test and, because it is reliable and will assist the trier of fact, should be admitted.

Dr. Hubbard opines that the portion of the share price drop attributable to the costs of a dam break are ***not*** caused by the fraud because they would likely occur without any misrepresentations. But the Second Circuit disagrees. In *Waggoner v. Barclays PLC*, 875 F.3d 79, 106 (2d Cir. 2017), it held that such costs are included in fraud-induced losses, explaining that "[i]nvestors were concerned with lack of management honesty and control because, as had happened in the past following the LIBOR scandal, such problems could result in considerable costs related to defending a regulatory action and, ultimately, in the imposition of substantial fines." Therefore, "***the regulatory action and any ensuing fines were a part of the alleged harm the Plaintiffs suffered***, and the failure to disaggregate the action and fines did not preclude class certification." *Id*. Here, investors were likewise concerned with Vale's dam risks and commitment to dam safety following the Fundão failure because of the tremendous costs that dam failures entail. Any share price decline related to those costs is therefore properly part of Plaintiff's losses and does not need to be disaggregated.

Setting aside the legal deficiency of his opinion, Dr. Hubbard's argument makes no economic sense. If investors discovered there was, say, a 45% undisclosed chance of a dam collapse that would cost $1 billion, Dr. Hubbard argues that investors would not reduce Vale's market capitalization by $450 million because "a portion, if not all, of the price declines following the Dam 1 collapse was due to, among other things, reduced cash flow expectations resulting from operations interruptions, output reductions, fines, and lawsuits that are to be expected given the occurrence of a safety incident (in this case, the collapse of Dam 1)." Hubbard Rep. at ¶56, ECF No. 143-3. But, if these effects are to be expected given the occurrence of a safety incident, they are also reduced cash-flow expectations that are to be expected, and accounted for by the market, given a disclosure of a risk of a safety incident. Thus, this portion of Dr. Hubbard's testimony should be excluded on both legal and logical grounds, as requested in Plaintiff's motion to exclude Dr. Hubbard's testimony (ECF No. 142).

### 2. *Defendants' Arguments About Disaggregation and the Proper But-For Price Are Contrary to Second Circuit Law and the Facts of This Case*

#### a. *Disaggregation of the "True" Probability of a Materialized Risk Is Not Required in this Circuit*

Defendants argue that when the materialized risk had less than a 100% probability, a plaintiff must prove the actual probability of the misrepresented risk and limit damages to the probability-adjusted losses. Defendants base their argument on a single out-of-circuit case, *In re BP p.l.c. Sec. Litig.*, 2014 WL 21122823, at *10 (S.D. Tex. May 20, 2014), ***which has not been followed by any court in this circuit*** and should not be followed by this Court.

The only case in this circuit where Defendants' exact disaggregation argument has been addressed is *In re Vivendi*, 634 F. Supp. 2d at 370–71, where Defendants' test was squarely rejected



on several grounds. Defendants attempt to distinguish *Vivendi* on the basis that there was a 100% liquidity risk there, but the probability arguments were the same as here. The plaintiffs' expert opined that the liquidity risk was "essentially" a 100% risk because "all of the pieces were there" to cause the liquidity crisis midway through the class period. *Id*. at 371. The defendants disagreed and argued that the plaintiffs' expert "performed no analysis to arrive at this conclusion." *Id*. But the *Vivendi* Court found that the "[expert's] opinion alone creates a genuine issue of material fact on this point," and the defendants could challenge the expert's credibility at trial. *Id*.

Defendants' attempted distinction also fails because the severity of the risk here is very similar to the *Vivendi* risk. Just as Vivendi had accumulated so much debt that a liquidity crisis was essentially inevitable, here, Vale's dams were in such an unstable condition and not being remediated that another dam failure was inevitable. As Plaintiff's dam expert opines, it was an "accident waiting to happen." *See* Pl.'s Br. at p.10, n.9, ECF No. 143-8. Vale's own internal calculation expected one dam failure every five years for just its 17 upstream dams, and the Board Report found Dam 1 was "fragile" throughout the Class Period and that its safety factor was close to "imminent failure," further supporting this conclusion. And, just like here, in *Vivendi*, the market was generally aware that Vivendi was subject to some liquidity risk. There is no basis to distinguish *Vivendi* on these facts, and Defendants' argument should be rejected here as it was there.

Defendants' argument hinges on the premise that the full price drop caused by a materialized risk cannot be considered fraud-related unless the misstated risk had a 100% probability. But it is doubtful that **all** of the many cases in this circuit claiming damages for a misrepresented risk that materialized involved risks with a 100% probability, including those cited above regarding the risk (1) that a company was misrepresenting the likelihood of entering into a major corporate transaction (*Castellano*, 257 F.3d 171); (2) that GE's undisclosed factoring would lead to a massive gap in cash flow (*Sjunde AP-Fonden,* 2023 WL 6314939, at *12); and (3) that Lehman would declare bankruptcy (*In re Lehman Bros*., 131 F. Supp. 3d at 265). *See also*, *Abramson v. Newlink Genetics Corp.*, 965 F.3d 165, 180 (2d Cir. 2020) (misrepresented risk of allegedly improper drug trial design materialized when the drug trial failed); *Suez Equity Invs., L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 98 (2d Cir. 2001) (misrepresentations concealing CEO's lack of managerial ability materialized when the business failed). If Defendants' argument were correct that only the delta of the true and stated risk probabilities can be considered fraud-related and hence, damages, surely there would be **at least one case** in this circuit saying so.

### b. *Dr. Hubbard's But-For Price Violates Second Circuit Law and Does Not Fit the Facts of this Case*

The parties largely agree on the basics of what the but-for price is, how it is used, and how it is typically calculated.[6] The dispute here arises from the experts' disagreement over what would

---

[6] The but-for price is an economic concept which refers to the price that shares would have traded at in a hypothetical world where there is a truthful disclosure at the start of the period. *See* Feinstein Rep. at ¶189, ECF No. 143-5; Hubbard Rep. at ¶31, ECF No. 143-3. It is used to calculate out-of-pocket damages, which is the difference between the actual purchase price and the but-for price. The but-for price is typically calculated, as it was here, by subtracting the "artificial inflation" from share prices, which is based on the price drop(s) caused by the materialization of the risk or corrective disclosure(s). *See Glickenhaus & Co. v. Household Int'l, Inc.*, 787 F.3d 408, 415 (7th Cir. 2015); Hubbard



be disclosed in the but-for world (i.e., a world with truthful disclosure). That decision informs how much of the back-end price impact of the corrective events equals front-end inflation in share prices due to the alleged fraud.

Dr. Hubbard argues that the proper but-for price should be based on a truthful disclosure by Vale of the real probability of a dam failure. His argument is contrary to the law and the facts of this case.

The law requires a rough match between the genericness of the alleged misstatements and the truthful statement that is substituted when evaluating whether the back-end price impact is equal to front-end inflation. "[T]he district court should [ask] 'what would have happened if [the company] had spoken ***truthfully***' . . . ***at an equally generic level***." *Arkansas Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.*, 77 F.4th 74, 99 (2d Cir. 2023) (citation omitted).[7] As an example, the *Goldman* Court cited favorably the analysis in *Vivendi*, where "as a truthful substitute for the company's 'rosy picture of its liquidity state,' the 'misgivings its executives were sharing behind the scenes,' which included statements—less specific than the corrective disclosure news—that the company was in 'danger' of a downgrade, or that its liquidity situation was 'tense.'" *Id.* at 98 (quoting *Vivendi*, 838 F.3d at 235, 258). By contrast, the *Goldman* Court found the lower court had erred by allowing "[t]he details and severity of the misconduct [to] be substituted in place of the challenged, more generic statements." 77 F.4th at 100.

Here, Defendants never represented—falsely or otherwise—what any of their dam failure probabilities were, or any quantitative measure of the total dam portfolio risk. Rather, they stated that "all the dams are safe and operating within normal limits," and that all the dams had stability certifications. Appropriate truthful substitutes ***at an equally generic level*** would be "***not*** all the dams are safe and operating within normal limits" and "***some*** of the dams have ***false*** stability certifications." *See Sjunde AP-Fonden v. Goldman Sachs Grp., Inc.*, 2024 WL 1497110, at *14-15 (S.D.N.Y. Apr. 5, 2024) (considering the inverse of two alleged misrepresentations as truthful substitutes "with the same level of generality"); *Edwards v. McDermott Int'l, Inc.*, 2024 WL 873054, at *18–19 (S.D. Tex. Feb. 29, 2024) (inserting "not" in alleged misstatements to create "the 'truthful substitute'" statements).

This is precisely how Dr. Feinstein described his hypothetical truthful disclosures in the but-for world, using the ***inverse*** of the alleged misrepresentations. Feinstein Dep. at 151:17-153:14, ECF No. 143-4 ("All I have done there is taken the allegations of what was said and put the word 'not' in there, that would have been a fully corrective disclosure."); Feinstein Reply Rep. at ¶90, ECF No. 143-6. Dr. Feinstein's model thus complies with binding Second Circuit law.

In contrast, Dr. Hubbard argues that an expert must ask, "had you known the full set of information, all those things that were in the file drawers at Vale, had the same analysts seen that, what would they and the technical experts they hire, have estimated the probability have been? So

---

Rep. at ¶31, ECF No. 143-3 (stating "[t]he but-for price is typically determined by estimating the 'inflation per share' and subtracting that 'inflation' from the actual security price.").

[7] Although *Goldman* involved corrective disclosures, the Second Circuit noted that "the 'basic calculus' remains the same whether the truth is revealed in 'a corrective disclosure describing the precise fraud' or through 'events constructively disclosing the fraud.'" *Id.* (quoting *Vivendi*, 838 F.3d at 262).



that's a calculation you're going to have to add." Hr'g Tr. at 77:5-9. Dr. Hubbard's model plainly violates *Goldman* by demanding a truthful disclosure with far greater detail than the alleged misrepresentations.

Dr. Hubbard's model also conflicts with how securities analysts valued Vale. Specifically, Hubbard's opinion that analysts would adjust forecasted cash flows is belied by the opinion of Defendants' expert on mining company investments, Randal Stephenson. Mr. Stephenson opined that pro forma forecasts are only adjusted for "known or reasonably anticipated or confirmed" costs,[8] whereas future risks or costs with an unknown value "will increase the discount rate to be applied to the DCF analysis[.]"[9]

Further to that point, Plaintiff's expert, Dr. Matthew Cain,[10] reviewed ten analysts' adjustments to discount rates and trading multiples after Dam 1's collapse, omitting any reductions to free cash flow projections (i.e., for lower potential revenue, increased capital expenditures, etc.).[11] Thus, after removing the direct effects of Dam 1's collapse on projections of Vale's financial results and focusing on the increase in perceived risk, Dr. Cain found adjustments that decreased valuations by a range of $3.4 to $19.6 billion, with a median of negative $13.6-$14.2 billion, and a mean of negative $11.8 billion.[12] The mean valuation decrease represents an impact of $2.26 per share (based on Vale's 5.2 billion outstanding)—*greater* than the artificial inflation of $1.63 per ADR for the January 25, 2019 collapse, and close to the total artificial inflation of $2.72 per ADR for all three corrective events in Dr. Feinstein's event study. Hence, a discount rate analysis of Vale's significant perceived dam risk supports damages in the range of what Dr. Feinstein demonstrated with the share price declines in his event study.

### 3. Dr. Feinstein's Damages Opinion Is Admissible Under Rule 702

Dr. Feinstein's damages opinion, which assumes that in the but-for world, investors would have priced Vale's stock anticipating another dam break, fits the facts of the case and is based on reliable economic principles that were reliably applied. Dr. Feinstein's study satisfies Fed. R. Evid. 702 and should be admitted.

First, as described above, Dr. Feinstein's but-for price is based on truthful disclosures that match the alleged misrepresentations, such as "*not* all of Vale's iron ore dams are safe and operating within normal limits," and "*some* of Vale's iron ore dams have *false* Stability [] Declarations," Vale "is *not* following the strictest international practices" for dam safety management, "since [the Fundão failure], we *have not* stood by our commitment to do what is right" and "we are *not* committed to safety." Investors would know from Vale's Sustainability Reports that the Company had over 150 dams in its Ferrous division, and that 17 of them were constructed by the riskier upstream method, like the failed Fundão Dam. In this but-for world,

---

[8] Again, Dr. Hubbard seeks to testify to exclude reasonably anticipated costs (had a full disclosure been made) from inflation, testimony that has no basis on the record and that is contradicted by Mr. Stephenson and common sense.

[9] Stephenson Rep. at ¶45, ¶42 (ECF No. 142-18).

[10] Dr. Cain holds a Ph.D. in Finance and is a Senior Fellow at the Berkeley Center for Law and Business. He previously worked as a Financial Economist for the U.S. Securities and Exchange Commission. Cain Rep. 20, ECF No. 142-19.

[11] *Id.* at ¶25.

[12] *Id.* at ¶¶25-27 and Ex. 1.



investors would have known there was an extremely significant risk but would not have had perfect information for valuing that risk. And, importantly, investors would know that Vale's management was not truly committed to safety and had not taken the necessary measures since the failure of the Fundão Dam to ensure the safety of Vale's other dams.

In these circumstances, it is well within the range of rational investor responses to price Vale's shares with the expectation of another dam break due not only to the true dam (in)stability, but ***doubts about the quality of management's commitment and ability to safely manage dams***.[13] Analyst commentary after Dam 1's collapse confirms that the changed perception about management's commitment to safety was significant to investors. *See* Feinstein Reply Rep. at ¶145, ECF No. 143-6 (quoting Morgan Stanley 2/7/2019 report that "[t]he long-term multiple implications are unclear, with much hinging on the company's efforts to regain the trust of key stakeholders and evidence that there wasn't any wrongdoing or negligence on its part."); *id*. at ¶130 (quoting HSBC report 1/27/2019 that implications were "significantly worst [sic] in terms of . . . credibility and reputation" than for the Fundão failure).

Considering that Defendants' commitment to dam safety is one of the categories of allegedly material misrepresentations upheld on Defendants' motion to dismiss, *In re Vale S.A. Sec. Litig.*, 2020 WL 2610979, at *12, it is not only appropriate, but necessary, that any damages assessment consider the impact of truthful substitutes for these alleged misrepresentations. Dr. Feinstein's damages study does this. Dr. Hubbard's model does not.

Further, Dr. Feinstein's analysis is supported by economics literature indicating that investors generally do not make systematic errors in forecasting when they are equipped with full truthful information.[14] Therefore, when estimating how investors would have *ex ante* valued the full truthful information, an economist should assume that investors would have forecasted correctly. Additionally, a seminal study related to information asymmetry found that investors steeply discounted stocks—by almost 66% of the share price drop—based on their reassessment of the quality and reliability of management.[15] This supports the notion that this aspect of the alleged fraud, which would have been revealed through a disclosure that Defendants were not committed to dam safety, played a significant role in the share price drop when Dam 1 failed. Dr. Hubbard does not dispute that information asymmetry is a valid economic theory with a long pedigree in academia, or that information asymmetries impact stock valuations. Indeed, Dr. Hubbard has acknowledged that "asymmetries of information should figure prominently in the decisions of buyers of common stock issues."[16]

---

[13] The failure of one dam was not the "worst-case scenario" considering Vale had 17 dams constructed by the riskier upstream method, **ten** of which had unacceptably high failure risks.

[14] Feinstein Rep. at ¶223, ECF No. 143-5 (citing "Rational Expectations and the Theory of Price Movements," by John Muth, *Econometrica*, vol. 29, no. 3, 1961; and "Asset Prices in an Exchange Economy," by Robert Lucas, Jr., *Econometrica*, vol. 46, no. 6, 1978.).

[15] *See* Attachment 1, Jonathan M. Karpoff, D. Scott Lee & Gerald S. Martin, *The Cost to Firms of Cooking the Books*, 43 J. Fin. & Quantitative Analysis 581, 581 (2008); *see also*, Feinstein Rep. at ¶118, ECF No. 143-5 (discussing Karpoff, et. al, (2008)).

[16] *Asymmetric Information, Corporate Finance, and Investment*, The University of Chicago Press, edited by R. Glenn Hubbard, National Bureau of Economic Research, 1990, p. 9.



Defendants' argument that the full share price drop from Dam 1's failure is not fraud-related presents a factual question that is not a proper basis for excluding Dr. Feinstein. For the purposes of Fed. R. Evid. 702, the Court's focus "must be solely on principles and methodology, not on the conclusions that they generate." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 595 (1993). Accordingly, in *Pfizer*, the Second Circuit found it was "an abuse of discretion to prevent [the expert] from testifying on the grounds that he did not disaggregate the stock price inflation caused or maintained by Pfizer's own statements from that caused or maintained by [third parties'] statements" because the plaintiffs intended to prove they were entitled to take the full inflation as damages. 819 F.3d at 660-661. The Second Circuit did not decide whether plaintiffs' theory was "either legally or factually sustainable," instructing that those were "not justifications for concluding that, in the context of Plaintiffs' theory, [the expert's] testimony is unreliable or unhelpful to the jury." *Id*. at 661.

Just like in *Pfizer*, Plaintiff here intends to prove that the full amount of inflation was caused by the alleged fraud, and Plaintiff's expert modeled damages accordingly. Under *Pfizer*, Plaintiff is entitled to make its case to the jury. *See also, In re Vivendi*, 838 F.3d at 256 (holding it is "up to the ***jury*** to determine how much, if any, of the artificial inflation identified by [plaintiffs' expert] was caused by [the company's] alleged fraud") (emphasis in original); *Sjunde AP-Fonden*, 2023 WL 6314939, at *16 (admitting expert's testimony about magnitude of inflation caused by fraud because "[t]o the extent that Defendants contend that there is evidence in the record to the contrary . . . the remedy is not exclusion, but '[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof.'"); *In re Under Armour Sec. Litig.*, 2024 WL 1635680, at *7 (D. Md. Apr. 16, 2024) ("Plaintiffs claim they can prove their case and support [the expert's] opinion that the full amount of the fraud-related inflation was in the stock from the start of the Class Period. As such, the jury must assess the validity of [the expert's] conclusions."); *Smilovits v. First Solar, Inc.*, 2019 WL 7282026, at *7–8 (D. Ariz. Dec. 27, 2019) (admitting Feinstein's opinions about magnitude of inflation because his methodology was reliable and "the jury must assess the validity of Feinstein's conclusions").

### 4.   *What Happens If The Court Finds A Portion Of Dr. Feinstein's Report Inadmissible*

If the Court finds a portion of Dr. Feinstein's report is inadmissible, it should strike only that portion and admit the remainder. As this Court recently recognized, "[w]here only part of an expert's testimony meets the Rule 702 standard of admissibility, the court should limit the expert's testimony, rather than 'throw the good out with the bad.'" *Hasemann v. Gerber Prod. Co*., 2024 WL 1282368, at *10 (E.D.N.Y. Mar. 25, 2024) (Komitee, J.) (citing *In re Pfizer*, 819 F.3d at 662, 665, 667).

If the Court were to exclude Dr. Feinstein's opinion that, with full disclosure, investors would have anticipated another dam break and priced the stock accordingly, the remainder of his report would still provide an ample basis for the jury to determine damages. Specifically, the jury could use Dr. Feinstein's event study, which demonstrates the full amount of inflation potentially attributable to the alleged fraud (i.e., 100%), plus the parties' dam expert reports concerning the "true" riskiness of Dam 1 and Vale's portfolio of dams to calculate the fraud-induced inflation. Once the jury found the amount of "true" undisclosed risk, it would simply divide that number by



the disclosed risk at the time of the corrective events and multiply the result by the total inflation.[17] Dr. Feinstein's damages model thus "provides a means for calculating each Plaintiff's damages", *Vivendi*, 838 F.3d at 260, and is admissible for that purpose.

Defendants incorrectly argue that the failure to disaggregate purportedly non-fraud related losses from recoverable damages requires exclusion of Dr. Feinstein's entire report. Not so. As the Second Circuit explained in *Vivendi*, determining the amount of a plaintiff's damages is the province of the jury:

> [A]lthough [plaintiffs' expert] calculated the artificial inflation in Vivendi's stock that was due to the market's misapprehension about Vivendi's true liquidity risk . . . [i]t was up to the ***jury*** to determine how much, if any, of the artificial inflation identified by [plaintiffs' expert] was caused by Vivendi's alleged fraud . . . by assessing the alleged misstatements and their connection to the misconception in question. [The expert]'s analysis merely operated on the assumption that Plaintiffs would be able to prove at trial all the necessary elements to succeed on their private 10b–5 action.

*In re Vivendi*, 838 F.3d at 256 (emphasis in original). The plaintiffs' expert in *Vivendi* calculated the maximum inflation using the full price drops on the corrective event dates, like Dr. Feinstein did here. But the *Vivendi* jury ultimately found the fraud-induced inflation was approximately ***half*** of what plaintiffs' expert had opined, and also zeroed out the inflation on a few days. *In re Vivendi Universal, S.A. Sec. Litig.*, 765 F. Supp. 2d 512, 564-565 (S.D.N.Y. 2011). With the same evidence of share price inflation that the *Vivendi* jury had, here a jury will be able to determine the amount of fraud-induced inflation in connection with its liability determinations.

And juries have great latitude to determine damages in accordance with their view of the evidence, irrespective of what the parties argue. *See Gruber v. Gilbertson*, 628 F. Supp. 3d 472, 489 (S.D.N.Y. 2022) (upholding jury finding of 57% inflation where "the jury accepted some but not all" of expert's "testimony regarding disaggregation"); *Williams v. Gaye*, 895 F.3d 1106, 1129 (9th Cir. 2018) (upholding jury damages award based on range of potential recoveries and "jury's choice" to apportion profits of approximately 40% though no party argued for that percentage).

In summary, we respectfully submit that Dr. Feinstein's testimony should be admitted in full because it was arrived at by reliable methods that were reliably applied to the facts Plaintiff intends to prove. In the event the Court excludes Dr. Feinstein's testimony about the amount of inflation attributable to the alleged fraud, it should follow the *Pfizer* Court's instruction to only strike that portion and allow the case to proceed.

Respectfully,

/s/ *Frederic S. Fox*
Frederic S. Fox

---

[17] David Tabak, *Risk Disclosures and Damages Measurement in Securities Fraud Cases*, Sec. Reform Act Litig. Rep., Vol. 21, No. 1 (April 2006) at p.8 (explaining calculation multiplying the effect of the updated probability by the cost).