# GIBSON DUNN

Gibson, Dunn & Crutcher LLP

200 Park Avenue
New York, NY 10166-0193
Tel 212.351.4000
www.gibsondunn.com

Christopher M. Joralemon
Direct: +1 212.351.2668
Fax: +1 212.351.5268
CJoralemon@gibsondunn.com

August 23, 2024

The Honorable Eric Komitee
United States District Court for the Eastern District of New York
225 Cadman Plaza East, Courtroom 6G North
Brooklyn, New York 11201

Re:     *In re: Vale S.A. Securities Litigation*, No. 19 Civ. 526 (EK) (SJB)

Dear Judge Komitee:

Defendants respectfully submit this supplemental letter brief:  (1) in further support of their motion to exclude the testimony of Plaintiff's expert Steven Feinstein pursuant to Rule 702 of the Federal Rules of Evidence; and (2) in response to the issues raised by the Court at the conclusion of the August 5, 2024 hearing (the "Hearing"), including, in particular, the consequences of the Court's anticipated rejection of Feinstein's unprecedented "but-for" world that rests on a theory of "information asymmetry."  *See* Dkt. No. 144 (Hr'g Tr.) 82:22-24; 92:5-93:18.

In short, the Court should exclude Feinstein's testimony in its entirety.  His fatally flawed but-for construct infects every aspect of his analysis and cannot be cured simply by excising a few lines from his opinions (which could not be located in any event).  The momentous consequence of this exclusion—summary judgment in favor of Defendants— should not influence the Court's decision.  *See City of Providence v. Bats Glob. Mkts., Inc.*, 2022 WL 902402, at *14 (S.D.N.Y. Mar. 28, 2022) (recognizing that the "Court's role in applying *Daubert*'s gatekeeping requirement is an important one," and an expert opinion that does not pass muster "*must be* . . . excluded" even if that "conclusion[] will have a significant impact" on the disposition of a long-running securities fraud case; namely, summary judgment in favor of defendant (emphasis added) (internal quotations omitted)).  Indeed, Plaintiff here has no one to blame but itself.  In a clear bid to "supersize" its recovery, Plaintiff enlisted Feinstein to invent an unprecedented approach based on an incongruous but-for world with ongoing fraud and information asymmetry to pin "artificial inflation" at its maximum level from Day One of the class period and then declare as damages every penny of market losses on the alleged "corrective event" dates.  In other words, with Feinstein, Plaintiff gets everything.  Without him, Plaintiff gets nothing.  That is the gamble it took.

Beijing • Brussels • Century City • Dallas • Denver • Dubai • Frankfurt • Hong Kong • Houston • London • Los Angeles • Munich
New York • Orange County • Palo Alto • Paris • San Francisco • São Paulo • Singapore • Washington, D.C.

**GIBSON DUNN**

August 23, 2024
Page 2

## Calculating Damages in a Securities Class Action

### *Basic Principles*

The United States Supreme Court has stated—in no uncertain terms—that the federal securities laws do not "provide investors with broad insurance against market losses," but instead only provide a means of redress for declines actually caused by an issuer's alleged misrepresentations. *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 345 (2005). To that end, "[e]conomic loss in Section 10(b) cases is traditionally determined by the use of the 'out-of-pocket' measure for damages," *In re Longfin Corp. Sec. Class Action Litig.*, 2020 WL 4345731, at *3 (S.D.N.Y. July 29, 2020), which measures "the difference between the fair value of all that the" plaintiff "received and the fair value of what [it] would have received had there been no fraudulent conduct," *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 155 (1972). An economist hired to calculate economic loss therefore must determine what the market price of the security would have been "but for" the fraud—with the difference between the actual price and the but-for price equaling artificial inflation. *See In re Pfizer Inc. Sec. Litig.*, 819 F.3d 642, 649 (2d Cir. 2016). The retained expert also must "disaggregate those losses caused by changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events, from disclosures of the truth behind the alleged misstatements." *Menorah Mivtachim Ins. Ltd. v. Sheehan*, 2024 WL 1613907, at *2 (2d Cir. Apr. 15, 2024) (quotations and citation omitted).

### *Event-Driven Cases Based on Realization of an Understated Risk*

"Event-driven securities suits—ones that arise after an issuer has experienced some kind of disaster—have become increasingly prevalent in recent years." Merritt B. Fox & Joshua Mitts, *Event-Driven Suits and the Rethinking of Securities Litigation*, 78 BUS. LAW. 1, 1 (2023). In the wake of this rising trend, courts only recently have been called upon to confirm the proper damages methodology a plaintiff relying on the fraud-on-the-market doctrine must employ in these understated risk cases. *See In re: BP p.l.c. Sec. Litig.*, 2016 WL 3090779, at *33 (S.D. Tex. May 31, 2016) (rejecting plaintiffs' damages model and granting summary judgment for defendant in securities class action filed in wake of Deepwater Horizon oil spill). The key point—which both Plaintiff and Feinstein deny—is that a viable damages model must disaggregate the portion of loss attributable to the risk that plaintiff admittedly assumed when making the investment. *Id.* ("[W]hen the corrective event is the materialization of an understated risk, the stock price movement on the date of correction (*i.e.*, on the date that the risk materialized) will not equate to inflation on the date of purchase unless the probability

**GIBSON DUNN**

August 23, 2024
Page 3

of the risk materializing was 100 percent." (quoting *In re BP p.l.c. Sec. Litig.*, 2014 WL 2112823, at *10 (S.D. Tex. May 20, 2014))).[1]

Economists long have recognized this disaggregation principle in understated risk scenarios. Dkt. No. 143-3 (Hubbard Report) ¶ 57. As explained by Defendants' rebuttal expert Professor Glenn Hubbard, an appropriate damages analysis must isolate the artificial inflation, if any, resulting from the incremental difference between (1) investors' assessment of the probability of a safety incident occurring given the alleged misrepresentations and (2) the "true probability" of such an incident. Hubbard Report ¶ 24. Indeed, *Plaintiff's own expert* on market efficiency, David Tabak, agrees with the approach outlined by Professor Hubbard. *See* David Tabak, Risk Disclosures and Damages Measurement in Securities Fraud Cases, 21 SEC. REFORM ACT LITIG. REP. 6, 9 (2006) (noting that, in an understated risk case, realization of the risk "will cause a price decline in excess of what would have occurred had the risk alone been disclosed," and thus "[t]o properly calculate the level of artificial inflation in a security's price at earlier points in time, it is necessary to adjust that price decline to reflect only the information that could have been revealed earlier").

In any event, the Court made clear during the Hearing that the *BP* decision and Professor Hubbard's opinions are aligned with federal securities law. *See, e.g.*, Hr'g Tr 31:16-20 ("I do believe that what the law here calls for is a calculation of the difference to which this stock price was discounted by the perceived risk, on the one hand, and the amount by which the stock price would have been discounted had the real risk been disclosed."); 94:24-95:1 ("[T]he law of calculating damages says that we compare the real world of perceived or induced risk to the actual world of actual risk on that same subject.").

---

[1] Plaintiff finds no relief from its disaggregation obligation by citing *In re Vivendi Universal, S.A. Sec. Litig.*, 634 F. Supp. 2d 352 (S.D.N.Y. 2009). As noted by the *BP* court, *Vivendi* is "uninstructive" on the topic of proper damages methodology in understated risk cases. *BP*, 2014 WL 2112823, at *10 n.9. Indeed, *Vivendi* stands for the unremarkable proposition that a plaintiff is entitled to recover the full price drop resulting from the materialization of a risk where (a) the risk was not disclosed to investors (*i.e.*, the market priced in a zero percent chance of it happening), and (b) the true likelihood of the risk being realized during the class period was 100%. *See Vivendi*, 634 F. Supp. 2d at 370–71.

And Plaintiff's other favorite case—*Lentell v. Merrill Lynch & Co.*, 396 F.3d 161 (2d Cir. 2005)—is entirely inapposite with respect to the issue of an expert's proper damages calculation. *Id.* at 173 (addressing Rule 12 pleading standard for alleging loss causation); *accord Miller v. Asensio & Co.*, 364 F.3d 223, 230, 232 (4th Cir. 2004) (noting that *fact* of proximately caused damage is "separate . . . inquir[y]" from the "amount" of proximately caused damage; in latter, plaintiff must prove that defendant's conduct was "sole cause" of amount claimed).

Finally, at the Hearing, Plaintiff also mentioned in passing *Castellano v. Young & Rubicam, Inc.*, 257 F.3d 171 (2001). H'rg Tr. 65:20, 87:6. Like *Lentell*, *Castellano* does not address the proper method of calculating damages. Perhaps that is why Plaintiff failed even to cite it in its opposition brief.

GIBSON DUNN

August 23, 2024
Page 4

**<u>Feinstein's Fatally Flawed Approach</u>**

Feinstein flat out rejects any suggestion that he should have disaggregated losses attributable to the realization of dam-collapse risks previously and repeatedly disclosed to investors by Vale throughout the class period.  *See, e.g.*, Dkt. No. 143-4 (Feinstein Dep.) 271:15-23 ("[T]he economic model doesn't call for that disaggregation.  The economic model uses that [full] drop [on the three corrective event dates] as a gauge of a floor, minimum amount, that the stock price would have fallen if investors had learned earlier that they were being deprived of the information to anticipate that event."); Dkt. No. 143-6 (Feinstein Reply) ¶ 80 (arguing that "Professor Hubbard is wrong" in observing that any artificial inflation in Vale securities is the "difference in price attributable to the incremental difference between these two probabilities [of perceived risk and actual risk]," and instead contending that "[a]rtificial inflation must also include the inflation caused by the Company's deception, misconduct, and its efforts to conceal important information").

Feinstein justifies his refusal to adhere to governing law and sound economic principles by creating a novel and indefensible but-for world.  A proper but-for world in a securities fraud case, as Feinstein himself has conceded, must envision a scenario in which "there [had] been no alleged fraud."  Dkt. No. 143-5 (Feinstein Report) ¶ 189.  Here, however, Feinstein's but-for world is *not* one without fraud—*i.e.*, it is not a world in which Vale discloses all material information allegedly misrepresented or concealed by the challenged statements.  Instead, according to *Feinstein's own description*, he has constructed a scenario in which the market "received information that the company was engaged in a campaign to mislead the public and investors about dam safety and the other items."  Feinstein Dep. 138:20-25.  This "ongoing campaign of deception" then allows Feinstein to invoke the information asymmetry theory and conclude that investors would have assumed some undefined "worst-case scenario."  *Id.* at 104:21-25; 272:2-18; Feinstein Report ¶¶ 219–20; *see also* Feinstein Report ¶ 24 ("Had the Company instead disclosed that it was determined to withhold from the public accurate information about dam conditions and the Company's conduct, the impact on the prices of Vale Securities would have been even worse.").

As the Court itself observed during the Hearing, Feinstein's but-for construct does not pass muster.  *See* Hr'g Tr. 33:11-14 ("The but-for world is where the truth is disclosed, not some strange half-truth about we're concealing accurate information from you, but we're not going to tell you what we're concealing.").  Indeed, the Court implored Plaintiff's counsel— no less than three times during the Hearing—to cite to "legal authority that would support this information asymmetry but-for world where the . . . corrective disclosure is, we are not giving you accurate information."  Hr'g Tr. 34:7-12; *see also id.* 34:20-21 ("Where does the legal authority for that but-for [world] come from?"); *id.* 35:6-9 ("What is the legal – I'm asking for a case that would support this information asymmetry theory that he's come up with.").  And all three times Plaintiff's counsel failed to provide any response.  Nor does Plaintiff's brief in opposition to Defendants' motion to exclude Feinstein's testimony provide a single legal

**GIBSON DUNN**

August 23, 2024
Page 5

citation to support Feinstein's bizarre but-for world.  Dkt. No. 143-8 (Pl.'s Br.) at 12.  ***Because no such authority exists.***

### Consequences of Feinstein's Failures

At the conclusion of the Hearing, the Court invited the parties to explain the consequences of the Court's anticipated rejection of Feinstein's "vision of the but-for world." Hr'g Tr. 82:9-18; 92:24-93:8 ("I think it's going to be a stretch to conclude that the but-for world is one in which the investors know that the company [is] lying to them about dam safety but they don't know how much the company is lying to them about dam safety.  I think the but-for world as a legal matter is probably a world of truthful disclosure about the accurate risk of a dam collapse and we just won't have testimony about that at trial.  So what happens if we lose that part of the expert analysis?").  In that vein, the Court pondered whether it could just "strike the one line where [Feinstein] says it's a hundred percent risk [of collapse]," Hr'g Tr. 82:22-23, and then leave it to a jury to perform the work required of Plaintiff's expert in calculating "the real probability" of a dam risk collapse during the class period.  *Id.* 82:13-14. For a cavalcade of reasons (as explained below), there is no such half-measure option available here.  In short, the Court should exclude all of Feinstein's testimony.

*First*, as a threshold matter, an expert's failure either to (1) construct a reliable but-for world or (2) disaggregate non-fraud losses disqualifies that expert's testimony *in its entirety*. *See, e.g.*, *In re: NFL "Sunday Ticket" Antitrust Litig.*, 2024 WL 3628118, at *3–8 (C.D. Cal. Aug. 1, 2024) (excluding two damages reports due to speculative assumptions within but-for world and overturning $4.7 billion jury verdict); *In re Elysium Health-ChromaDex Litig.*, 2022 WL 421135, at *20 (S.D.N.Y. Feb. 11, 2022) (excluding damages report based on unfounded assumptions within but-for world); *Compania Embotelladora Del Pacifico, S.A. v. Pepsi Cola Co.*, 650 F. Supp. 2d 314, 321 (S.D.N.Y. 2009) (excluding expert testimony based on "one baseless assumption after another" in but-for scenario); *Bricklayers & Trowel Trades Int'l Pension Fund v. Credit Suisse First Bos.*, 853 F. Supp. 2d 181, 190 (D. Mass. 2012) (ruling that "[a]n event study that fails to disaggregate the effects of confounding factors *must* be excluded" (emphasis added)), *aff'd sub nom. Bricklayers & Trowel Trades Int'l Pension Fund v. Credit Suisse Sec. (USA) LLC*, 752 F.3d 82 (1st Cir. 2014); *Bats*, 2022 WL 902402, at *12 (excluding analyses that "do not attempt to control for, or disentangle the effects of, other factors that contribute to" loss expert purported to measure).

*Second*, as a practical matter, *nowhere* in any of Feinstein's three reports does he engage with any probabilities concerning the perceived or real risk of a dam collapse, and thus there simply are no lines to "strike."  Indeed, Feinstein explicitly—and repeatedly—rejected the notion that such probabilities should play any role in his damages analysis.  *See, e.g.*, Feinstein Reply ¶ 105 (labeling as "false" Professor Hubbard's criticism that Feinstein's opinions rest on the conclusion that, "but for the alleged misrepresentations and omissions, investors would have assessed the true risk of Dam 1 collapsing to be 100%"); *id.* at Section V.E.2 ("The Inflation Ribbon Presented in the Feinstein LCD Report Does Not Assume a

**GIBSON DUNN**

August 23, 2024
Page 6

100% Probability of Dam 1 Failure"); *id.* ¶ 59 (stating that spread between probabilities of failure "is not what this case is about"); *id.* ¶ 106 ("I do not assume that the probability of Dam 1 collapsing was 100%, nor that a but-for disclosure would have informed investors that there was a 100% probability of Dam 1 collapsing."); *id.* ¶ 119 ("[W]ith the proper but-for disclosure, rational investors would have priced into the Vale Securities a discount to account for anticipation of a worst-case scenario. That is, they might not have known with 100% certainty that Dam 1 would collapse, or that any dam would necessarily collapse, but given the information asymmetry that they would have been aware of, the proper valuation would have called for a significant discount to reflect a bad outcome.").

*Third*, the consequences of rejecting Feinstein's flawed but-for construct and misplaced reliance on information asymmetry theory cannot be confined to his disaggregation failures, as those unreliable principles and methods he employs infect *every aspect* of his causation and damages analysis. Indeed, relying on his but-for world/information asymmetry methodology, Feinstein opines that the alleged "artificial inflation" in the price of all eight Vale securities at issue here peaked on Day One of the class period, and remained constant over two-and-a-half years until the collapse of Dam 1. He offers that incredible view of maximum constant artificial inflation even though:

- *None* of the alleged 26 misstatements issued over the class period had any detectable positive price impact on the Vale ADRs (Feinstein Reply ¶ 96; Feinstein Dep. 46:21-50:14);[2] and

- The risks of a dam collapse were evolving throughout the class period given significant developments, including, for example, Vale's efforts to decommission all upstream tailings dams. *See, e.g.*, Compl. ¶¶ 64, 129, 135, 150, 151, 157, 188, 189, 191, 193, 195, 199.

That is, Feinstein simply ignores all evidence relevant to two critical factors in a proper analysis—the contemporaneous perceived and actual risks of a collapse—and instead just invokes information asymmetry over and over again to justify his conclusion of peak, never-changing artificial inflation. *See, e.g.*, Feinstein Dep. 109:13-23 ("A. . . . So my understanding is that Plaintiffs seek to prove that what the market understood the condition of the dams to be was very different from what the company understood the condition of the dams to be. There was asymmetric understanding and information about that. Q. On day one of the class period? A. On day one."); 124:20-125:12 ("Inflation is going to remain at the level that I calculate . . . as long as there is a gap between what the company could have told people about this effort and this campaign to deceive and the market's ignorance that there was such a campaign."); 66:13-23 ("Q. Okay. And what economic principle are you relying on in holding artificial inflation constant throughout the class period? A. It's the . . . generally accepted financial

---

[2]  Two obvious explanations for this lack of price reaction are (1) the challenged statements were immaterial to investors, or (2) the markets for the Vale securities were inefficient.

**GIBSON DUNN**

August 23, 2024
Page 7

principles of how investors in the market react to asymmetric information, rational expectations, and game theory.").

*Fourth*, the Court should not countenance any attempt by Feinstein and Plaintiff to recast Feinstein's heretofore undefined "worst-case scenario" as really just meaning that on Day One of the class period investors would have concluded—albeit incorrectly[3]—that a dam would collapse. Any such eleventh-hour pivot would amount to nothing more than unvarnished *ipse dixit* from Feinstein. Indeed, upon taking the stand at the Hearing, Feinstein—raising a proverbial "finger to the wind"—*for the first time ever* floated the 100% figure. *See* Hr'g Tr. 64:1-24. This testimony came as a shock even to Plaintiff's counsel, who immediately rejected the notion that "Plaintiffs intend to prove 100 percent chance of a dam collapse," Hr'g Tr. 64:15-17, even while Feinstein dissembled through an answer that veered back and forth between yes and no, *id.* at 64:18-24. Obviously, Feinstein—as previously recognized by the Court—was once again employing a "moving target" strategy, offering a "series of amorphous, vague, flexible, and ever-changing standards to justify [his] conclusion and fend off any rebuttal." *See In re Vale S.A. Sec. Litig.*, 2022 WL 122593, at *13 (E.D.N.Y. Jan. 11, 2022) (criticizing Feinstein's market efficiency event study analysis previously submitted in this case in connection with Plaintiff's class certification motion), *R. & R. adopted*, 2022 WL 969724 (E.D.N.Y. Mar. 31, 2022). In sum, Feinstein's riffing on the stand, devoid of any reliable principles and methods, only further serves to confirm that all his testimony is inadmissible. *See, e.g.*, *TNS Media Rsch., LLC v. TRA Glob., Inc.*, 977 F. Supp. 2d 281, 316 (S.D.N.Y. 2013) (excluding expert opinion where it "rest[ed] on speculation," and was "unmoored from the scientific method").

*Finally*, the law simply does not permit Plaintiff to abdicate its responsibility to adduce admissible expert testimony establishing critical elements of its claim and instead just ask a jury to cure the expert's failures with respect to complex issues of causation and loss. *See In re Omnicom Grp., Inc. Sec. Litig.*, 541 F. Supp. 2d 546, 554 (S.D.N.Y. 2008) (granting summary judgment in favor of defendant after finding that without an expert to "disaggregat[e] . . . confounding factors, . . . there is simply no way for a juror to determine whether the alleged fraud caused any portion of Plaintiffs' loss"), *aff'd*, 597 F.3d 501 (2d Cir. 2010); *Gordon Partners v. Blumenthal*, 2007 WL 1438753, at *2 (S.D.N.Y. May 16, 2007) (holding that when plaintiff has "not provided this Court with any evidence as to what [its] true damages are . . . , [Defendants] are entitled to summary judgment"); *In re N. Telecom Ltd. Sec. Litig.*, 116 F. Supp. 2d 446, 460 (S.D.N.Y. 2000) (granting summary judgment to defendants after finding

---

[3]  Plaintiff knows full well that the actual contemporaneous risk of Dam 1 collapsing during the class period was quite low, as *its own geotechnical expert* has opined that the correct probability of failure was $5 \times 10^{-4}$ or *0.05%*. *See* Reply Expert Report of Dr. Franco Oboni, Ph.D ¶¶ 44–45. And Plaintiff also knows that the "50%" figure it has bandied about is grossly misleading, as that inflated figure rests on the hypothetical assumption of a catastrophic triggering incident such as an earthquake. *See* Deposition Transcript of Dr. Franco Oboni, Ph.D at 181:7-182:11; *see also* Expert Report of Dr. Timothy D. Stark, P.E., D.GE, F.ASCE ¶¶ 164–166.

GIBSON DUNN

August 23, 2024
Page 8

that testimony from Plaintiff's expert was "fatally deficient" in part because he did not remove effects of confounding factors from analysis); *In re Warner Commcn's Sec. Litig.*, 618 F. Supp. 735, 744 (S.D.N.Y. 1985) ("[E]xpert testimony would be needed to fix not only the amount, but the existence, of actual damages."), *aff'd*, 798 F.2d 35 (2d Cir. 1986); *Cape v. Aquila, Inc.*, 2005 WL 1138833, at *8 (W.D. Mo. 2005) ("In a Section 10(b) and Rule 10b-5 case, expert testimony is required in order for Plaintiff to meet its burden of proof in establishing the fact of damages and the means of calculation of same."); *cf. Bats Glob. Mkts.*, 2022 WL 902402, at *19 ("[The expert reports] are necessary to demonstrate an injury in fact and they are inadmissible.").

* * * *

The Court's gatekeeping role under Rule 702 is paramount here. *See* Fed. R. Evid. 702 advisory committee's note to 2023 amendments (cautioning that sufficiency of basis of an expert's opinions and application of an expert's methodology are *critical questions of admissibility and not weight*). Feinstein's fatally flawed "but for" world and his misplaced reliance on information asymmetry theory do not reflect the reliable principles and methods a causation and damages expert must employ in a federal securities class action. This unreliable approach adopted by Feinstein corrupts every aspect of his proffered testimony, from his failure to disaggregate non-fraud factors at the root of price declines on the alleged corrective event dates, to his bald proclamation that all the alleged artificial inflation in all eight Vale securities existed on Day One of the class period and persisted at a maximum level for almost two-and-a-half years until a dam collapsed.

Thus, for all the foregoing reasons, as well as those offered in Defendants' prior briefs and at the Hearing, Defendants respectfully request that the Court grant their motion to exclude *in its entirety* the testimony of Plaintiff's expert Steven Feinstein.

Respectfully submitted,

/s/ Christopher M. Joralemon

cc: All Counsel of Record (*via ECF*)