UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------x

IN RE VALE S.A. SECURITIES          **MEMORANDUM & ORDER**
LITIGATION.                         19-CV-526 (EK)(VMS)

--------------------------------------x

ERIC KOMITEE, United States District Judge:

Plaintiff brought this securities-fraud class action against Vale S.A. and five of its executives.  Now before the Court are plaintiff and defendants' reciprocal motions to exclude each other's loss-causation and damages experts.  ECF Nos. 142, 143.  For the following reasons, defendants' motion to exclude the testimony of Dr. Steven P. Feinstein is granted in part.  Plaintiff's motion to exclude the testimony of Dr. Glenn Hubbard is also granted to the extent that the exclusion of Dr. Feinstein's damages model renders his rebuttal irrelevant.

## I.   Background

### A.   Factual Background

Following the 2015 collapse of an iron-ore tailings dam owned by a Vale joint venture, Vale and its executives made a series of public statements about Vale's risk-management practices and the safety and stability of its dams.  Examples include Vale's statement in its 2016 annual report that it had "conducted extraordinary audits on the stability conditions of [its] upstream dams, and no anomalies were identified"; Vale's

statement during a 2018 Environmental, Social, and Governance webinar that "all of Vale's iron ore dams are safe and operating within normal limits"; and a 2018 statement by Vale's CEO that "today the dams are impeccable." Compl. ¶¶ 135, 174, 197, ECF No. 47. Plaintiff alleges these statements were false and that, in reality, many of Vale's dams were in unstable and unsafe condition.

Plaintiff further alleges that the truth was revealed to investors on January 25, 2019, when the dam at Vale's Córrego do Feijão mine burst, with early reports suggesting extensive environmental damage and hundreds of potential fatalities. *Id.* ¶¶ 203-204. The price of Vale's American Depositary Shares ("ADSs") declined sharply in response. *Id.* ¶ 205. Later reports — on February 4 and 6 — about the suspension of operations at another of Vale's mines caused the ADS price to fall even further. *Id.* ¶¶ 210-214.

**B.    Loss Causation and Damages: Background Legal Principles**

Loss causation is the element of a Section 10(b) claim that requires plaintiffs to prove "the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff[s]." *Lentell v. Merrill Lynch & Co.*, 396 F.3d

161, 172 (2d Cir. 2005).[1]  The Second Circuit has described loss causation by analogy to "the tort-law concept of proximate cause."  *Id.*  Plaintiffs can prove loss causation by showing that the loss was "within the *zone of risk* concealed by the misrepresentations."  *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 513 (2d Cir. 2010) (emphasis altered).

Damages in securities cases are typically calculated using the "out-of-pocket measure of damages," *In re Vivendi Universal, S.A. Sec. Litig.*, 123 F. Supp. 3d 424, 433 (S.D.N.Y. 2015), meaning "the difference between the fair value of all that the [plaintiff] received and the fair value of what he would have received had there been no fraudulent conduct." *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 155 (1972).  "In other words, damages consist of the difference between the price paid and the [true] value of the stock when bought."  *Acticon AG v. China N.E. Petroleum Holdings Ltd.*, 692 F.3d 34, 38 (2d Cir. 2012).[2]

---

[1] Unless otherwise noted, when quoting judicial decisions this order accepts all alterations and omits all citations, footnotes, and internal quotation marks.

[2] Securities plaintiffs' damages are also capped by the Private Securities Litigation Reform Act's "bounce back" provision.  *See* 15 U.S.C. § 78u-4(e)(1).

## C.    Feinstein Report

Plaintiff retained Dr. Feinstein to offer testimony on both loss causation and damages.[3]  Feinstein Rpt. ¶ 6, ECF No. 143-5.

*Loss Causation.*  Dr. Feinstein conducted two analyses to "assess whether [c]lass members suffered losses as a result of the alleged misrepresentations and omissions described in the [c]omplaint."  *Id.*  First, he undertook a qualitative analysis that examined "financial principles, company statements, and commentary by market participants" to determine whether the "alleged misrepresentations and omissions constitute[d] economically material information."  *Id.* ¶ 99.  Because he found that they did, *id.* ¶¶ 122-125, that meant that disclosures correcting those misrepresentations should have "cause[d] a security price decline."  *Id.* ¶ 100.[4]

Dr. Feinstein also conducted an "empirical analysis, to determine whether the revelation of the previously concealed truth *did observably cause* a security price decline."  *Id.* ¶ 102 (emphasis added).  By controlling for "the effects of market and sector factors," Dr. Feinstein was able to determine "that there

---

[3] Dr. Feinstein also offered expert testimony in support of class certification.  *See* ECF No. 97-2.  That testimony, which the Court concluded was "entitled to no weight," Order Adopting R&R on Class Cert. 8-9, ECF No. 116, is not at issue here.

[4] This assumes the market for Vale securities was efficient.  *See, e.g.*, Feinstein Rpt. ¶ 99.  But the Court has already determined that it was.  *See generally* Decert. Order, ECF No. 150.

4

was a security price reaction to company-specific information on [each] corrective disclosure date." *Id.* ¶¶ 103, 105. Given the "absence of any economically material confounding news," Dr. Feinstein concluded that the alleged misrepresentations and omissions caused losses to Vale investors on each of the corrective disclosure dates. *Id.* ¶¶ 162-170 (ADR investors), 171-188 (Note investors).

***Damages.*** Dr. Feinstein also created a model for calculating class members' out-of-pocket damages. *Id.* ¶ 189. He assumed — in line with an inflation-maintenance theory of securities fraud — that the full amount of artificial inflation was baked into the Vale securities' prices on day 1 of the class period and remained constant until the first corrective disclosure. *Id.* ¶ 224. He then used the "fraud-related price declines elicited by corrective disclosures to measure the amount of inflation." *Id.* ¶ 196.

Dr. Feinstein concluded that the amount of inflation during the class period was equal to, or even greater than,[5] the amount by which the Vale securities' prices fell over the course of the three corrective disclosure dates. *See, e.g.*, *id.* ¶ 213

---

[5] Dr. Feinstein concluded that, if anything, this estimate is conservative because a truthful revelation at the start of the class period would have "resulted in a *greater* loss of security value" — "Vale's realized earnings and cash flow during the Class Period would not have occurred, and the Company's restructuring efforts would have been stymied." Feinstein Rpt. ¶ 24. Moreover, "information continued to enter the market" between January 26 and February 1, and any price decline attributable to that new information is not included in his damages estimate. *Id.* ¶ 132.

(for ADRs).  He saw no "new, unexpected, economically material, negative news, unrelated to the case allegations" on those days that "could have contributed" to the price decline.  *Id.* ¶¶ 201, 204, 212.  So, Dr. Feinstein determined that the full amount of the price decline was attributable to news about the dam collapse.  In turn, he concluded that the market's re-valuation of the Vale securities in response to the dam collapse was equivalent to the amount by which the securities had been inflated: "had investors been apprised . . . that important information was being misrepresented and concealed about dam stability and the Company's related conduct," they would have "rationally assume[d] the worst," i.e. that a dam collapse would definitely occur.  *Id.* ¶¶ 24, 219; *see also id.* ¶ 220 (investors would have "rationally assum[ed] . . . a worst-case scenario" — i.e., a certain dam collapse); OA Tr. 46:20-47:7, ECF No. 144 ("THE COURT: So did you — does your model peg the true probability at 100 percent?  [DR. FEINSTEIN]: Essentially.").

In sum, it is Dr. Feinstein's opinion that Vale's alleged misrepresentations about dam safety had the effect of inflating Vale's equity by the full amount — 100% — of the losses that emerged after the Córrego do Feijão dam collapse.

**D.    Hubbard Report**

Defendants retained Dr. Hubbard to respond to Dr. Feinstein's loss-causation and damages analyses, Hubbard Rpt.

6

¶ 18, ECF No. 143-3, though he dedicates the bulk of his rebuttal report to critiquing Dr. Feinstein's damages model. Most significantly, Dr. Hubbard contends that an appropriate damages analysis would isolate the impact of the alleged fraud, meaning the "incremental difference between investors' assessment of the probability of a safety incident occurring given the Alleged Misrepresentations and their assessment of what the 'true' probability of a safety incident occurring would have been absent the Alleged Misrepresentations." *Id.* ¶ 34.  He opines that Dr. Feinstein failed to perform "any economic analysis" to determine what investors' actual assessment of the risk was or what it would have been absent the misrepresentations.  *Id.* ¶ 49.  As a result, Dr. Feinstein's damages calculation — based on the total value of the securities' price drops — includes both the loss due to the alleged fraud and the loss due to the "materializations of the disclosed risks of a dam failure."  *Id.* ¶ 35.  In Dr. Hubbard's view, Dr. Feinstein's calculation depends on the "inappropriate and unsupported assumption that, but for the Alleged Misrepresentations, investors would have assessed the 'true' risk of Dam 1 collapsing, *ex ante*, to be 100 percent starting at the beginning of the Class Period."  *Id.* ¶ 24.

7

## II.  Legal Standard

Under Federal Rule of Evidence 702, the proponent of expert testimony must demonstrate "to the court that it is more likely than not that: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case."  "The law assigns district courts a gatekeeping role in ensuring that expert testimony satisfies [these] requirements . . . ."  *United States v. Farhane*, 634 F.3d 127, 158 (2d Cir. 2011).  In that role, the trial court must ensure that all expert testimony is both reliable and relevant.  *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993).

Expert testimony is also "subject to Rule 403, and may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury."  *Nimely v. City of New York*, 414 F.3d 381, 397 (2d Cir. 2005).  Indeed, Rule 403 is "uniquely important" in the context of expert testimony, "given the unique weight such evidence may have in a jury's deliberations."  *Id.*

8

## III. Discussion

### A.   Dr. Feinstein's Loss-Causation Analysis

Defendants raise several objections to Dr. Feinstein's loss causation analysis: (1) his conclusion that the alleged misstatements and omissions were "economically material" improperly invades the province of the jury; (2) his conclusions regarding the effect of the alleged corrective events are overly speculative; and (3) he includes corrective disclosures in his analysis that plaintiff did not allege in its complaint. *See* Defs.' Br. in Supp. of Feinstein Mot. 9-11, 14 n.4 ("Feinstein Mot."), ECF No. 143-1.  Dr. Feinstein will not be permitted to use the word "materiality," given the substantial risk (discussed below) that doing so would usurp the jury's role as to that element.  The jury will, however, be permitted to hear the substance of his loss-causation analysis.

First, defendants object to Dr. Feinstein's opinion that "the subject matter of the alleged misrepresentations and omissions" was "economically material" to investors.  *See* Feinstein Rpt. ¶ 108.  This assertion, they argue, "is an impermissible legal conclusion."  Feinstein Mot. 14 n.4.  While "[e]xpert testimony concerning materiality is often introduced" in Section 10(b) cases, *United States v. Martoma*, 993 F. Supp. 2d 452, 457 (S.D.N.Y. 2014), courts diverge on the question of whether allowing an expert to testify regarding "economic

9

materiality" would usurp the jury's role in assessing legal materiality. *Compare SEC v. Airborne Wireless Network*, No. 21-CV-1772, 2023 WL 5935627, at *6 (S.D.N.Y. Sep. 12, 2023) (disallowing testimony), *with Baker v. SeaWorld, Ent., Inc.*, 423 F. Supp. 3d 878, 898-99 (S.D. Cal. 2019) (allowing testimony).

Here, we will proceed with caution but not exclude the substance of the testimony. To avoid confusion, Dr. Feinstein will be instructed not to use the word "materiality," given that materiality is an element for the jury. Still, he can properly testify regarding his analysis of the financial literature and analyst reports, and what that analysis revealed (to him) about the "economic impact" the misstatements might have had to investors. *See Pearlstein v. Blackberry Ltd.*, No. 13-CV-7060, 2022 WL 741941, at *6 (S.D.N.Y. Mar. 11, 2022) (concluding, as to the same expert, that the word "materiality . . . should not escape Dr. Feinstein's lips during his testimony"); *see also In re Under Armour Sec. Litig.*, 730 F. Supp. 3d 172, 183 (D. Md. 2024) ("[T]o avoid confusion, [the expert] should describe his opinions as relating to economic 'importance' as opposed to economic 'materiality.'").

Next, defendants seek to exclude Dr. Feinstein's conclusion that the alleged corrective disclosures revealed the "collective import" of Vale's misrepresentations. They argue that opinion is "vague" and "conclusory" because "without

10

focusing at all on the specific content of any of the challenged statements, Feinstein fails to connect those statements to any information disclosed on the corrective event dates." Feinstein Mot. 10; Defs.' Reply in Supp. of Feinstein Mot. 6, ECF No. 143-13. But that is more than the loss-causation element requires. Rather, plaintiff must prove only that "the risk that caused the loss was within the zone of risk *concealed* by the misrepresentations." *Omnicom Grp.*, 597 F.3d at 513. And Dr. Feinstein's analysis could permit a jury to conclude that the challenged statements misled Vale's investors as to the risk of a dam collapse. That is, the losses investors suffered when the dam collapsed fell within the zone of risk that the alleged misrepresentations concealed.

Finally, defendants contend that Dr. Feinstein "impermissibly adds corrective events [p]laintiff did not even allege, such as the suspension and cancellation of the Laranjeiras dam license on February 4 and 6." Feinstein Mot. 10. But Laranjeiras was the "dam associated to the Brucutu mine." Feinstein Rpt. ¶ 209 (quoting a BMO analyst report). And two of the corrective disclosures alleged in the complaint involved the "temporar[y] halting [of] some operations at [Vale's] Brucutu mine" on February 4 and 6 *in response* to dam safety concerns. Compl. ¶¶ 210-211. So, we will allow the jury to hear testimony about the Laranjeiras dam closure, though

11

defendants can — of course — question him regarding the decision to include those corrective events in his analysis.  *See U.S. Bank Nat'l Ass'n v. PHL Variable Life Ins. Co.*, 112 F. Supp. 3d 122, 134 (S.D.N.Y. 2015) (collecting cases) ("[I]t is up to the opposing party to examine the factual basis for the opinion in cross-examination.").

**B.    Dr. Feinstein's Damages Model**

Defendants' principal criticism of Dr. Feinstein's damages model is that it fails to disaggregate the investment losses caused by Vale's alleged misrepresentations — i.e., the ostensible understatement of the risk — from the losses caused by the actual dam collapse.  *See* Feinstein Mot. 8.  We agree. When, as here, "the corrective event is the materialization of an understated risk, the stock price movement on the date of correction (i.e., on the date that the risk materialized) will not equate to inflation on the date of purchase unless the probability of the risk materializing was 100 percent."  *In re: BP p.l.c. Sec. Litig.*, No. 10-MD-2185, 2016 WL 3090779, at *33 (S.D. Tex. May 31, 2016).

As noted above, Dr. Feinstein opines that investors would "rationally" assume the worst — namely, that the risk of a dam collapse was 100%.  But he provides no real basis for this assumption, despite attributing it to "generally accepted economic principles."  Feinstein Rpt. ¶ 219.  Although he touts

the "prolific" research regarding the effect that information asymmetries have on markets, the most he cites that research for is the proposition that such asymmetries may contribute to "adverse selection" or cause investors to "severely discount securities when they become aware that important information is [being] withheld."  *Id.* ¶¶ 21, 218.  Ultimately, his assertion that investors would have fixed the probability of a collapse at 100% stands on nothing but his own *ipse dixit.  See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) (district courts not required "to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert"); *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 22-23 (2d Cir. 1996) (projections based on entirely "unsupported assumption" "were without factual basis, and should not have been admitted"). Rule 702 requires more: "An expert opinion requires some explanation as to . . . what methodologies or evidence substantiate [the expert's] conclusion."  *Riegel v. Medtronic, Inc.*, 451 F.3d 104, 127 (2d Cir. 2006), *aff'd*, 552 U.S. 312 (2008).

Dr. Feinstein's assertion is not only unsupported.  It simply makes no sense: the fact that the dam collapse actually occurred does not mean it had a 100% probability of occurring. If a coin toss comes up heads, we continue to believe that the *ex-ante* probability of that outcome was 50%, despite the

13

outcome.  This is true regardless of whether a speaker has shaded or misrepresented that probability: even if the speaker says the probability of a heads-outcome is 10%, and even if the listener learns this number is too low, there is no reason that the listener should peg the true probability anywhere but at its correct level — at 50% rather than, say, 90 or 100% — once the misrepresentation has been corrected.

So too in the instant context.  Assume, for example, that a reasonable investor, possessed of all relevant (and true) facts, would have estimated the risk of a dam collapse at 60%. Assume further that she estimated a 20% risk because of the company's misrepresentations.  The appropriate measure of damages attributable to the misrepresentations would be the difference in investors' cash flow expectations from the 40% delta in the perceived risk of a dam collapse, not the price decline when the risk materializes.  *See* Hubbard Rpt. ¶ 24.  Dr. Feinstein has offered no reason based in economics to think otherwise, and the Court is aware of none.

Dr. Feinstein invokes the rational expectations hypothesis — the principle that investors equipped with accurate information do not make systematic forecasting errors — to argue that the actual outcome of the dam collapse is the best estimate of what investors would have expected had they known the truth. Feinstein Rpt. ¶¶ 221-23 & n.157.  But that conclusion simply

14

does not follow.  The rational expectations hypothesis holds that forecasts are unbiased on average across many predictions, not that any *single* realization means forecasters would have predicted that occurrence with 100% certainty.  Again, that a dam collapsed does not mean that a fully informed investor would have predicted collapse with certainty, any more than a coin landing on heads means the expected outcome was heads.  The hypothesis thus does not bridge the gap between the price decline caused by the dam collapse and the inflation attributable to the alleged misrepresentations.[6]

Moreover, the  relevant legal standard requires disaggregation: damages in a securities case are based on "what the price of [the] security would have been had the alleged wrongful conduct not occurred."  *In re Pfizer Inc. Sec. Litig.*, 819 F.3d 642, 649 (2d Cir. 2016); *see also Affiliated Ute*, 406 U.S. at 155.  Here, had the allegedly fraudulent conduct not occurred, investors — like the company — would have been aware of the true state of Vale's dam safety.

---

[6] In addition to relying on the work of John Muth and Robert Lucas, Jr., Dr. Feinstein invokes the "Market for Lemons" paper by George Akerlof. Feinstein Rpt. ¶ 21 n.11; *id.* ¶ 218 n.156.  But none of these sources stands for the proposition for which Dr. Feinstein relies on them.  Akerlof's lemons paper, for example, demonstrates that information asymmetries can cause *adverse selection* — buyers discount goods of unknown quality because they fear getting a "lemon," which can cause market breakdown.  That is a far cry from proving that investors price a *specific* concealed risk at 100%.  Akerlof shows that information asymmetries can cause prices to decline, *on average*, and markets to shrink; he does not show that buyers price in the worst-case outcome with certainty.

15

But instead, to substantiate his assumption that investors would have pegged the risk of a dam collapse at 100%, Dr. Feinstein presupposes a "but-for" world in which investors were not only "informed that the Company's representations were false" but also "that important information was being withheld" — i.e., that Vale was "engaged in deceptive conduct to deceive investors and regulators." Feinstein Rpt. ¶ 217; Feinstein Dep. 153:7-9, ECF No. 143-4.[7] Again, however, this is a mismatch for the legal standard: a world in which investors are told that the company is misleading them is not a world in which "the alleged wrongful conduct [did] not occur[]." *Pfizer*, 819 F.3d at 649.[8] Indeed, Dr. Feinstein's report is explicit that his but-for scenario is one in which investors learn "that important information was being misrepresented and concealed about dam stability and the Company's related conduct." Feinstein Rpt. ¶ 219. That framing layers an information-asymmetry penalty on top of the risk assessment, producing a but-for world that is

---

[7] *See also* Pl.'s Br. in Opp. to Feinstein Mot. 13 ("Feinstein Opp'n"), ECF No. 143-8 ("[H]e was not required to create a world in which Vale engaged in no misconduct or was properly managing dam safety. For instance, in the but-for world, Vale may still be pressuring auditors to certify unstable dams and failing to adhere to international standards — the point of the but-for world is to imagine that they *disclosed* these facts. That is what Feinstein did.").

[8] Dr. Feinstein may have resorted to the 100% probability because the true probability is unknowable or, at the very least, a matter for a different type of expert (such as an engineer). Either way, his estimate does not comport with the governing law.

worse for the company — and thus more favorable to plaintiff —
than one in which the fraud simply never occurred.

Because Dr. Feinstein's damages model does not
calculate "the difference between the price paid and the [true]
value of the stock when bought," *Acticon AG*, 692 F.3d at 38, it
must be excluded. *See Olin Corp. v. Lamorak Ins. Co.*, No. 84-
CV-1968, 2018 WL 1901634, at *21 (S.D.N.Y. Apr. 18, 2018)
("Expert testimony also should be excluded when it applies the
wrong legal standard."); *Amorgianos v. Nat'l R.R. Passenger
Corp.*, 303 F.3d 256, 268-69 (2d Cir. 2002) (expert's opinion not
based on "good grounds" because it rested on a "faulty
assumption"); *cf. In re Scotts EZ Seed Litig.*, No. 12-CV-4727,
2017 WL 3396433, at *10 (S.D.N.Y. Aug. 8, 2017) ("[B]ecause this
damages model does not relate to an issue in the case, it is not
relevant or admissible."). This conclusion flows not only from
*Daubert* and Federal Rule of Evidence 702, but also from Rule
403.[9]

Plaintiff offers several counterarguments. First,
plaintiff cites *In re Vivendi, S.A. Sec. Litig.*, 634 F. Supp. 2d
352 (S.D.N.Y. 2009), for the proposition that "price declines
allegedly caused by the materialization of the risk should . . .

---

[9] Dr. Feinstein's model does not help prove damages under the relevant
case law and allowing him to present it at trial might "cloud[] the issue for
the jury." *United States v. Gatto*, 986 F.3d 104, 118 (2d Cir. 2021)
(affirming exclusion of expert evidence under Rule 403 where it was legally
irrelevant and might have confused the jury).

17

be incorporated into plaintiffs' damages." *Id.* at 371; *see* Feinstein Opp'n 10. The *Vivendi* court reasoned that to hold otherwise would require plaintiffs to "bear a risk they did not assume and that was intentionally concealed from them." *Id.* But plaintiff does not seriously contend that class members assumed *no* risk of a dam collapse — nor could it, given the tragic collapse of the Fundão dam less than a year prior to the start of the class period. *See* Compl. ¶¶ 4, 58 (discussing the Fundão collapse); *see also* Hubbard Rpt. ¶ 62 (Vale's 2015 Form 20-F disclosed that "[o]ur business is subject to a number of operational risks . . . such as: . . . Accidents or incidents involving our mines and related infrastructure, such as dams"). Instead, plaintiff claims to have been misled as to the *degree* of risk. And Section 10(b) is not intended to "provide investors with broad insurance against market losses, but to protect them against those economic losses that misrepresentations actually cause." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 345 (2005).

Furthermore, in *Vivendi*, the court admitted the plaintiffs' expert's opinion that "the probability of a liquidity crisis was basically a hundred percent," meaning disaggregation was unnecessary. *Vivendi*, 634 F. Supp. 2d at 371. *But see In re BP p.l.c. Sec. Litig.*, No. 10-CV-2185, 2014 WL 2112823, at *10 n.9 (S.D. Tex. May 20, 2014) (distinguishing

18

*Vivendi* on this basis), *aff'd sub nom. Ludlow v. BP, P.L.C.*, 800 F.3d 674 (5th Cir. 2015). Because the entire price decline in *Vivendi* was plausibly attributable to the materialization of a near-certain risk, there was no non-fraud-related loss component to disaggregate. And again, neither plaintiff nor its expert contends that the true risk of a Vale dam collapse was actually 100%. *See* OA Tr. 47:10-14, 64:15-17.

Plaintiff also argues that disaggregation is unnecessary because to prove investors' losses, it must show only that the "loss was foreseeable and caused by the materialization of the risk concealed by the fraudulent statement." Pl.'s Apr. 23, 2024 Ltr. 1, ECF No. 145 (quoting *Omnicom Grp.*, 597 F. 3d at 513). But that is the standard for proving loss causation, not the standard for proving actual damages. And "it is important not to confuse causation with damages when comparing competing causes for a stock decline. In theory, [to establish loss causation,] plaintiffs need only prove that they suffered *some* damage from the fraud. Liability obviously does not hinge on how much damage." *Vivendi*, 634 F. Supp. 2d at 364. It is only "during the subsequent damages inquiry that the exact amount of damages *solely* caused by the

19

defendant's conduct must be calculated." *Miller v. Asensio & Co.*, 364 F.3d 223, 229 (4th Cir. 2004).[10]

Nor can Dr. Feinstein's error be mitigated: it infects every aspect of his damages model, including his use of a constant inflation ribbon. Plaintiff argues that it is "commonly accepted to apply the full amount of inflation" from the start of the class period when, as here, it is alleged that the misrepresentations *maintained* an already inflated stock price. Feinstein Opp'n 6. But here, the appropriate measure of inflation is the difference between the perceived and actual risk of a dam collapse. And even if investors' *perceived* risk of a dam collapse remained the same throughout the class period, that does not necessarily mean the *actual* risk, as would have been revealed via appropriate truthful disclosures, remained the same. Dr. Feinstein conducted no analysis to determine whether the real risk of a dam collapse remained constant throughout the class period. This is yet another way in which his damages model is methodologically flawed and yet another reason it must be excluded. *See Amorgianos*, 303 F.3d at 267 ("[A]ny step that renders the analysis unreliable under the *Daubert* factors

---

[10] This distinction becomes even clearer when one considers that loss causation is often analogized to the concept of proximate cause in tort law. After all, no one would suggest that proximate cause and damages are interchangeable elements of a tort claim. *See Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 466 (2006) ("Proximate cause and certainty of damages . . . are distinct requirements for recovery in tort.").

renders the expert's testimony inadmissible." (emphasis omitted)).

Defendants argue that the Court should exclude not only Dr. Feinstein's damages model, but his entire testimony. *See* Defs.' Aug. 23, 2024 Ltr. 1, ECF No. 146.  But his loss causation and damages analyses are easily severable.  And the Second Circuit has instructed that "when the unreliable portion of an opinion can easily be distinguished from testimony that could help the jury, it may be an abuse of discretion to throw the good out with the bad."  *Pfizer*, 819 F.3d at 665.  Thus, while we are "not obligated to prune away all of the problematic elements" of Dr. Feinstein's damages model "to save the remaining portions, however small," *id.*, it remains appropriate to permit the jury to hear his loss-causation analysis.

C.   **Dr. Hubbard's Rebuttal Report**

Plaintiff's motion to exclude Dr. Hubbard's testimony is aimed almost entirely at his critiques of Dr. Feinstein's damages analysis.  *See* Pl.'s Br. in Supp. of Hubbard Mot. 5-13, ECF No. 142-1.  Those opinions have obviously now been rendered irrelevant and therefore must be excluded.  *See Fin. Guar. Ins. Co. v. Putnam Advisory Co., LLC*, No. 12-CV-7372, 2020 WL 4251229, at *10 (S.D.N.Y. Feb. 19, 2020) (collecting cases).  To the extent that portions of Dr. Hubbard's testimony remain relevant, and defendants seek to rely on that testimony at

21

summary judgment or trial, plaintiff may renew its objections then.  In particular, to the extent that Dr. Hubbard's report addresses Dr. Feinstein's loss-causation analysis, that testimony has not been rendered moot and may well remain relevant at later stages of this litigation.

## IV.  Conclusion

For the foregoing reasons, defendants' motion to exclude Dr. Feinstein's testimony is granted in part.  Dr. Feinstein may testify to his qualitative and quantitative loss-causation analyses (though he may not use the phrase "economic materiality").  But Dr. Feinstein's damages model is excluded pursuant to Federal Rules of Evidence 403 and 702.

Plaintiff's motion to exclude Dr. Hubbard's testimony is granted to the extent that his opinions have been rendered irrelevant by the exclusion of Dr. Feinstein's damages analysis. Should defendants seek to introduce testimony from Dr. Hubbard in support of summary judgment or at trial, plaintiff may renew any relevant objections at that time.

SO ORDERED.


_/s/ Eric Komitee_
ERIC KOMITEE
United States District Judge


Dated:    April 13, 2026
          Brooklyn, New York


22